**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JANSSEN BIOTECH, INC., ) | |
| ) | |
| Plaintiff, ) | Civil Action No. l:17-cv-11008-MLW |
| ) | |
| v. ) | |
| ) | LEAVE TO FILE UP TO 30 PAGES |
| CELLTRION HEALTHCARE CO., LTD., ) | GRANTED ON JULY 10, 2017 |
| CELLTRION, INC., and ) | |
| HOSPIRA, INC., ) | **CONFIDENTIAL -** |
| ) | **FILED UNDER SEAL** |
| Defendants. ) | |
| ) | |
| ) | |

**DEFENDANTS' MEMORANDUM OF LAW IN SUPPORT OF THEIR**
<u>**MOTION TO DISMISS FOR LACK OF STANDING**</u>

# TABLE OF CONTENTS

Page

I. **Four Named Inventors Assigned The '083 Patent To A Group Of Companies** .......... 2

    A.    The Plain Language of the Agreements Makes Clear that "COMPANY" Means What the Agreements Say "COMPANY Means" ..................................... 3

    B.    Janssen, J&J, and Other J&J Companies Have Repeatedly Interpreted "COMPANY" to Mean More than Just the Employer .......................................... 5

        1.    Janssen's Parent J&J and Other J&J Companies Have Repeatedly Interpreted "COMPANY" In Accordance with its Plain Definition .......... 6

        2.    Janssen Itself Has Interpreted "COMPANY" in Accordance with its Plain Definition ..................................................................................... 8

    C.    None of Janssen's Proposed Interpretations of "COMPANY" Pass Muster .......... 9

        1.    Janssen's "Traveling Agreement" Interpretation Is Not Supported by the Agreement ........................................................................................ 9

        2.    Janssen's New Non-Definition of "COMPANY" Makes No Sense and Is Unsupportable Under Basic Law of Contract Interpretation ........ 11

        3.    Estoppel Prevents Janssen from Defining "COMPANY" Contrary to the Plain Language of the Agreements ................................................. 12

II. **Janssen's "Extrinsic Evidence" Cannot Alter The Plain Words Of The Contract** ............................................................................................................. 14

    A.    Janssen's Declarations Are Entitled to No Weight ............................................. 15

        1.    The Declarants Lack Firsthand Knowledge ............................................. 15

        2.    The Threat of "Chaos" Does Not Make Sense ........................................ 16

    B.    Janssen's Other "Extrinsic Evidence" Does Not and Cannot Alter the Plain Language of the Employment Agreements ........................................................... 18

        1.    The '083 Patent ........................................................................................ 18

        2.    Invention Disclosure Form ...................................................................... 18

        3.    ██████████████████████████████ ................ 19

        4.    Defendants' Documents ........................................................................... 19

i

        5.      Janssen's 2015 "Assignments" ................................................... 20

C.    Janssen Has Effectively Conceded That Mr. Epstein and Others Assigned The '083 Patent To The J&J Family Of Companies............................................. 21

**III.    Janssen Has Not Fixed Its Standing Problem ............................................ 22**

A.    The March 2017 Agreement Did Not Assign Co-Owners' Rights to Janssen ....................................................................................................... 23

B.    The March 2017 Agreement Did Not "Disclaim Ownership," and Cannot Confer Standing Upon Janssen ........................................................... 24

C.    Avoiding Duplicative Infringement Suits Does Not Create Standing ................. 28

D.    The March 2017 Agreement Does Not Alter the Rights of J&J's Current or Former Subsidiaries .......................................................................... 29

**IV.    Conclusion ........................................................................................... 30**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Point of Care Inc. v. Epocal, Inc.*,
  666 F.3d 1299 (Fed. Cir. 2012) ........................................................................... 2, 6

*Abraxis Biosci. Inc. v. Navinta LLC*,
  625 F.3d 1359 (Fed. Cir. 2010) ............................................................................... 20

*Arachnid, Inc. v. Merit Indus., Inc.*,
  939 F.2d 1574 (Fed. Cir. 1991) ............................................................................... 27

*Assisted Living Assocs. of Moorestown, L.L.P. v. Moorestown Twp.*,
  31 F. Supp. 2d 389 (D.N.J. 1998) ........................................................................... 10

*Bushnell, Inc. v. Brunton Co.*,
  659 F. Supp. 2d 1150 (D. Kan. 2009) ............................................................... 28, 29

*Celanese Ltd. v. Essex Cty. Improvement Auth.*,
  404 N.J. Super. 514 (App. Div. 2009) ....................................................................... 4

*City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*,
  429 U.S. 167 (1976) ................................................................................................. 24

*Conway v. 287 Corporate Ctr. Assocs.*,
  901 A.2d 341 (N.J. 2006) ....................................................................................... 5, 6

*D.R. by M.R. v. E. Brunswick Bd. of Educ.*,
  838 F. Supp. 184 (D.N.J. 1993) ................................................................................. 3

*Dubrosky v. Colonial Life & Acc. Ins. Co.*,
  129 F. App'x 691 (3d Cir. 2005) .............................................................................. 10

*Ethicon, Inc. v. U.S. Surgical Corp.*,
  135 F.3d 1456 (Fed. Cir. 1998) ..................................................................... 3, 25, 26

*Filmtec v. Allied-Signal Inc.*,
  939 F.2d 1568 (Fed. Cir. 1991) ............................................................................... 20

*Friedheim v. Walter H. Hildic Co.*,
  89 S.E. 358 (S.C. 1916) ........................................................................................... 10

*Gabriel v. Jackson Nat. Life Ins. Co.*,
  No. 11-12307-MLW, 2015 WL 1410406 (D. Mass. Mar. 26, 2015) ....................... 20

*Gellman v. Telular Corp.*,
   449 F. App'x 941 (Fed. Cir. 2011) ................................................................ 21, 26

*Guay v. Burack*,
   677 F.3d 10 (1st Cir. 2012) ............................................................................. 14

*Hoffman-La Roche Inc. v. Teva Pharm. USA*,
   No. 09-5283, 2011 WL 6028583 (D.N.J. Dec. 2, 2011) ...................................... 18

*In re Colonial Mortg. Bankers Corp.*,
   324 F.3d 12 (1st Cir. 2003) ............................................................................. 14

*Int'l Nutrition Co. v. Horphag Research Ltd.*,
   257 F.3d 1324 (Fed. Cir. 2001) ....................................................................... 26

*Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., U.A.W. v. Skinner Engine Co.*,
   188 F.3d 130 (3d Cir. 1999) ............................................................................. 18

*IpVenture v. Prostar Computer, Inc.*,
   503 F.3d 1324 (Fed. Cir. 2007) ................................................................... 26, 27

*Israel Bio-Eng'g Project v. Amgen, Inc.*,
   475 F.3d 1256 (Fed. Cir. 2007) ..................................................................... 2, 25

*Kahanovitz v. Electro-Biology, Inc.*,
   No. A-3635-09T3, 2011 WL 242031 (N.J. Super. Ct. App. Div. Jan. 27, 2011) ...................... 6

*Kampf v. Franklin Life Ins. Co.*,
   161 A.2d 717 (N.J. 1960) ................................................................................. 12

*Kieffer v. Best Buy*,
   14, A.3d 737 (N.J. 2011) ................................................................................. 18

*Kotkin v. Aronson*,
   815 A.2d 962 (N.J. 2003) ................................................................................. 12

*Max Sound Corp. v. Google, Inc.*,
   147 F. Supp. 3d 948 (N.D. Cal. 2015) .............................................................. 30

*McClaskey v. Harbison-Walker Refractories Co.*,
   138 F.2d 493 (3d Cir. 1943) ............................................................................. 24

*McMahon v. City of Newark*,
   951 A.2d 185 (N.J. 2008) ................................................................................. 12

*Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*,
   692 F.3d 983 (9th Cir. 2012) ........................................................................... 14

*Morrow v. Microsoft Corp.,*
   499 F.3d 1332 (Fed. Cir. 2007) ............................................................. 29

*New Hampshire v. Maine,*
   532 U.S. 742 (2001) ............................................................................. 14

*New Medium Techs. LLC v. Barco N.V.,*
   644 F. Supp. 2d 1049 (N.D. Ill. 2007) ................................................. 24

*Newark Publishers' Ass'n v. Newark Typographical Union,*
   No. 103 (N.J. 1956) ............................................................................. 12

*Nye v. Ingersoll Rand Co.,*
   783 F. Supp. 2d 751 (D.N.J. 2011) ..................................................... 12

*Ortho Pharm. Corp. v. Genetics Inst., Inc.,*
   52 F.3d 1026 (Fed. Cir. 1995) ............................................................. 28

*Patriot Cinemas, Inc. v. Gen. Cinemas Corp.,*
   834 F.2d 208 (1st Cir. 1987) ............................................................... 13

*Patriot Universal Holdings, LLC v. Formax, Inc.,*
   24 F. Supp. 3d 802 (E.D. Wis. 2014) ................................................. 24

