# EXHIBIT 4

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.
SUPERIOR COURT
BUSINESS LITIGATION SESSION

|  |  |  |
|---|---|---|
| DEPUY SPINE, INC. and JOHNSON & JOHNSON REGENERATIVE THERAPEUTICS, LLC | ) ) . ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) ) | C. A. No. 07-1464 -*BLS* |
| STRYKER BIOTECH L.L.C. and G. JOSEPH ROSS, | ) ) ) | |
| Defendants. | ) ) ) ) ) | |

## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION, OR ALTERNATIVELY, FOR TEMPORARY RESTRAINING ORDER

Pursuant to Mass. R. Civ. P. 65(a) and (b), Plaintiffs, DePuy Spine, Inc. ("DePuy Spine") and Johnson & Johnson Regenerative Therapeutics, LLC ("JJRT") (together, the "Companies"), move for a preliminary injunction, or, in the alternative, a temporary restraining order, enjoining Defendant, G. Joseph Ross ("Ross"), from competing with his former employer, DePuy Spine, in violation of his Employee Secrecy, Non-Competition and Non-Solicitation Agreement (the "Agreement"). In the absence of injunctive relief, Ross will undertake employment on April 11, 2006, and DePuy Spine and JJRT will be irreparably harmed. In support of this Motion, DePuy Spine and JJRT submit their Memorandum in Support of Plaintiffs' Motion for Preliminary Injunction, or Alternatively, for Temporary Restraining Order and state as follows:

1.     DePuy Spine is in the business of manufacturing, marketing and distributing spinal implant and bone graft products.  JJRT is in the business of research and development of orthobiologic products, including bone graft products.

2.     As a former employee of DePuy Spine, Ross is subject to non-competition and non-solicitation covenants with DePuy Spine and JJRT, which prohibit him from taking employment in a position where he can utilize confidential information of the Companies to "enhance the use or marketability" of products which "resemble or compete" with a product of DePuy Spine or JJRT.  Ross's Agreement with the Companies also prohibits Ross from assisting other companies in the solicitation of customers with whom Ross has had contact in the twelve months prior to terminating his employment with DePuy Spine.

3.     Ross, the former Worldwide Vice President of New Business Development for DePuy Spine, possesses confidential information concerning DePuy Spine's and JJRT's products, including confidential information about customers, marketing strategies, sales and financial information, distribution network, new product development and licensing and acquisition activities for both bone graft and spinal implant technologies and products.

4.     Ross also possesses confidential information regarding the Companies' relationships with key surgeon opinion leaders and surgeon customers.  Ross has had contact with such surgeons in the twelve months prior to his resignation.

5.     Ross intends to undertake employment for Stryker Biotech as its Vice President of Marketing on April 11, 2007.

6.     Stryker Biotech competes with DePuy Spine and JJRT in the bone graft product business, and its affiliated corporation, Stryker Spine, competes with DePuy Spine in the spinal implant business.

- 2 -

7.     The nature of Ross's responsibilities for Stryker Biotech will inevitably cause Ross to utilize the Companies' confidential information to enhance "the use and marketability" of Stryker Biotech's products, and will be in breach of Ross's non-competition and non-solicitation covenants.

8.     A preliminary injunction is required to prevent Ross from violating the Agreement and causing irreparable harm to the Companies.

9.     In the event that this matter cannot be set for hearing on the preliminary injunction prior to Ross's proposed starting date of April 11, 2007, or should the Court determine that a further evidentiary hearing on this Motion is necessary, DePuy Spine and JJRT respectfully request that a Temporary Restraining Order be issued to maintain the *status quo* by restraining Ross from assuming his new employment until determination of this Motion for preliminary relief.

WHEREFORE, Plaintiffs, DePuy Spine and JJRT, respectfully request that, for a period of eighteen months from the termination of Ross's employment with DePuy Spine or until further Court notice, the Court enjoin:

(i)     Ross's employment by Stryker Biotech as its Vice President of Marketing or in any other position relating to sales, marketing, research and development, or licensing and acquisition; and,

(ii)    disclosure, solicitation of a disclosure or use of any confidential

information of DePuy Spine or JJRT that Ross gained during the course of his employment

with DePuy Spine.

## REQUEST FOR HEARING

Pursuant to Superior Court Rules 9A(c)(2) and (3), DePuy Spine and JJRT respectfully

request a hearing on this Motion.

DEPUY SPINE, INC. and JOHNSON
& JOHNSON REGENERATIVE
THERAPEUTICS, LLC,

By their attorneys,

*Kathryn K. Conde*

Kathryn K. Conde (BBO#634347)
Rebecca L. Sipowicz (BBO#650715)
NUTTER, MCCLENNEN & FISH LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA  02210
(617) 439-2000

Date:  April 6, 2007

1618967.1

- 4 -

OMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPERIOR COURT
BUSINESS LITIGATION
SESSION

|  |  |
|---|---|
| DEPUY SPINE, INC. and JOHNSON & JOHNSON REGENERATIVE THERAPEUTICS, LLC | ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) C. A. No. 07-1464 - *BLS* / ) |
| STRYKER BIOTECH L.L.C. and G. JOSEPH ROSS, | ) ) ) |
| Defendants. | ) ) ) ) |

## MEMORANDUM IN SUPPORT OF
## PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION
## OR ALTERNATIVELY, FOR TEMPORARY RESTRAINING ORDER

This case concerns a violation of a non-competition and non-solicitation agreement by a former senior executive of Plaintiff, DePuy Spine, Inc. ("DePuy Spine"), by virtue of his undertaking employment with Defendant, Stryker Biotech L.L.C. ("Stryker Biotech"), a direct competitor of DePuy Spine. Defendant, G. Joseph Ross ("Ross"), has accepted a position as Stryker Biotech's Vice President of Marketing, a position in which he will inevitably utilize confidential information of the Plaintiffs to advantage Stryker Biotech. Plaintiffs, DePuy Spine and its affiliated entity, Johnson and Johnson Regenerative Therapeutics, LLC ("JJRT"), seek preliminary injunctive relief enjoining Ross from undertaking this position. This memorandum is submitted in support of Plaintiffs' Motion for Preliminary Injunction, or Alternatively, for Temporary Restraining Order.

