# EXHIBIT 5

Nutter

**Kathryn K. Conde**
Direct Line: 617-439-2420
Fax: 617-310-9420
E-mail: kconde@nutter.com

April 5, 2007
12055-

**BY HAND**
Clerk for Civil Business
Suffolk County Courthouse
Three Pemberton Square
Boston, MA 02108

Re: DePuy Spine, Inc. and Johnson & Johnson Regenerative Therapeutics, LLC v. Stryker Biotech, L.L.C. and G. Joseph Ross

Dear Madam/Sir:

In connection with the above-referenced matter, enclosed for filing are the following documents:

1. Complaint;
2. Plaintiff's Motion for Special Process Server;
3. Civil Action Cover Sheet; and,
4. Check for filing fee: $ 240.00.

Kindly date stamp the enclosed copy of the Complaint and return it to my waiting messenger.

Thank you for your assistance.

Very truly yours,

Kathryn K. Conde

KKC/jab
Enclosures

bcc: Catherine W. Smith, Esquire (*via electronically*)
Greg Maloblocki, Esquire (*via electronically*)
Rebecca L. Sipowicz, Esquire (w/enc.)

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
BUSINESS LITIGATION SESSION

DEPUY SPINE, INC. and
JOHNSON & JOHNSON REGENERATIVE
THERAPEUTICS, LLC

Plaintiffs,

v.

STRYKER BIOTECH L.L.C. and
G. JOSEPH ROSS,

Defendants.

C. A. No.

**COMPLAINT AND JURY DEMAND**

In this action, Plaintiffs seek an injunction and an award of money damages against G. Joseph Ross, a former employee of Plaintiff DePuy Spine, Inc. ("DePuy Spine") and his purported employer, Stryker Biotech L.L.C. ("Stryker Biotech"), for breach of Ross's non-competition and non-solicitation agreements with Plaintiffs.

**PARTIES**

1. Plaintiff, DePuy Spine, is a Massachusetts corporation with a principal place of business in Raynham, Massachusetts. DePuy Spine is one of the Johnson and Johnson family of companies.

2. Plaintiff, Johnson & Johnson Regenerative Therapeutics ("JJRT"), is a Massachusetts limited liability corporation with a principal place of business in Raynham, Massachusetts.

3. Defendant, Ross, is an individual who resides at 10 Hickory Ridge Road, Rehoboth, Massachusetts.

4. Defendant, Stryker Biotech, is a Michigan limited liability corporation, authorized to do business in Massachusetts, with a principal place of business at 35 South Street, Hopkinton, Massachusetts.

## JURISDICTION AND VENUE

5. This Court has jurisdiction over the parties pursuant to G.L. c. 223A.

6. Pursuant to the rules of the Business Litigation Session, this case presumptively qualifies for hearing before the BLS because it includes claims involving a restrictive covenant.

7. Pursuant to Administrative Directive No. 03-1, venue is appropriate in Suffolk County for inclusion in the Business Litigation Session as this case would otherwise have venue in Middlesex County.

8. Venue is also appropriate in Suffolk County because this case requests injunctive relief against the threatened misappropriation of trade secrets.

## FACTS COMMON TO ALL COUNTS

***Business of DePuy Spine, JJRT, and Stryker Biotech***

9. DePuy Spine manufactures, distributes and markets products that are used to treat spinal disorders and injuries. DePuy Spine's products include plastic and metal hardware, such as spinal implant and external fixation devices, and bone graft products, also called orthobiologic products.

10. Spinal implant products include interbody fusion cages, plates, and rods, as well as the highly specialized screws used to affix these objects to human bone. Spinal implant products are used in spinal surgeries to mechanically stabilize and fuse together segments of the spine.

11. In most spinal fusion surgeries, a bone graft is performed in conjunction with the implantation of such devices, to facilitate bone growth in order to reinforce the bone fusion and to strengthen the spine. When the bone graft is performed by transplanting bone into the spine from another part of the patient's body, it is called an autograft. In lieu of or in conjunction with an autograft, surgeons utilize bone graft products of the sort sold by DePuy Spine and others, to facilitate bone regeneration in the spine.

12. DePuy Spine currently markets a variety of bone graft products. It also has a number of bone graft products in development.

