# EXHIBIT 7



**RIKER**
**DANZIG**
**SCHERER**
**HYLAND**
**PERRETTI** LLP

Edwin F. Chociey, Jr.

<u>Direct:</u>
t: 973.451.8412
f: 973.451.8629
echociey@riker.com
Reply to: Morristown

ATTORNEYS AT LAW

December 10, 2009

**VIA HAND DELIVERY**

Clerk
New Jersey Superior Court, Chancery Division, Middlesex County
Middlesex County Courthouse
56 Paterson Street
New Brunswick, NJ 08903

**Re:    Johnson & Johnson and Cordis Corporation v. ev3, Inc., Rhonda Barr, Andrew Fitzpatrick and Brendan McKeever**

Dear Clerk:

We represent plaintiffs Johnson & Johnson and Cordis Corporation. Enclosed for filing are the original and three copies of the following documents: (1) Verified Complaint; and (2) Civil Case Information Statement. Kindly charge our firm account no. 0083800 for the filing fee and return one "filed" copy of these documents to us in the enclosed envelope. Thank you.

Very truly yours,

Edwin F. Chociey, Jr.

Edwin F. Chociey, Jr.

Enclosures

4002847.1

Headquarters Plaza, One Speedwell Avenue, Morristown, NJ 07962-1981 • t: 973.538.0800 f: 973.538.1984
50 West State Street, Suite 1010, Trenton, NJ 08608-1220 • t: 609.396.2121 f: 609.396.4578
500 Fifth Avenue, New York, NY 10110 • t: 212.302.6574 f: 212.302.6628
London Affiliate: 33 Cornhill, London EC3V 3ND, England • t: +44 (0) 20.7877.3270 f: +44 (0) 20.7877.3271
www.riker.com

JANREM0112986

RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800

Attorneys for Plaintiffs
Johnson & Johnson and Cordis Corporation

| | |
|---|---|
| JOHNSON & JOHNSON and CORDIS CORPORATION,<br><br>Plaintiffs,<br><br>vs.<br><br>EV3, INC., RHONDA BARR, ANDREW FITZPATRICK AND BRENDAN McKEEVER,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION<br>MIDDLESEX COUNTY<br>DOCKET NO.<br><br><br>CIVIL ACTION<br><br>VERIFIED COMPLAINT |

Plaintiffs Johnson & Johnson ("J&J), a corporation organized under the laws of the State of New Jersey, having its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933, and Cordis Corporation ("Cordis"), a corporation organized under the laws of the State of Florida, having its principal place of business at 430 Route 22 East, Bridgewater, New Jersey 08807, by way of Verified Complaint against defendants, say:

**A.    Introduction**

1.    This is a civil action seeking injunctive relief and damages against the individual defendants Rhonda Barr, Andrew (Bart) Fitzpatrick and Brendan McKeever (collectively, "Individual Defendants") and ev3, Inc. ("ev3"), a direct competitor of plaintiffs that has hired the Individual Defendants. ev3 is targeting Cordis' top-performing Sales Representatives: Barr,

JANREM0112987

Fitzpatrick and McKeever were the #1, #8 and #11 ranked Cardiology Sales Representatives at Cordis in 2008, respectively.

2.     To prevent immediate and irreparable harm, plaintiffs seek injunctive relief to stop the flagrant pirating of plaintiffs' top-performing Sales Representatives by ev3 and to enforce the Individual Defendants' covenants not to compete, covenants not to solicit plaintiffs' customers and common law duties owed to plaintiffs, including the duty of loyalty.  In addition to injunctive relief, plaintiffs seek an award of damages that they have sustained or will sustain.

**B.     The Parties**

3.     Plaintiff J&J is the parent company of subsidiaries engaged in the business of developing, manufacturing and marketing a wide variety of health care products, and providing related services, for the consumer, pharmaceutical and professional markets.  J&J's subsidiaries and operating companies market their products to customers located throughout the United States and the world.

4.     Plaintiff Cordis is a subsidiary of J&J and is one of the world's leading developers and manufacturers of interventional vascular technology and products for interventional medicine, minimally invasive computer-based imaging and electrophysiology, which involves the study of the electrical properties of biological cells and tissues.  For 50 years, Cordis has pioneered less invasive treatments for vascular disease.  Cordis' products include, but are not limited to, coronary, endovascular and other stents, catheters, balloon catheters, guide wires and other medical devices used to treat cardiovascular (heart) and endovascular (peripheral, e.g., leg) disease.

JANREM0112988

5.      Among many other examples of Cordis' pioneering technologies and products, Cordis developed: the first full line of Pre-Shaped Judkins catheters in 1966; the first percutaneous transluminal coronary angioplasty ("PTCA") balloon that utilized nylon balloon technology in 1990; and the first approved drug-eluting stent in 2003, known as the Cypher® Sirolimus-eluting Coronary Stent ("Cypher® Stent"). The American Heart Association named the Cypher® Stent one of the top 10 medical advancements of 2003.

6.      Cordis is comprised of five business units: (1) Cordis Cardiology – a worldwide leader in developing and manufacturing interventional vascular technology, such as coronary stents and catheters for the treatment of cardiovascular disease; (2) Cordis Endovascular – a recognized leader in developing stents, catheters and vena cava filters for the treatment of biliary obstructive disease and peripheral vascular disease, i.e., vascular disease existing outside of the heart and brain; (3) Cordis Biologics Delivery Systems – a leader in the emerging field of biologics delivery, which concentrates on optimizing the delivery of therapies to treat vascular disease; (4) Conor Medsystems LLC – which focuses on controlled vascular drug delivery technologies; and (5) Biosense Webster, Inc. – which focuses on electrophysiology and medical sensor technology in cardiovascular procedures.

7.      Defendant ev3, Inc. ("ev3") is a Delaware corporation with its principal place of business located at 3033 Campus Drive, Plymouth, Minnesota 55441. ev3 is a direct competitor of plaintiffs in developing, manufacturing and marketing endovascular stents, catheters, balloon catheters, guide wires and other products used to treat endovascular disease.

8.      Defendant Rhonda Barr ("Barr") is a resident of Louisiana residing at 9052 Hayden Drive, Shreveport, Louisiana 71106. Barr began working for Cordis in April 2005 as a Sales Representative. As a condition of her employment, Barr executed an Employee Secrecy,

JANREM0112989

Non-Competition and Non-Solicitation Agreement with plaintiffs ("Barr's Agreement"). A true and correct copy of Barr's Employee Secrecy, Non-Competition and Non-Solicitation Agreement with plaintiffs is attached hereto as Exhibit A.

9.      Among other provisions, Barr's Agreement contains an 18 month non-compete period. Barr was one of the top-performing Sales Representatives at Cordis. She resigned from Cordis on February 13, 2009, and after a brief period of employment elsewhere, she joined ev3 in or about August 2009, having been recruited by the former Cordis Vice President of Sales for Cardiology and current ev3 Vice President of Sales for Endovascular, Kevin Cordell.

10.     Defendant Andrew Fitzpatrick ("Fitzpatrick") is a resident of Ohio residing at 3954 Devonshire Drive, Cincinnati, Ohio 45226. Fitzpatrick began working for Cordis in January 2000 as Sales Representative. As a condition of his employment, Fitzpatrick also executed an Employee Secrecy, Non-Competition and Non-Solicitation Agreement with plaintiffs ("Fitzpatrick's Agreement"). Plaintiffs are presently unable to locate a copy of said Agreement. It was and is plaintiffs' practice to require all Sales Representatives to execute such an Agreement, as indicated in the January 3, 2000 offer of employment letter from Cordis that Fitzpatrick signed on January 4, 2000. In addition, two other Sales Representatives who began working at Cordis during the same time frame as Fitzpatrick signed Employee Secrecy, Non-Competition and Non-Solicitation Agreements with plaintiffs. A true and correct copy of the January 3, 2000 offer of employment letter from Cordis that Fitzpatrick signed on January 4, 2000 and the two aforementioned Employee Secrecy, Non-Competition and Non-Solicitation Agreements with plaintiffs are attached hereto as Exhibit B.

11.     Among other provisions, Fitzpatrick's Agreement contains an 18 month non-compete period. Fitzpatrick also was a top-performing Sales Representatives at Cordis. He

4

JANREM0112990

resigned from Cordis on September 1, 2009, and joined ev3, also having been recruited by former Cordis Vice President of Sales for Cardiology Kevin Cordell.

12.     Defendant Brendan McKeever ("McKeever") is a resident of New York residing at 615 Blauvelt Road, Pearl River, New York 10965.

13.     McKeever began working for Cordis in July 2000 as a Sales Representative. As a condition of his employment, McKeever also executed an Employee Secrecy, Non-Competition and Non-Solicitation Agreement with plaintiffs ("McKeever's Agreement"). A true and correct copy of McKeever's Employee Secrecy, Non-Competition and Non-Solicitation Agreement with plaintiffs is attached hereto as Exhibit C.

14.     Among other provisions, McKeever's Agreement contains an 18 month non-compete period. McKeever also was a top-performing Sales Representatives at Cordis. He resigned from Cordis on November 20, 2009, and joined ev3.

## C.     Jurisdiction

14.     On information and belief, ev3's products are sold throughout the United States, including New Jersey, and its sales representatives solicit customers and sell ev3's products to customers in New Jersey. ev3 has purposefully, systematically and continually directed contacts to and conducted business in New Jersey. ev3 is subject to this Court's jurisdiction.

15.     As employees of Cordis, the Individual Defendants directed telephone and written communications to J&J and Cordis employees in New Jersey on a regular basis. In addition, the Individual Defendants received paychecks issued by Johnson & Johnson Services, Inc., a New Jersey corporation with its principal place of business in New Jersey. The Individual Defendants have purposefully, systematically and continuously directed contacts to and conducted business

JANREM0112991

in New Jersey. McKeever reported directly to a Cordis Division Manager in New Jersey, Brian

Bonacum, and engaged in daily communications through telephone and e-mail with Bonacum in

New Jersey. McKeever also attended a balloon launch training divisional update meeting at

Cordis in New Jersey in early 2008, and he serviced The Valley Hospital account for Cordis in or

about 2004 through early 2006. The Valley Hospital is located in Ridgewood, New Jersey. In

addition, McKeever arranged for Manish Parikh, M.D., a nationally-recognized interventional

cardiologist who practices in New York, to meet with Cordis senior management personnel in

New Jersey. The Individual Defendants are subject to this Court's jurisdiction.

16.   Barr has consented to personal jurisdiction in New Jersey. Barr's Agreement

(¶16) provides:

> This Agreement shall be interpreted according to the laws of the State of New
> Jersey without regard to the conflict of law rules thereof. I agree that any action
> relating to or arising out of this Agreement may be brought in the courts of the
> State of New Jersey or, if subject matter jurisdiction exists, in the United States
> District Court for the District of New Jersey. I consent to personal jurisdiction
> and venue in both such courts and in service of process by United States mail or
> express courier service in any such action. (See Exhibit A)

17.   Fitzpatrick's Agreement (¶17) and McKeever's Agreement (¶17) provide: "This

agreement shall be interpreted according to the laws of the State of New Jersey without regard to

the conflict of law rules thereof." (See Exhibit A)

**D.   J&J and Cordis, and their protectable customer relationships and confidential,
proprietary and trade secret information**

18.   The market for products that treat vascular disease, such as those offered by

Cordis, has become more and more competitive in recent years. Cordis has been developing

innovative responses to better develop and maintain its customer relationships and to better

6

JANREM0112992

position its products in these markets.  The medical device industry for the treatment of vascular disease is a multi-billion dollar, world-wide market.

19.    In recent years, Cordis has expended large amounts of time, resources and money in developing and training its sales force in the United States, and in maintaining and developing its customer relationships in the United States through its Sales Representatives.  Cordis has protected its investment in its customer relationships through, among other things, the non-competition provisions of its Employee Secrecy, Non-Competition and Non-Solicitation Agreements with its Sales Representatives, such as the Individual Defendants.

20.    Cordis customer accounts differ as to which individual or individuals are responsible for purchasing products for treating vascular disease, such as Cardiology and Endovascular products.  For example, at given customer accounts such as hospitals or physician practice groups, a physician, a vice president of purchasing or finance, a purchasing agent, a nurse, administrator or other staff member in the catheterization laboratory or others may be responsible for purchasing Cardiology and Endovascular products.

21.    Cordis considers each such person involved in the purchasing decision at a given account to be its customer.  On Cordis' behalf, Sales Representatives maintain, develop and strengthen their relationships with the appropriate person or persons at the account who is responsible for purchasing Cordis products.

22.    The relationships that Cordis Sales Representatives maintain and/or develop – through the expenditure of significant time, resources and money by Cordis – with the individuals who are responsible for purchasing products to treat vascular disease at Cordis' customer accounts comprise plaintiffs' significant, protectable interests.  Cordis expends considerable time, resources and money in training and educating their Sales Representatives

JANREM0112993

about how to most effectively present Cordis' cutting-edge products and technologies to Cordis' customers, how to price Cordis' products and how to provide discounts to maximize sales, how to most effectively service Cordis' customers, etc. – essentially, how to do and say everything necessary to maintain, develop and strengthen Cordis' customer relationships.

23.    Cordis has invested considerable resources in developing the optimal strategy for the alignment of its sales force in the United States.  For a sales force to be effective, it is important to employ the correct number of salespersons, each placed in a strategically defined geographic territory.

24.    Cordis also expends considerable time, resources and money in researching, developing and testing innovative, new products for treating vascular disease.  Due to its significant efforts, Cordis has innovative, new products in its pipeline for the short term (1 year) and mid term (2 to 5 years).  Such information about Cordis' pipeline products and research and development efforts and plans are considered plaintiffs' confidential, proprietary and trade secret information.

25.    Cordis also has expended large amounts of time, resources and money in developing confidential, proprietary and trade secret information relating to strategies in connection with the marketing and sale of its current and pipeline products in the United States. Such information includes, but is not limited to, products in development, launch strategies, cost information per product, clients to target, pricing and discount pricing.

26.    Cordis' pricing and discount pricing information is highly confidential, proprietary and trade secret information.  Cordis develops pricing for three general categories of accounts: (1) Group Purchasing Organizations ("GPO") or national account contracting; (2) government operated facilities; and (3) independently operated facilities.  Approximately 84% of

8

JANREM0112994

hospitals in the United States belong to a GPO to obtain better bargaining power. GPOs negotiate with Cordis to establish prices, and because they purchase in high volume, GPOs receive significant discounts. The discounts vary depending on the product and the GPO, and are subject to confidentiality agreements. Also, hospitals in different regions of the country can belong to the same GPO.

27.     Plaintiffs take substantial measures to protect their confidential, proprietary and trade secret information. All employees are issued IDs, and there is a sign-in procedure for visitors at all facilities. No one visits a facility without an escort. All computers are equipped with secure access features and fire walls. Plaintiffs also enter into security and confidentiality policies and agreements, which they enforce.

**E.     The Individual Defendants' employment with Cordis**

28.     Each Individual Defendant was employed with Cordis for a significant period of time. They possess considerable experience with and knowledge about Cordis' customers and one or more of Cordis' product lines. They were top-performing Sales Representatives at Cordis on a national basis.

