# EXHIBIT 8



| | |
|---|---|
| JOHNSON & JOHNSON and CORDIS CORPORATION, | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION MIDDLESEX COUNTY DOCKET NO. MID-C-251-09 |
| Plaintiffs, | |
| vs. | CIVIL ACTION |
| EV3, INC., RHONDA BARR, ANDREW FITZPATRICK AND BRENDAN McKEEVER, | |
| Defendants. | |

## BRIEF IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ACCELERATED DISCOVERY

RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800

Attorneys for Plaintiffs
Johnson & Johnson and Cordis Corporation

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ..................................................................................................1

STATEMENT OF FACTS ......................................................................................................3

LEGAL ARGUMENT............................................................................................................3

I.   TEMPORARY RESTRAINTS ARE NECESSARY TO PROTECT J&J AND
     CORDIS PENDING THIS ACTION'S OUTCOME..................................................3

    A.  J&J and Cordis have satisfied the standard for the issuance of a temporary
       restraining order ...............................................................................................3

    B.  Plaintiffs have demonstrated a reasonable likelihood of success on the merits.................4

       1.  As a matter of law, J&J and Cordis maintain an absolute, judicially
          enforceable right to protect their customer relationships.............................4

       2.  J&J and Cordis possess a clear legal right to protect their confidential,
          proprietary and trade secret information........................................................8

       3.  The Court should enforce the Agreements and their reasonable, valid
          restrictive covenants.....................................................................................12

          a.  The Agreements reasonably protect J&J's and Cordis' interest in their customer
             relationships and confidential, proprietary and trade secret information,
             particularly in view of the Individual Defendants' knowledge thereof.................12

          b.  The Agreements impose no undue hardship on the Individual Defendants ...........17

          c.  The Agreements do not impair the public interest...................................................19

    C.  J&J and Cordis will be irreparably harmed if the temporary restraining order is
       not granted.....................................................................................................22

    D.  The balance of the equities weighs in favor of granting a temporary restraining
       order.............................................................................................................28

II.  PLAINTIFFS ARE ENTITLED TO EXPEDITED DISCOVERY PENDING A HEARING
     ON THEIR PRELIMINARY INJUNCTION APPLICATION...............................................29

CONCLUSION....................................................................................................................31

## PRELIMINARY STATEMENT

Plaintiffs Johnson & Johnson ("J&J") and Cordis Corporation ("Cordis") respectfully submit this brief in support of their application for a temporary restraining order and expedited discovery against defendants ev3, Inc. ("ev3"), Rhonda Barr, Andrew Fitzpatrick and Brendan McKeever (collectively, "Individual Defendants").

The limited injunctive relief sought by plaintiffs is firmly authorized and, in fact, mandated by the well-established case law set forth herein.  Here, ev3, a direct competitor of plaintiffs, has targeted three of Cordis' top-performing Sales Representatives, and has hired and assigned them to the same territories that they served at Cordis, where they have contacted and solicited, and will contact and solicit, the Cordis accounts, customers and clients whom they called on for many years as Cordis Sales Representatives.  The Individual Defendants entered into valid, enforceable Employee Secrecy, Non-Competition and Non-Solicitation Agreements ("Agreement") with plaintiffs, which contained non-disclosure, non-compete and non-solicitation covenants.

During their tenure at Cordis, the Individual Defendants had access to and acquired intimate knowledge plaintiffs' customer relationships and confidential, proprietary and trade secret information, including pricing, marketing and research and development efforts and strategies.  The Individual Defendants served as Cardiology Sales Representatives at Cordis, yet their exposure to Cordis' customer relationships and confidential information extended beyond Cardiology into the very same area in which ev3 is employing them, Endovascular products.  ev3 is a direct competitor of Cordis in the Endovascular area.

On Cordis' behalf and at Cordis' great expense, the Individual Defendants developed close relationships with physicians, including interventional cardiologists who perform both

cardiovascular (heart) and endovascular (peripheral) procedures, and who therefore purchase and use both Cardiology and Endovascular products. They also developed, on Cordis' behalf and at Cordis' great expense, close relationships with other customers, such as purchasing agents, hospital administrators and catheterization laboratory nurses and staffs, whose responsibilities include selecting, using, negotiating and/or purchasing both Cardiology and Endovascular products for such interventional cardiologists.

Now, ev3 seeks to pirate these customer relationships for its commercial advantage by hiring Cordis' top-performing Sales Representatives and deploying them in the same territories and among those same accounts, customers and clients, despite the Individual Defendants' non-compete agreements. The Court should not countenance such unfair competition.

Nor should the Court permit the Individual Defendants to use or disclose plaintiffs' confidential, proprietary and trade secret information. It is inevitable that they will do so, consciously or unconsciously, if they are permitted to work for ev3 in areas and with respect to products that directly compete with plaintiffs. The New Jersey courts have long recognized that it is appropriate to restrict a former employee's new employment with a competitor under these circumstances, even absent a non-compete agreement.

Consequently, J&J and Cordis request that the Court enforce the Agreements and defendants' common law obligations to plaintiffs, which would only prevent the Individual Defendants from soliciting any business from, selling to or rendering any services to or, directly or indirectly, helping others solicit business from or rendering any service or selling to, any of the accounts, customers or clients with whom they had contact during the last 12 months of employment with Cordis. Likewise, doing so would only prevent the Individual Defendants from holding any employment position or engaging in any employment activity with ev3, directly or

indirectly, that in any way relates to or involves any ev3 product that resembles or competes with any product of plaintiffs on which they worked or about which they became knowledgeable as a result of their employment with plaintiffs and whose use or marketability could be enhanced by application of plaintiffs' confidential, proprietary or trade secret information to which they had access during their employment with plaintiffs.  The Court also should enjoin defendants from, directly or indirectly, soliciting plaintiffs' employees.

Despite the egregious conduct by defendants, J&J and Cordis do not seek to enjoin the Individual Defendants' employment by ev3 completely.  Rather, plaintiffs merely seek to restrict the areas of the Individual Defendants employment to the extent necessary to address the wrongs already incurred, and to enforce applicable non-compete, non-solicitation and non-disclosure agreements to the extent necessary to prevent immediate and irreparable injury.

## STATEMENT OF FACTS

The factual background supporting plaintiffs' application is set forth in the Verified Complaint.  Rather than repeat those facts herein, plaintiffs will refer to them in their discussion of the relevant law.

## LEGAL ARGUMENT

### I.   TEMPORARY RESTRAINTS ARE NECESSARY TO PROTECT J&J AND CORDIS PENDING THIS ACTION'S OUTCOME

#### A.   J&J and Cordis have satisfied the standard for the issuance of a temporary restraining order

To obtain temporary or preliminary injunctive relief, a plaintiff must typically demonstrate: (1) a reasonable probability of success on the merits; (2) that the plaintiff will be irreparably harmed if the preliminary injunction does not issue; and (3) that the balance of the

equities tips in favor of granting injunctive relief.  See Crowe v. DeGioia, 90 N.J. 126, 132-34

(1982); General Elec. Co. v. Gem Vacuum Stores, Inc., 36 N.J. Super. 234, 237 (App. Div.

