# EXHIBIT 9

N.J. SUPERIOR COURT
MIDDLESEX VICINAGE

03 JUL -3 PM 1:57

FILED & RECEIVED

RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800

Attorneys for Plaintiffs
Johnson & Johnson and Cordis Corporation

| | |
|---|---|
| JOHNSON & JOHNSON and CORDIS CORPORATION,<br><br>Plaintiffs,<br><br>vs.<br><br>STENTYS, INC. and JIN S. PARK,<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION<br>MIDDLESEX COUNTY<br>DOCKET NO.<br><br>CIVIL ACTION<br><br>**VERIFIED COMPLAINT** |

Plaintiffs Johnson & Johnson ("J&J), a corporation organized under the laws of the State of New Jersey, having its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933 and Cordis Corporation ("Cordis"), a corporation organized under the laws of the State of Florida, having its principle place of business at 7 Powderhorn Drive, Warren, New Jersey, by way of Verified Complaint against defendants, say:

## THE PARTIES

1. Plaintiff J&J is the parent company of subsidiaries engaged in the business of developing, manufacturing and marketing a wide variety of health care products, and providing related services, for the consumer, pharmaceutical and professional markets. J&J's subsidiaries and operating companies market their products to customers located throughout the United States and the world.

2. Plaintiff Cordis is a subsidiary of J&J and is one of the world's leading developers and manufacturers of interventional vascular technology and products for interventional medicine, minimally invasive computer-based imaging, and electrophysiology. Electrophysiology involves the study of the electrical properties of biological cells and tissues Cordis' products include, but are not limited to, coronary and other stents used to treat coronary vascular and endovascular disease. Cordis' products are complex making it very difficult to precisely reverse engineer.

3. Defendant Stentys, Inc. is a subsidiary of a French Company, Stentys, S.A.S. Stentys S.A.S. and Stentys, Inc. will be collectively referred to as Stentys. Stentys is registered to do business in New Jersey. Stentys is a direct competitor of plaintiffs in developing, manufacturing and marketing coronary stents used to treat coronary vascular disease.

4. Defendant Jin S. Park ("Park") is a resident of New Jersey residing at 300 Parsippany Road, Parsippany, New Jersey 07054. For seven plus years, Park was employed by Cordis and, after several promotions, became a key Staff Product Development Engineer working in Warren, New Jersey. During the course of his employment, Park received prestigious awards and played a critical role in the development of many of Cordis' trade secrets and other confidential information related to stents. As a condition of his employment, Park executed an Employee Secrecy, Non-Competition and Non-Solicitation Agreement (the "Agreement"). In or about mid June 2008, Park tendered his resignation from Cordis and informed Cordis that he accepted employment with Stentys. Shortly thereafter, plaintiffs informed Park and Stentys that Park's anticipated employment with Stentys would violate the Agreement. Thereafter, the parties attempted to amicably resolve their disputes but were unsuccessful. Since Park is highly valued, Cordis offered to re-employ him and continues to do so.

**CORDIS AND ITS BUSINESS UNITS**

5. For more than 40 years, Cordis has pioneered less invasive treatments for vascular disease by developing medical devices for interventional vascular medicine, minimally invasive computer-based imaging and electrophysiology. For example, among many other things, Cordis developed the first full line of Pre-Shaped Judkins catheters in 1966, the first percutaneous transluminal coronary angioplasty ("PTCA") balloon that utilized nylon balloon technology in 1990, and the first approved drug-eluting stent in 2003.

6. Cordis has four business units: (1) Cordis Cardiology – a worldwide leader in developing and manufacturing interventional vascular technology such as coronary stents and catheters for the treatment of coronary vascular disease; (2) Cordis Endovascular – a recognized leader in developing stents, catheters and vena cava filters for the treatment of peripheral vascular disease (i.e., vascular disease existing outside of the heart and brain); (3) Cordis Neurovascular – a leader in developing treatment solutions for neurovascular disease and strokes, including the development of the first neurointerventional microcatheter; and (4) Cordis Biologics Delivery Systems – a leader in the emerging field of biologics delivery, which focuses on optimizing the delivery of therapies to treat vascular disease.

**PLAINTIFFS AND SOME OF THEIR CONFIDENTIAL INFORMATION AND TRADE SECRETS**

7. The market for products that treat vascular disease, such as those offered by Cordis, has become more and more competitive in recent years and plaintiffs have been developing innovative responses to better position their products in these markets. The medical device industry for the treatment of vascular disease is a multi-billion dollar, world-wide market.

8. In recent years, Cordis has expended large amounts of time, resources and money in researching, developing, and testing innovative, new products for treating coronary and peripheral vascular disease. Due to its significant efforts, Cordis has innovative, new products in its pipeline for the short term (1 year) and long term (+ 5 years). Such information about Cordis' pipeline products and research and development efforts and plans are considered confidential, proprietary and trade secret information (collectively "Confidential Information").

9. Cordis' research and development efforts have lead to significant breakthroughs in treating vascular disease. For example, after an expensive and extensive trial and error process, Cordis developed a product called CYPHER® Sirolimus-eluting Coronary Stent ("CYPHER® Stent"), which received FDA approval in 2003 and has been in the market ever since. The CYPHER® Stent is used to treat the stenotic (i.e., narrowed) coronary arteries of the heart found in coronary heart disease.

