# EXHIBIT 13

FILED

2016 SEP -6  PM 2: 31

CLERK, US DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DISTRICT

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

ETHICON, INC., and
DEPUY ORTHOPAEDICS, INC.,

              Plaintiffs,

v.

LAURA ANGELINI,

              Defendant.

_____/

Case No. 3:16cv1194-J-39 PDB

## VERIFIED COMPLAINT

Plaintiffs Ethicon, Inc. ("Ethicon") and DePuy Orthopaedics, Inc. ("DePuy Synthes") (together, "J&J Companies") hereby file this Verified Complaint against Defendant Laura Angelini ("Angelini") and allege as follows:

## NATURE OF THE ACTION

1.    In this action, the J&J Companies seek injunctive relief and damages against Angelini, a long-time high-level executive within the Johnson & Johnson Family of Companies and specifically within its Medical Devices segment, for violation of Angelini's post-employment non-competition and confidentiality obligations contained in her Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement ("Agreement," attached as Exhibit A).

2.    The J&J Companies are global leaders in the highly competitive medical device industry and the disclosure or use of their highly confidential business information would harm these businesses. Angelini has been exposed to and possesses highly

JANREM0112394

confidential and sensitive business information regarding, among others, the J&J Companies' biosurgery business.

3.     Angelini has accepted employment as Worldwide President of Biosurgery at Baxter Healthcare Corporation ("Baxter"), a direct competitor, which competes head-to-head with the J&J Companies in many product areas, including biosurgery.

4.     As a condition of her employment as a Global Platform Leader, Angelini expressly acknowledged in the Agreement that she would be privy to confidential and proprietary information in connection with her job responsibilities.   In exchange for providing her access to the highest levels of internal non-public information, she agreed not to work for any competitor in any position and in any location in which there was a risk that she would disclose or use that information to the J&J Companies' detriment and to the competitor's advantage for eighteen months after her employment with the J&J Companies terminated.

5.     Instead of complying with these obligations, Angelini has accepted a top executive position at Baxter where the position she is taking creates a substantial risk that she will use or disclose proprietary and highly confidential information belonging to the J&J Companies in violation of her Agreement.

6.     Due to the nature of the risk – specifically, the fact that the J&J Companies cannot monitor Angelini's compliance and the fact that it will be difficult to measure the damages caused by the disclosure of its confidential and proprietary information – the J&J Companies are requesting immediate injunctive relief to prevent such irreparable harm from occurring.

2

JANREM0112395

## THE PARTIES

7.      Plaintiff Ethicon, Inc. is a New Jersey corporation with its principal place of business in West Somerville, New Jersey.  It is a wholly-owned subsidiary of Johnson & Johnson ("J&J") and is therefore an entity within the Johnson & Johnson Family of Companies and a "Company" as that term is defined in Angelini's Agreement.

8.      Plaintiff DePuy Orthopaedics, Inc. is an Indiana corporation with its principal place of business in Warsaw, Indiana.  It is a wholly-owned subsidiary of Synthes, Inc., which is a wholly-owned subsidiary of DePuy Synthes, Inc, which, in turn, is a wholly-owned subsidiary of Johnson & Johnson International, a subsidiary of J&J.

9.      Angelini is a citizen of the State of Florida, residing at 313 Plantation Circle, Ponte Vedra Beach, FL 32082.

## JURISDICTION AND VENUE

10.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332.  This is an action between parties of diverse citizenship with an amount in controversy that exceeds $75,000.

11.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b) because Angelini is a resident of the State of Florida and of this judicial district.

## FACTUAL BACKGROUND

## I.      THE J&J COMPANIES' BUSINESS IS BUILT ON CONFIDENTIAL AND PROPRIETARY INFORMATION

12.     The J&J Family of Companies is comprised of over 260 companies, which together operate the world's largest and most diverse medical device, pharmaceutical and consumer products company.  The J&J Family of Companies operates generally in three

3

JANREM0112396

broad divisions:  Consumer Healthcare; Medical Devices; and Pharmaceuticals.  The businesses in which these entities are engaged are extremely competitive.

13.    Ethicon and DePuy Synthes are two key businesses within J&J's Medical Devices segment and, as wholly-owned subsidiaries of J&J, are part of the J&J Family of Companies.

14.    Formed in 1887 as the first company to mass produce sterile sutures, Ethicon develops, manufactures, and markets sutures, ligatures, staplers, and other wound-closing products.  Today, Ethicon is a global market leader in this business, and its primary focus is to develop and create innovative products and medical devices for use in surgery.

15.    Among one of Ethicon's key areas of focus and innovation is biosurgery, which is an area dedicated to developing an array of technologies to minimize intra- and post-operative complications using biologically-based products for surgical conditions that are difficult or expensive to manage or may not be addressed by standard surgical techniques like sutures or cauterization.

16.    Ethicon's products in this area consist of hemostats, which stop the flow of blood, as well as sealants, to ensure wounds clot and close properly.  Because of its innovative use of biomaterials for these purposes, protection of Ethicon's confidential and propriety information is of utmost importance.

17.    Like Ethicon, DePuy Synthes is a worldwide leader in the medical device industry with a focus on implants and instrumentation for use in orthopedic surgery for the repair and healing of the musculoskeletal system.  DePuy Synthes' products include, among

999998.02858/103314493v.6

JANREM0112397

other things, plates and screws for the healing of traumatic injuries, products used in spine surgery, and joint replacement products like knees, hips, and shoulders.

18.     The medical device industry in which the J&J Companies are engaged is highly competitive and the protection of confidential, proprietary, and trade secret information is vital to prevent competitors or would-be competitors from obtaining an unfair competitive advantage. To compete and to serve its customers and the patient community, the J&J Companies invest millions of dollars annually in resources to develop its technology, systems, and products.

19.     Their business relationships and confidential information are protected by requiring critical employees, as a condition of employment, to agree not to disclose confidential and/or proprietary information, not to solicit customers, and not to compete in a position that would compromise the confidential information for a reasonable period of time following employment.

## II.     ANGELINI JOINS J&J AND GAINS EXTENSIVE ACCESS TO THE J&J COMPANIES' HIGHLY CONFIDENTIAL AND SENSITIVE BUSINESS INFORMATION

20.     Angelini began her career with J&J on or around July 1, 1991 as a Product Manager for Ethicon Italy.

21.     Since that time, she has worked for several companies within the Johnson & Johnson Family of Companies, and has been privy to their highly-confidential information.

22.     From 2010 through 2012, Angelini was a Regional Vice President for Eastern Eurpoe charged with responsibility for Ethicon's business, including Biosurgery, for Europe, the Middle East and Africa.

5

JANREM0112398

23.    On or around February 6, 2012, Angelini was promoted to the position of Vice President for Global Strategic Marketing for Ethicon's Surgical Care business.

24.    In this role, Angelini used her twenty-one years of experience to oversee the strategic direction of Ethicon's suture and endo-mechanical businesses and was privy to Ethicon's confidential, proprietary, and trade secret information across Ethicon's businesses.

25.    Indeed, because of the high level of this position, Angelini would have had access to information regarding Ethicon's Biosurgery business at the strategic level, including the pipeline and various key issues for the development of that pipeline.

26.    In and around October 2013, Angelini became the President of North America and Global Strategic Marketing at Johnson & Johnson Vision Care, Inc. ("Vision Care").

27.    Most recently, in March 2016, Angelini became the Global Platform Leader – Joints for DePuy Synthes ("Platform Leader").   Angelini's assumption of this position coincided with J&J's Medical Device business restructuring.

28.    Starting in late 2015, J&J's Medical Device businesses, which include, among others, Ethicon and DePuy Synthes, began to integrate and streamline their operations and research and development functions to create one Medical Device organization.  As part of this restructuring, the Medical Device businesses sought to accelerate the pace of innovation and to prioritize and reallocate research and development resources to key platforms and geographies.  To do so, it was critical that the top level leadership within these platforms share information and align on the priorities across J&J Medical Device.

29.    Therefore, in connection with her assigned responsibilities as Platform Leader, a top executive position, Angelini had access to highly confidential and proprietary

6

JANREM0112399

information relating to *all* of the J&J Family of Companies Medical Device businesses, including Ethicon and its Biosurgery unit. The biosurgery business is unique from a strategic planning perspective because it cuts across many of the J&J Companies' surgical platforms. The confidential and proprietary information to which she had access included, without limitation, market data, share position, pricing and pricing strategies, project share gains and losses, product portfolio gaps, research and development pipeline, growth plans, compensation plans, and advantages and key innovations across J&J product lines.

