# EXHIBIT 14

**FILED**

AUG 27 2007

Judge Alexander P. Waugh, Jr.

RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800

Attorneys for Plaintiffs
Johnson & Johnson, DePuy Orthopaedics, Inc.
and DePuy Products, Inc.

| | |
|---|---|
| JOHNSON & JOHNSON, DEPUY ORTHOPAEDICS, INC. and DEPUY PRODUCTS, INC., | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION MIDDLESEX COUNTY DOCKET NO. MID-C-107-07 |
| Plaintiffs, | |
| vs. | CIVIL ACTION |
| BIOMET, INC. and ROBIN T. BARNEY, | TEMPORARY RESTRAINING ORDER |
| Defendants. | |

THIS MATTER having been opened to the Court by plaintiffs Johnson & Johnson ("J&J"), DePuy Orthopaedics, Inc. ("DePuy Orthopaedics") and DePuy Products, Inc. ("DePuy Products"), seeking relief by way of temporary restraints pursuant to R. 4:52; and the Court having considered the papers filed in connection with said application; and the Court having heard the arguments of counsel on July 17, 2007; and the Court having set forth its opinion on the record on July 17, 2007, and having conducted a telephone conference with counsel concerning the form of this Order on August 22, 2007; and for good cause shown;

IT IS on this _27th_ day of _August_, 2007,

ORDERED that defendants Biomet, Inc. ("Biomet") and Theresa Barney ("Ms. Barney") be and hereby are enjoined and restrained as follows, pending further Order of the Court:

1.    Ms. Barney will not hold an employment position or engage in any employment activities with Biomet other than in connection with Biomet's Dental Division.  Biomet and its officers, agents and employees will not cause or permit Ms. Barney to do so.   Biomet's Dental Division is also known as 3i.

2.    Ms. Barney may have business-related conferences and communications only with Biomet employees who are employed by Biomet's Dental Division or in connection with work that applies only to the Dental Division.  Ms. Barney may not have business-related conferences and communications relating to Orthopedics with Biomet employees.  For purposes of this Order, "Orthopedics" means everything other than Biomet's Dental Division.  For example, "Orthopedics" includes, but is not limited to, Biomet's Orthopedics, Spine (which includes the Bracing and Soft Goods Lines), Trauma, Sports Medicine and Microfixation (Cranial/Neuro) Divisions, all of which are competitive with Plaintiffs.

3.    Ms. Barney shall not send to or receive from Biomet employees or agents written or electronic communications, such as emails, relating to Orthopedics, however, if Ms. Barney receives a written or electronic communication from Biomet's employees or agents that substantially relates to Biomet's Dental Division and also relates to Biomet's non-Dental business, the fact that Biomet did not redact the non-Dental references from such communication or that Ms. Barney reviewed such non-Dental references shall not be deemed a violation of this Order.  Ms. Barney is not permitted to otherwise learn about Biomet's non-Dental business.

2

4.     Ms. Barney may work at Biomet's Warsaw, Indiana facilities in connection with the Dental Division, but Ms. Barney's office will not be located adjacent to the group of Biomet employees who work in connection with Biomet's Orthopedics business.

5.     Ms. Barney may not attend those portions of general or other meetings of Biomet where the Orthopedic aspect of Biomet's business might or would be discussed in any way. If a given meeting involves more than one Biomet business unit, Ms. Barney may attend only that portion of the meeting concerning Biomet's Dental Division, and will not attend or otherwise be involved in any way in other portions of the meeting regarding Orthopedics.

6.     Ms. Barney will not disclose, use, disseminate, lecture upon or publish any of plaintiffs' confidential information, meaning, as defined in her Employee Secrecy, Non-Disclosure, Non-Competition and Non-Solicitation Agreement ("Agreement") with plaintiffs, information disclosed to Ms. Barney or known by Ms. Barney as a result of her employment by plaintiffs, not generally known to the trade or industry in which plaintiffs are engaged, about products, processes, technologies, machines, customers, clients, employees, services and strategies of plaintiffs, including, but not limited to, inventions, research, development, manufacturing, purchasing, finance, computer software, computer hardware, automated systems, engineering, marketing, merchandising, selling, sales volumes or strategies, number or location of sales representatives, names or significance of plaintiffs' customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, or other customer or client-specific information. Plaintiffs recognize that defendants contest the validity of the Agreement; and it is further

3

7.    ORDERED that, effective as of July 17, 2007, plaintiffs will supplement Ms. Barnsy's salary as provided in the Agreement, subject to discovery and modification of this Order by the Court; and it is further

ORDERED that the return date of plaintiffs' preliminary injunction motion is September 12, 2007 at 9:30 a.m.; and it is further

ORDERED that any party may move to dissolve or modify any temporary restraints herein contained on two (2) days notice to the other parties; and it is further

ORDERED that plaintiffs' counsel will serve a "filed" copy of this Order on defendants' counsel within __7__ days of receipt hereof.

