# EXHIBIT 15

RIKER, DANZIG, SCHERER, HYLAND & PERRETTI, LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800

Attorneys for Plaintiffs
Johnson & Johnson, DePuy Orthopaedics, Inc.
and DePuy Products, Inc.

| | |
|---|---|
| JOHNSON & JOHNSON, DEPUY ORTHOPAEDICS, INC. and DEPUY PRODUCTS, INC., <br><br> Plaintiffs, <br><br> vs. <br><br> BIOMET, INC. and ROBIN T. BARNEY, <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION MIDDLESEX COUNTY DOCKET NO. <br><br> CIVIL ACTION <br><br> **VERIFIED COMPLAINT** |

Plaintiffs Johnson & Johnson ("J&J"), a corporation organized under the laws of the State

of New Jersey, having its principal place of business at One Johnson & Johnson Plaza, New

Brunswick, New Jersey 08933-7002, DePuy Orthopaedics, Inc. ("DePuy Orthopaedics"), a

corporation organized under the laws of the State of Indiana, having its principal place of

business at 700 Orthopaedic Drive, Warsaw, Indiana 46581-0988, and DePuy Products, Inc.

("DePuy Products"), a corporation organized under the laws of the State of Indiana, having its

principal place of business at 700 Orthopaedic Drive, Warsaw, Indiana 46581-0988, by way of

Verified Complaint against defendants, say:

JANREM0113047

## The Parties

1.     Plaintiff J&J is the parent company of subsidiaries engaged in the business of developing, manufacturing and marketing a wide variety of health care products, and providing related services, for the consumer, pharmaceutical and professional markets.  J&J's subsidiaries and operating companies market their products to customers located throughout the United States and the world.

2.     DePuy, Inc. ("DePuy"), one of the world's leading orthopedics companies, is a subsidiary of J&J.  DePuy has several subsidiaries within the DePuy family of companies.  Plaintiff DePuy Orthopaedics is one of those subsidiaries of DePuy.  Plaintiff DePuy Products is a subsidiary of DePuy Orthopaedics.

3.     Defendant Biomet, Inc. ("Biomet"), which has its principal place of business at 56 East Bell Drive, Warsaw, Indiana, 46582 is, on information and belief, a corporation organized under the laws of the State of Indiana.  Biomet is a direct competitor of plaintiffs in developing, manufacturing and marketing orthopedic products.

4.     Defendant Robin T. Barney ("Barney") was the Vice President Worldwide Operations of DePuy Orthopaedics.  Barney was employed by DePuy Products.  On or about May 9, 2007, Barney tendered her resignation from DePuy.  Barney is a resident of the State of Indiana with her principal place of domicile located at 15008 Sea Holly Court, Fort Wayne, Indiana 46814.

## The DePuy Family of Companies

5.     DePuy, founded in 1895, is the oldest manufacturer of orthopedic implants in the United States.  DePuy is an innovator in new orthopedic product and medical device developments.

JANREM0113048

6.     DePuy Orthopaedics and its affiliated companies develop, manufacture and market products and instruments for: total hip and extremity implants; total knee implants; sports medicine; trauma; orthobiologics; neurosurgery; and surgical equipment.  DePuy is an innovator in the research and development of such products and instruments.

7.     DePuy Products, a subsidiary of DePuy Orthopaedics, is responsible for the operations of the production facilities and research and development for DePuy Orthopaedics and its affiliated companies.

8.     These affiliated companies include DePuy Spine, Inc. (a leading manufacturer and marketer of implants and instruments for the treatment of spinal deformities and injuries), DePuy International (DePuy's international office located in Leeds, England), DePuy ACE (a world leader in specialty orthopedic trauma products), DePuy Orthopaedic Technology, Inc. (a leading developer, manufacturer and marketer of patent-protected orthopedic products for the sports medicine market), DePuy CMW (a bone cement manufacturer), Codman & Shurtleff, Inc. (a developer and marketer of diagnostic and therapeutic products for the treatment of central nervous system disorders), and DePuy Mitek, Inc. (a manufacturer and marketer of surgical and reconstructive products).

## Plaintiffs and Some of Their Confidential Information and Trade Secrets

9.     The market for orthopedic and medical device products offered by DePuy Orthopaedics and its affiliated companies has become more and more competitive in recent years and plaintiffs have been developing innovative responses to better position their products in these markets.  The medical device industry is a multi-billion dollar, world-wide market.

10.     In recent years, DePuy has expended large amounts of time, resources and money in developing, studying and testing innovative, new approaches and solutions to its

JANREM0113049

manufacturing operations to provide it with a competitive edge in the manufacture of its orthopedic products and medical devices.   In particular, DePuy has developed proprietary manufacturing techniques.

