# EXHIBIT 29

FILED

UNITED STATES DISTRICT COURT 2016 SEP -6 PH 4: 44
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ETHICON, INC., and
DEPUY ORTHOPAEDICS, INC.,

               Plaintiffs,                       Case No. 3:16CV1124-J-39PDB

     v.

LAURA ANGELINI,

               Defendant.

_____/

## PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION AND INCORPORATED MEMORANDUM OF LAW

       Plaintiffs Ethicon, Inc. ("Ethicon") and DePuy Orthopaedics, Inc. ("DePuy") (together, "J&J Companies"), by an through the undersigned counsel, hereby file this Motion for Temporary Restraining Order and Preliminary Injunction and Incorporated Memorandum of Law against Defendant Laura Angelini ("Angelini"), to enforce the plain language of the Employee Secrecy, Intellectual Property, Non-Solicitation and Non-Compete Agreement ("Agreement") and to prevent her from working for a direct competitor, Baxter Healthcare Corporation ("Baxter").

## I.    INTRODUCTION

       Laura Angelini is a top executive who worked for the J&J Companies for over twenty-five years and who, unless enjoined, intends to take a position as Worldwide President of the Biosurgery business of a direct competitor, Baxter, on September 12, 2016 in violation of the plain terms of her Agreement with the J&J Companies. Accordingly, the J&J

JANREM0112439

Companies are constrained to seek an interim TRO to prevent Angelini from taking this position to prevent the immediate risk to their confidential and trade secret information until they may be heard on their motion for a preliminary injunction. Such interim relief will inflict almost no harm to Angelini since this Court must schedule a hearing on a preliminary injunction in short order; however, the risk of the threatened disclosure of confidential and competitively valuable information to a direct competitor would exact significant irreparable harm on the J&J Companies.

In her position as Global Platform Leader, Angelini gained access to very detailed and highly-confidential non-public information regarding J&J's Medical Device business, including Ethicon's Biosurgery business. She received this information in writing in advance of an intensive 48-hour workshop – the Strategic Planning & Innovation Workshop – that was held over three days at J&J headquarters at the end of April 2016. Angelini not only received the information prior to the meeting, but was engaged and actively participated in this deep-dive strategy Workshop. Unbeknownst to the J&J Companies, she was, at the same time, interviewing for the position that she intends to take with Baxter – Worldwide President of Biosurgery – a position in which she would be *required* to drive strategy for a direct competitor. It is simply impossible for Angelini to take this position with Baxter and *not* use the confidential strategic information disclosed in advance of and during the Workshop.

In addition to the Workshop materials, Angelini regularly received updated information regarding key projects and the status of such projects. As recently as August 9, 2016, Angelini received documents containing key projects and strategies for the Medical

2

Device business, including Biosurgery.  Her prior lengthy tenure with Ethicon coupled with the recent refresh on the J&J Companies' strategic plan and pipeline for their Biosurgery business puts the J&J Companies' highly confidential information at serious risk should Angelini be permitted to begin her expected employment with Baxter in this high-level executive position.

Accordingly, there can be no question that Angelini's employment with Baxter in the proposed capacity will be a direct violation of her obligations to the J&J Companies under the Agreement, which prohibits her from working for a competitor for a period of eighteen (18) months where she could provide a competitive advantage based on her knowledge of the J&J Companies' confidential information.  The Agreement, which is attached as Exhibit A, is narrowly drawn to protect the legitimate interests of the J&J Companies in their confidential information.  The Agreement does not prevent Angelini from working for a competitor like Baxter, it only restricts her ability to work in a position like Worldwide President of Baxter's Biosurgery business when she so recently acquired Ethicon's playbook for its Biosurgery business.  New Jersey law, which applies, supports the entry of an injunction on these facts. *See Nat'l Reprographics, Inc. v. Strom*, 621 F. Supp. 2d 204 (D.N.J. 2009) (enforcing non-compete where a trusted high-level employee with access to development and strategies was going to work for a direct competitor); *Campbell Soup Co. v. Desatnick*, 58 F. Supp. 2d 477 (D.N.J. 1999) (enforcing non-compete where executive had been exposed to highly sensitive competitive information by virtue of the position held at the company).

Based on the allegations of the Verified Complaint and the supporting Declarations of Beth McCombs and Dan Wildman, attached hereto as Exhibits B and C, respectively, the

JANREM0112441

Court should grant the J&J Companies' motion, enter an immediate temporary restraining order and schedule this matter for a preliminary injunction hearing for the following reasons:

*First*, the J&J Companies are likely to succeed on the merits of their claim for breach of contract. The Agreement, which Angelini signed as a condition of her employment as a Global Platform Leader, is valid and enforceable because it is reasonably tailored to protect the legitimate business interests of the J&J Companies in their confidential information. Here, highly-confidential information regarding Ethicon's Biosurgery business is at risk should Angelini be permitted to take the position as President of the J&J Companies' direct competitor, including its portfolio prioritization strategy and pipeline, its strategic plans and the specific tactics for how to accomplish those plans, the identified unmet needs in the market and the detail on how Ethicon specifically intends to take advantage of such market opportunities in terms of value, execution, risks, and key metrics, the competitive challenges and specific competitor offerings in this space and plans for meeting those competitive challenges, including those presented by Baxter. Indeed, it would be impossible for Angelini to fulfill her new responsibilities to Baxter *without* disclosing this information. Angelini's post-employment obligations under the Agreement do not cause any undue hardship to Angelini, who has chosen to take this top executive position with Baxter despite these risks. Finally, enforcement of valid contracts like the Agreement is in the public interest. If permitted to take this position with Baxter, there is no question that Angelini would be in breach of the plain terms of the Agreement and that such a breach would cause J&J damages, though the damages, as discussed below, would be very difficult to measure.

JANREM0112442

*Second*, it is well-established that putting confidential and trade secret information at risk, by definition, will cause the J&J Companies to suffer irreparable harm. The loss of valuable confidential and proprietary information is difficult, if not impossible, to measure by monetary damages. Once the information has been used or disclosed, there is no way to unring that bell or force Baxter not to use or disclose such information; once Angelini starts working for Baxter as its Worldwide President of Biosurgery, it will be impossible for the J&J Companies to monitor her compliance with her ongoing obligations. Indeed, that is the entire reason why the Agreement contains a non-compete provision. It is also difficult in these types of cases to link the use of competitive information to a specific action (or inaction) undertaken by Angelini or Baxter that would show monetary damages to the J&J Companies; it would be particularly difficult here, where Angelini is to be responsible for driving Baxter's strategy and has the J&J Companies' strategic plan for directly competing with Baxter. That is why the normal relief in these types of situations is an injunction to prevent the risk that the value of this information will be lost in the first place. Here, the J&J Companies are seeking only interim relief in the form a temporary restraining order until the Court can hold a full hearing on the J&J Companies' request for a preliminary injunction. A temporary restraining order of a short duration will inflict almost no harm to Angelini while significant harm will be exacted on the J&J Companies should she be able to commence employment with Baxter in a top executive position.

*Third*, the injury to the J&J Companies – the loss of its investment in confidential information to a direct competitor – far outweighs any potential harm to Angelini, who is not restricted from obtaining a job with a competitor so long as that job does not involve the risk

JANREM0112443

to the J&J Companies' confidential information to which she had access.  The Agreement permits Angelini to obtain any other employment that does not conflict with these narrow restrictions, including employment with Baxter in non-competitive areas.

*Fourth*, the entry of an injunction would serve the public's interest; the enforcement of valid and enforceable contracts that outline the clear expectations of the parties serves the public's interest by creating stability for businesses and individuals alike.

For these reasons, as explained in greater length below and supported by the well-settled law of this Circuit and of New Jersey, the Court should enter a temporary restraining order to prevent immediate harm to the J&J Companies, and schedule this matter for a preliminary injunction hearing.

## II.   STATEMENT OF RELEVANT FACTS

A full statement of relevant facts is set forth in Plaintiffs' Verified Complaint and the accompanying Declarations, which are incorporated by reference as if fully stated herein.

### A.   THE J&J COMPANIES' BUSINESS IS BUILT ON CONFIDENTIAL AND PROPRIETARY INFORMATION.

The J&J Family of Companies is comprised of over 260 companies, which together operate the world's largest and most diverse medical device, pharmaceutical and consumer products company.   Verified Complaint ("VC") ¶ 12.   The J&J Family of Companies operates generally in three broad divisions:   Consumer Healthcare; Medical Devices; and Pharmaceuticals.   The businesses in which these entities are engaged are extremely competitive. *Id.* Ethicon and DePuy Synthes are two key businesses within J&J's Medical Devices segment and, as wholly-owned subsidiaries of J&J, are part of the J&J Family of Companies. *Id.* at ¶ 13.

6

The medical device industry in which the J&J Companies are engaged is highly competitive and the protection of confidential, proprietary, and trade secret information is vital to prevent competitors or would-be competitors from obtaining an unfair competitive advantage. VC ¶ 18. To compete and to serve its customers and the patient community, the J&J Companies invest millions of dollars annually in resources to develop their technology, systems, and products. *Id.* Their business relationships and confidential information are protected by requiring critical employees, as a condition of employment, to agree not to disclose confidential and/or proprietary information, not to solicit customers, and not to compete in a position that would compromise the confidential information for a reasonable period of time following employment. *Id.*

**B.     ANGELINI JOINS J&J AND GAINS ACCESS TO THE J&J COMPANIES' HIGHLY CONFIDENTIAL AND SENSITIVE BUSINESS INFORMATION.**

Angelini began her career with J&J on or around July 1, 1991, when she was hired as a Product Manager for Ethicon Italy. VC ¶ 20. Since that time, she has worked for various companies within the Johnson & Johnson Family of Companies, and has been privy to their highly-confidential information. *Id.* at ¶ 21. On or around February 6, 2012, Angelini was promoted to the position of Vice President for Global Strategic Marketing for Ethicon's Surgical Care business. *Id.* at ¶ 23. Because of the high level of this position, Angelini had access to information regarding Ethicon's Biosurgery business at the strategic level, including the pipeline and various key issues for the development of that pipeline. *Id.* at ¶ 25. In October 2013, Angelini became the President of North America and Global Strategic Marketing at Johnson & Johnson Vision Care, Inc. ("Vision Care"). Recently, in March

JANREM0112445

2016, she returned to the Medical Device segment as a Global Platform Leader – Joints for DePuy Synthes ("Platform Leader"). *Id.* at ¶¶ 26-27.

