# EXHIBIT 30

**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

ETHICON, INC., and

DEPUY ORTHOPAEDICS, INC.,

        Plaintiffs,                                 Case No. 3:16CV1124-J-39PDB

    v.

LAURA ANGELINI,

        Defendant.

_____/

**PLAINTIFFS' REPLY IN SUPPORT OF THEIR AMENDED MOTION FOR**
**TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

JANREM0112902

## I.    ANGELINI IS WRONG TO DOWNPLAY BEING PRIVY TO SECRETS.

Angelini's self-serving assertion (Doc 24 "Opp" at 24) that Plaintiffs' Motion can be "boiled down" to a concern about her access to information about one product already disclosed in the market in the Biosurgery pipeline is completely incorrect. As reflected in the evidence filed under seal, Angelini was privy to a *trade secret* strategic plan for the Biosurgery business ████████████████████████████████████████████████ ████████████████████████████████    ████████████████████████████████ ██████. Second Declaration of Dan Wildman ("Wildman Decl. II"), ¶ 3.[1] None of this information is publicly available or disclosed in the referenced investor presentation. These materials reveal the Biosurgery business' focus on ████████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████    *See* DS/E 0109; Wildman Decl. II, ¶¶ 8-9.   The information also includes a comprehensive analysis showing███████████████████████████████ ████████████████████████████████    *Id.* ██████████████████████████ ████████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████    Wildman Decl. II, ¶¶ 11-12. If Baxter had that information, it would be able to replicate these programs and unfairly compete. *Id.* In addition to the strategic plan, the pre-read describes, in granular detail, the current pipeline consisting of ████████████████████████████████████████████████████████    (See p.34 of DS/E 0111). This top secret information which would provide a competitive advantage to any

---

[1] The Second Declaration of Dan Wildman is filed under seal because he details information which is closely held and not disclosed to the market.

1

competitor includes details of Plaintiffs' development plans and their value to the business. While one pipeline product (SURGICEL Powder) *has* been publicly disclosed, Angelini conveniently ignores that there is critical and highly-valuable competitive information to which she is privy which has *not* been publicly disclosed about this product. As communicated on a top secret basis in in the Factbook and Top Projects Scorecard that Angelini received in July and August 2016, ███████████████████████████████

███████████ JE 3A at p. 10, 12, 20 and JE 4B at p. 8.

## II.   THE SECRETS DIRECTLY LINK TO HER ROLE AT BAXTER.

Unlike the employee in *Marinelli v. Medco Health Solutions, Inc.*, 951 F.Supp.2d 303, 318 (D. Conn. 2013), Angelini was not just in "receipt of an email." Rather, the information she *received* and which was covered at the executive strategic planning meeting she *attended* (and participated in) provides the playbook for how to compete against Ethicon. She could not possibly meet her fiduciary obligations as a Baxter executive for the ████ she is being paid in a role involving the strategic direction of Plaintiffs' main Biosurgery competitor without being informed by this information. This is a classic example of the insuperable conflict which results from a person armed with trade secret information jumping ship to go to battle for a major competitor. In *Ingersoll-Rand Co. v. Ciavatta*, 542 A.2d 879, 884-85 (N.J. 1988), the New Jersey Supreme Court held that employers have a legitimate interest in protecting information not known in the industry to which an employee has been exposed and enriched as a result of their employment. Both *Campbell Soup Co. v. Desatnick*, 58 F.Supp.2d 477 (D.N.J. 1999) and *Nat'l Reprographics v. Strom*, 621 F. Supp.2d 204 (D.N.J. 2009) held that, once it is established that the employee has confidential

2

JANREM0112904

information which relates directly to the intended job position, there is a risk of disclosure and protection should be afforded because this constitutes irreparable harm. Once Angelini starts working for Baxter, the damage is irreparable: "The cat is out of the bag and there is no way of knowing to what extent their use has caused damage or loss." *Nat'l Starch & Chem. Corp.*, 530 A.2d 31, 33 (N.J. Sup. Ct. 1987). This is exactly the type of harm that New Jersey law will protect through injunctive relief.

