# EXHIBIT 31



C. OCT 22 AM 10: 56

RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue          FILED & RECEIVED
Morristown, NJ 07962-1981
(973) 538-0800

Attorneys for Plaintiffs
Johnson & Johnson, DePuy, Inc.
and DePuy Spine, Inc.

| | |
|---|---|
| JOHNSON & JOHNSON, DEPUY, INC. and DEPUY SPINE, INC., | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION MIDDLESEX COUNTY DOCKET NO. |
| Plaintiffs, | |
| vs. | CIVIL ACTION |
| BIOMET, INC., EBI, LP, EBI, HOLDINGS, INC. and STEVEN F. McALLISTER, | VERIFIED COMPLAINT |
| Defendants. | |

Plaintiffs Johnson & Johnson ("J&J"), a corporation organized under the laws of the State of New Jersey, having its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933, DePuy, Inc. ("DePuy"), a corporation organized under the laws of the State of Delaware, having its principal place of business at 700 Orthopaedic Drive, Warsaw, Indiana 46581, and DePuy Spine, Inc. ("DePuy Spine"), a corporation organized under the laws of the State of Ohio, having its principal place of business at 325 Paramount Drive, Raynham, Massachusetts 02767, by way of Verified Complaint against defendants, say:

JANREM0113287

## The Parties

1.    Plaintiff J&J is the parent company of subsidiaries engaged in the business of developing, manufacturing and marketing a wide variety of health care products, and providing related services, for the consumer, pharmaceutical and professional markets. J&J's subsidiaries and operating companies market their products to customers located throughout the United States and the world.

2.    Plaintiff DePuy, Inc. ("DePuy"), one of the world's leading medical device companies, is a subsidiary of J&J. DePuy has several subsidiaries within the DePuy family of companies. DePuy and its subsidiaries are referred to as the "DePuy Franchise". Plaintiff DePuy Spine and DePuy Orthopaedics, Inc. ("DePuy Orthopaedics") are subsidiaries of the DePuy Franchise.

3.    Defendant Biomet, Inc. ("Biomet"), which is a corporation organized under the laws of the State of Indiana, has its principal place of business at 56 East Bell Drive, Warsaw, Indiana, 46582. Biomet is a direct competitor of plaintiffs in developing, manufacturing and marketing spine and orthopedic products as well as other medical devices.

4.    Defendant EBI, LP dba Biomet Spine and Biomet Trauma, which is a corporation organized under the laws of the State of Indiana, has its principal place of business at 100 Interpace Parkway, Parsippany, New Jersey, 07054. Defendant EBI Holdings, Inc. is organized under the laws of the State of Delaware and has its principal place of business at 100 Interpace Parkway, Parsippany, New Jersey, 07054. Defendants EBI, LP and EBI Holdings, Inc. will be collectively refereed to as "Biomet Spine & Trauma". Biomet Spine and Trauma is a direct competitor of DePuy Spine and DePuy Orthopaedics.

2

JANREM0113288

5.     Defendant Steven F. McAllister ("McAllister") was the Director of Finance of Operations for the DePuy Franchise.   In September 2007, McAllister tendered his resignation from the DePuy Franchise.  Upon information and belief, McAllister has already started working for Biomet Spine and Trauma as its Vice President of Finance and Administration.

### The DePuy Family of Companies

6.     DePuy, founded in 1895, is the oldest manufacturer of medical devices in the United States.   The DePuy Franchise is comprised of the following operating companies: (1) DePuy Orthopaedics; (2) DePuy Spine; (3) DePuy Mitek (sports medicine); and (4) Codman (neurology).

7.     Plaintiff DePuy Spine develops, manufactures and markets implants and technologies for the treatment of cervical, thoracic, lumbar and spinal pathologies, including spinal deformities and injuries.  DePuy Spine is an innovator in the research and development of such products and instruments.

8.     DePuy Orthopaedics designs, develops, manufactures and markets products and instruments for, among other things, total hip and trauma and extremity implants and total knee replacements.

9.     DePuy Mitek designs, develops, manufactures and markets medical devices for surgery, with a focus on sports medicine and reconstruction.

10.     Codman designs, develops, manufactures and markets products for the treatment of central nervous system disorders with a focus on pain management, pediatric and adult hydrocephalus, and neuro critical care.

JANREM0113289

## Plaintiffs and Some of Their Confidential Information and Trade Secrets

11.    The market for spine, orthopedic and other medical device products offered by DePuy Spine and DePuy Orthopaedics and their affiliated companies has become more and more competitive in recent years and plaintiffs have been developing innovative responses to better position their products in these markets. The medical device industry is a multi-billion dollar, world-wide market.

