# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JANSSEN BIOTECH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:17-cv-11008-MLW |
| | ) | |
| v. | ) | |
| | ) | LEAVE TO FILE UP TO 30 PAGES |
| CELLTRION HEALTHCARE CO., LTD., | ) | GRANTED ON JULY 10, 2017 |
| CELLTRION, INC., and | ) | |
| HOSPIRA, INC., | ) | **REDACTED VERSION** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

# JANSSEN'S OPPOSITION TO
# DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING

## <u>TABLE OF CONTENTS</u>

**Page**

I.     INTRODUCTION .................................................................................................1

II.    BY THEIR TERMS, THE AGREEMENTS ASSIGN PATENTS TO THE
       EMPLOYER, HERE CENTOCOR/JANSSEN.................................................2

     A.     "Any" of J&J's Subsidiaries and Affiliates Does Not Mean "All" J&J
              Companies Collectively ...............................................................................4

     B.     The Term "COMPANY" Means Any J&J Company to Which the
              Provisions of the Contract Apply.................................................................6

     C.     The Patent Assignment Provision Applies to the Employer of the
              Inventors, Here Centocor ............................................................................8

III.   THE EXTRINSIC EVIDENCE RELIED ON BY BOTH PARTIES SUPPORTS
       JANSSEN'S READING OF THE AGREEMENTS .........................................9

     A.     J&J Has Always Understood Its Employee Agreements to Assign Patents
              to the Employer Alone ...............................................................................10

     B.     Neither Janssen Nor J&J Has Ever Interpreted "COMPANY" to Mean All
              J&J Companies Collectively........................................................................12

     C.     The Extrinsic Evidence Concerning the Employee Agreements at Issue
              Here Confirms That Janssen Owns the '083 Patent.................................15

          1.     The invention disclosures ......................................................16

          2.     The face of the patent..............................................................17

          3.     The subsequent assignments...................................................17

     D.     Janssen's Longstanding Patent Practices Demonstrate That Employee
              Inventions Are Assigned to Janssen .......................................................19

     E.     Reading the Agreements to Apply to All J&J Companies Collectively
              Would Be Absurd and Unreasonable........................................................20

IV.    J&J'S DISCLAIMER OF OWNERSHIP DEFEATS DEFENDANTS'
       STANDING CHALLENGE ............................................................................22

     A.     The J&J Disclaimer Eliminates the Need to Add the Purported Co-Owners
              As Co-Parties .............................................................................................22

B.      Defendants Cite No Authority Holding That a Disclaimer of Ownership
Cannot Cure a Purported Defect of Prudential Standing ........................................26

C.      The J&J Disclaimer Binds J&J's Current and Former Subsidiaries and
Affiliates. ....................................................................................................................28

V.     CONCLUSION...............................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accurate Abstracts, LLC v. Havas Edge, LLC*,
2015 U.S. Dist. LEXIS 139441 (D. N.J. Oct. 14, 2015)...........................................................20

*Acoustic Techs., Inc. v. Itron, Inc.*,
2010 U.S. Dist. LEXIS 142166 (D. Mass. Dec. 21, 2010)......................................................27

*Advanced Tech. Incubator, Inc. v. Sharp Corp.*,
2009 U.S. Dist. LEXIS 69556 (E.D. Tex. July 6, 2009).........................................................26

*Agilent Techs., Inc. v. Micromuse, Inc.*,
2004 U.S. Dist. LEXIS 20723 (S.D.N.Y. Oct. 19, 2004) .......................................................26

*Atlantic N. Airlines, Inc. v. Schwimmer*,
12 N.J. 293 (1953) ...................................................................................................................9

*Bellehumeur v. Bonnett*,
127 F. App'x 480 (Fed. Cir. 2005) ........................................................................................27

*Booth v. U.S. Fid. & Guar. Co.*,
130 A. 131 (N.J. 1925)............................................................................................................20

*Bushnell, Inc. v. Brunton Co.*,
659 F. Supp. 2d 1150 (D. Kan. 2009).....................................................................................28

*City of Gloucester City v. Beazer Homes Corp.*,
2014 N.J. Super. Unpub..........................................................................................................20

*Conway v. 287 Corporate Ctr. Assocs.*,
901 A.2d 341 (N.J. 2006).........................................................................................................9

*Cromartie v. Carteret Sav. & Loan*,
649 A.2d 76 (N.J. App. Div. 1994).........................................................................................18

*Hardy ex rel. Dowdell v. Abdul-Matin*,
965 A.2d 1165 (N.J. 2009)........................................................................................................3

*Enovsys LLC v. Nextel Commc'ns., Inc.*,
614 F.3d 1333 (Fed. Cir. 2010)...............................................................................................25

*First Bank & Trust v. Firstar Info. Servs. Corp.*,
276 F.3d 317 (7th Cir. 2001) ...............................................................................................4, 5

iii

*Frank Stamato & Co. v. Lodi,*
  71 A.2d 336 (N.J. 1950)..................................................................................20

*Geier v. Mozido, LLC,*
  2016 De. Ch. LEXIS 149 (Sept. 29, 2016) ..............................................29

*Grunley Walsh US, LLC v. Raap,*
  2009 U.S. Dist. LEXIS 38609 (E.D. Va. May 6, 2009), *aff'd*, 386 F. App'x
  455 (4th Cir. 2010)........................................................................................29

*Hoffman-La Roche, Inc. v. Teva Pharm. USA,*
  2011 U.S. Dist. LEXIS 139239 (D.N.J. Dec. 2, 2011) ..........................17

*Invitrogen Corp. v. Emp'rs. Ins. Co.,*
  2007 U.S. Dist. LEXIS 19301 (D. Ariz. Mar. 9, 2007) ........................29

*IpVenture, Inc. v. Prostar Computer, Inc.,*
  503 F.3d 1324 (Fed. Cir. 2007).............................................................23, 24

*Kahanovitz v. Electro-Biology, Inc.,*
  2011 WL 242031 (N.J. Super. Ct. App. Div. Jan. 27, 2011).................19

*Katrinecz v. Motorola Mobility LLC,*
  2014 U.S. Dist. LEXIS 190707 (W.D. Tex. Nov. 7, 2014)....................25

*Kolbe v. BAC Home Loans Servicing, LP,*
  738 F.3d 432 (1st Cir. 2013)........................................................................15

*MacFadden v. MacFadden,*
  49 N.J. Super. 356, 139 A.2d 774 (App. Div. 1958) .............................18

*Max Sound Corp. v. Google, Inc.,*
  147 F. Supp. 3d 948 (N.D. Cal. 2015) ......................................................29

*McClaskey v. Harbison-Walker Refractories Co.,*
  138 F.2d 493 (3d Cir. 1943)........................................................................28

*MediaTek, Inc. v. Sanyo Elec. Co.,*
  2007 U.S. Dist. LEXIS 98625 (E.D. Tex. Apr. 16, 2007) ....................26

*Microstrategy, Inc. v. Acacia Research Corp.,*
  2010 Del. Ch. LEXIS 254 (Dec. 30, 2010)..............................................30

*Estate of Monroe v. Commissioner,*
  124 F.3d 699 (5th Cir. 1997) ......................................................................23

*N. Sec. Ins. Co. v. Mietc Elecs., Ltd.,*
  965 A.2d 447 (Vt. 2008) ..............................................................................29

iv

*Nixon v. Mo. Mun. League*,
   541 U.S. 125 (2004) ............................................................................................4

*Nomadix, Inc. v. Hewlett-Packard Co.*,
   2012 U.S. Dist. LEXIS 64101 (C.D. Cal. May 7, 2012) ......................................26

*Ortho Pharm. Corp. v. Genetics Inst., Inc.*,
   52 F.3d 1026 (Fed. Cir. 1995)............................................................................27

*Patriot Universal Holdings, LLC v. Formax, Inc.*,
   24 F. Supp. 3d 802 (E.D. Wis. 2014)..................................................................28

*Perry v. Passarella*,
   2013 N.J. Super. Unpub. ...................................................................................20

*Pi-Net Int'l, Inc. v. Focus Bus. Bank*,
   2015 U.S. Dist. LEXIS 44910 (N.D. Cal. Apr. 6. 2015) .....................................27

*Prima Tek II v. A-Roo Co.*,
   222 F.3d 1372 (Fed. Cir. 2000)..........................................................................27

*Quantum Corporation v. Riverbed Technology, Inc.*,
   2008 U.S. Dist. LEXIS 11348 (N.D. Cal. Feb. 4, 2008) .....................................29

*Quinn v. Quinn*,
   137 A.3d 423 (N.J. 2016)...................................................................................20

*Royal Indus. v. St. Regis Paper Co.*,
   420 F.2d 449 (9th Cir. 1969) .............................................................................29

*In re Scheyer's Estate*,
   59 N.W.2d 33 (Mich. 1953).................................................................................5

*Speedfit LLC v. Woodway USA, Inc.*,
   2016 U.S. Dist. LEXIS 179464 (E.D.N.Y. Dec. 28, 2016) ..................................28

