## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| JANSSEN BIOTECH, INC. and<br>NEW YORK UNIVERSITY<br>    Plaintiffs,<br><br>    v.<br><br>CELLTRION HEALTHCARE CO., LTD.,<br>CELLTRION, INC., and<br>HOSPIRA, INC.<br>    Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:15-cv-10698-MLW<br>Civil Action No. 1:16-cv-11117-MLW |

## DECLARATION OF KATHERINE AMOS

I, Katherine Amos, declare and state as follows:

1.      I am the Senior Director, Global Transfer Pricing at Johnson & Johnson ("J&J"). I have been in that position since May 2016. I have over twenty-four years of experience working in various companies and professional services firms, with a focus on tax-related transfer pricing issues. The term "transfer pricing" refers to the intercompany[1] pricing of (among other things) goods, services and intangibles within a multi-national enterprise, such as J&J, when its various subsidiaries transact within one another.

2.      Before joining J&J, I spent over seven years in tax executive positions responsible for transfer pricing at Eaton Corporation, and before that, Tyco International. Prior to those positions, I spent over sixteen years in professional services firms, at PricewaterhouseCoopers, and before that, Ernst & Young, focusing on transfer pricing in a number of industries, including the pharmaceutical, biotech, and medical device industries.

---

[1] In the tax context, "intercompany" is generally used to describe transactions between separate legal entities, even where those legal entities may be affiliated or commonly owned as part of a larger corporate group.

3.      In my role as Senior Director, Global Transfer Pricing, I am responsible for leading the development, implementation and oversight of J&J's global transfer pricing strategy and policies.

4.      J&J is a holding company with hundreds of subsidiaries doing business throughout the world.

**The Need to Properly Account for Company-Specific Earnings and Intercompany Transactions**

5.      With the exception of a handful of small nations, all the major countries in the world impose taxes on corporate earnings. Because J&J's subsidiaries are independent corporate entities, they are each required to accurately account for, report, and pay taxes on their earnings in the country or countries where they operate. Although the profit or loss of each J&J subsidiary ultimately accrues to the benefit of J&J and its shareholders, it is crucial for tax purposes (among other reasons) that income and expenses associated with any individual country be fairly and accurately reported by each independent corporate entity.

6.      J&J subsidiaries may transact with one another through, for example, the sale of tangible goods, the provision of services, or the use of intangibles (such as intellectual property). When such transactions occur, the consideration paid affects the allocation of profits from one country to another. If the consideration in these transactions is not appropriately accounted for, tax authorities will reallocate earnings to what they consider to be the correct company and impose additional tax liabilities, as well as any applicable penalties, accordingly.

7.      In the United States, for example, the tax code provides that for companies "owned or controlled directly or indirectly by the same interests," the Internal Revenue Service "may distribute, apportion, or allocate gross income, deductions, credits, or allowances between

or among such organizations, trades, or businesses, if [it] determines that such distribution, apportionment, or allocation is necessary in order to prevent evasion of taxes or clearly to reflect the income of any of such organizations, trades, or businesses." 26 U.S.C. § 482.  In the United States, appropriate allocations are those that conform to the results that would be realized by unrelated parties acting at arm's length.  A similar standard applies in most developed economies, as reflected in the transfer pricing guidelines promulgated by the Organization for Economic Co-operation and Development ("OECD").

8.      Furthermore, many countries around the world impose penalties for inaccurate tax reporting.  In the U.S. tax code, 26 U.S.C. § 6662 imposes penalties on companies with underpayments of tax attributable to certain types of inaccuracies or misstatements.  For transfer pricing in particular, the regulations set out a detailed regime for analyzing and documenting transactions between related parties; this documentation is required in order to establish that specific penalties do not apply to underpayments of tax attributable to transfer pricing. 26 CFR § 1.6662-6(d); 26 CFR §§ 1.482-1 through 1.482-9.

9.      As a result of these laws and regulations, it is the practice of J&J, of the other companies I am familiar with, and I believe of all major companies that operate through subsidiaries, to make efforts to analyze and responsibly account for significant intercompany transactions in order to ensure that the allocation of income among subsidiaries is well-founded and consistent with the behavior of unrelated parties acting at arm's length.  In fact, the majority of my time is spent analyzing and assessing the accuracy of intercompany transfer pricing for tax purposes.

**Accounting for Patent Rights**

10.     Based on my experience with the pharmaceutical industry, companies throughout the industry rely on intellectual property protections, primarily patents, to enable them to translate their R&D investments into profits.  In accounting for earnings and other transactions (including intercompany transactions) in the pharmaceutical industry, it is crucial to properly account for patent rights.

11.     Section 482 of the Internal Revenue Code, the section cited above that addresses all intercompany transactions, includes an additional provision for transactions involving intellectual property.  It provides that in "the case of any [intercompany] transfer (or license) of intangible property . . . the income with respect to such transfer or license shall be commensurate with the income attributable to the intangible."  26 U.S.C. § 482.  Failure to properly account for intercompany transfers or licenses of intellectual property can result in underpayment and, potentially, penalties pursuant to section 6662 of the tax code, as discussed above.

