**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JANSSEN BIOTECH, INC., | |
| Plaintiff, | Civil Action No. l:17-cv-11008-MLW |
| v. | **CONFIDENTIAL -** |
| CELLTRION HEALTHCARE CO., LTD., CELLTRION, INC., and HOSPIRA, INC., | **FILED UNDER SEAL** |
| Defendants. | |

## JOINT REPORT

Pursuant to the Court's Order of June 21, 2017 (No. 15-10698 Dkt. 574), the parties jointly submit this report regarding: (a) their respective positions on whether discovery regarding damages should be stayed until the Defendants' motion to dismiss the 2017 action is decided; and (b) their respective proposed pretrial schedules and trial dates.  As noted below, a report on the status of the parties' resumed settlement discussions has been submitted separately, under seal.

**A.     Whether Discovery Regarding Damages Should Be Stayed Until the Defendants' Motion to Dismiss the 2017 Action Is Decided**

1.     Defendants' Position Is That Discovery Should Be Stayed[1]

Defendants continue to believe that discovery on damages should remain stayed until the Court decides Defendants' motion to dismiss, for at least three reasons.

---

[1] As of Thursday, August 17, 2017, the parties planned to exchange their respective sections of the joint report on Monday, August 21st.  On the morning of August 21st, Janssen indicated that it no longer wished to exchange position statements in advance of the joint filing.

*First*, as explained more fully in Defendants' briefing, their motion to dismiss is meritorious.  Janssen has been changing positions on standing since January, necessitating multiple rounds of briefing, only to finally capitulate and dismiss both its 2015 and 2016 complaints.  *See* No. 15-10698 Dkt. 584.  Janssen originally claimed that "COMPANY" in the employment agreements, "correctly construed," meant "any company to which I become transferred while I'm employed," such that the agreement "travel[s] with the employee if he or she is transferred to another J&J company," despite acknowledging that the form agreement "doesn't literally say that."  2/8/17 Hr'g Tr. at 47:15–23.  But discovery (which Janssen opposed) revealed that Janssen's parent and sister companies have repeatedly interpreted "COMPANY" in the same or similar agreements much more broadly, as including more than a person's employer(s)—even telling one court that "plaintiffs" J&J and Cordis "own all inventions" an employee developed, pursuant to his employment agreement.  Dkt. 14 at 7–8.  Faced with this problem, Janssen now leaves the law of contract interpretation and common sense even further behind, arguing that "COMPANY" means whatever J&J or any of its family companies say it means, which may depend not only on "the facts of a given case," but also on what may have happened since the signing of a particular contract or "on the terms of the particular contract provision at issue" to which the term "COMPANY" would apply.  Dkt. 26 at 6.

To be clear, Janssen asks this Court to rule that a defined term in a form agreement, which expressly applies "[a]s used in this Agreement," means whatever Janssen or J&J or any other enforcing company deems to be "applicable" in any particular circumstance.  *Id*. Janssen's position runs contrary to the most fundamental concept of contract law, namely the "essential characteristic" of a contract that the "obligations be specifically described in order to enable a court or a trier of fact to ascertain what it was the promisor undertook to do."  *Malaker Corp.*

*Stockholders Protective Comm. v. First Jersey Nat. Bank*, 163 N.J. Super. 463, 474 (N.J. Super. Ct. App. Div. 1978).  Indeed, Janssen's proposed non-definition of "COMPANY" would render J&J's form agreement unenforceable, putting at risk all of the J&J family's proprietary assets, including patents and confidential information.  *Id.* at 474 ("An agreement so deficient in the specification of its essential terms that the performance by each party cannot be ascertained with reasonable certainty is not a contract, and clearly is not an enforceable one.").  Janssen's approach cannot be the correct interpretation of the agreements.  "[D]oubt or difference"—the consequences of Janssen's non-definition—are "incompatible with agreement." *Borough of W. Caldwell v. Borough of Caldwell*, 26 N.J. 9, 25 (1958).

Yet simultaneously—and conveniently—Janssen argues that, with respect to Paragraph 1 of the agreements regarding assignment of inventions, inventions are always "unmistakably assigned to the J&J company employing the inventor." *Id.* at 8.  The plain language of the agreements say no such thing. And achieving this result, such as by substituting "EMPLOYER" for "COMPANY" as J&J did in its more recent version of the employment agreements (Dkt. 14 at 10) would have been simple, but was not the choice the drafter made.

Janssen complains about negative consequences its chosen contract language purportedly would have ███████████████████████████████████████ or undergo reissue proceedings at the U.S. Patent Office (which it has not done).  But New Jersey law is clear that the court "cannot make … a better or more sensible contract than the one [drafters] made for themselves." *Kotkin v. Aronson*, 815 A.2d 962, 963 (N.J. 2003); *see also Abbott Point of Care Inc. v. Epocal, Inc.*, 666 F.3d 1299, 1302 (Fed. Cir. 2012) (applying New Jersey law and explaining that "it is well-settled ... that when the terms of a contract are clear, it is the function of a court to enforce it as written and not to make a better contract for either of the parties.")

