# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

JANSSEN BIOTECH, INC.,

               Plaintiff,

v.

CELLTRION HEALTHCARE CO., LTD.,
CELLTRION, INC., and
HOSPIRA, INC.,

               Defendants.

Civil Action No. l:17-cv-11008-MLW

LEAVE TO FILE UP TO 30 PAGES
GRANTED ON JULY 10, 2017

**CONFIDENTIAL -
FILED UNDER SEAL**

# DEFENDANTS' REPLY BRIEF IN SUPPORT OF
## THEIR MOTION TO DISMISS FOR LACK OF STANDING

# TABLE OF CONTENTS

**Page**

**I.    Patents Are Assigned To "The COMPANY," Which Is Defined As The J&J Family** ..................................................................................................... **4**

    A.    Janssen's Non-Definition of "COMPANY" Is Contrary to Law ........................... 4

        1.    Janssen's proposal is contrary to fundamental contract law principles ............................................................................................... 5

        2.    Janssen's proposal is contrary to principles of fairness and consistent application of the law, and precluded by judicial estoppel ...................................................................................................... 6

    B.    The Word "Any" Does Not Support Janssen's Argument ..................................... 6

        1.    The common sense reading of "any" is "all" .............................................. 7

        2.    "One or more" does not achieve Janssen's nebulous meaning of "COMPANY" ............................................................................................. 8

        3.    The definition of "Affiliates" supports Defendants, not Janssen ............... 9

    C.    Plugging Janssen's Definition of "COMPANY" Into the Invention Assignment Provision Does Not Result in "COMPANY" Meaning "Employer" ....................................................................................................... 12

        1.    Janssen's "plug and play" approach does not work as Janssen intends ..................................................................................................... 12

        2.    Janssen asks the Court to rewrite the agreement ...................................... 14

        3.    Janssen's "extrinsic evidence" is improper and unavailing ..................... 15

        4.    The most authentic and reliable extrinsic evidence is how J&J companies have actually used the employment agreements .................... 18

**II.    The March 2017 "Disclaimer" Agreement Cannot Cure Janssen's Lack of Standing** ........................................................................................................... **19**

    A.    Under Federal Circuit Law, All Patent Co-Owners Must Join as Plaintiffs ......... 19

    B.    There Is No Authority Permitting a Third Exception to Ethicon .......................... 20

        1.    Cases finding no co-owner do not support Janssen .................................. 20

        2.    Cases applying Rule 19 do not support Janssen ....................................... 22

3.      Cases addressing whether an exclusive licensee may be deemed the assignee do not support Janssen.................................................................. 24

4.      Defendants' cases correctly apply Ethicon and show that the "disclaimer" is not an exception to the rule requiring joinder ................. 25

C.      The March 2017 Agreement Does Not Bind Companies Other Than J&J.......... 27

1.      The "disclaimer" does not bind current J&J subsidiaries ....................... 27

2.      The "disclaimer" does not bind former J&J subsidiaries......................... 29

**Cases**

*259 Holdings Co., LLC v. Union Dry Dock & Repair Co.*,
No. A-0267-06T5, 2007 WL 3274272 (N.J. Super. Ct. App. Div. Nov. 7, 2007) ...................... 8

*Abbott Point of Care Inc. v. Epocal, Inc.*,
666 F.3d 1299 (Fed. Cir. 2012) ........................................................................................ 15, 29

*Acme Plastics of N.J., Inc. v. Int'l Fixtures, Ltd.*,
Civ. No. 02-5906, 2007 WL 1321197 (D.N.J. May 4, 2007) ..................................................... 5

*Advanced Tech. Incubator, Inc. v. Sharp Corp.*,
2009 WL 2460985 (E.D. Tex. Aug. 10, 2009) ........................................................................ 24

*Advanced Tech. Incubator, Inc. v. Sharp Corp.*,
No. 07-468, 2009 WL 2448156 (E.D. Tex. July 6, 2009) ......................................................... 24

*Advanced Video Techs. LLC v. HTC Corp.*,
No. 15-4626, 2016 WL 3434819 (S.D.N.Y. June 14, 2016) ..................................................... 23

*Agilent Techs., Inc. v. Micromuse, Inc.*,
No. 04-3090, 2004 WL 2346152 (S.D.N.Y. Oct. 19, 2004) ..................................................... 23

*Alps S., LLC v. Ohio Willow Wood Co.*,
787 F.3d 1379 (Fed. Cir. 2015) ........................................................................................... 24

*Atl. Cas. Ins. Co. v. Interstate Ins. Co.*,
100 A.2d 192 (N.J. Super. Ct. App. Div. 1953) ...................................................................... 7

*Borough of W. Caldwell v. Borough of Caldwell*,
138 A.2d 402 (N.J. 1958) ................................................................................................. 5, 11

*Bross Utils. Serv. Corp. v. Aboubshait*,
618 F. Supp. 1442 (S.D.N.Y. 1985) ...................................................................................... 29

*Bushnell, Inc. v. Brunton Co.*,
659 F. Supp. 2d 1150 (D. Kan. 2009) ................................................................................... 26

*Celanese Ltd. v. Essex Cty. Improvement Auth.*,
962 A.2d 591 (N.J. Super. Ct. App. Div. 2009) ...................................................................... 5

*Commodity Futures Trading Comm'n v. Zelener*,
373 F.3d 861 (7th Cir. 2004) .............................................................................................. 11

*Congregation B'nai Jacob v. City of Oak Park*,
302 N.W.2d 296 (Mich. App. 1981) ...................................................................................... 7

*Consol. Rail Corp. v. Grand Trunk W. R.R. Co.*,
No. 09-10179, 2012 WL 3758843 (E.D. Mich. Aug. 29, 2012) .............................................. 17

*Conway v. 287 Corp. Ctr. Assocs.*,
   901 A.2d 341 (N.J. 2006) ................................................................................ 15

*Dontzin v. Myer*,
   694 A.2d 264 (N.J. Super. Ct. App. Div. 1997) ............................................. 16

*Enovsys LLC v. Nextel Commc'ns, Inc.*,
   614 F.3d 1333 (Fed. Cir. 2010) ..................................................................... 21

*Ericsson, Inc. v. D-Link Sys., Inc.*,
   773 F.3d 1201 (Fed. Cir. 2014) ..................................................................... 15

*Ethicon, Inc. v. U.S. Surgical Corp.*,
   135 F.3d 1456 (Fed. Cir. 1998) .......................................................... 3, 19, 26

*Geier v. Mozido, LLC*,
   2016 De. Ch. LEXIS 149 (Del. Ch. Sep. 29, 2016) ....................................... 28

*Grayzel v. Boston Sci. Corp.*,
   No. A-0991-14T2, 2015 WL 9694354 (N.J. Super. Ct. App. Div. Jan. 11, 2016) .......... 1, 5, 14

*Grunley Walsh US, LLC v. Raap*,
   2009 U.S. Dist. LEXIS 38609 (E.D. Va. May 6, 2009) ................................. 27

*Henson v. Santander Consumer USA Inc.*,
   137 S. Ct. 1718 (2017) ................................................................................... 10

*In re Cendant Corp. Sec. Litig.*,
   569 F. Supp. 2d 440 (D.N.J. 2008) .................................................................. 7

*In re Estate of Tjaden*,
   402 N.W.2d 288 (Neb. 1987) ............................................................................. 7

*Indep. Wireless Tele. Co. v. Radio Corp. of Am.*,
   269 U.S. 459 (1926) .................................................................................. 25, 30

*Invitrogen Corp. v. Emp'rs. Ins. Co.*,
   2007 U.S. Dist. LEXIS 19301 (D. Ariz. Mar. 9, 2007) ................................ 27

*IpVenture, Inc. v. Prostar Comput., Inc.*,
   503 F.3d 1324 (Fed. Cir. 2007) ................................................................. 20, 21

*Israel Bio-Eng'g Project v. Amgen, Inc.*,
   475 F.3d 1256 (Fed. Cir. 2007) ..................................................................... 19

*Karl's Sales & Serv., Inc. v. Gimbel Bros.*,
   592 A.2d 647 (N.J. Super. Ct. App. Div. 1991) ............................................. 14

*Kotkin v. Aronson*,
  815 A.2d 962 (N.J. 2003) ............................................................................ 14

*Levison v. Weintraub*,
  521 A.2d 909 (N.J. Super. Ct. App. Div. 1987) ................................... 3, 14

*Livingston v. Trustgard Ins.*,
  988 F. Supp. 2d 873 (N.D. Ill. 2013) ......................................................... 7

*LNT Merch. Co. v. Dyson, Inc.*,
  No. 08-2883, 2009 WL 2169236 (D.N.J. July 21, 2009) ............................ 5

*Lovetap, LLC v. CVS Health Corp.*,
  No. 16-3530, 2017 WL 3250374 (N.D. Ga. July 31, 2017) ........................ 3

*Malad, Inc. v. Miller*,
  199 P.3d 623 (Ariz. Ct. App. 2008) .......................................................... 17

*Max Sound Corp. v. Google, Inc.*,
  147 F. Supp. 3d 948 (N.D. Cal. 2015) ................................................ 28, 29

*MediaTek. Inc. v. Sanyo Elec. Co.*,
  No. 05-323, 2007 WL 5186792 (E.D. Tex. 2007) ..................................... 25

*Medtronic Sofamor Danek USA, Inc. v. NuVasive, Inc.*,
  136 S. Ct. 893 (2016) ................................................................................. 14

