# EXHIBIT 35

WEST/CRS

Nos. 06-1012, -1081

IN THE

# United States Court of Appeals
## FOR THE FEDERAL CIRCUIT

IPVENTURE, INC.,

*Plaintiff-Appellant,*

*v.*

PROSTAR COMPUTER, INC. and
MIDERN COMPUTER, INC.,

*Defendants-Cross Appellants.*

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE CENTRAL DISTRICT OF CALIFORNIA
IN CASE NO. 03-CV-5780, JUDGE DALE S. FISHER

# BRIEF OF PLAINTIFF-APPELLANT
# IPVENTURE, INC.

MORGAN CHU
RICHARD M. BIRNHOLZ
RUDY Y. KIM

**IRELL & MANELLA LLP**

1800 Avenue of the Stars, Suite 900
Los Angeles, California 90067-4276
(310) 277-1010

*Attorneys for Plaintiff-Appellant*
IPVENTURE, INC.

March 13, 2006

## CERTIFICATE OF INTEREST

Counsel for Plaintiff-Appellant, IpVenture, Inc., certifies the following:

1.    The full name of every party or amicus represented by us is:

      IpVenture, Inc.

2.    The names of all real parties in interest (if the party named in the caption is not the real party in interest) represented by us are:

      Not applicable.

3.    All parent corporations and any publicly held companies that own 10% or more of the stock of the party or amicus curiae represented by us are:

      None.

4.    The names of all law firms and the partners or associates that appeared for the party or amicus now represented by us in the trial court or agency or are expected to appear in this Court are:

      Irell & Manella LLP
      Morgan Chu
      Richard M. Birnholz
      Rudy Y. Kim
      Craig B. Whitney (no longer with the firm)

By:                              

      Richard M. Birnholz
      Attorneys for Plaintiff-Appellant
      IPVENTURE, INC.

## TABLE OF CONTENTS

Page

JURISDICTIONAL STATEMENT ........................................................................ 1

PRELIMINARY STATEMENT ........................................................................... 2

STATEMENT OF THE ISSUES ......................................................................... 6

STATEMENT OF THE CASE ............................................................................ 7

STATEMENT OF FACTS ................................................................................. 9

I.      The '235 Patent ................................................................................ 9

II.     IpVenture Brought This Action As The Assignee Of Both Inventors ....... 10

III.    Pre-Suit Events ................................................................................ 10

        A.      The HP-Thomas Employment Agreement ...................................... 10

        B.      The April 2003 IpVenture-HP Agreement ...................................... 12

IV.     The District Court Proceedings ........................................................... 13

        A.      The April 2005 IpVenture-HP Agreement ...................................... 15

        B.      Defendants' Motion To Dismiss .................................................. 16

        C.      The District Court Decision ...................................................... 19

SUMMARY OF THE ARGUMENT ................................................................... 23

ARGUMENT ............................................................................................... 26

I.      STANDARD OF REVIEW ................................................................... 26

II.     THIS COURT SHOULD REVERSE THE DISTRICT COURT'S
        HOLDING THAT THE HP-THOMAS AGREEMENT WAS AN
        ASSIGNMENT AND THAT HP WAS A CO-OWNER ......................... 26

        A.      IpVenture Is The Sole Holder Of Legal Title To The '235
                Patent ................................................................................ 26

Page

    B.    HP Is Not A Co-Owner Of '235 Patent ............................... 28

        1.    *Arachnid* And Its Progeny Require Express
            Conveyance Language To Assign Legal Title. ..................... 29

        2.    The '235 Patent Was Never Assigned To HP ........................ 31

        3.    The District Court Incorrectly Relied On *Speedplay*
            and *Filmtec* ............................................................ 35

        4.    California Cases Are Consistent With *Arachnid* ................... 39

    C.    The Conduct Of The Parties Contradicts The District Court's
        Ruling And Evidences The Lack Of An Assignment Of
        Legal Title ........................................................... 43

III.    EVEN ASSUMING HP WAS A CO-OWNER, THIS COURT
      SHOULD REVERSE THE DISMISSAL BECAUSE HP WAS
      NOT A NECESSARY PARTY ............................................... 45

    A.    IpVenture Has Constitutional Standing As a Patent Owner ............ 46

    B.    HP's Alleged Absence Raises Only "Prudential" Issues Of
        Joinder ................................................................ 47

    C.    The District Court Erred In Not Performing Any Analysis Of
        Whether HP Was A Necessary Party Under Rule 19 ..................... 50

CONCLUSION ........................................................................ 55

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Abbott Labs v. Diamedix Corp.,*
    47 F.3d 1128 (Fed. Cir. 1995) ................................................................ 54

*Agilent Techs., Inc. v. Micromuse, Inc.,*
    2004 WL 2346152 (S.D.N.Y. Oct. 19, 2004)......................................... 57

*Altmann v. Republic of Austria,*
    317 F.3d 954 (9th Cir. 2002) ........................................................... 59, 60

*Arachnid, Inc. v. Merit Industries,*
    939 F.2d 1574 (Fed. Cir. 1991) ...................................................... passim

*Aspex Eyewear, Inc. v. Miracle Optics, Inc.,*
    434 F.3d 1336 (Fed. Cir. 2006) ............................................................ 60

*Cubic Corp. v. Marty,*
    185 Cal. App. 3d 438, 229 Cal. Rptr. 828 (1986) ...................... 45, 46, 47

*Dewakuku v. Martinez,*
    271 F.3d 1031 (Fed. Cir. 2001) ............................................................ 28

*Ellison Educ. Equip., Inc. v. Chen,*
    2004 WL 3154592 (C.D. Cal. Dec. 21., 2004)....................................... 38

*Ethicon, Inc. v. U.S. Surgical Corp.,*
    135 F.3d 1456 (Fed. Cir. 1998) ...................................................... passim

*E-Z Bowz, L.L.C. v. Professional Prod. Research Co.,*
    2003 WL 22064257 (S.D.N.Y. Sep. 5, 2003) ................................... 56, 58

*Filmtec Corp. v. Allied-Signal, Inc.,*
    939 F.2d 1568 (Fed. Cir. 1991) ................................................. 37, 40, 41

*Filmtec Corp. v. Hydranautics,*
    982 F.2d 1546 (Fed. Cir. 1992) ...................................................... passim

*Freedom Wireless, Inc. v. Boston Communications Group, Inc.,*
    220 F. Supp.2d 16 (D. Mass. 2002)................................... 36, 37, 38, 42

Page(s)

*GAF Bldg. Materials Corp. v. Elk Corp. of Dallas,*
    90 F.3d 479 (Fed. Cir. 1996) .................................................................. 55

*Gaia Techs., Inc. v. Reconversion Techs., Inc.,*
    93 F.3d 774 (Fed. Cir. 1996) ........................................................... 38, 55

*Grove v. Grove Valve & Regulator Co.,*
    4 Cal. App. 3d 299, 84 Cal. Rptr. 300 (1970) ................................... 44, 45

*Intellectual Prop. Dev., Inc. v. TCI Cablevision of Cal., Inc.,*
    248 F.3d 1333 (Fed. Cir. 2001) .................................................. 28, 52, 53

*International Business Machines Corp. v. Conner Peripherals, Inc.,*
    1994 WL 409493, 30 U.S.P.Q.2d 1315 (N.D. Cal. 1994)...................... 58

*Lujan v. Defenders of Wildlife,*
    504 U.S. 555 (1992)................................................................................. 51

*Media Techs. Licensing, LLC v. Upper Deck Co.,*
    334 F.3d 1366 (Fed. Cir. 2001) .............................................................. 51

*Mentor H/S, Inc. v. Med. Device Alliance, Inc.,*
    240 F.3d 1016 (Fed. Cir. 2001) .............................................................. 54

*Michaels of Oregon Co. v. Mil-Tech, Inc.,*
    1995 WL 852122, 38 U.S.P.Q.2d 1060 (D. Or. 1995).......................... 58

*Morey v. Vannucci,*
    64 Cal. App. 4th 904 (1998) .................................................................. 48

*Prima Tek II, L.L.C. v. A-Roo Co.,*
    222 F.3d 1372 (Fed. Cir. 2000) .............................................................. 53

*Provident Tradesmens Bank & Trust Co. v. Patterson,*
    390 U.S. 102 (1968)................................................................................. 60

*Rawlings v. Nat'l Molasses Co.,*
    394 F.2d 645 (9th Cir. 1968) .................................................................. 57

*Regents of The Univ. of New Mexico v. Knight,*
    321 F.3d 1111 (Fed. Cir. 2003) .............................................................. 43

Page(s)

*Rite-Hite Corp. v. Kelley Co.*,
   56 F.3d 1538 (Fed. Cir. 1995) ................................................................ 28

*Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*,
   402 F.3d 1198 (Fed. Cir. 2005) .............................................................. 54

*Shaw v. Regents of the University of California*,
   58 Cal. App. 4th 44 (1997) .............................................................. 46, 47

*Sigma Eng'g Serv., Inc. v. Halm Instrument Co.*,
   33 F.R.D. 129 (S.D.N.Y. 1963) ......................................................... 38, 41

*Speedplay, Inc. v. Bebop, Inc.*,
   211 F.3d 1245 (Fed. Cir. 2000) ...................................................... passim

*Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*,
   944 F.2d 870 (Fed. Cir. 1991) .............................................................. 53

**Statutes**

28 U.S.C. § 1295(a)(1) ............................................................................. 1

28 U.S.C. § 1331 .................................................................................... 55

28 U.S.C. § 1338(a) ............................................................................ 1, 55

28 U.S.C. § 2107(a) ................................................................................. 1

35 U.S.C. § 100(d) ............................................................................. 26, 47

35 U.S.C. § 116 ...................................................................................... 27

35 U.S.C. § 151 ...................................................................................... 27

35 U.S.C. § 261 ...................................................................................... 27

35 U.S.C. § 262 ...................................................................................... 27

35 U.S.C. § 281 ................................................................................. 26, 47

35 U.S.C. § 285 ............................................................................... 1, 8, 22

Cal. Civ. Code § 1641 ............................................................................. 38

Page(s)

Cal. Labor Code § 2870 ..................................................................................... 11

**Rules**

Fed. R. Civ. P. 12(b)(1)............................................................................. 2, 7, 16

Fed. R. Civ. P. 19 ...................................................................................... passim

Fed. R. Civ. P. 21 ............................................................................................. 49

.

## STATEMENT OF RELATED CASES

No other appeal in or from this same civil action was previously before this Court or any other court of appeals.  Further, there is no case known by counsel to be pending in this or any other court that will directly affect or be directly affected by this Court's decision in the pending appeal.

## JURISDICTIONAL STATEMENT

The United States District Court for the Central District of California (Judge Dale S. Fisher) had jurisdiction over the patent infringement action giving rise to this appeal pursuant to 28 U.S.C. § 1338(a).

The United States Court of Appeals for the Federal Circuit has jurisdiction over this appeal pursuant to 28 U.S.C. § 1295(a)(1).

The notice of appeal in Appeal No. 06-1012 from the district court's August 26, 2005 Judgment Dismissing Action Without Prejudice and related orders was timely filed by Plaintiff-Appellant IpVenture, Inc. in accordance with 28 U.S.C. § 2107(a) and Rule 4(a) of the Federal Rules of Appellate Procedure on September 26, 2005.

This case also involves a cross-appeal, Appeal No. 06-1081. On November 2, 2005, Defendants-Cross Appellants ProStar Computer, Inc. and Midern Computer, Inc. filed a notice of appeal in Appeal No. 06-1081 from the district court's October 18, 2005 Order Denying Motion for Declaration of Exceptional Case and Award of Attorneys' Fees Pursuant to 35 U.S.C. § 285.

## PRELIMINARY STATEMENT

This is an appeal in Plaintiff-Appellant IpVenture's patent infringement action against Defendants-Cross Appellants ProStar Computer, Inc. and Midern Computer, Inc. with respect to U.S. Patent No. 6,216,235 (the "'235 patent"), entitled "Thermal and Power Management For Computer Systems." The district court dismissed IpVenture's action on the grounds that IpVenture lacked sufficient standing and that the court lacked subject matter jurisdiction. Although it was not in dispute that IpVenture owned the '235 patent, on Defendants' motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure, the district court held that a third-party was a co-owner of the '235 patent at the time the Complaint was filed. Because that party was not joined as a plaintiff, the district court entered a judgment dismissing the action without prejudice.

The district court's dismissal should be reversed. IpVenture is the sole assignee of the '235 patent through a written assignment from both named inventors, C. Douglass Thomas and Alan Thomas. The district court's dismissal was based on the erroneous legal conclusion that Hewlett-Packard Company ("HP"), for whom inventor Douglass Thomas previously worked as a patent attorney, was a co-owner of the '235 patent. Defendants conceded that IpVenture was an owner of the '235 patent through its assignment from inventor Alan Thomas. But Defendants argued that HP also was a co-owner of the '235 patent

- 2 -

through a form employment-related agreement with inventor Douglass Thomas, who worked on the inventions of the '235 patent and the related patent applications entirely on his own time outside of his employment. HP never asserted or claimed any ownership interest in the '235 patent, and in fact expressly disclaimed any such interest. Nevertheless, the district court incorrectly held that the agreement between Douglass Thomas and HP constituted a present assignment of legal title of the inventions of the '235 patent.

The district court's ruling that HP was a co-owner of the '235 patent is contrary to this Court's controlling decision in *Arachnid, Inc. v. Merit Industries*, 939 F.2d 1574 (Fed. Cir. 1991). Under *Arachnid* and its progeny, an agreement that is merely an "agreement to assign" is "not an assignment" and does not transfer legal title. Rather, legal title is only passed by a conveyance. The employment agreement between Douglass Thomas and HP, on which the district court relied, did not contain the required conveyance language and was at most an agreement to assign that did not affect legal title. Indeed, the HP-Thomas agreement contains "agree to assign" language that this Court has held does not constitute a present conveyance. *Arachnid*, 939 F.2d at 1580-81. Moreover, HP never asked for an assignment and after Defendants (not HP) raised an issue of ownership, HP confirmed that HP has never asserted ownership of, and has never had any rights to, the patents. HP also released claims with respect to the

- 3 -

enforcement of the patents. Legal title remained at all times with the inventors, until they properly assigned ownership to IpVenture.

In holding HP to be a co-owner of the '235 patent, the district court incorrectly analogized the agreement in this case to the ones at issue in *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245 (Fed. Cir. 2000) and *Filmtec Corp. v. Hydranautics*, 982 F.2d 1546 (Fed. Cir. 1992). Neither case applies here. Both of those cases, like all other cases finding an agreement to be a present assignment of legal title, involved language expressly assigning all right, title and interest to the inventions in question.

Even assuming for the sake of argument that HP was a co-owner of the '235 patent, the district court also erred in holding that the case must be dismissed. In dismissing, the district court relied on this Court's decision in *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1468 (Fed. Cir. 1998), which states that "all co-owners must ordinarily consent to join as plaintiffs in an infringement suit." The district court apparently viewed this case as setting forth a *per se* rule that the absence of a co-owner requires dismissal. The district court's reliance on *Ethicon*, however, is misplaced. *Ethicon* did not address the question of whether an action must be dismissed where the absent party has disclaimed ownership in the patent, as HP did here.

IpVenture is not aware of any Federal Circuit case that has addressed this specific question.  In such circumstances, the appropriate inquiry is whether such a party is a necessary party under Rule 19 of the Federal Rules of Civil Procedure. The district court erred in failing to do any analysis of joinder and did not consider any of the factors set forth in Rule 19.  The district court also refused to consider the 2005 agreement between HP and IpVenture in which HP disclaimed any ownership interest, incorrectly holding that such agreement need not be considered simply because it post-dated the complaint.  Because HP has not even claimed an interest in the subject of this action, and has expressly disclaimed any such interest, it is not a necessary party and requiring its joinder would serve no purpose.

IpVenture is the sole assignee and holder of legal title to the '235 patent. The district court erred in holding to the contrary.  IpVenture had standing to bring this action and the district court's dismissal should be reversed.

## STATEMENT OF THE ISSUES

1.     Whether the district court erred in holding that third-party Hewlett Packard Company ("HP") was a co-owner of the '235 patent, when the agreement on which Defendants relied to argue HP's alleged ownership interest was at most an agreement to assign, not a present conveyance of legal title?

2.     Whether the district court erred in dismissing IpVenture's action for lack of subject matter jurisdiction or lack of standing, where IpVenture had both constitutional and prudential standing to sue for infringement as the assignee and holder of legal title to the patent at issue and where the alleged absent "co-owner" expressly disclaimed any interest in the patent-in-suit and thus cannot be considered a necessary party whose joinder was required in the case?

## STATEMENT OF THE CASE

This is a patent infringement case. IpVenture appeals from the "Judgment Dismissing Action Without Prejudice" entered by the United States District Court for the Central District of California on August 26, 2005 (A1); the "Order Setting Evidentiary Hearing Re Defendants' Renewed Motion To Dismiss" dated July 27, 2005 (A2-21); the "Order On Defendants' Renewed Motion To Dismiss" dated August 25, 2005 (A22-23); and the "Amended Order On Defendants' Renewed Motion To Dismiss and Order Denying Request To Withdraw Joint Stipulation From The Record" dated August 31, 2005 (A24-25).

On August 14, 2003, IpVenture filed suit against ProStar and Midern (collectively, "Defendants") alleging infringement of U.S. Patent No. 6,216,235 (the "'235 patent") based on Defendants' sale of notebook computers.

On May 27, 2005, Defendants moved to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure, based on the non-joinder of Hewlett Packard Company ("HP"), a third party that Defendants contended was a co-owner of the '235 patent.

On July 27, 2005, the district court issued an "Order Setting Evidentiary Hearing re Defendants' Renewed Motion to Dismiss," setting forth conclusions of law and scheduling an evidentiary hearing to resolve certain factual matters, as will be described in more detail below in the Statement of Facts. (A2-21) On

August 24, 2005, IpVenture filed a "Statement Re 'Proprietary Development' Issue on Defendants' Renewed Motion to Dismiss," informing the district court that IpVenture did not contest the factual issue to be addressed at the contemplated evidentiary hearing. (A576-579)

On August 25, 2005, the district court issued its "Order On Defendants' Renewed Motion To Dismiss," in which the court concluded that the action must be dismissed without prejudice. (A22-23) On August 26, 2005, the district court entered its Judgment dismissing the action without prejudice. (A1) Defendants moved for an award of attorneys' fees under 35 U.S.C. § 285, a motion the court denied on October 18, 2005 because Defendants were not "prevailing parties" as they had not received any relief on the merits. (A26-28)

## STATEMENT OF FACTS

**I.    The '235 Patent**

The patent-in-suit in this case is U.S. Patent No. 6,216,235 (the "'235 patent"), entitled "Thermal and Power Management For Computer Systems." The '235 patent relates to improved approaches for providing thermal and power management for computers. In particular, "[t]hese approaches facilitate intelligent control of a processor's clock frequency and/or a fan's speed so as to provide thermal and/or power management for the computing device." (A59, Abstract) The '235 patent issued on April 10, 2001, and resulted from a continuation application filed July 10, 1999 which claimed priority to a parent application filed June 20, 1994. (*Id.*)

The named inventors on the '235 patent are C. Douglass Thomas, Plaintiff-Appellant IpVenture's co-founder, and his father Alan Thomas. Douglass Thomas is a patent attorney who prosecuted the patent applications that led to the '235 patent on his own behalf with his own resources. Plaintiff-Appellant IpVenture is the assignee of the '235 patent. In March 2003, before the filing of the suit, both inventors Alan Thomas and Douglass Thomas assigned their entire right, title and interest in and to the '235 patent (and three other patents) to IpVenture. (A171-177) The written assignment confirmed that IpVenture "has succeeded to all of INVENTORS' right, title, and standing to . . . institute and prosecute all suits and

proceedings under the Patents" and "collect, assert, or enforce any claim . . . of any kind under any and all of the Patents, whether arising before or after the Effective Date." (A172) An "Assignment Agreement" reflecting the assignment from Alan Thomas and Douglass Thomas to IpVenture was duly recorded in the United States Patent and Trademark Office on April 15, 2003. (A179-181)

## II.   IpVenture Brought This Action As The Assignee Of Both Inventors

On August 14, 2003, IpVenture filed its Complaint against ProStar and Midern alleging infringement of the '235 patent. Based on the assignment from both of the inventors, IpVenture's complaint alleged that IpVenture "is the owner by assignment of all right, title and interest in and to the '235 patent." (A55, ¶ 7) Defendants ProStar and Midern are California companies that sell notebook computers. IpVenture alleged Defendants infringed by, among other things, selling infringing notebook computers. (A55-56, ¶¶ 8, 12)

## III.   Pre-Suit Events

### A.   The HP-Thomas Employment Agreement

Douglass Thomas worked at Hewlett-Packard Company ("HP") from approximately August 1992 to May 1995 as a patent attorney in HP's legal department. On August 18, 1992, Douglass Thomas signed an employment-related agreement with HP entitled "Agreement Regarding Confidential Information and Proprietary Developments" (the "HP-Thomas Agreement"). (A111) Among other

things, the agreement contained language describing certain defined "Proprietary
Developments" that might ultimately become subject to the agreement.

Paragraph 3 of the HP-Thomas Agreement provided:

> This Agreement also concerns inventions and discoveries (whether or not
> patentable) . . . (hereinafter called "Proprietary Developments") that are
> conceived or made by me alone or with others while I am employed by HP;
> that relate to the research and development or the business of HP, or result
> from work performed by me for HP; or that do not qualify fully under the
> prevailing provisions of California Labor Code Section 2870.*  Such
> Proprietary Developments are the sole property of HP, and I agree:
>
> > a.  to disclose them promptly to HP;
> >
> > b.  to assign them to HP; and
> >
> > c.  to execute all documents and cooperate with HP in all necessary
> >     activities to obtain patent, copyright, mask work and/or trade
> >     secret protection in all countries, HP to pay the expenses.

