**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| JANSSEN BIOTECH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:17-cv-11008-MLW |
| | ) | |
| v. | ) | |
| | ) | LEAVE TO FILE UP TO 30 PAGES |
| CELLTRION HEALTHCARE CO., LTD., | ) | GRANTED ON JULY 10, 2017 |
| CELLTRION, INC., and | ) | |
| HOSPIRA, INC., | ) | **REDACTED VERSION** |
| | ) | |
| Defendants. | ) | |
| | ) | |
| | ) | |

**JANSSEN'S SURREPLY IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS FOR LACK OF STANDING**

# **TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................................................1

II.     NEW JERSEY LAW CALLS FOR INTERPRETING UNCLEAR CONTRACTUAL
        LANGUAGE ACCORDING TO EXTRINSIC EVIDENCE OF THE PARTIES'
        INTENT .................................................................................................................2

III.    THE AGREEMENTS' DEFINITION OF "COMPANY" IS AMBIGUOUS ...................3

        A.      Defendants Concede That "Any" Need Not Mean "All" .......................................4

        B.      Defendants' Attacks on Janssen's Reading of the Agreement Only Succeed in
                Proving That the Disputed Language Is Ambiguous.................................................7

        C.      Janssen's Interpretation Is Not "Contrary to the Law".........................................10

IV.     THE EXTRINSIC EVIDENCE DEMONSTRATES THAT THE '083 PATENT WAS
        INTENDED TO BE ASSIGNED TO JANSSEN.............................................................11

        A.      Defendants Fail to Respond to Much of Janssen's Extrinsic Evidence.................12

        B.      Ms. Martinson's Testimony Is Undisputed Evidence of Janssen's Intent.............13

        C.      The Inventors' Subsequent Assignment Documents Show They Intended to
                Assign the '083 Patent to Centocor/Janssen .........................................................15

        D.      Defendants Fail to Dispute Janssen's Evidence of Absurd Results......................16

        E.      The Enforcement of Non-Compete Agreements Does Not Help Defendants .......17

V.      THE J&J DISCLAIMER ELIMINATES ANY PURPORTED STANDING DEFECT...18

        A.      *Ethicon* Does Not Require the Joinder of J&J or Companies In the J&J Family
                Because They Are Not Co-Owners.......................................................................18

        B.      Controlling Case Law Holds That Disclaimers Can Eliminate Alleged Co-
                Ownership ..............................................................................................................19

        C.      Defendants' Cases Are Inapposite Because They Involved Less Than A Full
                Disclaimer Of All Patent Rights ...........................................................................21

        D.      The Disclaimer Binds J&J's Current and Former Subsidiaries and Affiliates ......23

VI.     CONCLUSION.................................................................................................................26

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Accurate Abstracts, LLC v. Havas Edge, LLC*,
   2015 U.S. Dist. LEXIS 139441 (D.N.J. Oct. 14, 2015)...........................................................25

*Acme Plastics of N.J., Inc. v. Int'l Fixtures LTD*,
   2007 U.S. Dist. LEXIS 33001 (D.N.J. May 4, 2007) ............................................................10

*Advanced Tech. Incubator, Inc. v. Sharp Corp.*,
   2009 U.S. Dist. LEXIS 69556 (E.D. Tex. July 6, 2009).........................................................21

*Agilent Techs., Inc. v. Micromuse, Inc.*,
   2004 U.S. Dist. LEXIS 20723 (S.D.N.Y. Oct. 19, 2004) .......................................................21

*Atl. N. Airlines, Inc. v. Schwimmer*,
   96 A.2d 652 (N.J. 1953)............................................................................................................2

*Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys.*,
   583 F.3d 832 (Fed. Cir. 2009)....................................................................................................2

*Booth v. U.S. Fid. & Guar. Co.*,
   130 A. 131 (N.J. 1925).............................................................................................................25

*Broadway Maint. Corp. v. Rutgers, State University*,
   447 A.2d 906 (N.J. 1982).................................................................................................10, 11

*Bross Utilities Service Corporation v. Aboubshait*,
   618 F. Supp. 1442 (S.D.N.Y. 1985)........................................................................................24

*Bushnell, Inc. v. Brunton Co.*,
   659 F. Supp. 2d 1150 (D. Kan. 2009) ...............................................................................21, 22

*City of Gloucester City v. Beazer Homes Corp.*,
   2014 N.J. Super. Unpub. LEXIS 126 (App. Div.). ..................................................................25

*Conway v. 287 Corporate Ctr. Assocs.*,
   901 A.2d 341 (N.J. 2006).....................................................................................................3, 11

*Cruz-Mendez v. Isu/Insurance Servs.*,
   722 A.2d 515 (N.J. 1999)...........................................................................................................2

*Enovsys LLC v. Nextel Commcn's, Inc.*,
    614 F.3d 1333 (Fed. Cir. 2010)........................................................................ *passim*

*Ethicon, Inc. v. United States Surgical Corporation*,
    135 F.3d 1456 (Fed. Cir. 1998)...............................................................18, 19, 21

*F. Hoffmann-La Roche Ltd v. Empagran S.A.*,
    542 U.S. 155 (2004)..............................................................................................10, 11

*First Bank & Trust v. Firstar Info. Servs. Corp.*,
    276 F.3d 317 (7th Cir. 2001) ...................................................................................4

*Frank Stamato & Co. v. Lodi*,
    71 A.2d 336 (N.J. 1950)...........................................................................................25

*Grunley Walsh U.S., LLC v. Raap*,
    2009 U.S. Dist. LEXIS 38609 (E.D. Va. May 6, 2009), *aff'd*, 386 F. App'x
    455 (4th Cir. 2010).................................................................................................24

*Invitrogen Corp. v. Emplrs. Ins. Co.*,
    2007 U.S. Dist. LEXIS 19301 (D. Ariz. Mar. 9, 2007) ..........................................24

*IpVenture, Inc. v. Prostar Computer, Inc.*,
    503 F.3d 1324 (Fed. Cir. 2007)...............................................................19, 20, 22

*Joseph Hilton & Assocs. v. Evans*,
    201 N.J. Super. 156 (App. Div. 1985), certif. den. 501 A.2d 977 (N.J. 1985) .......15

*Katrinecz v. Motorola Mobility LLC*,
    2014 U.S. Dist. LEXIS 190707 (W.D. Tex. Nov. 7, 2014) ....................................20

*Kieffer v. Best Buy*,
    14 A.3d 737 (N.J. 2011)..........................................................................................2

*Kingston Trap Tock Co. v. Eastern Eng'g Co.*,
    39 A.2d 422 (N.J. 1944).........................................................................................15

*Lewis v. Bd. of Trustees*,
    841 A. 2d 483 (N.J. App. 2004)................................................................................6

*LNT Merch. Co. v. Dyson, Inc.*,
    2009 U.S. Dist. LEXIS 62308 (D.N.J. July 21, 2009)...........................................10

*Massachusetts v. United States*,
    333 U.S. 611 (1948)...............................................................................................19

*Max Sound Corp. v. Google, Inc.*,
    147 F. Supp. 3d 948, 953 (N.D. Cal. 2015) ...........................................................24

*Minco Inc. v. Combustion Eng'g, Inc.*,
    95 F.3d 1109 (Fed. Cir. 1996) ..................................................................2

*N. Assurance Co. of Am. v. Heard*,
    755 F. Supp. 2d 295 (D. Mass. 2010) ....................................................20

*Noble v. Samsung Elecs. Am., Inc.*,
    682 F. Appx 113 (3d Cir. Mar. 3, 2017) .................................................10

*Nomadix, Inc. v. Hewlett-Packard Co.*,
    2012 U.S. Dist. LEXIS 64101 (C.D. Cal. May 7, 2012) .......................20

*Pacifico v. Pacifico*,
    920 A.2d 73 (N.J. 2007) ............................................................................2

*Paz-Alvarez v. United States*,
    2017 U.S. Dist. LEXIS 71600 (D.P.R. Apr. 25, 2017) ..........................13

*Perry v. Passarella*,
    2013 N.J. Super. Unpub LEXIS 2635 (App. Div.). .................................25

