**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JANSSEN BIOTECH, INC., | |
| Plaintiff, | Civil Action No. l:17-cv-11008-MLW |
| v. | Filed pursuant to Court Order entered during proceedings held on October 12, 2017 |
| CELLTRION HEALTHCARE CO., LTD., CELLTRION, INC., and HOSPIRA, INC., | **CONFIDENTIAL - FILED UNDER SEAL** |
| Defendants. | |

**DEFENDANTS' SUPPLEMENTAL BRIEF RELATED TO JUDICIAL ESTOPPEL
IN SUPPORT OF THEIR MOTION TO DISMISS FOR LACK OF STANDING**

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

I.    **Judicial Estoppel Requires Neither Defendants' Nor Janssen's Participation In The Earlier Proceedings** ................................................................................ **2**

    A.    Judicial Estoppel Requires Only Two Conditions ................................................. 2

    B.    Judicial Estoppel Does Not Require Defendants' Participation in the Earlier Proceedings ................................................................................ 3

    C.    Janssen Is Bound by the Positions Adopted in Earlier Litigations by its Parent and Sister Companies ................................................................................ 5

II.    **The Conditions For Judicial Estoppel Are Satisfied Here** ........................................... **10**

    A.    Clear Inconsistency ................................................................................ 10

    B.    Success In Persuading A Court to Adopt the Prior Inconsistent Position ............ 25

III.    **The Optional Factor Of Unfair Advantage Also Is Satisfied** ...................................... **26**

Judicial estoppel precludes Janssen from taking positons in this Court that are directly contrary to positions other J&J companies (in some cases represented by the same lawyers) took in earlier cases in other courts. This is precisely what judicial estoppel is designed to prevent.

Under the majority rule followed by the First Circuit, it is irrelevant that Celltrion and Hospira were not parties in the earlier cases. While equitable estoppel focuses on the relationship between the parties to the earlier litigation, judicial estoppel does not—it focuses instead on "protect[ing] the integrity of the courts." *Patriot Cinemas*, *Inc. v. Gen. Cinemas Corp.*, 834 F.2d 208, 214 (1st Cir. 1987). Regardless of identity of the other parties, judicial estoppel precludes a litigant from "playing fast and loose" with the courts, because "[a]n effective legal system depends upon norms of candor and responsibility," and "[i]f parties feel free to select contradictory positions before different tribunals to suit their ends, the integrity and efficacy of the courts will suffer." *Id.* at 213-14. "The essential function of judicial estoppel is to prevent intentional inconsistency," and its object "is to protect the judiciary, as an institution, from the perversion of judicial machinery." *Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598–99 (6th Cir. 1982).

There's no question Janssen's positions before Your Honor directly contradict earlier positions taken before different judges. Here, Janssen initially told this Court that "'COMPANY' *cannot* include J&J and its subsidiaries" and "can *only* mean Centocor," which Janssen claims employed the inventors. No. 15-10698, Dkt. 445 at 5.[1] Janssen later shifted to saying "COMPANY" *could be* expanded beyond the specific employer on a case-by-case basis "as applicable," but only through a fact-based inquiry about which entities gave the employee "confidential information," such as when an employee obtained "confidential information" from "a project team from another company." Dkt. 26 at 6; Dkt. 15 Ex. 2 (Martinson Tr.) at 179:16–21.

---

[1] All emphasis inside quotations is added unless otherwise noted.

But Janssen's parent and sister companies previously took directly contrary positons. They told other courts that "COMPANY" *automatically* includes J&J and other non-employers simply based on the plain language of the term's definition. In one successful case, for example, one group of J&J companies asserted that the agreement is "enforceable by" a non-employer company, without ever offering any justification beyond stating that "[t]he term 'Company' is defined to include *not only* [employer] DePuy Spine *but also* [non-employer] 'JOHNSON & JOHNSON and any of their successors or assigns, purchasers, acquirers, and any of their existing and future subsidiaries, divisions or affiliates.'" Dkt. 15 Ex. 5 at -0113344; Dkt. 15 Ex. 4 at 7. In a separate successful case, another group argued that ████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████ Dkt. 15 Ex. 6 at -0115569.

The interpretation J&J adopted in previous litigations is the one Defendants advocate here. That is the only interpretation offered by either party that is true to the words of the agreement and that does not require a rewrite of the contract language. Janssen—and ultimately J&J—is playing fast and loose, seeking to use a broad definition of "COMPANY" to prevail in some cases and a narrow definition of "COMPANY" to avoid dismissal here. This Court has the ability to prevent such conduct, in the interest of protecting the integrity of the courts, and should do so.

## I.   Judicial Estoppel Requires Neither Defendants' Nor Janssen's Participation In The Earlier Proceedings

### A.   Judicial Estoppel Requires Only Two Conditions

"There are two generally agreed-upon conditions for the application of judicial estoppel." *Guay v. Burack*, 677 F.3d 10, 16–17 (1st Cir. 2012).[2] "First, the estopping position and the

---

[2] In cases reviewed by the Federal Circuit, like this one, the question of "[w]hether judicial estoppel applies is a matter of regional circuit law." *Minnesota Min. & Mfg. Co. v. Chemque, Inc.*, 303 F.3d 1294, 1302–03 (Fed. Cir. 2002).

estopped position must be directly inconsistent, that is, mutually exclusive." *Alt. Sys. Concepts, Inc. v. Synopsys, Inc.,* 374 F.3d 23, 33 (1st Cir. 2004). "Second, the responsible party must have succeeded in persuading a court to accept its prior position." *Id.* "The presence of these elements creates the appearance that either the first court has been misled or the second court will be misled, thus raising the specter of inconsistent determinations and endangering the integrity of the judicial process." *Id.*

"While it is not a formal element of a claim of judicial estoppel, courts frequently consider a third factor: absent an estoppel, would the party asserting the inconsistent position derive an unfair advantage?" *Alt. Sys. Concepts*, 374 F.3d at 33 (citing *New Hampshire v. Maine*, 532 U.S. 742, 750–51 (2001)). But the courts "generally have not required a showing of unfair advantage." *Guay*, 677 F.3d at 16–17. This is because, as the First Circuit explained in *Alternative Systems Concepts*, the second element (earlier success) and the third consideration (unfair advantage) "normally are two sides of the same coin (after all, it is unlikely that a party will advance a particular position unless that position benefits its cause)"—*i.e.*, the unfairness is benefiting from the earlier inconsistent position. *Alt. Sys. Concepts*, 374 F.3d at 33. "To the extent that there is a separation, however, it is the court's acceptance of the party's argument, not the benefit flowing from the acceptance, that primarily implicates judicial integrity." *Id.*

### B.   Judicial Estoppel Does Not Require Defendants' Participation in the Earlier Proceedings

Given the purpose of judicial estoppel and the lack of any prejudice requirement, it does not matter that Celltrion and Hospira were not parties in the earlier cases. In fact, when discussing the lack of any prejudice requirement, the First Circuit in *Patriot Cinemas* cited *Hurd v. Dimento & Sullivan*, where the defendant law firm successfully asserted judicial estoppel even though it

was neither a party nor counsel in the earlier litigation. *See Patriot Cinemas*, 834 F.2d at 214; *Hurd v. Dimento & Sullivan*, 440 F.2d 1322, 1323 (1st Cir. 1971), *cert. denied*, 404 U.S. 862 (1971).

