# EXHIBIT 44

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
JOHNSON & JOHNSON,        .    Case No. 09-6306 (GEB)
                          .
         Plaintiff,       .
                          .    402 East State Street
         v.               .    Trenton, NJ 08608
                          .
EV3, Inc., et al.,        .
                          .
         Defendants.      .
                          .    December 23, 2009
. . . . . . . . . . . . ..      10:01 a.m.
```

TRANSCRIPT OF HEARING
BEFORE HONORABLE GARRETT E. BROWN, JR.
UNITED STATES DISTRICT COURT CHIEF JUDGE

APPEARANCES:

For the Plaintiff:        Riker, Danzig, Scherer, Hyland &
                          Perretti, LLP
                          By:  EDWIN F. CHOCIEY, JR., ESQ.
                          50 West State Street
                          Suite 1010
                          Trenton, NJ 08608-1220

                          Johnson & Johnson
                          By:  JOHN O'SHAUNESSEY, ESQ.

For the Defendants:       Nukk-Freeman & Cerra, P.C.
                          By:  KERRIE HESLIN, ESQ.
                               ROBIN ROME, ESQ.
                          Short Hills Plaza
                          636 Morris Turnpike, Suite 2F
                          Short Hills, NJ 07078

Audio Operator:           Kimberly Korchick

Proceedings recorded by electronic sound recording, transcript
                produced by transcription service.

---

**J&J COURT TRANSCRIBERS, INC.**
**268 Evergreen Avenue**
**Hamilton, New Jersey 08619**
**E-mail:  jjcourt@optonline.net**

**(609)586-2311      Fax No. (609) 587-3599**

2

1    THE COURT:  Johnson & Johnson, Inc., et al. which is

2    Docket Number 09-6306.  For Johnson & Johnson?

3    MR. CHOCIEY:  Good morning, Your Honor, Edwin Chociey

4    from Riker, Danzig, Scherer, Hyland and Perretti.  I also have

5    John O'Shaunessey who is the assistant general counsel for

6    Johnson & Johnson on the phone.

7    MR. O'SHAUNESSEY:  Good morning, Your Honor.

8    THE COURT:  Okay.  And for the defense, EV3, and the

9    individual defendants.

10   MS. HESLIN:  Good morning, Your Honor.  Kerrie Heslin

11   and Robin Rome from Nukk-Freeman and Cerra.

12   THE COURT:  Okay.  Now, this case, although it was

13   filed quite recently, has a bit of a history to it.  The

14   verified complaint was filed on the 11th.  A notice of removal

15   was filed by the defense on the 14th.  A motion for temporary

16   restraint and accelerated discovery was filed here on the 16th.

17   I believe that that relief was sought or contemplated in the

18   State Court before removal.  We subsequently have a response by

19   the defense on the 17th.  That's Number 4 on the docket.  I

20   spoke to counsel on the 18th.  We have a further response with

21   a certification of Mr. Grant and then we have a reply brief

22   which was filed by the plaintiffs on the 21st, Number 6 on the

23   docket, and some further certifications filed on the 22nd which

24   is very recently.

25   So, what we have here is this verified complaint

**J&J COURT TRANSCRIBERS, INC.**

1  wherein the plaintiff is seeking temporary restraints and we

2  have an opposition by the defense.  What I'm going to do is I'm

3  going to set this down for a preliminary injunction hearing in

4  any event, but before I do that on the temporary restraints let

5  me hear counsel from -- for plaintiff and then counsel for the

6  defense.  Counsel for the plaintiff?

7        MR. CHOCIEY:  Thank you, Your Honor.  The protectable

8  interests here, Your Honor, are in particular the customer

9  relationships.  This is a relationship business and the

10  relationships are key.

11        The sales representative in this case, as do all

12  sales representatives -- or should all sales representatives,

13  develop a very close relationship, a very close level of trust

14  with physicians such as interventional cardiologists and with

15  other purchasing agents, hospital administrators and nurses and

16  staff members of the catheterization laboratory.  These sales

17  representatives are in the procedure rooms with the

18  interventional cardiologists during procedures.  They develop

19  a -- they become an intellectual resource for the physicians.

20        In this case, the individuals defendants called on

21  interventional cardiologists who use both cardiology and

22  endovascular products.  And the -- they've also called on these

23  other purchasing agents and administrators who purchase,

24  negotiate and select both cardiology and endovascular products

**J&J COURT TRANSCRIBERS, INC.**

 1  for the interventional cardiologists.

 2          The individual defendants developed and maintained

 3  these relationships for the benefit of the Cordis and Johnson &

 4  Johnson over many years.  Fitzpatrick and McKeever joined in

 5  2000, Barr in 2005.  These are not recent employees.  They have

 6  developed these relationships.  They maintained these

 7  relationships at great expenditure of time, money, training,

 8  education by Cordis with respect to these individuals.  These

 9  individuals, Your Honor, are top sales representatives from

10  Cordis.  Barr was Number 1 in cardio, Fitzpatrick, Number 8,

11  McKeever, Number 11, throughout the entire country in cardio.

12          These individuals were handsomely compensated.

13  They've received hundreds of thousands of dollars in salary and

14  in variable compensation.  And when they began employment with

15  Cordis, they signed enforceable, valid, non-compete,

16  non-solicitation and non-disclosure agreements with Cordis

17  which specifically relates to, in Paragraphs 6 and 7,

18  non-competition through subsequent employment, that would be

19  competitive, and the non-solicitation of customers.  And that's

20  Paragraphs 6 and 7 of the employment agreements that these

21  three individuals signed and were handsomely compensated for.

22          These three individuals, Your Honor, they resigned

23  from Cordis.  They were not terminated.  And that's an

24  important factor when it comes to the issue of undo hardship.

25  These individuals voluntarily left Cordis.  Here, Your Honor,

1  these individuals easily can, and indeed we have evidence that

2  they already have, traded on and exploited their Cordis

3  customer relationships for EV3's benefit.  They can use their

4  existing relationships with these interventional cardiologists

5  and other purchasers -- other customers to sell endovascular

6  products, and that relates to the peripheral procedures that

7  compete directly with Cordis endovascular products.

8       Mr. McKeever has admitted that he had been calling on

9  Lenox Hill Hospital.  He admitted that to Mr. Bonacome

10 (phonetic) and that's in Mr. Bonacome's reply certification.

