## APPENDIX A:

## DESCRIPTIONS OF CASES WITH JUDICIAL DECISIONS[1]

### *Johnson & Johnson v. ev3, Inc.*

The *ev3* case involved plaintiffs Johnson & Johnson ("J&J") and its wholly owned subsidiary operating company Cordis Corporation ("Cordis"). Cordis was the former employer of the defendants, three sales representatives (Barr, Fitzpatrick, and McKeever) who defected to a direct competitor of Cordis in the endovascular stent market. *ev3* Complaint (Dkt. 15-6), ¶ 1. Each of the individual defendants had executed an employment agreement with Cordis similar to those at issue in this case. The complaint alleged that the individual defendants' employment with ev3 breached their respective employment agreements (First Count) and their independent duty of loyalty (Second Count). *Id.* ¶¶ 66-72. The plaintiffs sought and obtained a TRO, the only decision in the case that could have conceivably resulted in judicial estoppel here (the parties later settled).

The patent assignment provisions of the individual defendants' agreements were neither relevant to the case nor mentioned in the TRO. The TRO enjoined the individual defendants from disclosing "any of plaintiffs' confidential, proprietary and trade secret information as defined in their respective employment non-compete agreements." *See* Order to Show Cause with Temporary Restraints and for Accelerated Discovery ("*ev3* TRO") (Ex. 1), at 5. It did not specify on what grounds it was granting relief. *See id.* at 2 (reciting allegations concerning "violation of the Agreements and common law"). Plaintiffs' brief in support of the TRO sought relief both for breach of the defendants' employment agreements and under the common law. *See ev3* Brief in Support of Plaintiffs' Application for a Temporary Restraining Order and Accelerated Discovery (Dkt. 15-7), at 10 ("Courts also will restrict a former employee's activities on his new employer's behalf, even in the absence of a non-compete agreement.").

### *Johnson & Johnson v. Invatec, LLC*

In the *Invatec* case, plaintiffs J&J and Cordis sued several Cordis sales representatives who were planning a simultaneous mass exodus to work for Invatec, LLC, a direct competitor of Cordis in the stent market. *Invatec* Complaint (Ex. 2), ¶¶ 2-3. Defendant Hardage, the ringleader, was alleged to have recruited fellow sales representatives from the inside to Invatec. *Id.* ¶ 3. Each of the defendants had an employee agreement of varying forms; all but Hardage's and Bates's were similar to those issue in this case (defining the term COMPANY comparably). *Id.* Exs. B-C, E-F.[2]

---

[1] Not described are three cases in which no judicial decision was reached and the fourth *Ethicon, Inc. v. Angelini*, where the employment agreement at issue was not of the same form as those at issue in this case. See the chart at the end of this appendix.

[2] Hardage's and Bates's were different; they did not use the term COMPANY at all. Rather, they used the term CORDIS or JOHNSON, defined to mean "Cordis Corporation [or Johnson & Johnson], its successors or assigns, and any of their existing and future divisions or subsidiaries." *Invatec* Complaint Ex. A, D.

The *Invatec* complaint treated the agreements identically, asserting two claims against the individual defendants:  breach of their employment agreements (First Count), and breach of their "duty of loyalty that existed independent of their respective non-compete agreement to refrain from disclosing Confidential Information that they learned while employed by Cordis" (Second Count).  *Id.* ¶¶ 66-74.  The Confidential Information described in the complaint – such as product development and launch plans, sales and pricing plans, and customer information – related to Cordis.  *See id.* ¶ 43.

