# Exhibit 2

RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800

Attorneys for Plaintiffs
Johnson & Johnson and Cordis Corporation

SUPERIOR COURT
MIDDLESEX COUNTY
RECEIVED & FILED

AUG 1 3 2008

GREGORY EDWARDS
DEPUTY CLERK
OF SUPERIOR COURT

| | |
|---|---|
| JOHNSON & JOHNSON and CORDIS CORPORATION,<br><br>Plaintiffs,<br><br>vs.<br><br>INVATEC, LLC, PRESTON HARDAGE, KEVIN BARRINGHAUS, MICHAEL LIGUORI, TERENCE BATES, and JOHN and JANE DOES.<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY<br>CHANCERY DIVISION<br>MIDDLESEX COUNTY<br>DOCKET NO.<br><br><br>CIVIL ACTION<br><br>**VERIFIED COMPLAINT** |

Plaintiffs Johnson & Johnson ("J&J"), a corporation organized under the laws of the State of New Jersey, having its principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933 and Cordis Corporation ("Cordis"), a corporation organized under the laws of the State of Florida, having its principal place of business at 7 Powderhorn Drive and 33 Technology Drive, Warren, New Jersey, by way of Verified Complaint against defendants, say:

JANREM0113204

# INTRODUCTION

1.      This is a civil action seeking injunctive relief and damages against the individual defendants (the "Individual Defendants"), who are current employees of Cordis, and Invatec, LLC ("Invatec"), a direct competitor of plaintiffs that has hired the Individual Defendants. To prevent immediate and irreparable harm, plaintiffs seek injunctive relief to stop the flagrant pirating of plaintiffs' employees by Invatec in concert and conspiracy with at least one of plaintiffs' existing employees, which amounts to a shameless violation of his duties of loyalty to plaintiffs, and to enforce the Individual Defendants' covenants not to compete, covenants not to solicit plaintiffs' customers, covenants not to solicit plaintiffs' employees, and the common law duties owed to plaintiffs, including the duty of loyalty.

2.      In the past three months, Invatec, which is trying to establish a sales force in the United States, hired approximately 10 Cordis employees and attempted to hire and/or continues to attempt to hire approximately 5 other employees.   These Cordis employees are sales personnel.  In a carefully coordinated plan to schedule a mass exodus, 8 of the 10 Cordis sales personnel, pursuant to instructions from Invatec, provided their notice of resignation to Cordis on August 4, 2008 or August 1, 2008.  This would allow all of them to leave Cordis on the same day (i.e., August 15, 2008 – a Friday) and to start with Invatec on the same day.  Cordis also learned that Invatec is having a group sales training seminar for these sales personnel on August 18, 2008, which is the following Monday, so that they can hit the streets running – immediately.

JANREM0113205

3.    Demonstrating the egregiousness of defendants' conduct, Invatec is using Insiders to actively and secretly solicit and hire other Cordis employees while these Insiders were still employed by Cordis.  In other words, having secretly made the decision to leave Cordis to join Invatec in July 2008 or earlier, these Insiders assisted Invatec in soliciting and hiring other Cordis' employees while the Insiders were still on Cordis' payroll.  In fact, one Insider, Preston Hardage ("Hardage"), was using an Invatec email address, preston.hardage@invatec-us.com, to communicate with, and solicit, Cordis' employees even though Hardage was still on Cordis' payroll.  Hardage was also sending letters to the Cordis' employees that he was actively soliciting on Invatec's letterhead with the title "VP Sales" next to his name– all while he was still employed by Cordis.

4.    In addition to injunctive relief, plaintiffs seeks an award of damages which it has sustained or will sustain.

## THE PARTIES

5.    Plaintiff J&J is the parent company of subsidiaries engaged in the business of developing, manufacturing and marketing a wide variety of health care products, and providing related services, for the consumer, pharmaceutical, medical device and diagnostics markets. J&J's subsidiaries and operating companies market their products to customers located throughout the United States and the world.

6.    Plaintiff Cordis is a subsidiary of J&J and is one of the world's leading developers and manufacturers of interventional vascular technology and products for interventional medicine, minimally invasive computer-based imaging, and electrophysiology. Electrophysiology involves the study of the electrical properties of biological cells and tissues.

JANREM0113206

Cordis' products include, but are not limited to, coronary and endovascular stents, as well as other stents, catheters, balloon catheters, guide wires and other medical devices used to treat cardiovascular and endovascular disease.

7.      For more than 40 years, Cordis has pioneered less invasive treatments for cardiovascular and endovascular disease. For example, among many other things, Cordis developed the first full line of Pre-Shaped Judkins catheters in 1966, the first percutaneous transluminal coronary angioplasty ("PTCA") balloon that utilized nylon balloon technology in 1990, and the first approved drug-eluting stent in 2003 known as the CYPHER® Sirolimus-eluting Coronary Stent ("CYPHER® Stent"). The American Heart Association named the CYPHER® Stent one of the top 10 medical advancements of 2003.

8.      Cordis has four business units: (1) Cordis Cardiology – a worldwide leader in developing and manufacturing interventional vascular technology such as coronary stents and catheters for the treatment of cardiovascular disease; (2)  Cordis Endovascular – a recognized leader in developing stents, catheters and vena cava filters for the treatment of peripheral vascular disease (i.e., vascular disease existing outside of the heart and brain); (3) Cordis Neurovascular – a leader in developing treatment solutions for neurovascular disease and strokes, including the development of the first neurointerventional microcatheter; and (4) Cordis Biologics Delivery Systems – a leader in the emerging field of biologics delivery, which focuses on optimizing the delivery of therapies to treat vascular disease.

9.      Defendant Invatec is a subsidiary of Invatec s.r.l., a European based company. Invatec and Invatec s.r.l. will be collectively referred to as Invatec.  Invatec is a Delaware corporation and its principal place of business is located at 2430 Emrick Boulevard, Bethlehem, Pennsylvania 18020.  Invatec is a direct competitor of plaintiffs in developing, manufacturing

JANREM0113207

and marketing coronary and endovascular stents, catheters, balloon catheters and guide wires used to treat cardiovascular and endovascular disease.  Invatec currently markets and sells only its endovascular products throughout the United States through a third party distributor, ev3, Inc ("EV3").  As such, Invatec does not have its own sales force in the United States.  Invatec, however, is terminating its agreement with EV3 and intends to sell its endovascular and cardiovascular products throughout the United States directly to the customer using its own sales force.  On information and belief, Invatec intends to hire 18 to 25 sales personnel in the United States in anticipation of terminating the agreement with EV3.

10.    Defendant Preston Hardage ("Hardage") is a resident of Florida residing at 2716 Oakmont Court, Weston, Florida, 33332.   Hardage began working for Cordis in July 1988 as Division Sales Manager – Endovascular.   During his over 20 years with Cordis, Hardage received several promotions.   As of January 2006, Hardage was the Director of Sales for the United States – Neurovascular.  In that position, Hardage supervised division sales managers and sales representatives in the sale of Cordis' neurovascular products throughout the United States. As a condition of his employment, Hardage executed a non-compete agreement (the "Hardage Agreement"). (Exh. A).

11.    In June 2008, Hardage announced his retirement from Cordis.  Hardage requested that August 15, 2008 be his last day at Cordis because his unvested stock units would vest on August 15, 2008.   Believing that Hardage was a trustworthy and loyal employee, Cordis agreed to continue to employee Hardage until August 15, 2008 so that he could obtain the benefit of his unvested stock units.

JANREM0113208

12.     Cordis recently learned that Hardage has been acting as an Insider.  Specifically,
Hardage accepted the position of Vice President of Sales with Invatec by at least mid July 2008,
if not earlier, and since then, has been assisting and actively recruiting and hiring other Cordis
employees for the benefit of Invatec even though he was employed by Cordis at the time.  In
fact, in late July 2008, Hardage, while still employed by Cordis, went to Fort Lauderdale, Florida
on two different occasions to assist Invatec interview Jolanta A. Wierzbicki ("Wierzbicki") and
Lia Jones ("Jones"), both Cordis employees, and to persuade them to join Invatec.  He even
presented offers of employment to them on behalf of Invatec.  During these interviews, Hardage
presented himself out to be an Invatec representative and actively recruited Wierzbicki and Jones
to terminate their employment with Cordis.  Invatec even assigned an email address to Hardage,
preston.hardage@invatec-us.com, and he used this email address to communicate with, and
solicit, Wierzbicki even though Hardage was still employed by Cordis at the time.  Just as
significant, Hardage was also sending letters to the Cordis' employees that he was actively
soliciting on Invatec's letterhead with the title "VP Sales" next to his name– all while he was still
employed by Cordis.  On information and belief, Hardage established August 18, 2008 as the
date for Invatec's sales training seminar.

13.     Kevin Barringhaus ("Barringhaus") is a resident of Missouri residing at 1255 Polo
Lake Drive, Ellisville, Missouri, 63021.  Barringhaus began working for Ethicon, Inc., a J&J
subsidiary, in January 1988 and stayed with Ethicon until he transferred to Cordis in April 1993.
Since April 1993, Barringhaus received several promotions and worked in several positions in
Cordis' sales department.  In these positions, he was responsible for selling either Cordis'
cardiovascular, endovascular or neurovascular products.  In other words, Barringhaus was
involved in selling all three of Cordis' major product lines.  As of August 2008, Barringhaus held

6

JANREM0113209

the position of Account Executive – Neurovascular. In that position, Barringhaus was responsible for the sale of Cordis' neurovascular products in Missouri, South Illinois, Kansas City, Kansas and parts of Oklahoma and Arkansas. As a condition of his employment, Barringhaus executed a non-compete agreement (the "Barringhaus Agreement"). (Exh. B).

14.     On August 4, 2008, Barringhaus announced that he was resigning from Cordis, that his last day with Cordis would be August 15, 2008 and that he accepted employment with Invatec. Upon information and belief, Barringhaus accepted the position of sales representative with Invatec. Upon information and belief, Barringhaus has been acting as an Insider.

15.     Defendant Michael Liguori ("Liguori") is a New York resident and resides at 534 East Hudson Street, Long Beach, New York, 11561. Liguori started to work for Cordis in February 2001 as a Sales Representative – Endovascular. He was promoted in March 2007 as a Senior Sales Representative – Endovascular. In that position, Liguori was responsible for selling Cordis' endovascular products in Manhattan and Staten Island. As a condition of his employment, Liguori executed a non-compete agreement (the "Liguori Agreement"). (Exh. C). On or about August 4, 2008, Liguori provided Cordis with notice of his resignation and informed Cordis that his last day of work would be August 15, 2008. He also informed Cordis that he accepted employment with Invatec. Upon information and belief, Liguori accepted the position of sales representative with Invatec.

16.     Defendant Terence Bates ("Bates") is a resident of California residing at 2512 Countryview Glen, Escondido, California, 92026. Bates began employment with Cordis in July 1996 as a Sales Representative – Endovascular. In August 2004, Bates became Cordis' Account Executive – Endovascular whereby he was responsible for selling Cordis' endovascular products in Southern California. As a condition of his employment, Bates executed a non-compete

JANREM0113210

agreement (the "Bates Agreement"). (Exh. D).   Bates provided Cordis with his notice of resignation on August 4, 2008.   Similar to Hardage, Barringhaus and Liguori, Bates informed Cordis that his last day with Cordis would be August 15, 2008.   At the time of his resignation, Bates informed Cordis that he would be working for Invatec as a sales representative responsible for Invatec's sales efforts in Southern California.

17.     Defendants John and Jane Does are unknown employees of plaintiffs that Invatec has hired and/or has used as Insiders.

## OTHER CORDIS EMPLOYEES THAT INVATEC HIRED AND/OR ATTEMPTED TO HIRE

18.     John Otto ("Otto") is a resident of Texas residing at 3609 Bentfield Place, Arlington, Texas, 76016.   Otto began working for Cordis in September 1996 as a Sales Representative – Cardiology.   Thereafter, Otto received several promotions and occupied several positions in Cordis' sales department across all three of Cordis' major product lines.   As a result, throughout his career with Cordis, Otto was responsible for selling either Cordis' cardiovascular, endovascular or neurovascular products.   As of August 2008, Otto held the position of Division Manager – Neurovascular whereby he managed sales representatives who were responsible for various territories and accounts within Texas, Louisiana, Oklahoma, Arkansas, Mississippi, Tennessee, Kentucky, Colorado and Kansas.    As a condition of his employment, Otto executed a non-compete agreement (the "Otto Agreement"). (Exh. E).

19.     On or about August 1, 2008, Otto announced that he was resigning from Cordis, that his last day with Cordis would be August 13, 2008 and that he would be working for Invatec.  Upon information and belief, Otto accepted the position of sales representative with

JANREM0113211

Invatec.  Upon information and belief, Otto has been acting as an Insider.  Plaintiffs are filing suit against Otto in Florida pursuant to the Florida forum selection clause in the Otto Agreement.

20.     Jeff Murdock ("Murdock") is a resident of Florida and resides at 2022 NW 139 Avenue, Pembroke Pines, Florida, 33028.  Murdock began working for Cordis in July 1993 as a Sales Representative – Cardiology.  After receiving several promotions in Cordis' sales department, Murdock transferred to Cordis' marketing department in or about 2004.   By December 2007, Murdock held the position of Director of Marketing – Cardiology whereby he was responsible for implementing and developing marketing strategies for Cordis' cardiovascular products.  As a condition of his employment, Murdock executed a non-compete agreement (the "Murdock Agreement").  (Exh. F).  In December 2007, Murdock resigned from Cordis and began working for Invatec in June 2007 as the Regional Sales Director for the Western United States.   Plaintiffs are filing suit against Murdock in Florida pursuant to the Florida forum selection clause in the Murdock Agreement.

21.     John "Jack" Springer ("Springer") is a resident of Pennsylvania residing at 1639 Woodfield Drive, Bethlehem, Pennsylvania, 18015.  Springer starting working for Cordis in July 1994.  He received several promotions while at Cordis and occupied positions in both Cordis' sales and marketing departments.  By July 2006, Springer was Cordis' General Manager – Endovascular and he worked out of Cordis' Warren, New Jersey location.  In that position, Springer had overall responsibility for Cordis Endovascular.  In July 2006, Springer resigned from Cordis.  Due to his non-compete agreement, Springer became the President and CEO of Neuromonics, a start-up company specializing in the treatment of tinnitus.    In May 2008, Invatec hired Springer as its Vice-President and General Manager.    When Invatec hired Springer, he was quoted as stating, "I look forward to building Invatec's US team and develop

9

JANREM0113212

and introduce to physician groups during the next two years a full pipeline of interesting and innovative products." (Exh. G).

22.     Besides the above individuals, Invatec hired Donald Matthias as the Regional Sales Director for the Eastern United States after he resigned in June 2008 as Cordis' Division Manager – Cardiovascular and Endovascular.  Invatec also hired Patrick D'Amico ("D'Amico") as Vice President of Sales Operations after he resigned in August 2008 from a J&J affiliate, Ortho-McNeil.  D'Amico had a long history with Cordis in sales before transferring to Ortho-McNeil.

23.     In addition, Invatec attempted to solicit and/or is currently attempting to solicit the following Cordis employees: (1) Robbie Armistead ("Armistead"), Southeast Regional Sales Director – Cardiovascular and Endovascular; (2) Jolanta Wierzbicki ("Wierzbicki"), Senior Sales Representative – Neurovascular for Massachusetts, Rhode Island, New Hampshire, Vermont and Maine; (3) Lia Jones ("Jones"), Senior Sales Representative – Neurovascular for North Carolina, Southern Virginia and South Carolina; (4) Timothy Brophy ("Brophy"), Account Executive – Endovascular for North New Jersey, Bronx, New York and Westchester, New York; (5) Mark Sims ("Sims"), Account Executive – Endovascular for South Carolina and Augusta, Georgia; (6) Andrew Wahlstrom ("Wahlstrom"), Senior Sales Representative – Neurovascular for Northern Illinois, Iowa and Milwaukee, Wisconsin; (7) Geoffrey Peters ("Peters"), Sales Representative – Neurovascular for Western Tennessee, Mississippi and New Orleans, Louisiana; and (8) Holt Parke ("Parke"), Account Executive – Endovascular for North Virginia and Washington, DC.

24.     Invatec was initially successful in soliciting Wierzbicki, Jones and Brophy, mostly through the efforts of Hardage.  After accepting Invatec's offer, Wierzbicki, Jones and Brophy submitted their resignations to Cordis on August 4, 2008 and, like Hardage, Barringhaus,

JANREM0113213

Liguori and Bates, informed Cordis that their last day would be August 15, 2008.   Since then, Wierzbicki, Jones and Brophy decided to reject Invatec's offer and remain employed by Cordis.

25.     The Sales Representatives and Account Executives[1] identified in Paragraph No. 23 consistently post high sale numbers for their territories.

## JURISDICTION

26.     On information and belief, Invatec's products are sold throughout the United States, including New Jersey. On information and belief, Invatec communicated with Cordis' employees in New Jersey, including Brophy and D'Amico, both of whom reside in New Jersey.

27.     Invatec has purposefully, systematically and continually directed contacts to and conducted business in New Jersey.

28.     Invatec is subject to the jurisdiction of this Court.

29.     As employees of Cordis, the Individual Defendants routinely visited J&J's headquarters in New Brunswick, New Jersey and/or Cordis' headquarters in Warren, New Jersey for meetings, usually involving sales.

30.     As employees of Cordis, the Individual Defendants directed telephone and written communications to J&J and Cordis employees in New Jersey on a regular basis.   In addition, the Individual Defendants received paychecks through New Jersey and filed reimbursement requests in New Jersey.   Defendant Liguori consented to personal jurisdiction in this Court pursuant to paragraph 16 of his Agreement. (Exh.  C).

31.     The Individual Defendants have purposefully, systematically and continuously directed contacts to and conducted business in New Jersey.

32.     The Individual Defendants are subject to the jurisdiction of this Court.

---

[1] An Account Executive is a senior sales representative that is given the responsibility of training new and current sales representatives.

JANREM0113214

## PLAINTIFFS AND SOME OF THEIR CONFIDENTIAL INFORMATION

33.     The market for products that treat vascular disease, such as those offered by Cordis, has become more and more competitive in recent years and plaintiffs have been developing innovative responses to better position their products in these markets.  The medical device industry for the treatment of vascular disease is a multi-billion dollar, world-wide market.

34.     In recent years, Cordis has expended large amounts of time, resources and money in researching, developing, and testing innovative, new products for treating cardiovascular and endovascular disease.  Due to its significant efforts, Cordis has innovative, new products in its pipeline for the short term (1 year) and mid term (2 to 5 years).  Such information about Cordis' pipeline products and research and development efforts and plans are considered confidential, proprietary and trade secret information (collectively "Confidential Information").

