Exhibit 4

FILED & RECEIVED

|  |  |
|---|---|
| JOHNSON & JOHNSON and CORDIS CORPORATION, | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION MIDDLESEX COUNTY DOCKET NO. |
| Plaintiffs, | |
| vs. | CIVIL ACTION |
| INVATEC, LLC, PRESTON HARDAGE, KEVIN BARRINGHAUS, MICHAEL LIGUORI, TERENCE BATES, and JOHN and JANE DOES, | |
| Defendants. | |

---

## BRIEF IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ACCELERATED DISCOVERY

---

RIKER, DANZIG, SCHERER, HYLAND &
    PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800

Attorneys for Plaintiffs
Johnson & Johnson and Cordis Corporation

JANREM0114362

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ...............................................................................1

STATEMENT OF FACTS ......................................................................................3

LEGAL ARGUMENT .............................................................................................3

    I.    PLAINTIFFS ARE ENTITLED TO A TEMPORARY RESTRAINING
        ORDER BASED ON DEFENDANTS INAPPROPRIATE RAIDING AND
        BREACHES OF DUTY OF LOYALTY ....................................................3

        A.    Invatec has used improper means, including inducing and encouraging
            Cordis' employees to breach their duty of loyalty and their Non-
            Compete Agreements.............................................................................4

        B.    Invatec and the Individual Defendants have an improper motive......................7

    II.    PLAINTIFFS ARE ENTITLED TO A TEMPORARY RESTRAINING
        ORDER BASED ON THE CROWE STANDARD. ...................................9

        A.    Plaintiffs have clear legal rights to the relief that they seek under both
            the Non-Compete Agreements and the common law. ......................................10

        B.    Issuance of a temporary restraining order is necessary to prevent
            irreparable harm to plaintiffs. .................................................................23

        C.    The material facts underlying plaintiffs' claims are uncontroverted. ...............29

    III.    PLAINTIFFS ARE ENTITLED TO EXPEDITED DISCOVERY PENDING
        A HEARING ON THEIR PRELIMINARY INJUNCTION APPLICATION. ..........29

CONCLUSION .....................................................................................................33

i

JANREM0114363

## PRELIMINARY STATEMENT

It is doubtful that this Court has ever confronted a more egregious case warranting the issuance of a temporary restraining order based upon: (1) a secret, calculated campaign by a direct competitor, in conspiracy with an existing employee of plaintiffs, to raid plaintiffs' employees in order to establish an in-house sales force for the competitor; and (2) the coordinated, mass recruiting of plaintiffs' employees and hiring of them in violation of existing non-compete and other agreements.

Here, the faithless employee, Preston Hardage ("Hardage") had an email address established with defendant Invatec and used Invatec stationary identifying him as Invatec's "Vice President of Sales" to actively and secretly recruit plaintiffs' employees and to coordinate an actual and attempted mass exodus of numerous Cordis employees on a designated date, all while Hardage was still on Cordis' payroll. Employees with a non-compete agreement were informed by Hardage at secret hotel recruitment meetings that they were expected to, and would, solicit the same accounts that they serviced and called on while being paid by Cordis, in direct violation of their non-compete agreements. The shameless breaches of the duty of loyalty were also coordinated with defendant Invatec, through other former Cordis employees, and in violation of their own agreements with Cordis.[1]

Suffice it to say, the appalling and reprehensible conduct engaged in by Invatec, through its senior executives, who are also former Cordis employees, in conspiracy with one or more existing Cordis employees, must be stopped – now. The blatant violations of duty of loyalty,

---

[1]   In two cases, the conspiring former-Cordis employees have non-compete/non-solicitation agreements that designate Florida as the relevant law and choice of forum. Accordingly, plaintiffs have filed a separate litigation in **(footnote continued...)**

conspiratorial conduct intended to injure plaintiffs, the coordinated mass resignations, Cordis' efforts to mitigate and re-recruit its existing employees back, the naked violations of relevant non-compete agreements, the secret meetings at hotels, the disparaging tactics employed by defendants, and other tortious conduct of both Invatec and Hardage, are detailed below. A temporary restraining order should be issued to prevent further damage to plaintiffs as a result of the naked defalcations by Hardage and Invatec, which is seeking to build a sales force, for the first time, and apparently is attempting to do so at Cordis' expense and through tortious recruitment of Cordis' existing employees.

Despite the egregious conduct by Invatec and Hardage, plaintiffs do not seek to enjoin Hardage's and the other Individual Defendants' employment by Invatec completely. Rather, plaintiffs merely seek to restrict the areas of Hardage's and the Individual Defendants' employment to the extent necessary to address the wrongs already incurred, and to enforce applicable non-compete agreements to the extent necessary to prevent immediate and irreparable injury. To prevent Hardage and Invatec from continuing to benefit from Hardage's indefensible breaches of his loyalty, and to prevent the violation of the relevant non-compete agreements, this Court should enter a temporary restraining order enjoining and restraining:

1. Defendants Hardage and Barringhaus from holding any employment position or engaging in any employment activity with Invatec, directly or indirectly, that in any way relates to or involves cardiovascular and endovascular products for a period of 2 years for Hardage and 18 months for Barringhaus;

2. Defendants Bates and Liguori from holding any employment position or engaging in any employment activity with Invatec, directly or indirectly, that in any way relates to or involves Invatec's endovascular products for a period of 2 years for Bates and 18 months for Liguori;

---

Florida to address those two employees. The two employees involved are Jeff Murdock and John M. Otto. Given their conspiratorial conduct, some of their acts will be referenced herein.

JANREM0114365

3.    The Individual Defendants from soliciting any business from, selling to, or rendering any services to, or, directly or indirectly, helping others solicit business from or rendering any service or selling to, any of the accounts, customers or clients with whom they had contact during the last 12 months of employment with Cordis for a period of 2 years for Hardage and Bates and for 18 months for Barringhaus and Liguori;

4.    Individual Defendants from soliciting or hiring on their behalf or on behalf of anyone else, including but not limited to Invatec, any employee of plaintiffs for a period of 12 months from the date hereof;

5.    Invatec and its officers, agents and employees from soliciting or hiring any employee of plaintiffs for a period of 12 months from the date hereof;

6.    The Individual Defendants from disclosing, using, disseminating, lecturing upon or publishing any of plaintiffs' Confidential Information as defined in their respective non-compete agreements;

## STATEMENT OF FACTS

The factual background supporting plaintiffs' application is set forth in the Verified Complaint. Rather than repeat those facts herein, plaintiffs will refer to them in their discussion of the relevant law. All Exhibits referenced in this brief are attached to the Verified Complaint.

