Exhibit 6

| | |
|---|---|
| JOHNSON & JOHNSON and CORDIS CORPORATION, | SUPERIOR COURT OF NEW JERSEY CHANCERY DIVISION MIDDLESEX COUNTY DOCKET NO. |
| Plaintiffs, | |
| vs. | CIVIL ACTION |
| STENTYS, INC. and JIN S. PARK, | |
| Defendants. | |

## BRIEF IN SUPPORT OF PLAINTIFFS' APPLICATION FOR A TEMPORARY RESTRAINING ORDER AND ACCELERATED DISCOVERY

RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP
Headquarters Plaza
One Speedwell Avenue
Morristown, NJ 07962-1981
(973) 538-0800

Attorneys for Plaintiffs
Johnson & Johnson and Cordis Corporation

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ........................................................................................1

STATEMENT OF FACTS ............................................................................................4

LEGAL ARGUMENT ....................................................................................................4

    I.    PLAINTIFFS ARE ENTITLED TO A TEMPORARY RESTRAINING
        ORDER. ........................................................................................................4

        A.    Plaintiffs have clear legal rights to the relief that they seek under
            both the Agreement and the common law. .......................................5

            1.    The Agreement is reasonable and enforceable under New
                Jersey law, thus giving plaintiffs a settled legal right
                underlying their claims. ..........................................................5

            2.    Plaintiffs have a clear legal right to restrict Park's
                employment under the common law as well. ........................13

        B.    Issuance of a temporary restraining order is necessary to prevent
            irreparable harm to plaintiffs. .........................................................17

        C.    The material facts underlying plaintiffs' claims are
            uncontroverted. ...............................................................................21

    II.    PLAINTIFFS ARE ENTITLED TO EXPEDITED DISCOVERY
        PENDING A HEARING ON THEIR PRELIMINARY INJUNCTION
        APPLICATION. ............................................................................................22

CONCLUSION ...............................................................................................................25

CONFIDENTIAL

JANREM0114133

## PRELIMINARY STATEMENT

Plaintiffs Johnson & Johnson ("J&J") and Cordis Corporation ("Cordis") submit this Brief in support of their application for a limited temporary restraining order, preliminary injunction and accelerated discovery against Stentys, Inc. ("Stentys") and Jin S. Park ("Park").

The limited injunctive relief sought by plaintiffs is firmly authorized and, in fact, mandated by the Appellate Division's decision in National Starch & Chem. v. Parker Chem., 219 N.J. Super. 158 (App. Div. 1987). There, confronted with facts strikingly similar to those asserted herein, the Appellate Division affirmed the trial court's issuance of a preliminary injunction which continued temporary restraints virtually identical to those sought by plaintiffs in this matter. In National Starch, the former technical employee, who had no non-compete, was enjoined from "commencing any employment responsibilities that 'in any way relate to or involve envelope adhesives'" 219 N.J. Super at 159.

It is respectfully submitted that the facts in the instant action are far more compelling than even those asserted in National Starch. Here, unlike the situation in National Starch, the former employee, Park, not only executed a confidentiality agreement, but, as a condition of his employment, he also agreed to and signed a non-compete covenant (the "Agreement"), which provides an additional basis for the injunctive relief the plaintiffs seeks. Also, Park was not simply a former technical employee. Instead, Park was plaintiffs' key Staff Product Development Engineer who was responsible for research and development across Cordis' business units, especially Cordis Cardiology and Cordis Endovascular. Cordis Cardiology and Cordis Endovascular develop, manufacturer and market coronary and peripheral stents for the treatment of coronary heart and endovascular disease, respectively.

In sum, through his work as Staff Product Development Engineer, and his over seven years of employment with plaintiffs, Park was provided with direct access to and obtained detailed knowledge of plaintiffs' confidential, proprietary and trade secret information (collectively, "Confidential Information"). Park's access to and knowledge of plaintiffs' Confidential Information is deep and significant. For example, Park knows, among other things, Cordis' pipeline products, the areas of vascular intervention that Cordis will focus on in the next few years, Cordis' testing methods and procedures, and Cordis' designs and material specifications for its coronary and peripheral stents, including Cordis' most popular coronary stent, the CYPHER® Stent. The other Confidential Information that Park had access to or gained knowledge of includes the following:

- strategic priorities and objectives for the short-term (1 to 2 years), mid-term (3 to 5 years) and long-term (+ 5 years);
- pipeline products;
- product development plans and strategies for new products and how the company plans on changing current products;
- research and development information;
- product testing techniques;
- product components and designs;
- material specifications for all products;
- cost to manufacture products;
- manufacturing techniques and technologies;
- production processes;
- launch strategies for new products, including launch dates, packaging, product forms;
- management of supply chain;
- regulatory progress of products; and
- customer complaints and feedback concerning existing products and instruments.

In or about mid June 2008, Park tendered his resignation from Cordis and informed Cordis that he accepted employment with Stentys and would be working in Stentys' research and development department. Stentys is a direct competitor to plaintiffs. In that regard, Stentys is currently developing a coronary stent that will directly compete with Cordis' CYPHER® Stent as

2

well as other products offered, or being developed, by Cordis.  Park has intimate knowledge of plaintiffs' Confidential Information concerning Cordis' products and pipeline products.   With that information, Stentys will be able to improve its products or immediately duplicate Cordis' products at minimal cost and to unfairly compete with plaintiffs.

