UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

JANSSEN BIOTECH, INC.,            )
        Plaintiff,                )
                                  )
                                  )
        v.                        )
                                  )      C.A. No. 17-11008-MLW
                                  )
CELLTRION HEALTHCARE CO.,         )
LTD., ET AL.,                     )
        Defendants.               )
                                  )


MEMORANDUM AND ORDER

WOLF, D.J.                                    October 31, 2017

I.   INTRODUCTION

     Plaintiff Janssen Biotech, Inc. ("Janssen") alleges that

defendants Celltrion Healthcare, Co., Ltd. and Celltrion, Inc.

(together, "Celltrion"), and Hospira, Inc. ("Hospira") have

infringed U.S. Patent No. 7,598,083 (the "'083 Patent").

Defendants have moved to dismiss for lack of standing. They claim

that Janssen lacks standing because it is not the sole owner of

the '083 Patent and the other co-owners have not joined Janssen as

plaintiffs as required by Section 262 of the Patent Act, 35 U.S.C.

§262. See Ethicon, Inc. v. U.S. Surgical Corp., 135 F.3d 1456,

1467 (Fed. Cir. 1998). In particular, defendants allege that the

inventors, in a series of employee secrecy agreements (the

"Agreements"), assigned the rights to the '083 Patent to more than

200 other companies, including Johnson and Johnson ("J&J") and its subsidiaries and affiliates.

The court, however, finds that the Agreements assigned the patent rights to Janssen's predecessor Centocor, Inc. ("Centocor") alone. Therefore, Janssen is the sole owner of the '083 Patent and is not required to join any other party to maintain this action. Accordingly, the motion to dismiss is being denied.

II. THE COMPLAINT AND PROCEDURAL HISTORY

    A. The Complaint

The facts as alleged in the complaint are as follows.

Janssen produces Remicade, a biologic medicine whose active ingredient is a monoclonal antibody called infliximab. See Compl. at ¶¶38. Growing the cells that produce biologic medicines like infliximab requires a composition called "cell culture media." Janssen alleges that it holds the '083 Patent. The patent claims a "soluble composition suitable for producing a final volume of cell culture media," and lists 61 ingredients in varying concentrations. Compl. Ex. A. It names as inventors David Epstein, Roger Monsell, Joseph Horowitz, Susan Lenk, Sadettin Ozturk, and Christopher Marsh. See id. Centocor, Janssen's predecessor, is named as the assignee. See id.

Celltrion produces a biosimilar to Remicade called Inflectra, which received Food and Drug Administration ("FDA") approval on April 5, 2016. See id. at ¶52. Third-party HyClone makes the cell

culture media that Celltrion uses to produce its biosimilar infliximab product. Id. at ¶7. Hospira collaborates with Celltrion to market Inflectra. See id. at ¶9. Plaintiff alleges that Celltrion infringes the '083 Patent by employing HyClone to manufacture the media under Celltrion's direction and control, and by inducing HyClone to infringe the patent.[1] See id. at ¶¶1, 101, 111. It alleges that Hospira is liable for Celltrion's actions as a joint venturer and induces Celltrion to infringe the patent by ordering Inflectra from it, among other things. See id. at ¶83.

B. Procedural History

On March 6, 2015, plaintiff initiated Civil Action No. 15-10698 (the "2015 Action") alleging, among other things, technical infringement of the '083 Patent under the Biologics Price Competition and Innovation Act.[2] On June 14, 2016, after obtaining

---

[1] A party is liable for direct infringement under 35 U.S.C. §271(a) when it "[a] acts through an agent (applying traditional agency principles) or [b] contracts with another" to do the infringing act. See Akamai v. Limelight Networks, 797 F. 3d 1020, 1022 (Fed. Cir. 2015). Induced infringement under §271(b) requires both an affirmative act that encourages infringement and specific intent: that is, "knowledge that the induced acts constitute patent infringement." Global-Tech Appliances, Inc. v. SEB S.A., 563 U.S. 754, 766 (2011).

[2] The complaint in the 2015 Action also alleged infringement of several related patents, including U.S. Patent No. 6,284,741 (the "'471 Patent"), which relates to the infliximab antibody that is the fundamental component of Remicade. On August 19, 2016, the court granted summary judgment for defendants on the claim concerning the '471 Patent on the ground that the '471 Patent is invalid. The court subsequently entered partial judgment, authorizing plaintiffs to appeal the grant of summary judgment.

more information in discovery, plaintiffs filed a second action alleging actual infringement of the '083 Patent under the Patent Act, 35 U.S.C. §271(a) and (b). The cases were consolidated and scheduled for trial beginning on February 13, 2017.

At a January 18, 2017 scheduling conference, the parties requested that the court address certain legal issues concerning the appropriate measure of damages and plaintiffs' entitlement to a permanent injunction if defendants were found to have infringed the '083 Patent. The court subsequently ordered the parties to file memoranda addressing these issues.

In their memorandum, defendants argued for the first time that Janssen failed to join all co-owners of the '083 Patent in either action and, therefore, lacked standing. In particular, defendants argued that four of the inventors of the '083 Patent had, in their Agreements with Centocor, assigned their rights to the '083 Patent not only to Janssen's predecessor, Centocor, but also to Janssen's parent, J&J, and all of J&J's subsidiaries and affiliates (together, the "J&J Family" of companies). As explained earlier, a plaintiff's failure to join all co-owners in an action for patent infringement requires dismissal without prejudice for lack of jurisdiction. See Ethicon, 135 F.3d at 1467.

On February 8, 2017, the court heard oral argument on the

---

That appeal is pending in the United States Court of Appeals for the Federal Circuit.

4

issue of standing and found that the Agreements, which did not clearly assign patent rights to Janssen's predecessor Centocor, raise serious questions concerning its jurisdiction. As the parties agreed, those questions required the postponement of trial to permit the filing of a motion to dismiss for lack of jurisdiction and limited additional discovery.