*Perez v. Volvo Car Corp.,*
   247 F.3d 303 (1st Cir. 2001) ............................................................... 16

*Picture Patents, LLC v. Aeropostale, Inc.,*
   788 F. Supp. 2d 127 (S.D.N.Y. 2011) ........................................... 21, 24

*Pi-Net Int'l, Inc. v. Focus Bus. Bank,*
   No. 12-04958, 2015 WL 1538259 (N.D. Cal. Apr. 6, 2015) ................ 29

*Pinpoint, Inc. v. Amazon.com, Inc.,*
   347 F. Supp. 2d 579 (N.D. Ill. 2004) ................................................. 24

*Prima Tek II, L.L.C. v. A-Roo Co.,*
   222 F.3d 1372 (Fed. Cir. 2000) ................................................. 2, 28, 29

*Quantum Corp. v. Riverbed Tech., Inc.,*
   No. 07-04161, 2008 WL 314490 (N.D. Cal. Feb. 4, 2008) ......... 21, 29, 30

*RFF Family P'ship, LP v. Ross,*
   814 F.3d 520 (1st Cir. 2016) ............................................................... 13

*Royal Indus., v. St. Regis Paper Co.,*
   420 F.2d 449 (9th Cir. 1969) ............................................................... 30

*Speedfit LLC v. Woodway USA, Inc.*,
   No. 13-1276, 2016 WL 7471307 (E.D.N.Y. Dec. 28, 2016) .................................................. 26

*Speedplay, Inc. v. Bebop, Inc.*,
   211 F.3d 1245 (Fed. Cir. 2000) .................................................................................................. 24

*State v. Prob. Ass'n of N.J.*,
   No. A-5864-04T5, 2006 WL 1716129 (N.J. Super. Ct. App. Div. Jun. 23, 2006) .................... 6

*STC.UNM v. Intel Corp.*,
   754 F.3d 940 (Fed. Cir. 2014) .................................................................................................... 26

*Taylor v. Taylor Made Plastics, Inc.*,
   565 F. App'x 888 (Fed. Cir. 2014) .............................................................................................. 3

*Thore v. Howe*,
   466 F.3d 173 (1st Cir. 2006) .............................................................................................. 13, 14

*Twp. of White v. Castle Ridge Dev. Corp.*,
   16 A.3d 399 (N.J. Super. Ct. App. Div. 2011) ......................................................................... 12

*Univ. Patents, Inc. v. Kligman*,
   762 F. Supp. 1212 (E.D. Pa. 1991) ........................................................................................... 24

*Unleashed Doggie Day Care, LLC v. Petco Animal Supplies Stores, Inc.*,
   No. 10-10742, 2011 WL 6812642 (D. Mass. Dec. 28, 2011) .................................................. 16

*Vapor Point LLC v. Moorhead*,
   832 F.3d 1343 (Fed. Cir. 2016) ................................................................................................. 24

**Statutes**

35 U.S.C. § 261 ............................................................................................................... 24, 25, 30

37 C.F.R. § 3.54 ......................................................................................................................... 18

**Rules**

Fed. R. Civ. P. 12(h)(3) ................................................................................................................ 3

After six briefs on standing issues filed in January and February, Janssen's request for a formal motion to dismiss and thus three more briefs, Janssen's injection of never-before-seen evidence, and a discovery dispute over Janssen's improper privilege assertions, Janssen finally faced the reality that has long been clear—that it could not survive Defendants' previous motion to dismiss. So it capitulated, abandoned its 2015 and 2016 claims of infringement of the '083 patent altogether, and now attempts to start again with its new 2017 complaint.

But Janssen's 2017 complaint still lacks standing for one of the same reasons the 2015 and 2016 complaints did—it does not join all co-owners of the '083 patent. Four of the named inventors of the '083 patent executed employee "secrecy" agreements that assigned their rights in the '083 patent not to Janssen alone, but to the "COMPANY," which "***means*** CENTOCOR ***and*** JOHNSON & JOHNSON ***and***" other related entities. *E.g.*, Ex. 1 at -98780.[1] Janssen puts forth a host of *post hoc*, litigation-driven, cherry-picked documents and testimony to argue that the '083 patent inventors did not assign their rights to the J&J family. But it cannot overcome the clear, unambiguous meaning of the words of the contracts themselves, and no extrinsic "evidence" Janssen offers is more probative or more reliable than the fact that in other enforcement efforts, Janssen, its parent J&J, and its sister companies have interpreted "COMPANY" in agreements like the ones at issue here to mean the entire J&J family.

Janssen and J&J have made a last-ditch effort to save the case by "agreeing" that J&J will "forbear from asserting" "any ownership rights to the '083 patent," and purporting to agree that J&J subsidiaries will not "assert any ownership rights to the '083 patent." Dkt. 521, Ex. G. But the agreement on which Janssen relies, executed in the midst of the parties' standing dispute, cannot rescue Janssen from its lack of standing. "Standing to sue for infringement depends

---

[1]   Page citations to "-####" refer to Bates numbered pages with the prefix "JANREM." All emphasis within quotations is added unless otherwise noted.

entirely on the putative plaintiff's proprietary interest in the patent, not on any contractual arrangements among the parties regarding who may sue and who will be bound by judgments." *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1381 (Fed. Cir. 2000). And even if an agreement not to sue were sufficient, the March 2017 agreement was signed only by Janssen and J&J, and thus does not bind J&J's other subsidiaries, and certainly not any former subsidiaries who remain co-owners of the '083 patent. It is black-letter law that "a co-owner acting alone…lack[s] standing." *Israel Bio-Eng'g Project v. Amgen, Inc.*, 475 F.3d 1256, 1265 (Fed. Cir. 2007). It is Janssen's "burden to show necessary ownership rights to support standing to sue" (*Abbott Point of Care Inc. v. Epocal, Inc.*, 666 F.3d 1299, 1302 (Fed. Cir. 2012)), which it has not met.

Janssen says it wants to "simply proceed to trial" (Dkt. 562 at 1),[2] but standing is a threshold jurisdictional requirement. Proceeding under a jurisdictional cloud makes no sense, given that the Federal Circuit could undo years of costly litigation with the stroke of a pen. Having voluntarily dismissed its first two complaints more than five months after Defendants raised standing defects Janssen knew about years ago, Janssen has no one but itself to blame for any delay. The case must be dismissed. Janssen can proceed if and when it has standing to do so.

## I.     Four Named Inventors Assigned The '083 Patent To A Group Of Companies

Between 2001 and 2003, named inventors Epstein, Marsh, Monsell, and Ozturk executed "Employee Secrecy" agreements that state, "I assign and agree to assign my entire right, title and interest [to inventions] to the COMPANY." Ex. 1 (Epstein, *et al*. agmts). "COMPANY" is defined as:

> The COMPANY ***means*** CENTOCOR ***and*** JOHNSON & JOHNSON ***and*** any of their successors or assigns, purchasers, acquirers, ***and*** any of their existing and future subsidiaries, divisions or affiliates, including any such subsidiary, division

---

[2] All docket citations refer to Case No. 15-10698 unless otherwise noted.

or affiliate of Johnson & Johnson to which I may be transferred or by which I may be employed in the future. Affiliates of the COMPANY are any corporation, entity or organization at least 50% owned by the COMPANY, by Johnson & Johnson or by any subsidiary of Johnson & Johnson.

*Id.* at -98780; -98807, -98796, -98813. The agreements plainly and unambiguously assigned rights to the '083 patent not just to Centocor, but to Centocor, J&J, and affiliates of Centocor and J&J, who are not plaintiffs in this litigation. But "a suit for patent infringement must join all co-owners of the patent as plaintiffs," and where, as here, fewer than all co-owners of a patent are joined as plaintiffs in a case, "the suit must be dismissed for lack of standing." *Taylor v. Taylor Made Plastics, Inc.*, 565 F. App'x 888, 889 (Fed. Cir. 2014) (citing *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1468 (Fed. Cir. 1998)). Janssen's lack of standing means the Court lacks subject-matter jurisdiction and "must dismiss the action." Fed. R. Civ. P. 12(h)(3).

### A.     The Plain Language of the Agreements Makes Clear that "COMPANY" Means What the Agreements Say "COMPANY Means"

Under New Jersey law, which governs the four "secrecy agreements," "construction is not permitted or required" where, as here "the language of the contract is plain, unambiguous and susceptible to only one interpretation." *D.R. by M.R. v. E. Brunswick Bd. of Educ.*, 838 F. Supp. 184, 190 (D.N.J. 1993). Each of the four agreements at issue begins with the words, "***[a]s used in this [a]greement***," followed by the definition of the term "COMPANY." Ex. 1 at -98780, -98807, -98796, -98813. Two of the four agreements even label this section "DEFINITIONS." *Id.* at -98796, -98813. With this definition of "COMPANY," the four inventors plainly assigned their rights to their inventions to: (1) "Centocor," (2) "and Johnson & Johnson," (3) "and any of their successors or assigns, purchasers, acquirers," (4) "and any of their existing and future subsidiaries, divisions or affiliates, including any such subsidiary, division or affiliate of Johnson & Johnson to which [the employee] may be transferred or by which [the employee] may be employed in the future." *Id.* at -98780. Like any defined term,

3

"COMPANY" should have the same meaning throughout the agreement. *See, e.g., Celanese Ltd. v. Essex Cty. Improvement Auth.*, 404 N.J. Super. 514, 528–29 (App. Div. 2009) ("no reason in logic or policy why" the "principle[] of statutory construction [] that 'identical words used in different parts of the same act are intended to have the same meaning'" should not apply to contract interpretation).