## FACTUAL BACKGROUND

*The Non-Competition and Non-Solicitation Agreements*

Ross has been employed by DePuy Spine in a variety of positions for the last eleven years, including most recently as its Worldwide Vice President, New Product Development. (Affidavit of Bradley T. Moore, dated April 5, 2007, ¶14, filed herewith ("Moore Aff.").) On or about March 19, 2007, Ross informed DePuy Spine that he intended to take a position as Stryker Biotech's Vice President of Marketing. (Ltr. from G. Joseph Ross to G. Fischetti, dated March 19, 2007, attached hereto as Ex. A.) Ross is subject to an Employee, Secrecy, Non-Competition and Non-Solicitation Agreement (the "Agreement") which he re-executed on July 27, 2005, as a condition of his most recent promotion. (Agreement and promotion letter attached as Ex. B hereto). In the preamble of the Agreement, Ross acknowledges the receipt of confidential information as follows:

> I recognize that CONFIDENTIAL INFORMATION is significant to the COMPANY'S competitive position and that the COMPANY therefore expects me to keep it secret and also expects me not to compete with the COMPANY during my employment and for a period of time thereafter.

The Agreement prohibits Ross from competing as follows:

> [F]or a period of eighteen (18) months after termination of my employment with the Company for any reason I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION ... in which the service I may provide could enhance the use or marketability of a CONFLICTING PRODUCT by application of CONFIDENTIAL INFORMATION which [I] shall have had access to during [my] employment.

Agreement, § 6. The Agreement also contains a non-solicitation provision which provides:

> I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not solicit any business from, sell to, or render any service, *or directly or indirectly, help others to solicit business from or render service or sell to, any of the accounts, customers or clients with whom I have had contact during the last*

- 2 -

> *twelve (12) months of my employment with the COMPANY*, for any purpose
> related to the sale of any such product or service.

Agreement, § 7 *(emphasis added)*.

The term "Company" is defined to include not only DePuy Spine but also "JOHNSON

& JOHNSON and any of their successors or assigns, purchasers, acquirers, and any of their

existing and future subsidiaries, divisions or affiliates." Agreement, § 1. "Confidential

Information" is broadly defined to include:

> information disclosed to me or known by me as a result of my employment by
> the COMPANY, not generally known to the trade or industry in which the
> COMPANY is engaged, about products, processes, machines, customers,
> clients, employees and services of the COMPANY, including, but not limited
> to, inventions, research, development, manufacturing, purchasing, finance, data
> processing, engineering, marketing, merchandising, selling, sales volumes and
> strategies, number and location of sales representatives, names and significance
> of the COMPANY's customers and clients and their employees and
> representatives, preferences, needs and requirements, purchasing histories, and
> other customer or client-specific information, and comparable information about
> the products, processes, machines, customers, clients and services of the
> affiliates of the COMPANY acquired by me during my employment by the
> COMPANY.

Agreement, § 1.

A "Conflicting Organization" is defined with reference to a "Conflicting Product" to

mean "any person or organization which is engaged or about to become engaged in research

on, consulting regarding, or development, production, marketing, or selling of a Conflicting

Product." Agreement, § 1. It expressly includes entities involved or potentially involved in

research and development. The term "Conflicting Product" is defined to mean:

> any product, process, machine, invention or service of any person or
> organization other than the COMPANY in existence or under development
> which resembles or competes with a product, process, machine, invention or
> service upon which I shall have worked or about which I become knowledgeable
> as a result of employment with the COMPANY and whose use or marketability
> could be enhanced by application to it of CONFIDENTIAL INFORMATION
> which I shall have had access to during my employment.

- 3 -

Agreement, § 1. "Conflicting Product" thus expressly encompasses products "under development."

### The Business of DePuy Spine

DePuy Spine manufactures and distributes products utilized in the treatment and repair of spinal disorders and injuries. (Moore Aff., ¶3.) These products include metal and plastic hardware products, such as spinal implant and external fixation devices, and bone graft products (also called orthobiologic or biologic products), which are utilized in conjunction with spinal implant products to facilitate the regeneration of bone in the spine. (*Id.*)

DePuy Spine's spinal implant products include cages, rods, plates and the specialized screws used to affix these items to human bone. (Affidavit of Scott P. Bruder, M.D., Ph.D., dated April 4, 2007, ¶7, filed herewith ("Bruder Aff.").) Spinal implant products are used in spinal surgeries to fuse together segments of the spine. (*Id.*) In most such surgeries, a bone graft is performed, in conjunction with the implantation of such devices, to facilitate bone growth in order to reinforce the bone fusion and to strengthen the spine. (*Id.*) When a bone graft is performed using the patient's own bone material, it is called an autograft. In lieu of or in conjunction with an autograft, surgeons may use bone graft products of the sort sold by DePuy Spine and others. (Moore Aff., ¶4.)

DePuy Spine's bone graft products include allograft, which is donated bone material, and bone graft materials. (Bruder Aff., ¶8.) Optium and I/C Graft Chamber are the allograft products sold by DePuy Spine. (*Id.*) DePuy Spine's bone graft materials include Healos, Conduit, Cellect and Symphony. (*Id.*; *see also* DePuy Spine website, particular pages attached as Ex. C.) All these bone graft materials are designed to facilitate bone regeneration in the spine, using a variety of biologic approaches. (Bruder Aff., ¶8.)

## DePuy Spine Products in Development at JJRT

DePuy Spine's product development work is performed by JJRT, the biologics research and development entity for the Johnson and Johnson ("J&J") family of companies. (Bruder Aff., ¶4.) JJRT works in partnership with the J&J operating companies, performing the research and development work necessary to bring products through FDA or other required regulatory approval. (*Id.*) The operating companies are then responsible for commercialization, product launch, marketing and sales activities of the new products. (*Id.*)

In addition to its current portfolio of bone graft products, DePuy Spine has in development at JJRT several other bone graft products. (Bruder Aff., ¶9; Moore Aff., ¶6.) These developmental products include bone graft materials composed of bone morphogenetic proteins, or BMPs. (Bruder Aff., ¶9.) BMPs can be used to regenerate bone or soft tissue, such as cartilage, tendons, ligaments or meniscus. (*Id.*) The active protein, contained in high concentrations, works like the protein found in human bone. (*Id.*) One of these BMP projects is a bone graft product for use in spinal fusions; the other is intended to regenerate spinal discs, by injecting the proteins without surgery. (*Id.*) JJRT and DePuy Spine have additional bone graft products in progress or planning, involving technologies other than BMP. (*Id.*)

## Business of Stryker Biotech

Stryker Biotech and its affiliated company, Stryker Spine, are competitors of DePuy Spine in the markets for spinal implant and bone graft products. (Moore Aff., ¶9; Bruder Aff., ¶ 11, 13.) Stryker Biotech currently has in development two bone graft products, called OP-1 Implant and OP-1 Putty. (Moore Aff., ¶10; Bruder Aff., ¶6; portions of Stryker Biotech website attached as Ex. D hereto.) Stryker Biotech's OP-1 products, like the BMP bone graft product in development for DePuy Spine, is composed of bone morphogenetic proteins.