13. DePuy Spine markets and sells its spinal implant and bone graft products through a single distribution scheme to surgeons and purchasing agents for hospitals and clinics. The same surgeons and purchasing agents who purchase spinal implant products also purchase bone graft products.

14. Research and development for DePuy Spine is performed by JJRT. JJRT currently has a number of bone graft products in development for DePuy Spine, including a bone graft product and a disc regeneration product, utilizing bone morphogenetic proteins.

15. Defendant, Stryker Biotech, competes with DePuy Spine in the bone graft business. It currently has two bone graft products under development called OP-1 Implant and OP-1 Putty which are composed of bone morphogenetic proteins. These products are available to a limited number of patients pursuant to a Humanitarian Device Exemption. Stryker Biotech has other similar products under development.

16. Stryker Spine is an affiliate of Stryker Biotech and sells spinal implant products in competition with DePuy Spine. Both Stryker Biotech and Stryker Spine are subsidiaries of Stryker Corporation.

***Ross's Employment Agreement With DePuy Spine***

17. Ross has been employed by DePuy Spine since November 1995 in various sales and marketing positions and, most recently, in licensing and acquisition for new product development. In July 2005, Ross was promoted to his most recent position as Worldwide Vice President, New Business Development. As a condition of that promotion, Ross re-executed an Employee Secrecy, Non-Competition and Non-Solicitation Agreement (the "Agreement") on or about July 27, 2005. A true and correct copy of the Agreement and promotion letter are attached hereto as Exhibit A.

18. The Agreement acknowledges Ross's receipt of confidential information as follows:

> I recognize that CONFIDENTIAL INFORMATION is significant to the COMPANY'S competitive position and that the COMPANY therefore expects me to keep it secret and also expects me not to compete with the COMPANY during my employment and for a period of time thereafter.

19. Section 6 of the Agreement prohibits Ross from competing with DePuy Spine or certain Johnson and Johnson companies following his termination as follows: "[F]or a period of eighteen (18) months after termination of my employment with the Company for any reason I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION ... in which the service I may provide could enhance the use or marketability of a CONFLICTING PRODUCT by application of CONFIDENTIAL INFORMATION which [I] shall have had access to during [my] employment."

20. Section 7 of the Agreement also contains a non-solicitation provision which provides:

> I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not solicit any business from, sell to, or render any service, or directly or indirectly, help others to solicit business from or render service or sell to, any of the accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY, for any purpose related to the sale of any such product or service.

21. The Agreement is enforceable by DePuy Spine and JJRT.

22. Stryker Biotech is a "Conflicting Organization" under the Agreement. Stryker Biotech's OP-1 products and its other products in development constitute "Conflicting Products" under the Agreement.

***Ross's Resignation and Intended Employment at Stryker Biotech***

23. By letter dated March 19, 2007, Ross tendered his resignation. Ross indicated that he had accepted a position with DePuy Spine's competitor, Stryker Biotech, as Vice-President of Marketing.

24. In that position, Ross will be responsible for worldwide business development and marketing of Stryker Biotech's OP-1 bone graft products as well as similar products under development, including its disc regeneration product. He will be responsible for developing and implementing a marketing strategy for these bone graft products. As part of his overall responsibilities, Ross will develop market and product forecasts, pricing and reimbursement strategies, product positioning and core marketing messages. He will be responsible for product launches and for providing commercial leadership on product life cycle strategies and will be interacting with key surgeon opinion leaders to develop input for Stryker Biotech's marketing plan. He will also advise Stryker Biotech regarding licensing and acquisition and product development issues related to marketing. On information and belief, Ross will consult with Stryker Spine regarding its marketing of spinal implant products. A true and correct copy of Ross's job description is attached hereto as Exhibit B.

25. At the time that Stryker Biotech hired Ross, it knew that Ross was subject to a non-competition and non-solicitation agreement. Stryker Biotech reviewed the Agreement in advance of offering to hire Ross. Stryker Biotech's hiring of Ross was in knowing violation of Ross's Agreement with JJRT and DePuy Spine.

***Ross's Access to DePuy Spine's and JJRT's Confidential Information and Trade Secrets.***

26. Prior to his resignation, Ross served on DePuy Spine's senior executive team, as Worldwide Vice President of New Business Development. In that position, Ross had extensive access to confidential information and trade secrets concerning bone graft and spinal implant products.