29.     Through their positions and due to their long history with Cordis, the Individual Defendants had access to and acquired intimate knowledge of Cordis' customer relationships on both the Cardiology and Endovascular sides of the business in the Individual Defendants' respective territories.

30.     The Individual Defendants also had access to Cordis' confidential, proprietary and trade secret information relating to its Cardiology and Endovascular business, and they acquired knowledge of such information for all of Cordis' Cardiology product lines and business

9

JANREM0112995

and certain Cordis Endovascular product lines and business. Such information included but was not limited to:

- marketing and sales plans for Cordis customers;
- pricing, discount pricing and pricing strategies;
- cost information, such as cost structure and profit margins per product;
- positioning of Cordis' sales force in their respective territories;
- activity levels of hospitals and other medical facilities and sales information concerning such facilities within their respective territories;
- Cordis' strategic plans for which clients to target with which products within their respective territories;
- contract terms for Cordis' largest customers within their respective territories;
- lists of Cordis Sales Representatives throughout the country that include names, addresses and cell phone numbers;
- monthly reports of performance-to-sales targets and ranking positions of Cordis Sales Representatives;
- professional education plans and clinical training modes;
- new product development and plans to change existing products; and
- launch strategies for Cordis' pipeline products for the short-term (1 year) and the mid term (2 to 5 years), including launch dates and client targeting for their respective territories.

31.     For example, each Individual Defendant is intimately knowledgeable about, and had access to, Cordis' confidential, proprietary and trade secret information regarding its customers and sales force plan concerning their respective territories, including: (1) how Cordis breaks down the territories; (2) how a sales force that markets and sells products that treat vascular disease should be geographically divided; (3) the areas where Cordis should stress its marketing and sales force based on the activity level of hospitals and other medical facilities; (4) which products better match the needs of certain clients; (5) the amount of sales made to Cordis' clients; and (8) pricing information.

32.     Cordis' different business units share the same clients. In other words, a Cordis Sales Representative who sells only Cardiology products in a given territory generally will call on the same hospitals and other medical facilities as a Cordis Sales Representative who sells only Endovascular products in that territory. In addition, beginning in August 2007 through October

10

JANREM0112996

2008, each territorial division within Cordis contained both Endovascular and Cardiovascular Sales Representatives. It was and is standard procedure at Cordis to share information about both sides of the business with the Sales Representatives such as Barr, Fitzpatrick and McKeever. The Endovascular and Cardiovascular Sales Representatives also share information with each other, including customer relationships, financial information, sales and marketing strategy and other resources.

33.    The Individual Defendants did not bring to Cordis the customer relationships that they serviced while employed by Cordis. Such accounts were existing, often long-standing Cordis accounts that Cordis assigned to the Individual Defendants. Cordis expended considerable time, resources and money in training and educating the Individual Defendants to maintain, develop and strengthen Cordis' relationship with such customers.

34.    The Individual Defendants, as with all other Cordis Sales Representatives, had access to the J&J Gateway Commerce computer system. The Gateway Commerce system provides Sales Representatives with extensive, detailed account information, from the J&J companies that use the Gateway system, for all accounts assigned to their respective territories. Cordis is one such company. Thus, Cordis Endovascular account information is accessible to a Cordis Cardiology Sales Representative for the accounts in his or her territory, and vice versa.

35.    Such account information includes but is not limited to: customer purchases; prices charged to customers; credits to customers; quantities shipped to customers; the frequency of shipments to customers; quantities returned to customers; the cost of products; and the terms of contracts, supply agreements and consignment agreements with customers. The Individual Defendants thus had access to such invaluable account information for both Cordis Endovascular and Cardiology customers in their respective territories.

JANREM0112997

36.     In addition, the Individual Defendants, as with all other Cordis Sales Representatives, had access to the internal www.mycordis.com website.   That website is maintained by Cordis' Bridgewater, New Jersey-based Commercial Operations group, and the server is located in Raritan, New Jersey.   The website is an internal repository for sales information, including training materials, sales rankings and rosters of Sales Representatives, sales reports, educational materials, promotional materials, marketing materials and clinical data.

37.     The Individual Defendants can and will use, consciously or unconsciously, their intimate knowledge about Cordis' customer relationships and confidential, proprietary and trade secret information to unfairly compete with plaintiffs and to improve the marketability of ev3's products.  If they are allowed, on ev3's behalf, to solicit Cordis customers that they contacted on Cordis' behalf, or if they are allowed to work at ev3 in connection with ev3 endovascular products that compete with Cordis endovascular products, it is inevitable that they will improperly exploit their relationships with Cordis' customers that they developed on Cordis' behalf and at Cordis' expense and that they will disclose plaintiffs' confidential, proprietary and trade secret information.

38.     As another example, the Individual Defendants are intimately knowledgeable of Cordis' short term (1 year) and mid term (2 to 5 years) pipeline products and marketing and sales strategies.   The Individual Defendants can steer ev3's development of its pipeline products by, for example, identifying pipeline products on which ev3 should focus, which would allow ev3 to unfairly compete with Cordis, or they can provide new ideas for pipeline products to ev3 based on Cordis pipeline products.

39.     Plaintiffs and ev3 are direct competitors in the Endovascular market.   If ev3, through the Individual Defendants' services, were permitted to misappropriate plaintiffs'

JANREM0112998

customer relationships in order to sell their Endovascular products that compete with Cordis' Endovascular products, plaintiffs would suffer immediate, irreparable and severe harm. Likewise, if ev3 were to gain knowledge of even some of the aforementioned confidential, proprietary and trade secret information, plaintiffs would be immediately, irreparably and severely harmed. Money damages would not adequately compensate plaintiffs for the losses and injuries they would suffer, leaving plaintiffs with no adequate remedy at law.

### 1.    Rhonda Barr

40.    Barr, who earned a B.A. in Elementary Education from Louisiana State University-Shreveport, began her employment with Cordis in April 2005 as a Sales Representative. As a condition of her employment, and because of her access to Cordis' customer relationships and confidential, proprietary and trade secret information, Barr executed a Employee Secrecy, Non-Competition and Non-Solicitation Agreement. (See Exhibit A) Barr's Agreement provides in pertinent part:

> CONFIDENTIAL INFORMATION means information disclosed to me or known by me as a result of my employment by the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, about products, processes, technologies, machines, customers, clients, employees, services and strategies of the COMPANY, including, but not limited to, inventions, research, development, manufacturing, purchasing, finance, computer software, computer hardware, automated systems, engineering, marketing, merchandising, selling, sales volumes or strategies, number or location of sales representatives, names or significance of the COMPANY's customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, or other customer or client-specific information.

> CONFLICTING PRODUCT means any product, process, technology, machine, invention or service of any person or organization other than the COMPANY in existence or under development which resembles or competes with a product, process, technology, machine, invention or service upon which I shall have worked or about which I become knowledgeable as a result of employment with the COMPANY and whose use or marketability could be enhanced by application

13

JANREM0112999

to it of CONFIDENTIAL INFORMATION which I shall have had access to during my employment.

CONFLICTING ORGANIZATION means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a CONFLICTING PRODUCT.

\*\*\*\*

5.    I recognize that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a CONFLICTING ORGANIZATION, will cause immediate irreparable injury to the COMPANY. Unless I first secure the COMPANY's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION. I understand and agree that my obligations not to disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION shall continue after termination of my employment for any reason.

6.    During my employment with the COMPANY and for a period of eighteen (18) months after termination of my employment with the COMPANY for any reason, I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States, or in any foreign country or territory in which the services I may provide could enhance the use or marketability of a CONFLICTING PRODUCT by application of CONFIDENTIAL INFORMA-TION which I shall have had access to during my employment, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION, provided that the COMPANY, prior to my accepting such employment, shall receive separate written assurances satisfactory to the COMPANY from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly, for an 18-month period, in connection with any CONFLICTING PRODUCT. I also agree that during my employment with the COMPANY and for a period of 18 months thereafter, I will not render services to any other organization or person in a position in which I could use CONFIDENTIAL INFORMATION to the detriment of the COMPANY.

7.    I recognize that the COMPANY's relations with its accounts, customers and clients represents an important business asset that results from the COMPANY's significant investment of its time and resources. I further recognize that by virtue of my employment by the COMPANY, I have gained or may gain relationships with the accounts, customers and clients of the COMPANY, and because of such relationships, I could cause the COMPANY great loss, damage, and immediate irreparable harm, if, during my employment by

14

JANREM0113000

the COMPANY or subsequent to the termination of such employment for any reason, I should for myself or on behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a product or service that could compete with a product or service being sold or developed by the COMPANY.   I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not solicit any business from, sell to, or render any service to, or, directly or indirectly, help others to solicit business from or render service or sell to, any of the accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY, for any purpose related to the sale of any such product or service.  I also agree that for a period of twelve (12) months after termination of employment with the COMPANY for any reason, I will not solicit or hire on my own behalf, or on behalf of others, any COMPANY employee.

**\*\*\*\***

13.     I understand and acknowledge that if I violate this Agreement or am about to violate this Agreement by disclosing or using information prohibited by paragraph 5 above, accepting employment or providing services prohibited by paragraph 6 or 7 above, or failing to turn over property as required by paragraph 12 above, the COMPANY shall have the right, and be entitled to, in addition to any other remedies it may have, injunctive relief; in other words, I understand and acknowledge that the COMPANY can bar me from disclosing or using such information, bar me from accepting such employment or rendering such services for the periods specified in paragraphs 6 and 7 above, and require that I turn over such property.

41.     Paragraph 9 of Barr's Agreement provides that if, because of her obligations under paragraphs 6 and 7, she is unable to obtain employment consistent with her training and education, such obligations are contingent on Cordis paying her (a) the prorated monthly compensation that she received from Cordis, or (b) the difference between such prorated monthly compensation and the similarly computed monthly compensation that she receives from her post-Cordis employment if her post-Cordis employment provides less compensation as a result of the prohibitions contained in paragraphs 6 and 7.

42.     Barr served as the Cordis Cardiology Sales Representative in its Shreveport, Louisiana territory.  She serviced accounts in Shreveport, Monroe and New Orleans, Louisiana

JANREM0113001

and Jackson and Vicksburg, Mississippi.  Cordis promoted Barr from Sales Representative to Senior Sales Representative in February 2008.

43.    Barr was consistently ranked as one of the top-performing Cordis Sales Representatives in the United States.  For example, in 2008, Barr was ranked as the #1 Cardiology Sales Representative in the United States in total sales.  At that time, there were approximately 117 Cardiology Sales Representatives in the United States.

44.    Barr was handsomely compensated at Cordis.  She received annual base salaries as follows: $50,000 (effective May 2, 2005); $51,000 (February 27, 2006); $52,900 (February 26, 2007); $57,600 (February 25, 2008); and $62,000 (March 10, 2008).  She also received variable compensation (i.e., sales commissions, sales bonuses, sales and marketing promotions, sales awards) as follows: $88,000 (April-December 2005); $157,000 (2006); $160,000 (2007); $243,000 (2008); and $38,000 (January-February 2009), for a total of $686,000 in variable compensation.

45.    Barr developed close relationships with physicians, including interventional cardiologists, who use both Cardiology and Endovascular products, as well as with other customers, such as purchasing agents, hospital administrators and catheterization laboratory nurses and staffs, whose responsibilities include selecting, using, negotiating and/or purchasing purchase both Cardiology and Endovascular products for such interventional cardiologists.  Such cardiologists perform both cardiovascular (heart) and endovascular (peripheral) procedures, and therefore purchase and use both Cardiology and Endovascular products.

46.    As a Cordis Cardiology Sales Representative, Barr had access to Cordis' Endovascular pricing, combined programs in Endovascular and Cardiovascular, Endovascular

JANREM0113002

division strategies and Endovascular sales information for approximately 90% of the accounts of Cordis' Shreveport Endovascular Sales Representative, Roger Parik.

47.    Barr possesses relationships with many of the same physicians, purchasing agents, hospital administrators and others that she gained as a Sales Representative for Cordis Cardiology.  Barr and Parik worked together as a team to grow the Cordis Endovascular and Cardiovascular business in the Shreveport territory.  They collaborated with each other and sold to accounts together.

48.    As part of Cordis' strategy for the Shreveport territory, Parik and Barr shared with each other highly strategic information about their respective Endovascular and Cardiovascular sales efforts.  Barr and Parik partnered in their cross-selling efforts so as to present a "unified front" to the Cordis customers in the Shreveport territory, and to be able to address concerns and questions regardless of the product at issue, whether Endovascular or Cardiovascular.  Barr gained insight and experience through combined "in-services" (i.e., Barr was present for and witnessed sales presentations by Cordis Endovascular Sales Representatives to physicians, purchasing agents, catheterization laboratory nurses and staff members, etc. at Cordis accounts), divisional meeting training, presentations and conference calls involving the cross-sharing of knowledge and information about Cordis' Endovascular and Cardiovascular divisions.  Such information included but was not limited to prices, pricing strategies, marketing strategies, sales training techniques and product codes.  Barr also reported for a period of time to a Cordis Division Manager, Michael McNulty, who was responsible for both the Endovascular and Cardiovascular divisions.

JANREM0113003

49.     Barr also attended Cordis Endovascular Dinner Meetings.   Typically, at such meetings, physician presenters discussed cutting-edge Endovascular procedures and their need for and use of Endovascular products.

50.     Barr resigned from Cordis on February 13, 2009.   Upon information and belief, she joined St. Jude Medical in its pace maker division, and then joined ev3 in or about September-October 2009, having been hired by Kevin Cordell, who previously served as the Vice President of Sales for Cordis Cardiology and who left Cordis in February 2007 and now serves as ev3's Vice President of Sales for ev3's Endovascular division.   Barr now serves as ev3's sales representative for Shreveport, Louisiana and the surrounding area – the same area that she covered while employed by Cordis.   She sells ev3 products, such as Endo SX Stents, Endo BX Stents and Endo PTA balloons, that compete directly with Cordis Endovascular products.

51.     Barr presently covers and solicits for ev3 many of the same customers – the same physicians, physician practice groups, hospitals, hospital administrators, hospital purchasing agents, catheterization laboratory nurses, administrators and staff and others – that she covered as a Cordis Sales Representative during the last 12 months of her employment with Cordis.

### 2.     Andrew Fitzpatrick

52.     Fitzpatrick, who earned a B.S.B.A. in Finance from Ohio State University and M.B.A. from Xavier University, began his employment with Cordis in January 2000 as a Senior Sales Representative.   As a condition of his employment, and because of his access to Cordis' customer relationships and confidential, proprietary and trade secret information, Fitzpatrick executed a Employee Secrecy, Non-Competition and Non-Solicitation Agreement.   (See Exhibit B)  Fitzpatrick's Agreement provides in pertinent part:

JANREM0113004

CONFIDENTIAL INFORMATION means information disclosed to me or known by me as a result of my employment by the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, about products, processes, machines, customers, clients, employees and services of the COMPANY, including, but not limited to, inventions, research, development, manufacturing, purchasing, finance, data processing, engineering, marketing, merchandising, selling, sales volumes and strategies, number and location of sales representatives, names and significance of the COMPANY's customers and clients and their employees and representatives, preferences, needs and requirements, purchasing histories, and other customer or client-specific information and comparable information about the products, processes, machines, customers, clients and services of affiliates of the COMPANY acquired by me during my employment by the COMPANY.