1955); Zanin v. Ianoco, 198 N.J. Super. 490, 498-99 (Law Div. 1984); Peters v. Public Service

Corp. of New Jersey, 132 N.J. Eq. 500, 511-12 (Ch. Div. 1942), aff'd, 133 N.J. Eq. 283 (1943).

> In considering the appropriateness of temporary or preliminary injunctive relief:
>
> mere doubt as to the validity of the claim is not an adequate basis for refusing to
> maintain the status quo....Indeed, the point of temporary relief is to maintain the
> parties in substantially the same condition "when the final decree is entered as
> they were when the litigation began."

Crowe, 90 N.J. at 133-34 (citing Peters, 132 N.J. Eq. at 511-12).  Here, J&J and Cordis have

satisfied the requirements for the issuance of a temporary restraining order.

### B.    Plaintiffs have demonstrated a reasonable likelihood of success on the merits

#### 1.    As a matter of law, J&J and Cordis maintain an absolute, judicially enforceable right to protect their customer relationships

Plaintiffs possess an absolute, judicially enforceable right to protect their customer

relationships under the Agreements and the common law.  It is well settled New Jersey law that a

restrictive covenant against post-employment competition will be given effect if the covenant is

reasonable under all the circumstances.  Whitmyer Bros., Inc. v. Doyle, 58 N.J. 25, 32 (1971);

Solari Indus., Inc. v. Malady, 55 N.J. 571, 585 (1970).  In Solari, the New Jersey Supreme Court

enunciated a three part test for determining whether a restrictive covenant is reasonable: (1) a

covenant must be no more restrictive than is necessary to protect the employer's legitimate

business interest; (2) it must impose no undue hardship on the employee; and (3) it must not

impair the public interest.  Id. at 585.

As to the first element of the Solari test, New Jersey courts have consistently held that an

employer possesses a patently legitimate interest in protecting its customer relationships through

a post-employment restrictive covenant.  See Karlin v. Weinberg, 77 N.J. 408, 411-12 (1978);

Whitmyer, 58 N.J. at 33; Solari, 55 N.J. at 586; Schuhalter v. Salerno, 279 N.J. Super. 504, 512

(App. Div.), certif. denied, 142 N.J. 454 (1995); A.T. Hudson & Co., Inc. v. Donovan, 216 N.J.

Super. 426, 433 (App. Div. 1987); Hogan v. Bergen Brunswig Corp., 153 N.J. Super. 37, 42

(App. Div. 1977); Platinum Management, Inc. v. Dahms, 285 N.J. Super. 274, 292 (Law Div.

1995).  As the Chancery Division explained in United Board & Carton Corp. v. Britting, 63 N.J.

Super. 517 (Ch. Div. 1959), aff'd, 61 N.J. Super. 340 (App. Div. 1960):

> It is not merely the knowledge of the identity of the customers, but the friendly
> contact with them, which is important to the solicitors....Their personal
> acquaintance with customers and knowledge of their respective places of
> residence, their peculiar likes and fancies and other characteristics, a knowledge
> of which would greatly aid them in securing and retaining the business of said
> former customers, is sufficient to invoke equitable protection against the
> subsequent use by a former employee of such information.

63 N.J. Super. at 527 (citations omitted).

In Solari, a former employee solicited business from his former employer's customers and

prospective customers in direct violation of a post-employment restrictive covenant.[1]  Seeking to

enforce the restrictive covenant, the former employer alleged that the former employee

represented a substantial risk to its relationships with its customers.  In remanding the case to

determine whether a preliminary injunction should issue, the Supreme Court suggested that the

---

[1]  In Solari, the subject covenant provided: "[Employee] agrees that on the termination of his
employment, for any reason whatever, he will not for one year thereafter engage, either directly
or indirectly, without the prior consent in writing of the Board of Directors of [employer], in
promoting or selling equipment, products, appliances, or systems similar to or competitive with
any of those represented by [employer] or [employer's American affiliate] nor will he within said
year divert or attempt to divert from [employer] or [employer's American affiliate] or any
business represented by it or any business whatsoever, particularly by influencing or attempting
to influence any of the customers with whom he may have had dealings in connection with the
promotion of equipment, products, appliances or systems hereunder."  55 N.J. at 573.

appropriate remedy might be a limited restraint against the employee's dealings with any of the former employer's actual or prospective customers with whom the employee had dealt while in the former employer's employ. 55 N.J. at 586.

Similarly, in A.T. Hudson, the Appellate Division recognized the employer's legitimate business interest in protecting its customer relationships through a restrictive covenant.[2] The employer, a management consulting firm, sought to enforce a post-employment restrictive covenant against a former employee who had solicited business from one of the employer's customers. In reversing the trial court's judgment for the employee and acknowledging the covenant's enforceability, the Appellate Division admonished the trial judge for his complete disregard of the legitimate business interests that the covenant was designed to protect, declaring:

> [C]onsulting firms expend great energy and money in soliciting clients and developing projects for their benefit. Each client that plaintiff is able to attract represents a significant investment of time, effort and money which is worthy of protection.

216 N.J. Super. at 434.

Likewise, Platinum Management is instructive with regard to an employer's legal right to protect its customer relationships through a restrictive covenant. There, the employee sales representative of the employer toy manufacturer terminated his employment to accept a position with the employer's principal competitor. Before ending his employment, and immediately thereafter, the employee solicited business from his former employer's existing clients in direct

---

[2] The A.T. Hudson post-employment restrictive covenant provided in relevant part: "5. For a period of two (2) years after you leave the employ of the Company, you will not directly or indirectly, for yourself or for any other Business Entity, solicit any business from or render any services to: (a) Any Business Entity which has been a Customer of the Company at any time or from time to time during the two (2) year period prior to the date of the termination of your employment with the Company...." 216 N.J. Super. at 428.

disregard of a restrictive covenant.[3]  In acknowledging the restrictive covenant's enforceability, the Platinum Management court expressly noted the employer's legitimate business interests that the covenant was designed to protect:

> The restrictive covenant here was designed to protect two legitimate business interests of [the employer]: its proprietary and confidential information; and its customer relationships.   These interests are legitimately protectable through restrictive covenants.

285 N.J. Super. at 294 (citing Ingersoll-Rand Co. v. Ciavatta, 110 N.J. 609, 626 (1988); A.T. Hudson, 216 N.J. Super. at 433).