10. The coronary arteries of the heart narrow due to the build up of cholesterol laden plaques. The therapeutic procedure used to treat coronary heart disease is called percutaneous transluminal coronary intervention ("PTCI" or "PCI"), commonly known as coronary angioplasty. PCI is much less invasive than the alternative – coronary artery bypass surgery. PCI is typically performed by an interventional cardiologist. Interventional cardiologist may perform balloon angioplasty in connection with PCI, which involves the inflation of a balloon within the coronary artery to crush the plaque buildup. Intervention cardiologist also typically introduce a stent into the artery to prop it open to maintain blood flow. In the past, interventional cardiologist used bare metal coronary stents. Since the arrival of such stents in 1995, re-occurrence of the narrowing of the arteries (i.e., re-stenosis) even with the stent in place was a major limitation of interventional cardiology, occurring in as many as 30% of patients.

11. To combat re-stenosis, Cordis, after expending a significant amount of time, resources and money, developed the CYPHER® Stent, which was the first approved drug/device (i.e., drug-eluting) stent. The CYPHER® Stent is a coronary stent for the treatment of coronary heart disease that props open the diseased artery to maintain blood flow. The CYPHER® Stent also releases certain drugs over time to help prevent re-stenosis. The American Heart Association named the CYPHER® Stent one of the top 10 medical advancements of 2003. The CYPHER® Stent has also been chosen by cardiologists worldwide to treat approximately three million patients with coronary heart disease and it has the broadest clinical experience and longest-term clinical follow-up than any drug-eluting stent. The CYPHER® Stent is used to treat blockages located in straight arteries and blockages located in a junction between a main artery and its side-branch artery (i.e., bifurcated arteries).

12. Also, in developing new products, a significant amount of bench testing (i.e., testing outside of a living organism) occurs to confirm the intended performance and safety of the new product. For example, during the bench testing phase, most new medical device products are put through fatigue testing to ensure that the structural integrity of the new product remains in tact when placed under certain stresses. Bench testing occurs several times during the development of a new product. After the intended performance and safety of the new product is confirmed by bench testing, the new product enters clinical trials and then testing for regulatory approval. Once regulatory approval is achieved, the product is manufactured. At the manufacturing stage, the product continues to be tested to verify and validate equipment, techniques and processes.

13. Testing methods and procedures are critical to the development of a new product. With the appropriate testing methods and procedures, a company can efficiently make design decisions or determine which new products are more practical. Overall, with the appropriate testing methods and procedures, a company can make new products, or change existing products, faster and better than a competitor. As such, Cordis' testing methods and procedures are considered highly Confidential Information.

14. The industry recognizes that such testing methods and procedures are highly Confidential Information. For example, when a company seeks FDA approval for a drug or medical device, it must file an application with the FDA. The application typically describes the company's testing methods and procedures. The FDA then makes the application public, usually by making the application accessible on its website. The FDA, however, does not make the company's testing methods and procedures available to the public since such information is considered Confidential Information.

15. Cordis has also expended large amounts of time, resources and money to provide it with a competitive edge in the manufacturing of its products and other medical devices. In particular, Cordis has developed Confidential Information regarding the equipment, material and the manufacturing techniques and technologies it uses to manufacture its products. For example, Cordis uses a material called Nitinol to manufacture certain of its products. Nitinol has shape memory and super elasticity, which are two important characteristics for medical devices such as stents. Most stents must travel through a delivery system (i.e., catheter) that is smaller than the stent in order for the stent to be placed in the diseased artery. The stent, therefore, must be crimped in size so that it can go though the catheter, and then must expand to its intended normal size once it exists the catheter and is placed in the diseased artery. Nitinol allows this to occur.

Although Nitinol is widely used in the industry, Cordis uses a highly confidential and secret technique for processing Nitinol and incorporating Nitinol into its products so that its products have the required shape memory and elasticity.

16. Plaintiffs take measures to protect its Confidential Information. All employees have IDs and there is a sign-in procedure for visitors at all facilities. No one visits a facility without an escort. All computers have secure access features and fire walls. Plaintiffs also have security and confidentiality policies and agreements which they enforce.

## PARKS' EMPLOYMENT AT CORDIS

17. Park, who has a degree in engineering, began his employment with Cordis in March 2001 as a Senior Engineer. In August 2001, he was promoted to the position of Senior Product Development Engineer. Then, in October 2002, he was promoted to the position of Staff Product Development Engineer. As a condition of his employment, and because of his access to Confidential Information, Park was required to sign the Agreement. A true and correct copy of the Agreement signed by Park is attached hereto as Exhibit A. The Agreement provides in pertinent part:

> CONFIDENTIAL INFORMATION means information disclosed to me or known by me as a result of my employment by the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, about products, processes, technologies, machines, customers, clients, employees, services and strategies of the COMPANY, including but not limited to, inventions, research, development, manufacturing, purchasing, finance, computer software, computer hardware, automated systems, engineering, marketing, merchandising, selling, sales volumes or strategies, number and location of sales representatives, names and significance of the COMPANY's customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, and other customer or client-specific information.