30.     In this role, Angelini also received regularly-prepared reports regarding the Medical Device segment businesses, including updates on the portfolio strategy, progress on the execution of such strategy, project updates, project launch dates and reports for the Medical Device segments overall, including Ethicon and its Biosurgery business, and DePuy Synthes. Angelini received these reports as recently as August 9, 2016.

31.     In addition, from April 25 through 27, 2016, J&J held a Strategic Planning & Innovation Workshop for its Medical Device segment to further its goal of integrating its subsidiaries to cross-develop products. J&J brought all platform leaders together to discuss innovation priorities, product lines, product and marketing development, technologies, and product and business priorities.

32.     The purpose of the meeting was for each business leader to present the key issues, strategies and products for their business, to have their peers from other businesses review and comment on the plans and pipelines, and to make decisions together about how to invest in each of these businesses and test the various strategies that were proposed to determine the path forward.

999998.02858/103314493v.6

JANREM0112400

33.     Invitees to the Strategic Planning & Innovation Workshop included Angelini, and other top executives from across the Medical Device segment including DePuy Synthes and Ethicon.

34.     Information regarding the strategic direction of Ethicon and its Biosurgery unit were disclosed and discussed, including strengths, weaknesses, and priorities. Significant detail was provided and discussed for the Biosurgery business and where it ranks as a priority for the entire Medical Device portfolio.

35.     Angelini had access to this information prior to the meeting and was involved in the discussion of the direction of this business, which she knew and understood and to which she could contribute based on her many years of experience with Ethicon.

36.     Indeed, though she had been responsible for another business within J&J prior to March 2016, the Medical Device Strategic Planning & Innovation Workshop provided Angelini with a "re-fresh" on all current plans, pipelines, and strategies for Ethicon, including its Biosurgery business.

37.     Angelini would have been in the unique position to have detailed knowledge of this business due to her tenure with Ethicon, to see how the strategies and pipeline had developed over time, and to provide comments and feedback on the direction and strategy for this business going forward.

38.     Unbeknownst to the J&J Companies, at the time that Angelini was receiving these highly confidential business planning and strategy documents and attending this intensive innovation workshop, she was coordinating a second round of interviews with executives at a direct competitor, Baxter, for, upon information and belief, the position that

8

JANREM0112401

she has ultimately accepted and intends to take: Worldwide President of Baxter's Biosurgery business. *See* emails between executive recruiting firm Spencer Stuart and Angelini from April and May 2016, attached hereto as Exhibit B.

39.     Therefore, Angelini *knew* that she was engaged in discussions with a direct competitor, yet chose to attend and be engaged at the Medical Device Strategic Planning & Innovation Workshop where all of the Medical Device segment's plans and strategies were discussed and vetted across the Medical Device leadership team.

40.     The information disclosed in advance and during this and similar meetings between top executives at J&J, in addition to the Medical Device segment reports, was strictly regulated, as it concerned each business operation within the Medical Device business and involved discussion amongst all top executives, including Angelini, about strictly confidential future developments and business innovation.

41.     These types of documents were circulated only to a select number of leaders within J&J, who were strictly instructed not to forward the documents by email. The documents were marked as "Confidential. For J&J internal use only." with the instruction "Do Not Distribute or Print" directly emblazoned on the documents. In addition, the printing function for these documents was disabled so that recipients could not make hard copies.

42.     All of these measures demonstrate that the information Angelini had access to was of a highly-confidential and sensitive nature.

999998.02858/103314493v.6

JANREM0112402

III.   **ANGELINI'S OBLIGATIONS UNDER THE EMPLOYEE SECRECY, INTELLECTUAL PROPERTY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT**

43.     As a condition of her employment, Angelini signed an Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement ("Agreement").

44.     Pursuant to the Agreement, Angelini was made aware that she would be given access to confidential information, would develop, maintain or enhance business and/or customer relationships and receive training.

45.     Additionally, Angelini was made aware that she would have access to confidential information "relating to the business of other entities within the Johnson & Johnson Family of Companies." Ex. A ¶ A.

46.     CONFIDENTIAL INFORMATION under the Agreement is defined as:

> "information or a compilation of information, in any form (tangible or intangible) about the business of the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, which is disclosed to you or known by you as a result of your employment by the COMPANY. CONFIDENTIAL INFORMATION includes, but is not limited to, (a) such things as trade secrets, inventions, research, development, strategies, operations, logistics, manufacturing, distribution, purchasing, licensing, business planning and development, products in existence or under development, product performance information, product technical information, product know-how, discoveries, methodologies, algorithms, formulas, protocols, reports, data, results, observations, computer programs, patent applications, strategic plans, hypotheses, research direct ions, developments, improvements, drawings, designs, specifications, opinions of legal counsel, clinical trials, draft or final regulatory filings, finance, computer software or hardware, automated systems, engineering, marketing, merchandising, pricing, training, training methods or procedures, selling, sales, personnel, customers or clients, including, but not limited to, customer lists, sales volumes or strategies, number or location of sales

10

JANREM0112403

> representatives, names or significance of the COMPANY's customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, likes, dislikes, habits or other customer or client-specific information; and (b) personal or business information about the COMPANY's employees, customers, vendors, consultants and agents which is not publicly known and which is disclosed to you or known by you in connection with your employment by the COMPANY including, but not limited to, performance reviews and other performance related information, organizational charts, compensation, benefits, and rankings."

Ex. A at ¶ B.

47.    Importantly, the term "COMPANY" in turn, is defined as "individually and/or collectively DePuy Orthopaedics, Inc., Johnson & Johnson, and all other entities within the Johnson & Johnson Family of Companies, and their respective successors and assigns. An entity is within the Johnson & Johnson Family of Companies if it is at least 50 percent owned by Johnson & Johnson, either directly or indirectly." *Id.* Ethicon falls under the definition of COMPANY, because it is a wholly-owned subsidiary of J&J.

48.    In addition, paragraph 16 provides that "Each COMPANY is an express third-party beneficiary of this Agreement."

49.    Angelini further agreed that, for a period of 18 months after her last date of employment with DePuy Synthes, she would not: "directly or indirectly, perform work for any COMPETITOR in any position and in any location in which [she] could disadvantage **any** COMPANY or advantage the COMPETITOR by: (a) [her] disclosure or use of CONFIDENTIAL INFORMATION to which [she] had access; (b) [her] use of the specialized training provided to [her] by [DePuy] or **any** COMPANY for which [she has]

11

JANREM0112404

worked; and/or (c) [her] use of CUSTOMER relationships and goodwill. " *Id.* at ¶ C(6) (emphasis added).

      50.    "COMPETITOR" is further defined as any person or entity

> "(a) that is engaged in or preparing to become engaged in research, development, production, marketing selling of, or consulting on a product, process, technology, machine, invention or service in existence or under development that resembles or competes with an existing or potential product, process, technology, machine, invention or service of any COMPANY that is in existence or under development or (b) that could benefit from: (i) CONFIDENTIAL INFORMATION; (ii) [her] use of the specialized training provided to [her] by [DePuy] or **any** COMPANY; and/or (c) that could benefit from [her] use of the COMPANY's customer relationships and/or goodwill."

*Id.* at ¶ B (emphasis added).

      51.    The Agreement contains a limitation on the non-compete provision in section C paragraph 6 which provides that Angelini *could* work for a competitor *if* it is determined that the competitor has a diversified business and "no portion of the business for which [she] would render services is a COMPETITOR" and Angelini provides written assurances satisfactory to "the COMPANY with a competitive interest" that she "will not render any services to the portion of the business that is a COMPETITOR." *Id.* at ¶ C(6).

      52.    The Agreement also contains an Addendum A that provides for payments to Angelini in the event that she is "unable to obtain employment in a position in which [her] annual base salary is at least equal to [her] annual base salary at the time of [her] termination solely because of" the non-compete and non-solicitation restrictions in the Agreement, and subject to her satisfaction of other conditions contained in the Addendum including notice to

999998.02858/103314493v.6

JANREM0112405

the appropriate person in writing of her efforts to find employment that complies with her obligations under the Agreement.