_____
Hon. Alexander P. Waugh, Jr., P.J.Ch.

J7760043.3

4

**LETTER OPINION – NOT FOR PUBLICATION**

December 6, 2007

Dwight D. Lueck, Esquire
Barnes & Thornburg LLP
11 South Meridian Street
Indianapolis, IN 46204

**FILED**

DEC 0 6 2007

Judge Alexander P. Waugh, Jr.

William N. Howard, Esquire
Freeborn & Peters LLP
Suite 3000
311 S. Wacker Drive
Chicago, IL 60606

James P. Fenton, Esquire
Eilbacher Fletcher LLP
Suite 400
803 South Calhoun Street
Fort Wayne, IN 46802

> Re:   J & J/DePuy v. Biomet, Inc. and Barney
> Docket No. C-107-07
> Appellate Division Docket No. AM-216-07
> Amplification of Prior Statement of Reasons
> Pursuant to R. 2:5-1(b)

Dear Counsel:

As you know, this matter was before me on October 4, 2007 for oral argument with respect to the Plaintiffs' application for a

L                                    I IMBAI AAI AAFN

preliminary injunction.   By letter dated October 11, 2007, I
informed you that I had decided to continue the temporary
restraints previously entered and briefly explained my reasons.
The preliminary injunction was entered on November 2, 2007.

In the interim, on October 15, 2007, I entered an order for
mediation pursuant to R. 1:40-4. The mediation was scheduled for
November 29, 2007. Consequently, I deferred preparation of a
more detailed opinion in the hope that the mediation would be
successful.

A motion for leave to appeal was filed by the Defendants on
November 23, 2007, which I believe was the last day to file such a
motion, or close to it. Counsel agreed to the Plaintiffs' application
to the Appellate Division for an extension of time to respond to the
motion for leave to appeal, pending the mediation, which was
granted. The mediation took place on November 29, 2007, but
proved unsuccessful. Consequently, the Plaintiffs will be opposing
the motion for leave to appeal. Pursuant to R. 2:5-1(b), I am
exercising my right to submit "an amplification" of my prior very
brief statement of reasons.

Before considering the facts presented on the application for
a preliminary injunction, a review of the applicable law will be
helpful. A court asked to enter preliminary injunctive relief must
always bear in mind that "[t]he power to issue injunctions is the
strongest weapon at the command of a court of equity, and its use,
therefore, requires the exercise of great caution, deliberation and
sound discretion." Light v. National Dyeing & Printing Co., 140
N.J. Eq. 506, 510 (Ch.1947).

The factors to be considered are well known. The party
seeking preliminary injunctive relief must demonstrate (1) the need
to prevent irreparable injury, (2) a reasonable probability of
success on the merits, (3) a settled underlying legal right and (4) a

2

balancing of hardships that favors injunctive relief. Crowe v. De Gioia, 90 N.J. 126, 132-34 (1982); McKenzie v. Corzine, ____ N.J. Super. ____, _____ (App. Div. 2007); J.H. Renarde, Inc. v. Sims, 312 N.J. Super. 195, 206 (Ch. Div. 1998). If a court is doing more than preserving the status quo, it must determine whether all of the Crowe elements are present. McKenzie v. Corzine, ____ N.J. Super. at _____. And, contrary to the assertion of counsel for the Plaintiffs, a court must consider whether the Crowe factors "clearly and convincingly support[] the entry of injunctive relief." Ibid.

As will be seen, this case centers on the enforcement of a restrictive covenant, or covenant not to compete, in an employment agreement.   New Jersey recognizes and will enforce post-employment restrictive covenants between an employer and employee, but only if they are reasonable and not merely intended to prevent "competition as such". Whitmyer Bros., Inc. v. Doyle, 58 N.J. 25, 33-34 (1971). While the employer cannot merely stifle competition, it has "a patently legitimate interest in protecting [] trade secrets as well as [] confidential business information and [] an equally legitimate interest in protecting [] customer relationships." Id. at 33. Such agreements will be enforced in whole or in part "to the extent reasonable under the circumstances." Solari Industries, Inc. v. Malady, 55 N.J. 571, 585 (1970). Such an agreement is reasonable when it protects the legitimate interests of the employer, imposes no undue hardship on the employee, and is not injurious to the public. Karlin v. Weinberg, 77 N.J. 408, 417 (1978).