11.     DePuy has also developed proprietary information relating to financial strategies and global sourcing that provide it with a competitive edge in the manufacture of orthopedic products and medical devices.

12.     DePuy has a large manufacturing operation in Warsaw, Indiana.   In addition, DePuy Orthopaedics and its subsidiaries have manufacturing operations in: Raynham, Massachusetts; Leeds, England; Ireland; France; Switzerland; and China.

13.     Many of the manufacturing operations carried out at these facilities are confidential and proprietary.   Workers execute confidentiality agreements.   Portions of the facilities are shielded from those who have not executed confidentiality agreements and do not have a need to view the facilities.

14.     Information relating to the cost of acquisition of these facilities, equipment in the facilities, technology employed in the facilities and the costs of operations, are kept confidential.

15.     In addition, plans concerning the acquisition or development of additional manufacturing facilities, the closing of existing facilities or changes to the existing facilities, are kept confidential.

16.     Because those in charge of manufacturing facilities must anticipate the future manufacturing needs of the company, those managing the manufacturing facilities are provided with confidential information concerning new DePuy products that have not been announced or disclosed to the public.   This knowledge of what is in the product pipeline in a valuable trade secret of DePuy Orthopaedics.

JANREM0113050

### Barney's Employment at DePuy

17.     Barney joined a predecessor of DePuy Orthopaedics in 1992.  Over the years she has been employed by a number of DePuy affiliates and has executed confidentiality agreements with those affiliates.

18.     In 2004, Barney became Vice President WorldWide Operations for DePuy Orthopaedics.

19.     As a condition of her employment, and because of her access to confidential, proprietary and trade secret information, Barney was required to sign an Employee Secrecy, Non-Competition and Non-Solicitation Agreement ("Agreement").  A true and correct copy of the Agreement signed by Barney is attached hereto as Exhibit A.

20.     The Agreement provides in pertinent part:

CONFIDENTIAL INFORMATION means information disclosed to me or known by me as a result of my employment by the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, about products, processes, machines, customers, clients, employees and services of the COMPANY, including but not limited to, inventions, research, development, manufacturing, purchasing, finance, data processing, engineering, marketing, merchandising, selling, sales volumes and strategies, number and location of sales representatives, names and significance of the COMPANY's customers and clients and their employees and representatives, preferences, needs and requirements, purchasing histories, and other customer or client-specific information, and comparable information about the products, processes, machines, customers, clients and services of affiliates of the COMPANY acquired by me during my employment by the COMPANY.

CONFLICTING PRODUCT means any product, process, machine, invention or service of any person or organization other than the COMPANY in existence or under development which resembles or completes with a product, process, machine, invention or service upon which I shall have worked or about which I become knowledgeable as a result of employment with the COMPANY and whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION which I shall have had access to during my employment.

JANREM0113051

CONFLICTING ORGANIZATION means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a CONFLICTING PRODUCT.

\*       \*       \*

5.     I recognize that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a CONFLICTING ORGANIZATION, will cause immediate irreparable injury to the COMPANY. Unless I first secure the COMPANY's written consent. I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION.   I understand and agree that my obligations not to disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION shall continue after termination of my employment for any reason.

6.     During my employment with the company and for a period of eighteen (18) months after termination of my employment with the COMPANY for any reason, I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States, or in any foreign country or territory in which the services I may provide could enhance the use or marketability of a CONFLICTING   PRODUCT   by   application   of   CONFIDENTIAL INFORMATION which I shall have had access to during my employment, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION, provided that the COMPANY, prior to my accepting such employment, shall receive separate written assurances satisfactory to the COMPANY from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly, for an 18-month period, in connection with any CONFLICTING PRODUCT.

7.     I recognize that the COMPANY's relations with its accounts, customers and clients represents an important business asset that results from the COMPANY's significant investment of its time and resources.   I further recognize that by virtue of my employment by the COMPANY, I have gained or gain relationships with the accounts, customers and clients of the COMPANY, and because of such relationships, I could cause the COMPANY great loss, damage, and immediate irreparable harm, if, during my employment by the COMPANY or subsequent to the termination of such employment for any reason. I should for myself or on behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a product or service that could compete with a product of service being sold or developed by the COMPANY. I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not

JANREM0113052

solicit any business from, sell to, or render any service to, or, directly or indirectly, help others to solicit business from or render service or sell to, any of the accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY, for any purpose related to the sale of any such product or service. I also agree that for a period of twelve (12) months after termination of employment with the COMPANY for any reason, I will not solicit or hire on my own behalf, or on behalf of others, any COMPANY employee.

21.     As Vice President WorldWide Operations, Barney reported to the DePuy Company Group Chairman.   To the extent that position was open, Barney reported to the WorldWide Chairman, Medical Devices and Diagnostics, of Johnson & Johnson.