Because of the high level of this position, Angelini attended, from April 25 through 27, 2016, a Strategic Planning & Innovation Workshop for its Medical Device segment to further its goal of integrating its subsidiaries to cross-develop products. J&J brought all platform leaders together to discuss innovation priorities, product lines, product and marketing development, technologies, and product and business priorities. VC at ¶ 31.

Angelini had access to information prior to the meeting relating to, among other things, the Biosurgery business, and was involved in the discussion of the direction of this business, which she knew and understood and to which she could contribute based on her many years of experience with Ethicon. *Id.* at ¶ 35. But, unbeknownst to the J&J Companies, at the same time that Angelini was receiving these highly confidential business planning and strategy documents and attending this intensive innovation workshop, she was coordinating a second round of interviews at Baxter for the position that she has ultimately accepted and intends to take: Worldwide President of Baxter's Biosurgery business. *Id.* at ¶ 38. See Ex. B to the VC.

## C. ANGELINI'S OBLIGATIONS UNDER THE EMPLOYEE SECRECY, INTELLECTUAL PROPERTY, NON-COMPETITIVE AND NON SOLICITATION AGREEMENT.

As a condition of her employment in the position of Platform Leader, Angelini signed the Agreement. *Id.* at ¶ 43. Angelini was made aware that she would have access to confidential information "relating to the business of other entities within the Johnson & Johnson Family of Companies." Ex. A ¶ A. Importantly, the term "COMPANY" is defined

JANREM0112446

in way that includes Ethicon as a wholly-owned subsidiary of J&J. In addition, Ethicon is an express third-party beneficiary of this Agreement. *Id.* at ¶ 16. Among other obligations, Angelini agreed that, for a period of 18 months after her last date of employment with DePuy Synthes, she would not: "directly or indirectly, perform work for any COMPETITOR in any position and in any location in which [she] could disadvantage any COMPANY or advantage the COMPETITOR by: (a) [her] disclosure or use of CONFIDENTIAL INFORMATION to which [she] had access; (b) [her] use of the specialized training provided to [her] by [DePuy] or any COMPANY for which [she has] worked; and/or (c) [her] use of CUSTOMER relationships and goodwill. " Ex. A ¶ C(6) (emphasis added). There is no question that Baxter falls squarely within the definition of a competitor under the Agreement.

**D.  ANGELINI INTENDS TO LEAVE DEPUY SYNTHES FOR A DIRECT COMPETITOR WHERE HER KNOWLEDGE OF CONFIDENTIAL INFORMATION WILL BENEFIT BAXTER AND PUT THE J&J COMPANIES AT A COMPETITIVE DISADVANTAGE.**

On August 11, 2016, Angelini resigned from her position as Global Platform Leader – Joints. Her last day will be September 9, 2016. Thereafter, she intends to commence employment at Baxter as Worldwide President of Biosurgery. *Id.* at ¶ 55. There is no question that Baxter competes directly and head-to-head with Ethicon in the medical device industry, particularly when it comes to Biosurgery products. *Id.* at ¶ 56. The confidential, proprietary, and trade secret information that Angelini received as a leader of Ethicon, coupled together with the recent and current regular reports she received in her newer role at DePuy Synthes, as well as playbook of the Biosurgery businesses' pipeline and strategy disclosed during the recent Strategic Planning & Innovation Workshop, in addition to other top executive meetings that she attended and reports she received, would undoubtedly cause

9

JANREM0112447

irreparable harm if she is permitted to take the executive leadership position for Baxter's Biosurgery business. *Id.* at ¶ 57. Angelini's new position at Baxter will require her to drive strategy and decision-making for a direct competitor's Biosurgery business and, by virtue of this position, she will use and disclose the confidential, proprietary, and trade secret information that she has acquired in her high-level roles at the J&J Companies. *Id.* at ¶ 58.

## III. MEMORANDUM OF LAW

The nature and extent of the confidential information that Angelini so recently had access to as a result of her position as Global Platform Leader within the Medical Device segment justifies the entry of a temporary restraining order and preliminary injunction to enforce the plain terms of the Agreement, and to prevent Angelini taking a position as an executive with responsibility for strategic decision-making at a direct competitor, Baxter in which she will surely use the information to which she had access at the J&J Companies. The Agreement is valid and enforceable – it exists for the purpose of protecting the J&J Companies' confidential information, specialized training, and goodwill and is reasonably limited to protect those legitimate business interests – and applies to the precise situation presented here: where a high-level executive had access to information across several different businesses. Here, the level of threat is made even greater due to Angelini's long tenure with the J&J Companies and, in particular, Ethicon. Angelini was in the unique position to fully understand and appreciate the business planning and strategy of Ethicon's Biosurgery business due to her longtime involvement with Ethicon at the highest levels. Moreover, the fact that she was interviewing for the Baxter position *at the same time* as she attended the Medical Device Strategic Planning & Innovation Workshop demonstrates that,

JANREM0112448

assuming the worst case, Angelini purposefully attended to obtain this information or, at the very least, did not appreciate that her possession of this information would present an issue with respect to taking an executive role with a direct competitor. Either way, this fact shows that an injunction is necessary to protect the information that Angelini had access to from the use and disclosure by a direct competitor.

### A.      Legal Standard.

A temporary restraining order and preliminary injunction should issue where, like here, a plaintiff establishes:   (1) a substantial likelihood of success on the merits; (2) irreparable harm to the moving party unless the injunction issues; (3) that the threatened injury to the moving party outweighs the potential harm the proposed injunction may cause the opposing party if the injunction issues; (4) if issued, the injunction would not disserve or be adverse to the public interest. *Int'l Cosmetics Exch., Inc. v. Gapardis Health & Beauty, Inc.*, 303 F.3d 1242 (11th Cir. 2002); *see Outdoor Sports Corp. v. Am. Fed. Of Labor, Local 23132*, 6 N.J. 217, 230 (1951) (holding that the purpose of preliminary injunctive relief "is to prevent some threatening irreparable mischief which should be averted until opportunity is offered for a full and deliberate investigation of the case. Acts destroying a complainant's business, custom and profits do an irreparable injury and authorize the issuance of a preliminary injunction.")  The J&J Companies satisfy all of these elements and Angelini should be immediately enjoined from commencing employment at Baxter as Worldwide President of Biosurgery.  Should the Court deny the J&J Companies' request for immediate injunctive relief, Baxter will, by virtue of Angelini's proposed executive position, gain access to very specific and highly-sensitive strategic and confidential information concerning the

11

JANREM0112449

J&J Companies' strategy and pipeline, which is information that provides the J&J Companies with a competitive advantage in the marketplace. Once this information is within the possession of a direct competitor like Baxter, there is no way to accurately measure the harm to the J&J Companies.

**B.      The J&J Companies Have Demonstrated A Likelihood Of Success On The Merits Of Its Breach Of Contract Claim.**

The J&J Companies are likely to succeed on the merits of their claim for breach of contract.  To prevail on this claim under New Jersey law,[1] the J&J Companies must show that "(1) a valid contract existed, (2) that the defendant failed to perform under the contract, and (3) that a failure to perform caused injury to plaintiff." *Gutwirth v. Woodford Cedar Run Wildlife Refuge*, 38 F. Supp. 3d 485, 491 (D.N.J. 2014); *see also Aldora Aluminum & Glass Prods. v. Poma Glass & Specialty Windows, Inc.*, 2016 U.S. Dist. LEXIS 95280 (M.D. Fla. May 16, 2016) (same elements under Florida law).

Furthermore, New Jersey courts routinely uphold restrictive covenants that seek to protect a business's confidential information and recognize that

> [t]hrough contract, an employer may protect its legitimate interest in preventing employees from using the thoughts and ideas generated by the

---

[1] New Jersey law applies here because the Agreement contains a New Jersey choice-of-law provision. (*See* VC, Ex A ¶ 19 ("This Agreement will be governed by and interpreted according to the laws of the State of New Jersey, without regard to its conflict of law rules.").)  In diversity cases, the Florida federal courts apply Florida law in determining the enforceability of a choice-of-law provision.  Florida courts enforce choice-of-law provisions unless the law of the chosen forum contravenes a strong public policy of the state.  *Russo v. Fifth Third Bank*, 634 Fed. App'x 774, 776 (11th Cir. 2015).  Here, there is no conflict in the laws of New Jersey and Florida as it relates to the enforceability of restrictive covenants like those in Angelini's Agreement.  If anything, Florida law more strongly supports the enforcement of these types of agreements because the statute specifically requires courts not to consider the hardship to the individual employee in determining the enforceability of the agreement.  *See* FLA. STAT. § 542.335(1)(g)(1) ("In determining the enforceability of a restrictive covenant, a court [s]hall not consider any individualized economic or other hardship that might be caused to the person against whom enforcement is sought.")

JANREM0112450

> employee and fellow workers while being paid by and using the resources of the employer to invent [or manufacture, sell, promote, etc.] a product that directly competes with the employer's product.