## III.   ANGELINI GROSSLY OVERSTATES THE HARM TO HER IF ENJOINED.

Despite Angelini's misrepresentation to the contrary (Opp. at 23), Plaintiffs never conditioned Angelini's continued employment with the J&J Companies on the withdrawal of her candidacy with Baxter *before* litigation. The J&J Companies have made it clear again and again – even after this lawsuit was filed – that there is still a job position available for her so long as she does not commence employment with Baxter, even if this results from an injunction on Monday. Declaration of Leigh Ann Buziak, ¶ 7. Moreover, Plaintiffs seek to enjoin her from assuming the position of WW President of Baxter's Biosurgery business where the confidential information she was familiar with at Plaintiffs is directly relevant to her new strategic role. Plaintiffs do not assert that she cannot work for a competitor in a non-conflicting role which does not have strategic direction at its core, and there are many positions at many companies she pursue, including the two she was admittedly offered in March 2016, (Angelini Decl., ¶ 14), which would not pose the same risk of irreparable harm. From Plaintiffs, Angelini stands immediately to gain ███████ in vested options and she will receive a payout of █████ in other long-term incentive compensation. Declaration of Thiago Licias de Oliveira, ¶ 9. It is therefore disingenuous for her to suggest that she will not

3

JANREM0112905

be able to support her family or pay college tuition (Opp. at 22-23).

## IV.    THERE IS REASON TO MISTRUST ANGELINI.

Angelini asserts that the J&J Companies have not established any conduct to suggest that Angelini cannot be trusted to abide by her non-disclosure covenant. Opp. at 22.   This argument misses the mark under *Desatnick*, *Strom*, and *Nat'l Starch* but even notwithstanding the law on point, Angelini cannot be trusted. She knew that she was going to be engaged in a second round of interviews with Baxter to lead its Biosurgery business, yet she stayed for this presentation.[2] Knowing she was engaged in high-level interviews with a direct competitor, she could have recused herself but chose not to.  When she interviewed for the position of Global Platform Leader, she promised her new boss, Ciro Romer, that she would stay in that role for three years.   Declaration of Ciro Romer ¶ 3.  She violated that promise.  Worse still, she represented to key surgeon customers that she would be the leader that they could count on for the joints business. *Id.* at 7.  That was also false.  Now, when faced with the J&J Companies' serious concerns about their confidential information, she brushes them off in her declaration and is fully willing to proceed with this job in breach of her contractual obligations. Her willingness to downplay the secret nature of the information and its competitive import raises serious doubt about the judgments she would make behind closed doors at Baxter when her fiduciary duty to her new employer and the financial

---

[2] Angelini's alleged lapse in memory with regard to the Biosurgery information she has been exposed to at J&J Companies in the past 6 months is not credible, and courts have rightfully rejected it. *See, e.g., Hekiman Laboratories, Inc. v. Domain Systems, Inc.*, 664 F. Supp. 493 (S.D. Fl. 1987) (finding defendant's "convenient memory lapses" regarding information he was exposed to at former employer "incredulous" in light of defendant's knowledge of and exposure to inner workings of company); *Intermetro Industries Corp. v. Kent*, No. 3:CV-07-0075, 2007 WL 1140637 (M.D.Pa. 2007) (finding defendant's memory lapse an attempt to "undermine the importance of the information" and stating that "[w]hile the Court does not doubt that [former employee] only retains a general understanding of [company's] strategy . . . this general information is still valuable and is not generally known to the public.").

JANREM0112906

enticements impel her to act in Baxter's interest to beat its main Biosurgery competitor.

## V.    ANGELINI"S SELF-SERVING DISCLAIMERS SHOULD NOT BE CREDITED BUT WOULD REQUIRE AN EVIDENTIARY HEARING.

The evidence in the record shows that Angelini had access to the highly-guarded trade secrets and business strategies that relate directly to her intended job position as a top executive for Baxter.  It would be antithetical to New Jersey law and her obligations under the contract to permit her to work for a direct competitor under these circumstances.