12.    The DePuy Franchise has expended large amounts of time, resources and money to provide it with a competitive edge in the manufacturing and marketing of its spine and orthopedic products and other medical devices. In particular, the DePuy Franchise has developed proprietary manufacturing techniques and marketing information.

13.    The DePuy Franchise has also developed proprietary information relating to financial strategies and global sourcing that provide it with a competitive edge.

14.    The DePuy Franchise has manufacturing operations throughout the world, including in: Warsaw, Indiana; Raynham, Massachusetts; Leeds, England; Ireland; France; Switzerland; and China.

15.    Information relating to the cost of acquisition of these facilities, equipment in the facilities, technology employed in the facilities, costs of operations, profit margins per product and per facility and marketing information are kept confidential.

16.    In addition, plans concerning the acquisition or development of additional manufacturing facilities, the closing of existing facilities or changes to the existing facilities, and new product developments are kept confidential.

17.    Since the DePuy Franchise must anticipate the future manufacturing and marketing needs of the company, those involved in managing the financial aspects of the

JANREM0113290

manufacturing facilities and marketing activities are provided with confidential information that has not been disclosed to the public concerning new products and research and development initiatives. Knowledge of the product pipeline and research and development initiatives are valuable trade secrets and/or confidential and proprietary information of plaintiffs.

### McAllister's Employment With DePuy

18.     McAllister began his employment with plaintiffs in October 1999. In February 2002, McAllister was promoted to Director of Finance of DePuy Spine. In September 2004, McAllister became Director of Finance for Operations of the DePuy Franchise, where he had financial duties and responsibilities for the world wide Operations of the Franchise.[1]

19.     As a condition of his employment and because of his access to confidential, proprietary and trade secret information, McAllister was required to sign an Employee Secrecy, Non-Competition and Non-Solicitation Agreement ("Agreement"). A true and correct copy of the Agreement signed by McAllister is attached hereto as Exhibit A.

20.     The Agreement provides in pertinent part:

CONFIDENTIAL INFORMATION means information disclosed to me or known by me as a result of my employment by the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, about products, processes, machines, customers, clients, employees and services of the COMPANY, including but not limited to, inventions, research, development, manufacturing, purchasing, finance, data processing, engineering, marketing, merchandising, selling, sales volumes and strategies, number and location of sales representatives, names and significance of the COMPANY's customers and clients and their employees and representatives, preferences, needs and requirements, purchasing histories, and other customer or client-specific information, and comparable information about the products, processes, machines, customers, clients and services of affiliates of the COMPANY acquired by me during my employment by the COMPANY.

---

[1] The DePuy Franchise is a collection of DePuy operating companies. As a result, although McAllister was the Director of Finance for Operations of the DePuy Franchise, he was employed by DePuy Spine.

JANREM0113291

<u>CONFLICTING PRODUCT</u> means any product, process, machine, invention or service of any person or organization other than the COMPANY in existence or under development which resembles or competes with a product, process, machine, invention or service upon which I shall have worked or about which I become knowledgeable as a result of employment with the COMPANY and whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION which I shall have had access to during my employment.

<u>CONFLICTING ORGANIZATION</u> means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a CONFLICTING PRODUCT.

*　　　*　　　*

5.      I recognize that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a CONFLICTING ORGANIZATION, will cause immediate irreparable injury to the COMPANY. Unless I first secure the COMPANY's written consent. I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION.    I understand and agree that my obligations not to disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION shall continue after termination of my employment for any reason.

6.      During my employment with the company and for a period of eighteen (18) months after termination of my employment with the COMPANY for any reason, I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States, or in any foreign country or territory in which the services I may provide could enhance the use or marketability of a CONFLICTING PRODUCT by application of CONFIDENTIAL INFORMATION which I shall have had access to during my employment, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION, provided that the COMPANY, prior to my accepting such employment, shall receive separate written assurances satisfactory to the COMPANY from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly, for an 18-month period, in connection with any CONFLICTING PRODUCT.

JANREM0113292

7.     I recognize that the COMPANY's relations with its accounts, customers and clients represents an important business asset that results from the COMPANY's significant investment of its time and resources.   I further recognize that by virtue of my employment by the COMPANY, I have gained or may gain relationships with the accounts, customers and clients of the COMPANY, and because of such relationships, I could cause the COMPANY great loss, damage, and immediate irreparable harm, if, during my employment by the COMPANY or subsequent to the termination of such employment for any reason,   I should for myself or on behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a product or service that could compete with a product of service being sold or developed by the COMPANY.   I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not solicit any business from, sell to, or render any service to, or, directly or indirectly, help others to solicit business from or render service or sell to, any of the accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY, for any purpose related to the sale of any such product or service. I also agree that for a period of twelve (12) months after termination of employment with the COMPANY for any reason, I will not solicit or hire on my own behalf, or on behalf of others, any COMPANY employee.