*State v. Timmerman*,
   542 N.W.2d 221 (Wis. Ct. App. 1995) .................................................................4

*Stone v. Free Bridge Auto Sales, Inc.*,
   2006 U.S. App. LEXIS 14728 (4th Cir. June 15, 2006) ........................................5

*Tele-Guia Talking Yellow Pages v. Cablevision Sys. Corp.*,
   2007 U.S. Dist. LEXIS 80616 (S.D.N.Y. Oct. 31, 2007) .....................................26

*Thore v. Howe*,
   466 F.3d 173 (1st Cir. 2006)..............................................................................15

*Three D Dept., Inc. v. K Mart Corp.*,
   732 F. Supp. 901 (N.D. Ill. 1990) ............................................5

*United States v. Baxter Int'l, Inc.*,
   345 F.3d 866 (11th Cir. 2003) ...............................................6

*United States v. Genendo Pharm., N.V.*,
   485 F.3d 958 (7th Cir. 2007) .................................................5

*Univ. Patents, Inc. v. Kligman*,
   762 F. Supp. 1212 (E.D. Pa. 1991) ......................................28

*Vapor Point LLC v. Moorhead*,
   832 F.3d 1343 (Fed. Cir. 2016)............................................27

*Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*,
   944 F.2d 870 (Fed. Cir. 1991)..............................................26

*Walker Digital, LLC v. Expedia, Inc.*,
   950 F. Supp. 2d 729 (D. Del. 2013)......................................24

*West v. Bd. of Review*,
   1983 Ohio App. LEXIS 14830 (Ct. App., Lorain County Feb. 23, 1983) .............................5

**Statutes**

35 U.S.C. § 281.......................................................................27

35 U.S.C. § 253.......................................................................28

35 U.S.C. § 261.......................................................................23

**Other Authorities**

American Heritage Dictionary of the English Language (5th ed. 2011) ........................................4

BLACK'S LAW DICTIONARY (6th ed. 1990)..........................................................4

Merriam-Webster Collegiate Dictionary (11th ed. 2004)........................................4

Random House Dictionary of the English Language (2d ed. 1987) ...............................4

Webster's II New College Dictionary (2001)................................................4

Webster's Third New International Dictionary of the English Language (2002) ..........................4

vi

## I.      INTRODUCTION

After the Court ruled that Janssen's remedies would not be limited regardless of the outcome of Defendants' standing challenge and after Defendants insisted that Janssen nonetheless file a new complaint, Janssen decided to avoid an unnecessary dispute by dismissing its earlier lawsuits without prejudice and proceeding with this action.  By renewing their motion to dismiss, Defendants have failed to display the same sense of restraint.  Despite the fact that extensive standing discovery produced no support for their position, and despite Johnson & Johnson's ("J&J") express disclaimer of any rights in the '083 patent on behalf of itself and its subsidiaries, Defendants persist in contending that J&J and all of its subsidiaries are necessary parties whose absence deprives Janssen of prudential standing.

Defendants' argument rests on a fundamental misreading of the inventor employee agreements at issue.  Contrary to Defendants' assumption, the term "COMPANY," which is defined to include "any of" the successors, subsidiaries, and affiliates of Janssen's predecessor Centocor and J&J, does not mean "all" J&J companies collectively.  Rather, as dictionaries and case law alike make clear, "any" has multiple meanings and in this context means "one or more" of a group, to be specified later.  The employee agreements here specify that inventions "conceived or made . . . *during my employment with the COMPANY*" are assigned to the COMPANY.  Plugging in the definition of COMPANY, this means that inventions are assigned to "any" J&J company that employs the inventor at the time of the invention—here, Centocor (now Janssen).  Defendants' contention that the agreements "unambiguously" assign inventions to *all* J&J companies collectively is simply wrong as a matter of plain English.

Turning to the extrinsic evidence, as Defendants admit the Court must do, nothing supports Defendants' reading of the agreements.  As J&J employment attorney Anne Martinson

testified at her deposition, J&J has always understood the "COMPANY" to whom inventions are assigned to be the employer.  In fact, Ms. Martinson herself revised the agreements to clarify this point in 2008.  The documentary evidence confirms beyond legitimate dispute that Janssen has always considered its patents to be assigned to it alone, and that the inventors here have always understood the '083 patent to be assigned only to Centocor/Janssen.  And although, as Defendants point out, J&J companies have enforced other provisions of the agreements on behalf of *one or more* J&J companies (the correct reading of "any"), they have never done so on behalf of *all* J&J companies collectively.  Rather, such enforcement actions have typically been on behalf of the employer alone, with another J&J company occasionally added, as applicable, when it had an interest in the subject matter of the dispute.  J&J's enforcement of the agreements is consistent with Janssen's position and inconsistent with Defendants'.

As for the J&J disclaimer, the case law is clear that it eliminates any purported standing issue that may arise from the employee agreements.  Crucially, there is no dispute that Janssen is an owner of the '083 patent; Defendants' contention is that there are supposedly other owners who should have been joined as plaintiffs.  But more than a half-dozen cases, including two from the Federal Circuit, hold that an alleged co-owner that has disclaimed its rights to the patent does *not* need to be named as a plaintiff.  Meanwhile, it is well-established that companies may release rights on behalf of themselves, their affiliates, and their subsidiaries.  Ultimately, there is no prudential reason to join as plaintiffs purported co-owners who have disclaimed ownership of the patent.  Defendants' motion should be denied.

## II.     BY THEIR TERMS, THE AGREEMENTS ASSIGN PATENTS TO THE EMPLOYER, HERE CENTOCOR/JANSSEN

Defendants contend that four of the inventors of the '083 patent (Epstein, Monsell, Ozturk, and Marsh) assigned their rights in the patent to all J&J companies collectively by virtue

of employee agreements they signed when they started working for Janssen's predecessor,

Centocor, Inc.  The four employee agreements at issue, called either "Employee Secrecy

Agreement" or "Employee Secrecy and Non-Compete Agreement," differ in certain respects, but

they all contain similar provisions relating to patent assignment.  Each provides that:

> In consideration of my employment or the continuation of my employment by the COMPANY:
>
> 1. *I agree to disclose promptly to the COMPANY all INVENTIONS conceived or made by me* whether or not during my hours of employment or with the use of the COMPANY's facilities, materials or personnel, either solely or jointly with another or others *during my employment with the COMPANY,* and related to the actual or anticipated business or activities of the COMPANY, or related to its actual or anticipated research and development or suggested by or resulting from any task assigned to me or work performed by me for, or on behalf of, the COMPANY. *I assign and agree to assign my entire right, title and interest therein to the COMPANY*.   (Dow Decl.[1] Ex. A at JANREM0098780 (emphasis added); *accord id.* at JANREM0098807; -98796; 98813).

The four agreements also have similar definitions of the term "COMPANY":

> As used in this Agreement . . . the COMPANY means CENTOCOR and JOHNSON & JOHNSON and *any* of their successors or assigns, purchasers, acquirers, and *any* of their existing and future subsidiaries, divisions or affiliates, including *any* such subsidiary, division or affiliate of Johnson & Johnson to which I may be transferred or by which I may be employed in the future. Affiliates of the COMPANY are any corporation, entity or organization at least 50% owned by the COMPANY, by Johnson & Johnson or by any subsidiary of Johnson & Johnson.  (*Id.*) (emphasis added).

According to Defendants, the fact that "COMPANY" includes "any of" the successors,

subsidiaries, and affiliates of Centocor and J&J means that patents assigned to the "COMPANY"

"unambiguous[ly]" belong to all 250-plus J&J companies collectively.  Def. Br. 2-5.  But this

interpretation of the agreements is far from unambiguous and it fails to read the contracts "as a

whole in a fair and common sense manner."  *Hardy ex rel. Dowdell v. Abdul-Matin*, 965 A.2d

---

[1] The March 8, 2017 Declaration of Kenneth Dow declaration, previously submitted in connection with Defendants' motion to dismiss in the prior litigation, is being resubmitted here in redacted form by agreement between the parties.

1165, 1169 (N.J. 2009) (holding that this a "basic principle of contract interpretation").  Read

correctly, the agreements assign patents to "any" J&J company that employs the inventors at the

time of their invention.  Here, that company is Centocor.

### A.      "Any" of J&J's Subsidiaries and Affiliates Does Not Mean "All" J&J Companies Collectively

Defendants contend that it is "clear," "plain," and "unambiguous" that the inclusion of

"any" subsidiaries and affiliates of Centocor and J&J in the definition of "COMPANY" means

that patents are assigned to *all* such subsidiaries and affiliates collectively.  Def. Br. 1, 3, 5.  But

this is simply not correct as a matter of English.  "'[A]ny' can and does mean different things

depending upon the setting." *Nixon v. Mo. Mun. League*, 541 U.S. 125, 132 (2004).