12.     Accordingly, it is the practice of J&J and of the other major pharmaceutical companies I am familiar with to undertake efforts to properly account for intercompany transfers of patent rights.  This requires that patent rights be clearly assigned to specific J&J subsidiaries.  Otherwise, it would not be possible to accurately allocate earnings associated with patented products to the proper subsidiary as required by tax law.

**The Extreme Impracticality of Companywide Patent Ownership**

13.     I have been informed that in the above-captioned litigation, there is a question as to whether a patent asserted by Janssen Biotech, Inc., a J&J pharmaceutical company, is legally owned jointly by every company in the J&J family of companies.

14.     In my experience at J&J, I have never encountered a situation where a patent was owned jointly by the entire J&J family of companies; nor am I aware of other pharmaceutical companies that assign patent rights jointly to all of their subsidiaries. Rather, it is companywide practice at J&J (and elsewhere) that patents be owned by individual subsidiaries.

15.     This is for very good reason. For the reasons discussed above, it would extremely impractical for patent rights to be legally owned jointly by all of J&J's subsidiaries. It would not be an exaggeration to say that this joint ownership arrangement would create chaos from a tax perspective.  The arrangement would make it extremely difficult for J&J's subsidiaries to appropriately account for and defend their earnings and tax liabilities.

16.     The complexity and uncertainty created by such joint legal ownership would greatly increase the potential for simultaneous, overlapping disputes with tax authorities in the countries in which J&J operates, as well as disputes between countries (e.g., between the tax authorities of the U.S. and Canada) concerning which country has the right to tax income associated with a patent. This would likely lead to multiple-taxation of the same income as countries disagree over the calculation and division of the income.

17.     Furthermore, as mentioned above, it is J&J's practice to conduct detailed analyses of intercompany transfers, including the transfer/sale of patent ownership, or license of particular rights to a patent in exchange for royalties, to ensure that they are accurately priced. As a matter of transfer pricing law, if a patent were jointly owned by all of J&J's subsidiaries, transactions involving that patent could require—or be treated as—a license from, and royalty payments to, every single other J&J company. As a simple matter of administrability, keeping

track of these transactions would be highly impractical.  To accurately price and defend each of these transactions would be extremely difficult.

18.     The problems associated with collective ownership would not end even if an initial arrangement satisfying the tax law and transfer pricing rules could be designed for the use or sale of a patent or other intangible property.  In the United States, the "commensurate with income" standard for transfers of intangible property in the tax code allows the Internal Revenue Service to make adjustments to the consideration paid based on the actual, after-the-fact, income attributable to intangible property.  26 U.S.C. § 482; 26 CFR § 1.482-4(f). Therefore, the significant burdens on the J&J subsidiaries would be ongoing and require constant reanalysis of the economic results attributable to the patent or other intangible property, from the perspective of each of the numerous joint owners.

19.     Transactions involving intangible property are also given additional scrutiny by tax authorities outside the United States, as demonstrated by the OECD and G20's recent multi-year project to address the risks associated with "high risk" transactions, including intangibles transactions. *See* OECD/G20 Base Erosion and Profit Shifting Project, Actions 8-10 Final Reports (Oct. 5, 2015).

20.     It has been suggested, I am told, that J&J might have assigned patent ownership jointly to all its subsidiaries so that any J&J subsidiary would have the freedom to use any J&J patent without a license.  But because of the tax laws and regulations described above, assigning patents jointly to multiple J&J subsidiaries would not free J&J subsidiaries from their obligations to account for and defend the consideration charged (or lack of consideration) in transactions involving patents.  If anything, joint ownership would create overwhelming, ongoing burdens; J&J would still be required by law to determine and allocate the revenue and

6

expenses associated with the patents.  But as discussed above, this would be an exceedingly difficult task if all J&J patents were jointly owned by all of J&J's subsidiaries.

**The '083 Patent**

21.     Setting aside the extreme burdens associated with joint ownership generally, there would be no reason for J&J to provide for joint ownership of U.S. Patent No. 7,598,083 ("the '083 patent"), the patent asserted by Janssen Biotech, Inc. that is the subject of this litigation, and doing so would potentially create tax-related difficulties.  As I understand the origins of this patent, it was developed exclusively by employees of Janssen Biotech, Inc. (then known as Centocor, Inc.), and was entirely funded by Centocor, Inc.  Company records indicate that the patent is owned by Janssen Biotech, Inc. and not by any other J&J company.

22.     I have been informed that the '083 patent has not been used in connection with any product that has been sold commercially.  If the patent were to generate earnings in the future, however, for example through a settlement payment or damages award in this litigation, these earnings would be allocated to Janssen Biotech, Inc., which J&J understands to be the sole owner of the patent.  To do otherwise would raise serious questions about the economic results of this allocation.  The assignment of legal ownership to all J&J subsidiaries would lead to multiple complications and risks from a tax perspective.

23.     I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

_____

Katherine Amos

7