(internal citations and quotation marks omitted); *City of Orange Twp. v. Empire Mortg. Servs., Inc.*, 341 N.J. Super. 216, 224 (N.J. Super. Ct. App. Div. 2001) ("The court has no right to rewrite the contract merely because one might conclude that it might well have been functionally desirable to draft it differently.") (internal quotations omitted).  Where "the language of a contract is plain and capable of legal construction, the language alone must determine the agreement's force and effect." *Manahawkin Convalescent v. O'Neill*, 217 N.J. 99, 118 (2014) (internal quotations omitted).

Additionally, Janssen and J&J's so-called "disclaimer" agreement cannot fix the standing problem.  Under Federal Circuit law, which governs standing in patent cases, it is a "settled principle" that "[a]n action for infringement must join as plaintiffs all co-owners." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1467 (Fed. Cir. 1998), *cert. denied*, 525 U.S. 923 (1998). The Federal Circuit has recognized only two exceptions to this rule, neither of which apply here. *See* Dkt. 14 at 25–26; *STC.UNM v. Intel Corp.*, 754 F.3d 940, 946 (Fed. Cir. 2014), *cert. denied*, 135 S. Ct. 1700 (2015).  First, *Ethicon* recognizes that a missing co-owner can be compelled to join a suit against his will if the co-owner "waive[d] his right to refuse to join suit." *Ethicon*, 135 F.3d at 1468 n.9.  That is, all co-owners have a right to refuse to join a lawsuit, and they may exercise that right, in which case they cannot be joined, or they may waive that right, in which case they can be joined in order for there to be standing.  *Id.*; *see also STC.UNM*, 754 F.3d at 946.  Janssen does not argue that J&J and its subsidiaries have waived their right to refuse to join the suit.  Second, *Ethicon* recognizes that "when any patent owner has granted an exclusive license, he stands in a relationship of trust to his licensee and must permit the licensee to sue in his name"—another exception that Janssen does not even contend applies here (nor could it, given the lack of any licenses related to the '083 patent).  *Id.*  Rather than argue either exception

applies, Janssen's most recent brief ignores *Ethicon*, despite it being the key authority on joinder of co-owners. Janssen attempts to lead the Court astray, pointing to *IpVenture*,[2] which found that a third party was ***not*** a co-owner, and thus did not reach the question of joinder or the rule of *Ethicon*, and *Enovsys*,[3] which gave *res judicata* effect to a state court divorce decree, likewise concluding that there was no co-ownership and not thus addressing the question of joinder. Worse, Janssen argues that "a half-dozen cases hold that a purported co-owner's disclaimer of ownership is sufficient to cure a prudential standing problem" (Dkt. 26 at 28), but those cases, as Defendants will explain in their reply brief, likewise did not reach the question of whether a co-owner must be joined, are not good law in view of recent Federal Circuit precedent, or both.

Finally, even if agreeing not to assert patent ownership rights was a recognized exception to *Ethicon*—and it is not—Janssen has not shown that J&J has acted on behalf of all its subsidiaries, much less companies who were J&J subsidiaries when legal title to the invention was assigned, but ***were not part of the J&J family*** as of the time of the so-called "disclaimer" agreement. According to public records, there are at least five such companies. It is ***Janssen's*** burden to prove that there are no unjoined co-owners, which it has failed to do. *Sicom Sys., Ltd. v. Agilent Techs., Inc.*, 427 F.3d 971, 976 (Fed. Cir. 2005) ("The party bringing the action bears the burden of establishing that it has standing."); *see also Abbott*, 666 F.3d at 1302 ("[The plaintiff] has the burden to show necessary ownership rights to support standing to sue.").

The requirements for filing a patent case are few. A plaintiff must have a basis to believe its patent is infringed and valid, and must have standing to sue. It is entirely reasonable for the Court and Defendants to hold Janssen to these requirements. Despite ample time and numerous half-attempts to fix its standing problems, Janssen has yet to meet the basic requirements to bring

---

[2] *IpVenture, Inc. v. Prostar Computer, Inc.*, 503 F.3d 1324 (Fed. Cir. 2007).
[3] *Enovsys LLC v. Nextel Commc'ns, Inc.*, 614 F.3d 1333 (Fed. Cir. 2010).

a patent lawsuit.  Indeed, it appears to Defendants that it cannot do so.  Unless and until Janssen has proven that it meets the requirements for standing, the parties and the Court should not expend substantial resources on wide-ranging, burdensome, and expensive discovery, or on resolving discovery disputes (discussed in more detail below).