*Medtronic, Inc. v. Comm'r of Internal Revenue*,
  111 T.C.M. (CCH) 1515, 2016 WL 3221153 (T.C. Jun. 9, 2016) ............ 15

*Nester v. O'Donnell*,
  693 A.2d 1214 (N.J. Super. Ct. App. Div. 1997) ........................................ 1

*Noble v. Samsung Elecs. Am., Inc.*,
  682 F. App'x 113 (3d Cir. 2017) ................................................................. 5

*Nomadix, Inc. v. Hewlett-Packard Co.*,
  No. 09-08441, 2012 WL 1577436 (C.D. Cal. May 7, 2012) ..................... 21

*Ortho Pharm. Corp. v. Genetics Inst., Inc.*,
  52 F.3d 1026 (Fed. Cir. 1995) ................................................................... 27

*Patriot Cinemas, Inc. v. Gen. Cinemas Corp.*,
  834 F.2d 208 (1st Cir. 1987) ....................................................................... 6

*Poly-Am., L.P. v. GSE Lining Tech., Inc.*,
  383 F.3d 1303 (Fed. Cir. 2004) ................................................................. 15

*Prima Tek II, L.L.C. v. A-Roo Co.*,
    222 F.3d 1372 (Fed. Cir. 2000) ........................................................ 25, 26, 27

*Quantum Corp. v. Riverbed Tech., Inc.*,
    No. 07-04161, 2008 WL 314490 (N.D. Cal. Feb. 4, 2008) ........................ 28

*Royal Industries v. St. Regis Paper Co.*,
    420 F.2d 449 (9th Cir. 1969) .................................................................. 28, 29

*Sachau v. Sachau*,
    17 A.3d 793 (N.J. 2011) ................................................................................ 17

*Sifers v. Horen*,
    188 N.W.2d 623 (Mich. 1971) ......................................................................... 7

*Speedfit LLC v. Woodway USA, Inc.*,
    226 F. Supp. 3d 149 (E.D.N.Y. 2016) ............................................................. 26

*STC.UNM v. Intel Corp.*,
    754 F.3d 940 (Fed. Cir. 2014) .................................................... 17, 19, 23, 26

*STC.UNM v. Intel Corp.*,
    767 F.3d 1351 (Fed. Cir. 2014) ..................................................................... 23

*Tavory v. NTP, Inc.*,
    297 F. App'x 9762 (Fed. Cir. 2008) ............................................................... 17

*Tele-Guia Talking Yellow Pages v. Cablevision Sys. Corp.*,
    No. 07-3948, 2007 WL 3224573 (S.D.N.Y. Oct. 31, 2007) .......................... 22

*Thore v. Howe*,
    466 F.3d 173 (1st Cir. 2006) .......................................................................... 6

*TMW Enter., Inc. v. Fed. Ins. Co.*,
    619 F.3d 574 (6th Cir. 2010) ......................................................................... 11

*United States v. Castleman*,
    134 S. Ct. 1405 (2014) .................................................................................. 14

*United States v. Tierney*,
    760 F.2d 382 (1st Cir. 1985) ......................................................................... 27

*Uptown Food Store, Inc. v. Ginsberg*,
    123 N.W.2d 59 (Iowa 1963) ............................................................................ 7

*Vassiliu v. Daimler Chrysler Corp.*,
    839 A.2d 863 (N.J. 2004) ................................................................................ 8

*Walker Digital, LLC v. Expedia, Inc.*,
  950 F. Supp. 2d 729 (D. Del. 2013) ........................................................ 21

*Warsaw Orthopedic, Inc. v. NuVasive, Inc.*,
  778 F.3d 1365 (Fed. Cir. 2015) ........................................................ 14, 15

*Whetstone Candy Co. v. Kraft Foods, Inc.*,
  351 F.3d 1067 (11th Cir. 2003) ........................................................ 29

*Zion v. Kurtz*,
  405 N.E.2d 681 (N.Y. 1980) ........................................................ 7

**Statutes**

28 U.S.C. § 2072 ........................................................ 23

35 U.S.C. § 262 ........................................................ 14, 17

**Other Authorities**

Black's Law Dictionary 94 (6th ed. 1990) ........................................................ 7

**Rules**

Fed. R. Civ. P. 19(a) ........................................................ 23

Janssen is stuck. Seven months and ten briefs ago, when the parties first appeared before the Court regarding standing, Janssen argued that "COMPANY" means "any company to which I become transferred while I'm employed," meaning here that all the agreement's provisions, "one by one by one, [are] talking about obligations to Centocor." 2/8/17 Hr'g. Tr. at 47:16–17, 52:20–23. In fact, for this case to survive, Janssen *needs* "COMPANY"—defined as "Centocor *and* Johnson & Johnson *and*" other entities—to mean *only* Centocor. But in other litigations involving the same or similar form agreements, Janssen's parent and sister companies have asserted that "COMPANY" means *multiple companies* beyond the specific employer. Janssen's "solution" is to now ask the Court to find that "COMPANY" is a chameleon, meaning different things "depending on…the facts of a given case," except that, for the patent assignment provision, "COMPANY" would *always* mean "the employer of the inventors, here Centocor." Janssen Br., Dkt. 26 ("J. Br.") at 6, 8.

This is not how the law works. "[W]here a contract repeats the same terms, such terms should be given the same meaning," particularly where an agreement is the result of "careful lawyering." *Grayzel v. Boston Sci. Corp.*, No. A-0991-14T2, 2015 WL 9694354, at *5 (N.J. Super. Ct. App. Div. Jan. 11, 2016). Here, that "same meaning" is clear. The plain text of "COMPANY" refers to the entire family of J&J companies, so there is no ambiguity to resolve. "An ambiguity in a contract exists if the terms of the contract are susceptible to at least two reasonable alternative interpretations." *Nester v. O'Donnell*, 693 A.2d 1214, 1220 (N.J. Super. Ct. App. Div. 1997). But Janssen cannot point to any "reasonable" alternative.

Janssen now concedes, as it was forced to do, that "COMPANY" means more than just Centocor (or "employer"). The question then is thus whether the term means what it plainly says ("Centocor *and* Johnson & Johnson *and*" all other J&J entities), or, as Janssen now contends, it is

a nebulous, undefined term meaning any number of things, depending on facts and circumstances such as the particular employee, his roles and responsibilities, when the question is raised, or what provisions of the agreement are at issue. To support that nebulous meaning, Janssen relies on the word "any" in the definition of "COMPANY"—"CENTOCOR and JOHNSON & JOHNSON and *any* of their successors or assigns, purchasers, acquirers, and *any* of their existing and future subsidiaries, divisions or affiliates"—which Janssen says means "one or more." Then, Janssen says, simply "[p]lugging in [its] definition of COMPANY" into Paragraph 1 "means that inventions are assigned to 'any' J&J company that employs the inventor at the time of the invention." J. Br. at 1.

This is incorrect. The definition of "COMPANY" has clauses separated by "and," so each clause is a required part of the definition. Thus, even under Janssen's "one or more" interpretation, COMPANY still would always include at least *both* Centocor *and* Johnson & Johnson, as well as other entities. Moreover, context demands that "any" be construed as "all" to protect the confidential information and competitive interests of the J&J family of companies, as Janssen has argued in other cases, and as this Court previously observed: "Superficially, it doesn't seem unreasonable for Johnson & Johnson to want to obligate an employee to protect the confidentiality not only of Centocor but of any other Johnson & Johnson company *which might provide* confidential information to the Centocor employee." 2/8/17 Hr'g Tr. at 63:12–16.

Unable to avoid the contract language it chose for itself, Janssen urges the Court to consider the alleged "burden" and "difficulty" associated with assigning inventions to every J&J family company. J. Br. at 20–21. But Janssen ignores the "burden" and "difficulty" associated with its own interpretation, which, by leaving "COMPANY" undefined, jeopardizes the J&J family's all-important confidential information and competitive interests. Moreover, a Court may not use

extrinsic evidence in the way Janssen proposes, "to rewrite the contract merely because one might conclude that it might well have been functionally desirable to draft it differently." *Levison v. Weintraub*, 521 A.2d 909, 910–11 (N.J. Super. Ct. App. Div. 1987). Janssen and J&J easily could have written a different agreement, and ███████████████████████████████████

████████████████████████████████████████████████████████████

In sum, as between Defendants' simple, consistent, plainly recited definition, or Janssen's contorted, inconsistent meaning that results in no definition at all, the Court should adopt Defendants' definition. "[A]s Ockham would say, it is the simpler explanation that is usually the correct one." *Lovetap, LLC v. CVS Health Corp.*, No. 16-3530, 2017 WL 3250374, at *3 (N.D. Ga. July 31, 2017).

With the J&J companies properly found to be co-owners of the '083 patent, the so-called "disclaimer" agreement does not cure the standing defect. It is a "settled principle" that "[a]n action for infringement must join as plaintiffs all co-owners." *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1467 (Fed. Cir. 1998). The Federal Circuit recently reaffirmed that there are only two exceptions to the *Ethicon* rule, and Janssen does not argue that either applies. Instead, without even acknowledging *Ethicon*, it asks to proceed **without** all co-owners, exactly what *Ethicon* prohibits. None of Janssen's cases support its position. They either conclude that there were no co-owners, and thus did not address the *Ethicon* rule, or they are no longer good law because they allowed Federal Rule 19 regarding joinder to override the law of prudential standing, which the Federal Circuit has since prohibited. And even if a "disclaimer" could theoretically avoid *Ethicon*, Janssen has failed to show that the "disclaimer" binds J&J's current subsidiaries, much less **former** subsidiaries with rights to the '083 patent, of which there are at least five.