(*Id.*)

There is no assignment from Douglass Thomas to HP with respect to the
'235 patent, and HP has never requested any assignment.  Nor has HP ever asserted
that it owns or owned the '235 patent.  As Douglass Thomas testified in deposition,
the inventions set forth in the parent application to the '235 patent (and related

patents) were made entirely on his own time outside of work, without using any of HP's money, resources, equipment, supplies, facilities, or trade secret information. (A936 at 122:5-20)  It is undisputed that inventor Alan Thomas had no affiliation with HP.

## B.    The April 2003 IpVenture-HP Agreement

In April 2003, before this suit was filed, IpVenture entered into an agreement with HP that contained a covenant not to sue under the '235 patent (and a number of other IpVenture patents) (the "2003 Agreement").  (A1024-1027) This agreement allowed IpVenture to explore retaining its present counsel, which also represents HP on unrelated matters, without the law firm having any conflict of interest.  (*Id.*)

The 2003 Agreement recited that "IpVenture is the owner of certain patent rights relating to thermal management," and that "HP and IpVenture desire to resolve any issues regarding those certain patents . . . ." (A1024)  The agreement further recited that "IpVenture may wish to employ the law firm of Irell & Manella to represent it in asserting the IpVenture Patents against parties other than HP, and IpVenture now wishes to remove any conflict of interest for this firm by entering into this Agreement." (*Id.*)

The patents that were the subject of the 2003 Agreement were identified by patent number, and defined as "IpVenture Patents," which means the '235 patent,

three other listed patents in the same family, as well as related patents.  (*Id.*,

¶ 1.1(b))  The patents themselves were not attached to the Agreement, though like

all issued patents they are publicly available and easily obtained.  In the agreement,

IpVenture covenanted not to sue HP on the IpVenture Patents.  (*Id.*, ¶ 3.1)  HP

correspondingly released IpVenture "from any claims, demand and rights of action

HP now has or may have arising from or with regard to the validity or

enforceability of the IpVenture Patents or of attempts to enforce the IpVenture

Patents."  (*Id.*, ¶ 2.2)  HP also covenanted "not to bring any action against

IpVenture asserting any claim or defense that was or could have been brought as a

counterclaim in an Action brought by IpVenture against HP to enforce the

IpVenture Patents."  (*Id.*, ¶ 3.2)

## IV.   **The District Court Proceedings**

IpVenture filed this lawsuit against ProStar and Midern in the Central

District of California in August 2003.  For a number of reasons not directly

pertinent to the issues on appeal, such as Defendants' successive changes of

counsel, meaningful discovery did not proceed in the case until late 2004.  In

addition to conducting discovery on issues of patent validity and infringement,

Defendants sought discovery from HP relating to Douglass Thomas' previous

employment.  In December 2004, Defendants subpoenaed HP for documents,

including the HP-Thomas Agreement.  (A1050-1057)

In February 2005, Defendants served interrogatory responses in which Defendants contended that HP held an ownership interest in the '235 patent as a result of the HP-Thomas Agreement.  Defendants raised new defenses based on this assertion, including that HP had effectively licensed the '235 patent to Defendants, among others.  Defendants asserted that HP's participation in an industry specification relating to power management called "ACPI" (Advanced Configuration and Power Interface) resulted in a license to the entire computer industry, including Defendants.  Defendants also asserted that HP had a patent cross-license with Intel, the supplier of microprocessors for Defendants' computers, which purportedly provided Defendants with some sort of license rights.  Separate and apart from the substantive flaws in these defenses, all of Defendants' "license via HP" theories depend on HP having been an owner of the '235 patent – an issue on which the district court reached an erroneous legal conclusion and a principal subject of this appeal.

IpVenture's counsel notified Defendants that these new allegations regarding HP's alleged ownership in the '235 patent raised the potential for adversity between IpVenture and HP.  This resulted in a potential conflict for IpVenture's counsel, which also represented HP in unrelated matters.  (A187)  In light of the circumstances, on March 9, 2005, IpVenture and Defendants submitted a Joint Status Report with the district court that acknowledged that there was a potential

conflict issue that "needs to be addressed and resolved" before discovery and

further motion practice could continue. (A1081-1083)

A.    The April 2005 IpVenture-HP Agreement

The conflict issue was resolved on April 20, 2005, when IpVenture and HP

entered into a document entitled "Settlement Agreement" (the "2005 Agreement").

(A209-214) This agreement further resolved any dispute relating to patent

ownership, which arose only as a result of Defendants' allegations in this suit.

(A209)

The 2005 Agreement begins with the recital that "IpVenture is the sole

assignee of" the '235 patent (and other patents). (*Id.*) The agreement then

references this pending lawsuit, Defendants' challenge to IpVenture's sole

ownership rights based on Douglass Thomas' prior employment with HP, and the

potential conflict of interest issue for IpVenture's counsel that had arisen from

Defendants' allegations. (*Id.*) The agreement states that the "parties wish to

resolve these ownership issues once and for all times and remove any possible

conflict of interest" for IpVenture's counsel. (*Id.*)

In the 2005 Agreement, HP confirmed that "HP has never asserted any

ownership rights to the IpVenture Patents and agrees to forbear from asserting any

such rights at any time in the future." (A210, ¶ 2.2) HP also expressly confirmed

that HP "has no rights . . . and never has had any legal or equitable rights,

including any shop rights, to any of the IpVenture Patents," including the '235

patent at issue in this case.  (*Id.*)  HP released IpVenture "of and from any and all

manner of claims relating to the IpVenture Patents . . . ."  (A211, ¶ 2.4)  Further,

HP expressly waived any conflict of interest for IpVenture's counsel at Irell &

Manella to represent IpVenture with respect to the IpVenture Patents.  (A210-211,

¶ 2.3)  In consideration, IpVenture agreed to pay HP a portion of net revenues

received with respect to the IpVenture Patents.  (A211, ¶ 3.2)

## B.   Defendants' Motion To Dismiss

On May 27, 2005, Defendants filed a motion to dismiss, entitled "Renewed

Motion to Dismiss."[1]  (A83)  This is the motion which ultimately resulted in the

judgment of dismissal and related orders that are the subject of this appeal.

In their motion, Defendants requested that the district court dismiss the

action for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal

Rules of Civil Procedure.  Defendants argued that IpVenture lacked standing to

sue, and that the district court therefore lacked subject matter jurisdiction, on the

ground that IpVenture allegedly was not the sole owner of the '235 patent.  (A99-

---

[1] Earlier on March 28, 2005, Defendants had filed a similar "Motion to Dismiss."  On April 1, 2005, however, the parties submitted a joint stipulation stating that the Defendants' motion "relates to matters squarely within the scope of the conflict matter previously brought to the Court's attention" and requesting that the district court extend the time for briefing and hearing on the motion until the matter was resolved.  (A1093-1095)

102)  Notwithstanding the fact that the HP-Thomas Agreement stated that the employee only "agree[d] . . . to assign" inventions made during his employment, Defendants relied on the statement that certain "Proprietary Developments" that may become subject to the agreement "are the sole property of HP."  (*Id.*) Defendants argued that this descriptive language in the HP-Thomas Agreement from 1992 constituted a present assignment of patent rights that later operated automatically as an assignment of the '235 patent's 1994 parent application as well as the '235 patent when it came to being in 2001.  As a result, Defendants argued HP was a co-owner of the '235 patent at the time the complaint was filed.  Because HP was not joined as a plaintiff, Defendants sought dismissal.  (*Id.*)  Defendants further requested that the dismissal be *with* prejudice based on the conclusory assertion that Defendants, and the entire notebook computer industry, held a license through HP's participation in the "ACPI" specification.  (A105)[2]

IpVenture opposed the motion on the ground that IpVenture's standing was not an issue.  (A123, A128-29)  IpVenture argued that it was the sole owner and holder of legal title to the '235 patent through assignments from both inventors.

---

[2] IpVenture argued that the request for a dismissal with prejudice was without basis, as well as a disguised attempt to obtain summary judgment on Defendants purported "license via HP via ACPI" defense.  (A146-147; A6 n.6) The district court correctly declined to reach the merits of Defendants' defense that it was licensed in connection with HP's participation in ACPI, stating:  "The Court cannot decide this factual issue on this motion."  (A6 n.5)

IpVenture also argued that HP had no ownership interest because HP never held legal title to the '235 patent.  Under the Federal Circuit's decision in *Arachnid, Inc. v. Merit Industries, Inc.*, 939 F.2d 1574 (Fed. Cir. 1991), and other Federal Circuit, district court and California cases, the HP-Thomas Agreement contained no present grant or conveyance and hence could not constitute an assignment conveying legal title to patents.  Rather, the agreement explicitly contained the language "I agree . . . to assign," which as this Court held in *Arachnid* was at most an "agreement to assign" that did not transfer legal title.  (A111; A134-141)

IpVenture also argued that even assuming HP had an co-ownership interest, there was no basis to dismiss.  Because IpVenture indisputably held an assignment from one of the inventors, Alan Thomas, IpVenture was a "patentee" with "constitutional" standing to sue.  At the hearing on Defendants' motion to dismiss, the district court recognized this point, which the Defendants conceded.  (A247)  Any issue of standing therefore was at most "prudential" but had been cured in light of HP's releases of IpVenture and express confirmation that HP "has no rights . . . and never has had any legal or equitable rights" to the '235 patent.  Further, IpVenture argued that there was no basis to require joinder of HP as a necessary or indispensable party under Rule 19.  Joining HP was unnecessary and would serve no purpose given HP's disclaimers of any interest.  (A143-146)

## C.     The District Court Decision

On July 27, 2005, the district court ruled on Defendants' motion to dismiss. (A2-21)  The district court addressed two issues:  (1) whether Douglass Thomas assigned his rights to the '235 patent to HP, making HP a co-owner of the patent; and (2) if HP had an ownership interest, what impact this had on IpVenture's ability to sue without joining HP as a plaintiff.  (A6)

The district court held that the HP-Thomas Agreement "constitutes an assignment of all Proprietary Developments to HP." (A17)  The court concluded that the phrase "are the sole property of HP" was a "present assignment," notwithstanding that this clause was followed by the language "I agree . . . to assign them to HP." (A17-18)  The district court concluded that this case was more analogous to the agreements in *Filmtec Corp. v. Hydranautics*, 982 F.2d 1546 (Fed. Cir. 1992), and *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245 (Fed. Cir. 2000), which both contained express grant language, rather than the agreement in *Arachnid*, which involved similar language to that here but was held to constitute only an agreement to assign. (A18)

The district court next considered whether further proceedings on the motion were necessary if HP held an ownership interest.  The court quoted the statement in *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1468 (Fed. Cir. 1998), that "all co-owners must ordinarily consent to join as plaintiffs in an infringement suit."

(A19) The Court then turned to the 2003 Agreement and the 2005 Agreement "to determine whether they resolve this issue." (A20) Even though the 2005 Agreement included HP's express disclaimer of any ownership interest in the '235 patent and confirmation that HP has never asserted ownership rights, the district court declined to consider that agreement at all, stating: "The agreement reached in April 2005 need not be considered because the Complaint was filed in August 2003." (*Id.*) The district court stated that subsequent events could not cure standing issues, erroneously relying on cases involving *constitutional* standing defects that existed at the time the complaint was filed, circumstances not present in this case. The district court then asked whether the 2003 Agreement vested IpVenture with sole rights in the '235 patent. The court held it did not, and hence was not a factor in the analysis – notwithstanding that the 2003 Agreement recognized IpVenture's ownership and contained a release of claims against IpVenture arising from or with respect to any attempts to enforce the '235 patent and other listed "IpVenture Patents."

The district court concluded its discussion by stating that "Under *Ethicon*, if a co-owner cannot be joined, the action must be dismissed." (A21) The district court made no inquiry into whether HP could be joined or whether HP should be deemed a necessary or indispensable party under Rule 19 of the Federal Rules of Civil Procedure.

Having concluded that the HP-Thomas Agreement "was an assignment," the district court then set an evidentiary hearing "to determine whether the '235 Patent constitutes a Proprietary Development as the term is defined in the Thomas Employment Agreement." (A21)  On August 24, 2005, IpVenture informed the court that IpVenture maintained its disagreement with the court's ruling on whether the HP-Thomas Agreement constituted an assignment of legal title.  However, as to the separate issue of whether the invention of the '235 patent was a "Proprietary Development" under the HP-Thomas Agreement, IpVenture informed the court that IpVenture did not contest that factual issue.  (A576-579)

On August 25, 2005, the district court entered an order taking the evidentiary hearing off calendar and dismissing the action without prejudice.  In light of its previous ruling, the district court held that "the '235 patent was assigned to HP and that HP is a co-owner of the '235 patent.  As HP is not joined as a plaintiff, the action must be dismissed without prejudice." (A23)  At a telephonic hearing with the parties, the district court acknowledged that it "thought it was a difficult issue and – and a hard one to decide . . . " (A865)

Because the district court never addressed HP's current ownership status, and indeed expressly declined to consider the 2005 Agreement, IpVenture requested that the district court correct the statement in the order that HP "is" a co-owner.  (A613-615).  On August 31, 2005, the district court did so and entered an

"Amended Order On Defendants' Renewed Motion To Dismiss" in which it changed its statement that HP "is a co-owner" to read that "HP was, at least at the time the Complaint was filed, a co-owner of the '235 patent." (A24-25)

On August 26, 2005, the district court entered its Judgment dismissing the action without prejudice. (A1)  On October 18, 2005, the district court denied Defendants' motion for attorneys fees under 35 U.S.C. § 285 on the grounds that Defendants were not "prevailing parties" under the statute because they had not obtained any relief on the merits. (A26-28)

This appeal followed.

## SUMMARY OF THE ARGUMENT

The district court erred in dismissing IpVenture's action for lack of subject matter jurisdiction and lack of standing. IpVenture is the sole owner of the entire right, title and interest in and to the '235 patent. IpVenture became the sole assignee and holder of legal title as a result of a valid assignment from Alan Thomas and Douglass Thomas, the two named inventors of the '235 patent. Therefore, IpVenture has both constitutional and prudential standing to bring and maintain this action.

First, the district court erred in its legal conclusion that HP was a co-owner of the '235 patent that needed to be joined as a plaintiff in order for the court to have subject matter jurisdiction. The court reached this conclusion after determining that the HP-Thomas Agreement constituted a present assignment that transferred to HP legal title to the inventions claimed in the '235 patent. This ruling is contrary to *Arachnid, Inc. v. Merit Industries, Inc.*, 939 F.2d 1574 (Fed. Cir. 1991), in which this Court held that an "agreement to assign" is "not an assignment" and does not convey legal title. Contrary to the district court's determination, there was never any assignment of the '235 patent from Douglass Thomas to HP.

As a matter of law, the HP-Thomas Agreement was at most an *agreement to assign* certain future inventions that might be made; it was not an actual

assignment.  The plain language of the agreement –  "I agree . . . to assign" – is

precisely the kind of *agreement to assign* certain possible future inventions that the

Court in *Arachnid* held did not convey legal title.  The HP-Thomas Agreement

does not include any language indicative of a present assignment, such as "I *hereby*

*grant*" or "I *hereby convey, transfer and assign*."  Nor does the agreement mention

any specific rights to be conveyed (e.g., "*my full and entire right, title and interest*"

or "*all right, title and interest*").  Yet the district court incorrectly relied

exclusively on the phrase that certain future developments "are the sole property of

HP" and held that this language by itself constituted a present assignment.  But this

language is effectively the same as language in *Arachnid* that the invention "shall

be the property of CLIENT," as well as language in other cases applying *Arachnid*

and in which the courts consistently found no present assignment of legal title.

HP's lack of any ownership interest in the '235 patent is further evidenced by

the parties' conduct.  HP never asserted that it had any ownership interest in the

'235 patent and never asked Douglass Thomas for an assignment.  On the contrary,

HP entered into the 2003 Agreement and the 2005 Agreement with IpVenture, in

which it expressly disclaimed any ownership rights to the '235 patent.

Accordingly, the district court erred in concluding that the HP-Thomas Agreement

constituted a present assignment of legal title as opposed to an "agreement to

assign." The district court did not even consider the 2005 Agreement, erroneously concluding that it need not do so simply because it post-dated the Complaint.

Second, the district court incorrectly relied on this Court's decision in *Ethicon, Inc. v. U.S. Surgical Corp.*, 135 F.3d 1456, 1468 (Fed. Cir. 1998) in holding that dismissal was required because HP was not joined as a party. First, because IpVenture's "constitutional" standing as an owner of the '235 patent was not in dispute, any remaining issue was a "prudential" issue of joinder. In *Ethicon*, however, this Court did not consider a situation like the one here involving an absent alleged co-owner that has expressly disclaimed an interest. Other courts faced with similar circumstances have applied traditional joinder rules and declined to join such a party. In light of HP's express disclaimer of ownership, as well as the corresponding releases of IpVenture with respect to claims relating to the enforcement of the '235 patent, HP was not a necessary party under Rule 19 of the Federal Rules of Civil Procedure. Yet the district court erred by failing to consider the current status of the relevant parties and making no inquiry at all into the Rule 19 factors that guide whether an absent person should be joined as a party.

IpVenture is the sole holder of legal title to the '235 patent. HP is not and never has been an owner of the '235 patent, and because legal title remained with both inventors until they assigned all of their rights, title and interest to IpVenture, this Court should reverse the district court's dismissal.

1463091

- 25 -

## ARGUMENT

## I.   STANDARD OF REVIEW

Whether a party has standing to sue for patent infringement is a

jurisdictional question, which this Court reviews *de novo*. *Intellectual Prop. Dev.,*

*Inc. v. TCI Cablevision of Cal., Inc.*, 248 F.3d 1333, 1339 (Fed. Cir. 2001); *Rite-*

*Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1551 (Fed. Cir. 1995). The legal effect of

an agreement purportedly transferring patent rights is an issue of law that this court

reviews *de novo*. *Intellectual Prop.*, 248 F.3d at 1339. Contract interpretation is a

question of law, which this Court reviews *de novo*. *Dewakuku v. Martinez*, 271

F.3d 1031, 1036 (Fed. Cir. 2001).

## II.   THIS COURT SHOULD REVERSE THE DISTRICT COURT'S

   **HOLDING THAT THE HP-THOMAS AGREEMENT WAS AN**

   **ASSIGNMENT AND THAT HP WAS A CO-OWNER**

### A.   IpVenture Is The Sole Holder Of Legal Title To The '235 Patent

Under 35 U.S.C. § 281, "[a] patentee shall have the remedy by civil action

for infringement of his patent." The term "patentee" is defined as (1) the patentee

to whom the patent issued, and (2) successors in title to the patentee. 35 U.S.C. §

100(d). Thus, "[t]he general rule is that one seeking to recover money damages for

infringement of a United States patent (an action 'at law') must have held the *legal*

*title* to the patent *during the time of the infringement*." *Arachnid, Inc. v. Merit*

*Industries, Inc.*, 939 F.2d 1574, 1579 (Fed. Cir. 1991) (italics in original).

IpVenture is the "patentee" with respect to the '235 patent and has properly brought this action.

Under federal law, the presumptive owner of property rights in patentable inventions – the holder of legal title – is the person or entity to whom the PTO issues the patent. *See, e.g., Arachnid*, 939 F.2d at 1578 n.2 ("[t]he entity to whom the grant of a patent is made by the PTO [or that entity's successor in title] holds the 'legal title' to the patent."); 35 U.S.C. § 151 (issue of patent; notice of allowance given to applicant). An inventor to whom a patent is issued of course is free to transfer ownership in patents. As set forth in 35 U.S.C. § 261, "patents shall have the attributes of personal property" and "shall be assignable in law by an instrument in writing."

The two named inventors to whom the '235 patent issued on April 10, 2001 – Alan Thomas and Douglass Thomas – held legal title to the '235 patent until March 2003.[3] At that time, both inventors assigned their entire right, title and interest in and to the patent to IpVenture pursuant to an Assignment Agreement.

---

[3] A patented invention may be the work of two or more joint inventors, though each inventor need not have made the same amount or type of contribution or a contribution to every claim of the patent. 35 U.S.C. § 116. Joint inventors apply for a patent jointly. *Id.* Each joint owner of a patent owns an undivided interest in the entire patent, with the full rights to make, use, offer to sell, or sell the patented invention, "without the consent of and without accounting to the other owners." 35 U.S.C. § 262.

(A171-177)  Under this assignment, IpVenture "has succeeded to all of

INVENTORS' right, title, and standing to . . . institute and prosecute all suits and

proceedings under the Patents" and "collect, assert, or enforce any claim . . . of any

kind under any and all of the Patents, whether arising before or after the Effective

Date." (A172)  The assignment to IpVenture was recorded in the PTO on April 15,

2003.  (A179-181)  IpVenture thus is the sole holder of legal title to the '235

patent.

### B.    HP Is Not A Co-Owner Of '235 Patent

There is no question that IpVenture is a lawful owner of the '235 patent.

There is no dispute that the '235 patent was duly assigned to IpVenture, at least

through the assignment from Alan Thomas.  Rather, in challenging the district

court's jurisdiction, Defendants argued that IpVenture was a co-owner and that

IpVenture "does not own all interest in the '235 patent, and therefore lacks standing

to sue." (A5)  The sole basis for this contention, with which the district court

incorrectly agreed, was the argument that the other named inventor, Douglass

Thomas, had previously assigned his rights to the '235 patent to HP in connection

with his prior employment at HP.  Putting aside that HP has never asserted

ownership, and that HP has confirmed in the 2003 Agreement and 2005 Agreement

with IpVenture that HP never had any such interest, HP was never a co-owner of

the '235 patent.  Under *Arachnid*, the HP-Thomas Agreement was at most an

"agreement to assign," not an assignment. The district court erred in concluding to the contrary.