*Quantum Corporation v. Riverbed Technology, Inc.*,
    2008 U.S. Dist. LEXIS 11348 (N.D. Cal. Feb. 4, 2008) .......................23

*Royal Industries v. St. Regis Paper Co.*,
    420 F.2d 449 (9th Cir. 1969) ..................................................................24

*In re Scheyer's Estate*,
    59 N.W.2d 33 (Mich. 1953) .......................................................................5

*Simonson v. Z Cranbury Assocs. P'ship*,
    695 A.2d 222 (N.J. 1997) ...........................................................................3

*Skidgel v. Maine Dep't of Human Servs.*,
    994 F.2d 930 (1st Cir. 1993) ...................................................................14

*Speedfit LLC v. Woodway USA, Inc.*,
    226 F. Supp. 3d 149 (E.D.N.Y. 2016) ...............................................21, 22

*Stone v. Free Bridge Auto Sales, Inc.*,
    2006 U.S. App. LEXIS 14728 (4th Cir. June 15, 2006) ..........................5

*Tele-Guia Talking Yellow Pages v. Cablevision Sys. Corp.*,
    2007 U.S. Dist. LEXIS 80616 (S.D.N.Y. Oct. 31, 2007) ......................21

*Three D Dept., Inc. v. K Mart Corp.*,
    732 F. Supp. 901 (N.D. Ill. 1990) ..............................................................5

*United States v. Baxter Int'l, Inc.*,
   345 F.3d 866 (11th Cir. 2003) ................................................................6

*United States v. Genendo Pharm., N.V.*,
   485 F.3d 958 (7th Cir. 2007) ................................................................5

*United States v. Mendieta-Garza*,
   254 F. App'x 307 (5th Cir. 2007) ........................................................23

*Victory Constr. Co. v. United States*,
   510 F.2d 1379 (Ct. Cl. 1975) ..............................................................14

*VRG Corp. v. GKN Realty Corp.*,
   641 A.2d 519 (N.J. 1994)....................................................................15

*Whetstone Candy Co. v. Kraft Foods, Inc.*,
   351 F.3d 1067 (11th Cir. 2003) ..........................................................24

*Whiting v. Johns Hopkins Hosp.*,
   416 F. App'x 312 (4th Cir. 2011) ........................................................14

I.      INTRODUCTION

As their reply brief makes clear, Defendants' motion to dismiss fails in the face of three simple propositions they are powerless to dispute.  First, although Defendants barely mention the controlling legal framework, they do not deny that under applicable principles of New Jersey law, extrinsic evidence is always considered, and unclear or ambiguous contract language is interpreted according to what the evidence shows to be the intent of the parties.  Second, Defendants cannot dispute that "any" *can* mean "one or more" as Janssen contends rather than "all collectively" as Defendants contend, and that for this reason, among others, the disputed term "COMPANY" is at a minimum ambiguous.  Third, Defendants make no serious attempt to refute the extrinsic evidence showing that the parties to the employee agreements at issue here – Janssen's predecessor Centocor and the '083 patent's inventors – have always intended the '083 patent to be assigned only to Centocor/Janssen.  Indeed, Defendants cannot point to any record evidence supporting their argument that the term "COMPANY" in the patent assignment provision of the employee agreements, or in any other provision of those agreements, was intended to mean all J&J companies together at the same time.

Instead of defending their reading of the agreements based on the applicable law or the record evidence, Defendants make a series of strained interpretive and legal arguments that are ultimately self-defeating.  Although Defendants submit pages of intricate textual analysis purporting to refute Janssen's reading of the agreements, their convoluted discussion at best succeeds in demonstrating that the agreements' literal definition of "COMPANY" is hopelessly ambiguous.  Defendants' baseless contention that interpreting the meaning of "COMPANY" to depend on the context would be "contrary to the law" only highlights their own misunderstanding of Janssen's position and finds no support in the case law.  And when they finally turn to the dispositive question on this motion – the extrinsic evidence of the parties'

intent – Defendants have shockingly little to say.  Defendants do not even respond to Janssen's evidence that ***their own practices*** contradict their arguments in this motion.  Unable to point to anything in the record refuting Janssen's arguments, Defendants end up falling back, again and again, on the indefensible proposition that their reading of the agreements is unambiguously correct.  It is not, and as a result, the agreements must be interpreted according to the effectively undisputed evidence of the parties' intent.  Defendants' motion must be denied.

## II.     NEW JERSEY LAW CALLS FOR INTERPRETING UNCLEAR CONTRACTUAL LANGUAGE ACCORDING TO EXTRINSIC EVIDENCE OF THE PARTIES' INTENT

Because Defendants' reply brief wanders far afield from the relevant law, it is necessary to reiterate the basic legal principles applicable to this motion.  Under New Jersey law, which governs here,[1] the central objective of contract interpretation is to ascertain and give effect to the intent of the contracting parties.  *See Kieffer v. Best Buy*, 14 A.3d 737, 742-43 (N.J. 2011) ("The objective in . . . in construing any . . . part of a contract . . . is to determine the intent of the parties."); *Pacifico v. Pacifico*, 920 A.2d 73, 77 (N.J. 2007) ("[I]t is a basic rule of contractual interpretation that a court must discern and implement the common intention of the parties.") *Cruz-Mendez v. Isu/Insurance Servs.*, 722 A.2d 515, 522 (N.J. 1999) ("When interpreting a contract, our goal is to ascertain the intention of the parties to the contract . . .") (internal quotation marks and citation omitted); *Atl. N. Airlines, Inc. v. Schwimmer*, 96 A.2d 652, 656 (N.J. 1953) ("The polestar of construction is the intention of the parties to the contract.").

---

[1] With the exceptions of certain patent-specific questions that are not at issue, the "proper construction of the assignment agreements . . . is a matter of state contract law."  *Minco Inc. v. Combustion Eng'g, Inc.*, 95 F.3d 1109, 1117 (Fed. Cir. 1996); *accord Bd. of Trs. of the Leland Stanford Junior Univ. v. Roche Molecular Sys.*, 583 F.3d 832, 848 (Fed. Cir. 2009).  The parties agree that New Jersey law controls.  Dkt. 27-1, at 3, 6, 10, 14 (N.J. choice of law provisions); Dkt. 14 at 3 (Defendants acknowledging this point).

In order to identify the intent of the parties, New Jersey courts "always" consider extrinsic evidence, even when the language of the contract is allegedly "free from ambiguity." *Conway v. 287 Corporate Ctr. Assocs.*, 901 A.2d 341, 347 (N.J. 2006). Although the purpose of considering extrinsic evidence is not to "chang[e] the writing," it is admissible "to secure light by which to measure [the] actual significance" of the contractual language. *Id*. Accordingly, New Jersey courts do not engage in arcane textual analysis of disputed contract language without placing it in context of the parties' evident intentions. "[A] contract should not be construed literally so as to defeat the probable intention of the parties; rather, 'particular words or clauses may be qualified by the context and given the meaning that comports with the probable intention.'" *Simonson v. Z Cranbury Assocs. P'ship*, 695 A.2d 222, 224 (N.J. 1997) (quoting *West Caldwell v. Caldwell*, 138 A.2d 402 (1958)).

Despite these principles, Defendants' motion focuses almost entirely on the language of the agreements, and makes no serious attempt to engage with or refute the extrinsic evidence that Janssen and the inventors intended the '083 patent to be assigned to Janssen alone. Reply Br. (Dkt. 38) at 4-19. To be clear, as Janssen demonstrates in its opposition briefing and below, Defendants' reading of the contractual language is flatly wrong even when taken on its own terms. More fundamentally, however, Defendants' futile efforts to extract dispositive clarity from the agreements' messy language run contrary to the teachings of New Jersey law.

## III.   THE AGREEMENTS' DEFINITION OF "COMPANY" IS AMBIGUOUS

Although Janssen believes that its interpretation of the disputed contractual language is the only reasonable one, it does not deny that the agreements' literal definition of "COMPANY" is ambiguous. In contrast, Defendants' entire motion rests on the assertion that "there is no

ambiguity to resolve."  Reply Br. at 1.  Because Defendants fall far short of establishing this

untenable proposition, their motion fails.