Citing *Patriot Cinemas*, the Third Circuit in *Ryan Operations v. Santiam-Midwest Lumber* relied on the "majority view" when rejecting the argument that judicial estoppel can be asserted "only" by "those who were parties or in privity with a party to the prior proceeding." *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 359-360 (3d Cir. 1996). The court explained that any such requirement would be divorced from the doctrine's purpose:

> There are many instances in which the assertion of inconsistent positions can work to the advantage of a party but where there is no identity or relationship between those against whom the claim (or defense) is asserted. Where the contentions are mutually exclusive, it is irrelevant that they are asserted against diverse parties for the purposes of determining judicial estoppel. The integrity of the court is affronted by the inconsistency notwithstanding the lack of identity of those against whom it is asserted.

*Id.*; *accord Edwards v. Aetna Life Ins. Co.*, 690 F.2d 595, 598 (6th Cir. 1982) ("judicial estoppel may be applied even if detrimental reliance or privity does not exist"); *In re Coastal Plains, Inc.*, 179 F.3d 197, 205 n.3 (5th Cir. 1999); *Total Petroleum, Inc. v. Davis*, 822 F.2d 734, 737 n. 6 (8th Cir. 1987); *see also Marshall v. Honeywell Tech. Sys. Inc.*, 828 F.3d 923, 931 (D.C. Cir. 2016), *cert. denied*, 137 S. Ct. 830 (2017) (affirming application of judicial estoppel where the requesting party was not a party to the prior litigation); *Fleck v. KDI Sylvan Pools, Inc.*, 981 F.2d 107, 121–22 (3d Cir. 1992) (affirming application of judicial estoppel where the requesting party was not a party to the prior litigation); *Allen v. Zurich Ins. Co.*, 667 F.2d 1162, 1166–67 (4th Cir. 1982) (affirming dismissal of plaintiff's claim against defendant on the basis of judicial estoppel emanating from plaintiff's state court judgment against another defendant in previous lawsuit); *Newfield Expl. Co. v. Applied Drilling Tech., Inc.*, No. 01-2746, 2003 WL 23253, at *6 (E.D. La. Jan. 2, 2003) (defendants not barred from seeking judicial estoppel because of the fact that they were not parties to the prior lawsuit).

### C.   Janssen Is Bound by the Positions Adopted in Earlier Litigations by its Parent and Sister Companies

#### 1.   Judicial estoppel does not require identity of parties adopting the inconsistent positions

Judicial estoppel also does not require that Janssen itself participated in the earlier proceedings. As explained below, it is enough that its parent and sister companies participated, particularly considering its parent is participating in this case, too.

As noted above, judicial estoppel "should be employed when a litigant is 'playing fast and loose with the courts,' and when 'intentional self-contradiction is being used as a means of obtaining unfair advantage in a forum provided for suitors seeking justice.'" *Patriot Cinemas*, 834 F.2d at 212. While "[t]he contours of the judicial estoppel doctrine are not sharply defined, and there is no mechanical test for determining its applicability," it is to be applied with an eye towards its key goal, "protect[ing] the integrity of the judicial process." *Thore v. Howe*, 466 F.3d 173, 181 (1st Cir. 2006). As the First Circuit has noted, "courts sometimes have allowed judicial estoppel when the estopped party was responsible in fact for the earlier representation … or when the estopped party was the assignee of a litigation claim or assumed the original party's role." *Perry v. Blum*, 629 F.3d 1, 9, 11 (1st Cir. 2010) ("a flat holding that judicial estoppel can be circumvented simply by transferring property to a third party would be folly") (citing *Ladd v. ITT Corp.*, 148 F.3d 753, 756 (7th Cir. 1998) and 18B Charles A. Wright, Arthur R. Miller & Edward H. Cooper, Federal Practice and Procedure § 4477, at 618–19 (2d ed. 2002)).

Other circuits have likewise found that judicial estoppel can apply when the prior inconsistent position was advanced by an entity in privity with the present party. *See Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC*, 692 F.3d 983, 998 (9th Cir. 2012) (representations made by executor in privity with beneficiary attributable to beneficiary for judicial estoppel); *Lia v. Saporito*, 541 F. App'x 71, 73 (2d Cir. 2013) (affirming the application of judicial estoppel to a

5

party that was in privity with an entity in a prior proceeding and basing its privity finding on the

party's management, financing, and 75% ownership of the entity from the prior proceeding);

*Maitland v. Univ. of Minn.*, 43 F.3d 357, 364 (8th Cir. 1994) (declining to apply judicial estoppel

on other grounds, but noting that for judicial estoppel, "the party who is to be estopped, or one in

privity with that party, must have asserted a fact or claim, or made a promise, that another party

relied on, that a court relied on, or that a court adjudicated."); *cf. In re Colonial Mortg. Bankers

Corp.*, 324 F.3d 12, 19 (1st Cir. 2003) (sister companies in privity for purposes of more stringent

test for res judicata).[3]

This application of the doctrine beyond identical parties makes sense because "judicial

estoppel is intended to protect the courts," and the "[i]dentity of parties is not a mere matter of

form, but of substance. Parties nominally the same may be, in legal effect, different; and parties

nominally different may be, in legal effect, the same." *Milton*, 692 F.3d at 996. As one leading

treatise similarly explains, "[i]t may be fair to bind a nonparty who was responsible in fact, not

mere theory, for the litigating behavior." *See* § 4477 Preclusion of Inconsistent Positions—Judicial

Estoppel, 18B Fed. Prac. & Proc. Juris. § 4477 (2d ed.); *see also Ladd*, 148 F.3d at 756 (applying

estoppel to parties that were not involved in the first case because they encouraged and assisted a

---

[3] Numerous district courts have likewise applied judicial estoppel against parties that were in privity with prior litigants. *See, e.g., Patriot Mfg. LLC v. Hartwig, Inc.*, 996 F. Supp. 2d 1120, 1127 (D. Kan. 2014), *aff'd*, 613 F. App'x 753 (10th Cir. 2015) (applying judicial estoppel because of privity between company and its sole member); *Mathison v. Berkebile*, 988 F. Supp. 2d 1091, 1103 (D.S.D. 2013) (preliminary finding of judicial estoppel based on privity between warden and his predecessor); *Raizberg v. JV CJSC Gulfstream Sec. Sys.*, No. 11 CIV. 8498 KMW, 2013 WL 1245545, at *6 (S.D.N.Y. Mar. 26, 2013) (finding estoppel based on statements as to both plaintiffs even though only one plaintiff participated in the prior proceeding since the parties were "essentially indistinguishable, in that Raizberg was the founder and sole shareholder of Misash"); *Nat'l Union Fire Ins. Co. v. Allfirst Bank*, 282 F. Supp. 2d 339, 348 (D. Md. 2003) (applying judicial estoppel against an insurance company based on prior positions taken by the insured); *Capsopoulos on Behalf of Capsopoulos v. Chater*, No. 95 C 3274, 1996 WL 717456, at *2 (N.D. Ill. Dec. 9, 1996) (applying judicial estoppel where "[d]ecedent and his privy, Plaintiff, have adopted contradictory positions"); *In re 815 Walnut Assocs.*, 183 B.R. 423, 431–32 (Bankr. E.D. Pa. 1995) (applying judicial estoppel based on finding that privity existed between assignee and assignor).

prior litigant in advancing a position—thereby gaining a financial advantage—only to take an inconsistent position in a later case).