11 Lenox Hill Hospital in Manhattan became one of the busiest,

12 most prestigious and most lucrative accounts.  He said that he

13 was on a case at Lenox Hill Hospital and that means that you're

14 in the procedure room.  You're in scrubs.  You're with the

15 interventional cardiologist or the physician.  You're there.

16 You're answering any questions.  You're holding products for

17 the physician.  Again, that level of trust that's built up with

18 the customer, i.e., the interventional cardiologists.

19      Mr. Fitzpatrick has admitted that at least four of

20 his Cordis accounts have been assigned to him at EV3.  He

21 doesn't tell us which other Cordis accounts he had been calling

22 on or that have been assigned to him at EV3.  He tried to

23 sidestep the issue by saying that he wasn't actively servicing

24 the other Cordis accounts, but I question what exactly -- he

25 doesn't explain what that means.  And in the agreement there's

6

1  no standard that he's only prohibited from calling on customers
2  that he actively serviced.  The agreement is quite clear in
3  Paragraphs 6 and 7 in terms of the customers, the clients and
4  the accounts that he is prohibited from calling on in a
5  post-employment situation.  He cannot rewrite this agreement,
6  Your Honor.

7          Finally, Barr -- Ms. Barr, she doesn't even address
8  in her certification the accounts -- the Cordis accounts that
9  she is calling on and she does not deny that she is calling on
10 her Cordis accounts for EV3, a very telling silence on her part
11 in terms of the Shreveport territory.

12         Your Honor, it makes no difference here that the
13 individual defendants are selling endovascular products for EV3
14 and not cardiology products.  It's the relationships that are
15 the protectable interests here.  It's the relationships with
16 the physicians and the other customers who purchased both
17 cardio and endovascular products and who do so.  The individual
18 defendants, they have these relationships, they develop, they
19 maintained them for Cordis and -- on Cordis' dime and Paragraph
20 7 of these agreements squarely address this circumstance and
21 prohibit this type of solicitation and selling to those
22 customers.

23         And the customers -- these relationships are
24 legitimately protectable interests.  We look at Harlington
25 Weinberg (phonetic) from the New Jersey Supreme Court.  We look

**J&J COURT TRANSCRIBERS, INC.**

1    at the <u>Whitmeyer Bros.</u> case, as well which clearly state

2    that -- for instance in <u>Whitmeyer</u>, the Court said that, "The

3    employer has a patently legitimate interest in protecting his

4    trade secrets as well as the confidential business information

5    and has an equally legitimate interest in protecting his

6    customer relationships."  That's from <u>Whitmeyer Bros</u>, 58 N.J.

7    at 33.

8         Your Honor, we also have a situation where these

9    individual defendants have received significant exposure to

10   Cordis' endovascular products and sensitive information such as

11   sales and rebate information for specific accounts, such as

12   products in the pipeline and strategic plans.  And we have laid

13   out in our verified complaint and in our reply certification

14   the sources of this knowledge, Your Honor.

15        The defendants try and paint a picture whereby Cordis

16   Endo and Cordis Cardio are completely separate entities sealed

17   off -- hermetically sealed off from each other with no sharing

18   of information, no collaborative efforts, nothing like that.

19   And that's far from the cases shown particularly in the reply

20   where we have set forth examples of the regular interaction.

21   And it just makes common sense, Your Honor.

22        The regular interaction between endo sales reps and

23   cardio sales reps when it comes to discussing their accounts,

24   sharing leads and inquiries from physicians and from other

25   purchasers, other clients, being physically present in the

1  hospital, seeing where your colleague is spending his or her

2  time, seeing where your colleague is -- with whom he or she is

3  speaking on a regular basis, knowing who the big accounts are

4  in endo, gathering intelligence, sharing this intelligence.  It

5  makes good business sense and it's not brain surgery to

6  understand that these type of interactions take place.  It's

7  just simply good business practice.

8          Then we also have, Your Honor, collaborative efforts

9  between cardio and endo.  For instance, co-promotion rebate

10  programs where collective sales targets for cardio and endo are

11  established by Cordis.  We have meetings with managers and with

12  sales representatives such as the individual defendants here

13  where the collective sales information is discussed.  We have

14  meetings with the specific accounts where the sales reps

15  reviews with those accounts the purchasing goals for both

16  endovascular and cardiology products to achieve their rebates.

17  We have email updates and status reports that contain both

18  Cordis Cardio and Endo information and target information

19  that's provided to the individual defendants.

20          And then we have a host of other types of meetings

21  such as national sales meetings, additional meetings where

22  confidential and sensitive information about endovascular

23  products and cardio products are discussed and reviewed and

24  presented to the sales reps such as the individual defendants

25  here.  Indeed, one of the individual defendants admits that

1  there was sales information discussed at these national

2  meetings.

3       Then we have -- for instance, Your Honor,

4  specifically with respect to Ms. Barr, we have testimony in the

5  certifications relating to the combined sales efforts of the

6  cardio and endo through things such as lunches that are

7  presented by the sales reps in cardio and endo in Shreveport.

8  And in those discussions there's information provided about

9  endovascular products, about endovascular sales, et cetera.

10       Your Honor, in summation here, we have valid

11  enforceable restrictive covenants in the employment agreements,

12  specifically, again, Paragraphs 6 and 7 of the agreements, that

13  prohibit this very type of unfair competition in which the

14  individual defendants and EV3 have been engaged.  EV3 has

15  assigned these individuals to the same territories, to the same

16  accounts and we even have admissions as to accounts that have

17  been called on or that have been assigned to these individuals

18  that were Cordis customer relationships.  These agreements are

19  specifically tailored to this situation and cover exactly this

20  type of unfair competition and unfair solicitation of

21  customers.

22       If the shoe were on the other foot here, Your Honor,

23  I would ask if EV3 would allow Cordis to hire the EV3 sales

24  representatives and allow them to call on the very same

25  physicians, the interventional cardiologists who use both

1    cardiovascular and endovascular products, purchase those

2    products.  And I daresay the answer would be no and I think

3    that that would show that the protectable interests here, in

4    particular the relationships, customer relationships and the

5    sensitive information relating to endovascular is of compelling

6    concern to be addressed by these agreements and also under the

7    law that we've cited extensively in our papers.