The plaintiffs obtained a TRO.[3]  Order to Show Cause with Temporary Restraints and for Accelerated Discovery ("*Invatec* TRO") (Ex. 3), at 6-8.  The TRO enjoined the various individual defendants in different ways, ostensibly tailored to the nature of the confidential information they had obtained as a result of their employment with Cordis.  For example, it temporarily enjoined defendants Hardage and Barringhaus from working at Invatec in both cardiovascular and endovascular product fields, while it enjoined defendants Bates and Liguori from working at Invatec only in the endovascular field.  *See id.* at 6.  In the TRO, the individual defendants were also enjoined from working in any position that "would place them in a position of using or disclosing plaintiffs' Confidential Information," defined in the TRO as "plaintiffs' confidential, proprietary, and trade secret information . . . concerning, among other things, plaintiffs' customer relationships and information, pricing information and strategies, pipeline products, sales force plans, marketing and sales plans and business strategies."  *Id.* at 1, 6.  And, it prohibited all the individual defendants (for different periods of time) from soliciting any business from accounts, customers, or clients with whom they had contact during their last year of employment at Cordis.  *Id.* at 7.

The patent assignment provisions of the individual defendants' agreements were neither relevant to the case nor mentioned in the TRO.  The TRO does not expressly refer to any of the individual defendants' employment agreements.  The TRO is also silent as to the basis on which the relief was granted.  In their brief requesting the TRO, plaintiffs pressed both their breach of contract and breach of common law duty of loyalty claims.  *See Invatec* Brief in Support of Plaintiffs' Application for a Temporary Restraining Order and Accelerated Discovery (Ex. 4), at 10-23.

### Johnson & Johnson v. Stentys, Inc.

J&J together with Cordis brought the *Stentys* case against a former Cordis-employed engineer, Jin Park, and his then-current employer Stentys.  *Stentys* Complaint (Dkt. 15-8), ¶ 4.  As mentioned above, Cordis was in the business of developing, among other things, cardiovascular and endovascular stents.  Stentys was a direct competitor, developing a stent at the time to compete with one of Cordis's major products.  *Id.* ¶¶ 27-28.  Park was involved in the research and development of numerous stent projects; indeed, he is a named inventor on about a dozen Cordis-assigned patents.  *See, e.g.*, Dkt. No. 26-3 (Martison Dep. Ex. 21).[4]

---

[3] The case settled about a month later, in connection with which the *Invatec* court issued a Consent Order referring to the settlement agreement.

[4] It bears noting that the *Stentys* complaint inaccurately states that "[p]ursuant to Paragraph 1 of the Agreement, plaintiffs own all inventions, patentable or not, developed by Park while at plaintiffs."

Appx. 2

In connection with his employment at Cordis, Park signed an employment agreement of similar form to those at issue in this case.  *Stentys* Complaint Ex. A.  In the *Stentys* complaint, plaintiffs alleged that Park's working for Stentys breached his employment agreement (First Count) and breached his "duty of loyalty that existed independent of his Agreement to refrain from disclosing Confidential Information that he learned while employed by Cordis" (Second Count).  *Id.* ¶¶ 41-47.

The plaintiffs obtained a TRO.[5]  Order to Show Cause with Temporary Restraints and for Accelerated Discovery ("*Stentys* TRO") (Ex. 5), at 6-7.  The TRO enjoined Park from working for Stentys in any position involving certain types of stents "or any other position that would place him in a position of disclosing plaintiffs' Confidential Information" and prohibited him from disclosing "plaintiffs' Confidential Information as defined in Park's Agreement."  *Id.* at 6.

The patent assignment provision of Park's agreement, though referenced in the complaint, is not mentioned in the TRO.  The TRO does not state, expressly or implicitly, whether the basis for relief was the alleged breach of employment agreement or the alleged breach of the duty of loyalty, both of which were pressed in plaintiffs' application for the TRO.  *See Stentys* Brief in Support of Plaintiffs' Application for a Temporary Restraining Order and Accelerated Discovery (Ex. 6), at 5-17.

### *Johnson & Johnson v. Biomet, Inc. ("McAllister")*

The *Biomet* case involved former DePuy Spine employee Steven F. McAllister, who was the Director of Finance for the DePuy Franchise (consisting of DePuy, Inc. and its subsidiary operating companies:  DePuy Orthopaedics, DePuy Spine, DePuy Mitek, and Codman & Shurtleff).  *McAllister* Complaint (Dkt. 16-14), ¶¶ 2, 5.  The plaintiffs were J&J, DePuy, and DePuy Spine, McCallister's direct employer.  As a result of his employment as the Director of Finance of the whole DePuy Franchise, "McAllister was called upon to evaluate and review confidential, proprietary and trade secret information (collective 'Confidential Information') relating to Operations for all four of the DePuy Franchise's companies, including [plaintiff former employer] DePuy Spine and [non-party] DePuy Orthopaedics."  *Id.* ¶ 23.