35.     Cordis has also expended large amounts of time, resources and money in developing Confidential Information relating to strategies in connection with the marketing and sale of its current and pipeline products in the United States.  Such information includes, but is not limited to, products in development, launch strategies, cost information per product, clients to target, pricing and discount pricing.

36.     Cordis' pricing and discount pricing information is highly Confidential Information.  Cordis develops pricing for three general categories of accounts:  (1) Group Purchasing Organizations ("GPO") or national account contracting; (2) government operated facilities; and (3) independently operated facilities.  Approximately 84% of hospitals in the United States belong to a GPO to obtain better bargaining power.  GPOs negotiate with Cordis to establish prices, and because they purchase in high volume, GPOs receive significant discounts.  The discounts vary depending on the product and the GPO, and are subject to confidentiality

JANREM0113215

agreements. Also, hospitals in different regions of the country can be in the same GPO. As a result, hospitals in Pennsylvania, Ohio, New York and California can all be in the same GPO.

37.    Cordis also invested a considerable amount of time, resources and money in developing its sales force in the United States. For a sales force to be effective, it is important to have the right number of salespersons, each placed in a strategically defined geographic territory. Cordis has invested considerable resources in developing the optimal strategy for the alignment of its sales force in the United States

38.    Plaintiffs take measures to protect its Confidential Information. All employees have IDs and there is a sign-in procedure for visitors at all facilities. No one visits a facility without an escort. All computers have secure access features and fire walls. Plaintiffs also have security and confidentiality policies and agreements which they enforce.

### THE INDIVIDUAL DEFENDANTS' EMPLOYMENT AT CORDIS

39.    As described above, each of the Individual Defendants worked for Cordis' sales department for a considerable period of time and many of them worked with all three of Cordis' major product lines – cardiology, endovascular and neurovascular. As a condition of their employment, and because of their access to Confidential Information, each of the Individual Defendants executed a non-compete agreement. Each non-compete agreement varies slightly from the others. Nevertheless, in general, the non-compete agreements for each of the Individual Defendants contain three covenants.

40.    First, each agreement contains a non-compete covenant whereby each Individual Defendant promised not to work for a competitor if he or she would work on the competitor's product that competes with Cordis' product and he or she had access to Confidential Information regarding Cordis' product that could be used to enhance the use or marketability of the

JANREM0113216

competitor's product. The restrictive period in the non-compete covenants in the agreements vary from 18 months to 2 years after termination for any reason. (Hardage Agreement, Exh. A at Article 6; Barringhaus Agreement, Exh. B at Article 6; Liguori Agreement, Exh. C at Article 6; Bates Agreement, Exh. D at Article 6).

41.    Second, some of the agreements contain a non-solicitation covenant whereby the Individual Defendant, for a period of 18 months after termination for any reason, cannot solicit any business from, sell to, or render any services to, or, directly or indirectly, help others solicit business from or render any service or sell to, any of the accounts, customers or clients with whom they had contact during the last 12 months of employment with Cordis, for any purpose related to the sale of a product or service that could compete with a product or service being sold or developed by plaintiffs. (Barringhaus Agreement, Exh. B at Article 7; Liguori Agreement, Exh. C at Article 7). Some of the agreements state that the Individual Defendant cannot, directly or indirectly, render *any services* to a competitor for 2 years after termination from Cordis for any reason if such service competes with Cordis and he or she had access to Confidential Information regarding Cordis' product or service that can be used to enhance the competitor's product or service. (Hardage Agreement, Exh. A at Article 6; Bates Agreement, Exh. D at Article 6).

42.    Third, some of the agreements contain a non-solicitation covenant whereby the Individual Defendant, for a period of 12 months after termination for any reason, cannot solicit or hire on their own behalf, or on behalf of others, any employees of plaintiffs. (Barringhaus Agreement, Exh. B at Article 7; Liguori Agreement, Exh. C at Article 7). Again, some of the agreements state that the Individual Defendant cannot, directly or indirectly, render *any services* to a competitor for 2 years after termination from Cordis for any reason if such service competes

JANREM0113217

with Cordis and he or she had access to Confidential Information regarding Cordis' product or service that can be used to enhance the competitor's product or service. (Hardage Agreement, Exh. A at Article 6; Bates Agreement, Exh. D at Article 6).

43.    Each Individual Defendant has been with Cordis' sales department for a significant period of time, including some with over 10 years, and have considerable experience with one or more of Cordis' product lines.   Through their positions and due to their long history with Cordis, each of the Individual Defendants had access to and acquired intimate knowledge of plaintiffs' Confidential Information, including the following:

- new product development and plans to change existing products;
- launch strategies for Cordis' pipeline products for the short-term (1 year) and the mid term (3 to 5 years), including launch dates and client targeting for their respective territories;
- marketing and sales plans;
- pricing, discount pricing and pricing strategies;
- cost information, such as cost structure and profit margins per product;
- Cordis' clients in their respective territories;
- positioning of Cordis' sales force in their respective territories;
- activity levels of hospitals and other medical facilities and sales information concerning such facilities within their respective territories;
- Cordis' strategic plans for which clients to target with which products within their respective territories;
- contract terms for Cordis' largest customers within their respective territories, including GPO contracting;
- names, addresses, cell phone numbers and sales numbers of Cordis' representatives in each territory;
- employee lists and strengths and weaknesses of certain employees and succession planning;
- Professional Education Plans and clinical training modes; and
- Cordis' customer relationships with each customer serviced by the relevant employee.

44.    For example, each Individual Defendant is intimately knowledgeable about, and had access to, Cordis' Confidential Information regarding its clients and sales force plan concerning their respective territories, including: (1) how Cordis breaks down the territories; (2)

JANREM0113218

how a sales force that markets and sells products that treat vascular disease should be geographically divided; (3) the areas where Cordis should stress its marketing and sales force based on the activity level of hospitals and other medical facilities; (4) Cordis' clients; (5) which products better match the needs of certain clients; (6) the amount of sales made to Cordis' clients; and (7) pricing information.

45.     Cordis' different business units share the same clients.  In other words, a Cordis sales representative that sells only neurovascular products in New Jersey will, in general, call on the same hospitals and other medical facilities as a Cordis sales representative that sells only endovascular products in New Jersey.

46.     In addition, since each Individual Defendant was involved with contracting during their employment with Cordis, they have considerable knowledge, and had access to, Cordis' Confidential Information concerning: (1) the hospitals and other medical facilities that belong to each GPO within their respective territories;  (2) expiration dates/terms of contracts with GPOs and government and independently operated facilities; and (3) pricing and discount information.

47.     Each Individual Defendant, therefore, has intimate knowledge of plaintiffs' most Confidential Information with respect to the territory they covered and products they sold, respectively.  If they are allowed to work at Invatec in connection with Invatec's cardiovascular or endovascular products, it is inevitable that they will disclose plaintiffs' Confidential Information.

48.     With regard to Hardage, he was a member of the Senior Leadership Team (the "SLT") since August 2007 that consisted of sales and marketing leaders from all three of Cordis' major product lines.   The SLT conducted weekly telephone conferences and physically met every quarter in places throughout the United States, including New Jersey.   During the calls

JANREM0113219

and meetings, the SLT discussed the above Confidential Information for all three of Cordis' major product lines – cardiovascular, endovascular and neurovascular.  As such, due to his position, long history with Cordis and his membership on the SLT, Hardage had access to and acquired knowledge of the above information for all three of Cordis' major product lines.

49.     Plaintiffs and Invatec are direct competitors and if Invatec were to gain knowledge of even some of the Confidential Information concerning the above, plaintiffs would be immediately, irreparably and severely harmed.  Similarly, if Invatec, through the services of the Individual Defendants, were permitted to misappropriate plaintiffs' customer relationships, plaintiffs would suffer immediate, irreparable and severe harm. Money damages would not adequately compensate plaintiffs for the losses and injuries they would suffer, leaving plaintiffs with no adequate remedy at law.

50.     The above Confidential Information would be of critical importance to Invatec since it is attempting to build a sales force in anticipation of terminating its agreement with EV3. For example, the Individual Defendants are intimately familiar with Confidential Information concerning Cordis' sales force plan, marketing and sales plans, customers, contracting strategies, including GPO contracts, and pricing for their respective territories.   The Individual Defendants can use and will use, consciously or unconsciously, this Confidential Information to improve the marketability of Invatec's products and unfairly compete with plaintiffs.  In fact, Invatec can create a sales force that mimics Cordis' sales force overnight.

51.     As another example, the Individual Defendants are intimately knowledgeable of Cordis' short term (1 year) and mid term (3 to 5 years) pipeline products, marketing and sales strategies and customer relationships. The Individual Defendants can steer Invatec's development of its pipeline products by, for example, identifying pipeline products that Invatec

JANREM0113220

should focus on that would allow Invatec to unfairly compete with Cordis, or they can provide new ideas for pipeline products to Invatec based on Cordis' pipeline products.

## DEFENDANTS' CONDUCT

52.     As explained above, Springer was a long time Cordis employee who resigned in July 2006.   Invatec hired Springer in May 2008 as its Vice President and General Manager. When Invatec hired Springer, he was quoted as stating, "I look forward to building Invatec's US team . . . ." (Exh. G).   Upon information and belief, Invatec, in anticipation of terminating its agreement with EV3, is seeking to build a sales force in the United States with 18 to 25 sales personnel and seeks to fill all or most of those positions with plaintiffs' employees.   Invatec then hired Murdock and Matthias, both former Cordis employees, in or about June 2008 to serve as Invatec's Regional Sales Directors.

53.     With the assistance of Springer, Murdock, Matthias and the Insiders, Invatec has engaged in a raiding campaign of Cordis' employees.   Invatec already hired 10 of Cordis' employees and has attempted and continues to attempt to hire approximately 5 other Cordis employees.   In doing so, Invatec has used improper means, had an improper purpose, induced the Individual Defendants to breach their non-compete agreements, and has tortiously interfered with those agreements.   Similarly, the Individual Defendants breached their non-compete agreements and, in some cases, their common law duties, including the duty of loyalty.

### Wierzbicki

54.     On or about July 18, 2008, Matthias contacted Wierzbicki and asked whether she was interested in working for Invatec as a sales representative.   After indicating that she was interested, Wierzbicki received a phone call from Murdock a few hours later.   During the phone call, Murdock asked Wierzbicki if Invatec could interview her at its headquarters in Bethlehem,

JANREM0113221

Pennsylvania. At some point during the conversation, Murdock introduced Hardage and passed the phone to Hardage so that he could discuss Invatec with Wierzbicki. Hardage explained that Invatec was a great company and that if Wierzbicki were to join Invatec, he would pay her a lot of money. Murdock, Hardage and Wierzbicki eventually agreed to conduct the interview on July 25, 2008 at the Hyatt located in Fort Lauderdale, Florida because it was more convenient.

55.    Murdock and Hardage were at the interview on behalf of Invatec in Fort Lauderdale, Florida on July 25, 2008. Hardage presented to Wierzbicki a presentation about Invatec on his Invatec laptop, which included slides regarding the history of Invatec, its pipeline products, business plans, sales force and sales force expansion plans. During the interview, which lasted several hours, Hardage and Murdock explained that Wierzbicki would be selling Invatec's endovascular products as a sales representative. The position would cover territory that significantly overlapped with Wierzbicki's current territory at Cordis. As such, Wierzbicki would be calling on and selling to the same hospitals and other medical facilities for Invatec that she currently calls, and sells to, on behalf of Cordis. They also knew that she executed a non-compete agreement with plaintiffs. In addition, during the meeting, Hardage and Murdock explained that they were talking to other Cordis employees, including Jones and Wahlstrom. During the meeting, Hardage also explained that although he was not currently getting paid by Invatec, he has done a lot of work for Invatec so far and that Invatec owed him a lot of money.

56.    Hardage transmitted Invatec's offer letter and non-compete agreement to Wierzbicki on July 25, 2008. (Exhs. H, I). Wierzbicki executed the offer letter on July 29, 2008 and transmitted the executed copy to Hardage. After transmitting the offer letter, Hardage called Wierzbicki a few times to ensure that she would provide her notice of resignation to Cordis on August 4, 2008 so that she could make the August 18, 2008 sales training seminar. During this

19

JANREM0113222

time, Hardage communicated with Wierzbicki using an email address that Invatec assigned to him, preston.hardage@invatec-us.com.

57.    On August 4, 2008, Wierzbicki submitted her notice of resignation to Cordis.   In the morning of August 5, 2008, Otto contacted Wierzbicki and asked if he could answer any of her questions about Invatec.  In the afternoon of August 5, 2008, Wierzbicki withdrew her notice of resignation from Cordis and decided to reject Invatec's offer.  Hardage and Barringhaus called Wierzbicki several times on August 5, 2008, but Wierzbicki did not answer the calls.  In one of his voicemails, Barringhaus asked Wierzbicki if she was not calling him back because she changed her mind regarding the Invatec offer.  On August 6, 2008, Wierzbicki informed Hardage that she changed her mind.   When she did, Hardage became angry.  After this phone call ended, Hardage called Wierzbicki two times, but she did not answer his calls.  Also on August 6, 2008, Wierzbicki informed Barringhaus that she changed her mind regarding the Invatec offer.

**Jones**

58.    In or about the week of July 21, 2008, Hardage contacted Jones and asked Jones how much she would make with Cordis this year.  Hardage then inquired whether Jones would work for Invatec if he could guarantee her a salary of $225,000.  Hardage then requested that Jones fly to Fort Lauderdale, Florida so that they could further discuss Invatec.

59.    On July 27, 2008, which was a Sunday, Jones had dinner with Hardage in Fort Lauderdale, Florida to discuss Invatec.  During dinner, they discussed general information about Invatec such as its products, where it is headquartered, pipeline products, salary, benefits, and where the company is heading.   They also discussed that Jones would likely cover North Carolina, South Carolina, Virginia and Washington, D.C. if she joined Invatec. Sometime during the day on Sunday, Hardage presented Jones with Invatec's offer letter. (Exh. J).

JANREM0113223

60.     In the morning of July 28, 2008, Jones met again with Hardage.  The meeting
lasted approximately two hours.  During the meeting, Hardage presented to Jones a slide
presentation about Invatec on an Invatec laptop, which included slides regarding the
endovascular products that Jones would be selling if she joined Invatec.  According to Hardage,
Invatec plans on selling only its endovascular products in the United States for about a year or so
before possibly introducing cardiovascular products.   Hardage went through the slide
presentation quickly because they talked about most of the issues covered by the presentation
during dinner the night before.  About an hour and a half into the meeting, Murdock joined the
meeting.  After the meeting concluded, Hardage drove Jones to the airport.  During the drive to
the airport, Hardage requested that Jones fax to him an executed copy of the Invatec offer letter
that night and that Jones should provide her notice of resignation to Cordis on August 4, 2008 so
that she could make the August 18, 2008 sales training seminar.

61.     On August 4, 2008, Jones executed, and then faxed to Hardage, the Invatec offer
letter.  Invatec then sent a "Welcome to Invatec" letter to Jones.  The "Welcome to Invatec"
letter, which was on Invatec letterhead, was signed by several people, including Hardage with
the title "VP Sales" next to Hardage's name.  (Exh. K).  Shortly thereafter, Jones provided Cordis
with notice of her resignation and that her last day with Cordis would be August 15, 2008.  After
Hardage learned that Wiezbicki rescinded the Invatec offer, Hardage called Jones several times
to ensure that she was still on board.  Jones called Hardage on August 8, 2008 to inform him that
she was rescinding Invatec's offer.

**Parke**

62.     On a Friday sometime in mid July 2008, Matthias contacted Parke to inquire
whether he was interested in a sales representative position with Invatec selling its endovascular

JANREM0113224

products.  Matthias stated that if Parke were interested, the position would be his, but that Parke would have to meet with Invatec the following week.  Matthias stated that if he met with Invatec, Parke would meet with Hardage, Springer, Lisa Begley ("Begley") and himself, and that Begley would call him to schedule a meeting.  The following Monday, Begley contacted Parke and informed him that he should consider Invatec since there was "no leadership" at Cordis.  Parke informed Begley that he was not interested and that he did not plan on leaving Cordis because he was there for a significant amount of years and was happy with Cordis.

**Sims**

63.    In mid July 2008, Murdock contacted Sims by telephone to determine if he was interested in working for Invatec.  During this brief conversation, Murdock directed him to Invatec's website to learn about the company and its products.   A few days later, Begley contacted Sims.  Since Sims knew Begley because she previously worked for Cordis, much of the conversation was spent on catching up.  However, during the conversation, Begley asked whether Sims was interested in joining Invatec.

64.    Approximately a week after his conversation with Begley, Murdock called Sims a couple of times over the course of a week and a half to two weeks and inquired whether he was interested in joining Invatec.  During these conversations, Murdock mentioned that Invatec hired several ex-Cordis employees and was currently talking to some current Cordis employees.  Sims informed Murdock that he was not interested in joining Invatec.

**Armistead**

65.    In or around the Spring 2008, Invatec made an overture to Armistead about possibly joining Invatec.  Armistead stated he was not interested.

22

JANREM0113225

## FIRST COUNT

66.     Plaintiffs repeat the allegations contained in the foregoing paragraphs and incorporate those allegations in this Count by reference.

67.     The Individual Defendants intended and actual employment with Invatec will and does constitute a breach of their respective non-compete agreements because they would be employed by a company that competes with plaintiffs during the restricted period and would involve the Individual Defendants providing services that may enhance the use or marketability of a competing product by application of plaintiffs' Confidential Information.  The Individual Defendants intended employment with Invatec also will inevitably induce and require the Individual Defendants to breach their respective non-compete agreements and common law duties with plaintiffs because they would be joining an organization that is engaged in direct competition with plaintiffs and their employment with Invatec would make it inevitable that they would disclose Confidential Information that they learned while employed by Cordis.

68.     The Individual Defendants intended and actual employment with Invatec will and does constitute a breach of their respective non-compete agreements because after their termination from Cordis and while employed by Invatec, they will be soliciting business from, selling to, and/or rendering services to the accounts, customers or clients with whom they had contact during their employment with Cordis for purposes related to the sale of a product or service that could compete with products or services being sold or developed by plaintiffs.

69.     One or more of the Individual Defendants have also breached the covenant regarding non-solicitation of plaintiffs' employees in their respective non-compete agreements.

70.     As a result of these breaches and/or inevitable breaches, plaintiffs will suffer immediate, severe and irreparable harm to its business, and other damages and injuries.

JANREM0113226

## SECOND COUNT

71.     Plaintiffs repeat the allegations contained in the foregoing paragraphs and incorporate those allegations in this Count by reference.

72.     As employees of Cordis, each of the Individual Defendants had a duty of loyalty that existed independent of their respective non-compete agreement to refrain from disclosing Confidential Information that they learned while employed by Cordis. If the Individual Defendants are allowed to work for Invatec, a direct competitor of plaintiffs, it is inevitable that they will breach their duty by disclosing plaintiffs' Confidential Information.