## LEGAL ARGUMENT

### I.   PLAINTIFFS ARE ENTITLED TO A TEMPORARY RESTRAINING ORDER BASED ON DEFENDANTS INAPPROPRIATE RAIDING AND BREACHES OF DUTY OF LOYALTY

The mere persuasion of an employee to change jobs is not wrongful under New Jersey law. However, it is "wrongful if done to benefit the raider at the employer's expense unless done in the exercise of an equal or superior right." Avtec Indus. v. Sony Corp. of America, 205 N.J. Super. 189 (App. Div. 1985). The right to compete for employees is such an equal right *provided it is not done for an improper purpose or by improper means* Id. at 193. (emphasis added).

3

New Jersey courts have stated that "improper means" is a "hazy term difficult to define" but that it clearly includes "such conduct as fraud, misrepresentation, intimidation, obstruction and molestation" or exploiting a "confidential relationship". "But it goes further and includes conduct which fails to accord with generally accepted standards of morality." Avtec, 205 N.J. Super. at 194-196. "Each case involving these claims must be decided on its own facts and usually turns on whether the interference by defendant was 'sanctioned by the rules of the game . . . There can be no tighter test of liability in this area than that of the common conception of what is right and just dealing under the circumstances . . ." Id. at 195.

Courts in New Jersey and in other jurisdictions have granted injunctions to prevent competitors and former employees from raiding employees and/or customers of the former employer. Trans American Trucking Serv., Inc. v. Ruane, 273 N.J. Super. 130, 133-134 (App. Div. 1994); French Bros. Bauer Co. v. Townsend Bros. Milk Co., 152 N.E. 675, 676 (Ohio Ct. App. 1925)(enjoining competitor, which former employee started while still employed by plaintiff, from hiring plaintiff's employees and from soliciting plaintiff's customers); American League Baseball v. Pasquel, 63 N.Y.S.2d 537, 538-540 (N.Y. Sup. Ct. 1946)(enjoining competitor from inducing or attempting to induce plaintiff's employees); Morgan's Home Equip. Corp. v. Martucci, 136 A.2d 838, 847-848 (Pa. 1952)(enjoining competitor from systematic inducing of employees).

**A.      Invatec has used improper means, including inducing and encouraging Cordis' employees to breach their duty of loyalty and their Non-Compete Agreements.**

Invatec has used "improper means" by inducing Otto and defendants Hardage and Barringhaus to breach their duties of loyalty to Cordis by secretly acting as Insiders.      An

4

JANREM0114367

employee owes an affirmative common law duty of loyalty to their employer.  Lamorte Burns & Co., Inc. v. Walters, 167 N.J. 285, 302-303 (2001).  In that regard, an employee owes a duty of loyalty to the employer and must not, while employed, act contrary to the employer's interest. Also, during the period of employment, the employee has a duty not to compete with the employer's business.  Id.; Chernow v. Reyes, 239 N.J. Super. 201, 204 (App. Div. 1990).  A employer "may prove a prima facie case of an employee's breach of the duty of loyalty not only by showing that the employee directly competed with the employer while employed, but also by showing that the employee while employed assisted the employer's competitor."  Id. (citing Cameco, Inc. v. Gedicke, 157 N.J. 504, 517 (1999)).

An employee owes a duty of loyalty as long as the employee is being paid by the employer.  United Board & Carton Corp. v. Britting, 63 N.J. Super. 517, 531 (Ch. Div.), aff'd, 61 N.J. Super. 340, certif. denied, 33 N.J. 326 (1960).  In fact, the employee owes the employer a duty of loyalty until the very last hour of the employee's service to that employer.  Id. at 526.

Here, some of the Individual Defendants violated their duty of loyalty to Cordis by acting as Insiders.  In other words, having secretly made the decision to leave Cordis to join Invatec, the Insiders actively solicited and hired Cordis' employees for the benefit of Invatec while the Insiders were still on Cordis' payroll.  For example, Hardage, while still employed by Cordis, actively solicited Cordis' employees for Invatec's benefit starting in mid July 2008, if not earlier.

Specifically, Hardage contacted several Cordis employees, including Wierzbicki and Jones, to persuade them to join Invatec.  In fact, Hardage, on behalf of Invatec, interviewed Wiezbicki and Jones in Fort Lauderdale, Florida.  During the interviews, which occurred on two separate occasions, Hardage presented to Wierzbicki and Jones a presentation about Invatec on a laptop that Invatec issued to Hardage.  The presentation included slides regarding the history of

JANREM0114368

Invatec, its pipeline products, business plans, sales force and sales force expansion plans. Despite the fact that Hardage was aware that Wiezbicki and Jones executed non-compete agreements with Cordis, Hardage made it clear during these interviews that they, as Invatec sales representatives, would cover the same territories that they covered while at Cordis.

Also, Hardage transmitted Invatec's offer letters to Wiezbicki and Jones and accepted the executed offer letters on behalf of Invatec. After they executed the offer letters, Hardage contacted Wierzbicki and Jones several times to ensure that they provided their notice of resignation to Cordis on August 4, 2008, along with the 6 other Cordis employees that Invatec pirated, so that all 8 Cordis employees would leave en mass.

Hardage's shameless conduct goes even further. Hardage actually communicated with Wierzbicki using an email address that Invatec assigned to him, preston.hardage@invatec-us.com. Also, Invatec sent to Jones a "Welcome to Invatec" letter after she executed the Invatec offer letter. The "Welcome to Invatec" letter, which was on Invatec letterhead, was signed by Hardage with the title "VP Sales" next to his name. (Exh. K).

Hardage was clearly working for the benefit of Invatec and to the detriment of Cordis, even though he was still employed by Cordis and on Cordis' payroll. It is likely that Invatec will pay Hardage for this work. In fact, Hardage informed Wierzbicki during the interview in Florida that although he was not getting paid by Invatec at that time, he did a lot of work for Invatec and that Invatec owed him a lot of money – clearly indicating that Invatec was going to pay Hardage after he "officially" joined Invatec on August 18, 2008. Unfortunately, Hardage was not the only Insider. Barringhaus and Otto also acted as Insiders. For example, Otto, while still employed by Cordis, contacted Wierzbicki and asked if he could answer any of her questions about Invatec.

JANREM0114369

Invatec has also used "improper means" by inducing Cordis' employees to breach their Non-Compete Agreements. Specifically, Invatec hired Cordis' employees and assigned them to the same territories that they covered while employed by Cordis. As such, these Cordis employees will be selling the same type of products and/or selling to the same customers as they did while employed by Cordis. Invatec did so even though it was aware that these Cordis employees executed Non-Compete Agreements with Cordis. It should also be noted that Invatec induced Murdock to breach the employee non-solicitation covenant in his Non-Compete Agreement.

The actions of Invatec and the Individual Defendants, therefore, are clearly wrongful and exploit a confidential relationship. Even Invatec acknowledges that such actions are "not sanctioned by the rules of the game". In that regard, when Weirzbicki initially accepted Invatec's offer, she was required to execute a 5 page Employee Proprietary Information and Inventions and Non-Solicitation of Employees and Customers Agreement (the "Invatec Agreement"). (Exh. H, ¶ 6). The Invatec Agreement contains broad non-solicitation provisions whereby an Invatec employee may not solicit Invatec's employees or customers on behalf of a competitor during their employment with Invatec and for 18 months after termination. (Exh. I, ¶¶ 3, 4). The Invatec Agreement, therefore, proscribes the very conduct that Invatec has induced and encouraged the Individual Defendants to carry out.