Plaintiffs informed Park and Stentys that Park's anticipated employment with Stentys would violate the Agreement.   The parties attempted to work out their differences, but were unsuccessful.   Upon information and belief, Park started to work for Stentys on or about July 2, 2008 or will do so shortly.   As a result, a temporary restraining order is necessary, now, to prevent irreparable harm to the plaintiffs.  As the Appellate Division stated in National Starch:

> [D]amages will not be an adequate remedy when the competitor has obtained the secrets.  The cat is out of the bag and there is no way of knowing to what extent their use has caused damages or loss.

National Starch, 219 N.J. Super. at 162-63.

3

## STATEMENT OF FACTS

The factual background supporting plaintiffs' application is set forth in the Verified Complaint. Rather than repeat those facts herein, plaintiffs will refer to them in their discussion of the relevant law.

## LEGAL ARGUMENT

**I.    PLAINTIFFS ARE ENTITLED TO A TEMPORARY RESTRAINING ORDER.**

The standard that a plaintiff must meet to obtain temporary injunctive relief is well-settled in New Jersey.  Before a court will issue a temporary restraining order, the moving party must show that:

1.    the legal right underlying the plaintiff's claim is settled;

2.    the issuance of a temporary injunction is necessary to prevent immediate irreparable harm; and

3.    the material facts underlying the plaintiff's claims are uncontroverted.  A plaintiff must only "make a preliminary showing of a reasonable probability of ultimate success on the merits."

Crowe v. De Gioia, 90 N.J. 126, 132-33 (1982).

For the reasons set forth below, plaintiffs are entitled to temporary injunctive relief to prevent irreparable harm to plaintiffs and their affiliated companies.

4

**A.**    **Plaintiffs have clear legal rights to the relief that they seek under both the Agreement and the common law.**

**1.**    **The Agreement is reasonable and enforceable under New Jersey law, thus giving plaintiffs a settled legal right underlying their claims.**

Post-employment restrictive covenants are valid and enforceable, provided that they protect a legitimate interest of the employer, pose no undue hardship on the employee and are not injurious to the public. Karlin v. Weinberg, 77 N.J. 408, 411-12 (1978); Whitmyer Bros., Inc. v. Doyle, 58 N.J. 25, 32-33 (1971). Here, the Agreement protects plaintiffs' legitimate interests, poses no undue hardship to Park and is not injurious to the public interest.

**a.**    **The Agreement protects plaintiffs' trade secrets and confidential information.**

It is clear that an "employer has a patently legitimate interest in protecting his trade secrets as well as his confidential business information . . . ." Whitmyer, 58 N.J. at 33 (citing Solari Indus., Inc. v. Malady, 55 N.J. 571 (1970)). The courts have recognized that no agreement at all is necessary to prevent disclosure of trade secrets and confidential information. Sun Dial Corp. v. Rideout, 16 N.J. 252, 259-60 (1954); National Starch, 219 N.J. Super. at 162-63.

"A trade secret may consist of a formula, process, device or compilation which one uses in his business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it." Sun Dial, 16 N.J. at 257; National Tile Bd. Corp. v. Panelboard Mfg. Co., 27 N.J. Super. 348, 351 (Ch. Div. 1953). In addition to technical information, trade secrets and confidential information include "product pricing," "marketing and sales strategies," "manufacturing processes," "quality control procedures," "new and existing product research and development," "raw material suppliers" and other confidential business information. National Starch, 219 N.J. Super. at 160-63. See also Pepsico, Inc. v. Redmond, 54 F.3d 1262 (7th Cir.

CONFIDENTIAL                                                                                    JANREM0114138

1995) (affirming injunction of plaintiff's former business manager from working for competitor where he would inevitably disclose his knowledge of plaintiff's trade secrets and confidential information, including strategies, operating and sales plans, pricing information and "attack plans" for specific markets).

Neither absolute secrecy nor novelty are required for information to constitute a trade secret; rather, the inquiry focuses upon the competitive advantage that the information provides. See Sun Dial, 16 N.J. at 257. Accordingly, the Sun Dial Court, in defining the concept of a trade secret, stated:

> Its subject matter must not be a matter of public knowledge or of general knowledge within the industry. Although a substantial measure of secrecy must exist, the secrecy need not be absolute and disclosure to employees involved in its use will not ordinarily result in loss of the employer's protection. . . . Novelty and invention are not essential for the trade secret as they are for patentability. And the fact that every ingredient is known to the industry is not controlling for the secret may consist of the method of combining them which produces a product superior to that of competitors.

Id. (citations omitted).