On February 22, 2017, plaintiffs filed a motion to dismiss the 2015 and 2016 Actions for lack of standing due to plaintiffs' alleged failure to join all co-owners of the '083 Patent. The parties conducted limited discovery in connection with that motion. On March 6, 2016, Janssen and J&J entered into an agreement that states that Janssen is the sole owner of the '083 Patent, and that neither J&J nor any of its operating companies ever owned any interest in the '083 patent. See C.A. No. 15-10698, Docket No. 521-7. Janssen filed that agreement on March 8, 2017 with its opposition to the motion to dismiss. See id.

On June 30, 2017, before briefing concerning the motion to dismiss was complete, the parties agreed to the dismissal of all of the claims for infringement of the '083 Patent in the 2015 Action and the complete 2016 Action, each without prejudice. See C.A. No. 15-10698, Docket No. 582 at 2-3.

On May 31, 2017, Janssen filed this case. Defendants again moved to dismiss, arguing that the court lacks jurisdiction unless Janssen joins each of the more than 200 members of the J&J Family

that defendants assert are co-owners of the '083 Patent. On October 13, 2017, the court heard oral argument on the motion.

III. LEGAL STANDARDS

A. <u>Motion To Dismiss for Lack of Subject Matter Jurisdiction</u>

The court must satisfy itself that it has subject-matter jurisdiction before the merits of this case can be decided. <u>See</u> <u>Steel Co. v. Citizens for a Better Env't</u>, 523 U.S. 83, 94-95 (1998). When, here, "the facts relevant to the jurisdictional inquiry are not intertwined with the merits of the plaintiff's claim...the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case." <u>Torres-Negron v. J & N Records</u>, LLC, 504 F. 3d 151, 163 (1st Cir. 2007); <u>see also DDB Techs., L.L.C. v. MLB Advanced Media, L.P</u>, 517 F.3d 1284, 1291-92 (Fed. Cir. 2008).

B. <u>Standing</u>

To establish that the court has subject matter jurisdiction, the plaintiff has the burden of proving by a preponderance of the evidence that it has standing to sue. <u>See Lujan v. Defenders of Wildlife</u>, 504 U.S. 555, 561 (1992).

One co-owner acting alone lacks standing and must "join as plaintiffs all co-owners" of the patent. <u>Ethicon</u>, 135 F.3d at 1467 (citing <u>Waterman v. Mackenzie</u>, 138 U.S. 252, 255 (1891)). In addition, any co-owners must ordinarily consent to join an infringement suit and cannot be joined involuntarily under Federal

Rule of Civil Procedure 19. See STC.UNM v. Intel Corp., 754 F.3d 940, 945-46 (Fed. Cir. 2014). In Ethicon, the Federal Circuit characterized this standing requirement as "a matter of substantive patent law," which gives "one co-owner...the right to impede the other co-owner's ability to sue infringers by refusing to voluntarily join in such a suit." 135 F.3d at 1468 (citing 35 U.S.C. §262). The rule protects alleged infringers from being subject to multiple lawsuits, and potentially conflicting rulings and judgments. See IpVenture, Inc. v. Prostar Computer, Inc., 503 F.3d 1324, 1325 (Fed. Cir. 2007) (citing Indep. Wireless Tel. Co. v. Radio Corp. of Am., 269 U.S. 459, 468 (1926)).

   C. Interpretation of Patent Assignments

   Patent owners may assign or transfer their ownership interests in a patent as personal property. See 35 U.S.C. §261. Section 261 provides that patents "shall be assignable in law by an instrument in writing" which may "take the form of a patent license or any other written instrument that transfers patent rights." Morrow v. Microsoft Corp., 499 F.3d 1332, 1337 n. 3 (Fed. Cir. 2007). "State law governs contractual obligations and transfers of property rights, including those relating to patents." Regents Of Univ. Of New Mexico v. Knight, 321 F.3d 1111, 1118 (Fed. Cir. 2003). "[The Federal Circuit] treats an agreement granting patent rights as a contract and interpret[s] its terms consistent with the choice of law provision in the agreement in

7

question." Diamond Coating Techs., LLC v. Hyundai Motor Am., 823 F.3d 615, 618 (Fed. Cir. 2016).

In this case, the relevant Agreements state that New Jersey law governs their terms. See Exhibit A to the Declaration of Kenneth Dow (Docket No. 27-1) at 3, 6, 10, and 14 of 15. In interpreting a contract under New Jersey law, the court must "discern and implement the common intention of the parties." McMahon v. City of Newark, 195 N.J. 526, 546 (2008). However, "a contracting party is bound by the apparent intention he outwardly manifests to the other contracting party. To the extent that his real, secret intention differs therefrom, it is entirely immaterial." Frangella v. Frangella, 2013 WL 4792863, at *5 (N.J. Super. Ct. App. Div. 2013). Therefore, the court's role is to "consider what is written in the context of the circumstances at the time of drafting and to apply a rational meaning in keeping with the expressed general purpose." McMahon, 195 N.J. at 546 (emphasis added). "The quest is for the reasonably certain meaning of the language used, taken as an entirety, considering the situation of the parties, the attendant circumstances, the operative usages and practices, and the objects the parties were striving to achieve." George M. Brewster & Sion, Inc. v. Catalytic Constr. Co., 17 N.J. 20, 32 (1954); accord Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014)("Courts enforce contracts based on the intent of the parties, the express terms of the contract,

surrounding circumstances and the underlying purpose of the contract.").