The confidentiality and non-compete provisions of the agreements support the plain definition of "COMPANY." The primary purpose of the "secrecy" agreements was to protect confidential information belonging to the "COMPANY." The inventors "recognize[d] that CONFIDENTIAL INFORMATION is of great value to the COMPANY…and that the disclosure to anyone not authorized to receive such information will cause immediate irreparable injury to the COMPANY." Ex. 1 at -98781. Also, under Paragraph 4 of the agreements, employees must not "disclose to the COMPANY or induce the COMPANY to use any secret, proprietary or confidential information or material belonging to others including my former employers, if any." *Id.* at -98780, -98808, -98797, -98814. Janssen and J&J concede, and it only makes sense, that

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

████ Ex. 2 (Martinson Tr.) at 167:8–24, 217:16–218:12; 241:6–242:4. A narrower construction of "COMPANY," as Janssen asserts, under which employees (1) owe no obligations of confidentiality or non-competition to J&J or any of its subsidiaries or affiliates; and (2) are prohibited from disclosing others' confidential information to their employer but not other J&J family companies, would be contrary to the plain language and intent of the agreement.

In attempting to avoid Defendants' interpretation of "COMPANY," Janssen has pointed the Court to the definition of "CONFIDENTIAL INFORMATION" in the agreements. Dkt. 520

at 13–14. According to Janssen, "CONFIDENTIAL INFORMATION" is defined to include "information about the products, processes, machines, customers, clients and services of affiliates of the COMPANY acquired by me during my employment by the COMPANY." *Id.* Thus, Janssen argues that broad protection for confidential information of all J&J affiliates—a necessity Janssen does not dispute—flows from this definition, such that there is no need for "COMPANY" to be interpreted as including J&J's and Janssen's "affiliates." *Id.* But this definition of "CONFIDENTIAL INFORMATION" cannot save Janssen—it is absent altogether in the earliest two of the four agreements (Epstein and Monsell). *Compare* Ex. 1 at -98796, -98813 *with id.* at -98780, -98807. Janssen has also argued that the definition of "CONFLICTING PRODUCT" somehow supports a narrow interpretation of "COMPANY" because it includes products "about which I become knowledgeable as a result of employment with the 'COMPANY.'" Dkt. 520 at 14. But this definition makes no reference to "affiliates" and thus is not inconsistent with "COMPANY" including J&J and affiliates. Ex. 1 at -98807, -98796, -98813. Also, the "CONFLICTING PRODUCT" provision exists in only some of the agreements. *See id.* at -98780–781.

The Court should construe the "COMPANY" to mean what it plainly says: the four inventors assigned their rights to Janssen, J&J, and the affiliates and related companies of J&J.[3]

### B. Janssen, J&J, and Other J&J Companies Have Repeatedly Interpreted "COMPANY" to Mean More than Just the Employer

Under New Jersey law, extrinsic evidence is "admissible in aid of the interpretation of an integrated agreement." *Conway v. 287 Corporate Ctr. Assocs.*, 901 A.2d 341, 347 (N.J. 2006).

---

[3] ████████████████████████████████████████████████████████████████

"The admission of evidence of extrinsic facts is not for the purpose of changing the writing, but to secure light by which to measure its actual significance." *Id.* "Such evidence is adducible only for the purpose of interpreting the writing—***not for the purpose of modifying or enlarging or curtailing its terms***, but to aid in determining the meaning of what has been said. So far as the evidence tends to show, not the meaning of the writing, but an intention wholly unexpressed in the writing, it is irrelevant." *Id*. Courts have repeatedly applied this limitation on use of extrinsic evidence. *See Abbott Point of Care*, 666 F.3d at 1303 ("New Jersey law explains that extrinsic evidence is admissible to aid in contract interpretation, but it is not for the purpose of modifying or enlarging or curtailing its terms.") (internal quotation marks omitted); *State v. Prob. Ass'n of N.J.*, No. A-5864-04T5, 2006 WL 1716129, at *4 (N.J. Super. Ct. App. Div. Jun. 23, 2006) (same).

### 1.    Janssen's Parent J&J and Other J&J Companies Have Repeatedly Interpreted "COMPANY" In Accordance with its Plain Definition

If extrinsic evidence is needed to shed light on the meaning of an agreement, proper evidence for consideration includes "custom, usage, and the interpretation placed on the disputed provision by the parties' conduct." *Kahanovitz v. Electro-Biology, Inc.*, No. A-3635-09T3, 2011 WL 242031, at *9 (N.J. Super. Ct. App. Div. Jan. 27, 2011) (citation omitted). Janssen, J&J, and other J&J companies have repeatedly argued that employment agreements with the same or similar language as the Epstein, *et al*. agreements should be interpreted as Defendants argue, when trying to protect the interests of the J&J family of companies. For example, in April 2007, J&J subsidiaries DePuy Spine, Inc. and Johnson & Johnson Regenerative Therapeutics, LLC ("JJRT") brought a case in Massachusetts state court to enforce provisions of an "Employee Secrecy, Non-Competition and Non-Solicitation agreement" dated July 27, 2005. Ex. 4 at 27.[4]

---

[4] For clarity of citations, certain exhibits have had document page numbers added to them.

The former employee had been employed by DePuy Spine, and the agreement had a "DePuy Spine" header. *Id.* at 6, 27. Represented by Nutter, McClennen & Fish LLP (representing Janssen in this case), and applying New Jersey law, DePuy Spine and JJRT argued that the agreement was "enforceable by DePuy Spine *and JJRT*," telling the court in particular that the term "COMPANY" is defined to include *not only* DePuy Spine *but also* "JOHNSON & JOHNSON *and* any of their successors or assigns, purchasers, acquirers, and any of their existing and future subsidiaries, divisions or affiliates." *Id.* at 4, 7. That definition was the same definition of "COMPANY" as in the Epstein, *et al*. agreements. The plaintiffs even described the agreement as "Ross's *Agreement with JJRT and DePuy Spine.*" *See* Ex. 5 at -113343–345.

Other J&J family companies have advocated the same interpretation of "COMPANY":

- In June 2005, J&J subsidiaries LifeScan, Inc., Diabetes Diagnostics, Inc., and Inverness Medical Ltd. sued a former LifeScan employee to enforce a "Nondisclosure, Noncompetition and Developments Agreement and an Employee Secrecy Agreement," executed on "LifeScan" letterhead. Ex. 6 at -115564–565, -115585. The agreement contains the same definition of "COMPANY" as the Epstein, *et al*. agreements. *Id*. at -115585. The plaintiffs, represented by the Nutter law firm, argued that "*Plaintiffs DDI and Inverness are subsidiaries either directly or indirectly, of Johnson & Johnson, and, therefore, along with LifeScan, are protected by the Secrecy Agreement*." *Id.* at -115569.

- In 2009, J&J and then-subsidiary Cordis sued certain former Cordis employees seeking to enforce their employee secrecy agreements, labeled with the "Cordis" company name, and containing the same definition of "COMPANY" as the Epstein, *et al*. agreements. Ex. 7 at -112987–989, -112994; *id.* at -113021–038. J&J and Cordis argued that "*[t]he Agreements reasonably protect J&J's and Cordis' interest* in their customer relationships and confidential, proprietary and trade secret information…" Ex. 8 at 4, 12; *see also id.* at 24–26 (referring to "J&J's and Cordis' right to injunctive relief," quoting agreement provisions referring to "COMPANY").

- In July 2008, J&J and Cordis sued a former Cordis employee to enforce terms of an "Employee Secrecy, Non-Competition and Non- Solicitation Agreement" also labeled "Cordis." Ex. 9 at -113311–312. The agreement is identical or almost identical to the one signed by '083 patent named inventor Mr. Monsell in July 2001. *See id.* at -113333; Ex. 1. J&J and Cordis told the court in the complaint (verified by a Cordis executive) that "[p]ursuant to Paragraph 1 of the [Secrecy] Agreement, *plaintiffs own all inventions*,

patentable or not, developed by Park while at plaintiffs." *Id.* at -113321.[5]

As further shown in Appendix A, J&J and its subsidiaries have filed various other lawsuits to enforce employment agreements that have an identical or similar definition of "COMPANY" as the Epstein, *et al.* agreements, even though the employee at issue was not an employee of each J&J family plaintiff. *See* App'x A; Dkt. 553, Ex. 10 (list of enforcement litigations); Ex. 2 (Martinson Tr.) at 159:2–160:23; 345:22–347:4. In doing this, they interpreted "COMPANY" broadly, as Defendants do here.