- 5 -

(Bruder Aff., ¶9, 13.)  Stryker Biotech's OP-1 products are not yet generally available, having

received only limited regulatory approval, called a Humanitarian Device Exemption, which

permits their sale to no more than 4,000 patients a year.  (Moore Aff., ¶11.)  Stryker Biotech

has applied for FDA approval to allow for a broader distribution of its OP-1 Putty product.

(Bruder Aff., ¶12.)  Stryker Biotech also has research and development efforts underway for at

least one other BMP product which can be used, like the product under development for

DePuy Spine, to regenerate spinal discs by injection of the proteins, without surgery.  (*Id.*)

*Similarity of and Competition Between DePuy Spine and Stryker Biotech Products*

DePuy Spine's existing bone graft product line (*e.g.,* Healos, Conduit, Cellect and

Symphony) and Stryker Biotech's OP-1 Putty product are comparable in terms of function and

use.  (Bruder Aff., ¶11; Moore Aff., ¶10.)  DePuy Spine's existing bone graft products, like

Stryker Biotech's bone graft products, are intended for use in bone graft procedures to

facilitate the regeneration of bone.  (Moore Aff., ¶10; Bruder Aff., ¶8, 12.)  To the extent that

Stryker Biotech's OP-1 Putty product is commercially available, it competes with DePuy

Spine's currently available bone graft products. (Moore Aff., ¶12;  Bruder Aff., ¶13.)

In addition, DePuy Spine's developmental bone graft and disc regeneration products are

comparable to Stryker Biotech's OP-1 products and its disc regeneration product.  Stryker

Biotech's OP-1 Putty and DePuy Spine's developmental bone graft product, both of which

utilize BMPs, are similar in composition, intended functioning and target patient population.

(Bruder Aff., ¶ 13.)   The parties' respective disc regeneration products, both utilizing BMPs

in injectible form, are also comparable in terms of target population, base technology and use.

(*Id.*)  When the parties' respective BMP products (BMP bone graft and BMP disc

regeneration) become commercially available, they will compete with each other.  (*Id.*)

- 6 -

*Nature of Ross's Employment at DePuy Spine*

Ross has obtained substantial confidential information at the core of DePuy Spine's and JJRT's strategic plans over the course of his eleven year career.[1]  He has held a variety of positions at DePuy Spine, with responsibilities ranging across both the spinal implant and bone graft product lines. In 1995, he was hired as a sales representative for spinal implant products. (Moore Aff., ¶14.)  After three years, he moved from sales to marketing, becoming a Product Manager for spinal implant systems. (*Id.* at ¶15.)  He assumed increasing responsibility in marketing over the next several years, advancing from Product Manager to Product Director in 1999 and Group Product Director for spinal implant systems in 2000.  (*Id.*)  In the summer of 2003, Ross was promoted to Director of Marketing for Arthroplasty. (*Id.* at ¶16.)  In 2005, he was again promoted, to his most recent position as Worldwide Vice President of New Business Development.  (*Id.*)

As Worldwide Vice President of New Business Development, Ross's primary responsibility was to implement a product development strategy by identifying new product and technological opportunities to be pursued through licensing or acquisition ("L&A"). (Moore Aff., ¶17.)  As a part of the senior executive team, reporting to the President of the company, his duties extended well beyond L&A. (*Id.* at ¶18.)  He served as a member of DePuy Spine's Management Board, which is responsible for managing all aspects of DePuy Spine's business, under the direction of the company President. (*Id.*)  Board members regularly review confidential information regarding DePuy Spine's strategic business plan, strategic marketing plans, technical product development information, regulatory plans, product pipeline plans,

---

[1]  The presentations and reports to which Ross was privy, referenced in Mr. Moore's affidavit, contain highly sensitive materials not suitable for disclosure outside of the company, in the absence of appropriate protections.  Plaintiffs will make these documents available for *in camera* review of the Court upon request.

and all aspects of the financial and sales performance of DePuy Spine. (*Id.*) In addition to his membership on the Management Board, Ross served on a number of important committees responsible for discrete aspects of the company's management. (*Id.* at ¶19.)

*Ross's Possession of Confidential Information of DePuy Spine and JJRT*

Ross's confidential knowledge extends to at least six areas, relevant to his intended position at Stryker Biotech: product pipeline planning, distribution networks for bone graft products, strategic business and marketing plans and market analyses, licensing and acquisition and Key Surgeon Opinion Leaders and surgeon customers.

*Product Pipeline Plan*

DePuy Spine's Product Pipeline Plan is a detailed and highly confidential plan, prioritizing current and future research and development products, their relative risk and priority, market-size estimates for each product, product launch timelines and L&A targets. (Moore Aff., ¶¶20, 22.) The plan covers DePuy Spine's bone graft and disc regeneration products under development, including those utilizing BMPs. (*Id.* at ¶¶20-22.) The formulation of the plan involves consideration of the company's strategic business plan, strategic marketing plan, assessments of the market potential for the new product, considerations with respect to potential positioning of new products, and assessment of potential products *vis a vis* competitor's products. (*Id.* at ¶¶20-22.) Ross assisted in the formulation of this plan as a member of the Product Pipeline Committee and is aware of plan details and its underlying market rationale. (*Id.* at ¶23.) Information contained in the Product Pipeline Plan would be relevant to the marketing of Stryker Biotech's similar bone graft and disc regeneration products, even though the products are still in the R&D stages. (*Id.*) Marketing planning begins in the R&D phase for these sorts of products. (*Id.* at 8.)

- 8 -

*Distribution and Sales of Bone Graft Products*

Ross possesses information regarding DePuy Spine's recent evaluation and reorganization of its distribution network. (Moore Aff., ¶26.) In 2006, DePuy Spine undertook a critical review of its distribution network to identify underperforming distributors. (*Id.*) Decisions were made to restructure the distribution system to address those issues, including by replacing certain distributors. (*Id.*) Ross has knowledge of the weaknesses and strengths of the distribution system, sales turnover rates, sales representative salaries and commissions, sales performance by distributor and market size and growth by distributor region. (*Id.*) With respect to areas where new distributors have been appointed, Ross has knowledge of those potentially vulnerable markets. (*Id.*) Ross has also been privy to regular regional sales performance presentations for the new distribution system, covering, by way of example, sales results, including for biologic products, growth rates, sales trends and goals, identification of key existing accounts and key target accounts and identification of DePuy Spine's current marketing and sales strategies. (*Id.*) All of this information would be useful to the development of Stryker Biotech's marketing plan. (*Id.*)

*Strategic Business and Marketing Plans and Market Analyses*

In his capacity as a DePuy Spine Management Board member, Ross has been privy to DePuy Spine's strategic business plan, which includes market share estimates, revenue forecasts, including forecasts for bone graft and disc regeneration products, assessments of competitors' product portfolios, and elements of DePuy Spine's market strategy. (Moore Aff., ¶30.) Ross has had access to other market analyses, such as quarterly analyses containing forecasts of market growth and market share by product area, including for bone graft and disc regeneration products. (Moore Aff., ¶31.)