27. As Worldwide Vice President of New Business Development, Ross was responsible for identifying new product opportunities in the area of orthobiologic and spinal implant products to be pursued through licensing or acquisition. Ross reviewed license and acquisition opportunities concerning bone graft and spinal implant products. He possesses confidential information concerning DePuy Spine's and JJRT's evaluation of those opportunities.

28. Ross served on the DePuy Spine Management Board and a number of committees responsible for discrete aspects of the company's management. The Management Board manages all aspects of DePuy Spine's business under the direction of the company President. In the course of his duties on the Board and committees, Ross obtained confidential information concerning DePuy Spine's customers, strategic plans, marketing strategies, sales and financial information, distribution structure and new product development.

29. During the course of his employment with DePuy Spine, Ross obtained confidential information about key surgeon opinion leaders and surgeon customers and developed relationships with these surgeon opinion leaders and other surgeon customers.

30. In his position as Stryker Biotech's Vice President of Marketing, Ross will be rendering service to a competitor of DePuy Spine in a manner in which his knowledge of JJRT's and DePuy Spine's "Confidential Information" could enhance the use or marketability of Stryker Biotech's products. The nature of his responsibilities for Stryker Biotech will cause Ross inevitably to disclose DePuy Spine's confidential information and trade secrets. Ross will also be rendering service to a DePuy Spine competitor to directly or indirectly assist it to sell competing products to surgeon customers with whom Ross had contact in the twelve months prior to his resignation. Ross's intended employment at Stryker Biotech will violate

the Agreement.

**COUNT I**
(Breach of the Employee Secrecy, Non-Competition and Non-Solicitation Agreement - Ross)

31. The allegations contained in Paragraphs 1-30 above are incorporated by reference as if fully stated herein.

32. DePuy Spine has fully performed any obligations to Ross under the parties' Agreement.

33. Ross possesses information which constitutes Confidential Information under the Agreement.

34. Stryker Biotech is a Conflicting Organization under the Agreement.

35. Ross's employment at Stryker Biotech is a breach of the non-competition covenant of the Agreement.

36. Ross's employment at Stryker Biotech is a breach of the non-solicitation covenant of the Agreement.

37. Ross's breach of the Agreement presents an immediate threat of irreparable harm to DePuy Spine and JJRT. In addition, Ross has caused DePuy Spine and JJRT to suffer damages in an amount to be determined at trial.

**COUNT II**
(Intentional Interference With Contractual Relations - Stryker Biotech)

38. The allegations contained in Paragraphs 1-37 above are incorporated by reference as if fully stated herein.

39. Stryker Biotech knew of Ross's contractual obligations to DePuy Spine and JJRT.

40. Stryker Biotech's hiring of Ross is in violation of Ross's contractual obligations to DePuy Spine and JJRT.

41. Stryker Biotech's hiring of Ross was improper in motive or means.

42. Stryker Biotech's unlawful interference has caused and continues to cause substantial damage and irreparable harm to DePuy Spine and JJRT.

**COUNT III**
(G.L. c. 93A – Stryker Biotech)

43. The allegations contained in Paragraphs 1-42 above are incorporated by reference as if fully stated herein.

44. Each of DePuy Spine, JJRT and Stryker Biotech is engaged in trade or commerce.

45. By its above-described actions, Stryker Biotech has engaged in unfair or deceptive acts or practices within the meaning of G.L. c. 93A, § 2.

46. Stryker Biotech's actions were knowing and willful.

47. Stryker Biotech's unfair or deceptive actions or practices have caused and continue to cause irreparable harm and substantial damage to DePuy Spine and JJRT.

**COUNT IV**
(Misappropriation of Trade Secrets and Confidential Information – Ross and Stryker Biotech)

48. The allegations contained in paragraphs 1-47 above are incorporated by reference as if fully stated herein.

49. Ross's employment by Stryker Biotech will result in Ross's inevitable disclosure and use of DePuy Spine's and JJRT's trade secrets and confidential information.

50. The disclosure and use of such information by Ross and Stryker Biotech constitutes a misappropriation of trade secrets and confidential information in violation of common law and G.L. c. 93, §§ 42 and 42A.