CONFLICTING PRODUCT means any product, technology, process, machine, invention or service of any person or organization other than the COMPANY in existence or under development which resembles or competes with a product, process, machine, invention or service upon which I shall have worked or about which I become knowledgeable as part of my job responsibilities during my term of employment with the COMPANY and whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION which I shall have had access to during my employment.

CONFLICTING ORGANIZATION means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a CONFLICTING PRODUCT.

****

5.      I recognize that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a CONFLICTING ORGANIZATION, will cause immediate irreparable injury to the COMPANY. Unless I first secure the COMPANY's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION. I understand and agree that my obligations not to disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION shall continue after termination of my employment for any reason.

6.      I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States or Canada, or in any other foreign country or territory in which I performed services for the Company, for a period of eighteen (18) months after termination of my employment with the COMPANY for any reason, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its

JANREM0113005

business in which I accept employment, not a CONFLICTING ORGANIZATION, provided that the COMPANY, prior to my accepting such employment, shall receive separate written assurances satisfactory to the COMPANY from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly, for an 18-month period, in connection with any CONFLICTING PRODUCT.

7.    I recognize that the COMPANY's relations with its accounts, customers and clients represents an important business asset that results from the COMPANY's significant investment of its time and resources.  I further recognize that by virtue of my employment by the COMPANY, I have gained or may gain relationships with the accounts, customers and clients of the COMPANY, and because of such relationships, I could cause the COMPANY great loss, damage, and immediate irreparable harm, if, during my employment by the COMPANY or subsequent to the termination of such employment for any reason, I should for myself or on behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a product or service that could compete with a product or service being sold or developed by the COMPANY.  I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not solicit any business from, sell to, or render any service to, or, directly or indirectly, help others to solicit business from or render service or sell to, any of the accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY, for any purpose related to the sale of any such product or service.  I also agree that for a period of twelve (12) months after termination of employment with the COMPANY for any reason, I will not solicit or hire on my own behalf, or on behalf of others, any COMPANY employee.

****

9.    If I am unable to obtain employment consistent with my training and education solely because of prohibitions of paragraphs 6 and 7 of this Agreement, the prohibitions of those paragraphs that have caused me to be unable to obtain such employment shall bind me only as long as the COMPANY shall make payments to me equal to my monthly base pay at termination (exclusive of extra compensation and employee benefits) for each month of such unemployment for the period of the prohibition specified in paragraphs 6 and 7, provided that I am in compliance with paragraphs 8, 10 and 11 of this Agreement.

13.    I understand and acknowledge that if I violate this Agreement or am about to violate this Agreement by accepting employment or providing services prohibited by paragraph 6 or 7 above, the COMPANY shall have the right, and be entitled to, in addition to any other remedies it may have, injunctive relief; in other words, I understand and acknowledge that the COMPANY can bar me from accepting such employment or rendering such services for the periods specified in paragraphs 6 and 7 above.

JANREM0113006

53.     Fitzpatrick served as a Cordis' Cardiology Senior Sales Representative in its Cincinnati North territory.   Fitzpatrick was promoted from Senior Sales Representative to Account Executive in March 2004.

54.     Fitzpatrick was consistently ranked as one of the top-performing Cordis Sales Representatives in the United States.   In 2008, Fitzpatrick finished #8 out of approximately 117 Cardiology Sales Representatives in the United States in terms of total sales.   He finished at 107% of his forecast, i.e., target, achievement for the sale of Cypher® stents, and at 103% for core products, such as interventional guiding catheters, diagnostic catheters, PTCA balloons, etc. He was chosen to serve as a Field Sales Trainer, a prestigious position in which he trained Cordis Sales Representative trainees.   He was a five-time President's Club winner, meaning that he finished in the top 10% of his sales organization.   He was one of several Sales Representatives who were chosen to participate in the Cordis Management Development Program, meaning that he attended specialized training programs in New Jersey.

55.     Fitzpatrick was handsomely compensated at Cordis.   He received annual base salaries as follows: $52,400 (effective January 17, 2000); $55,200 (January 1, 2001); $57,190 (January 6, 2003); $65,000 (March 1, 2004); $68,400 (February 28, 2005); $71,400 (February 27, 2006); $74,700 (February 26, 2007); $78,200 (February 25, 2008); and $81,100 (February 23, 2009).   In addition, he received variable compensation (i.e., sales commissions, sales bonuses, sales and marketing promotions, sales awards) as follows: $88,000 (2000); $166,000 (2001); $115,000 (2002); $238,000 (2003); $382,000 (2004); $314,000 (2005); $313,000 (2006); $219,000 (2007); $246,000 (2008); and $128,000 (January-August 2009), for a total of $2,211,000 in variable compensation.

JANREM0113007

56.     Like Barr, Fitzpatrick developed close relationships with physicians, including interventional cardiologists, who purchase and use both Cardiology and Endovascular products. He also developed close relationships with other customers, such as purchasing agents, hospital administrators and catheterization laboratory nurses and staffs, whose responsibilities include selecting, using, negotiating and/or purchasing both Cardiology and Endovascular products for such interventional cardiologists.     Such cardiologists perform both cardiovascular and endovascular procedures.

57.     Fitzpatrick resigned from Cordis on September 1, 2009.  He joined ev3, now serves as an ev3 sales representative in the Cincinnati area and, upon information and belief, solicits some of the same accounts that he solicited on Cordis' behalf during the last 12 months of his employment with Cordis.

**3.     Brendan McKeever**

58.     McKeever, who earned a B.A. in Political Science from Hunter College, began his employment with Cordis in July 2000 as a Sales Representative.  As a condition of his employment, and because of his access to Cordis' customer relationships and confidential, proprietary and trade secret information, McKeever executed a Employee Secrecy, Non-Competition and Non-Solicitation Agreement.  (See Exhibit C)  McKeever's Agreement contains the same confidentiality, non-competition and non-solicitation provisions as Fitzpatrick's Agreement (¶5, 6, 7, 9, 13).

59.     McKeever served as a Cordis Cardiology Sales Representative in its New York division (Northern Manhattan territory).  The New York division encompasses seven territories: Northern Manhattan; Southern Manhattan; Brooklyn/Queens/Long Island; Northern New Jersey; Central New Jersey; Southern New Jersey; and Western New Jersey.  McKeever was promoted

JANREM0113008

from Sales Representative to Senior Sales Representative in January 2003, and from Senior Sales Representative to Account Executive in February 2005.

60.    McKeever was consistently ranked as one of the top-performing Cordis Sales Representatives in the United States.  He serviced some of Cordis' most high profile customer relationships in the country, such as Lenox Hill Hospital, Columbia Presbyterian Hospital and New York Hospital-Cornell.  He also serviced New York Hospital-Queens, an affiliate of New York Hospital-Cornell.  In 2008, McKeever finished #11 out of approximately 117 Cardiology Sales Representatives in the United States in terms of total sales.  In 2008, he was recognized as a Cordis "Elite Trip Award Winner," meaning that he ranked in the top 10% of Cordis Sales Representatives nation-wide.  He sold more than $100 million of Cordis Cypher® product during his employment with Cordis.  In 2008, he sold almost $2 million worth of Cypher® stents to finish at 149% of his forecasted achievement, he finished at 101% of his forecast achievement for core products, such as interventional guiding catheters, diagnostic catheters, PTCA balloons, etc., and he was ranked as the #2 seller of PTCA balloons in the New York division.

61.    McKeever was handsomely compensated at Cordis.  He received annual base salaries as follows: $45,000 (effective July 9, 2000); $50,000 (January 6, 2003); $55,000 (January 20, 2003); $58,800 (March 1, 2004); $65,000 (February 28, 2005); $68,400 (February 27, 2006); $71,000 (February 26, 2007); $73,700 (February 25, 2008); and $76,500 (February 23, 2009).  He also received variable compensation (i.e., sales commissions, sales bonuses, sales and marketing promotions, sales awards) as follows: $46,000 (July-December 2000); $158,000 (2001); $135,000 (2002); $247,000 (2003); $396,000 (2004); $295,000 (2005); $249,000 (2006); $207,000 (2007); $253,000 (2008); and $59,000 (January-October 2009), for a total of $2,044,000 in variable compensation.

JANREM0113009

62.     Like Barr and Fitzpatrick, McKeever developed close relationships with physicians, including interventional cardiologists, who purchase and use both Cardiology and Endovascular products.   He similarly developed close relationships with other customers, including purchasing agents, hospital administrators and catheterization laboratory nurses and staff members, whose responsibilities include selecting, using, negotiating and/or purchasing both Cardiology and Endovascular products for the interventional cardiologists who perform both cardiovascular and endovascular procedures.

63.     McKeever resigned from Cordis on November 20, 2009.  He joined ev3, and now serves as an ev3 sales representative in New York.  Upon information and belief, he is soliciting some of the same accounts that he solicited on Cordis' behalf during the last 12 months of his employment with Cordis, including Lenox Hill Hospital – one of the most significant, lucrative and prestigious accounts in the United States.

**F.     Plaintiffs have attempted to resolve this matter amicably with ev3**

64.     Before filing this action, plaintiffs attempted to resolve amicably with ev3 the matter of ev3's employment of the Individual Defendants.  Plaintiffs' counsel sent an October 19, 2009 letter to ev3's counsel (at that time, McKeever had not yet resigned from Cordis), and ev3 ultimately responded by way of a November 18, 2009 letter from its counsel.  A true and correct copy of plaintiffs' counsel's October 19, 2009 letter to ev3 and ev3's counsel's November 18, 2009 letter to plaintiffs' counsel are attached hereto as Exhibit D.

65.     Plaintiffs and ev3 thereafter continued to discuss the potential amicable resolution of ev3's employment of the Individual Defendants.  Nevertheless, ev3 failed and refused to provide plaintiffs with adequate assurances that ev3 would not employ the Individual Defendants in capacities that would lead to them to violate their Agreements with plaintiffs and their other

JANREM0113010

duties owed to plaintiffs. Consequently, plaintiffs must seek judicial intervention to prevent immediate, irreparable harm, to stop the pirating of plaintiffs' top-performing Sales Representatives by ev3 and to enforce the Individual Defendants' covenants not to compete, covenants not to solicit plaintiffs' customers and common law duties owed to plaintiffs, including the duty of loyalty.

## First Count

66.     Plaintiffs repeat the allegations contained in the foregoing paragraphs and incorporate those allegations in this Count by reference.

67.     The Individual Defendants' employment with ev3 constitutes a breach of their respective non-compete agreements because they are employed by a company that competes with plaintiffs during the restricted period and involves the Individual Defendants providing services that may enhance the use or marketability of a competing product by application of plaintiffs' confidential, proprietary and trade secret information. The Individual Defendants' employment with ev3 also will inevitably induce and require the Individual Defendants to breach their respective non-compete agreements and common law duties with plaintiffs because they have joined an organization that is engaged in direct competition with plaintiffs and their employment with ev3 makes it inevitable that they will disclose confidential, proprietary and trade secret information that they learned while employed by Cordis.

68.     The Individual Defendants' employment with ev3 constitutes a breach of their respective non-compete agreements because after their termination from Cordis and while employed by ev3, they will be soliciting business from, selling to and/or rendering services to the accounts, customers or clients with whom they had contact during their employment with Cordis

JANREM0113011

for purposes related to the sale of a product or service that could compete with products or services being sold or developed by plaintiffs.

69.     As a result of these breaches and/or inevitable breaches, plaintiffs will suffer immediate, severe and irreparable harm to its business, and other damages and injuries.

### Second Count

70.     Plaintiffs repeat the allegations contained in the foregoing paragraphs and incorporate those allegations in this Count by reference.

71.     As employees of Cordis, each of the Individual Defendants had a duty of loyalty that existed independent of their respective non-compete agreement to refrain from disclosing confidential, proprietary and trade secret information that they learned while employed by Cordis.   If the Individual Defendants are allowed to work for ev3, a direct competitor of plaintiffs, it is inevitable that they will breach their duty by disclosing plaintiffs' confidential, proprietary and trade secret information.

72.     As a result of these breaches and/or inevitable breaches, plaintiffs will suffer immediate, severe and irreparable harm to its business, and other damages and injuries.

### Third Count

73.     Plaintiffs repeat the allegations contained in the foregoing paragraphs and incorporate those allegations in this Count by reference.

74.     ev3 is aware that the Individual Defendants have entered into the non-compete agreements with plaintiffs.   ev3 is also aware that the Individual Defendants possess highly confidential, proprietary and trade secret information that belongs to plaintiffs.   ev3 is aware that hiring the Individual Defendants constitutes a breach of their respective non-compete agreements and common law duties, including the duty of loyalty.

JANREM0113012

75.     Despite that knowledge, ev3 has conspired with, encouraged and tortiously induced the Individual Defendants to breach both their non-compete agreements and their common law duties to plaintiffs and, therefore, has tortiously and maliciously interfered with plaintiffs' contractual relationship with the Individual Defendants and with their common law duties of loyalty.

76.     As a result of ev3's actions, plaintiffs will suffer immediate, severe and irreparable harm to its business, and other damages and injuries.

### Fourth Count

77.     Plaintiffs repeat the allegations contained in the foregoing paragraphs and incorporate those allegations in this Count by reference.

78.     By hiring the Individual Defendants, ev3 and the Individual Defendants have wrongfully contracted, combined, conspired and agreed to and have: (1) engaged in unfair competition; (2) breached common law obligations; (3) tortiously interfered with the contractual relationships and prospective economic advantage of plaintiffs; (4) wrongfully converted and misappropriated confidential, proprietary and trade secret information of plaintiffs; and (5) unjustly enriched themselves at the expense of plaintiffs.

79.     The acts of ev3 and the Individual Defendants constitute wrongful and malicious conduct undertaken without legal justification and with the knowledge and intent that their actions will cause substantial damage and injury to plaintiffs.

80.     Unless ev3 and the Individual Defendants are immediately enjoined and restrained, plaintiffs will suffer immediate and irreparable injury for which they have no adequate remedy at law or in money damages, and other damages and injuries.