The Platinum Management court further acknowledged that the employer "expended substantial energy and money, either through [the employee] or otherwise, in soliciting the actual customers involved herein – a matter 'worthy of protection.'"  Id. at 296 (quoting A.T. Hudson, 216 N.J. Super. at 434).  Recognizing the legitimacy of the employer's interest in protecting its customer relationships, the court categorically rejected the competitor's contention that the employer's customer relationships were nonexclusive and, therefore, precluded from protection in a restrictive covenant.  The court reasoned that "[t]here is nothing in the Solari line of cases that in any wise suggests that the customers protected must be exclusively those of the employer."  Id. at 298 (citing Solari, supra; Hogan, 153 N.J. Super. at 42).  The court concluded that the enforcement of the covenant, in modified form, would not cause any undue harm to the former employee.  Id. at 299.

---

[3]  The Platinum Management restrictive covenant stated that, during its term and for one year after its termination, the employee would not "solicit or accept business from any [of the employer's] customers for anyone other than [the employer]; or disclose the names of any such customers to any other person."  285 N.J. Super. at 285.

> **2.      J&J and Cordis possess a clear legal right to protect their confidential, proprietary and trade secret information**

Also as to the first element of the <u>Solari</u> test, <u>i.e.</u>, that a covenant must be no more restrictive than is necessary to protect the employer's legitimate business interest, the New Jersey courts have consistently held that an employer possesses a legitimate, enforceable right to protect its trade secrets and confidential, proprietary business information. <u>See</u> <u>Ingersoll-Rand Co. v. Ciavatta</u>, 110 N.J. 609, 626 (1988); <u>Whitmyer</u>, 58 N.J. at 31.  Trade secrets are generally defined as comprising any formula, pattern, device or compilation of information used in one's business that gives such party an opportunity to obtain an advantage over competitors who do not know or use it.  <u>Sun Dial Corp. v. Rideout</u>, 16 N.J. 252, 257 (1954); <u>National Tile Bd. Corp. v. Panel Board Mfg. Co.</u>, 27 N.J. Super. 348, 351 (Ch. Div. 1953); <u>see</u> <u>Restatement (Second) of Torts</u>, §757, comment b (1977).  The information need not be novel, inventive or patentable to fall within this category, as long as it plays a role in producing a product superior to that of a competitor. <u>Ingersoll Rand</u>, 110 N.J. at 637; <u>Sun Dial</u>, 16 N.J. at 257-58.

"Confidential information" subsumes trade secrets, but is far broader and includes information learned through the course of employment as a direct result of the employer-employee relationship. <u>A. Hollander & Son, Inc. v. Imperial Fur Blending Corp.</u>, 2 N.J. 235, 249 (1949).  The determination of such information's confidential nature is not predicated on methods or processes secret in fact and revealed to the employee in confidence, but rests on the protection afforded to an employer against disclosure of business and industrial methods used, records compiled and customer contacts in employment.  <u>Id.</u> at 249.

In addition to technical information, trade secrets and confidential information include "product pricing," "marketing and sales strategies," "manufacturing processes," "quality control

procedures," "new and existing product research and development," "raw material suppliers" and other confidential business information.  National Starch & Chem. Corp. v. Parker Chem. Corp., 219 N.J. Super. 158, 160-63 (App. Div. 1987).  See Pepsico, Inc. v. Redmond, 54 F.3d 1262 (7th Cir. 1995) (affirming injunction of plaintiff's former business manager from working for competitor where he would inevitably disclose his knowledge of plaintiff's trade secrets and confidential information, including strategies, operating and sales plans, pricing information and "attack plans" for specific markets).

Neither absolute secrecy nor novelty are required for information to constitute a trade secret; rather, the inquiry focuses upon the competitive advantage that the information provides. Sun Dial, 16 N.J. at 257.  Accordingly, the Sun Dial Court, in defining the concept of a trade secret, declared:

> Its subject matter must not be a matter of public knowledge or of general knowledge within the industry.  Although a substantial measure of secrecy must exist, the secrecy need not be absolute and disclosure to employees involved in its use will not ordinarily result in loss of the employer's protection....Novelty and invention are not essential for the trade secret as they are for patentability.  And the fact that every ingredient is known to the industry is not controlling for the secret may consist of the method of combining them which produces a product superior to that of competitors.

Id. (citations omitted).

To prevent the substantial and irreparable harm that will invariably result from such information's disclosure, New Jersey courts will enjoin both employees and third parties from using or disclosing an employer's trade secrets and other confidential and proprietary information.  See National Starch, 219 N.J. Super. at 159, 162-64; Platinum Management, 285 N.J. Super. at 299; Adolph Gottscho, Inc. v. American Marketing Corp., 35 N.J. Super. 333 (Ch. Div. 1954), aff'd, 18 N.J. 467, cert. denied, 350 U.S. 834 (1955); Club Razor & Blade Mfg.

Corp. v. Bindzsus, 131 N.J. Eq. 283 (Ch. Div. 1942), aff'd, 133 N.J. Eq. 38 (1943).  As the court

stated in Stone v. Goss, 65 N.J. Eq. 756 (1903):

> [E]mployees of one having a trade secret, who are under an express contract, or a
> contract implied from their confidential relationship to their employer, not to
> disclose that secret, will be enjoined from divulging the same to the injury of their
> employer, whether before or after they have left his employ; and that other
> persons, who induce the employee to disclose the secret, knowing of his contract
> not to disclose the same, or knowing that his disclosure is in violation of the
> confidence reposed in him by his employer, will be enjoined from making any use
> of the information so obtained, although they might have reached the same result
> independently by their own experiments or efforts.

Id. at 759-60.

Courts also will restrict a former employee's activities on his new employer's behalf,

even in the absence of a non-compete agreement.  See Sun Dial, 16 N.J. at 259; National Starch,

219 N.J. Super. at 162-63.  Consequently, in Sun Dial, the Supreme Court affirmed the granting

of an injunction prohibiting former employees from using or disclosing a secret process learned

in confidence while in the employer's employ.  Notwithstanding the absence of any express non-

disclosure agreement, the Court found that the employees were bound by a fiduciary duty to

refrain from disclosing confidential information under common law principles of good faith.  16

N.J. at 259.

In National Starch, the Appellate Division affirmed the Chancery Division's order

enjoining a former employee, pending trial, from working for his new employer in the envelope

adhesives area.  The defendant employee had worked in envelope adhesives for his former

employer and received its confidential, proprietary and trade secret information relating to that

area.  219 N.J. Super. at 159, 164.  The defendant employee only executed a non-disclosure

agreement with the former employer, and not a non-compete agreement.  Nevertheless, the

Appellate Division found that the trial court had properly concluded that there was a "sufficient

threat of impending injury to warrant preliminary relief pending trial," and affirmed the restriction on the defendant's employment. Id. at 162.

In doing so, the Appellate Division rejected the competitor's arguments and recognized the realities of life and human nature – where a former employee signed a non-disclosure agreement and had access to and became familiar with his former employer's confidential, proprietary and trade secret information, a temporary restraining order should issue because of the inevitability that the employee will use or disclose that information if he works for a competitor of the former employer on a competing product. The inevitable disclosure need not involve a conscious breach of the employee's obligation. Instead, where an employee is placed in the position of direct competition with his former employer, that employee cannot help but use the information he possesses to assist his new employer. Id. at 162-63.