CONFLICTING PRODUCT means any product, technology, process, machine, invention or service of any person or organization other than the COMPANY in existence or under development which resembles or competes with a product, process, technology, machine, invention or service upon which I shall have worked or about which I become knowledgeable as a result of employment with the COMPANY and whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION which I shall have had access to during my employment.

CONFLICTING ORGANIZATION means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a CONFLICTING PRODUCT.

* * * *

5. I recognize that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a CONFLICTING ORGANIZATION, will cause immediate irreparable injury to the COMPANY. Unless I first secure the COMPANY's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION. I understand and agree that my obligations not to disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION shall continue after termination of my employment for any reason.

6. During my employment with the COMPANY and for a period of eighteen (18) months after termination of my employment with the COMPANY for any reason, I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States, or in any foreign country or territory in which the services I may provide could enhance the use or marketability of a CONFLICTING PRODUCT by application of CONFIDENTIAL INFORMATION which I shall have had access to during my employment, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION, provided that the COMPANY, prior to my accepting such employment, shall receive separate written assurances satisfactory to the COMPANY from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly, for an 18-month period, in connection with any CONFLICTING PRODUCT. I also agree that during my employment with the COMPANY and for a period of 18 months thereafter, I will not render services to any other organization or person in a position in which I could use CONFIDENTIAL INFORMATION to the detriment of the COMPANY.

> 7. I recognize that the COMPANY's relations with its accounts, customers and clients represents an important business asset that results from the COMPANY's significant investment of its time and resources. I further recognize that by virtue of my employment by the COMPANY, I have gained or may gain relationships with the accounts, customers and clients of the COMPANY, and because of such relationships, I could cause the COMPANY great loss, damage, and immediate irreparable harm, if, during my employment by the COMPANY or subsequent to the termination of such employment for any reason, I should for myself or on behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a product or service that could compete with a product or service being sold or developed by the COMPANY. I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not solicit any business from, sell to, or render any service to, or, directly or indirectly, help others to solicit business from or render service or sell to, any of the accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY, for any purpose related to the sale of any such product or service. I also agree that for a period of twelve (12) months after termination of employment with the COMPANY for any reason, I will not solicit or hire on my own behalf, or on behalf of others, any COMPANY employee.
>
> * * * *
>
> 13. I understand and acknowledge that if I violate this Agreement or am about to violate this Agreement by disclosing or using information prohibited by paragraph 5 above, accepting employment or providing services prohibited by paragraph 6 or 7 above, or failing to turn over property as required by paragraph 12 above, the COMPANY shall have the right, and be entitled to, in addition to any other remedies it may have, injunctive relief; in other words, I understand and acknowledge that the COMPANY can bar me from disclosing or using such information, bar me from accepting such employment or rendering such services for the periods specified in paragraphs 6 and 7 above, and require that I turn over such property.

18. Paragraph 9 of the Agreement provides that Park's obligations under paragraphs 6 and 7 of that Agreement are contingent upon Cordis' payment to him of (i) the prorated monthly compensation he had received from Cordis in the event that, because of the prohibitions contained in paragraphs 6 and 7, he could not obtain employment consistent with his training and education or (ii) the difference between his prorated monthly compensation received while employed by Cordis and the similarly computed monthly compensation he receives from his

post-Cordis employment if his post-Cordis employment provided less compensation as a result of the prohibitions contained in paragraphs 6 and 7.

19. As the Staff Product Development Engineer, Park was responsible for research and development across Cordis' business units, especially Cordis Cardiology and Cordis Endovascular. During his employment with Cordis, Park received significant training from stent design experts. Because of his long history in research and development and his training with stent design experts, Park was regularly called upon to evaluate and review highly sensitive Confidential Information relating to Cordis' current and pipeline products that treat vascular disease, including stents, and Cordis' research and development efforts and plans. For example, Park learned of and became knowledgeable about the following Confidential Information:

- strategic priorities and objectives for the short-term (1 to 2 years), mid-term (3 to 5 years) and long-term (+ 5 years);
- pipeline products;
- product development plans and strategies for new products and how the company plans on changing current products;
- research and development information;
- product testing techniques;
- product components and designs;
- material specifications for all products;
- cost to manufacture products;
- manufacturing techniques and technologies;
- production processes;
- launch strategies for new products, including launch dates, packaging, product forms;
- management of supply chain;
- regulatory progress of products; and
- customer complaints and feedback concerning existing products and instruments.

20. Park was known for being super technical and in fact received the 2001 "Hoffman Scientist award" for significant technical achievement. While at Cordis, he was significantly involved in designing and developing new coronary and peripheral stents utilizing various materials such as stainless steel, cobalt-chrome and Nitinol. For example, Park was the lead

designer on a coronary stent project whereby he converted Cordis' coronary stents from stainless steel to cobalt-chrome, which required Park to re-design the stents.

21. Park also assisted in designing an expandable stent for endovascular applications and developing stent performance testing. In addition, Park was the lead designer for creating a new stent to treat percutaneous abdominal aortic aneurisms ("AAA"). In doing so, Park created a unique stent-graft attachment method for the treatment of AAA.