53.      Angelini acknowledged, by executing the Agreement, that if she violates or is "about to violate" the provisions of the Agreement addressing the use or disclosure of confidential information, "immediate irreparable injury to any COMPANY will result, warranting (in addition to any other relief) the imposition of injunctive relief against [her]." *Id.* at ¶ C(12).

## IV.    ANGELINI LEAVES DEPUY SYNTHES FOR A DIRECT COMPETITOR WHERE HER KNOWLEDGE OF CONFIDENTIAL INFORMATION WILL BENEFIT THE COMPETITOR AND PUT THE J&J COMPANIES AT A COMPETITIVE DISADVANTAGE

54.      On August 11, 2016, Angelini resigned from her position as Global Platform Leader – Joints, stating in an email that she wished to express her "intention to leave JnJ and present [her] formal resignation" as well as her "gratitude to JnJ . . . for 25 wonderful years with the company."

55.      Angelini's last day at DePuy Synthes will be September 9, 2016. Thereafter, she intends to commence employment at Baxter as Worldwide President of Biosurgery.

56.      There is no question that Baxter competes directly and head-to-head with Ethicon in the medical device industry, particularly when it comes to Biosurgery products.

57.      The confidential, proprietary, and trade secret information that Angelini knew about and had access to as a leader of Ethicon, coupled together with the regular reports she received in her newer role at DePuy Synthes, as well as that disclosed during the recent Strategic Planning & Innovation Workshop, as well as other top executive meetings that she

999998.02858/103314493v.6

JANREM0112406

attended and reports she received, would undoubtedly cause great and irreparable harm if disclosed to Baxter.

58.     Angelini's new position at Baxter will require her to encounter many of the same questions and tasks that she has during her 25 years within J&J, and will inevitably require her to use and disclose the confidential, proprietary, and trade secret information that she has acquired in her various high-level roles at the J&J Companies.

59.     Accordingly, the very fact of Angelini's employment at Baxter, particularly in a top executive position, compromises confidential information relating to the whole of J&J's Medical Device operations, including Ethicon and its Biosurgery business that Angelini had access to.

## V.     IRREPARABLE HARM TO THE J&J COMPANIES

60.     By working for a direct competitor of the J&J Companies in a top executive role and having had such broad and extensive access to highly sensitive information across the Medical Device segment, Angelini will disclose proprietary and confidential information and is in direct violation of her obligations under the Agreement.

61.     The J&J Companies will suffer immediate and irreparable harm unless Angelini is enjoined from breaching her Agreement.  Among other things, the J&J Companies will suffer the loss of valuable confidential and proprietary information, as well as the concomitant loss of competitive advantage, including loss of market share and potentially the loss of market-leading positions that are entitled to protection under the law. It will be very difficult, if not impossible, to calculate the loss and damage resulting from Angelini's breach of her Agreement.

14

JANREM0112407

62.     There is no adequate remedy at law for the irreparable harm that the J&J Companies will suffer unless Angelini is enjoined from breaching her Agreement.

63.     Injunctive relief is necessary to preserve the status quo and restore the parties to the situation that existed immediately before Angelini began engaging in wrongful conduct.

64.     Additionally, injunctive relief is appropriate in these circumstances because the J&J Companies will most likely prevail on the merits and the balancing of equities favors the J&J Companies.

### COUNT ONE – BREACH OF CONTRACT

65.     The J&J Companies hereby incorporate the allegations contained in the preceding paragraphs as if set forth fully herein.

66.     As a condition of her employment, Angelini agreed, for a period of eighteen months following her employment, not to perform work for any competitor in any position or location in which she could disadvantage the J&J Companies or advantage the competitor by her disclosure or use of confidential information to which she had access.

67.     During her employment, Angelini had significant and extensive access to a broad array of confidential and proprietary information related to the finances and global business strategies of the J&J Companies and other entities within the J&J Family of Companies, including Ethicon's Biosurgery business, and including pricing calculations, cost data, market analyses, launch dates, strategic plans, and product portfolios.

15

JANREM0112408

68.    Angelini held a high level executive position in which she had access to confidential and trade secret information which would unquestionably disadvantage the J&J Companies and advantage Baxter.

69.    For example, Angelini participated in a Strategic and Innovation Planning Meeting on April 25-27, 2016 in which the J&J Companies' strategic and innovation playbook was reviewed and discussed in detail. This included its strategy and pipeline for the Biosurgery business.

70.    Before the meeting, a significant, detailed pre-read presentation was provided to the participants, including Angelini.

71.    Angelini also received regularly-prepared reports regarding the entire Medical Device portfolio, including strategies for the entire business as well as launch dates and other non-public and highly valuable information.

72.    The J&J Companies have taken adequate measures to protect the confidentiality of this information, including requiring Angelini to sign the Agreement, which expressly prohibits her from working for a competitor in any capacity in which she could harm the J&J Companies or benefit a competitor by her use or disclosure of such information. And, the information shared in the Medical Devices segment reports and in the recent Strategic and Innovation Planning meeting was highly confidential and for internal use only, and was distributed only to a specified target audience. Information relating to the meetings was shared via a secured .PDF document with the print feature disabled so as to further limit distribution. The documents were also embossed with the legend "Confidential. For J&J internal use only." and "Do Not Distribute or Print."

16

JANREM0112409

73.     With this information, coupled with her previous experience leading Ethicon and other strategic information she has received including as recently as August 9, 2016 about pipeline, projects and milestones, there is no conceivable way she can do her job as Worldwide President for Baxter without the risk of disclosure, use, or reliance, whether purposeful or not.

74.     Baxter is a direct competitor of Ethicon and if Baxter gains access to the confidential information to which Angelini had access while at the J&J Companies, the J&J Companies will suffer immediate and irreparable harm to its business.

75.     Angelini plans to begin her employment with Baxter on September 12, 2016, and, thus, is or will be in a position in which her use or disclosure of the J&J Companies' confidential information could damage the J&J Companies and advantage Baxter.

76.     Angelini acknowledged, by executing the Agreement, that if she violates or is "about to violate" the provisions of the Agreement addressing the use or disclosure of confidential information, "immediate irreparable injury to [the J&J Companies] will result, warranting (in addition to any other relief) the imposition of injunctive relief against [her]." (Ex. A (Agreement) at ¶ 12.)

77.     Unless Baxter is enjoined from breaching her restrictive covenant, the J&J Companies will suffer irreparable injury to their business.

**WHEREFORE**, Plaintiffs Ethicon, Inc. and DePuy Synthes Orthopaedics, Inc. seek the following relief:

A.      An order enjoining Angelini, for a period of eighteen (18) months beginning August 11, 2016, from directly or indirectly performing work for Baxter or any other competitor of the J&J Companies, and all other entities that are at least 50 percent owned by Johnson & Johnson, either directly or indirectly,

JANREM0112410

and their respective successors and assigns ("the companies"), in any position and in any location in which she could disadvantage the companies or advantage Baxter or any other competitor of the companies by the disclosure or use of confidential information to which she had access while employed with the J&J Companies;

B.    Compensatory damages in an amount to be determined at trial;

C.    Attorney's fees and costs of suit; and

D.    Such other and further relief as the Court deems just and reasonable.

Dated: September 6, 2016

MURPHY & ANDERSON, P.A.

/s/ Niels P. Murphy
NIELS P. MURPHY
Florida Bar No.: 0065552
nmurphy@murphyandersonlaw.com
scassidy@murphyandersonlaw.com
SARAH J. HULSBERG
Florida Bar No. 0106027
shulsberg@murphyandersonlaw.com
pmarchman@murphyandersonlaw.com
1501 San Marco Boulevard
Jacksonville, Florida 32207
904-598-9282 (phone)
904-598-9283 (fax)
*Trial Counsel for Plaintiffs Ethicon, Inc.
and DePuy Orthopaedics, Inc.*

BLANK ROME LLP

/s/ Leigh Ann Buziak
Anthony B. Haller
haller@blankrome.com
Leigh Ann Buziak
buziak@blankrome.com
Daniel S. Morris
morris-d@blankrome.com
(*motions for admission pro hac vice will
be forthcoming*)

18

999998.02858/103314493v.6

JANREM0112411

One Logan Square
Philadelphia, PA 19103
215-569-5500 (phone)
*Attorneys for Plaintiffs Ethicon, Inc. and
DePuy Orthopaedics, Inc.*

19

JANREM0112412

## VERIFICATION

I, Dan Wildman, verify that I am a Global Platform Leader for DePuy Synthes, a family of wholly-owned subsidiaries of Johnson & Johnson and I have previously held leadership positions within Ethicon.  Accordingly, I am authorized to make this Verification on behalf of DePuy  Orthopaedics, Inc. and Ethicon, Inc., and that the facts in the foregoing Complaint are true and correct to the best of my knowledge or information and belief, and are made subject to the provisions of 28 U.S.C. § 1746, relating to unsworn falsification to authorities.