Defendant Robin T. Barney ("Barney") was a high level executive of Plaintiff DePuy Orthopaedics, Inc. ("DePuy"). DePuy has offices in Warsaw, Indiana, which is where Barney worked at the time she left DePuy. Defendant Biomet, Inc. ("Biomet"), Barney's current employer, is also located in Warsaw, Indiana. Biomet offers many, if not most, of the same products as

3

DePuy and its affiliated companies. The issue here is whether the covenant not to compete signed by Barney while at DePuy prevents her from working immediately in the same product area for Biomet or whether she must wait eighteen months, or perhaps some shorter period, before doing so.

Plaintiff Johnson & Johnson (J & J), which is located in New Brunswick, New Jersey, has subsidiaries active in the development, promotion and sale of medical device and diagnostic ("MD&D") products, consumer products and pharmaceutical and biotechnology products. The MD&D portion of these J & J businesses includes six segments, one of which is DePuy, Inc. and its subsidiaries, which are sometimes referred to as the "DePuy franchise." Within that "franchise" are Plaintiff DePuy Orthopaedics, as well as DePuy Spine, DePuy Mitek (sports medicine) and Codman (neurology). Codman products include products used for cranial and maxillofacial reconstruction.

Barney worked for J & J operating companies for 15 years. Her resume described her progress from an engineering manager to various higher level positions in several locations, including Indiana, as follows: "VP, Spine Operations, DePuy (1999-2000, Raynham, Massachusetts)," "VP, US Joints, DePuy (2000-2002, Warsaw, Indiana)," "VP WW Joints, DePuy (2002-2004, Cork, Ireland)" to "VP, WW Operation, DePuy (2004 to [2007], Warsaw, Indiana)." In her resume, she described her duties as Vice President Worldwide Operations, her last position at DePuy, as being "[r]esponsible for all aspects of operations including: procurement, forecasting, planning, logistics, inventory management, manufacturing, and distribution – across all DePuy Operating Companies (Joints/Trauma/Extremities, Codman, Spine, and Mitek)."

Over the course of her employment at J & J/DePuy, Barney signed agreements containing covenants not to compete. The first

4

appears to have been in 1999 (when she first became a Vice President).  There was another in 2000 and yet another in 2004.  It appears that she did not sign such an agreement in 2002, when she went to DePuy's subsidiary in Ireland, because they are not permitted under Irish law.

The 2004 Employee Secrecy, Non-Competition and Non-Solicitation Agreement ("Agreement"), the one primarily at issue here, was signed after Barney returned from Ireland and was promoted to the position of Vice President, Worldwide Operations. It provides, in pertinent part, as follows:

CONFIDENTIAL INFORMATION means information disclosed to me or known by me as a result of my employment by the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, about products, processes, machines, customers, clients, employees and services of the COMPANY, including but not limited to, inventions, research, development, manufacturing, purchasing, finance, data processing, engineering, marketing, merchandising, selling, sales volumes and strategies, number and location of sales representatives, names and significance of the COMPANY's customers and clients and their employees and representatives, preferences, needs and requirements, purchasing histories, and other customer or client-specific information, and comparable information about the products, processes, machines, customers, clients and services of affiliates of the COMPANY acquired by me during my employment by the COMPANY.

CONFLICTING PRODUCT means any product, process, machine, invention or service of any person or organization other than the COMPANY in existence or

5

under development which resembles or completes with a product, process, machine, invention or service upon which I shall have worked or about which I become knowledgeable as a result of employment with the COMPANY and whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION which I shall have had access to during my employment.

CONFLICTING ORGANIZATION means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a CONFLICTING PRODUCT.

\*   \*   \*

5.   I   recognize   that   CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such   information,   including   a   CONFLICTING ORGANIZATION, will cause immediate irreparable injury to the COMPANY.   Unless I first secure the COMPANY's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION.   I understand and agree that my obligations not to disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION shall continue after termination of my employment for any reason.