22.     Individuals reporting to Barney in her position of Vice President WorldWide Operations included company vice presidents, directors and other employees located in: Warsaw, Indiana; Raynham, Massachusetts; Cork, Ireland; Leeds, England; Switzerland; and China.

23.     In fulfilling her responsibilities, Barney was a member of the DePuy Global Management Board (the "GMB") led by DePuy's Company Group Chairman.   The GMB is comprised of representatives from DePuy Orthopaedics and the other DePuy entities identified in paragraph 8, supra.   The GMB is intimately involved in strategic planning and tactical execution for all of the DePuy affiliated companies.   As a member of this GMB, Barney had access to and discussed with other members of that board some of the most secret, proprietary and confidential information at DePuy.

24.     The GMB met regularly in the United States and several times in New Brunswick, New Jersey.

25.     Until the end of 2006, Barney was chairperson of Johnson & Johnson's Medical Device and Diagnostics Operations Council.   This group was involved in strategic planning for the facilities, equipment and personnel needed to manufacture and distribute the products of Johnson & Johnson medical device companies and affiliated entities.

JANREM0113053

26.     Barney was also a member of Johnson & Johnson's Worldwide Operations Council, led by the Vice President WorldWide Operations for Johnson & Johnson. This group met on a regular basis at J&J's corporate offices in New Brunswick, New Jersey.

27.     Because her job responsibilities included responsibilities outside the operations of DePuy Orthopaedics, Barney was regularly called upon to evaluate and review highly sensitive and proprietary information relating to all of the DePuy companies. Therefore, through her extensive involvement in the DePuy GMB, Barney received secret, proprietary information detailing DePuy's strategies, research and product development plans in its spinal, trauma, orthopedic, sports medicine, orthobiologics and neuroradiology businesses, and the modifications to DePuy's manufacturing processes that would be needed to improve manufacturing of existing products and manufacture new products.

28.     The work of the DePuy GMB and the Johnson & Johnson Operations Council is highly confidential. Written documents containing confidential and trade secret information regarding the matters under consideration by that Board and Council are distributed only to Board or Council members. Documents containing confidential information provided to members of the upper management of DePuy Orthopaedics (including Barney) are selectively distributed, on a need-to-know basis. If a DePuy employee who is not in senior management is not involved in a certain field, he or she is not provided with sensitive materials relating to that field.

29.     Through her responsibilities as Vice President WorldWide Operations and her involvement with the DePuy Global Management Board and the J&J Worldwide Operations Council, Barney had access to and acquired intimate knowledge of plaintiffs' confidential, proprietary and trade secret information concerning its current and future medical products. For

JANREM0113054

example, Barney learned of and became knowledgeable about the following confidential information:

- manufacturing techniques and technologies;
- production processes;
- agreements with and information about (current and potential) external business partners and suppliers;
- employees within the DePuy operations organizations, their strengths and compensation structures;
- product testing techniques;
- product development plans and strategies;
- acquisitions and divestitures of DePuy manufacturing assets;
- marketing and sales plans;
- the regulatory progress of products;
- research and development information, including plans, funding and budgets;
- customer complaints and feedback concerning existing products and instruments;
- new product development and launches;
- strategic priorities and objectives for the short-term (2 years), mid-term (5 years) and long-term (10+ years);
- revenue projections for various markets;
- product formulas; and
- pricing and cost information.

30.     On February 28 through March 2, 2007, Barney attended a three day GMB strategic planning meeting that addressed the strategic plans for the DePuy affiliated companies for the next several years

31.     Beginning on April 14, 2007, Barney attended a two day mid-year update of the budgets for the DePuy affiliated companies concerning performance year-to-date and steps to be taken in the remaining months of 2007.

32.     In April 2007, Barney participated in succession planning exercises to identify succession planning strategies for the individuals involved in DePuy operations.   This process involved analysis of current employees, their strengths and weaknesses.

JANREM0113055

### Barney's Planned Employment by Biomet

33.     On information and belief, Barney plans to commence employment with Biomet notwithstanding her Agreement.

34.     On Wednesday, May 9, 2007, Barney informed Michael Mahoney, Company Group Chairman, that she was leaving DePuy to take the position of Senior Vice President of Operating Systems for Biomet. She provided Mahoney with a copy of a resignation letter, a true and correct copy of which is attached as Exhibit B to this Verified Complaint.

35.     As described in that resignation letter, the position that Barney proposes to take with Biomet is virtually identical to the position she has held for DePuy.

36.     Barney has intimate knowledge of some of plaintiffs' most confidential and proprietary information and trade secrets. If Barney is to work for Biomet as a senior executive in its operations, it is inevitable that Barney will disclose plaintiffs' confidential and proprietary information and trade secrets.