*Desatnick*, 58 F. Supp. 2d at 489 (quoting *Ingersoll-Rand Co. v. Ciavatta*, 110 N.J. 609, 636 (1988)). There is no question that businesses have a legitimate interest in protecting "'highly specialized, current information not generally known in the industry'" and "'are in need of some protection against the use or disclosure of valuable information regarding the employer's business, which information is passed on to certain employees confidentially by virtue of the positions those employees hold in the employer's enterprise.'" *Desatnick*, 58 F. Supp. 2d at 489 (quoting *Ciavatta*, 110 N.J. at 638-39). In fact, the dominant purpose and effect of a restrictive covenant like the Agreement in this case is to protect proprietary information and competitively-sensitive plans. *See Desatnick*, 58 F. Supp. 2d at 490 (holding that, in factually similar circumstances, "[t]he dominant purpose and effect of the restrictive covenant is to protect proprietary information and competitively sensitive plans and strategies and not to stifle competition").

A restrictive covenant is enforceable under New Jersey law if it is: (a) "reasonably necessary to protect the employer's legitimate business interests," (b) does "not cause undue hardship to the employee," and (c) does "not impair the public interest." *Strom*, 621 F. Supp. 2d at 222-23 (citing *Solari Indus. v. Malady*, 55 N.J. 571, 576 (1970)). Courts consider three additional factors when determining the proper scope of a restriction: "its duration, the geographic limits, and the scope of the activities prohibited. Each of those factors must be narrowly tailored to ensure the covenant is no broader than necessary to protect the employer's interests." *The Comm. Hosp. Grp., Inc. v. More*, 183 N.J. 36, 58-59 (2005).

JANREM0112451

Notably, New Jersey courts are "'hesitant to find undue hardship on the employee' when the employee voluntarily [leaves] the employment and in effect [brings] the hardship upon himself." *Klabin Fragrances, Inc. v. Hagelin & Co., Inc.*, No. SOM-C-12027-05, 2005 WL 1502254, at *7 (N.J. Super. Ct. Ch. Div. June 24, 2005) (quoting *Karlin v. Weinberg*, 77 N.J. 408, 424 (1978)) (finding a *three year* non-solicitation agreement reasonable when the employee could "perform sales services to an unlimited number of customers without geographical limitations, as long as the [were] not Plaintiff's clients"). And, under Florida law, Florida courts are not permitted by statute to consider "any individualized economic or other hardship that might be caused to the person against whom enforcement is sought." FLA. STAT. § 542.335(1)(g)(1). Here, the legal standard strongly supports the entry of injunctive relief to enforce the valid, enforceable and narrow terms of the Agreement.

   **1. The Agreement between the J&J Companies and Angelini is valid and enforceable.**

     **a. The Agreement is reasonably necessary to protect J&J Companies' legitimate business interests in its confidential and trade secret information.**

The Agreement between Angelini and the J&J Companies exists to protect the J&J Companies' legitimate interest in maintaining the confidentiality of – among other categories of information – its product and business development plans, market plans and strategies, pipeline strategy and development, and cross-department innovations, the confidentiality of which is essential to the J&J Companies' businesses, which are engaged in highly competitive markets where strategy and research and development provide a competitive edge. *See Desatnick*, 58 F. Supp. 2d at 489 ("New Jersey courts also recognize that employers may have legitimate interests in protecting information that is not a trade secret or

JANREM0112452

proprietary information, such as highly specialized, current information not generally known in the industry, created and stimulated by the research environment furnished by the employer, to which [an] employee has been 'exposed' and 'enriched' solely due to his employment.") (citing *Ciavatta*, 542 A.2d at 879).

As further detailed in the Complaint and the Declarations of Beth McCombs and Dan Wildman, Angelini had access to the current, very specific and highly confidential strategic plans relating to, among others, Ethicon's Biosurgery business, including, generally, plans for their product lines and technology, their market projections, the particular product areas in which the Companies are successful and in which they will invest and in which they do not, and how J&J Companies measure up to its competitors and the reasons behind their competitiveness—or lack thereof.   With respect to Biosurgery in particular, the "pre-read" document for the Workshop provided specific information regarding the strategic direction of Biosurgery including strengths, weaknesses, and priorities.   McCombs Decl. at ¶ 17.[2]  This document – and the presentation at the Workshop – discussed in detail the strategic plans and specific tactics for how to accomplish those plans.   *Id.*   It identified unmet needs in the market and, with great detail, how the company specifically intends to take advantage of such market opportunities in terms of value, execution, risks, and key metrics.   *Id.*   It identified the competitive challenges and specific competitor offerings in this space, including Baxter, and plans for meeting those competitive challenges.   *Id.*   The pre-read and presentation further

---

[2] The J&J Companies have purposefully characterized the information Angelini had access to generically for this public filing and would be willing to make this information available for *in camera* review.

JANREM0112453

made recommendations for how to proceed with the current pipeline of projects and the plans for driving the innovation on such projects. *Id.*

The presentation further discussed key strategic partnerships that are driving growth within the Biosurgery business. *Id.* at ¶ 18. Critical drivers relating to these partnerships were discussed which would be both valuable and actionable to a competitor like Baxter. *Id.* As another specific point, the presentation discussed the portfolio prioritization of innovation within the Biosurgery portfolio which is likewise very valuable information to a competitor like Baxter. *Id.* at ¶ 19. If Baxter had access to this information, it would be able to adjust its own plans and strategies to better compete with Ethicon. *Id.* The pre-read and presentation further highlighted other commercial strategies that have driven growth within the Biosurgery business that Ethicon has been able to capitalize on. *Id.* at ¶ 20. This information would be extremely valuable to a competitor like Baxter who could replicate this same strategy if it was aware of the success that Ethicon had in executing it. *Id.* Yet another example of key strategic information presented in the pre-read and during the presentation is the product pipeline that Ethicon intends to focus and bet on for the future, as well as Ethicon's evaluation of the risks and obstacles relating to those plans. *Id.* at ¶ 21. If a competitor like Baxter had this information, it would know precisely where Ethicon intends to focus its efforts and resources and could, in a more focused way, adjust its own plans to better compete against Ethicon in the market. *Id.* Ultimately, if Angelini is permitted to take the position of Worldwide President of Baxter's Biosurgery business, she would use the J&J Companies' information about how the Biosurgery business addressed, from a strategic standpoint, various issues in the marketplace. Wildman Decl. at ¶ 16.

16

New Jersey courts have regularly enforced restrictive covenants where, like here, an employee was exposed to such sensitive information. *See, e.g., Strom,* 621 F. Supp. 2d 204; *Desatnick,* 58 F. Supp. 2d 477. Notably, attendance at even a single high-level meeting is sufficient to show that an employer's interests in enforcing the agreement is worthy of protection. In *Strom,* the district court found that an employee who was leaving to work for a competitor – but had not yet begun work – had been "exposed to a considerable amount of information of the type that is entitled to protection under New Jersey law." *Id.* at 228. The district court listed the types of information the employee was privy to, which included attending a meeting at which highly sensitive and confidential business information about specific branches and the overall market was discussed, just like the Strategic Planning & Innovation Workshop Angelini attended in April 2016. Like Angelini, the employee in *Strom* was privy to information regarding the company's plan to grow its business and expand market position.  The district court specifically stated that, "[a]lthough [the employee] only attended one SBP meeting at which [a certain executive] presented information, and has had no interaction with [this executive] since the meeting, as a trusted high-level employee of plaintiff, he was privy to the development of the strategies for the market. Strom now seeks to work for a company competing in the same market." *Id.* The district court determined that the employer had shown that its interests in enforcing the non-competition agreement were deserving of protection and granted the employer's motion for preliminary injunction. *Id.*

Likewise, in *Desatnick,* 58 F. Supp. 2d 477, the district court found that a senior executive had been exposed to a considerable amount of highly sensitive competitive

JANREM0112455

information that is entitled to protection under New Jersey law. "Examples of his personal involvement in these lines of proprietary endeavor include attending . . . sensitive meetings with a consultant about a key (confidential) aspect of Campbell's outside advertising and quality, and attending . . . a confidential meeting of Campbell executives and its advertising agencies in which aspects of the three-year plan were introduced behind closed doors with no copies being distributed." *Id.* at 484. The district court concluded that the employee had "been privy to some of the most guarded corporate strategic secrets over the past two years, including much that is not public and may never become public." *Id.* at 485. As a result, the court found that Campbell had proved that its corporate interests in enforcing the non-competition agreement as to its former employee or any other senior executive in his position was deserving of judicial protection, since the dominant purpose and effect of the restrictive covenant was to protect proprietary information and competitively sensitive plans, and not to stifle competition. *Id.* at 490. "New Jersey courts acknowledge the 'business reality that modern day employers are in need of some protection against the use or disclosure of valuable information regarding the employer's business, which information is passed on to certain employees confidentially by virtue of the positions those employees hold in the employer's enterprise.'" *Id.* at 489 (quoting *Ciavatta*, 110 N.J. at 638-39).

The facts are even stronger in this case and therefore compel the same result. Angelini not only attended the intensive Strategic Planning & Innovation Workshop just like Strom attended a high-level executive session prior to leaving National Reprographics, but she received, in advance of that meeting, a "pre-read" presentation that set forth in detail the plans and strategies for the entire Medical Device segment including comprehensive plans

JANREM0112456

and information regarding Ethicon's Biosurgery business, which included information regarding the strategic direction of Ethicon and its Biosurgery unit, brand strengths, weaknesses, and priorities. During the meeting, Angelini was engaged and interested and was involved in the discussion of the direction of this business, which she knew and understood and to which she could contribute based on her many years of experience with Ethicon. Wildman Decl. at ¶ 13.