However, to the extent that the Court has any lingering doubts about the J&J Companies' clear right to relief or believes that the right is clouded by Angelini's self-serving statements, the Court must hold an evidentiary hearing to resolve that perceived dispute. Where there are serious factual disputes as to issues central to the claims, a court must hold an evidentiary hearing to resolve hotly contested issues in a preliminary injunction proceeding. *All Care Nursing Service, Inc. v. Bethesda Memorial Hospital, Inc.*, 887 F.2d 1535, 1538 (11th Cir. 1989) (holding that the trial court abused its discretion in failing to hold an evidentiary hearing), *CBS Broadcasting, Inc. v. EchoStar Communications Corp.*, 265 F.3d 1193, 1207 (11th Cir. 2001) ("In the face of two plausible interpretations of evidence submitted to demonstrate a contested issue, the district court is not at liberty to accept one construction of the evidence and reject the other without the benefit of an evidentiary hearing.")  The appropriate procedure would be to enter a TRO to preserve the status quo – that Angelini has not started for Baxter – while the parties develop the record for presentation to the Court.  Because, as noted above, once Angelini starts with Baxter, the cat will be out of the bag, the damage will be done, and there will be no way for the J&J Companies to measure the harm of that result.

JANREM0112907

Respectfully submitted,

**MURPHY & ANDERSON, P.A.**

/s/ Niels P. Murphy
**NIELS P. MURPHY**
Florida Bar No.:  0065552
nmurphy@murphyandersonlaw.com
scassidy@murphyandersonlaw.com
**SARAH J. HULSBERG**
Florida Bar No. 0106027
shulsberg@murphyandersonlaw.com
pmarchman@murphyandersonlaw.com
1501 San Marco Boulevard
Jacksonville, Florida  32207
904-598-9282 (phone)
904-598-9283 (fax)
*Trial Counsel for Plaintiffs Ethicon, Inc.*
*and DePuy Orthopaedics, Inc.*

**BLANK ROME LLP**
/s/ Leigh Ann Buziak
Anthony B. Haller
haller@blankrome.com
Leigh Ann Buziak
buziak@blankrome.com
Daniel S. Morris
morris-d@blankrome.com
(*admitted pro hac vice*)
One Logan Square
Philadelphia, PA 19103
215-569-5500 (phone)
*Attorneys for Plaintiffs Ethicon, Inc. and*
*DePuy Orthopaedics, Inc.*

JANREM0112908

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that on September 16, 2016, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF, which will send an electronic notice of the filing to all counsel of record.

/s/ Niels P. Murphy
ATTORNEY

JANREM0112909

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ETHICON, INC., and
DEPUY ORTHOPAEDICS, INC.,

                Plaintiffs,                        Case No. 3:16CV1124-J-39PDB

      v.

LAURA ANGELINI,

                Defendant.

_____/

## DECLARATION OF THIAGO LICIAS DE OLIVEIRA

I, Thiago Licias de Oliveira, pursuant to 28 U.S.C. § 1746 declare:

1.      I am the head of Human Resources for the DePuy Synthes franchise, which is within the Medical Device segment of Johnson & Johnson ("J&J"). I make this declaration based on my personal knowledge.

2.      I assisted Ciro Römer, Company Group Chairman for DePuy Synthes, in recruiting and interviewing candidates for the position of Global Platform Leader-Joints. When Römer decided to hire Laura Angelini for this position, DePuy Synthes presented her with her offer package, which included the Employee Secrecy, Intellectual Property, Non-Solicitation and Non-Compete Agreement ("Non-Compete Agreement"), acceptance of which was a condition of the position.

3.      After she received the Non-Compete Agreement, Angelini told me that she did not need to sign it because she had signed other non-compete agreements in her tenure with Ethicon and/or Vision Care that detailed specific competitors she could not work for

during the restricted period. I was not sure what agreement Angelini was referring to. I explained to Angelini that the Non-Compete does not apply to specific competitors, but relates to the confidential information she has access to and if such access could be used against J&J companies if she went to a competitor. I reiterated that it was a condition of her employment as a Global Platform Leader to sign the Non-Compete Agreement. After that conversation, she signed and returned the Non-Compete Agreement.

4.     Laura Angelini's J&J Employee Planning Form is attached as Exhibit 1. This document, which is a document kept in the ordinary course of business to provide employees with information regarding their compensation as of the end of the year, reflects Angelini's performance history and ranges for salary, bonus, and long-term incentive compensation, and her salary history, bonus history, and long-term compensation awards since 2012 and 2013 and as of December 31, 2015.