21.     As Director of Finance for Operations of the DePuy Franchise, McAllister reported directly to the CFO of the DePuy Franchise and indirectly to the Worldwide Vice President of Operations for the DePuy Franchise.

22.     Individuals directly and indirectly reporting to McAllister included Financial Managers for the DePuy Franchise's companies located throughout the world, including those located in: Warsaw, Indiana; Raynham, Massachusetts; Cork, Ireland; Leeds, England; Switzerland; and China.

23.     Because his job responsibilities included responsibilities for Operations for the entire DePuy Franchise, McAllister was called upon to evaluate and review confidential, proprietary and trade secret information (collectively "Confidential Information") relating to Operations for all four of the DePuy Franchise's companies, including DePuy Spine and DePuy

JANREM0113293

Orthopaedics.   As such, McAllister received Confidential Information detailing the DePuy Franchise's strategies and new product pipeline plans in all four companies.

24.     Through his responsibilities as Director of Finance for Operations of the DePuy Franchise, McAllister had access to and acquired intimate knowledge of plaintiffs' Confidential Information concerning its current and future products for DePuy Spine, DePuy Orthopaedics and the other companies that comprise the DePuy Franchise.   For example, McAllister learned of and became knowledgeable about the following Confidential Information:

- strategic priorities and objectives for the short-term (2 years), mid-term (5 years) and long-term (7+ years);
- new product pipeline plans;
- acquisitions and divestitures of manufacturing assets;
- cost information, such as cost structure and profit margins per product and cost of operations per facility;
- tax strategies;
- distribution strategies;
- inventory strategies;
- production and inventory levels per facility;
- revenue projections for various markets;
- employees within the DePuy Franchise Finance Department, their strengths and compensation structures;
- agreements with and information about (current and potential) external business partners, suppliers and distributors;
- licensing and royalty agreements;
- marketing and sales plans;
- the regulatory progress of products; and
- product components.

25.     While he was the Director of Finance for Operations of the DePuy Franchise, McAllister attended monthly meetings with the Franchise's Finance Department to discuss goals and objections, status on financial projects, financial system strategy, employee development and succession planning.

26.     McAllister also attended meetings held by Operations, which were usually held bi-monthly, where strategic goals, among other things, were discussed.

JANREM0113294

27.     From December 2006 to March 2007, the DePuy Franchise developed a seven year strategic plan (the "Seven Year Strategic Plan"). McAllister, as the Director of Finance for Operations of the DePuy Franchise, helped prepare and had access to the Operations Strategy section of the Seven Year Plan. The Operations Strategy involves the inventory, distribution and global foot print strategies.   To develop the Operations Strategy, McAllister had to be well versed in the above identified Confidential Information.

28.     In developing the Seven Year Strategic Plan, the DePuy Franchise reviewed the market share of the DePuy Franchise companies, including DePuy Spine and DePuy Orthopaedics as compared to the market share of competitors. The DePuy Franchise then sought to develop strategies to improve the Franchise's market share for its major product lines of each of the DePuy Franchise companies.

29.     As a result, the Seven Year Strategic Plan identifies the sources of anticipated growth for DePuy Spine, DePuy Orthopaedics and their affiliated companies in the short, mid and long (through 2014) term with regard to product lines, including (1) existing products, (2) new products, (3) line extensions, or improved versions of existing products or (4) acquisitions of companies or products.   The Seven Year Strategic Plan projects DePuy Spine's and DePuy Orthopaedics' profit and loss statements through 2014.   McAllister obtained knowledge of this Confidential Information.

30.     In sum, through his work as the Director of Finance for Operations of the DePuy Franchise and in connection with his work on the Operations Strategy, McAllister was provided with direct access to and obtained detailed knowledge of plaintiffs' most secret Confidential Information concerning DePuy Spine, DePuy Orthopaedics and the other DePuy Franchise companies, including its global footprint strategies. For example, McAllister knows the product

JANREM0113295

lines that DePuy Spine and DePuy Orthopaedics intend to enter or exit, when they intend to do so and where they plan to open, close or shift manufacturing operations.

31.    In addition, as part of his duties as Director of Finance for Operations, McAllister, on a yearly basis, was involved in developing and obtained knowledge of the yearly business plan for DePuy Spine, DePuy Orthopaedics and the other DePuy Franchise companies.  For example, McAllister was involved in developing the operations portion of the 2008 Business Plan.  He even attended a meeting concerning that plan as late as September 2007.  To develop such plans on a yearly basis, McAllister had to be well versed in the above identified Confidential Information.