Dictionaries and case law alike recognize that "'any' has a variety of meanings including:

'some,' 'one or more,' 'an indefinite number,' 'either,' 'every,' and 'all.'" *First Bank & Trust v.

Firstar Info. Servs. Corp.*, 276 F.3d 317, 325 (7th Cir. 2001) (quoting *State v. Timmerman*, 542

N.W.2d 221, 224 (Wis. Ct. App. 1995) and BLACK'S LAW DICTIONARY 94 (6th ed. 1990));

*see also, e.g,* Merriam-Webster Collegiate Dictionary 56 (11th ed. 2004) (definition of "any"

includes "one or some indiscriminately of whatever kind" and "one, some, or all indiscriminately

of whatever quantity").  As these and other sources make clear, "any" frequently means "one or

more" or "an indeterminate number" rather than "all."[2]

Language expert Bryan Garner explains that "[a]s an adjective, *any* has essentially six

---

[2] *See also* Webster's II New College Dictionary (2001) at 51 (definitions of "any" include "One or some regardless of sort, quantity, or number . . . [a]ny one or ones among three or more . . . [or] [a]n indeterminate number or amount"); The American Heritage Dictionary of the English Language (5th ed. 2011) at 81 (definitions of "any" include "One, some, every, or all without specification" or "Any one or more persons, things, or quantities"); The Random House Dictionary of the English Language (2d ed. 1987) at 96 (definitions of "any" include "one, a, an, or some; one or more without specification or identification"); Webster's Third New International Dictionary of the English Language (2002) at 97 (definitions of "any" include "one indifferently out of more than two: one or some indiscriminately of whatever kind"; "one, some , or all indiscriminately of whatever quantity"; "one or more: not none"; or "one or more indiscriminately from all those of a kind").

uses." Prior Dkt. 521-2 (Garner's Modern American Usage (3d Ed. 2009)) at 52.[3]  The usage

that is relevant here is where the context implies "that a selection or discretionary act will

follow."  *Id.*  In this context, courts have frequently concluded that a reference to "any" of a

category does not refer to ***all*** members of that category collectively, but rather to one or more

members of the category to be identified separately as applicable.  *See, e.g., United States v.*

*Genendo Pharm., N.V.,* 485 F.3d 958, 963 (7th Cir. 2007) ("Genendo's argument flows from an

unstated belief that the word 'any' in § 353(a) necessarily means 'all.' But that is not so."); *Stone*

*v. Free Bridge Auto Sales, Inc.*, 2006 U.S. App. LEXIS 14728, 5-6 (4th Cir. June 15, 2006)

("Cash Price (including any accessories, services, and taxes)" did not mean "all" accessories,

services, and taxes but rather "'any' of those charges that [Defendant] chooses to include within

the Cash Price").[4]  Indeed, sometimes the term "any" does not even ***include*** "all" as a possible

choice, but rather refers ***only*** to a subset of the relevant category.  *See, e.g., First Bank*, 276 F.3d

at 325 (provision allowing party to "terminate providing any Service" could reasonably be read

not to "permit the complete cessation of all services"); *Three D Dept., Inc. v. K Mart Corp.,* 732

F. Supp. 901, 904-905 (N.D. Ill. 1990) (holding it to be ambiguous whether a contractual clause

allowing Kmart to close "any" stores covered by a contract allowed it to close all such stores); *In*

*re Scheyer's Estate*, 59 N.W.2d 33, 35 (Mich. 1953) (holding that bequest of "[a]ny home

belonging to me" meant "any one" home, not all homes belonging to the decedent).

      In light of the fact that the word "any" does not necessarily mean "all," Defendants'

repeated assertion that the term "COMPANY" "unambiguous[ly]" means all of Centocor and

---

[3] "Prior Dkt" refers to Case No. 15-10698.  "Dkt" refers to Case No. 17-11008.

[4] *See also West v. Bd. of Review*, 1983 Ohio App. LEXIS 14830, 3-5 (Ct. App., Lorain County Feb. 23, 1983) (stating, with respect to unemployment statute requiring employee to be available for "any" shift, that "obviously no one would be expected to work all shifts or every shift, but a person certainly could be expected to work any one single shift that he might be called upon to work").

J&J's successors and affiliates collectively is just wrong as a matter of English usage.  Def. Br.

3-5.  This fundamental mistake dooms Defendants' motion.

> **B.      The Term "COMPANY" Means Any J&J Company to Which the
> Provisions of the Contract Apply**

In the employee agreements at issue here, the phrase "any of" the successors,

subsidiaries, and affiliates of Centocor and J&J does not mean "all" J&J companies collectively.

Rather, it means that the agreements apply to "any" one or more J&J company, as applicable,

depending on the terms of the particular contract provision at issue and the facts of a given case.

The paragraph defining "COMPANY" proves this point.  The agreements state that the

term COMPANY means "any" of J&J's subsidiaries, divisions, and affiliates "including any

such subsidiary, division or affiliate . . . to which I may be transferred or by which I may be

employed in the future."  Dow Decl. Ex. A at JANREM0098780.  Defendants point out that this

language does not **_limit_** the term "COMPANY" to current and future employers.  Def. Br. 9-10.

Although we once posited this as a possible reading of the language, the extrinsic evidence has

made it clear that it is not so limited.  The specific example of what the term "COMPANY"

includes, however, informs how the general word "any" should be read.  *See United States v.*

*Baxter Int'l, Inc*., 345 F.3d 866, 906 (11th Cir. 2003) (invoking *ejusdem generis* canon to find

that statutory provision permitting suit against "any . . . entity (including any physician or

provider) that has received payment" should be understood with reference to "physician" and

"provider" and to "encompass only entities of like kind").  By specifying that the term

"COMPANY" **_includes_** J&J companies that "may" become employers in the future, the

agreements make clear that "any" refers to "any" company as applicable, not to all companies

collectively.  If "COMPANY" were intended to mean a collective entity comprised of all J&J

companies, it would be redundant and confusing to state that it includes any future employer

within the J&J family.

The next sentence of the definition further refutes Defendants' collective reading of the

term "COMPANY":

> Affiliates of the COMPANY are any corporation, entity or organization at least
> 50% owned [1] by the COMPANY, [2] by Johnson & Johnson or [3] by any
> subsidiary of Johnson & Johnson.

Dow Decl. Ex. A at JANREM0098780 (bracketed numerals inserted).  The three groups in this

sentence parallel those identified in the preceding sentence (quoted above), but with

"CENTOCOR" replaced by "COMPANY."  Thus, the most natural reading of the sentence is

that the "COMPANY" is the employer, Centocor.  As Janssen has previously argued, the tension

between the uses of COMPANY in this and the previous sentence makes the term ambiguous.

Prior Dkt. 520 at 11-12.  What is clear, however, is that the term "COMPANY" does ***not*** mean

J&J and its subsidiaries collectively, because those entities are listed disjunctively in the same

sentence.  The sentence would make no sense if the "COMPANY" were comprised of Centocor,

J&J, and all of J&J's subsidiaries together.[5]

Indeed, very little in the agreements would make sense if the "COMPANY" were read to

mean "all J&J companies collectively."  Since few, if any, activities are undertaken by ***all*** of

J&J's hundreds of operating companies together, virtually every provision of the agreements

---

[5] Defendants have previously contended that the term "COMPANY" is separated from J&J and its
subsidiaries in this sentence in order to make clear that "affiliates" include companies that are "at least
50% owned, collectively, by multiple entities that are within the group constituting the 'COMPANY.'"
Prior Dkt. 508 at 15-16.  This argument fails.  First, by Defendants' reading of the agreements, the same
result would be accomplished by the word "COMPANY" standing alone, rendering the rest of the
sentence confusing surplusage.  Second, if the purpose of the sentence is to clarify that a collectively
owned entity is included within the definition of "affiliates," the sentence, which never even mentions
collective ownership, hardly achieves the desired clarity.  Finally, Defendants' acknowledgement that the
term "COMPANY" can refer to a subset of "entities that are ***within the group*** constituting the
'COMPANY'" belies their assumption that it necessarily means ***all*** J&J companies collectively.

must, as a practical matter, refer to a subset of J&J companies, not to all of them.  Defendants

themselves have previously acknowledged this point, asserting in earlier briefs that the term

"COMPANY" can refer to "multiple entities that are ***within the group constituting*** the

'COMPANY.'"  Prior Dkt. 508 at 15-16 (emphasis added).  If a subset of entities "within the

group constituting the COMPANY" is still the "COMPANY," then the "COMPANY" does not

mean ***all*** J&J companies collectively as Defendants contend.  It means "any" J&J company to

which a given contractual provision applies.