*Second*, the down-side of staying discovery is very minor. As of the submission of this report, the motion to dismiss is scheduled to be resolved in just over seven weeks. This pales in comparison to the delay Janssen has created in this case. After submission of six briefs on standing issues in January and February, Janssen requested that the parties start the process over with a motion to dismiss.  No. 15-10698 Dkt. 487 at 1.  This required setting a schedule that spanned five weeks.  *See* No. 15-10698 Dkt. 499 at 3.  At that time, Janssen said extrinsic evidence was unnecessary,[4] and knew that adding such evidence would require additional time for Defendants to seek and take discovery.  *Id*. at 3–4; 2/8/17 Lobby Conf. Tr. at 5–7.  But during briefing, Janssen nonetheless reversed course and injected volumes of never-before-seen documents it selected and declarations from as yet unheard-of witnesses, then refused to allow defendants fair discovery into the new "evidence."  This resulted in a two-and-a-half month delay, first because the Court ordered Janssen to provide document discovery and depositions, and then because Defendants were forced to file a motion regarding Janssen's improper assertions of privilege (issues on which the Court ruled almost entirely in Defendants' favor, or on which Janssen ultimately capitulated).  No. 15-10698 Dkts. 542, 564, 568.

Then Janssen pushed the restart button yet again, capitulating to Defendants' motion to dismiss and dropping both its complaints—more than two years into the litigation—in view of the serious standing problems it faced.  By all indications, Janssen knew about these problems

---

[4] *E.g.*, No. 15-10698 Dkt. 445 at 3 (referring to the "plain and obvious meaning of the Agreements"), 8 n.4 (arguing that the agreements are not ambiguous).

since 2015 when it executed two rounds of so-called "confirmatory assignments."  *See* Dkt. 14 at 21.  Janssen filed this brand new 2017 action, necessitating yet another round of briefing, with a schedule spanning fourteen more weeks.   Dkt. 1.   And while Defendants proposed that the renewed motion to dismiss be heard in early September, Janssen requested a hearing in October. Ex. 1 (6/15/17 counsel corresp.).  In short, Janssen cannot credibly claim prejudice from waiting a few more weeks, until after the Court decides Defendants' motion (and if the Court denies the motion), before discovery begins.

*Third*, by contrast, the potential benefits of staying discovery are high in the event the Court grants Defendants' motion.  Janssen's initial discovery requests are fulsome: 47 requests for production (41 plus multiple prior requests incorporated by reference), and 8 interrogatories. More important than the number of discovery requests is their subject matter and content. Janssen's discovery requests seek, by way of example:

- ██████████████████████████████████████████████████ (Ex. 2, Interrog. Nos. 1, 3; Ex. 3, RFP Nos. 5, 15, 17, 28, 29, 32, 33);

- ██████████████████████████████████████████████████ (Ex. 2, Interrog. Nos. 2, 4 ; Ex. 3, RFP Nos. 15, 17, 28, 33); and

- ████████████████████████████████ (Ex. 2, Interrog. No. 5; Ex. 3, RFP Nos. 4, 6, 9, 11, 14, 16).

Janssen is not, under any interpretation of the law, entitled to damages for *worldwide* sales of infliximab, nor damages for sales of infliximab that were made using a process that involved cell culture media powder produced in *Singapore*.[5]  Although Defendants contend there has never been any infringement, it is uncontested that the patent laws do not provide "compensation for a defendant's foreign exploitation of a patented invention, which is not infringement at all." *Power*

---

[5] As the Court is aware, Defendants maintain that Janssen is not entitled to lost profits at all as a matter of law.  *See* No. 15-10698 Dkts. 414, 441.

*Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1371 (Fed. Cir. 2013); *see also Brown v. Duchesne*, 60 U.S. 183, 195–196 (1856) ("[T]he **use** of [a patented invention] outside of the jurisdiction of the United States is not an infringement of [a patent owner's] rights, and he has no claim to **any compensation** for the profit or advantage the party may derive from it.") (emphasis added); *WesternGeco LLC v. ION Geophysical Corp.*, 791 F.3d 1340, 1350 (Fed. Cir. 2015), *vacated sub. nom. on other grounds*, 136 S. Ct. 2486 (2016) ("It is clear that under § 271(a) the export of a finished product cannot create liability for extraterritorial use of that product."). Indeed, Janssen previously represented that it was restricting its lost profits request to "Defendants' sales [of infliximab] **in the United States** that are the foreseeable result of Defendants' acts of infringement **in the United States**." *E.g.*, No. 15-10698 Dkt. 445 at 11; *see also id*. at 12–14; 2/23/17 Hr'g Tr. at 120:10–13 ("[W]e're not seeking damages for sales of Inflectra around the world, either reasonable royalty or lost profits."); *id*. at 125.

Yet Janssen reversed course entirely for its third complaint. Now, Janssen claims that it

██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████ Ex. 4 at 7–8 (Janssen Interrogatory Responses) (emphasis added). ████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████
████████████████████████ *Id*. at 8. The examples above show that Janssen's July 11 discovery requests and subsequent discovery responses represent a drastic expansion of what Janssen itself has previously acknowledged are the boundaries of its claim for damages.

Should discovery move forward, it is likely that additional resources will be expended by the Court and the parties resolving the propriety and scope of Janssen's discovery requests and improper damages theories.