None of this is unfair to Janssen. There are but two basic requirements for filing a patent

infringement lawsuit: standing, and a good faith basis for the claim. It is not too much to ask that Janssen be held to these requirements before dragging an adversary to trial in pursuit of ████████ ██████████. Janssen should have fixed the standing defect in a way the law recognizes, either by having all co-owners assign their rights to Janssen, or joining co-owners as plaintiffs. It did neither and, therefore, the case should be dismissed for lack of standing.

## I.     Patents Are Assigned To "The COMPANY," Which Is Defined As The J&J Family

Janssen's primary argument is that the defined term "COMPANY" means whatever J&J companies are "applicable" based on "the facts of a given case." J. Br. at 6. This conflicts with fundamental principles of contract interpretation, would result in inconsistent and unfair outcomes across different cases, and would permit J&J companies (like Janssen here) to shift its positions in different courts depending on what best suits its interests at the time.

### A.     Janssen's Non-Definition of "COMPANY" Is Contrary to Law

By the agreements' express terms, "COMPANY" has one meaning, as "***used in this Agreement***," which is the whole point of a definition.[1] Dkt. 27, Ex. A at -98780, -98807, -98796, -98813. Two of the four agreements even label this section "DEFINITIONS." *Id*. at -98796, -98813. Janssen initially agreed that "COMPANY" has one meaning: "any company to which I become transferred while I'm employed." 2/8/17 Hr'g. Tr. at 47:15–17. But Janssen was forced to abandon that approach when discovery (which Janssen opposed) revealed that J&J and its subsidiaries told other courts that "COMPANY," in the same or similar agreements, includes entities beyond a person's direct employer. *See* Defendants' Br., Dkt. 14 ("D. Br.") at 6–8, Appx. A. Now Janssen has shifted positions, arguing that "COMPANY" means whatever J&J family company or companies are "applicable," "depending on…the facts." J. Br. at 6. This new argument

---

[1] All emphasis throughout the brief is added unless otherwise noted.

fails as well.

**1.    Janssen's proposal is contrary to fundamental contract law principles**

Janssen's interpretation would eviscerate the purpose of a defined contract term, which is to provide clarity and certainty. A contract "must be sufficiently definite 'that the performance to be rendered by each party can be ascertained with reasonable certainty.'" *Acme Plastics of N.J., Inc. v. Int'l Fixtures, Ltd.*, Civ. No. 02-5906, 2007 WL 1321197, at *4 (D.N.J. May 4, 2007). It is "essential" that a contract's "obligations be specifically described in order to enable a court or a trier of fact to ascertain what it was the promissor undertook to do." *Id.*; *see also LNT Merch. Co. v. Dyson, Inc.*, No. 08-2883, 2009 WL 2169236, at *2 (D.N.J. July 21, 2009) (requiring "sufficiently definite essential terms"); *Noble v. Samsung Elecs. Am., Inc.*, 682 F. App'x 113, 116 (3d Cir. 2017) (same). "'[D]oubt or difference' is incompatible with agreement." *Borough of W. Caldwell v. Borough of Caldwell*, 138 A.2d 402, 410 (N.J. 1958).

Permitting "COMPANY" to have multiple meanings in the same agreement, as Janssen suggests, is the opposite of this required clarity. Under settled law, where a contract "repeats the same terms, such terms should be given the same meaning" throughout, particularly where, as here, the contract "is clearly the product of careful lawyering." *Grayzel*, 2015 WL 9694354, at *5 (citing *Celanese Ltd. v. Essex Cty. Improvement Auth.*, 962 A.2d 591, 601 (N.J. Super. Ct. App. Div. 2009) ("One of the principles of statutory construction is that 'identical words used in different parts of the same act are intended to have the same meaning.' …. [W]e can perceive no reason in logic or policy why that principle should not be equally applicable [to a contract].")).

Contrary to these settled principles, Janssen now argues that "COMPANY" has different meanings "depending on the terms of the particular contract provision at issue." J. Br. at 6. And not only can the term's meaning change from provision to provision, but according to Janssen, it can also change "depending on…the facts"—things like ██████████████████████████

5

███████████████████████████████████████

███████████████████████████████████████

████████████████████████████. *Id.*; Dkt. 15, Ex. 2 at 173:25–180:25. This

is the antithesis of definite.

### 2.   Janssen's proposal is contrary to principles of fairness and consistent application of the law, and precluded by judicial estoppel

Janssen's argument that the meaning of "COMPANY" "depends on" the situation flouts basic principles of fairness and consistency. As Defendants argued in their opening brief, Janssen is taking inconsistent positions, arguing here that "COMPANY" is **limited** to the employer, whereas in other cases J&J and related companies have argued that the very same term **extends** to non-employers. *See* D. Br. at 13; *Thore v. Howe*, 466 F.3d 173, 182 (1st Cir. 2006). Judicial estoppel, premised on fairness to litigants, prevents this type of game playing. A party cannot use "intentional self-contradiction…as a means of obtaining unfair advantage" in this forum or others. *Patriot Cinemas, Inc. v. Gen. Cinemas Corp.*, 834 F.2d 208, 212 (1st Cir. 1987) (citation omitted). "[T]he function of judicial estoppel is to protect the integrity of the courts." *Id.* at 214. "If parties feel free to select contradictory positions before different tribunals to suit their ends, the integrity and efficacy of the courts will suffer." *Id.* Adopting Janssen's interpretation of "COMPANY" would grant the entire J&J family of companies this very freedom. Not surprisingly, Janssen has not cited any case holding that a defined contract term has countless different meanings "depending on…the facts of a given case."

### B.   The Word "Any" Does Not Support Janssen's Argument

Because the law does not support giving malleable meaning to defined terms, Janssen attempts to derive its strained interpretation from the word "any," which appears within the definition of "COMPANY." *E.g.*, Dkt. 27, Ex. A at -98780. Janssen's arguments are without merit.

### 1.      The common sense reading of "any" is "all"

Janssen argues that "any" can have different meanings, and that the one to use "in this context" is "'***one or more***' of a group." J. Br. at 1, 4–5. But as many courts acknowledge, "'[a]ny' is often synonymous with 'either,' 'every,' or 'all.'" *In re Cendant Corp. Sec. Litig.*, 569 F. Supp. 2d 440, 444 (D.N.J. 2008) (citing Black's Law Dictionary 94 (6th ed. 1990)); *see also Atl. Cas. Ins. Co. v. Interstate Ins. Co.*, 100 A.2d 192, 198 (N.J. Super. Ct. App. Div. 1953) ("The word 'any' clearly may and should be interpreted as meaning 'all or every.'"); *Livingston v. Trustgard Ins.*, 988 F. Supp. 2d 873, 878 (N.D. Ill. 2013), *aff'd* 558 F. App'x 681 (7th Cir. 2014) ("[T]o the extent that dictionaries and usage guides shed light on this question, they also generally agree that, in this context, 'any' more often means 'all.'").[2]

Janssen cites language expert Bryan Garner to argue that "any" means "one or more" in this case. J. Br. at 4–5. But Mr. Garner's teachings support Defendants:

> …. (3) In affirmative sentences, it means "every" or "all" <Any attempt to flout the law will be punished> <You are required to produce any documents relating to the issue>. (4) In a sentence implying that a selection or discretionary act will follow, it may mean "one or more (unspecified things or people); whichever; whatever" <Any student may seek a tutorial> <Pick any books you like> <a good buy at any price>. ….

C.A. No. 15-10698, Dkt. 521, Ex. B at 3. Janssen focuses on part (4) involving a selection or discretionary act. J. Br. at 5. But the agreements' opening statement—"As used in this Agreement: The COMPANY means…"—does not imply selection or discretion. It is an affirmative sentence, setting a definition for the whole agreement.

In an effort to imply selection or discretion, Janssen argues that the fact that "the term

---

[2] *See also, e.g.*, *In re Estate of Tjaden*, 402 N.W.2d 288, 293 (Neb. 1987) ("In popular parlance, any usually means 'all' or 'every.'"); *Congregation B'nai Jacob v. City of Oak Park*, 302 N.W.2d 296, 297 n.4 (Mich. App. 1981) ("any parsonage" construed to mean every parsonage); *Zion v. Kurtz*, 405 N.E.2d 681, 686 (N.Y. 1980) ("[T]he word 'any' means 'all' or 'every' and imports no limitation. It is difficult to imagine … a more comprehensive proscription than one against 'any business or activities of any kind, directly or indirectly.'"); *Sifers v. Horen*, 188 N.W.2d 623, 624 n.2 (Mich. 1971) ("The word 'any' means just what it says. It includes 'each' and 'every'."); *Uptown Food Store, Inc. v. Ginsberg*, 123 N.W.2d 59, 63 (Iowa 1963) ("The word 'any' has the force and effect of 'all' or 'every.'").

'COMPANY' *includes* J&J companies that 'may' become employers in the future" "informs how the general word 'any' should be read." J. Br. at 6 (emphasis in original). Nonsense. It is well settled that "the word 'includes' is usually a term of enlargement, and not of limitation." *Vassiliu v. Daimler Chrysler Corp.*, 839 A.2d 863, 868 (N.J. 2004). That is the situation here. And the provision says "may" only to recognize the obvious: that the employee may not become employed by a different J&J company "in the future."

If, as Janssen contends, the drafters intended "COMPANY" to be undefined, it would have been far simpler to include no definition, rather than counting on the reader to use the "including" phrase to decode the meaning of "any" to conclude that the definition of "COMPANY" is actually no definition at all. "A court should not torture the language of a contract to create ambiguity." *259 Holdings Co., LLC v. Union Dry Dock & Repair Co.*, No. A-0267-06T5, 2007 WL 3274272, at *3 (N.J. Super. Ct. App. Div. Nov. 7, 2007).