### 1. *Arachnid* And Its Progeny Require Express Conveyance Language To Assign Legal Title.

Under longstanding principles, "'[t]he *legal title* to an invention can pass to another only by a conveyance which operates on the thing invented after it has become capable of being made the subject of an application for a patent.'" *Arachnid*, 939 F.2d at 1581 (citation omitted). As explained at length in Arachnid, express conveyance language is required to effect a transfer of legal title. Because such language is missing in this case, as it was in Arachnid, there was no transfer of legal title to HP.

In *Arachnid*, a judgment was entered for patent infringement. The defendant argued that it could not be liable for patent damages for the period before the plaintiff obtained legal title to the patent. This Court agreed and reversed, noting that although "the facts regarding standing were essentially undisputed, we hold that the district court incorrectly applied the governing law to those facts." *Id.* at 1582.

The plaintiff in *Arachnid* argued that it automatically acquired rights to the invention at issue under an agreement with its consultant, IDEA. This Court stated that "we view as untenable Arachnid's position when IDEA signed the agreement

in 1980 it automatically divested itself of any and all rights to inventions that might

be developed under the agreement or to patents to issue thereon." *Id*. at 1580.  The

agreement provided that "[a]ny inventions conceived by IDEA or its employees . . .

shall be the property of CLIENT [Arachnid], and all rights thereto will be assigned

by IDEA . . . to CLIENT." *Id*. at 1576 (emphasis added in opinion).  This Court

explained that:

> [T]he fact remains that the Arachnid/IDEA consulting agreement was an
>
> *agreement to assign*, not an assignment.  Its provision that all rights to
>
> inventions developed during the consulting period 'will be assigned' by
>
> IDEA to Arachnid does not rise to the level of a present assignment of an
>
> existing invention, effective to transfer all legal and equitable rights therein
>
> to Arachnid and extinguish any rights of IDEA.  Nor does the provision
>
> amount to a present assignment of an expectant interest.  [Citation omitted]
>
> Although an agreement to assign in the future inventions not yet developed
>
> may vest the promisee with *equitable* rights in those inventions once made,
>
> such an agreement does not by itself vest *legal* title to patents on the
>
> inventions in the promise:  'The *legal* title to an invention can pass to another
>
> only by a conveyance which operates on the thing invented after it has
>
> become capable of being made the subject of an application for a patent.'

*Arachnid*, 939 F.2d at 1580-81 (citations omitted) (italics in original).  Because the agreement in question was only an agreement to assign, and not a present assignment, the plaintiff in *Arachnid* could not recover damages for the period of infringement when it did not hold legal title to the patent.

**2.    The '235 Patent Was Never Assigned To HP.**

*Arachnid* controls this case.  The plain language of the HP-Thomas Agreement is not a present assignment of patents.  In describing "Proprietary Developments," the agreement states "Such Proprietary Developments are the sole property of HP, and **I agree**:

        a.    to disclose them promptly to HP;

        b.    **to assign** them to HP; and

        c.    to execute all documents and cooperate with HP in all necessary activities to obtain patent, copyright, mask work and/or trade secret protection in all countries, HP to pay the expenses."

(A111) (emphasis added).

By its own express terms, the agreement is at most an *agreement to assign*.  Indeed, that is exactly what the agreement states:  "I *agree...to assign*."  There is no present action – no grant, no conveyance, and no transfer of anything.  Nor are there any specified rights or quantum of rights mentioned, such as "all right, title or interest" in the '235 patent, or any other patent.  The agreement simply describes

matters subject to the agreement and then states certain actions the employee agreed to take in the future. In addition to the future act of assigning the covered developments, other future acts are specifically contemplated in subsection (c), which indicates a further agreement "to execute" other documents to obtain intellectual property protection. Without words of present conveyance or language expressly *conveying* and assigning specific rights from one party to another (e.g., "I hereby grant . . . my full and entire right, title and interest" or "I hereby convey . . . all right, title and interest"), the agreement itself has no impact on the *legal title* to any invention. The absence of such language is dispositive.

In concluding that the HP-Thomas Agreement was an assignment, the district court relied not on the "I agree: . . . to assign" language, but on the statement that "Such Proprietary Developments are the sole property of HP. . . ." First, this language cannot be held to constitute sufficient conveyance language. In the context of an agreement concerning future developments, the language "are the sole property of HP" at issue here and "shall be the property of CLIENT" in *Arachnid* are the same. Both are *descriptive* of a potential expectant interest in something that might become subject to the agreement in the future and might then be the subject of a later assignment of legal title. What is key is the language containing the active verb, the operative agreement of the parties. In *Arachnid*, this was the agreement that applicable inventions "will be assigned." Language

- 32 -

having the same meaning is used here -- "agree . . . to assign." And even assuming this language conveys some equitable rights in inventions once made, as the court in *Arachnid* explained, "such an agreement does not by itself vest *legal* title to patents on the invention in the promisee." *Arachnid*, 939 F.3d at 1581 (emphasis in original).

Second, IpVenture is aware of no case holding language such as that at issue here to be a present assignment of legal title. Indeed, a district court applying *Arachnid* to a contract which provided that inventions "belong to" a third party held that such language did not constitute a present assignment of legal title. In *Freedom Wireless, Inc. v. Boston Communications Group, Inc.*, 220 F. Supp.2d 16 (D. Mass. 2002), the defendant alleged that the plaintiff Freedom Wireless did not own the patent-in-suit because one of the inventors allegedly had assigned the invention to their previous employer as part of an employment contract. The contract in question provided that all inventions "conceived or made by the Employee during his or her employment period *belong to the Company*. The Employee will promptly disclose such inventions . . . and perform all actions reasonably requested by the Company to establish and confirm such ownership, including but not limited to cooperation in connection with the Company's obtaining patent and/or copyright protection." *Id.* at 18 (emphasis added). The district court followed *Arachnid* and held that the contract in the case was merely

- 33 -

"an agreement by [the employee] to assign his invention to [the employer] at some point in the future and not an actual present assignment." *Id.* at 19.

As the court in *Freedom Wireless* explained: "In order for a pre-invention assignment contract to create a present assignment of an expectant interest in an invention that automatically vests by operation of law into an actual assignment upon conception, the contract must contain words of present conveyance and must require 'no further act once an invention [comes] into being.'" *Id.* (quoting *Filmtec Corp. v. Allied-Signal, Inc.*, 939 F.2d 1568, 1570 (Fed. Cir. 1991) ("*Filmtec I*"). The court reasoned that "[t]he agreement in this case, which states that 'all inventions belong . . . to the Company,' and which requires future acts by the inventor such as 'disclos[ing]' the invention and 'perform[ing]' actions necessary to establish ownership, is not sufficient to convey legal title to the invention." *Id.* The court held that the employment contract thus "did not contain terms sufficient to convey legal title" to the previous employer. *Id.* at 20. The *Freedom Wireless* case is particularly instructive and pertinent to this case, because the "belong to the Company" language at issue is effectively the same as the "are the sole property of" language in the HP-Thomas Agreement.

The district court's decision here is directly at odds with *Arachnid, Freedom Wireless*, as well as the numerous other cases holding that agreements lacking an express conveyance do not constitute present assignments. When such language is

- 34 -

missing, the cases all come out the same way, finding no present assignment of legal title. *See Gaia Techs., Inc. v. Reconversion Techs., Inc.*, 93 F.3d 774, 779 (Fed. Cir. 1996) (holding that "an agreement to assign is not an assignment and thus did not vest legal title in [the plaintiff]"); *Ellison Educ. Equip., Inc. v. Chen*, 2004 WL 3154592, *4 (C.D. Cal. Dec. 21., 2004) (district court rejected ownership challenge; agreement that provided in part that plaintiff "will assign to [Fremont Machine] all rights in and to any inventions . . . merely is an agreement to assign, not an assignment."); *Sigma Eng'g Serv., Inc. v. Halm Instrument Co.*, 33 F.R.D. 129 (S.D.N.Y. 1963) (defendants contended that inventors who assigned to plaintiff had worked at Corning "under an agreement obligating them to transfer all patent rights to inventions made while in its employ," but court denied motion to dismiss stating "[n]o such transfer was made in this case.").

### 3. The District Court Incorrectly Relied On *Speedplay* and *Filmtec*

In deciding not to follow *Arachnid*, and in concluding that the HP-Thomas Agreement was not an agreement to assign, the district court principally relied on this Court's decisions in *Speedplay* and *Filmtec*. Both cases are inapposite. Both *Speedplay* and *Filmtec* involved agreements that did contain the critical conveyance language that is missing in this case.

In *Speedplay, Inc. v. Bebop, Inc.*, 211 F.3d 1245 (Fed. Cir. 2000), the Court

explained how the agreement vesting rights in the plaintiff in that case contained

language that "differs significantly" from the language at issue in *Arachnid*. *Id*. at

1253. The language at issue in *Speedplay* provided that inventions "shall belong

exclusively to [Speedplay] and [inventor] hereby conveys, transfers and assigns to

[*Speedplay*] . . . all right, title and interest in and to Inventions." *Id*. Thus, the

agreement in *Speedplay* contained the "shall belong" language, a phrase almost

identical to the phrase "shall be the property of CLIENT" present in *Arachnid*).

But the agreement also provided that the inventor "*hereby conveys, transfers and*

*assigns . . . all right, title and interest* in and to" the inventions to Speedplay, key

language missing here and in *Arachnid*. *Id*. (emphasis added). This express

language specifically conveying, transferring and assigning legal title thus was

essential to, indeed determinative of, the holding in *Speedplay* that the agreement

was a present assignment.

The *Speedplay* panel followed this Court's decision in *Filmtec Corp. v.*

*Allied-Signal, Inc.*, 939 F.2d 1568 (Fed. Cir. 1991) ("*Filmtec I*"). In *Filmtec I*, the

Court reversed the entry of a preliminary injunction because of questions

surrounding the plaintiff's title to the patent. The Court explained that the district

court's evaluation of likelihood of success on the merits was called into question

because plaintiff was party to an agreement that explicitly provided that the entity

"agrees to grant *and does hereby grant* to the Government *the full and entire domestic right, title and interest*" in inventions made in the course of the contract. *Id.* at 1570 (emphasis added). The agreement thus "did not merely obligate MRI to grant future rights, but *expressly granted* to the Government MRI's rights in any future invention." *Id.* at 1573 (emphasis added).

Moreover, the work in question in *Filmtec* also was performed under a research contract with the government under a federal statute vesting the government with title to inventions. *See Filmtec Corporation v. Hyrdanautics*, 982 F.2d 1546, 1553 (Fed. Cir. 1992) (*Filmtec II*) ("Under the FNERDA, title to inventions made by an employee hired to perform that research automatically vested in the United States."). The *Filmtec I* Court therefore distinguished the case of *Sigma Engineering*, 33 F.R.D. 129, in which (as in this case) "no such transfers of title were made." *Filmtec I*, 939 F.3d at 1573.

In the present case, the district court erroneously concluded that the language in the HP-Thomas Agreement was more analogous to the contracts in *Filmtec* and *Speedplay*, rather than *Arachnid*. In making such comparisons, the district court focused on the phrase "are the sole property of HP" rather than the key language "I agree . . . to assign." The district court stated that the language in *Speedplay* – "shall belong" and "hereby conveys, transfers and assigns" – was "more similar to that at issue here" (i.e., *"are* the sole property of HP"). (A18).

The remainder of the agreement, according to the district court, was simply "the process to be followed on the creation of the inventions." (*Id.*) But the district court's reliance on *Speedplay* to conclude that the phrase at issue in this case constitutes an effective present grant conflates the similar descriptive language in *Speedplay*, "shall belong to," with the express grant "hereby conveys." Indeed, the agreement in *Arachnid* included the similar language "shall be the property of CLIENT," but that language was held not to change the character of the agreement from an agreement to assign. *See also Freedom Wireless, Inc.*, 220 F. Supp.2d at 18 (contract providing that "all inventions *belong* to the Company" not an assignment) (emphasis added). Moreover, the district court's interpretation improperly renders superfluous the key "agree to assign" language. *See* Cal. Civ. Code § 1641 ("The whole of a contract is to be taken together, so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other."). It does not make sense for an agreement to contain an agreement to assign if the subject matter had already been assigned.

IpVenture is aware of no case where the court held a descriptive phrase like the one at issue here, or the use of the word "are" by itself, constituted an immediate, automatic assignment of all right, title, and interest to a patent application and all subsequent patents issued therefrom. *Speedplay* and *Filmtec*, and all other cases finding assignments to have been made, turned on the presence

or absence of language conveying specific rights, such as "hereby conveys,

transfers and assigns . . . all right, title and interest" (*Speedplay*) and "does hereby

grant . . . the full and entire domestic right" (*Filmtec*).  This language is totally

absent from the agreement at issue here.  Like the agreement in *Arachnid*, the HP-

Thomas Agreement is at most an agreement to assign, not a present assignment of

legal title.

### 4.      California Cases Are Consistent With *Arachnid*

The Federal Circuit and district court cases described above do not expressly

state whether they are applying state or federal law to the question of whether an

agreement is a present assignment of legal title or an agreement to assign.  While

issues of patent law and policy, and standing, are of course governed under federal

law, the Federal Circuit has stated that "[s]tate law governs contractual obligations

and transfers of property rights, including those relating to patents."  *Regents of*

*The Univ. of New Mexico v. Knight*, 321 F.3d 1111, 1118 (Fed. Cir. 2003).  In

reviewing pertinent California law, however, IpVenture has not discerned a

meaningful difference from the principles in *Arachnid* and the other federal court

decisions described above.

When considering California cases in the context of intellectual property

disputes over ownership, it is important to bear in mind that these cases by their

very nature are not examining whether a particular party held legal title to a patent

at a particular point in time to qualify as a "patentee" under federal law.  Rather,

they are typically contract disputes over "ownership" to intellectual property

between the parties to an agreement.  The matters at issue thus encompass all rights

that one party may have against the other contracting party, both legal and

equitable.  Nonetheless, California case law reveals that an express assignment

with operative conveyance language is contemplated in order to transfer legal title

under California law, as well.

For example, a case involving language almost identical to that here, and in

*Arachnid*, is *Grove v. Grove Valve & Regulator Co.*, 4 Cal. App. 3d 299, 84 Cal.

Rptr. 300 (1970).  Grove was the founder of the defendant company and an

inventor on certain inventions that he made and patented.  Under certain

agreements, Grove agreed that specific inventions and improvements relating to o-

ring valve seals "shall be the sole and exclusive property of [the defendant], and

Grove *agrees to assign* the same to [defendant], together with all United States and

foreign Letters Patent and applications thereon."  *Id.* at 306, 84 Cal. Rptr. at 303

(emphasis added).  This language provided the employer with an equitable interest,

but not *legal* title to, the inventions.  In connection with the employer's claims

seeking an injunction to compel Grove to transfer the patents, the trial court

"concluded that defendants were *entitled* to ownership of the [] inventions . . . *and*

*to assignment* from plaintiff of all such patents and patent applications *provided*

*that* defendants reimburse plaintiff for the patent expenses incurred by him . . ." *Id.*
at 314, 84 Cal. Rptr. at 309 (emphasis added). The Court of Appeal affirmed the
trial court's judgment, including the condition that expenses be reimbursed to
Grove as a condition precedent to the transfer of the patents. Thus, the court's
decision indicates that the defendant employer did <u>not</u> already hold legal title to the
inventions at issue because there had been no assignment. Rather, the employer
only had an equitable right to ownership under the agreement, which the court
enforced. Further steps would be needed in order to obtain the injunction requiring
transfer of title to the patents, including the payment of expenses the inventor
incurred in obtaining and maintaining the patents.

In *Cubic Corp. v. Marty*, 185 Cal. App. 3d 438, 229 Cal. Rptr. 828 (1986),
express conveyance language was present, and predictably the court reached a
different result. In *Cubic*, an employer sued for breach of an employment contract
and a declaration that it owned certain patents for inventions created by its
employee during employment. The employee signed an invention and secrecy
agreement that provided in part that certain inventions subject to the agreement
"shall be the sole and exclusive property of Company, and Employee *assigns* and
hereby agrees to assign his *entire right, title and interest* in and to the same to
Company." *Id.* at 444, 229 Cal. Rptr. at 830 (emphasis added). The court ruled in
favor of the employer because this agreement contained specific conveyance

language – "assigns . . . his entire right, title and interest," a point the trial court

highlighted in ruling on a motion for summary adjudication. *Id.* at 446, 229 Cal.

Rptr. at 832 ("The summary judgment order stated the Agreement *'conveys* by its

terms the entire right, title and interest' in the invention to Cubic.") (italics in

original).

In contrast, in *Shaw v. Regents of the University of California*, 58 Cal. App.

4th 44 (1997), the court examined an agreement which only contained an

agreement to assign inventions, and held that the agreement did not automatically

transfer ownership in the inventions. The court explained:

> "The clear language of the patent agreement does not, as the University
>
> argues, effect a contemporaneous and 'complete transfer of plaintiff's rights
>
> to the University.' Accordingly, the University's reliance upon cases in
>
> which the parties' agreement so provides is misplaced."

*Shaw*, 58 Cal. App. 4th at 53. One of the cases cited in which the agreement "so

provides" was *Cubic*, which as noted above contained an express conveyance. The

*Shaw* court thus distinguished other cases involving contracts that did expressly

transfer rights, reaffirming the principle that an express conveyance is required to

effect a transfer of ownership.

As with the federal cases discussed above, California case law consistently

contemplates some act that represents a formal transfer of legal title. Absent

language evidencing an act of assignment, the HP-Thomas Agreement does not convey legal title from one party to another, but is at most, as a matter of law, an agreement to assign. No assignment to HP was ever made, and none was ever requested. Legal title remained at all times with Douglass Thomas and Alan Thomas, until the two named inventors assigned all rights, title and interest in the relevant patents to IpVenture. The district court's holding to the contrary was error and must be reversed.

C.    **The Conduct Of The Parties Contradicts The District Court's Ruling And Evidences The Lack Of An Assignment Of Legal Title**

In deciding whether the HP-Thomas Agreement was an agreement to assign or an already completed assignment of legal title, the district court declined to consider the conduct of the parties after the agreement. *See Morey v. Vannucci,* 64 Cal. App. 4th 904, 912 (1998) ("The mutual intention to which the courts give effect is determined by objective manifestations of the parties' intent, including the words used in the agreement, as well as extrinsic evidence of such objective matters as the surrounding circumstances under which the parties negotiated or entered into the contract; the object, nature and subject matter of the contract; and the subsequent conduct of the parties."). This evidence contradicts the district court's ruling and further supports the conclusion that there was no transfer of legal title.

In particular, the district court expressly declined to consider the 2005

Agreement between HP and IpVenture.  One of the clearly stated purposes of this

agreement is to resolve the ownership issues that arose as a result of Defendants'

allegations "once and for all times."  (A209)  This agreement specifically recites

that IpVenture is the "sole assignee" of the '235 patent.  (*Id.*)  The agreement also

confirms that "HP has never asserted any ownership rights" in the '235 patent and

that HP "has no rights . . . and never has had" any ownership interest in the '235

patent.  (A210,¶ 2.2)  HP further specifically "releases, acquits, absolves and

forever discharges IpVenture of and from any and all manner of claims relating to

the IpVenture Patents . . ."  (A211, ¶ 2.4)  HP made similar agreements in the 2003

Agreement as well.  In that agreement, HP acknowledged that IpVenture was the

owner of patents relating to thermal management and released any claims "arising

from or with regard to . . . attempts to enforce the IpVenture Patents."  (A1025,

¶ 2.2).

Such express disavowal of any rights to the '235 patent highlights how the

HP-Thomas Agreement did not constitute a completed assignment of the '235

patent.  These agreements are consistent with the fact that the '235 patent was the

result of patent applications filed by Douglass Thomas and Alan Thomas, and

prosecuted by Douglass Thomas entirely on his own time and at his own expense.

Indeed, the prosecution of the '235 patent took place in 1999 until the patent issued in 2001, all well after Douglass Thomas had left HP.

## III.   EVEN ASSUMING HP WAS A CO-OWNER, THIS COURT SHOULD REVERSE THE DISMISSAL BECAUSE HP WAS NOT A NECESSARY PARTY

After concluding that HP was a co-owner as of the time the Complaint was filed, the district court issued an order stating: "As HP is not joined as a Plaintiff, the action must be dismissed without prejudice." (A23)  In dismissing the action, the district court stated that it was applying the rule set out in *Ethicon* that "all co-owners must ordinarily consent to join as plaintiffs in an infringement suit." *Ethicon*, 135 F.3d at 1468.  Because HP was not a party, the district court incorrectly concluded that the action must be dismissed.  In light of HP's express disclaimer of an ownership interest, the district court's reliance on *Ethicon* was misplaced and the court's dismissal must be reversed.

In ruling on Defendants' motion to dismiss, the district court only considered whether IpVenture had sole ownership of the '235 patent at the time the complaint was filed.  The district court erroneously declined to consider events that post-dated the filing of the complaint, and erred in not analyzing whether HP was a necessary party under Rule 19 of the Federal Rules of Civil Procedure.  While all co-owners of a patent ordinarily must join in an infringement suit in the typical

case, this principle has no application in a situation like that presented here, where the plaintiff is a patentee with constitutional standing to sue and the absent "co-owner" has disclaimed an ownership interest. The Federal Circuit did not address this question in *Ethicon*, and IpVenture does not believe that this Court has addressed the issue in any other of its decisions. Other courts, however, that faced similar circumstances have held that the appropriate inquiry is the analysis under Rule 19 – whether the absent party is a necessary party. Given HP's disclaimer of ownership of the '235 patent, HP is not a necessary party and its joinder would serve no purpose. The district court therefore erred in dismissing IpVenture's action.