### A.    Defendants Concede That "Any" Need Not Mean "All"

Under the employee agreements at issue, the inventors of the '083 patent assigned to the

"COMPANY" inventions "conceived or made by me . . . during my employment with the

COMPANY."  Dkt. 27-1 at JANREM0098780.  The term "COMPANY" is defined as follows:

> As used in this Agreement . . . the COMPANY means CENTOCOR and
> JOHNSON & JOHNSON and *any* of their successors or assigns, purchasers,
> acquirers, and *any* of their existing and future subsidiaries, divisions or affiliates,
> including any such subsidiary, division or affiliate of Johnson & Johnson to which
> I may be transferred or by which I may be employed in the future. Affiliates of
> the COMPANY are any corporation, entity or organization at least 50% owned by
> the COMPANY, by Johnson & Johnson or by any subsidiary of Johnson &
> Johnson.

*Id.* (emphasis added).  Janssen contends that this definition means "any" J&J company

implicated by a given provision of the agreements, and that inventions conceived or made

"during my employment with the COMPANY" are necessarily assigned to the company

employing the inventor.  Janssen Opp. (Dkt. 26) at 6-9.  Here, that is Centocor.  Defendants, on

the other hand, argue that "COMPANY" unambiguously means Centocor, J&J, and *all* of

Centocor and J&J's successors, subsidiaries, and affiliates collectively, and that as a result all

J&J patents are owned collectively by all J&J companies.  Reply Br. at 7-8

On their face, Defendants' arguments fail to show that their unreasonable reading of the

agreements is ***unambiguously*** correct.  As Janssen explained in its opposition brief (and as

Defendants do not really dispute), "'any' has a variety of meanings including: 'some,' 'one or

more,' 'an indefinite number,' 'either,' 'every,' and 'all.'"  *First Bank & Trust v. Firstar Info.*

*Servs. Corp.*, 276 F.3d 317, 325 (7th Cir. 2001).  *See* Janssen Opp. at 4-5.  In particular, Janssen

demonstrated that all major dictionaries, numerous precedents from across the country, and

Bryan Garner's Modern American Usage (3d Ed. 2009) confirm that "any" *can* mean "one or more" or an "indeterminate number" rather than "all." *Id*. As a result, Janssen contended, "Defendants' repeated assertion that term 'COMPANY' '*unambiguous[ly]*' means all of Centocor and J&J's successors and affiliates collectively is just wrong as a matter of English usage." *Id*. at 5-6 (emphasis added).

Defendants respond to this point with blatantly evasive arguments that amount to a concession. Defendants argue that "*many* courts acknowledge" that the word "any" is "*often* synonymous with 'either,' 'every,' or 'all.'" Reply Br. at 7 (quoting *In re Cendant Corp. Secs. Litig*., 569 F Supp. 2d 440, 444 (D.N.J. 2008); emphasis added here). But whatever "many" courts "often" do, this does not change the fact that "any" can *also* mean "one or more" or "an indefinite number."[2] Janssen Opp. at 4-5. Defendants go on to contend that instead of embodying the *fourth* out of the six "uses" of the word "any" described in Garner's treatise (as Janssen contends), the agreements here are more properly read to embrace Garner's *third* use, which is "every" or "all." Reply Br. at 7-8. Even if the Court were to accept Defendants'

---

[2] None of the case cited by Defendants (Reply Br. at 7 & n.2) support their position that "any" *necessarily* means "all" or does so in this case. Indeed, Defendants do not even contend that their cases are analogous to this one. In contrast, the cases concerning the word "any" cited in Janssen's opposition brief, which Defendants do not even attempt to distinguish, *are* directly on point, in that they hold that the word need not be read to mean "all" when such a reading would be unreasonable or contrary to the available evidence. Janssen Opp. at 5; *see United States v. Genendo Pharm., N.V.*, 485 F.3d 958, 963 (7th Cir. 2007) ("Genendo's argument flows from an unstated belief that the word 'any' in § 353(a) necessarily means 'all.' But that is not so."); *Stone v. Free Bridge Auto Sales, Inc.*, 2006 U.S. App. LEXIS 14728, 5-6 (4th Cir. June 15, 2006) ("Cash Price (including any accessories, services, and taxes)" did not mean "all" accessories, services, and taxes but rather "'any' of those charges that [Defendant] chooses to include within the Cash Price"); *Three D Dept., Inc. v. K Mart Corp.*, 732 F. Supp. 901, 904-905 (N.D. Ill. 1990) (holding it to be ambiguous whether a contractual clause allowing Kmart to close "any" stores covered by a contract allowed it to close all such stores); *In re Scheyer's Estate*, 59 N.W.2d 33, 35 (Mich. 1953) (holding that bequest of "[a]ny home belonging to me in which we are residing at the time of my death" meant one home, not both homes in which the decedent lived).

reading of Garner (which it should not),[3] this argument fails to refute Janssen's contention that the language in question is ambiguous and fails to support Defendants' argument that it is unambiguous.  At most, Defendants' arguments illustrate that the agreements' reference to "any" successors, subsidiaries, and affiliates of Centocor and J&J is ambiguous.

Defendants' argument that Janssen's reading is "[n]onsense" because "the word 'includes' is usually a term of enlargement, and not of limitation" is similarly self-defeating. Reply Br. at 8 (quoting *Vassiliu v. Daimler Chrysler Corp.*, 839 A.2d 863, 868 (N.J. 2004)).  If the word "including" were enlarging here, that would support Janssen's position, not Defendants', because under Defendants' maximal reading of "COMPANY," further enlargement is impossible. Furthermore, Defendants ignore the very principle that Janssen cited, *ejusdem generis,* which holds that specific examples can indeed guide the interpretation of general language.  *See, e.g., United States v. Baxter Int'l, Inc.*, 345 F.3d 866, 906 (11th Cir. 2003) (invoking *ejusdem generis* canon to narrowly interpret phrase "any . . . entity (including any physician or provider) that has received payment"); *Lewis v. Bd. of Trustees*, 841 A. 2d 483, 486 (N.J. App. 2004) (noting that "*ejusdem generis* . . . suggests that the inclusion of specific words and phrases controls or limits more general words and phrases").

---

[3] Defendants contend that the definition of "COMPANY" is an "affirmative sentence" that "does not imply discretion or selection" and therefore should be understood to fall under Garner's third "use" of "any" ("every" or "all") rather than his fourth ("one or more (unspecified things or people); whichever; whatever").  Reply Br. at 7.  If Defendants mean to suggest that any sentence that does not ***expressly*** limit the scope of the word "any" must mean "every or all," that suggestion is contradicted by Garner himself, who states that the fourth, selective use of "any" operates in sentences "***implying*** that a selection or discretionary act will follow," and gives as examples phrases that contain no express limitation.  Prior Dkt. 521-2 at 3 (emphasis added; and providing "a good buy at any price" as an example of the selective use of "any").  Once it is understood that the correct sense of "any" is a matter of implication from context, Defendants' argument evaporates and it becomes clear that the selective use is correct for all the reasons given in Janssen's opposition brief.  Janssen Opp. at 6-8.  In any event, which of multiple use of 'any' is correct in context is the very definition of an ambiguous question, which under New Jersey law is resolved according to extrinsic evidence as discussed below.

Janssen does not contend that the phrase "including any such subsidiary . . . of Johnson & Johnson to which I may be transferred or by which I may be employed in the future" (Dkt. 27-1 at JANREM0098780) limits the word "any" to something less than its literal meaning.  Rather, this phrase informs which of several possible literal readings is correct.  *See* Janssen Opp. at 6-7. If "any" J&J subsidiary meant "all" J&J subsidiaries collectively as Defendants contend, it would not make sense to specify that it includes any J&J subsidiaries that may employ the employee in the future, a category that for any given employee will be a small subset of the universe of "all" J&J's subsidiaries.  Even if Defendants' argument as to what the word "including" "usually" implies were relevant, in any event, this would hardly demonstrate that Defendants' reading of the term "COMPANY" is ***unambiguously*** correct.