Given the equitable origin of the doctrine, there is no requirement that the parties taking inconsistent positions be identical. Privity or litigation control justifies invoking judicial estoppel.

### 2.   Janssen and the parties to the prior cases are commonly controlled and in privity

J&J drafted all the disputed agreements in question, and it is the parent of Janssen and all the relevant parties in the earlier litigations. Its role in these litigations, and the close relationship among the J&J family of companies, means that privity exists here. Janssen thus should be judicially estopped from taking positions that are inconsistent with prior positions taken by its parent and its sister companies.

*First*, while Janssen is the named plaintiff in this action, an overwhelming number of facts confirm that J&J controls (and would benefit from) this litigation. The decision-makers with full access to the information in the litigation, including the person who handles settlement discussions, Mr. Eric Harris, are all J&J personnel. No. 15-10698 Dkt. 170 at 6; Dkt. 16 Ex. 17 (LinkedIn profiles). Mr. Harris, for example, "is an Assistant General Counsel at Johnson & Johnson and is the in-house attorney responsible for this litigation." No. 15-10698 Dkt. 434 at 36; *see also* 2/23/17 Sealed Lobby Conf. Tr. at 4 ██████████████████████████████████████████ ██████████████████████████████████████████████████████████ Also, J&J controls public relations concerning the litigation. Dkt. 16 Ex. 18 (press release); Dkt. 16 Ex. 19 at 4 (earnings call transcript). ████████████████████████████████ ████████████████████████ Dkt. 16 Ex. 22 (annual report) at 12–13; Dkt. 16 Ex. 23 (Grabowski 8/31/16 report excerpts) at ¶ 31. Further, all three witnesses Janssen identified as allegedly having evidence related the disputed agreements are J&J employees. Dkt. 15 Ex. 2 (Martinson Tr.) at

12:19–24; Dkt. 15 Ex. 3 (Dow Tr.) at 8:18–20; Dkt. 28 at ¶ 1. Ms. Martinson was designated by

Janssen and J&J to serve as Rule 30(b)(6) witnesses for both companies simultaneously. No. 15-

10698 Dkt. 553 Ex. 1 (Martinson Tr.) at 98:12–22.[4] ███████████████████████████

███████████████████████████████████████ Dkt. 16 Ex. 20 (Epstein Tr.)

at 256:10–23; Dkt. 16 Ex. 21 (Marsh Tr.) at 8:16–23. This is not surprising given that ████████

██████████████████████████████████ Dkt. 26 Ex. 4 (Dow

Tr.) at 205:18–24, 235:3–237:11, 289:14–17.

    *Second*, J&J controls the content and assertion of the form employment agreements at

issue. J&J was directly involved in many of the prior litigations where J&J family companies

asserted a broad interpretation of "COMPANY" for the same or similar employment agreements.

*See* Dkt. 14 Appx. A. The same outside counsel—the law firms of Riker, Danzig, Scherer, Hyland

& Perretti LLP, and Nutter, McClennen & Fish LLP—were retained for multiple enforcement

actions despite differences in the parties, also indicating that it is J&J making the hiring decisions

and otherwise at the helm of the litigations. *See, e.g.*, *id.* at 3 (Riker Danzig firm); *id.* at 5 (same);

*id.* at 11 (same); *id.* at 8 (Nutter firm); *id.* at 10 (same).

    J&J also provides the template-employee secrecy agreements for use by ***all*** J&J companies

in the United States. No. 15-10698 Dkt. 553 Ex. 1 (Martinson Tr.) at 84:8–18, 94:13–18, 95:12–

21. And, critically, J&J has centralized management of employment-related matters. For example,

Ms. Anne Martinson, J&J's Rule 30(b)(6) witness about the relevant employment agreements,

testified that in 2007 as a J&J senior counsel, she was responsible for advising multiple "operating

companies within the Johnson & Johnson family of companies" "with respect to employment

---

[4] For the Court's convenience, pages of the transcript of Anne Martinson previously filed as No. 15-10698 Dkt. 553 Ex. 1 are reattached to this brief as Ex. 37.

matters." No. 15-10698 Dkt. 553 Ex. 1 (Martinson Tr.) at 23:10–24:24, 100:11–101:11. Those companies included Ethicon, Biosense, Centocor R&D, and LifeScan, among others. *Id*.

Today, Ms. Martinson is a practice group leader, and the majority of J&J's employment lawyers report to her and are responsible for "most" J&J subsidiaries. *Id*. at 29:11–30:12. In her role as counsel for J&J, Ms. Martinson works directly with law firms for defense and enforcement of employment agreements for J&J and its operating companies. *Id*. at 43:25–44:21. It is her general practice to review pleadings in employment litigation matters before they are submitted to courts, and she agreed that it is "important to Johnson & Johnson that they attempt to be truthful and accurate in pleadings that are filed with courts." *Id*. at 109:6–110:20. Simply put, it is J&J that controls its operating companies' use of the form agreements at issue, including in litigation.

*Third*, the close relationships between J&J and its subsidiaries and the collective benefits the J&J family has received from these employment agreements support the application of judicial estoppel. For example, J&J's annual securities filings include financials from its subsidiaries. *E.g.*, Dkt. 15 Ex. 22 (J&J 2016 10K). The J&J family companies share confidential information between one another. *See* Part II.A.1.b, below. Each and every J&J company receives a benefit from the broad interpretation of "COMPANY" (whether explicitly exercised or not)—it ensures that the J&J family's confidential information remains protected. *See, e.g.*, Dkt. 14 Appx. A; *see also* Dkt. 26 Ex. 1 (Martinson Tr.) at 158:3–12, 185:12–186:3, 346:12–347:5. Importantly, J&J's prior broad interpretation of "COMPANY" also ensured that employees did not violate third parties' confidences, by prohibiting employees from sharing third-party confidential information to anyone within the entire J&J family, as opposed to prohibiting sharing of such information only within a person's employing company. *See* Dkt. 14 at 4 & Appx. A; *see also* Dkt. 26 Ex. 1 (Martinson Tr.) at 166:15–167:24; 203:2–21; 217:16–218:12; 241:6–242:4. To allow Janssen—and the controlling

entity in this case, J&J—to reverse course after having received the benefit of family-wide protection would be inequitable and should be barred. *See, e.g., Milton*, 692 F.3d at 998; *Lia*, 541 F. App'x at 73; *Ladd*, 148 F.3d at 756; § 4477, 18B Fed. Prac. & Proc. Juris.