8         And it also shows irreparable harm.  The irreparable

9    harm, Your Honor, goes to the exploitation and the trading on

10   these relationships and in the <u>Manhattan Associates</u> case, in

11   the Third Circuit case of (<u>indiscernible) Enterprises</u> which we

12   also cited in our papers, they say -- those Courts stated the

13   grounds for irreparable injury include loss of control of the

14   reputation, loss of trade and loss of good will.  And that's

15   exactly what we have here, Your Honor.

16        We have well compensated sales representatives who

17   have been at Cordis for a lengthy period of time who have now

18   voluntarily terminated their employment with Cordis and who are

19   going to be -- who are going to and who can go to the exact

20   same customers with whom they dealt over a number of years and

21   easily transfer those relationships to the endovascular side of

22   the business of EV3 because those very customers are the ones

23   who purchased and used both cardio and endovascular products

24   through Cordis.

25        Now, EV3 also has a division in neurovascular, so

**J&J COURT TRANSCRIBERS, INC.**

1  this is not a situation where these individual defendants would

2  be put out of work or put out on the street.  Their sales

3  skills are certainly transferable to other areas and so in

4  order to comply with the agreements -- actually there's even a

5  provision in these employment agreements, Your Honor, that

6  deals with a new employer that is diversified and --

7         THE COURT:  I read that.

8         MR. CHOCIEY:  And, so this is a prime example where

9  that type of situation can be used and addressed.

10         THE COURT:  Very well.

11         MR. CHOCIEY:  Thank you, very much, Your Honor.  We

12  also have a request about expedited discovery.

13         THE COURT:  I know that.  We'll deal with that later.

14         MR. CHOCIEY:  Thank you.

15         THE COURT:  Let's first deal with this issue.  Ms.

16  Heslin?

17         MS. ROME:  Your Honor, it's Robin Rome on behalf of

18  the defendants.  If I may, I'd like to briefly address the

19  facts and as Your Honor knows we -- we've raised issues

20  regarding personal jurisdiction.  If Ms. Heslin can address

21  that briefly and then we can get back to the merits of the TRO.

22         THE COURT:  All right.  Well, if you want to address

23  the jurisdictional aspect, we can -- that's a preliminary one

24  we can deal with quite quickly.  Ms. Heslin, do you have

25  anything further than what's in your papers?

**J&J COURT TRANSCRIBERS, INC.**

1          MS. HESLIN:  Well, Your Honor, it's our position that
2     the Court with all due respect does not have parental
3     jurisdiction over the individual defendants Fitzpatrick and
4     McKeever.  While Ms. Barr signed and non-compete agreement in
5     which she consented to do jurisdiction in the State and Federal
6     Courts in New Jersey, the non-compete agreement where it is
7     signed by Mr. Fitzpatrick and Mr. McKeever do not contain that
8     same provision and they are clearly (indiscernible) defendants.
9     Due process requires that a defendant who is not physically
10    present in New Jersey has certain minimal contacts with New
11    Jersey, but that the maintenance of a lawsuit against them does
12    not send judicial motions of their claims substantial --

13         THE COURT:  I know.  I read your papers on that.
14    Anything further?  I think this can be disposed of very
15    quickly.  We have defendants here as far as Fitzpatrick and
16    McKeever who are working for a New Jersey corporation in a
17    national company, gone to another national company with
18    contacts in New Jersey and elsewhere and they get their
19    paychecks from New Jersey.  They deal with their superiors in
20    New Jersey.  To read this in that -- this narrow manner would
21    be contrary to the teachings on jurisdiction, so I will deny
22    that.  Let's move on to the merits.

23         MS. ROME:  Your Honor, the plaintiff would have this
24    Court believe that EV3 essentially plucked these three
25    individuals defendants out of Cordis Cardio, put them in the

1  exact same territories they were servicing, servicing the exact
2  same customers that they serviced with Cordis Cardio and that
3  they're funneling confidential proprietary information to EV3.
4  That's -- that is simply not the case and the certifications
5  that have been submitted by the defendants support that.

6       What we contend has actually happened here is that
7  Cordis as a company, particularly its cardio division, has
8  basically been bleeding sales representatives.  They're now
9  trying to tie all three of these individuals because they've
10 all gone to EV3 at entirely different time periods to try to
11 create some type of nefarious conduct on the part of the
12 individuals and EV3.

13      THE COURT:  Well, it's all around the same time
14 period, September through November, isn't it?

15      MS. ROME:  It is, Judge, but if you look at the --
16 actually no because Ms. Barr had a pretty lengthy -- a five
17 month gap in her --

18      THE COURT:  I know that.  She was with St. Jude's,
19 but she went with your company during the September through
20 November time period, correct?

21      MS. ROME:  Correct, Judge.  Correct.  And as Ms. Barr
22 put in her certification, there are many other sales
23 representatives who went to other competing organizations from
24 Cordis Cardio, as well.  So, they clearly have been losing
25 sales representatives over the past several months.

**J&J COURT TRANSCRIBERS, INC.**

 1          In terms of the -- this -- the way they're presenting

 2   what's happened here, they talk about EV3 targeting these

 3   individuals and perhaps I guess to the point Your Honor was

 4   just making, there's absolutely no evidence of that.  All of

 5   the individual defendants have all certified they were not

 6   targeted.  They were not recruited by EV3.  They reached out.

 7   They were dissatisfied with their employment with Cordis.  They

 8   reached out to EV3.

 9          EV3 is a market leader in the peripheral vascular

10   market.  Before these individual defendants joined them, they

11   already had a presence in these territories.  They had

12   customers.  They had products.  They did not pull these

13   defendants out of Cordis Cardio to come in and service the same

14   clients, the same territory and the same accounts.

15          In addition, Judge, clearly EV3 did not target the

16   individual defendants to gain any insight into confidential

17   proprietary information.  All of the individuals have certified

18   they did not take any confidential information with them and

19   they certainly had not shared any confidential information with

20   anyone at EV3.

21          I think it's important to note too, Judge, the way

22   the plaintiff has positioned its case, accurately it is a

23   customer relationship that are the key to their claims and

24   their request for a TRO, but they misstate the agreement.  The

25   agreement does not just protect customer relationships with

**J&J COURT TRANSCRIBERS, INC.**

1  whom these individuals had contact during twelve months.

2  There's an additional limitation if they do not reveal their

3  papers and that their orders did not reflect which is the

4  individuals have to be contacting those customers for the

5  purpose of selling competing products.  And that's really key

6  in this case because what the individual defendants did is

7  precisely what they should have done.