DePuy is in the business of medical devices, and its operating companies develop, among other things, spinal implants, hip and knee implants, surgery medical devices for sports medicine, and neurological devices.  McAllister left the DePuy Franchise for a company alleged to compete directly with DePuy Spine and DePuy Orthopaedics.  *Id.* ¶ 35.  Plaintiffs' complaint alleged claims of breach of McAllister's employment agreement with DePuy Spine (First Count) and breach of duty of loyalty (Second Count) against McAllister, concerned about disclosure of Confidential Information.  *Id.* ¶¶ 51-58.

---

*Stentys* Complaint ¶ 25.  But all patents on which Park is named as an inventor were assigned on their face to Cordis alone, consistent with the facts in this case.  Paragraph 1 of Park's employment agreement (the patent assignment provision) was not discussed by the *Stentys* court; no interpretation of Paragraph 1 was adopted or accepted by the court; and no relief was sought or obtained regarding that provision of the Agreement.

[5] The case settled very soon thereafter, followed by a Consent Order referencing the settlement agreement.

The case settled quickly, prior to any merits decision in the case. In connection with the settlement, the court issued a Consent Decree referencing the settlement agreement. The Consent Decree prohibited McAllister from using or disclosing "DePuy's Confidential Information as defined by" his employment agreement, but it contained no discussion about the meaning of CONFIDENTIAL INFORMATION in the agreement. *McAllister* Consent Decree (Ex. 7), ¶ 4.[6] The Consent Decree is also completely silent as to whether it was premised on the breach of contract claim, the breach of duty of loyalty claim, or the terms of the settlement agreement standing alone. Accordingly, the Consent Decree in the *McAllister* case cannot be the basis for any judicial estoppel in this case.

### *Johnson & Johnson v. Biomet, Inc. ("Barney")*

In the *Barney* case, the individual defendant, Robin Barney, was a high-level executive within the DePuy Franchise who resigned from her employment to work at Biomet, a direct competitor of DePuy (as discussed above with respect to the *McAllister* case). *Barney* Complaint (Ex. 15-14), ¶¶ 4, 34. Barney was employed by DePuy Products (one of the plaintiffs), and held the position of Vice President Worldwide Operations of DePuy Orthopaedics (a co-plaintiff). *Id.* ¶ 4. As a result of her employment, Barney obtained the confidential information of all the companies within DePuy Franchise (in particular in connection with her role as a member of the DePuy Global Management Board), as well as broader J&J confidential information (in connection with chairing J&J's Medical Device and Diagnostics Operations Council and her service on J&J's Worldwide Operations Council). *See id.* ¶¶ 23, 25-29. The three plaintiffs, DePuy Products, DePuy Orthopaedics, and J&J, alleged that Barney breached her employment agreement (First Count) – which was of a similar form to those at issue in this case – and that Barney breached her "duty of loyalty that existed independent of her Agreement to refrain from disclosing confidential information and trade secrets that Barney learned while employed by plaintiffs" (Second Count). *Id.* ¶¶ 46-52.

The plaintiffs sought and obtained both a TRO and a PI, the latter of which the court explained in a lengthy letter opinion. *See Barney* TRO and Letter Opinion (Case No. 15-cv-10698, Dkt. 508-4). In the Letter Opinion, the court quoted the definitions of CONFIDENTIAL INFORMATION, CONFLICTING PRODUCT, and CONFLICTING ORGANIZATION, as well as paragraphs 5-7, of Barney's agreement. *Id.* (Letter Opinion), at 5-8. Notably, however, nowhere in the 21 pages of its ruling did the court quote, cite, or discuss the definition of the term COMPANY. The court found that Barney "had access to significant amounts of confidential and proprietary information belonging to J&J/DePuy as part of her work for the DePuy franchise," stating stated that this was "the type of confidential business information that is appropriately subject to protection, ***with or without a covenant not to compete***." *Id.* (Letter Opinion), at 11-12 (emphasis added) (citing *Whitmyer Bros., Inc. v. Doyle*, 58 N.J. 25, 33 (1971)). It did not explain whether it was relying on the agreement or the employee's common law duties in granting plaintiffs injunctive relief. *Id.* (Letter Opinion), at 17.