73.     As employees of Cordis, each of the Individual Defendants had a duty of loyalty that existed independent of their respective non-compete agreement to refrain from soliciting and/or hiring plaintiffs' other employees for the benefit of Invatec, or taking any other action for the benefit of Invatec, while the Individual Defendants were still employed by Cordis.   The Individual Defendants breached that duty of loyalty by, among other things, acting as Insiders.

74.     As a result of these breaches and/or inevitable breaches, plaintiffs will suffer immediate, severe and irreparable harm to its business, and other damages and injuries.

## THIRD COUNT

75.     Plaintiffs repeat the allegations contained in the foregoing paragraphs and incorporate those allegations in this Count by reference.

76.     Invatec is aware that the Individual Defendants have entered into the non-compete agreements with plaintiffs.  Invatec is also aware that the Individual Defendants possess highly Confidential Information that belongs to plaintiffs.  Invatec is aware that hiring the Individual Defendants would constitute a breach of their respective non-compete agreements and common law duties, including the duty of loyalty.   Invatec is also aware that the Individual Defendants

24

JANREM0113227

have solicited, and continue to solicit, other Cordis employees for the benefit of Invatec while the Individual Defendants were still employed by Cordis.

77.     Despite that knowledge, Invatec has conspired with, encouraged and tortiously induced the Individual Defendants to breach both their non-compete agreements and their common law duties to plaintiffs and, therefore, have tortiously and maliciously interfered with plaintiffs' contractual relationship with the Individual Defendants and with their common law duties of loyalty.

78.     As a result of Invatec's actions, plaintiffs will suffer immediate, severe and irreparable harm to its business, and other damages and injuries.

## FOURTH COUNT

79.     Plaintiffs repeat the allegations contained in the foregoing paragraphs and incorporate those allegations in this Count by reference.

80.     By hiring the Individual Defendants, Invatec and the Individual Defendants have wrongfully contracted, combined, conspired and agreed to and have: (1) engaged in unfair competition; (2) breached common law obligations; (3) tortiously interfered with the contractual relationships and prospective economic advantage of plaintiffs; (4) wrongfully converted and misappropriated Confidential Information of plaintiffs; and (5) unjustly enriched themselves at the expense of plaintiffs.

81.     The acts of Invatec and the Individual Defendants constitute wrongful and malicious conduct undertaken without legal justification and with the knowledge and intent that their actions will cause substantial damage and injury to plaintiffs.

JANREM0113228

82.     Unless Invatec and the Individual Defendants are immediately enjoined and restrained, plaintiffs will suffer immediate and irreparable injury for which it has no adequate remedy at law or in money damages, and other damages and injuries.

WHEREFORE, plaintiffs demand judgment against defendants, jointly and severally:

A.     Temporarily, interlocutorily and permanently enjoining Hardage and Barringhaus, from holding any employment position or engaging in any employment activity with Invatec, directly or indirectly, that in any way relates to or involves cardiovascular and endovascular products, or any other position that would place them in a position of using or disclosing plaintiffs' Confidential Information, for a period of 2 years from the date hereof for Hardage and 18 months from the date hereof for Barringhaus;

B.     Temporarily, interlocutorily and permanently enjoining and restraining Invatec and its officers, agents and employees from causing or permitting Hardage, Barringhaus and Otto and Murdock to hold any employment position or engage in any employment activity with Invatec, directly or indirectly, that in any way relates to or involves cardiovascular and endovascular products, or any other position that would place them in a position of using or disclosing plaintiffs' Confidential Information, for a period of 2 years for Hardage from the date hereof and 18 months from the date hereof for Barringhaus, Otto and Murdock;

C.     Temporarily, interlocutorily and permanently enjoining Bates and Liguori from holding any employment position or engaging in any employment activity with Invatec, directly or indirectly, that in any way relates to or involves Invatec's endovascular products, or any other position that would place them in a position

JANREM0113229

of using or disclosing plaintiffs' Confidential Information, for a period of 2 years from the date hereof for Bates and 18 months from the date hereof for Liguori;

D.   Temporarily, interlocutorily and permanently enjoining and restraining Invatec and its officers, agents and employees from causing or permitting Bates and Liguori to hold any employment position or engage in any employment activity with Invatec, directly or indirectly, that in any way relates to or involves Invatec's endovascular products, or any other position that would place them in a position of using or disclosing plaintiffs' Confidential Information, for a period of 2 years for Bates from the date hereof and 18 months from the date hereof for Liguori;

E.   Temporarily, interlocutorily and permanently enjoining the Individual Defendants from soliciting any business from, selling to, or rendering any services to, or, directly or indirectly, helping others solicit business from or rendering any service or selling to, any of the accounts, customers or clients with whom they had contact during the last 12 months of employment with Cordis for a period of 2 years from the date hereof for Hardage and Bates and for 18 months from the date hereof for Barringhaus and Liguori;

F.   Temporarily, interlocutorily and permanently enjoining and restraining Invatec and its officers, agents and employees from causing or permitting the Individual Defendants and Otto and Murdock to sell to, or render any services to, or, directly or indirectly, help others solicit business from or render any service or selling to, any of the accounts, customers or clients with whom they had contact during the last 12 months of employment with Cordis for a period of 2 years from the date

JANREM0113230

hereof for Hardage and Bates and for 18 months from the date hereof for Barringhaus, Liguori, Otto and Murdock;

G. Temporarily, interlocutorily and permanently enjoining the Individual Defendants from soliciting or hiring on their behalf or on behalf of anyone else, including but not limited to Invatec, any employee of plaintiffs for a period of 12 months from the date hereof;

H. Temporarily, interlocutorily and permanently enjoining and restraining Invatec and its officers, agents and employees from causing or permitting the Individual Defendants and Otto and Murdock from soliciting or hiring on Invatec's behalf, any employee of plaintiffs for a period of 12 months from the date hereof;

I. Temporarily, interlocutorily and permanently enjoining Invatec from soliciting or hiring any employee of plaintiffs for a period of 12 months from the date hereof;

J. Temporarily, interlocutorily and permanently enjoining and restraining the Individual Defendants from disclosing, using, disseminating, lecturing upon or publishing any of plaintiffs' Confidential Information as defined in their respective non-compete agreements;

K. Temporarily, interlocutorily and permanently enjoining and restraining Invatec from (1) causing or permitting the Individual Defendants and Otto and Murdock to disclose or use and (2) receiving, using and disclosing, plaintiffs' Confidential Information as defined by their respective non-compete agreements;

L. Ordering defendants to turn over and return to plaintiffs all of plaintiffs' Confidential Information that defendants have removed, copied, taken, used,

JANREM0113231

disseminated or reviewed, or otherwise have in their possession, custody or control;

M.     Temporarily, interlocutorily and permanently enjoining and restraining the Individual Defendants from otherwise violating any of the terms of their respective non-compete agreements;

N.     Temporarily, interlocutorily and permanently enjoining and restraining Invatec from otherwise causing or permitting the Individual Defendants and Otto and Murdock to violate any of terms of their respective non-compete agreements or their common law obligations to plaintiffs;

O.     Awarding compensatory damages to plaintiffs including, but not limited to, the cost in training the Individual Defendants and the cost in recruiting and training new employees to replace the Individual Defendants;

P.     Awarding punitive damage to plaintiffs;

Q.     Awarding cost and attorneys' fees to plaintiffs;

R.     Awarding such other and further relief as the Court deems just and equitable.


                              RIKER, DANZIG, SCHERER, HYLAND
                                & PERRETTI LLP

                              Attorneys for Plaintiffs
                              Johnson & Johnson and Cordis Corporation

                              By: _Glenn A Clark / KK_
                                      Glenn A. Clark

Dated: August 13, 2008

JANREM0113232

## RULE 4:5-1 CERTIFICATION

I certify that to the best of my present knowledge, the matter in controversy is not the subject of any other action pending in any court or of a pending arbitration proceeding, and no such other action or arbitration proceeding is presently contemplated by plaintiffs, except that plaintiffs intend to file suit in Florida against Otto and Murdock pursuant to the Florida forum selection clause in their respective non-compete agreements.  I am not presently aware of any non-parties who should be joined in this action pursuant to Rule 4:28 or who is subject to joinder pursuant to Rule 4:29-1(b) because of potential liability to any party on the basis of the same transactional facts.

Glenn A. Clark, Esq.

Dated: August 13, 2008

JANREM0113233

## VERIFYING CERTIFICATION

I, Kristen Garbolino, of full age, certify as follows:

1.     I am the Human Resources Manager of Cordis Corporation.

2.     I have read the Verified Complaint to which this Verifying Certification is attached and the factual allegations in Paragraphs 5 to 11, 13 to 22, 24, and 26 to 32, based on my personal knowledge and from my review of Cordis' records, are true unless expressly stated as based on information and belief.

3.     I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_Kristen Garbolino_
Kristen Garbolino

Dated: August 13, 2008

31

JANREM0113234

## VERIFYING CERTIFICATION

I, Robbie Armistead, of full age, certify as follows:

1.     I am the Southeast Regional Sales Director – Cardiovascular and Endovascular of Cordis Corporation.

2.     I have read the Verified Complaint to which this Verifying Certification is attached and the factual allegations in Paragraphs 25, 33 to 38, 43 to 47, 49 to 51 and 65, based on my personal knowledge, are true unless expressly stated as based upon information and belief.

3.     I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

Robbie Armistead

Dated: August 13, 2008

32

JANREM0113235

## VERIFYING CERTIFICATION

I, John Murray, of full age, certify as follows:

1.      I am the Director, US Sales and Marketing – Neurovascular of Cordis Corporation.

2.      I have read the Verified Complaint to which this Verifying Certification is attached and the factual allegations in Paragraphs 24, 33 to 38, 42 to 47 and 49 to 51, based on my personal knowledge, are true unless expressly stated as based upon information and belief.

3.      I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_____
John Murray

Dated:  August 13, 2008

33

JANREM0113236

## VERIFYING CERTIFICATION

I, Thomas Metcalf, of full age, certify as follows:

1.  I am the Field Sales Director – Cardiovascular and Endovascular for the Western half of the United States of Cordis Corporation.

2.  I have read the Verified Complaint to which this Verifying Certification is attached and the factual allegations in Paragraphs 48 to 49, based on my personal knowledge, are true unless expressly stated as based upon information and belief.

3.  I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_____
Thomas Metcalf

Dated: August 12, 2008

34

JANREM0113237

## VERIFYING CERTIFICATION

I, Jolanta Wierzbicki, of full age, certify as follows:

1.      I am a Senior Sales Representative – Neurovascular of Cordis Corporation.

2.      I have read the Verified Complaint to which this Verifying Certification is attached and the factual allegations in Paragraphs 54 to 57, based on my personal knowledge, are true unless expressly stated as based upon information and belief.

3.      I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_____
Jolanta Wierzbicki

Dated:  August 12, 2008

35

JANREM0113238

## VERIFYING CERTIFICATION

I, Lia Jones, of full age, certify as follows:

1.     I am a Senior Sales Representative – Neurovascular of Cordis Corporation.

2.     I have read the Verified Complaint to which this Verifying Certification is attached and the factual allegations in Paragraphs 58 to 61, based on my personal knowledge, are true unless expressly stated as based upon information and belief.

3.     I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_____
Lia Jones

Dated:  August 13, 2008

36

JANREM0113239

## VERIFYING CERTIFICATION

I, Holt Parke, of full age, certify as follows:

1.      I am an Account Executive – Endovascular of Cordis Corporation.

2.      I have read the Verified Complaint to which this Verifying Certification is attached and the factual allegations in Paragraphs 62, based on my personal knowledge, are true unless expressly stated as based upon information and belief.

3.      I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_____
Holt Park

Dated: August 12, 2008

37

JANREM0113240

## <u>VERIFYING CERTIFICATION</u>

I, Mark Sims, of full age, certify as follows:

1.      I am an Account Executive – Endovascular of Cordis Corporation.

2.      I have read the Verified Complaint to which this Verifying Certification is attached and the factual allegations in Paragraphs 63 to 64, based on my personal knowledge, are true unless expressly stated as based upon information and belief.

3.      I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_____

Mark Sims

Dated:  August 13, 2008

JANREM0113241

## CERTIFICATION PURSUANT TO RULE 1:4-4(c)

I, Khaled J. Klele, Esq., of full age, certify as follows:

1.      I am an attorney-at-law in the State of New Jersey and an associate of the law firm of Riker, Danzig, Scherer, Hyland & Perretti LLP, attorneys for plaintiffs in this matter.

2.      Attached hereto are the Verifying Certifications of Kristen Garbolino, Robbie Armistead, John Murray, Thomas Metcalf, Jolanta Wierzbicki, Lia Jones, Holt Parke and Mark Sims, with a facsimile of their original signatures.  I certify that Kristen Garbolino, Robbie Armistead, John Murray, Thomas Metcalf, Jolanta Wierzbicki, Lia Jones, Holt Parke and Mark Sims have acknowledged the genuineness of their respective signatures and that the documents or a copy with original signatures affixed will be filed if requested by the Court or a party.

3.      I certify that the foregoing statements made by me are true.  I am aware that if any of the foregoing statements are willfully false, I am subject to punishment.

_____
Khaled J. Klele

3880263

JANREM0113242



JANREM0113243



**Employee Sec. ecy Agr ement**
(With Covenant Against Conflicting Emp oyment)

| Name of Employee | | |
|---|---|---|
| HARDAGE, PRESTON H | | S. LES - '90 |
| Residence Address | City | : ate | Zip |
| 14349 CYPRESS HILL DR | CHESTERFIELD, M( | 6 1017 |

As used in this agreement:

CORDIS means Cordis Corporation, its successors or assigns, and any of their existing and future divisions or subsidiaries.

I means the employee whose name appears above, also referred to by its use of first person pronouns, such as me and my.

CONFIDENTIAL INFORMATION means information disclosed to me or known by me as a result of my employment by CORD S, not ge erally known in the trade or industry in which CORDIS is engaged, about CORDIS products, processes, machines and services, includ ng resea ch, development, manufacturing, purchasing, finance, data processing, engineering, marketing, merchandising and selling; and cor espondir g information about the products, processes, machines, and services of CORDIS affiliates, acquired by me during my employment by CORI IS.

INVENTIONS means discoveries, improvements and ideas, whether patentable or not.

CONFLICTING PRODUCT means any product, process, machine, or service of any person or organization other than CORDIS ( x existen e or under development which resembles or competes with a product, process, machine, or service upon with which I shall have wo ked durir g my term of employment with CORDIS, and whose use or marketability could be enhanced by application to it of CONFIDENTIAL I FORMA TION to which I shall have had access during my employment.

CONFLICTING ORGANIZATION means any person or organization which is engaged in or about to become engaged in researc: on or de vel opment, production, marketing, or selling of a CONFLICTING PRODUCT.

I AM EMPLOYED OR DESIRE TO BE EMPLOYED BY CORDIS IN A CAPACITY IN WHICH I MAY RECEIVE OR CONTRIBUTE 'O CONFI- DENTIAL INFORMATION.

In consideration of my employment by CORDIS:

1. I agree to disclose promptly to CORDIS all INVENTIONS conceived or made by me whether or not during my hours of emplo ment or with the use of CORDIS facilities, materials, or personnel, either solely or jointly with another or others during my employment by C )RDIS, a id related to the actual or anticipated business or activities of CORDIS, or related to its actual or anticipated research and developm nt or sug jest- ed by or resulting from any task assigned to me or work performed by me for, or on behalf of, CORDIS. I assign and agree to assig n my enti re right, title and interest therein to CORDIS.

2. I shall, whenever requested to do so by CORDIS, execute any applications, assignments or other instruments which CORDIS sl all consi er necessary, to apply for and obtain Letters Patent in the United States, or any foreign country, or to protect otherwise CORDIS int rests. Th se obligations shall continue beyond the termination of my employment with CORDIS with respect to INVENTIONS conceived or i ade by m e during my period of employment, and shall be binding upon my executors, administrators or other legal representatives.

3. I shall not disclose to CORDIS or induce CORDIS to use any secret or confidential information or material belonging to others, includin; my former employers, if any.

4. Unless I first secure the written consent of CORDIS, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTI. L INFOI - MATION of which I become informed during my employment, whether or not developed by me.

5. I will not assert any rights under any INVENTIONS as having been made or acquired by me prior to my being employed by CO1 DIS, unl ss such INVENTIONS are identified on a sheet attached hereto and signed by me as of the date of this agreement.

6. I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States or Canada, for a p riod of t o (2) years after termination of my employment with CORDIS, except that I may accept employment with a CONFLICTING ORGA NIZATIO V whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGA NIZATIC N, provided CORDIS, prior to accepting such employment shall receive separate written assurances satisfactory to CORDIS from suc! CONFLI: T- ING ORGANIZATION and from me, that I will not render services directly or indirectly, in connection with any CONFLICTING F ROĐUCT.

7. If I am unable to obtain employment consistent with my training and education, solely because of the provisions of this agreeme it with respect to employment by a CONFLICTING ORGANIZATION, such prohibition shall bind me only as long as CORDIS shall make payment to me equal to my monthly base pay at termination (exclusive of extra compensation and employee benefits) for each month of such unemplo - ment for the period specified in paragraph 6.

JANREM0113244

8. I will, for each month of such unemployment for which I claim payment, give CORDIS a detailed written account of my efforts to obtain employment, and such account will include a statement by me that although I conscientiously sought employment, I was unable to obtain it solely because of the provisions of this agreement. I will submit such account within fifteen (15) days following the end of each calendar month of my unemployment, and CORDIS shall make payment to me equal to my monthly base pay at termination.

9. It is understood that CORDIS shall, at its option, be relieved of making a monthly payment to me for any month with respect to which I have failed to account to CORDIS.

10. If after termination of my employment with CORDIS, I will obtain other employment but, because of the provisions of this agreement my position will be such that my gross monthly income will be less than which I last received from CORDIS as regular monthly base pay, then the obligation of CORDIS to make payments to me for the period specified in paragraph 6 will be limited to the difference between the amount I last received from CORDIS as regular monthly base pay, and the gross monthly income I will receive in my subsequent employment.

11. If CORDIS, at any time within the period specified in paragraph 6, following termination of my employment gives me a written release from the obligations of paragraph 6 of this agreement, CORDIS will thereafter no longer be obligated to make the payments required according to this agreement.

12. I agree that in the event I am transferred from CORDIS to a CORDIS subsidiary or affiliate, such transfer shall not operate to terminate or modify this agreement except that the employer corporation to which I am transferred shall be construed for the purpose of this agreement as standing in the same place and stead as "CORDIS" as of the date of transfer. However, the promises and obligations of paragraph 6 through a 11, as applicable, shall remain binding upon CORDIS and me throughout such employment by the CORDIS subsidiary or affiliate, the same as if I had continued in the employment of CORDIS. It is expressly understood that the two (2) year period provided in paragraph 6 shall contain once upon termination of my employment with CORDIS and at no subsequent time, irrespective of the duration of my employment by any CORDIS subsidiary or affiliate to which a separate two (2) year period shall be applicable.