**B.      Invatec and the Individual Defendants have an improper motive.**

As a separate reason, this Court should also granted plaintiffs' requested injunctive relief because Invatec and the Individual Defendants have an "improper motive". The ferocity and brazenness by which Invatec and the Individual Defendants have solicited Cordis' employees

JANREM0114370

clearly demonstrate that the defendants have an improper motive to harm plaintiffs' business. Invatec targeted these Cordis employees because they post high sales numbers for their territories. In addition to the fact that Invatec instructed the Cordis employees to leave en mass, Invatec, as demonstrated below, has attempted to hire away Cordis' sales force on a national level thereby leaving Cordis without a sales force for significant portions of the United States:

| Employee | Position at Cordis | Status with Invatec |
|---|---|---|
| Preston Hardage | Director of Sales for the United States | Hired as Vice President of Sales in mid July 2008, if not earlier |
| Kevin Barringhaus | Account Executive for Missouri, South Illinois, Kansas City, Kansas and parts of Oklahoma and Arkansas | Hired sometime in July 2008 |
| Michael Liguori | Senior Sales Representative for Manhattan and Staten Island | Hired sometime in July 2008 |
| Terence Bates | Account Executive for Southern California | Hired sometime in July 2008 |
| Courtney Gunderson | Senior Sales Representative for Pennsylvania | Hired sometime in August 2008 |
| John Otto | Division Manager for Texas, Louisiana, Oklahoma, Arkansas, Mississippi, Tennessee, Kentucky, Colorado and Kansas | Hired sometime in July 2008 |
| Donald Matthias | Division Manager | Hired in August 2008 as Regional Sales Director for the Eastern United States |
| Patrick D'Amica | Director of Training and Development—Ortho-McNeil | Hired in August 2008 as Vice President of Sales Operations |

JANREM0114371

| Jolanta Wierzbicki | Senior Sales Representative for Massachusetts, Rhode Island, New Hampshire, Vermont and Maine | Hired in early August 2008, but then Wierzbicki rescinded acceptance |
|---|---|---|
| Lia Jones | Senior Sales Representative for North Carolina, Southern Virginia and South Carolina | Hired in early August 2008, but then Jones rescinded acceptance |
| Timothy Brophy | Account Executive for North New Jersey, Bronx, New York and Westchester, New York | Hired in or about early August 2008, but then Brophy rescinded acceptance |
| Mark Sims | Account Executive for South Carolina and Augusta, Georgia | Attempted to solicit in July 2008 but Sims declined |
| Holt Parke | Account Executive for Endovascular for Northern Virginia and Washington, DC. | Attempted to solicit in July 2008 but Park declined |
| Robbie Armistead | Southeast Regional Sales Director | Attempted to solicit in Spring 2008 but Armistead declined |
| Andrew Wahlstrom | Senior Sales Representative for Northern Illinois, Iowa and Milwaukee, Wisconsin | Attempting to solicit |
| Geoffrey Peters | Sales Representative for Western Tennessee, Mississippi and New Orleans, Louisiana | On information and belief, attempting to solicit |

As a result, separate and apart from defendants' "improper methods", this Court should grant plaintiffs' requested injunctive relief because defendants have an "improper motive."

## II.   PLAINTIFFS ARE ENTITLED TO A TEMPORARY RESTRAINING ORDER BASED ON THE CROWE STANDARD.

The standard that a plaintiff must meet to obtain temporary injunctive relief is well-settled in New Jersey.  Before a court will issue a temporary restraining order, the moving party

9

JANREM0114372

must show that: (1) the legal right underlying the plaintiff's claim is settled; (2) the issuance of a temporary injunction is necessary to prevent immediate irreparable harm; and (3) the material facts underlying the plaintiff's claims are uncontroverted. A plaintiff must only "make a preliminary showing of a reasonable probability of ultimate success on the merits." Crowe v. De Gioia, 90 N.J. 126, 132-33 (1982). For the reasons set forth below, plaintiffs are entitled to temporary injunctive relief.

### A. Plaintiffs have clear legal rights to the relief that they seek under both the Non-Compete Agreements and the common law.

#### 1. The Non-Compete Agreements are reasonable and enforceable under New Jersey law, thus giving plaintiffs a settled legal right underlying their claims.

Post-employment restrictive covenants are valid and enforceable, provided that they (a) protect a legitimate interest of the employer; (b) pose no undue hardship on the employee and (c) are not injurious to the public. Karlin v. Weinberg, 77 N.J. 408, 411-12 (1978); Whitmyer Bros., Inc. v. Doyle, 58 N.J. 25, 32-33 (1971). Here, the Non-Compete Agreements protect plaintiffs' legitimate interests, poses no undue hardship to the Individual Defendants and are not injurious to the public interest.

##### a. The Non-Compete Agreements protect a legitimate interest because they protect plaintiffs' Confidential Information and/or customer relationships.

It is clear that an "employer has a patently legitimate interest in protecting his trade secrets as well as his confidential business information . . . ." Whitmyer, 58 N.J. at 33 (citing Solari Indus., Inc. v. Malady, 55 N.J. 571 (1970)). In fact, the courts of New Jersey have recognized that no agreement at all is necessary to prevent disclosure of trade secrets and

JANREM0114373

confidential information.  Sun Dial Corp. v. Rideout, 16 N.J. 252, 259-60 (1954); National

Starch, 219 N.J. Super. at 162-63.

"A trade secret may consist of a formula, process, device or compilation which one uses

in his business and which gives him an opportunity to obtain an advantage over competitors who

do not know or use it."  Sun Dial, 16 N.J. at 257; National Tile Bd. Corp. v. Panelboard Mfg.

Co., 27 N.J. Super. 348, 351 (Ch. Div. 1953).  In addition to technical information, trade secrets

and confidential information include "product pricing," "marketing and sales strategies,"

"manufacturing processes," "quality control procedures," "new and existing product research and

development," "raw material suppliers" and other confidential business information.  National

Starch, 219 N.J. Super. at 160-63.  See also Pepsico, Inc. v. Redmond, 54 F.3d 1262 (7th Cir.

1995) (affirming injunction of plaintiff's former business manager from working for competitor

where he would inevitably disclose his knowledge of plaintiff's trade secrets and confidential

information, including strategies, operating and sales plans, pricing information and "attack

plans" for specific markets).

Neither absolute secrecy nor novelty are required for information to constitute a trade

secret; rather, the inquiry focuses upon the competitive advantage that the information provides.