Here, each year Cordis expends large amounts of time and money for research and development of new and better products, and the best manner in which to test and manufacture those products. Cordis has developed and used extensive efforts to protect a wide body of Confidential Information including, but not limited to:

- strategic priorities and objectives for the short-term (1 to 2 years), mid-term (3 to 5 years) and long-term (+ 5 years);
- pipeline products;
- product development plans and strategies for new products and how the company plans on changing current products;
- research and development information;
- product testing techniques;
- product components and designs;
- material specifications for all products;
- cost to manufacture products;

6

JANREM0114139

- manufacturing techniques and technologies;
- production processes;
- launch strategies for new products, including launch dates, packaging, product forms;
- management of supply chain;
- regulatory progress of products; and
- customer complaints and feedback concerning existing products and instruments.

It is critical that the above highly sensitive Confidential Information that Park possesses remains confidential.   Park was highly regarded by his peers and was known as being "super technical."   In fact, he received the 2001 "Hoffman Scientist award" for significant technical achievement.   As a key Staff Product Development Engineer, Park was responsible for research and development across Cordis' business units, especially Cordis Cardiology and Cordis Endovascular.  Also, during his employment with Cordis, Park received significant training from stent design experts.   As such, Park received highly sensitive Confidential Information while working for Cordis such as Cordis' pipeline products, the areas of vascular intervention that Cordis will focus on in the next few years, and Cordis' testing methods and procedures.   Park also acquired knowledge and had access to Cordis' Confidential Information regarding designs and material specifications for its coronary and peripheral stents, including Cordis' most popular coronary stent, the CYPHER® Stent.

For example, Park is intimately familiar with Cordis' highly secretive process for the use of a material called Nitinol. Nitinol has shape memory and super elasticity, which are two important characteristics for medical devices such as stents.  Most stents must travel through a delivery system (i.e., catheter) that is smaller than the stent in order for the stent to be placed in the diseased artery.   The stent, therefore, must be miniaturized so that it can go though the catheter, and then must expand to its intended normal size once it exists the catheter and is placed in the diseased artery.   Nitinol allows this to occur.   Although Nitinol is widely used in

CONFIDENTIAL                                                                                           JANREM0114140

the industry, Cordis uses a highly confidential and secret technique for processing Nitinol and incorporating Nitinol into its products so that its products have the required shape memory and elasticity. Park has knowledge of this process. Park even developed a new and unique Nitinol heat treatment process while he was employed at Cordis.

Park was also significantly involved in designing and developing new coronary and peripheral stents utilizing various materials such as stainless steel, cobalt-chrome and Nitinol. For example, Park was the lead designer on a coronary stent project whereby he converted Cordis' coronary stents from stainless steel to cobalt-chrome, which required Park to re-design the stents. In addition, he assisted in designing an expandable stent for endovascular applications and developing stent performance testing. Moreover, Park was the lead designer for creating a new stent to treat percutaneous abdominal aortic aneurisms ("AAA"). In doing so, Park created a unique stent-graft attachment method for the treatment of AAA.

Park's responsibilities and duties also included taking Cordis' stents that were designed for a blood vessel or artery in a specific part of the body and redesigning those stents using Cordis' highly secretive testing methods and procedures so that they could be used on blood vessels or arteries located in other parts of the body.

Overall, Park was involved with 7 patents while at Cordis. Significantly, Park is also listed as an inventor on two pending patent applications regarding a new stent for the treatment of coronary and peripheral blockages located in bifurcated vessels and arteries.

It is clear that information such as that possessed by Park is within the definition of a trade secret as defined by the New Jersey Supreme Court. See Sun Dial, 16 N.J. at 257. The Agreement protects against disclosure of this type of information. Accordingly, the Agreement clearly protects plaintiffs' legitimate interests. Indeed, the Appellate Division has recognized the

CONFIDENTIAL                                                                                                                          JANREM0114141

need to protect such legitimate interests by way of interlocutory injunctive relief in circumstances similar to those before this Court. See National Starch, 219 N.J. Super. at 162-63. See also Pepsico, 54 F.3d at 1269 (observing that a company's "strategic goals" and "particularized plans or processes developed by [the company] and disclosed to [the former employee] while the employer-employee relationship existed, which are unknown to others in the industry and which give the employer an advantage over his competitors" should be protected).

In fact, Park acknowledged throughout the Agreement, including Paragraph 5, that he would receive Confidential Information from plaintiffs and that maintaining the secrecy of that Confidential Information was critical to plaintiff's success.  (VC, Exh. A).

> **b.    Enforcement of the Agreement will not impose an undue hardship on Park.**

The New Jersey Supreme Court has stated: "Although . . . [the employee] will suffer adverse financial consequences as a result of enforcement of the covenant, a mere showing of personal hardship does not amount to an 'undue hardship' that would prevent enforcement of the covenant." Karlin, 77 N.J. at 417-18, n.3 (citation omitted).  The Karlin Court also recognized that in evaluating undue hardship, courts should examine the reason for the termination of the employment relationship:

> Where this occurs because of a breach of the employment contract by the employer, or because of actions by the employer detrimental to the public interest, enforcement of the covenant may cause hardship on the employee which may fairly be characterized as 'undue' in that the employee has not, by his conduct, contributed to it. On the other hand, where the breach results from the desire of an employee to end his relationship with his employer rather than from any wrong-doing by the employer, a court should be hesitant to find undue hardship on the employee, he in fact, having brought that hardship on himself. Ordinarily a showing of personal hardship, without more, will not amount to an 'undue hardship' such as would prevent enforcement of the covenant.