"When the terms of [a] contract are clear," the court must "enforce it as written and not...make a better contract for either of the parties," as "the parties are entitled to make their own contracts." McMahon, 195 N.J. at 545-46. A contract is not "clear" and is instead ambiguous "if its terms are susceptible to at least two reasonable alternative interpretations, or when it contains conflicting terms." Woodhaven Lumber & Millwork, Inc. v. Monmouth Design & Development Co., Inc., 2014 WL 1326994, at *6 (N.J. Super. Ct. App. Div. 2014); 5907 Blvd. L.L.C. v. W. N.Y. Suites, L.L.C., 2013 WL 3762695, at *4 (N.J. Super. Ct. App. Div. 2013). If the contract is ambiguous, the court must give the contracting "parties' practical construction of the contract...controlling weight in determining a contract's interpretation." Cty. of Morris v. Fauver, 153 N.J. 80, 103 (1998).

"To determine whether a contract is ambiguous," and "to discover the intention of the parties," courts may consider evidence outside the text of the contract. Frangella, 2013 WL 4792863, at *5 (citing Conway v. 287 Corp. Ctr. Assocs., 187 N.J. 259, 268-69 (2006)). Such extrinsic evidence includes "the circumstances leading up to the formation of the contract, custom, usage, and the interpretation placed on the disputed provision by the parties' conduct." Conway, 187 N.J. at 268-69.

The use of extrinsic evidence to determine whether a contract is ambiguous, as well as to resolve ambiguity once it is found, is consistent with federal common law. See Frangella, 2013 WL 4792863 at *5 (citing In re Teamsters Indus. Emp. Welfare Fund, 989 F.2d 132, 135 (3d Cir. 1993)). In In re Teamsters, the Third Circuit explained that under "traditional rules of contract interpretation:"

> To decide whether a contract is ambiguous, we do not simply determine whether, from our point of view, the language is clear. Rather, we hear the proffer of the parties and determine if there [are] objective indicia that, from the linguistic reference point of the parties, the terms of the contract are susceptible of different meanings. Before making a finding concerning the existence or absence of ambiguity, we consider the contract language, the meanings suggested by counsel, and the extrinsic evidence offered in support of each interpretation. See also Restatement (Second) of Contracts §223 cmt. b (1981)("There is no requirement that an agreement be ambiguous before evidence of a course of dealing can be shown, nor is it required that the course of dealing be consistent with the meaning the agreement would have apart from the course of dealing"). Extrinsic evidence may include the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning.

989 F. 2d at 135 (citations omitted).

In Atl. N. Airlines v. Schwimmer, the New Jersey Supreme Court cautioned that even though extrinsic evidence of the parties' intent may reveal and resolve ambiguity in the contractual language, the court may not use such evidence to rewrite a contract whose terms are clear:

> The admission of evidence of extrinsic facts <u>is not for the purpose of changing the writing</u>, but to secure light by which to measure its actual significance. Such evidence is adducible only for the purpose of interpreting the writing--not for the purpose of modifying or enlarging or curtailing its terms, but to aid in determining the meaning of what has been said. So far as the evidence tends to show, not the meaning of the writing, but an intention wholly unexpressed in the writing, it is irrelevant.

12 N.J. 293, 301 (1953); <u>see also</u> <u>Cnty. Of Morris</u>, 153 N. J. at 103 ("Where both parties to a contract have erred in the construction of that contract, courts will generally not require that the parties continue in that mistaken construction, but will instead insist on a return to the written provisions of the contract.").

Nevertheless, the contractual text "should not be construed [so] literally...as to defeat the probable intention of the parties; rather, particular words or clauses may be qualified by the context and given the meaning that comports with the probable intention." <u>Kolbe v. BAC home Loans Servicing, LP</u>, 738 F. 3d 432, 439-40 (1st Cir. 2013)(quoting <u>Simonson v. Z Cranbury Assocs. P'ship</u>, 149 N.J. 536, 540 (1997)). "Semantics cannot be allowed to twist and distort [the words'] obvious meaning in the minds of the parties." <u>Conway</u>, 187 N.J. at 269-70. Similarly, "words and phrases are not to be isolated but related to the context and the contractual scheme as a whole, and given the meaning that comports with the probable intent and purpose; and thus the literal sense

of terms may be qualified by the context." <u>Newark Publishers' Ass'n</u>

<u>v. Newark Typographical Union, No. 103</u>, 22 N.J. 419, 426 (1956).

    IV.   THE CONTRACTS AT ISSUE

    Four of the inventors of the '083 Patent, Epstein, Marsh,

Monsell, and Ozturk executed the Agreements at issue during their

employment with Centocor and before the '083 Patent issued.[3] The

Agreements are Exhibit A to the declaration of Kenneth Dow (Docket

No. 27-1).[4]

    All   the   Agreements   contain   an   assignment   provision

identifying "the COMPANY" as the assignee of inventions conceived

in  the  course  of  the  inventor's  employment.  The  assignment

provisions are identical and state, in relevant part:

> <u>I agree to disclose promptly to the COMPANY all</u>
> <u>INVENTIONS</u>[5] <u>conceived  or  made  by  me</u>...<u>during my</u>
> <u>employment with the COMPANY</u>, and related to the actual
> or anticipated business or activities of the COMPANY, or
> related  to  its  actual  or  anticipated  research  and

---

[3] The parties do not dispute that plaintiffs have demonstrated a
chain of title between Centocor and Janssen, and consequently that
anything previously assigned to Centocor is owned by Janssen. The
parties also do not dispute, and the court finds, that Joseph
Horowitz and Susan Lenk assigned their rights to the '083 Patent
to Janssen. <u>See</u> C.A. No. 15-10698 Docket Nos. 452-3, 452-6, and
495 at 31.

[4] The parties agreed at the October 13, 2017 hearing that Epstein's
agreement is sufficiently representative of the others to be used
for  the  purposes  of  deciding  the  motion  to  dismiss.  Unless
otherwise  noted,  all  citations  to  the  "Agreement"  refer  to
Epstein's Agreement in Exhibit A to Dow's declaration.