### 2. Janssen Itself Has Interpreted "COMPANY" in Accordance with its Plain Definition



---

[5] Janssen may point out that one of the patents referenced in the 2008 complaint filed by J&J and Cordis identifies Cordis on its face as the assignee. But the assignee identified by a patent applicant to the Patent Office does not necessarily accurately reflect, nor is it necessarily based upon, a correct interpretation of any relevant assignment agreements. *See* Part II.B.1, *infra*.

███████████████████████████████████████████████████

Janssen's conduct makes its arguments that Defendants' interpretation of "COMPANY" is "[in]conceivable," "absurd," or "preposterous," Dkt. 539 at 9; Dkt. 445 at 3, 6–8, untenable to say the least. Janssen and its parent and sister companies have interpreted the agreements just as Defendants argue, time and time again over more than a decade, including through the same law firm representing Janssen in this case, and in the courts of this State. This Court should not adopt a different interpretation now because it suits Janssen's needs in this case.

###### C.     None of Janssen's Proposed Interpretations of "COMPANY" Pass Muster

Janssen's proposed construction—or more accurately, its multiple proposed constructions—of "COMPANY" do not pass muster. Initially, Janssen argued that "COMPANY" meant "Centocor," and that the remaining language in the agreement merely ensured that employees "do not need to execute new agreements every time they are transferred to 'any' different operating company within the Johnson & Johnson family." Dkt. 445 at 4. Janssen's theory was that the agreement at issue "travel[s] with the employee if he or she is transferred to another J&J company." 2/8/17 Hr'g Tr. at 47:15–20. Janssen later abandoned that position and argued the meaning of "COMPANY" varies depending upon the situation, for example, what an employee does while part of the J&J family, and can even vary within the agreement. Janssen's interpretations find no support in the agreement and fly in the face of established rules of contract interpretation.

###### 1.     Janssen's "Traveling Agreement" Interpretation Is Not Supported by the Agreement

Janssen acknowledges that the employee secrecy agreement "doesn't literally say" what Janssen initially argued—*i.e.*, that "COMPANY" means only a person's employer, or any other

subsequent employer. 2/8/17 Hr'g Tr. at 47:15–22. To arrive at this contrived interpretation, Janssen cherry picked from the four categories identified in the express definition of "COMPANY," accepting the ones it liked and rejecting the ones it did not, as shown below:

> The COMPANY means CENTOCOR ~~and JOHNSON & JOHNSON~~ and any of ~~their~~ **its** successors or assigns, purchasers, acquirers, ~~and any of their existing and future subsidiaries, divisions or affiliates, including~~ **or** any ~~such~~ subsidiary, division or affiliate of Johnson & Johnson to which I may be transferred or by which I may be employed in the future.

Among other changes, Janssen rewrote "*their* successors or assigns, purchasers, acquirers" to say "*its* successors [etc.]," because it contended that "'COMPANY' cannot include J&J and its subsidiaries." Dkt. 445 at 5. Of course, the agreement expressly states, "The COMPANY means CENTOCOR **and JOHNSON & JOHNSON and**…" Ex. 1 at -98780. Janssen's arbitrary redlining of the definition of "COMPANY" violates the "elementary rule[] of construction" requiring that all of the words of a contract "must have some meaning." *Friedheim v. Walter H. Hildic Co.*, 89 S.E. 358, 359 (S.C. 1916); *see also Dubrosky v. Colonial Life & Acc. Ins. Co.*, 129 F. App'x 691, 693 (3d Cir. 2005) (it is a "cardinal principle that each term of a contract should be given meaning so that no term is superfluous").

Further, if the drafter wanted "COMPANY" to mean **only** the employer or subsequent employers, he "could have easily done so in just those words, without resorting to the circumlocutions they now ask this Court to adopt." *Assisted Living Assocs. of Moorestown, L.L.P. v. Moorestown Twp.*, 31 F. Supp. 2d 389, 400 (D.N.J. 1998). ████████████████

████████████████████████████████████████████

████████████████████████████████████ Ex. 10 at -115489; Ex. 13 at -112416; Ex. 2 (Martinson Tr.) at 152:18–153:23, 198:7–14. ████████████████

████████████████████████████████████████ Ex. 10 at -115490; Ex. 13 at -112417–418. The Epstein, *et al.* agreements, by contrast, do not work this

way.

**2.      Janssen's New Non-Definition of "COMPANY" Makes No Sense and Is Unsupportable Under Basic Law of Contract Interpretation**

Unable to support its original position, Janssen has more recently taken the position that "COMPANY" varies depending on the situation. J&J employment law attorney, and J&J and Janssen's corporate designee, Anne Martinson testified that ███████████████████

████████████████████████████████████████████████████████

██████████████████████████ Ex. 2 (Martinson Tr.) at 162:22–163:9, 163:16–23. ███

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████. *Id.* at 173:25–180:25.

In Janssen's view, ███████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████ *Id.* at 188:24–189:19, 190:3–13. Janssen even claims that ████████████████████████████████████████ *Id.* at 167:17–168:13.

Janssen's chameleon-like interpretation of "COMPANY" is not credible. Ms. Martinson admitted that █████████████████████████████████████████████████

████████████████ *Id.* at 173:8–24. In particular, ██████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ *Id.* at 79:16–80:7, 83:13–84:18, 171:19–23, 173:8–15. Also, Janssen's take on how the

Court should construe the Epstein, *et al.* agreements has forced Janssen and J&J to adopt the

untenable position that ████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████ *Id.* at 223:23–224:11, 227:17–228:5, 268:22–270:7, 271:6–21, 334:4–335:13.

That the plain definition of "COMPANY" has consequences Janssen does not like in this

particular case is not a basis to rewrite the contract. New Jersey courts have "repeatedly…hewed

to the maxim that 'courts cannot make contracts for parties. They can only enforce the contracts

which the parties themselves have made.'" *McMahon v. City of Newark*, 951 A.2d 185, 196 (N.J.

2008) (quoting *Kampf v. Franklin Life Ins. Co.*, 161 A.2d 717, 720 (N.J. 1960)); *see also Kotkin

v. Aronson*, 815 A.2d 962, 963 (N.J. 2003) (a court "cannot make for [contract drafters] a better

or more sensible contract than the one they made for themselves") (citing *Kampf*, 161 A.2d at

720). Where, as here, "the language is plain and capable of legal construction, the language alone

must determine the agreement's force and effect." *Twp. of White v. Castle Ridge Dev. Corp.*, 16

A.3d 399, 403 (N.J. Super. Ct. App. Div. 2011). "[S]ubjective intent does not matter" (*Nye v.

Ingersoll Rand Co.*, 783 F. Supp. 2d 751, 761 n.12 (D.N.J. 2011)), and the Court is "not at liberty

to introduce and effectuate some supposed unrevealed intention." *Newark Publishers' Ass'n v.

Newark Typographical Union, No. 103*, 126 A.2d 348, 353 (N.J. 1956).

### 3.     Estoppel Prevents Janssen from Defining "COMPANY" Contrary to the Plain Language of the Agreements

Janssen's prior litigation positions, discussed above in Part I.B, estop it from arguing now

that "COMPANY" does not mean the entire J&J family. In the First Circuit, "[j]udicial estoppel should be employed when a litigant is 'playing fast and loose with the courts,' and when 'intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.'" *Patriot Cinemas, Inc. v. Gen. Cinemas Corp.*, 834 F.2d 208, 212 (1st Cir. 1987) (citation omitted). The doctrine applies when "(1) the estopping position and the estopped position are directly inconsistent; and (2) the responsible party succeeded in persuading a court to have accepted its prior position." *Thore v. Howe*, 466 F.3d 173, 182 (1st Cir. 2006) (internal citation omitted). Consistent with the goal of fairness, some cases have held that "the party seeking to assert the inconsistent position must stand to derive an unfair advantage if the new position is accepted by the court." *RFF Family P'ship, LP v. Ross*, 814 F.3d 520, 528 (1st Cir. 2016). All of these factors are met here.

As an example, in *Johnson & Johnson and DePuy Orthopaedics, Inc., et al. v. Biomet, Inc. and Robin T. Barney*, No. C-107-07, (N.J. Super. Ct.), J&J sought to enforce an employment agreement similar to the Epstein, *et al.* agreements and successfully obtained a temporary restraining order against an employee who planned to leave a J&J subsidiary to work for an alleged competitor. Ex. 14 at 1–4. J&J argued that the obligations of the employee under her employment agreement protected not only her employer DePuy Orthopaedics, but also J&J, arguing that violations of the agreement would create "significant and unfair competitive advantage over ***plaintiffs***" such that "[m]oney damages would not adequately compensate ***plaintiffs*** for the losses and injuries ***they*** would suffer." Ex. 15 at -113056–057. The court granted the injunction because of the employee's access to "confidential business information of the DePuy franchise," which consists of "DePuy Orthopaedics, as well as Depuy Spine, DePuy Mitek (sports medicine) and Codman (neurology)." Ex. 14 at 8, 14. And it prevented the

employee from disclosing "any of *plaintiffs'* confidential information...as defined in her [agreement] with *plaintiffs*..." *Id.* at 3.