- 9 -

## Licensing and Acquisition

Ross has intimate knowledge of DePuy Spine's L&A strategy, including specific opportunities that DePuy Spine is continuing to review and those which it has rejected. (Moore Aff., ¶24; Affidavit of Sudhakar Kadiyala, Ph.D., dated April 3, 2007, ¶¶5-6, filed herewith ("Kadiyala Aff.").) Ross's L&A work over the past year included assessment of at least ten targets with biologic bone graft technologies or technologies otherwise suitable for DePuy Spine's orthobiologics portfolio. (Moore Aff., ¶24; Kadiyala Aff., ¶¶6-7.) At least three of those opportunities are still being considered by JJRT or DePuy Spine. (Moore Aff., ¶24; Kadiyala Aff., ¶¶6-7.) As recently as January, 2007, Ross was involved in a conference call concerning a target possessing bone graft technology and is aware that DePuy Spine will be meeting with that target over the summer. (Moore Aff., ¶25.)

## Key Surgeon Opinion Leaders and Surgeon Customers

Surgeons practicing in the field of spinal surgery are an important element of the marketing and product development efforts for DePuy Spine and other companies in the industry. (Moore Aff., ¶27.) Influential surgeons are frequently consulted with respect to new product development, product performance and surgeon preference for purposes of formulating product development and marketing plans. (Id.) Research is done to identify these key surgeons, and investments are made to develop relationships with them through various collaborations. (Id.) As a Management Board member, Ross was responsible as a primary or backup contact for twenty-two key surgeon opinion leaders, at least two of which are specifically aiding in the development of new biologics products and technologies. (Id.)

Over the course of his employment, Ross has developed an even greater number of relationships with key surgeon opinion leaders. (Moore Aff., ¶29.) As Chair of the Industry

- 10 -

Landscape Surgeon Advisory Panel, Ross was responsible for assembling committees of surgeons by their area of expertise to elicit feedback from these surgeons on industry trends, particular technologies and companies that would be of interest to DePuy Spine. (*Id.* at ¶ 28.)

Based on his years of experience in marketing and sales, Ross knows many of DePuy Spine's surgeon customers who are not designated as opinion leaders. (Moore. Aff., ¶29.) In addition, as a member of the Management Board, Ross was required to make quarterly field visits to surgeon customers, including to meet with high-profile surgeon thought leaders or high-profile surgeon sales targets during these field visits. (*Id.*)

*Ross's Intended Employment with Stryker Biotech*

As Stryker Biotech's Vice-President of Marketing, Ross will be responsible for worldwide business development and marketing of Stryker Biotech's OP-1 bone graft products, as well as similar bone graft and disc regeneration products in development.[2]  He will "develop[ ] and implement[ ] a global marketing strategy" for these products, which have yet to be made generally commercially available. (Ross Job Description, Ex. E.) Ross will manage product roadmaps for commercialization, including management of timelines for clinical trials, manage product launch, develop core marketing messages, determine product positioning, and prepare market and product forecasts. (*Id.*) As he did for DePuy Spine, Ross will be required to interview key surgeon opinion leaders to elicit information applicable to the performance and marketing of the OP-1 products. In addition, Ross will coordinate with other parts of Stryker Biotech's management team, including on L&A and on regulatory planning and clinical trials. Ross will assist in evaluating L&A opportunities in the area of

---

[2] Stryker Biotech has not identified these similar products in development other than to indicate that they are intended for applications in cartilage regeneration, bone-based fusions, and for treatment of osteoarthritis, osteoporosis and other areas. (Ross Job Description, Ex. E.)

orthobiologics, his primary responsibility at DePuy Spine. He will also interface with his peers managing Research and Development and Clinical and Regulatory Affairs to provide input on marketing of products in their early stages of development.

Ross's duties will overlap directly with his most recent role at DePuy Spine and will implicate nearly every aspect of the core strategic information about DePuy Spine and JJRT that he gained through his employment.

## LEGAL STANDARD

The Agreement provides that it shall be governed by New Jersey law. Agreement, § 16. Massachusetts courts give effect to choice of law provisions where such provisions are reasonably chosen by the parties to govern their rights under the contract. *Morris v. Watsco, Inc.*, 385 Mass. 672, 675 (1982). Since Massachusetts law recognizes and enforces non-competition and non-solicitation agreements, the choice of New Jersey law in the Agreement is valid. *Novelty Bias Binding Co. v. Shevrin*, 342 Mass. 714, 716 (1961); *see also* Restatement (Second) Conflict of Laws, § 187(2); *Shipley Co., Inc. v. Clark*, 728 F. Supp. 818, 825 (D. Mass 1990).

In order to obtain preliminary injunctive relief, the movant must show: "(1) a likelihood of success on the merits; (2) that irreparable harm will result from denial of the injunction; and (3) that, in light of the [moving party's] likelihood of success on the merits, the risk of irreparable harm to the [moving party] outweighs the potential harm to the [nonmoving party] in granting the injunction." *Tri-Nel Mgt., Inc. v. Bd. of Health of Barnstable*, 433 Mass. 217, 219 (2001); *see also Packaging Indus. Group., Inc. v. Cheney*, 380 Mass. 609, 615-16 (1980). Applying this standard, DePuy Spine and JJRT are entitled to preliminary injunctive relief against Ross and Stryker Biotech.

## ARGUMENT

I.     **DePuy Spine and JJRT are Likely to Succeed on the Merits of Their Claims.**

DePuy Spine and JJRT are likely to succeed on their claim that Ross's employment

with Stryker Biotech is in breach of his non-competition and non-solicitation agreements.

Stryker Biotech competes with DePuy Spine and JJRT in the research, development and

marketing of bone graft products.  Ross possesses high-level confidential information

applicable to his job at Stryker Biotech, which could be used to "enhance the use or

marketability" of Stryker Biotech's products.