51. DePuy Spine and JJRT will suffer substantial, immediate, and irreparable harm and damages unless Ross and Stryker Biotech are enjoined from disclosing and using such trade secrets and confidential business information.

**COUNT V**
(Breach of the Duty of Loyalty - Ross)

52. The allegations contained in Paragraphs 1-51 above are incorporated by reference as if fully stated herein.

53. Ross was employed by DePuy Spine in a position of trust and confidence, and he therefore owes a duty of loyalty to DePuy Spine.

54. Ross has access to the trade secrets and confidential information of DePuy Spine.

55. DePuy Spine took reasonable steps to prevent its trade secrets and confidential information from disclosure, including, *inter alia*, requiring Ross to execute the Agreement as a condition of his employment at DePuy Spine and immediately revoking his access to such information when he announced his resignation.

56. Ross's employment by Stryker Biotech will result in Ross's inevitable disclosure of DePuy Spine's trade secrets and confidential information and will damage and irreparably harm DePuy Spine, in breach of Ross's duty of loyalty to DePuy Spine.

## RELIEF REQUESTED

WHEREFORE, Plaintiffs, DePuy Spine and JJRT, request that the Court grant the following relief:

(a) enter a preliminary injunction that, for a period of eighteen months from terminating his employment or until further notice, Defendant, G. Joseph Ross, be enjoined from:

(i) employment by Stryker Biotech L.L.C., as Vice President of Marketing, or in any other capacity involving sales, marketing, research and development, or licensing and acquisition; and

(ii) disclosing or using any confidential information of DePuy Spine or JJRT that he gained during the course of his employment with DePuy Spine.

(b) enter a preliminary injunction that, for a period of eighteen months from Ross's termination of his employment or until further notice, Defendant, Stryker Biotech L.L.C., be enjoined from:

(i) employing G. Joseph Ross, as its Vice President of Marketing, or in any other capacity involving sales, marketing, research and development or licensing and acquisition; and

(ii) soliciting or using any of DePuy Spine's or JJRT's confidential information from Ross.

(c) after trial on the merits,

(i) enter judgment in favor of DePuy Spine and JJRT on Counts I, II, III, and IV of the Complaint;

(ii) enter judgment in favor of DePuy Spine on Count V of the Complaint;

(iii) award all monetary damages determined at trial;

(iv) award multiple damages and attorney's fees pursuant to G.L. c. 93A;

(v) enter permanent injunctions in the form set out in paragraphs (a) and (b) above;

(vi) award DePuy Spine and JJRT their attorney's fees, interest, and costs; and

(vii) award such other relief as this Court deems just and proper.

**DEMAND FOR JURY**

DePuy Spine and JJRT request a trial by jury on all issues so triable.

DEPUY SPINE, INC. and JOHNSON & JOHNSON REGENERATIVE THERAPEUTICS, LLC,

By their attorneys,

Kathryn K. Conde

Kathryn K. Conde (BBO#634347)
Rebecca L. Sipowicz (BBO#650715)
NUTTER, MCCLENNEN & FISH LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210
(617) 439-2000

Date: April 5, 2007

1616679.2

# EXHIBIT A

**DePuySpine**
a Johnson & Johnson company

July 26, 2005

Joe Ross
10 Hickory Ridge Road
Rehoboth, MA 02769

RE: **OFFER LETTER- PROMOTION**

Dear Joe,

I am very pleased to offer you the position of World Wide Vice President, New Business Development, reporting to Earl Fender. This position represents a promotion for you and therefore your new annual salary will be $205,000. Please note that you will continue to be eligible for the Executive Compensation Bonus Program for the year 2005.

This offer is contingent upon the execution of an Employee Secrecy Agreement with covenant against conflicting employment. This offer letter constitutes our complete offer package to recognize your new responsibilities.

DePuy Spine, Inc. maintains an employment-at-will relationship with its employees. This means that both you and the Company retain the right to terminate this employment relationship at any time and for any reason.

Any promises or representations, either verbal or written, that are not contained in this letter are not valid and are not binding on the Company.

Kindly acknowledge your acceptance of this offer by signing below and returning this to my attention as soon as possible.

Congratulations and best wishes on your new position.