WHEREFORE, plaintiffs demand judgment against defendants, jointly and severally:

JANREM0113013

A.      Temporarily, interlocutorily and permanently enjoining and restraining the Individual Defendants from soliciting any business from, selling to or rendering any services to or, directly or indirectly, helping others solicit business from or rendering any service or selling to, any of the accounts, customers or clients with whom they had contact during the last 12 months of employment with Cordis, for a period of 18 months from the date of the Court's Order;

B.      Temporarily, interlocutorily and permanently enjoining and restraining ev3 and its officers, agents and employees from causing or permitting the Individual Defendants to sell to, or render any services to or, directly or indirectly, help others solicit business from or render any service or selling to, any of the accounts, customers or clients with whom they had contact during the last 12 months of employment with Cordis, for a period of 18 months from the date of the Court's Order;

C.      Temporarily, interlocutorily and permanently enjoining and restraining the Individual Defendants from soliciting or hiring on their behalf or on behalf of anyone else, including but not limited to ev3, any employee of plaintiffs, for a period of 12 months from the date of the Court's Order;

D.      Temporarily, interlocutorily and permanently enjoining and restraining ev3 and its officers, agents and employees from causing or permitting the Individual Defendants from soliciting or hiring on ev3's behalf, any employee of plaintiffs, for a period of 12 months from the date of the Court's Order;

E.      Temporarily, interlocutorily and permanently enjoining ev3 from soliciting or hiring any employee of plaintiffs for a period of 12 months from the date of the Court's Order;

JANREM0113014

F.     Temporarily, interlocutorily and permanently enjoining and restraining the Individual Defendants from holding any employment position or engaging in any employment activity with ev3, directly or indirectly, that in any way relates to or involves any ev3 product that resembles or competes with any product of plaintiffs on which the Individual Defendants worked or about which the Individual Defendants became knowledgeable as a result of their employment with plaintiffs and whose use or marketability could be enhanced by application of plaintiffs' confidential, proprietary or trade secret information to which the Individual Defendants had access during their employment with plaintiffs, or any other position that would place them in a position of using or disclosing plaintiffs' confidential, proprietary and trade secret information, for a period of 18 months from the date of the Court's Order;

G.     Temporarily, interlocutorily and permanently enjoining and restraining ev3 and its officers, agents and employees from causing or permitting the Individual Defendants to hold any employment position or engage in any employment activity with ev3, directly or indirectly, that in any way relates to or involves  any ev3 product that resembles or competes with any product of plaintiffs on which the Individual Defendants worked or about which the Individual Defendants became knowledgeable as a result of their employment with plaintiffs and whose use or marketability could be enhanced by application of plaintiffs' confidential, proprietary or trade secret information to which the Individual Defendants had access during their employment with plaintiffs, or any other position that would place them in a position of using or disclosing plaintiffs' confidential, proprietary and trade secret information, for a period of 18 months from the date of the Court's Order;

H.     Temporarily, interlocutorily and permanently enjoining and restraining the Individual Defendants from disclosing, using, disseminating, lecturing upon or publishing any of

29

JANREM0113015

plaintiffs' confidential, proprietary and trade secret information as defined in their respective non-compete agreements;

I.       Temporarily, interlocutorily and permanently enjoining and restraining ev3 from (1) causing or permitting the Individual Defendants to disclose or use and (2) receiving, using and disclosing, plaintiffs' confidential, proprietary and trade secret information as defined by their respective non-compete agreements;

J.       Ordering defendants to turn over and return to plaintiffs all of plaintiffs' confidential, proprietary and trade secret information that defendants have removed, copied, taken, used, disseminated or reviewed, or otherwise have in their possession, custody or control;

K.       Temporarily, interlocutorily and permanently enjoining and restraining the Individual Defendants from otherwise violating any of the terms of their respective non-compete agreements and common law obligations;

L.       Temporarily, interlocutorily and permanently enjoining and restraining ev3 from otherwise causing or permitting the Individual Defendants to violate any of terms of their respective non-compete agreements or their common law obligations to plaintiffs;

M.       Awarding compensatory damages to plaintiffs including, but not limited to, the cost in training the Individual Defendants and the cost in recruiting and training new employees to replace the Individual Defendants;

N.       Awarding punitive damage to plaintiffs;

O.       Awarding costs, expenses and attorneys' fees to plaintiffs;

P.       Awarding such other and further relief as the Court deems just and equitable.

JANREM0113016

RIKER, DANZIG, SCHERER, HYLAND
& PERRETTI LLP
Attorneys for Plaintiffs
Johnson & Johnson and Cordis Corporation

By: _____
Glenn A. Clark
Edwin F. Chociey, Jr.

Dated: December 10, 2009

### Rule 4:5-1 Certification

I certify that to the best of my present knowledge, the matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, and no such other action or arbitration proceeding is presently contemplated by plaintiffs. I am not presently aware of any non-parties who should be joined in this action pursuant to Rule 4:28 or who is subject to joinder pursuant to Rule 4:29-1(b) because of potential liability to any party on the basis of the same transactional facts.

_____
Edwin F. Chociey, Jr.

Dated: December 10, 2009

JANREM0113017

## Verifying Certification

I, William Irby, of full age, certify as follows:

1.    I am the Director of Sales – Cardiology, Southeast Region of Cordis Corporation.

2.    I have read the Verified Complaint to which this Verifying Certification is attached and the factual allegations in sections B, C, D, E, E(1), E(2) and F, based on my personal knowledge and from my review of Cordis' records, are true unless expressly stated as based on information and belief.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_William Irl._
                    William Irby

Dated: December 10, 2009

JANREM011130

## Verifying Certification

I, Brian T. Bonacum, of full age, certify as follows:

1.  I am the Division Manager – New York of Cordis Corporation.

2.  I have read the Verified Complaint to which this Verii Certification is attached and the factual allegations in sections B, C, D, E and E(3), based on my personal knowledge and from my review of Cordis' records, are true unless expressly stated as based on information and belief.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

Brian T. Bonacum

Dated: December 10, 2009

33

JANREM0113019

## CERTIFICATION PURSUANT TO RULE 1:4-4(c)

I, Edwin F. Chociey, Jr., of full age, certify as follows:

1.      I am an attorney-at-law in the State of New Jersey and a member of the law firm of Riker, Danzig, Scherer, Hyland & Perretti LLP, attorneys for plaintiffs in this matter.

2.      Attached hereto are the Verifying Certifications of William Irby and Brian T. Bonacum, with a facsimile of their original signatures.  I certify that Mr. Irby and Mr. Bonacum have acknowledged the genuineness of their respective signatures and that the documents or a copy with original signatures affixed will be filed if requested by the Court or a party.

I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_____
Edwin F. Chociey, Jr.

Dated: December: 10, 2009

4001548.1

JANREM0113020

# EXHIBIT A

JANREM0113021



**Cordis**®

:: (Johnson&Johnson company)

## EMPLOYEE SECRECY, NON-COMPETITION
## AND NON-SOLICITATION AGREEMENT

Name of Employee: **Rhonda Barr**

Residence Address: **9052 Hayden Dr.**
**Shreveport, La. 71106**

As used in this Agreement:

**the COMPANY** means CORDIS CORPORATION, and JOHNSON & JOHNSON and any of their successors or assigns, purchasers, acquirers, and any of their existing and future subsidiaries, divisions or affiliates, including any such subsidiary, division or affiliate of Johnson & Johnson to which I may be transferred or by which I may be employed in the future. Affiliates of the COMPANY are any corporation, entity or organization at least 50% owned by the COMPANY, by Johnson & Johnson or by any subsidiary of Johnson & Johnson.

**I** means the employee whose name appears above, also referred to by the use of first person pronouns, such as me and my.

**INVENTIONS** mean discoveries, improvements and/or ideas, whether patentable or not.

**CONFIDENTIAL INFORMATION** means information disclosed to me or known by me as a result of my employment by the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, about products, processes, technologies, machines, customers, clients, employees, services and strategies of the COMPANY, including, but not limited to, inventions, research, development, manufacturing, purchasing, finance, computer software, computer hardware, automated systems, engineering, marketing, merchandising, selling, sales volumes or strategies, number or location of sales representatives, names or significance of the COMPANY's customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, or other customer or client-specific information.

**CONFLICTING PRODUCT** means any product, process, technology, machine, invention or service of any person or organization other than the COMPANY in existence or under development which resembles or competes with a product, process, technology, machine, invention or service upon which I shall have worked or about which I become knowledgeable as a result of employment with the COMPANY and whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION which I shall have had access to during my employment.

**CONFLICTING ORGANIZATION** means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a CONFLICTING PRODUCT.

I recognize that the business in which the COMPANY is engaged is extremely competitive and that the COMPANY will be providing me with CONFIDENTIAL INFORMATION both at the commencement of my employment and thereafter and may also be providing me with the opportunity to contribute to the creation of CONFIDENTIAL INFORMATION, which will assist both the COMPANY and me in competing effectively. I recognize that CONFIDENTIAL INFORMATION is significant to the COMPANY'S competitive position and that the COMPANY therefore expects me to keep it secret and also expects me not to compete with the COMPANY during my employment and for a period of time thereafter.

Accordingly, in consideration of the receipt of CONFIDENTIAL INFORMATION, my employment or the continuation of my employment by the COMPANY, and other benefits being provided to me in connection with this Agreement, including those provided pursuant to paragraph 9:

1. I agree to disclose promptly to the COMPANY all INVENTIONS conceived or made by me whether or not during my hours of employment or with the use of the COMPANY's facilities, materials or personnel, either solely or jointly with another or others during my employment with the COMPANY, and related to the actual or anticipated business or activities of the COMPANY, or related to its actual or anticipated research and development or suggested by or resulting from any task assigned to me or work performed by me for, or on behalf of, the COMPANY. I assign and agree to assign my entire right, title and interest therein to the COMPANY. I will not assert any rights under or to any INVENTIONS as having been made or acquired by me prior to my being employed by the COMPANY unless such INVENTIONS are identified on a sheet attached hereto and signed by me and the COMPANY as of the date of this Agreement.

2. I recognize that all works, including, but not limited to reports, computer programs, drawings, documentation and publications, which I prepare within the scope of my employment with the COMPANY, shall be works made for hire and that the worldwide copyrights

JANREM0113022

therein shall be the sole and exclusive property of the COMPANY. In the event that any said copyrightable work or portion thereof shall not be legally qualified as a work made for hire, or shall subsequently be so held to not be a work made for hire, I agree to assign, and do hereby so assign to the COMPANY, all right, title and interest in and to said work or portion thereof. I will promptly and fully disclose all such works to the COMPANY.

3.  I shall, whenever requested to do so by the COMPANY, execute any applications, assignments or other instruments which the COMPANY shall consider necessary to apply for and obtain Letters Patent, trademark and/or copyright registrations in the United States, or any foreign country, or to protect otherwise the COMPANY's interests. These obligations shall continue beyond the termination of my employment with the COMPANY with respect to INVENTIONS, trademarks or copyrightable works conceived, authored or made by me during my period of employment, and shall be binding upon my executors, administrators, or other legal representatives.

4.  I shall not disclose to the COMPANY or induce the COMPANY to use any secret, proprietary or confidential information or material belonging to others, including my former employers, if any. I am aware of no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would in any way restrict, limit or prohibit my employment by the COMPANY that I have not disclosed and provided to the COMPANY.

5.  I recognize that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a CONFLICTING ORGANIZATION, will cause immediate irreparable injury to the COMPANY. Unless I first secure the COMPANY's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION. I understand and agree that my obligations not to disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION shall continue after termination of my employment for any reason.

6.  During my employment with the COMPANY and for a period of eighteen (18) months after termination of my employment with the COMPANY for any reason, I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States, or in any foreign country or territory in which the services I may provide could enhance the use or marketability of a CONFLICTING PRODUCT by application of CONFIDENTIAL INFORMATION which I shall have had access to during my employment, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION, provided that the COMPANY, prior to my accepting such employment, shall receive separate written assurances satisfactory to the COMPANY from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly, for an 18-month period, in connection with any CONFLICTING PRODUCT. I also agree that during my employment with the COMPANY and for a period of 18 months thereafter, I will not render services to any other organization or person in a position in which I could use CONFIDENTIAL INFORMATION to the detriment of the COMPANY.

7.  I recognize that the COMPANY's relations with its accounts, customers and clients represents an important business asset that results from the COMPANY's significant investment of its time and resources. I further recognize that by virtue of my employment by the COMPANY, I have gained or may gain relationships with the accounts, customers and clients of the COMPANY, and because of such relationships, I could cause the COMPANY great loss, damage, and immediate irreparable harm, if, during my employment by the COMPANY or subsequent to the termination of such employment for any reason, I should for myself or on behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a product or service that could compete with a product or service being sold or developed by the COMPANY. I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not solicit any business from, sell to, or render any service to, or, directly or indirectly, help others to solicit business from or render service or sell to, any of the accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY, for any purpose related to the sale of any such product or service. I also agree that for a period of twelve (12) months after termination of employment with the COMPANY for any reason, I will not solicit or hire on my own behalf, or on behalf of others, any COMPANY employee.

8.  To enable the COMPANY to monitor my compliance with the obligations imposed by this Agreement, I agree to inform the COMPANY, at the time I give notice of my termination of employment, of the identity of my new employer and of my job title and responsibilities, and will continue to so inform the COMPANY, in writing, any time I change employment during the eighteen (18) months following termination of my employment with the COMPANY for any reason.

9.  If I am unable to obtain employment consistent with my training and education solely because of a prohibition of paragraph 6 or 7 of this Agreement, or if I am able to obtain only a position in which my Gross Monthly Pay is less than what I last received from the COMPANY as Gross Monthly Pay, then any prohibition of those paragraphs that caused me to be unable to obtain such employment (or that is responsible for the above-referenced differential in pay), shall bind me only as long as the COMPANY shall make monthly payment to me equal to the lesser of (a) the amount last received from the COMPANY as Gross Monthly Pay, or (b) the difference between my last Gross Monthly Pay at the COMPANY and my Gross Monthly Pay in any subsequent employment. Gross Monthly Pay shall consist of the sum of the following applicable amounts, prorated to a monthly basis: my annual base pay, annual commissions, year-end cash bonus, and the monetary value of my year-end stock award (but not stock option grants, any other extra compensation or benefits). My Gross Monthly Pay at the COMPANY will be based on the amounts actually received by me during the last twelve calendar months I was employed by the COMPANY. My Gross Monthly Pay in any subsequent employment will be based on a projection of the amounts to be received by me during the first twelve months in that employment.

10. In order to qualify for the payments provided for in paragraph 9 above, I understand that I must, for each month that I claim payment is due, represent to the Vice President of Human Resources of the COMPANY, in writing within fifteen (15) days following the end

- 2 -

Revised 11/02/04

of that calendar month, that although I diligently sought employment consistent with my training and education, I was unable to obtain it, or was unable to attain a position in which my Gross Monthly Pay equaled what I last received from the COMPANY as Gross Monthly Pay, as the case may be, solely because of a prohibition of paragraph 6 or 7 of this Agreement. I must also promptly submit such further information as the COMPANY may request to enable it to verify the accuracy of my representation. I understand that the COMPANY shall, at its option, be relieved of making a monthly payment to me for any month with respect to which I have failed to comply with a requirement of this paragraph 10.

11. I further understand that if, at any time within the period of prohibition specified in paragraph 6 or 7, the COMPANY gives me a written release from the prohibition of paragraph 6 or 7 that has been the sole cause of my inability to obtain employment consistent with my training and education or my inability to obtain a position in which my Gross Monthly Pay equals what I last received from the COMPANY as Gross Monthly Pay, as the case may be, then, the COMPANY will no longer be obligated to make the payments that had been required due to those prohibitions.'

12. Upon termination of my employment with the COMPANY for any reason, I shall turn over to a designated individual employed by the COMPANY, all property then in my possession or custody and belonging to the COMPANY, including any computer equipment. I shall not retain any copies of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents in any form whatsoever (including information contained in computer memory or on any computer disk) relating in any way to the affairs of the COMPANY and which were entrusted to me or obtained by me at any time during my employment with the COMPANY.