Similarly, in Pepsico, the Seventh Circuit affirmed the district court's ruling that the plaintiff's former business manager would inevitably disclose its confidential strategic objectives and distribution, packaging, pricing and marketing plans if he were employed in a similar position at its competitor. 54 F.3d at 1269-70. The business manager had signed a confidentiality agreement with the plaintiff, but not a non-competition covenant. Id. at 1264. The Seventh Circuit agreed with the district court's conclusion that "unless [the former business manager] possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions about [his new employer's products that compete with his former employer's products] by relying on his knowledge of [his former employer's] trade secrets." Id. at 1269. The Seventh Circuit affirmed the district court's order enjoining the business manager from working for the defendant company for a period of time and from ever disclosing the plaintiff's trade secrets and confidential information. Id. at 1272.

### 3.    The Court should enforce the Agreements and their reasonable, valid restrictive covenants

J&J's and Cordis' entitlement to injunctive relief is clear.  In view of the foregoing well-established case law, J&J and Cordis respectfully submit that the restrictions contained in the Individual Defendants' Agreements are eminently reasonable, impose no undue hardship on the Individual Defendants and do not affront public policy.  See Solari, 55 N.J. at 585.

#### a.    The Agreements reasonably protect J&J's and Cordis' interest in their customer relationships and confidential, proprietary and trade secret information, particularly in view of the Individual Defendants' knowledge thereof

First, the Agreement's post-employment restrictions are reasonable, and are narrowly drafted to protect J&J's and Cordis' legitimate interests in their customer relationships and confidential, proprietary and trade secret information.  The judicially-recognized legitimacy of such interests is addressed in detail above in Points I.B.1 and 2.  In the interest of conciseness, plaintiffs respectfully refer the Court to the non-disclosure, non-compete and non-solicitation provisions of the Individual Defendants' Agreements.  (Verified Complaint, Exh. A (Barr's Agreement, ¶5-7), Exh. B. (Fitzpatrick's Agreement, ¶5-7), Exh. C (McKeever's Agreement, ¶5-7))

Here, Cordis has expended large amounts of time, resources and money in developing and training its sales force in the United States, and in maintaining and developing its customer relationships in the United States through its Sales Representatives such as Barr, Fitzpatrick and McKeever.  Cordis customer accounts differ as to which individual or individuals are responsible for purchasing products for treating vascular disease, such as Cardiology and Endovascular products.  For example, at given customer accounts such as hospitals or physician practice groups, a physician, a vice president of purchasing or finance, a purchasing agent, a nurse,

administrator or other staff member in the catheterization laboratory or others may be responsible for purchasing Cardiology and Endovascular products.  (Verified Complaint, ¶19-20)

Cordis considers each such person involved in the purchasing decision at a given account to be its customer.   On Cordis' behalf, Sales Representatives such as Barr, Fitzpatrick and McKeever maintain, develop and strengthen their relationships with the appropriate person or persons at the account who is responsible for purchasing Cordis products.  The relationships that Cordis Sales Representatives maintain and/or develop – through the expenditure of significant time, resources and money by Cordis – with the individuals who are responsible for purchasing products to treat vascular disease at Cordis' customer accounts comprise plaintiffs' significant, protectable interests.  Cordis expends such time, resources and money in training and educating its Sales Representatives about how to most effectively present Cordis' cutting-edge products and technologies to Cordis' customers, how to price Cordis' products and how to provide discounts to maximize sales, how to most effectively service Cordis' customers, etc. – essentially, how to do and say everything necessary to maintain, develop and strengthen Cordis' customer relationships.  (Verified Complaint, ¶21-22)

Through their positions and due to their long history with Cordis, the Individual Defendants had access to and acquired intimate knowledge of Cordis' customer relationships on both the Cardiology and Endovascular sides of the business in the Individual Defendants' respective territories.   Barr, Fitzpatrick and McKeever developed close relationships with physicians, including interventional cardiologists, who use both Cardiology and Endovascular products.  They also developed close relationships with other customers, such as purchasing agents, hospital administrators and catheterization laboratory nurses and staffs, whose responsibilities include selecting, using, negotiating and/or purchasing both Cardiology and

Endovascular products for such interventional cardiologists.  Such cardiologists perform both cardiovascular (heart) and endovascular (peripheral) procedures, and therefore purchase and use both Cardiology and Endovascular products.  (Verified Complaint, ¶29, 45, 56, 62)

Further, Cordis' different business units share the same clients.  In other words, a Cordis Sales Representative who sells only Cardiology products in a given territory generally will call on the same hospitals and other medical facilities as a Cordis Sales Representative who sells only Endovascular products in that territory.  In addition, beginning in August 2007 through October 2008, each territorial division within Cordis contained both Endovascular and Cardiovascular Sales Representatives.  It was and is standard procedure at Cordis to share information about both sides of the business with the Sales Representatives such as Barr, Fitzpatrick and McKeever.  The Endovascular and Cardiovascular Sales Representatives also share information with each other, including customer relationships, financial information, sales and marketing strategy and other resources.  (Verified Complaint, ¶32)

The Individual Defendants did not bring to Cordis the customer relationships that they serviced while employed by Cordis.  Such accounts existed, often long-standing Cordis accounts that Cordis assigned to the Individual Defendants.  Cordis expended considerable time, resources and money in training and educating the Individual Defendants to maintain, develop and strengthen Cordis' relationship with such customers.  (Verified Complaint, ¶33)

In addition to the Individual Defendants' knowledge of J&J's and Cordis' customer relationships, including knowledge relating to interventional cardiologists who purchase and use both Cardiology and Endovascular products, Barr, Fitzpatrick and McKeever also had access to Cordis' confidential, proprietary and trade secret information relating to its Cardiology and Endovascular business, and they acquired knowledge of such information for all of Cordis'

Cardiology product lines and business and certain Cordis Endovascular product lines and business. Such information included but was not limited to:

- marketing and sales plans for Cordis customers;
- pricing, discount pricing and pricing strategies;
- cost information, such as cost structure and profit margins per product;
- positioning of Cordis' sales force in their respective territories;
- activity levels of hospitals and other medical facilities and sales information concerning such facilities within their respective territories;
- Cordis' strategic plans for which clients to target with which products within their respective territories;
- contract terms for Cordis' largest customers within their respective territories;
- lists of Cordis Sales Representatives throughout the country that include names, addresses and cell phone numbers;
- monthly reports of performance-to-sales targets and ranking positions of Cordis Sales Representatives;
- professional education plans and clinical training modes;
- new product development and plans to change existing products; and
- launch strategies for Cordis' pipeline products for the short-term (1 year) and the mid term (2 to 5 years), including launch dates and client targeting for their respective territories.