22. Park's responsibilities and duties also included taking Cordis' stents that were designed for a blood vessel or artery in a specific part of the body and redesigning those stents using Cordis' highly secretive testing methods and procedures so that they could be used on blood vessels or arteries located in other parts of the body.

23. Park also gained considerable knowledge of Cordis' internally developed and secretive processes regarding Nitinol and even developed a new and unique Nitinol heat treatment process.

24. Overall, Park was involved with 7 patents while at Cordis. Significantly, Park is also listed as an inventor on two pending patent applications regarding a new stent for the treatment of coronary and peripheral blockages located in bifurcated vessels and arteries: (1) US 2005/0288771 A1 and (2) US 2005/0131524 A1.

25. Pursuant to Paragraph 1 of the Agreement, plaintiffs own all inventions, patentable or not, developed by Park while at plaintiffs.

## PARK'S PLANNED EMPLOYMENT BY STENTYS

26. In or about mid June 2008, Park tendered his resignation from Cordis. Park eventually informed Cordis that he accepted employment with Stentys, a competitor of Cordis, and would be working in Stentys' research and development department. Cordis immediately

informed Park and Stentys that his intended employment with Stentys would violate the express terms of the Agreement.

27. Stentys is currently developing a bifurcated stent for the treatment of coronary heart disease that involves treating blockages located in bifurcated vessels and arteries. Stentys' bifurcated coronary stent is currently pending a patent. Stentys contends that its bifurcated coronary stent will provide the same advantages as the CYPHER® Stent because it will reduce the re-stenosis rate.

28. Stentys' bifurcated coronary stent will compete directly with the CYPHER® Stent and Cordis' bifurcated stent that is currently pending a patent. Presumably, Stentys is developing other stents and related products that will compete with Cordis' other products.

29. Park has intimate knowledge of some of plaintiffs' most Confidential Information. If Park is allowed to work at Stentys' in connection with any Conflicting Products, it is inevitable that he will disclose plaintiffs' Confidential Information.

30. Plaintiffs and Stentys are direct competitors and if Stentys were to gain knowledge of even some of the Confidential Information concerning the products intimately known to Park, plaintiffs would be immediately, irreparably and severely harmed. Money damages would not adequately compensate plaintiffs for the losses and injuries they would suffer, leaving plaintiffs with no adequate remedy at law.

31. For example, Park is intimately familiar with Confidential Information concerning the CYPHER® Stent and Cordis' patent pending bifurcated stent, such as designs, manufacturing techniques, testing methods and procedures, and material specifications. Park can use and will use, consciously or unconsciously, this Confidential Information to improve Stentys' bifurcated stent and/or other Conflicting Products. In addition, Park had access to

Cordis' cost in manufacturing CYPHER® Stent, which Stentys can use to unfairly compete with plaintiffs.

32. As another example, since Park is intimately familiar with Cordis' testing methods and procedures, Park can use that information to modify and re-design Stentys' bifurcated coronary stent so that it could be used on vessels and arteries outside of the heart. If so, such products would then compete with Cordis' peripheral stents.

33. In addition, Park has intimate knowledge of Cordis' pipeline products and the designs of its current products. If Park is permitted to work for Stentys, then Stentys will be able to immediately duplicate such products overnight at minimal costs and unfairly compete with Cordis.

34. After plaintiffs informed Park and Stentys of its objections to Park's employment with Stentys, the parties attempted to work out their differences. The parties, however, were unsuccessful thereby necessitating the filing of this Verified Complaint and application for a temporary restraining order. Upon information and belief, Park started to work for Stentys on or about July 2, 2008 or will do so shortly.

## JURISDICTION

35. According to the New Jersey State Business Gateway Service Corporate and Business Information Report, which is attached as Exhibit B, Stentys is registered to do business in the State of New Jersey, and some of Stentys' employees, such as Hikmat Hojeibane, currently live and work for Stentys in New Jersey.[1]

[1] Mr. Hojeibane was a former Cordis employee. In January 2005, he was transferred to another J&J subsidiary, Ethicon, Inc., and worked in an area unrelated to stents throughout his employment with Ethicon.. He left Ethicon in February 2007. Mr. Hojeibane did not start working for Stentys until September 2007 – which is greater than 18 months after the last time Mr. Hojeibane worked on stents for Cordis

36. Stentys has purposefully, systematically and continuously directed contacts to and conducted business in New Jersey.

37. Stentys is subject to the jurisdiction of this Court.

38. In his capacity as Staff Product Development Engineer, Park worked in Cordis' offices located in Warren, New Jersey. Park has resided and currently resides in Parsippany, New Jersey. Park also consented to personal jurisdiction and venue to the Courts of New Jersey pursuant to paragraph 16 of his Agreement.