DAN WILDMAN

Dated:  September 2, 2016

JANREM0112413

JS 44 (Rev. 07/16)

# CIVIL COVER SHEET   3:16cv1104-J-39PDB

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Ethicon, Inc., and Depuy Orthopaedics, Inc.

## DEFENDANTS

Laura Angelini

**(b)** County of Residence of First Listed Plaintiff   West Somerville, NJ
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant   St. Johns, FL
*(IN U.S. PLAINTIFF CASES ONLY)*
NOTE:    IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
Murphy & Anderson, P.A.
1501 San Marco Boulevard, Jacksonville, FL 32207
904-598-9282

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

- ☐ 1  U.S. Government Plaintiff
- ☐ 2  U.S. Government Defendant
- ☐ 3  Federal Question *(U.S. Government Not a Party)*
- ☒ 4  Diversity *(Indicate Citizenship of Parties in Item III)*

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff and One Box for Defendant)*
*(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☒ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY** | **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal | ☐ 376 Qui Tam (31 USC |
| ☐ 130 Miller Act | ☐ 315 Airplane Product | Product Liability | | 28 USC 157 | 3729(a)) |
| ☐ 140 Negotiable Instrument | Liability | ☐ 367 Health Care/ | | | ☐ 400 State Reapportionment |
| ☐ 150 Recovery of Overpayment | ☐ 320 Assault, Libel & | Pharmaceutical | | **PROPERTY RIGHTS** | ☐ 410 Antitrust |
| & Enforcement of Judgment | Slander | Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers' | Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted | Liability | ☐ 368 Asbestos Personal | | ☐ 840 Trademark | ☐ 460 Deportation |
| Student Loans | ☐ 340 Marine | Injury Product | | | ☐ 470 Racketeer Influenced and |
| (Excludes Veterans) | ☐ 345 Marine Product | Liability | **LABOR** | **SOCIAL SECURITY** | Corrupt Organizations |
| ☐ 153 Recovery of Overpayment | Liability | **PERSONAL PROPERTY** | ☐ 710 Fair Labor Standards | ☐ 861 HIA (1395ff) | ☐ 480 Consumer Credit |
| of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 370 Other Fraud | Act | ☐ 862 Black Lung (923) | ☐ 490 Cable/Sat TV |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 720 Labor/Management | ☐ 863 DIWC/DIWW (405(g)) | ☐ 850 Securities/Commodities/ |
| ☒ 190 Other Contract | Product Liability | ☐ 380 Other Personal | Relations | ☐ 864 SSID Title XVI | Exchange |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal | Property Damage | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 890 Other Statutory Actions |
| ☐ 196 Franchise | Injury | ☐ 385 Property Damage | ☐ 751 Family and Medical | | ☐ 891 Agricultural Acts |
| | ☐ 362 Personal Injury - | Product Liability | Leave Act | | ☐ 893 Environmental Matters |
| | Medical Malpractice | | ☐ 790 Other Labor Litigation | | ☐ 895 Freedom of Information |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 791 Employee Retirement | **FEDERAL TAX SUITS** | Act |
| ☐ 210 Land Condemnation | ☐ 440 Other Civil Rights | **Habeas Corpus:** | Income Security Act | ☐ 870 Taxes (U.S. Plaintiff | ☐ 896 Arbitration |
| ☐ 220 Foreclosure | ☐ 441 Voting | ☐ 463 Alien Detainee | | or Defendant) | ☐ 899 Administrative Procedure |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment | ☐ 510 Motions to Vacate | | ☐ 871 IRS—Third Party | Act/Review or Appeal of |
| ☐ 240 Torts to Land | ☐ 443 Housing/ | Sentence | | 26 USC 7609 | Agency Decision |
| ☐ 245 Tort Product Liability | Accommodations | ☐ 530 General | | | ☐ 950 Constitutionality of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities - | ☐ 535 Death Penalty | **IMMIGRATION** | | State Statutes |
| | Employment | **Other:** | ☐ 462 Naturalization Application | | |
| | ☐ 446 Amer. w/Disabilities - | ☐ 540 Mandamus & Other | ☐ 465 Other Immigration | | |
| | Other | ☐ 550 Civil Rights | Actions | | |
| | ☐ 448 Education | ☐ 555 Prison Condition | | | |
| | | ☐ 560 Civil Detainee - | | | |
| | | Conditions of | | | |
| | | Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

- ☒ 1 Original Proceeding
- ☐ 2 Removed from State Court
- ☐ 3 Remanded from Appellate Court
- ☐ 4 Reinstated or Reopened
- ☐ 5 Transferred from Another District *(specify)*
- ☐ 6 Multidistrict Litigation - Transfer
- ☐ 8 Multidistrict Litigation - Direct File

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
28 U.S.C. Sec. 1332

Brief description of cause:
Breach of Contract

## VII. REQUESTED IN COMPLAINT:

- ☐ CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, F.R.Cv.P.

DEMAND $                    CHECK YES only if demanded in complaint:
JURY DEMAND:    ☐ Yes  ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE                    DOCKET NUMBER

DATE
09/06/2016

SIGNATURE OF ATTORNEY OF RECORD
/s/ Niels P. Murphy

**FOR OFFICE USE ONLY**

RECEIPT #              AMOUNT  400.00        APPLYING IFP              JUDGE  39        MAG. JUDGE  PDB

JAX 021400

# EXHIBIT A

JANREM0112415

## EMPLOYEE SECRECY, INTELLECTUAL PROPERTY, NON-COMPETITION
## AND NON-SOLICITATION AGREEMENT

Name of Employee:  Laura Angelini

TO BE PROVIDED BY H.R.

Employee WWID:  41000006

### A.  Introduction

DePuy Orthopaedics, Inc. is one of numerous entities within the Johnson & Johnson Family of Companies.  The businesses in which these entities are engaged are extremely competitive.  During your employment, you will be given access to CONFIDENTIAL INFORMATION (as defined below), will develop, maintain or enhance business and/or customer relationships and receive training relating to the business of DePuy Orthopaedics, Inc. and may have access to CONFIDENTIAL INFORMATION relating to the business of other entities within the Johnson & Johnson Family of Companies.  This Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement (this "Agreement") also applies to any employment you may subsequently have with any other entity within the Johnson & Johnson Family of Companies.

This Agreement sets forth your obligations during and after your employment with the COMPANY including, but not limited to, defining certain rights and obligations concerning intellectual property, non-solicitation-of-business, non-competition, non-solicitation of employees and publicity.

### B.  Definitions

As used in this Agreement:

**COMPANY** means individually and/or collectively DePuy Orthopaedics, Inc., Johnson & Johnson, and all other entities within the Johnson & Johnson Family of Companies, and their respective successors and assigns.  An entity is within the Johnson & Johnson Family of Companies if it is at least 50 percent owned by Johnson & Johnson, either directly or indirectly.

**EMPLOYER** means DePuy Orthopaedics, Inc. or, if applicable, any other COMPANY by which you are (or were) employed at any time.  For purposes of this Agreement, after you are no longer employed by any COMPANY, EMPLOYER means any COMPANY by which you were last employed.

**INVENTIONS** means (a) discoveries, improvements, ideas, concepts, research, data, reports, plans, systems, technology, products, methods, and processes, whether or not patentable, and (b) trademarks, service marks, trade dress, design marks, design rights, logos, domain names, handles, user names, and trade names, whether or not registered, that relate to any work assigned to or performed by you for or on behalf of your EMPLOYER or any COMPANY or to the actual or anticipated research or development or other business activities of your EMPLOYER or any  COMPANY.