6.   During my employment with the company and for a period of eighteen (18) months after termination of my employment with the COMPANY for any reason, I

6

will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States, or in any foreign country or territory in which the services I may provide could enhance the use or marketability of a CONFLICTING PRODUCT by application of CONFIDENTIAL INFORMATION which I shall have had access to during my employment, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION, provided that the COMPANY, prior to my accepting such employment, shall receive separate written assurances satisfactory to the COMPANY from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly, for an 18-month period, in connection with any CONFLICTING PRODUCT.

7.   I recognize that the COMPANY's relations with its accounts, customers and clients represents an important business asset that results from the COMPANY's significant investment of its time and resources. I further recognize that by virtue of my employment by the COMPANY, I have gained or gain relationships with the accounts, customers and clients of the COMPANY, and because of such relationships, I could cause the COMPANY great loss, damage, and immediate irreparable harm, if, during my employment by the COMPANY or subsequent to the termination of such employment for any reason, I should for myself or on behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a product or service that could compete with a product of service being sold or developed by the

7

COMPANY.   I therefore agree that during my
employment with the COMPANY and for eighteen (18)
months after termination of such employment for any
reason, I will not solicit any business from, sell to, or
render any service to, or, directly or indirectly, help
others to solicit business from or render service or sell
to, any of the accounts, customers or clients with whom
I have had contact during the last twelve (12) months of
my employment with the COMPANY, for any purpose
related to the sale of any such product or service. I also
agree that for a period of twelve (12) months after
termination of employment with the COMPANY for
any reason, I will not solicit or hire on my own behalf,
or on behalf of others, any COMPANY employee.

(Emphasis in original).

Although Barney had signed several such agreements prior to
her transfer to Ireland in 2002, she was not immediately asked to
sign one upon her return to the United States and related promotion
in 2004.  When she was subsequently asked to sign one, she
initially demurred.  Barney testified that she understood that she
would not receive her "bonus" for calendar year 2004 if she did not
sign the Agreement.  Earle Hanlin, the person who allegedly told
her this, recalls telling her that she would not receive stock options
or Certificates of Extra Compensation ("CECs") if she did not sign
the Agreement.  It appears that the awarding of bonuses, stock
options and CECs are discretionary at DePuy.

While DePuy may have been heavy-handed in obtaining
Barney's signature at that time, she had worked for DePuy/J & J
long enough to know that people at her level were required to sign
such agreements, as apparently is also the case at Biomet. Barney
signed the Agreement and did not challenge its validity or notify
DePuy that she did not consider herself to be bound by it for the

8

approximately three years she remained at DePuy, during which time she continued to receive the full salary, as well as discretionary benefits and additional remuneration, of her position as Vice President of World Wide Operations. See Martindale v. Sandvik, Inc., 173 N.J. 76, 88-89 (2002) and Hogan v. Bergen Brunswig Corp., 153 N.J. Super. 37, 43 (App. Div. 1977) for the proposition that continued employment can be consideration for such an agreement.

Barney also contends that, prior to her execution of the Agreement, Hanlin told her that covenants such as the one contained in the Agreement "were intended only for enforcement against personnel employed in sales, marketing, or research and development functions." Barney testified that this recollection is supported by an email from Lawrence Cunningham that Hanlin showed her at the time. The emails exchanged between Cunningham and Hanlin are not entirely consistent with Barney's recollection. The emails from Cunningham state that covenants not to compete were to protect trade secrets and intellectual property, and "unless there's a blatant conflict of interest, usually in a scientific or technical field, they are virtually not enforceable."

However, Barney never asked Hanlin whether DePuy would seek to enforce the covenant against her: "We never talked about enforcement against me." Moreover, Barney recognized that Hanlin "wasn't a crystal ball reader."[1] In any event, it is clear that Barney does not even allege that she was actually told that the Agreement would not be enforced against her. I see no factual

---

[1] At the time that Hanlin engaged in the discussion, he was in the role of supporting Barney for personnel purposes; he was not her superior. Barney did not speak about the issue of enforcement of the covenant as to her with Cunningham, the individual who had asked Hanlin to seek signature of the Agreement, nor with Tony Vernon, the person to whom she reported at the time.

9

and definite promise, (ii) made with the expectation that the other
party will rely upon that promise, (iii) the other party reasonably
relied on the promise, and (iv) the other party suffers a substantial
detriment. Royal Assocs. v. Concannon, 200 N.J. Super. 84, 91-92
(App. Div. 1985). Certainly there is no indication of fraud. See
Jewish Center of Sussex County v. Whale, 86 N.J. 619, 624-26
(1981).