37.     Plaintiffs and Biomet are direct competitors and if Biomet were to gain knowledge of even some of the confidential information concerning the products intimately known to Barney, plaintiffs would be immediately, irreparably and severely harmed. By way of example only, Barney is aware of the financial terms between DePuy and vendors who may also be vendors to Biomet.

38.     Money damages would not adequately compensate plaintiffs for the losses and injuries they would suffer, leaving plaintiffs with no adequate remedy at law. For example, if Biomet knew of Barney's knowledge about plaintiffs' plans in the areas of manufacturing techniques, research and development, product development, marketing plans or financial,

JANREM0113056

pricing and cost information, it would give Biomet a significant and unfair competitive advantage over plaintiffs

39.     Biomet is aware of Barney's Agreement and DePuy's objections to Barney taking the position at Biomet that she has announced she is accepting.

## Jurisdiction

40.     On information and belief, Biomet has engaged and currently engages sales representatives to sell Biomet's products in New Jersey, and some of those Biomet sales representatives have lived or currently live in New Jersey.

41.     Biomet has purposefully, systematically and continuously directed contacts to and conducted business in New Jersey.

42.     Biomet is subject to the jurisdiction of this Court.

43.     In her capacity as DePuy's Vice President WorldWide Operations, Barney regularly visited J&J's headquarters in New Jersey and directed telephone and written communications to J&J personnel in New Jersey on a regular basis.  Barney also consented to personal jurisdiction in this Court pursuant to paragraph 16 of her Agreement.

44.     Barney has purposefully, systematically and continuously directed contacts to and conducted business in New Jersey.

45.     Barney is subject to the jurisdiction of this Court.

## First Count

46.     Plaintiffs repeat the allegations contained in the foregoing paragraphs and incorporate those allegations in this Count by reference.

47.     Barney's intended employment with Biomet as its Senior Vice President of Operating Systems will constitute a breach of the Agreement because Barney would be

JANREM0113057

employed by a Conflicting Organization, as defined in the Agreement, within 18 months after termination of her employment with plaintiff.  Barney's intended employment with Biomet also will inevitably induce and require Barney to breach her Agreement with plaintiffs because Barney would be joining an organization that is engaged in direct competition with plaintiffs and Barney's employment with Biomet would make it inevitable that she would disclose confidential and proprietary information and trade secrets that she learned while employed by plaintiffs.

48.   As a result of that breach, plaintiffs will suffer immediate, severe and irreparable harm to their business.

### Second Count

49.   Plaintiffs repeat the allegations contained in the foregoing paragraphs and incorporate those allegations in this Count by reference.

50.   As an employee of plaintiffs, Barney had a duty of loyalty that existed independent of her Agreement to refrain from disclosing confidential information and trade secrets that Barney learned while employed by plaintiffs.

51.   If Barney is allowed to work for Biomet, a direct competitor of plaintiffs, it is inevitable that she will breach her duty by disclosing plaintiffs' confidential and proprietary business information and trade secrets.

52.   As a result of the inevitable breach of Barney's duty, plaintiffs will suffer immediate, severe and irreparable harm to their business.

### Third Count

53.   Plaintiffs repeat the allegations contained in the foregoing paragraphs and incorporate those allegations in this Count by reference.

JANREM0113058

54.     Biomet is aware that Barney has entered into an Agreement with plaintiffs. Biomet also is aware that Barney possesses highly confidential and proprietary information and trade secrets that belong to plaintiffs. Biomet is also aware that hiring Barney would constitute a breach of the Agreement.

55.     Despite that knowledge, Biomet has conspired with and tortiously induced Barney to breach both her Agreement and her duties to plaintiffs.

56.     As a result of Biomet's action, plaintiffs will suffer immediate, severe and irreparable harm to their business.

### Fourth Count

57.     Plaintiffs repeat the allegations contained in the foregoing paragraphs and incorporate those allegations in this Count by reference.

58.     By hiring Barney, Biomet and Barney have wrongfully contracted, combined, conspired and agreed to: (1) engage in unfair competition; (2) breach common law obligations; (3) tortiously interfere with the contractual relationships and prospective economic advantage of plaintiffs; (4) wrongfully convert and misappropriate confidential and proprietary information and trade secrets of plaintiffs; and (5) unjustly enrich themselves at the expense of plaintiffs.

59.     The acts of Biomet and Barney constitute wrongful and malicious conduct undertaken without legal justification and with the knowledge and intent that their actions will cause substantial damage and injury to plaintiffs.

60.     Unless Barney and Biomet are immediately enjoined and restrained, plaintiffs will suffer immediate and irreparable injury for which they have no adequate remedy at law or in money damages.