In addition to the meeting materials, Angelini also received additional regular reports regarding the key projects in the pipeline as well as the status and progress of such projects, including those for Ethicon's Biosurgery business. All of this information would have had special import and meaning to Angelini based on the number of years of experience she had working for Ethicon and would have provided her with a refreshed and updated view into this particular business. Such information would be highly valuable to a competitor like Baxter and exceptionally relevant to Baxter's Worldwide President of its Biosurgery business, *a position for which Angelini was interviewing at the same time she received this information*. The J&J Companies are entitled to protect this information, and it is necessary to enforce the non-compete here to do so. In fact, this is precisely the situation that the Agreement was intended to protect against.

### b.      The Agreement does not cause undue hardship to Angelini.

The enforcement of the Agreement does not cause any undue hardship to Angelini. Pursuant to the Agreement, Angelini can work <u>anywhere</u> in a variety of different capacities so long as she does not work for a competitor of the J&J Companies in a capacity in which she may use or disclose the J&J Companies' confidential information to the J&J Companies'

JANREM0112457

detriment.  VC, Ex. A ¶ C(6).  Under the Agreement, Angelini could even work for Baxter immediately, just not in any of the divisions about which Angelini had access to confidential information at the J&J Companies.  Instead, however, Angelini is voluntarily choosing to leave the J&J Companies to accept a top executive position with a direct competitor dealing with the same markets about which she had access to current, detailed, and specific strategic information while employed with the J&J Companies.  Whatever minimal hardship the covenant imposes, such hardship is self-imposed and should be disregarded.  *See Klabin Fragrances*, 2005 WL 1502254, at \*7.

c.      **The Agreement does not impair the public interest.**

Additionally, the Agreement does not impair the public interest.  In fact, as discussed further below, this Agreement merely promotes business stability and certainty.  *See, e.g., Wright Med. Tech., Inc. v. Somers*, 37 F. Supp. 2d 673, 684 (D.N.J. 1999). *Telemundo Media, LLC v. Mintz*, No. 3D16-154, 2016 WL 2609516, at \*2 (Fla. Dist. Ct. App. May 6, 2016), *reh'g denied* (June 3, 2016) ("the public has a cognizable interest in the protection and enforcement of contractual rights.").  The Agreement is otherwise narrowly tailored.  For example, the non-compete restriction, which is quite limited, lasts for a reasonable amount of time – eighteen months – which is far less than the time periods New Jersey courts have upheld as reasonable.  *See Klabin Fragrances*, 2005 WL 1502254, at \*7; *see also Southernmost Foot & Ankle Specialists, P.A. v. Torregrosa*, 891 So. 2d 591 (Fla. 3d Dist. Ct. App. 2004), *review dismissed*, 901 So. 2d 121 (Fla. 2005) (enforcing two year term for a restrictive covenant).  Accordingly, enforcement of the Agreement is in the public interest.

2.      **Unless enjoined, Angelini will breach the plain language of the Agreement.**

20

Unless enjoined, Angelini's intention to join Baxter as its Worldwide President of Biosurgery violates the clear terms of the Agreement because it puts the J&J Companies' sensitive information directly into the hands of a competitor.  Not only is taking this position with Baxter a plain violation of the non-compete provision within the Agreement, but it is likely to be a violation of her non-disclosure obligations as well.  *See NASC Servs., Inc. v. Jervis*, No. 07-CV-5793 (DMC), 2008 WL 2115111, at *4 (D.N.J. May 19, 2008) ("Nondisclosure agreements protect the employer against the former employee disclosing proprietary information to competitors-information such as client lists, techniques, methods and trade secrets that the employer has labored for years to develop.  Where disclosures of proprietary information are inevitable, it is appropriate for the Court to protect the plaintiff employer's interests with preliminary injunctive relief."); *Lumex, Inc. v. Highsmith*, 919 F. Supp. 624, 631 (E.D.N.Y. 1996) (enforcing a non-compete agreement in part because "notwithstanding [Defendant's] good intentions, there not only is a high risk, but it is inevitable that he will disclose important…trade secrets and confidential information in his efforts to . . .aid his new employer [a major competitor of plaintiff] and his own future").

### 3.   Angelini's breach of the Agreement will cause the J&J Companies irreparable harm.

Angelini's breach and repudiation of the Agreement will cause the J&J Companies to suffer damages.  *See, e.g., Nat'l Starch & Chem. Corp.*, 530 A.2d 31, 33 (N.J. Sup. Ct. 1987) ("Damages will not be an adequate remedy when the competitor has obtained secrets. The cat is out of the bag and there is no way of knowing to what extent their use has caused damage or loss.").  As Angelini herself acknowledged in the Agreement, by accepting the position of

21

Worldwide President of Biosurgery at Baxter, "immediate irreparable injury to [Synthes] will result, warranting . . .the imposition of injunctive relief against [her]." VC, Ex. A ¶ 14.

### C.    The J&J Companies Will Suffer Irreparable Harm If Preliminary Relief Is Not Granted.

The J&J Companies will suffer irreparable harm absent an injunction preventing Angelini from working for Baxter in a top executive capacity.

Generally, "'to show irreparable harm a plaintiff must demonstrate a potential harm which cannot be redressed by a legal or equitable remedy following a trial.'" *Strom*, 621 F. Supp. 2d at 229 (quoting *Acierno v. New Castle Cnty.*, 40 F.3d 645, 653 (3d Cir. 1994)).[3] In other words, the injury "'must be of a peculiar nature, so that compensation in money cannot atone for it.'" *Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92 (3d Cir. 1992) (quoting *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987)). The "disclosure of confidential information or trade secrets may constitute irreparable harm." *Ace Am. Ins. Co. v. Wachovia Ins. Agency Inc.*, 306 F. App'x 727, 732 (3d Cir. 2009); *see also Cont'l Grp., Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 358-59 (3d Cir. 1980) (holding that former employee's use of confidential information may be properly enjoined); *Laidlaw, Inc. v. Student Transp. Of Am., Inc.*, 20 F. Supp. 2d 727, 766 (D.N.J. 1998) ("Generally, the loss of good will, the disclosure of confidential and proprietary information, and the interference with customer relationships may be the basis for a finding of irreparable harm"); *Nat'l Starch & Chem. Corp. v. Parker Chem. Corp.*, 219 N.J. Super. 158, 162 (App. Div. 1987) (restraining the use of a company's confidential business information).

---

[3]    Under Florida law, a violation of an enforceable restrictive covenant creates a *presumption* of irreparable harm. *7-Eleven, Inc. v. Kapoor Bros. Inc.*, 977 F. Supp. 2d 1211, 1229 (M.D. Fla. 2013).

JANREM0112460

No amount of money will make the J&J Companies whole if Angelini is permitted to work as Worldwide President of Biosurgery for Baxter immediately after leaving the J&J Companies. Even if it could, such an amount would be very difficult or perhaps impossible to measure. If the J&J Companies' direct competitor is given access to the information Angelini had access to, or if that information is used for a competitor's benefit – which, it will be, given that Angelini will owe a fiduciary duty to Baxter to engage strategically in this competitive marketplace – the J&J Companies would suffer damage to the competitive advantage in which it has so heavily invested. With the J&J Companies' information, a company like Baxter would enjoy a competitive advantage over Ethicon. Wildman Decl. at ¶ 12. For example, Baxter could prioritize its own projects, match up its own strategies against Ethicon's, and choose to direct its resources to more directly beat Ethicon in the marketplace. *Id.* It may also choose not to pursue certain strategies or direct resources in other ways in light of Ethicon's plans, saving time and money. *Id.*

The safekeeping of a business's confidential, proprietary, and trade secret information is crucial to its success in a competitive field and the J&J Companies will be significantly harmed if their own information is used against it or disclosed to a third party. Moreover, if the confidentiality of the J&J Companies' proprietary and trade secret information is breached, it may be very difficult to trace that breach to Angelini and hold her responsible. It will be impossible to tell what Baxter is doing internally with respect to strategy, product development and pipeline until it is too late. McCombs Decl. at ¶ 29. The very fact of Angelini's employment with Baxter, particularly in a top executive position, compromises confidential information relating to Ethicon's Biosurgery business. *Id.*

JANREM0112461

Thus, without the preliminary relief it seeks, the J&J Companies will suffer immediate and irreparable harm. *See Strom*, 621 F. Supp. 2d at 229. The Court should not allow Angelini and Baxter to benefit at the J&J Companies' expense.

**D.      The Balance Of Equities Favors J&J Companies.**

The balance of equities favors the J&J Companies. Injunctive relief will ensure that Angelini honors the Agreement into which she freely entered with the J&J Companies and which serves to protect the J&J Companies' legitimate business interests. When considering a motion for a preliminary injunction, the court "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Buzz Bee Toys, Inc. v. Swimways Corp.*, 20 F. Supp. 3d 483, 510 (D.N.J. 2014); *see also Johnson Controls, Inc. v. Rumore*, 2008 WL 203575 (M.D. Fla. Jan. 23, 2008) (granting motion for preliminary).

In *Trico Equip., Inc. v. Manor*, No. 08-5561(RBK), 2009 WL 1687391 (D.N.J. June 15, 2009), the court considered the effect of an injunction enforcing a 24-month non-compete, non-solicitation, and confidentiality agreement prohibiting the defendant from working for *any* competitor of the plaintiff. The court recognized that any prohibitions imposed by the injunction would be temporary and acknowledged that the defendant "agreed to the restrictions knowing their significance" and knew that he "would face litigation" if he worked for a competitor. *Id.* at *9. The court concluded that "any harm to [the defendant] is essentially self-inflicted and not significant enough to deny plaintiff the relief it seeks." *Id.*

Here, the Agreement at issue is far less restrictive than the agreement enforced in *Trico*. In addition, like the defendant in *Trico*, Angelini voluntarily entered into the

24

restrictive covenant, and the confidentiality and non-compete provision here are reasonable and temporary. The Agreement does not completely prevent Angelini from working for a competitor, but merely restricts her from working in a capacity for eighteen months in which she could use or reveal J&J Companies' confidential information. Any harm to Angelini caused by an injunction will be minimal. The J&J Co000mpanies, however, will suffer great hardship if preliminary relief is denied because their confidential, proprietary, and trade secret information will be in the hands of a direct competitor. Given these facts, the balance of equities favors the J&J Companies.