5.     Angelini's compensation for 2015 was ▇▇▇▇ in base compensation, with a bonus of ▇▇▇▇, and a long-term compensation award of ▇▇▇▇.

6.     Angelini's compensation for 2014 was ▇▇▇▇ with a bonus of ▇▇▇▇ and a long-term compensation award of ▇▇▇▇.

7.     Angelini's compensation for 2013 was ▇▇▇▇ with a bonus of ▇▇▇▇ and a long-term compensation award of ▇▇▇▇.

8.     A summary of the value of Laura Angelini's long-term incentive as of September 14, 2016 at the J&J stock price of $119.75 – which is subject to change – is attached as Exhibit 2. This document reflects that Angelini currently (as of September 14, 2016 at $119.75/share) has ▇▇▇▇ in options that are outstanding and which she may

JANREM0112911

exercise within ninety (90) days of the date of her termination.  She also has vested ████████

in what are termed CLPs, an older long-term incentive plan no longer in place, and ████████

in CLCs, another plan that is no longer in place.

     9.     Angelini will therefore receive approximately ████████ as a result of these

long-term compensation awards and has the ability to exercise an additional approximately

████████ in stock options until 90 days from the date of her termination, subject to the

changing J&J stock price.

     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the forgoing

statements are true and correct to the best of my knowledge and belief.

Dated: September 15, 2016

THIAGO LICIAS DE OLIVEIRA

3

# EXHIBIT 1

JANREM0112913

# Johnson & Johnson Employee Planning Form

For Performance Year 2015



*Confidentiality Notice:*

JANREM0112914

# EXHIBIT 2

JANREM0112915

Confidential

# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### JACKSONVILLE DIVISION

ETHICON, INC., and
DEPUY ORTHOPAEDICS, INC.,

          Plaintiffs,                        Case No. 3:16CV1124-J-39PDB

    v.

LAURA ANGELINI,

          Defendant.

_____/

## DECLARATION OF CIRO RÖMER

I, Ciro Römer, pursuant to 28 U.S.C. § 1746 declare:

1.      I am the Company Group Chairman of the DePuy Synthes Franchise, which is within the Medical Device segment of Johnson & Johnson ("J&J"). In her role as Global Platform Leader for Joints, Laura Angelini reported directly to me. I make this declaration based on my personal knowledge.

2.      I interviewed Angelini for the position of Global Platform Leader Joints which, in my view, is one of the most important business units for the DePuy Synthes franchise. Because of the critical nature of this business and because of certain strategic developments for this business in the near term, I was looking for someone for this position that was committed to the role and someone that was interested in performing in this role for longer than a year or two.

3.      For that reason, I specifically asked Angelini during the interview process if she was committed to J&J and would be committed to this position for at least two to three

JANREM0112917

years. She told me unequivocally that she was committed to J&J and would stay in this role for at least two to three years.

4.      On that basis, I hired her for the position of Global Platform Leader for Joints.

5.      Just over two months ago, on July 15, 2016, we organized a meeting with me, Angelini, Aaron Villaruz (Platform Leader, Hips) and four of our key surgeon opinion leaders and customers that consult with us on the development of products in the joint reconstruction area.

6.      These surgeon customers had previously expressed concerns with continuing to work with J&J because of leadership and integration changes. This meeting was an opportunity to discuss our innovation agenda and let them get to know Angelini as the new leader for this business and assuage their concerns about changing leadership.

7.      Angelini told these surgeons in sum and substance that they could trust her, that she was committed to leading the organization, and that she was not going anywhere.

8.      Based on the timing of her resignation on August 10, 2016, I have to assume that she was already in deep negotiations with Baxter for the position of President of its biosurgery business at the time of this meeting only a few weeks earlier.

9.      The fact that Angelini resigned shortly after this meeting and after making those representations to these surgeons has caused credibility and reputational damage to J&J and specifically with these surgeons.

10.     On August 10, 2016, after a dinner at an offsite meeting where I honored Angelini for her twenty five years of service with J&J, Angelini asked me and Thiago

2



JANREM0112918

Oliveira, head of Human Resources for the DePuy Synthes franchise, if we could speak for five minutes outside.