32.    In fulfilling his responsibilities, McAllister also participated in the DePuy Franchise's financial updates with members of the DePuy Global Management Board (the "GMB").  The GMB is led by the DePuy Franchise's Company Group Chairman.  The GMB is comprised of senior representatives from the entire DePuy Franchise, (1) DePuy Orthopaedics, (2) DePuy Spine, (3) DePuy Mitek (sports medicine) and (4) Codman (neurology), as well as senior functional leaders from across the DePuy Franchise, including operations, quality, finance, human resources, information technology, health care compliance and legal.  The GMB is intimately and extensively involved in strategic planning and tactical execution for the DePuy Franchise.

33.    McAllister also had access to and gained knowledge of DePuy Spine's and DePuy Orthopaedics' distribution strategy and the territory breakdown of their sales force.

10

JANREM0113296

## McAllister's Planned Employment by Biomet Spine and Trauma

34.   In September 2007, McAllister provided notice that he was resigning from the DePuy Franchise to take the position of Vice President of Finance and Administration of Biomet Spine and Trauma.

35.   As explained above, Biomet Spine and Trauma competes directly with DePuy Spine and DePuy Orthopaedics.

36.   McAllister has intimate knowledge of some of plaintiffs' most Confidential Information. If McAllister is to work for Biomet Spine and Trauma as a senior executive, it is inevitable that McAllister will disclose plaintiffs' Confidential Information.

37.   Plaintiffs and Biomet Spine and Trauma are direct competitors and if Biomet Spine and Trauma were to gain knowledge of even some of the Confidential Information concerning the products, strategies and plans intimately known to McAllister, plaintiffs would be immediately, irreparably and severely harmed.  By way of example only, upon information and belief, the distribution system for Biomet Spine and Trauma has been floundering for years. McAllister has intimate knowledge of DePuy Spine's and DePuy Orthopaedics' distribution strategies and contract terms and prices with distributors.

38.   Money damages would not adequately compensate plaintiffs for the losses and injuries they would suffer, leaving plaintiffs with no adequate remedy at law.  For example, if Biomet and/or Biomet Spine and Trauma knew of McAllister's knowledge about plaintiffs' plans in the areas of manufacturing techniques, research and development, product development, marketing plans or financial, pricing and cost information, it would give Biomet and Biomet Spine and Trauma a significant and unfair competitive advantage over plaintiffs.

JANREM0113297

39.     Plaintiffs informed Biomet and McAllister that McAllister's employment with Biomet would violate the Agreement. For weeks, the plaintiffs have attempted to amicably resolve these issues. Plaintiffs also requested assurances from Biomet that it would not allow McAllister to perform any services on behalf of Biomet until the parties resolved their disputes. To date, the parties have been unable to resolve their disputes and Biomet has refused to provide assurances and even informed plaintiffs that McAllister has already begun his employment as the Vice President of Finance and Administration for Biomet Spine and Trauma.

<u>Jurisdiction</u>

40.     On information and belief, Biomet has engaged and currently engages sales representatives to sell Biomet's products in New Jersey, and some of those Biomet sales representatives have lived or currently live in New Jersey.

41.     Biomet has purposefully, systematically and continuously directed contacts to and conducted business in New Jersey.

42.     Biomet is subject to the jurisdiction of this Court.

43.     Biomet Spine and Trauma is headquartered in Parsippany, New Jersey. Biomet Spine and Trauma is subject to the jurisdiction of this Court.

44.     In his capacity as the Director of Finance for Operations of the DePuy Franchise, McAllister regularly visited J&J's headquarters in New Jersey and directed telephone and written communications to J&J personnel in New Jersey on a regular basis.

45.     McAllister consented to personal jurisdiction in this Court pursuant to paragraph 16 of his Agreement.

46.     McAllister's new position with Biomet Spine and Trauma is located in New Jersey. Upon information and belief, McAllister is currently residing in New Jersey since he

JANREM0113298

already started his employment with Biomet Spine and Trauma. McAllister has purposefully, systematically and continuously directed contacts to and conducted business in New Jersey.

47.     McAllister is subject to the jurisdiction of this Court.

### First Count

48.     Plaintiffs repeat the allegations contained in the foregoing paragraphs and incorporate those allegations in this Count by reference.

49.     McAllister's intended and actual employment with Biomet Spine and Trauma will and do constitute a breach of the Agreement because McAllister would be employed by a Conflicting Organization, as defined in the Agreement, within 18 months after termination of his employment with plaintiffs. McAllister's intended employment with Biomet Spine and Trauma also will inevitably induce and require McAllister to breach his Agreement with plaintiffs because he would be joining an organization that is engaged in direct competition with plaintiffs and McAllister's employment with Biomet Spine and Trauma would make it inevitable that he would disclose Confidential Information that he learned while employed by plaintiffs.