> **C.**     **The Patent Assignment Provision Applies to the Employer of the**
> **Inventors, Here Centocor**

Turning to the patent assignment provisions of the agreements, rights in inventions are

unmistakably assigned to the J&J company employing the inventor, here Centocor.  In their

motion, Defendants barely mention the agreements' patent assignment paragraph, quoting only a

single, altered sentence from it: "I assign and agree to assign my entire right, title and interest [to

inventions] to the COMPANY."  Def. Br at 2 (brackets in Defendants' brief).  But contrary to

this altered quotation, the agreements do not contain an unqualified assignment of "inventions"

to the "COMPANY."  Rather, the assignment is limited to inventions that are (among other

things) conceived and made "during my employment with the COMPANY":

> I agree to disclose promptly to the COMPANY all INVENTIONS conceived or
> made by me . . . ***during my employment with the COMPANY***. . . .  I assign and
> agree to assign my entire right, title and interest therein to the COMPANY.  (Dow
> Decl. Ex. A at JANREM0098780 (emphasis added); *accord id*. at
> JANREM0098807; -98796; 98813).

Since the word "therein" plainly refers to the "INVENTIONS" described in the previous

sentence, the proper bracketed phrase to insert into the assignment sentence is: "I assign and

agree to assign my entire right, title and interest [in inventions ***conceived or made during my***

***employment with the COMPANY***] to the COMPANY."  When the agreements' definition of

"COMPANY" is plugged into this sentence, it is evident that inventions are assigned to "any" of the successors, subsidiaries, and affiliates of Centocor and J&J *that employ the inventor at the time of the invention*.  No rights are assigned to J&J companies that are not employers of the inventor, because for such companies, no inventions are conceived or made "during my employment with the COMPANY."

Here, all four of the inventors whose employee agreements are being challenged were employed by Janssen's predecessor Centocor at the time of the invention.  Dow Decl. Ex. B at p. 3.  Accordingly, they assigned the '083 patent to Centocor.  Based on the plain language of the contracts, Janssen is the sole owner of the patent.

## III.   THE EXTRINSIC EVIDENCE RELIED ON BY BOTH PARTIES SUPPORTS JANSSEN'S READING OF THE AGREEMENTS

As Defendants now acknowledge, Def. Br. 5-6, under New Jersey law extrinsic evidence "is always admissible in aid of the interpretation of an integrated agreement . . . *even when the contract on its face is free from ambiguity.*"  *Conway v. 287 Corporate Ctr. Assocs.*, 901 A.2d 341, 347 (N.J. 2006) (quoting *Atlantic N. Airlines, Inc. v. Schwimmer,* 12 N.J. 293, 301 (1953)) (emphasis added).  Defendants point out that the purpose of extrinsic evidence is not to "chang[e] the writing, but to secure light by which to measure its actual significance."  *Id*.  But as explained above, the plain language of the agreements here leads directly to Janssen's position that "any" means any J&J company as applicable and that, with respect to patents, the only applicable J&J company is the employer.  The extrinsic evidence, including the evidence relied on by Defendants, confirms Janssen's position that patents are assigned only to the employer. No evidence supports Defendants' position that patents are jointly assigned to *all* J&J companies collectively or to any J&J company other than the employer.

**A.    J&J Has Always Understood Its Employee Agreements to Assign Patents to the Employer Alone**

When Janssen initially responded to Defendants' standing challenge, it focused on the indisputable evidence, discussed below, that Janssen has always understood that its employees assign patents to Janssen alone, and that the inventors have always recognized that the '083 patent was assigned to Janssen.  *See* Prior Dkt. 520 at 14-17.  After the Court ordered further discovery related to the interpretation and enforcement of similar employee agreements by other J&J employees, Janssen produced J&J's lead employment attorney, Anne Osborne Martinson, to testify more generally about J&J's understanding of the employee agreements, which are based on a template that was used across J&J for many years.  Ms. Martinson confirmed that J&J has always understood its employee agreements to assign patent rights to the employer.



, Ex. 1 hereto (Martinson Tr.) 126:6-128:2,

*Id.* 149:5-23 & Dkt. 15-9.

Dkt. 15-9 at JANREM0115489.

*Id.* at JANREM0115490.

Ex. 1 154:19-155:14.



*Id.* 182:5-12. 

*Id.* 172:23-173:4.

In response to extensive questioning on the subject, 

*Id.*; *see also id.* 353:8-354:4. 

*id.* 161:14-23, 

*Id.* 159:17-160:6. 

*Id.* 156:19-157:25. 

*Id.* 162:24-163:5. 

*Id.* 172:13-20.

In the patent assignment paragraph, Ms. Martinson testified, 

*Id.* 187:5-189:19; 203:22-204:18. 

*Id.* 290:13-291:11; 356:7-12. 

*id.* 353:8-354:4,

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████  Dkt. 15-9 at

JANREM0115490.  This revision, and Ms. Martinson's understanding of the contracts, is

supported by overwhelming extrinsic evidence about Janssen's patent assignment practices (set

forth in Parts II(C)-(E), *infra*), none of which Defendants even purport to dispute.

 Lacking any substantive response to Ms. Martinson's testimony, Defendants contend that

Ms. Martinson's understanding of the term "COMPANY" amounts to a "non-definition" that is

"chameleon-like" and "not credible."  Def. Br. 11-12.  Elsewhere they add that it is "*post hoc*,

litigation-driven," and "cherry-picked."  *Id*. at 1.  But Ms. Martinson's understanding of the

employee agreements is not *post hoc* or litigation-driven; it is memorialized in her revised

agreement, which dates from 2009.  Dkt. 15-9.  As for Defendants' contention that Ms.

Martinson's understanding of "COMPANY" is somehow a "non-definition," it is in fact the

dictionary definition of the operative word, "any."  As discussed above, "any" ***means*** "one or

some indiscriminately," and it is frequently used to imply that a "selection or discretionary act

will follow."  Ms. Martinson's testimony ████████████████████████████

████████████████████████████████  is perfectly consistent with the agreements'

definition of "COMPANY."  Indeed, it is the only reasonable reading of the contracts as a whole.

 **B.** **Neither Janssen Nor J&J Has Ever Interpreted "COMPANY" to Mean All J&J Companies Collectively**

 Before turning to the overwhelming extrinsic evidence demonstrating that Janssen has

always understood the employee agreements to assign patents to the employer alone, we pause to

address the extrinsic evidence on which Defendants rely.  Defendants contend that because on

several occasions more than one J&J company has sued to enforce ***confidentiality*** and ***non-***

*compete* provisions of similar agreements, Defendants' interpretation of the ***patent assignment***

provisions must prevail. Def. Br. 6-8. To the contrary, these cases support Janssen's reading of

the employee agreements. They make clear that the term "COMPANY" means "any" J&J

company as applicable, not ***all*** J&J companies collectively as Defendants contend.

In discovery, Janssen identified eleven cases in which J&J companies (but not Janssen)

brought suit to enforce confidentiality and non-compete obligations on behalf of more than one

company. *See* Ex. 2 hereto. These cases represent a small portion of J&J's confidentiality and

non-compete lawsuits, ████████████████████████████████████████████

Ex. 1 354:20-355:3. In each of the eleven cases, the plaintiffs consisted of either two or three

J&J companies. In none of them were more than three J&J companies, let alone all 250-plus J&J

companies, joined as plaintiffs. For this reason alone, the cases provide no support for

Defendants' argument that "COMPANY" means all J&J companies collectively.

J&J's interpretation of the agreements in the non-compete cases is consistent with its

position in this motion. The non-compete provisions of the employee agreements prohibit

confidential information obtained "as a result of my employment by the COMPANY" from

being disclosed to competitors or being used to compete with products or services "upon which I

shall have worked or about which I become knowledgeable as a result of employment with the

COMPANY."[6] *See* Dow Decl. Ex. A at JANREM0098780; -98807; -98796; 98813. For those

employees who obtained confidential information belonging to more than one J&J company (or

who have been employed by more than one J&J company), the definition of "COMPANY" to

---

[6] In two of the agreements at issue here, confidential information is defined to include not only information "about" the COMPANY, but also "comparable information about . . . ***affiliates*** of the COMPANY." Dow Decl. Ex. A at JANREM0098796; -98813 (emphasis added). By treating the COMPANY and affiliates of the COMPANY separately, this language makes clear that COMPANY is not intended to mean all J&J companies collectively. Indeed, this language makes it ambiguous whether COMPANY is intended to mean any company besides the employer.

include "any of" J&J's affiliates and subsidiaries permits a cause of action on behalf of more

than one J&J company as applicable: any J&J company with an ownership interest in such

information.  These lawsuits thus support Janssen's reading of the contracts.  For example:

- In the case brought by Ethicon and DePuy Orthopaedics, Inc., the employee worked for both Ethicon and DePuy.  Dkt. 15-12.

- In the case brought by LifeScan, Inc., Diabetes Diagnostics, Inc. ("DDI"), and Inverness Medical Ltd., the employee was, at one time, an employee of all three plaintiffs.  Dkt. 15-5 at JANREM0115564 (the employee agreement was "executed by employee . . . in consideration for his employment with LifeScan and with [DDI's successor]"); *id.* at JANREM0115571 ("O'Connell left his employment at Nova Biomedical and also began working at Inverness as a quality engineer").  Further, while he was employed by LifeScan and DDI, the employee "perform[ed] a multitude of services for Inverness, including having direct responsibility to Inverness's Director of Business and Product Management." *Id.* at JANREM0115565.