Additionally, whether Janssen's requests are narrowed or not, collecting the documents and information Janssen seeks will be time-consuming and costly.[6]  The American Intellectual Property Law Association (AIPLA), which aggregates statistics on costs associated with patent litigation, reports that for a patent infringement suit where more than $25 million is at risk (far, far less than what Janssen has indicated it will request in this case), costs through the end of discovery average about $4 million.  Ex. 5, *AIPLA Report of the Economic Survey 2015* at 40.  A RAND Institute for Civil Justice survey of 45 cases found document production costs in intellectual property cases ranged up to almost $8 million. Ex. 6, Pace, N. and Zakaras, L., *Where the Money Goes: Understanding Litigant Expenditures for Producing Electronic Discovery*, RAND (2012) at 17–18.  Janssen's document requests—which are only its first round of requests—are, as explained above, numerous and wide-reaching.[7]  Given the amount of damages Janssen seeks, that a substantial portion of the documents will come from South Korea using foreign e-discovery vendors and likely requiring translation, and the existing cost

---

[6] While much technical discovery was completed in the prior phase, there has been essentially no damages discovery completed to date.

[7] *See, e.g.*, Ex. 3, Janssen RFP Nos. 2 (***all*** documents concerning FDA's postponement of the Arthritis Advisory

experience from the liability phase of the case, there is no doubt this will be an expensive endeavor.  Third party discovery will be implicated as well, for example, on the issue of the availability of non-infringing alternatives, which will impose additional costs and burdens not only on the parties, but also potentially on other courts in other judicial districts.  Defendants understand that Janssen, for example, has already approached GE HyClone to make further requests for discovery.  The last time Janssen pursued discovery from GE HyClone, it involved motions to quash and compel that involved six briefs and a 13-page decision from a different federal district court.  *See generally*, docket for No. 1:16-mc-00027-TC (D. Utah).

**Finally**, much of the information Janssen seeks is of the utmost confidentiality, such as information about production costs, profits, regulatory activity, and other competitively sensitive information, which Defendants ordinarily would not share outside their respective companies.  Defendants should not be required to turn over yet more of their most sensitive information as a part of this litigation unless and until Janssen has met its burden to show that it at least has the right to proceed.

2.   <u>Plaintiff's Position on Stay of Discovery</u>

Discovery pertaining to damages should not be stayed, so that a trial in this case on both liability and damages can proceed without undue delay.  The infringement claim in this case has been pending since March 2015 and the liability case has been trial ready since February 2017.  Early in the predecessor case, Defendants successfully opposed Janssen's motion to stay proceedings on the '471 patent, which was then in reexamination, on the ground that it was of immense importance to Defendants to obtain patent certainty prior to their launch of their biosimilar product.  In opposing that motion to stay, Defendants argued that it was the public policy of the BPCIA, the statute governing the approval of the biosimilar product at issue here, to resolve patent disputes "expeditiously."  Dkt. 41 at 8.  The Court agreed and denied the motion

to stay.  Dkt. 157 at 1.   Although Defendants are apparently no longer interested in an expeditious resolution of Janssen's patent infringement claim, the public policy of the BPCIA – as well as the policy of the Federal Rules of Civil Procedure to ensure a "just, speedy, and inexpensive determination of every action and proceeding," Fed. R. Civ. P. 1 – has not changed.

There is no good reason to stay discovery here.  Defendants argue that their pending motion to dismiss for lack of subject matter jurisdiction warrants a stay.  Of course, the fact that a motion to dismiss has been filed is not in itself a basis to stay discovery.  *See, e.g.*, *Mun. Review Comm. Inc. v. USA Energy Grp. LLC*, No. 1:14-cv-00180-DBH, 2015 U.S. Dist. LEXIS 6491, at *2 (D. Me. Jan. 21, 2015) ("As a general rule, the fact that a party intends to file, or has filed a motion to dismiss does not warrant the entry of a stay order.").  The circumstances here confirm that discovery should not be stayed.  First and foremost, as the Court has repeatedly noted and Defendants have repeatedly acknowledged, it is highly unlikely that Defendants will ultimately manage to avoid discovery on damages, regardless of the outcome of their pending motion to dismiss.  *See, e.g.*, 2/8/17 Lobby Conf. Tr. 7 (counsel for Defendants stating that █

██████████████████████████████████████████████████████████████

███████████ ); 6/1/17 Teleconf. Tr. 16 (the Court recognizing that, one way or the other, "at some point we're probably going to litigate this case"); 6/21/17 Teleconf. Tr. 21 (Defendants' counsel acknowledging that damages discovery may "ha[ve] to be done at some point" and, if so, "we can do it at that point").  This is because a dismissal on standing grounds would be without prejudice to refiling the case with any purported standing defects resolved.  Thus, the discovery to be taken now cannot be avoided; it can only be delayed.  Delaying discovery that will take place anyway is not a good reason to grant a stay.  *E.g.*, *Mun. Review Comm.*, 2015 U.S. Dist. LEXIS 6491, at *2 (denying motion to stay because "even if Defendant

prevails on its motion, Defendant undoubtedly will have to respond to most of the discovery requests that it seeks to avoid").