In reality, Janssen knows "any" means "all" and that "COMPANY" means the whole family. ███████████████████████████████████████████████████████

███████████████████████████████████████████████████████

█████████   Dkt. 15, Ex. 10 at -115489–90, Ex. 13 at -112416–418.  ██████████████████

████████████   if the definition of "COMPANY" already gave the J&J family carte blanche to interpret "COMPANY" as needed, "depending on the…contract provision at issue and the facts of a given case." J. Br. at 6.

### 2.   "One or more" does not achieve Janssen's nebulous meaning of "COMPANY"

As a more practical matter, Janssen's approach would not produce the result Janssen seeks anyway. Substituting "one or more" for "any" results in the following definition:

> As used in this Agreement: The COMPANY means **[1]** CENTOCOR *and* **[2]** JOHNSON & JOHNSON *and* **[3]** [*one or more*] of their successors or assigns,

8

purchasers, acquirers, ***and* [4]** [*one or more*] of their existing and future subsidiaries, divisions or affiliates, including [*one or more*] such subsidiary, division or affiliate of Johnson & Johnson to which I may be transferred or by which I may be employed in the future.

*E.g.*, Dkt. 27, Ex. A at -98780. The definition is a series of clauses separated by the word "and," which means "COMPANY" would still include at least four members. Notably, J&J's presence is fixed—it is always included under any construct. Nothing about the definition reasonably suggests an "it depends" meaning.

### 3. The definition of "Affiliates" supports Defendants, not Janssen

Janssen's attempt to contrast the definition of "Affiliates of the COMPANY" with the definition of "COMPANY" is equally unavailing. As noted, "COMPANY" means:

[1] CENTOCOR and [2] JOHNSON & JOHNSON and [3] any of their successors or assigns, purchasers, acquirers, and [4] any of their existing and future subsidiaries, divisions or affiliates, including any such subsidiary, division or affiliate of Johnson & Johnson to which I may be transferred or by which I may be employed in the future.

*E.g.*, Dkt. 27, Ex. A at -98780. The next sentence of the agreements provides that:

Affiliates of the COMPANY are any corporation, entity or organization at least 50% owned [1] by the COMPANY, [2] by Johnson & Johnson or [3] by any subsidiary of Johnson & Johnson.

*Id*. Janssen claims that "[t]he three groups in [the Affiliates] sentence parallel those identified in the preceding [COMPANY] sentence," and "[t]hus, the most natural reading of the [Affiliates] sentence is that the 'COMPANY' is the employer, Centocor." J. Br. at 7. In other words, according to Janssen, the first listed items in each definition are equal to one another, such that [1] COMPANY (from the Affiliates definition) is equal to [1] CENTOCOR (from the COMPANY definition). *Id*. Janssen casts this as "tension between the uses of COMPANY" in the two sentences, which "makes the term ambiguous." *Id.*

But this defies the plain language. The two definitions are not even "parallel" lists.

"COMPANY" has four items while "Affiliates" has three. And even if they were parallel, there is no reason that the first item in each list must have the same meaning. To the contrary, the use of different words implies different meanings. *Cf. Henson v. Santander Consumer USA Inc.*, 137 S. Ct. 1718, 1723 (2017) ("And, usually at least, when we're engaged in the business of interpreting statutes we presume differences in language like this convey differences in meaning."). Janssen's argument is illogical. The ***express*** definition of "COMPANY" includes four items, only one of which is "CENTOCOR," so "COMPANY" cannot be just Centocor. Janssen's attempt to fabricate "ambiguity" fails.

Treating "COMPANY" as meaning "Centocor" in the "Affiliates" definition also improperly circumscribes the scope of "COMPANY," for example, with respect to subsidiaries. Janssen's narrow definition of "Affiliates" only includes subsidiaries that are at least 50% owned by Centocor, J&J, or a subsidiary of J&J. J. Br. at 7. That narrow definition would exclude, for example, a subsidiary of Centocor, or a third level or lower subsidiary of J&J. For a company like J&J, with numerous nested subsidiaries, this would materially limit the scope and enforceability of the employment agreements. *See, e.g.*, Ex. 32 (J&J subsidiary J&J Consumer, Inc. acquired TriStrata and its subsidiary Neostrata); Ex. 33 (Micrus Endovascular "operate[s] under Codman Neurovascular, a business unit of Codman & Shurtleff, Inc., the global neurosurgery device company of the DePuy Family of Companies within Johnson & Johnson").

Janssen also ignores other problems with its argument. The definition of "Affiliates" incorporates "COMPANY." So if it were true that "COMPANY" changes "depending on the facts," then "Affiliates" would also change "depending on the facts." And because the definition of "COMPANY" likewise incorporates the term "Affiliates," the reverse would be true, too. This mind-bogglingly complex and circular result was not plausibly intended.

By contrast, Defendants' interpretation of "Affiliate" has a simple and straightforward meaning, which does includes deeper J&J family subsidiaries because it captures entities at least 50% owned by the "COMPANY"—*i.e.*, by the family. Included entities also could be owned 50%, collectively, "by the COMPANY" (*e.g.*, two J&J family entities owning 25% each), which would not be included under Janssen's approach. Thus, Janssen's argument that having "COMPANY" include J&J and all of its subsidiaries "would make no sense" because it would make the definition of "Affiliates" redundant (J. Br. at 7) is incorrect. In any event, redundancy in contracts is common. *See, e.g.*, *TMW Enter., Inc. v. Fed. Ins. Co.*, 619 F.3d 574, 578 (6th Cir. 2010) (lawyers "frequently say two (or more) things when one will do or say two things as a way of emphasizing one point.").

\* \* \*

In sum, Janssen's argument contorts the definition of "COMPANY" by trying to derive far more from the word "any" than it can plausibly support. Indeed, "[d]isproportionate emphasis upon a word or clause or a single provision does not serve the object of interpretation." *Borough of W. Caldwell*, 138 A.2d at 410. Rather, "[t]he general purpose of the agreement is to be considered in ascertaining the sense of particular terms." *Id.* Here, Janssen concedes, as it must, that the general purpose of the agreements is to afford broad protection to the J&J family. Defendants' interpretation accomplishes this purpose, treats the definition of "COMPANY" as an actual definition, gives the contract terms reasonable certainty, is predictable and fair, and can be administered consistently. It does not contort the language and does not attribute undue, nonsensical meaning to single words or phrases. In the words of Judge Easterbrook, "[b]est to take Occam's Razor and slice off needless complexity." *Commodity Futures Trading Comm'n v. Zelener*, 373 F.3d 861, 868 (7th Cir. 2004).

### C. Plugging Janssen's Definition of "COMPANY" Into the Invention Assignment Provision Does Not Result in "COMPANY" Meaning "Employer"

After jumping through hoops to argue against a fixed definition, Janssen argues that, when its interpretation of "COMPANY" is "plugged into" Paragraph 1, it is "unmistakabl[e]" and "evident" that inventions are assigned to the company or companies "that employ the inventor at the time of the invention." J. Br. at 8–9. Janssen is wrong.

### 1. Janssen's "plug and play" approach does not work as Janssen intends

As discussed above, "COMPANY" necessarily includes at least J&J. Thus, Janssen cannot even get out of the gate with its argument that "COMPANY" in Paragraph 1 is limited to the entity "that employs the inventor at the time of the invention." J. Br. at 4. In fact, even under Janssen's definition of "any," "COMPANY" still includes at least four entities, as discussed above. When this definition is "plugged into" Paragraph 1, the paragraph does not make sense, and does not accomplish Janssen's goal:

> I agree to disclose promptly to **[Centocor and J&J and other entities]** all INVENTIONS conceived or made by me whether or not during my hours of employment or with the use of **[Centocor and J&J and other entities]** facilities, materials or personnel, either solely or jointly with another or others during my employment with **[Centocor and J&J and other entities]**…

*E.g.*, Dkt. 27, Ex. A at -98780. Janssen's "plug and play" approach does not result in assignment of inventions to the employer alone.

Nor does Janssen's attempt to rely on how Paragraph 1 describes "INVENTIONS." According to Janssen, the reference to "inventions conceived or made ***during my employment with the COMPANY***" means that inventions are assigned only to the employer. J. Br. at 1, 8. But other paragraphs in the agreements refer to "employment with the COMPANY" or "employment by the

COMPANY,"[3] and Janssen has conceded that these paragraphs extend to companies who are ***not*** direct employers and that the J&J family has enforced them in this way. *See id.* at 6 (disavowing interpretation of agreements as covering only employers); *id.* at 11 ███████████████ ████████████████████████████████████████████████████████████████████ ████████████ ; Dkt. 15, Ex. 4 at 1, 27 (employer DePuy Spine and non-employer JJRT enforcing provisions with "my employment with the COMPANY" clause); *id.*, Ex. 14 at 1–4, Ex. 15 at - 113066 (employer DePuy Orthopaedics and non-employers J&J and DePuy Products, Inc. enforcing provisions with "employment by [/with] the COMPANY" clauses). The phrase "employment with the COMPANY" thus can and does refer broadly to the J&J family. It does not support limiting Paragraph 1 only to employers.