### A.   IpVenture Has Constitutional Standing As a Patent Owner

"The doctrine of standing limits federal judicial power and has both constitutional and prudential components." *Media Techs. Licensing, LLC v. Upper Deck Co.*, 334 F.3d 1366, 1369 (Fed. Cir. 2001). Constitutional standing only requires that a plaintiff suffer an injury-in-fact, that there be a causal connection between the plaintiff's injury and a defendant's conduct, and that the plaintiff's injury be capable of redress by a favorable court decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (setting forth requirements for constitutional standing). Even assuming HP was a co-owner, IpVenture holds an undivided interest in the '235 patent at least through its assignment from Alan Thomas. As a

successor in legal title, IpVenture is a "patentee" with constitutional standing to sue. See, e.g., 35 U.S.C. § 281 ("patentee" may bring infringement action); 35 U.S.C. § 100(d) (defining term "patentee" as including "successors in title" or assignees to the patent); *Intellectual Prop. Dev. v. TCI Cablevision*, 248 F.3d 1333, 1348 (Fed. Cir. 2001) (explaining that a patentee "is constitutionally injured by another entity that makes, uses or sells the invention."). Constitutional standing thus is not at issue. Defendants conceded this point at the hearing before the district court. (A247)

## B.  HP's Alleged Absence Raises Only "Prudential" Issues Of Joinder

Because IpVenture met the constitutional requirements for standing from the outset of the case, the issue that remains is a prudential issue of joinder – whether all the necessary parties were before the court. The district court, however, did not perform any joinder analysis. Rather, in dismissing, the district court incorrectly applied a *per se* rule that the absence of a party who may have been a "co-owner" when the complaint was filed requires dismissal.

To the extent that the issue of absent co-owners is considered in the context of IpVenture's "standing," which IpVenture has as an owner of the '235 patent, the issue raises only "prudential" considerations. Issues of prudential standing typically arise in a different context, such as when a lawsuit is brought by an exclusive licensee without the patent owner. Unless an exclusive licensee holds all

substantial rights to a patent in an agreement that is tantamount to an assignment

for standing purposes, the patent owner must be joined as a party in a suit by an

exclusive licensee. *Vaupel Textilmaschinen KG v. Meccanica Euro Italia S.P.A.*,

944 F.2d 870, 875 (Fed. Cir. 1991). As this Court explained in *Intellectual*

*Property Development*, 248 F.3d at 1348, "[t]he general principle set forth in [the

Supreme Court's decision in] *Independent Wireless* requiring that a patent owner

be joined, either voluntarily or involuntarily, in any infringement suit brought by

an exclusive licensee having fewer than all substantial rights is *prudential* rather

than constitutional." *See also Prima Tek II, L.L.C. v. A-Roo Co.*, 222 F.3d 1372,

1377 (Fed. Cir. 2000) (setting forth basis for Article III standing of patentee and

explaining that general rule requiring joinder of patent owner is "prudential rather

than constitutional in nature"). Prudential concerns include ensuring that the

"patentee" is a party to the suit, as well as the factors set forth in Rule 19 that are

aimed at avoiding the risk that a defendant will be subject to multiple lawsuits and

protecting the interests of absent parties.

Issues of prudential standing, however, may be cured by events that occur

after the filing of the complaint or, if necessary, redressed through joinder of

parties. Once a plaintiff has constitutional standing, such as IpVenture, "any

prudential standing concerns may be overcome by adding a plaintiff with proper

standing." *Schreiber Foods, Inc. v. Beatrice Cheese, Inc.*, 402 F.3d 1198, 1203 n.4

(Fed. Cir. 2005); *see also Mentor H/S, Inc. v. Med. Device Alliance, Inc.*, 240 F.3d 1016, 1019 (Fed. Cir. 2001) (exclusive licensee had constitutional standing; court allowed motion to join patent owner, even after appeal); *Abbott Labs v. Diamedix Corp.*, 47 F.3d 1128, 1133 (Fed. Cir. 1995) (reversing denial of a patent owner's motion to intervene); Fed. R. Civ. P. 21 ("Parties may be dropped or added by order of the court on motion of any party or of its own initiative at any stage of the action and on such terms as are just.").

The district court in this case, however, incorrectly concluded that events that post-dated the complaint, including HP's express disclaimer of any ownership interest, should not be considered at all. In particular, the court refused to consider the 2005 Agreement between IpVenture and HP which stated that HP has not claimed any ownership interest in the patent, and released claims relating to the enforcement of the IpVenture Patents. (A209-214) The district court stated that "[t]he agreement reached in April 2005 need not be considered because the Complaint was filed in August 2003." (A20) The court explained that "acquisitions of rights in the patents at issue subsequently do not cure standing defects, even if the assignments are 'retroactive.'" (*Id.*) This statement is incorrect as a matter of law when the issue presented is not constitutional standing, but prudential. Indeed, the court's error is highlighted by the court's citation of two cases which both addressed constitutional standing defects. *See Gaia Tech.*, 93

F.3d at 779 (plaintiff did not own patent sued on and hence lacked constitutional standing); *GAF Bldg. Materials Corp. v. Elk Corp. of Dallas*, 90 F.3d 479 (Fed. Cir. 1996) (complaint filed before valid patent had issued dismissed for lack of subject matter jurisdiction and lack of Article III constitutional standing).

**C.     The District Court Erred In Not Performing Any Analysis Of Whether HP Was A Necessary Party Under Rule 19**

Moreover, the district court erred as a matter of law in failing to perform any analysis as to whether HP was a necessary party under Rule 19 of the Federal Rules of Civil Procedure. While all patent owners ordinarily must consent to join as plaintiffs, as set forth in *Ethicon*, it is not *always* the case that all persons labeled a "patent owner" automatically should be considered a necessary party. For example, when an absent co-owner has disclaimed an interest, or the defendant is not at risk of being subjected to multiple lawsuits, joinder should not be necessary.

The Federal Circuit has not addressed this specific question, and did not address it in *Ethicon*. In *Ethicon*, an unnamed inventor on a patent was held to have been an inventor, and hence an owner of the patent. Because the unnamed inventor had not consented to be joined in the infringement suit, and had expressly licensed his inventions to the defendant, the court dismissed the action. *Ethicon*, 135 F.3d at 1468. *Ethicon*, however, did not involve a situation where an absent

party disclaimed its ownership interest nor did it address the question of whether an action could proceed in the absence of such a party.

Other courts considering the question in similar circumstances have treated the issue as one of joinder under Rule 19 of the Federal Rules of Civil Procedure and held that an absent co-owner is not a necessary party. "Since the introduction of Fed. R. Civ. P. 19 and the 1966 amendments to the rule, however, courts are less concerned with abstract characterizations of the parties and are more concerned with whether the rights of the parties can be fairly adjudicated absent joinder of the patent co-owner." *E-Z Bowz, L.L.C. v. Professional Prod. Research Co.*, 2003 WL 22064257 (S.D.N.Y. Sep. 5, 2003) (internal quotations omitted) (court denied motion to dismiss for failure to join patent owner who transferred interest in patent after suit commenced; such a person was not an indispensable party under Rule 19 and need not be joined). When the absent party does not claim an interest in the proceedings, or the defendant is not subject to a risk of multiple or inconsistent obligations, joinder is not necessary. *See Rawlings v. Nat'l Molasses Co.*, 394 F.2d 645, 647-48 (9th Cir. 1968) (reversing dismissal of patent infringement action for lack of an indispensable party where joint-owner refused to join action as a plaintiff and instead assigned its interest in the patent to the plaintiff after the action was commenced); *Agilent Techs., Inc. v. Micromuse, Inc.*, 2004 WL 2346152 (S.D.N.Y. Oct. 19, 2004) (denying motion to add HP as necessary party;

"where the co-owner of a patent or other entity whose interest in a patent might be directly affected by litigation has specifically disclaimed all interest in pursuing litigation related to the patent in favor of the party who has brought the suit, courts have held that joinder of the co-owner or other entity is not necessary."); *E-Z Bowz*, 2003 WL 22064257 at * 3-*4; *Michaels of Oregon Co. v. Mil-Tech, Inc.*, 1995 WL 852122, 38 U.S.P.Q.2d 1060 (D. Or. 1995) (denying motion to dismiss for lack of subject matter jurisdiction and failure to join indispensable party for failure to join absent co-owner who had relinquished the capacity to file an independent claim for patent infringement); *International Business Machines Corp. v. Conner Peripherals, Inc.*, 1994 WL 409493, 30 U.S.P.Q.2d 1315 (N.D. Cal. 1994) (court denied motion to dismiss patent counterclaim for failure to join co-owner who had given up the right to sue in favor of the other co-owner; patent defendant "does not face a substantial risk of incurring double, multiple or otherwise inconsistent obligations").

Here, HP cannot be deemed a "necessary party" under Rule 19.  Rule 19 only requires joinder when "(1) in the person's absence complete relief cannot be accorded among those already parties" or "(2) the person claims an interest relating to the subject of the action" that it cannot adequately protect absent joinder or which will expose the present parties to a "substantial risk" of multiple or inconsistent obligations.  Fed. R. Civ. P. 19.  In this case, complete relief can be

accorded between IpVenture and Defendants, and HP has no interest, and has never claimed an interest, in the '235 patent. *See Altmann v. Republic of Austria*, 317 F.3d 954, 971 (9th Cir. 2002), *aff'd*, 124 S. Ct. 2240 (2004) (A finding that a party should be joined under Rule 19 is "contingent upon an initial requirement that the absent party claim a legally protected interest relating to the subject matter of the action.").

The only parties contending that HP has an ownership interest are the Defendants. Yet in an agreement with the stated purpose of resolving "once and for all times" the ownership questions that arose from Defendants' allegations in the case, HP affirmatively disclaimed any ownership rights in the '235 patent. (A209-210, ¶ 2.2.) HP also affirmatively stated that it "releases, acquits, absolves and forever discharges IpVenture of and from any and all manner of claims relating to the IpVenture Patents." (A211, ¶ 2.4.) HP has explicitly disavowed any ownership and hence could not have any interest to protect. Where the nonparty is aware of an action and chooses not to claim an interest in it, the non-party is not a "necessary party." *Altmann*, 317 F.3d at 971 (holding that non-party who held 25% interest in disputed property was not a "necessary" party because non-party was aware of the action yet never asserted a claim); *see also* cases cited *supra*. This same conclusion applies with full force here. Accordingly, the district court's dismissal for failure to join HP was improper.

Moreover, the district court here did not even examine the factors under Rule 19, nor evaluate whether HP could be joined, but rather dismissed the case automatically after (incorrectly) concluding that HP was a co-owner at the time the complaint was filed. As the Supreme Court explained in *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 118-19 (1968), "a court does not know whether a particular person is 'indispensable' until it ha[s] examined the situation to determine whether it can proceed without him." The failure to consider post-filing events and the current status of the parties thus was error. Although HP should not be considered a necessary party as a matter of law and the judgment may be reversed, at a minimum, the judgment must be vacated for the district court to evaluate the joinder question under the appropriate standards of Rule 19. *See Aspex Eyewear, Inc. v. Miracle Optics, Inc.*, 434 F.3d 1336, 1344-45 (Fed. Cir. 2006) (vacating district court decision that plaintiff lacked standing and remanding for district court to consider whether all necessary parties were joined or could have been joined).

## **CONCLUSION**

The district court has subject matter jurisdiction over this patent infringement action under 28 U.S.C. §§ 1331 and 1338(a).  IpVenture is the sole owner of the '235 patent, and therefore has standing to assert the claims of patent infringement.  Because HP is not a holder of legal title to the '235 patent, and has disclaimed any ownership interest, the district court's dismissal on the grounds that HP was not joined as a party should be reversed.


Dated:  March 13, 2006                          Respectfully Submitted,


                                                IRELL & MANELLA LLP
                                                Morgan Chu
                                                Richard M. Birnholz
                                                Rudy Y. Kim


                                                By:_____
                                                    Richard M. Birnholz
                                                    Attorneys for Plaintiff-Appellant
                                                    IPVENTURE, INC.

# ADDENDUM

## INDEX OF ADDENDUM

| Description | Page Numbers |
|---|---|
| Judgment Dismissing Action Without Prejudice entered August 26, 2005 | A1 |
| Order Setting Evidentiary Hearing Re Defendants' Renewed Motion To Dismiss dated July 27, 2005 | A2-21 |
| Order On Defendants' Renewed Motion To Dismiss dated August 25, 2005 | A22-23 |
| Amended Order On Defendants' Renewed Motion To Dismiss And Order Denying Request To Withdraw Joint Stipulation From The Record dated August 31, 2005 | A24-25 |
| U.S. Patent No. 6,216,235 | A59-76 |

1462834

# ORIGINAL

Priority ✓
Send ✓
Enter ✓
Closed ✓
JS-5/JS-6 ✓
JS-2/JS-3
Scan Only

FILED
CLERK, U.S. DISTRICT COURT
ENTERED
CLERK, U.S. DISTRICT COURT
AUG 26 2005
CENTRAL DISTRICT OF CALIFORNIA
BY          DEPUTY

FILED
CLERK, U.S. DISTRICT COURT
AUG 26 2005
CENTRAL DISTRICT OF CALIFORNIA
BY          DEPUTY

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

IPVENTURE, INC.,                    )    CASE NO. CV03-5780-DSF (CTx)
                                     )
          Plaintiff,                 )    JUDGMENT DISMISSING ACTION
                                     )    WITHOUT PREJUDICE
     v.                              )
                                     )
PROSTAR COMPUTER INC.,               )
et al.,                              )
                                     )
          Defendants.                )

Defendants' Renewed Motion to Dismiss having been presented and fully considered, the issues having been duly heard and a decision having been duly rendered,

IT IS ORDERED AND ADJUDGED that the plaintiff take nothing, that the action be dismissed without prejudice, and that defendants recover their costs of suit pursuant to a bill of costs filed in accordance with 28 U.S.C. § 1920.

DATED: 8-25-05

_____
DALE S. FISCHER
United States District Judge

A 1

# ORIGINAL

Priority ✓
Send
Enter
Closed
JS-5/JS-6
JS-2/JS-3
Scan Only

FILED
CLERK, U.S. DISTRICT COURT

JUL 27 2005

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

1
2
3
4
5
6
7

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

8
9
10

IpVENTURE, INC.,                 )    CASE NO. CV03-5780-DSF (CTx)
11
              Plaintiff,         )    ORDER SETTING EVIDENTIARY
12                               )    HEARING RE DEFENDANTS'
        v.                       )    RENEWED MOTION TO DISMISS
13                               )
PROSTAR COMPUTER INC.,           )
14  et al.,                      )
                                 )
15            Defendants.        )

DOCKETED ON CM

JUL 28 2005

005
16
17
18                      I.  **INTRODUCTION**
19
20        The parties are involved in contentious patent litigation.  During the course
21  of discovery, and only after a motion to compel production of documents was
22  granted, Defendants uncovered documents suggesting that Plaintiff IpVenture, Inc.
23  was not the sole owner of the patent in suit, at least at the time this lawsuit was
24  filed.  Defendants move to dismiss on the grounds that the co-owner is not
25  included as a plaintiff.  The Court agrees that Plaintiff may not be the sole owner
26  of the patent.  An evidentiary hearing is necessary, however, to resolve this issue.
27        Defendants' Renewed Notice of Motion and Motion to Dismiss, the
28  Confidential Version of the Memorandum of Points and Authorities ("Motion"),

A 2

1  and the Sealed Declaration of Michael A. Molano ("Sealed Molano Dec."),[1] were

2  lodged on May 27, 2005. The Unsealed Declaration of Michael A. Molano in

3  Support (Thereof) ("Unsealed Molano Dec.") was filed on the same day.

4       IpVenture's Memorandum of Points and Authorities in Opposition to

5  Defendants' Motion to Dismiss ("Opp.") was filed on June 13, 2005.

6       Defendants' Reply Brief in Support of Renewed Motion to Dismiss was

7  filed on June 20, 2005.

8       At the hearing on June 27, 2005, this Court asked for additional briefing on

9  the issue of contract interpretation under California law. On July 8, 2005, Plaintiff

10  filed its Supplemental Memorandum of Points and Authorities in Opposition to

11  Defendants' Motion to Dismiss and Defendants filed their Supplemental Brief on

12  California Case Law in Support of Renewed Motion to Dismiss. On July 12,

13  2005, Plaintiff filed a Reply to Defendant's Supplemental Brief Re Renewed

14  Motion to Dismiss.

15

16  ## II.  LEGAL STANDARD

17

18  **A.  Motions to Dismiss for Lack of Subject Matter Jurisdiction**

19       **Generally**

20  Motions to dismiss for lack of subject matter jurisdiction must be assessed

21

---

22  [1]  The Court finds no reason to conclude that any of the documents filed "under seal"

23  should remain under seal. Defendants filed them under seal only because they had been
designated confidential by others pursuant to a protective order. The Court refers to

24  portions of one of the sealed documents in this Order. If the Court receives no reasoned

25  objection, see Phillips ex rel. Estates of Byrd v. General Motors Corp., 307 F.3d 1206,
1212 (9th Cir. 2002), to the unsealing of all sealed documents relating to this motion by

26  August 25, the Court will order all documents to be unsealed. Defendants are

27  immediately to notify Hewlett-Packard Company of this provision of the Court's Order,
and to provide proof of service of such notice.

28

2

1  under Rule 12(b)(1) in one of two ways. "If the motion is a facial attack, i.e., if it

2  challenges the sufficiency of the pleading itself, the Court must use the standard

3  applied to motions under Rule 12(b)(6)." Laurence Wolf Capital Mgmt. Trust v.

4  City of Ferndale, 176 F. Supp. 2d 725, 726 (E.D. Mich. 2000). However, if the

5  motion is a factual attack, "[a] district court may hear evidence and make findings

6  of fact necessary to rule on the subject matter jurisdiction question prior to trial, if

7  the jurisdictional facts are not intertwined with the merits." Rosales v. U.S., 824

8  F.2d 799, 803 (9th Cir. 1987) (citations omitted). In that event, "[n]o presumption

9  of truthfulness attaches to the plaintiff's allegations, and the existence of disputed

10  material facts will not preclude the trial court from evaluating for itself the merits

11  of the jurisdictional claims." Augustine v. U.S., 704 F.2d 1074, 1077 (9th Cir.

12  1983) (citation omitted). Where the jurisdictional and substantive claims "are so

13  intertwined that resolution of the jurisdictional question is dependent on factual

14  issues going to the merits, the district court should employ the standard applicable

15  to a motion for summary judgment . . . ." Rosales, 824 F.2d at 803.

16

17      **B.      Patent Infringement Actions**

18          As a general matter, "parties should possess rights before seeking to have

19  them vindicated in court." Gaia Techs., Inc. v. Reconversion Techs., Inc., 93 F.3d

20  774, 780 (Fed. Cir. 1996) (citation omitted).[2] "Later events may not create

21  jurisdiction where none existed at the time of filing. Rather, the presence or

22  absence of jurisdiction must be determined on the facts existing at the time the

23  complaint under consideration was filed." GAF Bldg. Materials Corp. v. Elk

24  Corp. of Dallas, 90 F.3d 479, 483 (Fed. Cir. 1996) ("It is undisputed that the

25  [patent in dispute] had not issued when the original complaint was filed . . . . The

26

27  _____

28  [2]  "The question of a party's standing to bring a case is a jurisdictional one . . . ." Gaia
     Techs., 93 F.3d at 778.

3

**A 4**

1  subsequent issuance of [that patent] did not cure this jurisdictional defect.")

2  (internal quotations and citations omitted).

3      Moreover, all co-owners of a patent must ordinarily consent to join as

4  plaintiffs in an infringement suit. Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d

5  1456, 1468 (Fed. Cir. 1998). See also Int'l Nutrition Co. v. Horphag Research

6  Ltd., 257 F.3d 1324, 1331 (Fed. Cir. 2001) (all co-owners must ordinarily join as

7  plaintiffs, and one co-owner can impede the other co-owner's ability to sue

8  infringers by refusing to join in an infringement suit voluntarily).

9

10      ### III.  FACTUAL BACKGROUND

11

12      The Complaint was filed on August 14, 2003.

13      Plaintiff alleges it is the owner by assignment of all right, title and interest

14  in and to United States Patent No. 6,216,235 (the "'235 Patent"), which was issued

15  April 10, 2001. Compl. ¶ 7. Plaintiff alleges that both Defendants have been

16  infringing, contributorily infringing, or inducing infringement of the '235 Patent

17  by, among other things, making, using, selling, offering to sell, importing or

18  promoting infringing products, including, without limitation, notebook computers,

19  without authority. Id. ¶¶ 8, 11.

20      Defendants argue that Plaintiff does not own all interest in the '235 Patent.

21  They assert that the primary[3] inventor of the '235 Patent, C. Douglasss Thomas

22  ("Douglass Thomas"), conceived of the invention while he was employed as a

23  patent attorney at the Hewlett-Packard Company ("HP"), where he was subject to

24

25

26

27  ───────────────────

    [3]  This is Defendants' term, though it seems irrelevant to the Court's analysis. See
28  Ethicon, 135 F.3d at 1466.