### B.  Defendants' Attacks on Janssen's Reading of the Agreement Only Succeed in Proving That the Disputed Language Is Ambiguous

Defendants' remaining attacks on Janssen's interpretation of the term "COMPANY" undermine their own reading of the agreements and further demonstrate that the disputed language, read literally, is unclear and ambiguous.  For example, Defendants contend that reading "any" to mean "one or more" would not support Janssen's argument because "COMPANY" would "still include at least four members": [1] Centocor ***and*** [2] J&J ***and*** [3] "one or more" of "their successors or assigns, purchasers, acquirers" ***and*** [4] "one or more" of "their existing and future subsidiaries, divisions or affiliates."  Reply Br. at 8-9, 12.  But this argument equally defeats Defendants' collective reading of the agreement.  Because a company and its successors cannot exist at the same time, the term "COMPANY" cannot mean Centocor ***and*** J&J ***and*** "all" of "their successors or assigns, purchasers, acquirers" together; indeed, not even a single Centocor successor can exist at the same time as Centocor.  Similarly, "COMPANY" cannot mean Centocor ***and*** J&J ***and*** "all" of their "existing ***and*** future

7

subsidiaries," because not all "existing and future subsidiaries" can exist at once.[4]  Defendants'

close parsing of the agreements' definition of "COMPANY" only proves that some selectivity is

necessary for the term to make any sense at all.  And once again, even it were true that the

"COMPANY" included a minimum of "four members" as Defendants contend, this would not

mean that Defendants' reading of the agreement, under which "COMPANY" includes hundreds

of members, is correct.  To the contrary, it would only mean that the language of the agreement

is hopelessly ambiguous.

Similarly, Defendants' convoluted argument that the definition of "Affiliates" supports

their position fails to establish a lack of ambiguity.  Reply Br. at 9-11.  In its opposition brief,

Janssen made the simple point that this definition's disjunctive listing of "the COMPANY,"

"Johnson & Johnson," *or* "any subsidiary of Johnson & Johnson" contradicts Defendants'

collective reading of the agreement and renders the contractual language ambiguous.

Janssen Opp. at 7.  In response, Defendants devote pages (Reply Br. at 9-11) to arguing that their

interpretation is somehow more "simple and straightforward" because it "includes deeper J&J

family subsidiaries" and "also could" include "e.g., two J&J family entities owning 25% each."

*Id*. at 11.  But Defendants' reading of the "Affiliates" definition is anything but "simple and

straightforward," and they do not even contend that it renders the agreements unambiguous.  For

example, how does Defendants' contention that the term "COMPANY" applies to "two J&J

family entities" engaged in a joint venture square with their position the "COMPANY"

necessarily refers to "all" J&J companies collectively?

---

[4] Under Defendants' reading of the agreement, J&J patents would apparently be owned not only by the entire J&J family of companies at the time of the invention, but also by unidentifiable or even non-existent companies that may in the "future" become subsidiaries of J&J.  That is untenable.

When they finally turn to the agreements' patent assignment provisions, Defendants' arguments become, if anything, even weaker. Reply Br. at 12-14. As Janssen explained in its opposition brief, because the inventions assigned to the "COMPANY" are conceived or made "during my employment with the COMPANY," the "COMPANY" referred to in this provision must be the employer and no one else. Janssen Opp. at 8-9. Unable to explain how the phrase "during my employment with the COMPANY" can refer to companies other than the employer, Defendants assert that Janssen has "conceded" that it does. Reply Br. at 13. But Defendants' citations do not support this assertion and Janssen has conceded nothing of the kind.[5] Meanwhile, Defendants' argument that Janssen's reading would allow employees to avoid assigning inventions related to "activities of any J&J company other than their direct employer" is incorrect. Reply Br. at 13-14. The assignment provisions apply not only to inventions related to the activities of the COMPANY, but also to inventions "resulting from any task assigned to me or work performed by me for, or on behalf of" the COMPANY. Dkt. 27-1 at JANREM0098780. If an employee of one J&J company is tasked with a work assignment that puts the employee into contact with the activities of a different J&J company, any resulting inventions are still assigned to the employer.

---

[5] Janssen has always maintained that, as used in the patent assignment provision, "COMPANY" means the employer, Centocor. *See* Janssen Opp. at 8-9, *id.* at 11 ("In the patent assignment paragraph, Ms. Martinson testified, the term "COMPANY" was intended to mean the employer alone."). Defendants cite the fact that ***information*** belonging to J&J companies other than the employer can fall within the definition of CONFIDENTIAL INFORMATION, which is defined in part as "information disclosed to me or known by me as a result of my employment by the COMPANY." Reply Br. at 13 n.3. But this definition literally applies to companies that are not the employer; employees may receive information belonging to one J&J company "***as the result of***" their employment with another J&J company. That the definition of "CONFIDENTIAL INFORMATION" covers this situation does not mean that the phrase "my employment with the COMPANY," in itself, can refer to a non-employer.

9

### C.        Janssen's Interpretation Is Not "Contrary to the Law"

Recognizing that they cannot rely on a purported lack of ambiguity, Defendants argue that Janssen's reading of the agreements is "contrary to the law" because it is supposedly indefinite and contradicted by positions other J&J companies have taken in employment litigation.  Reply Br. at 4-6.  These arguments rest on the flawed premise that Janssen reads the term "COMPANY" to have "multiple meanings" at different times.  *Id*. at 5.  In fact, the term "COMPANY" has one meaning, but because it is defined to include "any" J&J company, its ***application*** depends on the context and the facts.  The principle that defined terms should have the same meaning throughout the contract (*id*. at 5, 14) does not mean that contractual terms must have the same legal consequences in every provision of the contract in which they appear and on every set of facts.  To the contrary, the application of contractual terms often depends on the way they are used in context and the facts of the case.  *See, e.g., Broadway Maint. Corp. v. Rutgers, State University*, 447 A.2d 906, 914 (N.J. 1982) ("The scope and application of [a contract] provision may depend on particular circumstances."); *cf. F. Hoffmann-La Roche Ltd v. Empagran S.A.*, 542 U.S. 155, 174 (2004) ("Linguistically speaking, a statute can apply and not apply to the same conduct, depending upon other circumstances . . . .").

Furthermore, Defendants' contention that Janssen's interpretation would render the employee agreements impermissibly vague relies on inapposite case law.  Reply Br. at 5.  As the cases cited by Defendants indicate, the vagueness doctrine addresses whether there was a sufficiently definite "meeting of minds" such that a valid contract was formed.  *LNT Merch. Co. v. Dyson, Inc*., 2009 U.S. Dist. LEXIS 62308 (D.N.J. July 21, 2009); *accord Acme Plastics of N.J., Inc. v. Int'l Fixtures LTD*, 2007 U.S. Dist. LEXIS 33001, 11-12 (D.N.J. May 4, 2007); *Noble v. Samsung Elecs. Am., Inc*., 682 F. Appx 113, 116 (3d Cir. Mar. 3, 2017).  While the

agreements here contain ambiguous language, they are not vague such that they are rendered invalid. Courts routinely interpret ambiguous language contained in contracts that, like the agreements here, are binding and represent a meeting of the minds. This interpretation, as discussed above, is governed by the parties' intent. *See supra* Part II. Here, the employee agreements in question are plainly valid contracts and Defendants do not seriously argue otherwise. Defendants' vagueness argument is therefore a red herring.

Finally, Defendants' contention that Janssen has taken "inconsistent positions" in prior employment litigations and on this motion (Reply Br. at 6; *accord id*. at 18) fails because there is no such inconsistency. *See* Janssen Opp. at 15. In this litigation and in others, Janssen has never taken the position that the term "COMPANY" applies to "all" companies in the J&J family collectively. Although we initially believed (prior to discovery) that the term "COMPANY" applied only to whichever J&J company was the employer at any particular time, it is now clear that the term applies to "any" J&J company implicated by the contractual language and the facts, and that for certain provisions other than the patent assignment provision, this can include companies other than the employer. *Id*. at 6-8, 10-12. Although Defendants contend that no case law supports this reading (Reply Br. at 6), it is in fact commonplace for the application of particular language to depend on the context and circumstances. *See, e.g., Broadway Maint. Corp.*, 447 A.2d at 914; *Hoffmann-La* Roche, 542 U.S. at 174. Defendants' entire motion rests on failing to understand (or pretending not to understand) this simple point.