Given these facts, the Court should find that Janssen is in privity with J&J and its sister companies, and that J&J is responsible in fact for the litigating behavior in this action and the others, and should apply judicial estoppel to prevent Janssen from taking inconsistent positions.

## II.      The Conditions For Judicial Estoppel Are Satisfied Here

### A.      Clear Inconsistency

Both of Janssen's interpretations in this litigation—first, that "COMPANY" means *only* Centocor, and second, that "COMPANY" means "any J&J" company "as applicable"—directly contradict the positions J&J took in earlier cases.

#### 1.      Janssen's first position regarding the meaning of "COMPANY" is clearly inconsistent with the positions advanced in past cases

For its first position before this Court—which it relied upon to avoid dismissal in February 2017—Janssen argued that "'COMPANY' *cannot* include J&J and its subsidiaries" and "can *only* mean Centocor." No. 15-10698 Dkt. 445 at 5. Janssen's position then was based on the notion that "'COMPANY' applied only to whichever J&J company was the employer at any particular time…" Dkt. 42 at 11. This position directly contradicts the positions taken by J&J companies in earlier litigations involving the same (or essentially the same) form employment agreements.

##### a.      In the enforcement actions, Janssen's family companies interpreted "COMPANY" as meaning more than just the specific employer

In multiple cases before other judges, J&J family companies have successfully asserted that "COMPANY" was *not* limited to a defendant's specific employer, and they supported that positon through a straightforward reading of the "COMPANY" definition—the very same reading

Defendants have advocated here. *See* Dkt. 26 Ex. 2 (identifying enforcement actions "which involve(d) any entity other than or in addition to the entity that employs(-ed) the employee signatory"); Dkt. 14 at 7–8 & Appx. A (identifying and describing multi-party enforcement actions); Dkt. 15 Exs. 4–9, 15; Dkt. 16, Ex. 31 (filings from enforcement actions).

For example, J&J subsidiaries DePuy Spine and JJRT successfully obtained a preliminary injunction against G. Joseph Ross in Massachusetts state court before Judge van Gestel in 2007. Ex. 38 at 7 (Ross Mem. and Order). Ross "ha[d] been employed by DePuy Spine in a variety of positions for the last eleven years." Dkt. 15 Ex. 4 at 6 of 29. To justify nevertheless including JJRT as a plaintiff, the plaintiffs told Judge van Gestel that "[t]he term 'Company' is defined to include **not only** DePuy Spine **but also** 'JOHNSON & JOHNSON and any of their successors or assigns, purchasers, acquirers, and any of their existing and future subsidiaries, divisions or affiliates.'" Dkt. 15 Ex. 4 at 7. They further stated that "[a]s a former employee of DePuy Spine, Ross is subject to non-competition and non-solicitation covenants with DePuy Spine and JJRT," and that "[t]he Agreement is enforceable by DePuy Spine and JJRT." *Id.* at 2; Dkt. 15 Ex. 5 at -0113344.

Other J&J family companies have similarly taken the position that multiple plaintiffs—non-employers, including J&J—were protected by the agreements and thus fell within the definition of "COMPANY." Dkt. 14 at 7–8 & Appx. A. At least five such plaintiffs, including J&J and other non-employers, described the employment agreements at issue as agreements "with plaintiffs." Dkt. 14 Appx. A at 7, 12 (citing Dkt. 15 Ex. 8 at 1; Dkt. 16 Ex. 31 at -0113299).

A particularly glaring contradiction is that Janssen tells this Court that J&J itself is *not* covered by the "COMPANY" definition, whereas J&J and its family companies in earlier cases adopted the position that J&J *was* covered. There are at least four litigations in which J&J was named as a plaintiff, without having been identified as an employer. *See* Dkt. 14 Appx. A at 3, 5–

8, 11–12. Two of these actions—*J&J and Cordis Corp. v. EV3, Inc., Rhonda Barr, et al.*, and *J&J, DePuy, Inc. and DePuy Spine, Inc. v. Steven F. McAllister, et al.*, both in New Jersey state court— were ones in which the plaintiffs argued that the employment agreement was "with plaintiffs," *i.e.*, with both the employing company and J&J. Dkt. 14 at 7–8; Dkt. 14 Appx. A at 7, 12; Dkt. 15 Ex. 7 at -112987–989, -112994; -113021–038; Dkt. 15 Ex. 8 at 1, Dkt. 16 Ex. 31 at -0113291, -0113299.

For example, J&J and then-subsidiary Cordis also filed a complaint against Mr. Jin Park in 2007 before Judge Frank M. Ciuffani in New Jersey. Dkt. 15 Ex. 9. Park "was employed by Cordis" "[f]or seven plus years." *Id.* at -0113312. J&J was nevertheless included as a plaintiff without any explanation beyond noting that J&J "is the parent company of subsidiaries engaged in the business of developing, manufacturing and marketing a wide variety of health care products, and providing related services, for the consumer, pharmaceutical and professional markets." *Id.* at -0113311. In their successful effort to obtain a temporary restraining order on behalf of both J&J and employer Cordis, the plaintiffs provided approximately five pages of allegations about "Park's Employment at Cordis," including detailed information about his positions at "Cordis," responsibilities at "Cordis," access to "Cordis" confidential information, various accomplishments related to "Cordis' coronary stents," "Cordis' highly secretive testing methods and procedures," and "Cordis' internally developed and secretive processes regarding Nitinol." *Id.* at -0113317–21. At the end of this section, J&J and Cordis told Judge Ciuffani that "Park was involved with 7 patents while at Cordis," and "Pursuant to Paragraph 1 of the [employment] Agreement, *plaintiffs*"—not "Cordis" alone—"own all inventions, patentable or not, developed by Park while at plaintiffs." *Id.* at -0113321. This, of course, refers to the use of "COMPANY" in Paragraph 1 relating to assigning inventions.

In the current litigation, Janssen has never grappled with the contradiction between its current position (J&J is *not* covered) and the position taken in these earlier cases (J&J *is* covered). In fact, there is no sensible way to reconcile the two positons. The definition of "COMPANY" states in plain English that "COMPANY means CENTOCOR *and* JOHNSON & JOHNSON," followed by two other clauses referring back to both companies with the word "their":

> The COMPANY means [1] CENTOCOR and [2] JOHNSON & JOHNSON and [3] any of *their* successors or assigns, purchasers, acquirers, and [4] any of *their* existing and future subsidiaries, divisions or affiliates . . . .