8          They went to work for an organization, EV3, that

9  services an entirely different market that they serviced when

10  they were at Cordis.  They were at one of five divisions with

11  Cordis, Cordis Cardio.  Cordis Endo is an entirely distinct

12  division.  That's actually the language used on the Cordis

13  website.  It's distinct.  They did not sell endovascular

14  products, peripheral vascular products.  They sold cardiology

15  products.

16          In terms of competition between endo -- Cordis Endo

17  and EV3, EV3 and the individuals and sales reps, their primary

18  target is a very specific proprietary system that EV3 has.

19  It's the atherectomy products and what they do is they

20  essentially remove plaque.  Cordis does not have that product.

21  Cordis is not in that market and neither is J&J.

22          So, what the plaintiff had done here is they've lost,

23  as counsel said, top sales representatives.  They're upset with

24  that.  These sales reps did exactly what they should have done.

25  They went to a totally different market and now they're trying

1   to tie in facts that aren't there to prevent them from working

2   in a totally unrelated field.

3          In terms of some of the other initial facts that are

4   really relevant here, Mr. McKeever, as counsel said, he --

5   actually there is only one account that he also called upon

6   when he was with, again, Cordis Cardio, not Cordis Endo.  He

7   did not sell any endovascular products to Lenox Hill.  At Lenox

8   Hill, he is selling only the plaque removal product.  He does

9   not sell any of the products that directly compete with Cordis

10  Endo.  There's another sales representative from EV3 assigned

11  to that account who sells those products.  Lenox Hill is an

12  existing client of EV3.  They were a client of the company

13  before Mr. Fitzpatrick -- or before Mr. McKeever joined and he

14  is selling different products as I just stated.

15         Now, with respect to Mr. Fitzpatrick, Mr. Fitzpatrick

16  -- and, again, I would contend (indiscernible) to present any

17  conflicting evidence.  They just take issue with the wording

18  that Mr. Fitzpatrick has used.  Mr. Fitzpatrick, of all of the

19  accounts he has with EV3, of those 39 accounts there are four

20  accounts that he had contacts with.  Again, he did not sell any

21  competing products when he was with Cordis Cardio when he had

22  contacts with these accounts.  Three of those accounts, and

23  this is in Mr. Fitzpatrick's certification, three of those

24  accounts don't even use Cordis Endo products.  Cordis Endo has

25  no presence in those particular accounts.  As a matter of fact,

1  I think one account as we said in the certification, prohibited

2  from using Cordis Endo products.  They use products of another

3  EV3 competitor.  And that two of these accounts, two of the

4  four, he is -- his customers, his clients are individuals that

5  EV3 introduced him to.  He had no contact with these

6  individuals when he worked at Cordis Cardio.

7         With respect to Ms. Barr, the facts with Ms. Barr are

8  actually even more tenuous.  Mr. Barr, as we said earlier, had

9  a gap in her employment.  She left Cordis Cardio.  She went to

10  work for St. Jude Medical.  Now, Judge, St. Jude Medical -- the

11  five months that she worked there, she serviced the same exact

12  territory that she did with Cordis Cardio.  She called on the

13  same customers she did with Cordis Cardio.  Now, plaintiffs

14  really don't address that issue directly in their certification

15  except to say that St. Jude Medical, it does not compete.  That

16  section's not accurate.

17         Cordis has another division, one of their five

18  divisions, that actually sells those same products as St. Jude

19  Medical and that's their (indiscernible) division.  So, for

20  Cordis Cardio to now come in late in the game when Ms. Barr has

21  continued to develop these relationships with St. Jude, now ten

22  months later to try and preclude her from calling on these

23  customers, certainly can be deemed a waiver of any restrictions

24  with respect to her.

25         And as we noted in our certification, Judge, most of

**J&J COURT TRANSCRIBERS, INC.**

the customers, but for the ones we've cited, customers in
Mississippi that she doesn't even service with EV3, she brought
with them to Cordis Cardio.  They were her customers as a
pharmaceutical rep.  Again, the plaintiffs do not dispute that.
They referred to her employment application and the length of
her employment in pharmaceutical sales, but they have
absolutely no facts to contradict that these were existing
relationships she brought with her.

Your Honor, knowing that these individual defendants
do not sell competing products and that this is really
dispositive on their violation of the customer non-solicit
because, again, it's not just the relationships.  It's whether
they're selling competing products.  That's their language.
It's a contract of adhesion that these individuals signed
believing by going to a different market they were not
competing.

They really try to blur the line between Cordis
Cardio and Cordis Endo, but there are really common facts in
all of the certifications we've submitted that are dispositive
in terms of the TRO.

First of all, they never handled marketing or sales
of products of Cordis Endo.  They never called on any customers
with Cordis Endo.  During the time they were with Cordis
Cardio, individual defendants never trained on any endovascular
products or any Cordis Endo products.  During the time they

1  were with Cordis Cardio, the individual defendants never had

2  any knowledge of Cordis Endo type life products, research or

3  development plans, cost for products, charging clients or

4  pricing.  And in addition, all of the individual defendants

5  certified that the technology resources that the plaintiffs had

6  identified, namely, the Gateway System by Cordis, they never

7  accessed those systems for information on Cordis Endo.

8         They also all certified that they did not take any

9  Cordis confidential information with them when they left.  They

10  also had not used any Cordis Endo sales or marketing strategies

11  or pricing as part of their employment with EV3.  The bottom

12  line is, Judge, they are not doing anything to violate any

13  confidentiality obligations.  They are not utilizing that

14  information in the course of their employment with EV3.

15         So, when you actually look at it, Judge, I would like

16  to address briefly that -- the first two prongs of the TRO

17  standard and then Ms. Heslin's going to address the other two

18  prongs.  But, first and foremost, there are clearly disputed

19  issues of fact here.  The individual defendants have submitted

20  their certifications.  The plaintiffs have now submitted three

21  additional certifications and the primary purpose is to dispute

22  the facts in the individual defendant's certifications.

23         It's very clear under the authorities in this circuit

24  that when there is a disputed issue of fact, it is

25  inappropriate to issue injunctive relief.  In looking at the --

1           THE COURT:  Preliminary injunction, one must rule on

2  disputed issues of fact.  On a TRO however --

3           MS. ROME:  Right.

4           THE COURT:  -- just the fact that you dispute what

5  someone else says, doesn't mean that there's no TRO or the

6  courts would be useless.  Proceed.