---

[6] The Consent Decree, by collectively referring to the four DePuy Franchise entities as "DePuy" in paragraph 2, is ambiguous as to what paragraph 4 meant by referring to "DePuy's Confidential Information, as defined by [McAllister's Agreement] that he executed with DePuy Spine, Inc."

Appx. 4

10040764

The patent assignment provision of Barney's agreement was neither relevant to the case nor discussed in the PI. That PI's specific holding was to continue the restraints in the TRO which the court had tailored to be "as fair and focused as possible," *id.* (Letter Opinion) at 21, and the TRO itself did not state on which ground (contract or common law) relief was granted, nor did it quote, cite, or discuss the meaning of COMPANY or the patent-assignment provisions, *see id.* (TRO), ¶ 6.

## *LifeScan, Inc. v. O'Connell*

In the *LifeScan* case, the defendant O'Connell left LifeScan to work for a competitor, AgaMatrix. The plaintiffs in the lawsuit were 1) Diabetes Diagnostics, Inc. ("DDI"), the successor-in-interest to O'Connell's first employer, SelfCare, Inc., 2) LifeScan, Inc. ("LifeScan"), O'Connell's last employer, and 3) Inverness Medical Ltd. ("Inverness"), an affiliate with whom O'Connell worked directly and to whose Director of Business and Product Management O'Connell reported. *LifeScan* Complaint (Dkt. 15-5) ¶¶ 2, 4-6, 18. All three plaintiffs were in the business of developing and manufacturing blood glucose monitoring products and related products for the treatment of diabetes. *Id.* ¶ 2.

The lawsuit alleged that by working for AgaMatrix O'Connell breached his employment agreement with SelfCare (Count I), breached his employment agreement with LifeScan (Count II), and violated Massachusetts's trade secret statute (Count III). *Id.* ¶¶ 26-46. Only the LifeScan agreement is in the form of the agreements at issue in this case; the SelfCare agreement is different. *Id.* Exs. A, B. The court's only merits decision, a temporary restraining order ("TRO"), stated, in relevant part:

> Defendant [O'Connell], his agents, servants, attorneys, and persons in active concert or participation with him, are temporarily restrained from: (i) working for or providing any services to defendant [AgaMatrix]; (ii) using or otherwise disclosing to AgaMatrix, or any other person or entity, plaintiffs' trade secrets and other proprietary and confidential information.

*LifeScan* TRO (Ex. 8) ¶ 1.

The patent assignment provision of the LifeScan agreement was neither discussed in the case nor relevant to the decision. The TRO does not even mention the LifeScan agreement or the definition of COMPANY. Nor does it identify on which of plaintiffs' claims the relief was granted.

## *DePuy Spine, Inc. v. Stryker Biotech L.L.C.*

In the *Stryker* case, G. Joseph Ross, a Vice President of New Business Development for plaintiff DePuy Spine, Inc. ("DePuy Spine"), defected to work at defendant Stryker Biotech L.L.C. ("Stryker"), a competitor in bone graft business. *Stryker* Complaint (Dkt. 15-4), ¶¶ 23-24, 26. DePuy Spine sued together with Johnson & Johnson Regenerative Therapeutics, LLC ("JJRT"), which performs research and development for DePuy Spine, including the development of bone graft products. *Id.* ¶ 14. Both plaintiffs are part of the J&J family of

companies.  The complaint asserted claims against Ross for breach of his employment agreement (Count I), misappropriation of trade secrets and confidential information under Massachusetts statutes (Count IV), and breach of the common law duty of loyalty (Count V).  *Id.* ¶¶ 31-37, 48-56.