13. Upon termination of my employment with CORDIS, prior to or upon my retirement, I shall turn over to a designated individual employed by CORDIS all property then in my possession or custody and belonging to CORDIS. I shall not retain any copies or reproductions of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents relating in any way to the affairs of CORDIS or to the affairs of its affiliated companies and which are entrusted to me at any time during my employment with CORDIS.

14. I ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, and agree that with respect to the subject matter hereof it is my entire agreement with CORDIS, superseding any previous oral or written communications, representations, understandings, or agreements with CORDIS or any of its officials or representatives.

15. This agreement shall be interpreted according to the laws of the State of New Jersey.

IN WITNESS WHEREOF, I have hereunto affixed my hand and seal, and thereafter CORDIS has caused these presents to be signed by a duly authorized officer and its seal affixed this 15th day of Dec. , 19 97 .

Witness As to Employee (must be two)

_Preston H Hardage_ LS.
Employee

Name _Mary Bitto Dawsey_
Address
City _14349 Cypress Hill Chesterfield Mo 63017_   State   Zip

Name _Terry Hardage_
Address
City _14349 Cypress Hill Dr._   State   Zip
_Chesterfield MO 63017_

_____
Authorized Cordis Officer

# B

JANREM0113246

# EMPLOYEE SECRECY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT

**Cordis**

a Johnson-Johnson company

Name of Employee: KEVIN BARRINGHAUS

Residence Address: 776 TRAGO CREEK DRIVE
BALLWIN, MO 63021

*Cordis Corporation*
*14201 N.W. 60th Avenue*
*Miami Lakes, FL 33014*
*Phone (305) 824-2000*
*Fax (305) 824-2080*

*Mailing Address:*
*P.O. Box 025700*
*Miami, FL 33102-5700*

## DEFINITIONS

As used in this agreement:

the **COMPANY** means CORDIS CORPORATION, and JOHNSON & JOHNSON and any of their successors or assigns, purchasers, acquires, and any of their existing and future subsidiaries, divisions or affiliates, including any such subsidiary, division or affiliate of Johnson or Johnson to which I may be transferred or by which I may be employed in the future. Affiliates of the COMPANY are any corporation, entity or organization more than 30% owned by the COMPANY, by Johnson & Johnson or by any subsidiary of Johnson & Johnson.

**I** means the employee whose name appears above, also referred to by the use of first person pronouns, such as me and my.

**INVENTIONS** means discoveries, improvements and/or ideas, whether patentable or not.

**CONFIDENTIAL INFORMATION** means information disclosed to me or known by me as a result of my employment by the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, about products, processes, machines, customers, clients, employees and services of the COMPANY, including, but not limited to, inventions, research, development, manufacturing, purchasing, finances, data processing, engineering, marketing, merchandising, selling, sales volumes and strategies, number and location of sales representatives, names and significance of the COMPANY's customers and clients and their employees and representatives, preferences, needs and requirements, purchasing histories, and other customer or client-specific information and comparable information about the products, processes, machines, customers, clients and services of affiliates of the COMPANY acquired by me during my employment by the COMPANY.

**CONFLICTING PRODUCT** means any product, process, machine, invention or service of any person or organization other than the COMPANY in existence or under development which resembles or competes with a product, process, machine, invention or service upon which I shall have worked or about which I become knowledgeable as part of my job responsibilities during my term of employment with the COMPANY and whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION which I shall have had access to during my employment.

**CONFLICTING ORGANIZATION** means any person or organization which is engaged in or about to become engaged in research or consulting regarding, or development, production, marketing, or selling of a CONFLICTING PRODUCT.

I recognize that the business in which the COMPANY is engaged is extremely competitive and that the COMPANY will be providing me with CONFIDENTIAL INFORMATION both at the commencement of my employment and thereafter and may also be providing me with the opportunity to contribute to the creation of CONFIDENTIAL INFORMATION, which will assist both the COMPANY and me in competing effectively. I recognize that CONFIDENTIAL INFORMATION is significant to the COMPANY'S competitive position and that the COMPANY therefore expects me to keep it secret and also expects me not to compete with the COMPANY during my employment and for a period of time thereafter.

Accordingly, in consideration of the receipt of CONFIDENTIAL INFORMATION and my employment or the continuation of my employment by the COMPANY:

1. I agree to disclose promptly to the COMPANY all INVENTIONS conceived or made by me whether or not during my hours of employment or with the use of the COMPANY's facilities, materials or personnel, either solely or jointly with another or others during my employment with the COMPANY, and related to the actual or anticipated business or activities of the COMPANY, or related to its actual or anticipated research and development or suggested by or resulting from any task assigned to me or work performed by me for, or on behalf of, the COMPANY. I assign and agree to assign my entire right, title and interest therein to the COMPANY. I will not assert any right under to any INVENTIONS as having been made or acquired by me prior to my being employed by the COMPANY unless such INVENTIONS are identified on a sheet attached hereto and signed by me and the COMPANY as of the date of this agreement.

2. I recognize that all works, including, but not limited to reports, computer programs, drawings, documentation and publications, which I prepare within the scope of my employment with the COMPANY, shall be works made for hire and that the worldwide copyright is therein shall be the sole and exclusive property of the COMPANY. I will promptly and fully disclose all such works to the COMPANY.

3. I shall, whenever requested to do so by the COMPANY, execute any applications, assignments or other instruments which the COMPANY shall consider necessary to apply for and obtain Letters Patent and/or copyright registrations in the United States, or any foreign country, or to protect otherwise the COMPANY's interests. These obligations shall continue beyond the termination of my employment with the

COMPANY with respect to INVENTIONS or copyrightable works conceived, authored or made by me during my period of employment, and shall be binding upon my executors, administrators, or other legal representatives.

4. I shall not disclose to the COMPANY or induce the COMPANY to use any secret, proprietary or confidential information or material belonging to others, including my former employers, if any. I am aware of no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would in any way restrict, limit or prohibit my employment by the COMPANY that I have not disclosed and provided to the COMPANY.

5. I recognize that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a CONFLICTING ORGANIZATION, will cause immediate irreparable injury to the COMPANY. Unless I first secure the COMPANY's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION. I understand and agree that my obligations not to disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION shall continue after termination of my employment for any reason.

6. I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States or Canada, or in any other foreign country or territory in which I performed services for the Company, for a period of eighteen (18) months after termination of my employment with the COMPANY for any reason, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION, provided the COMPANY, prior to my accepting such employment, shall receive separate written assurances satisfactory to the COMPANY from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly, for an 18-month period, in connection with any CONFLICTING PRODUCT.

7. I recognize that the COMPANY's relations with its accounts, customers and clients represents an important business asset that results from the COMPANY's significant investment of its time and resources. I further recognize that by virtue of my employment by the COMPANY, I have gained or may gain relationships with the accounts, customers and clients of the COMPANY, and because of such relationships, I could cause the COMPANY great loss, damage, and immediate irreparable harm, if, during my employment by the COMPANY or subsequent to the termination of such employment for any reason, I should for myself or on behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a product or service that could compete with a product or service being sold or developed by the COMPANY. I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not solicit any business from, sell to, or render any service to, or, directly or indirectly, help others to solicit business from or render service or sell to, any of the accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY, for any purpose related to the sale of any such product or service. I also agree that for a period of twelve (12) months after termination of employment with the COMPANY for any reason, I will not solicit or hire on my own behalf, or on behalf of others, any COMPANY employee.

8. To enable the COMPANY to monitor my compliance with the obligations imposed by this Agreement, I agree to inform the COMPANY, at the time I give notice of my termination of employment, of the identity of my new employer and of my job title and responsibilities, and I will continue to so, inform the COMPANY, in writing, any time I change employment during the eighteen (18) months following termination of my employment by the COMPANY for any reason.

9. If I am unable to obtain employment consistent with my training and education solely because of prohibitions of paragraphs 6 or 7 of this Agreement, the prohibitions of those paragraphs that have caused me to be unable to obtain such employment shall bind me only as long as the COMPANY shall make payments to me equal to my monthly base pay at termination (exclusive of extra compensation and employee benefits) for each month of such unemployment for the period of the prohibition specified in paragraphs 6 and 7, provided that I am in compliance with paragraphs 8, 10 and 11 of this Agreement.

10. I will, for each month of such unemployment for which I claim payment, give the COMPANY a detailed written account of my efforts to obtain employment, and such account will include a statement by me that, although I conscientiously sought employment consistent with my training and education, I was unable to obtain it solely because of a prohibition of paragraphs 6 or 7 of this Agreement, and will also specify which particular prohibition caused me to be unable to obtain the employment. I will submit such account to the Vice President Human Resources of the COMPANY within fifteen (15) days following the end of each calendar month of my unemployment, and the COMPANY shall make a payment to be equal to my monthly base pay at termination. It is understood that the COMPANY shall, at it option, be relieved of making a monthly payment to me for any month with respect to which I have failed to account to the COMPANY, as required by this paragraph 10.

11. If after termination of my employment with the COMPANY, I obtain other employment but, solely because of the prohibitions in paragraphs 6 or 7 of this Agreement, my position is such that my gross monthly income will be less than what I last received from the COMPANY as regular monthly base pay, then the COMPANY's obligation to make payments to me for the period specified in paragraphs 6 and 7 will be limited to the difference between the amount I last received from the COMPANY as regular monthly base pay, and the gross monthly income I will receive in my subsequent employment. However, I understand that I must provide appropriate written documentation from my employer verifying my compensation to support my claim for entitlement to this salary differential.

- 2 -

JANREM0113248

12. If the COMPANY, at any time within the period of prohibition specified in paragraphs 6 and 7, gives me a written release from the prohibitions of paragraphs 6 and 7 that have been the sole cause of my inability to obtain employment consistent with my training and education or my inability to obtain a position in which my gross monthly income equals my last regular monthly base pay at the COMPANY, the COMPANY will thereafter no longer be obligated to make the payments that had been required due to those prohibitions.

13. Upon termination of my employment with the COMPANY, either prior to or upon my retirement, I shall turn over to a designated individual employed by the COMPANY, all property then in my possession or custody and belonging to the COMPANY, including any computer equipment. I shall not retain any copies of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents, including electronic information and property, relating in any way to the affairs of the COMPANY and which were entrusted to me or obtained by me at any time during my employment with the COMPANY.

14. I understand and acknowledge that if I violate this Agreement or am about to violate this Agreement by accepting employment or providing services prohibited by paragraph 6 or 7 above, the COMPANY shall have the right, and be entitled to, in addition to any other remedies it may have, injunctive relief; in other words, I understand and acknowledge that the COMPANY can bar me from accepting such employment or rendering such services for the periods specified in paragraphs 6 and 7 above.

15. I hereby consent and agree to assignment by the COMPANY of this Agreement and all rights and obligations hereunder including, but not limited to, an assignment in connection with any merger, sale, transfer or acquisition by the COMPANY or relating to all or part of its assets, division and/or affiliates.

16. Nothing herein shall limit or reduce my common law duties to the COMPANY, including but not limited to my duty of loyalty.

17. This agreement shall be interpreted according to the laws of the State of New Jersey without regard to the conflict of law rules thereof.

18. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.

19. The following applies only to a California, Minnesota or North Carolina employee: Notification is hereby given that paragraph 1 does not apply to an invention to the extent that no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely by me on my own time, and (a) which does not relate (i) to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research development, or (b) which does not result from any work performed by me for the COMPANY.

20. The following applies only to a State of Washington employee: Notification is hereby given that this agreement does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely on my own time, unless (a) the invention relates (i) directly to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research development, or (b) the invention results from any work performed by me for the COMPANY.

21. Nothing contained in this agreement shall be deemed to confer on me any rights with respect to the duration of my employment with the COMPANY. I UNDERSTAND AND AGREE THAT MY EMPLOYMENT RELATIONSHIP WITH THE COMPANY IS TERMINABLE AT WILL BY EITHER THE COMPANY OR ME, WITH OR WITHOUT CAUSE, EXCEPT THAT IF I INITIATE THE TERMINATION, THERE SHALL BE, AT THE COMPANY'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER I GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. IF THE COMPANY ELECTS TO CONTINUE MY EMPLOYMENT DURING THE NOTICE PERIOD, IT SHALL ADVISE ME OF THAT FACT, AND OF THE DURATION OF THE NOTICE PERIOD. DURING ANY NOTICE PERIOD, I WILL PROVIDE SUCH TRANSITIONAL SERVICES AS THE COMPANY MAY REQUEST. THE COMPANY WILL BE OBLIGATED TO PAY ME MY FULL BASE SALARY DURING THE NOTICE PERIOD, AND MY DUTY OF LOYALTY TO THE COMPANY SHALL CONTINUE THROUGH SUCH PERIOD.

I ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, and agree that with respect to the subject matter hereof it is my entire agreement with the COMPANY, superseding any previous oral or written communications, representations, understandings, or agreements with the COMPANY or any of its officials or representatives.

DATE: _11-20-00_

EMPLOYEE _Kevin Barringhaus_

Name _KEVIN BARRINGHAUS_

Address _776 TRAGO CREEK DR._

City/State _BALLWIN, MO 63021_

- 3 -

JANREM0113249

C

JANREM0113250



## EMPLOYEE SECRECY, NON-COMPETITION AND NON-SOLICITATION AGREEMENT

Name of Employee:       *Michael Liguori*

Residence Address:      *200 Blackheath Rd.*

                        *Long Beach, NY 11561*

As used in this Agreement:

the COMPANY means CORDIS CORPORATION and JOHNSON & JOHNSON and any of their successors or assigns, purchasers, acquirers, and any of their existing and future subsidiaries, divisions or affiliates, including any such subsidiary, division or affiliate of Johnson & Johnson to which I may be transferred or by which I may be employed in the future. Affiliates of the COMPANY are any corporation, entity or organization at least 50% owned by the COMPANY, by Johnson & Johnson or by any subsidiary of Johnson & Johnson.

I means the employee whose name appears above, also referred to by the use of first person pronouns, such as me and my.

INVENTIONS mean discoveries, improvements and/or ideas, whether patentable or not.

CONFIDENTIAL INFORMATION means information disclosed to me or known by me as a result of my employment by the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, about products, processes, technologies, machines, customers, clients, employees, services and strategies of the COMPANY, including, but not limited to, inventions, research, development, manufacturing, purchasing, finance, computer software, computer hardware, automated systems, engineering, marketing, merchandising, selling, sales volumes or strategies, number or location of sales representatives, names or significance of the COMPANY's customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, or other customer or client-specific information.

CONFLICTING PRODUCT means any product, process, technology, machine, invention or service of any person or organization other than the COMPANY in existence or under development which resembles or competes with a product, process, technology, machine, invention or service upon which I shall have worked or about which I become knowledgeable as a result of employment with the COMPANY and whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION which I shall have had access to during my employment.

CONFLICTING ORGANIZATION means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a CONFLICTING PRODUCT.

I recognize that the business in which the COMPANY is engaged is extremely competitive and that the COMPANY will be providing me with CONFIDENTIAL INFORMATION both at the commencement of my employment and thereafter and may also be providing me with the opportunity to contribute to the creation of CONFIDENTIAL INFORMATION, which will assist both the COMPANY and me in competing effectively. I recognize that CONFIDENTIAL INFORMATION is significant to the COMPANY'S competitive position and that the COMPANY therefore expects me to keep it secret and also expects me not to compete with the COMPANY during my employment and for a period of time thereafter.

Accordingly, in consideration of the receipt of CONFIDENTIAL INFORMATION, my employment or the continuation of my employment by the COMPANY, and other benefits being provided to me in connection with this Agreement, including those provided pursuant to paragraph 9:

1.  I agree to disclose promptly to the COMPANY all INVENTIONS conceived or made by me whether or not during my hours of employment or with the use of the COMPANY's facilities, materials or personnel, either solely or jointly with another or others during my employment with the COMPANY, and related to the actual or anticipated business or activities of the COMPANY, or related to its actual or anticipated research and development or suggested by or resulting from any task assigned to me or work performed by me for, or on behalf of, the COMPANY. I assign and agree to assign my entire right, title and interest therein to the COMPANY. I will not assert any rights under or to any INVENTIONS as having been made or acquired by me prior to my being employed by the COMPANY unless such INVENTIONS are identified on a sheet attached hereto and signed by me and the COMPANY as of the date of this Agreement.

2.  I recognize that all works, including, but not limited to reports, computer programs, drawings, documentation and publications, which I prepare within the scope of my employment with the COMPANY, shall be works made for hire and that the worldwide copyrights therein shall be the sole and exclusive property of the COMPANY. In the event that any said copyrightable work or portion thereof shall not be legally qualified as a work made for hire, or shall subsequently be so held to not be a work made for hire, I agree to assign, and do hereby so assign to the COMPANY, all right, title and interest in and to said work or portion thereof. I will promptly and fully disclose all such works to the COMPANY.

3. I shall, whenever requested to do so by the COMPANY, execute any applications, assignments or other instruments which the COMPANY shall consider necessary to apply for and obtain Letters Patent, trademark and/or copyright registrations in the United States, or any foreign country, or to protect otherwise the COMPANY's interests. These obligations shall continue beyond the termination of my employment with the COMPANY with respect to INVENTIONS, trademarks or copyrightable works conceived, authored or made by me during my period of employment, and shall be binding upon my executors, administrators, or other legal representatives.

4. I shall not disclose to the COMPANY or induce the COMPANY to use any secret, proprietary or confidential information or material belonging to others, including my former employers, if any. I am aware of no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would in any way restrict, limit or prohibit my employment by the COMPANY that I have not disclosed and provided to the COMPANY.

5. I recognize that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a CONFLICTING ORGANIZATION, will cause immediate irreparable injury to the COMPANY. Unless I first secure the COMPANY's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION. I understand and agree that my obligations not to disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION shall continue after termination of my employment for any reason.

6. During my employment with the COMPANY and for a period of eighteen (18) months after termination of my employment with the COMPANY for any reason, I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States, or in any foreign country or territory in which the services I may provide could enhance the use or marketability of a CONFLICTING PRODUCT by application of CONFIDENTIAL INFORMATION which I shall have had access to during my employment, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION, provided that the COMPANY, prior to my accepting such employment, shall receive separate written assurances satisfactory to the COMPANY from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly, for an 18-month period, in connection with any CONFLICTING PRODUCT. I also agree that during my employment with the COMPANY and for a period of 18 months thereafter, I will not render services to any other organization or person in a position in which I could use CONFIDENTIAL INFORMATION to the detriment of the COMPANY.