See Sun Dial, 16 N.J. at 257.  Accordingly, the Sun Dial Court, in defining the concept of a trade

secret, stated:

> Its subject matter must not be a matter of public knowledge or of general
> knowledge within the industry.  Although a substantial measure of secrecy must
> exist, the secrecy need not be absolute and disclosure to employees involved in its
> use will not ordinarily result in loss of the employer's protection. . . . Novelty and
> invention are not essential for the trade secret as they are for patentability.  And
> the fact that every ingredient is known to the industry is not controlling for the
> secret may consist of the method of combining them which produces a product
> superior to that of competitors.

JANREM0114374

Id. (citations omitted).

Here, each year Cordis expends large amounts of time and money for research and development of new and better products, and the best manner in which to test and manufacture those products. Cordis has developed and used extensive efforts to protect a wide body of Confidential Information including, but not limited to:

- new product development and plans to change existing products;
- launch strategies for Cordis' pipeline products for the short-term (1 year) and the mid term (3 to 5 years), including launch dates and client targeting for their respective territories;
- marketing and sales plans;
- pricing, discount pricing and pricing strategies;
- cost information, such as cost structure and profit margins per product;
- Cordis' clients in their respective territories;
- positioning of Cordis' sales force in their respective territories;
- activity levels of hospitals and other medical facilities and sales information concerning such facilities within their respective territories;
- Cordis' strategic plans for which clients to target with which products within their respective territories;
- contract terms for Cordis' largest customers within their respective territories, including GPO contracting;
- names, addresses, cell phone numbers and sales numbers of Cordis' representatives in each territory;
- employee lists and strengths and weaknesses of certain employees;
- Training; and
- Cordis' customer relationships with each customer serviced by the relevant employee.

It is critical that the above highly sensitive Confidential Information, which each Individual Defendant possesses, remains confidential. Each of the Individual Defendants have worked in Cordis' sales department for a significant period of time and each received highly sensitive Confidential Information while working for Cordis.

For example, the Individual Defendants are knowledgeable about Cordis' Confidential Information regarding its clients and sales force plan concerning their respective territories, including: (1) how Cordis breaks down the territories; (2) how a sales force that markets and sells

JANREM0114375

products that treat vascular disease should be geographically divided; (3) the areas where Cordis should stress its marketing and sales force based on the activity level of hospitals and other medical facilities; (4) Cordis' clients; (5) which products better match the needs of certain clients; (6) the amount of sales made to Cordis' clients; and (7) pricing information.

As another example, Cordis develops pricing for three general categories of accounts: (1) Group Purchasing Organizations ("GPO") or national account contracting; (2) government operated facilities; and (3) independently operated facilities. Approximately 84% of hospitals in the United States belong to a GPO to obtain better bargaining power. GPOs negotiate with Cordis to establish prices, and because they purchase in high volume, GPOs receive significant discounts. The discounts vary depending on the product and the GPO, and are subject to confidentiality agreements. Since each Individual Defendant was involved with contracting, they have considerable knowledge, and had access to, Cordis' Confidential Information concerning: (1) the hospitals and other medical facilities that belong to each GPO within their respective territories; (2) expiration dates/terms of contracts with GPOs and government and independently operated facilities; and (3) pricing and discount information.

It is clear that information such as that possessed by the Individual Defendants is within the definition of a trade secret as defined by the New Jersey Supreme Court. See Sun Dial, 16 N.J. at 257. Since the Non-Compete Agreements protect against disclosure of Confidential Information, the Agreements clearly protect plaintiffs' legitimate interests. Indeed, the Appellate Division has recognized the need to protect such legitimate interests by way of interlocutory injunctive relief in circumstances similar to those before this Court. See National Starch, 219 N.J. Super. at 162-63. See also Pepsico, 54 F.3d at 1269 (observing that a company's "strategic goals" and "particularized plans or processes developed by [the company] and disclosed to [the

13

JANREM0114376

former employee] while the employer-employee relationship existed, which are unknown to others in the industry and which give the employer an advantage over his competitors" should be protected).

The Non-Compete Agreements also protect plaintiffs' legitimate interests because the Agreements protect plaintiffs' customer relationships. A.T. Hudson & Co., Inc. v. Donovan, 216 N.J. Super. 426, 524 A.2d 412 (App. Div. 1987)(holding that protecting customer relationships is a legitimate interest); Platinum Mgmt., Inc. v. Dahms, 285 N.J. Super. 274, 305 (Law Div. 1995) (holding that customer buying habits, customer pricing, sales projections and product strategies are clearly confidential and proprietary and protectable through a restrictive covenant). As noted by the Court in Carton,

> It is not merely the knowledge of the identity of the customers, but the friendly contact with them, which is important to the solicitors . . . Their personal acquaintance with customers and knowledge of their respective places of residence, their peculiar likes and fancies and other characteristics, a knowledge of which would greatly aid them in securing and retaining the business of said former customers, is sufficient to invoke equitable protection against the subsequent use by a former employee of such information.

Carton, 63 N.J. Super. at 527 (citations omitted).

It is significant to note that the Invatec Agreement contains a non-disclosure provision regarding Confidential Information similar to the non-disclosure provision in the Non-Compete Agreements executed by the Individual Defendants with Cordis. (Exh. I, ¶ 1.1). In addition, the Invatec Agreement defines "confidential information" to include "new products, marketing and selling, business plans, research and development . . . prices and costs, suppliers, customers and customer lists; customer information, investors etc . . ." (Exh. I., ¶ 1.2). The Invatec Agreement also states the following:

14

JANREM0114377

> Because of the highly confidential and competitive nature of our business, information about our products, research and development, marketing, sales activity, and customers must be handled with extreme care and sensitivity. Disclosure of any confidential information could seriously jeopardize our business interests and irreparably damage us. Also, Company investment in new products and development must be preserved to ensure a healthy future for all employees . . . .

(Exh. I at Introduction).  Invatec, therefore, recognizes that such agreements are reasonably necessary to protect an employer's legitimate interests.

In this action, Cordis seeks to protect the same Confidential Information that Invatec identifies as Confidential Information in the Invatec Agreement.  Cordis also seeks to preclude the raiding of its employees and the solicitation of its customers, which is exactly the purpose of Paragraphs 3 and 4 of the Invatec Agreement.  In addition, Cordis has a legitimate interest in preventing the Individual Defendants from using its Confidential Information to unfairly compete with Cordis.  Thus, the Court should hold that the Non-Compete Agreements are valid.

      **b.**    **Enforcement of the Agreement will not impose an undue hardship on the Individual Defendants.**

The New Jersey Supreme Court has stated: "Although . . . [the employee] will suffer adverse financial consequences as a result of enforcement of the covenant, a mere showing of personal hardship does not amount to an 'undue hardship' that would prevent enforcement of the covenant."  Karlin, 77 N.J. at 417-18, n.3 (citation omitted).  The Karlin Court also recognized that in evaluating undue hardship, courts should examine the reason for the termination of the employment relationship:

> Where this occurs because of a breach of the employment contract by the employer, or because of actions by the employer detrimental to the public interest, enforcement of the covenant may cause hardship on the employee which may fairly be characterized as 'undue' in that the employee has not, by his conduct, contributed to it.  *On the other hand, where the breach results from the desire of*

15

JANREM0114378

> *an employee to end his relationship with his employer rather than from any wrong-doing by the employer, a court should be hesitant to find undue hardship on the employee, he in fact, having brought that hardship on himself. Ordinarily a showing of personal hardship, without more, will not amount to an 'undue hardship' such as would prevent enforcement of the covenant.*

Id. at 423-24 (emphasis added).