9

CONFIDENTIAL

Id. at 423-24 (emphasis added).

In this case, enforcement of the Agreement will cause Park no undue hardship. Park made the decision to voluntarily end his employment with Cordis for reasons that had nothing to do with Cordis. Cordis offered, and will continue to offer, re-employment to Park because he was a valued employee. He also has rights under Paragraph 9 of the Agreement to receive compensation in accordance with its terms.

In addition, the Agreement's non-competition and confidentiality provisions are narrowly drafted and plaintiffs are seeking only limited restraints on Park's employment with Stentys, which will cause no financial hardship to Park. Plaintiffs are not asking that Park's employment with Stentys be prohibited. Plaintiffs simply seek to enjoin Stentys from permitting Park to perform any services, or from employing him in any position at Stentys, that in any way relates to or involves coronary or peripheral stents, including bifurcated stents, or any other position that would place him in a position of using or disclosing plaintiffs' Confidential Information.

In that area, Park's knowledge of plaintiffs' Confidential Information would inevitably be disclosed, whether consciously or subconsciously. See E.I. duPont de Nemours & Co. v. American Potash & Chem. Corp., 200 A.2d 428, 435 (Del. Ch. 1964) ("I think it is evident even to one unsophisticated in chemical and engineering matters that at least at this stage it is impossible to say that all of plaintiff's trade secrets in those areas are susceptible of consciously being isolated by Hirsch [the former employee]. One cannot now say that there is no issue as to his ability to avoid drawing on them when he comes to give instructions or suggestions relative to the solution of problems arising in Potash's [the competitor] commercial chloride process operation."); Allis-Chalmers Mfg. Co. v. Continental Aviation & Eng'g Corp., 255 F. Supp. 645, 654 (E.D. Mich. 1966) ("The virtual impossibility of Mr. Wolff [the former employee]

CONFIDENTIAL                                                                      JANREM0114143

performing all of his prospective duties for Continental [the competitor] to the best of his ability, without in effect giving it the benefit of Allis-Chalmers' [the former employer] confidential information, makes a simple injunction against disclosure and use of this information inadequate. . . . Thus, the injunction granted is as restricted as possible to protect the secrets involved without undue restraint on Mr. Wolff's right to pursue his chosen vocation, only prohibiting work in the design and development of distributor type pumps."). In <u>National Starch</u>, the Appellate Division relied upon both <u>E.I. duPont</u> and <u>Allis Chalmers</u>.

Here, enforcement of the Agreement would only prevent Park from working in the aforementioned area, where his knowledge of plaintiffs' Confidential Information could have an adverse impact on plaintiffs and enable Stentys to compete unfairly. Park's general business knowledge and skills are transferable to other products and technologies, and he would not be prohibited from working in such areas at Stentys.

Just as important, Park will not experience any financial hardship because the Agreement provides Park with compensation in the event Park could not find employment, or accepted a position with less compensation, as a result of his obligations under the Agreement. As a result, Park will not experience any financial hardship.

Accordingly, the issuance of a temporary restraining order will not subject Park to undue hardship as a matter of law.

### c. Enforcement of the Agreement is not contrary to public policy.

This Court's enforcement of the Agreement and its non-competition and secrecy provisions would not contravene public policy. Although public policy certainly encourages competition, public policy equally discourages <u>unfair</u> competition.

11

CONFIDENTIAL                                                                                     JANREM0114144

Cordis has been for many years a leader and innovator in the research, development, manufacturing and marketing of products that treat coronary and peripheral vascular disease. Cordis is a pioneer in its field and has, for over 40 years, developed less invasive treatments for vascular disease, often through an expensive and long trial and error process that includes extensive research and development efforts. For example, among many other things, Cordis developed the first full line of Pre-Shaped Judkins catheters in 1966, the first percutaneous transluminal coronary angioplasty ("PTCA") balloon that utilized nylon balloon technology in 1990, and the CYPHER® Stent—the first approved drug-eluting stent in 2003.

Stentys, a French corporation, is a competitor in this area. If the Court fails to enforce the Agreement in this context, thereby encouraging foreign competitors to pirate Confidential Information plaintiffs have developed by expending vast amounts of time and money, the investment of such resources by companies such plaintiffs will be discouraged. If a company like Stentys is permitted to short-circuit the extensive research, development, testing, manufacturing and marketing process and place a viable competitive product into the market almost immediately, the commercial advantage normally attained through the efforts and expense of plaintiffs' research, development, manufacturing and marketing personnel would be negated. Additionally, Stentys would be able to price products without having to consider the recovery of the costs incurred in developing the product. See E.I. duPont, 200 A.2d at 437 (finding a public interest in protecting trade secrets because such protection "tends to encourage . . . substantial expenditures to find or improve ways and means of accomplishing commercial and industrial goals. The protection of such efforts when translated into trade secrets tends to encourage such efforts and the result is beneficial to the employer and presumably to society.").