[5] "INVENTIONS"  are  identically  defined  in  each  contract  as
"discoveries,  improvements  and/or  ideas,  whether  patentable  or
not." Dow Decl. Ex. A at 2 of 15.

development or suggested by or resulting from any task assigned to me or work performed by me for, or on behalf of, the COMPANY. <u>I assign and agree to assign my entire right, title and interest therein to the COMPANY</u>.

Dow Decl. Ex. A at 2, 4, 8, and 12 of 15 (emphasis added).

Each of the Agreements includes the following provision regarding the meaning of the term "the COMPANY":

> As used in this Agreement:
>
> The COMPANY means CENTOCOR[6] and JOHNSON & JOHNSON and any of their successors or assigns, purchasers, acquirers, and any of their existing and future subsidiaries, divisions or affiliates, including any such subsidiary, division or affiliate of Johnson & Johnson to which I may be transferred or by which I may be employed in the future. Affiliates of the COMPANY are any corporation, entity or organization at least 50% owned by the COMPANY, by Johnson & Johnson or by any subsidiary of Johnson & Johnson.

<u>Id.</u>

The term "the COMPANY" is used throughout the Agreements, including in several confidentiality and non-compete provisions. For example, the confidentiality provision in each Agreement states that the inventors:

> recognize that CONFIDENTIAL INFORMATION is of great value to the COMPANY...and that the disclosure to anyone not authorized to receive such information...will cause immediate irreparable injury to the COMPANY. Unless I first secure the COMPANY's written consent, I will not disclose, use, disseminate, lecture upon or publish CONFIDENTIAL INFORMATION. I understand and agree that my obligations not to disclose, use, disseminate, lecture

---

[6] The Marsh and Ozturk agreements contain a comma here. However, the court does not consider this difference material to its conclusions.

upon or publish CONFIDENTIAL INFORMATION shall continue after termination of my employment for any reason.

Id. at ¶5. Epstein and Monsell's Agreements define "CONFIDENTIAL INFORMATION" to include "information disclosed to me or known by me as a result of my employment by the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, about the products, processes, technologies, machines, customers, clients, employees, services and strategies of the COMPANY." Dow Decl. at 2 & 4 of 15. The Agreements of Ozturk and Marsh contain definitions that are identical in all material respects.[7] Id. at 8 & 12 of 15.

V.   ANALYSIS

As indicated earlier, the Agreements assign patent rights, which include the rights to the '083 Patent, to "the COMPANY," which is defined, in pertinent part, as (1) Centocor "and" (2) J&J, "and" (3) "any" of the J&J Family Companies, "including any" company in the J&J Family which may employ the inventor in the future. Defendants argue that this language assigns the rights to the '083 Patent not just to Centocor, but to J&J and the entire J&J Family, which includes more than 200 companies. Janssen

---

[7] Ozturk's and Marsh's Agreements protect information "of affiliates of the COMPANY," see Dow Ex. A at 8, 12 of 15, which Janssen has argued implies that "the COMPANY" at least sometimes excludes J&J affiliates. However, because the reference to "affiliates" does not appear in Epstein or Monsell's Agreements, the court is not relying on it.

contends that, in the context of the assignment provision, "the COMPANY" means the entity that employed the inventor when he or she "conceived or made" the invention--in this case Centocor.

The court finds that "the express terms of the contract" are ambiguous, and Janssen's interpretation is most consistent with "the intent of the parties" as discerned from the "surrounding circumstances." Manahawkin, 217 N.J. at 118. In particular, the "the interpretation placed on the [assignment] provision by the...conduct" of the inventors, Janssen, and the rest of the J&J Family manifest their intent to assign the '083 Patent to Centocor, and therefore Janssen, alone. Conway, 187 N.J. at 268-69.

The Agreements are poorly drafted and do not clearly identify the intended assignee of the rights at issue. The assignee, "the COMPANY," is defined to include not only Centocor, but also J&J and "any" of the J&J Family Companies. "Any" may have at least two meanings. The parties agree that "any" sometimes means "all" or "every." For example, "Any attempt to flout the law will be punished," or "You are required to produce any documents relating to the issue." See Bryan A. Garner, Garner's Modern Usage (3d Ed. 2009) at 52 (2015 Action Docket No. 521-2) ("Garner"). However, "in a sentence implying that a selection or discretionary act will follow, it may mean 'one or more (unspecified things or people); whichever; whatever,'" to be specified later. Garner at 52; see also First Bank & Trust v. Firstar Info. Servs. Corp., 276 F.3d

317, 325 (7th Cir. 2001); Black's Law Dictionary 94 (6th ed. 1990)). In the definition of "the COMPANY," "any" J&J Family Company could reasonably be construed to mean "one or more" such companies, to be specified further in another provision. Moreover, the assignment provision, which refers to "inventions conceived or made by me during my employment with the COMPANY," implies that "the COMPANY" means the inventor's employer.

Even if "any" means "one or more," "the COMPANY" is still defined as "Janssen and J&J and any [J&J Family Company]." Agreement at 1 (emphasis added). Interpreted literally, therefore, the term "the COMPANY" includes at least two entities--Janssen and J&J. As defendants argue, "if the drafter wanted "COMPANY" to mean only the employer or subsequent employers," and not to include J&J, he "could have easily done so in just those words..." Defs' Memo. at 10 (citing Assisted Living Assocs. of Moorestown, L.L.P. v. Moorestown Twp., 31 F. Supp. 2d 389, 400 (D.N.J. 1998)).