The agreement in the *DePuy Orthopaedics* case defined "COMPANY" the same way it is defined in the Epstein, *et al.* agreements. Ex. 15 at -113066. J&J's position in the *DePuy Orthopaedics* case that J&J (and other subsidiaries) were protected by the employment agreement is "directly inconsistent" with Janssen and J&J's position here that "COMPANY" does not include J&J or other companies. And by obtaining injunctive relief, J&J successfully "persuad[ed] a court to...accept[] its prior position." *Thore*, 466 F.3d at 182. Also, while estoppel does not require such a showing, "[w]here unfair advantage exists...it is a powerful factor in favor of applying the doctrine." *Guay v. Burack*, 677 F.3d 10, 16–17 (1st Cir. 2012). This consideration is present here. Janssen would derive an unfair benefit by interpreting the same term both broadly and narrowly in order to obtain the outcome most favorable to it in separate litigations. Janssen is "playing fast and loose with the courts" (*Patriot Cinemas*, 834 F.2d at 212) and its "deliberate[] chang[e of] positions according to the exigencies of the moment" should be rejected. *New Hampshire v. Maine*, 532 U.S. 742, 750 (2001). "If parties" such as Janssen "feel free to select contradictory positions before different tribunals to suit their ends, the integrity and efficacy of the courts will suffer." *Patriot Cinemas*, 834 F.2d at 214.[6]

## II.    Janssen's "Extrinsic Evidence" Cannot Alter The Plain Words Of The Contract

[6] Estoppel can apply where the party to be estopped is not the same party in the prior proceeding, but the two parties are in privity. *Cf. In re Colonial Mortg. Bankers Corp.*, 324 F.3d 12, 19 (1st Cir. 2003) (sister companies in privity for purposes of res judicata); *see also, e.g., Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 998 (9th Cir. 2012) (representations made by executor in privity with beneficiary attributable to beneficiary for judicial estoppel). While Janssen is the named plaintiff in the instant litigation, J&J controls it and has identity of interests with it. For example, the decision-makers with full access to the information in the litigation, including the person who handles settlement discussions, are J&J personnel. Dkt. 170 at 6; Ex. 17 (LinkedIn profiles). J&J controls public relations concerning the litigation. Ex. 18 (press release); Ex. 19 at 4 (earnings call transcript). Ex. 20 (Epstein Tr.) at 256:10–23; Ex. 21 (Marsh Tr.) at 8:16–23. ███████████ Ex. 22 at 12–13 (annual report); Ex. 23 at ¶ 31 (Grabowski 8/31/16 report excerpts). The Court should estop Janssen from asserting positions that are inconsistent with J&J's prior representations. *See Monroe*, 692 F.3d at 998; *cf. Colonial*, 324 F.3d at 19.

## A.      Janssen's Declarations Are Entitled to No Weight

In support of its arguments, Janssen previously submitted declarations from two J&J employees: Kenneth J. Dow, Assistant General Counsel for Patents in the J&J Law Department and Vice President Patent Law at Janssen, and Katherine Amos, the Senior Director, Global Transfer Pricing at J&J. Ex. 16; Dkt. 523.[7] Both declarations are legally improper, and neither can change the unambiguous meaning of the agreements.

### 1.      The Declarants Lack Firsthand Knowledge

Janssen's declarations should be ignored because the declarants lack firsthand knowledge, or any knowledge, about the intent of the agreements' drafters and signatories. Mr. Dow admitted that ████████████████████████████████████████████████████ ████████████████████████████ Ex. 3 (Dow Tr.) at 125:10–126:2. But Dow does not have this knowledge. ████████████████████████████████████ ███████████████████ *Id.* at 83:9–22. ███████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████████ *Id.* at 83:23–84:3, 76:12–77:2; 85:17–24; *see also id.* at 75:22–25, 90:13–20. Further, ███████████████████████ ████████████████████████████████████████████████████████ ████████████████████████████████ *Id.* at 106:24–108:3.

---

[7] Janssen agreed to strike certain portions of the Dow declaration (Dkt. 522), and the deposition transcript of Ms. Martinson (Dkt. 553, Ex. 1) to which Defendants objected as containing legal argument and/or waiving privilege. *See* Dkt. 571 at 2–3. For clarity, Defendants submit with this brief Exhibits 16 (Dow Decl.) and 2 (Martinson Tr. excerpts) with these portions redacted.

██████████████████████████████████████████ *Id.*
at 57:16–58:2, 84:4–5; *see also id*. at 134:10–135:5. ███████████████████

████████████████████████████████ *Id*. at 289:23–290:2. █████

████████████████████████████████ *See, e.g., id*. at 196:21–197:15; Dkt.
539 at 12; Dkt. 539-1 at 7; *see also* Ex. 3 (Dow Tr.) at 65:14–66:4, 67:19–68:23. ████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████ Ex. 3
(Dow Tr.) at 206:7–207:7, 222:12–225:7.

Ms. Amos also lacks firsthand knowledge. She did not join J&J until May of 2016, more than a decade after the agreements were drafted and signed. Dkt. 523 at ¶ 1. The only two paragraphs of her declaration addressing the '083 patent suggest that some unnamed person told her what to say. *Id*. at ¶¶ 21–22. Such "evidence" should be disregarded. *See, e.g.*, *Perez v. Volvo Car Corp.*, 247 F.3d 303, 316 (1st Cir. 2001) ("Because the record makes manifest that the relationship began before Gonzalez became Trebol's general manager, his statements about the early years of the Volvo/Trebol/AUM arrangement cannot properly be considered."); *Unleashed Doggie Day Care, LLC v. Petco Animal Supplies Stores, Inc.*, No. 10-10742, 2011 WL 6812642, at \*7 n.1 (D. Mass. Dec. 28, 2011) (declining to consider "affidavits… [that] offer legal conclusions or opinion testimony not based on personal knowledge").[8]

### 2.    The Threat of "Chaos" Does Not Make Sense

---

[8] Janssen's (and J&J's) other witness Ms. Martinson ███████████████████
████████████████████████████████████████████████████████ Ex. 2
(Martinson Tr.) at 188:24–189:19, 190:3–13. But Martinson, ███████████████
████████████████████████████████████████████ *Id*. at 23:3–12, 119:19–120:23,
172:21–23; *see also id*. at 182:25–183:6. Martinson did ███████████████
████████████████████████████████████████████ *Id*. at 129:20–130:7,
208:9–21. Ms. Martinson's arguments should be rejected as unhelpful and impermissible extrinsic evidence.

Ms. Amos asserted that the J&J family would not share ownership of patents because it would result in tax complexities if J&J needed to allocate income or revenue associated with a patent. Dkt. 523 at ¶¶ 10–12; *see also id.* at ¶¶ 15–18. Mr. Dow similarly asserted that joint ownership would be "cumbersome or unnecessarily burdensome" because "the filing of a reissue application requires the consent of all assignees, and that consent must include a showing of ownership by the assignees." Ex. 16 at ¶ 15. To be clear, this parade of horribles is inapplicable to the '083 patent because it ███████████████████████████████████ ███████████ Dkt. 523 at ¶ 22; Ex. 3 (Dow Tr.) at 266:6–15. In any event, the "chaos" that allegedly would result under Defendants' interpretation if those things were to happen is not a basis for the Court to adopt Janssen's contrived construction. Dkt. 520 at 19; Dkt. 523 at ¶ 15.

First, "chaos" would result under Janssen's own view that "COMPANY" does not include the entire J&J family. There would be no broad protection for proprietary and trade secret information of all J&J companies, which "the J&J companies' business is built" upon and which they consider "vital to prevent competitors or would-be competitors from obtaining an unfair competitive advantage." Ex. 13 at -112396, -112398; *see also* Dkt. 520 at 13–14. This is why J&J and its subsidiaries have interpreted "COMPANY" broadly when enforcing the confidentiality and non-compete provisions of employment agreements. Second, any purported "chaos" related to patent ownership, specifically, is presumably why ██████████████ ████████████████████████████████████████████ ██████████████████ *See* Part I.C.1, *supra*.

At bottom, Janssen's declarations are self-serving, litigation-driven restatements of Janssen's attorneys' arguments, and are not the type of extrinsic evidence New Jersey law permits. Janssen "must produce objective facts, not subjective and self-serving testimony, to

show that a contract which looks clear on its face is actually ambiguous." *Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., U.A.W. v. Skinner Engine Co.*, 188 F.3d 130, 145 (3d Cir. 1999) (declining to rely on executives' testimony "as to what they believed the collective bargaining agreements required") (citation omitted). This Court should discredit the declarations as "unpersuasive and self-serving…*post hoc* rationalizations which distort the original language" of the agreements at issue. *Assisted Living Assocs.*, 31 F. Supp. 2d at 400.