A.     The Non-Competition and Non-Solicitation Agreements are Enforceable.

Reasonable non-competition agreements are enforceable under New Jersey law. *Solari*

*Indus., Inc. v. Malady*, 55 N.J. 571, 576, 264 A.2d 53 (1970);  *see also A.T. Hudson & Co.,*

*Inc. v. Donovan*, 216 N.J. Super. 426, 432, 524 A.2d 412 (1987).  A non-competition

agreement is reasonable under New Jersey law "where it simply protects the legitimate

interests of the employer, imposes no undue hardship on the employee, and is not injurious to

the public." *Solari*, 55 N.J. at 576.[3]

1.     *The Agreement Protects Legitimate Business Interests.*

The non-competition and non-solicitation agreements protect DePuy Spine and JJRT's

legitimate interest in preserving the confidentiality of their information and protecting customer

goodwill.  New Jersey courts "'recognize as legitimate the employer's interest in protecting

trade secrets, confidential information, and customer relations.'" *Campbell Soup Co. v.*

---

[3] In addition, New Jersey law allows "blue penciling" (i.e. limiting a restrictive covenant to cure any
unreasonableness in scope). *See Solari*, 55 N.J. at 585; *see also Raven v. A. Klein & Co.*, 195 N.J. Super. 209,
217, 478 A.2d 1208 (App. Div. 1984) (finding non-competition agreement reasonable aside from length of ten
years, and limiting scope to three years).

- 13 -

*Desatnick*, 58 F. Supp. 2d 447, 489 (D.N.J. 1999) (*quoting Ingersoll Rand Co. v. Ciavatta*, 110 N.J. 609, 628, 542 A.2d 879 (1988)).  Employers' right to protect confidential information extends even to "'highly specialized, current information not generally known in the industry, created and stimulated by the research environment furnished by the employer, to which [an] employee has been 'exposed' and 'enriched' solely due to his employment.'" *Campbell Soup*, 58 F. Supp. 2d at 489 (*quoting Ingersoll Rand*, 110 N.J. at 638-39). Protection for customer goodwill extends to information developed about the identity and preferences of customers through the course of employment, even if that information is publicly available. *See e.g. A.T. Hudson*, 2116 N.J. Super at 433;  *Platinum Mgmt. Inc. v. Dahms*, 285 N.J. Super 274, 294-95, 666 A.2d 1028 (Law Div. 1995) (although customer names may be listed in trade publications, their identity is still entitled to protection when divulged in confidence to a key employee subject to a non-solicitation agreement).

      2.    *There Is No Undue Hardship On Ross.*

Hardship on an employee is undue if the restrictions protect more, on balance, than the extent to which the employer has a legitimate interest to protect.  *Coskey's Television & Radio Sales & Serv. v. Foti*, 253 N.J. Super. 626, 636, 602 A.2d 789 (App. Div. 1992).  DePuy Spine and JJRT have an unquestionable interest in protecting against the use of their confidential information and customer goodwill in favor of a competitor.  The non-competition and non-solicitation provisions are narrowly drawn to protect that interest.  The Agreement does not prevent Ross from finding employment in the industry, and does not even prohibit him from undertaking any position with a competitor.  Any hardship on Ross is mitigated, in any case, by the compensation provision, affording Ross one hundred percent of his base salary should he satisfy the requirements of that provision.  *See Campbell Soup*, 58 F. Supp.

- 14 -

2d at 490. ("safety net" provision cushions financial loss to former employee, adding to reasonableness of non-competition agreement).

     *3.*    *The Agreement Is In the Public Interest.*

A non-competition or non-solicitation agreement may be found to be contrary to public interest in cases where there is some "public component" of the industry, such as "rights of the public to have free access to the advice of professionals licensed by the State." *Coskey's Television*, 253 N.J. Super. at 634. Here, there are no public considerations to protect.

     *4.*    *The Agreement Is Reasonable in Time, Scope, and Manner.*

To be reasonable, the geographic and time restrictions of a non-competition agreement must be limited to protect the employer's legitimate interest, under the circumstances, and not unduly interfere with the employee's ability to earn a livelihood. *Ingersoll Rand*, 110 N.J. at 615. Numerous non-competition agreements with durations of eighteen months to three years have been found to be enforceable. *See e.g. A.T. Hudson*, 216 N.J. at 432 (two-years); *Campbell Soup*, 58 F. Supp. 2d at 490-91 (eighteen months); *Mansol Indus.*, 1996 U.S. Dist. LEXIS 22823, at *33 (three-years). Given Ross's extensive confidential knowledge, as well as the competitive nature of the market, an eighteen month restriction is similarly appropriate and reasonable. The application of the non-competition covenant within Massachusetts, when the products are marketed worldwide, is also presumptively reasonable.

B.   Ross's Employment with Stryker Biotech Will Breach the Non-Competition and Non-Solicitation Provisions of the Agreement.

1.   *There is a High Likelihood that DePuy Spine and JJRT Prevail on their Claim that Ross's Employment Breaches the Non-Competition Agreement.*

DePuy Spine and JJRT have a high likelihood of success of prevailing on their claim that Ross's employment with Stryker Biotech constitutes a breach of the non-competition agreement. Ross possesses a wide variety of high-level "Confidential Information," as that term is defined in the Agreement. Stryker Biotech qualifies as a "Conflicting Organization" because it markets and develops "Conflicting Products." Stryker Biotech's OP-1 bone graft and disc regeneration products constitute "Conflicting Products" because they "resemble or compete" with both the commercialized and developmental products of DePuy Spine. Like DePuy Spine's current and developmental bone graft products, Stryker Biotech's OP-1 Putty is used for bone grafting in spinal fusion surgeries. Both DePuy Spine's and Stryker Biotech's products facilitate bone regeneration in the spine and can be used in connection with or in lieu of allografts. In addition, DePuy Spine's and Stryker Biotech's BMP bone graft and disc regeneration products utilize the same biologic approach. Stryker Biotech's and DePuy Spine's bone graft and disc regeneration product portfolio resemble and compete with each other.

Ross's employment at Stryker Biotech will be in breach of Section 6 of the Agreement because "the services [he] may provide could enhance the use or marketability of a CONFLICTING PRODUCT by application of CONFIDENTIAL INFORMATION." Ross can use the confidential business information in a multitude of ways. He could use his knowledge of DePuy Spine's strategic business plans, marketing plans or newly restructured distribution system to tailor the marketing plan he develops for Stryker Biotech products in

- 16 -

order to improve market success.  Ross's knowledge of DePuy Spine's core marketing message and product positioning strategy is also directly applicable to his new job.  When providing input into the marketing aspects of Stryker Biotech's L&A decisions, Ross can employ his knowledge of DePuy Spine's and JJRT's L&A activities, including their decisions with respect to pursuing or abandoning any opportunity.  Ross's knowledge of DePuy Spine's product pipeline plan, with information about product launches, product roadmaps and prioritization, could also be utilized to enhance his efforts to manage product launches, commercialization timelines and timelines for clinical trials to advantage Stryker Biotech.  In addition, Ross could use confidential information regarding key surgeon opinion leaders obtained from DePuy Spine to enhance his efforts to convince such surgeons to work with Stryker Biotech.