Very truly yours,

Glenn Wambolt
Director, Human Resources

*Agreed & Accepted*

Joe Ross

27 July, 2005
Date

DePuySpine™
a Johnson & Johnson company

**EMPLOYEE SECRECY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT**

G. Joseph Ross
Name
10 Hickory Ridge Rd
Address
Rehoboth MA 02769
City/State/Zip

**DEFINITIONS**

As used in this Agreement:

**the COMPANY** means DePuy Spine, and JOHNSON & JOHNSON and any of their successors or assigns, purchasers, acquirers, and any of their existing and future subsidiaries, divisions or affiliates, including any such subsidiary, division or affiliate of Johnson & Johnson to which I may be transferred or by which I may be employed in the future. Affiliates of the COMPANY are any corporation, entity or organization at least 50% owned by the COMPANY, by Johnson & Johnson or by any subsidiary of Johnson & Johnson.

**I** means the employee whose name appears above, also referred to by the use of first person pronouns, such as me and my.

**INVENTIONS** means discoveries, improvements and/or ideas, whether patentable or not.

**CONFIDENTIAL INFORMATION** means information disclosed to me or known by me as a result of my employment by the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, about products, processes, machines, customers, clients, employees and services of the COMPANY, including, but not limited to, inventions, research, development, manufacturing, purchasing, finance, data processing, engineering, marketing, merchandising, selling, sales volumes and strategies, number and location of sales representatives, names and significance of the COMPANY's customers and clients and their employees and representatives, preferences, needs and requirements, purchasing histories, and other customer or client-specific information, and comparable information about the products, processes, machines, customers, clients and services of affiliates of the COMPANY acquired by me during my employment by the COMPANY.

**CONFLICTING PRODUCT** means any product, process, machine, invention or service of any person or organization other than the COMPANY in existence or under development which resembles or competes with a product, process, machine, invention or service upon which I shall have worked or about which I become knowledgeable as a result of employment with the COMPANY and whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION which I shall have had access to during my employment.

**CONFLICTING ORGANIZATION** means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a CONFLICTING PRODUCT.

I recognize that the business in which the COMPANY is engaged is extremely competitive and that the COMPANY will be providing me with CONFIDENTIAL INFORMATION both at the commencement of my employment and thereafter and may also be providing me with the opportunity to contribute to the creation of CONFIDENTIAL INFORMATION, which will assist both the COMPANY and me in competing effectively. I recognize that CONFIDENTIAL INFORMATION is significant to the COMPANY'S competitive position and that the COMPANY therefore expects me to keep it secret and also expects me not to compete with the COMPANY during my employment and for a period of time thereafter.

Accordingly, in consideration of the receipt of CONFIDENTIAL INFORMATION, my employment or the continuation of my employment by the COMPANY, and the benefits being provided to me pursuant to paragraph 9:

1. I agree to disclose promptly to the COMPANY all INVENTIONS conceived or made by me whether or not during my hours of employment or with the use of the COMPANY's facilities, materials or personnel, either solely or jointly with another or others during my employment with the COMPANY, and related to the actual or anticipated business or activities of the COMPANY, or related to its actual or anticipated research and development or suggested by or resulting from any task assigned to me or work performed by me for, or on behalf of, the COMPANY. I assign and agree to assign my entire right, title and interest therein to the COMPANY. I will not assert any rights under or to any INVENTIONS as having been made or acquired by me prior to my being employed by the COMPANY unless such INVENTIONS are identified on a sheet attached hereto and signed by me and the COMPANY as of the date of this Agreement.

2. I recognize that all works, including, but not limited to reports, computer programs, drawings, documentation and publications, which I prepare within the scope of my employment with the COMPANY, shall be works made for hire and that the worldwide copyrights therein shall be the sole and exclusive property of the COMPANY. I will promptly and fully disclose all such works to the COMPANY.

3. I shall, whenever requested to do so by the COMPANY, execute any applications, assignments or other instruments which the COMPANY shall consider necessary to apply for and obtain Letters Patent, trademark and/or copyright registrations in the United States, or any foreign country, or to protect otherwise the COMPANY's interests. These obligations shall continue beyond the termination of my employment with the COMPANY with respect to INVENTIONS, trademarks or copyrightable works conceived, authored or made by me during my period of employment, and shall be binding upon my executors, administrators, or other legal representatives.