13. I understand and acknowledge that if I violate this Agreement or am about to violate this Agreement by disclosing or using information prohibited by paragraph 5 above, accepting employment or providing services prohibited by paragraph 6 or 7 above, or failing to turn over property as required by paragraph 12 above, the COMPANY shall have the right, and be entitled to, in addition to any other remedies it may have, injunctive relief; in other words, I understand and acknowledge that the COMPANY can bar me from disclosing or using such information, bar me from accepting such employment or rendering such services for the periods specified in paragraphs 6 and 7 above, and require that I turn over such property.

14. I hereby consent and agree to assignment by the COMPANY of this Agreement and all rights and obligations hereunder including, but not limited to, an assignment in connection with any merger, sale, transfer or acquisition by the COMPANY or relating to all or part of its assets, divisions and/or affiliates.

15. Nothing herein shall limit or reduce my common law duties to the COMPANY, including but not limited to my duty of loyalty.

16. This Agreement shall be interpreted according to the laws of the State of New Jersey without regard to the conflict of law rules thereof. I agree that any action relating to or arising out of this Agreement may be brought in the courts of the State of New Jersey or, if subject matter jurisdiction exists, in the United States District Court for the District of New Jersey. I consent to personal jurisdiction and venue in both such courts and to service of process by United States Mail or express courier service in any such action.

17. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.

18. The following applies only to a California, Minnesota or North Carolina employee: Notification is hereby given that paragraph 1 does not apply to an invention to the extent that no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely by me on my own time, and (a) which does not relate (i) to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by me for the COMPANY.

19. The following applies only to a State of Washington employee: Notification is hereby given that paragraph 1 does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely on my own time, unless (a) the invention relates (i) directly to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by me for the COMPANY.

20. The following applies only to these situations: (i) while I am based in California while employed by the COMPANY; (ii) while I am employed by a part of the COMPANY that is based in California; or (iii) while I am based in California after my employment with the COMPANY ends:

   (a) The prohibitions set forth in Paragraph 6 above limiting my ability to provide services during the 18 month period after the termination of my employment shall not apply. I agree, however, that it will be presumed that any services I provide for a CONFLICTING ORGANIZATION during that period threaten misuse of the COMPANY'S CONFIDENTIAL INFORMATION and I agree that I will have the burden to rebut that presumption in any dispute concerning such services. I also agree that it will be presumed that I have misused the COMPANY's CONFIDENTIAL INFORMATION in the course of providing such services and I agree that I will have the burden of rebutting such presumption in any dispute concerning such services. However, such presumptions shall not apply to services that I provide to a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business to which I provide services, not a CONFLICTING ORGANIZATION.

- 3 -

JANREM0113024

(b) To enable the COMPANY to monitor my compliance with the obligations imposed by this Agreement and protect its legitimate interests, I agree to voluntarily provide information requested by the COMPANY about any services I provide to a CONFLICTING ORGANIZATION during the 18 month period after the termination of my employment with the COMPANY except with respect to services I provide to a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business to which I provide services, not a CONFLICTING ORGANIZATION. The COMPANY shall not use information provided by me pursuant to this paragraph except to enforce my obligations to the COMPANY or to remedy breaches or unlawful interference by others with my obligations to the COMPANY. In responding to any such requests for information, I shall not disclose to the COMPANY any trade secret, proprietary or confidential information belonging to any others. In addition, nothing in this paragraph shall alter the COMPANY's rights to use information received pursuant to Paragraph 3 of this Agreement or to receive the information required pursuant to Paragraph 8 of this Agreement.

(c) The following shall replace the last sentence of Paragraph 7 above: I, thus, agree that for a period of twelve (12) months after termination of employment with the COMPANY for any reason, I will not solicit or recruit on my own behalf, or on behalf of others, any COMPANY personnel.

21. Nothing contained in this Agreement shall be deemed to confer on me any rights with respect to the duration of my employment with the COMPANY. I UNDERSTAND AND AGREE THAT MY EMPLOYMENT RELATIONSHIP WITH THE COMPANY IS TERMINABLE AT WILL BY EITHER THE COMPANY OR ME, WITH OR WITHOUT CAUSE, EXCEPT THAT IF I INITIATE THE TERMINATION, THERE SHALL BE, AT THE COMPANY'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER I GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. If the COMPANY elects to continue my employment during the notice period, it shall advise me of that fact, and of the duration of the notice period. During any notice period, I will provide such transitional services as the COMPANY may request. The COMPANY will be obligated to continue my pay during the notice period, and my duty of loyalty to the COMPANY shall continue through such period.

I ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, and agree that with respect to the subject matter hereof it is my entire agreement with the COMPANY, superseding any previous oral or written communications, representations, understandings, or agreements with the COMPANY or any of its officials or representatives.

DATE: 4-5-05

EMPLOYEE: Rhonda Barr

Name: Rhonda Barr

Address: 9052 Hayden Dr.

City/State: Shreveport, La. 71106

- 4 -

Revised 11/02/04

JANREM0113025

# EXHIBIT B

JANREM0113026

January 3, 2000



**Cordis**

a Johnson-Johnson company

Revised from letter dated December 28, 1999

Cordis Corporation
14201 N.W. 60th Avenue
Miami Lakes, FL 33014
Phone (305) 824-2000
Fax (305) 824-2080

Mr. Bart Fitzpatrick
3954 Devonshire Drive
Cincinnati, Ohio  45226

Mailing Address:
P.O. Box 025700
Miami, FL 33102-5700

Dear Bart,

I am pleased to confirm on behalf of Cordis Corporation an offer of employment for the position of Sr. Sales Representative, Cardiology Systems for the Cincinnati North territory. This position will report to Chris Barys, Division Manager. Your base compensation will be $52,400.00 annually.

You will receive a six-month guarantee of $4,583.00 per month to be paid as follows. During the first three months of employment you will be paid a guarantee of $4,583.00 per month. At the end of the fourth, fifth, and sixth months, the guarantee will be reconciled against your earned commissions. Should your earned commissions exceed the guarantee, you will be paid the greater amount at the end of each month.

This offer is contingent upon your successful completion of a pre-placement physical examination, which includes a drug screen; a background check of both your academic and professional credentials; a credit review and compensation verification, which will be conducted by an outside agency; presentation of appropriate work authorization papers (I-9); and your completed application. If, for any reason, you do not meet the necessary requirements, this offer of employment is void and Cordis Corp. is under no obligation to hire you for this or any other position.

This offer is also contingent upon execution of the attached Employee Secrecy, Non-Competition and Non-Solicitation Agreement. The signed agreement must be returned to me before you begin employment or relocation.

An expectation of both the Sales Management Team and the Sales Training Department is that you maintain an 85% or higher score on all course work during training. Course work includes exams, quizzes, homework and oral presentations. Failure to successfully fulfill the requirements of this development program may result in separation from the company. To help you meet this challenge; we will send you a copy of our pre-training study guide.

JANREM0113027

All compensation indicated in this letter is subject to continued employment and satisfactory job performance. This offer letter constitutes our complete offer package to recognize your job responsibilities. Any promises or representation, either oral or written, that are not contained in this letter are not valid and are not binding on the Company.

Cordis employs an Employee Dispute Resolution Program (Common Ground) as the exclusive means for attempting to resolve disputes between employees and the Company. In accepting this position, you agree to process all employment related claims against the Company through this Program.

Cordis, like other Johnson & Johnson companies, maintains an employment-at-will relationship with its employees. This means that both you and the Company retain the right to terminate this employment relationship at any time and for any reason.

Upon being employed, you will be able to participate in the Johnson & Johnson benefits program. Benefits will be administered by the Benefit Service Center and an enrollment package will be mailed directly to your home. A toll free number will be available for any benefit questions you may have.

Please signify your acceptance of this offer of employment by signing below and returning the original letter to me. A photocopy of this offer letter is included for your records. If you have any questions about the information in this letter, please call me at (305) 824-2722. If you wish, you may fax the letter back at (305) 824-2600.

Welcome to Cordis. I want to wish you luck in your new position!

Sincerely,

Mayte E. Morales
Human Resources Administrator

cc: Chris Barys

Agree and accepted:

Bart Fitzpatrick                              1/4/06
Bart Fitzpatrick                              Date

JANREM0113028

~Endo

# EMPLOYEE SECRECY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT

## *Cordis*
a *Johnson-Johnson* company

Name of Employee:   MICHAEL P. DONAHUE

Residence Address:   100 EAST CLARKSVILLE CT
CARY, NC 27513

Cordis Corporation
14201 N.W. 60th Avenue
Miami Lakes, FL 33014
Phone (305) 824-2000
Fax (305) 824-2080

Mailing Address:
P.O. Box 025700
Miami, FL 33102-5700

## DEFINITIONS

As used in this agreement:

**the COMPANY** means CORDIS CORPORATION, and JOHNSON & JOHNSON and any of their successors or assigns, purchasers, acquirers, and any of their existing and future subsidiaries, divisions or affiliates, including any such subsidiary, division or affiliate of Johnson & Johnson to which I may be transferred or by which I may be employed in the future. Affiliates of the COMPANY are any corporation, entity or organization more than 30% owned by the COMPANY, by Johnson & Johnson or by any subsidiary of Johnson & Johnson.

**I** means the employee whose name appears above, also referred to by the use of first person pronouns, such as me and my.

**INVENTIONS** means discoveries, improvements and/or ideas, whether patentable or not.

**CONFIDENTIAL INFORMATION** means information disclosed to me or known by me as a result of my employment by the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, about products, processes, machines, customers, clients, employees and services of the COMPANY, including, but not limited to, inventions, research, development, manufacturing, purchasing, finance, data processing, engineering, marketing, merchandising, selling, sales volumes and strategies, number and location of sales representatives, names and significance of the COMPANY's customers and clients and their employees and representatives, preferences, needs and requirements, purchasing histories, and other customer or client-specific information and comparable information about the products, processes, machines, customers, clients and services of affiliates of the COMPANY acquired by me during my employment by the COMPANY.

**CONFLICTING PRODUCT** means any product, process, machine, invention or service of any person or organization other than the COMPANY in existence or under development which resembles or competes with a product, process, machine, invention or service upon which I shall have worked or about which I become knowledgeable as part of my job responsibilities during my term of employment with the COMPANY and whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION which I shall have had access to during my employment.

**CONFLICTING ORGANIZATION** means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a CONFLICTING PRODUCT.

I recognize that the business in which the COMPANY is engaged is extremely competitive and that the COMPANY will be providing me with CONFIDENTIAL INFORMATION both at the commencement of my employment and thereafter and may also be providing me with the opportunity to contribute to the creation of CONFIDENTIAL INFORMATION, which will assist both the COMPANY and me in competing effectively. I recognize that CONFIDENTIAL INFORMATION is significant to the COMPANY'S competitive position and that the COMPANY therefore expects me to keep it secret and also expects me not to compete with the COMPANY during my employment and for a period of time thereafter.

Accordingly, in consideration of the receipt of CONFIDENTIAL INFORMATION and my employment or the continuation of my employment by the COMPANY:

1.  I agree to disclose promptly to the COMPANY all INVENTIONS conceived or made by me whether or not during my hours of employment or with the use of the COMPANY's facilities, materials or personnel, either solely or jointly with another or others during my employment with the COMPANY, and related to the actual or anticipated business or activities of the COMPANY, or related to its actual or anticipated research and development or suggested by or resulting from any task assigned to me or work performed by me for, or on behalf of, the COMPANY. I assign and agree to assign my entire right, title and interest therein to the COMPANY. I will not assert any rights under or to any INVENTIONS as having been made or acquired by me prior to my being employed by the COMPANY unless such INVENTIONS are identified on a sheet attached hereto and signed by me and the COMPANY as of the date of this agreement.

2.  I recognize that all works, including, but not limited to reports, computer programs, drawings, documentation and publications, which I prepare within the scope of my employment with the COMPANY, shall be works made for hire and that the worldwide copyrights therein shall be the sole and exclusive property of the COMPANY. I will promptly and fully disclose all such works to the COMPANY.

3.  I shall, whenever requested to do so by the COMPANY, execute any applications, assignments or other instruments which the COMPANY shall consider necessary to apply for and obtain Letters Patent and/or copyright registrations in the United States, or any foreign country, or to protect otherwise the COMPANY's interests. These obligations shall continue beyond the termination of my employment with the

JANREM0113029

COMPANY with respect to INVENTIONS or copyrightable works conceived, authored or made by me during my period of employment, and shall be binding upon my executors, administrators, or other legal representatives.

4.  I shall not disclose to the COMPANY or induce the COMPANY to use any secret, proprietary or confidential information or material belonging to others, including my former employers, if any.   I am aware of no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would in any way restrict, limit or prohibit my employment by the COMPANY that I have not disclosed and provided to the COMPANY.

5.  I recognize that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a CONFLICTING ORGANIZATION, will cause immediate irreparable injury to the COMPANY.   Unless I first secure the COMPANY's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION.   I understand and agree that my obligations not to disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION shall continue after termination of my employment for any reason.

6.  I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States or Canada, or in any other foreign country or territory in which I performed services for the Company, for a period of eighteen (18) months after termination of my employment with the COMPANY for any reason, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION, provided the COMPANY, prior to my accepting such employment, shall receive separate written assurances satisfactory to the COMPANY from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly, for an 18-month period, in connection with any CONFLICTING PRODUCT.

7.  I recognize that the COMPANY's relations with its accounts, customers and clients represents an important business asset that results from the COMPANY's significant investment of its time and resources.  I further recognize that by virtue of my employment by the COMPANY, I have gained or may gain relationships with the accounts, customers and clients of the COMPANY, and because of such relationships, I could cause the COMPANY great loss, damage, and immediate irreparable harm, if, during my employment by the COMPANY or subsequent to the termination of such employment for any reason, I should for myself or on behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a product or service that could compete with a product or service being sold or developed by the COMPANY.  I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not solicit any business from, sell to, or render any service to, or, directly or indirectly, help others to solicit business from or render service or sell to, any of the accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY, for any purpose related to the sale of any such product or service.  I also agree that for a period of twelve (12) months after termination of employment with the COMPANY for any reason, I will not solicit or hire on my own behalf, or on behalf of others, any COMPANY employee.

8.  To enable the COMPANY to monitor my compliance with the obligations imposed by this Agreement, I agree to inform the COMPANY, at the time I give notice of my termination of employment, of the identity of my new employer and of my job title and responsibilities, and will continue to so inform the COMPANY, in writing, any time I change employment during the eighteen (18) months following termination of my employment by the COMPANY for any reason.

9.  If I am unable to obtain employment consistent with my training and education solely because of prohibitions of paragraphs 6 or 7 of this Agreement, the prohibitions of those paragraphs that have caused me to be unable to obtain such employment shall bind me only as long as the COMPANY shall make payments to me equal to my monthly base pay at termination (exclusive of extra compensation and employee benefits) for each month of such unemployment for the period of the prohibition specified in paragraphs 6 and 7, provided that I am in compliance with paragraphs 8, 10 and 11 of this Agreement.