(Verified Complaint, ¶30, 31)

Cordis expends considerable time, resources and money in researching, developing and testing innovative, new products for treating vascular disease. Due to its significant efforts, Cordis has innovative, new products in its pipeline for the short term (1 year) and mid term (2 to 5 years). Such information about Cordis' pipeline products and research and development efforts and plans are considered plaintiffs' confidential, proprietary and trade secret information. Cordis also has expended large amounts of time, resources and money in developing confidential, proprietary and trade secret information relating to strategies in connection with the marketing and sale of its current and pipeline products in the United States. Such information includes, but is not limited to, products in development, launch strategies, cost information per product, clients to target, pricing and discount pricing. (Verified Complaint, ¶24, 25)

The Agreements' non-disclosure, non-compete and non-solicitation covenants reasonably protect J&J's and Cordis' interests in their customer relationships and confidential, proprietary and trade secret information – especially in light of Barr's, Fitzpatrick's and McKeever's knowledge of such customers relationships and information.   It is clear that information such as that possessed by the Individual Defendants is within the definition of a trade secret and protectable confidential information.   See Sun Dial, 16 N.J. at 257; A Hollander & Son, 2 N.J. at 249.   New Jersey courts have consistently upheld the enforceability of post-employment covenants that are decidedly more onerous than the subject Agreements.   See Karlin, 77 N.J. at 411-12; A.T. Hudson, 216 N.J. Super. at 428; Hogan, 153 N.J. Super. at 40.   Further, the interests that J&J and Cordis seek to protect through such covenants, i.e., customer relationships – which Barr, Fitzpatrick and McKeever maintained and developed at plaintiffs' considerable expense – and confidential business information, are protectable as a matter of law, and are sufficiently compelling to mandate a temporary restraining order.   See, e.g., Karlin, 77 N.J. at 411-12; Whitmyer, 58 N.J. at 33; Solari, 55 N.J. at 586; Schuhalter, 279 N.J. at 512; A.T. Hudson, 216 N.J. Super. at 433; Hogan, 153 N.J. Super. at 42; Platinum Management, 285 N.J. Super. at 292.[4]

---

[4] Plaintiffs also possess a clear legal right to restrict the Individual Defendants' employment at ev3 under the common law, including the common law obligation prohibiting the disclosure of confidential, proprietary and trade secret information and the common law duty of loyalty.  Such right to restrict the Individual Defendants' employment and to protect against the misappropriation of Cordis' customer relationships and the disclosure of its confidential, proprietary and trade secret information is settled under the common law: New Jersey courts have acknowledged that an agreement is not necessary to prohibit the disclosure of confidential, proprietary and trade secret information.  Sun Dial, 16 N.J. at 259-60;  National Starch, 219 N.J. Super. at 162-63. See Pepsico, 54 F.3d at 1269-72.

**b.     The Agreements impose no undue hardship on the Individual Defendants**

Second, the imposition of the injunctive and equitable relief requested will impose no undue hardship on the Individual Defendants. In <u>Karlin</u>, the Supreme Court enumerated several factors that courts should address in evaluating whether the "hardship" attendant to a restrictive covenant's enforcement is "undue:"

> The trial court must determine also whether enforcement of the covenant will impose any undue hardship on the employee. In this connection the inquiry should look to the likelihood of the employee finding work in his field elsewhere. The trial court should examine also the reason for the termination of the relationship between the parties to the employment contract. Where this occurs because of a breach of the employment contract by the employer, or because of actions by the employer detrimental to the public interest, enforcement of the covenant may cause hardship on the employee which may be fairly characterized as "undue" in that the employee has not, by his conduct, contributed to it. <u>On the other hand, where the breach results from the desire of an employee to end his relationship with his employer rather than from any wrongdoing on the part of the employer, a court should be hesitant to find undue hardship on the employee, he in effect having brought that hardship on himself.</u> Ordinarily, a showing of personal hardship without more, will not amount to an "undue hardship" such as would prevent enforcement of the covenant.

77 N.J. at 423-24 (emphasis added).

Here, the Individual Defendants willingly terminated their employment with J&J and Cordis. Further, they became, and remain, employed by ev3, and are presently engaged in the sale of ev3 products on ev3's behalf. (Verified Complaint, ¶50, 51, 57, 63) The relief requested by plaintiffs does not, presently, seek to interdict the Individual Defendants' employment with ev3. Rather, the injunctive and equitable relief requested is narrowly tailored to protect plaintiffs' legitimate interests in their customer relationships and confidential, proprietary information. Like the salesperson in <u>Platinum Management</u>, the Individual Defendants are free to do business on an international and domestic basis, and to work for anyone in the

Endovascular industry, even ev3, as long as they do not solicit the customer relationships that they maintained and developed while employed by Cordis, and do not disclose or use Cordis' other confidential, proprietary information. See 285 N.J. Super. at 274.

Enforcing the Agreements would only prevent the Individual Defendants from soliciting any business from, selling to or rendering any services to or, directly or indirectly, helping others solicit business from or rendering any service or selling to, any of the accounts, customers or clients with whom they had contact during the last 12 months of employment with Cordis. Enforcing the Agreements also would only prevent them from holding any employment position or engaging in any employment activity with ev3, directly or indirectly, that in any way relates to or involves any ev3 product that resembles or competes with any product of plaintiffs on which they worked or about which they became knowledgeable as a result of their employment with plaintiffs and whose use or marketability could be enhanced by application of plaintiffs' confidential, proprietary or trade secret information to which they had access during their employment with plaintiffs.  It is in those areas that the Individual Defendants' knowledge of plaintiffs' customer relationships and confidential, proprietary and trade secret information could adversely impact plaintiffs – and enable ev3 to compete unfairly.

The Individual Defendants' general business knowledge and skills are transferable to ev3's other products and technologies, and they would not be prohibited from working in such areas at ev3.  For example, ev3 sells neurovascular products. See http://www.ev3.net.  Such products are used in the brain, primarily by interventional neuroradiologists.

Here, plaintiffs do not seek to categorically bar the Individual Defendants from working for ev3, but seek to place only limited, fair restrictions on the scope of their employment activities.  Plaintiffs simply seek to require defendants to compete fairly, and to require the

Individual Defendants to abide by the Agreements. This Court's enforcement of such post-employment restrictions will impose no undue hardship on defendants. The issuance of a temporary restraining order will not subject the Individual Defendants to undue hardship as a matter of law.

### c.    The Agreements do not impair the public interest

Third, enforcing the Agreements, and granting J&J and Cordis the injunctive and equitable relief that they seek, will not impair the public interest. Although public policy certainly encourages competition, public policy equally discourages <u>unfair</u> competition.