39. Park has purposefully, systematically and continuously directed contacts to and conducted business in New Jersey.

40. Park is subject to the jurisdiction of this Court.

## FIRST COUNT

41. Plaintiffs repeat the allegations contained in the foregoing paragraphs and incorporate those allegations in this Count by reference

42. Park's intended and actual employment with Stentys will and does constitute a breach of the Agreement because he would be employed by a Conflicting Organization within 18 months after termination of his employment with Cordis and would involve Park providing services that may enhance the use or marketability of Conflicting Products by application of plaintiffs' Confidential Information. Park's intended employment with Stentys also will inevitably induce and require Park to breach his Agreement and common law duties with plaintiffs because he would be joining an organization that is engaged in direct competition with plaintiffs and Park's employment with Stentys would make it inevitable that he would disclose Confidential Information that he learned while employed by Cordis.

43. As a result of that breach, plaintiffs will suffer immediate, severe and irreparable harm to its business, and other damages and injuries.

## SECOND COUNT

44. Plaintiffs repeat the allegations contained in the foregoing paragraphs and incorporate those allegations in this Count by reference.

45. As an employee of Cordis, Park had a duty of loyalty that existed independent of his Agreement to refrain from disclosing Confidential Information that he learned while employed by Cordis.

46. If Park is allowed to work for Stentys, a direct competitor of plaintiffs, it is inevitable that he will breach his duty by disclosing plaintiffs' Confidential Information.

47. As a result of the inevitable breach of Park's duty, plaintiffs will suffer immediate, severe and irreparable harm to its business, and other damages and injuries.

## THIRD COUNT

48. Plaintiffs repeats the allegations contained in the foregoing paragraphs and incorporate those allegations in this Count by reference

49. Stentys is aware that Park has entered into an Agreement with plaintiffs. Stentys is also aware that Park possesses highly Confidential Information that belongs to plaintiffs. Stentys is aware that hiring Park would constitute a breach of the Agreement.

50. Despite that knowledge, Stentys has conspired with and tortiously induced Park to breach both his Agreement and his duties to plaintiffs and, therefore, has tortiously and maliciously interfered with plaintiffs' contractual relationship with Park.

51. As a result of Stentys' actions, plaintiffs will suffer immediate, severe and irreparable harm to its business, and other damages and injuries.

**FOURTH COUNT**

52. Plaintiffs repeat the allegations contained in the foregoing paragraphs and incorporate those allegations in this Count by reference.

53. By hiring Park, Stentys and Park have wrongfully contracted, combined, conspired and agreed to: (1) engage in unfair competition; (2) breach common law obligations; (3) tortiously interfere with the contractual relationships and prospective economic advantage of plaintiffs; (4) wrongfully convert and misappropriate Confidential Information of plaintiffs; and (5) unjustly enrich themselves at the expense of plaintiffs.

54. The acts of Stentys and Park constitute wrongful and malicious conduct undertaken without legal justification and with the knowledge and intent that their actions will cause substantial damage and injury to plaintiffs.

55. Unless Stentys and Park are immediately enjoined and restrained, plaintiffs will suffer immediate and irreparable injury for which it has no adequate remedy at law or in money damages, and other damages and injuries.

WHEREFORE, plaintiffs demand judgment against defendants, jointly and severally:

A. Temporarily, interlocutorily and permanently enjoining Park from holding any employment position or engaging in any employment activity with Stentys, directly or indirectly, that in any way relates to or involves coronary or peripheral stents, including bifurcated stents, or any other position that would place him in a position of using or disclosing plaintiffs' Confidential Information, for a period of 18 months from the date hereof;

B. Temporarily, interlocutorily and permanently enjoining and restraining Stentys and its officers, agents and employees from causing or permitting Park to hold any employment position or engage in any employment activity with Stentys, directly or indirectly, that in any way relates to or involves coronary or peripheral stents, including bifurcated stents, or any other position that would place him in a position of using or disclosing plaintiffs' Confidential Information, for a period of 18 months from the date hereof;

C. Temporarily, interlocutorily and permanently enjoining and restraining Park from disclosing, using, disseminating, lecturing upon or publishing any of plaintiffs' Confidential Information as defined in Park's Agreement;

D. Ordering defendants to turn over and return to plaintiffs all of plaintiffs' Confidential Information that defendants have removed, copied, taken, used, disseminated or reviewed, or otherwise have in their possession, custody or control;

E. Temporarily, interlocutorily and permanently enjoining Park from soliciting or hiring on his behalf or on behalf of anyone else, including but not limited to Stentys, any employee of plaintiffs for a period of 12 months from the date hereof;

F. Temporarily, interlocutorily and permanently enjoining and restraining Stentys from (1) causing or permitting Park to disclose or use and (2) receiving, using and disclosing, plaintiffs' Confidential Information as defined by Park's Agreement;

G. Temporarily, interlocutorily and permanently enjoining and restraining Park from otherwise violating any of the terms of the Agreement;

H. Temporarily, interlocutorily and permanently enjoining and restraining Stentys from otherwise causing or permitting Park to violate any of terms of his Agreement or his common law obligations to plaintiffs;

I. Awarding compensatory damages to plaintiffs;

J. Awarding punitive damage to plaintiffs;

K. Awarding cost and attorneys' fees to plaintiffs;

L. Awarding such other and further relief as the Court deems just and equitable.

RIKER, DANZIG, SCHERER, HYLAND
& PERRETTI LLP

Attorneys for Plaintiffs
Johnson & Johnson and Cordis Corporation

By:__________________________
Glenn A. Clark

Dated: July 3, 2008

**RULE 4:5-1 CERTIFICATION**

I certify that to the best of my present knowledge, the matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, and no such other action or arbitration proceeding is presently contemplated by plaintiffs. I am not presently aware of any non-parties who should be joined in this action pursuant to Rule 4:28 or who is subject to joinder pursuant to Rule 4:29-1(b) because of potential liability to any party on the basis of the same transactional facts.