**CONFIDENTIAL INFORMATION** means information or a compilation of information, in any form (tangible or intangible) about the business of the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, which is disclosed to you or known by you as a result of your employment by the COMPANY.  CONFIDENTIAL INFORMATION includes, but is not limited to, (a)  such things as trade secrets, inventions, research, development, strategies, operations, logistics, manufacturing, distribution, purchasing, licensing, business planning and development, products in existence or under development, product performance

1

JANREM0112416

information, product technical information, product know-how, discoveries, methodologies, algorithms, formulas, protocols, reports, data, results, observations, computer programs, patent applications, strategic plans, hypotheses, research directions, developments, improvements, drawings, designs, specifications, opinions of legal counsel, clinical trials, draft or final regulatory filings, finance, computer software or hardware, automated systems, engineering, marketing, merchandising, pricing, training, training methods or procedures, selling, sales, personnel, customers or clients, including, but not limited to, customer lists, sales volumes or strategies, number or location of sales representatives, names or significance of the COMPANY's customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, likes, dislikes, habits or other customer or client-specific information; and (b) personal or business information about the COMPANY's employees, customers, vendors, consultants and agents which is not publicly known and which is disclosed to you or known by you in connection with your employment by the COMPANY including, but not limited to, performance reviews and other performance related information, organizational charts, compensation, benefits, and rankings.

**COMPETITOR** means any person or entity including, but not limited to, you or anyone acting on your behalf, (a) that is engaged or preparing to be engaged in research, development, production, marketing, selling of, or consulting on a product, process, technology, machine, invention or service in existence or under development that resembles or competes with, or can be substituted for, a product, process, technology, machine, invention, or service of any COMPANY that is in existence or under development; (b) that could benefit from: (i) CONFIDENTIAL INFORMATION; (ii) your use of the specialized training provided to you by your EMPLOYER or any COMPANY; and/or (c) that could benefit from your use of the COMPANY's customer relationships and/or goodwill.

**CUSTOMER** means any entity, client, account or person including the employees, agents, or representatives of the foregoing, or any entity or person who participates, influences or has any responsibility in making purchasing decisions on behalf of such entities, clients, accounts or persons, to whom or to which you contacted, solicited any business from, sold to, rendered any service to, were assigned to, had management responsibilities for, received commissions or any compensation on, or promoted or marketed any products or services to, during the last eighteen months of your employment with any COMPANY.

## C. Rights and Obligations

In consideration of your receipt of CONFIDENTIAL INFORMATION, training, your employment or the continuation of your employment with your EMPLOYER, your access to customer relationships and good will, and/or for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, you agree, and intend to be legally bound, as follows:

1. You will disclose promptly in writing to your EMPLOYER or its designee all INVENTIONS conceived, created and/or reduced to practice by you during your employment whether or not during your hours of employment and/or whether or not with the use of your EMPLOYER's or any COMPANY's facilities, materials or personnel, either solely or jointly with another or with others, and related to the actual or anticipated business or activities of your EMPLOYER or any COMPANY, or related to their actual or anticipated research and development or suggested by or resulting from any task assigned by you or work performed by you for, or on behalf of, your EMPLOYER or any COMPANY. Except as otherwise provided in Paragraphs 22, 23 and 24 of this Agreement, you agree to assign and hereby assign your entire right, title and interest in all INVENTIONS (including, but not limited to, all related patent applications and all priority rights

2

JANREM0112417

relating to any INVENTIONS or to any related patent applications) to your EMPLOYER or its designee. You will not assert any rights to any INVENTIONS as having been made or acquired by you prior to your being employed by your EMPLOYER unless such INVENTIONS are identified on a sheet attached hereto and signed by you and your EMPLOYER as of the date of this Agreement.

2. All copyrightable works, including, but not limited to, writings, articles, publications, presentations, reports, computer programs, drawings, tables, graphs, images, artwork, photographs, videos, musical works, sound recordings and audiovisual works, that you create or prepare during and within the scope of your employment with your EMPLOYER or relating to work performed for any COMPANY whether or not created or prepared during your hours of employment and/or whether or not with the use of your EMPLOYER's or any COMPANY's facilities, materials or personnel, and regardless whether the creation or preparation of such work was specifically requested by your EMPLOYER, shall be considered works made for hire, and the worldwide copyrights therein shall be the sole and exclusive property of your EMPLOYER or such COMPANY. If any such copyrightable work or portion thereof shall not legally qualify as a work made for hire, or shall subsequently be held not to be a work made for hire, you agree to assign and hereby assign to your EMPLOYER, such COMPANY, or their designee all your right, title and interest therein. You agree to promptly disclose all such works to your EMPLOYER.

3. You will execute any applications, assignments or other instruments that your EMPLOYER considers necessary to apply for, obtain, transfer and maintain a patent, or trademark or copyright registration or other proprietary rights to protect the interests of your EMPLOYER or the COMPANY with respect to INVENTIONS, or copyrightable works conceived, reduced to practice, created, authorized or made by you during your employment. These obligations shall continue beyond the termination of your employment and shall be binding upon your executors, administrators and other legal representatives.

4. You will not use or disclose to the COMPANY any confidential information belonging to others, including your former employers, if any. You represent there is no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would prohibit or restrict your ability to perform your job-related duties that you have not disclosed and provided to your EMPLOYER.

5. You acknowledge that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a COMPETITOR, will cause immediate irreparable injury to the COMPANY. Except as required by your duties for your EMPLOYER, you will not use, disclose, disseminate, lecture upon or publish any CONFIDENTIAL INFORMATION, either during your employment with your EMPLOYER or thereafter, unless you first obtain the prior written consent of your EMPLOYER or any COMPANY to which the CONFIDENTIAL INFORMATION relates.

6. Except as provided in the next sentence or to any extent prohibited by applicable law, during your employment with any COMPANY and for a period of eighteen (18) months after the termination of your employment (whether voluntary or involuntary), you will not, directly or indirectly, perform, or assist others to perform, work for any COMPETITOR in any position and in any location in which you could disadvantage any COMPANY or advantage the COMPETITOR by: (a) your disclosure or use of CONFIDENTIAL INFORMATION to which you had access; (b) your use of the specialized training provided to you by your EMPLOYER or any COMPANY for which you have worked; and/or (c) your use of CUSTOMER relationships and goodwill.

3

JANREM0112418

Following the termination of your employment, you will be permitted to work for an entity or person if (a) the COMPANY with a competitive interest determines that the entity or person for which you wish to work has a diversified business and no portion of the business for which you would render services is a COMPETITOR, and (b) prior to your commencing any work, such entity or person and you each provides written assurances satisfactory to the COMPANY with a competitive interest that you will not render any services for the portion of the business that is a COMPETITOR for a period of eighteen (18) months after your last date of employment within the COMPANY. The restrictions of this Paragraph 6 will not apply with respect to services you render in California after termination of your employment within the COMPANIES that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

7. You acknowledge that the COMPANY's relationships with CUSTOMERS and the goodwill associated with such relationships are important and valuable business assets that results from the COMPANY's significant investment of its time and resources. Therefore, you agree that during your employment and for eighteen (18) months after the termination of your employment (whether voluntary or involuntary) with the COMPANY, you shall not, directly or indirectly, contact, call upon, solicit business from, sell to, or render services to, or assist others in contacting, calling upon, soliciting business from, selling to, or rendering services to, any CUSTOMER: (a) in connection with the sale, support, service or use of any product or service that resembles or competes with or that may be substituted for one that is being sold, under development or acquired by any COMPANY; (b) if you are working with, for, or as a COMPETITOR of any COMPANY; and/or (c) if your activities could damage or interfere with the CUSTOMER relationships of any COMPANY or divert business from such CUSTOMERS to a COMPETITOR. For purposes of this Paragraph 7, COMPANY shall mean your EMPLOYER and any COMPANY that you worked for during the last eighteen months of your employment. The restrictions of this Paragraph 7 will not apply to limit services you render in California after termination of your employment that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

8. Except to any extent prohibited by applicable law, you agree that for a period of twelve (12) months after your last date of employment within the COMPANY, you will not, directly or indirectly, on your own behalf or on behalf of others, solicit, recruit, interview, hire, identify, suggest or comment on any individual employed by any COMPANY to leave his or her employment with the COMPANY. The restrictions of this Paragraph 8 will not apply to limit services you render in California after termination of your employment that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