Barney clearly had access to significant amounts of
confidential and proprietary information belonging to J & J/DePuy
as part of her work for the DePuy franchise. Barney was provided
with the following types of information, among others: sales
information, data relating to cost savings of DePuy and its
affiliated companies, information assessing the capabilities of key
employees, information concerning the profitability and annualized
savings of the DePuy franchise by operating company,
information, at a level of detail not known to the public,
concerning standard cost information and products being
developed by DePuy. She was involved in discussions concerning
the DePuy franchise's business planning and future strategies, such
as an Operations Strategic Plan including plans and projections for
headcount, inventory levels and capital expenditures through to
2013.

Barney was involved in many aspects of strategic planning.
By way of example, Barney was a member of the DePuy Global
Management Board ("GMB") from 2003 or 2004 to the time of her
resignation.   The GMB is comprised of senior commercial
representatives from the entire DePuy global franchise: (1)
Orthopaedics, (2) Spine, (3) Mitek (sports medicine) and (4)
Codman (neurology). The GMB is also comprised of senior
functional leaders from across the DePuy franchise, including
operations, quality, finance, human resources, information
technology, business development, research & development,

10

communications, health care compliance and legal. The GMB met on a quarterly basis from the third quarter of 2005 through approximately October 2006. The GMB then met on a monthly basis again from approximately November 2006 through the second quarter of 2007.

Because the GMB is extensively involved in the strategic planning and tactical execution for the entire DePuy global franchise, members of the GMB are privy to confidential, proprietary and trade secret information concerning all four of the DePuy companies: (1) Orthopaedics, (2) Spine, (3) Mitek (sports medicine) and (4) Codman (neurology). The GMB's strategic operational focus is on the present and the short- and mid-term – it examines the current year and approximately the next 18-24 month period, as well as strategic business planning for approximately a seven year horizon. Other activities and sources of information are found in the record on the application for the preliminary injunction.

Barney was also a member of J & J's Medical Device and Diagnostics ("MD&D") Council and its Worldwide Operations Council. The MD&D Council provides strategic planning for the facilities, equipment and personnel needed to manufacture and distribute the products of J & J's MD&D business, which includes five companies other than DePuy: Cordis (interventional cardiology); Life Scan (diabetes management); Ortho Clinical Diagnostics (diagnostics and other testing equipment); Ethicon-Endo (minimally invasive surgical products and equipment); and Ethicon (surgical closures and binding materials such as sutures). Until the beginning of 2006, Ms. Barney chaired the MD&D Council, and thereafter she served as DePuy's representative on that Council. Ms. Barney also served on the J & J Worldwide Operations Council, which focuses on developing strategies to ensure that J & J's products are of the highest quality, while improving the cost of goods and effective tax rates. That Council

focuses on implementing best practices and operations across J & J and reviews J & J's three major business groups: (1) Medical Device and Diagnostics; (2) Consumer; and (3) Pharmaceutical and Biotechnology.

In my view, the record is quite clear that Barney had access on a regular basis to the type of confidential business information that is appropriately subject to protection, with or without a covenant not to compete. Whitmyer Bros., Inc. v. Doyle, 58 N.J. at 33. Tellingly, in my view, Biomet expects Barney to sign a covenant not to compete with it, although it had not yet been signed as of the date of oral argument. In addition, when Biomet produced some business information similar to the DePuy information to which Barney had access, it did so subject to a confidentiality order. There is no basis in the record to conclude that the types of information to which Barney had access were simply "matters of general knowledge within the industry" or "routine or trivial differences in practices and methods", which are not entitled to protection from competitors. Id. at 33-34.

In the spring of 2007, Barney was dissatisfied with her work at DePuy and disappointed that she had not received a promotion that she believed had been promised to her. Although Barney claims that she was deprived of the promotion by a new superior who acted for discriminatory (gender-based) reasons, she has not filed a counterclaim stating such a cause of action nor has she set forth a compelling factual case, as opposed to assertions, for such discrimination at this point. Had she done so, I would have considered the issue in weighing the Crowe factors.

12

Barney contacted a former President of DePuy Orthopaedics, and asked him to put her in contact with Jeffrey Binder (Binder), the President of Biomet - himself a former President of DePuy Orthopaedics. Barney informed Binder that she had executed a confidentiality and non-compete agreement with Plaintiffs and provided him with a copy of the Agreement. Attorneys for Barney and Biomet discussed the Agreement at some length. Barney's counsel told Biomet's counsel "[t]hat someone in the human resources department at DePuy had explained to Robin that [covenants not to compete] were typically only enforced against employees working in sales and marketing or research and development."