WHEREFORE, plaintiffs demand judgment against defendants, jointly and severally:

JANREM0113059

A.  Temporarily, interlocutorily and permanently enjoining Barney from holding any employment position or engaging in any employment activities with Biomet that in any way relate to or involve the operations of Biomet's facilities, or any other position that would place her in a position of using or disclosing DePuy trade secrets, for a period of 18 months from the date hereof;

B.  Temporarily, interlocutorily and permanently enjoining and restraining Biomet and its officers, agents and employees from causing or permitting Barney to hold any employment positions or engage in any employment activities with Biomet that in any way relate to or involve the operation of its facilities, or any other position that would place her in a position of using or disclosing DePuy trade secrets, for a period of 18 months from the date hereof;

C.  Temporarily, interlocutorily and permanently enjoining and restraining Barney from disclosing, using, disseminating, lecturing upon or publishing any of plaintiffs' confidential or proprietary information or trade secrets as defined in Barney's Agreement;

D.  Ordering defendants to turn over and return to plaintiffs all of plaintiffs' confidential or proprietary information or trade secrets that defendants have removed, copied, taken, used, disseminated or reviewed, or otherwise have in their possession, custody or control;

E.  Temporarily, interlocutorily and permanently enjoining Barney from soliciting or hiring on her behalf or on behalf of anyone else, including but not limited to Biomet, any employee of plaintiffs for a period of 12 months from the date hereof;

JANREM0113060

F.   Temporarily, interlocutorily and permanently enjoining and restraining Biomet from (1) causing or permitting Barney to disclose or use and (2) receiving, using and disclosing, plaintiffs' confidential or proprietary information or trade secrets as defined by Barney's Agreement;

G.   Temporarily, interlocutorily and permanently enjoining and restraining Barney from otherwise violating any of the terms of the Agreement;

H.   Temporarily, interlocutorily and permanently enjoining and restraining Biomet from otherwise causing or permitting Barney to violate any of terms of her Agreement or her common law obligations to plaintiffs;

I.   Awarding compensatory damages to plaintiffs;

J.   Awarding punitive damage to plaintiffs;

K.   Awarding cost and attorneys' fees to plaintiffs;

L.   Awarding such other and further relief as the Court deems just and equitable.

RIKER, DANZIG, SCHERER, HYLAND
  & PERRETTI LLP
Attorneys for Plaintiffs
Johnson & Johnson, DePuy Orthopaedics, Inc. and
DePuy Products, Inc.

By: _Edwin F. Chociey, Jr. / K.K_
       Glenn A. Clark
       Edwin F. Chociey, Jr.

Dated: May 21, 2007

*Of Counsel:*
Dwight D. Lueck, Esq.
Barnes & Thornburg LLP
11 South Meridian Street
Indianapolis, IN  46204
(317) 231-7713

JANREM0113061

## RULE 4:5-1 CERTIFICATION

I certify that to the best of my present knowledge, the matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, and no such other action or arbitration proceeding is presently contemplated by plaintiffs.  I am not presently aware of any non-parties who should be joined in this action pursuant to Rule 4:28 or who is subject to joinder pursuant to Rule 4:29-1(b) because of potential liability to any party on the basis of the same transactional facts.

_____
Edwin F. Chociey, Jr.

Dated: May 21, 2007

16

JANREM0113062

## VERIFYING CERTIFICATION

I, Thomas Sullivan, of full age, certify as follows:

1.      I am the President of DePuy Orthopaedics, Inc.

2.      I have read the Verified Complaint to which this Verifying Certification is attached and the factual allegations set forth in paragraphs 5-39 are true unless expressly stated as based upon information and belief.

3.      I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_____
Thomas Sullivan

Dated:  *May 21, 2007*

JANREM0113063

## CERTIFICATION PURSUANT TO RULE 1:4-4(c)

I, Edwin F. Chociey, Jr., of full age, certify as follows:

1.      I am an attorney-at-law in the State of New Jersey and a member of the law firm of Riker, Danzig, Scherer, Hyland & Perretti LLP, attorneys for plaintiffs in this matter.

2.      Attached hereto is the Verifying Certification of Thomas Sullivan, with a facsimile of his original signature.  I certify that Mr. Sullivan has acknowledged the genuineness of his signature and that the document or copy with original signature affixed will be filed if requested by the Court or a party.