### E.   An Injunction Will Serve The Public Interest.

Florida courts have recognized that "the public has a cognizable interest in the protection and enforcement of contractual rights." *Mintz*, 2016 WL 2609516, at *2 (citation omitted); *see Wright Med. Tech., Inc. v. Somers*, 37 F. Supp. 2d 673, 684 (D.N.J. 1999) ("Judicial enforcement of non-competition provisions of employment contracts serves the public interest by promoting stability and certainty in business and employment relationships."). The relief the J&J Companies seeks will ensure that businesses are able to protect their legitimate interests, such as confidential proprietary and trade secret information. *See Desatnick*, 58 F. Supp. 2d at 489. Accordingly, the public interest in this regard will be well-served by a temporary restraining order against Angelini.

## IV.   CONCLUSION

For the foregoing reasons, this Court should grant the J&J Companies' motion for a temporary restraining order pending a full hearing on its motion for a preliminary injunction.

JANREM0112463

Dated: September 6, 2016

MURPHY & ANDERSON, P.A.

/s/ Niels P. Murphy
**NIELS P. MURPHY**
Florida Bar No.: 0065552
nmurphy@murphyandersonlaw.com
scassidy@murphyandersonlaw.com
**SARAH J. HULSBERG**
Florida Bar No. 0106027
shulsberg@murphyandersonlaw.com
pmarchman@murphyandersonlaw.com
1501 San Marco Boulevard
Jacksonville, Florida 32207
904-598-9282 (phone)
904-598-9283 (fax)
*Trial Counsel for Plaintiffs Ethicon, Inc.*
*and DePuy Orthopaedics, Inc.*

**BLANK ROME LLP**

/s/ Leigh Ann Buziak
Anthony B. Haller
haller@blankrome.com
Leigh Ann Buziak
buziak@blankrome.com
Daniel S. Morris
morris-d@blankrome.com
(*motions for admission pro hac vice will*
*be forthcoming*)
One Logan Square
Philadelphia, PA 19103
215-569-5500 (phone)
*Attorneys for Plaintiffs Ethicon, Inc. and*
*DePuy Orthopaedics, Inc.*

26

JANREM0112464

# EXHIBIT A

JANREM0112465

## EMPLOYEE SECRECY, INTELLECTUAL PROPERTY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT

Name of Employee: Laura Angelini

TO BE PROVIDED BY H.R.

Employee WWID: 41000006

### A.  Introduction

DePuy Orthopaedics, Inc. is one of numerous entities within the Johnson & Johnson Family of Companies.  The businesses in which these entities are engaged are extremely competitive.  During your employment, you will be given access to CONFIDENTIAL INFORMATION (as defined below), will develop, maintain or enhance business and/or customer relationships and receive training relating to the business of DePuy Orthopaedics, Inc. and may have access to CONFIDENTIAL INFORMATION relating to the business of other entities within the Johnson & Johnson Family of Companies.  This Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement (this "Agreement") also applies to any employment you may subsequently have with any other entity within the Johnson & Johnson Family of Companies.

This Agreement sets forth your obligations during and after your employment with the COMPANY including, but not limited to, defining certain rights and obligations concerning intellectual property, non-solicitation-of-business, non-competition, non-solicitation of employees and publicity.

### B.  Definitions

As used in this Agreement:

**COMPANY** means individually and/or collectively DePuy Orthopaedics, Inc., Johnson & Johnson, and all other entities within the Johnson & Johnson Family of Companies, and their respective successors and assigns.  An entity is within the Johnson & Johnson Family of Companies if it is at least 50 percent owned by Johnson & Johnson, either directly or indirectly.

**EMPLOYER** means DePuy Orthopaedics, Inc. or, if applicable, any other COMPANY by which you are (or were) employed at any time.  For purposes of this Agreement, after you are no longer employed by any COMPANY, EMPLOYER means any COMPANY by which you were last employed.

**INVENTIONS** means (a) discoveries, improvements, ideas, concepts, research, data, reports, plans, systems, technology, products, methods, and processes, whether or not patentable, and (b) trademarks, service marks, trade dress, design marks, design rights, logos, domain names, handles, user names, and trade names, whether or not registered, that relate to any work assigned to or performed by you for or on behalf of your EMPLOYER or any COMPANY or to the actual or anticipated research or development or other business activities of your EMPLOYER or any COMPANY.

**CONFIDENTIAL INFORMATION** means information or a compilation of information, in any form (tangible or intangible) about the business of the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, which is disclosed to you or known by you as a result of your employment by the COMPANY.  CONFIDENTIAL INFORMATION includes, but is not limited to, (a)  such things as trade secrets, inventions, research, development, strategies, operations, logistics, manufacturing, distribution, purchasing, licensing, business planning and development, products in existence or under development, product performance

I

JANREM0112466

information, product technical information, product know-how, discoveries, methodologies, algorithms, formulas, protocols, reports, data, results, observations, computer programs, patent applications, strategic plans, hypotheses, research directions, developments, improvements, drawings, designs, specifications, opinions of legal counsel, clinical trials, draft or final regulatory filings, finance, computer software or hardware, automated systems, engineering, marketing, merchandising, pricing, training, training methods or procedures, selling, sales, personnel, customers or clients, including, but not limited to, customer lists, sales volumes or strategies, number or location of sales representatives, names or significance of the COMPANY's customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, likes, dislikes, habits or other customer or client-specific information; and (b) personal or business information about the COMPANY's employees, customers, vendors, consultants and agents which is not publicly known and which is disclosed to you or known by you in connection with your employment by the COMPANY including, but not limited to, performance reviews and other performance related information, organizational charts, compensation, benefits, and rankings.

**COMPETITOR** means any person or entity including, but not limited to, you or anyone acting on your behalf, (a) that is engaged or preparing to be engaged in research, development, production, marketing, selling of, or consulting on a product, process, technology, machine, invention or service in existence or under development that resembles or competes with, or can be substituted for, a product, process, technology, machine, invention, or service of any COMPANY that is in existence or under development; (b) that could benefit from: (i) CONFIDENTIAL INFORMATION; (ii) your use of the specialized training provided to you by your EMPLOYER or any COMPANY; and/or (c) that could benefit from your use of the COMPANY's customer relationships and/or goodwill.

**CUSTOMER** means any entity, client, account or person including the employees, agents, or representatives of the foregoing, or any entity or person who participates, influences or has any responsibility in making purchasing decisions on behalf of such entities, clients, accounts or persons, to whom or to which you contacted, solicited any business from, sold to, rendered any service to, were assigned to, had management responsibilities for, received commissions or any compensation on, or promoted or marketed any products or services to, during the last eighteen months of your employment with any COMPANY.

## C.  Rights and Obligations

In consideration of your receipt of CONFIDENTIAL INFORMATION, training, your employment or the continuation of your employment with your EMPLOYER, your access to customer relationships and good will, and/or for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, you agree, and intend to be legally bound, as follows:

1.  You will disclose promptly in writing to your EMPLOYER or its designee all INVENTIONS conceived, created and/or reduced to practice by you during your employment whether or not during your hours of employment and/or whether or not with the use of your EMPLOYER's or any COMPANY's facilities, materials or personnel, either solely or jointly with another or with others, and related to the actual or anticipated business or activities of your EMPLOYER or any COMPANY, or related to their actual or anticipated research and development or suggested by or resulting from any task assigned by you or work performed by you for, or on behalf of, your EMPLOYER or any COMPANY. Except as otherwise provided in Paragraphs 22, 23 and 24 of this Agreement, you agree to assign and hereby assign your entire right, title and interest in all INVENTIONS (including, but not limited to, all related patent applications and all priority rights

2

JANREM0112467

relating to any INVENTIONS or to any related patent applications) to your EMPLOYER or its designee. You will not assert any rights to any INVENTIONS as having been made or acquired by you prior to your being employed by your EMPLOYER unless such INVENTIONS are identified on a sheet attached hereto and signed by you and your EMPLOYER as of the date of this Agreement.

2. All copyrightable works, including, but not limited to, writings, articles, publications, presentations, reports, computer programs, drawings, tables, graphs, images, artwork, photographs, videos, musical works, sound recordings and audiovisual works, that you create or prepare during and within the scope of your employment with your EMPLOYER or relating to work performed for any COMPANY whether or not created or prepared during your hours of employment and/or whether or not with the use of your EMPLOYER's or any COMPANY's facilities, materials or personnel, and regardless whether the creation or preparation of such work was specifically requested by your EMPLOYER, shall be considered works made for hire, and the worldwide copyrights therein shall be the sole and exclusive property of your EMPLOYER or such COMPANY. If any such copyrightable work or portion thereof shall not legally qualify as a work made for hire, or shall subsequently be held not to be a work made for hire, you agree to assign and hereby assign to your EMPLOYER, such COMPANY, or their designee all your right, title and interest therein. You agree to promptly disclose all such works to your EMPLOYER.

3. You will execute any applications, assignments or other instruments that your EMPLOYER considers necessary to apply for, obtain, transfer and maintain a patent, or trademark or copyright registration or other proprietary rights to protect the interests of your EMPLOYER or the COMPANY with respect to INVENTIONS, or copyrightable works conceived, reduced to practice, created, authorized or made by you during your employment. These obligations shall continue beyond the termination of your employment and shall be binding upon your executors, administrators and other legal representatives.

4. You will not use or disclose to the COMPANY any confidential information belonging to others, including your former employers, if any. You represent there is no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would prohibit or restrict your ability to perform your job-related duties that you have not disclosed and provided to your EMPLOYER.