11.     Angelini told us that she was leaving J&J. This was a complete surprise. She told us that she was going to work for Baxter in its biosurgery unit and that she did not believe that it would be a problem under her non-compete. I told her in response that her resignation needed to be formalized and that she could stay at the offsite meeting but that we would make sure that she was not exposed to any further critical information.

12.     I informed Gary Pruden, the Worldwide Chairman of the Medical Device segment, and Susan Podlogar, Global Head of Human Resources for Medical Device of Angelini's resignation.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the forgoing statements are true and correct to the best of my knowledge and belief.

Dated: 9/16/2016

CIRO ROMER

3

JANREM0112919

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

ETHICON, INC., and
DEPUY ORTHOPAEDICS, INC.,

        Plaintiffs,                         Case No. 3:16CV1124-J-39PDB

    v.

LAURA ANGELINI,

        Defendant.

_____/

## SECOND DECLARATION OF DAN WILDMAN

    I, Dan Wildman, pursuant to 28 U.S.C. § 1746 declare:

    1.    I am currently the Platform Leader for the DePuy Synthes Spine business, which, along with many other businesses including Ethicon, is a part of J&J's Medical Device segment. Prior to this position, I was the head of Global Franchise Strategy and Growth for Ethicon from June 2014 until September 2015. Before that, from January 2003 through June 2014, I was the Worldwide President of Ethicon's Biosurgery business. In that role, I had responsibility for strategy, portfolio development, product development, and global brand management for Ethicon's Biosurgery products. I make this declaration based upon my personal knowledge.

    2.    I have reviewed the publicly-filed version of Laura Angelini's Memorandum of Law in Opposition to the J&J Companies' Amended Motion for Temporary Restraining Order and Preliminary Injunction and her Declaration.

JANREM0112920

3.      The pre-read for the Strategic Innovation & Planning Workshop which is marked as Joint Exhibit 2 contains the strategic plan for this business unit for the next seven years.

4.      It shows that the Biosurgery business at J&J will focus on: ██ ████████████

████████████████████████████████████████████

████████████

5.      The pre-read further lays out exactly and precisely how the Biosurgery business is going to carry out those strategic goals, including ████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████

6.      With respect to SURGICEL in particular, this strategy would have significance to Baxter because ██████████████████████████████████

████████████████████

7.      The Biosurgery business is further going to increase ████████████████

██████ ██████████████████████████████████████

████████████████████████████████████████████

██████████████████

8.      Importantly, the plan calls for ██████████████████████████

████████████████████████████████████████████

██████████████████

2

JANREM0112921

9.     To that end, one of the key points in the pre-read and in discussion at the Workshop related to ███████████████████████████████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████████████

██████████████████████████████████████████████████

█████████████████████

10.     Another key product that was discussed in the pre-read and in the meeting is

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████

11.     The pre-read further shows the SWOT analysis, showing the Strengths, Weaknesses, Opportunities and Threats to the Biosurgery business.  Two of the key strengths of this business ██████████████████████████████████████████

██████████████████████████████████████████████████████████

█████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████████████████████

3

JANREM0112922

████████████████████████████████████████████████████████

████████████████████████

12.     If Baxter had that information — they would be able to replicate these

programs for its own business and unfairly compete in the marketplace.

13.     The Biosurgery business's focus on ████████████████████████

████████████████████████████████████████████████████████

████████████████████████

14.     The pre-read also shows ████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████.

15.     The existence of SURGICEL Powder has been disclosed as one of the

products that Ethicon is focused on in the pipeline.

16.     What has not been publicly disclosed but what was disclosed in the Factbook

and Top Projects Scorecard that Angelini received in July and August 2016 was that ██

████████████████████████████████████████████████████████

████████████████

17.     The fact that the market knows that this was a priority project for J&J ████

████████████████████████████████████████████████

████

4

18.     I received a call from an executive recruiter regarding the position of Worldwide President of Baxter's Biosurgery business that Angelini intends to take.  I declined to pursue this opportunity further because I knew that I would not be able to do the job without disclosing Ethicon's highly confidential and strategic information.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the forgoing statements are true and correct to the best of my knowledge and belief.

Dated: September 16, 2016

DAN WILDMAN

5

JANREM0112924