50.     As a result of that breach, plaintiffs will suffer immediate, severe and irreparable harm to their business, and other damages and injuries.

### Second Count

51.     Plaintiffs repeat the allegations contained in the foregoing paragraphs and incorporate those allegations in this Count by reference.

52.     As an employee of plaintiffs, McAllister had a duty of loyalty that existed independent of his Agreement to refrain from disclosing Confidential Information that he learned while employed by plaintiffs.

JANREM0113299

53.     If McAllister is allowed to work for Biomet Spine and Trauma, a direct competitor of plaintiffs, it is inevitable that he will breach his duty by disclosing plaintiffs' Confidential Information.

54.     As a result of the inevitable breach of McAllister's duty, plaintiffs will suffer immediate, severe and irreparable harm to their business, and other damages and injuries.

### Third Count

55.     Plaintiffs repeat the allegations contained in the foregoing paragraphs and incorporate those allegations in this Count by reference.

56.     Biomet and Biomet Spine and Trauma are aware that McAllister has entered into an Agreement with plaintiffs.  Upon information and belief, Biomet and Biomet Spine and Trauma are also aware that McAllister possesses highly Confidential Information that belongs to plaintiffs.  Upon information and believe, Biomet and Biomet Spine and Trauma are aware that hiring McAllister would constitute a breach of the Agreement.

57.     Despite that knowledge, Biomet and Biomet Spine and Trauma have conspired with and tortiously induced McAllister to breach both his Agreement and his duties to plaintiffs.

58.     As a result of Biomet's and Biomet Spine and Trauma's actions, plaintiffs will suffer immediate, severe and irreparable harm to their business, and other damages and injuries.

### Fourth Count

59.     Plaintiffs repeat the allegations contained in the foregoing paragraphs and incorporate those allegations in this Count by reference.

60.     By hiring McAllister, Biomet, Biomet Spine and Trauma and McAllister have wrongfully contracted, combined, conspired and agreed to: (1) engage in unfair competition; (2) breach common law obligations; (3) tortiously interfere with the contractual relationships and

14

JANREM0113300

prospective economic advantage of plaintiffs; (4) wrongfully convert and misappropriate Confidential Information of plaintiffs; and (5) unjustly enrich themselves at the expense of plaintiffs.

61.    The acts of Biomet, Biomet Spine and Trauma and McAllister constitute wrongful and malicious conduct undertaken without legal justification and with the knowledge and intent that their actions will cause substantial damage and injury to plaintiffs.

62.    Unless Biomet, Biomet Spine and Trauma and McAllister are immediately enjoined and restrained, plaintiffs will suffer immediate and irreparable injury for which they have no adequate remedy at law or in money damages, and other damages and injuries.

WHEREFORE, plaintiffs demand judgment against defendants, jointly and severally:

A.    Temporarily, interlocutorily and permanently enjoining McAllister from holding any employment positions or engaging in any employment activities with Biomet Spine and Trauma that in any way relates to financial operations, or any other position that would place him in a position of using or disclosing plaintiffs' Confidential Information, for a period of 18 months from the date hereof;

B.    Temporarily, interlocutorily and permanently enjoining and restraining Biomet and Biomet Spine and Trauma and its officers, agents and employees from causing or permitting McAllister to hold any employment positions or engage in any employment activities with Biomet Spine and Trauma that in any way relates to financial operations, or any other position that would place him in a position of using or disclosing plaintiffs' Confidential Information, for a period of 18 months from the date hereof;

JANREM0113301

C.     Temporarily, interlocutorily and permanently enjoining and restraining McAllister from disclosing, using, disseminating, lecturing upon or publishing any of plaintiffs' Confidential Information as defined in McAllister's Agreement;

D.     Ordering defendants to turn over and return to plaintiffs all of plaintiffs' Confidential Information that defendants have removed, copied, taken, used, disseminated or reviewed, or otherwise have in their possession, custody or control;

E.     Temporarily, interlocutorily and permanently enjoining McAllister from soliciting or hiring on his behalf or on behalf of anyone else, including but not limited to Biomet and Biomet Spine and Trauma, any employee of plaintiffs for a period of 12 months from the date hereof;

F.     Temporarily, interlocutorily and permanently enjoining and restraining Biomet and Biomet Spine and Trauma from (1) causing or permitting McAllister to disclose or use and (2) receiving, using and disclosing, plaintiffs' Confidential Information as defined by McAllister's Agreement;

G.     Temporarily, interlocutorily and permanently enjoining and restraining McAllister from otherwise violating any of the terms of the Agreement or his common law obligations to plaintiffs;