- In the case brought by DePuy Spine, Inc. and JJRT, the employee was the Worldwide Vice President, New Business Development of DePuy Spine, Inc.  Dkt. 15-3 at 11.  His primary responsibility was to implement a product development strategy, and DePuy's product development work was performed by JJRT.  *Id.* at 9, 11.

- In the case brought by J&J, DePuy Orthopaedics, Inc. and DePuy Products, Inc., the employee worked for DePuy Orthopaedics (of which DePuy Products was a subsidiary).  Dkt 15-14 at JANREM0113053.  Further, she reported to J&J's WorldWide Chairman of Medical Devices and Diagnostics and was chairperson of J&J's Medical Device and Diagnostics Council.  *Id.*

- In the case brought by J&J, DePuy, Inc., and DePuy Spine, Inc., the employee was employed by both DePuy Spine, Inc. and was the Director of Finance of the DePuy Franchise, which included plaintiff DePuy, Inc.  She also reported directly to the CFO of the DePuy franchise.  Dkt. 16-14 at JANREM0113291, -93.[7]

███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

---

[7] In a small number of cases, J&J was named as a co-plaintiff along with one or two J&J operating companies because J&J was considered to have an "interest" in the information at issue.  Dkt. 15-7 at 4, 12.  In one of these cases, involving J&J and Cordis, Inc., the pleading incorrectly referred to a patent invented by the employee as being owned by "plaintiffs."  Dkt. 15-8 at 12.  In fact, the patent at issue there is owned by Cordis, Inc.  Ex. 1 hereto 355:4-23 & Ex. 3 hereto.  Litigation counsel's reference to "plaintiffs" does not change that fact.  *Cf.* 2/24/2017 Hr. Tr. at 5:1 (Hospira's in-house counsel stating that he represented "defendants").



Def. Br. 8-9

Dkt. 15-9 at JANREM0115494; Dkt. 15-10 at JANREM0115487; *see also* Ex. 1 213-14; 217-29.

Based on the above, it goes without saying that Janssen is not judicially estopped from asserting that the "COMPANY" referred to in the patent assignment provisions at issue here is Janssen.  Def. Br. 12-14.  Neither Janssen nor J&J has ever argued, to a court or otherwise, that "COMPANY" necessarily means all J&J companies collectively.  J&J has routinely asserted that the term can, depending on the facts, apply to a single company; indeed, the "vast majority" of the non-compete and confidentiality lawsuits filed by J&J companies have been on behalf of a single company.  *See* Ex. 1 354:20-355:3.  There is no contradiction, let alone a "clear inconsisten[cy]," between the positions in J&J's past non-compete litigations and Janssen's position in the current litigation.  *Thore v. Howe*, 466 F.3d 173, 181 (1st Cir. 2006).

C.     **The Extrinsic Evidence Concerning the Employee Agreements at Issue Here Confirms That Janssen Owns the '083 Patent**

Turning to the specific question at issue on this motion—whether the '083 patent was assigned to Centocor—the extrinsic evidence is clear and indisputable that this was indeed the intention of all parties to the relevant agreements.  *See Kolbe v. BAC Home Loans Servicing, LP*,

15

738 F.3d 432, 459 (1st Cir. 2013) ("Where there is no dispute between the contracting parties

about which of two reasonable interpretations of their agreement is correct, the parties' shared

understanding surely would govern—barring some collateral reason to depart from ordinary

principles.") (applying New Jersey law).

### 1.      The invention disclosures

As noted above, the employee agreements required the inventors "to disclose promptly"

and to "assign and agree to assign" to "the COMPANY all INVENTIONS conceived or made by

me . . . during my employment with the COMPANY." Dow Decl. Ex. A at JANREM0098780

(emphasis added); *accord id*. at JANREM0098807; -98796; 98813. The inventors of the '083

patent complied with the disclosure obligation by submitting a formal invention disclosure to Mr.

Dow in May 2004. Dow Decl. Ex. B. The disclosure is on Centocor letterhead, is addressed to

Mr. Dow in his capacity as "V.P. Patent Law, Centocor," states that it is "Centocor confidential

information," and identifies the inventors as Centocor employees. *Id.* The document clearly

shows that the inventors (and Centocor) considered the disclosure obligations to the

"COMPANY" to run to their employer, Centocor.

Defendants' contention that the "disclosure of an invention to a particular J&J entity does

not determine the assignee(s) of the patent under the operative assignment agreements," Def. Br.

19, misses the point of extrinsic evidence. Although disclosure may not "determine" assignment

as a formal matter, the fact that the parties considered the "COMPANY" to be Centocor for

purposes of disclosure is strong ***evidence*** that they considered the "COMPANY" to be Centocor

for purposes of patent assignment as well. Meanwhile, Defendants' observations that J&J

attorneys prosecute Janssen's patents on behalf of Janssen and that J&J pays patent maintenance

fees, Def. Br. 19, are red herrings. Unlike disclosure of inventions, which is expressly required

16

by the agreements, no contractual provision obligates Centocor to prosecute patents or pay

maintenance fees on its own behalf.

### 2. The face of the patent

Once the application for the '083 patent was granted, the parties again manifested their

shared understanding of the agreements by listing the assignee of the patent as Centocor, Inc.

Dow Decl. ¶ 10.  In response to this evidence, Defendants point out that the assignee listed on

the face of the patent is not dispositive of ownership as a matter of law.  Def. Br. 18.  But the

assignee listed on the patent is certainly ***probative*** of who the parties believed the assignee of the

patent to be.  Nothing in Defendants' motion calls into question the probative value of the patent

as extrinsic evidence.[8]

### 3. The subsequent assignments

Paragraph 3 of the employee agreements required the inventors to "execute any

applications, assignments or other instruments which the COMPANY shall consider necessary to

apply for and obtain Letters Patent."  Dow Decl. Ex. A at JANREM0098780.  In fulfillment of

these obligations, the '083 patent inventors have executed a number of additional assignment

documents.  Dow Decl. ¶ 9 & Exs. C-H.  In every case, these assignments were to Centocor or,

later, to Janssen, alone.  *Id.*  This shows once again that the inventors understood their

assignment obligations to run to Centocor/Janssen.

Again missing the point, Defendants contend that the subsequent assignment documents

did not effectively assign rights in the '083 patent, because those rights had already been

---

[8] In *Hoffman-La Roche, Inc. v. Teva Pharm. USA*, 2011 U.S. Dist. LEXIS 139239 (D.N.J. Dec. 2, 2011), the sole case cited by Defendants on this point, the court's opinion does not even mention who is listed as an assignee on the face of the patent; that is why Defendants need to attach a copy of the patent to their motion in order to substantiate their point.  Dkt. 16-8.  The court's silence says nothing about the probative value of this extrinsic evidence.

assigned in the employee agreements. Def. Br. 20-21. But Janssen does not contend that the subsequent assignments supersede the employee agreements. Rather, the subsequent documents show how the parties to the original agreements interpreted them in practice. This is highly probative extrinsic evidence of the parties' intent. *See Cromartie v. Carteret Sav. & Loan*, 649 A.2d 76, 80 (N.J. App. Div. 1994) ("The practical construction that parties give to a contract by their conduct is entitled to great, if not controlling weight in interpreting the contract.") (quoting *MacFadden v. MacFadden*, 49 N.J. Super. 356, 139 A.2d 774 (App. Div. 1958)).

Defendants' argument that the subsequent assignments should be discounted as litigation-driven documents is simply wrong. Def. Br. 21. First, each of the inventors assigned (Canadian) rights in the invention to Centocor in 2007 (and Susan Lenk also assigned her U.S. rights to Centocor in 2005)—long before this litigation. Dow Decl. Exs. C-D. Thus, this litigation had no impact whatsoever on the inventors' belief that the invention was assigned to Centocor. Second, the subsequent assignments are evidence not only of Janssen's understanding, but also that of the inventors, who are not parties to this litigation (and have not been employed by Janssen for many years).[9] Ultimately, there is no legitimate dispute that the parties to the employee agreements believed they assigned patent rights to Centocor alone. That established fact is entitled "to great, if not controlling weight" in resolving any ambiguities in the language of the agreements. *See Cromartie*, 649 A. 2d at 80.

---

[9] As for Defendants' suggestion that the subsequent assignments showed that Janssen knew it had a standing problem, ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ Ex. 4 hereto (Dow Tr.) 216:12-217:14. Furthermore, Janssen has never contended that the confirmatory assignments supersede the employee agreements that are at issue in this motion. The subsequent assignment agreements cannot be evidence that Janssen knew it had an ownership problem when Janssen does not claim that they fixed the purported problem. Similarly, Defendants' argument that Janssen has "effectively conceded" a standing defect by dismissing its prior actions is wrong. Def. Br. 21-22. The reason that Janssen dismissed both actions is that no purpose would be served by pursuing them in light of the Court's ruling on BPCIA remedies. Indeed, even under Defendants' mistaken analysis of the BPCIA, there is no difference between the 2016 action and this one with respect to Janssen's entitlement to remedies.