Furthermore, the discovery that will take place while the motion to dismiss is pending will not be unduly burdensome.  Based on the Court's prior practices, it is likely that the motion to dismiss will be decided by the end of the scheduled hearing of October 13, 2017, or soon thereafter.  Under Janssen's proposed schedule (set forth below), the only discovery proceedings that would take place before that motion is decided would be the production of documents, which would not need to be completed until October 31.  Because the process of document collection and review is time-consuming, allowing it to proceed without delay would substantially expedite the ultimate trial date in this case.  Relatively speaking, however, document production is not burdensome to the parties in a case of this nature, in that it typically does not require travel by counsel, full-day commitments by clients, or in-depth substantive analysis of the documents at issue, as depositions do.

Any complaint by Defendants regarding the cost of document production, moreover, would ring hollow "considering the importance of the issues at stake in the action, the amount in controversy, the parties' relative access to relevant information, the parties' resources, the importance of the discovery in resolving the issues, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  Fed. R. Civ. P. 26(b)(1).  This case involves highly important issues concerning intellectual property protections for biotechnological innovation, Janssen's damages claim is likely to approach $1 billion, and the parent companies of Janssen and Defendant Hospira are among the largest in the world, all factors that make the out-of-pocket costs of litigation less salient here than in typical cases.  Indeed, Defendants themselves appear to recognize this point, having displayed no sign of cost-consciousness so far

in this case.  They have retained a large litigation team with more than ample staffing at hearings and depositions, and they have repeatedly demanded maximal discovery and briefing whenever they believe such expensive proceedings will provide an incremental benefit to their position in this litigation.

A continued stay on discovery would serve only to needlessly delay ultimate resolution of this case.  Janssen therefore respectfully requests that the Court lift the stay of discovery.

**B.     The Parties' Proposed Pretrial Schedules and Trial Dates**

1.     <u>Defendants' Proposed Pretrial Schedule(s) and Trial Dates</u>

Defendants present the below proposed alternate schedules depending on whether the Court orders discovery to proceed during the pendency of Defendants' motion to dismiss (and assuming solely for the purpose of this submission that the Court denies the motion to dismiss). Defendants believe a single non-phased trial will be most efficient, and trial scheduled in July or August 2018 is necessary to allow for discovery (fact and expert), briefing and argument related to dispositive motions, *Daubert* motions, and any motions *in limine*, and other pre-trial submissions such as trial brief, jury instructions, exhibit lists, verdict forms, *etc.*

a.     Defendants' schedule provides time for issues to be properly presented to the Court, while Janssen seeks an unduly compressed schedule.

Plaintiff's proposal unworkably compresses discovery.  It allows only three weeks to depose experts on issues related to damages.  In the prior phase of the case, the parties needed seven weeks to conduct expert depositions.  No. 15-10698 Dkt. 124.  Given the size of Janssen's damages request and the issues surrounding lost profits and reasonable royalties, damages discovery will be expensive and likely involve a similar number of experts as the liability phase. Janssen also allows a mere ***eight weeks*** between the close of expert discovery and trial, to conduct all pretrial matters (including *Daubert* motions), and provides no time whatsoever for

briefing and hearing summary judgment motions.  In the prior phase, the Court and parties spent over three months on such issues, extending the schedule multiple times, and were not yet complete.  As the Court knows, one summary judgment motion is pending already (which would remove Hospira from this case),[8] and two expert-related motions likewise have not yet been resolved.  Further, Defendants anticipate additional summary judgment motions on key damages-related issues, such as whether lost profits are unavailable as a matter of law (for example, due to the presence of non-infringing alternatives) and whether Janssen is limited to a reasonable royalty under the BPCIA.  Defendants should not be deprived of an opportunity to narrow the case as contemplated by the Federal Rules of Civil Procedure.  *See* Fed. R. Civ. P. 56.

> b.     A single non-phased trial will provide efficiencies and allow the jury to evaluate the case a whole.

Regarding trial, conducting a single trial for both liability and damages together will be more efficient than a phased trial due to the substantial overlap of issues. In addition to overlapping factual testimony, such as on issues related to intent (relevant to both inducement and willful infringement) and the development of both accused media and the media claimed in the '083 patent (relevant to damages, invalidity, and infringement), much of the expert testimony will be relevant to both liability and damages. For instance, the existence of non-infringing alternatives, a key issue related to Janssen's claim for lost profits, overlaps with the issue of invalidity of the '083 patent.  *See* No. 15-10698 Dkts. 441 at 13–17 (identifying prior art media as non-infringing alternatives), 414 at 18–19.