Limiting Paragraph 1 to an employer also defies common sense because assigned "INVENTIONS" are those "related to the actual or anticipated business or activities ***of the COMPANY***, or related to its actual or anticipated research and development or suggested by or resulting from any task assigned to me or work performed by me ***for, or on behalf of, the COMPANY***." *E.g.*, Dkt. 27, Ex. A at -98780. Janssen's interpretation would allow employees to keep for themselves inventions they develop that relate to the activities of any J&J company other than their direct employer, with the untenable result that employees could freely compete with other J&J companies. This contradicts J&J's Code of Business Conduct, which covers "[a]ll employees of the Johnson & Johnson Family of Companies," treats the family's "intellectual property and confidential information a[s] irreplaceable assets," and prohibits "[t]he use of

---

[3] *See, e.g.*, Dkt. 27, Ex. A at -98780 ("CONFIDENTIAL INFORMATION means information disclosed to me or known by me as a result of ***my employment by the COMPANY***…"); *id.* at -98781 ("I shall not retain any copies of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents in any form whatsoever…relating in any way to the affairs of the COMPANY and which were entrusted to me or obtained by me at any time during ***my employment with the COMPANY***."); *id.* at -98808 ("During ***my employment with the COMPANY*** and for a period of eighteen (18) months after termination of ***my employment with the COMPANY*** for any reason, I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION…").

Company assets—physical or intellectual—for personal gain." Ex. 34 at 6, 25, 32.

### 2.      Janssen asks the Court to rewrite the agreement

Janssen's effort to give COMPANY different meanings within the same agreement defies settled law on contract interpretation. Where, as here, a contract that "is clearly the product of careful lawyering" and "repeats the same terms," "such terms should be given the same meaning" throughout. *Grayzel*, 2015 WL 9694354, at *5; *cf. United States v. Castleman*, 134 S. Ct. 1405, 1417 (2014) (Scalia, J., concurring) (referring to "presumption of consistent usage—the rule of thumb that a term generally means the same thing each time it is used"). The agreements use the defined term "COMPANY" throughout, and the Court may not override that choice.

In effect, Janssen is asking the Court to write a different agreement to suit its needs in this particular litigation. But a court cannot "make for [contract drafters] a better or more sensible contract than the one they made for themselves." *Kotkin v. Aronson*, 815 A.2d 962, 963 (N.J. 2003). It has "no right to rewrite the contract merely because one might conclude that it might well have been functionally desirable to draft it differently." *Levison*, 521 A.2d at 910-911; *Karl's Sales & Serv., Inc. v. Gimbel Bros.*, 592 A.2d 647, 650 (N.J. Super. Ct. App. Div. 1991) (same).

Moreover, while Janssen argues *in this case* that the plain reading of "COMPANY" is a detriment to its objectives, Defendants have shown several benefits to the plain reading already, with respect to confidentiality and competitive interests. There are other benefits, too. Assigning inventions to the family of companies avoids transfer or license agreements giving other J&J companies the right to use inventions (*see* 35 U.S.C. § 262), which must take place at arm's length, or fair market value. *See, e.g.*, *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 778 F.3d 1365, 1377 (Fed. Cir. 2015), *cert. granted, judgment vacated sub nom. Medtronic Sofamor Danek USA, Inc. v. NuVasive, Inc.*, 136 S. Ct. 893 (2016), *and opinion reinstated in part,* 824 F.3d 1344 (Fed. Cir. 2016); *Medtronic, Inc. v. Comm'r of Internal Revenue*, 111 T.C.M. (CCH) 1515, 2016 WL

3221153, at *23–26 (T.C. Jun. 9, 2016). It avoids the related issue of addressing inter-company royalties in later litigation, as part of a royalty analysis. *See, e.g.*, *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) ("[L]icenses may be presented to the jury to help the jury decide an appropriate royalty award"). It also avoids the problem that arises when the patent owner and the company selling a patented product are separate entities, because of the rule that "lost profits must come from the lost sales of a product or service the patentee itself was selling." *Warsaw Orthopedic*, 778 F.3d at 1376; *see also Poly-Am., L.P. v. GSE Lining Tech., Inc.*, 383 F.3d 1303, 1311 (Fed. Cir. 2004) (where companies "separate[e] the owner of the patent from the seller of the patented product," patent owner "can recover only its own lost profits").

Moreover, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

D. Br. at 10; Dkt. 15, Ex. 10 at -115490; *id.*, Ex. 13 at -112417–418. ▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ J. Br. at 11. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

### 3.    Janssen's "extrinsic evidence" is improper and unavailing

Janssen argues that various types of "extrinsic evidence" show an intent for inventions to be assigned to "any" J&J companies "that employ the inventor at the time of the invention." J. Br. at 9–22. As the Federal Circuit has recognized, when interpreting a contract under New Jersey law, which it does *de novo*, "extrinsic evidence is admissible to aid in contract interpretation, but it is 'not for the purpose of modifying or enlarging or curtailing its terms.'" *Abbott Point of Care Inc. v. Epocal, Inc.*, 666 F.3d 1299, 1303 (Fed. Cir. 2012) (citing *Conway v. 287 Corp. Ctr. Assocs.*, 901 A.2d 341, 346–47 (N.J. 2006). It cannot be used to "give effect to an intent at variance with that language." *Abbott Point of Care*, 666 F.3d at 1303-04 (citing *Dontzin v. Myer*, 694 A.2d 264,

267 (N.J. Super. Ct. App. Div. 1997)). Yet that is exactly what Janssen seeks to do.

Defendants have addressed most, if not all, of Janssen's "extrinsic evidence" in prior briefs regarding standing, including Defendants' opening brief for this motion. *See* D. Br. at 14–21; *see also* No. 15-10698, Dkts. 508, 553. This included at least the face of the '083 patent, the invention disclosure form, J&J's internal list of patents associated with Janssen, the so-called "assignment" agreements executed during litigation, the couple of Defendants' documents, and the declarations from Mr. Dow and Ms. Amos. *See* D. Br. at 18–21. Though none of the "extrinsic evidence" can change the wording and meaning of the agreements at issue, additional points responsive to Janssen's arguments are addressed below.

"Subsequent assignments" (Dkt. 27, Exs. C–H). The 2007 Canadian "assignments" are, like the 2015 ones, ineffective, at least with respect to Epstein, Marsh, Monsell, and Ozturk. Dkt. 27, Ex. D. They bear no apparent connection to the form employment agreements or the drafter of them, and thus do not reflect what he or she intended. *Id*. The 2005 assignment from Ms. Lenk (Dkt. 27, Ex. C), who, to Defendants' knowledge, did not previously assign her inventions to "the COMPANY," simply shows that there was a means to convey rights to "Centocor, Inc." alone, but J&J or Centocor did not proceed in this way with respect to the other inventors.

Allegedly "absurd and unreasonable" results (*see* J. Br. at 20–22). As an initial matter, it is Janssen's contrived interpretation of "COMPANY" that results in illogicalities and inconsistencies that are nothing short of unreasonable and absurd.  *See* Parts I.A–B, *supra*. Also, Defendants do not "conced[e]" anything regarding alleged "tax risks and difficulties" described by Ms. Amos. J. Br. at 21. To the contrary, Janssen's claim that joint ownership "would be a nightmare, with the balance sheets of hundreds of companies around the world potentially affected by each revenue-generating patent of any J&J company" (*id.*) is wrong as a matter of law. "In the absence of any

16

agreement to the contrary, each of the joint owners of a patent may make, use, offer to sell, or sell the patented invention within the United States, or import the patented invention into the United States, without the consent of and without accounting to the other owners." 35 U.S.C. § 262. This autonomy extends to "commercializing or exploiting [a] patent through licensing." *STC.UNM v. Intel Corp.*, 754 F.3d 940, 947 (Fed. Cir. 2014); *see also Tavory v. NTP, Inc.*, 297 F. App'x 976, 982 (Fed. Cir. 2008) ("[L]icensing is also covered by § 262."). Thus, earnings a co-owner makes on a patent are its own and would not impact "balance sheets of hundreds of companies." The threat about "routine patent office actions," such as "reissue" proceedings, is empty as well. J. Br. at 20. Seeking reissuance of a patent is hardly a "routine" occurrence. ████████████ ███████████████████████████████████████████████████████████████████. Dkt. 27, Ex. I. Getting "consent of all assignees" (Dkt. 27 at ¶ 15) is at most a potential inconvenience that can be worked around, not an "absurd result."

Janssen's selected evidence reflects its improper effort to overcome the plain and unambiguous text of definition of "COMPANY" in favor of a meandering non-definition that defies the rule that a single "term[] should be given the same meaning" throughout a contract. *Grayzel*, 2015 WL 9694354, at *5. It is inappropriate for the Court to use extrinsic evidence in that manner simply to accommodate Janssen's goals for this case. *See, e.g.*, *Sachau v. Sachau*, 17 A.3d 793, 796 (N.J. 2011) ("A court's role is to consider what is written in the context of the circumstances at the time of drafting and to apply a rational meaning in keeping with the expressed general purpose."); *Malad, Inc. v. Miller*, 199 P.3d 623, 627 (Ariz. Ct. App. 2008) ("We interpret a contract based on the parties' intent upon entering the agreement, not their intent after the fact."); *Consol. Rail Corp. v. Grand Trunk W. R.R. Co.*, No. 09-10179, 2012 WL 3758843, at *10 (E.D. Mich. Aug. 29, 2012) ("[T]his court must interpret the contractual language without reference to

self-serving, after-the-fact, assertions by a party to the contract as to what its subjective intent was.").