4

A 5

1     an agreement that provides that such inventions "are the sole property of HP."[4]

2     Defendants also assert that HP has granted a royalty-free license to the entire

3     notebook computer industry, including Defendants, through Advanced

4     Configuration & Power Interface, which they refer to as "an industry standards-

5     setting body." Motion, 3:1-2.[5]

6

7                    **IV. ANALYSIS**

8

9        There are two basic issues the Court must decide here[6]: (1) whether

10    Douglass Thomas assigned his rights to the '235 Patent to HP, making HP a co-

11    owner of the '235 Patent, and (2) if HP had an ownership interest in the '235

12    Patent, the impact on Plaintiff's ability to sue without joining HP as a plaintiff.

13

14

15

16

17    [4]   Both sides submit documents that are not properly authenticated. Because the
18    parties agreed at oral argument that the documents are authentic, the Court considers
      them where relevant. See Branch v. Tunnell, 14 F.3d 449, 454 (9th Cir. 1994) (internal
19    citations and quotations omitted), overruled on other        by Galbraith v. County of
      Santa Clara, 307 F.3d 1119 (9th Cir. 2002).

20

21    [5]   Defendants assert that, because of this license, HP, like the co-inventor in Ethicon,
      cannot join as a plaintiff -- and the action must be dismissed without leave to amend.
22    The Court cannot decide this factual issue on this motion.

23    [6]   Plaintiff argues that, because Defendants' attempt to challenge the Court's
      jurisdiction is a "*factual* attack [on the pleadings] based on alleged extrinsic evidence,"
24    Opp., 7:1-2, their motion is nothing less than a "disguised motion for summary
25    judgment on its [sic] defective and unsupported license defense." Id., 7:14-15. Plaintiff
      makes no effort to explain how the factual issues are "intertwined with the underlying
26    merits." The Court has declined to decide the license issue and finds the issues to be
27    decided on this motion are not intertwined with the merits of Plaintiff's claims or the
      defenses raised.

28

A.    The Douglass Thomas Employment Agreement

1.    California Law

The parties agree, as they must, that state law governs contractual obligations and transfers of property rights, including those relating to patents. See Regents of the Univ. of N.M. v. Knight, 321 F.3d 1111, 1118 (Fed. Cir. 2003).

Generally, in California, the whole of the contract is to be interpreted so as to give effect to every part, if reasonably practicable, each clause helping to interpret the other. Cal. Civ. Code § 1641; Ahlgren v. Walsh, 173 Cal. 27, 35 (1916); National City Police Officers Ass'n v. City of National City, 87 Cal App. 4th 1274, 1279 (2001).

California courts distinguish between agreements to assign patent rights and assignments of patent rights. Compare Shaw v. Regents of the Univ. of Cal., 58 Cal. App. 4th 44, 53 (1997) (agreement that embodied employee's promises to disclose any inventions he may create in the future "does not . . . effect a contemporaneous and complete transfer of [employee's] rights to the [employer]") (internal quotations omitted) with Cubic Corp. v. Marty, 185 Cal. App. 3d 438, 444, 456 (1986) (employee did not own the patent in question because he had assigned it in his employment agreement) and Treu v. Garrett Corp., 264 Cal. App. 2d 432, 437 (1968) (ownership of the patented invention "was a fleeting thing which [the employee] had bargained away even before it became a reality").

"While no particular form of assignment is necessary, the assignment, to be effectual, must be a manifestation to another person by the owner of the right indicating his intention to transfer, without further action or manifestation of intention, the right to such other person, or to a third person." Cockerell v. Title Ins. and Trust Co., 42 Cal. 2d 284, 291 (1954) (citations omitted). Few, if any, per se rules exist that distinguish an assignment from an agreement to assign, though the tenses of the verbs used in the underlying agreement are obviously an important indicator. See Bailly v. Loock, 103 Cal. App. 220, 227 (1930) ("Words

6

A 7

1   of transfer or conveyance in the present or past tense, i.e., 'sells' or 'sold' not

2   'agrees to sell,' while not conclusive of the question as to whether the parties

3   contemplated a consummated sale will, it seems, be held to be determinative,

4   unless their force and effect is overcome by other provisions of the instrument.")

5   (citation omitted).

6

7             **a.**     **Cubic Corp.**

8       William B. Marty, Jr. became a Cubic employee in December 1976. At the

9   time, he signed an invention and secrecy agreement by which he agreed:

10

11       [t]o promptly disclose to Company all ideas, processes, inventions,

12       improvements, developments and discoveries coming within the scope of

13       Company's business or related to Company's products or to any research,

14       design experimental or production work carried on by Company, or to any

15       problems specifically assigned to Employee, conceived alone or with others

16       during this employment, and whether or not conceived during regular

17       working hours.  All such ideas, processes, trademarks, inventions,

18       improvements, developments and discoveries shall be the sole and exclusive

19       property of Company, and Employee assigns and hereby agrees to assign his

20       entire right, title and interest in and to the same to Company.

21   185 Cal. App. 3d at 444. In 1977 Marty conceived of an idea for an electronic

22   warfare simulator (EWS), a device for training pilots in electronic warfare. He

23   showed a diagram and a manuscript describing his invention to employees of

24   Cubic, representing it might be a new product that Cubic could add to its existing

25   product for training pilots.  Cubic funded an internal project to study the

26   invention, and ultimately submitted a proposal to the Navy for the invention under

27   a different Cubic employee's name.

28       In 1978 Marty applied for a patent on this invention without telling Cubic.

1  A patent was issued in December 1979.  Marty offered to license it to Cubic,

2  which took the position that the patent belonged to Cubic.  Cubic told Marty that

3  his continued employment there was contingent on his assigning the patent.  He

4  refused.

5      Cubic sued Marty seeking, among other things, declaratory relief as to

6  ownership of the patent and specific enforcement of the agreement.  The trial court

7  granted summary adjudication in favor of Cubic, finding that the agreement

8  "conveys by its terms the entire right, title and interest" in the invention to Cubic.

9  Id. at 446.  This ruling, and the later findings after the court trial, were upheld on

10  appeal.

11

12              **b.    Treu**

13      The facts in this case are not especially helpful because the court never

14  quotes the language of the agreement at issue, but simply states that the

15  employment contract "provided that any inventions [the employee, Morris] made

16  while [employed] would belong to [the employer, Garrett]."  264 Cal. App. 2d at

17  433.  It is obvious, however, that whatever the wording, the court concluded the

18  relevant document constituted an assignment.

19      After analyzing the invention and licensing arrangements not relevant here,

20  the court held that the rights Morris had were assigned to Garrett.  "When Morris

21  left his employment . . . . [h]e had developed an ability to invent improvements,

22  and whatever he created later in the application of that ability was his own.  That

23  ownership, however, was a fleeting thing which he had bargained away even

24  before it became a reality.  He had a sufficient interest to enable him to apply for a

25  patent and assign the same to Garrett, but the instant the improvement was

26  invented it became the exclusive property of Garrett."  Id. at 436-37.

27

28

8

**A 9**

c.    Shaw

1

2    Douglass Shaw was hired by the Regents of the University of California

3  (the "University") to teach and do research.  At the time, the University had an

4  policy providing that the University "in administering intellectual property rights

5  for public benefit, desire[s] to encourage and assist members of the faculties,

6  employees, and others associated with the University in the use of the patent

7  system with respect to their discoveries and inventions in a manner that is

8  equitable to all parties involved." 55 Cal. App. 4th at 48.  The policy mandated

9  "[a]n agreement to assign inventions and patents to the [University] . . . for all

10  employees . . . ." Id.  It also stated that exceptions to this assignment requirement

11  may be authorized when "the mission of the University is better served" thereby.

12  Id.

13    As to those who agreed to assign their inventions to the University, the

14  policy states that "[t]he [University] agree[s], for and in consideration of said

15  assignment of patent rights, to pay annually to the named inventor(s), the

16  inventor(s)' heirs, successors, or assigns 50% of the net royalties and fees received

17  by [the University]." Id.

18    The patent agreement obligates the signatory to inform the University

19  promptly of "every possibly patentable device, process, plant or product" that the

20  signatory may conceive in the course of University employment.  Should the

21  University deem the invention patentable, the signatory promises thereafter "to

22  assign to University all rights, title and interest" in the invention. Id.

23    After Shaw was hired, the University revised the policy to reduce the

24  percentage from 50%.  When the University announced it would pay Shaw the

25  reduced percentage for his patented inventions conceived after the policy change,

26  Shaw sought a declaration that he was entitled to 50% of the net royalties and fees.

27  He was granted summary judgment, and the University appealed.

28    In affirming summary judgment that Shaw was entitled to a 50% royalty, the

9

1 appellate court noted that, by its terms, the patent agreement embodied Shaw's
2 promises to disclose any inventions he may create in the future so that the
3 University may "examine[] . . . and determine rights and equities therein in
4 accordance with the Policy" and, if the University "desires . . . to seek patent
5 protection thereon," to assign his interest in the invention to the University. Id. at
6 53.

7      The court held that the clear language of the patent agreement did not effect
8 a contemporaneous and "complete transfer of plaintiff's rights to the University,"
9 and distinguished the case from Cubic Corp. and Treu. Id.

10

11           **2.    Federal Circuit Law**

12      Both sides devoted substantial portions of their initial briefs to the
13 discussion of Arachnid, Inc. v. Merit Indust., Inc., 939 F.2d 1574 (Fed. Cir. 1991),
14 FilmTec Corp. v. Hydranautics, 982 F.2d 1546 (Fed. Cir. 1992), and Speedplay,
15 Inc. v. Bebop, Inc., 211 F.3d 1245 (Fed. Cir. 2000). These cases demonstrate that
16 the "Federal Circuit authority"[7] is similar to California state law, and the result is
17 the same regardless of which is considered.

18

19           **a.    Arachnid**

20      Arachnid, an electronic dart game manufacturer, entered into an agreement
21 with Industrial Design Electronic Associates ("IDEA") in 1980, whereby IDEA
22 was to provide consulting services for improvement of the computerized scoring
23 system of Arachnid's dart games. The consulting agreement provided that "any
24 inventions conceived by IDEA or its employees . . . in the course of the project

25 ——————————————————————

26   [7]  Presumably the Federal Circuit in            on state law, see
27 Regents of the Univ. of N.M., 321 F3d at 1118, though that is not apparent from the
    decisions. The decision in FilmTec was presumably based on interpretation of the
28 federal statute at issue. See FilmTec, 982 F.2d at 1550.

10

covered by this agreement, shall be the property of CLIENT [Arachnid], and all

rights thereto *will be assigned* by IDEA . . . to CLIENT." <u>Arachnid</u>, 939 F.2d at

1576 (emphasis provided by Federal Circuit).

On November 17, 1982, several months after the consulting agreement was

terminated, IDEA engineers filed an application for the "'781 patent." The

inventors (IDEA's president Donald DeVale and two other employees) assigned

the '781 patent to IDEA, not Arachnid. The assignment to IDEA, executed

November 5, 1982, was recorded in the Patent and Trademark Office (PTO) and

the patent was issued to IDEA on May 14, 1985.

Arachnid sued IDEA. During the course of the litigation, IDEA filed a

Chapter 11 bankruptcy petition and sold its assets, including the '781 patent, to

Kidde Recreation Products, Inc. Ultimately, the district judge directed a verdict in

favor of Arachnid and issued an order including a statement that "plaintiff

Arachnid, Inc. is hereby declared and decreed *to have been and to be* the lawful

owner of all right, title, and interest in and to the invention [of the '781 patent]

. . . ." <u>Id.</u> at 1576 (emphasis provided by Federal Circuit).

On May 6, 1985, while that lawsuit was pending, IDEA had granted a

nonexclusive license to Merit. Beginning in December 1985 and ending in June

1986, Merit manufactured and sold several hundred games using a feature of the

'781 patent. Arachnid sought to recover damages for infringement from Merit.

The pivotal question before the Federal Circuit was whether Arachnid had

standing to seek recovery for Merit's alleged infringement during the 1985-86

time period. The Court explained that "[t]he general rule is that one seeking to

recover money damages for infringement of a United States patent (an action 'at

law') must have held the *legal title* to the patent *during the time of the*

*infringement.*" <u>Id.</u> at 1579 (emphasis added). Evaluating the consulting

11

A 12

1  agreement itself,[8] the Federal Circuit found that it was "an *agreement to assign*,
2  not an assignment." Id. at 1580. Its provision that all rights to inventions
3  developed during the consulting period "will be assigned" by IDEA to Arachnid
4  "does not rise to the level of a present assignment of an existing invention,
5  effective to transfer all legal and equitable rights therein to Arachnid and
6  extinguish any rights of IDEA. Nor does the provision amount to a present
7  assignment of an expectant interest." Id. at 1580-81. The Federal Circuit held that
8  Arachnid did not have standing to sue in 1989 for infringement that occurred in
9  1985-86. Id. at 1581.

10

11                               b.    FilmTec

12      At issue in FilmTec was a patent resulting from research performed under a
13  government contract. In 1976, the Office of Water Research and Technology of
14  the U.S. Department of the Interior entered into a research contract (the
15  "Contract") with the North Star Division of Midwest Research Institute ("MRI"), a
16  not-for-profit research organization. The government entered into the Contract
17  under authority of the Saline Water Conversion Act of 1971 (the "Act"), Pub. L.
18  No. 92-60, 85 Stat. 159, which had the broad purpose of developing means for
19  desalinizing salt water so as to make it suitable for municipal, industrial, and
20  agricultural uses. Section 6(d) of the Act provided that all patents resulting from
21  contracts made pursuant to it, such as the Contract, will "be available to the
22  general public." FilmTec, 982 F.2d at 1548. Congress further provided that "title
23  to . . . inventions made or conceived in the course of or under any contract or grant
24  pursuant to the . . . Saline Water Conversion Act of 1971 . . . shall be governed by
25  . . . section []9 . . . of the Federal Non-nuclear Energy, Research, and Development

26

27  [8]  The Federal Circuit first addressed whether the invention was conceived while
    IDEA was under contract to Arachnid, and found Arachnid's position on that issue
28  "untenable." Id. at 1580.

12

1 Act of 1974 [FNERDA] . . . ." Id. (quoting Pub. L. No. 94-316, 90 Stat. 694

2 (effective date June 22, 1976)."

3      Section 9 of the FNERDA provides in part:

4

5      (a) Whenever any invention is made or conceived in the course of or under

6      any contract of the Administration . . . and the Administrator [of the Energy

7      Research and Development Administration] determines that --

8      (1) the person who made the invention was employed or assigned to

9      perform research . . . and the invention is related to the work he was

10      employed or assigned to perform, or that it was within the scope of his

11      employment duties . . .

12      title to such invention *shall vest* in the United States, and if patents on such

13      invention are issued they *shall be issued* in the United States, unless in

14      particular circumstances the Administrator waives all or any part of the

15      rights of the United States to such invention in conformity with the

16      provisions of this section.

17      (b) Each contract entered into by the Administration with any person shall

18      contain effective provisions under which such person shall furnish

19      promptly to the Administration a written report containing full and complete

20      technical information concerning any invention . . . which may be made in

21      the course of or under such contract.

22 Id. (quoting Pub. L. No 93-577, 88 Stat. 1878, 1887-88) (emphasis added).

23      The Federal Circuit noted: "In light of Congressional intent to ensure that

24 the government receive title to all patents resulting from research contracts

25 authorized by the Saline Water Conversion Act, the Contract explicitly provided

26 that MRI '*does hereby grant* to the Government the full and entire domestic right,

27 title and interest in [any invention . . . [conceived or first actually reduced to

28 practice] in the course of or under this contract or any subcontract].'" Id.

13

**A 14**

1  (emphasis added).  In addition, the Contract required MRI to "submit . . . written

2  information concerning the conception or actual reduction to practice . . . of every

3  invention made by [MRI] pertaining to the work called for in this contract which

4  was conceived or first actually reduced to practice . . . during . . . the term of this

5  contract, which invention would be a Subject Invention if made under this

6  contract, but which the Contractor believes was made outside the performance of

7  work required under this Contract." Id.  The Contract also provided that "failure

8  to furnish such information shall, in any subsequent proceeding, place on the

9  Contractor the burden of going forward with the evidence to establish that such

10  invention is not a Subject Invention.  If such evidence is not then presented the

11  invention shall be deemed to be a Subject Invention." Id.

12      MRI hired John Cadotte to carry out the research contemplated by the

13  Contract.  Cadotte left MRI and joined FilmTec as one of its four co-founders.

14  He essentially duplicated the experiments he had conducted at MRI, but with

15  better results.  He then filed a patent application relating to his research, and his

16  application issued as the "'344 patent."  FilmTec sued Hydranautics for

17  infringement of two claims in the '344 patent, and Hydranautics asserted that

18  under the Contract, the United States, not FilmTec, had legal title to the '344

19  patent and that FilmTec lacked standing to maintain its infringement suit.

20  Therefore, the threshold issue was whether the United States or FilmTec owned

21  the '344 patent.

22      After concluding that the invention of the '344 patent was made or

23  conceived while Cadotte was at MRI, the Federal Circuit held that "[u]nder the

24  FNERDA, title to inventions made by an employee hired to perform that research

25  *automatically vested in the United States*." Id. at 1553 (emphasis added).  The

26  Contract required MRI to include a provision in its employment contracts with

27  employees hired to do research under it that the government "would retain title to

28  all inventions conceived or reduced to practice during its term." Id.  "Thus, when

14

A 15

the invention was conceived by Cadotte, title to that invention *immediately vested* in the United States by operation of law. He had no right to assign it to FilmTec; the statute had divested him of all of his interest. Although the formalities of the statute, including issuance to the United States, were not complied with, that omission does not change the effect of the law." Id. (emphasis added).

### c.   Speedplay

Speedplay, Inc. and Bebop, Inc. were involved in a lawsuit over two patents for bicycle pedals. While the case was pending, Richard Bryne, the chief executive officer and founder of Speedplay, Inc., was issued the "'894 patent" on a clip-less bicycle pedal, and Speedplay amended its complaint to allege infringement of the '894 patent. Bebop responded by alleging, *inter alia*, that the '894 patent was invalid.

Speedplay traced its rights in the '894 patent to a Confidentiality and Inventions Agreement ("CIA") entered into on September 17, 1992, by Bryne as employee and Speedplay as employer. The CIA defined an "Invention" to be any intellectual property conceived or developed by Bryne within the scope of his employment and during the term of the agreement. All inventions covered by the CIA "shall belong exclusively to [Speedplay] and [Bryne] hereby conveys, transfers and assigns to [Speedplay] . . . all right, title and interest in and to Inventions." Speedplay, 211 F.3d at 1253. The Federal Circuit agreed with Speedplay that, as the '894 patent application was submitted on April 29, 1994, Speedplay automatically obtained title to the '894 patent pursuant to the CIA. Id.

Bebop contended that the CIA was merely a "promise to assign a future invention," but the Federal Circuit distinguished the language in the CIA from the language in Arachnid. The CIA provided that inventions "shall belong to Speedplay," and that Bryne "hereby conveys, transfers and assigns" the inventions to Speedplay. Therefore, the Federal Circuit held, the case was not controlled by

15

A 16

1  Arachnid, but, instead, by FilmTec.  Id.

2

3          **3.     Application to the Thomas Employment Agreement**

4          The employment agreement between Douglasss Thomas and HP ("Thomas

5  Employment Agreement") provides in part:

6

7          This Agreement also concerns inventions and discoveries (whether or not

8          patentable), designs, works of authorship, mask works, improvements, data,

9          processes, computer programs and software (hereinafter called "Proprietary

10         Developments") that are conceived or made by me alone or with others

11         while I am employed by HP; that relate to the research and development or

12         the business of HP, or result from work performed by me for HP; or that do

13         not qualify fully under the prevailing provisions of California Labor Code

14         Section 2870.  Such Proprietary Developments are the sole property of HP,

15         and I agree:

16         a.  to disclose them promptly to HP;

17         b.  to assign them to HP; and

18         c.  to execute all documents and cooperate with HP in all necessary

19         activities to obtain patent, copyright, mask work and/or trade secret

20         protection in all countries, HP to pay the expenses.

21  Sealed Molano Dec. at Ex. A (footnote omitted).  After considering the authority

22  discussed above, the Court concludes the Thomas Employment Agreement

23  constitutes an assignment of all Proprietary Developments to HP.  The words "I

24  agree," and the text that follows, establish the procedure that Thomas would

25  follow when he conceived of a Proprietary Development.  It would not be possible

26  to give meaning to the words "Proprietary Developments are the sole property of

27  HP" and still hold that the Thomas Employment Agreement was merely an

28  "agreement to agree."  An interpretation that reads the words "are the sole property

16

A 17

1  of HP" as a present assignment, however, and reads all that follows as a

2  description of the process to be followed on the creation of the inventions, gives

3  meaning to each of the words.

4      This conclusion is consistent with both California and Federal Circuit

5  precedent. Douglass Thomas' ownership of any Proprietary Developments "was a

6  fleeting thing" that he "had bargained away even before it became a reality." See

7  Treu, 264 Cal. App. 2d at 437. At the moment of the invention, all he was

8  obligated to do was follow the steps listed in his Employment Agreement as a, b,

9  and c. As in Treu and Cubic, the agreement he signed was an assignment of his

10  rights. See 264 Cal. App. 2d at 437; 185 Cal. App. 3d at 456.

11      Further, the Thomas Employment Agreement is analogous to the contracts

12  in FilmTec and Speedplay, and distinguishable from the one in Arachnid. The

13  agreement in Arachnid, held to be an "agreement to assign," said that all rights

14  "will be assigned." 939 F.2d at 1580. The Thomas Employment Agreement, in

15  contrast, says that all Proprietary Developments "*are* the sole property of HP."

16  Sealed Molano Dec. at Ex. A (emphasis added). FilmTec, where the contract said

17  "does hereby grant to the Government the full and entire domestic right," 982 F.2d

18  at 1548, and Speedplay, where the contract said "shall belong" and "hereby

19  conveys, transfers and assigns," 211 F.3d at 1252, contain language more similar

20  to that at issue here.