## IV.   THE EXTRINSIC EVIDENCE DEMONSTRATES THAT THE '083 PATENT WAS INTENDED TO BE ASSIGNED TO JANSSEN

Because the literal definition of "COMPANY" is far from clear and unambiguous, this motion must be decided in light of the extrinsic evidence of the parties' intent. *See Conway* , 901 A.2d at 347; *supra* Part II. Indeed, although Defendants now contend that reliance on extrinsic

11

evidence would be "improper" (Reply Br. at 15, 17), the Court has recognized from the beginning that it "probably would appropriately consider extrinsic evidence on the meaning of the Epstein type contracts." 2/8/17 Tr. (Prior Dkt. 495) at 78:1-23.  Defendants themselves argued strenuously for discovery into extrinsic evidence of the parties' intent, and they obtained such discovery.  *E.g.*, Prior Dkt. 525; Prior Dkt. 526-1.  Defendants now wish to avoid the extrinsic evidence because it defeats their motion.  Their opening and reply papers are conspicuous in their failure to raise any legitimate dispute that the extrinsic evidence of the parties' intent supports only Janssen.

### A.   Defendants Fail to Respond to Much of Janssen's Extrinsic Evidence

As Janssen showed in its opposition brief, the following extrinsic evidence supports Janssen's reading of the employee agreements: (1) the testimony of Anne Osborne Martinson, who testified based on personal knowledge ████████████████████████ ███████████████████████████████████████████████ ███████████████ (Janssen Opp. at 10-12); (2) the record of Janssen's employment litigation under the agreements, which shows that J&J companies have enforced their non-compete provisions on behalf of one to three relevant companies, and never on behalf of all J&J companies collectively as Defendants contend (*id*. at 12-15); (3) the invention disclosures for the '083 patent, which show that Centocor and the inventors considered the contractual invention disclosure obligations to run to Centocor (*id.* at 16-17); (4) the face of the patent, which lists the assignee as Centocor (*id*. at 17); (5) the subsequent assignments executed by the inventors, all of whom are parties to the disputed agreements, and all of which confirm that the patent is assigned to Centocor or Janssen (*id*. at 17-18); (6) Janssen's longstanding practice of owning patents in its own right rather than collectively with other J&J companies (*id*.

at 19-20); and (7) declarations of Janssen's patent and tax specialists, as well as evidence of Defendants' own practices, confirming that it would be great folly to lodge patent ownership collectively in all J&J companies (*id*. at 20-22).

Defendants' reply to this evidence can most charitably be described as perfunctory. Reply Br. at 15-19.  Indeed, with respect to points (3), (4), and (6) listed above, Defendants have literally no response at all, simply asserting that they "addressed" this evidence in their opening brief.  *Id*. at 16.  But Janssen's opposition papers explained in detail why Defendants' opening brief failed to refute the probative value of Janssen's extrinsic evidence.  *E.g*., Janssen Opp. at 17-20.  By failing to reply to these arguments, Defendants have forfeited their ability to dispute Janssen's points.  *See, e.g., Paz-Alvarez v. United States*, 2017 U.S. Dist. LEXIS 71600, at *7-8 (D.P.R. Apr. 25, 2017) (failure to respond to argument in reply brief can be deemed a waiver).

### B.    Ms. Martinson's Testimony Is Undisputed Evidence of Janssen's Intent

When Defendants do respond to Janssen's extrinsic evidence, they have very little to say. Perhaps most surprisingly, Defendants barely address the testimony of the J&J 30(b)(6) witness, Ms. Martinson, which they went to Court to obtain.  Prior Dkt. 525.  As Janssen explained in its opposition brief (Janssen Opp. at 10-12), Ms. Martinson testified ███████████████

██████████████████████████████████████████████

████████████████████████████████████

███████  Dkt. 26-1 at 182:5-12.  Ms. Martinson's testimony is thus direct evidence that the intent behind the agreements was to assign patents to the inventors' employer.  As discussed above, that intent is decisive under New Jersey law.  *Supra* Part II.

Despite its obvious materiality and its prominent place in Janssen's opposition papers, Defendants' discussion of Ms. Martinson's testimony is just two sentences long.  Reply Br. at

13

15.   Defendants begin by mischaracterizing her words as "spin" from "Janssen," misleadingly citing to Janssen's brief as if the words were attorney argument rather than direct quotations from Ms. Martinson's sworn testimony.  *Id*.  Defendants then contend that Ms. Martinson's revisions amount to a "concession that the original language did not assign inventions to the employer alone." *Id*.  The record directly contradicts this argument.  Not only did Ms. Martinson

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████  Dkt. 27-9 (Dow Decl. Ex. I).

Despite Defendants' factually and legally unsupported assertion to the contrary, revisions to clarify prior meaning are commonplace both in statutes and in contracts.  *See, e.g.*, Fed. R. Evid. 501, Advisory Committee Note re 2011 Amendments (changes to Rule 501 "intended to be stylistic only" with "no intent to change any result"); Fed. R. Civ. P. 37, Advisory Committee Note re 1987 Amendment ("The amendments are technical.  No substantive change is intended."); *Skidgel v. Maine Dep't of Human Servs.*, 994 F.2d 930, 939 (1st Cir. 1993) (finding that Congress's labeling of a statutory amendment as a "technical correction" meant that Congress did not mean to make any substantive changes); *Whiting v. Johns Hopkins Hosp*., 416 F. App'x 312, 315 n.* (4th Cir. 2011) (rejecting argument that revisions to a regulation "in the interest of clarity" implied that the previous version meant something different; *Victory Constr. Co. v. United States*, 510 F.2d 1379, 1386 (Ct. Cl. 1975) ("[T]he language of the 1968 revision is accepted as a clarification of the meaning intended by the predecessor provision . . . .").  There can be no legitimate dispute as to the truth of Ms. Martinson's testimony that ████████

████████████████████████████████████████████████████████████████

██████████████████

14

### C.   The Inventors' Subsequent Assignment Documents Show They Intended to Assign the '083 Patent to Centocor/Janssen

Defendants' reply to the evidence that the inventors of the '083 patent executed subsequent documents assigning rights in the invention to Centocor or Janssen is similarly weak. Reply Br. at 16.   Defendants contend that the subsequent agreements "bear no apparent connection to the form employment agreements or the drafter of them, and thus do not reflect what he or she intended."  *Id.*   In fact, the subsequent assignments are closely connected to the employee agreements, because those agreements required the inventors to execute further "applications, assignments, or other instruments which the COMPANY shall consider necessary" to secure and enforce patent rights.  Dkt. 27-1 at JANREM0098780.   Furthermore, as Defendants themselves have previously acknowledged, probative extrinsic evidence is not limited to drafting history, but also encompasses how the parties have interpreted a contract in practice after it is executed.  *See* Dkt. 14 at 6 ("[P]roper evidence for consideration includes 'custom, usage, ***and the interpretation placed on the disputed provision by the parties' conduct.***'") (quoting *Kahanovitz v. Electro-Biology, Inc.*, 2011 N.J. Super. Unpub. LEXIS 190, at *25 (App. Div. Jan. 27, 2011)) (emphasis added); *accord VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 523 (N.J. 1994).[6]  The subsequent assignments, including those executed long before litigation commenced, demonstrate that the inventors understood their assignment obligations to run to Centocor/Janssen.

---

[6] *See also Kingston Trap Tock Co. v. Eastern Eng'g Co.*, 39 A.2d 422, 425 (N.J. 1944) ("There is no surer way to ascertain the intention of the parties to a contract than to ascertain the meaning which parties by their conduct gave to the contract, and then construe it accordingly.") (internal quotation marks and citation omitted); *Joseph Hilton & Assocs. v. Evans*, 201 N.J. Super. 156, 171 (App. Div. 1985), certif. den. 501 A.2d 977 (N.J. 1985) ("[T]he conduct of the parties after execution of the contract is entitled to great weight in determining its meaning.").