*E.g.*, Dkt. 15 Ex. 1 at -0098780. Certainly the drafter did not write this simple definition including four items phrased in the conjunctive, separated by the word "and," expecting the reader to discern that it meant only Centocor. Any such intent could have been accomplished much more simply:

> The COMPANY means CENTOCOR ~~and JOHNSON & JOHNSON and any of their successors or assigns, purchasers, acquirers and any of their existing and future subsidiaries, divisions or affiliates, including any such subsidiary, division or affiliate of Johnson & Johnson to which I may be transferred or by which I may be employed in the future. Affiliates of the COMPANY are any corporation, entity or organization at least 50% owned by the COMPANY, by Johnson & Johnson or by any subsidiary of Johnson & Johnson~~.

After all, what is the purpose of all the language beyond Centocor (the employer) if not to make clear that "COMPANY" also includes those other entities? The J&J family lawyers in the *Ross* case got it right, correctly stating that "[t]he Agreement is enforceable by DePuy Spine and JJRT," without ever offering any justification beyond stating that "COMPANY" "is defined to include not only [the employer] DePuy Spine but also 'JOHNSON & JOHNSON and any of their successors or assigns, purchasers, acquirers, and any of their existing and future subsidiaries, divisions or affiliates.'" Dkt. 15 Ex. 5 at -0113344; Dkt. 15 Ex. 4 at 7.

Ultimately, the Court is not permitted to rewrite the contracts in the manner required to accept Janssen's original positon that "COMPANY" is limited to Centocor, which directly contradicts the positons taken in the earlier enforcement cases discussed above. *See McMahon v.*

*City of Newark*, 951 A.2d 185, 196 (N.J. 2008) ("[T]his Court repeatedly has hewed to the maxim that 'courts cannot make contracts for parties. They can only enforce the contracts which the parties themselves have made.'"); *Kotkin v. Aronson*, 815 A.2d 962, 963 (N.J. 2003) ("Consistent with established case law, we cannot make for sellers a better or more sensible contract than the one they made for themselves."); *Newark Publishers' Ass'n v. Newark Typographical Union, No. 103*, 126 A.2d 348, 353 (N.J. 1956) ("We are not at liberty to introduce and effectuate some supposed unrevealed intention.").

### b.    Janssen's position on the importance of confidentiality is contradicted by positions in earlier cases

Another direct contradiction arises from Janssen's failed efforts to avoid New Jersey's settled rule that "where a contract repeats the same terms, such terms should be given the same meaning, particularly when the contract under consideration is clearly the product of careful lawyering on both sides." *Grayzel v. Boston Sci. Corp.*, No. A-0991-14T2, 2015 WL 9694354, at *5 (N.J. Super. Ct. App. Div. Jan. 11, 2016). This rule should be applied on steroids when dealing with a defined term, the whole point of which is to ensure that the term has the same meaning throughout the agreement.

In this litigation, Janssen has at times taken the positon that "COMPANY" means different things for the different provisions relating to confidential information and provisions relating to inventions, arguing, for example, that "for certain provisions *other than* the patent assignment provision, ['COMPANY'] can include companies other than the employer." Dkt. 42 at 11. At other times, such as during the recent hearing, Janssen has acknowledged the same-meaning rule, suggesting it would accept a single, narrow definition of "COMPANY" for both confidential information and invention assignments.

To attempt to justify a narrow definition in both contexts, Janssen has relied on the testimony of Ms. Martinson, a current employee of J&J and former lawyer from Patterson Belknap, the firm representing Janssen in this case. No. 15-10698 Dkt. 553 Ex. 1 (Martinson Tr.) at 17:19–18:6, 21:24–22:6. Ms. Martinson stated, "For the vast number of employees, the only information they had access to was the information belonging to their employer which is the operating company that employed them." Dkt. 26 Ex. 1 (Martinson Tr.) at 158:20–23.

But this is the opposite of what Janssen's parent and sister companies argued in other courts. For example, J&J and two of its subsidiaries successfully obtained a temporary restraining order and preliminary injunction against Robin Barney, who "worked for DePuy Orthopaedics." Dkt. 26 at 14. In doing so, the J&J companies represented that Ms. Barney—and by implication every person on the same boards and councils as Ms. Barney—had broad access to highly confidential information from *at least nine* J&J companies, and indeed potentially from all "Johnson & Johnson medical device companies and affiliated entities." Dkt. 15 Ex. 15 at -113048–49, -113053–54. In granting the preliminary injunction, Judge Alexander Waugh, Jr. concluded:

- "Barney clearly had access to significant amounts of confidential and proprietary information belonging to J&J/DePuy as part of her work for the DePuy franchise," including confidential information about "DePuy and its affiliated companies" and "confidential, proprietary and trade secret information concerning all four of the DePuy companies: Orthopaedics, (2) Spine; (3) Mitek (sports medicine) and (4) Codman (neurology)." Dkt. 15 Ex. 14 at 14–15;

- Barney had confidential information about "strategic planning" concerning "facilities, equipment and personnel" related to manufacturing, from "five companies other than DePuy" in the J&J family, including "Cordis (interventional cardiology); Life Scan (diabetes management); Ortho Clinical Diagnostics (diagnostics and other testing equipment); Ethicon-Endo (minimally invasive surgical products and equipment); and Ethicon (surgical closures and binding materials such as sutures)." *Id.* at 15;

- Barney had access to confidential information about "best practices and operations" and "J&J's three major business groups: (1) Medical Device and Diagnostics; (2) Consumer and (3) Pharmaceutical and Biotechnology." *Id.* at 16.

Broad access to multiple companies' confidential information would also arise for every employee of JJRT, which DePuy Spine and JJRT described in one litigation as "the biologics research and development entity for the Johnson and Johnson ('J&J') family of companies." Dkt. 15 Ex. 4 at 9.

The same was true in another case filed by J&J and two of its subsidiaries against Steven McAllister, who was "Director of Finance for DePuy Spine", then "Director of Finance for Operations of the DePuy Franchise." Dkt. 16 Ex. 31 at -0113291. The plaintiffs represented that Mr. McAllister had "intimate knowledge of plaintiffs' Confidential Information" concerning the "current and future products for DePuy Spine, DePuy Orthopaedics and the other companies that comprise the DePuy Franchise," such as "DePuy Mitek (sports medicine)" and "Codman (neurology)." *Id.* at -0113294-96.

None of this can be reconciled with Janssen's current position that J&J family companies are not concerned with employees obtaining confidential information from J&J companies other than their direct employers.

### c.      Janssen's attempts to explain away the inconsistencies fail

In an effort to avoid accountability for the inconsistencies, Janssen argues that Defendants have cited only a "small number of cases" where J&J family companies took inconsistent positions. Dkt. 26 at 14 n.7. But judicial estoppel does not require multiple prior instances of inconsistency. One is sufficient. And here there are several. In any event, there may be other cases. Discovery was limited to whatever relevant cases Janssen could "reasonably identify after good faith effort" and related documents Janssen could "reasonably obtain with a good faith effort" inside a period of about three and a half weeks. No. 15-10698 Dkt. 542 at 1.

There also is no support for Janssen's claim that J&J family companies took these inconsistent positions in only a small percentage of their enforcement actions. Nothing in the record indicates how often J&J family companies go to the extreme step of actually filing lawsuits

16

against former employees, as opposed to working out disputes without litigation. Besides, Janssen has failed to identify any case—not one—where any J&J family company made the arguments about the meaning of "COMPANY" that Janssen is making before this Court.