7           MS. ROME:  In terms of the TRO standard, Judge, the

8  irreparable harm issue -- actually, let me take first the

9  prong, plaintiffs are not likely to prevail on the merits of

10  the case.  We talked about the facts, Judge, that the crux of

11  this case is really the customer non-solicit.  There is also a

12  paragraph, I believe it's Paragraph 6, which talks about

13  post-employment work that the defendants can undertake.  I do

14  not believe that the plaintiffs are seeking to bar entirely the

15  employment of these individuals from EV3.  As a matter of fact,

16  on Page 24 of their briefing they specifically say that.

17  They're free to work at EV3, or anybody in the endovascular

18  industry as long as they don't solicit the customer

19  relationships or disclose confidential information.

20           Now, again, Judge, it's not merely soliciting the

21  relationships.  It's soliciting for purposes of selling a

22  competing product.  But, I think clearly in this case the

23  relief is being requested in the TRO in terms of barring them

24  from working for EV3 appears to be a moot issue.

25           In terms of the customer relationships and looking at

1  irreparable harm, again, Judge, as we emphasized in the outset,

2  they're interpreting and stretching the non-solicit obligations

3  way beyond the language and scope.  Their TRO order,

4  specifically Paragraph A, precludes the individual defendants

5  from calling on any customers they had contact with during the

6  last 12 months of their employment.  It has to be customers

7  with which they're selling a competing product.

8         Now, to the extent that they try to expand the

9  competing product beyond those offered by the company they work

10 for, Cordis Cardio, it's defendants' intention that that would

11 be unreasonable under the standards that had been enunciated by

12 the Court in this circuit.  Specifically, it would be beyond

13 the scope of what would be necessary to protect the legitimate

14 business interests of Cordis Cardio.

15        As a matter of fact, Judge, the way the agreement

16 could be deemed to be worded would also be able to include J&J,

17 which J&J is a worldwide company also engaged in pharmaceutical

18 sales.  It would be highly unreasonable to think that these

19 individuals who have had careers in sales for their entire

20 lives would be precluded from calling on any medical device

21 company, any pharmaceutical company simply because that is a

22 product that is offered by J&J or Cordis.  And, again, Your

23 Honor, the facts with respect to Barr and the plaintiff's

24 conduct in that case is dispositive.  She went to work for a

25 competitor calling a competitor from one of their divisions,

1  calling on the same customers, the same territory and they sat.
2  They did nothing with respect to Barr.

3          THE COURT:  All right.  Anything further?  Mr.
4  Chociey, any response before I rule?

5          MR. CHOCIEY:  Yes, just very briefly, Your Honor.  I
6  think it's very telling here that the key of the relationships
7  here is that these relationships provide the individual
8  defendants with instant access to these customers.  Otherwise,
9  why would EV3 be sending these sales representatives to the
10 very same accounts that they serviced for Cordis?

11         With respect to Barr, she had nothing to do with the
12 Cordis product line that was the subject of her work with St.
13 Jude.  So, it's a totally different circumstance.

14         And, Your Honor, if you look at the language in
15 Paragraphs 6 and 7 of the agreement, it specifically applies to
16 competing products.  And if you look at -- if you tie that into
17 the language in the certifications of Fitzpatrick and Barr,
18 they talk about their focus is on these plaque products.  They
19 don't say that they're exclusively selling it.  They carefully
20 word it that their focus is on that.  And then with respect to
21 the certification of McKeever, he doesn't even have that type
22 of language in Paragraph 5 of his certification.  He simply
23 talks about endovascular products.

24         So, Your Honor, we would submit that the plaintiffs
25 here -- we met the TRO standard.  These relationships are

1  covered by the employment agreements, specifically Paragraphs 6

2  and 7, and we would request that the Court enter the order to

3  show cause with the temporary restraints and provide expedited

4  discovery.  Thank you, Judge.

5         THE COURT:  Thank you, counsel.  Now, I have reviewed

6  the submissions here and I've considered the four factors.  And

7  I emphasize that what we have here is a prompt request for

8  temporary restraints and order to show cause for a preliminary

9  injunction.  In any event, we will have a hearing.  We will

10  make a determination of disputed facts as counsel noted and we

11  will make that determination.  But, now I have a request for a

12  temporary restraining order only.

13         Looking at this, it seems to me that we have these

14  three representatives who have considerable knowledge and

15  contacts of the individual accounts, different product, but

16  there is a very close relationship as the plaintiff notes in

17  its papers between what they are now selling and what they

18  previously sold.  And they're indeed -- the customers, whether

19  it's the hospitals or the doctors, can use both lines of

20  product and frequently do.

21         The plaintiff requests an order to show cause and I

22  will set that down.  Also requests the temporary restraints

23  during the period before the order to show cause.  As to those

24  individual restraints, I will grant in part and deny in part.

25  We turn to Page 6 of the proposed order, I will temporarily

1  enjoin and temporarily restrain the individual defendants from

2  soliciting any business from, selling to or rendering any

3  service to, or directly or indirectly helping others to solicit

4  business from, or render any service, or selling to any of the

5  accounts, customers or clients with whom they had contact

6  during the last 12 months of employment with Cordis for a

7  period of 18 months.  Now, I will say for now from the date of

8  the Court order, but I will consider at the hearing whether it

9  should be 18 months from the time they left or 18 months from

10 some subsequent time.  But, for now I will enter the first

11 paragraph.

12      B, EV3 and its officers, agents and employees are

13 enjoined from causing or permitting the individual defendants

14 to sell to, or render any services to, or directly or

15 indirectly help others solicit business from, or render any

16 service or selling to any of the accounts, customers or clients

17 with whom they've had contact during the last 12 months of

18 employment with Cordis for a period of 18 months.  And it will

19 presently be from the date of this order, but I will consider

20 whether it should be from the time they left or whether it

21 should be from a subsequent date.

22      Now, as far as Item C, which provides the individual

23 defendants are enjoined from soliciting or hiring on their

24 behalf or on behalf of anyone else including, but not limited

25 to EV3, any employee of plaintiff's who have signed a

1 non-compete agreement for a period of 12 months from the date

2 of the Court's order, I will not grant that as temporary

3 restraints. We'll consider that at the hearing. But, based

4 upon the information I have here so far, when we look at the

5 four factors; substantial likelihood of success on the merit,

6 irreparable injury, a balance of the hardships and the public

7 interests, I'm not going to enter that.