The *Stryker* court, in a written decision, granted a preliminary injunction based on Ross's employment agreement, which was similar in form to two of the four at issue in this case. *Stryker* Memorandum and Order on Request for Preliminary Injunction  (Ex. 10).  The decision quotes the non-compete and non-solicitation clauses of ¶¶ 6-7 of the agreement, as well as the definition of CONFLICTING ORGANIZATION and CONFLICTING PRODUCT, and asks the questions "whether Stryker Biotech is a CONFLICTING ORGANIZATION, as that term is used in the agreement, and, if so, whether any CONFLICTING PRODUCT will be involved if Ross assumes his new position with Stryker Biotech."  *Id.* at 2-3.

In answering this question, the decision focused exclusively on Ross's employer, DePuy Spine, and the overlap with Stryker with respect to their bone graft lines of business.  And the court's order, in relevant part, enjoined Ross from disclosing "any confidential DePuy Spine information, including any confidential information regarding any DePuy Spine products, either in existence or in development, its distribution network, or its business plan."  *Id.* at 7.  The order portion of the opinion does not mention co-plaintiff JJRT, nor does it state that JJRT, or any other J&J affiliate, is within the definition of COMPANY in Ross's agreement.  To the extent that plaintiffs in the *Stryker* case were advocating such a position, it was not adopted by the court insofar as its order was limited to DePuy Spine's confidential information.  Furthermore, the patent assignment provision of Ross's agreement was neither discussed in the case nor relevant to the decision.

| Case Name | Plaintiffs | Court | Case Number | Any Judicial Decisions? |
|---|---|---|---|---|
| Codman & Shurtleff, Inc. et al. v. Peters | J&J Codman & Shurtleff, Inc. | Superior Court Of New Jersey Middlesex County Chancery Division | Docket No. C-65-12 | No |
| Johnson & Johnson v. ev3, Inc. | J&J Cordis Corp. | United States District Court For The District Of New Jersey | 09-CV-06306-GEB-DEA | Yes |
| Cordis Corp. v. Invatec, LLC | J&J Cordis Corp. | Circuit Court 11th Judicial Circuit Miami Dade County Florida | 08-46947CA02 | No |
| Cordis Corp. v. Invatec, LLC | J&J Cordis Corp. | Superior Court Of New Jersey Chancery Division Middlesex County | C-171-08 | Yes |
| Johnson & Johnson v. Stentys, Inc. | J&J Cordis Corp. | Superior Court Of New Jersey Chancery Division Middlesex County | MID-C-141-08 | Yes |
| Ethicon, Inc. v. Angelini | Ethicon DePuy Orthopaedics, Inc. | United States District Court Middle District Of Florida Jacksonville Division | 3:16-CV-1124-J-39-PDB | Yes |
| Johnson & Johnson v. Biomet Inc. ("McAllister") | J&J DePuy, Inc. DePuy Spine, Inc. | Superior Court Of New Jersey Chancery Division Middlesex County | C-227-07 | Yes |

Appx. 7

| Johnson & Johnson v. Biomet, Inc. ("Barney") | J&J DePuy Ortopaedics, Inc. DePuy Products, Inc. | Superior Court Of New Jersey Middlesex County Chancery Division | C-107-07  (App Div Am-216-07) | Yes |
|---|---|---|---|---|
| Lifescan, Inc. v. O'Connell | LifeScan, Inc. Diabetes Diagnostics, Inc. Inverness Medical, Ltd. | Commonwealth Of Massachusetts | 200402043 | Yes |
| McNeil v. Pharmacia & Chester | J&J McNeil Consumer Healthcare (formerly McNeil Consumer Products Co., a division of McNeil-PPC Inc.) | Superior Court Of New Jersey Chancery Division Hunterdon County | HNT-C-14003-01 | No |
| Depuy Spine, Inc. v. Stryker Biotech LLC | DePuy Spine, Inc. Johnson & Johnson Regenerative Therapeutics, LLC | Commonwealth Of Massachusetts Suffolk Superior Court | 07-1464 | Yes |