7. I recognize that the COMPANY's relations with its accounts, customers and clients represents an important business asset that results from the COMPANY's significant investment of its time and resources. I further recognize that by virtue of my employment by the COMPANY, I have gained or may gain relationships with the accounts, customers and clients of the COMPANY, and because of such relationships, I could cause the COMPANY great loss, damage, and immediate irreparable harm, if, during my employment by the COMPANY or subsequent to the termination of such employment for any reason, I should for myself or on behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a product or service that could compete with a product or service being sold or developed by the COMPANY. I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not solicit any business from, sell to, or render any service to, or, directly or indirectly, help others to solicit business from or render service or sell to, any of the accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY, for any purpose related to the sale of any such product or service. I also agree that for a period of twelve (12) months after termination of employment with the COMPANY for any reason, I will not solicit or hire on my own behalf, or on behalf of others, any COMPANY employee.

8. To enable the COMPANY to monitor my compliance with the obligations imposed by this Agreement, I agree to inform the COMPANY, at the time I give notice of my termination of employment, of the identity of my new employer and of my job title and responsibilities, and will continue to so inform the COMPANY, in writing, any time I change employment during the eighteen (18) months following termination of my employment with the COMPANY for any reason.

9. If I am unable to obtain employment consistent with my training and education solely because of a prohibition of paragraph 6 or 7 of this Agreement, or if I am able to obtain only a position in which my Gross Monthly Pay is less than what I last received from the COMPANY as Gross Monthly Pay, then any prohibition of those paragraphs that caused me to be unable to obtain such employment (or that is responsible for the above-referenced differential in pay), shall bind me only as long as the COMPANY shall make monthly payment to me equal to the lesser of (a) the amount last received from the COMPANY as Gross Monthly Pay, or (b) the difference between my last Gross Monthly Pay at the COMPANY and my Gross Monthly Pay in any subsequent employment. Gross Monthly Pay shall consist of the sum of the following applicable amounts, prorated to a monthly basis: my annual base pay, annual commissions, year-end cash bonus, and the monetary value of my year-end stock award (but not stock option grants, any other extra compensation or benefits). My Gross Monthly Pay at the COMPANY will be based on the amounts actually received by me during the last twelve calendar months I was employed by the COMPANY. My Gross Monthly Pay in any subsequent employment will be based on a projection of the amounts to be received by me during the first twelve months in that employment.

10. In order to qualify for the payments provided for in paragraph 9 above, I understand that I must, for each month that I claim payment is due, represent to the Vice President of Human Resources of the COMPANY, in writing within fifteen (15) days following the end of that calendar month, that although I diligently sought employment consistent with my training and education, I was unable to obtain it, or was unable to attain a position in which my Gross Monthly Pay equaled what I last received from the COMPANY as Gross Monthly Pay, as the case may be, solely because of a prohibition of paragraph 6 or 7 of this Agreement. I must also promptly submit such further information as the COMPANY may request to enable it to verify the accuracy of my representation. I understand that the COMPANY shall, at its option, be relieved of making a monthly payment to me for any month with respect to which I have failed to comply with a requirement of this paragraph 10.

- 2 -

Revised 11/16/00

JANREM0113252

11. I further understand that if, at any time within the period of prohibition specified in paragraph 6 or 7, the COMPANY gives me a written release from the prohibition of paragraph 6 or 7 that has been the sole cause of my inability to obtain employment consistent with my training and education or my inability to obtain a position in which my Gross Monthly Pay equals what I last received from the COMPANY as Gross Monthly Pay, as the case may be, then, the COMPANY will no longer be obligated to make the payments that had been required due to those prohibitions.

12. Upon termination of my employment with the COMPANY for any reason, I shall turn over to a designated individual employed by the COMPANY, all property then in my possession or custody and belonging to the COMPANY, including any computer equipment. I shall not retain any copies of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents in any form whatsoever (including information contained in computer memory or on any computer disk) relating in any way to the affairs of the COMPANY and which were entrusted to me or obtained by me at any time during my employment with the COMPANY.

13. I understand and acknowledge that if I violate this Agreement or am about to violate this Agreement by disclosing or using information prohibited by paragraph 5 above, accepting employment or providing services prohibited by paragraph 6 or 7 above, or failing to turn over property as required by paragraph 12 above, the COMPANY shall have the right, and be entitled to, in addition to any other remedies it may have, injunctive relief; in other words, I understand and acknowledge that the COMPANY can bar me from disclosing or using such information, bar me from accepting such employment or rendering such services for the periods specified in paragraphs 6 and 7 above, and require that I turn over such property.

14. I hereby consent and agree to assignment by the COMPANY of this Agreement and all rights and obligations hereunder including, but not limited to, an assignment in connection with any merger, sale, transfer or acquisition by the COMPANY or relating to all or part of its assets, divisions and/or affiliates.

15. Nothing herein shall limit or reduce my common law duties to the COMPANY, including but not limited to my duty of loyalty.

16. This Agreement shall be interpreted according to the laws of the State of New Jersey without regard to the conflict of law rules thereof. I agree that any action relating to or arising out of this Agreement may be brought in the courts of the State of New Jersey or, if subject matter jurisdiction exists, in the United States District Court for the District of New Jersey. I consent to personal jurisdiction and venue in both such courts and to service of process by United States Mail or express courier service in any such action.

17. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.

18. The following applies only to a California, Minnesota or North Carolina employee: Notification is hereby given that paragraph 1 does not apply to an invention to the extent that no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely by me on my own time, and (a) which does not relate (i) to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by me for the COMPANY.

19. The following applies only to a State of Washington employee: Notification is hereby given that paragraph 1 does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely on my own time, unless (a) the invention relates (i) directly to the business of the COMPANY or to the COMPANY's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by me for the COMPANY.

20. Nothing contained in this Agreement shall be deemed to confer on me any rights with respect to the duration of my employment with the COMPANY. I UNDERSTAND AND AGREE THAT MY EMPLOYMENT RELATIONSHIP WITH THE COMPANY IS TERMINABLE AT WILL BY EITHER THE COMPANY OR ME, WITH OR WITHOUT CAUSE, EXCEPT THAT IF I INITIATE THE TERMINATION, THERE SHALL BE, AT THE COMPANY'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER I GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. If the COMPANY elects to continue my employment during the notice period, it shall advise me of that fact, and of the duration of the notice period. During any notice period, I will provide such transitional services as the COMPANY may request. The COMPANY will be obligated to continue my pay during the notice period, and my duty of loyalty to the COMPANY shall continue through such period.

I ACKNOWLEDGE HAVING READ, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, and agree that with respect to the subject matter hereof it is my entire agreement with the COMPANY, superseding any previous oral or written communications, representations, understandings, or agreements with the COMPANY or any of its officials or representatives.

DATE: _2/12/2001_

EMPLOYEE _Michael Liguori_
Name _700 Blackheath Road_
Address _Long Beach, NY 11561_
City/State

- 3 -

Revised 11/16/00

JANREM0113253

# D

JANREM0113254

**JOHNSON & JOHNSON**
NEW BRUNSWICK, NEW JERSEY

## EMPLOYEE SECRECY AGREEMENT
(With Covenant Against Conflicting Employment)

(NAME OF EMPLOYEE)

TERENCE L. BATES

| (RESIDENCE ADDRESS) | (CITY) | (STATE) |
| --- | --- | --- |
| 2512 Country View Glen ESCONDIDO, CA  92026 | | |

As used in this agreement:

JOHNSON means Johnson & Johnson, its sucessors or assigns, and any of their existing and future divisions or subsidiaries.

I means the employee whose name appears above, also referred to by its use of first person pronouns, such as me and my.

CONFIDENTIAL INFORMATION means information disclosed to me or known by me as a result of my employment by JOHNSON, not generally known in the trade or industry in which JOHNSON is engaged, about JOHNSON's products, processes, machines, and services, including research, development, manufacturing, purchasing, finance, data processing, engineering, marketing, merchandising and selling; and corresponding information about the products, processes, machines, and services of JOHNSON's affiliates, acquired by me during my employment by JOHNSON.

INVENTIONS means discoveries, improvements and ideas, whether patentable or not.

CONFLICTING PRODUCT means any product, process, machine, or service of any person or organization other than JOHNSON in existence or under development which resembles or competes with a product, process, machine, or service upon with which I shall have worked during my term of employment with JOHNSON, and whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION to which I shall have had access during my employment.

CONFLICTING ORGANIZATION means any person or organization which is engaged in or about to become engaged in research on or development, production, marketing, or selling of a CONFLICTING PRODUCT.

I AM EMPLOYED OR DESIRE TO BE EMPLOYED BY JOHNSON IN A CAPACITY IN WHICH I MAY RECEIVE OR CON-TRIBUTE TO CONFIDENTIAL INFORMATION.

In consideration of my employment by JOHNSON:

1. I agree to disclose promptly to JOHNSON all INVENTIONS conceived or made by me whether or not during my hours of employment or with the use of JOHNSON's facilities, materials, or personnel, either solely or jointly with another or others during my employment by JOHNSON, and related to the actual or anticipated business or activities of JOHNSON, or related to its actual or anticipated research and development or suggested by or resulting from any task assigned to me or work performed by me for, or on behalf of, JOHNSON. I assign and agree to assign my entire right, title and interest therein to JOHNSON.

2. I shall, whenever requested to do so by JOHNSON, execute any applications, assignments or other instruments which JOHN-SON shall consider necessary to apply for and obtain Letters Patent in the United States, or any foreign country, or to protect other-wise JOHNSON's interests. These obligations shall continue beyond the termination of my employment with JOHNSON with respect to INVENTIONS conceived or made by me during my period of employment, and shall be binding upon my executors, administrators, or other legal representatives.

3. I shall not disclose to JOHNSON or induce JOHNSON to use any secret or confidential information or material belonging to others, including my former employers, if any.

4. Unless I first secure JOHNSON's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION of which I become informed during my employment, whether or not developed by me.

5. I will not assert any rights under any INVENTIONS as having been made or acquired by me prior to my being employed by JOHNSON, unless such INVENTIONS are identified on a sheet attached hereto and signed by me as of the date of this agreement.

6. I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States or Canada, for a period of two (2) years after termination of my employment with JOHNSON, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business in which I accept employ-ment, not a CONFLICTING ORGANIZATION, provided JOHNSON, prior to my accepting such employment shall receive separate written assurances satisfactory to JOHNSON from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly, in connection with any CONFLICTING PRODUCT.

FORM 1137-312 REV. 2/89 (FRONT)

JANREM0113255

7. If I am unable to obtain employment consistent with my training and education, solely because of the provisions of this agreement with respect to employment by a COMPETING ORGANIZATION, such prohibition will bind me only as long as JOHNSON shall make payments to me equal to my monthly base pay at termination (exclusive of extra compensation and employee benefits) for each month of such unemployment for the period specified in paragraph 6.

8. I will, for each month of such unemployment for which I claim payment, give JOHNSON a detailed written account of my efforts to obtain employment, and such account will include a statement by me that although I conscientiously sought employment, I was unable to obtain it solely because of the provisions of this agreement. I will submit such account within fifteen (15) days following the end of each calendar month of my unemployment, and JOHNSON shall make a payment to me equal to my monthly base pay at termination.

9. It is understood that JOHNSON shall, at its option, be relieved of making a monthly payment to me for any month with respect to which I have failed to account to JOHNSON.

10. If after termination of my employment with JOHNSON, I will obtain other employment but, because of the provisions of this agreement, my position will be such that my gross monthly income will be less than which I last received from JOHNSON as regular monthly base pay, then JOHNSON's obligation to make payments to me for the period specified in paragraph 6 will be limited to the difference between the amount I last received from JOHNSON as regular monthly base pay, and the gross monthly income I will receive in my subsequent employment.

11. If JOHNSON, at any time within the period specified in paragraph 6, following termination of my employment gives me a written release from the obligations of paragraph 6 of this agreement, JOHNSON will thereafter no longer be obligated to make the payments required according to this agreement.

12. I agree that in the event I am transferred from JOHNSON to a JOHNSON subsidiary or affiliate, such transfer shall not operate to terminate or modify this agreement except that the employer corporation to which I am transferred shall be construed for the purpose of this agreement as standing in the same place and stead as "JOHNSON" as of the date of transfer. However, the promises and obligations of paragraph 6 through 11, as applicable, shall remain binding upon JOHNSON and me throughout such employment by the JOHNSON subsidiary or affiliate, the same as if I had continued in the employment of JOHNSON. It is expressly understood that the two (2) year period provided in paragraph 6 shall commence upon termination of my employment with JOHNSON and at no subsequent time, irrespective of the duration of my employment by any JOHNSON subsidiary or affiliate to which a separate two (2) year period shall be applicable.

13. Upon termination of my employment with JOHNSON, prior to or upon my retirement, I shall turn over to a designated individual employed by JOHNSON all property then in my possession or custody and belonging to JOHNSON. I shall not retain any copies or reproductions of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents relating in any way to the affairs of JOHNSON or to the affairs of its affiliated companies and which are entrusted to me at any time during my employment with JOHNSON.

14. I ACKNOWLEDGE HAVING READ EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, and agree that with respect to the subject matter hereof it is my entire agreement with JOHNSON, superseding any previous oral or written communications, representations, understandings, or agreements with JOHNSON or any of its officials or representatives.

15. This agreement shall be interpreted according to the laws of the State of New Jersey.

IN WITNESS WHEREOF, I have hereunto affixed my hand and seal, and thereafter JOHNSON has caused these presents to be signed by a duly authorized officer and its seal affixed this _____ day of _____ . 19__

WITNESSES AS TO EMPLOYEE
( must be two)

_____ (L.S.)
EMPLOYEE

NAME

ADDRESS

CITY                STATE

NAME

ADDRESS

CITY                STATE

ATTEST

JOHNSON & JOHNSON

BY _____
AUTHORIZED OFFICER

_____
ASSISTANT SECRETARY

FORM 1137-312 REV. 2/89 (BACK)

JANREM0113256

# E

JANREM0113257



## Cordis
a ~Johnson~&~Johnson~ company

### EMPLOYEE SECRECY, NON-COMPETITION
### AND NON-SOLICITATION AGREEMENT

Name of Employee:  JOHN M. OTTO

Residence Address:  5608 NE DR
ARLINGTON, TX 76013

As used in this Agreement:

**the COMPANY** means CORDIS CORPORATION and JOHNSON & JOHNSON and any of their successors or assigns, purchasers, acquirers, and any of their existing and future subsidiaries, divisions or affiliates, including any such subsidiary, division or affiliate of Johnson & Johnson to which I may be transferred or by which I may be employed in the future. Affiliates of the COMPANY are any corporation, entity or organization at least 50% owned by the COMPANY, by Johnson & Johnson or by any subsidiary of Johnson & Johnson.

**I** means the employee whose name appears above, also referred to by the use of first person pronouns, such as me and my.

**INVENTIONS** mean discoveries, improvements and/or ideas, whether patentable or not.

**CONFIDENTIAL INFORMATION** means information disclosed to me or known by me as a result of my employment by the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, about trade secrets, products, processes, technologies, machines, customers, clients, employees, services and strategies of the COMPANY, including, but not limited to, inventions, research, development, manufacturing, purchasing, finance, computer software, computer hardware, automated systems, engineering, marketing, merchandising, selling, sales volumes or strategies, number or location of sales representatives, names or significance of the COMPANY's existing and prospective customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, or other customer or client-specific information.

**CONFLICTING PRODUCT** means any product, process, technology, machine, invention or service of any person or organization in other than the COMPANY in existence or under development which resembles or competes with a product, process, technology, machine, invention, or service upon which I shall have worked or about which I become knowledgeable as a result of employment with the COMPANY and whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION which I shall have had access to during my employment.

**CONFLICTING ORGANIZATION** means any person or organization which is engaged in or about to become engaged in research on, consulting regarding, or development, production, marketing, or selling of a CONFLICTING PRODUCT.

**EXTRAORDINARY OR SPECIALIZED TRAINING** means any training or education which the COMPANY directly or indirectly provides to me to enable me to perform the responsibilities and duties of my employment with the COMPANY.

I recognize that the business in which the COMPANY is engaged is extremely competitive and that the COMPANY will be providing me with CONFIDENTIAL INFORMATION both at the commencement of my employment and thereafter and may also be providing me with the opportunity to contribute to the creation of CONFIDENTIAL INFORMATION, which will assist both the COMPANY and me in competing effectively. I recognize that CONFIDENTIAL INFORMATION is significant to the COMPANY's competitive position and that the COMPANY has a legitimate business interest in maintaining as confidential the CONFIDENTIAL INFORMATION. Therefore, I acknowledge that the COMPANY expects me to keep such CONFIDENTIAL INFORMATION secret and also expects me not to compete with the COMPANY during my employment and for a period of time thereafter.

I recognize that as part of my employment, the COMPANY may provide me with EXTRAORDINARY OR SPECIALIZED TRAINING and that the COMPANY has a legitimate business interest in ensuring that the COMPANY, and not a CONFLICTING ORGANIZATION, obtains the benefit of having provided me with such training.

Accordingly, in consideration of my receipt of CONFIDENTIAL INFORMATION, and/or EXTRAORDINARY OR SPECIALIZED TRAINING, my employment or the continuation of my employment by the COMPANY, and other benefits being provided to me in connection with this Agreement, including those provided pursuant to paragraph 10:

1. I agree to disclose promptly to the COMPANY all INVENTIONS conceived or made by me whether or not during my hours of employment or with the use of the COMPANY's facilities, materials or personnel, either solely or jointly with another or others during my employment with the COMPANY, and related to the actual or anticipated business or activities of the COMPANY, or related to its actual or anticipated research and development or suggested by or resulting from any task assigned to me or work

page 1 of 4

Revised 1-27-00.

JANREM0113258

performed by me for, or on behalf of, the COMPANY. I assign and agree to assign my entire right, title and interest therein to the COMPANY. I will not assert any rights under or to any INVENTIONS as having been made or acquired by me prior to my being employed by the COMPANY unless such INVENTIONS are identified on a sheet attached hereto and signed by me and the COMPANY as of the date of this Agreement.

2. I recognize that all works, including, but not limited to reports, computer programs, drawings, documentation and publications, which I prepare within the scope of my employment with the COMPANY, shall be works made for hire and that the worldwide copyrights therein shall be the sole and exclusive property of the COMPANY. In the event that any said copyrightable work or portion thereof shall not be legally qualified as a work made for hire, or shall subsequently be so held to not be a work made for hire I agree to assign, and do hereby so assign to the COMPANY, all right, title and interest in and to said work or portion thereof. I will promptly and fully disclose all such works to the COMPANY.