In this case, enforcement of the Non-Complete Agreements will cause the Individual Defendants no undue hardship since they voluntarily ended their employment with Cordis because Invatec seems to be offering a better financial package. Also, the Non-Compete Agreement's non-competition and confidentiality provisions are narrowly drafted and plaintiffs are seeking only limited restraints on the Individual Defendants' employment with Invatec, which will cause them no financial hardship. Plaintiffs are not asking that the Individual Defendants' employment with Invatec be prohibited. Instead, plaintiffs simply seek to enjoin Invatec from permitting defendants Hardage and Barringhaus from performing any services that involve cardiovascular and endovascular products and from permitting defendants Bates and Liguori from performing any services that involve endovascular products.

In these areas, the Individual Defendants' knowledge of plaintiffs' Confidential Information would inevitably be disclosed, whether consciously or subconsciously. See E.I. duPont de Nemours & Co. v. American Potash & Chem. Corp., 200 A.2d 428, 435 (Del. Ch. 1964) ("I think it is evident even to one unsophisticated in chemical and engineering matters that at least at this stage it is impossible to say that all of plaintiff's trade secrets in those areas are susceptible of consciously being isolated by Hirsch [the former employee]. One cannot now say that there is no issue as to his ability to avoid drawing on them when he comes to give instructions or suggestions relative to the solution of problems arising in Potash's [the competitor] commercial chloride process operation."); Allis-Chalmers Mfg. Co. v. Continental

JANREM0114379

_Aviation & Eng'g Corp._, 255 F. Supp. 645, 654 (E.D. Mich. 1966) ("The virtual impossibility of Mr. Wolff [the former employee] performing all of his prospective duties for Continental [the competitor] to the best of his ability, without in effect giving it the benefit of Allis-Chalmers' [the former employer] confidential information, makes a simple injunction against disclosure and use of this information inadequate . . . . Thus, the injunction granted is as restricted as possible to protect the secrets involved without undue restraint on Mr. Wolff's right to pursue his chosen vocation, only prohibiting work in the design and development of distributor type pumps."). In _National Starch_, the Appellate Division relied upon both _E.I. duPont_ and _Allis Chalmers_.

Here, enforcement of the Non-Compete Agreements would only prevent the Individual Defendants from working in the aforementioned area, where their knowledge of plaintiffs' Confidential Information could have an adverse impact on plaintiffs and enable Invatec to compete unfairly. The Individual Defendants' general business knowledge and skills are transferable to Invatec's other products and technologies, and they would not be prohibited from working in such areas at Invatec.

Accordingly, the issuance of a temporary restraining order will not subject the Individual Defendants to undue hardship as a matter of law.

### **c.     Enforcement of the Non-Complete Agreements is not contrary to public policy.**

This Court's enforcement of the Non-Compete Agreements and their non-competition and confidentiality provisions would not contravene public policy. Although public policy certainly encourages competition, public policy equally discourages unfair competition.

Cordis has been for many years a leader and innovator in the research, development, manufacturing and marketing of products that treat coronary and peripheral vascular disease.

JANREM0114380

Cordis is a pioneer in its field and has, for over 40 years, developed less invasive treatments for vascular disease, often through an expensive and long trial and error process that includes extensive research and development efforts. For example, among many other things, Cordis developed the first full line of Pre-Shaped Judkins catheters in 1966, the first percutaneous transluminal coronary angioplasty ("PTCA") balloon that utilized nylon balloon technology in 1990, and the CYPHER® Stent—the first approved drug-eluting stent in 2003.

Invatec is a competitor in this area. If the Court fails to enforce the Non-Compete Agreements in this context, thereby encouraging competitors to pirate Confidential Information plaintiffs have developed by expending vast amounts of time and money, the investment of such resources by companies such as plaintiffs will be discouraged. If a company like Invatec is permitted to short-circuit the extensive research, development and marketing process and place a viable competitive product into the market almost immediately, the commercial advantage normally attained through the efforts and expense of plaintiffs' research, development and marketing personnel would be negated. Additionally, Invatec would be able to price products without having to consider the recovery of the costs incurred in developing and marketing the product. See E.I. duPont, 200 A.2d at 437 (finding a public interest in protecting trade secrets because such protection "tends to encourage . . . substantial expenditures to find or improve ways and means of accomplishing commercial and industrial goals. The protection of such efforts when translated into trade secrets tends to encourage such efforts and the result is beneficial to the employer and presumably to society.").

In other words, Invatec should be required to spend millions of dollars to develop its own products, marketing plans and customer relationships instead of simply taking plaintiffs' secrets by hiring the Individual Defendants. Invatec has demonstrated a keen interest in repeatedly

JANREM0114381

hiring plaintiffs' employees notwithstanding the covenants contained in the Non-Compete Agreements. Apparently, Invatec recognizes that there is great value in obtaining the services of plaintiffs' employees for an obvious reason – the ability to enhance the use and marketability of its own products that compete with plaintiffs' products while substantially reducing its costs at plaintiffs' expense. Should the Court not preclude such unfair competition, there would be no benefit for companies like plaintiffs to spend millions of dollars to research, develop and market breakthrough products like the CYPHER® Stent, which the American Heart Association named as one of the top 10 medical advancements of 2003.

For the foregoing reasons, the Non-Compete Agreements are legal and enforceable in order to prevent unfair competition and, therefore, the legal rights underlying plaintiffs' claim are settled as a matter of law.

> **2.      Plaintiffs have a clear legal right to restrict the Individual Defendants' employment under the common law, including the common law obligation prohibiting the disclosure of Confidential Information and the common law duty of loyalty.**

As demonstrated above, plaintiffs' legal right under the Non-Compete Agreements to restrict the Individual Defendants' employment at Invatec and to protect against the disclosure of their Confidential Information is well-settled. Such rights are also settled under the common law. In that regard, as noted above, New Jersey courts have acknowledged that an agreement is not necessary to prohibit the disclosure of Confidential Information. Sun Dial, 16 N.J. at 259-60; National Starch, 219 N.J. Super. at 162-63. See Pepsico, 54 F.3d at 1269-72.

Also, an employee owes his employer a common law duty of loyalty, and an employee owes that duty until the last hour of his employment. Carton, 63 N.J. Super. at 524-526.

JANREM0114382

Here, the Individual Defendants, under the common law, are restricted from working at Invatec in the abovementioned areas.