CONFIDENTIAL                                                                                 JANREM0114145

In other words, Stentys should be required to spend millions of dollars to develop its own products instead of simply taking plaintiffs' secrets by hiring Park.   By doing so, Stentys will enhance the marketability of its own products that compete with plaintiffs' products by substantially reducing its costs of manufacturing, distribution, and marketing at plaintiffs' expense.   Should the Court not preclude such unfair competition, there would be no benefit for companies like the plaintiffs to spend millions of dollars to research and develop breakthrough products like the CYPHER® Stent, which the American Heart Association named as one of the top 10 medical advancements of 2003.

For the foregoing reasons, the Agreement is legal and enforceable in order to prevent unfair competition and, therefore, the legal rights underlying plaintiffs' claim are settled as a matter of law.

## 2.   Plaintiffs have a clear legal right to restrict Park's employment under the common law as well.

As demonstrated above, plaintiffs' legal right under the Agreement to restrict Park's employment at Stentys and to protect against the disclosure of their Confidential Information and is well-settled.   In addition, such rights are settled under the common law.   As observed above, the New Jersey courts have acknowledged that an agreement is not necessary to prohibit the disclosure of Confidential Information.[1]   See Sun Dial, 16 N.J. at 259-60.   Further, a former employee should be restricted from working for a new employer where it is inevitable that he or

---

[1] The Agreement expressly reserves Park's common law obligations to plaintiffs: "Nothing herein shall limit or reduce my common law duties to the COMPANY, including but not limited to my duty of loyalty."   (Agreement, ¶15).   Such obligations include Park's duty of non-disclosure of plaintiffs' Confidential Information after termination of his employment with plaintiffs, as stated in Sun Dial.

13

she will disclose or use the former employer's trade secrets and confidential information during the course of employment with the new employer.  National Starch, 219 N.J. Super. at 162-63. "It is sufficient that the circumstances give rise to an inference that substantial threat of disclosure exists." Id. at 163 (citation omitted).

In National Starch, the Appellate Division affirmed the Chancery Division's order enjoining a former employee, pending trial, from working for his new employer in the envelope adhesives area.  The facts in the instant case are virtually identical to National Starch:

| NATIONAL STARCH,<br>219 N.J. Super. at 160-161 | THE INSTANT CASE |
|---|---|
| Former employee worked for National Starch in research and development for nine years in envelope adhesives before resigning to work for a competitor. | Parked was employed by Cordis for over seven years in its research and development department before resigning to accept employment with Stentys in its research and development department. |
| National Starch expended large amounts of time and money in the research and development of envelope adhesive products. | Cordis expends significant amounts of time and money in research and development of coronary and peripheral stents. |
| National Starch asserted that its trade secrets and proprietary information included product formulas, manufacturing processes, cost of operations, quality control, new and existing product research and development, raw material suppliers, marketing and sales strategies and product specifications. | Many of the types of trade secrets/confidential information asserted by National Starch are being asserted by Cordis, and others. |
| National Starch asserted that its products were complex and almost impossible to reverse engineer. | Cordis' products are complex making it very difficult to precisely reverse engineer. |
| Former employee did not execute a non-compete agreement, but only executed a non-disclosure agreement. | Park executed the Agreement, which contains both non-compete and non-disclosure obligations. |

14

CONFIDENTIAL

JANREM0114147

| | |
|---|---|
| National Starch asserted that if the former employee uses its confidential information, it would enable the competitor to duplicate its envelope adhesive formula without the usual trial and error process, thereby resulting in a substantial cost savings, with a consequent competitive advantage. | With plaintiffs' Confidential Information, Stentys can immediately duplicate Cordis' products without the usual trial and error process resulting in a substantial cost savings to Stentys, thereby creating unfair competition. |
| The Court granted the TRO and Preliminary Injunction to protect National Starch's confidential information. | The Court should grant the TRO here. |

In <u>National Starch</u>, the defendant employee had worked in envelope adhesives for his former employer and received its Confidential Information relating to that area. <u>Id.</u> at 159, 164. The defendant employee only executed a non-disclosure agreement with the former employer and not a non-compete agreement. Nevertheless, the Appellate Division found that the trial court had properly concluded that there was "sufficient threat of impending injury to warrant preliminary relief pending trial," and affirmed the restriction on the defendant's employment. <u>Id.</u> at 162.

In doing so, the Appellate Court rejected the competitor's arguments and recognized the realities of life and human nature – where, as here, a former employee signed a non-disclosure agreement and had access to and became familiar with his former employer's Confidential Information, a temporary restraining order should issue because of the inevitability that the employee will use or disclose that information if he works for a competitor of the former employer on a competing product. The inevitable disclosure need not involve a conscious breach of the employee's obligation. Instead, where an employee is placed in the position of direct competition with his former employer, that employee cannot help but use the information he possesses to assist his new employer. <u>Id.</u> at 162-63.