However, if "the COMPANY" means Centocor and J&J, at minimum, this definition conflicts with the meaning implied in various other provisions of the agreement. The last sentence of the definition of "the COMPANY" defines "affiliates of the COMPANY" to mean "any corporation, entity or organization at least 50% owned by the COMPANY, by Johnson & Johnson or by any subsidiary of Johnson & Johnson." Agreement at 1. This definition of "affiliates" suggests that "the COMPANY" does not include J&J and its subsidiaries, or

always include them. If "the COMPANY" included, or always included, J&J and its subsidiaries, the clause could have easily ended at "the COMPANY," to read "any corporation, entity or organization at least 50% owned by the COMPANY."

Interpreting the "the COMPANY" to include J&J and its subsidiaries would render the additional references to those entities redundant and violate the "cardinal principle that each term of a contract should be given meaning so that no term is superfluous." Dubrosky v. Colonial Life & Acc. Ins. Co., 129 F. App'x 691, 693 (3d Cir. 2005). Contracts, like statutes, are sometimes drafted with redundancy to remove doubt or potential ambiguity. See TMW Enter., Inc. v. Fed. Ins. Co., 619 F.3d 574, 578 (6th Cir. 2010); cf. Marx v. General Revenue Corp., 133 S. Ct. 1166, 1176 (2013). However, in this case, the definition of affiliates does not remove any ambiguity. Rather, by including the reference to J&J and its subsidiaries, the drafters did not use obvious alternative language that would have made the definition of "the COMPANY" more clear and consistent with defendants' interpretation of the contract. Cf. Advocate Healthcare Network v. Stapleton, 137 S. Ct. 1652, 1659 (June 5, 2017) ("When legislators do not adopt 'obvious alternative' language, 'the natural implication is that they did not intend' the alternative."). Therefore, the reference to J&J and its subsidiaries in the

definition of "affiliates" creates ambiguity rather than resolving it.

In addition, as indicated earlier, in the assignment provision, the employee agrees to assign to "THE COMPANY" any invention made by the employee "during [his] employment with the COMPANY." See Agreement at 1. The inventors were employed only by Centocor. See Dow Decl. Ex. B at 4 of 26. Defendants do not contend that they had an employment relationship with J&J, or that the Agreements created one. Therefore, while the first sentence of the definition of "the COMPANY" literally includes both Centocor and J&J, the language of the assignment provision suggests that the term "the COMPANY" means only the inventor's employer.

As the literal definition of "the COMPANY" conflicts with the sense in which the term is used in at least two provisions of the contract, including the assignment provision, the term is ambiguous. See Woodhaven Lumber, 2014 WL 1326994, at *6; 5907 Blvd. L.L.C., 2013 WL 3762695, at *4. In view of the conflicting provisions, this ambiguity is not created by a "tortured" reading of the language. 259 Holdings Co., LLC v. Union Dry Dock & Repair Co., 2007 WL 3274272, at *3 (N.J. Super. Ct. App. Div. Nov. 7, 2007). Rather, conflicting language in the Agreement makes it ambiguous.

As explained earlier, when a contract's written terms are ambiguous, the contracting parties' common understanding of the

agreement has "controlling weight." Cnty. of Morris, 153 N.J. at 103. "Where there is no dispute between the contracting parties about which of two reasonable interpretations of their agreement is correct, the parties' shared understanding...govern[s]--barring some collateral reason to depart from ordinary principles." Kolbe, 738 F. 3d at 459. The parties' "shared understanding" can be determined from the parties' "custom[s]" and "the interpretation placed on the disputed provision by the parties' conduct" concerning the agreement. Conway, 187 N.J. at 268-69.

The extrinsic evidence establishes that the inventors, Janssen, and the other companies in the J&J Family understand the Agreements to have assigned the '083 Patent to Centocor, and therefore to Janssen, alone. Janssen customarily treats patent rights as being owned only by the inventor's employer, rather than by J&J or the entire J&J Family. Janssen's patent databases show that all of its patents are assigned either to Janssen alone or to Janssen and one other entity that was involved in the invention. See Dow Decl. Ex. I. In addition, J&J's lead employment counsel, Anne Martinson, revised J&J's standard employment agreement in 2008, before this litigation began, to provide clearly that inventions are assigned only to the inventor's employer. See Martinson Dep. at 154-155. She used three terms: (1) "COMPANIES," defined as "all" J&J Family companies; (2) "COMPANY," defined as "any of the COMPANIES;" and (3) "EMPLOYER," defined in Centocor

agreements as Centocor "or, if applicable, any other COMPANY by which you are (or were) employed at the time an issue arises under this agreement." Def. Ex. 10 (Sealed Docket No. 18-5) at 2 of 8. Patent rights are assigned to the inventor's "EMPLOYER" rather than to the "COMPANY" as they were in the pre-2008 version of the standard agreement. Id. at 3 of 8. The confidentiality provision covers "information about the business of any COMPANY." Id. at 3-4 of 8. Martinson testified that these changes reflected J&J's custom. See Martinson Dep. at 154-55, 182.

The practices of one contracting party in performing a contract are not always consistent with the parties' shared intent. For example, in Gabriel v. Jackson Life Ins. Co., this court found that an insurance company's consistent practice of "overstating the premium payments necessary to keep coverage in force" was a breach of contract and a violation of Massachusetts General Laws, Chapter 93A. See 2015 WL 1410406, at *1, 11, 18 (D. Mass. Mar. 26, 2015).