  **B. Janssen's Other "Extrinsic Evidence" Does Not and Cannot Alter the Plain Language of the Employment Agreements**

  The remaining arguments Janssen has made thus far are based on other "extrinsic evidence" that does not actually provide any information about the assignment of patent rights, and cannot properly be relied upon by the Court to "rewrite a contract for [Janssen] better than or different from the one [it] wrote for" itself. *Kieffer v. Best Buy*, 14 A.3d 737, 743 (N.J. 2011).

  **1. The '083 Patent**

  Janssen notes that the '083 patent identifies Janssen (Centocor) as the assignee (Dkt. 520 at 15–16), but this is entitled to little, if any, weight. The identification of an assignee on the face of a patent is based on the filing of a purported assignment document with the Patent Office; it "is not a determination by the Office of the validity of the document or the effect that document has on the title to an application, a patent, or a registration." 37 C.F.R. § 3.54; *see also Hoffman-La Roche Inc. v. Teva Pharm. USA*, No. 09-5283, 2011 WL 6028583 (D.N.J. Dec. 2, 2011) (holding Roche not to be assignee of a patent on which it was identified as assignee); Ex. 25 (cover page of patent in *Roche* case).

  **2. Invention Disclosure Form**

  Janssen cited an invention disclosure form on Centocor letterhead as supporting its definition of "COMPANY," at least for purposes of the patent assignment provision of the

agreements. Dkt. 520 at 16; Dkt. 522, Ex. B. That document simply indicates that the '083 patent inventors were associated with Centocor. *See* Dkt. 522 at ¶ 8; Dkt. 522, Ex. B; Ex. 3 (Dow Tr.) at 243:21–245:4. The disclosure of an invention to a particular J&J entity does not determine the assignee(s) of the patent under the operative assignment agreements. Other facts and documents related to Janssen's processes for obtaining patents suggest that patent rights are not conveyed to Janssen alone. For example, ███████████████████████████████████████████

███████████████████████████████████ (Ex. 26 (Baumeister Tr.) at 27:9–25), ████████████

████████████████████████████████████ Ex. 3 (Dow Tr.) at 236:10–24. ████████████

█████████████████████████████████████████████████████████████████

██████████ Ex. 26 (Baumeister Tr.) at 20:7–8, 11:23–14:7; Ex. 16 at 1.

**3.**   ████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████

███████████████████████████████████████████████

**4.   Defendants' Documents**

Janssen has argued that certain public Hospira and Pfizer documents are evidence of the "practices" of "other large sophisticated companies." Dkt. 520 at 15; Dkt. 521, Ex. D–E. These

documents have nothing to do with the intent of the parties to the agreements in question and shed no light on their meaning. Even if two lone documents were any kind of credible evidence of the "practices" of "large sophisticated companies" (they are not), the proper analysis here "must turn on the terms of the [employment agreements at issue], rather than whether [Janssen's] policies comported with prevailing industry practices." *Gabriel v. Jackson Nat. Life Ins. Co.*, No. 11-12307-MLW, 2015 WL 1410406, at *4 (D. Mass. Mar. 26, 2015).

### 5.      Janssen's 2015 "Assignments"

After filing its original complaint against Defendants in March 2015, Janssen procured two rounds of documents it called "assignments" from each of the six inventors of the '083 patent—one round starting in April 2015, and a second round in August 2015. *See* Exs. 27, 28. Janssen has held out these documents as "extrinsic evidence of the parties' intent," because, according to Janssen, "[i]n every case, these assignment documents were to Centocor or, later, to Janssen." Dkt. 520 at 14, 16. This effort fails.

First, the 2015 "assignments" did not assign the '083 patent. Epstein, Marsh, Monsell, and Ozturk assigned the patent to "the COMPANY" in their employment agreements executed in 2001–2003. In 2015, they "had nothing to give to [Janssen]," and their "purported assignment[s] to [Janssen are] a nullity." *Filmtec v. Allied-Signal Inc.*, 939 F.2d 1568, 1572 (Fed. Cir. 1991); *see also Abraxis Biosci. Inc. v. Navinta LLC*, 625 F.3d 1359, 1365 (Fed. Cir. 2010) ("AZ-UK could not assign the patents because it did not possess their titles."). As Mr. Dow agreed, "█

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████ Ex. 3 (Dow Tr.) at 215:12–22. Janssen cannot "rescue the assignment[s]" by describing them years after the fact, in different documents, as what Janssen wishes they had

been. *Picture Patents, LLC v. Aeropostale, Inc.*, 788 F. Supp. 2d 127, 137-38 (S.D.N.Y. 2011), *aff'd*, 469 F. App'x 912 (Fed. Cir. 2012) ("clarification" agreement could not "alter the Picture Patents Assignment or independently convey Intellinet's rights to Picture Patents").

Second, as documents Janssen procured during the litigation ████████████████ ██████████████████ they are not "extrinsic evidence of the parties' intent." Dkt. 520 at 14; Exs. 27, 28. If anything, they suggest that Janssen knew it had a standing problem. *See, e.g.*, *Quantum Corp. v. Riverbed Tech., Inc.*, No. 07-04161, 2008 WL 314490, at *3 (N.D. Cal. Feb. 4, 2008) ("The later assignment in December 2007, four months after the complaint was filed, suggests that plaintiff realized that the August 2007 licensing agreement needed fixing."). Tellingly, Mr. Dow ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████ Ex. 3 (Dow Tr.) at 220:16–22, 226:4–14.

## C.   Janssen Has Effectively Conceded That Mr. Epstein and Others Assigned The '083 Patent To The J&J Family Of Companies

Janssen knew it lacked standing to assert the '083 patent in its 2015 complaint. The law is clear that an agreement that an inventor "will assign" patent rights does not "expressly undertake the assigning act at the time of the agreement," but rather, "leave[s] [the assigning act] to some future date" and thus is not an actual assignment. *Gellman v. Telular Corp.*, 449 F. App'x 941, 944 (Fed. Cir. 2011); Dkt. 508 at 4–10. Inventor Horwitz's 1998 agreement was a "will assign" agreement, not an assignment, and Janssen had no assignment from Dr. Horwitz until more than four months after it filed its 2015 complaint. *Id*. It should come as no surprise that Janssen requested dismissal of its 2015 complaint.

But Janssen also asked to dismiss its 2016 complaint. This is despite the fact that Defendants did not allege that the 2016 complaint lacked standing due to Dr. Horwitz, but rather, only because of the assignment of rights from Epstein and others to the J&J family of companies. This reflects Janssen's recognition that the 2001–2003 Epstein, *et al*. assignments deprived Janssen of standing for the 2016 complaint. Those same assignments deprive Janssen's 2017 complaint of standing (as they would any complaint asserting the '083 patent).

The difference between Janssen's 2016 and 2017 complaints is that prior to the 2017 complaint, in March 2017, Janssen and J&J devised and executed an "agreement" that they claim resulted in J&J and its subsidiaries "disclaim[ing] any ownership interest in the '083 patent." Dkt. 562 at 2. As discussed below, the March 2017 so-called "disclaimer" agreement does not convey the necessary rights to the '083 patent to Janssen to confer standing even for the 2017 complaint. Janssen's voluntary dismissal of its 2016 complaint and its (failed) attempt to fix the problem created by the Epstein, *et al*. agreements only confirm that the inventors assigned their rights to the entire J&J family, not just Janssen.

## III.   Janssen Has Not Fixed Its Standing Problem

Janssen cites the "disclaimer" agreement as the sole basis for "conclud[ing] that [its] new action [filed May 31, 2017] fully protects Janssen's rights to litigate the '083 patent." *Id*.  But the agreement does not solve Janssen's standing woes. As an initial matter, it is illogical and full of internal inconsistencies. For example, if it were accurate, as the agreement self-servingly states, that "Janssen is the sole assignee" of the patent, and that the patent "was assigned to Centocor, Inc.," there would be no reason for Janssen and J&J to "agree" between themselves that "Janssen is the sole owner of the '083 patent." Dkt. 521, Ex. G. And if Janssen were in fact the "sole owner" of the patent, as the agreement states, the provisions of the agreement under which J&J "agree[s] to forbear from asserting any [ownership] rights [in the patent] at any time in the

future" and "represents that none of its successors, assigns, purchasers and acquirers and existing and future subsidiaries, divisions, and affiliates, other than Janssen…has or will assert any ownership rights to the '083 patent" would be nonsensical and entirely ineffectual. *Id.* at 2,

Setting aside the nonsense of it, however, the agreement does not fix Janssen's standing problem. *First*, the agreement did not transfer ownership of the '083 patent from the multiple patent co-owners to Janssen, because it is not an assignment. *Second*, though Janssen calls it a "disclaimer," it did not actually relinquish J&J's or its subsidiaries' ownership of the '083 patent, nor does there appear to be any precedent recognizing a "disclaimer" of patent ownership in order to cure a standing defect. *Third*, even if the March 2017 agreement minimized or avoided the risk of multiple lawsuits by '083 patent co-owners, under Federal Circuit precedent, this still cannot create standing where none exists. And *fourth*, the agreement does not bind J&J's current subsidiaries, and has no effect on companies that are no longer part of the J&J family.