The facts of this case bear strong resemblance to those in *Campbell Soup Co. v. Desatnick*, 58 F. Supp. 2d 477, 489 (D.N.J. 1999), where a senior level executive was enjoined from using high-level business information to advance a competitor's business.  The defendant in *Campbell Soup* was a high ranking advertising executive who, aside from his direct responsibilities in advertising, sat on Campbell's Leadership Group, which met monthly to discuss strategic planning, financial performance, financial forecasting, and resource allocation while planning and managing the company's overall business and performance.  *Id.* at 482.  Significantly, defendant had recently participated in meetings concerning Campbell's new advertising plans for its soup brands, as well as the formulation of position brands in the market, internal resource allocation, pricing strategies, and analyses of brand strengths and vulnerabilities.  *Id.* at 483.  According to the court, defendant "has been privy to some of the most guarded corporate strategic secrets over the past two years,

including much that is not public and may never become public." *Id.* at 485. The court

enforced the non-competition agreement as defendant had been exposed to "a considerable

amount of information of the type that is entitled to protection under New Jersey law," and

Campbell's had a legitimate business interest in preventing defendant from using this

information to its disadvantage on behalf of a direct competitor under New Jersey law. *Id.* at

491. That is the exact situation presented here. Ross's position at Stryker Biotech falls

squarely within the non-competition provision.

> 2.   *There is High Likelihood that DePuy Spine and JJRT Will Prevail on their Claim that Ross's Employment Will Breach the Non-Solicitation Agreement.*

DePuy Spine and JJRT also have a high likelihood of success in proving that Ross's

employment with Stryker Biotech violates the non-solicitation provision of the Agreement.

Section 7 prohibits Ross from "directly or indirectly, help[ing] others to solicit business from

or render service or sell to, any of the accounts, customers or clients with whom I have had

contact during the last twelve (12) months of my employment with the COMPANY." In the

last twelve months of his employment, Ross made quarterly sales visits to key surgeon

customers and had contact with key surgeon opinion leaders. As a result, he is barred from

employment which would involve the creation and implementation of a marketing plan which

assists the sales force in soliciting these surgeon customers. *See e.g. Lamorte Burns & Co. v.

Walters,* 167 N.J. 285, 292-309, 770 A.2d 1158 (2001) (enforcing non-solicitation agreement);

*Platinum Management,* 285 N.J. Super. at 294-95 (non-solicitation agreement valid as it

protected plaintiff's legitimate interest in customer relations). Given that Ross will have

company-wide responsibility for the marketing plan, he cannot cure this potential breach by

limiting his physician contacts.  By virtue of managing Stryker Biotech's marketing plan which will be targeted to these surgeons, he is in violation of Section 7 of the Agreement.

## II.    DePuy Spine and JJRT Will Suffer Irreparable Harm If the Injunction Is Not Issued.

Ross specifically agreed that a breach of the non-competition agreement would cause DePuy Spine "irreparable injury" not properly compensable by damages in an action at law. Agreement, § 5.  This recitation alone shows irreparable harm.  *See EMC Corp. v. Kempel*, 2001 WL 1763451, at *4 (Mass. Super. Ct. Nov. 20, 2001) (van Gestel, J.) (accepting recitation of irreparable harm at face value).  In addition, irreparable harm can be established through potential disclosure of confidential information.  *See Shipley*, 728 F. Supp. at 827; *Edgecomb v. Edmonston*, 257 Mass. 12, 18-20 (1926);  *Darwin Partners, Inc. v. Signature Consultants LLC*, 2000 Mass. Super. LEXIS 614, at *15 (Burnes, J.).  DePuy Spine and JJRT will suffer immediate and irreparable harm if Ross assumes his new position because, despite any intention to the contrary, he will inevitably utilize confidential information in performing his duties.  *See Nat'l Starch & Chem. Corp. v. Parker Chem. Corp.*, 219 N.J. Super. 158, 162, 530 A.2d 31 (App. Div. 1987) (finding sufficient likelihood of "inevitable disclosure" if former employee went to work for direct competitor, which would cause plaintiff irreparable harm);  *Campbell Soup*, 58 F. Supp. 29 at 489-90 (finding violation of non-competition agreement based on extent of relevant confidential information known by defendant without a showing of intent to disclose).  Ross possesses the highest-level of confidential information of DePuy Spine and JJRT, central to their ability to compete.  Even a minimal or unintended disclosure of this information will disadvantage these companies in the marketplace.

III.    **The Balance of Harms Favors DePuy Spine and JJRT .**

If a preliminary injunction were to enter, Ross would suffer, at most, the minimal harm of a delay in starting his employment.  Such a delay, or even the inability to undertake a particular job, does not, standing alone establish "undue hardship." *See e.g. Marine Contractors Co. Onc. v. Hurley*, 365 Mass. 280, 288-89 (1974); *Philips Elecs. N. Am. Corp.*, 2000 Mass. Super. LEXIS 574 at *14-15.  In contrast, DePuy Spine and JJRT will be irreparably harmed and unfairly disadvantaged by the use of its confidential information in favor of a competitor.  Public interest considerations also favor the entry of the injunction because "[i]t is in society's best interest to recognize and enforce agreements which were voluntarily entered into and accepted." *New England Circuit Sales, Inc. v. Randall*, 1996 WL 1171929, *3 (D. Mass. June 4, 1996).

## CONCLUSION

For the reasons stated above, DePuy Spine and JJRT request that this Court issue a preliminary injunction in the form set forth in their Motion, or, alternatively, enter a temporary restraining order as requested therein.

> DEPUY SPINE, INC. and JOHNSON
> & JOHNSON REGENERATIVE
> THERAPEUTICS, LLC,
>
> By their attorneys,
>
> Kathryn K. Conde (BBO#634347)
> Rebecca L. Sipowicz (BBO#650715)
> NUTTER, MCCLENNEN & FISH LLP
> World Trade Center West
> 155 Seaport Boulevard
> Boston, MA  02210
> (617) 439-2000

Dated:  April 6, 2007

1618958.6

- 20 -



●DePuy Spine.
a *Johnson-Johnson* company

325 Paramount Drive
Raynham, MA 02767
Direct Dial: (508) 828-3725
e-mail: jross4@dpyus.jnj.com

G. Joseph Ross
WW Vice President, New Business Development

19 March 2007

Gary Fischetti
President

Dear Gary,

It is with mixed emotions and some sadness that I wish to inform you of my desire to resign my position with DePuy Spine, effective March 30, in order to pursue other career opportunities. It has been both a pleasure and a privilege over the past eleven years to represent DePuy and Johnson & Johnson, and I am thankful for the experiences provided by my association with the corporation. DePuy Spine today employs a fantastic team of highly professional, capable and motivated individuals dedicated to the task of successfully completing the turn-around course that you have charted. I have enjoyed working with you and the rest of the management board whom I hold in the highest professional and personal regard.