4. I shall not disclose to the COMPANY or induce the COMPANY to use any secret, proprietary or confidential information or material belonging to others, including my former employers, if any. I am aware of no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would in any way restrict, limit or prohibit my employment by the COMPANY that I have not disclosed and provided to the COMPANY.

5. I recognize that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a CONFLICTING ORGANIZATION, will cause immediate irreparable injury to the COMPANY. Unless I first secure the COMPANY's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION. I understand and agree that my obligations not to disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION shall continue after termination of my employment for any reason.

6. During my employment with the company and for a period of eighteen (18) months after termination of my employment with the COMPANY for any reason, I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States, or in any foreign country or territory in which the services I may provide could enhance the use or marketability of a CONFLICTING PRODUCT by application of CONFIDENTIAL INFORMATION which I shall have had access to during my employment, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION, provided that the COMPANY, prior to my accepting such employment, shall receive separate written assurances satisfactory to the COMPANY from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly, for an 18-month period, in connection with any CONFLICTING PRODUCT.

7. I recognize that the COMPANY's relations with its accounts, customers and clients represents an important business asset that results from the COMPANY's significant investment of its time and resources. I further recognize that by virtue of my employment by the COMPANY, I have gained or may gain relationships with the accounts, customers and clients of the COMPANY, and because of such relationships, I could cause the COMPANY great loss, damage, and immediate irreparable harm, if, during my employment by the COMPANY or subsequent to the termination of such employment for any reason, I should for myself or on behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a product or service that could compete with a product or service being sold or developed by the COMPANY. I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not solicit any business from, sell to, or render any service to, or, directly or indirectly, help others to solicit business from or render service or sell to, any of the accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY, for any purpose related to the sale of any such product or service. I also agree that for a period of twelve (12) months after termination of employment with the COMPANY for any reason, I will not solicit or hire on my own behalf, or on behalf of others, any COMPANY employee.

8. To enable the COMPANY to monitor my compliance with the obligations imposed by this Agreement, I agree to inform the COMPANY, at the time I give notice of my termination of employment, of the identity of my new employer and of my job title and responsibilities, and will continue to so inform the COMPANY, in writing, any time I change employment during the eighteen (18) months following termination of my employment by the COMPANY for any reason.

9. If I am unable to obtain employment consistent with my training and education solely because of a prohibition of paragraph 6 or 7 of this Agreement, or if I am able to obtain only a position in which my gross monthly income is less than what I last received from the Company as regular monthly base pay (exclusive of extra compensation and employee benefits), then any prohibition of those paragraphs that caused me to be unable to obtain such employment (or that is responsible for the above-referenced differential in pay) shall bind me only as long as the Company shall make payment to me equal to the lesser of (a) the amount last received from the Company as regular monthly base pay, or (b) the difference between the amount I last received from the Company as regular monthly base pay and the gross monthly income that I am receiving in any subsequent employment.

10. In order to qualify for the payments provided for in paragraph 9 above, I understand that I must, for each month that I claim payment is due, represent to the Vice President of Human Resources of the Company, in writing within fifteen (15) days following the end of that calendar month, that although I diligently sought employment consistent with my training and education, I was unable to obtain it, or was unable to attain a position in which my gross monthly income equaled my last regular monthly base pay at the Company, as the case may be, solely because of a prohibition of paragraph 6 or 7 of this Agreement. I must also promptly submit such further information as the Company may request to enable it to verify the accuracy of my representation. I understand that the Company

shall, at its option, be relieved of making a monthly payment to me for any month with respect to which I have failed to comply with a requirement of this paragraph 10.

11. I further understand that if, at any time within the period of prohibition specified in paragraph 6 or 7, the Company gives me a written release from the prohibition of paragraph 6 or 7 that has been the sole cause of my inability to obtain employment consistent with my training and education or my inability to obtain a position in which my gross monthly income equals my last regular monthly base pay at the Company, as the case may be, then, the Company will no longer be obligated to make the payments that had been required due to those prohibitions.

12. Upon termination of my employment with the COMPANY, either prior to or upon my retirement, I shall turn over to a designated individual employed by the COMPANY, all property then in my possession or custody and belonging to the COMPANY, including any computer equipment. I shall not retain any copies of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents, including electronic information and property, relating in any way to the affairs of the COMPANY and which were entrusted to me or obtained by me at any time during my employment with the COMPANY.