10.  I will, for each month of such unemployment for which I claim payment, give the COMPANY a detailed written account of my efforts to obtain employment, and such account will include a statement by me that, although I conscientiously sought employment consistent with my training and education, I was unable to obtain it solely because of a prohibition of paragraphs 6 or 7 of this Agreement.  It will also specify which particular prohibition caused me to be unable to obtain the employment.  I will submit such account to the Vice President, Human Resources of the COMPANY within fifteen (15) days following the end of each calendar month of my unemployment, and the COMPANY shall make a payment to be equal to my monthly base pay at termination.  It is understood that the COMPANY shall, at its option, be relieved of making a monthly payment to me for any month with respect to which I have failed to account to the COMPANY, as required by this paragraph 10.

11.  If after termination of my employment with the COMPANY, I obtain other employment but, solely because of the prohibitions of paragraphs 6 or 7 of this Agreement, my position is such that my gross monthly income will be less than what I last received from the COMPANY as regular monthly base pay, then the COMPANY's obligation to make payments to me for the period specified in paragraphs 6 and 7 will be limited to the difference between the amount I last received from the COMPANY as regular monthly base pay, and the gross monthly income I will receive in my subsequent employment.  However, I understand that I must provide appropriate written documentation from my employer verifying my compensation to support my claim for entitlement to this salary differential.

- 2 -

JANREM0113030

12. If the COMPANY, at any time within the period of prohibition specified in paragraphs 6 and 7, gives me a written release from the prohibitions of paragraphs 6 and 7 that have been the sole cause of my inability to obtain employment consistent with my training and education or my inability to obtain a position in which my gross monthly income equals my last regular monthly base pay at the COMPANY, the COMPANY will thereafter no longer be obligated to make the payments that had been required due to those prohibitions.

13. Upon termination of my employment with the COMPANY, either prior to or upon my retirement, I shall turn over to a designated individual employed by the COMPANY, all property then in my possession or custody and belonging to the COMPANY, including any computer equipment. I shall not retain any copies of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents, including electronic information and property, relating in any way to the affairs of the COMPANY and which were entrusted to me or obtained by me at any time during my employment with the COMPANY.

14. I understand and acknowledge that if I violate this Agreement or am about to violate this Agreement by accepting employment or providing services prohibited by paragraph 6 or 7 above, the COMPANY shall have the right, and be entitled to, in addition to any other remedies it may have, injunctive relief; in other words, I understand and acknowledge that the COMPANY can bar me from accepting such employment or rendering such services for the periods specified in paragraphs 6 and 7 above.

15. I hereby consent and agree to assignment by the COMPANY of this Agreement and all rights and obligations hereunder including, but not limited to, an assignment in connection with any merger, sale, transfer or acquisition by the COMPANY or relating to all or part of its assets, division and/or affiliates.

16. Nothing herein shall limit or reduce my common law duties to the COMPANY, including but not limited to my duty of loyalty.

17. This agreement shall be interpreted according to the laws of the State of New Jersey without regard to the conflict of law rules thereof.

18. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.

19. The following applies only to a California, Minnesota or North Carolina employee: Notification is hereby given that paragraph 1 does not apply to an invention to the extent that no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely by me on my own time, and (a) which does not relate (i) to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research development, or (b) which does not result from any work performed by me for the COMPANY.

20. The following applies only to a State of Washington employee: Notification is hereby given that this agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely on my own time, unless (a) the invention relates (i) directly to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research development, or (b) the invention results from any work performed by me for the COMPANY.

21. Nothing contained in this agreement shall be deemed to confer on me any rights with respect to the duration of my employment with the COMPANY. I UNDERSTAND AND AGREE THAT MY EMPLOYMENT RELATIONSHIP WITH THE COMPANY IS TERMINABLE AT WILL BY EITHER THE COMPANY OR ME, WITH OR WITHOUT CAUSE, EXCEPT THAT IF I INITIATE THE TERMINATION, THERE SHALL BE, AT THE COMPANY'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER I GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. IF THE COMPANY ELECTS TO CONTINUE MY EMPLOYMENT DURING THE NOTICE PERIOD, IT SHALL ADVISE ME OF THAT FACT, AND OF THE DURATION OF THE NOTICE PERIOD. DURING ANY NOTICE PERIOD, I WILL PROVIDE SUCH TRANSITIONAL SERVICES AS THE COMPANY MAY REQUEST. THE COMPANY WILL BE OBLIGATED TO PAY ME MY FULL BASE SALARY DURING THE NOTICE PERIOD, AND MY DUTY OF LOYALTY TO THE COMPANY SHALL CONTINUE THROUGH SUCH PERIOD.

I ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, and agree that with respect to the subject matter hereof it is my entire agreement with the COMPANY, superseding any previous oral or written communications, representations, understandings, or agreements with the COMPANY or any of its officials or representatives.

DATE: _12/24/99_

_Michael P. Donahue_
EMPLOYEE

_MICHAEL P. DONAHUE_
Name

_1010 EAST CLARKSVILLE CT_
Address

_CARY, NC 27513_
City/State

- 3 -

JANREM0113031

*Endo*

## EMPLOYEE SECRECY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT



**Cordis**

a *Johnson-Johnson* company

Name of Employee: Christopher M. Hackett

Residence Address: C-715 Ringwood Ct. St. Louis MO C-3129

*Cordis Corporation*
*14201 N.W. 60th Avenue*
*Miami Lakes, FL 33014*
*Phone (305) 824-2000*
*Fax (305) 824-2080*

*Mailing Address:*
*P.O. Box 025700*
*Miami, FL 33102-5700*

### DEFINITIONS

As used in this agreement:

**the COMPANY** means CORDIS CORPORATION, and JOHNSON & JOHNSON and any of their successors or assigns, purchasers, acquirers, and any of their existing and future subsidiaries, divisions or affiliates, including any such subsidiary, division or affiliate of Johnson & Johnson to which I may be transferred or by which I may be employed in the future. Affiliates of the COMPANY are any corporation, entity or organization more than 30% owned by the COMPANY, by Johnson & Johnson or by any subsidiary of Johnson & Johnson.

**I** means the employee whose name appears above, also referred to by the use of first person pronouns, such as me and my.

**INVENTIONS** means discoveries, improvements and/or ideas, whether patentable or not.

**CONFIDENTIAL INFORMATION** means information disclosed to me or known by me as a result of my employment by the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, about products, processes, machines, customers, clients, employees and services of the COMPANY, including, but not limited to, inventions, research, development, manufacturing, purchasing, finance, data processing, engineering, marketing, merchandising, selling, sales volumes and strategies, number and location of sales representatives, names and significance of the COMPANY's customers and clients and their employees and representatives, preferences, needs and requirements, purchasing histories, and other customer or client-specific information and comparable information about the products, processes, machines, customers, clients and services of affiliates of the COMPANY acquired by me during my employment by the COMPANY.

**CONFLICTING PRODUCT** means any product, process, machine, invention or service of any person or organization other than the COMPANY in existence or under development which resembles or competes with a product, process, machine, invention or service upon which I shall have worked or about which I become knowledgeable as part of my job responsibilities during my term of employment with the COMPANY and whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION which I shall have had access to during my employment.

**CONFLICTING ORGANIZATION** means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a CONFLICTING PRODUCT.

I recognize that the business in which the COMPANY is engaged is extremely competitive and that the COMPANY will be providing me with CONFIDENTIAL INFORMATION both at the commencement of my employment and thereafter and may also be providing me with the opportunity to contribute to the creation of CONFIDENTIAL INFORMATION, which will assist both the COMPANY and me in competing effectively. I recognize that CONFIDENTIAL INFORMATION is significant to the COMPANY'S competitive position and that the COMPANY therefore expects me to keep it secret and also expects me not to compete with the COMPANY during my employment and for a period of time thereafter.

Accordingly, in consideration of the receipt of CONFIDENTIAL INFORMATION and my employment or the continuation of my employment by the COMPANY:

1. I agree to disclose promptly to the COMPANY all INVENTIONS conceived or made by me whether or not during my hours of employment or with the use of the COMPANY's facilities, materials or personnel, either solely or jointly with another or others during my employment with the COMPANY, and related to the actual or anticipated business or activities of the COMPANY, or related to its actual or anticipated research and development or suggested by or resulting from any task assigned to me or work performed by me for, or on behalf of, the COMPANY. I assign and agree to assign my entire right, title and interest therein to the COMPANY. I will not assert any rights under or to any INVENTIONS as having been made or acquired by me prior to my being employed by the COMPANY unless such INVENTIONS are identified on a sheet attached hereto and signed by me and the COMPANY as of the date of this agreement.

2. I recognize that all works, including, but not limited to reports, computer programs, drawings, documentation and publications, which I prepare within the scope of my employment with the COMPANY, shall be works made for hire and that the worldwide copyrights therein shall be the sole and exclusive property of the COMPANY. I will promptly and fully disclose all such works to the COMPANY.

3. I shall, whenever requested to do so by the COMPANY, execute any applications, assignments or other instruments which the COMPANY shall consider necessary to apply for and obtain Letters Patent and/or copyright registrations in the United States, or any foreign country, or to protect otherwise the COMPANY's interests. These obligations shall continue beyond the termination of my employment with the

JANREM0113032

COMPANY with respect to INVENTIONS or copyrightable works conceived, authored or made by me during my period of employment, and shall be binding upon my executors, administrators, or other legal representatives.

4.  I shall not disclose to the COMPANY or induce the COMPANY to use any secret, proprietary or confidential information or material belonging to others, including my former employers, if any.  I am aware of no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would in any way restrict, limit or prohibit my employment by the COMPANY that I have not disclosed and provided to the COMPANY.

5.  I recognize that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a CONFLICTING ORGANIZATION, will cause immediate irreparable injury to the COMPANY.  Unless I first secure the COMPANY's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION.  I understand and agree that my obligations not to disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION shall continue after termination of my employment for any reason.

6.  I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States or Canada, or in any other foreign country or territory in which I performed services for the Company, for a period of eighteen (18) months after termination of my employment with the COMPANY for any reason, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION, provided the COMPANY, prior to my accepting such employment, shall receive separate written assurances satisfactory to the COMPANY from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly, for an 18-month period, in connection with any CONFLICTING PRODUCT.

7.  I recognize that the COMPANY's relations with its accounts, customers and clients represents an important business asset that results from the COMPANY's significant investment of its time and resources.  I further recognize that by virtue of my employment by the COMPANY, I have gained or may gain relationships with the accounts, customers and clients of the COMPANY, and because of such relationships, I could cause the COMPANY great loss, damage, and immediate irreparable harm, if, during my employment by the COMPANY or subsequent to the termination of such employment for any reason, I should for myself or on behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a product or service that could compete with a product or service being sold or developed by the COMPANY.  I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not solicit any business from, sell to, or render any service to, or, directly or indirectly, help others to solicit business from or render service or sell to, any of the accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY, for any purpose related to the sale of any such product or service.  I also agree that for a period of twelve (12) months after termination of employment with the COMPANY for any reason, I will not solicit or hire on my own behalf, or on behalf of others, any COMPANY employee.

8.  To enable the COMPANY to monitor my compliance with the obligations imposed by this Agreement, I agree to inform the COMPANY, at the time I give notice of my termination of employment, of the identity of my new employer and of my job title and responsibilities, and will continue to so inform the COMPANY, in writing, any time I change employment during the eighteen (18) months following termination of my employment by the COMPANY for any reason.

9.  If I am unable to obtain employment consistent with my training and education solely because of prohibitions of paragraphs 6 or 7 of this Agreement, the prohibitions of those paragraphs that have caused me to be unable to obtain such employment shall bind me only as long as the COMPANY shall make payments to me equal to my monthly base pay at termination (exclusive of extra compensation and employee benefits) for each month of such unemployment for the period of the prohibition specified in paragraphs 6 and 7, provided that I am in compliance with paragraphs 8, 10 and 11 of this Agreement.

10.  I will, for each month of such unemployment for which I claim payment, give the COMPANY a detailed written account of my efforts to obtain employment, and such account will include a statement by me that, although I conscientiously sought employment consistent with my training and education, I was unable to obtain it solely because of a prohibition of paragraphs 6 or 7 of this Agreement.  It will also specify which particular prohibition caused me to be unable to obtain the employment.  I will submit such account to the Vice President, Human Resources of the COMPANY within fifteen (15) days following the end of each calendar month of my unemployment, and the COMPANY shall make a payment to be equal to my monthly base pay at termination.  It is understood that the COMPANY shall, at its option, be relieved of making a monthly payment to me for any month with respect to which I have failed to account to the COMPANY, as required by this paragraph 10.

11.  If after termination of my employment with the COMPANY, I obtain other employment but, solely because of the prohibitions of paragraphs 6 or 7 of this Agreement, my position is such that my gross monthly income will be less than what I last received from the COMPANY as regular monthly base pay, then the COMPANY's obligation to make payments to me for the period specified in paragraphs 6 and 7 will be limited to the difference between the amount I last received from the COMPANY as regular monthly base pay, and the gross monthly income I will receive in my subsequent employment.  However, I understand that I must provide appropriate written documentation from my employer verifying my compensation to support my claim for entitlement to this salary differential.

- 2 -

JANREM01113033

12. If the COMPANY, at any time within the period of prohibition specified in paragraphs 6 and 7, gives me a written release from the prohibitions of paragraphs 6 and 7 that have been the sole cause of my inability to obtain employment consistent with my training and education or my inability to obtain a position in which my gross monthly income equals my last regular monthly base pay at the COMPANY, the COMPANY will thereafter no longer be obligated to make the payments that had been required due to those prohibitions.

13. Upon termination of my employment with the COMPANY, either prior to or upon my retirement, I shall turn over to a designated individual employed by the COMPANY, all property then in my possession or custody and belonging to the COMPANY, including any computer equipment. I shall not retain any copies of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents, including electronic information and property, relating in any way to the affairs of the COMPANY and which were entrusted to me or obtained by me at any time during my employment with the COMPANY.

14. I understand and acknowledge that if I violate this Agreement or am about to violate this Agreement by accepting employment or providing services prohibited by paragraph 6 or 7 above, the COMPANY shall have the right, and be entitled to, in addition to any other remedies it may have, injunctive relief; in other words, I understand and acknowledge that the COMPANY can bar me from accepting such employment or rendering such services for the periods specified in paragraphs 6 and 7 above.

15. I hereby consent and agree to assignment by the COMPANY of this Agreement and all rights and obligations hereunder including, but not limited to, an assignment in connection with any merger, sale, transfer or acquisition by the COMPANY or relating to all or part of its assets, division and/or affiliates.

16. Nothing herein shall limit or reduce my common law duties to the COMPANY, including but not limited to my duty of loyalty.

17. This agreement shall be interpreted according to the laws of the State of New Jersey without regard to the conflict of law rules thereof.

18. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.

19. <u>The following applies only to a California, Minnesota or North Carolina employee:</u> Notification is hereby given that paragraph 1 does not apply to an invention to the extent that no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely by me on my own time, and (a) which does not relate (i) to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research development, or (b) which does not result from any work performed by me for the COMPANY.

20. <u>The following applies only to a State of Washington employee:</u> Notification is hereby given that this agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely on my own time, unless (a) the invention relates (i) directly to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research development, or (b) the invention results from any work performed by me for the COMPANY.