Cordis is one of the world's leading developers and manufacturers of interventional vascular technology and products for interventional medicine, minimally invasive computer-based imaging and electrophysiology. For 50 years, Cordis has pioneered less invasive treatments for vascular disease. Among many other examples of Cordis' pioneering technologies and products, Cordis developed: the first full line of Pre-Shaped Judkins catheters in 1966; the first percutaneous transluminal coronary angioplasty balloon that utilized nylon balloon technology in 1990; and the first approved drug-eluting stent in 2003, known as the Cypher® Sirolimus-eluting Coronary Stent ("Cypher® Stent"). The American Heart Association named the Cypher® Stent one of the top 10 medical advancements of 2003. (Verified Complaint, ¶4, 5)

Cordis Endovascular is a recognized leader in developing stents, catheters and vena cava filters for the treatment of biliary obstructive disease and peripheral vascular disease, <u>i.e.</u>, vascular disease existing outside of the heart and brain. ev3 is a competitor in this area. (Verified Complaint, ¶6, 7, 50)

If the Court fails to enforce the Agreements in this context, thereby encouraging competitors to pirate customer relationships that J&J and Cordis have developed by expending

vast amounts of time and money, the investment of such resources by companies such as J&J and Cordis will be discouraged. If a company such as ev3 is permitted to trade on customer relationships that J&J and Cordis maintained and developed through Barr, Fitzpatrick and McKeever at great expense to J&J and Cordis, the commercial advantage normally attained through the efforts and expense of plaintiffs' sales personnel will be negated.

Likewise, if the Court fails to enforce the Agreements, competitors such as ev3 would be encouraged to entice employees to reveal the confidential, proprietary and trade secret information of their former employers. The research, development and marketing processes that J&J and Cordis developed through the expenditure of substantial time, money and resources would be short-circuited by ev3, which could place a viable competitive product into the market almost immediately. Additionally, ev3 would be able to price products or offer discounts to certain customers without having to consider the recovery of the costs incurred in developing the customer relationships and marketing the products. See E.I. duPont, 200 A.2d at 437 (finding a public interest in protecting trade secrets because such protection "tends to encourage...substantial expenditures to find or improve ways and means of accomplishing commercial and industrial goals. The protection of such efforts when translated into trade secrets tends to encourage such efforts and the result is beneficial to the employer and presumably to society.").

In other words, ev3 should be required to spend millions of dollars to develop its own customer relationships, products and marketing plans instead of simply taking and trading on plaintiffs' established customer relationships and secrets by hiring plaintiffs' top-performing Sales Representatives. ev3 has demonstrated a keen interest in repeatedly hiring plaintiffs' top-performing sales employees, notwithstanding the Agreements' post-employment restrictions.

ev3 is targeting Cordis' top-performing Sales Representatives: Barr, Fitzpatrick and McKeever were the #1, #8 and #11 ranked Cardiology Sales Representatives among 117 such Sales Representatives at Cordis in 2008, respectively. (Verified Complaint, ¶1, 43, 54, 60)

The substantial compensation that the Individual Defendants received from Cordis demonstrates their great value as sales personnel, the importance of the customer relationships that they served while employed by Cordis and their significant impact on Cordis' business. Barr received annual base salaries of $50,000 (effective May 2, 2005), $51,000 (February 27, 2006), $52,900 (February 26, 2007), $57,600 (February 25, 2008) and $62,000 (March 10, 2008), as well as variable compensation (i.e., sales commissions, sales bonuses, sales and marketing promotions, sales awards) of $88,000 (April-December 2005), $157,000 (2006), $160,000 (2007), $243,000 (2008) and $38,000 (January-February 2009), for a total of $686,000 in variable compensation. Fitzpatrick received annual base salaries of $52,400 (effective January 17, 2000), $55,200 (January 1, 2001), $57,190 (January 6, 2003), $65,000 (March 1, 2004), $68,400 (February 28, 2005), $71,400 (February 27, 2006), $74,700 (February 26, 2007), $78,200 (February 25, 2008) and $81,100 (February 23, 2009), as well as variable compensation of $88,000 (2000), $166,000 (2001), $115,000 (2002), $238,000 (2003), $382,000 (2004), $314,000 (2005), $313,000 (2006), $219,000 (2007), $246,000 (2008) and $128,000 (January-August 2009), for a total of $2,211,000 in variable compensation. McKeever received annual base salaries of $45,000 (effective July 9, 2000), $50,000 (January 6, 2003), $55,000 (January 20, 2003), $58,800 (March 1, 2004), $65,000 (February 28, 2005), $68,400 (February 27, 2006), $71,000 (February 26, 2007), $73,700 (February 25, 2008) and $76,500 (February 23, 2009), as well as variable compensation of $46,000 (July-December 2000), $158,000 (2001), $135,000 (2002), $247,000 (2003), $396,000 (2004), $295,000 (2005), $249,000 (2006), $207,000 (2007),

$253,000 (2008) and $59,000 (January-October 2009), for a total of $2,044,000 in variable compensation. (Verified Complaint, ¶¶44, 55, 61)

Apparently, ev3 recognizes that there is great value in obtaining the services of plaintiffs' top-performing employees for an obvious reason – the ability to trade on their knowledge of Cordis' customer relationships and to enhance the use and marketability of its own products that compete with Cordis' products while substantially reducing its customer- and product-development costs at plaintiffs' expense. Should the Court not preclude such unfair competition, there would be no benefit for companies such as plaintiffs to spend millions of dollars to develop and maintain customer relationships, or to research, develop and market breakthrough products such as the CYPHER® Stent, which the American Heart Association named as one of the top 10 medical advancements of 2003.

For the foregoing reasons, the Agreements are legal and enforceable in order to prevent unfair competition and, therefore, J&J and Cordis have demonstrated a reasonable probability of success on the merits.

**C.     J&J and Cordis will be irreparably harmed if the temporary restraining order is not granted**

The second element of temporary or preliminary injunctive relief is that the plaintiff will be irreparably harmed if the injunction does not issue. Crowe, 90 N.J. at 132-34. J&J and Cordis seek injunctive and equitable relief enjoining defendants from infringing on plaintiffs' customer relationships, disclosing and using plaintiffs' confidential business information and continuing to entice plaintiffs' employees to leave Cordis and to join ev3. Absent the imposition of this injunctive and equitable relief, plaintiffs will be irreparably harmed.

Plaintiffs' fear that they will sustain irreparable harm as a result of the Individual Defendants' actions is well founded.  In blatant disregard of their contractual obligations under their Agreements, the Individual Defendants have worked on ev3's behalf in the same territories in which they served as Cordis Sales Representatives, soliciting the same accounts as they solicited at Cordis and trading on the same relationships that they maintained and developed at Cordis – and for which Cordis trained, educated and handsomely compensated them.  (Verified Complaint, ¶22, 44, 50, 51, 55, 57, 61, 63)

Further, the Individual Defendants' divulgence of plaintiffs' customer relationships and other proprietary and confidential information to a competitor such as ev3 is precisely the kind of unfair competition that the Agreements were intended to prevent.  Such information in the hands of ev3, coupled with the Individual Defendants' intimate knowledge of plaintiffs' specific customer relationships and how plaintiffs approach those customers, will afford ev3 an artificial and unfair advantage over plaintiffs (and all other competitors) in the marketplace.