Glenn A. Clark, Esq.

Dated: July 3, 2008

**VERIFYING CERTIFICATION**

I, Kathleen A. Vigue, of full age, certify as follows:

1. I am the Vice President, Device Development, of Cordis Corporation. I have a Bachelors of Science in Chemical Engineering and an MBA in Operations and Technology. I have approximately 25 years of experience in medical device development, including extensive experience with the products referred to in the Verified Complaint.

2. I have read the Verified Complaint to which this Verifying Certification is attached and the factual allegations, based on my personal knowledge, are true unless expressly stated as based upon information and belief.

3. I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

Kathleen A. Vigue

Kathleen A. Vigue

Dated: July 2, 2008

**CERTIFICATION PURSUANT TO RULE 1:4-4(c)**

I, Khaled J. Klele, Esq., of full age, certify as follows:

1. I am an attorney-at-law in the State of New Jersey and an associate of the law firm of Riker, Danzig, Scherer, Hyland & Perretti LLP, attorneys for plaintiffs in this matter.

2. Attached hereto is the Verifying Certification of Kathleen A. Vigue, with a facsimile of her original signature. I certify that Ms. Vigue has acknowledged the genuineness of her signature and that the document or a copy with original signature affixed will be filed if requested by the Court or a party.

3. I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

Khaled J. Klele

Dated: July 3, 2008

3869502.1

# A

Cordis
a Johnson & Johnson company

**EMPLOYEE SECRECY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT**

Name of Employee: Jin S. Park

Residence Address: 6 Hollandale Rd
Danbury CT. 06811

As used in this Agreement:

the COMPANY means CORDIS CORPORATION and JOHNSON & JOHNSON and any of their successors or assigns, purchasers, acquirers, and any of their existing and future subsidiaries, divisions or affiliates, including any such subsidiary, division or affiliate of Johnson & Johnson to which I may be transferred or by which I may be employed in the future. Affiliates of the COMPANY are any corporation, entity or organization at least 50% owned by the COMPANY, by Johnson & Johnson or by any subsidiary of Johnson & Johnson.

I means the employee whose name appears above, also referred to by the use of first person pronouns, such as me and my.

INVENTIONS mean discoveries, improvements and/or ideas, whether patentable or not.

CONFIDENTIAL INFORMATION means information disclosed to me or known by me as a result of my employment by the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, about products, processes, technologies, machines, customers, clients, employees, services and strategies of the COMPANY, including, but not limited to, inventions, research, development, manufacturing, purchasing, finance, computer software, computer hardware, automated systems, engineering, marketing, merchandising, selling, sales volumes or strategies, number or location of sales representatives, names or significance of the COMPANY's customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, or other customer or client-specific information.

CONFLICTING PRODUCT means any product, process, technology, machine, invention or service of any person or organization other than the COMPANY in existence or under development which resembles or competes with a product, process, technology, machine, invention or service upon which I shall have worked or about which I become knowledgeable as a result of employment with the COMPANY and whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION which I shall have had access to during my employment.

CONFLICTING ORGANIZATION means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a CONFLICTING PRODUCT.

I recognize that the business in which the COMPANY is engaged is extremely competitive and that the COMPANY will be providing me with CONFIDENTIAL INFORMATION both at the commencement of my employment and thereafter and may also be providing me with the opportunity to contribute to the creation of CONFIDENTIAL INFORMATION, which will assist both the COMPANY and me in competing effectively. I recognize that CONFIDENTIAL INFORMATION is significant to the COMPANY'S competitive position and that the COMPANY therefore expects me to keep it secret and also expects me not to compete with the COMPANY during my employment and for a period of time thereafter.

Accordingly, in consideration of the receipt of CONFIDENTIAL INFORMATION, my employment or the continuation of my employment by the COMPANY, and other benefits being provided to me in connection with this Agreement, including those provided pursuant to paragraph 9:

1. I agree to disclose promptly to the COMPANY all INVENTIONS conceived or made by me whether or not during my hours of employment or with the use of the COMPANY's facilities, materials or personnel, either solely or jointly with another or others during my employment with the COMPANY, and related to the actual or anticipated business or activities of the COMPANY, or related to its actual or anticipated research and development or suggested by or resulting from any task assigned to me or work performed by me for, or on behalf of, the COMPANY. I assign and agree to assign my entire right, title and interest therein to the COMPANY. I will not assert any rights under or to any INVENTIONS as having been made or acquired by me prior to my being employed by the COMPANY unless such INVENTIONS are identified on a sheet attached hereto and signed by me and the COMPANY as of the date of this Agreement.