9. For purposes of enabling your EMPLOYER and any other COMPANY with a competitive interest to monitor your compliance with your obligations under this Agreement, you will notify your EMPLOYER in writing, at least two weeks before your last date of employment with your EMPLOYER, and provide at least two weeks advance written notice whenever within the eighteen (18)-month period following the termination of employment you plan to commence work with a new entity or person of: your start date, the identity of each entity or person for which you will be working, your new title, and the responsibilities of the position (such as the products and/or services you will be working on for the new entity or person, and any territory you may cover ). During this time period you will also provide such notice regarding any planned or actual changes in your work responsibilities. You will provide the notices required under this Paragraph to the highest-ranking employee in the Human Resources organization of your EMPLOYER and will do so promptly, and, in any event, at least two (2) weeks prior to commencing any new position or (if

4

applicable) any new responsibilities. You will promptly provide any additional information requested by your EMPLOYER to determine compliance with your obligations under this Agreement. The information you provide pursuant to this Paragraph should not include any confidential information belonging to anyone outside the COMPANY and will not be used except to evaluate your compliance with your obligations under this Agreement, to enforce those obligations, and to seek remedies for your breach or another party's interference with your obligations under this Agreement.

10. If your employment with your EMPLOYER terminates for reasons other than misconduct, then you may be entitled to certain payments if you satisfy the requirements and procedures set forth and referenced in Addendum A, which is incorporated by reference herein. If you voluntarily terminate or resign from your employment with your EMPLOYER, then you shall not be eligible for such payments.

11. Upon termination of your employment with your EMPLOYER, you will turn over to an individual designated by your EMPLOYER all property in your possession or custody belonging to your EMPLOYER or any COMPANY, including any computer or electronic equipment. You shall not retain copies of any correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents in any form whatsoever (including information contained in computer memory or on any computer disk or drive) relating in any way to the business of your EMPLOYER or the COMPANY that were entrusted to, created by or obtained by you at any time during your employment with the COMPANY.

12. You acknowledge that your EMPLOYER and/or the COMPANY have a legitimate interest in protecting its CONFIDENTIAL INFORMATION, its customer relationships and the goodwill associated with such customer relationships, and the provision to you of specialized training. You further acknowledge that the restrictive covenants contained in this Agreement are reasonably necessary to ensure your EMPLOYER or the COMPANY is able to protect its legitimate interests and, therefore, you agree not to, in any action, suit or other proceeding, deny the reasonableness of, or assert the unreasonableness of, the restrictive covenants and you hereby waive any such defense. In addition, you agree that the restrictive covenants in this Agreement are separate and independent obligations and, therefore, the failure or alleged failure of the COMPANY to perform any obligations owed to you shall not constitute a defense to the enforceability of such restrictive covenants. Accordingly, you acknowledge that if you violate or are about to violate this Agreement, immediate irreparable injury to your EMPLOYER and the COMPANY will result, warranting (in addition to any other relief) the imposition of injunctive relief against you without the necessity of posting any bond.

13. If you breach any of the provisions of this Agreement, the duration of any applicable restrictive covenant shall commence from the date injunctive relief is granted or from the date that you cease such conduct that violates the restrictive covenant and shall be extended for an amount of time equivalent to any period of breach.

14. You agree to indemnify and pay your EMPLOYER and/or any COMPANY for the reasonable attorneys' fees and costs it incurs (including fees and costs incurred before the initiation of litigation, during litigation, and any trials, appeals and/or any petitions) to enforce the terms of the Agreement in the event you violate any of its terms or in the event you unsuccessfully challenge the validity or enforceability of any of the terms of this Agreement.

15. You agree that this Agreement applies to any position that you may hold as an employee of the COMPANY and shall continue in effect in the event of a promotion, demotion, retention by a different EMPLOYER or in a new position, or any other change in the

5

JANREM0112420

circumstances of your employment, including without limitation any change in the scope or nature of your responsibilities or assignment, your level or seniority, or your compensation or benefits.

16. You agree that your EMPLOYER may assign this Agreement and its rights and obligations, in whole or in part, to any affiliate or third party, including in connection with any merger, sale of assets, sale of stock or any other form of transaction that pertains to all or part of its business or the business of any other COMPANY. Each COMPANY is an express third-party beneficiary of this Agreement.

17. Nothing in this Agreement shall limit or affect any common law duties you have to any COMPANY, including, but not limited to, your duty of loyalty.

18. During your employment, while you may investigate other employment or business opportunities, you acknowledge and agree that you are subject to a duty of loyalty. Therefore, you agree that during your employment, you will not, directly or indirectly, among other things, compete against the COMPANY; do anything to impair your EMPLOYER's business or relationships with its CUSTOMERS; inform CUSTOMERS that you are terminating your employment and starting a competing business or going to work for a COMPETITOR; contact a CUSTOMER on behalf of a COMPETITOR; recommend a COMPETITOR or a COMPETITOR's products or services; engage in training on or assist in selling or promoting a COMPETITOR's products or services; engage in recruitment or solicitation of other employees of your EMPLOYER or any COMPANY to join a COMPETITOR.

19. This Agreement will be governed by and interpreted according to the laws of the State of New Jersey, without regard to its conflict of law rules. Any action that you initiate relating to or arising out of this Agreement must be brought in the courts of the State of New Jersey or, if subject matter jurisdiction exists, in the United States District Court for the District of New Jersey. You consent to personal jurisdiction and venue in both New Jersey State and Federal courts and to service of process by United States mail or express courier service in any such action. Any litigation initiated by you in any other forum or jurisdiction must be transferred to an appropriate court in New Jersey.

20. You irrevocably consent not to sue the COMPANY in any jurisdiction other than the state or federal courts of New Jersey for the purposes of any action arising out of or related to this Agreement. You further agree not to assist, aid, abet, encourage, be a party to, or participate in the commencement or prosecution of any lawsuit or action by any third party arising out of or related to this Agreement in any jurisdiction or venue other than a state or federal court in New Jersey.

21. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.

22. The following applies only to a Minnesota employee: Paragraph 1 does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of the COMPANY was used to conceive or reduce to practice such INVENTION and which was developed entirely by you on your own time, and (a) which does not relate at the time of conception or reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by you for your EMPLOYER.

6

23. <u>The following applies only to a California, Delaware, Illinois, Kansas, or North Carolina employee</u>:   Paragraph 1 above does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of the COMPANY was used and that was developed entirely on your own time, unless (a) the INVENTION relates at the time of conception or reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) the INVENTION results from any work performed by you for your EMPLOYER. For California employees, the requirement to assign your rights in an invention to your EMPLOYER does not apply to an invention which qualifies fully under the provisions of California Labor Code Section 2870.

24. <u>The following applies only to a State of Washington employee</u>:   Paragraph 1 above does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of any COMPANY was used and that was developed entirely on your own time, unless (a) the INVENTION relates at the time of conception or reduction to practice of the INVENTION (i) directly to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, and (b) the INVENTION results from any work performed by you for your EMPLOYER.

25. Nothing contained in this Agreement shall be deemed to confer on you any rights with respect to the duration of your employment. YOUR EMPLOYMENT IS TERMINABLE AT WILL BY EITHER YOUR EMPLOYER OR YOU, WITH OR WITHOUT CAUSE, EXCEPT THAT IF YOU INITIATE THE TERMINATION, THERE SHALL BE, AT YOUR EMPLOYER'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER YOU GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. If your EMPLOYER elects to continue your employment during the notice period, it shall advise you of that fact and of the duration of the notice period. During any notice period, you will provide such transitional services as your EMPLOYER may request. Your EMPLOYER will be obligated to continue your pay during the notice period, and your duty of loyalty to your EMPLOYER will continue through such period.

26. This Agreement sets forth the entire agreement between the parties relating to its subject matter and supersedes all prior agreements, written or oral, between them relating to its subject matter. In the event that this Agreement be declared invalid, void, or unenforceable for any reason, then you understand, agree, and acknowledge any non-compete, confidentiality, non-solicitation, and/or non-disclosure agreement previously entered between you and any COMPANY, which was superseded by this Agreement, shall be reinstated and remain in full force and effect. No modification of or amendment to this Agreement will be effective unless it is in writing and signed by you and an authorized representative of your EMPLOYER. You represent that you have not relied on any representations by any representative of the COMPANY concerning the subject matter of this Agreement that are not expressly stated in this Agreement.