During the course of negotiations with Biomet, Barney requested and Biomet agreed that Biomet would indemnify her against any claims that DePuy might make against her based on the Agreement. Barney also negotiated a provision that, in the event that she were to be enjoined from working in the orthopedics area, Biomet would place her in a suitable alternative position or business unit until her restriction expired. Biomet's dental division, in which Barney now works, was the only division discussed at the time.

Barney continued her activities at DePuy while she was negotiating her new employment arrangement with Biomet. She participated in portions of a two day GMB meeting in New Brunswick, New Jersey on April 17 and 18, 2007.

Barney received a draft offer letter from Biomet in early May, as well as a draft resignation letter prepared by counsel for Biomet. The offer letter referenced a number of other documents, including "Biomet's Confidentiality, Non-Disclosure and Non-Competition Agreement." On May 4, 2007, Barney's counsel asked for a copy of this Non-Competition Agreement and expressed the concern that "Ms. Barney is reluctant to sign another

13

non-competition agreement given the problems the agreement with DePuy is causing."

A revised offer letter was received on or about May 8, 2007. The Biomet Non-Competition Agreement was also provided. That covenant not to compete appears to be more restrictive than DePuy's covenant. While DePuy's covenant allows Barney to work for a non-competitive division of a competing organization, Biomet's covenant prohibits the employee from working, directly or indirectly, "with a person or entity which directly competes with the Company."

On May 4, Ms. Barney conducted research on her computer in an attempt to determine whether Plaintiffs had been successful in enforcing a covenant not to compete against a Worldwide Vice President of New Business Development for DePuy Spine, who apparently left DePuy to work for a competitor.

Barney announced her resignation to Michael Mahoney, company group chairman for DePuy, on May 9, 2007. In her resignation letter, Barney informed DePuy that she intended to take the position of Senior Vice President of Operating Systems at Biomet. DePuy advised Barney that resignation would be effective as of May 23, 2007, and that she would continue to receive compensation through that date.

In a letter dated May 14, 2007, DePuy placed Biomet on notice that it did not believe that Barney could fulfill the duties for Biomet identified in Barney's resignation letter without violating her obligations to DePuy under the Agreement. Plaintiffs filed their Verified Complaint with this Court on May 21, 2007. Barney was served with the Verified Complaint on May 23, 2007.

Barney reported to Biomet's headquarters in Warsaw, Indiana on May 24 or 25, 2007 to fill out the paperwork needed to

14

begin employment with that company.[2]    She filled out an Application for Employment in which she answered "Yes" to the question: "Are you bound by any employment contract, or non-competition agreement that may be breached by your employment with Biomet and/or does your current or any previous employer restrict your work activities after leaving their employment, for any period of time?" The Application then asked: "If 'yes,' until what date?" Ms. Barney responded: "See Non-Compete." Biomet inquired further: "What type of restriction?" Ms. Barney answered: "Non-Compete."

Biomet compensated Barney consistent with her offer letter, providing for an annual salary of $275,000 per year, plus benefits and a car allowance. This compensation was effective May 24, 2007. Barney started her employment with Biomet as its Senior Vice President of Operating Systems. She was placed in an office just "down the hall" from the office of Jeffrey Binder, the President of Biomet. She was given access to all of Biomet's data, not just data relating to the dental division (Biomet 3i), so that she could "learn about the company". She was also given plant tours of Biomet's Warsaw facilities. I understand that most of Biomet 3i's manufacturing facilities, on the other hand, are in Florida. That Barney has to travel to Florida to perform some of her duties for 3i, while perhaps inconvenient, is not a true hardship because her work has always involved travel to some extent.

On June 15, 2007, after it became clear that DePuy was pressing to enforce the Agreement, Biomet formally transferred Barney to Biomet 3i and reduced her compensation from $275,000 to $75,000. Biomet's Director of Corporate Human Resources was told that the transfer had "something to do with the, with the

---

[2]  Barney lived and worked for DePuy in Warsaw both prior to and after her stint at DePuy Ireland. She had apparently moved to Warsaw from Massachusetts in 2000, as part of a DePuy reassignment or promotion.

15

attorneys." Barney did not seek to negotiate the $75,000 amount with Biomet. According to Biomet, that amount reflects what a Biomet employee in a similar position would receive.