3.      I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_____
Edwin F. Chociey, Jr.

Dated: May 21, 2007

3759927.1

18

JANREM0113064

# EXHIBIT A

JANREM0113065



DePuy Orthopaedics, Inc.
PO Box 988
700 Orthopaedic Drive
Warsaw, Indiana 46581-0988
USA

Tel: +1 (219) 267 8143
Fax: +1 (219) 267 7196

## EMPLOYEE SECRECY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT

Name of Employee:    Robin T. Barney
Residence Address:    15201 Powderhorn Road
                      Fort Wayne, IN  46804

As used in this Agreement:

the COMPANY means DePuy, and JOHNSON & JOHNSON and any of their successors or assigns, purchasers, acquirers, and any of their existing and future subsidiaries, divisions or affiliates, including any such subsidiary, division or affiliate of Johnson & Johnson to which I may be transferred or by which I may be employed in the future. Affiliates of the COMPANY are any corporation, entity or organization at least 50% owned by the COMPANY, by Johnson & Johnson or by any subsidiary of Johnson & Johnson.

I means the employee whose name appears above, also referred to by the use of first person pronouns, such as me and my.

INVENTIONS mean discoveries, improvements and/or ideas, whether patentable or not.

CONFIDENTIAL INFORMATION means information disclosed to me or known by me as a result of my employment by the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, about products, processes, technologies, machines, customers, clients, employees, services and strategies of the COMPANY, including, but not limited to, inventions, research, development, manufacturing, purchasing, finance, computer software, computer hardware, automated systems, engineering, marketing, merchandising, selling, sales volumes or strategies, number or location of sales representatives, names or significance of the COMPANY's customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, or other customer or client-specific information.

CONFLICTING PRODUCT means any product, process, technology, machine, invention or service of any person or organization other than the COMPANY in existence or under development which resembles or competes with a product, process, technology, machine, invention or service upon which I shall have worked or about which I become knowledgeable as a result of employment with the COMPANY and whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION which I shall have had access to during my employment.

CONFLICTING ORGANIZATION means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a CONFLICTING PRODUCT.

I recognize that the business in which the COMPANY is engaged is extremely competitive and that the COMPANY will be providing me with CONFIDENTIAL INFORMATION both at the commencement of my employment and thereafter and may also be providing me with the opportunity to contribute to the creation of CONFIDENTIAL INFORMATION, which will assist both the COMPANY and me in competing effectively. I recognize that CONFIDENTIAL INFORMATION is significant to the COMPANY'S competitive position and that the COMPANY therefore expects me to keep it secret and also expects me not to compete with the COMPANY during my employment and for a period of time thereafter.

Accordingly, in consideration of the receipt of CONFIDENTIAL INFORMATION, my employment or the continuation of my employment by the COMPANY, and other benefits being provided to me in connection with this Agreement, including those provided pursuant to paragraph 9:

1.    I agree to disclose promptly to the COMPANY all INVENTIONS conceived or made by me whether or not during my hours of employment or with the use of the COMPANY's facilities, materials or personnel, either solely or jointly with another or others during my employment with the COMPANY, and related to the actual or anticipated business or activities of the COMPANY, or related to its actual or anticipated research and development or suggested by or resulting from any task assigned to me or work performed by me for, or on behalf of, the COMPANY. I assign and agree to assign my entire right, title and interest therein to the COMPANY. I will not assert any rights under or to any INVENTIONS as having been made or acquired by me prior to my being employed by the COMPANY unless such INVENTIONS are identified on a sheet attached hereto and signed by me and the COMPANY as of the date of this Agreement.

2.    I recognize that all works, including, but not limited to reports, computer programs, drawings, documentation and publications, which I prepare within the scope of my employment with the COMPANY, shall be works made for hire and that the worldwide copyrights therein shall be the sole and exclusive property of the COMPANY. In the event that any said copyrightable work or portion thereof shall not be legally qualified as a work made for hire, or shall subsequently be so held to not be a work made for hire, I agree to assign, and do hereby so assign to the COMPANY, all right, title and interest in and to said work or portion thereof. I will promptly and fully disclose all such works to the COMPANY.

JANREM0113066

3    I shall, whenever requested to do so by the COMPANY, execute any applications, assignments or other instruments which the COMPANY shall consider necessary to apply for and obtain Letters Patent, trademark and or copyright registrations in the United States, or any foreign country, or to protect otherwise the COMPANY's interests. These obligations shall continue beyond the termination of my employment with the COMPANY with respect to INVENTIONS, trademarks or copyrightable works conceived, authored or made by me during my period of employment, and shall be binding upon my executors, administrators, or other legal representatives.

4.    I shall not disclose to the COMPANY or induce the COMPANY to use any secret, proprietary or confidential information or material belonging to others, including my former employers, if any   I am aware of no agreement, contract, non-compete covenant, non-disclosure secrecy agreement or similar restriction that would in any way restrict, limit or prohibit my employment by the COMPANY that I have not disclosed and provided to the COMPANY.

5.    I recognize that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a CONFLICTING ORGANIZATION, will cause immediate irreparable injury to the COMPANY.  Unless I first secure the COMPANY's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION.  I understand and agree that my obligations not to disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION shall continue after termination of my employment for any reason.