5. You acknowledge that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a COMPETITOR, will cause immediate irreparable injury to the COMPANY. Except as required by your duties for your EMPLOYER, you will not use, disclose, disseminate, lecture upon or publish any CONFIDENTIAL INFORMATION, either during your employment with your EMPLOYER or thereafter, unless you first obtain the prior written consent of your EMPLOYER or any COMPANY to which the CONFIDENTIAL INFORMATION relates.

6. Except as provided in the next sentence or to any extent prohibited by applicable law, during your employment with any COMPANY and for a period of eighteen (18) months after the termination of your employment (whether voluntary or involuntary), you will not, directly or indirectly, perform, or assist others to perform, work for any COMPETITOR in any position and in any location in which you could disadvantage any COMPANY or advantage the COMPETITOR by: (a) your disclosure or use of CONFIDENTIAL INFORMATION to which you had access; (b) your use of the specialized training provided to you by your EMPLOYER or any COMPANY for which you have worked; and/or (c) your use of CUSTOMER relationships and goodwill.

3

Following the termination of your employment, you will be permitted to work for an entity or person if (a) the COMPANY with a competitive interest determines that the entity or person for which you wish to work has a diversified business and no portion of the business for which you would render services is a COMPETITOR, and (b) prior to your commencing any work, such entity or person and you each provides written assurances satisfactory to the COMPANY with a competitive interest that you will not render any services for the portion of the business that is a COMPETITOR for a period of eighteen (18) months after your last date of employment within the COMPANY. The restrictions of this Paragraph 6 will not apply with respect to services you render in California after termination of your employment within the COMPANIES that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

7.  You acknowledge that the COMPANY's relationships with CUSTOMERS and the goodwill associated with such relationships are important and valuable business assets that results from the COMPANY's significant investment of its time and resources. Therefore, you agree that during your employment and for eighteen (18) months after the termination of your employment (whether voluntary or involuntary) with the COMPANY, you shall not, directly or indirectly, contact, call upon, solicit business from, sell to, or render services to, or assist others in contacting, calling upon, soliciting business from, selling to, or rendering services to, any CUSTOMER: (a) in connection with the sale, support, service or use of any product or service that resembles or competes with or that may be substituted for one that is being sold, under development or acquired by any COMPANY; (b) if you are working with, for, or as a COMPETITOR of any COMPANY; and/or (c) if your activities could damage or interfere with the CUSTOMER relationships of any COMPANY or divert business from such CUSTOMERS to a COMPETITOR. For purposes of this Paragraph 7, COMPANY shall mean your EMPLOYER and any COMPANY that you worked for during the last eighteen months of your employment. The restrictions of this Paragraph 7 will not apply to limit services you render in California after termination of your employment that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

8.  Except to any extent prohibited by applicable law, you agree that for a period of twelve (12) months after your last date of employment within the COMPANY, you will not, directly or indirectly, on your own behalf or on behalf of others, solicit, recruit, interview, hire, identify, suggest or comment on any individual employed by any COMPANY to leave his or her employment with the COMPANY. The restrictions of this Paragraph 8 will not apply to limit services you render in California after termination of your employment that do not involve your use or disclosure of CONFIDENTIAL INFORMATION.

9.  For purposes of enabling your EMPLOYER and any other COMPANY with a competitive interest to monitor your compliance with your obligations under this Agreement, you will notify your EMPLOYER in writing, at least two weeks before your last date of employment with your EMPLOYER, and provide at least two weeks advance written notice whenever within the eighteen (18)-month period following the termination of employment you plan to commence work with a new entity or person of: your start date, the identity of each entity or person for which you will be working, your new title, and the responsibilities of the position (such as the products and/or services you will be working on for the new entity or person, and any territory you may cover ). During this time period you will also provide such notice regarding any planned or actual changes in your work responsibilities. You will provide the notices required under this Paragraph to the highest-ranking employee in the Human Resources organization of your EMPLOYER and will do so promptly, and, in any event, at least two (2) weeks prior to commencing any new position or (if

4

applicable) any new responsibilities. You will promptly provide any additional information requested by your EMPLOYER to determine compliance with your obligations under this Agreement. The information you provide pursuant to this Paragraph should not include any confidential information belonging to anyone outside the COMPANY and will not be used except to evaluate your compliance with your obligations under this Agreement, to enforce those obligations, and to seek remedies for your breach or another party's interference with your obligations under this Agreement.

10. If your employment with your EMPLOYER terminates for reasons other than misconduct, then you may be entitled to certain payments if you satisfy the requirements and procedures set forth and referenced in Addendum A, which is incorporated by reference herein. If you voluntarily terminate or resign from your employment with your EMPLOYER, then you shall not be eligible for such payments.

11. Upon termination of your employment with your EMPLOYER, you will turn over to an individual designated by your EMPLOYER all property in your possession or custody belonging to your EMPLOYER or any COMPANY, including any computer or electronic equipment. You shall not retain copies of any correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents in any form whatsoever (including information contained in computer memory or on any computer disk or drive) relating in any way to the business of your EMPLOYER or the COMPANY that were entrusted to, created by or obtained by you at any time during your employment with the COMPANY.

12. You acknowledge that your EMPLOYER and/or the COMPANY have a legitimate interest in protecting its CONFIDENTIAL INFORMATION, its customer relationships and the goodwill associated with such customer relationships, and the provision to you of specialized training. You further acknowledge that the restrictive covenants contained in this Agreement are reasonably necessary to ensure your EMPLOYER or the COMPANY is able to protect its legitimate interests and, therefore, you agree not to, in any action, suit or other proceeding, deny the reasonableness of, or assert the unreasonableness of, the restrictive covenants and you hereby waive any such defense. In addition, you agree that the restrictive covenants in this Agreement are separate and independent obligations and, therefore, the failure or alleged failure of the COMPANY to perform any obligations owed to you shall not constitute a defense to the enforceability of such restrictive covenants. Accordingly, you acknowledge that if you violate or are about to violate this Agreement, immediate irreparable injury to your EMPLOYER and the COMPANY will result, warranting (in addition to any other relief) the imposition of injunctive relief against you without the necessity of posting any bond.

13. If you breach any of the provisions of this Agreement, the duration of any applicable restrictive covenant shall commence from the date injunctive relief is granted or from the date that you cease such conduct that violates the restrictive covenant and shall be extended for an amount of time equivalent to any period of breach.

14. You agree to indemnify and pay your EMPLOYER and/or any COMPANY for the reasonable attorneys' fees and costs it incurs (including fees and costs incurred before the initiation of litigation, during litigation, and any trials, appeals and/or any petitions) to enforce the terms of the Agreement in the event you violate any of its terms or in the event you unsuccessfully challenge the validity or enforceability of any of the terms of this Agreement.

15. You agree that this Agreement applies to any position that you may hold as an employee of the COMPANY and shall continue in effect in the event of a promotion, demotion, retention by a different EMPLOYER or in a new position, or any other change in the

5

JANREM0112470

circumstances of your employment, including without limitation any change in the scope or nature of your responsibilities or assignment, your level or seniority, or your compensation or benefits.

16. You agree that your EMPLOYER may assign this Agreement and its rights and obligations, in whole or in part, to any affiliate or third party, including in connection with any merger, sale of assets, sale of stock or any other form of transaction that pertains to all or part of its business or the business of any other COMPANY. Each COMPANY is an express third-party beneficiary of this Agreement.

17. Nothing in this Agreement shall limit or affect any common law duties you have to any COMPANY, including, but not limited to, your duty of loyalty.

18. During your employment, while you may investigate other employment or business opportunities, you acknowledge and agree that you are subject to a duty of loyalty. Therefore, you agree that during your employment, you will not, directly or indirectly, among other things, compete against the COMPANY; do anything to impair your EMPLOYER's business or relationships with its CUSTOMERS; inform CUSTOMERS that you are terminating your employment and starting a competing business or going to work for a COMPETITOR; contact a CUSTOMER on behalf of a COMPETITOR; recommend a COMPETITOR or a COMPETITOR's products or services; engage in training on or assist in selling or promoting a COMPETITOR's products or services; engage in recruitment or solicitation of other employees of your EMPLOYER or any COMPANY to join a COMPETITOR.

19. This Agreement will be governed by and interpreted according to the laws of the State of New Jersey, without regard to its conflict of law rules. Any action that you initiate relating to or arising out of this Agreement must be brought in the courts of the State of New Jersey or, if subject matter jurisdiction exists, in the United States District Court for the District of New Jersey. You consent to personal jurisdiction and venue in both New Jersey State and Federal courts and to service of process by United States mail or express courier service in any such action. Any litigation initiated by you in any other forum or jurisdiction must be transferred to an appropriate court in New Jersey.

20. You irrevocably consent not to sue the COMPANY in any jurisdiction other than the state or federal courts of New Jersey for the purposes of any action arising out of or related to this Agreement. You further agree not to assist, aid, abet, encourage, be a party to, or participate in the commencement or prosecution of any lawsuit or action by any third party arising out of or related to this Agreement in any jurisdiction or venue other than a state or federal court in New Jersey.

21. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.

22. The following applies only to a Minnesota employee: Paragraph 1 does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of the COMPANY was used to conceive or reduce to practice such INVENTION and which was developed entirely by you on your own time, and (a) which does not relate at the time of conception or reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by you for your EMPLOYER.

6

23. <u>The following applies only to a California, Delaware, Illinois, Kansas, or North Carolina employee</u>: Paragraph 1 above does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of the COMPANY was used and that was developed entirely on your own time, unless (a) the INVENTION relates at the time of conception or reduction to practice of the INVENTION (i) to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, or (b) the INVENTION results from any work performed by you for your EMPLOYER. For California employees, the requirement to assign your rights in an invention to your EMPLOYER does not apply to an invention which qualifies fully under the provisions of California Labor Code Section 2870.