H.     Temporarily, interlocutorily and permanently enjoining and restraining Biomet and Biomet Spine and Trauma from otherwise causing or permitting McAllister to violate any terms of his Agreement or his common law obligations to plaintiffs;

I.     Awarding compensatory damages to plaintiffs;

J.     Awarding punitive damage to plaintiffs;

16

JANREM0113302

K.   Awarding cost and attorneys' fees to plaintiffs;

L.   Awarding such other and further relief as the Court deems just and equitable.

RIKER, DANZIG, SCHERER, HYLAND
& PERRETTI LLP

Attorneys for Plaintiffs
Johnson & Johnson, DePuy, Inc.
and DePuy Spine, Inc.

By: _____
Glenn A. Clark

Dated: October 22, 2007

17

JANREM0113303

## RULE 4:5-1 CERTIFICATION

I certify that to the best of my present knowledge, the matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, and no such other action or arbitration proceeding is presently contemplated by plaintiffs. I am not presently aware of any non-parties who should be joined in this action pursuant to R. 4:28 or who is subject to joinder pursuant to R. 4:29-1(b) because of potential liability to any party on the basis of the same transactional facts.

Glenn A Clark / lvrk
_____
Glenn Clark

Dated:  October 22, 2007

JANREM0113304

## VERIFYING CERTIFICATION

I, Ryan B. Weaver, of full age, certify as follows:

1.  I am the Controller, Worldwide Franchise.

2.  I have read the Verified Complaint to which this Verifying Certification is attached and the factual allegations set forth therein are true based on my personal knowledge unless expressly stated to be based upon information and belief.

3.  I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

Ryan B. Weaver

Dated: October 22, 2007

19

JANREM0113305

## CERTIFICATION PURSUANT TO RULE 1:4-4(c)

I, Khaled J. Klele, of full age, certify as follows:

1.     I am an attorney-at-law in the State of New Jersey and a member of the law firm of Riker, Danzig, Scherer, Hyland & Perretti LLP, attorneys for plaintiffs in this matter.

2.     Attached hereto is the Verifying Certification of Ryan B. Weaver, with a facsimile of his original signature.  I certify that Mr. Weaver has acknowledged the genuineness of his signature and that the document or a copy with original signature affixed will be filed if requested by the Court or a party.

3.     I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_____
Khaled J. Klele

Dated: October 22, 2007

3792847

JANREM0113306

# Exhibit A

JANREM0113307

09-10-07  07:37  From-                                                    T-000  P.02/04  F-022



## EMPLOYEE SECRECY, NON-COMPETITION
## AND NON-SOLICITATION AGREEMENT

Name of Employee:   STEVEN F. McALLISTER
                    6635 SWEETWOOD CT
                    Address
                    FT WAYNE IN 46814
                    City/State/Zip

## DEFINITIONS

As used in this Agreement:

the COMPANY means DePuy AcroMed, and JOHNSON & JOHNSON and any of their successors or assigns, purchasers, acquirers, and any of their existing and future subsidiaries, divisions or affiliates, including any such subsidiary, division or affiliate of Johnson & Johnson to which I may be transferred or by which I may be employed in the future. Affiliates of the COMPANY are any corporation, entity or organization at least 50% owned by the COMPANY, by Johnson & Johnson or by any subsidiary of Johnson & Johnson.

I means the employee whose name appears above, also referred to by the use of first person pronouns, such as me and my.

INVENTIONS means discoveries, improvements and/or ideas, whether patentable or not.

CONFIDENTIAL INFORMATION means information disclosed to me or known by me as a result of my employment by the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, about projects, processes, machines, customers, clients, employees and services of the COMPANY, including, but not limited to, inventions, research, development, manufacturing, purchasing, finance, data processing, engineering, marketing, merchandising, selling, sales volumes and strategies, number and location of sales representatives, names and significance of the COMPANY's customers and clients and their employees and representatives, preferences, needs and requirements, purchasing histories, and other customer or client-specific information, and comparable information about the products, processes, machines, customers, clients and services of affiliates of the COMPANY acquired by me during my employment by the COMPANY.

CONFLICTING PRODUCT means any product, process, machine, invention or service of any person or organization other than the COMPANY in existence or under development which resembles or competes with a product, process, machine, invention or service upon which I shall have worked or about which I become knowledgeable as a result of employment with the COMPANY and whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION which I shall have had access to during my employment.

CONFLICTING ORGANIZATION means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a CONFLICTING PRODUCT.