**D.     Janssen's Longstanding Patent Practices Demonstrate That Employee Inventions Are Assigned to Janssen**

Evidence concerning Janssen's longstanding patent practices further confirms that Janssen has always considered inventions created by its employees to be assigned to Janssen— not, as Defendants contend, to every J&J company collectively.  As Mr. Dow explains in his declaration, when an invention is made by Janssen employees alone, that invention is owned by Janssen alone.  Dow Decl. ¶¶ 7-11.  Janssen's and J&J's business records confirm this.  For example, attached to Mr. Dow's declaration is a database readout of all patents owned by Janssen.  Dow Decl. Ex. I.  ████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████  Janssen has never intended that the '083 patent, or any other invention by its employees, belongs to anyone but Janssen.

Defendants' response to this evidence misses the mark.  First, they urge the Court to ignore Mr. Dow's declaration because he did not draft the employee agreements at issue or perform a legal analysis of their language.  Def. Br. 15-16.  In fact ████████████████

████████████████████████ Mr. Dow ████████████████████

████████████████████████████████████████████████████

██████████████████████  Ex. 4 (Dow Tr.) 111:4-24.  More importantly, Janssen does not offer Mr. Dow's declaration as evidence of any analysis of the contractual language.  The declaration is evidence of Janssen's patent practices, about which Mr. Dow has copious firsthand knowledge.  Ex. 4 101:4-11; 239:21-240:19; Dow Decl.  As Defendants themselves point out, evidence of "custom, usage, and the interpretation placed on the disputed provision by the parties' conduct" is highly relevant extrinsic evidence.  Def. Br. 6 (quoting *Kahanovitz v. Electro-Biology, Inc.*, 2011 WL 242031, at *9 (N.J. Super. Ct. App. Div. Jan. 27, 2011)).

19

Meanwhile, Defendants' contention that J&J's internal records of patent ownership "deserve[] no weight" because they are "from 2017," Def. Br. 19, is nonsense.  Do Defendants mean to suggest that J&J has recently altered its internal records to list Janssen as the sole patent owner for dozens of patents?  If so, that false suggestion is refuted by the publicly available patents themselves, the vast majority of which, like the '083 patent, list Janssen or its predecessors as assignees on their face.  There is no legitimate dispute that Janssen (and J&J) have ***always*** considered patents to be assigned to the employer of the inventors.

### E.    Reading the Agreements to Apply to All J&J Companies Collectively Would Be Absurd and Unreasonable

Finally, Defendants' reading of "COMPANY" must be rejected because it leads to absurd and unreasonable results.  *See Quinn v. Quinn,* 137 A.3d 423, 429 (N.J. 2016)  ("[W]hen the intent of the parties is plain and the language is clear and unambiguous, a court must enforce the agreement as written, unless doing so would lead to an absurd result."); *Accurate Abstracts, LLC v. Havas Edge, LLC*, 2015 U.S. Dist. LEXIS 139441, at *10 n.4 (D. N.J. Oct. 14, 2015) (rejecting interpretation that would "lead to absurd results under the circumstances").[10]

As Mr. Dow and J&J tax specialist Katherine Amos explain in their declarations, assigning patents rights jointly to all of J&J's operating companies would be commercially unreasonable and burdensome to the point of absurdity.  If patents were owned by collectively by all of J&J's worldwide operating companies, routine patent office actions would become unreasonably difficult.  Dow Decl. ¶ 15.  Furthermore, it would be unduly burdensome, and

---

[10] *See also City of Gloucester City v. Beazer Homes Corp*., 2014 N.J. Super. Unpub. LEXIS 126, at *13 (App. Div. Jan. 23, 2014) (rejecting a literal reading of contract because it "would be an absurd result and contracts will not generally be read in that manner"); *Perry v. Passarella*, 2013 N.J. Super. Unpub. LEXIS 2635, at *9 (App. Div. Oct. 30, 2013) ("This interpretation is unreasonable because it logically leads to an undesirable and unintended consequence."); *Frank Stamato & Co. v. Lodi*, 71 A.2d 336, 340 (N.J. 1950) (rejecting a reading of a contract because it "would produce [an] absurd result"); *Booth v. U.S. Fid. & Guar. Co.*, 130 A. 131, 132 (N.J. 1925) (same).

entirely pointless, for J&J subsidiaries responsible for unrelated products, or situated in dozens of different countries around the world, to join in this and other patent infringement actions, as they would be required to do as co-owners.  From a financial and tax accounting perspective, assigning ownership of a single patent to 230 operating companies would be a nightmare, with the balance sheets of hundreds of companies around the world potentially affected by each revenue-generating patent of any J&J company.  Amos Decl. ¶¶ 14-20.  Besides the accounting chaos, the result would potentially expose J&J to serious tax risks and difficulties.  *Id.* ¶¶ 8, 11, 16.  No international business would operate in such a fashion.

Despite contending that Janssen's evidence of absurd results "does not make sense" and is "self-serving" and "litigation-driven," Def. Br. 16-17, Defendants fail to dispute any of Janssen's facts.  Indeed, Defendants declined even to take Ms. Amos's deposition, effectively conceding the accuracy of her declaration.  Instead of contesting the facts, Defendants make irrelevant arguments.  For example, the fact that the '083 patent has not been commercialized, *id.* at 17, hardly means that the employee agreements, which are not limited to the '083 patent, should be interpreted in a way that leads to absurd results.  And Defendants' argument that Janssen's interpretation of the agreements would fail to protect confidential information, *id.*, is simply incorrect for the reasons discussed above.  *See* supra Parts I(A)-(B).

The truth is that Defendants, who are large multi-national companies themselves, are well aware of the importance of assigning intellectual property rights to specific subsidiaries. Defendant Hospira, Inc., for example, represents that it is the sole assignee of a patent whose inventor signed an employee agreement naming both "HOSPIRA, INC." and "its Subsidiaries . .

. collectively" as parties.  Prior Dkt. 521-3-4.[11]  Hospira's parent, Pfizer, Inc., uses a similarly

broadly worded employee agreement, Prior Dkt. 521-5, yet also assigns patents to specific

companies.  Indeed, Pfizer—like many major pharmaceutical companies—reaps substantial tax

benefits from careful management of its patent portfolio.[12]  This is why Defendants cannot

dispute anything in Ms. Amos's declaration.  Recognizing that the '083 patent is assigned to

Janssen alone is the only commercially reasonable reading of the employee agreements.

## IV.     J&J'S DISCLAIMER OF OWNERSHIP DEFEATS DEFENDANTS' STANDING CHALLENGE

As the preceding discussion shows, the employee agreements, properly construed,

assigned rights in the '083 patent to Janssen alone, and Defendants' motion should be denied on

that basis.  But Defendants' motion also fails for a separate and independent reason: J&J, on its

own behalf and on behalf of all non-Janssen entities in the J&J family, disclaimed any patent

rights they may have obtained and agreed not to assert any ownership rights in the '083 patent at

any time in the future.  Ex. 5 hereto.  The disclaimer occurred before this lawsuit was filed and

the law is clear that it eliminates any purported need to join J&J and its subsidiaries as parties.

### A.     The J&J Disclaimer Eliminates the Need to Add the Purported Co-Owners As Co-Parties

On March 6 2017, Janssen and J&J entered into an agreement in which J&J affirmed that

Janssen "is the sole owner of the '083 patent and there has never been any owner of the '083

---

[11] Instead of providing any explanation regarding how Hospira's practices are consistent with its position in this motion, Defendants ask the Court to ignore the fact that they do not themselves believe the arguments they are making here.  Def. Br. 19-20.  But the Court should not ignore evidence of industry custom and practice, which, although not dispositive, is probative extrinsic evidence.  *See, e.g., Den norske Bank AS v. First Nat'l Bank*, 75 F.3d 49, 58 (1st Cir. 1996) ("[I]f First National means to suggest that such 'general' practices are not probative as to whether it is more or less likely that particular contracting parties harbored such an intent, it is simply in error.").

[12] *E.g.*, Reuters, "How Pfizer has shifted U.S. profits overseas for years," available at http://www.reuters.com/article/us-pfizer-tax-insight-idUSKCN0T51ZS20151116

patent other than Janssen" and represented that neither J&J nor any of its subsidiaries "has had

any rights and or any legal or equitable rights, including any shop rights, to the '083 patent." Ex.

5 at 2.  Contrary to Defendants' contention, there is nothing "illogical," "nonsensical," or

"ineffectual" about J&J's agreement to reaffirm what it has always believed to be the case.  Def.