There is also a possibility for overlap between Janssen's agency or "joint enterprise" theory of infringement and damages issues, for example, with respect to the nature of the relationship between Celltrion and Hospira and how Inflectra® was developed and is

---

[8] If Defendants' motion to dismiss is not granted, they may seek to have the outstanding summary judgment motion regarding Hospira resolved earlier in the case.

manufactured, distributed and sold.  There is likewise overlap between secondary considerations of obviousness (*e.g.*, the invention's commercial success (or lack thereof), the existence of an alleged long felt but unresolved need, alleged praise by others, *etc.*) and the reasonable royalty factors under a *Georgia-Pacific* analysis.  *See Georgia-Pac. Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970) (*e.g.*, commercial success, popularity, advantages over old modes or devices).  Janssen's willful infringement allegations may overlap with Janssen's claim that the Defendants induced GE HyClone to infringe because they allegedly "knew about the 083 patent and knew or were willfully blind to the fact it is infringed."  No. 15-10698 Dkt. 434 at 9.

In addition to the substantial overlap in issues, there are logistical concerns that favor a single trial.  For instance, a single trial will save substantial time by not repeating openings and closings and not recalling witnesses who previously testified.  This is particularly important for several witnesses Defendants expect to call regarding liability and damages related issues, who have to travel from South Korea, and third-party witness or witnesses from GE HyClone.  A single trial also allows the jury to understand the entire context and picture of the case, which will allow the parties to better present their narratives.  Indeed, just earlier this year Janssen argued that "[t]he jury should not consider this case in a vacuum.  The witnesses at trial need to discuss Remicade to provide the jury with a basic understanding of the factual context leading to this litigation."  No. 15-10698 Dkt. 419 at 6.  Despite the fact that the only patent at issue in the case relates to a generic nutrient powder, Janssen's entire damages theory, based on what Defendants have seen thus far, is based not on the nutrient powder, ████████████████████ ████████████, but on sales of Remicade®, a highly complex drug product which contains no nutrient powder and which Janssen sells to patients at a cost of up to $20,000 per year.  *See* Mem. and Order, No. 15-10698 Dkt. 249 at 3.  The jury should be given the benefit of

understanding the relevance of Remicade® to Janssen, the irrelevance of the '083 patent to Janssen, and the dollars Janssen claims are at stake, at one time so that the jury does not consider segments of the case in a vacuum.

Information related to how much money Janssen makes on Remicade® (and how much it claims to have lost due to the '083 patent) goes to at least the credibility of Janssen's stretched, twelve-way doctrine of equivalents theory and its position that "any" concentration of ingredients in a cell culture media is one that Janssen will consider to infringe.  The damages demand gives context to Janssen's motivation for leveraging an ███████████ cell food powder patent—which, as Defendants showed in expert reports and pre-trial briefing is almost identical to precursor cell food powders known for years prior in the field—in an effort to protect its "golden goose" product Remicade®.  Presentation of all these issues at once will be most fair and most efficient for the Court, the parties, third-party witnesses, and the jury.

      c.    Defendants' proposed schedules.

Thus Defendants propose and respectfully request a schedule for the remainder of the case as follows, with an option if discovery is stayed until Janssen has met its burden of establishing standing (consistent with Defendants' position, as discussed above) and one if discovery is not stayed:

| Event | Discovery During MTD Proceedings | No Discovery During MTD Proceedings |
|---|---|---|
| Report on discovery positions and settlement due | August 21, 2017 | |
| Defendants file reply re MTD | August 25, 2017 | |
| Janssen files sur-reply re MTD | September 8, 2017 | |
| Hearing on MTD | October 12, 2017 | |

| Event | Discovery During MTD Proceedings | No Discovery During MTD Proceedings |
|---|---|---|
| Fact discovery on issues related to damages begins | September 5, 2017 | To begin after the Court rules on MTD<br><br>[Estimated: October 16, 2017] |
| Fact discovery on issues related to damages ends | December 15, 2017<br><br>[about 3.5 months after fact discovery begins] | January 26, 2018 |
| Janssen's opening expert report(s) | January 12, 2018<br><br>[4 weeks after fact discovery ends] | February 23, 2018 |
| Defendants' rebuttal expert report(s) | February 16, 2018<br><br>[5 weeks after opening expert reports] | March 30, 2018 |
| Expert discovery on issues related to damages ends | March 16, 2018<br><br>[4 weeks after responsive expert reports] | April 27, 2018 |
| Deadline for dispositive motions and *Daubert* motions | April 6, 2018<br><br>[3 weeks after expert discovery ends] | May 18, 2018 |
| Deadline for responses to dispositive motions and *Daubert* motions | April 27, 2018<br><br>[3 weeks after opening motions] | June 8, 2018 |
| Deadline for replies to responses to dispositive motions and *Daubert* motions | May 11, 2018<br><br>[2 weeks after responses] | June 22, 2018 |
| Hearings on dispositive motions and *Daubert* motions | Week of May 28, 2018 | Week of July 16, 2018 |
| Parties exchange pretrial disclosures pursuant to Fed. R. Civ. P. 26(a)(3)<br><br>Deadline for motions *in limine* | June 8, 2018<br><br>[4 weeks after dispositive motion and *Daubert* replies] | July 20, 2018 |

| Event | Discovery During MTD Proceedings | No Discovery During MTD Proceedings |
|---|---|---|
| Deadline for responses to motions *in limine* | June 22, 2018<br><br>[2 weeks after motions *in limine*] | August 3, 2018 |
| Due date for pretrial memorandum and parties' respective trial briefs | July 6, 2018<br><br>[2 weeks after responses to motions *in limine*] | August 17, 2018 |
| Pretrial conference | Week of September 3 or 10, 2018 | Week of September 3 or 10, 2018 |
| Jury selection and trial begins | Week of September 10 or 17, 2018 | Week of September 10 or 17, 2018 |