### 4. The most authentic and reliable extrinsic evidence is how J&J companies have actually used the employment agreements

To the extent extrinsic evidence is used, the most compelling are the numerous enforcement actions involving the same or similar form employment agreements. Unlike the bulk of Janssen's selected extrinsic evidence, documents from the enforcement actions are untainted by Janssen's motivation in this case. The enforcement actions, discussed in Defendants' opening brief and summarized in their Appendix A, show that J&J and its subsidiaries regularly interpret "COMPANY" broadly, and strongly support Defendants' interpretation. *See* D. Br. at 6–9, Appx. A.

It does not matter whether these enforcement actions are a "small portion" of total enforcement actions, as Janssen argues. J. Br. at 13. There is no *de minimis* exception to the rule against playing fast and loose with the courts. It is equally irrelevant that none of the actions have named every J&J company as a plaintiff. *Id*. The fact is that Janssen's parent and family companies have leveraged the broad definition of "COMPANY" to suit their needs in other courts, including by telling at least one court that both J&J and its subsidiary Cordis "***own all inventions***" made by one former employee under an employment agreement with a definition of "COMPANY" almost identical to the one in the Epstein, *et al.* agreements. *See* D. Br., Appx. A.

Janssen argues that "J&J's enforcement of the agreements is consistent with Janssen's position and inconsistent with Defendants'" position, because the "J&J companies have enforced other provisions of the agreements on behalf of one or more J&J companies," but "they have never done so on behalf of all J&J companies collectively." J. Br. at 2. There is no inconsistency. There is no requirement for every party with enforcement rights to participate in an employment or trade

secret litigation.

Defendants advocate the definition of "COMPANY" as written, which provides a finite, single, simple meaning in every agreement, in every instance.

## II.    The March 2017 "Disclaimer" Agreement Cannot Cure Janssen's Lack of Standing

As an alternative to its self-serving, case-specific interpretation of "COMPANY," Janssen argues that the so-called "disclaimer" agreement satisfies the standing requirement ***without*** adding all of the owners as plaintiffs. J. Br. at 22–30. Janssen asserts that Defendants "cite no authority holding that a disclaimer of ownership cannot cure a purported defect of prudential standing." *Id.* at 26. Not true. Defendants cite the controlling authority on this issue, which Janssen ignores.

### A.    Under Federal Circuit Law, All Patent Co-Owners Must Join as Plaintiffs

Under Federal Circuit law, it is a "settled principle" that "[a]n action for infringement must join as plaintiffs all co-owners." *Ethicon*, 135 F.3d at 1467. "Absent the voluntary joinder of all co-owners of a patent, a co-owner acting alone will lack standing." *Israel Bio-Eng'g Project v. Amgen, Inc.*, 475 F.3d 1256, 1264–65 (Fed. Cir. 2007). As Defendants explained in their opening brief, there are "two established exceptions" to this rule, as recognized in *Ethicon*: (1) "when any patent owner has granted an exclusive license, he stands in a relationship of trust to his licensee and must permit the licensee to sue in his name"; and (2) "[i]f, by agreement, a co-owner waives his right to refuse to join suit, his co-owners may subsequently force him to join in a suit against infringers." *Ethicon*, 135 F.3d at 1468 n.9. The Federal Circuit recently reaffirmed *Ethicon,* leaving no doubt that its rule governs this case. In *STC.UNM v. Intel Corp.*, a patent co-owner "had not voluntarily joined as a co-plaintiff." The Federal Circuit affirmed the district court's dismissal for lack of standing, applying "the rule that a patent co-owner seeking to maintain an infringement suit must join all other co[-]owners" and confirming that only two exceptions to the rule "have as yet been recognized." *STC.UNM*, 754 F.3d at 944, 946.

Janssen does not dispute that, under Defendants' interpretation of "COMPANY," it has not joined all co-owners of the '083 patent. Nor does it dispute that neither *Ethicon* exception applies. Remarkably, even though Janssen cited *Ethicon* in earlier briefing (No. 15-10698, Dkt. 520 at 19), it now ignores the case altogether. Instead, Janssen asks this Court to hold the opposite of *Ethicon*—that standing does ***not*** require all co-owners' participation. This would be error.

### B.     There Is No Authority Permitting a Third Exception to *Ethicon*

The cases Janssen cites in support of its argument that "the J&J disclaimer eliminates the need to add" the '083 patent co-owners (J. Br. at 22) fall into three inapplicable categories.

### 1.     Cases finding no co-owner do not support Janssen

For the first category, Janssen cites cases finding that there was no co-owner of the disputed patent, which means the *Ethicon* rule was not even implicated. For instance, in *IpVenture*, the Court considered two questions: (1) "whether Hewlett-Packard had an ownership interest in the '235 patent when the suit was filed," and (2) "***if so***"—*i.e.*, if HP did have an ownership interest—"the effect of Hewlett-Packard's later statement that it 'never has had any legal or equitable rights' in the patent." *IpVenture, Inc. v. Prostar Comput., Inc.*, 503 F.3d 1324, 1326 (Fed. Cir. 2007). As Defendants explained in their opening brief, on the first question, the *IpVenture* court concluded that "Hewlett-Packard was not an assignee." *Id.* at 1327 (relying on *Arachnid* and other cases). Because HP was not a co-owner, the Court did not need to address the question of standing absent a co-owner.

Janssen relies heavily on the *IpVenture* statements that HP's "disclaimer" "removed the need to construe the employment agreement" and was "effective in accordance with its terms." J. Br. at 24. These statements, which were at best dicta, were made in the context of reaching the conclusion HP was not an assignee. *See IpVenture*, 503 F.3d at 1327. Because the Court definitively found HP not to be a co-owner, it did not reach the *Ethicon* rule, and did not find, as

Janssen claims, that the "disclaimer" "eliminates any purported standing defect." J. Br. at 24. Indeed, the Court did not even cite *Ethicon*. *See also* Ex. 35 at 23–25 (plaintiff IpVenture identifying two arguments involving the "disclaimer": (1) HP was not a co-owner, as supported by the disclaimer, and (2) even if it were, the Court should make an exception to *Ethicon* based on the disclaimer). Moreover, the Court held that it "need not reach the question of whether the district court had discretion, in applying Fed. R. Civ. P. 19(a), to permit the addition of parties in this case without requiring dismissal and refiling." *IpVenture*, 503 F.3d at 1326. In other words, had HP been a co-owner, the question would have been whether HP could be ***added***, not whether the case could proceed ***without*** HP.[4]

*Nomadix* (J. Br. at 26) is inapposite for the same reason. The defendants "contend[ed] that [the University of California] is co-owner of the patents and therefore must be party to th[e] suit." *Nomadix, Inc. v. Hewlett-Packard Co.*, No. 09-08441, 2012 WL 1577436 at *2 (C.D. Cal. May 7, 2012). The court held that UC did not hold title to the patents. *Id*. This conclusion was "[d]ispositive as to standing," and UC's "Non-Assertion Agreement d[id] not change the analysis." *Id.* at *2-3. As in *IpVenture*, there was no co-owner, no issue of standing, and thus, no holding that a "non-assertion" agreement circumvents the *Ethicon* rule.

Janssen's reliance on *Enovsys* (J. Br. at 25) is misplaced for the same reason. Nextel argued that Enovsys lacked standing because it failed to join the ex-wife of a patent inventor, whom Nextel claimed "acquired an ownership interest in the…patents because [the inventor] filed both patent applications during their marriage." *Enovsys LLC v. Nextel Commc'ns, Inc.*, 614 F.3d 1333, 1338 (Fed. Cir. 2010). The Federal Circuit held that "[p]rior to the divorce, the patents

---

[4]  *Walker Digital, LLC v. Expedia, Inc.*, 950 F. Supp. 2d 729 (D. Del. 2013), which Janssen cites, actually confirms that the question passed upon in *IpVenture* relating to the "disclaimer" agreement was "whether Hewlett-Packard, the employer of a co-inventor of the patent-in-suit, had an ownership interest in the patent" (950 F. Supp. 2d at 737 n.9), not that the agreement "eliminates any purported standing defect" as Janssen claims. J. Br. at 24.

were…presumptively community property," but that "[p]ursuant to the California divorce decree" that had been entered before the patent suit was filed, the ex-wife "retained no property rights in the patents." *Id*. at 1343. The divorce judgment, which "constituted a complete and final adjudication of [the couple's] property rights," was "entitled to *res judicata* effect." *Id*. at 1343. Again, therefore, there was no co-owner, so the Court never reached the *Ethicon* rule.[5]

### 2.     Cases applying Rule 19 do not support Janssen

For the second category, Janssen cites *Agilent* and *Tele-Guia*, which applied Federal Rule of Civil Procedure 19 regarding joinder of necessary parties, to conclude that patent co-owners need not be joined. These cases are not good law in view of *STC.UNM*.

*Tele-Guia* is not a standing case. The defendants moved to dismiss "pursuant to Rule 12(b)(7), Fed. R. Civ. P., for failure to join as necessary and indispensable parties an inventor and an assignee of the patents." *Tele-Guia Talking Yellow Pages v. Cablevision Sys. Corp.*, No. 07-3948, 2007 WL 3224573, at *1 (S.D.N.Y. Oct. 31, 2007). The court applied "the Rule 19 framework" and "Second Circuit law," not Federal Circuit law, concluding that while the third party had "an ownership interest," it had "contracted with Tele-Guia to disclaim any right to enforce this patent against parties other than Lucent." *Id*. at *2, 4. Citing provisions in Rule 19, such as the fact that the co-owner's "absence from this litigation [does not] prevent[] complete relief from being accorded between Tele-Guía and CSC," and "failure to join [the co-owner] would not leave CSC 'subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations,'" the court denied the motion. *Id*. at *4.