21      Defendants provide evidence through Thomas' own testimony that the '285

22  Patent is a "Proprietary Development" covered by the Thomas Employment

23  Agreement. Plaintiff addresses this issue only in a footnote, contending it is a

24  factual issue that cannot be considered on this motion (and that it need not be

25  resolved here because the Thomas Agreement is not an assignment). The Court

26  disagrees. As discussed above, factual issues often must be resolved in order to

27

28

17

A 18

1   determine jurisdiction.[9]

2       Because there is some suggestion in the documents that Plaintiff might be

3   able to establish that the invention was not a "Proprietary Development" covered

4   under the Thomas Employment Agreement, an evidentiary hearing will be

5   appropriate required in order for the Court to resolve this issue.

6

7      **B.    Impact on the Litigation[10]**

8       Plaintiff's repeated argument that HP's ownership, even if it exists, has no

9   impact on Plaintiff's standing because Alan Thomas is not bound by the Thomas

10   Employment Agreement, is conclusively refuted by Ethicon. There is no question

11   that Alan Thomas[11] had a right unilaterally to assign or license his interest in the

12   patent, 135 F.3d at 1466, and did so. But "*all* co-owners must ordinarily consent

13   to join as plaintiffs in an infringement suit. Consequently, 'one co-owner has the

14   right to impede the other co-owner's ability to sue infringers by refusing to

15   voluntarily join in such a suit.'" Id. at 1476 (footnote and citation omitted;

16

17   [9]   Whether this is an issue which, like inventorship, should be decided by the Court
based on clear and convincing evidence, see Ethicon, 135 F.3d at 1460 (discussing the

18   Court's determination of inventorship, which resulted in co-ownership), or by some
other standard is a matter to be briefed by the parties.

19

20   [10]   Though the Court has determined that an evidentiary hearing is required to resolve
whether the '235 Patent is covered by the Thomas Employment Agreement, that issue

21   will be moot if HP's potential ownership has no impact on the litigation for other

22   reasons. Therefore, the Court addresses this issue.

23   [11]   That the Employment Agreement does not bind Alan Thomas and cannot be
enforced against him is irrelevant. Defendants do not attempt to enforce the Thomas

24   Employment Agreement against Alan Thomas, they merely argue that HP is a co-owner

25   that must be joined in order for the litigation to proceed. The Court declines to address
the numerous other mis-characterizations of Defendants' positions. The Court also

26   rejects Plaintiff's alternate argument, that Defendants cannot seek to enforce the

27   Thomas Employment Agreement, and therefore cannot contest standing. See FilmTec,
982 F.2d at 1550 (distinguishing asserting equitable rights of ownership from legal

28   rights).

18

1  emphasis added). Plaintiff may be only a co-owner of the patent in question.

2  Therefore, it is possible that HP, who may also be a co-owner, must consent to be

3  joined. See Ethicon, 135 F.3d at 1468. The Court turns to the two agreements

4  between HP and IpVenture, one entered into in April 2003, and one entered into in

5  April 2005, to determine whether they resolve this issue.

6      The agreement reached in April 2005 need not be considered because the

7  Complaint was filed in August 2003. Even if the April 2005 agreement were

8  deemed an assignment of HP's interest (which Plaintiff and HP do not claim),

9  acquisitions of rights in the patents at issue subsequently acquired do not cure

10  standing defects, even if the assignments are "retroactive." See Gaia Tech., 93

11  F.3d at 777, 779 ("Absent ownership of the intellectual property, Gaia lacked

12  standing to sue on the patent and trademark infringement claims"; a "nunc pro

13  tunc assignment of trademark rights" executed after Gaia's filing of the instant

14  suit, but made retroactive to a date prior to the filing, was "not sufficient to confer

15  standing on Gaia retroactively"); GAF Bldg. Materials, 90 F.3d at 483.

16      The question, then, is whether the April 2003 agreement vested IpVenture

17  with *sole* rights in the '235 Patent. Plaintiff asserts that the agreement contained a

18  "covenant not to sue under the '235 patent," Opp., 4:25, but does not argue that it

19  gave Plaintiff the exclusive right to sue for infringement of the '235 Patent. The

20  agreement itself includes no language indicating that it represented any type of

21  transfer or assignment of rights in the '235 patent from HP to IpVenture. Instead,

22  it included the '235 patent in its list of patents within the definition of the term

23  "IpVenture Patents." Unsealed Molano Dec., Ex. 9 at IPV 24387. Plaintiff admits

24  that HP's counsel, Douglass Gilbert, testified that he did not intend to assign any

25  patent rights by way of the April 2003 agreement. Opp., 5 n.2.

26      The April 2003 agreement did not vest IpVenture with sole ownership of the

27  '235 Patent.

28

# V.  CONCLUSION

None of Plaintiff's arguments challenges the fundamental legal conclusion that all owners of a patent must join as plaintiffs in a patent infringement suit. Under Ethicon, if a co-owner cannot be joined, the action must be dismissed.

Having concluded that the Thomas Employment Agreement was an assignment, the next step is for the Court to determine whether the '235 Patent constitutes a Proprietary Development as the term is defined in the Thomas Employment Agreement. The Court sets an evidentiary hearing for August 31, 2005 at 3 p.m. to receive evidence on this issue. Direct testimony shall be submitted by declarations filed and served on or before August 24, 2005. All declarants must be present and available at the time of the hearing for cross-examination. Briefs (not to exceed ten pages) on the issue of the standard of proof should also be filed and served by that date.

Dated: July 27, 2005

Dale S. Fischer
United States District Judge

20

08/05/2005 08:55 FAX 2139841815          USDC                    ☑ 001/002

*310. 203 - 7199*
*Richard*
*Birnholz*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

Priority ✓
Send ✓
Enter ✓
Closed ✓
JS-5/JS-6 ✓
JS-2/JS-3 —
Scan Only ——

| Case No. | CV 03-5780-DSF (CTx) | Date | 8/25/05 |
|---|---|---|---|

Title   IPVENTURE, INC. v. PROSTAR COMPUTER, INC., et al.

Present: The Honorable   DALE S. FISCHER, UNITED STATES DISTRICT JUDGE

| PAUL PIERSON | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

Proceedings:    (IN CHAMBERS)    **ORDER ON DEFENDANTS' RENEWED MOTION TO DISMISS**

On July 27, 2005, this Court issued its Order Setting Evidentiary Hearing re Defendants' Renewed Motion to Dismiss ("Order"). In the Order, the Court held, *inter alia*, that the Court had no jurisdiction to proceed with the action (and therefore the action must be dismissed without prejudice) if fewer than all co-owners were joined as plaintiffs, and that the employment agreement entered into between one of plaintiff's assignors, Douglass Thomas, and Hewlett-Packard Company ("HP") ("Thomas Employment Agreement") constituted an assignment of all "Proprietary Developments" (as defined in the agreement) rather than an "agreement to agree."

Because Plaintiff had contended that the patent at issue was not a "Proprietary Development" as the term was defined in the agreement, the Court concluded that an evidentiary hearing was necessary to resolve the jurisdictional (standing) issue, and set the hearing for August 31, 2005. On August 23, at the request of Plaintiff, the Court held a telephonic hearing. During the hearing, the Court stated that, if Plaintiff advised the Court that it did not contest that factual issue, the Court would make a factual finding based on the failure to contest the issue, and would grant the Renewed Motion to Dismiss. On August 24, Plaintiff filed "IpVenture's Statement Re 'Proprietary Development' Issue on Defendants' Renewed Motion to Dismiss." In pertinent part, the Statement states: ". . . IpVenture does not contest that the invention of the '235 patent is

CV-90 (12/02)                          CIVIL MINUTES - GENERAL                    INITIALS OF DEPUTY CLERK_____

A 22

08/  /2005 08:55 FAX  2138941815          USDC                                    ☑002/002

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

**SEND**

a 'Proprietary Development' under the Thomas Employment Agreement." Emphasis in original.

As Plaintiff no longer contests that the invention of the '235 patent is a "Proprietary Development" under the Thomas Employment Agreement, the Court now finds that the invention of the '235 patent is a "Proprietary Development" under the Thomas Employment Agreement. Based on that finding, the Court further finds that the '235 patent was assigned to HP and that HP is a co-owner of the '235 patent. As HP is not joined as a Plaintiff, the action must be dismissed without prejudice. See Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d 1456, 1468 (Fed. Cir. 2001).

The evidentiary hearing scheduled for August 31, 2005 is placed off calendar.

IT IS SO ORDERED.

CV-90 (12/02)                    CIVIL MINUTES - GENERAL          INITIALS OF DEPUTY CLERK ____

Page 2 of 2

A 23

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**

$\rho$ - SEND

| Case No. | CV 03-5780-DSF (CTx) | | Date | 8/31/05 |
|---|---|---|---|---|

Title   IPVENTURE, INC. v. PROSTAR COMPUTER, INC., et al.

Present: The Honorable   DALE S. FISCHER, UNITED STATES DISTRICT JUDGE

| Sandy Eagle | Not Present |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

Proceedings:   **(IN CHAMBERS)  AMENDED ORDER ON DEFENDANTS'
RENEWED MOTION TO DISMISS AND ORDER DENYING
REQUEST TO WITHDRAW JOINT STIPULATION FROM
THE RECORD**

On July 27, 2005, this Court issued its Order Setting Evidentiary Hearing re Defendants' Renewed Motion to Dismiss ("Order").  In the Order, the Court held, *inter alia*, that the Court had no jurisdiction to proceed with the action (and therefore the action must be dismissed without prejudice) if fewer than all co-owners were joined as plaintiffs, and that the employment agreement entered into between one of plaintiff's assignors, Douglass Thomas, and Hewlett-Packard Company ("HP") ("Thomas Employment Agreement") constituted an assignment of all "Proprietary Developments" (as defined in the agreement) rather than an "agreement to assign."

Because Plaintiff had contended that the patent at issue was not a "Proprietary Development" as the term was defined in the agreement, the Court concluded that an evidentiary hearing was necessary to resolve the jurisdictional (standing) issue, and set the hearing for August 31, 2005.  On August 23, at the request of Plaintiff, the Court held a telephonic hearing.  During the hearing, the Court stated that, if Plaintiff advised the Court that it did not contest that factual issue, the Court would make a factual finding based on the failure to contest the issue, and would grant the Renewed Motion to Dismiss.  On August 24, Plaintiff filed "IpVenture's Statement Re 'Proprietary Development' Issue on Defendants' Renewed Motion to Dismiss."  In pertinent part, the

*173*

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL

**SEND**

Statement states: ". . . IpVenture does not contest that the invention of the '235 patent is a 'Proprietary Development' under the Thomas Employment Agreement." Emphasis in original.

As Plaintiff no longer contests that the invention of the '235 patent is a "Proprietary Development" under the Thomas Employment Agreement, the Court now finds that the invention of the '235 patent is a "Proprietary Development" under the Thomas Employment Agreement. Based on that finding, the Court further finds that the '235 patent was assigned to HP and that HP was, at least at the time the Complaint was filed, a co-owner of the '235 patent. As HP has not joined as a Plaintiff, the action must be dismissed without prejudice. See Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d 1456, 1468 (Fed. Cir. 2001).

The evidentiary hearing scheduled for August 31, 2005 is placed off calendar.

Plaintiffs' request to withdraw the stipulation from the record is DENIED. It is obvious from the document that Plaintiffs are not a signatory or a party to the stipulation. The stipulation was otherwise relevant to the hearing then scheduled.

IT IS SO ORDERED.

US006216235B1

(12) **United States Patent**
Thomas et al.

(10) Patent No.: **US 6,216,235 B1**
(45) Date of Patent: **\*Apr. 10, 2001**

(54) **THERMAL AND POWER MANAGEMENT FOR COMPUTER SYSTEMS**

(76) Inventors: **C. Douglass Thomas**, 1193 Capri Dr., Campbell, CA (US) 95008; **Alan E. Thomas**, 424 Atlantic Ave., Ocean City, NJ (US) 08226

(\*) Notice: This patent issued on a continued prosecution application filed under 37 CFR 1.53(d), and is subject to the twenty year patent term provisions of 35 U.S.C. 154(a)(2).

Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **09/351,051**

(22) Filed: **Jul. 10, 1999**

**Related U.S. Application Data**

(63) Continuation of application No. 08/914,299, filed on Aug. 18, 1997, now Pat. No. 5,974,557, which is a continuation of application No. 08/262,754, filed on Jun. 20, 1994, now Pat. No. 5,752,011.

(51) Int. Cl.[7] ............................ G06F 1/04; G06F 1/20

(52) U.S. Cl. .............................................. 713/501; 713/323

(58) Field of Search ........................... 713/322, 323, 713/501, 320, 321, 324; 702/99, 130, 182, 183; 714/25, 34, 40

(56) **References Cited**

**U.S. PATENT DOCUMENTS**

| | | |
|---|---|---|
| 3,453,601 | 7/1969 | Bogert et al. . |
| 3,941,989 | 3/1976 | McLaughlin et al. . |
| 4,279,020 | 7/1981 | Christian et al. . |

(List continued on next page.)

**FOREIGN PATENT DOCUMENTS**

| | | |
|---|---|---|
| 0 157 507 | 10/1985 | (EP) . |
| 0 214 297 A1 | 3/1987 | (EP) . |
| 0363567 | 4/1990 | (EP) . |
| 0364222 | 4/1990 | (EP) . |
| 0368144 | 5/1990 | (EP) . |
| 0381021 | 8/1990 | (EP) . |
| 0 419 908 A2 | 4/1991 | (EP) . |
| 0 426 410 B1 | 5/1991 | (EP) . |
| 0 456 012 B1 | 11/1991 | (EP) . |
| 0474963 | 3/1992 | (EP) . |
| 0496536 | 7/1992 | (EP) . |
| 0540287 | 5/1993 | (EP) . |
| 0 566 395 A1 | 10/1993 | (EP) . |
| 0 683 558 A1 | 11/1995 | (EP) . |
| 2235797 | 3/1991 | (GB) . |
| 58-099821 A2 | 6/1983 | (JP) . |
| 58-129524 A2 | 8/1983 | (JP) . |
| 60-150137 A2 | 8/1985 | (JP) . |

(List continued on next page.)

**OTHER PUBLICATIONS**

Advanced Power Management (APM), BIOS Interface Specification, Revision 1.1, Sep. 1993.

"Cooling Control," IBM Technical Disclosure Bulletin, vol. 18, No. 6, pp. 1705–1706, Nov. 1975.

"Computerized Control of Chilled Water System," IBM Technical Disclosure Bulletin, vol. 20, No. 8, pp. 2981–2984, Jan. 1978.

"Variable Air Cooling for Computer and/or Electronic Equipment," IBM Technical Disclosure Bulletin, vol. 32, No. 10A, pp. 196–198, Mar. 1990.

*Primary Examiner*—Thomas M. Heckler

(57) **ABSTRACT**

Improved approaches to providing thermal and power management for a computing device are disclosed. These approaches facilitate intelligent control of a processor's clock frequency and/or a fan's speed so as to provide thermal and/or power management for the computing device.

**54 Claims, 8 Drawing Sheets**



**US 6,216,235 B1**

Page 2

### U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,293,927 | 10/1981 | Hoshii . |
| 4,381,552 | 4/1983 | Nocilini et al. . |
| 4,409,665 | 10/1983 | Tubbs . |
| 4,448,543 | 5/1984 | Vail . |
| 4,670,837 | 6/1987 | Sheets . |
| 4,672,228 | 6/1987 | Swoboda . |
| 4,686,366 | 8/1987 | Tadao . |
| 4,689,659 | 8/1987 | Watonabe . |
| 4,698,748 | 10/1987 | Juzswik et al. . |
| 4,722,669 | 2/1988 | Kundert . |
| 4,812,733 | 3/1989 | Tobey . |
| 4,851,987 | 7/1989 | Day . |
| 4,893,271 | 1/1990 | Davis et al. . |
| 4,924,112 | 5/1990 | Anderson et al. . |
| 4,970,497 | 11/1990 | Broadwater et al. . |
| 4,980,836 | 12/1990 | Carter et al. . |
| 5,021,679 * | 6/1991 | Fairbanks et al. . |
| 5,025,387 | 6/1991 | Frane . |
| 5,036,493 | 7/1991 | Nielsen . |
| 5,058,389 | 10/1991 | Yesuda et al. . |
| 5,115,225 | 5/1992 | Dao et al. . |
| 5,121,291 | 6/1992 | Cope et al. . |
| 5,125,088 | 6/1992 | Culley . |
| 5,132,632 | 7/1992 | Russell et al. . |
| 5,134,703 | 7/1992 | Bumbarger . |
| 5,142,684 | 8/1992 | Perry et al. . |
| 5,167,024 | 11/1992 | Smith et al. . |
| 5,189,314 | 2/1993 | Georgiou et al. . |
| 5,201,059 | 4/1993 | Nguyen . |
| 5,218,704 | 6/1993 | Watts, Jr, et al. . |
| 5,222,239 | 6/1993 | Rosch . |
| 5,230,055 | 7/1993 | Katz et al. . |
| 5,230,074 | 7/1993 | Canova, Jr. et al. . |
| 5,239,652 | 8/1993 | Siebert et al. . |
| 5,241,680 | 8/1993 | Cole et al. . |
| 5,249,741 | 10/1993 | Bistline et al. . |
| 5,287,244 | 2/1994 | Hileman et al. . |
| 5,287,292 * | 2/1994 | Kenny et al. . |
| 5,291,607 | 3/1994 | Ristic et al. . |
| 5,349,688 | 9/1994 | Nguyen . |
| 5,349,823 | 9/1994 | Solomon . |
| 5,355,501 | 10/1994 | Gross et al. . |
| 5,359,234 | 10/1994 | Atriss et al. . |
| 5,369,771 | 11/1994 | Gettel . |
| 5,375,230 | 12/1994 | Fujimori et al. . |
| 5,381,043 | 1/1995 | Kohiyama et al. . |
| 5,388,265 | 2/1995 | Volk . |
| 5,392,437 | 2/1995 | Matter et al. . |
| 5,396,635 | 3/1995 | Pung . |
| 5,416,726 | 5/1995 | Garcia-Duarte et al. . |
| 5,418,751 | 5/1995 | Kaiser . |
| 5,422,832 | 6/1995 | Moyal . |
| 5,426,755 | 6/1995 | Yokouchi et al. . |
| 5,428,790 | 6/1995 | Harper et al. . |

| | | |
|---|---|---|
| 5,430,881 | 7/1995 | Ikeda . |
| 5,442,806 | 8/1995 | Chen et al. . |
| 5,469,320 | 11/1995 | Walker et al. . |
| 5,469,561 | 11/1995 | Takeda . |
| 5,473,767 | 12/1995 | Kardach et al. . |
| 5,475,847 | 12/1995 | Ikeda . |
| 5,483,102 * | 1/1996 | Neal et al. . |
| 5,485,127 | 1/1996 | Bertoluzzi et al. . |
| 5,498,971 | 3/1996 | Turnbull et al. . |
| 5,500,509 | 3/1996 | Vogt . |
| 5,502,838 * | 3/1996 | Kikinis . |
| 5,504,907 | 4/1996 | Stewart et al. . |
| 5,504,908 | 4/1996 | Ikeda . |
| 5,504,924 | 4/1996 | Ohashi et al. . |
| 5,511,203 | 4/1996 | Wisor et al. . |
| 5,526,289 | 6/1996 | Dinh et al. . |
| 5,535,401 | 7/1996 | Rawson, III et al. . |
| 5,539,681 | 7/1996 | Alexander et al. . |
| 5,546,568 | 8/1996 | Bland et al. . |
| 5,546,591 | 8/1996 | Wurzburg et al. . |
| 5,557,550 | 9/1996 | Vigil et al. . |
| 5,557,551 | 9/1996 | Craft . |
| 5,560,001 | 9/1996 | Kardach et al. . |
| 5,560,002 | 9/1996 | Kardach et al. . |
| 5,560,020 | 9/1996 | Naketani et al. . |
| 5,561,792 | 10/1996 | Ganapathy . |
| 5,574,667 | 11/1996 | Dinh et al. . |
| 5,579,524 | 11/1996 | Kikinis . |
| 5,586,332 | 12/1996 | Jain et al. . |
| 5,622,789 | 4/1997 | Young . |
| 5,623,594 | 4/1997 | Swamy . |
| 5,625,826 | 4/1997 | Atkinson . |
| 5,630,148 | 5/1997 | Norris . |
| 5,632,037 | 5/1997 | Maher et al. . |
| 5,664,201 | 9/1997 | Ikedea . |
| 5,664,205 | 9/1997 | O'Brien et al. . |
| 5,687,079 | 11/1997 | Bauer et al. . |
| 5,721,837 | 2/1998 | Kikinis et al. . |
| 5,721,938 | 2/1998 | Kunihara et al. . |
| 5,809,336 | 9/1998 | Moore et al. . |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| 63-100522 A2 | 5/1988 | (JP) . |
| 2-054707 A2 | 2/1990 | (JP) . |
| 2-083720 A2 | 3/1990 | (JP) . |
| 2-299009 A2 | 12/1990 | (JP) . |
| 3-116210 A2 | 5/1991 | (JP) . |
| 5-011897 A2 | 1/1993 | (JP) . |
| 5108193 | 4/1993 | (JP) . |
| 5189100 | 7/1993 | (JP) . |
| 5224773 * | 9/1993 | (JP) . |
| WO 91/00566 | 1/1991 | (WO) . |
| WO91/00523 | 1/1991 | (WO) . |

* cited by examiner



FIG. 1



FIG. 3

**U.S. Patent**        Apr. 10, 2001        Sheet 2 of 8        US 6,216,235 B1



CHIP TEMPERATURE   (ºC)

FIG. 2

A 62



FIG. 4



FIG. 5



FIG. 6



FIG. 7



FIG. 8



FIG. 9



FIG. 10

US 6,216,235 B1

**1**

THERMAL AND POWER MANAGEMENT
FOR COMPUTER SYSTEMS

This appln is a con't of Ser. No. 08/914,299 filed Aug. 18, 1997, U.S. Pat. No. 5,974,557, which is a con't of 08/262, 754 filed Jun. 20, 1994, U.S. Pat. No. 5,752,011.