15

### D.        Defendants Fail to Dispute Janssen's Evidence of Absurd Results

In response to Janssen's evidence that assigning patents jointly to all J&J companies would be unreasonable and absurd, Defendants fail to identify any record evidence that actually disputes Janssen's argument.  Reply Br. at 16-17.  Notably, Defendants declined to submit a contrary declaration or even to depose Katherine Amos, a J&J tax executive, who submitted a declaration addressing the untenable tax consequences of collective patent ownership.  Dkt. 28; *see* Janssen Opp. at 20-21.  This is undoubtedly because Ms. Amos's declaration is manifestly true, notwithstanding Defendants' irrelevant attorney arguments to the contrary.[7]  If Defendants actually disagreed with Ms. Amos's points, they could have submitted evidence saying so.  Their failure to do leaves her declaration undisputed.

The fact is that Defendants, notwithstanding their briefing on this motion, know that it would be unreasonable to assign patent ownership jointly to every subsidiary of a multinational company.  That is why in the real world, Defendant Hospira, Inc., and its parent Pfizer, Inc., interpret similarly worded employee agreements exactly the way Janssen interprets the employee agreements here.  *Id.* at 21-22.  It is also why, as pointed out in an article cited in Janssen's opposition brief and not disputed by Defendants, Pfizer has saved billions of dollars in U.S. taxes by (lawfully) having "an Irish subsidiary . . . buy the rights to patents developed in the United States and then use them to make drugs which are sold back to U.S. affiliates."[8]  Janssen Opp. at 21-22.  Transactions such as those would be impossible if patent ownership were not carefully allocated to specific subsidiaries.  Remarkably, despite repeatedly (and wrongly) accusing

---

[7] Defendants point out that each co-owner of a patent may use the invention (Reply Br. at 16-17), but this does not change the fact that each J&J company would be required to account to international tax authorities for the value of its intellectual property.  *See* Amos Decl. ¶ 20.

[8] Reuters, "How Pfizer has shifted U.S. profits overseas for years," available at http://www.reuters.com/article/us-pfizer-tax-insight-idUSKCN0T51ZS20151116

Janssen of making arguments that are inconsistent with its own practices, Defendants do not even respond to Janssen's pointed evidence of their own inconsistent conduct.

### E.   The Enforcement of Non-Compete Agreements Does Not Help Defendants

Finally, Defendants fail to explain how evidence of other J&J companies' enforcement of non-compete agreements supports their reading of the employee agreements.  Reply Br. at 18-19.  As the extrinsic record shows, J&J companies usually enforce non-competes on behalf of the employer alone, but occasionally do so on behalf of two or three J&J companies when an employee had access to more than one company's confidential information.  Janssen Opp. at 12-15.  This supports Janssen's position that the term "COMPANY" means "one or more" J&J company, and does nothing to support Defendants' argument that it means "all" J&J companies collectively.

Other than casting baseless aspersions,[9] all Defendants can say in response is that there is "no requirement for every party with enforcement rights to participate in an employment or trade secret litigation."  Reply Br. at 18-19.  But the most this shows is that the non-compete evidence does not, in itself, decisively ***disprove*** Defendants' interpretation.  It does not show that the evidence affirmatively supports Defendants' interpretation or contradicts Janssen's.  To the contrary, the fact that the non-compete provisions have typically been enforced only by a single J&J company and have never once been enforced by more than three companies is far more consistent with Janssen's position than with Defendants'.  As discussed above, the extrinsic evidence as a whole decisively establishes that Janssen's interpretation of the agreements is correct, and that the '083 patent has been assigned to Janssen alone.

---

[9] Defendants' contention that the "bulk" of Janssen's extrinsic evidence is "[]tainted by Janssen's motivation in this case" is demonstrably wrong.  Reply Br. at 18.  To the contrary, very little of the extrinsic evidence listed above dates to the time period of this litigation.  *See supra* Parts IV(A)-(D).

## V.   THE J&J DISCLAIMER ELIMINATES ANY PURPORTED STANDING DEFECT

Because the employee agreements assign the '083 patent to Janssen alone, Defendants' motion should be denied without reaching the question whether J&J's March 2017 disclaimer of ownership cures any purported standing defect arising from the agreements.  But under controlling law, it would.

### A.   *Ethicon* Does Not Require the Joinder of J&J or Companies In the J&J Family Because They Are Not Co-Owners

Defendants argue that the J&J disclaimer does not eliminate Janssen's purported standing problem because under *Ethicon, Inc. v. United States Surgical Corporation*, 135 F.3d 1456, 1467 (Fed. Cir. 1998), all co-owners must be joined as plaintiffs.  Reply Br. at 19-20.  This argument assumes its own conclusion that the disclaimer is ineffective, and that conclusion is wrong.  The whole point of the J&J disclaimer is even if J&J and its subsidiaries were owners before – which J&J emphatically denies – they are ***no longer*** co-owners as the result of the disclaimer.  Because the disclaimer was executed in March 2017, before this lawsuit was filed, Janssen would be the only remaining owner at the time this lawsuit was filed even if the Court were somehow to find that the J&J family of companies had previously been co-owners.

Giving effect to the J&J disclaimer is perfectly consistent with the rule stated by the Federal Circuit in *Ethicon*.  The *Ethicon* rule is that "an action for infringement must join as plaintiffs all co-owners." *Ethicon, Inc.* 135 F.3d at 1467.  Contrary to Defendants' argument, Janssen does not ask this Court to "hold the opposite" and find that "standing does not require all co-owners' participation."  Reply Br. at 20.  Rather, the J&J disclaimer means that J&J is not a co-owner, and as a result, the failure to join J&J does not present a standing problem under *Ethicon* or the succeeding line of cases.  *See, e.g., Enovsys LLC v. Nextel Commcn's, Inc.*, 614

F.3d 1333, 1341 (Fed. Cir. 2010) ("***When a patent is co-owned***, a joint owner must join all other

co-owners to establish standing.") (emphasis added).

> **B.      Controlling Case Law Holds That Disclaimers Can Eliminate Alleged Co-Ownership**

As Janssen showed in its opening brief, two Federal Circuit cases – both decided since

*Ethicon* – as well as multiple district court cases hold that a third party who is alleged to be a

patent co-owner can clarify that it is not a co-owner by disclaiming an ownership interest in the

patent.  Janssen Opp. at 23-26; *see IpVenture, Inc. v. Prostar Computer, Inc.*, 503 F.3d 1324,

1327 (Fed. Cir. 2007); *Enovsys LLC v. Nextel Commc'ns., Inc.*, 614 F.3d 1333 (Fed. Cir. 2010).

Defendants' attempt to distinguish these cases on the ground that they "[found] that there was no

co-owner of the disputed patent" (Reply Br. at 20-22) makes no sense.  The cases cited by

Janssen found there was no co-owner of the disputed patent precisely because the alleged co-

owner had *disclaimed ownership*.  That is exactly the situation with J&J: it is not a co-owner of

the '083 patent because it has disclaimed ownership of the patent.

Defendants' efforts to distinguish Janssen's case law fail.  As is familiar to this Court, in

*IpVenture* the Federal Circuit held that Hewlett-Packard's disclaimer of ownership was

"effective in accordance with its terms" and that dismissal for lack of standing "was in error"

because HP "had disclaimed any interest" in the patent.  503 F.3d at 1325.  Although Defendants

continue to assert that the Federal Circuit's discussion of the disclaimer was "dicta," Reply Br. at

20, Janssen has already demonstrated that this is not the case.  Janssen Opp. at 24; *IpVenture*,

503 F.3d at 1325 ("We conclude that the dismissal was in error, for Hewlett-Packard had no

assignment of an interest in the patent, ***and had disclaimed any interest therein***.") (emphasis

added); see *Massachusetts v. United States*, 333 U.S. 611, 623 (1948) (where a case has "been

decided on either of two independent grounds" and "rested as much upon the one determination

19

as the other," the "adjudication is effective for both"); *N. Assurance Co. of Am. v. Heard*, 755 F.