Janssen has also argued that the inconsistent statements from these cases were incorrect. According to Ms. Martinson, all of these parties and attorneys were "inaccurate" or "wrong," did not "do[] a full due diligence" or did not "really th[ink] it through" before making the statements they made. Dkt. 15 Ex. 2 at 223:23–224:11, 227:17–228:5, 268:22–270:7, 271:6–21, 334:4–335:13. This is nonsense. J&J is one of the largest and most sophisticated companies in the world. It is 35th on the Fortune 500 List.[5] And the form employment agreement applies to tens of thousands of J&J family employees nationwide.

The agreement, and particularly its broad definition of "COMPANY," is thus critically important to the massive J&J conglomerate, because its breadth is what protected J&J's life-blood confidential information and intellectual property. *See* 10/12/17 Hr'g Ex. 2 at slides 16–19; Dkt. 15 Ex. 13 at -112396, -112398. Proprietary and trade secret information is what "the J&J companies' business is built" upon and what they consider "vital to prevent competitors or would-be competitors from obtaining an unfair competitive advantage." Dkt. 15 Ex. 13 at -112396, -112398.

With all of that at stake, J&J's sophisticated attorneys deliberately chose a broad definition of "COMPANY," and then relied on that broad definition through years of enforcement efforts. Consistent with the attorneys' interpretation, ███████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

---

[5] *See* http://fortune.com/fortune500/johnson-johnson.

██████████ Dkt. 15 Ex. 11 at -0115487. ██████████

did the very same thing. Dkt. 15 Ex. 10 at -0115494.

J&J further maintained this broad definition through revisions of the form employment agreement, likely handled by multiple different attorneys, with at least three different versions completed during the period from 2000 to 2001 alone. *See generally* Dkt. 15 Ex. 1 (four agreements, comprising three separate versions, with revision dates in lower right corners). The level of sophistication of J&J's attorneys is confirmed by Ms. Martinson, who was educated at Princeton and New York University School of Law and had sixteen years' experience as an attorney, including tenure at Janssen's law firm of Patterson Belknap, before working for J&J. No. 15-10698 Dkt. 553 Ex. 1 (Martinson Tr.) at 16:11–18:9, 21:19–23:7.

Janssen may prefer now, in this particular case, that J&J's sophisticated attorneys made different choices, but the choices they made are far from "absurd," as Janssen now claims. There were good reasons J&J's attorneys broadly defined COMPANY for *both* confidential information *and* invention assignments. With respect to invention assignments, for instance, an employee's obligation to assign inventions relating to business activities *outside* of his specific employer depends entirely on a broad definition of "COMPANY." 10/12/17 Hr'g Tr. Ex. 2 at slide 19. Defendants explained other reasons to assign inventions to a family of companies in their briefing and during the recent hearing. *Id.* at slides 25–27. Janssen has offered no response.

The bottom line is that what Janssen advocates here and what related J&J companies argued in the enforcement actions are mutually exclusive and only one can be correct. Thus, there are two possibilities. Either:

> (1) at least ten different J&J entities, three different law firms, and eleven different attorneys, in at least six separate litigations filed in front of five different judges over a time span of ten years, *all* were wrong about "COMPANY" having a broad meaning; *or*

> (2) Janssen is wrong here about "COMPANY" having a narrow meaning, in a situation where the meaning of "COMPANY" is potentially dispositive of a case involving J&J's most successful drug worth $4.5B per year and allegedly entitling Janssen to an enormous sum of damages.

The more plausible of these two possibilities is readily apparent.

Finally, Janssen has conceded the mutual exclusivity between "COMPANY" meaning just the employer, on one hand, and "COMPANY" extending beyond the specific employer, on the other hand. It told the Court that as a result of the "extrinsic evidence" and "discovery" regarding standing, it became "clear" that the definition of "COMPANY" must include more than just the employer. Dkt. 26 at 6; Dkt. 42 at 12. As Janssen acknowledges, these two positions cannot be advanced at the same time. Either "COMPANY" is limited to just the employer, or it is not.

### 2. Janssen's second position regarding the meaning of "COMPANY" is clearly inconsistent with the positions advanced in past cases

Janssen later adopted a second position, asserting that "COMPANY" is a malleable term meaning any J&J company or companies "as applicable," depending on the provision at issue and the facts of the case at hand. This position, which Janssen only proposed when it realized the problems with its earlier position, is clearly inconsistent with earlier litigations as well.

### a. In the enforcement actions, Janssen's family companies took the position that entities are within the "COMPANY" simply by virtue of being subsidiaries

Janssen tells this Court that the scope of "COMPANY" is determined on a case-by-case basis "as applicable, depending on the terms of the particular contract provision at issue and the facts of a given case." Dkt. 26 at 6. As Ms. Martinson put it, the meaning of "COMPANY" "depends on the facts of that employee's experience within the family of companies" and "who is a [']company['] within the meaning of [the agreement] would change over the course of -- at the time we go back to look at this." Dkt. 15 Ex. 2 (Martinson Tr.) at 175:17–19, 177:8–10. This,

Janssen says, avoids judicial estoppel because all the plaintiffs in the earlier cases had interests at stake, making them proper parties under Janssen's new interpretation of "COMPANY."

But this does not avoid the direct inconsistency, because not once in any of those litigations did a J&J entity rely on anything but the plain text and meaning of the "COMPANY" definition. In the *O'Connell* case, for instance, ███████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████ Dkt. 15 Ex. 6 at -0115569.

Similarly, in the *Ross* case discussed above, the J&J companies did not argue, like here, that "COMPANY" is flexible and interpreted "as applicable, depending on the terms of the particular contract provision at issue and the facts of a given case." Dkt. 26 at 6. Instead, they relied on the plain language of the "COMPANY" definition as written, saying it is "defined to include not only DePuy Spine but also 'JOHNSON & JOHNSON and any of their successors or assigns, purchasers, acquirers, and any of their existing and future subsidiaries, divisions or affiliates." Dkt. 15 Ex. 4 at 7. Without ever offering any other explanation, they stated that "[t]he Agreement is enforceable by DePuy Spine and JJRT." Dkt. 15 Ex. 5 at -0113344

This position—that "COMPANY" requires no special fact-based analysis of what is "applicable" in a given situation—is the position Defendants advocate here, and the one the Court should adopt. Janssen has not come forth with even a single document from the stacks of enforcement litigation pleadings where any J&J company argued that an entity was within the

scope of "COMPANY" on the basis that the defined term "COMPANY" is actually undefined, allowing any entity to be included depending on the facts.

Janssen's current position makes no sense. Whether any entity's confidential information or competitive interests are at stake is normally hotly contested in employment actions. That is what the dispute is about. Construing a defined term in a way that turns on the outcome of any such contested issue defies the very purpose of a defined term, which is to ensure the term has one clear meaning throughout the agreement, and across all employees, situations and cases. Indeed, how would an employee, particularly a non-lawyer with imperfect information, ever hope to understand his or her contractual obligations under Janssen's latest "it depends" interpretation?