8 As the case of Subparagraph D, EV3 and its officers,

9 agents and employees are enjoined from causing or permitting

10 the individual defendants from soliciting or hiring on EV3's

11 behalf any employee of plaintiff who has signed a

12 non-compete agreement for a period of 12 months from date of

13 the Court's order, I will not enter that as a temporary

14 restraint. Of course, if EV3 or the defendants are alleged to

15 have encouraged other Cordis employees to breach non-compete

16 obligations, I will consider that at a subsequent time. But,

17 as of now, I will not.

18 And, again, Subparagraph E, Subparagraph F,

19 Subparagraph G, I will not grant. Subparagraph H on Page 8,

20 the individual defendants are enjoined from disclosing, using,

21 disseminating, lecturing upon or publishing any of plaintiff's

22 confidential proprietary trade secret information as defined in

23 the respective non-compete agreements. And I, EV3 and their

24 officers, agents and employees are enjoined from causing or

25 permitting the individual defendants to disclose or use

**J&J COURT TRANSCRIBERS, INC.**

1 receiving, using, disclosing plaintiff's confidential

2 proprietary and trade secret information as defined by the

3 respective non-compete agreements, I will enter those as

4 temporary restraints.

5       As far as J, the turnover of information, I will not

6 as this has seemed to be -- the defendants say they don't have

7 that information.  There's no proof that they do at this point.

8 K, otherwise enjoined from violating the terms, I will grant

9 that.  And L, I will grant that.  M, I will grant that.

10       Now, let's address the issue of a bond and the issue

11 of expedited discovery on a limited basis.  Now, I was planning

12 on holding this hearing in early January.  I don't know what

13 counsel's schedules are.  I have some time in the latter part

14 of the week of the 4th, the 6th, 7th or 8th when I could hear

15 you.  If we go on to the 11th, I'm going to be in the middle of

16 a six week criminal case and I would probably be hearing you

17 during the luncheon recess for maybe an hour a day or something

18 of that sort.  I don't know how that fits in with the

19 availability of your witnesses, the discovery that you feel you

20 need and, of course, the question of bond also.  It really

21 would depend on how long these restraints are going to be in

22 effect before the hearing.

23       It's now quarter of 11.  I have another case coming

24 up shortly.  My intent is to ask you folks to continue on the

25 line to discuss with yourselves your work schedule, witnesses'

**J&J COURT TRANSCRIBERS, INC.**

1   availability, the discovery that you reasonably want, what you

2   think is an appropriate bond and get back to me on that at

3   11:30.  How does that sound?

4              MS. ROME:  Very good, Your Honor.

5              MR. CHOCIEY:  That's fine, Your Honor.  Thank you.

6              THE COURT:  All right.  We'll talk to you at 11:30

7   then.

8              MS. ROME:  Your Honor?

9              THE COURT:  Yes.  Yes.

10             MS. ROME:  I apologize.  This is Robin Rome for the

11  defendants.  Can I get one point of clarification?  On the

12  restrictions in A and B which is specifically a customer

13  non-solicitation, the way the order is currently written is it

14  prohibits contact with the individuals which doesn't accurately

15  reflect the language of the agreement.  What we would ask is

16  that the order reflect the language of the agreement which is

17  contact during the last 12 months of employment for any purpose

18  related to the sale of any such product or service.

19             THE COURT:  Well, I'm going to allow you folks in

20  that time to discuss the form of order in which you think are

21  appropriate and get back to me with that at the same time, all

22  right?

23             MS. ROME:  Okay, Judge.  Thank you.

24             THE COURT:  So, all the details you'll be discussing

25  in the next 45 minutes, okay?

**J&J COURT TRANSCRIBERS, INC.**

1             MS. ROME:  Thank you.

2             MR. CHOCIEY:  Thank you.

3             THE COURT:  Thank you.  All right.

4             (Unrelated matters discussed at this time)

5             THE COURT:  Yes, this should be the Johnson & Johnson

6    case, is that right?

7             MS. ROME:  Yes, you're correct, Judge.

8             THE COURT:  All right.  Appearances again?

9             MR. CHOCIEY:  Yes, Your Honor, Edwin Chociey, Riker,

10   Danzig, Scherer, Hyland and Perretti for the plaintiffs.  I

11   also have John O'Shaunessey who is the assistant general

12   counsel of Johnson & Johnson on the telephone with me.

13            THE COURT:  All right.  And for the defense?

14            MS. HESLIN:  Kerrie Heslin and Robin Rome from

15   Nukk-Freeman and Cerra, Your Honor.

16            THE COURT:  And anyone else?

17            MR. CHOCIEY:  No, that's it, Your Honor.

18            THE COURT:  All right.  Now, you have conferred on

19   the form of the order and the bond, is that correct?

20            MR. CHOCIEY:  Yes, Your Honor.

21            THE COURT:  And what have you -- what are your

22   positions on this?

23            MR. CHOCIEY:  Well, Your Honor, we have discussed a

24   few items.  In terms of Paragraphs A and B of the order, the

25   defendants have requested some additional language in there

1 relating to the agreement and we had proposed -- we, the

2 plaintiffs, had proposed to add in the following language in

3 Paragraphs A and B to mirror the employment agreements.  And

4 where the restriction states that individual defendants are

5 enjoined from soliciting any business from, selling to, or

6 rendering any services to, or directly or indirectly helping

7 others solicit business from, or rendering any service or

8 selling to any of the accounts, customers or clients with whom

9 they had contact during the 12 months of employment for -- I'm

10 sorry, of plaintiff with Cordis, comma, we, the plaintiffs,

11 pursuant to our discussion and the request by the defendants

12 had suggested the following which mirrors the language of the

13 agreements.

14       For any purpose related to the sale of any product or

15 service that could compete with a product or service being sold

16 or developed by Cordis, comma, and then there's additional

17 language for a period of 18 months and I believe that Your

18 Honor had addressed that particular phrase in the Court's

19 earlier ruling.

20       THE COURT:  That's correct.

21       MR. CHOCIEY:  And, so that was what we had suggested

22 with respect to A and B pursuant to the point that the

23 defendants raised at the end of the prior phone call.

24       THE COURT:  And what's the defendant's reaction to

25 that?