3. I shall, whenever requested to do so by the COMPANY, execute any applications, assignments or other instruments which the COMPANY shall consider necessary to apply for and obtain Letters Patent, trademark and/or copyright registrations in the United States, or any foreign country, or to protect otherwise the COMPANY's interests. These obligations shall continue beyond the termination of my employment with the COMPANY with respect to INVENTIONS, trademarks or copyrightable works conceived, authored or made by me during my period of employment, and shall be binding upon my executors, administrators, or other legal representatives.

4. I shall not disclose to the COMPANY or induce the COMPANY to use any secret, proprietary or confidential information or material belonging to others, including my former employers, if any. I am aware of no agreement, contract, non-compete covenant, non-disclosure/secrecy agreement or similar restriction that would in any way restrict, limit or prohibit my employment by the COMPANY that I have not disclosed and provided to the COMPANY.

5. I recognize that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a CONFLICTING ORGANIZATION, will cause immediate irreparable injury to the COMPANY. Unless I first secure the COMPANY's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION. I understand and agree that my obligations not to disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION shall continue after termination of my employment for any reason.

6. During my employment with the COMPANY and for a period of eighteen (18) months after termination of my employment with the COMPANY for any reason, I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States, or in any foreign country or territory in which the services I may provide could enhance the use or marketability of a CONFLICTING PRODUCT by application of CONFIDENTIAL INFORMATION which I shall have had access to during my employment, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION, provided that the COMPANY, prior to my accepting such employment, shall receive separate written assurances satisfactory to the COMPANY from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly, for an 18-month period, in connection with any CONFLICTING PRODUCT. I also agree that during my employment with the COMPANY and for a period of 18 months thereafter, I will not render services to any other organization or person in a position in which I could use CONFIDENTIAL INFORMATION to the detriment of the COMPANY.

7. I recognize that the COMPANY's relations with its existing and prospective accounts, customers and clients represents an important business asset that results from the COMPANY's significant investment of its time and resources. I further recognize that by virtue of my employment by the COMPANY, I have gained or may gain relationships with the existing and prospective accounts, customers and clients of the COMPANY, and because of such relationships, I could cause the COMPANY great loss, damage, and immediate irreparable harm, if, during my employment by the COMPANY or subsequent to the termination of such employment for any reason, I should for myself or on behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a product or service that could compete with a product or service being sold or developed by the COMPANY. I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not solicit any business from, sell to, or render any service to, or, directly or indirectly, help others to solicit business from or render service or sell to, any of the existing or prospective accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY, for any purpose related to the sale of any such product or service. I also agree that for a period of twelve (12) months after termination of employment with the COMPANY for any reason, I will not solicit or hire on my own behalf, or on behalf of others, any COMPANY employee.

8. To enable the COMPANY to monitor my compliance with the obligations imposed by this Agreement, I agree to inform the COMPANY, at the time I give notice, of my termination of employment, of the identity of my new employer and of my job title and responsibilities, and will continue to so inform the COMPANY, in writing, any time I change employment during the eighteen (18) months following termination of my employment with the COMPANY for any reason.

9. I acknowledge that I have carefully read and considered the provisions of paragraphs 6, 7, and 8 hereof and, after having done so, agree that the restrictions set forth (including but not limited to, the time period restrictions, scope of activity encumpassed by the restrictions and the geographical area restrictions) are fair and reasonable and are reasonably necessary to protect the legitimate business interests of the COMPANY.

page 2 of 4

Revised 1-22-0

10. If the COMPANY terminates my employment with the COMPANY without cause, and if I am unable to obtain employment consistent with my training and education solely because of a prohibition of paragraph 6 or 7 of this Agreement, or if I am able to obtain only a position in which my Gross Monthly Pay is less than what I last received from the COMPANY as Gross Monthly Pay, then any prohibition of those paragraphs that caused me to be unable to obtain such employment (or that is responsible for the above-referenced differential in pay), shall bind me only as long as the COMPANY shall make monthly payment to me equal to the lesser of (a) the amount last received from the COMPANY as Gross Monthly Pay, or (b) the difference between my last Gross Monthly Pay at the COMPANY and my Gross Monthly Pay in any subsequent employment. Gross Monthly Pay shall consist of the sum of the following applicable amounts, prorated to a monthly basis: my annual base pay, annual commissions, year-end cash bonus, and the monetary value of my year-end stock award (but not stock option grants, any other extra compensation or benefits). My Gross Monthly Pay at the COMPANY will be based on the amounts actually received by me during the last twelve calendar months I was employed by the COMPANY. My Gross Monthly Pay in any subsequent employment will be based on a projection of the amounts to be received by me during the first twelve months in that employment.

11. In order to qualify for the payments provided for in paragraph 9 above, I understand that I must, for each month that I claim payment is due, represent to the Vice President of Human Resources of the COMPANY, in writing within fifteen (15) days following the end of that calendar month, that although I diligently sought employment consistent with my training and education, I was unable to obtain it, or was unable to attain a position in which my Gross Monthly Pay equaled what I last received from the COMPANY as Gross Monthly Pay, as the case may be, solely because of a prohibition of paragraph 6 or 7 of this Agreement. I must also promptly submit such further information as the COMPANY may request to enable it to verify the accuracy of my representation (including but not limited to a list of the names and phone numbers of all persons or entities I contacted during the prior month to inquire about possible employment). I understand that the COMPANY shall, at its option, be relieved of making a monthly payment to me for any month with respect to which I have failed to comply with a requirement of this paragraph 10.

12. I further understand that if, at any time within the period of prohibition specified in paragraph 6 or 7, the COMPANY gives me a written release from the prohibition of paragraph 6 or 7 that has been the sole cause of my inability to obtain employment consistent with my training and education or my inability to obtain a position in which my Gross Monthly Pay equals what I last received from the COMPANY as Gross Monthly Pay, as the case may be, then, the COMPANY will no longer be obligated to make the payments that had been required due to those prohibitions.

13. Upon termination of my employment with the COMPANY for any reason, I shall turn over to a designated individual employed by the COMPANY, all property then in my possession or custody and belonging to the COMPANY, including any computer equipment I shall not retain any copies of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents in any form whatsoever (including information contained in computer memory or on any computer disk) relating in any way to the affairs of the COMPANY and which were entrusted to me or obtained by me at any time during my employment with the COMPANY.

14. I understand and acknowledge that if I violate this Agreement or am about to violate this Agreement by disclosing or using information prohibited by paragraph 5 above, accepting employment or providing services prohibited by paragraph 6 or 7 above, or failing to turn over property as required by paragraph 12 above, the COMPANY shall have the right, and be entitled to, in addition to any other remedies it may have, injunctive relief; in other words, I understand and acknowledge that the COMPANY can bar me from disclosing or using such information, bar me from accepting such employment or rendering such services for the periods specified in paragraphs 6 and 7 above, and require that I turn over such property.

15. I hereby consent and agree to assignment by the COMPANY of this Agreement and all rights and obligations hereunder including, but not limited to, an assignment in connection with any merger, sale, transfer or acquisition by the COMPANY or relating to all or part of its assets, divisions and/or affiliates.

16. Nothing herein shall limit or reduce my common law duties to the COMPANY, including but not limited to my duty of loyalty.

17. This Agreement shall be interpreted according to the laws of the State of Florida without regard to the conflict of law rules thereof. I agree that any action relating to or arising out of this Agreement shall be brought in the courts of Miami-Dade County, Florida or, if subject matter jurisdiction exists, in the United States District Court for the Southern District of Florida. I consent to personal jurisdiction and venue in both such courts and to service of process by United States Mail or express courier service in any such action.

18. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions. To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited. This Agreement may only be modified, amended or changed by written instrument executed by both the COMPANY and me.

19. The following applies only to a California, Minnesota or North Carolina employee: Notification is hereby given that paragraph 1 does not apply to an invention to the extent that no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely by me on my own time, and (a) which does not relate (i) to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by me for the COMPANY.

20. The following applies only to a State of Washington employee: Notification is hereby given that paragraph 1 does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely on my own time, unless (a) the invention relates (i) directly to the business of the COMPANY or (ii) to the

Revised 1-22-02

JANREM0113260

COMPANY's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by me for the COMPANY.

21. Nothing contained in this Agreement shall be deemed to confer on me any rights with respect to the duration of my employment with the COMPANY.   I UNDERSTAND AND AGREE THAT MY EMPLOYMENT RELATIONSHIP WITH THE COMPANY IS TERMINABLE AT WILL BY EITHER THE COMPANY OR ME, WITH OR WITHOUT CAUSE, EXCEPT THAT IF I INITIATE THE TERMINATION, THERE SHALL BE, AT THE COMPANY'S OPTION, A PERIOD OF UP TO FOURTEEN (14) DAYS AFTER I GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE. If the COMPANY elects to continue my employment during the notice period, it shall advise me of that fact, and of the duration of the notice period. During any notice period, I will provide such transitional services as the COMPANY may request.  The COMPANY will be obligated to continue my pay during the notice period, and my duty of loyalty to the COMPANY shall continue through such period.

I ACKNOWLEDGE HAVING READ, UNDERSTOOD, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, and agree that with respect to the subject matter hereof it is my entire agreement with the COMPANY, superseding any previous oral or written communications, representations, understandings, or agreements with the COMPANY or any of its officials or representatives.

DATE: _4/19/02_

EMPLOYEE SIGNATURE _John M. Otto_

Name _JOHN M. OTTO_

Address _6708 VALE DR._

City/State _ARLINGTON, TX 76013_

page 4 of 4                                                            Revised 1-22-02

JANREM0113261

F

JANREM0113262



**a _Johnson~Johnson_ company**

<u>EMPLOYEE SECRECY, NON-COMPETITION</u>
<u>AND NON-SOLICITATION AGREEMENT</u>

Name of Employee:   Jeff Murdock

Residence Address:   2022 N.W. 139th Ave.
                     Pembroke Pines, FL 33028

As used in this Agreement:

the **COMPANY** means CORDIS CORPORATION and JOHNSON & JOHNSON and any of their successors or assigns, purchasers, acquirers, and any of their existing and future subsidiaries, divisions or affiliates, including any such subsidiary, division or affiliate of Johnson & Johnson to which I may be transferred or by which I may be employed in the future. Affiliates of the COMPANY are any corporation, entity or organization at least 50% owned by the COMPANY, by Johnson & Johnson or by any subsidiary of Johnson & Johnson.

I means the employee whose name appears above, also referred to by the use of first person pronouns, such as me and my.

**INVENTIONS** mean discoveries, improvements and/or ideas, whether patentable or not.

**CONFIDENTIAL INFORMATION** means information disclosed to me or known by me as a result of my employment by the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, about trade secrets, products, processes, technologies, machines, customers, clients, employees, services and strategies of the COMPANY, including, but not limited to, inventions, research, development, manufacturing, purchasing, finance, computer software, computer hardware, automated systems, engineering, marketing, merchandising, selling, sales volumes or strategies, number or location of sales representatives, names or significance of the COMPANY's existing and prospective customers or clients or their employees or representatives, preferences, needs or requirements, purchasing histories, or other customer or client-specific information.

**CONFLICTING PRODUCT** means any product, process, technology, machine, invention or service of any person or organization other than the COMPANY in existence or under development which resembles or competes with a product, process, technology, machine, invention or service upon which I shall have worked or about which I become knowledgeable as a result of employment with the COMPANY and whose use or marketability could be enhanced by application to it of CONFIDENTIAL INFORMATION which I shall have had access to during my employment.

**CONFLICTING ORGANIZATION** means any person or organization which is engaged in or about to become engaged in research, consulting regarding, or development, production, marketing, or selling of a CONFLICTING PRODUCT.

**EXTRAORDINARY OR SPECIALIZED TRAINING** means any training or education which the COMPANY directly or indirectly provides to me to enable me to perform the responsibilities and duties of my employment with the COMPANY.

I recognize that the business in which the COMPANY is engaged is extremely competitive and that the COMPANY will be providing me with CONFIDENTIAL INFORMATION both at the commencement of my employment and thereafter and may also be providing me with the opportunity to contribute to the creation of CONFIDENTIAL INFORMATION, which will assist both the COMPANY and me in competing effectively. I recognize that CONFIDENTIAL INFORMATION is significant to the COMPANY'S competitive position and that the COMPANY has a legitimate business interest in maintaining as confidential the CONFIDENTIAL INFORMATION. Therefore, I acknowledge that the COMPANY expects me to keep such CONFIDENTIAL INFORMATION secret and also expects me not to compete with the COMPANY during my employment and for a period of time thereafter.

I recognize that as part of my employment, the COMPANY may provide me with EXTRAORDINARY OR SPECIALIZED TRAINING and that the COMPANY has a legitimate business interest in ensuring that the COMPANY, and not a CONFLICTING ORGANIZATION, obtains the benefit of having provided me with such training.

Accordingly, in consideration of my receipt of CONFIDENTIAL INFORMATION, and/or EXTRAORDINARY OR SPECIALIZED TRAINING, my employment or the continuation of my employment by the COMPANY, and other benefits being provided to me in connection with this Agreement, including those provided pursuant to paragraph 10:

1. I agree to disclose promptly to the COMPANY all INVENTIONS conceived or made by me whether or not during my hours of employment or with the use of the COMPANY's facilities, materials or personnel, either solely or jointly with another or others during my employment with the COMPANY, and related to the actual or anticipated business or activities of the COMPANY, or related to its actual or anticipated research and development or suggested by or resulting from any task assigned to me or work performed by me for, or on behalf of, the COMPANY. I assign and agree to assign my entire right, title and interest that will to the

page 1 of 4                                                                              Revised 1-22-02

JANREM0113263

COMPANY. I will not assert any rights under or to any INVENTIONS as having been made or acquired by me prior to ...y being employed by the COMPANY unless such INVENTIONS are identified on a sheet attached hereto and signed by me and the COMPANY as of the date of this Agreement.

2. I recognize that all works, including, but not limited to reports, computer programs, drawings, documentation and publication, which I prepare within the scope of my employment with the COMPANY, shall be works made for hire and that the worldwide c. pyrights therein shall be the sole and exclusive property of the COMPANY. In the event that any said copyrightable work or portion thereof shall not be legally qualified as a work made for hire, or shall subsequently be so held to not be a work made for hire, I agree to assign, and do hereby so assign to the COMPANY, all right, title and interest in and to said work or portion thereof. I will promptly and fully disclose all such works to the COMPANY.

3. I shall, whenever requested to do so, by the COMPANY, execute any applications, assignments or other instruments which the COMPANY shall consider necessary to apply for and obtain Letters Patent, trademark and/or copyright registrations in the United States, or any foreign country, or to protect otherwise the COMPANY's interests. These obligations shall continue beyond the termination of my employment with the COMPANY with respect to INVENTIONS, trademarks or copyrightable works conceived, authored or made by me during my period of employment, and shall be binding upon my executors, administrators, or other legal representatives.

4. I shall not disclose to the COMPANY or induce the COMPANY to use any secret, proprietary or confidential information or material belonging to others, including my former employers, if any. I am aware of no agreement, contract, non-compete coven nt, non-disclosure/secrecy agreement or similar restriction that would in any way restrict, limit or prohibit my employment by the CC MPANY that I have not disclosed and provided to the COMPANY.

5. I recognize that CONFIDENTIAL INFORMATION is of great value to the COMPANY, that the COMPANY has legitimate business interests in protecting its CONFIDENTIAL INFORMATION, and that the disclosure to anyone not authorized to receive such information, including a CONFLICTING ORGANIZATION, will cause immediate irreparable injury to the COMPANY. Unl ss I first secure the COMPANY's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFI ENTIAL INFORMATION. I understand and agree that my obligations not to disclose, use, disseminate, lecture upon o publish CONFIDENTIAL INFORMATION shall continue after termination of my employment for any reason.

6. During my employment with the COMPANY and for a period of eighteen (18) months after termination of my employment with the COMPANY for any reason, I will not render services, directly or indirectly, to any CONFLICTING ORGANIZATION in the United States, or in any foreign country or territory in which the services I may provide could enhance the use or marketability of a CONFLICTING PRODUCT by application of CONFIDENTIAL INFORMATION which I shall have had access to during my employment, except that I may accept employment with a CONFLICTING ORGANIZATION whose business is diversified and which is, as to that part of its business in which I accept employment, not a CONFLICTING ORGANIZATION, provided that the COMPANY, prior to my accepting such employment, shall receive separate written assurances satisfactory to the COMPANY from such CONFLICTING ORGANIZATION and from me, that I will not render services directly or indirectly, for an 18-month period, in connection with any CONFLICTING PRODUCT. I also agree that during my employment with the COMPANY and for a period of 18 months thereafter, I will not render services to any other organization or person in a position in which I could use CONFIDENTIAL INFORMATION to the detriment of the COMPANY.

7. I recognize that the COMPANY's relations with its existing and prospective accounts, customers and clients represents an important business asset that results from the COMPANY's significant investment of its time and resources. I further recognize that by virtue of my employment by the COMPANY, I have gained or may gain relationships with the existing and prospective accounts, customers and clients of the COMPANY, and because of such relationships, I could cause the COMPANY great loss, damage, and immediate irreparable harm, if, during my employment by the COMPANY or subsequent to the termination of such employment for any reason, I should for myself or on behalf of any other person, entity, firm or corporation, sell, offer for sale, or solicit or assist in the sale of a product or service that could compete with a product or service being sold or developed by the COMPANY. I therefore agree that during my employment with the COMPANY and for eighteen (18) months after termination of such employment for any reason, I will not solicit any business from, sell to, or render any service to, or, directly or indirectly, help others to solicit business from or render service or sell to, any of the existing or prospective accounts, customers or clients with whom I have had contact during the last twelve (12) months of my employment with the COMPANY, for any purpose related to the sale of any such product or service. I also agree that for a period of twelve (12) months after termination of employment with the COMPANY for any reason, I will not solicit or hire on my own behalf, or on behalf of others, any COMPANY employee.

8. To enable the COMPANY to monitor my compliance with the obligations imposed by this Agreement, I agree to inform the COMPANY, at the time I give notice of my termination of employment, of the identity of my new employer and of my job title and responsibilities, and will continue to so inform the COMPANY, in writing, any time I change employment during the eighteen (18) months following termination of my employment with the COMPANY for any reason.

9. I acknowledge that I have carefully read and considered the provisions of paragraphs 6, 7, and 8 hereof and, after having done so, agree that the restrictions set forth (including but not limited to, the time period restrictions, scope of activity encompass d by the restrictions and the geographical area restrictions) are fair and reasonable and are reasonably necessary to protect the legitimate business interests of the COMPANY.