> **a.    The Individual Defendants should be restricted from working at Invatec in the abovementioned areas because they will inevitably disclose plaintiffs' Confidential Information if they are allowed to work in those areas.**

Under the common law, a former employee should be restricted from working for a new employer where it is inevitable that he or she will disclose or use the former employer's Confidential Information during the course of employment with the new employer. National Starch, 219 N.J. Super. at 162-63. "It is sufficient that the circumstances give rise to an inference that substantial threat of disclosure exists." Id. at 163 (citation omitted).

In National Starch, the Appellate Division affirmed the Chancery Division's order enjoining a former employee, pending trial, from working for his new employer in the envelope adhesives area. In that case, the defendant employee had worked in envelope adhesives for his former employer and received its Confidential Information relating to that area. Id. at 159, 164. The defendant employee only executed a non-disclosure agreement with the former employer and not a non-compete agreement. Nevertheless, the Appellate Division found that the trial court had properly concluded that there was a "sufficient threat of impending injury to warrant preliminary relief pending trial," and affirmed the restriction on the defendant's employment. Id. at 162.

In doing so, the Appellate Court rejected the competitor's arguments and recognized the realities of life and human nature – where, as here, a former employee signed a non-disclosure agreement and had access to and became familiar with his former employer's Confidential Information, a temporary restraining order should issue because of the inevitability that the employee will use or disclose that information if he works for a competitor of the former

JANREM0114383

employer on a competing product. The inevitable disclosure need not involve a conscious breach of the employee's obligation. Instead, where an employee is placed in the position of direct competition with his former employer, that employee cannot help but use the information he possesses to assist his new employer. Id. at 162-63.

Similarly, in Pepsico, the Seventh Circuit affirmed the district court's ruling that the plaintiff's former business manager would inevitably disclose its confidential strategic objectives and distribution, packaging, pricing and marketing plans if he were employed in a similar position at its competitor. Pepsico, 54 F.3d at 1269-70. The business manager had signed a confidentiality agreement with the plaintiff, but not a non-competition covenant. Id. at 1264. The Seventh Circuit agreed with the district court's conclusion that "unless [the former business manager] possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions about [his new employer's products that compete with his former employer's products] by relying on his knowledge of [his former employer's] trade secrets." Id. at 1269. The Seventh Circuit affirmed the district court's order enjoining the business manager from working for the defendant company for a period of time and from ever disclosing the plaintiff's trade secrets and confidential information. Id. at 1272.

Here, it is inevitable that the Individual Defendants will use and disclose plaintiff's Confidential Information if they are allowed to work as sales personnel in connection with Invatec's cardiovascular and/or endovascular products. Cordis' products that are used to treat cardiovascular and endovascular disease have been, and are being, developed through lengthy, expensive research and development efforts. In furtherance of those efforts, Cordis has created a vast array of Confidential Information including, but not limited to, customer relationships and information, pricing information and strategies, pipeline products, sales force plans, marketing

JANREM0114384

and sales plans, business strategies and the areas of vascular intervention that Cordis will focus on in the next few years. The Individual Defendants acquired knowledge of, and had access to, this Confidential Information.

If the Individual Defendants are allowed to work for Invatec in the abovementioned areas, the Individual Defendants will be placed in a situation where, to do their jobs to the best of their abilities, they will not be able to avoid taking advantage of their knowledge of plaintiffs' Confidential Information. It is impossible to believe that the Individual Defendants, or anyone else, would be able to avoid making use of what they know – plaintiffs' Confidential Information – even if they wanted to do so. For example, the Individual Defendants will inevitably use plaintiffs' Confidential Information that they acquired about customer relationships and information, pricing information and strategies, pipeline products, sales force plans, marketing and sales plans, business strategies and the areas of vascular intervention that Cordis will focus on in the next few years – all of which will allow Invatec to unfairly compete with Cordis.

Consequently, not only do plaintiffs have a settled legal right to restrict the Individual Defendants' employment in the abovementioned areas and to protect against the disclosure of their Confidential Information pursuant to the Non-Compete Agreements, but also those rights are well-settled under the common law. Thus, plaintiffs have demonstrated the first element of the test for temporary injunctive relief under Crowe.

          **b.**    **Some of the Individual Defendants breached their common law duties of loyalty.**

As explained above, defendants Hardage and Barringhaus breached their duties of loyalty to Cordis by secretly acting as Insiders. As such, this Court should grant the injunctive relief requested by plaintiffs. Platinum, 285 N.J. Super. at 305(holding that employee breached duty of

22

JANREM0114385

loyalty because, while still working for the former employer, he was soliciting colleagues to join competitor); Carton, 63 N.J. Super. at 524 (court enjoined defendants from doing business with plaintiff's customers for two years because defendants breached duty of loyalty to plaintiff); Townsend, 152 N.E. at 676 (enjoining competitor, which former employee started while still employed by plaintiff, from hiring plaintiff's employees and from soliciting plaintiff's customers).

>   **B.**     **Issuance of a temporary restraining order is necessary to prevent irreparable harm to plaintiffs.**

Plaintiffs will suffer irreparable harm if Invatec is permitted to employ the Individual Representatives as sales personnel with respect to cardiovascular and endovascular products. In such a position, it is inevitable that the Individual Defendants will disclose or use, consciously or unconsciously, plaintiffs' Confidential Information. As the New Jersey Supreme Court has recognized:

> Where the employee through his employment has learned of the business practices and methods of his employer which if disclosed to a competitor may result in irreparable injury to the complainant, *the court may presume irreparable injury will ensue from the breach of the covenant.*

A. Hollander & Son, Inc. v. Imperial Fur Blending Corp., 2 N.J. 235, 249 (1949) (emphasis added). The Individual Defendants' employment by plaintiffs placed them in a position to learn plaintiffs' Confidential Information including, but not limited to, customer relationships and information, pricing information and strategies, pipeline products, sales force plans, marketing and sales plans and business strategies. Plaintiffs took great precautions to protect this Confidential Information.

JANREM0114386

The Individual Defendants' disclosure of plaintiffs' Confidential Information will result in irreparable harm as a matter of law if plaintiffs are not granted the limited injunctive relief that they seek. As stated by the Appellate Division in upholding a grant of a preliminary injunction in a trade secrets case: "[D]amages will not be an adequate remedy when the competitor has obtained the secrets. The cat is out of the bag and there is no way of knowing to what extent their use has caused damage or loss." National Starch, 219 N.J. Super. at 163.