CONFIDENTIAL                                                                                                    JANREM0114148

Similarly, in Pepsico, the Seventh Circuit affirmed the district court's ruling that the plaintiff's former business manager would inevitably disclose its confidential strategic objectives and distribution, packaging, pricing and marketing plans if he were employed in a similar position at its competitor. Pepsico, 54 F.3d at 1269-70. The business manager had signed a confidentiality agreement with the plaintiff, but not a non-competition covenant. Id. at 1264. The Seventh Circuit agreed with the district court's conclusion that "unless [the former business manager] possessed an uncanny ability to compartmentalize information, he would necessarily be making decisions about [his new employer's products that compete with his former employer's products] by relying on his knowledge of [his former employer's] trade secrets." Id. at 1269. The Seventh Circuit affirmed the district court's order enjoining the business manager from working for the defendant company for a period of time and from ever disclosing the plaintiff's trade secrets and confidential information. Id. at 1272.

Here, it is inevitable that Park will use and disclose plaintiffs' Confidential Information if he is allowed to work in the research and development department at Stentys. Cordis' products that are used to treat coronary and peripheral vascular disease have been, and are being, developed through lengthy, expensive research and development efforts. In furtherance of those efforts, Cordis has created a vast array of Confidential Information, including but not limited to, pipeline products, the areas of vascular intervention that Cordis will focus on in the next few years, Cordis' testing methods and procedures, and Cordis' designs and material specifications for its coronary and peripheral stents, including Cordis' most popular coronary stent, the CYPHER® Stent. Park acquired knowledge of, and had access to, this Confidential Information.

If Park is allowed to work at Stentys, he will be placed in a situation where, to do his job to the best of his ability, he will not be able to avoid taking advantage of his knowledge of

CONFIDENTIAL

JANREM0114149

Confidential Information belong to plaintiffs. It is impossible to believe that he, or anyone else, would be able to avoid making use of what he knows – plaintiffs' Confidential Information – even if he wanted to do so. For example, Park will inevitably use plaintiffs' Confidential Information that he acquired about pipeline products, which will allow Stentys to unfairly compete with Cordis.

Consequently, not only do plaintiffs have a settled legal right to restrict Park's employment and to protect against the disclosure of their Confidential Information pursuant to the Agreement, but also those rights are well-settled under the common law. Thus, plaintiffs have demonstrated the first element of the test for temporary injunctive relief under Crowe.

**B.      Issuance of a temporary restraining order is necessary to prevent irreparable harm to plaintiffs.**

Plaintiffs will suffer irreparable harm if Stentys is permitted to employ Park in Stentys' research and development department. In such a position, it is inevitable that Park will disclose or use, consciously or unconsciously, plaintiffs' Confidential Information. As the New Jersey Supreme Court has recognized:

> Where the employee through his employment has learned of the business practices and methods of his employer which if disclosed to a competitor may result in irreparable injury to the complainant, the court may presume irreparable injury will ensue from the breach of the covenant.

A. Hollander & Son, Inc. v. Imperial Fur Blending Corp., 2 N.J. 235, 249 (1949) (emphasis added). Park's employment by plaintiffs placed him in a position to learn plaintiffs' Confidential Information including, but not limited to, pipeline products, research and development efforts and plans, testing methods and procedures, manufacturing costs, and Cordis' designs and material specifications for its coronary and peripheral stents, including Cordis' most popular

17

CONFIDENTIAL

JANREM0114150

coronary stent, the CYPHER® Stent.     Plaintiffs took great precautions to protect this Confidential Information.

Park's disclosure of plaintiffs' Confidential Information will result in irreparable harm as a matter of law if plaintiffs are not granted the limited injunctive relief that they seek.  As stated by the Appellate Division in upholding a grant of a preliminary injunction in a trade secrets case: "[D]amages will not be an adequate remedy when the competitor has obtained the secrets.  The cat is out of the bag and there is no way of knowing to what extent their use has caused damage or loss."  National Starch, 219 N.J. Super. at 163.

Any argument that Park will not disclose the Confidential Information that he possesses is without merit.  As noted above, the National Starch court recognized that where, as here, a former employee signed a non-disclosure agreement and had access to and became familiar with his former employer's Confidential Information, a temporary restraining order should issue because of the inevitability that the employee will use or disclose that information if he works for a competitor of the former employer on a competing product.  See id. at 162-63. The inevitable disclosure need not involve a conscious breach of the employee's obligation.  Instead, as the National Starch court determined, where an employee is placed in the position of direct competition with his former employer, that employee cannot help but use the information he possesses to assist his new employer.  Id.; Johnson & Johnson v. Biomet, Inc. and Robin T. Barney, Docket No. C-107-07, slip. op. 17-20 (N.J. Super., Chancery Division, Middlesex County)(granting preliminary injunction after finding that the non-complete agreement, which is similar to Park's, was valid and that irreparable harm existed based on inevitable disclosure). This opinion is attached as Exhibit A to the brief.

18

Here, Park's position at Stentys would clearly involve products that compete with the Cordis' products. Accordingly, it is inevitable that Park, either consciously or unconsciously, will use his knowledge of plaintiffs' Confidential Information to help his new employer to compete unfairly with plaintiffs thereby causing plaintiffs' irreparable harm.