In this case, however, the evidence demonstrates that both parties shared a common understanding. More specifically, the evidence regarding the inventors' intent shows that they, like Centocor and Janssen, understood the Agreements to have assigned patent rights, including the rights to the '083 Patent, to Centocor alone. First, the '083 Patent states that the assignee is "Centacor, Inc." and does not include J&J or other members of the

J&J Family. Compl. Ex. A. Second, as indicated earlier, the Agreements required the inventors "to disclose promptly" to "the COMPANY all INVENTIONS conceived or made by me...during my employment with the COMPANY." Agreement at ¶1. The inventors of the '083 patent complied with this disclosure obligation by submitting an invention disclosure to Centocor alone in May 2004. Dow Decl. Ex. B. The disclosure is on Centocor letterhead, is addressed to Kenneth Dow in his capacity as "V.P. Patent Law, Centocor," states that it is "Centocor confidential information," and identifies the inventors as Centocor employees. See id. Third, the Agreement also required that the employees "execute any applications, assignments or other instruments which the COMPANY shall consider necessary to apply for and obtain Letters Patent." Agreement at ¶3. The inventors executed several such assignments to Centacor or Janssen alone, and never to J&J or any other company in the J&J Family. This indicates that they understood their obligations to be only to Centocor or Janssen. Dow Decl. Exs. C-H.

Finally, there is no evidence that the other members of the J&J Family, which under defendants' interpretation would be intended beneficiaries of the Agreements as assignees, have ever asserted any rights to the '083 Patent or any invention conceived by the inventors. J&J and companies in its Family were on notice that the '083 Patent stated that Centocor was the only assignee.

According to Janssen's patent database this was consistent with the practice concerning inventions by employees of Centocor or Janssen. See Dow Decl. Ex. I. As explained earlier, J&J recently entered into an agreement with Janssen stating that it "has never asserted any ownership rights in the '083 patent..." and that none of the J&J Family of Companies "has or will assert any ownership rights to the '083 patent." C.A. No. 15-10698, Docket No. 521-7. Defendants have not presented any evidence rebutting these assertions.

As defendants argue, in at least eleven other cases, J&J and/or other companies in the J&J Family have interpreted "the COMPANY," as used in the confidentiality and non-compete provisions of similar or identical agreements, to include J&J and/or certain of its subsidiaries. See App'x A to Def. Memo (Docket No. 18-1); App'x C to Def. Supp. Br. (Docket No. 52-1). As indicated earlier, the confidentiality provision protects information "disclosed to [the employee] as a result of [his] employment with the COMPANY, not generally known to the trade or industry in which the COMPANY is engaged, about the products, processes, technologies, machines, customers, clients, employees, services and strategies of the COMPANY" disclosure of which it asserts "will cause immediate irreparable injury to the COMPANY." Agreement at 1 & ¶5. In these cases, J&J and/or J&J Family companies in addition to the employer alleged that their

confidential information was protected under these provisions and that they were entitled to enforce them. App'x A to Def. Memo (Docket No. 18-1); App'x C to Def. Supplemental Br. (Docket No. 52-1). The positions taken in these cases provide some support for defendants' assertion that "the COMPANY" as used in the Agreements means more than just Centocor.

Defendants argue that because Janssen's parent company has adopted this interpretation of "the COMPANY" in one section of the contract, Janssen cannot claim that it has a different meaning in the assignment provision. The "principle[] of statutory construction is that identical words used in different parts of the same act are intended to have the same meaning" is "equally applicable" to a contract, "particularly when the contract under consideration is [] clearly the product of careful lawyering on both sides." Celanese Ltd. v. Essex Cty. Improvement Auth., 962 A.2d 591, 601 (N.J. Super. Ct. App. Div. 2009). However, in this case there is no evidence that the inventors had counsel or that the Agreements were the result of careful lawyering. Rather, the court finds that they were poorly drafted. In any event, "the presumption of consistent usage 'readily yields' to context, and a statutory [or contractual] term--even one defined in the statute [or contract] --may take on distinct characters from association with distinct statutory [or contractual] objects calling for different implementation strategies." Util. Air Regulatory Group

v. EPA, 134 S. Ct. 2427, 2441 (2014); see also Robinson v. Shell Oil Co., 519 U.S. 337, 343-44 (1997). As explained earlier, the language of assignment provision and the extrinsic evidence persuades the court that, at least for the purposes of patent assignments, "the COMPANY" means only Centocor and its successor Janssen.

Assuming, without finding, that "the COMPANY" should be given a single consistent meaning throughout the Agreement, the positions taken by J&J and/or companies in its Family in the other cases do not compel the conclusion that the term refers to all of the companies in the J&J Family. Those suits were brought by J&J or J&J subsidiaries other than Janssen. The positions of companies in the J&J Family other than Janssen in other cases is not necessarily inconsistent with Janssen's position in this case. As indicated earlier, the other cases were brought to enforce provisions protecting "CONFIDENTIAL INFORMATION," or secret information "disclosed to [the employee] as a result of [his] employment with the COMPANY...about the products, processes, technologies, machines, customers, clients, employees, services and strategies of the COMPANY." Agreement at 1. This definition can be reasonably interpreted to cover information that also belongs to J&J Family companies in addition to the employer. Such information could include information about the employer's

products that also belongs to a company in the J&J Family company which jointly developed the product.

Indeed, this was alleged to be the case in DePuy Spine, Inc. and Johnson and Johnson Regenerative Therapies v. Stryker Biotech LLC and Joseph Ross, Suffolk Super. Ct. C.A. No. 07-1464 (Docket No. 15-3 at 9-10). In DePuy Spine, the plaintiffs were two companies in the J&J Family--DePuy Spine, which was the individual's employer, and another company, JJRT. It was alleged that "DePuy Spine's product development work is performed by [plaintiff non-employer] JJRT," which "works in partnership with the J&J operating companies, performing the research and development work necessary to bring products through FDA or other required regulatory approval." Id. The plaintiffs in DePuy Spine cited the "broad[]" definition of "CONFIDENTIAL INFORMATION" to support their assertion that the Agreements protected information about products that DePuy and JJRT were jointly developing and strategies concerning those products. Id. at 8, 10-16. Therefore, the position of the other companies that the Agreements protect their confidential information, as well as the employer's, is not necessarily inconsistent with Janssen's position that "the COMPANY" means only the employer. In any event, the conduct of other companies concerning other cases is not evidence of Janssen's customary practice or intent concerning the Agreement.