### A.     The March 2017 Agreement Did Not Assign Co-Owners' Rights to Janssen

Janssen and J&J executed the March 2017 agreement in response to Defendants' challenge to Janssen's standing. *See* Dkt. 520 at 20; Dkt. 521, Ex. G. Most of the agreement is a series of self-serving "whereas" clauses, stating things like "WHEREAS it is the practice throughout the operating companies of J&J for patents to be owned by a single J&J operating company or subsidiary," and "WHEREAS consistent with this practice the '083 patent was assigned to Centocor, Inc., now called Janssen." Dkt. 521, Ex. G. In the agreement, Janssen and J&J equally self-servingly "agree[d]" that "Janssen is the sole owner of the '083 patent and there has never been any owner of the '083 patent other than Janssen," that "J&J has never asserted any ownership rights to the '083 patent and agrees to forbear from asserting any such rights at any time in the future," and also that "J&J represents that none of its successors, assigns, purchasers and acquirers and existing and future subsidiaries, divisions, and affiliates, other than

Janssen: a. has or will assert any ownership rights to the '083 patent; and b. has had any rights and or any legal or equitable rights, including any shop rights, to the '083 patent." *Id.* at 2.

The agreement does not make Janssen the sole owner of the '083 patent. To have legal effect as an assignment, an agreement must meet certain requirements. It must be in writing and executed by the patentee or his assigns or legal representatives. 35 U.S.C. § 261; *Vapor Point LLC v. Moorhead*, 832 F.3d 1343, 1351 (Fed. Cir. 2016) (O'Malley, J., concurring). It should be drafted to reflect an immediate transfer of a present existing or expectant interest. *Abraxis*, 625 F.3d at 1364–65. And it "must be unambiguous and show a clear and unmistakable intent to part with the patent." *McClaskey v. Harbison-Walker Refractories Co.*, 138 F.2d 493, 499 (3d Cir. 1943); *see also Univ. Patents, Inc. v. Kligman*, 762 F. Supp. 1212, 1219 (E.D. Pa. 1991) (same); *Patriot Universal Holdings, LLC v. Formax, Inc.*, 24 F. Supp. 3d 802, 804 (E.D. Wis. 2014) (same). The March 2017 agreement fails on all counts. To establish standing, Janssen "must produce a written instrument documenting the transfer of proprietary rights in the patents" to Janssen, which it has not done. *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245, 1250 (Fed. Cir. 2000).[9]

## B.     The March 2017 Agreement Did Not "Disclaim Ownership," and Cannot Confer Standing Upon Janssen

Janssen characterizes the March 2017 agreement as a "disclaimer" of J&J's and its subsidiaries' "ownership interest" in, or "ownership in," the '083 patent. *See, e.g.*, Dkt. 562 at 2; Dkt. 524 at 1, 20. But it is not a disclaimer of ownership. The agreement simply states that J&J

---

[9] It should go without saying that the agreement did not turn Janssen into the sole owner of the patent simply by "agreeing" that Janssen is the sole owner, and did not make J&J or its subsidiaries not co-owners simply by stating that none of them "has had any rights" to the patent. Dkt. 521, Ex. G at 2. It is "ancient wisdom that calling a thing by a name does not make it so" (*City of Madison, Joint Sch. Dist. No. 8 v. Wis. Emp't Relations Comm'n*, 429 U.S. 167, 174 (1976)), and the fact that a co-owner "acknowledge[s], in effect, that [it] never had an ownership interest in the patent…[does]n't mean that [it] hadn't." *Pinpoint, Inc. v. Amazon.com, Inc.*, 347 F. Supp. 2d 579, 584 (N.D. Ill. 2004); *see also Picture Patents*, 788 F. Supp. 2d at 138; *New Medium Techs. LLC v. Barco N.V.*, 644 F. Supp. 2d 1049, 1056 (N.D. Ill. 2007) ("[C]onclusory [contract] terms regarding standing have no impact at all.").

"agrees to **forbear from asserting** any [ownership rights to the '083 patent] at any time in the future." Dkt. 527, Ex. G at 3. Likewise, J&J purports to "represent[]" that "none of its successors, assigns, purchasers and acquirers and existing and future subsidiaries, divisions, and affiliates, other than Janssen…**will assert any ownership rights** to the '083 patent." *Id.* The agreement does not state that J&J or its subsidiaries "disclaim" or relinquish rights under or ownership of the '083 patent; at most it is an agreement not to **assert** rights. It may be a covenant not to sue, but it is not, as Janssen argues, an agreement that gives up ownership.

In any event, and more critically, Janssen has not cited, and Defendants are not aware of, any cases or other authority supporting the idea that a patent co-owner may simply "disclaim" its ownership rights by way of such an agreement, and thereby affect legal title.[10] Nor are Defendants aware of any case in which a co-owner "disclaimed" its ownership interest in a patent and thereby cured a lack of standing. And it would be contrary to prevailing Federal Circuit case law for this Court to permit Janssen to do so.  As already discussed, absent joinder of all co-owners of a patent, a co-owner acting alone lacks standing. *Israel Bio-Eng'g*, 475 F.3d at 1264–65. Per the Federal Circuit, there are only two exceptions to the rule that co-owners must be joined and must consent to join, neither of which are applicable here. *Ethicon*, 135 F.3d at 1468 n.9. The first exception applies when an exclusive licensee wishes to file suit. The patent owner "stands in a relationship of trust to his licensee and must permit the licensee to sue in his name." *Id.* The second exception applies where one co-owner seeks to file a patent infringement suit, and permits involuntary joinder of another co-owner who has previously and by contract waived its right to refuse to join an infringement suit. *Id.* The Federal Circuit has consistently

---

[10]   There is a statute providing that "[w]henever a claim of a patent is invalid the remaining claims shall not thereby be rendered invalid," which also provides that "[a] patentee, whether of the whole or any sectional interest therein, may, on payment of the fee required by law, make disclaimer of any complete claim, stating therein the extent of his interest in such patent," and "[s]uch disclaimer shall be in writing and recorded in the Patent and Trademark Office." 35 U.S.C. § 253. This is not what J&J (or any of its subsidiaries) has done.

applied this rule, recognizing that a co-owner is a necessary party, and has the right to refuse to join an infringement suit unless he has waived (*i.e.*, contractually given up) that right and thus may be involuntarily joined. *Int'l Nutrition Co. v. Horphag Research Ltd.*, 257 F.3d 1324, 1331 (Fed. Cir. 2001) (patentee barred from bringing suit without co-owner); *STC.UNM v. Intel Corp.*, 754 F.3d 940, 946 (Fed. Cir. 2014) ("[T]he right of a patent co-owner to impede an infringement suit brought by another co-owner is a substantive right that trumps the procedural rule for involuntary joinder under Rule 19(a)."); *see also Speedfit LLC v. Woodway USA, Inc.*, No. 13-1276, 2016 WL 7471307, at *4 (E.D.N.Y. Dec. 28, 2016) ("Plaintiffs argue [that] an exception applies in the present case because Bostan waived his right not to be involuntarily joined in this lawsuit. The Federal Circuit has recognized this exception to the general requirement that all co-owners must be joined as plaintiffs in an infringement suit."). A "disclaimer" of ownership—even assuming such a thing did exist—is not one of the two recognized exceptions to the rule that standing requires all co-owners to be joined at the time the complaint is filed.

Janssen may argue that *IpVenture v. Prostar Computer, Inc.*, 503 F.3d 1324 (Fed. Cir. 2007) supports its position that its "disclaimer" cures its standing defect. But Janssen would be wrong. *IpVenture* involved an employment agreement between an inventor, Mr. Thomas, and his employer, third party Hewlett-Packard, in the 1990s. The question was whether the employment agreement was a present assignment, which would have conveyed to HP legal title to the patent, or rather merely an agreement to assign, which would have conveyed only an equitable interest—*i.e.*, the right to obtain legal title at some later point in time. *Id.* at 1326–27; *see also Gellman*, 449 F. App'x at 944. Relying on its own precedent, including *Arachnid, Inc. v. Merit Indus., Inc.*, 939 F.2d 1574 (Fed. Cir. 1991) and other cases, the Federal Circuit concluded that Mr. Thomas's employment agreement was not a present assignment, because Mr. Thomas

had merely "agree[d] to assign" his invention. *IpVenture*, 503 F.3d at 1327; *see also* Dkt. 508 at 5–8; Dkt. 553 at 3–6. This conclusion was "reinforced by" a statement HP had made in 2005, in the context of a settlement agreement, in which it stated that it "'never has had any legal or equitable rights' to the '235 patent." *IpVenture*, 503 F.3d at at 1327.