I would be remiss if I did not mention a couple of the factors that led to my willingness to consider career alternatives. As you know, I have felt that DePuy Spine has been under-resourced for a number of years now with regard to the internal and L&A pipeline in what is an extremely competitive and quickly moving market. As our performance deteriorated over time, our ability to execute was hampered by the ever-increasing amount of time and human resources required for analyzing, planning, updating, documenting and justifying. I believe that we have not been executing as efficiently as many of our competitors, creating a performance gap that is difficult to close in light of our necessary financial metrics. More recently, while I take great pride in our ability to thoroughly evaluate and prioritize target L&A opportunities, the approval process that must be navigated has proven to be wearying and hinders our ability to remain competitively in pursuit of identified opportunities.

I am confident that the strategic plan in place today has set the stage for a return to market and above growth, and that the turn-around will be successfully executed. I will always treasure my time with DePuy Spine and I maintain great respect for the company and the corporation. I want to thank you personally for the support that you have provided my team and please accept my best wishes for future success.

Best regards,

G. Joseph Ross

cc: Kate McDaniel

GJR



July 26, 2005

Joe Ross
10 Hickory Ridge Road
Rehoboth, MA 02769

RE: **OFFER LETTER- PROMOTION**

Dear Joe,

I am very pleased to offer you the position of World Wide Vice President, New Business Development, reporting to Earl Fender. This position represents a promotion for you and therefore your new annual salary will be $205,000. Please note that you will continue to be eligible for the Executive Compensation Bonus Program for the year 2005.

This offer is contingent upon the execution of an Employee Secrecy Agreement with covenant against conflicting employment. This offer letter constitutes our complete offer package to recognize your new responsibilities.

DePuy Spine, Inc. maintains an employment-at-will relationship with its employees. This means that both you and the Company retain the right to terminate this employment relationship at any time and for any reason.

Any promises or representations, either verbal or written, that are not contained in this letter are not valid and are not binding on the Company.

Kindly acknowledge your acceptance of this offer by signing below and returning this to my attention as soon as possible.

Congratulations and best wishes on your new position.

Very truly yours,

Glenn Wernbolt
Director, Human Resources

*Agreed & Accepted*

Joe Ross                                    27 July, 2005
                                                    Date



## EMPLOYEE SECRECY, NON-COMPETITION
## AND NON-SOLICITATION AGREEMENT

G. Joseph Ross
_____
Name
10 Hickory Ridge Rd
_____
Address
Rehoboth MA 02769
_____
City/State/Zip

### DEFINITIONS

As used in this Agreement:

**the COMPANY** means DePuy Spine, and JOHNSON & JOHNSON and any of their successors or assigns, purchasers, acquirers, and any of their existing and future subsidiaries, divisions or affiliates, including any such subsidiary, division or affiliate of Johnson & Johnson to which I may be transferred or by which I may be employed in the future. Affiliates of the COMPANY are any corporation, entity or organization at least 50% owned by the COMPANY, by Johnson & Johnson or by any subsidiary of Johnson & Johnson.

**I** means the employee whose name appears above, also referred to by the use of first person pronouns, such as me and my.

**INVENTIONS** means discoveries, improvements and/or ideas, whether patentable or not.

**CONFIDENTIAL INFORMATION** means information disclosed to me or known by me as a result of my employment by the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, about products, processes, machines, customers, clients, employees and services of the COMPANY, including, but not limited to, inventions, research, development, manufacturing, purchasing, finance, data processing, engineering, marketing, merchandising, selling, sales volumes and strategies, number and location of sales representatives, names and significance of the COMPANY's customers and clients and their employees and representatives, preferences, needs and requirements, purchasing histories, and other customer or client-specific information, and comparable information about the products, processes, machines, customers, clients and services of affiliates of the COMPANY acquired by me during my employment by the COMPANY.

**CONFLICTING PRODUCT** means any product, process, machine, invention or service of any person or organization other than the COMPANY in existence or under development which resembles or competes with a product, process, machine, invention or service upon which I shall have worked or about which I become knowledgeable as a result of employment with the COMPANY and whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION which I shall have had access to during my employment.

**CONFLICTING ORGANIZATION** means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a CONFLICTING PRODUCT.

I recognize that the business in which the COMPANY is engaged is extremely competitive and that the COMPANY will be providing me with CONFIDENTIAL INFORMATION both at the commencement of my employment and thereafter and may also be providing me with the opportunity to contribute to the creation of CONFIDENTIAL INFORMATION, which will assist both the COMPANY and me in competing effectively. I recognize that CONFIDENTIAL INFORMATION is significant to the COMPANY'S competitive position and that the COMPANY therefore expects me to keep it secret and also expects me not to compete with the COMPANY during my employment and for a period of time thereafter.

Accordingly, in consideration of the receipt of CONFIDENTIAL INFORMATION, my employment or the continuation of my employment by the COMPANY, and the benefits being provided to me pursuant to paragraph 9:

1. I agree to disclose promptly to the COMPANY all INVENTIONS conceived or made by me whether or not during my hours of employment or with the use of the COMPANY's facilities, materials or personnel, either solely or jointly with another or others during my employment with the COMPANY, and related to the actual or anticipated business or activities of the COMPANY, or related to its actual or anticipated research and development or suggested by or resulting from any task assigned to me or work performed by me for, or on behalf of, the COMPANY. I assign and agree to assign my entire right, title and interest therein to the COMPANY. I will not assert any rights under or to any INVENTIONS as having been made or acquired by me prior to my being employed by the COMPANY unless such INVENTIONS are identified on a sheet attached hereto and signed by me and the COMPANY as of the date of this Agreement.

2. I recognize that all works, including, but not limited to reports, computer programs, drawings, documentation and publications, which I prepare within the scope of my employment with the COMPANY, shall be works made for hire and that the worldwide copyrights therein shall be the sole and exclusive property of the COMPANY. I will promptly and fully disclose all such works to the COMPANY.

3. I shall, whenever requested to do so by the COMPANY, execute any applications, assignments or other instruments which the COMPANY shall consider necessary to apply for and obtain Letters Patent, trademark and/or copyright registrations in the United States, or any foreign country, or to protect otherwise the COMPANY's interests. These obligations shall continue beyond the termination of my employment with the COMPANY with respect to INVENTIONS, trademarks or copyrightable works conceived, authored or made by me during my period of employment, and shall be binding upon my executors, administrators, or other legal representatives.

4. I shall not disclose to the COMPANY or induce the COMPANY to use any secret, proprietary or confidential information or material belonging to others, including my former employers, if any. I am aware of no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would in any way restrict, limit or prohibit my employment by the COMPANY that I have not disclosed and provided to the COMPANY.