13. I understand and acknowledge that if I violate this Agreement or am about to violate this Agreement by accepting employment or providing services prohibited by paragraph 6 or 7 above, the COMPANY shall have the right, and be entitled to, in addition to any other remedies it may have, injunctive relief; in other words, I understand and acknowledge that the COMPANY can bar me from accepting such employment or rendering such services for the periods specified in paragraphs 6 and 7 above.

14. I hereby consent and agree to assignment by the COMPANY of this Agreement and all rights and obligations hereunder including, but not limited to, an assignment in connection with any merger, sale, transfer or acquisition by the COMPANY or relating to all or part of its assets, divisions and/or affiliates.

15. Nothing herein shall limit or reduce my common law duties to the COMPANY, including but not limited to my duty of loyalty.

16. This Agreement shall be interpreted according to the laws of the State of New Jersey without regard to the conflict of law rules thereof. I agree that any action relating to or arising out of this Agreement may be brought in the courts of the State of New Jersey or, if subject matter jurisdiction exists, in the United States District Court for the District of New Jersey. I consent to personal jurisdiction and venue in both such courts and to service of process by United States Mail or express courier service in any such action.

17. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.

18. <u>The following applies only to a California, Minnesota or North Carolina employee</u>: Notification is hereby given that paragraph 1 does not apply to an invention to the extent that no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely by me on my own time, and (a) which does not relate (i) to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by me for the COMPANY.

19. <u>The following applies only to a State of Washington employee</u>: Notification is hereby given that paragraph 1 does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely on my own time, unless (a) the invention relates (i) directly to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by me for the COMPANY.

20. Nothing contained in this Agreement shall be deemed to confer on me any rights with respect to the duration of my employment with the COMPANY. I UNDERSTAND AND AGREE THAT MY EMPLOYMENT RELATIONSHIP WITH THE COMPANY IS TERMINABLE AT WILL BY EITHER THE COMPANY OR ME, WITH OR WITHOUT CAUSE, EXCEPT THAT IF I INITIATE THE TERMINATION, THERE SHALL BE, AT THE COMPANY'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER I GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. If the Company elects to continue my employment during the notice period, it shall advise me of that fact, and of the duration of the notice period. During any notice period, I will provide such transitional services as the Company may request. The Company will be obligated to pay me my full base salary during the notice period, and my duty of loyalty to the Company shall continue through such period.

I ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, and agree that with respect to the subject matter hereof it is my entire agreement with the COMPANY, superseding any previous oral or written communications, representations, understandings, or agreements with the COMPANY or any of its officials or representatives.

DATE: 27 July 2005 EMPLOYEE SIGNATURE [signature]

# EXHIBIT B

## *VP, Global Marketing (Stryker BIOTECH)*

Stryker Biotech is 100% focused on the development of recombinant human proteins and pharmaceutical approaches in regenerative medicine.

Stryker Biotech does not sell any medical device hardware.

Stryker Biotech has a commercial recombinant human protein that grows bone at fracture sites. Mr. Ross' primary role will be supporting this activity globally. This product works by stimulating stem cells to regenerate tissue.

Mr. Ross will also help plan the launch of similar products for new indications

These indications include: a pharmaceutical approach to osteoarthritis, cartilage regenerations, bone-based fusions, osteoporosis and other areas.

Responsibilities will include:

1. Lead the development and implementation of a Global Marketing strategy with appropriate plans and roadmaps to ensure maximization of the value, growth and profitability of the product portfolio. Developed in conjunction with the major regions/countries to include launch plans.
2. Lead the strategic marketing process to develop Global product positioning, Core messages and claims, Global branding, Publication planning and core promotional materials.
3. Lead the development and implementation of promotional campaigns in the USA and track return on investment with corrective action if required.
4. Lead reimbursement, health economic and pricing strategies to enable global launches and optimization of the portfolio
5. Develop and manage the promotional budget and resources needed to maximize the product portfolio.
6. Develop market and product forecasts to achieve financial and manufacturing objectives.
7. Provide timely and accurate feedback on product performance versus objectives.
8. Provide commercial leadership for the life cycle management strategies of the portfolio including clinical phase IIIb/IV and new product development.
9. Recruit, develop and motivate a Global marketing team
10. Lead the development of Global advocates including major congress support
11. Provide support to Regions and countries – Global Marketing "Center of excellence"

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, ss.