21. Nothing contained in this agreement shall be deemed to confer on me any rights with respect to the duration of my employment with the COMPANY. I UNDERSTAND AND AGREE THAT MY EMPLOYMENT RELATIONSHIP WITH THE COMPANY IS TERMINABLE AT WILL BY EITHER THE COMPANY OR ME, WITH OR WITHOUT CAUSE, EXCEPT THAT IF I INITIATE THE TERMINATION, THERE SHALL BE, AT THE COMPANY'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER I GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. IF THE COMPANY ELECTS TO CONTINUE MY EMPLOYMENT DURING THE NOTICE PERIOD, IT SHALL ADVISE ME OF THAT FACT, AND OF THE DURATION OF THE NOTICE PERIOD. DURING ANY NOTICE PERIOD, I WILL PROVIDE SUCH TRANSITIONAL SERVICES AS THE COMPANY MAY REQUEST. THE COMPANY WILL BE OBLIGATED TO PAY ME MY FULL BASE SALARY DURING THE NOTICE PERIOD, AND MY DUTY OF LOYALTY TO THE COMPANY SHALL CONTINUE THROUGH SUCH PERIOD.

I ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, and agree that with respect to the subject matter hereof it is my entire agreement with the COMPANY, superseding any previous oral or written communications, representations, understandings, or agreements with the COMPANY or any of its officials or representatives.

DATE: 12-20-99

EMPLOYEE _Christopher M. Hackett_

Name   Christopher M. Hackett

Address   6715 Ringwood Ct.

City/State   St. Louis MO 63129

- 3 -

JANREM0113034

# EXHIBIT C

JANREM0113035

## EMPLOYEE SECRECY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT

# Cordis

a Johnson-Johnson company

Name of Employee: _Brendan McKeever_

Residence Address: _65 Duhurst Rd_
_Pearl River N.Y. 10965_

*Cordis Corporation*
*14201 N.W. 60th Avenue*
*Miami Lakes, FL 33014*
*Phone (305) 824-2000*
*Fax (305) 824-2080*

*Mailing Address:*
*P.O. Box 025700*
*Miami, FL 33102-5700*

### DEFINITIONS

As used in this agreement:

**the COMPANY** means CORDIS CORPORATION, and JOHNSON & JOHNSON and any of their successors or assigns, purchasers, acquirers, and any of their existing and future subsidiaries, divisions or affiliates, including any such subsidiary, division or affiliate of Johnson & Johnson to which I may be transferred or by which I may be employed in the future. Affiliates of the COMPANY are any corporation, entity or organization more than 30% owned by the COMPANY, by Johnson & Johnson or by any subsidiary of Johnson & Johnson.

**I** means the employee whose name appears above, also referred to by the use of first person pronouns, such as me and my.

**INVENTIONS** means discoveries, improvements and/or ideas, whether patentable or not.

**CONFIDENTIAL INFORMATION** means information disclosed to me or known by me as a result of my employment by the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, about products, processes, machines, customers, clients, employees and services of the COMPANY, including, but not limited to, inventions, research, development, manufacturing, purchasing, finance, data processing, engineering, marketing, merchandising, selling, sales volumes and strategies, number and location of sales representatives, names and significance of the COMPANY's customers and clients and their employees and representatives, preferences, needs and requirements, purchasing histories, and other customer or client-specific information and comparable information about the products, processes, machines, customers, clients and services of affiliates of the COMPANY acquired by me during my employment by the COMPANY.

**CONFLICTING PRODUCT** means any product, process, machine, invention or service of any person or organization other than the COMPANY in existence or under development which resembles or competes with a product, process, machine, invention or service upon which I shall have worked or about which I become knowledgeable as part of my job responsibilities during my term of employment with the COMPANY and whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION which I shall have had access to during my employment.

**CONFLICTING ORGANIZATION** means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a CONFLICTING PRODUCT.

I recognize that the business in which the COMPANY is engaged is extremely competitive and that the COMPANY will be providing me with CONFIDENTIAL INFORMATION both at the commencement of my employment and thereafter and may also be providing me with the opportunity to contribute to the creation of CONFIDENTIAL INFORMATION, which will assist both the COMPANY and me in competing effectively. I recognize that CONFIDENTIAL INFORMATION is significant to the COMPANY'S competitive position and that the COMPANY therefore expects me to keep it secret and also expects me not to compete with the COMPANY during my employment and for a period of time thereafter.

Accordingly, in consideration of the receipt of CONFIDENTIAL INFORMATION and my employment or the continuation of my employment by the COMPANY:

1. I agree to disclose promptly to the COMPANY all INVENTIONS conceived or made by me whether or not during my hours of employment or with the use of the COMPANY's facilities, materials or personnel, either solely or jointly with another or others during my employment with the COMPANY, and related to the actual or anticipated business or activities of the COMPANY, or related to its actual or anticipated research and development or suggested by or resulting from any task assigned to me or work performed by me for, or on behalf of, the COMPANY. I assign and agree to assign my entire right, title and interest therein to the COMPANY. I will not assert any rights under or to any INVENTIONS as having been made or acquired by me prior to my being employed by the COMPANY unless such INVENTIONS are identified on a sheet attached hereto and signed by me and the COMPANY as of the date of this agreement.

2. I recognize that all works, including, but not limited to reports, computer programs, drawings, documentation and publications, which I prepare within the scope of my employment with the COMPANY, shall be works made for hire and that the worldwide copyrights therein shall be the sole and exclusive property of the COMPANY. I will promptly and fully disclose all such works to the COMPANY.

3. I shall, whenever requested to do so by the COMPANY, execute any applications, assignments or other instruments which the COMPANY shall consider necessary to apply for and obtain Letters Patent and/or copyright registrations in the United States, or any foreign country, or to protect otherwise the COMPANY's interests. These obligations shall continue beyond the termination of my employment with the

JANREM0113036

COMPANY with respect to INVENTIONS or copyrightable works conceived, authored or made by me during my period of employment, and shall be binding upon my executors, administrators, or other legal representatives.

4.   I shall not disclose to the COMPANY or induce the COMPANY to use any secret, proprietary or confidential information or material belonging to others, including my former employers, if any.  I am aware of no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would in any way restrict, limit or prohibit my employment by the COMPANY that I have not disclosed and provided to the COMPANY.

5.   I recognize that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a CONFLICTING ORGANIZATION, will cause immediate irreparable injury to the COMPANY.  Unless I first secure the COMPANY's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION.  I understand and agree that my obligations not to disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION shall continue after termination of my employment for any reason.

6.   I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States or Canada, or in any other foreign country or territory in which I performed services for the Company, for a period of eighteen (18) months after termination of my employment with the COMPANY for any reason, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION, provided the COMPANY, prior to my accepting such employment, shall receive separate written assurances satisfactory to the COMPANY from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly, for an 18-month period, in connection with any CONFLICTING PRODUCT.

7.   I recognize that the COMPANY's relations with its accounts, customers and clients represents an important business asset that results from the COMPANY's significant investment of its time and resources.  I further recognize that by virtue of my employment by the COMPANY, I have gained or may gain relationships with the accounts, customers and clients of the COMPANY, and because of such relationships, I could cause the COMPANY great loss, damage, and immediate irreparable harm, if, during my employment by the COMPANY or subsequent to the termination of such employment for any reason, I should for myself or on behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a product or service that could compete with a product or service being sold or developed by the COMPANY.  I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not solicit any business from, sell to, or render any service to, or, directly or indirectly, help others to solicit business from or render service or sell to, any of the accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY, for any purpose related to the sale of any such product or service.  I also agree that for a period of twelve (12) months after termination of employment with the COMPANY for any reason, I will not solicit or hire on my own behalf, or on behalf of others, any COMPANY employee.

8.   To enable the COMPANY to monitor my compliance with the obligations imposed by this Agreement, I agree to inform the COMPANY, at the time I give notice of my termination of employment, of the identity of my new employer and of my job title and responsibilities, and will continue to so inform the COMPANY, in writing, any time I change employment during the eighteen (18) months following termination of my employment by the COMPANY for any reason.

9.   If I am unable to obtain employment consistent with my training and education solely because of prohibitions of paragraphs 6 or 7 of this Agreement, the prohibitions of those paragraphs that have caused me to be unable to obtain such employment shall bind me only as long as the COMPANY shall make payments to me equal to my monthly base pay at termination (exclusive of extra compensation and employee benefits) for each month of such unemployment for the period of the prohibition specified in paragraphs 6 and 7, provided that I am in compliance with paragraphs 8, 10 and 11 of this Agreement.

10.  I will, for each month of such unemployment for which I claim payment, give the COMPANY a detailed written account of my efforts to obtain employment, and such account will include a statement by me that, although I conscientiously sought employment consistent with my training and education, I was unable to obtain it solely because of a prohibition of paragraphs 6 or 7 of this Agreement.  It will also specify which particular prohibition caused me to be unable to obtain the employment.  I will submit such account to the Vice President, Human Resources of the COMPANY within fifteen (15) days following the end of each calendar month of my unemployment, and the COMPANY shall make a payment to be equal to my monthly base pay at termination.  It is understood that the COMPANY shall, at its option, be relieved of making a monthly payment to me for any month with respect to which I have failed to account to the COMPANY, as required by this paragraph 10.

11.  If after termination of my employment with the COMPANY, I obtain other employment but, solely because of the prohibitions of paragraphs 6 or 7 of this Agreement, my position is such that my gross monthly income will be less than what I last received from the COMPANY as regular monthly base pay, then the COMPANY's obligation to make payments to me for the period specified in paragraphs 6 and 7 will be limited to the difference between the amount I last received from the COMPANY as regular monthly base pay, and the gross monthly income I will receive in my subsequent employment.  However, I understand that I must provide appropriate written documentation from my employer verifying my compensation to support my claim for entitlement to this salary differential.

- 2 -

JANREM0113037

12. If the COMPANY, at any time within the period of prohibition specified in paragraphs 6 and 7, gives me a written release from the prohibitions of paragraphs 6 and 7 that have been the sole cause of my inability to obtain employment consistent with my training and education or my inability to obtain a position in which my gross monthly income equals my last regular monthly base pay at the COMPANY, the COMPANY will thereafter no longer be obligated to make the payments that had been required due to those prohibitions.

13. Upon termination of my employment with the COMPANY, either prior to or upon my retirement, I shall turn over to a designated individual employed by the COMPANY, all property then in my possession or custody and belonging to the COMPANY, including any computer equipment. I shall not retain any copies of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents, including electronic information and property, relating in any way to the affairs of the COMPANY and which were entrusted to me or obtained by me at any time during my employment with the COMPANY.

14. I understand and acknowledge that if I violate this Agreement or am about to violate this Agreement by accepting employment or providing services prohibited by paragraph 6 or 7 above, the COMPANY shall have the right, and be entitled to, in addition to any other remedies it may have, injunctive relief; in other words, I understand and acknowledge that the COMPANY can bar me from accepting such employment or rendering such services for the periods specified in paragraphs 6 and 7 above.

15. I hereby consent and agree to assignment by the COMPANY of this Agreement and all rights and obligations hereunder including, but not limited to, an assignment in connection with any merger, sale, transfer or acquisition by the COMPANY or relating to all or part of its assets, division and/or affiliates.

16. Nothing herein shall limit or reduce my common law duties to the COMPANY, including but not limited to my duty of loyalty.

17. This agreement shall be interpreted according to the laws of the State of New Jersey without regard to the conflict of law rules thereof.

18. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.

19. The following applies only to a California, Minnesota or North Carolina employee: Notification is hereby given that paragraph 1 does not apply to an invention to the extent that no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely by me on my own time, and (a) which does not relate (i) to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research development, or (b) which does not result from any work performed by me for the COMPANY.

20. The following applies only to a State of Washington employee: Notification is hereby given that this agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely on my own time, unless (a) the invention relates (i) directly to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research development, or (b) the invention results from any work performed by me for the COMPANY.

21. Nothing contained in this agreement shall be deemed to confer on me any rights with respect to the duration of my employment with the COMPANY. I UNDERSTAND AND AGREE THAT MY EMPLOYMENT RELATIONSHIP WITH THE COMPANY IS TERMINABLE AT WILL BY EITHER THE COMPANY OR ME, WITH OR WITHOUT CAUSE, EXCEPT THAT IF I INITIATE THE TERMINATION, THERE SHALL BE, AT THE COMPANY'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER I GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. IF THE COMPANY ELECTS TO CONTINUE MY EMPLOYMENT DURING THE NOTICE PERIOD, IT SHALL ADVISE ME OF THAT FACT, AND OF THE DURATION OF THE NOTICE PERIOD. DURING ANY NOTICE PERIOD, I WILL PROVIDE SUCH TRANSITIONAL SERVICES AS THE COMPANY MAY REQUEST. THE COMPANY WILL BE OBLIGATED TO PAY ME MY FULL BASE SALARY DURING THE NOTICE PERIOD, AND MY DUTY OF LOYALTY TO THE COMPANY SHALL CONTINUE THROUGH SUCH PERIOD.

I ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, and agree that with respect to the subject matter hereof it is my entire agreement with the COMPANY, superseding any previous oral or written communications, representations, understandings, or agreements with the COMPANY or any of its officials or representatives.

DATE: 6/23/2000

Brendan McKeever
**EMPLOYEE**

Name 65 Durhaime Road
Address Pearl River N.Y. 10765
City/State

-3-

JANREM0113038

# EXHIBIT D

JANREM0113039

# STEARNS WEAVER MILLER
# WEISSLER ALHADEFF & SITTERSON, P.A.

Eric S. Roth
150 West Flagler Street, Suite 2200
Miami, FL 33130
Direct: (305) 789-3351
Fax: (305) 789-2657
Email: eroth@stearnsweaver.com

October 19, 2009

VIA U.S. MAIL and FACSIMILE – 763-398-7200

Kevin Klemz
Senior Vice President and Chief Legal Officer
eV-3, Inc.
Corporate World Headquarters
9600 54h Avenue North
Plymouth, MN  55442-2111

**Re:    Rhonda Barr and Bart Fitzpatrick**

Dear Mr. Klemz:

We represent Cordis Corporation, and we are writing to you with respect to Rhonda Barr and Bart Fitzpatrick, both of whom are former Cordis sales representatives who we understand have recently accepted offers of employment with eV-3, Inc., as sales representatives.  We have some concerns about Ms. Barr's and Mr. Fitzpatrick's employment with eV-3.

Both Ms. Barr and Mr. Fitzpatrick signed non-competition agreements at the commencement of their employment with Cordis.  Cordis takes very seriously matters involving its non-compete agreement.  The relevant provisions of the non-compete agreement Ms. Barr executed are as follows (Mr. Fitzpatrick's agreement contains similar language):

> 6.    During my employment with the COMPANY and for a period of eighteen (18) months after termination of my employment with the COMPANY for any reason I will not render services directly or indirectly, to any CONFLICTING ORGANIZATION in the United States or in any foreign country or territory in which the services I may provide could enhance the use or marketability of a CONFLICTING PRODUCT by application of CONFIDENTIAL INFORMATION which I shall have had access to during my employment, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION, provided that the COMPANY, prior to my accepting such employment, shall receive separate written assurances satisfactory to the COMPANY from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly, for an 18-month period, in connection with any CONFLICTING PRODUCT.  I also agree

JANREM0113040

October 19, 2009
Page 2

that during my employment with the COMPANY and for a period of 18 months thereafter, I will not render services to any other organization or person in a position in which I could use CONFIDENTIAL INFORMATION to the detriment of the COMPANY.