New Jersey courts have expressly acknowledged the necessity of protecting such customer relationships and other information through a post-employment restrictive covenant. As the Platinum Management court determined:

> [T]he knowledge which [the employer] sought to protect through the Agreement went beyond merely the identity of [the employer's] customers.  It sought to protect [the employee's] knowledge of the customers' buying habits, [the employer's] mark-up structure, merchandising plans, sales projections and product strategies.  A competitor's knowledge of a particular customer's pricing and packaging requirements actually gives the competitor the ability to design for that customer's needs and to obtain an advantage over competitors who do not have this information.  Thus, all of the foregoing information is clearly confidential and proprietary as to [the employer], and protectable through a restrictive covenant.

285 N.J. Super. at 295-96.

As noted herein, customer relationships and information related thereto comprise highly confidential, proprietary business information, and such information's disclosure would cause irreparable harm. United Board & Carton, 63 N.J. Super. at 524; Scholastic Funding Group, LLC v. Kimble, 2007 U.S. Dist. LEXIS 30333, *24 (D.N.J. 2007) (court enjoined former employee from calling on accounts holding that former employer would suffer irreparable harm in form of lost reputation and good will if defendant employee, while working for new employer, were allowed to call on the same accounts he called on while working for former employer).

Plaintiffs will suffer irreparable harm if ev3 is permitted to employ the Individual Defendants as sales personnel with respect to the accounts, customers and clients with whom they had contact during the last 12 months of employment with Cordis. Likewise, J&J and Cordis will suffer irreparable harm if ev3 is permitted to employ the Individual Defendants with respect to any ev3 product that resembles or competes with any product of plaintiffs on which the Individual Defendants worked or about which the Individual Defendants became knowledgeable as a result of their employment with plaintiffs and whose use or marketability could be enhanced by application of plaintiffs' confidential, proprietary or trade secret information to which the Individual Defendants had access during their employment with plaintiffs.

The Agreements (¶6, 7) prohibit such employment activities by Barr, Fitzpatrick and McKeever. In their Agreements, the Individual Defendants also acknowledge J&J's and Cordis' right to injunctive relief and to bar them from accepting employment or rendering services that contravene the Agreements' restrictive covenants:

> I understand and acknowledge that if I violate this Agreement or am about to violate this Agreement by disclosing or using information prohibited by paragraph 5 above, accepting employment or providing services prohibited by paragraph 6 or 7 above, or failing to turn over property as required by paragraph 12 above, the COMPANY shall have the right, and be entitled to, in addition to any other

remedies it may have, injunctive relief: in other words, I understand and acknowledge that the COMPANY can bar me from disclosing or using such information, bar me, from accepting such employment or rendering such services for the periods specified in paragraphs 6 and 7 above, and require that I turn over such property. (Barr's Agreement, ¶13)

I understand and acknowledge that if I violate this Agreement or am about to violate this Agreement by accepting employment or providing services prohibited by paragraph 6 or 7 above, the COMPANY shall have the right, and be entitled to, in addition to any other remedies it may have, injunctive relief; in other words, I understand and acknowledge that the COMPANY can bar me from accepting such employment or rendering such services for the periods specified in paragraphs 6 and 7 above. (Fitzpatrick's Agreement, ¶14)

I understand and acknowledge that if I violate this Agreement or am about to violate this Agreement by accepting employment or providing services prohibited by paragraph 6 or 7 above, the COMPANY shall have the right, and be entitled to, in addition to any other remedies it may have, injunctive relief; in other words, I understand and acknowledge that the COMPANY can bar me from accepting such employment or rendering such services for the periods specified in paragraphs 6 and 7 above. (McKeever's Agreement, ¶14)

Indeed, the Court may presume irreparable harm under these circumstances. The

Supreme Court has recognized:

Where the employee through his employment has learned of the business practices and methods of his employer which if disclosed to a competitor may result in irreparable injury to the complainant, the court may presume irreparable injury will ensue from the breach of the covenant.

A. Hollander & Son, 2 N.J. at 249 (emphasis added). Further, as stated by the Appellate Division

in upholding a grant of a preliminary injunction in a trade secrets case: "[D]amages will not be an

adequate remedy when the competitor has obtained the secrets. The cat is out of the bag and

there is no way of knowing to what extent their use has caused damage or loss." National Starch,

219 N.J. Super. at 163.

Any argument that the Individual Defendants will not disclose J&J's and Cordis'

confidential, proprietary and trade secret information that they possess is without merit. As noted

above, the National Starch court recognized that when, as here, a former employee signed a non-disclosure agreement and had access to and became familiar with his former employer's confidential, proprietary and trade secret information, a temporary restraining order should issue because of the inevitability that the employee will use or disclose that information if he works for a competitor of the former employer on a competing product. See id. at 162-63. The inevitable disclosure need not involve a conscious breach of the employee's obligation. Instead, as the National Starch court determined, when an employee is placed in the position of direct competition with his former employer, that employee cannot help but use the information he possesses to assist his new employer. Id.; Johnson & Johnson v. Biomet, Inc. and Robin T. Barney, Docket No. C-107-07, slip. op. 17-20 (New Jersey Superior Court., Chancery Division, Middlesex County) (granting preliminary injunction after finding that the non-complete agreement was valid and that irreparable harm existed based on inevitable disclosure). This opinion is attached as part of Exhibit A hereto.[5]

The Court also should enjoin defendants from, directly or indirectly, soliciting plaintiffs' employees. See Scholastic Funding Group, 2007 U.S. Dist. LEXIS 30333 at *24 (court enjoined former employee from soliciting employees, holding that that former employer would suffer irreparable harm in form of lost reputation and good will because competitors and clients would view further employee defections in a negative light). It is apparent that ev3 is targeting plaintiffs' top-performing Sales Representatives in order to unfairly trade on the customer

---

[5] Also attached as part of Exhibit A hereto is the Court's August 15, 2008 Order to Show Cause With Temporary Restraints and for Accelerated Discovery in Johnson & Johnson and Cordis Corporation v. Invatec, LLC, et al., New Jersey Superior Court, Chancery Division, Middlesex County, Docket No. MID-C-171-08, in which the Court granted temporary restraints in a matter also involving J&J's and Cordis' employment agreements with former employees who had joined a competitor of plaintiffs and who were unfairly competing against plaintiffs.

relationships that they maintained and developed while employed by Cordis at Cordis' great expense and investment of time, training and education of the Individual Defendants.  In fact, Barr, Fitzpatrick and McKeever were the #1, #8 and #11 ranked Cardiology Sales Representatives among 117 such Sales Representatives at Cordis in 2008, respectively.  (Verified Complaint, ¶1, 43, 54, 60)