2. I recognize that all works, including, but not limited to reports, computer programs, drawings, documentation and publications, which I prepare within the scope of my employment with the COMPANY, shall be works made for hire and that the worldwide copyrights therein shall be the sole and exclusive property of the COMPANY. In the event that any said copyrightable work or portion thereof shall not be legally qualified as a work made for hire, or shall subsequently be so held to not be a work made for hire, I agree to

assign, and do hereby so assign to the COMPANY, all right, title and interest in and to said work or portion thereof. I will promptly and fully disclose all such works to the COMPANY.

3. I shall, whenever requested to do so by the COMPANY, execute any applications, assignments or other instruments which the COMPANY shall consider necessary to apply for and obtain Letters Patent, trademark and/or copyright registrations in the United States, or any foreign country, or to protect otherwise the COMPANY's interests. These obligations shall continue beyond the termination of my employment with the COMPANY with respect to INVENTIONS, trademarks or copyrightable works conceived, authored or made by me during my period of employment, and shall be binding upon my executors, administrators, or other legal representatives.

4. I shall not disclose to the COMPANY or induce the COMPANY to use any secret, proprietary or confidential information or material belonging to others, including my former employers, if any. I am aware of no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would in any way restrict, limit or prohibit my employment by the COMPANY that I have not disclosed and provided to the COMPANY.

5. I recognize that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a CONFLICTING ORGANIZATION, will cause immediate irreparable injury to the COMPANY. Unless I first secure the COMPANY's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION. I understand and agree that my obligations not to disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION shall continue after termination of my employment for any reason.

6. During my employment with the COMPANY and for a period of eighteen (18) months after termination of my employment with the COMPANY for any reason, I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States, or in any foreign country or territory in which the services I may provide could enhance the use or marketability of a CONFLICTING PRODUCT by application of CONFIDENTIAL INFORMATION which I shall have had access to during my employment, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION, provided that the COMPANY, prior to my accepting such employment, shall receive separate written assurances satisfactory to the COMPANY from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly, for an 18-month period, in connection with any CONFLICTING PRODUCT. I also agree that during my employment with the COMPANY and for a period of 18 months thereafter, I will not render services to any other organization or person in a position in which I could use CONFIDENTIAL INFORMATION to the detriment of the COMPANY.

7. I recognize that the COMPANY's relations with its accounts, customers and clients represents an important business asset that results from the COMPANY's significant investment of its time and resources. I further recognize that by virtue of my employment by the COMPANY, I have gained or may gain relationships with the accounts, customers and clients of the COMPANY, and because of such relationships, I could cause the COMPANY great loss, damage, and immediate irreparable harm, if, during my employment by the COMPANY or subsequent to the termination of such employment for any reason, I should for myself or on behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a product or service that could compete with a product or service being sold or developed by the COMPANY. I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not solicit any business from, sell to, or render any service to, or, directly or indirectly, help others to solicit business from or render service or sell to, any of the accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY, for any purpose related to the sale of any such product or service. I also agree that for a period of twelve (12) months after termination of employment with the COMPANY for any reason, I will not solicit or hire on my own behalf, or on behalf of others, any COMPANY employee.

8. To enable the COMPANY to monitor my compliance with the obligations imposed by this Agreement, I agree to inform the COMPANY, at the time I give notice of my termination of employment, of the identity of my new employer and of my job title and responsibilities, and will continue to so inform the COMPANY, in writing, any time I change employment during the eighteen (18) months following termination of my employment with the COMPANY for any reason.

9. If I am unable to obtain employment consistent with my training and education solely because of a prohibition of paragraph 6 or 7 of this Agreement, or if I am able to obtain only a position in which my Gross Monthly Pay is less than what I last received from the COMPANY as Gross Monthly Pay, then any prohibition of those paragraphs that caused me to be unable to obtain such employment (or that is responsible for the above-referenced differential in pay), shall bind me only as long as the COMPANY shall make monthly payment to me equal to the lesser of (a) the amount last received from the COMPANY as Gross Monthly Pay, or (b) the difference between my last Gross Monthly Pay at the COMPANY and my Gross Monthly Pay in any subsequent employment. Gross Monthly Pay shall consist of the sum of the following applicable amounts, prorated to a monthly basis: my annual base pay, annual commissions, year-end cash bonus, and the monetary value of my year-end stock award (but not stock option grants, any other extra compensation or benefits). My Gross Monthly Pay at the COMPANY will be based on the amounts actually received by me during the last twelve calendar months I was employed by the COMPANY. My Gross Monthly Pay in any subsequent employment will be based on a projection of the amounts to be received by me during the first twelve months in that employment.

10. In order to qualify for the payments provided for in paragraph 9 above, I understand that I must, for each month that I claim payment is due, represent to the Vice President of Human Resources of the COMPANY, in writing within fifteen (15) days following the end

of that calendar month, that although I diligently sought employment consistent with my training and education, I was unable to obtain it, or was unable to attain a position in which my Gross Monthly Pay equaled what I last received from the COMPANY as Gross Monthly Pay, as the case may be, solely because of a prohibition of paragraph 6 or 7 of this Agreement. I must also promptly submit such further information as the COMPANY may request to enable it to verify the accuracy of my representation. I understand that the COMPANY shall, at its option, be relieved of making a monthly payment to me for any month with respect to which I have failed to comply with a requirement of this paragraph 10.