7

JANREM0112422

YOU ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS
AGREEMENT, AND YOU AGREE TO THE TERMS ABOVE AND ACKNOWLEDGE THAT YOU
INTEND TO BE LEGALLY BOUND BY THIS AGREEMENT.

DATE: 04/15/2016

_____
EMPLOYEE SIGNATURE

_____
Print Employee Name (Please Print)

_____
Address

_____
City/State

8

JANREM0112423

## ADDENDUM A

A. If, after at least a month following the termination of your employment within the COMPANY, for reasons other than misconduct or your voluntary resignation, and after a diligent search for employment that complies with the terms of the Agreement and this Addendum, you are unable to obtain employment in a position in which your annual base salary is at least equal to your annual base salary at the time of such termination solely because of the restrictions set forth in Paragraph 6 or 7 of this Agreement, then, commencing after submission of an application for payment and any additional requested information and documents and a determination by your EMPLOYER in due course that you qualify for payment, your EMPLOYER shall make monthly payment to you equal to the lesser of (a) the amount you last received from your EMPLOYER as annual base salary or (b) the difference between your last annual base salary at your EMPLOYER and your annual base salary in any subsequent position for each month for which you properly apply for payment and your EMPLOYER determines your entitlement. Your annual base salary for or with any subsequent employer will be based on your EMPLOYER's reasonable projection of the amounts to be received by you during the first twelve (12) months in that employment. No payment shall be made in advance of the month for which it is requested.

B. To be considered for the payments provided for in Paragraph A above for each month that you claim payment is due, you must establish and represent in writing to the highest-ranking employee in the Human Resources organization of your EMPLOYER, within fifteen (15) days following the end of each month that you are seeking payment, that although you diligently sought work in the prior month consistent with your obligations under Paragraphs 6 and 7 of the Agreement, you were unable to attain employment from a new employer in a position in which your annual base salary equaled the annual base salary you last received from your EMPLOYER, solely because of a restriction set forth in Paragraph 6 or 7 in the Agreement. You must also submit a completed Application for Payment Pursuant to Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement and promptly provide such further information or documents concerning your job search as your EMPLOYER may request to determine if your employment status is solely due to a restriction set forth in Paragraph 6 or 7 of this Agreement, that a diligent search for employment consistent with your obligations was made, and to verify the accuracy of your representations. As more fully set forth in the Application and this Addendum, in order to establish a diligent search for employment satisfying the requirements of this Agreement, you must demonstrate, among other things, that you made best efforts to secure positions that were in compliance with the terms of the restrictions set forth in Paragraphs 6 and 7 of the Agreement. For avoidance of doubt, to be eligible for payment under the Agreement, you must demonstrate, among other things, that you sought employment in positions that would not violate your non-compete and non-solicitation obligations under Paragraphs 6 and 7. You must also establish, among other things, that the restrictions set forth in Paragraph 6 or 7 were the sole reason that you could not find employment with commensurate annual base salary and were not due to circumstances unrelated to those obligations including, without limitation, general economic conditions or competition from other candidates.

9

JANREM0112424

C.  In the event that you are offered a position which you believe conflicts with your obligations under either Paragraph 6 or 7 of the Agreement, you must inform your EMPLOYER so that your EMPLOYER may evaluate the position and consider whether the position may be allowable under the terms of this Agreement or permissible with appropriate restrictions. No payment shall be due under Paragraph A if you fail to make timely application for or to provide on a timely basis any information or documents requested by your EMPLOYER or required under this Addendum or if you provide incomplete or inaccurate information regarding your job search.

D.  If your EMPLOYER determines that you are entitled to payment under Paragraph A, your EMPLOYER may elect in its sole discretion, in lieu of payment, to provide you a written release from the restriction of Paragraph 6 or 7 of the Agreement. In the event your EMPLOYER elects to provide such written release, EMPLOYER will no longer be obligated to make any payments contemplated by Paragraph A above.

JANREM0112425

# EXHIBIT B

JANREM0112426

To:       Angelini, Laura [DPYUS][Lange1@ITS.JNJ.com]
From:     Elasah Dewey
Sent:     Fri 5/6/2016 6:43:58 PM
Importance:   Normal
Subject:  RE: Scheduling - Round 2 interview
Received:     Fri 5/6/2016 6:44:32 PM


Thanks Laura, I appreciate your patience with all the back and forth. I will be back in touch soon!


Elasah Dewey
Executive Assistant to Erik J.
Wordelman
Spencer Stuart Minneapolis/St. Paul


T 6123132033 | M 6513030222
Email | Minneapolis/St. Paul office



*Our Minneapolis/St. Paul office has moved to a new location. For updated address and directions, please visit the Spencer Stuart Website*

From: Angelini, Laura [DPYUS] [mailto:Lange1@ITS.JNJ.com]
Sent: Thursday, May 05, 2016 10:59 PM
To: Dewey, Elasah <edewey@SpencerStuart.com>
Subject: RE: Scheduling - Round 2 interview

All good and confirmed, Elasah.
Thank you !
Best regards,
Laura


**Laura Angelini**
**Global Platform Leader, Joints**



700 Orthopaedic Drive
P.O. Box 988
Warsaw, IN 46581-0988
P: +1-574-372-7355
M: +1-908-432-6221
Email: lange1@its.jnj.com

**Confidentiality Notice**
This message is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the person responsible for delivering the message solely to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone.

From: Elasah Dewey [mailto:edewey@SpencerStuart.com]
Sent: Thursday, May 05, 2016 2:31 PM
To: Angelini, Laura [DPYUS]
Subject: RE: Scheduling - Round 2 interview

Hi Laura,

I have had confirmation from Baxter that they would like to meet with you the evening of May 24 and morning of May 25th, if this still works for you?

They will be sending through a finalized agenda later, but I wanted to let you know so you can open up your calendar on the other dates we discussed. Thank you for your patience, they expressed that they are very intent upon meeting with you again, they have just had some difficulty aligning calendars with travel.

Best regards,
Elasah


**Elasah Dewey**
Executive Assistant to Erik J.
Wordelman
Spencer Stuart Minneapolis/St. Paul

T 6123132033 | M 6513030222
Email | Minneapolis/St. Paul office



*Our Minneapolis/St. Paul office has moved to a new location. For updated address and directions, please visit the Spencer Stuart Website*

**From:** Angelini, Laura [DPYUS] [mailto:Lange1@ITS.JNJ.com]
**Sent:** Monday, May 02, 2016 11:53 AM
**To:** Dewey, Elasah <edewey@SpencerStuart.com>
**Subject:** RE: Scheduling - Round 2 interview

Yes --- or I can change my afternoon plans on the 18th.
I am flying out at 19.20 CST from Chicago to Boston.
So could be at Baxter 04.00 to 05.00 and then heading to the airport.
I could do either morning from Warsaw VC or afternoon stopping by at Baxter before flying out. Whatever works better for them.
Let me know.
Thanks. Best regards,
Laura


**Laura Angelini**
**Global Platform Leader, Joints**



700 Orthopaedic Drive
P.O. Box 988
Warsaw, IN 46581-0988
P: +1-574-372-7355
M: +1-908-432-6211
Email: lange1@its.jnj.com

**Confidentiality Notice**
This message is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the person responsible for delivering the message solely to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone.

**From:** Elasah Dewey [mailto:edewey@SpencerStuart.com]

JANREM0112428

**Sent:** Monday, May 02, 2016 12:39 PM
**To:** Angelini, Laura [DPYUS]
**Subject:** RE: Scheduling - Round 2 interview

This would be for a VC on the 18th?