Four days later, on June 19, 2007, counsel for Barney sent a letter to counsel for Plaintiffs seeking to invoke the provisions of the Agreement requiring DePuy to make up a salary differential in the event the Agreement barred certain employment opportunities:

> Please be advised that, effective June 4, 2007, our client, Robin Barney, was hired by Biomet Dental as Manager of Lean Manufacturing. Her starting salary is $75,000. Pursuant to paragraph 9 of the Non-Competition Agreement with your client, DePuy, claims is an issue in this matter (a position with which our client strongly disagrees), demand is hereby made for immediate payment of the difference between Ms. Barney's salary at Biomet Dental and her total gross compensation when she was employed by DePuy.

Although I required Plaintiffs to provide the salary differential as a condition of both the TRO and the preliminary injunction, there are disputes as to whether the $75,000 salary is artificially low and whether Barney made a good faith search for other employment that would not have implicated the salary differential provisions of the Agreement with DePuy. In my view, those are both very viable issues, which is why I have not viewed the Plaintiffs' failure to agree to the payments immediately a breach of the Agreement which might excuse Barney's further obligations under the covenant not to compete.

Despite Barney's transfer to Biomet 3i, she apparently continued to perform some work as Vice President of Operations. On Saturday, June 23, she sent an email to Biomet's President, analyzing domestic and international backorders of all Biomet

16

product, including or pedic implants and instruments. On June 24, she requested information about orthopedic product open orders because "Jeff B. is asking a lot of questions, so I need to get some answers quickly." On June 30, Barney sent Binder her proposals for reorganization of all of Biomet's worldwide operations, although she now contends that these were not requested by Binder. On July 5, Barney reviewed the progress of Biomet's entire LEAN manufacturing program with Biomet's LEAN leader. On July 7, Barney complained about the "lousy result for spine last week" and asked what issues needed to be addressed. On Sunday, July 15, Barney was communicating with other Biomet employees about "knee forecast data."

On July 17, 2007, after requiring the Plaintiffs to give Biomet and Barney notice of the application, I heard argument on the Plaintiffs' application for a Temporary Restraining Order. I granted temporary restraints for the reasons set forth on the record on July 17, 2007.[3] Because there were disagreements about the form of the order, I held a telephone conference with counsel on August 22, 2007. The TRO was filed on August 27, 2007.

There is little doubt, in my view, that the Agreement, as applied to Barney, meets the general requirements of New Jersey law as set forth in Solari, Whitmyer and Karlin. Barney was a high-ranking executive who was privy to clearly confidential business information of the DePuy franchise well beyond that available to the general public or other competitors in the field. The record created by Plaintiffs, in connection with both applications for injunctive relief, supports their position in that regard.

---

[3] It does not appear that the Defendants made those reasons a part of the record on their application for leave to appeal.

17

Whether the information could properly be categorized as "trade secrets", such as the formula for Coke, is beside the point, inasmuch as Whitmyer Bros., Inc. v. Doyle, 58 N.J. at 33, holds that an employer has "a patently legitimate interest in protecting []confidential business information" in addition to trade secrets. The broad range of present and future business planning, development, manufacturing and product development information to which Barney was privy can easily be characterized as a "compilation which one uses in [] business and which gives [the business] an opportunity to obtain an advantage over competitors who do not know or use it." Sun Dial Corp. v. Rideout, 16 N.J. 252, 259-60 (1954); National Starch & Chem. Corp. v. Parker Chem. Corp., 219 N.J. Super. 158, 530 A.2d 31 (App. Div. 1987).

It is also clear to me that Barney had access to confidential business information concerning "the use or marketability" of DePuy franchise products, as that term is used in Paragraph 6 of the Agreement. In addition, I do not agree with the Defendants' argument that "marketability" is limited to sales, whereas Barney's area of particular expertise is cutting manufacturing costs. In my view, a common sense understanding of "marketability" includes the ability to reduce the cost of manufacture so that the product can be priced competitively, i.e. at a lower price than a competing product. While lower manufacturing costs can also enhance profitability, i.e., selling at the same price as a competitor and therefore making more profit, such close parsing of the language is not mandated by the longstanding judicial requirement that an ambiguous contract be interpreted against its drafter.

Barney was Vice President for World Wide Operations and travelled to various locations for the DePuy franchise. Consequently, this is not the type of situation, such as a localized business, in which a court might consider whether the territorial parameters of the covenant are excessive; nor do I understand that to be an issue.