6    During my employment with the COMPANY and for a period of eighteen (18) months after termination of my employment with the COMPANY for any reason, I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States, or in any foreign country or territory in which the services I may provide could enhance the use or marketability of a CONFLICTING PRODUCT by application of CONFIDENTIAL INFORMATION which I shall have had access to during my employment, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION, provided that the COMPANY, prior to my accepting such employment, shall receive separate written assurances satisfactory to the COMPANY from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly, for an 18-month period, in connection with any CONFLICTING PRODUCT.  I also agree that during my employment with the COMPANY and for a period of 18 months thereafter, I will not render services to any other organization or person in a position in which I could use CONFIDENTIAL INFORMATION to the detriment of the COMPANY

7.    I recognize that the COMPANY's relations with its accounts, customers and clients represents an important business asset that results from the COMPANY's significant investment of its time and resources.  I further recognize that by virtue of my employment by the COMPANY, I have gained or may gain relationships with the accounts, customers and clients of the COMPANY and because of such relationships, I could cause the COMPANY great loss, damage, and immediate irreparable harm, if, during my employment by the COMPANY or subsequent to the termination of such employment for any reason, I should for myself or on behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a product or service that could compete with a product or service being sold or developed by the COMPANY.  I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not solicit any business from, sell to, or render any service to, or, directly or indirectly, help others to solicit business from or render service or sell to, any of the accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY, for any purpose related to the sale of any such product or service.  I also agree that for a period of twelve (12) months after termination of employment with the COMPANY for any reason, I will not solicit or hire on my own behalf, or on behalf of others, any COMPANY employee.

8.    To enable the COMPANY to monitor my compliance with the obligations imposed by this Agreement, I agree to inform the COMPANY, at the time I give notice of my termination of employment, of the identity of my new employer and of my job title and responsibilities, and will continue to so inform the COMPANY, in writing, any time I change employment during the eighteen (18) months following termination of my employment with the COMPANY for any reason.

9.    If I am unable to obtain employment consistent with my training and education solely because of a prohibition of paragraph 6 or 7 of this Agreement, or if I am able to obtain only a position in which my Gross Monthly Pay is less than what I last received from the COMPANY as Gross Monthly Pay, then any prohibition of those paragraphs that caused me to be unable to obtain such employment (or that is responsible for the above-referenced differential in pay), shall bind me only as long as the COMPANY shall make monthly payment to me equal to the lesser of (a) the amount last received from the COMPANY as Gross Monthly Pay, or (b) the difference between my last Gross Monthly Pay at the COMPANY and my Gross Monthly Pay in any subsequent employment.  Gross Monthly Pay shall consist of the sum of the following applicable amounts, prorated to a monthly basis:  my annual base pay, annual commissions, year-end cash bonus, and the monetary value of my year-end stock award (but not stock option grants, any other extra compensation or benefits).  My Gross Monthly Pay at the COMPANY will be based on the amounts actually received by me during the last twelve calendar months I was employed by the COMPANY.  My Gross Monthly Pay in any subsequent employment will be based on a projection of the amounts to be received by me during the first twelve months in that employment.

10.    In order to qualify for the payments provided for in paragraph 9 above, I understand that I must, for each month that I claim payment is due, represent to the Vice President of Human Resources of the COMPANY, in writing within fifteen (15) days

Revised 11 16 00

JANREM0113067

following the end of that calendar month, that although I diligently sought employment consistent with my training and education, I was unable to obtain it, or was unable to attain a position in which my Gross Monthly Pay equaled what I last received from the COMPANY as Gross Monthly Pay, as the case may be, solely because of a prohibition of paragraph 6 or 7 of this Agreement. I must also promptly submit such further information as the COMPANY may request to enable it to verify the accuracy of my representation. I understand that the COMPANY shall, at its option, be relieved of making a monthly payment to me for any month with respect to which I have failed to comply with a requirement of this paragraph 10.

11. I further understand that if, at any time within the period of prohibition specified in paragraph 6 or 7, the COMPANY gives me a written release from the prohibition of paragraph 6 or 7 that has been the sole cause of my inability to obtain employment consistent with my training and education or my inability to obtain a position in which my Gross Monthly Pay equals what I last received from the COMPANY as Gross Monthly Pay, as the case may be, then, the COMPANY will no longer be obligated to make the payments that had been required due to those prohibitions.

12. Upon termination of my employment with the COMPANY for any reason, I shall turn over to a designated individual employed by the COMPANY, all property then in my possession or custody and belonging to the COMPANY, including any computer equipment. I shall not retain any copies of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents in any form whatsoever (including information contained in computer memory or on any computer disk) relating in any way to the affairs of the COMPANY and which were entrusted to me or obtained by me at any time during my employment with the COMPANY.