24. <u>The following applies only to a State of Washington employee</u>: Paragraph 1 above does not apply to an INVENTION for which no equipment, supplies, facility, or trade secret information of any COMPANY was used and that was developed entirely on your own time, unless (a) the INVENTION relates at the time of conception or reduction to practice of the INVENTION (i) directly to the business of your EMPLOYER or (ii) to your EMPLOYER's actual or demonstrably anticipated research or development, and (b) the INVENTION results from any work performed by you for your EMPLOYER.

25. Nothing contained in this Agreement shall be deemed to confer on you any rights with respect to the duration of your employment. YOUR EMPLOYMENT IS TERMINABLE AT WILL BY EITHER YOUR EMPLOYER OR YOU, WITH OR WITHOUT CAUSE, EXCEPT THAT IF YOU INITIATE THE TERMINATION, THERE SHALL BE, AT YOUR EMPLOYER'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER YOU GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. If your EMPLOYER elects to continue your employment during the notice period, it shall advise you of that fact and of the duration of the notice period. During any notice period, you will provide such transitional services as your EMPLOYER may request. Your EMPLOYER will be obligated to continue your pay during the notice period, and your duty of loyalty to your EMPLOYER will continue through such period.

26. This Agreement sets forth the entire agreement between the parties relating to its subject matter and supersedes all prior agreements, written or oral, between them relating to its subject matter. In the event that this Agreement be declared invalid, void, or unenforceable for any reason, then you understand, agree, and acknowledge any non-compete, confidentiality, non-solicitation, and/or non-disclosure agreement previously entered between you and any COMPANY, which was superseded by this Agreement, shall be reinstated and remain in full force and effect. No modification of or amendment to this Agreement will be effective unless it is in writing and signed by you and an authorized representative of your EMPLOYER. You represent that you have not relied on any representations by any representative of the COMPANY concerning the subject matter of this Agreement that are not expressly stated in this Agreement.

JANREM0112472

YOU ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS
AGREEMENT, AND YOU AGREE TO THE TERMS ABOVE AND ACKNOWLEDGE THAT YOU
INTEND TO BE LEGALLY BOUND BY THIS AGREEMENT.

DATE: 04/15/2016

_____
EMPLOYEE SIGNATURE

LAURA ANDERSON
Print Employee Name (Please Print)

313 PLANTATION CIRCUIT
Address

32082 PONTE VEDRA BEACH FL
City/State

8

JANREM0112473

## ADDENDUM A

A. If, after at least a month following the termination of your employment within the COMPANY, for reasons other than misconduct or your voluntary resignation, and after a diligent search for employment that complies with the terms of the Agreement and this Addendum, you are unable to obtain employment in a position in which your annual base salary is at least equal to your annual base salary at the time of such termination solely because of the restrictions set forth in Paragraph 6 or 7 of this Agreement, then, commencing after submission of an application for payment and any additional requested information and documents and a determination by your EMPLOYER in due course that you qualify for payment, your EMPLOYER shall make monthly payment to you equal to the lesser of (a) the amount you last received from your EMPLOYER as annual base salary or (b) the difference between your last annual base salary at your EMPLOYER and your annual base salary in any subsequent position for each month for which you properly apply for payment and your EMPLOYER determines your entitlement. Your annual base salary for or with any subsequent employer will be based on your EMPLOYER's reasonable projection of the amounts to be received by you during the first twelve (12) months in that employment. No payment shall be made in advance of the month for which it is requested.

B. To be considered for the payments provided for in Paragraph A above for each month that you claim payment is due, you must establish and represent in writing to the highest-ranking employee in the Human Resources organization of your EMPLOYER, within fifteen (15) days following the end of each month that you are seeking payment, that although you diligently sought work in the prior month consistent with your obligations under Paragraphs 6 and 7 of the Agreement, you were unable to attain employment from a new employer in a position in which your annual base salary equaled the annual base salary you last received from your EMPLOYER, solely because of a restriction set forth in Paragraph 6 or 7 in the Agreement. You must also submit a completed Application for Payment Pursuant to Employee Secrecy, Intellectual Property, Non-Competition and Non-Solicitation Agreement and promptly provide such further information or documents concerning your job search as your EMPLOYER may request to determine if your employment status is solely due to a restriction set forth in Paragraph 6 or 7 of this Agreement, that a diligent search for employment consistent with your obligations was made, and to verify the accuracy of your representations. As more fully set forth in the Application and this Addendum, in order to establish a diligent search for employment satisfying the requirements of this Agreement, you must demonstrate, among other things, that you made best efforts to secure positions that were in compliance with the terms of the restrictions set forth in Paragraphs 6 and 7 of the Agreement. For avoidance of doubt, to be eligible for payment under the Agreement, you must demonstrate, among other things, that you sought employment in positions that would not violate your non-compete and non-solicitation obligations under Paragraphs 6 and 7. You must also establish, among other things, that the restrictions set forth in Paragraph 6 or 7 were the sole reason that you could not find employment with commensurate annual base salary and were not due to circumstances unrelated to those obligations including, without limitation, general economic conditions or competition from other candidates.

9

JANREM0112474

C.  In the event that you are offered a position which you believe conflicts with your obligations under either Paragraph 6 or 7 of the Agreement, you must inform your EMPLOYER so that your EMPLOYER may evaluate the position and consider whether the position may be allowable under the terms of this Agreement or permissible with appropriate restrictions. No payment shall be due under Paragraph A if you fail to make timely application for or to provide on a timely basis any information or documents requested by your EMPLOYER or required under this Addendum or if you provide incomplete or inaccurate information regarding your job search.

D.  If your EMPLOYER determines that you are entitled to payment under Paragraph A, your EMPLOYER may elect in its sole discretion, in lieu of payment, to provide you a written release from the restriction of Paragraph 6 or 7 of the Agreement. In the event your EMPLOYER elects to provide such written release, EMPLOYER will no longer be obligated to make any payments contemplated by Paragraph A above.

10

JANREM0112475

Exhibit B

JANREM0112476

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

ETHICON, INC.
DEPUY ORTHOPAEDICS, INC.

        Plaintiffs,

  v.

LAURA ANGELINI,

        Defendant.

## DECLARATION OF BETH MCCOMBS

I, Beth McCombs, pursuant to 28 U.S.C. § 1746 declare:

1.      I am the Vice President, Research & Development for Ethicon, Inc. I have responsibility for all of the product development organizations within Ethicon, including its Biosurgery, Energy, Endomechanical, and Wound Closure businesses. I make this declaration based upon my personal knowledge.

2.      Ethicon is a global market leader in the business of developing and creating innovative products and medical devices for use in surgery, including sutures, staplers, wound-closing products, and energy devices.

3.      Among one of Ethicon's key areas of focus and innovation is Biosurgery, which is an area dedicated to developing an array of biomaterials and biologics technologies to minimize intra- and post-operative complications for surgical conditions that are difficult or expensive to manage or may not be fully addressed by standard surgical techniques like sutures or cauterization.

JANREM0112477

4.     Ethicon's products in this area consist of hemostats, which stop the flow of blood, as well as sealants, to ensure wounds close properly.

5.     Because of its innovative use of biomaterials for these purposes, protection of Ethicon's confidential and propriety information is of utmost importance.

6.     The industry in which Ethicon is engaged is highly competitive and the protection of confidential, proprietary, and trade secret information is vital to prevent competitors or would-be competitors from obtaining an unfair competitive advantage.   To compete and to serve its customers and the patient community, Ethicon invests millions of dollars annually in resources to develop its technologies, systems, and products.

7.     Starting in late 2015, all of J&J's Medical Device businesses, which includes, among others, Ethicon and DePuy Synthes, began to integrate and streamline their operations and research and development functions to create one Medical Device organization.  As part of this restructuring, the Medical Device businesses sought to accelerate the pace of innovation and to prioritize and reallocate research and development resources to key platforms and geographies.  In order to do so, it was critical that the leadership within these platforms share information and align on the priorities across the Medical Device enterprise.

8.     As a result of this initiative, in her role as a Platform Leader for DePuy Synthes, Laura Angelini would have received and did receive a monthly report summarizing the entire Medical Device segment's product launches (entitled the "G9 Launches") as well as a report summarizing the status and stages of critical projects (entitled the "RD Top Projects Scorecard") and estimated launch dates.  These reports included information regarding

2

JANREM0112478

Ethicon's product launches and the Biosurgery business in particular. Angelini received this information as recently as July 2016.

9.      In this role, Angelini would have received and did receive a report generated every other month called the "Portfolio Factbook", which contained a summary of strategies, goals and objectives, top projects, launches and detailed information regarding the status of the top projects and the specific rationale for prioritizing these projects across the Medical Device business. This report included information regarding Ethicon's products and the Biosurgery business in particular. Angelini received this information as recently as August 9, 2016.

10.     The July and August 2016 reports revealed highly sensitive information regarding the status of a high-priority project for Ethicon's Biosurgery business.

11.     If Baxter had access to this information in particular, it could adjust its own competitive strategy to account for the status of this high-priority project.

12.     In her role as a Platform Leader for DePuy Synthes, Laura Angelini would have received and did receive detailed information about the Medical Device segment's mid-year top project review and the status of the top projects, including Ethicon's Biosurgery business. She received this information as recently as August 9, 2016.

13.     In addition to these regular reports that contain highly confidential information from across the Medical Device businesses, from April 25 through April 27, 2016, the Medical Device segment held a Strategic Planning & Innovation Workshop at J&J's headquarters in New Brunswick, New Jersey, to bring together all of the leadership teams within each of the Medical Device businesses to further its goal of integrating these businesses and cross-develop and sell products.