I recognize that the business in which the COMPANY is engaged is extremely competitive and that the COMPANY will be providing me with CONFIDENTIAL INFORMATION both at the commencement of my employment and thereafter and may also be providing me with the opportunity to contribute to the creation of CONFIDENTIAL INFORMATION, which will assist both the COMPANY and me in competing effectively. I recognize that CONFIDENTIAL INFORMATION is significant to the COMPANY'S competitive position and that the COMPANY therefore expects me to keep it secret and also expects me not to compete with the COMPANY during my employment and for a period of time thereafter.

Accordingly, in consideration of the receipt of CONFIDENTIAL INFORMATION, my employment or the continuation of my employment by the COMPANY, and the benefits being provided to me pursuant to paragraph 9:

1.  I agree to disclose promptly to the COMPANY all INVENTIONS conceived or made by me whether or not during my hours of employment or with the use of the COMPANY's facilities, materials or personnel, either solely or jointly with another or others during my employment with the COMPANY, and related to the actual or anticipated business or activities of the COMPANY, or related to its actual or anticipated research and development or suggested by or resulting from any task assigned to me or work performed by me for, or on behalf of, the COMPANY. I assign and agree to assign my entire right, title and interest therein to the COMPANY. I will not assert any rights under or to any INVENTIONS as having been made or acquired by me prior to my being employed by the COMPANY unless such INVENTIONS are identified on a sheet attached hereto and signed by me and the COMPANY as of the date of this Agreement.

JANREM0113308

I recognize that all works, including, but not limited to reports, computer programs, drawings, documentation and publications, when I prepare within the scope of my employment with the COMPANY, shall be works made for hire and that the worldwide copyrights therein shall be the sole and exclusive property of the COMPANY, I will promptly and fully disclose all such works to the COMPANY.

3.   I shall, whenever requested to do so by the COMPANY, execute any applications, assignments or other instruments which the COMPANY shall consider necessary to apply for and obtain Letters Patent, trademark and/or copyright registrations in the United States, or any foreign country, or to protect otherwise the COMPANY's interests.  These obligations shall continue beyond the termination of my employment with the COMPANY with respect to INVENTIONS, trademarks or copyrightable works conceived, authored or made by me during my period of employment, and shall be binding upon my executors, administrators, or other legal representatives.

4.   I shall not disclose to the COMPANY or induce the COMPANY to use any secret, proprietary or confidential information or material belonging to others, including my former employers, if any.  I am aware of no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would in any way restrict, limit or prohibit my employment by the COMPANY that I have not disclosed and provided to the COMPANY.

5.   I recognize that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a CONFLICTING ORGANIZATION, will cause immediate irreparable injury to the COMPANY. Unless I first secure the COMPANY's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION.  I understand and agree that my obligations not to disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION shall continue after termination of my employment for any reason.

6.   During my employment with the company and for a period of eighteen (18) months after termination of my employment with the COMPANY for any reason, I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States, or in any foreign country or territory in which the services I may provide could enhance the use or marketability of a CONFLICTING PRODUCT by application of CONFIDENTIAL INFORMATION which I shall have had access to during my employment, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION, provided that the COMPANY, prior to my accepting such employment, shall receive separate written assurances satisfactory to the COMPANY from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly, for an 18-month period, in connection with any CONFLICTING PRODUCT.

7.   I recognize that the COMPANY's relations with its accounts, customers and clients represents an important business asset that results from the COMPANY's significant investment of its time and resources.  I further recognize that by virtue of my employment by the COMPANY, I have gained or may gain relationships with the accounts, customers and clients of the COMPANY, and because of such relationships, I could cause the COMPANY great loss, damage, and immediate irreparable harm, if, during my employment by the COMPANY or subsequent to the termination of such employment for any reason, I should for myself or on behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a product or service that could compete with a product or service being sold or developed by the COMPANY.  I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not solicit any business from, sell to, or render any service to, or, directly or indirectly, help others to solicit business from or render service or sell to, any of the accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY, for any purpose related to the sale of any such product or service.  I also agree that for a period of twelve (12) months after termination of employment with the COMPANY for any reason, I will not solicit or hire on my own behalf, or on behalf of others, any COMPANY employee.

8.   To enable the COMPANY to monitor my compliance with the obligations imposed by this Agreement, I agree to inform the COMPANY, at the time I give notice of my termination of employment, of the identity of my new employer and of my job title and responsibilities, and will continue to so inform the COMPANY, in writing, any time I change employment during the eighteen (18) months following termination of my employment by the COMPANY for any reason.