Br. 22-23, 24-25.  As the agreement expressly indicates, J&J and Janssen entered into the

agreement "for avoidance of doubt" given that Defendants "have disputed Janssen's sole

ownership of the `083 patent."  Ex. 5 at 2.  Nor is there anything unclear or ambiguous about

J&J's agreement that Janssen is the sole owner and that neither J&J nor any of its subsidiaries

has had any rights in the patent.[13]

Defendants' argument that the J&J disclaimer fails to cure the alleged standing defect

because it supposedly does not meet the assignment requirements of 35 U.S.C. § 261, Def. Br.

23-24, is contrary to the case law.  In fact, the Federal Circuit and the district courts have

repeatedly relied on disclaimers similar to the one at issue here in denying motions to dismiss

patent infringement actions for lack of standing.

In *IpVenture, Inc. v. Prostar Computer, Inc.,* 503 F.3d 1324, 1326 (Fed. Cir. 2007), for

example, the inventor was a co-owner of the plaintiff company, but he had worked for Hewlett

Packard ("HP") at the time of the invention.  Defendants argued that IpVenture lacked standing

because the inventor's rights had been transferred to HP as a result of a clause in his employment

---

[13] Defendants contention that it "should go without saying" that the disclaimer is not effective according to its terms is mistaken.  Def. Br. 24 n.9.  Although it may be true that J&J's representations and acknowledgements about past ownership are not conclusive in themselves (though as discussed above they are correct), J&J's express disclaimer of ownership is certainly binding on a going-forward basis.  None of the cases cited by Defendants suggest that it is impossible to disclaim rights in property.  *See, e.g. Estate of Monroe v. Commissioner*, 124 F.3d 699, 708 (5th Cir. 1997) (noting "disclaimers were effective to give up the legatees' rights to their respective bequests" to an estate).

agreement.  *Id.*  HP, however, disagreed that it was an owner of the patent.  It signed a document

stating that it had "never asserted any ownership rights to the IpVenture Patents and agrees to

forbear from asserting such rights at anytime in the future."  Prior Dkt. 521-1.  The Federal

Circuit reversed the district court's grant of the motion to dismiss, holding that "Hewlett-Packard

statement that it 'never has had any legal or equitable rights' is effective in accordance with its

terms.  We know of no public policy that is violated by giving this statement the meaning that is

stated on its face, at least when no intervening right or other equitable consideration is asserted."

*IpVenture*, 503 F.3d at 1327.

Defendants' attempt to distinguish *IpVenture* on the ground that "HP's lack of ownership

of the patent at issue was not a function of the statement HP made," Def. Br. 27, is contrary to

the text of the *IpVenture* opinion.  The court did not say that HP's disclaimer was superfluous

because HP independently lacked rights under the employment agreement.  Rather, the court

stated that HP's disclaimer "confirmed the situation as to that patent, and ***removed the need to***

***construe the employment agreement***."  *IpVenture*, 503 F.3d at 1327 (emphasis added).  Indeed,

the court's statement that the disclaimer was "effective in accordance with its terms" could

hardly have been clearer.  *Id.*  The J&J disclaimer is similarly effective according to its terms

and, like the disclaimer in *IpVenture*, it eliminates any purported standing defect.  *Cf. Walker*

*Digital, LLC v. Expedia, Inc.*, 950 F. Supp. 2d 729, 737 & n.9 (D. Del. 2013) (recognizing that

the "Federal Circuit held that [HP's] confirmation of the patent status removed the need to

construe an employment agreement patent" but holding that letter there was ineffective because

its "ambiguous language [was] a far cry from the clear language used by the parties in *IpVenture*

to confirm the status of a patent-in-suit").[14]

In *Enovsys LLC v. Nextel Commc'ns., Inc.,* 614 F.3d 1333 (Fed. Cir. 2010), the Federal Circuit again held that a disclaimer of ownership rights eliminated any standing defect. The defendant moved to dismiss a patent infringement suit on the ground that an inventor's former wife had a one-half interest in the patent—because the patent was community property—and the ex-wife was not joined as a plaintiff in the suit. *Id.* at 1338. The Federal Circuit held that although the patent was presumptively community property because it had been invented during the marriage, this "presumption was overcome by what [the couple] declared in their joint petition for summary dissolution" of the marriage. *Id.* at 1342. The court found the declaration that "we have no community assets or liabilities" to be a valid discharge of patent ownership that obviated the need to join the ex-wife. *Id.* The dissolution was given full legal effect even though (1) it was undisputed that the wife previously held an ownership interest in the patent; and (2) the declaration did not expressly assign rights in or even identify the patent. *Id.* at 1343. *See also Katrinecz v. Motorola Mobility LLC*, 2014 U.S. Dist. LEXIS 190707, at *9 (W.D. Tex. Nov. 7, 2014) (denying motion to dismiss for failing to join patent co-owner when separation agreement stated that all marital property had been distributed).

District courts have given effect to disclaimers or similar acknowledgements that a co-owner lacks the right to sue to enforce patent rights in at least five other cases. These cases involve the same question at issue here: whether the failure to join an alleged co-owner defeats standing. They hold that the alleged co-owner's disclaimer of rights eliminates any purported standing defect:

---

[14] Defendants also contend that the HP disclaimer was an express acknowledgement by HP of a preexisting verbal pre-employment agreement between the inventor and HP. Def. Br. 27. But the J&J disclaimer similarly reinforces a pre-existing understanding: "there has never been any owner of the '083 patent other than Janssen" and "J&J has never asserted any ownership rights to the '083 patent." Ex. 5.

- ***Tele-Guia Talking Yellow Pages v. Cablevision Sys. Corp.*, 2007 U.S. Dist. LEXIS 80616, at \*2, 9 (S.D.N.Y. Oct. 31, 2007)** (denying motion to dismiss for failure to join co-owner because, even though it was undisputed that the co-owner had an ownership interest in the patent, the co-owner had "disclaim[ed] any right to enforce this patent" and "agree[d] that" Tele-Guia shall have "the exclusive right to enforce the rights and interests under the Patent against third parties").

- ***MediaTek, Inc. v. Sanyo Elec. Co.*, 2007 U.S. Dist. LEXIS 98625, at \*5, 14 (E.D. Tex. Apr. 16, 2007)** (because involuntarily joined plaintiffs "disclaimed any ownership rights in the patents-at-issue, . . . their participation is no longer required as a prudential matter").

- ***Agilent Techs., Inc. v. Micromuse, Inc.*, 2004 U.S. Dist. LEXIS 20723, at \*20-24 (S.D.N.Y. Oct. 19, 2004)** (rejecting motion to dismiss for failure to join co-owner because the co-owner "expressly disclaimed any interest in pursuing a claim against [defendant] with respect to the" patent) (citing *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*, 944 F.2d 870, 875-76 (Fed. Cir. 1991)).

- ***Advanced Tech. Incubator, Inc. v. Sharp Corp.*, 2009 U.S. Dist. LEXIS 69556, at \*7, 31 (E.D. Tex. July 6, 2009)** (rejecting motion to dismiss for failure to join an indispensable party and giving legal effect to an "acknowledgement" in which the unjoined party "disclaimed any ownership interest whatsoever in that patents at issue" and "agreed it had no right to sue for infringement of the" patents).

- ***Nomadix, Inc. v. Hewlett-Packard Co.*, 2012 U.S. Dist. LEXIS 64101, at \*10-11 (C.D. Cal. May 7, 2012)** (a party need not be joined where it agreed to "disclaim any patent rights that it may have had" if the inventor agreed that it did not use the party's facilities or funds to invent the product) (internal quotation marks omitted).

Defendants fail to acknowledge this substantial line of authority finding standing where an alleged co-owner disclaims or relinquishes any interest in a patent.  Instead, they assert that they are "not aware of[] any cases or other authority supporting the idea that a patent co-owner may simply 'disclaim' its ownership rights."  Def. Br. 25.  As shown, there are many such cases, and they are directly on point.

**B.    Defendants Cite No Authority Holding That a Disclaimer of Ownership Cannot Cure a Purported Defect of Prudential Standing**

None of the cases Defendants cite hold that an alleged co-owner's disclaimer of ownership is insufficient to cure a purported standing defect on the facts presented here.  Importantly, Defendants do not dispute that the employee agreements here assigned an

ownership interest in the '083 patent to Janssen's predecessor Centocor.  Def. Br.  3.

Accordingly, it is undisputed that Janssen has constitutional (Article III) standing to bring a

claim for patent infringement as a "patentee."  35 U.S.C. § 281; *see Bellehumeur v. Bonnett*, 127

F. App'x 480, 483 (Fed. Cir. 2005) (a patent co-owner "has constitutional standing to bring this

lawsuit").  Defendants' argument is that the agreements also assigned rights to other companies,

who also must be joined in order to establish prudential standing.

Defendants cite no case holding that a disclaimer of co-ownership is ineffective to cure a

purported prudential standing defect.  Rather, the cases they cite stand for the inapposite

propositions that an assignment of patent rights must be in writing, *Vapor Point LLC v.