The above proposed pretrial conference and trial dates take into account Defendants' lead trial counsel's current conflicts with respect to other scheduled trials. If the Court is available to hold trial in September 2018, the parties may wish to discuss adjustment of the interim dates (*e.g.*, expert discovery, motions, etc.).

      1.    <u>Plaintiff's Proposed Pretrial Schedule(s) and Trial Dates</u>

Janssen proposes the following pretrial schedule and trial dates.

| Event | Proposed Date |
|---|---|
| Completion of damages document production and interrogatory responses | October 31, 2017 |
| Close of damages fact discovery | December 10, 2017 |
| Janssen's opening expert reports on damages | December 22, 2017 |
| Defendants' responsive expert reports on damages | January 29, 2018 |
| Janssen's reply expert reports on damages | February 19, 2018 |
| Close of expert discovery | March 12, 2018 |
| Pretrial disclosures (Fed. R. Civ. P. 26(a)(3) and LR 16.5(c)) | March 19, 2018 |
| Pretrial memoranda (LR 16.5(d)) | March 26, 2018 |

| Motions *in limine*, including *Daubert* motions (close of briefing) | April 20, 2018 |
|---|---|
| Trial briefs | April 27, 2018 |
| Final pretrial conference | Week of April 30, 2018 |
| Trial to commence | Week of May 7, 2018 |

Janssen's proposed schedule provides approximately the same amount of time to complete damages-related fact discovery as does Defendants' proposed schedule; the only difference as to fact discovery is that Defendants assume that discovery will be stayed until October 16. Janssen's schedule provides more than ten weeks from today (and over three and a half months from the service of document requests) to complete production of damages-related documents. Given that the parties have already responded to each other's document requests – which required investigating what documents they have in their possession, what it would entail to review and produce them, and whether they consider the responses objectionable in whole or in part – ten additional weeks is more than sufficient time to complete production. This is particularly true given that discovery on liability issues is closed, so the current discovery period is limited to issues of damages.[9]

The schedule also provides nearly six additional weeks after the completion of document production to conduct depositions of damages fact witnesses. Given the narrow focus of the discovery, six weeks should be more than sufficient time to complete these depositions.

Janssen has revised its proposal related to expert discovery in response to feedback provided by Defendants during the parties' meet and confer. Janssen initially proposed two rounds of simultaneous expert reports, with each side first serving opening reports and then

---

[9] Indeed, Janssen's damages-related discovery requests (attached hereto as Exhibits 2 and 3) are substantially less burdensome than Defendants' (attached hereto as Exhibit 7 and 8).

serving responsive reports.  Defendants, however, took the position that expert reports should be exchanged sequentially in light of the burden of proof, with Janssen serving its opening reports followed by Defendants' responsive reports.  Janssen believes this approach is unnecessary:  in addition to responding to the opinions of Janssen's experts, Defendants will likely provide their own proposed damages calculation that will be based on their own expert's analysis, will not be responsive to the opinions of Janssen's expert in any real sense, and could be presented in an opening report.   Nevertheless, by way of compromise Janssen has agreed to Defendants' proposal to have damages-related expert reports be sequential.

If expert reports are going to be sequential, however, it is necessary for Janssen to have the opportunity to reply to Defendants' responsive reports, as is reflected in Janssen's proposed schedule.  This is true because of the way the burden of proof to establish damages is allocated, and it is particularly important because of the nature of damages issues that the parties have identified in prior briefing.

> When basing the alleged lost profits on lost sales, the patent owner has an initial burden to show a reasonable probability that he would have made the asserted sales "but for" the infringement.  Once the patent owner establishes a reasonable probability of "but for" causation, the burden then shifts to the accused infringer to show that the patent owner's "but for" causation claim is unreasonable for some or all of the lost sales.

*Grain Processing Corp. v. American Maize-Prods.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999) (alteration, citations, and internal quotation marks omitted).  Thus, in its case-in-chief, Janssen "need only show" a reasonable probability that "but for" Defendants' infringement of the '083 patent, it would have made the lost profit; it "need not negate every possibility" that it would have made the profit "absent the infringement."  *See Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1545 (Fed. Cir. 1995) (en banc).  The burden then shifts to the Defendants to show the unreasonableness of Janssen's causation claim, for example by establishing the availability of an acceptable non-infringing alternative to the infringing cell culture media.  *See Grain Processing*,

185 F.3d at 1349 (describing the district court as accepting plaintiff's initial premise on causation, but defendant defeating lost profits by proving that a non-infringing alternative was available and acceptable).