*Agilent* was the same. The defendant sought to dismiss, or add HP "as a necessary party

---

[5]  *Katrinecz v. Motorola Mobility LLC*, 2014 U.S. Dist. LEXIS 190707 (J. Br. at 25) was the same. 2014 U.S. Dist. LEXIS 190707 at *9–10 ("The [Marital Settlement] Agreement was incorporated into the Final Judgment" and "[a] final judgment of divorce is *res judicata* as to all property rights of the parties that could have and should have been adjudicated in that proceeding.").

under Rules 12(b)(7) and 19(a)." *Agilent Techs., Inc. v. Micromuse, Inc.*, No. 04-3090, 2004 WL 2346152, at *1 (S.D.N.Y. Oct. 19, 2004). Similar to *Tele-Guia*, the court stated that under Rule 19, "courts are less concerned with abstract characterizations of the parties and more concerned with whether the rights of the parties can be fairly adjudicated absent joinder of the patent co-owner." *Id.* at *7 (citing Rule 19 cases). Agilent and HP had entered into an agreement "regarding their respective rights concerning the enforcement of the '138 Patent," and the court denied the motion because "[b]ased on the terms of the…Agreement, it does not appear that H-P's absence from this lawsuit will subject Micromuse to any 'substantial risk of incurring double, multiple, or otherwise inconsistent obligations…'" *Id.* at *8 (citing Fed. R. Civ. P. 19(a)).

Both cases relied on Rule 19 principles relating to, for example, providing "complete relief" and avoiding "double, multiple, or otherwise inconsistent obligations." Fed. R. Civ. P. 19(a). But these cases predate *STC.UNM*, and thus are not good law. In *STC.UNM*, the plaintiff argued that "the holding in *Ethicon* yields to Rule 19(a)'s involuntary joinder test." *STC.UNM*, 754 F.3d at 944. The Federal Circuit rejected that request, holding that "[r]ules of procedure, such as that in Rule 19(a), must give way to substantive patent rights." *Id.* at 946 (citing 28 U.S.C. § 2072). Rule 19 thus does not "trump[] the holding that substantive patent law ordinarily requires consent to joinder from all co[-]owners." *Id.* at 945; *see also STC.UNM v. Intel Corp.*, 767 F.3d 1351, 1353–55 (Fed. Cir. 2014). Indeed, the Southern District of New York (from which *Tele-Guia* and *Agilent* came) recently acknowledged, based on *STC.UNM*, that "an absent co-owner of a patent is both a necessary and indispensable party to suit for purposes of Rule 12(b)(7)," requiring dismissal when "one of the co-owners of the patent is not a party." *Advanced Video Techs. LLC v. HTC Corp.*, No. 15-4626, 2016 WL 3434819, at *16 (S.D.N.Y. June 14, 2016).

### 3.   Cases addressing whether an exclusive licensee may be deemed the assignee do not support Janssen

For the third category, Janssen relies on two cases from the Eastern District of Texas dealing with whether an exclusive licensee may be deemed an assignee. Neither addressed the *Ethicon* rule nor let a suit continue in the absence of a co-owner.

The question in *Advanced Technology* was whether the plaintiff ATI had obtained "all substantial rights" from the third party patent owner, to make ATI the effective sole owner. *Advanced Tech. Incubator, Inc. v. Sharp Corp.*, No. 07-468, 2009 WL 2448156, at *1, 4 (E.D. Tex. July 6, 2009) ("*ATI I*"), *report and rec. adopted as modified*, 2009 WL 2460985 (E.D. Tex. Aug. 10, 2009) ("*ATI II*"). The district judge concluded that at the time of filing suit, ATI "did not have all substantial rights so as to accord [it] the status of 'patentee,'" but it later obtained these rights, after the complaint was filed, by way of a "2008 Acknowledgement," in which the patent owner's successor had, among other things, "waived any requirement that ATI obtain [its] consent before transferring the patents-in-suit" and "disclaimed any right to enforce the patents-in-suit and agreed to be bound by the outcome of the case at bar." *ATI II*, 2009 WL 2460985 at *5. The court thus held that the 2008 Acknowledgment "rendered ATI an exclusive licensee with all substantial rights..."—in other words, the effective sole owner. *Id.*

*ATI* is not about an unjoined co-owner. It applied the rule that when "all 'substantial rights' under the patent are transferred by the owner of the patent, the transferee will be deemed the effective patentee under the statute and will be deemed to have standing to bring suit in its own name." *ATI I*, 2009 WL 2448156 at *4; *see also ATI II*, 2009 WL 2460985 at *4. It is thus like *IpVenture*, *Nomadix* or *Enovsys*, in which there was no co-owner. Moreover, *ATI*'s reliance on a post-complaint agreement is not good law. Since *ATI*, the Federal Circuit has held that a plaintiff "cannot correct a jurisdictional defect that existed at the time the complaint was filed by post-filing

activity." *Alps S., LLC v. Ohio Willow Wood Co.*, 787 F.3d 1379, 1384 (Fed. Cir. 2015).

*MediaTek* was similar. Plaintiff MediaTek had been given rights to the asserted patents from two other plaintiffs, UMC and Sarnoff. *MediaTek. Inc. v. Sanyo Elec. Co.*, No. 05-323, 2007 WL 5186792 at *1 (E.D. Tex. 2007). The focus, as in *ATI*, was whether MediaTek had obtained "all substantial rights." *Id.* at *4–5. The court concluded that "MediaTek is the assignee," *i.e.*, the sole owner, "or, alternatively, the exclusive licensee" of the patents, and permitted UMC and Sarnoff to be dismissed from the case because "[t]heir disclaimer is sufficient to protect Sanyo from future duplicative litigation." *Id.* at *8.  The reference to a disclaimer in *MediaTek* does not allow this Court to treat J&J's "disclaimer" as an exception to *Ethicon*. First, the *MediaTek* court's decision to allow the suit to proceed without UMC and Sarnoff rested on its "alternative" holding that "MediaTek ***is the assignee***," making participation by UMC and Sarnoff not necessary "at all." *Id.* And while the court stated it could proceed without UMC and Sarnoff even if they were still owners because of their agreement "to be bound by [] any judgment or settlement" (*id.*), that directly contradicts Federal Circuit law. A plaintiff who does not have "all substantial rights" and thus is not effectively the assignee, but rather an exclusive licensee, "***must still be joined*** in suit by the patent owner." *Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372, 1377 (Fed. Cir. 2000) (citing *Indep. Wireless Tele. Co. v. Radio Corp. of Am.*, 269 U.S. 459 (1926)). A patent owner's agreement "to be bound by any judgment" is not "sufficient to confer standing." *Prima Tek II*, 222 F.3d at 1380–81; J. Br. at 27 (acknowledging this rule).

### 4. Defendants' cases correctly apply *Ethicon* and show that the "disclaimer" is not an exception to the rule requiring joinder

In an effort to avoid the cases Defendants cited—*Bushnell* and *Speedfit*—Janssen asserts that standing was lacking in those cases "precisely because the co-owner had not adequately disclaimed ownership in the patent prior to suit." J. Br. at 28. That is flatly incorrect.

In *Bushnell*, the defendants argued that the existence of a third party co-owner meant that "plaintiffs lack prudential standing." *Bushnell, Inc. v. Brunton Co.*, 659 F. Supp. 2d 1150, 1162 (D. Kan. 2009). The plaintiffs responded, like Janssen here, that the co-owner "waived its right to sue these defendants." *Id.* at 1163. And like Janssen, the plaintiffs argued that under *IpVenture*, the co-owner's opting out of the suit "removes the possibility of multiple suits for infringement of the same patents," thus permitting standing. *Id.* The *Bushnell* court rejected this argument, declining to "create a new exception to the joinder rule: that joinder is not necessary where a co-owner waives the right to participate in a given infringement suit, agrees to be bound by the judgment and agrees not to license the patents to the alleged infringers." *Id.* It noted:

> The Federal Circuit has not recognized such an exception, and in fact it has expressly stated that a patent owner's agreement to be bound by judgments against an exclusive licensee does not necessarily resolve the issue of standing because "standing to sue for infringement depends *entirely* on the putative plaintiff's proprietary interest in the patent, not on any contractual arrangements among the parties regarding who may sue and who will be bound by judgments."

*Id.* at 1163-64 (citing *Prima Tek II*, 222 F.3d at 1381).  *Bushnell* thus rejects Janssen's argument.

*Speedfit* also correctly applied *Ethicon*. There, the plaintiffs argued for an "exception" to *Ethicon* where the absent co-owner allegedly "waived his right not to be involuntarily joined in this lawsuit." *Speedfit LLC v. Woodway USA, Inc.*, 226 F. Supp. 3d 149, 156 (E.D.N.Y. 2016). The court agreed that "'[i]f, by agreement, a co-owner waives his right to refuse to join suit, his co-owners may subsequently force him to join,'" and that "[t]he Federal Circuit has recognized this exception to the general requirement that all co-owners must be joined as plaintiffs." *Id.* (citing *Ethicon*, 135 F.3d at 1468 n.9; *STC.UNM I*., 754 F.3d at 946). Critically, however, like J&J's "disclaimer," the agreement in *Speedfit* "did ***not*** constitute a waiver by [the co-owner] of his right to refuse to join an infringement suit." *Id.* Rather, the absent co-owner had "***assert[ed]*** his right to refuse to join the lawsuit." *Id.* Accordingly, the plaintiffs lacked standing. *Id.* at 157. *Speedfit* thus

further supports that the March 2017 Agreement does not cure the standing defect.