BACKGROUND OF THE INVENTION

1. Field of the Invention

The present invention relates to a computing device and, more particularly, to a method and apparatus for controlling a processor's clock frequency.

2. Description of the Related Art

It is known that if no user activity has occurred for a period of time that a portable computer can be placed in a suspend or sleep mode. It is also known to suspend or slow a computer's processor (e.g., microprocessor, CPU) when the processor is not actively processing. The following patents and patent publications are representative of the current state of the art:

(a) U.S. Pat. No. 5,201,059 discloses a sleep mode which is activated when control given to BIOS or alternatively by incorporating some statistical analysis of the frequency of BIOS calls. In this patent, the sleep mode either stops the clock or slows it to 4 MHz.

(b) U.S. Pat. No. 5,167,024 discloses a power management system for a laptop computer. The power management system operates to disconnect power sources and/or clock signals to various peripheral devices to conserve battery power. The slow mode is entered into when no activity has been detected for a predetermined period of time.

(c) U.S. Pat. No. 5,218,704 discloses a technique for power conservation based on real-time sampling of CPU activity. The activity is sampled during interrupts and when it determines that the CPU may rest, a sleep clock is supplied to the CPU. The detection of an interrupt restores the clock to the fast rate prior to processing the interrupt.

(d) U.S. Pat. No. 5,239,652 discloses a technique for power consumption which disconnects the CPU from the power supply when control logic determines the CPU is not actively processing. Thereafter, the CPU is periodically powered-up to perform housekeeping chores as well as to determine if normal processing should be resumed.

(e) European patent publication EP-0474963 discloses a sleep mode controller which lowers the CPU clock speed when no input/output operation (when keyboard control routine of BIOS executed oo input key data in key buffer, or when CPU is idle and no input key data in the key buffer) is performed. The system uses a clock generator circuit which produces the low clock (4 MHz), the high clock (32 MHz) and a slightly slower high clock (16 MHz). A keyboard controller is used to determine which of the high clocks is used, with selection being made by the computer user. The sleep mode controller is disabled if the AC adapter is connected.

(f) U.S. Pat. No. 5,230,055 discloses a portable computer wherein the computer is make inoperable when ambient temperature or humidity become too high. Here, ambient temperature and humidity are periodically monitored.

(g) European patent publication EP-0381021 discloses a power saving system for a personal computer. The system operates to allow or stop power to be supplied to an oscillator based on control data set to a control register via keyboard or software.

(h) U.S. Pat. No. 5,021,679 discloses a power system for a portable computer wherein the supply voltage is varied

**2**

depending on the current being supplied to the computer by the power system. Further, a variable-frequency clock is provided which varies its frequency based on the supply voltage being produced.

External clocks have been used to provide a computer system with faster clocks. Here, the faster external clock is substituted for the internal clock of the computer system. U.S. Pat. No. 5,134,703 is illustrative of an external clock unit which supplies a faster clock to a computer without requiring any hardware changes within the computer.

The problem with all the prior solutions to energy conservation is that the processors can still overheat. In particular, during prolonged processing or activity by a computer's processor, the processor will not enter its sleep mode (if any) and as a result the processor will become hot and require extensive means to cool the processor to prevent overheating and eventual failure of the processor. Overheating and failure of the processor can also occur when the computer is used in particularly hot environmental temperatures, the computer's cooling fan fails, or when cooling of the processor is otherwise inadequate.

Another problem is that with portable computers, manufacturers have to either use a lower clock frequency (lower than would be used in a comparable desk top computer) for processing or provide a fan for cooling. A lower clock frequency is not satisfactory as users want maximum processing power just as they get with a desk top computer. Requiring a portable computer to use a fan for cooling is also unsatisfactory because it consumes battery energy.

Thus, there is a need for a solution to the above problems which enables a computing device to maximize its processing speed while, at the same time, preventing overheating.

SUMMARY OF THE INVENTION

Broadly speaking, the invention relates to novel techniques for controlling a processor's clock frequency or fan speed so as to prevent overheating. While preventing overheating, the invention attempts to maximizes the processing speed of the processor or to conserve power.

Other aspects and advantages of the invention will become apparent from the following detailed description, taken in conjunction with the accompanying drawings, illustrating by way of example the principals of the invention.

BRIEF DESCRIPTION OF THE DRAWINGS

The present invention will be readily understood by the following detailed description in conjunction with the accompanying drawings, wherein like reference numerals designate like structural elements, and in which:

FIG. 1 is a block diagram of a first embodiment of the invention;

FIG. 2 is a graph of an example of the relationship of chip temperature of a microprocessor frequency of a clock signal;

FIG. 3 is a block diagram of a second embodiment of the invention;

FIG. 4 is a block diagram of a third embodiment of the invention;

FIG. 5 is a block diagram of a fourth embodiment of the invention;

FIG. 6 is a timing diagram illustrating operation of the fourth embodiment;

FIG. 7 is a block diagram of a fifth embodiment of the invention;

US 6,216,235 B1

3

FIG. 8 illustrates a schematic diagram of an embodiment of an activity detector;

FIG. 9 is a block diagram of a sixth embodiment of the invention; and

FIG. 10 is a block diagram of a seventh embodiment of the invention.

## DETAILED DESCRIPTION OF THE INVENTION

The invention provides novel techniques for controlling a processor's clock frequency so as to prevent overheating. In addition to preventing overheating, the invention attempts to maximize the processing speed of the processor. The invention also operates to conserve the amount of energy consumed by the processor. Preventing the processor from overheating is important because when a processor overheats it no longer operates properly. Conservation of energy, although of general importance for all computing devices, is particularly important for portable computing devices.

The invention monitors a processor's activity and its temperature. When there is no activity for the processor, a slow clock frequency is used, thereby saving power and lowering the thermal heat produced by the processor. On the other hand, when there is activity for the processor, a fast clock frequency is used. However, when prolonged activity (i.e., sustained fast clock frequency) causes the processor's temperature to become dangerously high for proper operation, the clock frequency is reduced so as to maintain processing speed at a reduced speed while preventing overheating.

Embodiments of the invention are discussed below with reference to FIGS. 1–10. However, those skilled in the art will readily appreciate that the detailed description given herein with respect to these figures is for explanatory purposes as the invention extends beyond these limited embodiments.

FIG. 1 is a block diagram of a first embodiment of the invention. In this embodiment, a microprocessor 2 has a temperature sensor 4 which is integral with the microprocessor 2. The temperature sensor 4 is either integrated within the Very Large Scale Integration (VLSI) design of the microprocessor 2 or placed in contact with the housing or package thereof. In either case, the temperature sensor 4 is thermally coupled with the microprocessor 2. Because the temperature sensor 4 is integral or thermally coupled with the microprocessor 2, the temperature sensor 4 is very responsive to the temperature changes of the microprocessor 2. The temperature sensor 4 produces a temperature signal 6. Temperature sensing circuitry is well known and therefore not further described.

The temperature signal 6 is supplied to a voltage-controlled oscillator (VCO) 8. The VCO 8 produces a clock signal 10 which is supplied to a clock input of the microprocessor 2. The VCO 8 operates to produce different frequencies for the clock signal 10 depending on the value of the temperature signal. In this embodiment, the temperature signal 6 is preferably an analog voltage signal and the VCO 8 produces the clock signal 10 based on the value of the analog voltage signal. For example, the temperature signal could be a voltage ranging from zero to five volts. In response to the temperature signal 6, the VCO 8 could produce the clock signal with frequencies ranging from 100 MHz to 1 MHz. The frequency range is a design choice selected in accordance with the specific microprocessor being utilized. VCO's are well known and therefore are not further described.

4

FIG. 2 is a graph of an example of the relationship of chip temperature of the microprocessor 2 and clock frequency of the clock signal 10. The clock frequency varies between a maximum frequency (FMAX) and a minimum frequency (fMIN) for given microprocessor. The minimum frequency (fMIN) may be zero if the clock signal 10 is not responsible for refreshing dynamic memory; otherwise, it cannot fall below some minimum frequency. Notice that as the chip temperature increases beyond some threshold temperature ($V_{TH}$) (e.g., 120 degrees F.), the frequency of the clock signal 10 will gradually decrease. By decreasing the clock frequency in relation to the chip temperature, processing speed can be maximized for a given temperature without risking processor overheating. As the chip temperature become "hot", the clock frequency is reduced so as to reduce the thermal heat generated by the microprocessor 2. The profile of the curve for the clock frequency shown in FIG. 2 is illustrative as other curves may be used. For example, the frequency of the clock signal 10 could be controlled so that the chip temperature is maintained in a more limited temperature range. In any case, the profiles of the curves decrease the clock frequency as the temperature increases.

FIG. 3 is a block diagram of a second embodiment of the invention. In this embodiment, the temperature sensor 4, temperature signal 6, the VCO 8, and the clock signal 10 are similar to those utilized in the first embodiment. However, this embodiment further includes an activity detector 12, an activity signal 14, a VCO controller 16, and a control signal 18.

The activity detector 12 monitors the microprocessor 2 and/or some related peripheral device (e.g., interrupt controller, keyboard buffer, input/output ports, instruction cache, current instruction, program counter) to determine when the microprocessor 2 is actively processing or when processing is needed. In this case, the activity detector 12 notifies the VCO controller 16 that processing is needed with the activity signal 14. On the other hand, when no activity exists, the activity detector 12 notifies the VCO controller 16 that no processing is needed with the activity signal 14. The activity signal is preferably a digital signal having at least one bit. Activity detection is described in more detail in U.S. Pat. No. 5,201,059; U.S. Pat. No. 5,167,024; U.S. Pat. No. 5,218,704; U.S. Pat. No. 5,239,652; and European patent publication EP-0474963, which are hereby incorporated by reference.

The VCO controller 16 receives the activity signal 14 and the temperature signal 6. In response to these signals, the VCO controller 16 produces the control signal 18 which controls the VCO 8. The control signal 18 may be analog or digital depending on the design of the VCO 8. The basic operation of the VCO controller 16 is to cause the VCO 8 to produce the clock signal 10 for the microprocessor 2 in an intelligent manner so as to conserve energy and prevent overheating. Namely, if the activity detector 12 indicates that no processing is needed at a given point in time, then regardless of the temperature detected by the temperature sensor 4, the VCO controller 16 will cause the VCO 8 to produce a sleep (or slow) clock. The sleep clock has a frequency near the minimum frequency (fMIN). On the other hand, if the activity detector 12 indicates that processing is needed at this point in time, then the VCO controller 16 will cause the VCO 8 to produce a fast clock. The fast clock is the temperature-regulated maximum frequency such as discussed in FIGS. 1 and 2.

The second embodiment is particularly advantageous for portable computing devices because it conserves battery life by using a sleep clock when no processing is needed.

5

However, even in the case of prolonged processing, the embodiment prevents overheating.

FIG. 4 is a block diagram of a third embodiment of the invention. In this embodiment, the microprocessor 2 includes a clock regulation unit 20 which controls the frequency of the clock used by the microprocessor 2 based on chip temperature of the microprocessor 2. Preferably, the clock regulation unit 20 is integrated with circuitry of the microprocessor 2. Alternatively, the clock regulation unit 20 can be separate from the circuitry of the microprocessor 2 but nevertheless coupled thereto.

The clock regulation unit 20 receives an input clock from an oscillator 22 and produces an output clock which is used by the microprocessor 2. The clock regulation unit 20 includes a temperature sensor 4, a divider 24, a first AND gate 26, a second AND gate 28, an inverter 30 and an OR gate 32. The temperature sensor 4 is as previously described. The divider 24 divides the input clock (fast clock) from the oscillator 22 to produce a sleep (or slow) clock. For example, if the oscillator 22 is a 100 MHz fixed-frequency oscillator and the divider 24 divides by 100, then the sleep clock would be 1 MHz.

In this embodiment, the temperature sensor 4 produces a digital output. It is assumed that the digital output is normally "0", but when the microprocessor 2 becomes "hot", the digital output becomes "1". The digital output of the temperature sensor 4 together with the logic gates 26–32 operate to select either the fast clock or the sleep clock as the output clock which is used by the microprocessor 2. In particular, when the microprocessor 2 is not "hot", AND gate 26 is inactivated and AND gate 28 is activated by inverter 30. Hence, the output clock is the fast clock via AND gate 28 and OR gate 32. On the other hand, when the microprocessor 2 is "hot", AND gate 26 is activated and AND gate 28 is inactivated. Accordingly, in this case, the output clock is the sleep (or slow) clock via AND gate 26 and OR gate 32.

FIG. 5 is a block diagram of a fourth embodiment of the invention. In this embodiment, the microprocessor 2 includes a clock regulation unit 20 which controls the frequency of the clock used by the microprocessor 2 based on chip temperature of the microprocessor 2 and processing activity. The clock regulation unit 20 is preferably integrated with circuitry of the microprocessor 2.

As with the third embodiment, the clock regulation unit 20 for the fourth embodiment receives the input clock from the oscillator 22 and produces the output clock which is used by the microprocessor 2. The clock regulation unit 20 includes the temperature sensor 4, the divider 24, the first AND gate 26, the second AND gate 28, and the OR gate 32 as described above with reference to FIG. 4. The divider 24 divides the input clock (fast clock) from the oscillator 22 to produce a sleep clock. The temperature sensor 4 produces a digital output. Although the digital output from the temperature sensor 4 is normally "0", when the microprocessor 2 becomes "hot", the digital output becomes "1". The activity detector 12 produces an activity signal as described in the second embodiment. Here, the activity signal is a digital signal which is "high" or "1" when activity is present and "low" or "0" when no activity is present.

The digital output of the temperature sensor 4 together with the activity detector 12 and the logic gates 26, 28, 32, 34, 36 and 38 operate to select either the fast clock or the sleep clock. In particular, when the microprocessor 2 is not "hot" and activity is present, the AND gate 36 is activated by the inverter 34 and the activity

6

signal. The output of AND gate 36 then activates AND gate 28 and inverter 38 inactivates AND gate 26. Hence, the output clock is the fast clock via AND gate 28 and OR gate 32. On the other hand, when the microprocessor 2 is "hot", the AND gate 36 is inactivated by the inverter 34 regardless of the activity signal. The output of AND gate 36 inactivates AND gate 28, and inverter 38 activates the AND gate 26. In this case, the output clock is the sleep clock via AND gate 26 and OR gate 32.

FIG. 6 is a timing diagram illustrating operation of the fourth embodiment. The output clock (CLK) is a mixture of the fast clock produced by the oscillator 22 and the sleep clock produced by the divider 24. The temperature signal is the digital output of the temperature sensor 4. The temperature signal is "0" while the chip temperature is not "hot". However, when the chip temperature becomes "hot", the temperature signal becomes "1", as shown at point A. The activity signal is "1" when activity is present for processing by the microprocessor 2; otherwise, the activity signal is "0" to indicate no activity is present for processing. As shown in FIG. 6, the output clock follows the fast clock only when the temperature signal is "0" and the activity signal is "1"; otherwise, the output clock follows the sleep clock. Note that the transitions for the output clock from fast clock to sleep clock and from sleep clock to fast clock are shown as being synchronized with the low or "0" portion of the fast clock. For example, at point B the output clock would produce a partial pulse (from the fast clock) if not synchronized. Hence, it is probably preferred that switching occur only when the fast clock is "low," or when both the fast and sleep clocks are "low" as shown at point C. Note that at point C, the output clock transitions from the sleep clock to the fast clock but because the transition is synchronized with the "low" portion of the fast clock, the first pulse does not occur until point D. Such synchronization can be insured by the addition of known circuitry.

FIG. 7 is a block diagram of a fifth embodiment of the invention. Although only the clock regulation unit 20 is illustrated in FIG. 7, the fifth embodiment interacts with an oscillator 22 and a microprocessor 2 as did the third and fourth embodiments. In this embodiment, the clock regulation unit 20 includes a first divider 40 which divides the input clock (fast clock) to produce a sleep clock, and a second divider 42 which divides the input clock to produce a normal clock. The three clocks (sleep, normal and fast) are then supplied to a selector 44. The selector 44 outputs one of the three clocks as the output clock for the microprocessor 2 based on first and second select inputs IN1 and IN2. The first select input IN1 is generated by inverting the digital output from the temperature sensor 4 using an inverter 46. The second select input IN2 is generated by an activity detector 48 which functions similarly to the activity detector 12 in previous embodiments.

The activity detector 48 receives a plurality of activity inputs ACT1, . . . , ACTn. For example, the activity inputs notify the activity detector 48 whether or not activity exists. Each of the activity inputs may, for example, indicate an interrupt, keyboard activity, modem line activity, I/O port activity, or processor activity. As an example, FIG. 8 illustrates a schematic diagram of an embodiment of the activity detector 48. The activity detector 48 includes a OR gate 50 which outputs a "1" when either the activity input ACT1 or the activity input ACT2 is "1". If neither the activity signals ACT1 and ACT2 are "1", then the OR gate 50 outputs a "1", thereby indicating the presence of activity.

US 6,216,235 B1

7

The following Table I illustrates the selection of one of the three clocks by the selector 44 based on the first select input IN1 and the second select input IN2.

TABLE 1

| IN1 | IN2 | CLK Mode |
|-----|-----|----------|
| 0 | 0 | Sleep |
| 0 | 1 | Fast |
| 1 | 0 | Sleep |
| 1 | 1 | Normal |

Note that when no activity is detected by the activity detector 48, then the sleep clock is output. However, when activity is detected, then the normal clock is output if the chip temperature is "hot" and the fast clock is output if the chip temperature is not "hot". Like previous embodiments, this embodiment prevents overheating and conserves energy. Many alternatives can be made to the third, fourth and fifth embodiments discussed above. For example, additional clocks with different clock frequencies could be provided and selected for different temperature ranges to provide a more gradual decrease in frequency. However, if a microprocessor has sufficient thermal heat dissipation, then even the embodiment with only two different clock frequencies (fast and sleep) may provide reasonable processing speeds even when the microprocessor is getting hot because the switching between the clocks would be quite fast as the response of the temperature sensor 4 is very rapid because it is integrated with the microprocessor. Further, although FIGS. 4, 5, and 7 illustrate the temperature sensor 4 as resident within the clock regulation unit 20, the temperature sensor 20 need only be electrically coupled thereto and closely thermally coupled to the microprocessor 2.

FIG. 9 is a block diagram of a sixth embodiment of the invention. In this embodiment, the clock (CLK) received by a microprocessor 2 is either a sleep clock produced by an oscillator 52 or a temperature-regulated fast clock produced by a VCO 8 in accordance with a temperature signal 6 (analog) from a temperature sensor 4. Clock selection is achieved by a selector 54 based on an activity signal 14 provided by an activity detector 12, 48. The VCO 8, the temperature sensor 4 and the activity detector 12, 48 were discussed above with respect to previous embodiments. If activity is present, the temperature-regulated fast clock is supplied to the microprocessor 2. On the other hand, if no activity is detected, then the sleep clock is supplied to the microprocessor 2. The temperature regulation of the fast clock is achieved by the analog temperature signal as discussed above with regard to FIGS. 1 and 2.

Additionally, FIG. 9 illustrates an additional feature of the invention. Namely, FIG. 9 includes an analog-to-digital converter 56, a fan controller 58 and a cooling fan 60. Many conventional computing systems include a fan for circulating air through a computer's cabinet or add-on fans that provide air-flow on or near a microprocessor. Such add-on fans can be activated in accordance with ambient temperature. In contrast, the invention allows more accurate temperature monitoring of the microprocessor 2 because the temperature sensor 4 is integrated with the microprocessor 2. In addition, the invention facilitates more sophisticated energy conservation which is particularly important for portable computing devices. The temperature signal 6 is converted to digital form by the A/D converter 56 and then supplied to the fan controller 58. The fan controller 58 performs a pulse-width modulation operation on a supply voltage (Vcc) so as to control the speed of the fan 60.

8

Pulse-width modulation of the supply voltage allows the speed of the fan to be controlled without wasting energy. Thus, this embodiment further includes a temperature-activated, variable-speed fan.

In the case of a desk-top computing device, it is desirable to activate the fan 60 just prior to the temperature where the fast clock would be regulated downward because of high chip temperature. On the other hand, in the case of a portable computing device, it is desirable to attempt to limit the use of the fan 60 as much as possible by allowing the fast clock to be gradually reduced with increasing temperature before utilizing the fan 60. For example, if the maximum frequency of the fast clock is 100 MHz, the fan 60 could be activated in the desk-top case before the frequency would be regulated (e.g., attempts to maintain 100 MHz). This would eliminate or delay the reduction in the frequency of the fast clock. In the portable case, the fan 60 could be activated after the frequency of the fast clock is already decreased to 25 MHz. The fan 60 would then only be used when necessary to insure reasonable processing power and even then at the lowest effective speed, thereby saving battery energy to the extent possible.

Although not shown but described with reference to FIG. 6, depending on the particular design, synchronization of the switching of the frequency may be needed to prevent partial pulse in the clock signal. Such synchronization is easily implemented using well-known circuitry. Likewise, if the computing device requires a consistent clock period during certain events (e.g., analog-to-digital conversion), then hysteresis or other circuitry can be added to restrict the ability of the frequency of the clock to be changed during certain times.