Supp. 2d 295, 300 (D. Mass. 2010) ("[A]lternative holdings are not dicta.").  The Federal Circuit

did not hold that HP lacked rights under the employment agreement at issue and then

gratuitously speculate about the relevance of the disclaimer; rather, it held that the disclaimer

was "effective in accordance with its terms."  Furthermore, even if the underlying contract failed

to grant ownership rights to HP, that hardly distinguishes *IpVenture* from this one.  *See supra*

Part III.

 *Enovsys* is also indistinguishable – indeed, it is an *a fortiori* case.  Unlike here, where

Janssen and J&J dispute that J&J ever had an ownership interest in the patent, in *Enovsys* it was

undisputed that the unjoined third party had once been a co-owner.  614 F.3d at 1337.  Unlike the

J&J disclaimer, moreover – which expressly disclaims ownership in the '083 patent – the

disclaimer in *Enovsys* was general and did not specifically mention the patent.  *See id.* at 1342

(declaring that "we have no community assets or liabilities").  Nevertheless, the Federal Circuit

held that this general disclaimer was sufficient to eliminate an ownership interest that all parties

admitted had once existed.[10]  If the disclaimer in *Enovsys* was sufficient to eliminate co-

ownership, the J&J disclaimer, which is far more specific and no less legally binding, is similarly

sufficient to divest any alleged J&J ownership in the '083 patent.[11]

---

[10] That the disclaimer in *Enovsys* was memorialized in a state court divorce judgment and was given *res judicata* effect reinforces that disclaimers are recognized by courts and are legally effective to determine property rights.  *See also Katrinecz v. Motorola Mobility LLC*, 2014 U.S. Dist. LEXIS 190707, at *9-10 (W.D. Tex. Nov. 7, 2014) (recognizing that the disclaimer was incorporated into a final judgment of divorce and given *res judicata* effect).

[11] *Nomadix* and *Advanced Technology* are also on point and not "inapposite" as Defendants contend.  Reply Br. at 21.  In *Nomadix*, the court found that a third party did "not hold 'present legal title' to the patents."  *Nomadix, Inc. v. Hewlett-Packard Co.*, 2012 U.S. Dist. LEXIS 64101, at *10-11 (C.D. Cal. May 7, 2012).  This was "[d]ispositive as to standing," just as J&J's lack of ownership over the '083 patent is dispositive as to standing.  *Id.*  A disclaimer agreement executed by the third party supported the conclusion that the third party was not a co-owner of the patent.  *See id.* at *11-12.  In *Advanced Technology*, in determining that a third party need not be joined, the court credited an agreement, similar

Defendants' only rejoinder to *Enovsys* (and Janssen's other cases)[12] is that "there was no co-owner, so the Court never reached the *Ethicon* rule."  Reply Br. at 22; *see also id.* at 20, 21. But as discussed above, whether or not disclaimers eliminate co-ownership is precisely the question at hand.  On that question, Defendants have no answer at all.  A simple, clearly-established principle resolves this portion of Defendants' motion:  a company that has disclaimed ownership is no longer a co-owner whose joinder is needed to create standing.

### C.     Defendants' Cases Are Inapposite Because They Involved Less Than A Full Disclaimer Of All Patent Rights

In its opposition, Janssen showed that the cases relied on in Defendants' opening brief were inapposite.  Janssen Opp. at 26-28.  In reply, Defendants fail to defend the relevance of most of their cases and instead limit their discussion to two district court cases,  *Bushnell, Inc. v. Brunton Co.*, 659 F. Supp. 2d 1150, 1162 (D. Kan. 2009)  and *Speedfit LLC v. Woodway USA, Inc.*, 226 F. Supp. 3d 149, 156-57 (E.D.N.Y. 2016).   Reply Br. at 25-27.  But these cases show only that a ***partial*** disclaimer of rights does not eliminate the need to add a co-owner as a

---

to the J&J disclaimer, that disclaimed all ownership rights.  *Advanced Tech. Incubator, Inc. v. Sharp Corp.*, 2009 U.S. Dist. LEXIS 69556, at *7, 29 (E.D. Tex. July 6, 2009) ("ATI I"), *report and rec. adopted as modified*, 2009 U.S. Dist. LEXIS 69736 (E.D. Tex. Aug. 10, 2009) ("ATI II").  The third party agreed that it "has no ownership interest in" the patent; "has no right to enforce the" patent; and that the plaintiff, not the third party, is the "owner of the" patent.  *Id.* at *7-8.  Because the unjoined third party "disclaimed any ownership interest whatsoever in the patents at issue," any prudential standing defect was cured. Id. at *7, *28.  The secondary issue of the timing of the disclaimer—specifically, whether a plaintiff can "cure prudential standing defects post-filing"—is not at issue here, because the J&J disclaimer was executed *before* the complaint was filed in this matter.  *ATI I*, 2009 U.S. Dist. LEXIS 69556, at *29-31.  The Federal Circuit's subsequent decision regarding nunc pro tunc assignments does not overrule the primary holding in *ATI* regarding the substantive sufficiency of the disclaimer.  Reply Br. at 24-25 (citing *Alps S., LLC v. Ohio Willow Wood Co.*, 787 F.3d 1379, 1384 (Fed Cir. 2015)).

[12] *Tele-Guia* and *Agilent* are cases primarily about Rule 19, but they also affirm the rule that is dispositive in this case:  that a party who is not a co-owner at the time a patent infringement suit is brought need not be joined.  *See Tele-Guia Talking Yellow Pages v. Cablevision Sys. Corp.*, 2007 U.S. Dist. LEXIS 80616, at *9 (S.D.N.Y. Oct. 31, 2007) ("CSC has not shown that . . . Rodriguez is a necessary party.  There is no evidence that Rodriguez is a current owner of either patent . . . .");  *Agilent Techs., Inc. v. Micromuse, Inc.*, 2004 U.S. Dist. LEXIS 20723, at *19 (S.D.N.Y. Oct. 19, 2004) ("United States patent law requires that all co-owners normally must join as plaintiffs in an infringement suit") (internal alterations and citation omitted).

plaintiff.  They do not address the question of a complete disclaimer of ownership, which is the situation here, and which is governed by Federal Circuit case law.  *See supra* Part V(B).

In *Bushnell*, a third party refused to participate in a patent infringement action.  659 F. Supp. 2d at 1162.  Unlike here, there was ***no dispute*** that the unjoined party was a co-owner of the patent.  *See id.* at 1163 ("[P]laintiffs do not claim that individually or together they hold 'all substantial rights'" to the patent).  Instead, the plaintiffs argued that the court should create an exception to the rule that all co-owners must join an infringement suit "where a co-owner waives the right to participate in a given infringement suit, agrees to be bound by the judgment and agrees not to license the patents to the alleged infringers."  *Id.* at 1163.  The court rejected this argument because the unjoined co-owner had not fully disclaimed its ownership interest in the patent:

> Here, except for the right to participate in this litigation, Kama-Tech has retained virtually all of its rights under the patent.  It still has the right to make, use and vend the inventions of the LTI patents, to exclude everyone except the parties in this case from practicing the LTI patents and (except in the 'field of use' in which Bushnell is exclusively licensed) to license anyone except Defendants to practice the patents.

*Id.* at 1164.  Similarly, in *Speedfit LLC v. Woodway USA, Inc.*, 226 F. Supp. 3d 149, 156-57 (E.D.N.Y. 2016), an ambiguous statement regarding a co-owner's intent to waive its right to refuse to join a lawsuit was insufficient to remove requirement that he be joined.  In contrast to the partial disclaimer of rights at issue in *Bushnell* and *Speedfit*, J&J has clearly and unequivocally disclaimed any rights in the '083 patent.  That situation is not governed by *Bushnell* and *Speedfit*, but rather by *IpVenture* and *Enovsys*, which as discussed above hold that such disclaimers eliminate co-ownership.