In the context of this case—assuming, as required, that "COMPANY" means the same thing for both confidential information and assigned inventions—are the '083 patent owners any entity who gave confidential information to any of the inventors? And what if the inventors got confidential information from different collections of J&J entities? Are all of the members of the overlapping collections of entities owners of the patent? Given its burden to establish standing, Janssen certainly has not shown that all five inventors received confidential information from Centocor alone.

Janssen's interpretation defies not only common sense, but also the plain text. Janssen now says "any" essentially means "as applicable," where a selection of "one or more" companies is made when the litigation arises. Dkt. 26 at 1, 6; Dkt. 15 Ex. 2 (Martinson Tr.) at 174:21–175:19 ("the term would be defined at the time we tried to use it"). But as explained during the October 12 hearing, treating "any" as meaning "one or more" still results in at least four patent owners:

> The COMPANY means [1] CENTOCOR and [2] JOHNSON & JOHNSON and [3] [one or more] of their successors or assigns, purchasers, acquirers and [4] [one or more] of their existing and future subsidiaries, divisions or affiliates . . . .

Dkt. 15 Ex. 1 at -0098780. Janssen has never offered any response to this problem.

The bottom line is that nothing can reconcile Janssen's current position with the position taken in earlier cases, including the *O'Connell* case, ████████████████████ ████████████████████████████████████████████████ ████████████████████ Dkt. 15 Ex. 6 at -0115569.

#### b. Janssen's extrinsic evidence does not justify ignoring the inconsistent positions and rewriting the agreement

In another effort to smooth over the direct contradictions, Janssen has argued that the earlier cases interpreted "COMPANY" in the context of confidential information while this case involves the meaning of "COMPANY" in the context of assigned inventions. As explained above, this argument defies New Jersey's same-meaning rule for a term used throughout an agreement. Ignoring that rule, Janssen has relied on extrinsic evidence to argue for a special and narrower meaning for "COMPANY" specifically under Paragraph 1 involving inventions.  Even if it were permissible to use the extrinsic evidence to rewrite the agreement in this way (it is not), Janssen's extrinsic evidence cannot resolve the contradictions.

As made clear during the October 12 hearing, Janssen relies most heavily on the testimony of J&J attorney Anne Martinson, and her rewrite of the form employment agreement in 2008, calling it "undisputed evidence of Janssen's intent." Dkt. 42 at 13. It is nothing of the sort.

*First*, Ms. Martinson clearly did not "clarify" the form agreement to better reflect its true intent, because she admits that ***she does not know the intent*** of the original drafter. Dkt. 15 Ex. 2 (Martinson Tr.) at 172:21–23. She never talked to anyone involved in drafting or revising the earlier form agreements, and she never talked to any employee who signed that form. Dkt. 15 Ex. 2 (Martinson Tr.) at 182:25–183:6, 208:9–21. She was not even part of J&J in 2000 and 2001, when the agreements were drafted. 10/12/17 Hr'g Tr. Ex. 2 at slide 36; Dkt. 15 Ex. 1 (employment agreements reflecting revision dates of 11/16/00 and 6/6/01).

22

*Second*, in testimony Janssen played during the October 12 hearing, Ms. Martinson testified that she revised the agreement in 2008 "in light of [] the changing nature of the way the companies operated." Dkt. 15 Ex. 2 (Martinson Tr.) at 154:19–155:14. Janssen makes the same concession, acknowledging that the rewritten agreement was based not on the way the J&J companies operated in 2000 or 2001, but on "the way that J&J companies operated 'evolved over the course of time'" and "the way [they] were operating" as of the time the rewrite. Dkt. 26 at 11. This had to be the case, of course, because Ms. Martinson only joined J&J in 2007. Her 2008 agreement may reflect "the changing nature of the way the companies operated" or "the way [they] were operating" as of 2008, but what matters is the nature of the way Janssen and the J&J family of companies operated in 2000 and 2001. On this key question, Janssen offers no evidence.

*Third*, Janssen's claim that Ms. Martinson simply "clarified" a pre-existing intent about the meaning of "COMPANY" is belied by her wholesale re-write, reflected in the redline comparison provided by Defendants at the October 12 hearing. 10/12/17 Hr'g Ex. 4 (reattached as Ex. 39). Particularly considering the benefits of joint patent ownership arising from a broad definition of "COMPANY," which Defendants identified and Janssen has not rebutted, the Court should not disturb the drafting choices made in 2000 and 2001. The Court should thus reject Ms. Martinson's rewrite as purported evidence of the intent behind entirely different agreements drafted seven or eight years earlier.

In support of a special narrow meaning for "COMPANY" for invention assignments, Janssen also relies heavily on the face of the '083 patent, the excerpts from a J&J law department database of patents, and an invention disclosure form bearing Centocor's name. But none of those Janssen-only documents can be reconciled with the agreements' plain language, which reflect an

23

assignment to *at least* "Centocor *and* Johnson & Johnson." Janssen's "any" arguments only apply to *other* entities, *e.g.*, "their" successors and "their" subsidiaries.

All of these proffered documents also have a missing link, because there is no evidence that any of them was created based on an analysis of the language of the employment agreements. By contrast, when someone *did* conduct that analysis, after Janssen filed its first lawsuit against Defendants in 2015, Janssen scrambled to obtain two rounds of "assignment" documents from the '083 patent inventors, in an effort to paper over the existing assignments, or perhaps generate evidence designed to support the argument that Janssen is the sole owner. There is no contemporaneous evidence of intent that permits the Court to uproot the choices made by the drafters of the disputed agreements. And none of the extrinsic evidence serves to reconcile the inconsistent positions taken in this litigation and the earlier litigations.

Finally, at the October 12 hearing, Janssen argued that a finding of no standing in this lawsuit would have dramatic "consequences" for potentially "thousands" of J&J patents. This is attorney rhetoric, not evidence. True, Janssen failed to get the proper assignments in place before filing any of its three lawsuits on the '083 patent. But that does not mean Janssen or other J&J companies have done the same thing for other patents. The '083 patent is a generic cell culture media patent that Janssen does not even use. No. 15-10698 Dkt. 414 at 18 & Ex. 2. There is no evidence that other unexpired patents have the same ownership issue. On the contrary, for important patents that the J&J companies actually use and rely upon to protect their products, J&J's sophisticated attorneys presumably ensure that all the necessary assignments are in place before filing the patent application, before patent issuance, or at least before filing any infringement lawsuit. The assignment documents for the '471 patent, for instance, did not prompt Defendants to raise standing issues. Moreover, J&J has filed countless patent infringement lawsuits over the

years. To Defendants' knowledge based on public documents, no other party has identified the same standing deficiencies that are at issue for the '083 patent. This suggests that the '083 patent's standing difficulties are not nearly as widespread as Janssen now claims, without evidence.