**J&J COURT TRANSCRIBERS, INC.**

1          MS. ROME:  Your Honor, we appreciate that the

2    language will track what's in the agreement.  The concern has

3    to do with Cordis as opposed to Cordis Endo.  The entire basis

4    for the TRO, and I believe Your Honor's ruling earlier today,

5    was that there was a level of stickiness or interaction between

6    Cordis Endo and Cordis Cardio.  Cordis, as an entity, has five

7    different divisions.  Cardio and endo are two of the divisions,

8    but they have three others who are in completely different

9    markets, as well.

10          So, what we have proposed consistent with what was

11    requested in the TRO and ruled on this morning was it would be

12    the sale of any product or service offered by Cordis Endo.  And

13    obviously we could put Cordis Cardio in there, as well.

14          MR. CHOCIEY:  Your Honor, this is -- this is just a

15    way for the defendants to get these sales representatives back

16    into these relationships, trading on them, exploiting them for

17    whatever products, you know, they might try and address.  It's

18    a type of backdoor way of vitiating the language of the

19    agreements and the restrictions that are contained in this

20    agreement.

21          THE COURT:  Well, I'll tell you.  I think that --

22    let's stick with the language of the agreement.  I don't want

23    any emergency applications between Christmas and New Year's, so

24    we can deal with this in the hearing.  But, for now, let's

25    track the agreement.  I'll use the plaintiff's language on

1    that.  Next issue?

2          MR. CHOCIEY:  The next issue, Your Honor, is an issue

3    with respect to a specific product that the defendants raised

4    and that was these atherectomy products that they say that

5    their individual defendants are going to be selling at least in

6    part.  These are products that compete with the products that

7    -- such as stents and balloons that Cordis manufactures

8    themselves.  They do the same type of work in terms of clearing

9    blockages in arteries.  And we just want to be very clear that

10   the temporary restraints apply to those products from the

11   plaintiff's perspective.

12          MS. ROME:  And, Your Honor, what we had agreed to

13   previously is that we would do an exchange of the products --

14   the actual products themselves and then also the list of

15   customers, so the individual defendants would know exactly what

16   the limitations were in the TRO.  With the atherectomy products

17   as the certifications support, it is a one of a kind

18   proprietary product.  There are three other companies that

19   offer it.  Cordis and J&J are not one of them.

20          So, you know, for the individual defendants, even

21   given the language in the agreement, to be restricted from

22   selling those -- and, again, we'll exchange the list of

23   products that really do directly compete, would go down the

24   scope of even what the agreement provides.

25          MR. CHOCIEY:  Well, Your Honor, that's another

1  backdoor way of emasculating the agreement and the order in

2  terms of these atherectomy products being products that are --

3  that compete with and do the same type of --

4          THE COURT:  Well, they don't directly compete, do

5  they?  And --

6          MR. CHOCIEY:  No, they don't.  They do the same type

7  of work in terms of clearing blockages in arteries.

8          THE COURT:  That may well be and we can address that

9  at the hearing.  But, for now if we're dealing with something

10  other than direct competition based on this record for the

11  purpose of a TRO, I will not include that.  Next issue?

12          MS. ROME:  The other issue that we raised with

13  plaintiff, Judge, was with respect to Ms. Barr.  We had put

14  this in our papers and we really didn't explore it in the

15  argument, but Ms. Barr had several relationships that she

16  actually brought with her to Cordis that we -- we have 21

17  recommendations in hand that predate her employment.  Actually,

18  some of them were given to Cordis, so she could get the job.

19  And under the authority that -- specifically medicals -- and,

20  again, we raised this with counsel before we got on with Your

21  Honor, but could not resolve it, but the medical coordinates

22  makes it specifically clear that what an employee brings to

23  their employer they should not be able to take away.  So, to

24  the extent the employee has these existing relationships that

25  they brought with them to the employer, the employer is

1  prohibited from precluding those relationships even with a

2  restrictive covenant.

3          So, what we've proposed to plaintiff was we would --

4  and we could provide them with the recommendations themselves,

5  is actually come up with a list for Ms. Barr that represent the

6  pre-existing relationships that she brought with her and

7  serviced in Cordis.

8          THE COURT:  What's the plaintiff's position on this?

9          MR. CHOCIEY:  Your Honor, I haven't seen the list.

10 It's not part of the record here.  It would be something that

11 we would need to discuss offline.  We have yet -- we haven't

12 seen who these alleged customers are and I would need to

13 explore that with my client.  I don't think anybody is in a

14 position, whether it be plaintiffs or the Court, to address any

15 type of carve-outs from the order as we stand right now.

16 There's simply no record on it and it's something that we would

17 certainly discuss with the defendant's offline and have -- I

18 would then have an opportunity to review it with my client and

19 find out if those representations are correct.

20         THE COURT:  Well, the order provides for a

21 modification on two days notice.  Why don't we enter the order.

22 You can work this out, contact me if you can't work it out

23 among yourselves.

24         MR. CHOCIEY:  Okay.

25         MS. ROME:  Great.  Thank you, Your Honor.

**J&J COURT TRANSCRIBERS, INC.**

34

1          THE COURT:  Anything else?

2          MS. ROME:  Your Honor, the other issues left to

3   discuss with you are the issues of the schedule that we have

4   agreed to as far as discovery, also the issue of the bond.

5          THE COURT:  Okay.

6          MS. ROME:  We had proposed -- to maybe take the

7   easier one first, we proposed the -- a bond of $50,000 per

8   individual based on case law and we had not heard yet from the

9   plaintiffs whether they objected to that or not.

10         THE COURT:  Mr. Chociey?

11         MR. CHOCIEY:  Yes, Your Honor, it seems a bit high,

12  $50,000 per individual defendant.  We're obviously -- we'd be

13  subject to the Court's discretion in this regard, but it seems

14  a bit high per individual.

15         MS. ROME:  Well, Your Honor, under the discovery

16  schedule that the parties have agreed to, the here -- the

17  preliminary injunction hearing in this case will not occur

18  until mid February.  So, these people are essentially for the

19  next two months going to be put out of their livelihood.

20         THE COURT:  I think it's reasonable and certainly J&J

21  and Cordis won't be hurt by posting such a bond, so I will

22  provide for the 50,000.  Now, you're schedule for discovery and

23  hearing, tell me about that, people.