10. If the COMPANY terminates my employment with the COMPANY without cause, and if I am unable to obtain employment consistent with my training and education solely because of a prohibition of paragraph 6 or 7 of this Agreement, or if I am able to obtain only a

page 2 of 4                                                                 Revised -23-02

JANREM0113264

position in which my Gross Monthly Pay is less than what I last received from the COMPANY as Gross Monthly Pay, then any prohibition of those paragraphs that caused me to be unable to obtain such employment (or that is responsible for the above-referenced differential in pay), shall bind me only so long as the COMPANY shall make monthly payment to me equal to the lesser of (a) the amount last received from the COMPANY as Gross Monthly Pay, or (b) the difference between my last Gross Month ! Pay at the COMPANY and my Gross Monthly Pay in any subsequent employment.  Gross Monthly Pay shall consist of the sum of the following applicable amounts, prorated to a monthly basis:  my annual base pay, annual commissions, year-end cash bonus and the monetary value of my year-end stock option grants, and any other extra compensation or benefits).  My Gross Monthly Pay at the COMPANY will be based on the amounts actually received by me during the last twelve calendar months I was employed by the COMPANY.  My Gross Monthly Pay in any subsequent employment will be based on a projection of the amounts to be received by me during the first twelve months in that employment.

11. In order to qualify for the payments provided for in paragraph 10 above, I understand that I must, for each month that I claim payment is due, represent to the Vice President of Human Resources of the COMPANY, in writing within fifteen (15) days following the end of that calendar month, that although I diligently sought employment consistent with my training and education, I was unable to obtain it, or was unable to attain a position in which my Gross Monthly Pay equaled what I last received from the COMPANY as Gross Monthly Pay, as the case may be, solely because of a prohibition of paragraph 6 or 7 of this Agreement.  I must also promptly submit such further information as the COMPANY may request to enable it to verify the accuracy of my representation (including but not limited to a list of the names and phone numbers of all persons or entities I contacted during the prior month to inquire about possible employment).  I understand that the COMPANY shall, at its option, be relieved of making a monthly payment to me for any month with respect to which I have failed to comply with a requirement of this paragraph 11.

12. I further understand that if, at any time within the period of prohibition specified in paragraph 6 or 7, the COMPANY gives me a written release from the prohibition of paragraph 6 or 7 that has been the sole cause of my inability to obtain employment consistent with my training and education or my inability to obtain a position in which my Gross Monthly Pay equals what I last received from the COMPANY as Gross Monthly Pay, as the case may be, then, the COMPANY will be no longer be obligated to make the payment that had been required due to those prohibitions.

13. Upon termination of my employment with the COMPANY for any reason, I shall turn over to a designated individual employed by the COMPANY, all property then in my possession or custody and belonging to the COMPANY, including any computer equipment.  I shall not retain any copies of correspondence, memoranda, reports, notebooks, drawings, photographs, or other documents in any form whatsoever (including information contained in computer memory or on any computer disk) relating in any way to the affairs of the COMPANY, and which were entrusted to me or obtained by me at any time during my employment with the COMPANY.

14. I understand and acknowledge that if I violate this Agreement or am about to violate this Agreement by disclosing or using information prohibited by paragraph 5 above, accepting employment or providing services prohibited by paragraph 6 or 7 above, or failing to turn over property as required by paragraph 13 above, the COMPANY shall have the right, and be entitled to, in addition to any other remedies it may have, injunctive relief; in other words, I understand and acknowledge that the COMPANY can bar me from disclosing or using such information, bar me from accepting such employment or rendering such services for the periods specified in paragraphs 6 and 7 above, and require that I turn over such property.

15. I hereby consent and agree to assignment by the COMPANY of this Agreement and all rights and obligations hereunder including, but not limited to, an assignment in connection with any merger, sale, transfer or acquisition by the COMPANY or relating to all or part of its assets, divisions and/or affiliates.

16. Nothing herein shall limit or reduce my common law duties to the COMPANY, including but not limited to my duty of loyalty.

17. This Agreement shall be interpreted according to the laws of the State of Florida without regard to the conflict of law rules thereof.  I agree that any action relating to or arising out of this Agreement shall be brought in the courts of Miami-Dade County, Florida or, if subject matter jurisdiction exists, in the United States District Court for the Southern District of Florida.  I consent to personal jurisdiction of and venue in both such courts and to service of process by United States Mail or express courier service in any such action.

18. In the event that any provision of this Agreement is invalidated or unenforceable under applicable law, that shall not affect the validity or enforceability of the remaining provisions.  To the extent that any provision of this Agreement is unenforceable because it is overbroad, that provision shall be limited to the extent required by applicable law and enforced as so limited.  This Agreement may only be modified, amended or changed by written instrument executed by both the COMPANY and me.

19. The following applies only to a California, Minnesota or North Carolina employee:  Notification is hereby given that paragraph 1 does not apply to an invention to the extent that no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely by me on my own time, and, (a) which does not relate (i) to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research or development, or (b) which does not result from any work performed by me for the COMPANY.

20. The following applies only to a State of Washington employee:  Notification is hereby given that paragraph 1 does not apply to an invention for which no equipment, supplies, facility, or trade secret information of the COMPANY was used and which was developed entirely on my own time, unless (a) the invention relates (i) directly to the business of the COMPANY or (ii) to the COMPANY's actual or demonstrably anticipated research or development, or (b) the invention results from any work performed by me for the COMPANY.

page 3 of 4                                                                 Revised 1-22-02

21. Nothing contained in this Agreement shall be deemed to confer on me any rights with respect to the duration of my employment with the COMPANY.  I UNDERSTAND AND AGREE THAT MY EMPLOYMENT RELATIONSHIP WITH THE COMPANY IS TERMINABLE AT WILL BY EITHER THE COMPANY OR ME, WITH OR WITHOUT CAUSE, EXCEPT THAT IF I INITIATE THE TERMINATION, THERE SHALL BE, AT THE COMPANY'S OPTION, A PERIOD OF UP TO FOURTEEN (14 DAYS AFTER I GIVE WRITTEN NOTICE OF TERMINATION BEFORE THE TERMINATION BECOMES EFFECTIVE  If the COMPANY elects to continue my employment during the notice period, it shall advise me of that fact, and of the duration of the notice period.  During any notice period, I will provide such transitional services as the COMPANY may request.  The COMPANY will be obligated to continue my pay during the notice period, and my duty of loyalty to the COMPANY shall continue through such period.

I ACKNOWLEDGE HAVING READ, UNDERSTOOD, EXECUTED AND RECEIVED A COPY OF THIS AGREEMENT, and agree that with respect to the subject matter hereof it is my entire agreement with the COMPANY, superseding any previous oral or written communications, representations, understandings, or agreements with the COMPANY or any of its officials or representatives.

DATE: 12/10/04

EMPLOYEE SIGNATURE _Jeff Murdock_

Name: 2022 NW 139th Ave

Address: Pembroke Pines, FL 33028

City/State

page 4 of 4                                   Revised 1-23-02

JANREM0113266

# G

JANREM0113267

# REUTERS  THOMSON REUTERS

**LATEST NEWS** ⊞⊡ **U.S. CONVICTS BIN LADEN'S DRIVER AT GUANTANAMO**



**Live from Beijing**
Get the latest Olympics
news, event schedules
and more
**Olympics Coverage**

# REUTERS
# BUSINESS & FINANCE

Connecti
to prese
▸ Top stor

You are here:    Home > News > Article

# Former Cordis Executive Jack Springer to Lead Expansion by Medical Device Maker Invatec...

Mon May 12, 2008 8:27am EDT

Email |      Print |      Share|      Reprints |      Single Page | Recommend (-)

JANREM0113268

Former Cordis Executive Jack Springer to Lead Expansion by Medical Device Maker Inva

BRESCIA, Italy--(Business Wire)--
Jack Springer, the former Worldwide General Manager of Cordis
Endovascular, a unit of Johnson &Johnson, has been appointed
Vice-President and General Manager of Invatec-USA, based in Bethlehem,
Pa., a subsidiary of Invatec s.r.l, a leading manufacturer of
interventional devices for coronary and peripheral work and RFA
equipment. The company is headquartered in Brescia, Italy.

Andrea Venturelli, Co-Founder & CEO of Invatec said: "We are
extremely proud to have Jack join us to lead our U.S. business, as
well as becoming a member of our executive team."

Stefan Widensohler, Invatec's other founder, added: "Jack has more
than 20 years of experience in the medical device industry with an
exemplary record in management and marketing of innovative technology
that we believe will help us continue to grow and prosper in the
world's biggest market."

Mr. Springer joins Invatec from Neuromonics, a start-up company
specializing in the treatment of tinnitus, where he had served as
President and CEO since 2006.

Prior to Neuromonics, Mr. Springer's career at Cordis Endovascular
began before the Cordis merger with J&J in 1996 and continued until
2006. During that time he was instrumental in the successful
introduction and establishment of a wide range of interventional
devices whose revenues currently exceed $500 million annually.

Jack Springer spent four years as an officer in the United States
Army serving in several leadership positions within an Air Defense
Battalion after which he began his career in medical devices at Abbott
Diagnostics.

Commenting on his new appointment, Mr. Springer said: "It is
exciting to return to the interventional market with a company that
has long been admired in the industry for the quality of its products
and the enterprise of its founders.

"I look forward to building Invatec's US team to develop and
introduce to physician groups during the next two years a full
pipeline of interesting and innovative products," he added.

About Invatec s.r.l:

Invatec (a contraction of "Innovative Technologies") was founded
by two entrepreneurs, Andrea Venturelli and Stefan Widensohler, in
1996. With its three production sites in the Brescia, Italy and
another in Frauenfeld, Switzerland, Invatec competes aggressively in
the global interventional markets.

Product systems are developed from proprietary metal-, plastic-
and surface-treatment technologies and produced in a vertically
integrated manufacturing process independent of outside vendors. This
model supports continuous and fast development cycles.

JANREM0113269

© Thomson Reuters 2008 All rights reserved

**SHARE:**   Del.icio.us      Digg      Mixx      My Web      Facebook      Newsvine

## GLOBAL MARKETS NEWS

Blackstone sees pain ahead for regional banks

UPDATE 2-Pentagon revives tanker contest; bids due by Oct 1

CORRECTED - CORRECTED-UPDATE 1-Sirona Q3 earnings tops Street view, ups '08

Following Fidel's lead, Cuba cuts ethanol plans

More Global Markets News...

## ALSO ON REUTERS


Iraq's female bombers rise as Qaeda's men fall


Talk of the Town: Morgan Freeman recovering


Fido's not just yawning — he's empathizing

**Ads by Google** What's This?

Stent or No Stent,
Talk to Your Doctor to See What's Right For You.
www.PLAVIX.com

Medical Device Jobs
Find Device Jobs & Industry news! Post your resume today
www.devicespace.com

CYPHER® Sirolimus-eluting
Coronary Stent - Designed to Open Your Arteries and Keep Them Open.
CypherStent.com

Medical Device Suppliers
Looking for medical device materials? Search suppliers.
www.medicaldesign.com

JANREM0113270

# H

JANREM0113271



We make ideas come alive

**2430 Emrick Blvd.**
**Bethlehem, PA 18020**
**(610) 694-8998 Business**
**(610) 694-8115 Fax**

July 18, 2008

Ms. Jolanta Wierzbicki
60 Houston Avenue
Newport, RI 02840

Dear Jolanta:

## RE:  Offer Letter

Invatec, Inc. (the *Company*) is pleased by your interest in the Sales Representative position. This letter will summarize the terms of our agreement and other terms of your employment with the Company, and will supplement the Company's Employee Policy Manual, which otherwise remains in full force and effect:

1.      In the performance of your professional activities, you will report to Jeff Murdock, Regional Director, with whom you will collaborate and who will define your overall business mission and professional assignments.  You will be based in the Boston Area.  Your start date will be August 18, 2008.

2.      Your annual compensation shall consist of $80,000 paid semi-monthly and in accordance with the Company's customary payroll practices.  A commission plan will be offered to you on a monthly basis reconciled quarterly. Your target annual commission plan will be $144,000. You will have an annualized commission guarantee totaling $170,000 paid monthly ($14,166.67) and reconciled quarterly through June 30, 2009.  You will receive a car allowance of $650.00 per month and reimbursement according to travel policy of .30 cents per business mile.

3.      As a new hire you will be subject to a 90-day probationary period.  During the probationary period, you must establish that you are competent and qualified to carry out the services for which you have been hired.  If you are unable to prove your competence during this time period, or are otherwise unqualified, the Company shall immediately terminate your employment.  During the probationary period, the Company will provide training and will closely monitor your performance and progress.

4.      You shall be entitled to a full benefits package which will include healthcare, dental, and 401K. Medical and dental benefits will commence immediately and 401K will commence around October 1, 2008.  If you have specific questions regarding benefits, please contact Keith Westpy at (610) 694-8998. The company intends to offer executives a long-term incentive plan that will be finalized during the first six months of your employment. You will be eligible for this program immediately upon initiation. This program will provide a long-term incentive based on a combination of individual and company performance. You will be entitled to 3 weeks vacation; prorated from the date of hire during the first year of hire. You may carryover up to 2 weeks per year.     *Elain*

JANREM0113272

5.     You shall be employed on an "at-will" basis and for an indefinite term. This means that you are free to terminate your employment with the Company at any time for any or no reason, and you are not required to provide the Company with any notice of your termination. The Company is likewise free to terminate your employment at any time for any or no reason, and is not required to provide you with any notice of your termination.

6.     You acknowledge and agree that compliance with the Company's policies, practices, and procedures is a term and condition of your employment and that you will abide by all policies, practices, and procedures of the Company that exist or may be adopted from time to time in the future. As a condition of employment, you are required to comply with the terms and conditions of the Employee Proprietary Information and Inventions and Non-Solicitation of Employees and Customers Agreement (the *Non-Solicitation Agreement*) attached hereto, to be executed contemporaneously with this Letter Agreement.

Your acceptance of this Letter Agreement is required before beginning work for the Company. I ask that you please provide your signature below to indicate your acceptance.

Please return one signed copy of Letter Agreement and the signed Non-Solicitation Agreement to my attention.

Best regards,

Invatec, LLC

Keith Westpy
Controller

Accepted and agreed:

Print Name:  Jolanta Wierzbicki          7/29/08

2

JANREM0113273

I

JANREM0113274

## EMPLOYEE PROPRIETARY INFORMATION AND INVENTIONS AND NON-SOLICITATION OF EMPLOYEES AND CUSTOMERS AGREEMENT

This Employee Proprietary Information and Inventions and Non-Solicitation of Employees and Customers Agreement ("Agreement") is made in consideration for my employment or continued employment by INVATEC, LLC, a Delaware limited liability company, or its subsidiaries or affiliates (the "Company"), and the compensation now and hereafter paid to me. Because of the highly confidential and competitive nature of our business, information about our products, research and development, marketing, sales activity, and customers must be handled with extreme care and sensitivity. Disclosure of any confidential information could seriously jeopardize our business interests and irreparably damage us. Also, Company investment in new products and development must be preserved to ensure a healthy future for all employees. Therefore, the Company requires employees to enter into an agreement protecting our confidential information and rights. I hereby agree as follows:

## 1. NONDISCLOSURE.

**1.1 Recognition of Company's Rights; Nondisclosure.** At all times during my employment and thereafter, I will hold in strictest confidence and will not disclose, use, lecture upon or publish any of the Company's Proprietary Information (defined below), except as such disclosure, use or publication may be required in connection with my work for the Company, or unless an officer of the Company expressly authorizes such in writing. I will obtain Company's written approval before publishing or submitting for publication any material (written, verbal, or otherwise) that relates to my work at Company and/or incorporates any Proprietary Information. I hereby assign to the Company any rights I may have or acquire in such Proprietary Information and recognize that all Proprietary Information shall be the sole property of the Company and its assigns.

**1.2 Proprietary Information.** The term "Proprietary Information" shall mean any and all confidential and/or proprietary knowledge, data or information of the Company or related to the current, future, or proposed products or services of the Company. By way of illustration but not limitation, "Proprietary Information" includes (a) trade secrets, inventions, ideas, processes, source and object codes, data, programs, works of authorship, formulae, know-how, improvements, discoveries, processes, manufacturing techniques, procedures or processes, developments, designs and techniques, (in each case whether or not patented or patentable) (hereinafter collectively referred to as "Inventions"); (b) information regarding patents and patent applications, development, formulas, product designs, clinical trial data, new products, marketing and selling, business plans, research and development, manufacturing, budgets and unpublished financial statements and information, licenses, prices and costs, suppliers, customers and customer lists; customer information, investors and business and contractual relationships and (c) information regarding the skills and compensation of other employees of the Company. I agree that should I have any questions or uncertainty

whatsoever as to whether any information may be considered by the Company to be Proprietary Information, I will raise the issue with the Company before disclosing any such information.

**1.3 Third Party Information.** I understand, in addition, that the Company has received and in the future will receive from third parties confidential or proprietary information ("Third Party Information") subject to a duty on the Company's part to maintain the confidentiality of such information and to use it only for certain limited purposes. During the term of my employment and thereafter, I will hold Third Party Information in the strictest confidence and will not disclose to anyone (other than Company personnel who need to know such information in connection with their work for the Company) or use, except in connection with my work for the Company, Third Party Information unless expressly authorized by an officer of the Company in writing.

**1.4 No Improper Use of Information of Prior Employers and Others.** During my employment by the Company I will not improperly use or disclose any confidential information or trade secrets, if any, of any former employer or any other person to whom I have an obligation of confidentiality, and I will not bring onto the premises of the Company any unpublished documents or any property belonging to any former employer or any other person to whom I have an obligation of confidentiality unless consented to in writing by that former employer or person. I will use in the performance of my duties only information which is generally known and used by persons with training and experience comparable to my own, which is common knowledge in the industry or otherwise legally in the public domain, or which is otherwise provided or developed by the Company.

## 2. ASSIGNMENT OF INVENTIONS.

**2.1 Proprietary Rights.** The term "Proprietary Rights" shall mean all trade secret, patent, trademark, copyright and other intellectual property rights throughout the world.

1

JANREM0113275

**2.2   Prior Inventions.** Inventions, if any, patented or unpatented, which I made prior to the commencement of my employment with the Company are excluded from the scope of this Agreement. To preclude any possible uncertainty, I have set forth on Exhibit A attached hereto a complete list of all Inventions that I have, alone or jointly with others, conceived, developed or reduced to practice or caused to be conceived, developed or reduced to practice prior to the commencement of my employment with the Company, that I consider to be my property or the property of third parties and that I wish to have excluded from the scope of this Agreement (collectively referred to as "Prior Inventions"). If disclosure of any such Prior Invention would cause me to violate any prior confidentiality agreement, I understand that I am not to list such Prior Inventions in Exhibit A but am only to disclose a cursory name for each such invention, a listing of the party(ies) to whom it belongs and the fact that full disclosure as to such inventions has not been made for that reason. A space is provided on Exhibit A for such purpose. If no such disclosure is attached, I represent that there are no Prior Inventions. If, in the course of my employment with the Company, I incorporate a Prior Invention into a Company product, process or machine, the Company is hereby granted and shall have a nonexclusive, royalty-free, irrevocable, perpetual, worldwide license (with rights to sublicense through multiple tiers of sublicensees) to make, have made, modify, use and sell such Prior Invention. Notwithstanding the foregoing, I agree that I will not incorporate, or permit to be incorporated, Prior Inventions in any Company Inventions without the Company's prior written consent.