Any argument that the Individual Defendants will not disclose the Confidential Information that they possesses is without merit. As noted above, the National Starch court recognized that where, as here, a former employee signed a non-disclosure agreement and had access to and became familiar with his former employer's Confidential Information, a temporary restraining order should issue because of the inevitability that the employee will use or disclose that information if he works for a competitor of the former employer on a competing product. See id. at 162-63. The inevitable disclosure need not involve a conscious breach of the employee's obligation. Instead, as the National Starch court determined, where an employee is placed in the position of direct competition with his former employer, that employee cannot help but use the information he possesses to assist his new employer. Id.; Johnson & Johnson v. Biomet, Inc. and Robin T. Barney, Docket No. C-107-07, slip. op. 17-20 (N.J. Super., Chancery Division, Middlesex County)(granting preliminary injunction after finding that the non-complete agreement was valid and that irreparable harm existed based on inevitable disclosure). This opinion is attached as Exhibit A to the brief.

Here, plaintiffs are seeking three types of injunctive relief to prevent irreparable harm. First, Invatec's cardiovascular and endovascular products clearly compete with Cordis' products. As such, since defendants Hardage and Barringhaus had access to and obtained Confidential

JANREM0114387

Information regarding Cordis' cardiovascular and endovascular products, this Court should enjoin them from working on or providing any services in connection with Invatec's cardiovascular and endovascular products.   Also, since defendants Bates and Liguori had access to and obtained Confidential Information regarding Cordis' endovascular products, this Court should enjoin them from working on or providing any services in connection with Invatec's endovascular products.  If the Court does not do so and they were to work or provide any services in connection with such products, it is inevitable that the Individual Defendants, either consciously or unconsciously, will use their knowledge of plaintiffs' Confidential Information to help Invatec to compete unfairly with plaintiffs thereby causing plaintiffs' irreparable harm.

For example, Invatec does not have a sales force in the United States and is attempting to build that sales force.  The Individual Defendants are knowledgeable about Cordis' Confidential Information regarding its clients and sales force plan, including: (1) how Cordis breaks down the United States into territories; (2) the areas that Cordis stresses its marketing and sales force based on the activity level of hospitals and other medical facilities; (3) Cordis' clients; (4) which products better match the needs of certain clients; (5) the amount of sales made to Cordis' clients; (6) pricing information; and (7) contracting information regarding GPOs, government facilities and independently operated facilities. The Individual Defendants can use and will use, consciously or unconsciously, this Confidential Information to improve the marketability of Invatec's products and unfairly compete with plaintiffs. In fact, Invatec can create a sales force that mimics Cordis' sales force and establish customer relationships overnight.

As another example, the Individual Defendants are intimately knowledgeable of Cordis' short term (1 year) and mid term (3 to 5 years) pipeline products and marketing and sales strategies.  As such, the Individual Defendants, whether consciously or unconsciously, can steer

JANREM0114388

Invatec's development of its pipeline products by, for example, identifying pipeline products that Invatec should focus on that would allow Invatec to unfairly compete with Cordis, or they can provide new ideas for pipeline products to Invatec based on Cordis' pipeline products.

It is likely that defendant Hardage will argue, despite his egregious breaches of the duty of loyalty, that an injunction should not apply as to him because he only worked in Cordis Neurovascular. Hardage, therefore, is likely to argue that he does not have Confidential Information about Cordis' cardiovascular and endovascular products that could be used to enhance the marketability of Invatec's cardiovascular and endovascular products. Such an argument should be rejected. Hardage was a member of the Senior Leadership Team (the "SLT") since August 2007, which consisted of sales and marketing leaders from all three of Cordis' major product lines. The SLT conducted weekly telephone conferences and physically met every quarter in places throughout the United States, including New Jersey. During the calls and meetings, the SLT discussed the Confidential Information identified on pages 12-13 for all three of Cordis' major product lines – cardiovascular, endovascular and neurovascular. As such, Hardage had access to and gained knowledge of the Confidential Information identified on pages 12-13 for Cordis' cardiovascular and endovascular products.

Second, this Court should enjoin the Individual Defendants from, directly or indirectly, soliciting any business from, selling to, or rendering any services to, any of the accounts, customers or clients with whom they had contact during the last 12 months of employment with Cordis. Customer relationships and information are considered highly Confidential Information and the disclosure of such Information would clearly cause irreparable harm. Carton, 63 N.J. Super. at 524; Scholastic Funding Group, LLC v. Kimble, 2007 U.S. Dist. LEXIS 30333, *24 (D.N.J. 2007) (court enjoined former employee from calling on accounts holding that former

26

JANREM0114389

employer would suffer irreparable harm in form of lost reputation and good will if defendant employee, while working for new employer, were allowed to call on the same accounts he called on while working for former employer).

Indeed, Invatec recognizes that customer relationships and information are considered highly secretive Confidential Information and that disclosure of such Information would cause irreparable harm. For example, the Invatec Agreement States the following:

> The identification of such actual and prospective customers, the development of relationships with them, and the identification of their particular needs all constitutes key confidential and proprietary information which has been developed at great expense by Company and is the principal asset of the Company. By signing below, I acknowledge and agree that in order for me to solicit or to approach in any business manner any Company customer after the termination of my employment, I would almost invariable utilize to some degree the Company's confidential and proprietary information . . . Regardless of the use of proprietary and confidential information, I also recognize that the Company's customers are a key business asset of the Company and economically indispensable to the Company.
>
> In order to protect the Company's Proprietary Information and trade secrets, which would cause irreparable harm to the Company if disclosed to a competitor, while employed by the Company, and for a period of (18) months following the termination of my employment (or other affiliation) with the Company, (for any reason) I shall not directly or indirectly solicit any customer, client, investor supplier or consultant of the Company . . . .

(Exh. I, ¶ 4).

It is important to note that Cordis' different business units share the same clients. In other words, a Cordis sales representative that sells only neurovascular products in any location will, in general, call on the same hospitals and other medical facilities as a Cordis sales representative that sells only endovascular products in that same location. As a result, even though defendant Hardage may be selling endovascular products for Invatec, he will be calling

JANREM0114390

on and selling to the same clients for Invatec that he called on and sold to while selling neurovascular products for Cordis.

Third, this Court should enjoin the defendants from, directly or indirectly, soliciting plaintiffs' employees. Scholastic Funding Group, 2007 U.S. Dist. LEXIS 30333 at *24 (court enjoined former employee from soliciting employees holding that that former employer would suffer irreparable harm in form of lost reputation and good will because competitors and clients would view further employee defections in a negative light). Again, the Invatec Agreement contains an 18 month employee non-solicitation clause thereby demonstrating that Invatec recognizes the importance of preventing the solicitation of its current employees by former employees.

Considering the above, it is clear that plaintiffs have established the third element of temporary injunctive relief. As a result, the plaintiffs have established the irreparable harm element of Crowe and, therefore, this Court should grant plaintiffs' injunction relief, especially since defendants have a proclivity in breaching their obligations. PepsiCo, Inc., 1995 U.S. Dist. LEXIS 19437(holding that evidence that the former employee already breached the agreement, or evidence of conduct suggesting lack of forthrightness, supports the finding of irreparable harm.) For example, Otto and defendants Hardage and Barringhaus, with the approval and encouragement of Invatec, have already breached their duties of loyalty by activity soliciting Cordis' employees for the benefit of Invatec while still employed by Cordis. Murdock has also breached the employee non-solicitation clause in his Non-Compete Agreement.