For example, Cordis' product, the CYPHER® Stent is a drug-eluting coronary stent that is used to treat coronary heart disease that props open the diseased artery to maintain blood flow. The CYPHER® Stent also releases certain drugs over time to help prevent re-stenosis. When interventional cardiologist began using stents in 1995, the stents available in the market at that time were bare metal stents (i.e., with no drugs). Re-occurrence of the narrowing of the arteries (i.e., re-stenosis) even with the bare metal stent in place was a major limitation, occurring in as many as 30% of patients. Cordis designed the CYPHER® Stent to prevent re-stenosis and it has become a successful product. The CYPHER® Stent is used to treat blockages located in straight arteries and blockages located in a junction between a main artery and its side-branch artery (i.e., bifurcated arteries). Also, as explained above, Park assisted in inventing two pending patent applications regarding a new stent for the treatment of coronary and peripheral blockages located in bifurcated vessels and arteries.

Stentys is currently developing a bifurcated stent for the treatment of coronary heart disease that involves treating blockages located in bifurcated vessels and arteries. The stent is currently pending a patent. Stentys contends that its bifurcated coronary stent will provide the same advantages as the CYPHER® Stent because it will reduce the re-stenosis rate. Stentys' bifurcated coronary stent, therefore, will compete directly with the CYPHER® Stent and Cordis' bifurcated stent that is currently pending a patent. Presumably, Stentys is also developing other stents and related products that will compete with Cordis' other products.

CONFIDENTIAL                                                                              JANREM0114152

Park is intimately familiar with plaintiffs' Confidential Information concerning the CYPHER® Stent and Cordis' bifurcated stent that is currently pending a patent such as designs, manufacturing techniques, testing methods and procedures, and material specifications. Park can use and will use, consciously or unconsciously, this Confidential Information to improve Stentys' bifurcated stent and/or other Conflicting Products. In addition, Park is aware of Cordis' cost in manufacturing CYPHER® Stent, which Stentys can use to unfairly compete with plaintiffs.

As another example, Park acquired knowledge concerning plaintiffs' pipeline products and research and development efforts and plans for the next five years. As a result, Park can steer, whether consciously or unconsciously, the development of Stentys' products. Park can identify pipeline products Stentys should focus on that would allow Stentys to unfairly complete with Cordis, or Park can provide new ideas for pipeline products to Stentys based on his knowledge of Cordis' pipeline products. Also, since Park knows the designs and material specifications of Cordis' coronary and peripheral stents, he can duplicate those products overnight for Stentys so that Stentys can compete directly with Cordis' products.

In addition, as explained in the Verified Complaint, Cordis' testing methods and procedures for developing new products are highly secretive because with the appropriate testing methods and procedures, a company can efficiently make design decisions or determine which new products are more practical during the testing phase. Overall, with the appropriate testing methods and procedures, a company can make new products, or change existing products, faster and better than a competitor. As such, if Park were to use Cordis' testing methods and procedures, whether consciously or unconsciously, while working for Stentys, then Stentys would be able to unfairly compete with Cordis.

CONFIDENTIAL                                                                                       JANREM0114153

Moreover, Park's responsibilities and duties at Cordis included taking Cordis' stents that were designed for a blood vessel or artery in a specific part of the body and redesigning those stents using Cordis' highly secretive testing methods and procedures so that they could be used on blood vessels or arteries located in other parts of the body.  As such, Park can use Cordis' testing methods and procedures, whether consciously or unconsciously, to modify and re-design Stentys' bifurcated coronary stent so that it could be used on vessels and arteries outside of the heart.  If so, such products would then compete with Cordis' peripheral stents.

Also, as explained above, Park was intimately familiar with Cordis' processing techniques for Nitinol and even created a new and unique Nitinol heat treatment process while he was employed at Cordis.   If Park were allowed to work on Stentys' bifurcated stent and other Conflicting Products, then Park will use, whether consciously or unconsciously, Cordis' Confidential Information regarding Nitinol to improve Stentys' products so that Stentys can unfairly compete with Cordis.

Considering the above, it is clear that plaintiffs have established the third element of temporary injunctive relief.  In fact, Park acknowledged in Paragraph 5 of the Agreement that the plaintiffs would suffer such irreparable harm.  (VC, Exh. A).  As a result, the plaintiffs have established the irreparable harm element of Crowe.

## C.     The material facts underlying plaintiffs' claims are uncontroverted.

As set forth in the Verified Complaint, the material facts are uncontroverted.  In any event, this requirement, with respect to the issuance of a temporary restraining order, "is tempered by the principle that mere doubt as to the validity of the claim is not an adequate basis for refusing to maintain the status quo."  Crowe, 90 N.J. at 133.  Therefore, even if any of the

CONFIDENTIAL

JANREM0114154

material facts underlying plaintiffs' claim could be controverted, this Court should resolve any doubt by issuing a temporary restraining order. Id. at 134.

## II.   PLAINTIFFS ARE ENTITLED TO EXPEDITED DISCOVERY PENDING A HEARING ON THEIR PRELIMINARY INJUNCTION APPLICATION.

Plaintiffs are entitled to conduct expedited discovery to develop further the grounds for preliminary injunctive relief. The New Jersey Court Rules grant courts wide discretion to order expedited discovery. See R. 4:18-1(b) (providing that the court, on motion, may require a response to a document demand in fewer than the 30 days permitted in the Rule); R. 4:14-1 (permitting the taking of depositions prior to 45 days after service of the summons and complaint with leave of court).