Finally, while defendants identified eleven cases in which a company in addition to the individual's employer brought suit, Janssen has presented unrebutted testimony that the vast majority of the suits seeking to enforce similar or identical employment agreements have been brought only on behalf of the individual's employer. See Martinson Dep. at 354-55.[8]

In view of the forgoing, the court finds that the contracting parties' subsequent actions resolve the ambiguity in the assignment of patents provision and, for the purposes of that provision, "the COMPANY" means Centocor alone. While this conclusion is in tension with the literal definition of "the COMPANY," which refers to Centocor "and" J&J, a "[d]isproportionate emphasis upon a word or clause or a single provision does not serve the object of interpretation." Borough of W. Caldwell, 138 A.2d at 410. Particular "words or clauses" in the text "should not be construed literally...as to defeat the probable

---

[8] In addition, defendants have submitted two letters written by Janssen's Human Resources Manager, on behalf of Janssen, to two departing employees. In them, Janssen writes that the employee secrecy agreements created confidentiality obligations to "the Johnson and Johnson family of companies." See Defs. Exs. 10 & 11 (Docket Nos. 18-5 & 18-6). However, the positions in these letters are also not necessarily inconsistent with Janssen's position here because, as explained earlier, the confidentiality provisions can be reasonably interpreted to protect the information of other companies in the J&J family. In any event, the evidence in favor of Janssen's interpretation outweighs any inference that can be drawn from these two non-public letters to particular employees.

intention of the parties; rather, [they] may be qualified by the context and given the meaning that comports with the probable intention." Simonson, 149 N.J. at 540. In light of the extrinsic evidence that the inventors, Centocor, and J&J each understood the ambiguous Agreements to assign patent rights solely to Centocor, the court finds that Janssen is the only owner of the '083 Patent. Therefore, the court has jurisdiction concerning this case. See Ethicon, 135 F.3d at 1467.

This conclusion is not, as defendants argue, altered by the doctrine of judicial estoppel. "As a general matter, the doctrine of judicial estoppel prevents a litigant from pressing a claim that is inconsistent with a position taken by that litigant either in a prior legal proceeding or in an earlier phase of the same legal proceeding." InterGen N.V. v. Grina, 344 F.3d 134, 144 (1st Cir. 2003) (citing Pegram v. Herdrich, 530 U.S. 211, 227 n.8 (2000)) (emphasis added). "The doctrine is designed to ensure that parties proceed in a fair and aboveboard manner, without making improper use of the court system." Id. (citing New Hampshire v. Maine, 532 U.S. 742, 749-50 (2001)). "The contours of the doctrine are hazy, and there is no mechanical test for determining its applicability." Alternative System Concepts, Inc. v. Synopsys, Inc., 374 F.3d 23, 33 (1st Cir. 2004). "Because the rule is intended to prevent improper use of judicial machinery judicial estoppel is an equitable doctrine invoked by a court at its

discretion." <u>New Hampshire v. Maine</u>, 532 U.S. 742, 749-51 (2001) (internal quotation marks and citation omitted).

The Supreme Court has identified three factors that courts should consider in determining whether to exercise this discretion:

> First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled...A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

<u>Id.</u> (citations omitted). The Court cautioned, however, that "[i]n enumerating these factors, we do not establish inflexible prerequisites or an exhaustive formula for determining the applicability of judicial estoppel. Additional considerations may inform the doctrine's application in specific factual contexts." <u>Id.</u>

It is doubtful that the doctrine of judicial estoppel is relevant in this case. Neither Janssen nor Centocor was a party to any of the eleven prior suits on which defendants rely to invoke the doctrine. "[A] party against whom judicial estoppel is invoked, typically, must be the same party who made the prior inconsistent representation." <u>Knowlton v. Shaw</u>, 704 F.3d 1, 10 (1st Cir. 2013).

28

The First Circuit has recognized, however, that "courts sometimes have allowed judicial estoppel when the estopped party was responsible in fact for the earlier representation or when the estopped party was the assignee of a litigation claim or assumed the original party's role." Perry v. Blum, 629 F.3d 1, 9 (1st Cir. 2010) (internal citations omitted). In this case there is no evidence that Janssen, rather than J&J or other companies in its Family, was "responsible in fact" for the positions taken by other companies in other cases. Nor is Janssen the assignee of any of the litigation claims on which defendants rely.

Nevertheless, defendants contend that the doctrine is applicable because there is evidence that Janssen's parent company, J&J, is controlling Janssen in this litigation and also controls all litigation concerning similar or identical employment agreements brought by companies in the J&J Family, including the eleven prior cases on which defendants rely. Most of the authority defendants cite in support of this proposition, however, is inapposite. For example, several of the cases that defendants cite involve situations in which the estopped party was the legal successor to the party that had taken an inconsistent position in a prior litigation. See, e.g., Milton H. Greene Archives, Inc. v. Marilyn Monroe LLC, 692 F.3d 983, 998 (9th Cir. 2012) (estopped party was beneficiary of estate whose executor had taken

inconsistent position in prior litigation).[9]  Another case cited by defendants involve an estopped party that had controlled the prior litigation. See, e.g., Lia v. Saporito, 541 F. App'x 71, 73 (2d Cir. 2013) (estopped party was sole owner of entity that took inconsistent position in prior case).