Janssen may point to a statement by the *IpVenture* Court that HP "had no assignment of an interest in the patent, and had disclaimed any interest therein." *Id*. at 1325. But the facts and the question in *IpVenture* were not like the facts or question in front of this Court. HP's lack of ownership of the patent at issue was not a function of the statement HP made in 2005. It was a function of the employment agreement that the Court found was not an assignment, based on its language and the case law. *Id*. at 1327. Simply stated, the employment agreement there did ***not*** assign the patent to HP, and the subsequent agreement was ***consistent*** with this. By contrast, the Epstein, *et al*. employment agreements ***did*** assign the '083 patent to J&J and its subsidiaries— which must be true if the Court is even considering the March 2017 agreement. Janssen and J&J do use the March 2017 agreement to "confirm" or "reinforce" the Epstein, *et al*. assignments, but rather, for the opposite purpose—to try to ***change*** or ***undo*** their legal significance, and somehow turn patent owners into non-owners. This is not what *IpVenture* involved or permits.

Moreover, the 2005 agreement in *IpVenture* was an express acknowledgement by HP of a ***preexisting*** "verbal pre-employment agreement" between the inventor Mr. Thomas and HP that the invention at issue "would not belong to HP," which HP had "agree[d] to honor" in its 2005 settlement agreement. Dkt. 521, Ex. A at 4. The parallel here—which is lacking—would be if J&J (and all of its subsidiaries) had entered into a verbal, pre-employment agreement with Epstein, Marsh, Monsell, and Ozturk that their invention "would not belong" to J&J and its subsidiaries, and which the March 2017 agreement expressly referenced and acknowledged.

*IpVenture* is inapposite, and it would be error to rely upon it to find standing where none exists.

### C.    Avoiding Duplicative Infringement Suits Does Not Create Standing

Janssen has argued that because J&J has represented that neither it nor its subsidiaries will assert that they own the '083 patent, "[t]here is no possibility of multiple suits." Dkt. 520 at 20. But it is well established that executing an agreement that avoids the risk of suits by multiple co-owners, such as an "agreement to be bound by all judgments," does not "resolve[] the issue of standing." *Prima Tek II*, 222 F.3d at 1381. "Standing to sue for infringement depends entirely on the putative plaintiff's proprietary interest in the patent, not on any contractual arrangements among the parties regarding who may sue and who will be bound by judgments." *Id.; see also Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1034 (Fed. Cir. 1995) ("[A] contract cannot change the statutory requirement for suit to be brought by the 'patentee.'").

In one case, for example, the plaintiff "essentially ask[ed] th[e] Court to create a new exception to the joinder rule: that joinder is not necessary where a co-owner waives the right to participate in a given infringement suit, agrees to be bound by the judgment and agrees not to license the patents to the alleged infringers." *Bushnell, Inc. v. Brunton Co.*, 659 F. Supp. 2d 1150, 1163 (D. Kan. 2009). The court declined, citing the rule of *Prima Tek II* and explaining that "[t]he Federal Circuit has not recognized such an exception." *Id.* "[O]nly a person or persons with the 'full' right to exclude can bring an infringement action," and "[c]ontractual arrangements between the co-owners or parties cannot change this requirement, which flows from statute." *Id.* at 1164 (citing *Prima Tek II*, 222 F.3d at 1381; *Ortho Pharm.*, 52 F.3d at 1034). Thus, even assuming Janssen and J&J made a "contractual arrangement" that avoids the risk of multiple infringement actions against Defendants for the '083 patent, it has no impact on

Janssen's lack of standing.[11] *See also Pi-Net Int'l, Inc. v. Focus Bus. Bank*, No. 12-04958, 2015 WL 1538259, at *4 (N.D. Cal. Apr. 6, 2015) ("Pi-Net's attempt to contract around Article III's standing requirement is unavailing because 'standing to sue for infringement depends entirely on the putative plaintiff's proprietary interest in the patent, not on any contractual arrangements among the parties regarding who may sue and who will be bound by judgments.'") (citing *Prima Tek II*, 222 F.3d at 1381); *cf. Morrow v. Microsoft Corp.*, 499 F.3d 1332, 1341 n.8 (Fed. Cir. 2007) ("While parties are free to assign some or all patent rights as they see fit based on their interests and objectives, this does not mean that the chosen method of division will satisfy standing requirements.").

### D.   The March 2017 Agreement Does Not Alter the Rights of J&J's Current or Former Subsidiaries

Regardless of what impact the March 2017 agreement may have had on J&J, it has no effect on J&J's subsidiaries. To bind those companies' respective rights, legal representatives or assigns of each of them would have to be signatories to the March 2017 agreement. "Trouble is, [the subsidiaries] w[ere] not [] party to the agreement." *Quantum Corp.*, 2008 WL 314490, at *2. Rather, the only two signatories to the agreement are Janssen and J&J. Dkt. 521, Ex. G at 3; *id.* at 1 (naming only Janssen and J&J as "the Parties").

*Quantum Corp.* is an example of a parent company's inability to automatically bind subsidiaries with respect to patent rights. In that case, the asserted patent had been assigned to a company called Rocksoft, a subsidiary of a company called A.C.N. 120. *Quantum Corp.*, 2008 WL 314490, at *1. In an agreement entered into the day before suit was filed, A.C.N. 120 purported to grant to the plaintiff Quantum an exclusive license to "'all patents, patent applications, [and] intellectual property rights' owned by A.C.N. 120 and its subsidiaries," in an

---

[11] Janssen is on even weaker footing than the plaintiff in *Bushnell*, given that J&J has made no representation that it will be "bound" by any judgment of this Court. *See generally* Dkt. 521, Ex. G.

effort to allow Quantum to file suit. *Id.* "Significantly, however, [patent owner] Rocksoft did not sign the agreement." *Id.* The court concluded that absent an alter-ego showing, a parent company is not "automatically deemed to be the agent of its subsidiaries authorized to transfer patent rights," and that given that the license agreement "was not signed by Rocksoft, no rights in the '810 patent were transferred by that agreement." *Id.* at *2–3. "[I]t is not too much to ask sophisticated patent litigants to be careful when it comes to the threshold issue of standing," the *Quantum Corp.* court noted, and "[i]t is a simple task to execute express license agreements that satisfy the Federal Circuit standard. Among affiliated companies, it should be even simpler." *Id.* at *3. Janssen's attempt at a short-cut did not bind all J&J's subsidiaries, and thus regardless of what Janssen argues the March 2017 agreement accomplished with respect to J&J, its subsidiaries' rights remain unchanged. *See also Royal Indus., v. St. Regis Paper Co.*, 420 F.2d 449 (9th Cir. 1969) (where parent and wholly owned subsidiary were co-licensors of patent, parent could not terminate license without consent of subsidiary); *Max Sound Corp. v. Google, Inc.*, 147 F. Supp. 3d 948, 953 (N.D. Cal. 2015) (purported licensee could not have received any patent rights where the patent owner's parent company and not patent owner signed licensing agreement); *cf.* 35 U.S.C. § 261.

Finally, even if the March 2017 agreement had bound all of J&J's current subsidiaries with respect to their patent rights, it accomplished nothing with respect to companies who were part of the J&J family in the early 2000s, and thus obtained rights to the '083 patent under the Epstein, *et al.* agreements, but were subsequently sold by J&J and are no longer within the J&J family. Those companies remain co-owners, who are not joined in the suit as plaintiffs.

## IV.   Conclusion

For the reasons set forth above, Janssen lacks standing for its May 2017 complaint. The complaint must be dismissed.

Dated:  July 11, 2017

Respectfully submitted,

Celltrion Healthcare Co., Ltd., Celltrion, Inc., and Hospira, Inc.

By their attorneys,

/s/Andrea L.  Martin, Esq.
Dennis J.  Kelly (BBO # 266340)
Andrea L.  Martin (BBO #666117)
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA 02110-1624
Telephone: 617-345-3000
Facsimile: 617-345-3299
dkelly@burnslev.com
amartin@burnslev.com

James F. Hurst, P.C.  (*pro hac vice* to be filed)
Bryan S.  Hales, P.C. (*pro hac vice* to be filed)
Elizabeth A. Cutri (*pro hac vice* to be filed)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
james.hurst@kirkland.com
bryan.hales@kirkland.com
elizabeth.cutri@kirkland.com

Charles B.  Klein (*pro hac vice* to be filed)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817
Tel: (202) 282-5000
cklein@winston.com

*Attorneys for Defendants Celltrion Healthcare Co., Ltd., Celltrion, Inc., and Hospira, Inc.*

## <u>CERTIFICATE OF SERVICE</u>

I, Andrea L. Martin, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on July 11, 2017.

<u>/s/Andrea L. Martin, Esq.</u>
Andrea L. Martin, Esq.