5. I recognize that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a CONFLICTING ORGANIZATION, will cause immediate irreparable injury to the COMPANY. Unless I first secure the COMPANY's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION. I understand and agree that my obligations not to disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION shall continue after termination of my employment for any reason.

6. During my employment with the company and for a period of eighteen (18) months after termination of my employment with the COMPANY for any reason, I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States, or in any foreign country or territory in which the services I may provide could enhance the use or marketability of a CONFLICTING PRODUCT by application of CONFIDENTIAL INFORMATION which I shall have had access to during my employment, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION, provided that the COMPANY, prior to my accepting such employment, shall receive separate written assurances satisfactory to the COMPANY from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly, for an 18-month period, in connection with any CONFLICTING PRODUCT.

7. I recognize that the COMPANY's relations with its accounts, customers and clients represents an important business asset that results from the COMPANY's significant investment of its time and resources. I further recognize that by virtue of my employment by the COMPANY, I have gained or may gain relationships with the accounts, customers and clients of the COMPANY, and because of such relationships, I could cause the COMPANY great loss, damage, and immediate irreparable harm, if, during my employment by the COMPANY or subsequent to the termination of such employment for any reason, I should for myself or on behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a product or service that could compete with a product or service being sold or developed by the COMPANY. I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not solicit any business from, sell to, or render any service to, or, directly or indirectly, help others to solicit business from or render service or sell to, any of the accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY, for any purpose related to the sale of any such product or service. I also agree that for a period of twelve (12) months after termination of employment with the COMPANY for any reason, I will not solicit or hire on my own behalf, or on behalf of others, any COMPANY employee.

8. To enable the COMPANY to monitor my compliance with the obligations imposed by this Agreement, I agree to inform the COMPANY, at the time I give notice of my termination of employment, of the identity of my new employer and of my job title and responsibilities, and will continue to so inform the COMPANY, in writing, any time I change employment during the eighteen (18) months following termination of my employment by the COMPANY for any reason.

9. If I am unable to obtain employment consistent with my training and education solely because of a prohibition of paragraph 6 or 7 of this Agreement, or if I am able to obtain only a position in which my gross monthly income is less than what I last received from the Company as regular monthly base pay (exclusive of extra compensation and employee benefits), then any prohibition of those paragraphs that caused me to be unable to obtain such employment (or that is responsible for the above-referenced differential in pay) shall bind me only as long as the Company shall make payment to me equal to the lesser of (a) the amount last received from the Company as regular monthly base pay, or (b) the difference between the amount I last received from the Company as regular monthly base pay and the gross monthly income that I am receiving in any subsequent employment.

10. In order to qualify for the payments provided for in paragraph 9 above, I understand that I must, for each month that I claim payment is due, represent to the Vice President of Human Resources of the Company, in writing within fifteen (15) days following the end of that calendar month, that although I diligently sought employment consistent with my training and education, I was unable to obtain it, or was unable to attain a position in which my gross monthly income equaled my last regular monthly base pay at the Company, as the case may be, solely because of a prohibition of paragraph 6 or 7 of this Agreement. I must also promptly submit such further information as the Company may request to enable it to verify the accuracy of my representation. I understand that the Company

- 2 -

Revised 7/26/05

[28 of 29]

shall, at its option, be relieved of making a monthly payment to me for any month with respect to which I have failed to comply with a requirement of this paragraph 10.

11. I further understand that if, at any time within the period of prohibition specified in paragraph 6 or 7, the Company gives me a written release from the prohibition of paragraph 6 or 7 that has been the sole cause of my inability to obtain employment consistent with my training and education or my inability to obtain a position in which my gross monthly income equals my last regular monthly base pay at the Company, as the case may be, then, the Company will no longer be obligated to make the payments that had been required due to those prohibitions.

12. Upon termination of my employment with the COMPANY, either prior to or upon my retirement, I shall turn over to a designated individual employed by the COMPANY, all property then in my possession or custody and belonging to the COMPANY, including any computer equipment. I shall not retain any copies of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents, including electronic information and property, relating in any way to the affairs of the COMPANY and which were entrusted to me or obtained by me at any time during my employment with the COMPANY.

13. I understand and acknowledge that if I violate this Agreement or am about to violate this Agreement by accepting employment or providing services prohibited by paragraph 6 or 7 above, the COMPANY shall have the right, and be entitled to, in addition to any other remedies it may have, injunctive relief; in other words, I understand and acknowledge that the COMPANY can bar me from accepting such employment or rendering such services for the periods specified in paragraphs 6 and 7 above.

14. I hereby consent and agree to assignment by the COMPANY of this Agreement and all rights and obligations hereunder including, but not limited to, an assignment in connection with any merger, sale, transfer or acquisition by the COMPANY or relating to all or part of its assets, divisions and/or affiliates.

15. Nothing herein shall limit or reduce my common law duties to the COMPANY, including but not limited to my duty of loyalty.

16. This Agreement shall be interpreted according to the laws of the State of New Jersey without regard to the conflict of law rules thereof. I agree that any action relating to or arising out of this Agreement may be brought in the courts of the State of New Jersey or, if subject matter jurisdiction exists, in the United States District Court for the District of New Jersey. I consent to personal jurisdiction and venue in both such courts and to service of process by United States Mail or express courier service in any such action.

17. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.

18. The following applies only to a California, Minnesota or North Carolina employee: Notification is hereby given that paragraph 1 does not apply to an invention to the extent that no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely by me on my own time, and (a) which does not relate (i) to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by me for the COMPANY.

19. The following applies only to a State of Washington employee: Notification is hereby given that paragraph 1 does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely on my own time, unless (a) the invention relates (i) directly to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by me for the COMPANY.

20. Nothing contained in this Agreement shall be deemed to confer on me any rights with respect to the duration of my employment with the COMPANY. I UNDERSTAND AND AGREE THAT MY EMPLOYMENT RELATIONSHIP WITH THE COMPANY IS TERMINABLE AT WILL BY EITHER THE COMPANY OR ME, WITH OR WITHOUT CAUSE, EXCEPT THAT IF I INITIATE THE TERMINATION, THERE SHALL BE, AT THE COMPANY'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER I GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. If the Company elects to continue my employment during the notice period, it shall advise me of that fact, and of the duration of the notice period. During any notice period, I will provide such transitional services as the Company may request. The Company will be obligated to pay me my full base salary during the notice period, and my duty of loyalty to the Company shall continue through such period.

I ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, and agree that with respect to the subject matter hereof it is my entire agreement with the COMPANY, superseding any previous oral or written communications, representations, understandings, or agreements with the COMPANY or any of its officials or representatives.

DATE: 27 July 2005          EMPLOYEE SIGNATURE _____