SUPERIOR COURT
BUSINESS LITIGATION SESSION

| | | |
|---|---|---|
| DEPUY SPINE, INC. and<br>JOHNSON & JOHNSON REGENERATIVE<br>THERAPEUTICS, LLC<br><br>Plaintiffs,<br>v.<br><br>STRYKER BIOTECH L.L.C. and<br>G. JOSEPH ROSS,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C. A. No. |

**PLAINTIFF'S MOTION FOR SPECIAL PROCESS SERVER**

Pursuant to Mass. R. Civ. P. 4(c), DePuy Spine, Inc. and Johnson & Johnson Regenerative Therapeutics, LLC (collectively "Plaintiffs") hereby move for an Order appointing Thomas L. Savage as special process server in this action. In support of this motion, Plaintiffs state that Mr. Savage is experienced in the service of process, over 18 years of age, not a party to this action and disinterested in the outcome of this action.

DEPUY SPINE, INC. and JOHNSON
& JOHNSON REGENERATIVE
THERAPEUTICS, LLC,

By their attorneys,

Kathryn K. Conde

Kathryn K. Conde (BBO#634347)
Rebecca L. Sipowicz (BBO#650715)
NUTTER, MCCLENNEN & FISH LLP
World Trade Center West
155 Seaport Boulevard
Boston, MA 02210
(617) 439-2000

Date: April 5, 2007

| CIVIL ACTION COVER SHEET | DOCKET NO(S) B.L.S. | Trial Court Of Massachusetts<br>Superior Court Department<br>County: SUFFOLK |
|---|---|---|

| PLAINTIFF(S) | DEFENDANT(S) |
|---|---|
| DePuy Spine, Inc<br>Johnson & Johnson Regenerative Therapeutics, LLC | Stryker Biotech, LLC |
| ATTORNEY, FIRM NAME, ADDRESS AND TELEPHONE<br>Kathryn K. Conde (BBO# 634347)<br>Rebecca L. Sipowicz (BBO# 650715)<br>Nutter, McClennen & Fish, LLP<br>155 Seaport Blvd.<br>Boston, MA 02210<br>(617)439-2000 | ATTORNEY (if known)<br>Michael Quinn<br>Gibbons, P.C.<br>One Gateway Ctr.<br>Newark, NJ 07102-5310 |

Origin Code

Original Complaint

TYPE OF ACTION AND TRACK DESIGNATION (See reverse side)

| CODE NO. | TYPE OF ACTION (specify) | TRACK | IS THIS A JURY CASE? |
|---|---|---|---|
| BA 2 | Restrictive Covenant | (B)* | (X) Yes ( ) No |

The following is a full and detailed statement of the facts on which plaintiff relies to determine eligibility in to The Business Litigation Session.

In this action, plaintiffs seek an injunction and damages against its former employee and his new employer arising out of a breach of non-competition and non-solicitation agreement. Plaintiffs seeks a preliminary injunction to prevent the immediate and irreparable harm that will result from the new employment, which is in direct competition with plaintiffs' businesses and from any revelation of plaintiffs' confidential business information.

Pursuant to the Rule of the Business Litigation Session, this case presumptively qualifies for a hearing before the BLS because it includes claims involving a restrictive covenant. Pursuant to Administrative Directive No. 03-1, venue is appropriate in Suffolk County for inclusion in the Business Litigation Session as this case would otherwise have had venue in Middlesex County.

* A Special Tracking Order shall be created by the Presiding Justice of the Business Litigation Session at the Rule 16 Conference.

PLEASE IDENTIFY, BY CASE NUMBER, NAME AND COUNTY, ANY RELATED ACTION PENDING IN THE SUPERIOR COURT DEPARTMENT.

"I hereby certify that I have complied with the requirements of Rule 5 of the Supreme Judical Court Uniform Rules on Dispute Resolution (SJC Rule 1:18) requiring that I provide my clients with information about court-connected dispute resolution services and discuss with them the advantages and disadvantages of the various methods."

Signature of Attorney of Record Kathryn K. Conde DATE: 4/5/07