7.     I recognize that the COMPANY'S relations with its accounts, customers and clients represents an important business asset that results from the COMPANY'S significant investment of its time and resources. I further recognize that by virtue of my employment by the COMPANY, I have gained or may gain relationships with the accounts, customers and clients of the COMPANY, and because of such relationships, I could cause the COMPANY great loss, damage and immediate irreparable harm, if, during my employment by the COMPANY or subsequent to the termination of such employment for any reason, I should for myself or on behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a product or service that could compete with a product or service being sold or developed by the COMPANY. I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not solicit any business from, sell to, or render any service to, or, directly or indirectly, help others to solicit business from or render service or sell to, any of the accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY, for any purpose related to the sale of any such product or service. I also agree that for a period of twelve (12) months after termination of employment with the COMPANY for any reason, I will not solicit or hire on my own behalf, or on behalf of others, any COMPANY employee. ·

CONFLICTING PRODUCT means any product, process, technology, machine, invention or service of any person or organization other than the COMPANY in existence or under development which resembles or competes with a product, process, technology, machine, invention or service upon which I shall have worked or about which I become knowledgeable as a result of employment with the COMPANY and whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION which I shall have had access to during my employment.

CONFLICTING ORGANIZAITON means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a CONFLICTING PRODUCT.

Cordis employed Ms. Barr until February 2009. During her tenure as a Cordis sales representative, she called on accounts in Shreveport, Monroe and New Orleans, Louisiana as well as Jackson and Vicksburg, Mississippi. Although primarily responsible for sales of Cordis' cardiology products, Ms. Barr was also intimately involved with and knowledgeable about Cordis' endovascular business. Of primary concern to Cordis is the fact that Ms. Barr developed close relationships with physicians (including interventional cardiologists) who use endovascular products – the products she is or will soon be promoting for eV-3. We understand that, as part of her responsibilities for eV-3, she is or will be calling on the same hospitals and physicians she called on during the last 12 months of her employment with Cordis. As such, she will be acting in violation of her non-competition obligations to Cordis – both as to paragraph 6 (selling

STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON. P.A.

JANREM0113041

October 19, 2009
Page 3

Conflicting Product) and as to paragraph 7 (soliciting her Cordis customers). Clearly, for the remaining 11 months on her non-compete agreement, she cannot, as part of her responsibilities for eV-3, call on those doctors, nurses, cath lab staffs, hospital administrators and hospitals she called on for Cordis without violating the terms of her non-compete agreement and her obligations to Cordis. We will not allow her to call on such accounts, customers or clients in violation of the non-competition agreement.

Our concern with respect to Mr. Fitzpatrick relates primarily to whether he is or will be calling on any of the customers with whom he worked during his last 12 months as a Cordis sales representative. As with Ms. Barr, Mr. Fitzpatrick has relationships with many interventional cardiologists, some of whom perform peripheral procedures. If he is or will be calling on any of the same physicians/customers he worked with during the last 12 months of his employment with Cordis, he will be in violation of his non-compete agreement. We ask that you provide us with written assurance that Mr. Fitzpatrick will not, as part of his responsibilities for eV-3, solicit any business from or render service or sell to any of the accounts, physicians, customers or clients with whom he had contact during the last 12 months of his employment with Cordis.

Compounding Cordis' concern is the belief that eV-3 may be specifically targeting Cordis employees for recruitment. Cordis previously addressed that very situation with FoxHollow before it became a part of eV-3 and we understand that some of the FoxHollow sales team is still with eV-3. As you may know, there are individuals in your company who are familiar with many of the Cordis sales representatives. We trust that eV-3 is not inappropriately using the confidential information some of its employees may have about Cordis sales representatives to target Cordis' sales force for recruitment.

Cordis is prepared to take appropriate measures to protect its interests. However, I welcome the opportunity to discuss this matter to see if we can reach an understanding that will allow Ms. Barr and Mr. Fitzpatrick to pursue employment with eV-3 without violating the terms of their Cordis non-compete agreements. Please contact me by October 23, 2009 if you would like to discuss an amicable resolution of this matter.

Sincerely,

Eric S. Roth

J:\EROBarr-eV-3 letter.doc

cc.   Rhonda Barr
      Andrew Fitzpatrick

#37012 v1

JANREM0113042



Your endovascular company.

November 18, 2009

Eric Roth, Esq.
Stearns, Weaver, Miller, P.A.
150 West Flagler Street, Suite 2200
Miami, FL 33130

Re:  Rhonda Barr and Bart Fitzpatrick

Dear Mr. Roth:

I am following up on our telephone conversations regarding ev3's hiring of Rhonda Barr and
Bart Fitzpatrick.  As we have discussed, both Cordis and ev3 would like to resolve our
differences regarding the hiring of these two individuals.  With that in mind, ev3 presents to
you and your client the following proposal:

**Bart Fitzpatrick**

ev3 has reviewed the list of 46 accounts (either by hospital name and/or physician name)
submitted to us by Cordis, taken to be a comprehensive list of accounts Bart was responsible
for during his last twelve months with Cordis.  Of those accounts, 21 of them are not in Bart's
assigned territory with ev3.  There are 14 hospitals that Bart called on for Cordis which he is
now calling on for ev3.  However, he is contacting physicians at those hospitals that he had no
previous contact and/or relationship with while employed by Cordis.  Of all of the accounts
listed, there is just one physician customer that Bart had a previous business relationship with
while employed by Cordis, Dr. Lohman at Meadowview Hospital in Maysville, Kentucky.  e

With respect to the one overlapping account specified above, ev3 would be agreeable to
keeping Bart from calling on Dr. Lohman through March 31, 2010.

**Rhonda Barr**

ev3 has reviewed the list of 45 accounts (either by hospital name and/or physician name)
submitted to us by Cordis, taken to be a comprehensive list of accounts Rhonda was
responsible for during her last twelve months with Cordis.  Of those accounts, ev3 is willing to

ev3 Corporate World Headquarters / Peripheral Vascular • 3033 Campus Drive, Plymouth, MN 55441, USA • Ph +1 763 398 7000

ev3 Neurovascular • 9775 Toledo Way, Irvine, CA 92618 • Ph +1 949 837 3700

ev3 Europe / International Headquarters • 106/108 rue La Boétie, 75008 Paris, France • Ph +33 156 88 59 10

JANREM0113043


Your endovascular company.™

keep Rhonda out of 38 of the 45 accounts Cordis listed through January 31, 2010 (taking into account that Rhonda has not been in these accounts since her resignation from Cordis in February 2009).   ev3 proposes that Rhonda be allowed to call on the following seven customers without restrictions:

Dr. Ray Smith at Willis Knighton North
Dr. Brittan Eaves at Willis Knighton Bossier
Drs. Jerome Danzell, Anil Chhabra, and Rick Stafford at Willis Knighton Piermont
Dr. Greg Sampognaro and Steve Ramee at P & S

I will await you and your client's response to ev3's proposal regarding these two individuals.

Regards,

Dawn Sorensen
Deputy General Counsel

ev3 Corporate World Headquarters / Peripheral Vascular • 3033 Campus Drive, Plymouth, MN 55441, USA • Ph +1 763 398 7000

ev3 Neurovascular • 9775 Toledo Way, Irvine, CA 92618 • Ph +1 949 837 3700

ev3 Europe / International Headquarters • 106/108 rue La Boétie, 75008 Paris, France • Ph +33 156 88 59 10

JANREM0113044



## CIVIL CASE INFORMATION STATEMENT (CIS)

Use for initial Law Division
Civil Part pleadings (not motions) under Rule 4:5-1
**Pleading will be rejected for filing, under Rule 1:5-6(c),
if information above the black bar is not completed or
if attorney's signature is not affixed.**

| FOR USE BY CLERK'S OFFICE ONLY |
|---|
| PAYMENT TYPE:   CK   CG   CA |
| CHG/CK NO. |
| AMOUNT: |
| OVERPAYMENT: |
| BATCH NUMBER: |

| 1. ATTORNEY / PRO SE NAME Edwin F. Chocley, Jr. | 2. TELEPHONE NUMBER 973-538-0800 | 3. COUNTY OF VENUE Middlesex |
|---|---|---|
| 4. FIRM NAME (if applicable) Riker, Danzig, Scherer, Hyland & Perretti LLP | | 5. DOCKET NUMBER (When available) |
| 6. OFFICE ADDRESS Headquarters Plaza One Speedwell Avenue Morristown, NJ 07962-1981 | | 7. DOCUMENT TYPE Verified Complaint |
| | | 8. JURY DEMAND  ☐YES  ☒NO |

| 9. NAME OF PARTY (e.g. John Doe, Plaintiff) Johnson & Johnson and Cordis Corporation Plaintiffs | 10. CAPTION Johnson & Johnson and Cordis Corporation v. ev3, Inc., Rhonda Barr, Andrew Fitzpatrick and Brendan McKeever |
|---|---|
| 11. CASE TYPE NUMBER (See reverse side for listing) 508 | 12. IS THIS A PROFESSIONAL MALPRACTICE CASE?  ☐YES  ☒NO IF YOU HAVE CHECKED "YES," SEE N.J.S.A. 2A:53A-27 AND APPLICABLE CASE LAW REGARDING YOUR OBLIGATION TO FILE AN AFFIDAVIT OF MERIT. |
| 13. RELATED CASES PENDING?  ☐YES  ☒NO | 14. IF YES, LIST DOCKET NUMBERS |
| 15. DO YOU ANTICIPATE ADDING ANY PARTIES (arising out of same transaction or occurrence)?  ☐YES  ☒NO | 16. NAME OF DEFENDANT'S PRIMARY INSURANCE COMPANY, IF KNOWN NONE UNKNOWN X |

**THE INFORMATION PROVIDED ON THIS FORM CANNOT BE INTRODUCED INTO EVIDENCE.**

CASE CHARACTERISTICS FOR PURPOSES OF DETERMINING IF CASE IS APPROPRIATE FOR MEDIATION

| 17. A.  DO PARTIES HAVE A CURRENT, PAST OR RECURRENT RELATIONSHIP?  ☒YES  ☐NO | IF YES, IS THAT RELATIONSHIP | FORMER EMPLOYER-EMPLOYEE (BARR, FITZPATRICK, MCKEEVER)  X | FRIEND/NEIGHBOR BUSINESS | OTHER (explain) |
|---|---|---|---|---|

18. B.  DOES THE STATUTE GOVERNING THIS CASE PROVIDE FOR PAYMENT OF FEES BY THE LOSING PARTY?  ☐YES  ☒NO

19. USE THIS SPACE TO ALERT THE COURT TO ANY SPECIAL CASE CHARACTERISTICS THAT MAY WARRANT INDIVIDUAL MANAGEMENT OR ACCELERATED DISPOSITION:

20. DO YOU OR YOUR CLIENT NEED ANY DISABILITY ACCOMMODATIONS?  ☐YES  ☒NO    IF YES, PLEASE IDENTIFY THE REQUESTED ACCOMMODATION:

21. WILL AN INTERPRETER BE NEEDED?  ☐YES  ☒NO   IF YES, FOR WHAT LANGUAGE:

| 22. ATTORNEY SIGNATURE Revised effective 9/06    *Edwin F. Chocley, Jr.* | December 10, 2009 |
|---|---|

JANREM0113045

**SIDE 2**



# CIVIL CASE INFORMATION STATEMENT
## (CIS)
Use for initial pleadings (not motions) under *Rule* 4:5-1

**CASE TYPES** (Choose one and enter number of case type in appropriate space on the reverse side.)

**Track I – 150 days' discovery**

| | |
|---|---|
| 151 | NAME CHANGE |
| 175 | FORFEITURE |
| 302 | TENANCY |
| 399 | REAL PROPERTY (other than Tenancy, Contract, Condemnation, Complex Commercial or Construction) |
| 502 | BOOK ACCOUNT (debt collection matters only) |
| 505 | OTHER INSURANCE CLAIM (INCLUDING DECLARATORY JUDGMENT ACTIONS) |
| 506 | PIP COVERAGE |
| 510 | UM or UIM CLAIM |
| 511 | ACTION ON NEGOTIABLE INSTRUMENT |
| 512 | LEMON LAW |
| 801 | SUMMARY ACTION |
| 802 | OPEN PUBLIC RECORDS ACT (SUMMARY ACTION) |
| 999 | OTHER (Briefly describe nature of action |

**Track II – 300 days' discovery**

| | |
|---|---|
| 305 | CONSTRUCTION |
| 509 | EMPLOYMENT (other than CEPA or LAD) |
| 599 | CONTRACT/COMMERCIAL TRANSACTION |
| 603 | AUTO NEGLIGENCE – PERSONAL INJURY |
| 605 | PERSONAL INJURY |
| 610 | AUTO NEGLIGENCE – PROPERTY DAMAGE |
| 699 | TORT – OTHER |

**Track III – 450 days' discovery**

| | |
|---|---|
| 005 | CIVIL RIGHTS |
| 301 | CONDEMNATION |
| 602 | ASSAULT AND BATTERY |
| 604 | MEDICAL MALPRACTICE |
| 606 | PRODUCT LIABILITY |
| 607 | PROFESSIONAL MALPRACTICE |
| 608 | TOXIC TORT |
| 609 | DEFAMATION |
| 616 | WHISTLEBLOWER / CONSCIENTIOUS EMPLOYEE PROTECTION ACT (CEPA) CASES |
| 617 | INVERSE CONDEMNATION |
| 618 | LAW AGAINST DISCRIMINATION (LAD) CASES |

**Track IV – Active Case Management by Individual Judge / 450 days' discovery**

| | |
|---|---|
| 156 | ENVIRONMENTAL/ENVIRONMENTAL COVERAGE LITIGATION |
| 303 | MT. LAUREL |
| 508 | COMPLEX COMMERCIAL |
| 513 | COMPLEX CONSTRUCTION |
| 514 | INSURANCE FRAUD |
| 701 | ACTIONS IN LIEU OF PREROGATIVE WRITS |

**Mass Tort (Track IV)**

| | | | |
|---|---|---|---|
| 240 | REDUX/PHEN-FEN (formerly "DIET DRUG") | 268 | MANUFACTURED GAS PLANT (MGP) |
| 241 | TOBACCO | 271 | ACCUTANE |
| 248 | CIBA GEIGY | 272 | BEXTRA/CELEBREX |
| 264 | PPA | 601 | ASBESTOS |
| 266 | HORMONE REPLACEMENT THERAPY (HRT) | 619 | VIOXX |

**If you believe this case requires a track other than that provided above, please indicate the reason on Side 1, in the space under "Case Characteristics."**

Please check off each applicable category:

☐ Verbal Threshold          ☐ Putative Class Action          ☐ Title 59