Although merely persuading an employee to change jobs is not wrongful, if it is done to injure the employer, or to benefit the defendant at the employer's expense, it is wrongful and actionable.  Wear-Ever Aluminum, Inc. v. Towncraft Indus., Inc., 75 N.J. Super. 135, 141-42 (Ch. Div. 1962).  Further, the right to compete for employees is wrongful if done by improper means.  Avtec Indus., Inc. v. Sony Corp. of America, 205 N.J. Super. 189, 193 (App. Div. 1985).  Improper means "clearly includes such conduct as fraud, misrepresentation, intimidation, obstruction and molestation," as well as less egregious conduct, such as that which simply "fails to accord with generally accepted standards of morality."  Id. at 194.  The Avtec court quoted the Appellate Division's opinion in Sustick v. Slatina, 48 N.J. Super. 134, 144 (App. Div. 1957), wherein the court stated: "There can be no tighter test of liability in this area than that of the common conception of what is right and just dealing under the circumstances."  Id. at 195.  See also Loral Corp. v. Moyes, 174 Cal.App.3d 268, 279 (Cal. Ct. App. 1985) ("Defendant is restrained from disrupting, damaging, impairing or interfering with his former employer by raiding Conic employees under his termination agreement.  This does not appear to be any more of a significant restraint on his engaging in his profession, trade or business than a restraint on solicitation of customers or on disclosure of confidential information.").

Here, defendants have crossed the line into the type of improper conduct that is wrongful and actionable as a tortious interference with contract under New Jersey law.  ev3 has used

improper means by inducing Cordis' employees to breach their non-compete agreements. Specifically, ev3 hired the Individual Defendants and assigned them to the same territories that they covered while employed by Cordis.  As such, these Cordis employees have been and will be contacting and soliciting the same accounts, customers and clients as they did while employed by Cordis.  (Verified Complaint, ¶50, 51, 57, 63) ev3 sells Endovascular products in direct competition with Cordis' Endovascular products.  (Verified Complaint, ¶6, 7, 50)  The actions of ev3 and the Individual Defendants, therefore, are clearly wrongful and exploit a confidential relationship.

The Court also should grant plaintiffs' requested injunctive relief because ev3 and the Individual Defendants have demonstrated an improper motive.  ev3 has targeted three of Cordis' highest-performing Sales Representatives in the entire country.  (Verified Complaint, ¶1, 43, 54, 60)  The brazenness by which ev3 has hired Cordis' top salespeople and assigned them to the same territories that they serviced while employed by Cordis demonstrates that defendants possess an improper motive to harm plaintiffs' business.

**D.      The balance of the equities weighs in favor of granting a temporary restraining order**

The third and final element of temporary or preliminary injunctive relief is that the balance of the equities tips in favor of granting such relief.  Crowe, 90 N.J. at 132-34.  The injunctive and equitable relief sought by plaintiffs is narrowly tailored to protect their legitimate interests in their customer relationships and confidential, proprietary and trade secret information.  In the absence of such injunctive and equitable relief, plaintiffs will be irreparably harmed, and ev3 will unjustly reap the benefit of the Individual Defendants' wrongful conduct.

Conversely, the imposition of such injunctive and equitable relief will effect no harm on defendants.  Indeed, it is well settled that:

> The purpose of <u>ad</u> <u>interim</u> restraint is to enable the Court to fully deliberate and investigate the case in order that the injunction maintains the <u>status</u> <u>quo</u> so that the parties are in substantially the same plight as when the final decree is entered as they were when the litigation began.

<u>Peters</u>, 132 N.J. Eq. at 51.  Here, an injunction is an entirely appropriate remedy in order to "maintain the parties in substantially the same condition when the final decree is entered as they were when the litigation began." <u>Crowe</u>, 90 N.J. at 133-34.

## II.    PLAINTIFFS ARE ENTITLED TO EXPEDITED DISCOVERY PENDING A HEARING ON THEIR PRELIMINARY INJUNCTION APPLICATION

Plaintiffs are entitled to conduct expedited discovery to further develop the grounds for preliminary injunctive relief.  The New Jersey Court Rules grant courts wide discretion to order expedited discovery.  <u>See</u> <u>R.</u> 4:18-1(b) (providing that the court, on motion, may require a response to a document demand in fewer than the 30 days permitted in the Rule); <u>R.</u> 4:14-1 (permitting the taking of depositions prior to 45 days after service of the summons and complaint with leave of court).

Also, the Comment to <u>R.</u> 4:18-1 explains that <u>R.</u> 4:18-1 was taken from <u>Fed. R. Civ. P.</u> 34.  Federal Courts routinely allow parties to conduct expedited discovery under <u>Fed. R. Civ. P.</u> 34 in the context of preliminary injunctions.  <u>See</u> <u>Wright Medical Technology, Inc. v. Somers</u>, 37 F. Supp.2d 673, 679 (D.N.J. 1999) (parties conducted expedited discovery before the hearing on plaintiffs' application for a preliminary injunction barring plaintiffs' former employee from working for a competitor).  "Expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." <u>Ellsworth Associates, Inc. v. United States</u>, 917 F. Supp. 841, 844 (D.D.C. 1996).  Accelerated discovery is

appropriate where "[f]urther development of the record before the preliminary injunction hearing will better enable the court to judge the parties' interests and respective chances for success on the merits." Educata Corp. v. Scientific Computers, Inc., 599 F. Supp. 1084, 1088 (D. Minn.), aff'd in part, rev'd in part on other grounds 746 F.2nd 429 (8th Cir. 1984).

Here, plaintiffs seek the expedited discovery set forth in the proposed Order to Show Cause, to which plaintiffs respectfully refer the Court in the interest of conciseness.  In light of the facts set forth in the Verified Complaint, plaintiffs are rightfully concerned about the circumstances surrounding the Individual Defendants' employment with a direct competitor, ev3. The requested discovery is narrowly tailored to allow the parties to better understand the issues that are at stake.  In addition, these requests are not burdensome on defendants, as the requests are mostly focused on documents exchanged among them over a short period of time.  As a result, the Court should permit plaintiffs to conduct accelerated discovery before the hearing on plaintiffs' application for preliminary injunctive relief so that plaintiffs may further develop the grounds for a preliminary injunction.

## CONCLUSION

For the foregoing reasons, plaintiffs Johnson & Johnson and Cordis Corporation respectfully request that this Court issue a temporary restraining order and a preliminary injunction, and order expedited discovery, in accordance with the provisions set forth in the Verified Complaint and Order to Show Cause.

Respectfully submitted,

RIKER, DANZIG, SCHERER, HYLAND
   & PERRETTI LLP
Attorneys for Plaintiffs
Johnson & Johnson and Cordis Corporation

By: _____
       Glenn A. Clark
       Edwin F. Chociey, Jr.

Dated: December 11, 2009

4002413.1