11. I further understand that if, at any time within the period of prohibition specified in paragraph 6 or 7, the COMPANY gives me a written release from the prohibition of paragraph 6 or 7 that has been the sole cause of my inability to obtain employment consistent with my training and education or my inability to obtain a position in which my Gross Monthly Pay equals what I last received from the COMPANY as Gross Monthly Pay, as the case may be, then, the COMPANY will no longer be obligated to make the payments that had been required due to those prohibitions.

12. Upon termination of my employment with the COMPANY for any reason, I shall turn over to a designated individual employed by the COMPANY, all property then in my possession or custody and belonging to the COMPANY, including any computer equipment. I shall not retain any copies of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents in any form whatsoever (including information contained in computer memory or on any computer disk) relating in any way to the affairs of the COMPANY and which were entrusted to me or obtained by me at any time during my employment with the COMPANY.

13. I understand and acknowledge that if I violate this Agreement or am about to violate this Agreement by disclosing or using information prohibited by paragraph 5 above, accepting employment or providing services prohibited by paragraph 6 or 7 above, or failing to turn over property as required by paragraph 12 above, the COMPANY shall have the right, and be entitled to, in addition to any other remedies it may have, injunctive relief; in other words, I understand and acknowledge that the COMPANY can bar me from disclosing or using such information, bar me from accepting such employment or rendering such services for the periods specified in paragraphs 6 and 7 above, and require that I turn over such property.

14. I hereby consent and agree to assignment by the COMPANY of this Agreement and all rights and obligations hereunder including, but not limited to, an assignment in connection with any merger, sale, transfer or acquisition by the COMPANY or relating to all or part of its assets, divisions and/or affiliates.

15. Nothing herein shall limit or reduce my common law duties to the COMPANY, including but not limited to my duty of loyalty.

16. This Agreement shall be interpreted according to the laws of the State of New Jersey without regard to the conflict of law rules thereof. I agree that any action relating to or arising out of this Agreement may be brought in the courts of the State of New Jersey or, if subject matter jurisdiction exists, in the United States District Court for the District of New Jersey. I consent to personal jurisdiction and venue in both such courts and to service of process by United States Mail or express courier service in any such action.

17. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.

18. The following applies only to a California, Minnesota or North Carolina employee: Notification is hereby given that paragraph 1 does not apply to an invention to the extent that no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely by me on my own time, and (a) which does not relate (i) to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by me for the COMPANY.

19. The following applies only to a State of Washington employee: Notification is hereby given that paragraph 1 does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely on my own time, unless (a) the invention relates (i) directly to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by me for the COMPANY.

20. Nothing contained in this Agreement shall be deemed to confer on me any rights with respect to the duration of my employment with the COMPANY. I UNDERSTAND AND AGREE THAT MY EMPLOYMENT RELATIONSHIP WITH THE COMPANY IS TERMINABLE AT WILL BY EITHER THE COMPANY OR ME, WITH OR WITHOUT CAUSE, EXCEPT THAT IF I INITIATE THE TERMINATION, THERE SHALL BE, AT THE COMPANY'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER I GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. If the COMPANY elects to continue my employment during the notice period, it shall advise me of that fact, and of the duration of the notice period. During any notice period, I will provide such transitional services as the COMPANY may request. The COMPANY will be obligated to continue my pay during the notice period, and my duty of loyalty to the COMPANY shall continue through such period.

I ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, and agree that with respect to the subject matter hereof it is my entire agreement with the COMPANY, superseding any previous oral or written communications, representations, understandings, or agreements with the COMPANY or any of its officials or representatives.

DATE: 3/21/01

EMPLOYEE [signature]

Name Jin Park

Address 6 Hollandale Rd

City/State Danbury CT. 06811

# B

# New Jersey State Business Gateway Service
## Corporate and Business Information Reporting

## Business Entity Status Report

**Printing Instructions:** Open your Browser's Page Setup menu and set your page margins to 0.25". Use your Browser's Print option to print the report as seen on screen.

**Saving Instructions:** Save this file to your hard drive for later viewing by using the Browser's "Save As" function.

**All available information is displayed.**

**Status Report For: STENTYS INC.**

**Business Name:** STENTYS INC.
**Report Date:** 06/30/2008
**Business ID Number:** 0100992759
**Transaction Number: Sequence:** 1329580: 1

**Business Type:** FOREIGN PROFIT CORPORATION
**Status:** ACTIVE

**Filing Date:** 06/02/2008
**Home Jurisdiction:** DE
**Status Change Date:**
**Stock Amount:** 0
**DOR Suspension Start Date:**
**DOR Suspension End Date:**
**Tax Suspension Start Date:**
**Tax Suspension End Date:**
**Annual Report Month:** 6
**Last Annual Report Filed:**
**For Last Annual Report Paid Year:**

**Incorporator:**
**Agent:** CORPORATION SERVICE COMPANY
**Agent Address:** 830 BEAR TAVERN RD
WEST TRENTON, NJ 08628
**Office Address Status:** Deliverable
**Main Business Address:**

**Principal Business Address:**

**Associated Names**

| Name: | Type Description: |
|---|---|

**Officers/Directors/Members:** Not Available