Elasah Dewey
Executive Assistant to Erik J.
Wordelman
Spencer Stuart Minneapolis/St. Paul

T 6123132033 | M 6513030222
Email | Minneapolis/St. Paul office

www.spencerstuart.com 

*Our Minneapolis/St. Paul office has moved to a new location.  For updated address and directions, please visit the Spencer Stuart Website*

**From:** Angelini, Laura [DPYUS] [mailto:Lange1@ITS.JNJ.com]
**Sent:** Monday, May 02, 2016 11:18 AM
**To:** Dewey, Elasah <edewey@SpencerStuart.com>
**Subject:** RE: Scheduling - Round 2 interview

I have some opening on May 18th 10.30 to 12.00 EST (not CST)  if that could work for Brik.
Laura

**Laura Angelini**
**Global Platform Leader, Joints**

**DePuy Synthes**
·· ·· ·· Johnson-Johnson

700 Orthopaedic Drive
P.O. Box 988
Warsaw, IN 46581-0988
P: +1-574-372-7355
M: +1-908-432-6221
Email: lange1@its.jnj.com

**Confidentiality Notice**
This message is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the person responsible for delivering the message solely to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone.

**From:** Elasah Dewey [mailto:edewey@SpencerStuart.com]
**Sent:** Monday, May 02, 2016 12:16 PM
**To:** Angelini, Laura [DPYUS]
**Subject:** RE: Scheduling - Round 2 interview

I did not expect they would, but appreciate your quick response!

Elasah Dewey
Executive Assistant to Erik J.
Wordelman
Spencer Stuart Minneapolis/St. Paul

JANREM0112429

T 6123132033 | M 6513030222
Email | Minneapolis/St. Paul office

www.spencerstuart.com

*Our Minneapolis/St. Paul office has moved to a new location. For updated address and directions, please visit the Spencer Stuart Website*

**From:** Angelini, Laura [DPYUS] [mailto:Lange1@ITS.JNJ.com]
**Sent:** Monday, May 02, 2016 11:12 AM
**To:** Dewey, Elasah <edewey@SpencerStuart.com>
**Subject:** RE: Scheduling - Round 2 interview

Really sorry, Elasah, none of these can work for me ...

Laura Angelini
**Global Platform Leader, Joints**



700 Orthopaedic Drive
P.O. Box 988
Warsaw, IN 46581-0988
P: +1-574-372-7355
M: +1-908-432-6221
Email: lange1@its.jnj.com

**Confidentiality Notice**
This message is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the person responsible for delivering the message solely to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone.

**From:** Elasah Dewey [mailto:edewey@SpencerStuart.com]
**Sent:** Monday, May 02, 2016 12:03 PM
**To:** Angelini, Laura [DPYUS]
**Subject:** RE: Scheduling - Round 2 interview

Thank you Laura, Brik will also be traveling the week of May 9th, and out of pocket entirely that week.

Some other alternatives for a meeting in Deerfield. They know that your travel schedule this month is packed, so these are long shots, and I can also check into VC option during these windows if your calendar allows):

Mon, May 16 from 4-5pm CST
Thu, May 19 at 3:30-4:30 CST
Fri, May 20 at 11:15-12:15 CST

They would still like you to hold May 24-25 as well.

Thanks Laura, I appreciate your patience as we work through possibilities!

Elasah Dewey
Executive Assistant to Erik J. Wordelman
Spencer Stuart Minneapolis/St. Paul

, ·٠  ·

T 6123132033 | M 6513030222
Email | Minneapolis/St. Paul office

www.spencerstuart.com 

*Our Minneapolis/St. Paul office has moved to a new location. For updated address and directions, please visit the Spencer Stuart Website*

**From:** Angelini, Laura [DPYUS] [mailto:Lange1@ITS.JNJ.com]
**Sent:** Monday, May 02, 2016 10:48 AM
**To:** Dewey, Elasah <edewey@SpencerStuart.com>
**Subject:** RE: Scheduling - Round 2 interview

Hi Elasah,
Really sorry but no, I am in a Board Meeting in Boston all day on Thursday and all booked already for Friday.
Then on Monday I will leave for the UK and will be away all week.
However I am leaving on Monday afternoon, so I could potentially lock time in the morning for Brick if that works for him. Maybe we could use a video system thru our computers? I have used it for another interviews with some of my candidates and it worked quite well.
Let me know ...
Thanks. Best regards,
Laura

**Laura Angelini**
**Global Platform Leader, Joints**



700 Orthopaedic Drive
P.O. Box 988
Warsaw, IN 46581-0988
P: +1-574-372-7355
M: +1-908-432-6221
Email: lange1@its.jnj.com

**Confidentiality Notice**
This message is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the person responsible for delivering the message solely to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone.

**From:** Elasah Dewey [mailto:edewey@SpencerStuart.com]
**Sent:** Monday, May 02, 2016 11:43 AM
**To:** Angelini, Laura [DPYUS]
**Subject:** RE: Scheduling - Round 2 interview

Hi Laura,

Apologies for the delay, the client has had some difficulty aligning calendars due to Brik Eyre's travel schedule.   They have had a window of time open up this week on either Thursday (5/5) 8:30-10 or Friday (5/6) 1:30-2:30 CST, in Deerfield.  I know your calendar is also difficult this monght, so although unlikely, I wanted to check to see if there was any chance you might be able to make this work for a meeting with Brik?

They would still like you to hold the 24-25[th] if possible for other meetings.

Thank you for letting me know!

Best,

JANREM0112431

Elasah Dewey
Executive Assistant to Erik J.
Wordelman
Spencer Stuart Minneapolis/St. Paul

T 6123132033 | M 6513030222
Email | Minneapolis/St. Paul office

www.spencerstuart.com

*Our Minneapolis/St. Paul office has moved to a new location. For updated address and directions, please visit the Spencer Stuart Website*

**From:** Angelini, Laura [DPYUS] [mailto:Lange1@ITS.JNJ.com]
**Sent:** Tuesday, April 26, 2016 9:16 PM
**To:** Dewey, Elasah <edewey@SpencerStuart.com>
**Subject:** RE: Scheduling - Round 2 interview

No problem, Elasah. Thanks for letting me know. Dates are blocked.
Best regards,
Laura

**Laura Angelini**
**Global Platform Leader, Joints**

 DePuy Synthes

700 Orthopaedic Drive
P.O. Box 988
Warsaw, IN 46581-0988
P: +1-574-372-7355
M: +1-908-432-6221
Email: lange1@its.jnj.com

**Confidentiality Notice**
This message is intended for the use of the individual or entity to which it is addressed. It may contain information that is privileged, confidential and exempt from disclosure under applicable law. If you are not the intended recipient, or the person responsible for delivering the message solely to the intended recipient, you are hereby notified that any dissemination, distribution or copying of this communication is strictly prohibited. If you have received this communication in error, please notify us immediately by telephone.

**From:** Elasah Dewey [mailto:edewey@SpencerStuart.com]
**Sent:** Tuesday, April 26, 2016 7:07 PM
**To:** Angelini, Laura [DPYUS]
**Subject:** RE: Scheduling - Round 2 interview

Hi Laura,

Just an update, Baxter is still confirming calendars (waiting on one executive to confirm), and they hope to give me final "go" tomorrow. Thanks for your patience, and please continue to hold the dates if possible.

Best regards,
Elasah

Elasah Dewey

Spencer Stuart Minneapolis/St. Paul

T 6123132033 | M 6513030222
<u>Email</u> | <u>Minneapolis/St. Paul office</u>


<u>www.spencerstuart.com</u>

*Our Minneapolis/St. Paul office has moved to a new location.  For updated address and directions, please visit the <u>Spencer Stuart Website</u>*

**From:** Dewey, Elasah
**Sent:** Friday, April 22, 2016 3:56 PM
**To:** 'Angelini, Laura [VISUS]' <<u>Lange1@ITS.JNJ.com</u>>
**Subject:** Scheduling - Round 2 interview

Hi Laura,

Baxter would like to invite you to Deerfield, IL for second round interviews.  Please will you provide me with your availability in the next weeks, and I will provide to the client?

As before, I am happy to arrange your travel.

Best regards,
Elasah

**Elasah Dewey**
**Executive Assistant to Erik J. Wordelman**
**Spencer Stuart Minneapolis/St. Paul**

T 6123132033 | M 6513030222
<u>Email</u> | <u>Minneapolis/St. Paul office</u>


<u>www.spencerstuart.com</u>

*Our Minneapolis/St. Paul office has moved to a new location.  For updated address and directions, please visit the <u>Spencer Stuart Website</u>*

# SpencerStuart

Executive Search | Board Services | Succession Planning | Executive Assessment | Leadership Advisory Services