18

Whether, under the circumstances of this case, the appropriate period of employment restriction is 18 months, or whether the information involved becomes stale and Ms. Barney's ability to recall it becomes too limited earlier than 18 months after leaving DePuy, remains to be seen. Because of that concern, I have scheduled the trial to begin on February 26, 2008.

For all of these reasons, I have concluded that the Plaintiffs have provided clear and convincing support for their application for preliminary injunctive relief as to their likelihood of success on the merits in light of the uncontroverted "material facts" and the settled legal nature of their claim, which are two of the four Crowe factors. Parks v. Commerce Bank, N.A., 377 N.J. Super. 378, 387 (App. Div. 2005).

I am also satisfied that the Plaintiffs have satisfied their obligation to make a clear and convincing case for irreparable harm and the balancing of hardships in their favor. The essence of the Agreement between DePuy and Barney, in addition to a promise never to disclose confidential information, is the requirement that Barney not work for a competing company with respect to a competing product for 18 months. Clearly the purpose of this prohibition is to preclude the likelihood of either an inadvertent disclosure of protected information, avoiding for a reasonable period of time what the theologians might call "the occasion of sin", or a disclosure, whether verbal or otherwise, resulting from the employee's immediately doing essentially the same work for the competitor with fresh knowledge of the former employer's confidential information. The concept of "inevitable disclosure" is recognized in Nat'l Starch & Chem. Corp. v. Parker Chem. Corp., 219 N.J. Super. 158, 162 (App. Div. 1987).

The value to the former employer of the "time-out" in working for a competitor is clearly and dramatically reduced if the

19

"time-out" does not take place until the litigation is concluded. During the time the litigation is taking place, the former employee, in this case Barney, would be sitting in the same sort of meetings she attended for DePuy and talking about the same sort of issues she discussed at DePuy meetings, with knowledge of DePuy confidential information fresh in her mind, but the meetings would be for the benefit of a competitor and would be about similar products that compete with DePuy products. She would be overseeing the same sort of manufacturing processes and seeking to make them as cost-effective as possible for the competitor, again with fresh knowledge of how DePuy does the very same thing.

The lost value of the "time-out" immediately upon beginning similar employment for the new employer would be impossible to quantify monetarily. In addition, a "time-out" long after the change in employment would probably serve little, if any, purpose. Of course, all of that would not be a reason to enforce the covenant pending the litigation in the absence of the other Crowe factors. It would go significantly beyond merely preserving the status quo.

With respect to the balancing of the hardships, I noted above that I have required DePuy to pay Barney the salary differential as a condition to preliminary injunctive relief. I did so not because I am totally convinced that Barney is entitled to it contractually, but specifically to balance the hardships. Although she changed employers for her own purposes and knowing that she had signed the Agreement, I wanted to make sure that she would not be without the salary she had while at DePuy while the preliminary injunctive relief was in effect. To require Barney to work, during the litigation, for a salary $200,000 lower than she would earn absent enforcement of the Agreement, would, in my view, have tipped the balance of hardships in her favor.

I have already noted that DePuy questions her entitlement to the differential, and that will be a matter of proof at trial. I also

20

note that Biomet has agreed to indemnify Barney. Consequently, depending upon the decision on this issue at trial, there may be some need to adjust who is ultimately responsible for the cost, including the possibility that Biomet or Barney may be required to reimburse DePuy. If Barney is required to do so, she may be entitled to indemnification from Biomet under the terms of their agreement.

   For all of these reasons, I am satisfied that the Plaintiffs presented a clear and convincing case for preliminary injunctive relief under all of the Crowe factors. Because I attempted to tailor the TRO to be as fair and focused as possible, I continued those restraints in the preliminary injunction. I have also set a trial date at the end of February 2008.[4]

Sincerely yours,

Alexander P. Waugh, Jr.
Presiding Judge, Chancery Division

----

[4] Although not the subject of the motion for leave to appeal, I also concluded that New Jersey is an appropriate forum and that the Plaintiffs' choice of New Jersey as the forum is reasonable. J & J is the parent company of the DePuy entities and is headquartered in New Jersey. Ms. Barney has traveled to New Jersey, and other states, for business meetings on a regular basis while working for DePuy. Ms. Barney currently travels to other states as part of her new duties for Biomet. New Jersey has an interest in providing a forum for its corporate citizens in matters such as this. The sources of proof are not solely outside of New Jersey, and in fact some of them are within the same municipality as the courthouse where the trial will take place. See Kurzke v. Nissan Motor Corp. in U.S.A., 164 N.J. 159, 164-166 (2000).

21