13. I understand and acknowledge that if I violate this Agreement or am about to violate this Agreement by disclosing or using information prohibited by paragraph 5 above, accepting employment or providing services prohibited by paragraph 6 or 7 above, or failing to turn over property as required by paragraph 12 above, the COMPANY shall have the right, and be entitled to, in addition to any other remedies it may have, injunctive relief; in other words, I understand and acknowledge that the COMPANY can bar me from disclosing or using such information, bar me from accepting such employment or rendering such services for the periods specified in paragraphs 6 and 7 above, and require that I turn over such property.

14. I hereby consent and agree to assignment by the COMPANY of this Agreement and all rights and obligations hereunder including, but not limited to, an assignment in connection with any merger, sale, transfer or acquisition by the COMPANY or relating to all or part of its assets, divisions and/or affiliates.

15. Nothing herein shall limit or reduce my common law duties to the COMPANY, including but not limited to my duty of loyalty.

16. This Agreement shall be interpreted according to the laws of the State of New Jersey without regard to the conflict of law rules thereof. I agree that any action relating to or arising out of this Agreement may be brought in the courts of the State of New Jersey or, if subject matter jurisdiction exists, in the United States District Court for the District of New Jersey. I consent to personal jurisdiction and venue in both such courts and to service of process by United States Mail or express courier service in any such action.

17. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.

18. The following applies only to a California, Minnesota or North Carolina employee: Notification is hereby given that paragraph 1 does not apply to an invention to the extent that no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely by me on my own time, and (a) which does not relate (i) to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by me for the COMPANY.

19. The following applies only to a State of Washington employee: Notification is hereby given that paragraph 1 does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely on my own time, unless (a) the invention relates (i) directly to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by me for the COMPANY.

20. Nothing contained in this Agreement shall be deemed to confer on me any rights with respect to the duration of my employment with the COMPANY. I UNDERSTAND AND AGREE THAT MY EMPLOYMENT RELATIONSHIP WITH THE COMPANY IS TERMINABLE AT WILL BY EITHER THE COMPANY OR ME, WITH OR WITHOUT CAUSE, EXCEPT THAT IF I INITIATE THE TERMINATION, THERE SHALL BE, AT THE COMPANY'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER I GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. If the COMPANY elects to continue my employment during the notice period, it shall advise me of that fact, and of the duration of the notice period. During any notice period, I will provide such transitional services as the COMPANY may request. The COMPANY will be obligated to continue my pay during the notice period, and my duty of loyalty to the COMPANY shall continue through such period.

Revised 11 16 00

JANREM0113068

I ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, and agree that with respect to the subject matter hereof it is my entire agreement with the COMPANY, superseding any previous oral or written communications, representations, understandings, or agreements with the COMPANY or any of its officials or representatives.

DATE: _____

_____
Robin T. Barney

_____
Printed Name

_____
Address

_____
City/State

- 4 -

Revised 11-16-00

JANREM0113069

# EXHIBIT B

JANREM0113070

To Whom It May Concern:

Please be advised that I am hereby terminating my employment with DePuy Orthopaedics, Inc. ("DePuy") and Johnson & Johnson effective May 9, 2007. Allow this letter to serve as written notice of my termination ('notice') pursuant to paragraph 8 of the Employee Secrecy, Non-Competition and Non-Solicitation Agreement ("Agreement") dated December 10, 2004.

Pursuant to paragraph 8 of the Agreement, my new employer will be Biomet, Inc., and my job title will be Senior Vice President of Operating Systems. My position with Biomet will be in manufacturing operations and I will assist with LEAN manufacturing and Six Sigma initiatives to streamline and generate value creation throughout the supply chain. Biomet's operations are sufficiently unique and diversified, such that I will not be required to use any "Confidential Information" of DePuy, as that term is defined in the Agreement. Rather, I will utilize my general business acumen to address manufacturing needs and operations specific to Biomet.

Upon my termination, I will turn over to an individual you designate as the appropriate person, all property then in my possession or custody and belonging to DePuy, consistent with paragraph 12 of the Agreement. In reference to paragraphs 5 and 6 of the Agreement, I have not disclosed, and I do not intend to disclose, any Confidential Information of DePuy, to the detriment of DePuy.

Please confirm that the termination date set forth above is acceptable. If DePuy elects to continue my employment during the notice period, pursuant to paragraph 20 of the Agreement, please provide me with notice of that fact and the duration of the notice period elected by DePuy consistent with that paragraph.

Nothing in this letter is intended, nor shall it be construed as, an acknowledgement or agreement as to the applicability, legality or enforceability of the above-referenced, or any other, terms of the Agreement.

I look forward to your written response,

Very truly yours,

Robin T. Barney

JANREM0113071