JANREM0112479

14.     During this intensive forty-eight hour meeting held over three days, each business leader and research and development leader presented the strategic plan and pipeline in detail for their business and had peers from other businesses review and comment on the plans and strategies. The purpose of these presentations was to make decisions together about how to invest in each of these businesses and test the various strategies that were proposed to determine the path forward.

15.     Angelini was invited to and attended this intensive workshop. Like the other invitees, Angelini received – the week before the meeting – a detailed set of "pre-read" materials in preparation for the meeting.

16.     The "pre-read" materials covered each of the Medical Device businesses, including Ethicon's Biosurgery platform.

17.     With respect to Biosurgery in particular, the pre-read provided very specific information regarding the strategic direction of Biosurgery including strengths, weaknesses, and priorities. This document – and the presentation at the workshop – discussed in detail the strategic plans and specific tactics for how to accomplish those plans. It identified unmet needs in the market and, with great detail, how the company specifically intends to take advantage of such market opportunities in terms of value, execution, risks, and key metrics. It identified the competitive challenges and specific competitor offerings in this space and plans for meeting those competitive challenges. One of the identified key competitors was Baxter. The pre-read and presentation further made recommendations for how to proceed with the current pipeline of projects and the plans for driving the innovation on such projects.

JANREM0112480

18.     In particular, the presentation discussed key strategic partnerships that are driving growth within the Biosurgery business. The level of success of these partnerships is not public and it would be critical to a competitor like Baxter to understand how Ethicon has been able to achieve such growth.

19.     As another specific point, the presentation discussed the portfolio prioritization of innovation within the Biosurgery portfolio which is likewise very valuable information to a competitor like Baxter. If Baxter had access to the information presented on this point that Angelini had access to, it would be able to adjust its own plans and strategies to better compete with Ethicon.

20.     The pre-read and presentation further highlighted other commercial strategies that have driven growth within the Biosurgery business that Ethicon has been able to capitalize on. Again, this information would be extremely valuable to a competitor like Baxter who could replicate this same strategy if they were aware of the success that Ethicon had in executing it.

21.     Yet another example of key strategic information presented in the pre-read and during the presentation is the product pipeline that Ethicon intends to focus and bet on for the future. If a competitor like Baxter had this information, it would know precisely where Ethicon intends to focus its efforts and resources and could, in a more focused way, adjust its own plans to better compete against Ethicon in the market.

22.     These strategies were provided to meeting participants in advance of the meeting and then were presented during a presentation that lasted approximately 35-50 minutes, including a question and answer session. In addition to the presentation, the

JANREM0112481

Biosurgery business was also discussed throughout the meeting, because its products can be utilized in any surgery where there is bleeding. Therefore, opportunities for collaboration between the Biosurgery business and other parts of the Medical Devices businesses were discussed and explored.

23.     With this type of knowledge and information, a company like Baxter would enjoy a competitive advantage over Ethicon. It could prioritize its own projects, match up its own strategies against Ethicon's, and choose to direct its resources to more directly beat Ethicon in the marketplace. It may also choose not to pursue certain strategies or direct resources in other ways in light of Ethicon's plans, saving time and money.

24.     During the meeting, Angelini was engaged and interested and was involved in the discussion of the direction of this business, which she knew and understood and to which she could contribute based on her many years of experience with Ethicon.

25.     Baxter Healthcare Corporation ("Baxter") is a direct competitor of Ethicon's and competes head to head with Ethicon in several product areas, including biosurgery. Indeed, Baxter is Ethicon's largest competitor in the area of hemostats. We also believe Baxter intends to develop products that would be directly competitive with some products Ethicon has in the pipeline that were discussed during the workshop and in the launch and pipeline reports Angelini had access to.

26.     Therefore, if Angelini were to assume a top executive position at Baxter in its biosurgery business, such a position would create a substantial risk that she will use or disclose proprietary and highly confidential information belonging to Ethicon.

6

JANREM0112482

27.     It would be very difficult, if not impossible to monitor Angelini's compliance with her obligations in her new role.  We would not be able to tell what Baxter is doing internally with respect to strategy, product development and pipeline until it is too late.  The very fact of Angelini's employment at Baxter, particularly in a top executive position, compromises confidential information relating to Ethicon's Biosurgery business.

28.     The harm that could be caused by Angelini's use and disclosure of this information includes the loss of valuable confidential and proprietary information and the loss of the competitive advantage such information provides including loss of market share and potentially the loss of market-leading positions.  It will be very difficult, if not impossible, to calculate the loss and damage resulting from Angelini's the use or disclosure of information Angelini had access to.

7

JANREM0112483

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the forgoing statements are true and correct to the best of my knowledge and belief.

*Beth McCombs*

BETH MCCOMBS

Dated: September 1, 2016

JANREM0112484

Exhibit C

JANREM0112485

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

ETHICON, INC.
DEPUY ORTHOPAEDICS, INC.

           Plaintiffs,

   v.

LAURA ANGELINI,

           Defendant.

## DECLARATION OF DAN WILDMAN

I, Dan Wildman, pursuant to 28 U.S.C. § 1746 declare:

1.      I am currently the Platform Leader for the DePuy Synthes Spine business, which, along with many other businesses including Ethicon, is a part of J&J's Medical Device segment. Prior to this position, I was the head of Global Franchise Strategy and Growth for Ethicon from June 2014 until September 2015. Before that, from January 2003 through June 2014, I was the Worldwide President of Ethicon's Biosurgery business. In that role, I had responsibility for strategy, portfolio development, product development, and global brand management for Ethicon's Biosurgery products. I make this declaration based upon my personal knowledge.

2.      In my position as Worldwide President of Ethicon's Biosurgery business, from approximately 2012 to 2013, I worked with Laura Angelini.

3.      At that time, Ethicon's businesses were divided into four parts: Ethicon Endo-Mechanical, Ethicon Suture, Ethicon Energy, and Ethicon Biosurgery. Angelini was the lead for Global Strategic Marketing for Ethicon's Endo-Mechanical and Suture businesses. All four of these businesses ultimately reported in to the Worldwide Chairman of the Global Surgery Group.

4.      At that time, though the businesses had their own management structures, there

JANREM0112486

was a natural transparency and sharing of information across each of the businesses because, ultimately, the resources available to the entire company needed to be shared across the businesses and decisions needed to be made across the product portfolio as to where resources would be devoted and developed.

5.      At that level, Angelini would have had access to information about the products across the Ethicon businesses and the challenges and opportunities for the portfolio.  She would have known and understood the pipeline and the decisions that were being made and where Ethicon was going to be devoting its resources.

6.      At that time, Angelini would have had access to information in the Biosurgery business at a strategic level, its products and the pipeline, and particularly our emphasis at that time on certain strategic partnerships, the regulatory pathway for some of the Biosurgery products, and certain supply chain issues.  This information was material to the positioning of the Biosurgery business and would be of special import to Baxter given the status of its own product portfolio in this highly competitive market.

7.      I attended the Strategic Planning & Innovation Workshop that the Medical Device segment held on April 25 through April 27, 2016, at J&J's headquarters in New Brunswick, New Jersey.  This meeting brought together all of the leadership teams within each of the Medical Device businesses to further its goal of integrating these businesses and cross-develop and sell products.

8.      During this intensive meeting, each business leader presented the strategic plan and pipeline in detail for their business and had peers from other businesses review and comment on the plans and strategies.  The purpose of these presentations was to make decisions together about how to invest in each of these businesses and test the various strategies that were proposed

2

JANREM0112487

to determine the path forward.

9.      Angelini was invited to and attended this intensive workshop.  Like the other invitees, Angelini received – the week before the meeting – a detailed set of "pre-read" materials in preparation for the meeting.

10.      The "pre-read" materials covered each of the Medical Device businesses, including Ethicon's Biosurgery platform.

11.      These strategies were provided in writing to meeting participants in advance of the meeting and then were presented during a presentation that lasted approximately 35-50 minutes, including a question and answer session.  In addition to the presentation, the Biosurgery business was also discussed throughout the meeting, because its products can be utilized in any surgery where there is bleeding.  Therefore, opportunities for collaboration between the Biosurgery business and other parts of the Medical Devices businesses were discussed and explored.

12.      With this type of knowledge and information, a company like Baxter would enjoy a competitive advantage over Ethicon.  It could prioritize its own projects, match up its own strategies against Ethicon's, and choose to direct its resources to more directly beat Ethicon in the marketplace.  It may also choose not to pursue certain strategies or direct resources in other ways in light of Ethicon's plans, saving time and money.

13.      During the meeting, Angelini was engaged and interested and was involved in the discussion of the direction of this business, which she knew and understood and to which she could contribute based on her many years of experience with Ethicon.

14.      I understand that Angelini worked for another business, Vision Care, before returning to the Medical Device businesses in March 2016.  The information provided in the pre-

JANREM0112488

read for the Strategic Planning & Innovation Workshop, along with regular reports prepared for the overall Medical Device segment, would have provided her with a refreshed view and update on current plans, pipelines, and strategies for the Biosurgery business.

15.     It is the combination of Angelini's years of prior experience with the Ethicon business coupled together with the recent "refresh" of current information that makes her taking a position as Baxter's Worldwide President of Biosurgery so problematic.

16.     If Angelini were to take the position of Worldwide President of Baxter's Biosurgery business, she would be able to draw on this information about how the Biosurgery business addressed, from a strategic standpoint, various issues in the marketplace.

17.     Angelini would have been in the unique position to have detailed knowledge of this business due to her tenure with Ethicon, to see how the strategies and pipeline had developed over time, and to provide comments and feedback on the direction and strategy for this business going forward.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the forgoing statements are true and correct to the best of my knowledge and belief.


_____
DAN WILDMAN


Dated: September 2, 2016

4

JANREM0112489