9.   If I am unable to obtain employment consistent with my training and education solely because of a prohibition of paragraph 6 or 7 of this Agreement, or if I am able to obtain only a position in which my gross monthly income is less than what I last received from the Company as regular monthly base pay (exclusive of extra compensation and employee benefits), then any prohibition of those paragraphs that caused me to be unable to obtain such employment (or that is responsible for the above-referenced differential in pay) shall bind me only as long as the Company shall make payment to me equal to the lesser of (a) the amount last received from the Company as regular monthly base pay, or (b) the difference between the amount I last received from the Company as regular monthly base pay and the gross monthly income that I am receiving in any subsequent employment.

10.  In order to qualify for the payments provided for in paragraph 9 above, I understand that I must, for each month that I claim payment is due, represent to the Vice President of Human Resources of the Company, in writing within fifteen (15) days following the end of that calendar month, that although I diligently sought employment consistent with my training and education, I was unable to obtain it, or was unable to attain a position in which my gross monthly income equaled my last regular monthly base pay at the Company, as the case may be, solely because of a prohibition of paragraph 6 or 7 of this Agreement.  I must also promptly submit such further

- 2 -

Revised 12/19/01

JANREM0113309

09-10-07   07:38   From-                                          T-000   P.04/04   F-922

information as the Company may request to enable it to verify the accuracy of my representation. I understand that the Company shall, at its option, be relieved of making a monthly payment to me for any month with respect to which I have failed to comply with a requirement of this paragraph 10.

11. I further understand that if, at any time within the period of prohibition specified in paragraph 6 or 7, the Company gives me a written release from the prohibition of paragraph 6 or 7 that has been the sole cause of my inability to obtain employment consistent with my training and education or my inability to obtain a position in which my gross monthly income equals my last regular monthly base pay at the Company, as the case may be, then, the Company will no longer be obligated to make the payments that had been required due to those prohibitions.

12. Upon termination of my employment with the COMPANY, either prior to or upon my retirement, I shall turn over to a designated individual employed by the COMPANY, all property then in my possession or custody and belonging to the COMPANY, including any computer equipment. I shall not retain any copies of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents, including electronic information and property, relating in any way to the affairs of the COMPANY and which were entrusted to me or obtained by me at any time during my employment with the COMPANY.

13. I understand and acknowledge that if I violate this Agreement or am about to violate this Agreement by accepting employment or providing services prohibited by paragraph 6 or 7 above, the COMPANY shall have the right, and be entitled to, in addition to any other remedies it may have, injunctive relief; in other words, I understand and acknowledge that the COMPANY can bar me from accepting such employment or rendering such services for the periods specified in paragraphs 6 and 7 above.

14. I hereby consent and agree to assignment by the COMPANY of this Agreement and all rights and obligations hereunder including, but not limited to, an assignment in connection with any merger, sale, transfer or acquisition by the COMPANY or relating to all or part of its assets, divisions and/or affiliates.

15. Nothing herein shall limit or reduce my common law duties to the COMPANY, including but not limited to my duty of loyalty.

16. This Agreement shall be interpreted according to the laws of the State of New Jersey without regard to the conflict of law rules thereof. I agree that any action relating to or arising out of this Agreement may be brought in the courts of the State of New Jersey or, if subject matter jurisdiction exists, in the United States District Court for the District of New Jersey. I consent to personal jurisdiction and venue in both such courts and to service of process by United States Mail or express courier service in any such action.

17. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.

18. The following applies only to a California, Minnesota or North Carolina employee: Notification is hereby given that paragraph 1 does not apply to an invention to the extent that no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely by me on my own time, and (a) which does not relate (i) to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by me for the COMPANY.

19. The following applies only to a State of Washington employee: Notification is hereby given that paragraph 1 does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely on my own time, unless (a) the invention relates (i) directly to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by me for the COMPANY.

20. Nothing contained in this Agreement shall be deemed to confer on me any rights with respect to the duration of my employment with the COMPANY. I UNDERSTAND AND AGREE THAT MY EMPLOYMENT RELATIONSHIP WITH THE COMPANY IS TERMINABLE AT WILL BY EITHER THE COMPANY OR ME, WITH OR WITHOUT CAUSE, EXCEPT THAT IF I INITIATE THE TERMINATION, THERE SHALL BE, AT THE COMPANY'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER I GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. If the Company elects to continue my employment during the notice period, it shall advise me of that fact, and of the duration of the notice period. During any notice period, I will provide such transitional services as the Company may request. The Company will be obligated to pay me my full base salary during the notice period, and my duty of loyalty to the Company shall continue through such period.

I ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, and agree that with respect to the subject matter hereof it is my entire agreement with the COMPANY, superseding any previous oral or written communications, representations, understandings, or agreements with the COMPANY or any of its officials or representatives.

DATE: _1/2/02_____   EMPLOYEE SIGNATURE _Steven F. McMillan_____

- 3 -

Revised 12/19/01

JANREM0113310