Moorhead*, 832 F.3d 1343, 1351 (Fed. Cir. 2016) (O'Malley, J., concurring), that an exclusive

licensee without full ownership rights must join the patent owner as a party, *Prima Tek II v. A-

Roo Co.*, 222 F.3d 1372, 1381 (Fed. Cir. 2000), that a non-exclusive licensee lacks Article III

standing to bring a patent infringement suit, *Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d

1026, 1034 (Fed. Cir. 1995), or that a party that has assigned away its rights in a patent lacks

Article III standing to pursue an infringement action, *Pi-Net Int'l, Inc. v. Focus Bus. Bank*, 2015

U.S. Dist. LEXIS 44910, at *14 (N.D. Cal. Apr. 6. 2015) ("Pi-Net's attempt to contract around

Article III's standing requirement is unavailing").

As some of these cases show, when a party is not an owner, contractual arrangements

with the owner short of transferring all substantial rights do not remove the obligation to name

the patentee as a plaintiff.  Here, however, there is no dispute that Janssen obtained ownership in

the '083 patent by means of a proper written instrument: the employee agreements themselves.

The only alleged standing deficiency here is ***prudential***, not constitutional.  *See Acoustic Techs.,

Inc. v. Itron, Inc.*, 2010 U.S. Dist. LEXIS 142166, at *23-24 (D. Mass. Dec. 21, 2010) ("Joinder

of all co-owners of a patent presents an issue of standing but, as ATI notes, it is a prudential

issue of standing rather than an Article III constitutional issue of standing.").   As discussed

above, more than a half-dozen cases hold that a purported co-owner's disclaimer of ownership is

sufficient to cure a prudential standing problem where, as here, the plaintiff is an owner of the

patent.  *See supra* Part III(A).  In contrast, in the two district court cases cited by Defendants that

involve co-ownership, standing was lacking precisely because the co-owner had not adequately

disclaimed ownership in the patent prior to suit.  *See Bushnell, Inc. v. Brunton Co.*, 659 F. Supp.

2d 1150, 1162 (D. Kan. 2009) (granting motion to dismiss for lack of prudential standing where

co-owner had "not waived any rights to the [] patents except the right to participate in this

lawsuit"); *Speedfit LLC v. Woodway USA, Inc*., 2016 U.S. Dist. LEXIS 179464, at *13-14

(E.D.N.Y. Dec. 28, 2016) (granting motion to dismiss where co-owner's pre-suit agreement "did

not constitute a waiver by [co-owner] of his right to refuse to join an infringement suit").[15]

### C.    The J&J Disclaimer Binds J&J's Current and Former Subsidiaries and Affiliates.

In the J&J disclaimer, J&J "represent[ed] that none of its . . . existing and future

subsidiaries, divisions, and affiliates, other than Janssen has or will assert any ownership rights

to the '083 patent."  Ex. 5.  J&J had the authority to bind—and did bind—its subsidiaries.

Parent companies frequently release rights on behalf of themselves, their subsidiaries, and

---

[15] Defendants' other cases do not involve standing at all, but simply stand for the proposition that an assignment must "show a clear an unmistakable intent to part with the patent." *McClaskey v. Harbison-Walker Refractories Co.*, 138 F.2d 493, 499 (3d Cir. 1943); *Univ. Patents, Inc. v. Kligman*, 762 F. Supp. 1212 (E.D. Pa. 1991); *Patriot Universal Holdings, LLC v. Formax, Inc.*, 24 F. Supp. 3d 802, 804 (E.D. Wis. 2014).   Defendants also reference a statute allowing for patent disclaimers to be recorded in the PTO.  Def. Br. 25 n.10.  35 U.S.C. § 253 pertains to disclaimers of entire claims and of terminal interests. Moreover, even if a disclaimer *can* be recorded in the PTO, the statute does not *require* a disclaimer to take that form, as is clear by the multitude of cases crediting disclaimers of patent rights outside of this statutory provision.  *See supra* Part III(A).

affiliates, and such releases are routinely found to be binding. *See, e.g.*, *Grunley Walsh US, LLC v. Raap*, 2009 U.S. Dist. LEXIS 38609, at \*23-25 (E.D. Va. May 6, 2009), *aff'd*, 386 F. App'x 455, 462 (4th Cir. 2010) (company formed by "seller" bound by agreement in which "seller" agreed to release "buyer" "on behalf of itself and each of its . . . affiliates, successors and assigns"); *Invitrogen Corp. v. Emp'rs. Ins. Co.*, 2007 U.S. Dist. LEXIS 19301, at \*20-25 (D. Ariz. Mar. 9, 2007) (subsidiary bound by agreement promising that a company "and its present or former agents, officers, directors, shareholders, employees, and subsidiaries" agreed not to commence legal proceedings); *Geier v. Mozido, LLC*, 2016 De. Ch. LEXIS 149, at \*15-18 (Sept. 29, 2016) (release defining releasors as a company, its "affiliates, subsidiaries, and parents" included an individual who was in control of the company); *N. Sec. Ins. Co. v. Mietc Elecs., Ltd.*, 965 A.2d 447, 454-56 (Vt. 2008) (successor bound by release providing that "Mitec Systems Corporation, . . . does for its successors, affiliates and assigns, remise, release and forever discharge NSIC" from claims).

The cases cited by Defendants are not to the contrary. In two of those cases, the parent did not even purport to bind its subsidiaries. *See Royal Indus. v. St. Regis Paper Co.*, 420 F.2d 449 (9th Cir. 1969) (agreement to terminate license made no mention of doing so on behalf of subsidiary); *Max Sound Corp. v. Google, Inc.*, 147 F. Supp. 3d 948, 953 (N.D. Cal. 2015) (assignment, by its terms, assigned only parent's rights). In *Quantum Corporation v. Riverbed Technology, Inc.*, 2008 U.S. Dist. LEXIS 11348, at \*5 (N.D. Cal. Feb. 4, 2008), the plaintiff, which had no independent ownership interest in the patent, could not obtain such an interest by virtue of an agreement executed by the parent of the patent holder. Here, however, it is undisputed that Janssen already had an ownership interest in the '083 patent. It is J&J's disclaimer of ownership, not any transfer of ownership, that is relevant.

29

Finally, Defendants vaguely assert that former J&J subsidiaries may have an interest in the '083 patent, but they do not identify any former J&J subsidiary with any conceivable interest in the invention.  Nor do they identify any divestiture by J&J in which the divestiture agreement would even colorably give such an entity a right to maintain an ownership claim to inventions made by unrelated J&J subsidiaries that were not part of the divestiture.  Thus, Defendants fail to show that the employee agreements at issue here ever gave ownership rights to the '083 patent to such a company.  Furthermore, a former subsidiary of J&J with no connection whatsoever to the '083 patent would hardly be in a position to assert ownership of the patent based on an interpretation of a broadly-worded J&J contract that J&J has disclaimed.  *Cf. Microstrategy, Inc. v. Acacia Research Corp.*, 2010 Del. Ch. LEXIS 254, at *6 (Dec. 30, 2010) (a subsidiary formed after settlement agreement signed still bound by agreement in which company, "its parent companies, Subsidiaries, and Affiliates" granted a release and promised not to bring a patent infringement lawsuit).

## V.      CONCLUSION

For the reasons discussed above, Defendants' challenge to Janssen's standing in this action is contrary to the language of the employee agreements at issue, contrary to the extrinsic evidence, and contrary to the case law concerning the effect of disclaimers on prudential standing.  Defendants should not be permitted to delay resolution of the merits of Janssen's claims any longer.  Their motion should be denied.

Respectfully Submitted,

Dated: August 2, 2017

| | |
|---|---|
| *Of Counsel* | */s/ Alison C. Casey_____* |
| Gregory L. Diskant (admitted *pro hac vice*) | Heather B. Repicky (BBO # 663347) |
| gldiskant@pbwt.com | hrepicky@nutter.com |
| Aron Fischer (admitted *pro hac vice*) | Alison C. Casey (BBO #688253) |
| afischer@pbwt.com | acasey@nutter.com |
| Daniel A. Friedman (admitted *pro hac vice*) | NUTTER MCCLENNEN & FISH LLP |
| dfriedman@pbwt.com | Seaport West |
| PATTERSON BELKNAP WEBB & TYLER LLP | 155 Seaport Boulevard |
| 1133 Avenue of the Americas | Boston, MA 02210 |
| New York, NY 10036-6710 | 617-439-2000 |
| 212-336-2000 | FAX: 617-310-9192 |
| FAX: 212-336-2222 | |
| | *Attorneys for Plaintiff Janssen Biotech, Inc.* |

## CERTIFICATE OF SERVICE

I certify that on August 2, 2017, this document, filed through the ECF system, will be sent electronically to the parties or their counsel who are registered participants as identified on the Notice of Electronic Filing and if not so registered, that copies will be electronically mailed to such parties or their counsel.

/s/ *Alison C. Casey*_____