In prior briefing, Defendants have relied heavily on the alleged existence of acceptable non-infringing alternatives, contending that they foreclose a lost profits award.  In addition to being Defendants' burden under *Grain Processing*'s burden-shifting framework, any alleged acceptable non-infringing alternatives must, as a practical matter, be asserted in the first instance by Defendants, since Janssen denies that any such alternatives exist that would foreclose damages.  If Defendants are not going to put in opening expert reports, then in the absence of reply reports Janssen's experts will never have the opportunity to address any allegedly acceptable non-infringing alternative defense that Defendants come forward with.  Reply reports are therefore necessary.

Janssen's schedule provides for briefing on all damages-related motions *in limine* (including *Daubert* motions) to be completed several weeks in advance of trial.  Defendants' proposed schedule, in contrast, provides five months between the close of discovery for "dispositive motions" and *Daubert* motions.  Janssen does not believe that further dispositive motions (*i.e.*, motions on liability issues) are permitted under the Court's scheduling orders in the predecessor cases, which were incorporated into the record of this case by Court order.  Case No. 15-cv-10698, Dkt. No. 584.[10]  The pending motions *in limine* and *Daubert* motions on liability

---

[10] Indeed, in the course of negotiating the stipulation of dismissal of the prior cases, Defendants suggested that scheduling orders from the prior cases should not be made part of the record in this case.  Janssen disagreed, on the express grounds that it considered all proceedings on liability issues to be closed (as they were in the prior cases) and did not believe that the filing of the new case should reopen them.  The parties ultimately agreed to a stipulation that did not exclude scheduling orders from the proceedings that were made part of the record in this case.

issues, as well as the pending fully-briefed summary judgment motion pertaining to Hospira, can be decided at any convenient time between now and trial.  The only additional motions to be filed would pertain to damages.  Because these motions would only affect damages and cannot prevent the liability trial from going forward, it is not necessary or appropriate to build additional months into the schedule in order for them to be decided well in advance of trial.

Janssen respectfully requests that the Court adopt its proposed schedule.

## C.      The Status of Resumed Settlement Discussions

The parties have filed, via hand delivery contemporaneous with this filing, a separate letter to the Court from Defendants' counsel reporting the status of the parties' settlement discussions.

---

The Court so-ordered this stipulation.  Case No. 15-cv-10698, Dkt. No. 584.  Accordingly, proceedings on liability issues are closed.

Dated:  August 21, 2017

/s/ Andrea L. Martin                                            /s/ Alison C. Casey

Dennis J.  Kelly (BBO # 266340)                  NUTTER MCCLENNEN & FISH LLP
Andrea L.  Martin (BBO #666117)                 Heather B. Repicky BBO #663347
BURNS & LEVINSON LLP                             Alison C. Casey BBO# 688253
125 Summer Street                                Seaport West
Boston, MA 02110-1624                            155 Seaport Boulevard
Telephone: 617-345-3000                          Boston, Massachusetts 02210
Facsimile: 617-345-3299                          Tel.:  (617) 439-2000
dkelly@burnslev.com                              Fax:  (617) 310-9000
amartin@burnslev.com                             Email: hrepicky@nutter.com
                                                 Email: acasey@nutter.com

James F. Hurst, P.C.  (pro hac vice)
Bryan S.  Hales, P.C. (pro hac vice)             PATTERSON BELKNAP WEBB & TYLER LLP
Elizabeth A. Cutri (pro hac vice)                Gregory L. Diskant (pro hac vice)
KIRKLAND & ELLIS LLP                             Aron Fischer (pro hac vice)
300 North LaSalle                                Andrew D. Cohen (pro hac vice)
Chicago, IL 60654                                1133 Avenue of the Americas
Tel: (312) 862-2000                              New York, New York 10036
james.hurst@kirkland.com                         Tel:  (212) 336-2000
bryan.hales@kirkland.com                         Fax: (212) 336-2222
elizabeth.cutri@kirkland.com                     Email: gldiskant@pbwt.com
                                                 Email: afischer@pbwt.com
Ryan Kane (pro hac vice)                         Email: acohen@pbwt.com
James McConnell (pro hac vice)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022                               Attorneys for Janssen Biotech, Inc.
ryan.kane@kirkland.com
james.mcconnell@kirkland.com

Charles B.  Klein (pro hac vice)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817
Tel: (202) 282-5000
cklein@winston.com

Samuel S. Park (pro hac vice)
Dan H. Hoang (pro hac vice)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL  60601-9703
Tel: (312) 558-7931
spark@winston.com
dhoang@winston.com

Attorneys for Defendants Celltrion Healthcare
Co., Ltd., Celltrion, Inc., and Hospira, Inc.

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed through the electronic filing system and served electronically to the registered participants as identified on the Notice of Electronic Filing.

 /s/  Andrea L. Martin