Janssen also tries to explain away additional Federal Circuit cases that support Defendants, such as *Prima Tek II*, 222 F.3d at 1381 (standing "depends entirely on the putative plaintiff's proprietary interest in the patent, not on any contractual arrangements among the parties regarding who may sue and who will be bound by judgments") and *Ortho Pharm. Corp. v. Genetics Inst., Inc.*, 52 F.3d 1026, 1034 (Fed. Cir. 1995) ("[A] contract cannot change the statutory requirement for suit to be brought by the 'patentee.'"), dismissing them as related to "licensee[s]" or "Article III standing." J. Br. at 27. Janssen's effort is without merit. These cases, combined with the clear law of *Ethicon*, confirm that a "contractual" "disclaimer" cannot fix a lack of standing.

### C.      The March 2017 Agreement Does Not Bind Companies Other Than J&J

Even if there were a "disclaimer" exception to the *Ethicon* rule, it still would not cure Janssen's standing defect.

### 1.      The "disclaimer" does not bind current J&J subsidiaries

Janssen has asserted that the J&J family consists of "250-plus" companies around the world (J. Br. at 5, 21) and that J&J "doesn't control the operations of its operating subsidiaries," which are "all standalone companies." 2/8/17 Hr'g Tr. at 63:19–64:3. Yet, Janssen now asserts with no support that "J&J had the authority to bind—and did bind—its subsidiaries" with the so-called "disclaimer" agreement. J. Br. at 28. Janssen's inconsistent positions should be rejected. "Having one's cake and eating it, too, is not in fashion in this circuit." *United States v. Tierney*, 760 F.2d 382, 388 (1st Cir. 1985).

None of the cases Janssen cites stand for the proposition that a company can disclaim all of its subsidiaries' patent ownership interests.[6] The closest case to the current scenario is *Quantum*

---

[6] *See Grunley Walsh US, LLC v. Raap*, 2009 U.S. Dist. LEXIS 38609, at *23-25 (E.D. Va. May 6, 2009), *aff'd*, 386 F. App'x 455, 462 (4th Cir. 2010) (sellers "controlled Grunley Walsh U.S." which meant that Grunley Walsh U.S.

*Corp. v. Riverbed Tech., Inc.*, No. 07-04161, 2008 WL 314490 (N.D. Cal. Feb. 4, 2008), cited by Defendants, which requires a finding that J&J cannot disclaim all of its subsidiaries' interests without their participation. D. Br. at 29. In *Quantum*, the plaintiff argued that it had acquired rights to the asserted patent through an agreement executed by the patent owner's parent company on behalf of itself "and its subsidiaries." *Quantum*, 2008 WL 314490 at *2. But the "[t]rouble [wa]s, [the patent owner] was not a party to the agreement, *i.e.*, [it] did not sign the agreement." *Id.* The court cited "basic tenet[s] of American corporate law" about separateness of corporate entities, recognizing that "[p]arties who determine to avail themselves of the right to do business by means of the establishment of a corporate entity must assume the burdens thereof as well as the privileges." *Id.* There had been no showing that the parent company "should be treated as [the subsidiary's] alter ego," and thus the agreement signed by the parent was not effective with respect to its subsidiary. *Id.*

Janssen attempts to distinguish *Quantum* because the plaintiff "had no independent ownership interest," whereas here, Janssen has an ownership interest. J. Br. at 29. This is a distinction without a difference. The point of *Quantum* is that a parent cannot automatically bind its subsidiaries' with respect to their patent rights, simply by virtue of them being subsidiaries.

Janssen argues that in *Royal Industries v. St. Regis Paper Co.*, 420 F.2d 449 (9th Cir. 1969) and *Max Sound Corp. v. Google, Inc.*, 147 F. Supp. 3d 948 (N.D. Cal. 2015), which Defendants also cite, "the parent did not even purport to bind its subsidiaries." J. Br. at 29–30. This misses the point. In *Royal Industries*, a parent could not terminate a license without the consent of its

---

qualified as "affiliate" under terms of release); *Invitrogen Corp. v. Emp'rs. Ins. Co.*, 2007 U.S. Dist. LEXIS 19301, at *20-25 (D. Ariz. Mar. 9, 2007) (party to settlement agreement could not later seek reinsurance payments from subsidiary of parent it had agreed to release); *Geier v. Mozido, LLC*, 2016 De. Ch. LEXIS 149, at *15-18 (Del. Ch. Sep. 29, 2016) (release held to apply to person in charge of company in his individual capacity); *N. Sec. Ins. Co. v. Mietc Elecs., Ltd.*, 965 A.2d 447, 456-57 (Vt. 2008) (successor in interest bound by predecessor's release).

subsidiary. *See* D. Br. at 30; 420 F.2d at 453. "Royal and [subsidiary] Plas-Ties were separate legal entities in respect of their licensing contract," and therefore the proper course of action was to "obtain Plas-Ties' assent to termination before it filed suit" or "to join Plas-Ties as a plaintiff." 420 F.2d at 453. In *Max Sound*, "a parent's control of its subsidiaries [wa]s insufficient to confer standing" "because a parent company is not automatically deemed authorized to transfer its subsidiaries' patent rights." 147 F. Supp. 3d at 954. Other cases echo the principles from *Quantum*, *Royal Industries*, and *Max Sound. See, e.g., Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1074 (11th Cir. 2003) ("Corporations are separate legal entities and contracts made by a parent corporation do not bind a subsidiary merely because one corporation owns all of the stock of the other corporation."); *Bross Utils. Serv. Corp. v. Aboubshait*, 618 F. Supp. 1442, 1445 (S.D.N.Y. 1985) ("A parent corporation cannot create a subsidiary corporation and then ignore the separate corporate existence of that subsidiary whenever it would be advantageous to the parent.").

It is ***Janssen's burden*** to prove that it has prudential standing (*Abbott Point of Care*, 666 F.3d at 1302), and thus that J&J bound all of its "standalone" companies for which J&J "doesn't control the operations." Janssen has not met this burden.

### 2.       The "disclaimer" does not bind former J&J subsidiaries

In addition, since the early 2000s, portions of "the COMPANY" have been sold, are no longer part of the J&J family, and thus J&J could not act on their behalf in executing the March 2017 Agreement. According to publicly available information, J&J has sold at least five subsidiaries who were part of the J&J family during the time frame when Mr. Epstein and the others assigned their inventions to the J&J family. *See* Appendix B (summary of divested companies); Ex. 36 (documents evidencing sales). Janssen lacks any basis to claim that J&J bound these former family companies. No language in the March 2017 Agreement even purports to do so. *See* J. Br., Ex. 5.

Janssen tries to shift the burden to Defendants, arguing that Defendants do not identify any "divestiture agreement [that] would even colorably give such an entity a right to maintain an ownership claim." *Id*. at 30. But Janssen has already conceded that if inventors' rights were "assigned to all J&J companies that 'existed' in 2001–03, ***companies that were subsequently divested would retain rights in Centocor's patents*** and could impede Centocor's ability to enforce its patents by refusing to be joined." No. 15-10698, Dkt. 445 at 7.

Again, ***Janssen*** bears the burden of establishing standing, which requires demonstrating that there are no absent co-owners of the '083 patent. It has not done this. The March 2017 Agreement cannot bind companies who are outside the J&J family; thus, they maintain ownership of the '083 patent as a consequence of the plain meaning of "COMPANY." The requirement that a co-owner be joined "enable[s] the alleged infringer to respond in one action to all claims of infringement for his act, and thus either to defeat all claims in the one action, or by satisfying one adverse decree to bar all subsequent actions." *Indep. Wireless*, 269 U.S. at 468. This policy applies as much in this case as in any other. The third-party co-owners of the '083 patent who are unimpacted by the March 2017 Agreement preclude a finding of prudential standing.

Just recently, Janssen told the Court that if its case is dismissed, it will simply "refil[e] the case with any purported standing defects resolved." Dkt. 33 at 11. If it is true that Janssen can resolve its standing problem in a way the law recognizes, it should do so. Because it lacks standing now, and standing is a requirement for litigation, this action must be dismissed.

Dated: August 25, 2017

Respectfully submitted,

Celltrion Healthcare Co., Ltd., Celltrion, Inc., and Hospira, Inc.

By their attorneys,

/s/*Andrea L.  Martin, Esq.*
Dennis J.  Kelly (BBO # 266340)
Andrea L.  Martin (BBO #666117)
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA 02110-1624
Telephone: 617-345-3000
Facsimile: 617-345-3299
dkelly@burnslev.com
amartin@burnslev.com

James F. Hurst, P.C.  (*pro hac vice*)
Bryan S.  Hales, P.C. (*pro hac vice*)
Elizabeth A. Cutri (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
james.hurst@kirkland.com
bryan.hales@kirkland.com
elizabeth.cutri@kirkland.com

Ryan Kane (*pro hac vice*)
James McConnell (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
ryan.kane@kirkland.com
james.mcconnell@kirkland.com

Charles B.  Klein (*pro hac vice*)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817
Tel: (202) 282-5000
cklein@winston.com

Samuel S. Park (*pro hac vice*)
Dan H. Hoang (*pro hac vice*)

WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL  60601-9703
Tel: (312) 558-7931
spark@winston.com
dhoang@winston.com

*Attorneys for Defendants Celltrion Healthcare
Co., Ltd., Celltrion, Inc., and Hospira, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed through the electronic filing system and served electronically to the registered participants as identified on the Notice of Electronic Filing.

 */s/  Andrea L. Martin*