Prior embodiments operate to decrease the clock frequency of the clock signals supplied to a microprocessor to prevent overheating and to conserve energy. FIG. 10 is a block diagram of a seventh embodiment of the invention. This embodiment operates to provide a burst processing mode for use under certain conditions. During certain types of processing activity, a clock control unit 20 causes an overdrive clock to be supplied to a microprocessor 2. Because the overdrive clock is used only in short bursts, the frequency of the overdrive clock can and preferably exceeds the frequency which sustained processing would permit without rapidly overheating.

In this embodiment, the clock control unit 20 includes a first divider 62 which divides the input clock to produce a sleep clock, and a second divider which divides the input clock to produce a fast clock. Because the input clock serves as the overdrive clock, the input clock has a clock frequency that is faster than that necessary for sufficient performance and responsiveness in most cases. The clock control unit 20 also includes a selector 66, an activity detector 68, and a temperature sensor 4. The selector 66 operates to select one of the sleep, fast or overdrive clocks based on select inputs (IN1, IN2, IN3) it receives from the activity detector 68 and the temperature sensor 4. More particularly, the activity detector 68 receives activity signals ACT1, . . . , ACTn which cause the activity detector 68 to generate a burst activity signal and a normal activity signal. Certain of the activity signals ACT trigger the burst activity signal and other activity signal trigger the normal activity signal. The temperature sensor 4 is integral with the microprocessor 2 and produces a digital temperature signal which indicates whether or not the microprocessor 2 is "hot".

A 72

9

The following Table II illustrates the selection of one of the three clocks by the selector 66 based on the first select input IN1, the second select input IN2, and the third select input.

TABLE II

| IN1 | IN2 | IN3 | CLK Mode |
|-----|-----|-----|-----------|
| 0 | 0 | 0 | Sleep |
| 0 | 0 | 1 | Sleep |
| 0 | 1 | 0 | Fast |
| 0 | 1 | 1 | Sleep |
| 1 | 0 | 0 | Overdrive |
| 1 | 0 | 1 | Fast/Sleep |
| 1 | 1 | 0 | Overdrive |
| 1 | 1 | 1 | Fast/Sleep |

Note that when no activity (either burst or normal) is detected by the activity detector 68, then the sleep clock is output. However, when burst activity is detected, then the overdrive clock is output if the chip temperature is not "hot" and either the fast clock or the sleep clock is output if the chip temperature is "hot". The determination of which of the fast or sleep clocks to output in this situation is a design choice depending on the ability of the computing system to dissipate heat. In fact, it may be preferred to make the selection more sophisticated in this case so that selector can make the decision using addition temperature information such as signals indicating particular temperature ranges or rate at which temperature is rising. When only normal activity is detected, then the fast clock is output if the chip temperature is not "hot" and the sleep clock is output if the chip temperature is "hot". As a modification, the second divider 64 could be replaced with a VCO thereby using a temperature-regulated fast clock.

Like previous embodiments, this embodiment prevents overheating and conserves energy. The advantage of this embodiment is that processing will appear more uniform or regular to a user.

There are certain times during normal execution of a program, the computer is caused to execute operations which are beyond or unrequested by the program being executed. Such unrequested operations include interrupt processing, and data transfer to cache memory following a cache miss. Using the overdrive clock in these types of situations is advantageous because such will substantially lessen any delay induced by these unrequested operations. A computer user then perceives that the computer's responsiveness is more regular and uniform. For example, when a cache miss occurs an instruction currently being in process is not allowed to complete until the appropriate data block is loaded into the cache. The loading of the cache follow a cache miss causes the microprocessor to execute many operations for memory management that were not requested by the computer program or the user, thereby delaying the execution of the instruction. However, because the invention performs such unrequested operations at higher speeds (overdrive clock), the impact of having to perform the extra unrequested operations is substantially lessened and hopefully invisible.

In fact, a particular computer instruction could by used to indirectly select the desired clock frequency for the instruction. This could be useful for instructions that require more intensive processing than do normal instructions. An example of intensive processing is complex floating point computations. Here, the microprocessor would indicate to the activity detector that the overdrive clock is to be used if the chip temperature is not too "hot".

10

Yet another embodiment would be to alter processing frequency for extremely cold situations. Namely, if the temperature sensor indicates that the chip temperature (could also use ambient temperature) is less than a predetermined minimum temperature, then the clock frequency could by set regardless of activity to its maximum value to thereby cause the generation of as much heat as possible so that the computing device could operate correctly even in extremely cold conditions. Any cooling fan of the computing device would also be shut-off using a fan controller such as shown in FIG. 9.

The many features and advantages of the present invention are apparent from the written description and thus it is intended by the appended claims to cover all such features and advantages of the invention. Further, since numerous modifications and changes will readily occur to those skilled in the art, it is not desired to limit the invention to the exact construction and operation as illustrated and described. Hence, all suitable modifications and equivalents may be resorted to as falling within the scope of the invention.

What is claimed is:

1. A computer system, comprising:

a microprocessor, said microprocessor operates in accordance with a clock signal having a controllable frequency

a fan; and

a thermal management controller operatively connected to said microprocessor and said fan, said thermal management controller operates to thermally manage said microprocessor in accordance with one of a first cooling mode and a second cooling mode, the first cooling mode involving use of said fan for cooling said microprocessor, and the second cooling mode involving reduction in the controllable frequency of the clock signal for cooling said microprocessor,

wherein said fan has multiple speeds of operation, and

wherein, with the first cooling mode, said thermal management controller causes said fan to operate at higher of the speeds as needed to provided additional thermal cooling.

2. A computer system as recited in claim 1, wherein, with the second cooling mode, said thermal management controller causes the controllable frequency of the clock to be successively reduced as needed to provided additional cooling.

3. A computer system, comprising:

a microprocessor, said microprocessor operates in accordance with a clock signal having a controllable frequency;

a fan; and

a thermal management controller operatively connected to said microprocessor and said fan, said thermal management controller operates to thermally manage said microprocessor in accordance with one of a first cooling mode and a second cooling mode, the first cooling mode involving use of said fan for cooling said microprocessor, and the second cooling mode involving reduction in the controllable frequency of the clock signal for cooling said microprocessor,

wherein said microprocessor has a sleep mode in which the controllable frequency of the clock is substantially reduced, and

wherein said thermal management controller ensures that said fan is deactivated when said microprocessor is in the sleep mode.

11

12

4. A computer system, comprising:

a microprocessor, said microprocessor operates in accordance with a clock signal having a controllable frequency;

a fan; and

a thermal management controller operatively connected to said microprocessor and said fan, said thermal management controller operates to thermally manage said microprocessor in accordance with one of a first cooling mode and a second cooling mode, the first cooling mode involving use of said fan for cooling said microprocessor, and the second cooling mode involving reduction in the controllable frequency of the clock signal for cooling said microprocessor,

wherein, with the first cooling mode, said thermal management controller causes said fan to operate at successively higher speeds as needed to provided additional cooling.

5. A computer system as recited in claim 4, wherein said microprocessor has a sleep mode in which the controllable frequency of the clock is substantially reduced, and

wherein said thermal management controller ensures that said fan is deactivated when said microprocessor is in the sleep mode.

6. A computer system as recited in claim 4, wherein the first cooling mode serves to operate the computer for high performance operation, and the second cooling mode serves to conserve battery energy by operating the computer with reduced performance operation.

7. A computer, comprising:

a microprocessor that operates in accordance with a clock, the clock having a controllable frequency;

a temperature sensor that measures a temperature;

a fan; and

a thermal controller for providing thermal management of said computer, said thermal controller has a first cooling mode and a second cooling mode, the controllable frequency of the clock is reduced to regulate thermal conditions when in the first cooling mode, and said fan is activated to regulate thermal conditions when in the second cooling mode,

wherein when said thermal controller operates in the first cooling mode, the controlled frequency of the clock is reduced when the temperature exceeds a first temperature threshold, and

wherein said thermal controller operates in the second cooling mode, said fan is activated when the temperature exceeds a second temperature threshold.

8. A computer as recited in claim 7, wherein the first cooling mode is a reduced power mode and the second cooling mode is a performance mode.

9. A computer as recited in claim 7, wherein said temperature sensor measures the temperature of said microprocessor.

10. A computer as recited in claim 7, wherein said temperature sensor is integral with said microprocessor.

11. A computer as recited in claim 7, wherein said microprocessor has a sleep mode in which the controlled frequency of the clock is substantially reduced, and

wherein when said microprocessor is in the sleep mode said controller ensures that said fan is deactivated regardless of thermal conditions.

12. A computer as recited in claim 7, wherein said computer consumes reduced energy when in the first cooling mode than when in the second cooling mode, and wherein said computer operates at higher performance when in the second cooling mode than when in the first cooling mode.

13. A computer as recited in claim 7, wherein when said thermal controller operates in the first cooling mode, the controllable frequency of the clock is gradually and successively stepwise reduced as needed to regulate thermal conditions.

14. A computer as recited in claim 7, wherein in the first cooling mode the reduction in the controllable frequency is the primary thermal management method, and in the second cooling mode said fan is the primary thermal management method.

15. A computer as recited in claim 14, wherein in the first cooling mode said fan is the secondary thermal management method used when further cooling is needed, and in the second cooling mode the reduction in the controllable frequency is the secondary thermal management method when further cooling is needed.

16. A computer as recited in claim 7, wherein in the first cooling mode cooling of said microprocessor is achieved primarily through reduction in clock frequency for said microprocessor, and wherein in the second cooling mode cooling said microprocessor is achieved primarily through use of said fan.

17. A computer as recited in claim 16, wherein, in the first cooling mode, when further cooling of said microprocessor is needed beyond that provided by the reduction in the clock frequency, then said fan is activated to provide supplemental cooling of said microprocessor.

18. A computer as recited in claim 16, wherein, in the second cooling mode, when further cooling of said microprocessor is needed beyond that provided by said fan, then the clock frequency for said microprocessor can be reduced to provide supplemental cooling of said microprocessor.

19. A computer, comprising:

a microprocessor that operates in accordance with a clock, the clock having a controllable frequency;

a temperature sensor that measures a temperature;

a fan; and

a thermal controller for providing thermal management of said computer, said thermal controller has a first cooling mode and a second cooling mode, the controllable frequency of the clock is reduced to regulate thermal conditions when in the first cooling mode, and said fan is activated to regulate thermal conditions when in the second cooling mode,

wherein said microprocessor has a sleep mode in which the controlled frequency of the clock is substantially reduced, and

wherein said controller ensures that said fan is deactivated when said microprocessor is in the sleep mode.

20. A computer as recited in claim 19, wherein when said thermal controller operates in the first cooling mode, the controllable frequency of the clock is gradually and successively reduced as needed to regulate thermal conditions.

21. A computer as recited in claim 19, wherein when said thermal controller operates in the first cooling mode, the controllable frequency of the clock is dependent on the temperature measured by said temperature sensor.

22. A computer, comprising:

a microprocessor that operates in accordance with a clock, the clock having a controllable frequency;

a temperature sensor that measures a temperature;

a fan; and a thermal controller for providing thermal management of said computer, said thermal controller has a first cooling mode and a second cooling mode, the

13

controllable frequency of the clock is reduced to regulate thermal conditions when in the first cooling mode, and said fan is activated to regulate thermal conditions when in the second cooling mode.

wherein said fan is a variable-speed fan, and

wherein when said thermal controller operates in the second cooling mode, the speed of said fan is gradually increased as needed to regulate thermal conditions.

23. A computer, comprising:

a microprocessor that operates in accordance with a clock, the clock having a controllable frequency;

a temperature sensor that measures a temperature;

a fan; and

a thermal controller for providing thermal management of said computer, said thermal controller has a first cooling mode and a second cooling mode, the controllable frequency of the clock is reduced to regulate thermal conditions when in the first cooling mode, and said fan is activated to regulate thermal conditions when in the second cooling mode,

wherein said fan is a variable-speed fan, and

wherein when said thermal controller operates in the second cooling mode, the speed of said fan is dependent on the temperature measured by said temperature sensor.

24. A computer system, comprising:

a microprocessor, said microprocessor operating to perform operations in accordance with a clocking frequency;

a fan;

a temperature sensor that provides a temperature indication; and

a thermal manager operatively connected to said microprocessor and said fan, said thermal manager being configured to receive the temperature indication from said temperature sensor, and said thermal manager compares the temperature indication to first and second temperature thresholds, causes the clocking frequency for said microprocessor to be reduced to provide thermal management when the temperature indication indicates that the temperature of said microprocessor exceeds the first temperature threshold, and activates said fan when the temperature indication indicates that the temperature of said microprocessor exceeds the second temperature threshold, the second temperature threshold being greater than the first temperature threshold.

25. A computer system as recited in claim 24, wherein said fan is operable in a plurality of different speeds,

wherein when the temperature indication indicates that the temperature does not exceed the second temperature threshold, said fan is not activated,

wherein when the temperature indication indicates that the temperature does exceed the second temperature threshold, said fan is activated and the speed of said fan is dependent upon the extent that the temperature of said microprocessor exceeds the second temperature threshold, and

wherein pulse width modulation is used to control the speed of said fan.

26. A computer system as recited in claim 24, wherein said thermal controller minimizes the use of said fan so as to minimize power consumption.

14

27. A computer system as recited in claim 24, wherein said fan is operable in a plurality of different speeds, and

wherein when the temperature indication indicates that the temperature of said microprocessor does not exceed the second temperature threshold, said fan is not activated.

28. A computer system as recited in claim 24, wherein said thermal manager deactivates the fan when said microprocessor enters a reduced power mode.

29. A computer system as recited in claim 24, wherein said thermal manager deactivates the fan when said microprocessor enters a sleep mode.

30. A computer system as recited in claim 24, wherein said computer system further comprises:

an activity detector operatively connected to said microprocessor, said activity detector determines an activity level of said microprocessor, and

wherein the speed of said fan is controlled based on the temperature of said microprocessor and the activity level.

31. A computer system as recited in claim 30,

wherein said thermal manager is operatively connected to said activity detector, and

wherein when said activity detector detects that the activity level is low, said thermal manager causes the clocking frequency to be substantially reduced such that said fan need not be activated.

32. A computer system as recited in claim 24, wherein said thermal controller manages the temperature of said microprocessor to advert its overheating in an energy efficient manner by avoiding the use of said fan at a first stage and instead improving thermal conditions by sacrificing some performance of said microprocessor by lowering the clocking frequency.

33. A computer system as recited in claim 32, wherein in a second stage said fan is also used to improve the thermal conditions when the lowering of the clocking frequency in the first stage is unable to stabilize the thermal conditions.

34. A computer system as recited in claim 33, wherein in the second stage a plurality of respectively greater speeds for said fan can be used to attempt to stabilize the thermal conditions.

35. A computer system as recited in claim 33, wherein in the first stage a plurality of respectively lower clocking frequencies can be used to attempt to stabilize the thermal conditions.

36. A computer system as recited in claim 35, wherein in the second stage a plurality of respectively greater speeds for said fan can be used to attempt to stabilize the thermal conditions.

37. A computer system, comprising:

a microprocessor, said microprocessor operating to perform operations in accordance with a clocking frequency;

a fan;

a temperature sensor that provides a temperature indication; and

a thermal manager operatively connected to said microprocessor and said fan, said thermal manager being configured to receive the temperature indication from said temperature sensor, and said thermal manager compares the temperature indication to first and second temperature thresholds, activates said fan when the temperature indication indicates that the temperature of

US 6,216,235 B1

15

said microprocessor exceeds the first temperature threshold, and causes the clocking frequency for said microprocessor to be reduced to provide thermal management when the temperature indication indicates that the temperature of said microprocessor exceeds the second temperature threshold, the second temperature threshold being greater than the first temperature threshold.

38. A computer system as recited in claim 37,

wherein said fan is operable in a plurality of different speeds, and

wherein when the temperature indication indicates that the temperature does not exceed the first temperature threshold, said fan is not activated.

39. A computer system as recited in claim 37, wherein said thermal manager deactivates the fan when said microprocessor enters a reduced power mode.

40. A computer system as recited in claim 37, wherein said thermal manager deactivates the fan when said microprocessor enters a sleep mode.

41. A computer system as recited in claim 37, wherein said computer system further comprises:

an activity detector operatively connected to said microprocessor, said activity detector determines an activity level of said microprocessor, and

wherein the speed of said fan is controlled based on the temperature of said microprocessor and the activity level.

42. A computer system as recited in claim 41,

wherein said thermal manager is operatively connected to said activity detector, and

wherein when said activity detector detects that the activity level is low, said thermal manager causes the clocking frequency to be substantially reduced.

43. A computer system as recited in claim 37, wherein said thermal controller manages the temperature of said microprocessor to advert its overheating in an energy efficient manner by using use of said fan at a first stage to improve thermal conditions without sacrificing performance of said microprocessor by lowering the clocking frequency.

44. A computer system as recited in claim 43, wherein in the first stage a plurality of respectively greater speeds for said fan can be used to attempt to stabilize the thermal conditions.

45. A computer system as recited in claim 43, wherein in the second stage a plurality of respectively lower clocking frequencies can be used to attempt to stabilize the thermal conditions.

46. A computing apparatus, comprising:

a processing unit, said processing unit executes instructions in accordance with a clock signal having a clock frequency;

an activity detector that monitors activity of said processing unit; and

a clock control unit operatively connected to said processing unit and said activity detector, said clock control unit operates to alter the clock frequency of the

16

clock signal in a gradual and dynamic manner based on the activity of said processing unit as monitored by said activity detector.

47. A computing apparatus as recited in claim 46, wherein said computing apparatus is a microprocessor.

48. A computing apparatus as recited in claim 46, wherein said clock control unit operates to reduce the clock frequency of the clock signal to reduce power consumption by said processing unit when the activity of said processing unit is low.

49. A computing apparatus as recited in claim 46, wherein said computing apparatus further comprises:

a thermal sensor for monitoring temperature of said processing unit.

50. A computing apparatus as recited in claim 49, wherein said clock control unit operates to alter the clock frequency of the clock signal in a gradual and dynamic manner based on the activity of said processing unit as monitored by said activity detector and the temperature of said processing unit as monitored by said thermal sensor.

51. A computing apparatus as recited in claim 49, wherein said clock control unit operates to reduce the clock frequency of the clock signal to reduce power consumption by said processing unit when the activity of said processing unit is low.

52. A computing apparatus as recited in claim 51, wherein said clock control unit further operates to alter the clock frequency of the clock signal to reduce power consumption by said processing unit when the temperature of said processing unit exceeds a threshold temperature.

53. A computing apparatus as recited in claim 49,

wherein said clock control unit operates to reduce the clock frequency of the clock signal to a lower clock frequency when the activity of said processing unit is low, thereby reducing power consumption by said processing unit when the activity of said processing unit is low,

wherein said clock control unit operates to increase the clock frequency of the clock signal to a higher clock frequency when the activity of said processing unit is high, thereby increasing processing capabilities by said processing unit, and

wherein said clock control unit further operates to alter the clock frequency of the clock signal to limit the higher clock frequency when the temperature of said processing unit exceeds a first threshold temperature.

54. A computing apparatus as recited in claim 53, wherein, when said clock control unit is limiting the higher clock frequency because the temperature of said processing unit previously exceeded the first threshold temperature, said clock control unit further operates to release the limit to the higher clock frequency of the clock signal when the temperature of said processing unit falls below a second threshold temperature, the second threshold temperature being below the first threshold temperature.

* * * * *

## PROOF OF SERVICE AND FILING BY OVERNIGHT COURIER

In Re:      BRIEF OF PLAINTIFF-APPELLANT IPVENTURE, INC.; Nos. 06-1012, -1081
Caption:    IPVENTURE, INC. v. PROSTAR COMPUTER, INC., et al.
Filed:      IN THE FEDERAL CIRCUIT COURT OF APPEALS


STATE OF CALIFORNIA            )
                               )  ss:
COUNTY OF LOS ANGELES          )

I am a citizen of the United States and a resident of or employed in the City and County of Los Angeles; I am over the age of eighteen years and not a party to the within action; my business address is: 350 South Figueroa Street, Suite 400, Los Angeles, California 90071. On this date, I served two copies of the above-entitled document on the persons interested in said action by placing sealed envelopes in the service of an overnight courier for next business day delivery, addressed as follows:


IAN N. FEINBERG, ESQ.
Mayer, Brown, Rowe & Maw LLP
Two Palo Alto Square, Suite 300
3000 El Camino Real
Palo Alto, CA 94306
(650-331-2055)
(Counsel for Prostar Computer, Inc. and
Midern Computer, Inc.)


NOTE:      Appellant files this brief pursuant to FRAP 25(a)(2)(B)(ii): "A brief or appendix is timely filed . . . if on or before the last day for filing, it is dispatched to a third-party commercial carrier for delivery to the clerk within 3 calendar days."

I certify (or declare) under penalty of perjury that the foregoing is true and correct. Service and court filing executed on March 13, 2006, at Los Angeles, California.

_E. Gonzales_                                                          E. Gonzales

Lawyers Brief Service • Appellate Brief Printers • (213) 613-1013 • (949) 720-1510

## CERTIFICATE OF COMPLIANCE

I certify that the foregoing BRIEF OF PLAINTIFF-APPELLANT

IPVENTURE, INC. contains 12,490 words as measured by the word processing

software used to prepare this brief.

Dated: March 13, 2006                    Respectfully Submitted,


                                         IRELL & MANELLA LLP
                                         Morgan Chu
                                         Richard M. Birnholz
                                         Rudy Y. Kim



By:_____
                                         Richard M. Birnholz
                                         Attorneys for Plaintiff-Appellant
                                         IPVENTURE, INC.

1463091