### D.     The Disclaimer Binds J&J's Current and Former Subsidiaries and Affiliates

In its opposition brief, Janssen showed that courts frequently credit releases of rights that parent companies make on behalf of themselves, their subsidiaries, and their affiliates. Janssen Opp. at 28-29.  Defendants do not dispute this point and counter only that Janssen has not cited a case on the narrow issue of a parent disclaiming "all of its subsidiaries' patent ownership interests."  Reply Br. at 27.  But the absence of a case – in either direction – on this issue is unremarkable; it is presumably because few, if any, defendants have ever asserted that an employment agreement clause assigned a patent simultaneously to a parent and more than 200 subsidiaries.  Though not identical, the release cases are analogous.  *Cf. United States v. Mendieta-Garza*, 254 F. App'x 307, 313 (5th Cir. 2007) ("Though we have been unable to locate any cases with nearly identical facts to this case, our precedent . . . provides some guidance."). Contrary to Defendants' contention, moreover, there is no inconsistency between this body of law and the fact that J&J does not directly control the operations of its subsidiaries.  Reply Br. at 27.  Parents generally do not exercise direct control over their subsidiaries, but they are still capable of releasing rights on behalf of themselves and their subsidiaries.

By contrast, the cases relied on by Defendants are inapposite.  In *Quantum Corporation v. Riverbed Technology, Inc.*, 2008 U.S. Dist. LEXIS 11348 (N.D. Cal. Feb. 4, 2008), the court held that a parent's purported transfer of patent rights from a subsidiary to the plaintiff did not satisfactorily grant ownership rights to the plaintiff.  *Id.* at *5.  But here, the J&J disclaimer does not purport to transfer or assign rights to any entity; rather the J&J disclaimer simply relinquishes rights, as is done in a release.  Unlike in *Quantum*, moreover, where the patent was owned by the subsidiary independently and the parent had no direct ownership interest in it, here any supposed rights enjoyed by J&J's subsidiaries derive from a ***J&J form contract*** that was

never signed by any subsidiary or affiliate and that purportedly nonetheless assigns rights to all of J&J's subsidiaries and affiliates collectively.  Under these facts, there is no reason that J&J cannot disclaim rights on behalf of its subsidiaries.  *See, e.g., Grunley Walsh U.S., LLC v. Raap*, 2009 U.S. Dist. LEXIS 38609, at *22-25 (E.D. Va. May 6, 2009), *aff'd*, 386 F. App'x 455, 462 (4th Cir. 2010) (company formed by "seller" bound by agreement in which "seller" agreed to release "buyer" "on behalf of itself and each of its . . . affiliates, successors and assigns"); *Invitrogen Corp. v. Emplrs. Ins. Co.*, 2007 U.S. Dist. LEXIS 19301, at *20-25 (D. Ariz. Mar. 9, 2007) (subsidiary bound by agreement promising that a company "and its present or former agents, officers, directors, shareholders, employees, and subsidiaries" agreed not to commence legal proceedings).

Defendants' other cases show only that a parent does not bind a subsidiary without express language evincing the intent to do so in the operative text of an agreement.  In *Royal Industries v. St. Regis Paper Co.*, 420 F.2d 449 (9th Cir. 1969), the court did not reach the issue whether a parent, by express language, could bind its subsidiary because the subsidiary was not mentioned in the letter terminating the license.  *Id.* at 451; *see also Max Sound Corp. v. Google, Inc.*, 147 F. Supp. 3d 948, 953 (N.D. Cal. 2015) (assignment did not purport to assign subsidiary's rights); *Whetstone Candy Co. v. Kraft Foods, Inc.*, 351 F.3d 1067, 1074 (11th Cir. 2003) (statement about subsidiaries not binding because it was contained in a prefatory "whereas" clause).  And in *Bross Utilities Service Corporation v. Aboubshait*, 618 F. Supp. 1442, 1445 (S.D.N.Y. 1985), the court held that plaintiff could not assert a claim for breach of an agreement to which plaintiff's subsidiary – but not plaintiff – was a party.  The agreement "refer[red] only to" the subsidiary, not to the plaintiff.  *Id.* at 1444.  The J&J disclaimer, in contrast, refers to J&J's "successors, assigns, purchasers and acquirers and existing and future

24

subsidiaries, divisions, and affiliates." Dkt. 26-5. Indeed, the J&J disclaimer closely tracks the language of the agreements in question. Defendants' cases are therefore inapposite.

As for J&J's former subsidiaries, Defendants' argument that they have ownership interests in the '083 patent only underscores the absurdity of their interpretation of the employee agreements. *See supra* Part IV(D). It would be sheer insanity for a large multinational company such as J&J to structure its intellectual property in such a way that, whenever it divested itself of ***one*** subsidiary, it would be relinquishing rights in ***all*** patents invented by ***every other*** subsidiary. The unreasonableness of Defendants' position is brought into vivid focus by Appendix B to their reply brief, where they list five companies that have been divested from the J&J family and that, according to Defendants' interpretation of the employment agreements, are co-owners of the '083 patent. Dkt. 38-1. These companies have no connection to the inventors, no connection to Centocor or Janssen, no conceivable use for or interest in the invention, and would derive no legitimate benefit from owning the '083 patent. One of them, for example, is Tasmanian Alkaloids Pty. Ltd., a Tasmania, Australia based opium-poppy processing business. Dkt. 38-6 at 6. It is hard to imagine a better example of an absurd result than the notion that Tasmanian Alkaloids Pty. Ltd. is an owner of the '083 patent (as well as, potentially, thousands of other J&J patents). *See, e.g., Accurate Abstracts, LLC v. Havas Edge, LLC*, 2015 U.S. Dist. LEXIS 139441, at *10 n.4 (D.N.J. Oct. 14, 2015) (rejecting interpretation that would "lead to absurd results under the circumstances").[13]

---

[13] *See also City of Gloucester City v. Beazer Homes Corp.*, 2014 N.J. Super. Unpub. LEXIS 126, at *13 (App. Div. Jan. 23, 2014) (rejecting a literal reading of contract because it "would be an absurd result and contracts will not generally be read in that manner"); *Perry v. Passarella*, 2013 N.J. Super. Unpub. LEXIS 2635, at *9 (App. Div. Oct. 30, 2013) ("This interpretation is unreasonable because it logically leads to an undesirable and unintended consequence."); *Frank Stamato & Co. v. Lodi*, 71 A.2d 336, 340 (N.J. 1950) (rejecting a reading of a contract because it "would produce [an] absurd result"); *Booth v. U.S. Fid. & Guar. Co.*, 130 A. 131, 132 (N.J. 1925) (same).

In any event, the former subsidiaries should not be permitted to retain rights in the face of

the J&J disclaimer.  After all, the former subsidiaries are hardly in the position to argue that they

own the patent by virtue of a J&J-drafted agreement that they never executed or even knew was

being executed and that J&J itself has expressly disclaimed.  Ultimately, however, the correct

answer is that neither the former subsidiaries – nor any company besides Centocor/Janssen – has

ever owned the '083 patent.

## VI.    CONCLUSION

For the above reasons, Defendants' motion should be denied.

Respectfully Submitted,

Dated: September 8, 2017

*Of Counsel*                                                      /s/ Alison C. Casey_____
Gregory L. Diskant (admitted *pro hac vice*)      Heather B. Repicky (BBO # 663347)
gldiskant@pbwt.com                                     hrepicky@nutter.com
Aron Fischer (admitted *pro hac vice*)              Alison C. Casey (BBO #688253)
afischer@pbwt.com                                      acasey@nutter.com
Daniel A. Friedman (admitted *pro hac vice*)     NUTTER MCCLENNEN & FISH LLP
dfriedman@pbwt.com                                   Seaport West
PATTERSON BELKNAP WEBB & TYLER LLP      155 Seaport Boulevard
1133 Avenue of the Americas                          Boston, MA 02210
New York, NY 10036-6710                              617-439-2000
212-336-2000                                              FAX: 617-310-9192
FAX: 212-336-2222

*Attorneys for Plaintiff Janssen Biotech, Inc.*

## **CERTIFICATE OF SERVICE**

I certify that on September 8, 2017, this document, filed through the ECF system, will be sent electronically to the parties or their counsel who are registered participants as identified on the Notice of Electronic Filing and if not so registered, that copies will be electronically mailed to such parties or their counsel.

*/s/ Alison C. Casey*