### B.     Success In Persuading A Court to Adopt the Prior Inconsistent Position

The second (and final) element for judicial estoppel is that "the responsible party must have succeeded in persuading a court to accept its prior position." *Alt. Sys. Concepts*, 374 F.3d at 33. As indicated above, J&J companies have successfully persuaded courts on at least five occasions to grant relief to non-employer J&J companies, and they did so based on the premise that they were protected by the plain language of the relevant agreements. These instances are set forth in the attached Appendix C. A brief summary is below as well:

- *J&J, DePuy Orthopaedics, and DePuy Prods., Inc. v. Biomet, Inc. and Robin T. Barney*, No. C-107-7 (N.J. Sup. Ct.):  plaintiffs obtained TRO and PI;

- *J&J and Cordis Corp. v. Stentys, Inc. and Jin S. Park*, No. 141-08 (N.J. Sup. Ct.):  plaintiffs obtained TRO based on verified complaint;

- *J&J and Cordis Corp. v. EV3, Inc., Rhonda Barr, Andrew Fitzpatrick and Brendan McKeever*, No. 09-06306-GEB (D.N.J.):  plaintiffs obtained TRO;

- *DePuy Spine, Inc. and Johnson & Johnson Regenerative Therapeutics, LLC v. Stryker Biotech LLC and G. Joseph Ross*, No. 07-1464-GLSI (Mass. Sup. Ct.):  plaintiffs obtained PI;

- *LifeScan, Inc., Diabetes Diagnostics, Inc., and Inverness Med. Ltd. v. Daniel F. O'Connell and Agamatrix, Inc.*, No. 2004-02043-C (Mass. Sup. Ct.):  plaintiffs obtained TRO.[6]

Janssen's parent and sister companies have leveraged the broad scope of the employment agreements to their advantage, successfully obtaining relief that protected all the plaintiffs, each of whom were treated as part of the "COMPANY."

---

[6] Janssen asserts that defendant O'Connell was employed by "all three plaintiffs," though it incorrectly quotes the amended verified complaint. *See* Dkt. 26 at 14. The complaint indicates that ███████████████████████████████████████████████████████ Dkt. 15 Ex. 6 at -0115564. There is no claim that O'Connell was employed by plaintiff DDI, and in any event, as discussed above, the plaintiffs told the court ███ ████████████████████████████████████████████████████████ Dkt. 15 Ex. 6 at -0115569.

### III.     The Optional Factor Of Unfair Advantage Also Is Satisfied

As noted above, some cases consider as an additional factor whether the party advancing inconsistent positions stands to derive an unfair advantage if their new position is adopted.  *See, e.g.*, *Alt. Sys. Concepts*, 374 F.3d at 33. Here, if either of Janssen's proposed meanings of "COMPANY" is adopted, Janssen and the J&J family will get the unfair benefit of taking advantage of inconsistent positions: Janssen's sister companies repeatedly succeeded in obtaining injunctive relief based on the broad, plaining meaning of "COMPANY" while Janssen seeks to avoid dismissal here based on a narrow, revised meaning of "COMPANY."

This is precisely the kind of unfair advantage judicial estoppel protects against: "[I]f parties feel free to select contradictory positions before different tribunals to suit their ends, the integrity and efficacy of the courts will suffer." *Patriot Cinemas*, 834 F.2d at 214. Adopting Janssen's flexible "it depends" interpretation of "COMPANY" would be particularly unfair and disruptive of the judicial process, because it would rubber stamp, and indeed license, the J&J family's ability to adopt contradictory positions in different cases to suit different ends.

* * *

As Defendants noted during the October 12 hearing, Janssen never meaningfully replies to the three problems precluding any proper text-based "interpretation" of "COMPANY" that allows this case to survive. *First*, Janssen never explains how "COMPANY" does not include *at least* both Centocor and J&J. *Second*, it offers no answer to the fact that its definition of "any" as "one or more" necessarily results in at least four patent owners. *Third*, Janssen offers no justification for how "COMPANY"—a *defined* term specifically designed to provide the same meaning throughout the agreements—could possibly have different meanings in different paragraphs and different sentences. There is only one definition of "COMPANY" that resolves these three problems, and it is the definition Janssen's parent and sister companies have relied upon for years

26

leading up to this litigation: "COMPANY means CENTOCOR *and* JOHNSON & JOHNSON *and*

***their*** successors [etc.] *and **their*** subsidiaries [etc.]."

None of this is unfair to Janssen. As Defendants have pointed out, there are two basic requirements for filing a patent infringement lawsuit—standing and a good faith infringement theory. Janssen, a highly sophisticated company well versed in the patent laws, has the obligation to follow these basic rules, regardless of what Janssen claims is at stake or how far the case has proceeded. Under the applicable law, the Court cannot rewrite the 2000 and 2001 agreements to suit Janssen's needs in 2017. With Janssen's so-called "disclaimer agreement" having no impact on J&J's and its subsidiaries' status as co-owners of the '083 patent, as Defendants explained in briefing and during the October 12 hearing, Janssen's complaint must be dismissed.

Janssen has told the Court that if its case is dismissed, it will simply "refil[e] the case with any purported standing defects resolved." Dkt. 33 at 11. If this were true, Janssen would have already properly cured the problem in ways the law recognizes. It has not done so. If Janssen truly believes it can cure the standing defect, it should be required to do so before it can proceed. No one benefits from continuing to devote resources to the case unless and until Janssen meets its burden to prove standing in a way the law recognizes.

27

Dated: October 16, 2017

Respectfully submitted,

Celltrion Healthcare Co., Ltd., Celltrion, Inc., and Hospira, Inc.

By their attorneys,

/s/*Andrea L.  Martin, Esq.*
Dennis J.  Kelly (BBO # 266340)
Andrea L.  Martin (BBO #666117)
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA 02110-1624
Telephone: 617-345-3000
Facsimile: 617-345-3299
dkelly@burnslev.com
amartin@burnslev.com

James F. Hurst, P.C.  (*pro hac vice*)
Bryan S.  Hales, P.C. (*pro hac vice*)
Elizabeth A. Cutri (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
james.hurst@kirkland.com
bryan.hales@kirkland.com
elizabeth.cutri@kirkland.com

Ryan Kane (*pro hac vice*)
James McConnell (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
ryan.kane@kirkland.com
james.mcconnell@kirkland.com

Charles B.  Klein (*pro hac vice*)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817
Tel: (202) 282-5000
cklein@winston.com

Samuel S. Park (*pro hac vice*)
Dan H. Hoang (*pro hac vice*)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL  60601-9703
Tel: (312) 558-7931
spark@winston.com
dhoang@winston.com

*Attorneys for Defendants Celltrion Healthcare*
*Co., Ltd., Celltrion, Inc., and Hospira, Inc.*

## **CERTIFICATE OF SERVICE**

I hereby certify that a copy of the foregoing document was filed through the electronic filing system and served electronically to the registered participants as identified on the Notice of Electronic Filing.

 */s/  Andrea L. Martin*