24         MS. ROME:  Your Honor, just for clarification, our

25  request had been that the bond be for 50,000 per individual, so

**J&J COURT TRANSCRIBERS, INC.**

1  it would be 150.

2          THE COURT:  That's right.  That's right.

3          MR. CHOCIEY:  Your Honor, may we discuss timing

4  and --

5          THE COURT:  Yes.

6          MR. CHOCIEY:  -- some of these places require a

7  corporate signature and with the holidays.  It may be hard to

8  get that in place within a week or so.

9          THE COURT:  Get -- well, listen, get the bond in

10 by -- oh, let's see.  Why don't we make it by the 6th of

11 January, how's that sound?

12         MR. CHOCIEY:  That would be fine, Your Honor.

13         THE COURT:  I mean, again, I think both plaintiffs

14 and defendants are good for it, so there's not a problem here.

15         MR. CHOCIEY:  Okay.  Thank you.

16         THE COURT:  All right?  Now, your schedule, you

17 didn't like the first week in January.  Even the second week,

18 you wanted to push the PI back a bit?  Tell me about it.

19         MS. ROME:  Your Honor, while we certainly would

20 like -- and our client would like to get this resolved as soon

21 as possible especially since there are restraints now that are

22 going to be in place.  Realistically speaking, given the timing

23 with the holidays, the fact that our clients' facilities are

24 shut down from tomorrow until January 4th and the fact that all

25 of our clients are outside of New Jersey in four different

1  states, it's going to take a little bit of a Herculean effort

2  just to get this moving.

3          So, what we had agreed to is that the parties would

4  exchange written discovery demands by January 6th and turn

5  responses around in a little over a week by January 15th.  We

6  would conduct the depositions of these individuals the last two

7  weeks in January, so that would be the week of January 18th and

8  the week of January 25th.  We would submit to the Court

9  supplemental depositions in the anticipation of the preliminary

10 injunction hearing.  Plaintiffs would get their papers due by

11 February 5th.  We would get our papers due by February 10th and

12 if plaintiffs wanted to submit a reply, they would do that by

13 February 12th which would mean that we would be ready to

14 proceed before the Court the week of February 15th.

15         THE COURT:  Can't do it the week of the 15th.  Could

16 do it the week of the 22nd.

17         MS. ROME:  Okay.  I mean, if that would be better for

18 Your Honor, that's fine.

19         THE COURT:  All right.  I -- I'm assuming my trial

20 will be finished by then.  I'm inclined to give you the 25th

21 and hopefully all day then.  If I'm still in trial then, I'll

22 have to check -- chop it up a bit, but right now I think I can

23 carve out the day of the 25th, all right?

24         MS. ROME:  Thanks again, Your Honor.  The only issue

25 that hopefully we'll be able to resolve amongst ourselves is

1  the location of the depositions because the proposed order that

2  has been submitted to you requires that they can be conducted

3  in New Jersey.  And given that none of these defendants are in

4  New Jersey, I don't know, you know, if that's going to be a

5  problem.  We haven't had an opportunity to discuss that with

6  our client yet.

7          THE COURT:  I would think you could work it out,

8  can't you?

9          MS. ROME:  I think we can, Judge.

10          THE COURT:  All right.

11          MS. ROME:  There's only one last issue, Your Honor.

12  The proposed form of order that the defendant -- the plaintiff

13  has submitted includes in them a list of document demands.

14          THE COURT:  Yes.

15          MS. ROME:  And some of them are overly broad and, so

16  we tried to discuss them with plaintiff's counsel before

17  getting online with Your Honor, but they're not inclined to

18  narrow them at all.  And in light of the fact that Your Honor's

19  inclined to enter an order that includes these, we would need

20  to address some of them because they are just really a --

21          THE COURT:  All right.

22          MS. ROME:  -- above and beyond --

23          THE COURT:  Let's work out the order and as far as

24  the document demands and discovery, let's focus it narrowly to

25  the preliminary injunction hearing and what is relevant to

1 that. If you need me to try break and log jams, I will. But,
2 let's think of what can reasonably be done in this abbreviated
3 time frame. And also, I wonder if I could call upon both of
4 you to give me a -- an order consented to as of form as soon as
5 possible. How soon would that be?
6      MR. CHOCIEY: We could certainly work on that today,
7 Your Honor.
8      THE COURT: And when will I have it?
9      MR. CHOCIEY: By close of business?
10      THE COURT: All right. That's good.
11      MS. ROME: Your Honor -- but, Your Honor, the only
12 issue that we have is that we would need an opportunity to see
13 that, as well. And if it's only going to be submitted to Your
14 Honor by --
15      THE COURT: Oh, no. I said the two of you are going
16 to work on it. It's going to be, you know, joint agreement as
17 to as to form, not as to content, but as to form. So, work it
18 out among yourselves and get me a joint submission by close of
19 business today, all right?
20      MS. ROME: All right. Thank you, Your Honor.
21      MR. CHOCIEY: Your Honor, did the preliminary
22 injunction hearing, will that be with live testimony by
23 witnesses?
24      THE COURT: Well, that depends on what depositions
25 you have, what declarations you have and the like, but probably

**J&J COURT TRANSCRIBERS, INC.**

1    so.  We can work that out when we get your submissions.

2              MR. CHOCIEY:  Okay.  Thank you.

3              MS. ROME:  Thank you, Your Honor.

4              MS. HESLIN:  Thank you.

5              THE COURT:  If credibility is an issue, we'll need

6    live testimony.

7              MR. CHOCIEY:  Thank you, Your Honor.

8              MS. ROME:  Very good.  Thank you.

9              MR. CHOCIEY:  Bye-bye.

10             THE COURT:  9 a.m. on the 25th, thank you.

11             MS. ROME:  Thank you.

12             MR. CHOCIEY:  Bye-bye.

13             THE COURT:  All right.

14                              *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

**J&J COURT TRANSCRIBERS, INC.**

# C E R T I F I C A T I O N

        I, AMY L. RENTNER, court approved transcriber, certify that the foregoing is a correct transcript from the official electronic sound recording of the proceedings in the above-entitled matter, to the best of my ability.

/s/ Amy L. Rentner            Date:  January 3, 2010

AMY L. RENTNER

J&J COURT TRANSCRIBERS, INC.

**J&J COURT TRANSCRIBERS, INC.**