**2.3   Assignment of Inventions.** Subject to Sections 2.4, and 2.6, I hereby assign and agree to assign in the future (when any such Inventions or Proprietary Rights are first reduced to practice or first fixed in a tangible medium, as applicable) to the Company all my right, title and interest in and to any and all Inventions (and all Proprietary Rights with respect thereto) whether or not patentable or registrable under copyright or similar statutes, made or conceived or reduced to practice or learned by me, either alone or jointly with others, during the period of my employment with the Company. Inventions assigned to the Company, or to a third party as directed by the Company pursuant to this Section 2, are hereinafter referred to as "Company Inventions."

**2.4   Obligation to Keep Company Informed.** I will promptly disclose to the Company fully and in writing all Inventions authored, conceived or reduced to practice by me, either alone or jointly with others, during the period of my employment. The foregoing sentence does not apply with respect to an invention that both: (a) is developed entirely on my own time without using the Company's equipment, supplies, facilities, or trade secret information; and (b) does not relate at the time of conception or reduction to practice to the Company's business (including its actual or reasonably anticipated research or development efforts). In addition, I will promptly disclose to the Company all patent applications filed by me or on my behalf during my employment with the Company and within one year after termination of my employment.

**2.5   Government or Third Party.** I also agree to assign all my right, title and interest in and to any particular Invention to a third party, including without limitation the United States, as directed by the Company.

**2.6   Works for Hire.** I acknowledge that all original works of authorship which are made by me (solely or jointly with others) within the scope of my employment and which are protectable by copyright are "works made for hire," pursuant to United States Copyright Act (17 U.S.C., Section 101).

**2.7   Enforcement of Proprietary Rights.** I will assist the Company in every proper way to obtain, and from time to time enforce, United States and foreign Proprietary Rights relating to Company Inventions in any and all countries. To that end I will execute, verify and deliver such documents and perform such other acts (including appearances as a witness) as the Company may reasonably request for use in applying for, obtaining, perfecting, evidencing, sustaining and enforcing such Proprietary Rights and the assignment thereof. In addition, I will execute, verify and deliver assignments of such Proprietary Rights to the Company or its designee. My obligation to assist the Company with respect to Proprietary Rights relating to such Company Inventions in any and all countries shall continue beyond the termination of my employment, but the Company shall compensate me at a reasonable rate after my termination for the time actually spent by me at the Company's request on such assistance.

In the event the Company is unable for any reason, after reasonable effort, to secure my signature on any document needed in connection with the actions specified in the preceding paragraph, I hereby irrevocably designate and appoint the Company and its duly authorized officers and agents as my agent and attorney in fact, which appointment is coupled with an interest, to act for and in my behalf to execute, verify and file any such documents and to do all other lawfully permitted acts to further the purposes of the preceding paragraph with the same legal force and effect as if executed by me. I hereby waive and quitclaim to the Company any and all claims, of any nature whatsoever, which I now or may hereafter have for infringement of any Proprietary Rights assigned hereunder to the Company.

2

3. ADDITIONAL ACTIVITIES; EMPLOYEE NON-SOLICITATION.

I agree that during the period of my employment by the Company, I will not, without the Company's express written consent, engage in any employment or business activity other than for the Company. I agree further that for the period of my employment by the Company and for eighteen (18) months after the date of termination of my employment by the Company (for any reason) I will not, either directly or through others, solicit or attempt to solicit any employee, independent contractor or consultant of the company to terminate his or her relationship with the Company in order to become an employee, consultant or independent contractor to or for any other person or entity or otherwise interfere with the relationship any employee, consultant or independent contractor has with the Company. If any restriction set forth in this Section 3 is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend only over the maximum period of time, range of activities or geographic area as to which it may be enforceable. I further agree that if I violate any covenant contained in Section 3, the duration of such covenant so violated shall be automatically extended for a period of such violation.

4. NON-SOLICITATION CLIENTS/CUSTOMERS.

By signing below, I acknowledge and agree that as part of my performance, I will spend a significant amount of time learning, identifying and developing relationships with actual and prospective customers and learning their individualistic and divergent needs. The identification of such actual and prospective customers, the development of relationships with them, and the identification of their particular needs all constitutes key confidential and proprietary information which has been developed at great expense by Company and is a principal asset of the Company. By signing below, I acknowledge and agree that in order for me to solicit or to approach in any business manner any Company customer after the termination of my employment, I would almost invariably utilize to some degree the Company's confidential and proprietary information. The use of such proprietary and confidential information would start with the initial contact of the customer and inevitably extend to any discussions with the customer regarding product needs. Regardless of the use of proprietary and confidential information, I also recognize that the Company's customers are a key business asset of the Company and economically indispensable to the Company.

In order to protect the Company's Proprietary Information and trade secrets, which would cause irreparable harm to the Company if disclosed to a competitor, while employed by the Company, and for a period of eighteen (18) months

following the termination of my employment (or other affiliation) with the Company, (for any reason) I shall not directly or indirectly solicit any customer, client, investor, supplier, or consultant of the Company to terminate, reduce or negatively alter his, her, its relationship with the Company. The geographic scope of the covenants described in this paragraph 4 shall include any city, county, or state of the United States and any such other city, territory, country, or jurisdiction in which the Company does business. I further acknowledge and agree that in light of my knowledge of and access to the Company's Proprietary Information and trade secrets, and the highly competitive nature of Company's business, that the restrictions set forth in this Section 4 are reasonable and that any such solicitations would constitute unfair business practices and misappropriation of Proprietary Information and trade secrets. Moreover, I acknowledge and agree that the names and information regarding the Company's customers constitute Proprietary Information and trade secrets of the Company and that the sale or unauthorized use or disclosure of any of the Company's Proprietary Information and trade secrets constitutes unfair competition. Nothing in this paragraph 4 should be construed to narrow my obligations imposed by any other provision herein, any other Agreement, law or other source. If any restriction set forth in this Section 4 is found by any court of competent jurisdiction to be unenforceable because it extends for too long a period of time or over too great a range of activities or in too broad a geographic area, it shall be interpreted to extend only over the maximum period of time, range of activities or geographic area as to which it may be enforceable. I further agree that if I violate any covenant contained in Section 4, the duration of such covenant so violated shall be automatically extended for a period of such violation.

For purposes of this section, the word "customer" means any person, company or other entity who: (1) was a customer of the Company at the time of the termination of my employment with the Company; or (2) was engaged in active negotiations with the Company relating to the purchase of services or products from the Company at any time during the two years immediately prior to the date of the termination of my employment with the Company; or (3) became a customer of the Company within six months after the termination of my employment with the Company. This Section shall not apply to any of Company's customers unrelated to my performance under this Agreement, i.e., any customer which I did not solicit, approach or service in any business manner while I was employed by Company.

5. RECORDS.

I agree to keep and maintain adequate and current records (in the form of notes, sketches, drawings and in any other form that may be required by the Company) of all

3

Proprietary Information developed by me and all Inventions made by me during the period of my employment at the Company, which records shall be available to and remain the sole property of the Company at all times.

## 6. PERSONAL COMPUTERS AND SOFTWARE.

I will use my best efforts to prevent the unauthorized use of any personal computer (PC), peripheral devise, software or related technical documentation issued to me by the Company, and I will not input, load or otherwise attempt to use any unauthorized software, source code or object code in any Company PC, whether or not such PC is assigned to me.

## 7. PASSWORDS AND KEYS.

Unless I receive prior written approval of my manager, I will not (1) reveal, disclose or otherwise make available to any person (including, but not limited to, Company employees or agents) any Company password or key, whether or not the password or key is assigned to me (including network or voice network passwords), or (2) obtain, possess or use in any manner a Company password or key which is not assigned to me.

## 8. ACCESS TO RESTRICTED FACILITIES.

Unless I receive the prior written approval of my manager, I will not attempt to gain access to or enter any restricted Company facility, area or room, nor abuse or misuse any authority delegated to me by the Company to gain access to or enter any restricted Company facility, area or room.

## 9. SECURITY POLICY.

I will abide all Company security policies, procedures and standards which have been communicated to me during the course of my employment with the Company.

## 10. NO CONFLICTING OBLIGATION.

I represent that my performance of all the terms of this Agreement and as an employee of the Company does not and will not breach any agreement to keep in confidence information acquired by me in confidence or in trust prior to my employment by the Company. I have not entered into, and I agree I will not enter into, any agreement either written or oral in conflict herewith.

## 11. RETURN OF COMPANY MATERIALS; INSPECTION.

When I leave the employ of the Company, I will deliver to the Company any and all drawings, notes, memoranda, specifications, devices, formulas, client/customer lists and documents, together with all copies thereof, and any other material containing or disclosing any Company Inventions, Third Party Information or Proprietary

Information of the Company. I further agree to return any and all other tangible or intangible property of the Company's. I further agree that any property situated on the Company's premises, including disks and other storage media, filing cabinets or other work areas, is subject to inspection by Company personnel at any time with or without notice and that there is no expectation of privacy. In the event of the termination of my employment, I agree to sign and deliver to the Company an executed "Termination Certification" in the form attached as Exhibit B.

## 12. LEGAL AND EQUITABLE REMEDIES.

Because my services are personal and unique and because I may have access to and become acquainted with the Proprietary Information of the Company, the Company shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that the Company may have for a breach of this Agreement.

## 13. NOTICES.

Any notices required or permitted hereunder shall be given at the appropriate party at such address as the party shall specify in writing. Such notice shall be deemed given upon personal delivery to the appropriate address or if sent by certified or registered mail, three days after the date of mailing.

## 14. NOTIFICATION OF NEW EMPLOYER.

In the event that I leave the employ of the Company, I hereby consent to the notification of my new employer of my rights and obligations under this Agreement.

## 15. GENERAL PROVISIONS.

### 15.1 Governing Law; Consent to Personal Jurisdiction and Exclusive Forum. This Agreement will be governed by and construed according to the laws of the Commonwealth of Pennsylvania. I agree and acknowledge that any controversy arising out of or relating to this Agreement or the breach thereof, or any claim or action to enforce this Agreement or portion thereof, or any controversy or claim requiring interpretation of this Agreement must be brought in a forum located within the Commonwealth of Pennsylvania. No such action may be brought in any forum outside the Commonwealth of Pennsylvania. Any action brought in contravention of this paragraph by one party is subject to dismissal at any time and at any stage of the proceedings by the other, and no action taken by the other in defending, counter claiming or appealing shall be construed as a waiver of this right to immediate dismissal. A party bringing an action in contravention of this paragraph shall be liable to the other party for the costs,

4

JANREM0113278

expenses and attorney's fees incurred in successfully dismissing the action or successfully transferring the action to the state or federal courts located in the Commonwealth of Pennsylvania.

**15.2   Severability.** In case any one or more of the provisions contained in this Agreement (including Sections 3 and 4) shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein. If moreover, any one or more of the provisions contained in this Agreement shall for any reason be held to be excessively broad as to duration, geographical scope, activity or subject, it shall be construed by limiting and reducing it, so as to be enforceable to the extent compatible with the applicable law as it shall then appear.

**15.3   Successors and Assigns.** This Agreement will be binding upon my heirs, executors, administrators and other legal representatives and will be for the benefit of the Company, its successors, and its assigns.

**15.4   Survival.** The provisions of this Agreement shall survive the termination of my employment and the assignment of this Agreement by the Company to any successor in interest or other assignee.

**15.5   At-will Employment.** I agree and understand that my employment is at-will which means I or the company each have the right to terminate my employment at will, with or without advanced notice and with or without cause. I further agree and understand that nothing in this Agreement shall confer any right with respect to continuation of employment by the Company, nor shall it interfere in any way with my right or the Company's right to terminate my employment at any time, with or without cause.

**15.6   Waiver.** No waiver by the Company of any breach of this Agreement shall be a waiver of any preceding or succeeding breach. No waiver by the Company of any right under this Agreement shall be construed as a waiver of any other right. The Company shall not be required to give notice to enforce strict adherence to all terms of this Agreement.

**15.7   Entire Agreement.** The obligations pursuant to Sections 1 through 4 and Sections 6 and 7 (including all subparts) of this Agreement shall apply to any time during which I was previously employed, or am in the future employed, by the Company as a consultant if no other agreement governs nondisclosure and assignment of inventions during such period. This Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matter hereof and supersedes and merges all prior discussions between us. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing and signed by the party to be charged. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

5

JANREM0113279

**EXHIBIT A**

**TO:**  INVATEC, LLC

**FROM:**

**DATE:**

**SUBJECT:**  **Prior Inventions**

1.   Except as listed in Section 2 below, the following is a complete list of all Inventions (as defined in the and Employee Proprietary Information and Inventions Agreement to which this Exhibit is attached) relevant to the subject matter of my employment by INVATEC, LLC that have been made or conceived or first reduced to practice by me alone or jointly with others prior to my engagement by the Company:

☑   No Inventions.

☐   See below:

_____

_____

_____

_____

☐   Additional sheets attached.

2.   Due to a prior confidentiality agreement, I cannot complete the disclosure under Section 1 above with respect to Inventions generally listed below, the proprietary rights and duty of confidentiality with respect to which I owe to the following party(ies):

| Invention | Party(ies) | Relationship |
|-----------|-----------|--------------|
| 1. | | |
| 2. | | |
| 3. | | |

☐   Additional sheets attached.

7

JANREM0113280

**EXHIBIT B**

**TERMINATION CERTIFICATION**

This certifies that I do not have in my possession, nor have I failed to return, any Proprietary Information, customer information, vendor information, records, data, notes, reports, proposals, lists, correspondence, specifications, drawings, sketches, materials, equipment, devices, other documents, things, or property, or reproductions of any aforementioned items, or electronics versions thereof, belonging to the Company or its customers or vendors.

I further certify that I have complied with all the terms of the Company's Proprietary Information Agreement signed by me, including the reporting of any Developed Information conceived or made by me (whether solely or jointly with others) covered by that Agreement.

I further agree that, in accordance with the terms of the Proprietary Information Agreement, I will preserve and maintain the secrecy of all Company Proprietary Information.

I further confirm I will comply with all other terms of the Proprietary Information Agreement.

Date: 7/29/08

(Employee Signature)

Jolanta Wierzbicki

(Type/Print Employee Name)

8

JANREM0113281

J

JANREM0113282

W. mal, sbca, usne elke

**3101 Emrick Blvd.**
**Bethlehem, PA 18020**
**(610) 694-8998 Business**
**(610) 694-8115 Fax**

July 31, 2008

Ms. Lia Jones
905 Lake Boone Trail
Raleigh, NC  27607

Dear Lia:

RE:   Offer Letter

Invatec, Inc. (the *Company*) is pleased by your interest in the Sales Representative position.  This letter will summarize the terms of our agreement and other terms of your employment with the Company, and will supplement the Company's Employee Policy Manual, which otherwise remains in full force and effect:

1.      In the performance of your professional activities, you will report to Lisa Begley, Area Manager, with whom you will collaborate and who will define your overall business mission and professional assignments.  You will be based in Raleigh, NC.  Your start date will be August 18, 2008.

2.      Your annual compensation shall consist of $80,000 paid semi-monthly and in accordance with the Company's customary payroll practices.  A commission plan will be offered to you on a monthly basis reconciled quarterly.  Your target annual commission plan will be $144,000. You will have an annualized commission guarantee totaling $145,000 paid monthly ($12,083.33) and reconciled quarterly through June 30, 2009.  You will receive a car allowance of $650.00 per month and reimbursement according to travel policy of .30 cents per business mile.

3.      As a new hire you will be subject to a 90-day probationary period.  During the probationary period, you must establish that you are competent and qualified to carry out the services for which you have been hired.  If you are unable to prove your competence during this time period, or are otherwise unqualified, the Company shall immediately terminate your employment.  During the probationary period, the Company will provide training and will closely monitor your performance and progress.

4.      You shall be entitled to a full benefits package which will include healthcare, dental, and 401K. Medical and dental benefits will commence immediately and 401K will commence around October 1, 2008.  If you have specific questions regarding benefits, please contact Keith Westpy at (610) 694-8998. The company intends to offer executives a long-term incentive plan that will be finalized during the first six months of your employment.  You will be eligible for this program immediately upon initiation.  This program will provide a long-term incentive based on a combination of individual and company performance.  You will be entitled to 3 weeks vacation; prorated from the date of hire during the first year of hire.  You may carryover up to 2 weeks per year.

JANREM0113283

free to terminate your employment with the Company at any time for any or no reason, and you are not required to provide the Company with any notice of your termination. The Company is likewise free to terminate your employment at any time for any or no reason, and is not required to provide you with any notice of your termination.

6.     You acknowledge and agree that compliance with the Company's policies, practices, and procedures is a term and condition of your employment and that you will abide by all policies, practices, and procedures of the Company that exist or may be adopted from time to time in the future. As a condition of employment, you are required to comply with the terms and conditions of the Employee Proprietary Information and Inventions and Non-Solicitation of Employees and Customers Agreement (the *Non-Solicitation Agreement*) attached hereto, to be executed contemporaneously with this Letter Agreement.

Your acceptance of this Letter Agreement is required before beginning work for the Company. I ask that you please provide your signature below to indicate your acceptance.

Please return one signed copy of Letter Agreement and the signed Non-Solicitation Agreement to my attention.

Best regards,

Invatec, LLC

Keith Westpy
Controller

Accepted and agreed:

Print Name:

2

JANREM0113284

K

JANREM0113285



Welcome to Invatec!

On behalf of the Leadership team, we would like to welcome all of you as inaugural members of the Invatec US organization!

We are excited by each of your decisions to join Invatec and be a part of building an organization that we believe has the potential to impact both patients and physicians in a way that has not has not been seen in a long time.

In a few weeks, when we come together for the first time as an organization, you will quickly realize the depth and breadth of experience our group will be bringing to the market. Every member of the team has extensive experience in the cardiovascular field.

Just as important, you will also be involved in shaping the organizational culture and making Invatec a "Great" company. We want each of you to help us build and define what we want to be; to ourselves, and to our customers.

Again, our commitment to you is that we will strive to build an organization we can all be proud to call our own.


Jack Springer, General Manager

Preston Hardage, VP Sales

Chris Frederick, VP, Marketing

Pat D'Amico, VP, Commercial Operations

Invatec, Inc • 3101 Emrick Blvd, Suite 113 • Bethlehem, PA 18020 • (877) 4-INVATEC • Fax (610) 694-8115
http://www.invatec.com

JANREM0113286