JANREM0114391

C.    The material facts underlying plaintiffs' claims are uncontroverted.

As set forth in the Verified Complaint, the material facts are uncontroverted.  In any event, this requirement, with respect to the issuance of a temporary restraining order, "is tempered by the principle that mere doubt as to the validity of the claim is not an adequate basis for refusing to maintain the status quo."  Crowe, 90 N.J. at 133.  Therefore, even if any of the material facts underlying plaintiffs' claim could be controverted, this Court should resolve any doubt by issuing a temporary restraining order.  Id. at 134.

III.    PLAINTIFFS ARE ENTITLED TO EXPEDITED DISCOVERY PENDING A HEARING ON THEIR PRELIMINARY INJUNCTION APPLICATION.

Plaintiffs are entitled to conduct expedited discovery to develop further the grounds for preliminary injunctive relief.  The New Jersey Court Rules grant courts wide discretion to order expedited discovery.  See R. 4:18-1(b) (providing that the court, on motion, may require a response to a document demand in fewer than the 30 days permitted in the Rule); R. 4:14-1 (permitting the taking of depositions prior to 45 days after service of the summons and complaint with leave of court).

Also, the Comment to R. 4:18-1 states that R. 4:18-1 was taken from Fed. R. Civ. P. 34. Federal Courts routinely allow parties to conduct expedited discovery under Fed. R. Civ. P. 34 in the context of preliminary injunctions.  See Wright Medical Technology, Inc. v. Somers, 37 F. Supp.2d 673, 679 (D.N.J. 1999) (parties conducted expedited discovery before the hearing on plaintiffs' application for a preliminary injunction barring plaintiffs' former employee from working for a competitor).  "Expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings."  Ellsworth Associates, Inc. v. United States, 917 F. Supp. 841, 844 (D.D.C. 1996).  Accelerated discovery is

JANREM0114392

appropriate where "[f]urther development of the record before the preliminary injunction hearing will better enable the court to judge the parties' interests and respective chances for success on the merits." Educata Corp. v. Scientific Computers, Inc., 599 F. Supp. 1084, 1088 (D. Minn.), aff'd in part, rev'd in part on other grounds 746 F.2nd 429 (8th Cir. 1984).

Here, plaintiffs seek the following expedited discovery:

(1)     Any employment contracts, confidentiality agreements, restrictive covenants, non-solicitation agreements and/or non-compete agreements, or any other agreements, and any drafts thereof, exchanged between Invatec and the Individual Defendants, the Solicited Employees or any current or former Cordis employee, or that the Individual Defendants will be required or have already or will be requested to sign in connection with their employment at Invatec.   The Solicited Employees refer to Wierzbicki, Jones, Brophy, Sims, Parke, Armistead, Wahlstrom, Peters;

(2)     Copies of all form employment agreements, employment contracts, non-disclosure agreements, trade secret agreements, confidential information agreements, non-compete agreements, non-solicitation agreements and/or restrictive covenants utilized by Invatec;

(3)     All documents reflecting communications, whether oral, written or electronic that mentions, refers or relates to Invatec, from May 1, 2008 to the present, between or among (a) Invatec and the Individual Defendants; (b) Invatec and any other employees of plaintiffs, including the Solicited Employees; (c) the Individual Defendants and any other employees of plaintiffs, including the Solicited Employees; and (d) the Individual Defendants themselves. Invatec, the Individual Defendants, and the other employees of plaintiffs, including the Solicited Employees, include any of their representatives or agents (including but not limited to any "head hunter" or employment agency representing the Individual Defendants, Invatec or any of

30

JANREM0114393

plaintiffs' employees).  Such documents include, but are not limited to, correspondence, letters, memoranda and emails, regardless of the media in which the emails are stored and whether such emails were issued from or received by a work email account or personal email account;

(4)     All documents reflecting communications, whether oral, written or electronic, between Invatec and the Individual Defendants and any representatives or agents of Invatec and the Individual Defendants from May 1, 2008 to the present.  Such documents include, but are not limited to, correspondence, letters, memoranda and emails, regardless of the media in which the emails are stored and whether such emails were issued from or received by a work email account or personal email account;

(5)     All communications that Hardage received or sent from his Invatec email account, preston.hardage@invatec-us.com;

(6)     The presentation that Hardage presented to Jolanta Wierzbicki and Lia Jones;

(7)     All documents reflecting any type of payments, reimbursements or anything with any value provided by Invatec to Hardage or any of the other Individual Defendants;

(8)     Any and all documents and/or things provided by the Individual Defendants to Invatec or by Invatec to the Individual Defendants;

(9)     Any and all documents, things and Confidential Information as defined above that the Individual Defendants have removed from plaintiffs or received in connection with their employment at plaintiffs, that they have not returned to plaintiffs or that are presently in their care, custody or control;

(10)    All documents reflecting the Individual Defendants' job description at Invatec including, but not limited to, written job descriptions;

JANREM0114394

(11)   All documents concerning the steps Invatec and the Individual Defendants plan to take to assure that the Individual Defendants do not breach their obligations to plaintiffs in whatever position they are assigned to at Invatec;

(12)   All documents concerning the operating divisions of Invatec and how such operating divisions are kept separate;

(13)   All information concerning Invatec's customer relationships, customer lists, pricing information and strategies, pipeline products, research and development plans and efforts, sales force plans, marketing and sales plans, business strategies, cost of operations for all products, employee lists, contracting strategies, targeting strategies and training information;

(14)   The Individual Defendants' calendars, date books and/or appointment books for May 1, 2008 to the present; and

(15)   The depositions of the Individual Defendants and representative(s) of Invatec concerning the matters identified in such documents.

In light of the facts set forth in the Verified Complaint, plaintiffs are rightfully concerned about the circumstances surrounding the Individual Defendants' employment with a competitor, Invatec.  The above discovery is narrowly tailored to allow the parties to better understand the issues that are at stake.  In addition, these requests are not burdensome on the defendants since the requests are mostly focused on documents exchanged between them over a short period of time.  As a result, the Court should permit plaintiffs to conduct accelerated discovery before the hearing on plaintiffs' application for preliminary injunctive relief so that plaintiffs may further develop the grounds for a preliminary injunction.

JANREM0114395

## CONCLUSION

For the foregoing reasons, plaintiffs Johnson & Johnson and Cordis Corporation respectfully request that this Court issue a temporary restraining order and a preliminary injunction, and order expedited discovery, in accordance with the provisions set forth in the Verified Complaint and Order to Show Cause.

Respectfully submitted,

RIKER, DANZIG, SCHERER, HYLAND
& PERRETTI LLP

Attorneys for Plaintiffs
Johnson & Johnson and Cordis Corporation

By: _____
        Glenn A. Clark

Dated: August 14, 2008

33

JANREM0114396