Also, the Comment to R. 4:18-1 states that R. 4:18-1 was taken from Fed. R. Civ. P. 34. Federal Courts routinely allow parties to conduct expedited discovery under Fed. R. Civ. P. 34 in the context of preliminary injunctions. See Wright Medical Technology, Inc. v. Somers, 37 F. Supp.2d 673, 679 (D.N.J. 1999) (parties conducted expedited discovery before the hearing on plaintiffs' application for a preliminary injunction barring plaintiffs' former employee from working for a competitor). "Expedited discovery is particularly appropriate when a plaintiff seeks injunctive relief because of the expedited nature of injunctive proceedings." Ellsworth Associates, Inc. v. United States, 917 F. Supp. 841, 844 (D.D.C. 1996). Accelerated discovery is appropriate where "[f]urther development of the record before the preliminary injunction hearing will better enable the court to judge the parties' interests and respective chances for success on the merits." Educata Corp. v. Scientific Computers, Inc., 599 F. Supp. 1084, 1088 (D. Minn.), aff'd in part, rev'd in part on other grounds 746 F.2nd 429 (8th Cir. 1984).

Here, plaintiffs seek the following expedited discovery:

CONFIDENTIAL                                                                                    JANREM0114155

(1)     Any employment contracts, confidentiality agreements, restrictive covenants, non-solicitation agreements and/or non-compete agreements, or any other agreements, and any drafts thereof, exchanged between Park and Stentys, or that Park will be required or has already or will be requested to sign in connection with his employment at Stentys;

(2)     All agreements executed between Park and Stentys;

(3)     Copies of all form employment agreements, employment contracts, non-disclosure agreements, trade secret agreements, confidential information agreements, non-compete agreements, non-solicitation agreements and/or restrictive covenants utilized by Stentys;

(4)     All documents reflecting communications, whether oral, written or electronic between Park and Stentys and any representatives or agents of Park or Stentys (including but not limited to any "head hunter" or employment agency representing Park or Stentys) from March 1, 2008 to the present concerning Park's employment by Stentys.  Such documents include, but are not limited to, correspondence, letters, memoranda and emails, regardless of the media in which the emails are stored and whether such emails were issued from or received by Park's work email account or personal email account;

(5)     All documents reflecting communications, whether oral, written or electronic, between Park and Stentys and any representatives or agents of Park and Stentys from March 1, 2008 to the present.  Such documents include, but are not limited to, correspondence, letters, memoranda and emails, regardless of the media in which the emails are stored and whether such emails were issued from or received by Park's work email account or personal email account;

(6)     Any and all correspondence from March 1, 2008 to the present between Stentys and/or any "head hunter" or employment agency representing Stentys, and any other employee of plaintiff;

CONFIDENTIAL                                                                                                          JANREM0114156

(7)     Any and all documents and/or things provided by Park to Stentys or by Stentys to Park;

(8)     Any and all documents, things and Confidential Information as defined above that Park has removed from plaintiffs or received in connection with his employment at plaintiffs, that he has not returned to plaintiffs or that are presently in his care, custody or control;

(9)     All documents concerning the events leading up to Park's resignation from Cordis;

(10)    All documents reflecting Park's job description at Stentys including, but not limited to, written job descriptions;

(11)    All documents concerning the steps Park and Stentys plan to take to assure that Park does not breach his obligations to plaintiffs in whatever position he is assigned to at Stentys;

(12)    All documents concerning the operating divisions of Stentys and how such operating divisions are kept separate;

(13)    All information concerning Stentys' research and development efforts and plans, pipeline products, testing methods and procedures for all products, design and material specifications for all products, cost of operations for all products and material and manufacturing techniques and technologies;

(14)    Park's calendars, date books and/or appointment books for March 1, 2008 to the present; and

(15)    The deposition of Park and a representative(s) of Stentys concerning the matters identified in such documents.

CONFIDENTIAL                                                                          JANREM0114157

In light of the facts set forth in the Verified Complaint, plaintiffs are rightfully concerned about the circumstances surrounding Park's employment with a competitor, Stentys. The above discovery is narrowly tailored to allow the parties to better understand the confidential issues that are at stake, which are at the heart plaintiffs' request for a preliminary injunction. In addition, these requests are not burdensome on Park or Stentys since the requests are mostly focused on documents exchanged between Park and Stentys over a short period of time. As a result, the Court should permit plaintiffs to conduct accelerated discovery before the hearing on plaintiffs' application for preliminary injunctive relief so that plaintiffs may further develop the grounds for a preliminary injunction.

## CONCLUSION

For the foregoing reasons, plaintiffs Johnson & Johnson and Cordis Corporation respectfully request that this Court issue a temporary restraining order and a preliminary injunction, and order expedited discovery, in accordance with the provisions set forth in the Verified Complaint and Order to Show Cause.

Respectfully submitted,

RIKER, DANZIG, SCHERER, HYLAND
& PERRETTI LLP

Attorneys for Plaintiffs
Johnson & Johnson and Cordis Corporation

By: Glenn A. Clark / KK
    _____
    Glenn A. Clark

Dated:  July 3, 2007

25

JANREM0114158