There are some cases in which a party has been estopped because it was controlled by an entity that took the inconsistent position in the prior case. See Patriot Mfg. LLC v. Hartwig, Inc., 996 F. Supp. 2d 1120, 1127 (D. Kan. 2014) (estopped party was controlled by entity that took inconsistent position in earlier litigation); Raizberg v. JV CJSC Gulfstream Sec. Sys., 2013 WL 1245545, at *6 (S.D.N.Y. Mar. 26, 2013) (estopped party was owned by individual who took inconsistent position).[10]  Neither of these

---

[9] See also Mathison v. Berkebile, 988 F. Supp. 2d 1091, 1103 (D.S.D. 2013) (warden estopped because of inconsistent position taken by warden who had preceded him); Nat'l Union Fire Ins. Co. v. Allfirst Bank, 282 F. Supp. 2d 339, 348 (D. Md. 2003) (subrogee was estopped because subrogor took inconsistent position in prior litigation); Capsopoulos on Behalf of Capsopoulos v. Chater, No. 95 C 3274, 1996 WL 717456, at *2 (N.D. Ill. Dec. 9, 1996) (party seeking social security survivor benefits estopped by inconsistent position taken by decedent); In re 815 Walnut Assocs., 183 B.R. 423, 431-32 (Bankr. E.D. Pa. 1995) (assignee of claim estopped because owners of assignor took inconsistent position in prior litigation).

[10] Defendants also cite Ladd v. ITT Corp., 148 F.3d 753 (7th Cir. 1998) in support of their "controlling" entity argument.  That case, however, held that judicial estoppel did not apply to the defendants because they were not parties in the prior litigation, even if the doctrine's purpose would be served if it were applied. Id. at 756.

district court decisions in other circuits are consistent with the only two situations in which the First Circuit has held that judicial estoppel may apply to litigants that were not parties in the prior cases: "when the estopped party was responsible in fact for the earlier representation or when the estopped party was the assignee of a litigation claim or assumed the original party's role." Perry, 629 F.3d at 9 (internal citations omitted).

Defendants cite only a single First Circuit case, In re Colonial Mortg. Bankers Corp., 324 F.3d 12 (1st Cir. 2003), in support of their argument that Janssen may be estopped based on positions taken by J&J. That case, however, concerned res judicata, not judicial estoppel. Id. at 16. The court held that res judicata could apply to a litigant that was not a party to the prior litigation. Id. at 17. However, the court based its holding on the fact the estopped party and the party in the prior litigation "were treated as a single entity throughout the earlier litigation, and neither of them disputed that characterization." Id. No similar circumstances exist here or in any of the eleven prior lawsuits relied upon by defendants. In re Colonial Mortg. Bankers Corp. is, therefore, inapposite.

Even if Janssen could be estopped by the positions taken by J&J or other companies in its Family in other cases, the court would not find the requirements for estoppel to be satisfied. Janssen's position that, for the purpose of the assignment

provision, "the COMPANY" means the "Employer" is not "clearly inconsistent" with the positions taken by J&J affiliates concerning non-compete and confidentiality provisions in other cases. Perry, 629 F.3d at 9. Nor have defendants shown that any court adopted or relied upon a previous inconsistent position concerning the assignment provision asserted by a company in the J&J Family. Id. at 11-12. In view of these facts and the fact that Janssen was not a party in the other cases, Janssen will not derive an unfair advantage if not estopped. See RFF Family P'ship, LP v. Ross, 814 F.3d 520, 528 (1st Cir. 2016).

Moreover, judicial estoppel is an equitable, discretionary doctrine. See New Hampshire, 532 U.S. at 750 (internal citations omitted); Guay, 677 F.3d at 16 (1st Cir. 2012) (internal citations omitted). The court finds that even if it had discretion, the equities do not favor finding Janssen is estopped from asserting it is the sole owner of the '083 Patent. This case concerns the enforcement of patent rights that are evidently worth hundreds of millions of dollars. Patent rights encourage innovation and, therefore, serve an important public interest. It would not be equitable to estop Janssen from pursuing its patent claims because of any inconsistent positions taken by other companies in the J&J Family in employment cases brought against different defendants and concerning contract provisions that are not at issue in this case.

The final issue raised by the parties relates to the March 6, 2017 agreement between J&J and Janssen. As previously discussed, that agreement states that neither J&J nor any company in the J&J Family has ever had an ownership interest in the '083 Patent. See C.A. No. 15-10698 Docket No. 521-7. Janssen argues that this "disclaimer" provides an independent basis to find that it has standing as the sole owner of the '083 Patent.

This issue is moot in view of the court's decisions that the Agreements assigned the '083 Patent to Centocor alone, and that Janssen is not estopped from advocating this conclusion. In the interest of completeness, however, the court finds Janssen's argument unmeritorious.  The Federal Circuit has never held that co-owners of a patent are not required to be joined as plaintiffs if they disclaim their interest in the patent. Janssen relies primarily on IpVenture, Inc. v. Prostar Computer, Inc., 503 F.3d 1324 (Fed. Cir. 2007). IP Venture involved the question of whether a contract was an assignment of a patent or an agreement to assign it. See id. at 1325-26. The Federal Circuit held that the contract was an agreement to assign. See id. at 1327. The court further found that this interpretation was "reinforced" by a statement made by the purported assignee that it never had any legal or equitable rights to the patent at issue. Id. Therefore, the court in IP Venture essentially considered the disclaimer as extrinsic evidence supporting its interpretation of the agreement at issue.

IP Venture does not provide an alternative basis for finding that Janssen has standing to bring this cases because the Agreements assigned the '083 Patent to its predecessor Centocor alone.

   VI.   CONCLUSION

   In view of the foregoing, the court finds that the Agreements assigned the inventors' patent rights to Centocor only. Janssen, therefore, is the sole owner of the '083 Patent and has standing to bring this case. The doctrine of judicial estoppel does not alter this conclusion.  While the court finds that the March 6, 2017 agreement between J&J and Janssen does not provide a basis for finding that Janssen has standing, that issue is moot.

   In view of the forgoing, it is hereby ORDERED that defendants' Motion to Dismiss (Docket No. 13) is DENIED.


                              _____
                              UNITED STATES DISTRICT JUDGE