# Exhibit 31

1

2                    UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF MASSACHUSETTS

3

4                                        )
    JANSSEN BIOTECH, INC.,               )
5   and NEW YORK UNIVERSITY,             )
                                         )
6          Plaintiffs,                   )
                                         )              Civil Action
7   v.                                   )              No. 17-11008-MLW
                                         )
8   CELLTRION HEALTHCARE CO.,            )
    LTD, CELLTRION, INC., and            )
9   HOSPIRA, INC.,                       )
                                         )
10         Defendants.                   )
                                         )

11

12

13              BEFORE THE HONORABLE MARK L. WOLF
                  UNITED STATES DISTRICT JUDGE

14

15              TRANSCRIPT OF MOTION HEARING

16
                                   FEBRUARY 16, 2018
17

18
           John J. Moakley United States Courthouse
19                    Courtroom No. 10
                     One Courthouse Way
20            Boston, Massachusetts  02210

21

22
              DEBRA M. JOYCE, RMR, CRR, FCRR
23                 Official Court Reporter
               John J. Moakley U.S. Courthouse
24              1 Courthouse Way, Room 5204
                    Boston, MA  02210
25                 joycedebra@gmail.com

```
 1   APPEARANCES:

 2   ON BEHALF OF PLAINTIFFS:

 3   GREGORY L. DISKANT, ESQ.
     BENJAMIN F. JACKSON, ESQ.
 4   A. ROBERT QUIRK, ESQ.
     Patterson, Belknap, Webb & Tyler LLP
 5   1133 Avenue of the Americas
     New York, NY 10036
 6   212-336-2710
     gldiskant@pbwt.com
 7
     ALISON CASEY, ESQ.
 8   Nutter McLennen & Fish LLP
     155 Seaport Boulevard
 9   Boston, MA 02210
     617-439-2192
10   hrepicky@nutter.com

11   ON BEHALF OF DEFENDANTS:

12   CHARLES B. KLEIN, ESQ.
     Winston & Strawn, LLP
13   1700 K Street, N.W.
     Washington, DC 20006
14   202-282-5000
     cklein@winston.com
15
     BRYAN S. HALES, ESQ.
16   ELIZABETH CUTRI, ESQ.
     Kirkland & Ellis LLP
17   300 North LaSalle
     Chicago, IL 60654
18   312-862-2000
     james.hurst@kirkland.com
19
     ANDREA L. MARTIN, ESQ.
20   DENNIS J. KELLY, ESQ.
     Burns & Levinson LLP
21   125 Summer Street
     Boston, MA 02110
22   617-345-3000
     amartin@burnslev.com
23

24

25
```

```
 1    (APPEARANCES CONT'D)

 2    EDGAR H. HAUG, ESQ.
      SANDRA KUZMICH, ESQ.
 3    Haug Partners LLP
      745 Fifth Avenue
 4    New York, NY 10151
      212-558-0800
 5    ehaug@haugpartners.com

 6    JOSHUA S. BARLOW, ESQ.
      Haug Partners LLP
 7    One Post Office Square
      Boston, MA 02109
 8    617-377-7714
      jbarlow@haugpartners.com
 9
      JENNY A. SHMUEL, ESQ.
10    Fish & Richardson, P.C.
      One Marina Park Drive
11    Boston, MA 02210-1878
      617-521-7045
12    shmuel@fr.com

13    JOHN C. ADKISSON, ESQ.
      Fish & Richardson PC
14    3200 RBC Plaza
      60 South Sixth Street
15    Minneapolis, MN 55402
      612-335-5070
16    adkisson@fr.com

17    BRUCE M. GAGALA, ESQ.
      Leydig, Voit & Mayer, LTD.
18    Two Prudential Plaza, Ste. 4900
      Chicago, IL 60601-6780
19    312-616-5600
      bgagala@leydig.com
20

21

22

23

24

25
```

P R O C E E D I N G S

(The following proceedings were held in open court before the Honorable Mark W. Wolf, United States District Judge, United States District Court, District of Massachusetts, at the John J. Moakley United States Courthouse, 1 Courthouse Way, Boston, Massachusetts, on February 16, 2018.)

THE CLERK:  This is civil action 17-11088, Janssen v. Celltrion.

You may be seated.

THE COURT:  Good morning.

Would counsel please identify themselves for the Court and for the record.

MR. DISKANT:  Good morning, your Honor.  Gregory Diskant for the plaintiff.

MR. JACKSON:  Good morning, your Honor.  Benjamin Jackson for the plaintiff.

MR. QUIRK:  Good morning, your Honor.  Robert Quirk for the plaintiff.

MS. CASEY:  Good morning, your Honor.  Alison Casey for the plaintiff.

MR. HALES:  Good morning, your Honor.  Bryan Hales for defendants.

MS. CUTRI:  Good morning, your Honor.  Elizabeth Cutri on behalf of defendants.

MR. KLEIN:  Good morning, your Honor.  Charles Klein

 1  for the defendants.

 2          MR. KELLY:  Your Honor, Dennis Kelly for the

 3  defendants.

 4          MS. MARTIN:  Good morning, your Honor.  Andrea Martin

 5  for the defendants.

 6          MR. HAUG:  Good morning, your Honor.  Ed Haug for

 7  third party Biogen.

 8          MR. BARLOW:  Good morning, Judge.  Joshua Barlow also

 9  for Biogen

10:17 10          MS. KUZMICH:  Good morning, your Honor.  Sandra

11  Kuzmich also on behalf of Biogen.

12          MS. SHMUEL:  Good morning.  Jenny Shmuel on behalf of

13  third party Samsung Bioepis.

14          MR. ADKISSON:  Good morning, your Honor.  John

15  Adkisson on behalf of third party Samsung Bioepis.

16          MR. GAGALA:  Good morning, your Honor.  Bruce Gagala

17  on behalf of third party Samsung Bioepis.

18          THE COURT:  Okay.

19          Yesterday, I issued a scheduling order memorializing

10:18 20  the dates stated in court on February 2, 2018.  I now realize

21  that does not include a date for the parties to confer and

22  report regarding settlement before the motions for summary

23  judgment.

24          I'm now ordering that that be done by May 2, 2018 in

25  view of the May 4th date for summary judgment.

1    I recognize that, depending on the result of the

2    motion to dismiss the Section 271(f)(1) counterclaim, or if I

3    deny that, it may affect discovery, at least in the deadlines

4    for discovery at least from the defendants' perspective, and

5    all of these dates could be changed, but I wanted to note at

6    the outset that I'm ordering that the parties continue to

7    confer and see whether this complexing consequential case can

8    be resolved by agreement.

9    As indicated by my order concerning today's hearing, I

10:19 10   want to start by hearing the plaintiffs' -- I'm sorry -- the

11   defendants' motion to compel Janssen and Biogen to produce

12   documents, and Biogen or at least Samsung to produce a

13   deponent, and then I want to move to defendants' motion to

14   strike or dismiss plaintiffs' Section 271(f)(1) counterclaim.

15   I'm not going to hear argument on Hospira's motion for

16   summary judgment today, since I'm not close to prepared to

17   decide that orally.

18   But is there anything else that the parties think

19   should be on the agenda for today?

10:20 20   MR. DISKANT:  No, your Honor.

21   MR. HALES:  Your Honor, we had the last time we were

22   in, we raised or were about to raise a couple of discovery

23   issues related to damages that we thought we had worked out at

24   that time.  It sounds since we left the courtroom that's

25   changed.  We're not hearing from them that we're going to get

the things we thought we were going to get from them.  So now

this becomes a sensitive issue.  I think we should talk about

it, at least get you up to speed on that, maybe get a ruling on

that.

THE COURT:  All right.  We'll take that up after the

271(f) motion, okay?

MR. HALES:  Thank you.

THE COURT:  With regard to the motion to compel on the

271(f)(1) motion, it is my goal to hear the argument and decide

the motion to compel this morning.  Ideally I'd like to hear

the argument on the 271(f)(1) motion this morning, too, and

decide it later today.  But, in any event, it's my goal to

decide both of those motions before you leave today.

With regard to Celltrion's motions to compel, I'm sure

you have large decks of slides to show me, I -- I'll hear first

from Celltrion, but I don't know that I need lengthy argument.

I've studied the papers closely.  I expressed a tentative view

on February 2nd, Biogen and Samsung weren't here, but I did

express a tentative view that I would deny the motion to compel

but might allow a deposition, essentially a Biogen -- I think

it's Mr. Reusch, if I'm pronouncing it right, R-e-u-s-c-h,

who's provided a declaration to determine -- challenge the

credibility of the contention that the Biogen medium was not on

the market during the relevant period, to clarify whether it

was licensed, perhaps to permit some questioning concerning how

1  many scientists spent how much time and how much money to

2  develop the Biogen media.  But I'm not inclined to permit

3  discovery of the formula or the ingredients.

4       One thing I would note that contributes to my

5  tentative view, which is stronger than it was on February 2nd

6  but still tentative, is the impact of the existing protective

7  order.  It's ardently argued by Celltrion that the protective

8  order assures that there won't be any breach of the

9  confidentiality of the Biogen media.  But, as I discussed with

10:24 10  the parties on February 2, 2017, it is defendants' counsel,

11  Mr. Hurst, that acknowledges the protective order only covers

12  pretrial proceedings.  I was actually surprised when I looked

13  at it again, that I hadn't written that in, but it does in

14  paragraph 15 gives me the authority, which I would have

15  inherently anyway, to modify the protective order.  As I said

16  on February 7, 2017, the order governs only until trial.  The

17  jurisprudence is that discovery materials are presumptively

18  confidential, but documents used in court are presumptively

19  public, and I expect that if there's anything that's discussed

10:25 20  in testimony or any exhibits that come in, I'll have to be very

21  surgical in limiting what's kept confidential.  So this isn't

22  the time to try to do that surgery, but that's part of my

23  present thinking.

24       With regard to the proposition that documents or

25  information discussed during the trial or entered into evidence

1    are presumptively public, where discovery materials are

2    presumptively not public, are Poliquin, 989 F.2d 527, 533, and

3    Anderson v. Cryovac, 805 F.2d 1, 11-12, both 1st Circuit cases.

4    But I don't think the jurisprudence is different than any other

5    circuit, particularly the Federal Circuit, to my knowledge.

6         So, anyway, I wanted to share that with you so you

7    have it in mind as you make your argument.

8         But, Mr. Hales, are you going to address this issue?

9         MR. HALES:  Your Honor, Mr. Klein is going to handle

10:26 10   the motion to compel issues.

11        On that protective order issue, I would just add one

12   comment, which is that the fact that there are things to deal

13   with at trial in relation to how the protective order will

14   govern doesn't seem like a reason to not allow discovery.

15        THE COURT:  It does because -- well, there are other

16   reasons in my present conception, too, but if -- presumably you

17   want to discover it so you can use it at trial.  If it's not

18   potential evidence, I don't know why you would need it.

19        Is Mr. Klein going to address this?

10:27 20   MR. HALES:  He is.

21        THE COURT:  Then he'll address it.  Go ahead.

22        MR. KLEIN:  Thank you, your Honor.  I do have a

23   presentation, it's not long, but if you prefer --

24        THE COURT:  No, no, let me have it.

25        How long do you think it will take to go through it?

1           Somebody was probably up late last night polishing it

2     up, so it shouldn't go to waste.

3           MR. KLEIN:  It's not lengthy.

4           THE COURT:  We'll make this -- it is nice and short.

5           MR. KLEIN:  I told you.

6           THE COURT:  Very good for your credibility.

7           We'll make this Exhibit 1 of today's date.

8           (Exhibit 1 marked for identification.)

9           THE COURT:  All right.  You may proceed.

10:28 10           MR. KLEIN:  Thank you, your Honor.

11           I think it is important to emphasize that this is just

12    a discovery dispute, and we're governed by Rule 26.  You

13    mentioned in your comments that -- I think you mentioned there

14    is a dispute as to whether the Biogen media itself was publicly

15    available, and the issue of discovery and relevance in this

16    case is broader than that.

17           THE COURT:  I'll -- I'll help you.  I do think it's

18    relevant.  I think that Biogen has a legitimate interest in the

19    confidentiality of it, if it is indeed confidential, and

10:29 20    therefore, I have to do a balancing.  How much do you need it

21    or what part of it is relevant, what's it relevant for, and how

22    important is their interest in confidentiality?

23           MR. KLEIN:  Got it.  And the balancing is important,

24    and Rule 26, which is the governing standard, talks about the

25    balancing.

1          Obviously, Rule 26 is a liberal discovery standard,

2    and we're entitled to discovery if it's relevant to a party's

3    claim or defense and proportional to the needs of the case.  So

4    I think the confidentiality issue falls within the

5    proportionality bucket.

6          THE COURT:  My concern isn't about proportionality,

7    but there's another provision of Rule 26, you have it on your

8    slide, that talks about entering protective orders in

9    appropriate instances.

10:30 10          MR. KLEIN:  Yes.  I don't have that on the slide, but

11    it's certainly in Rule 26, and there's language in Rule 45.

12          But I do think it's important to emphasize how we

13    believe the information we're seeking is relevant --

14          THE COURT:  Go ahead.

15          MR. KLEIN:  -- because that ties into the

16    proportionality and balancing your Honor talked about.

17          As Rule 26 makes clear, our burden today is not to

18    convince you that the information we're seeking will in fact be

19    admissible at trial.  That's not our burden.  That's what Rule

10:30 20    26 says.  It just has to be relevant to a claim or defense and

21    proportional to the needs of the case.

22          Putting aside confidentiality for the moment, the

23    proportionality standard, we submit, is a very low bar in this

24    case.

25          THE COURT:  I don't see this -- proportionality goes

if you were looking for, you know, another 50,000 documents and

there was only $50,000 at stake.  I don't see this as an issue

of proportionality.

MR. KLEIN:  Right.  And the information we seek is

discrete.  So I just wanted to make that clear.  We're not

looking for a ton of documents, and the deposition.

So the key issue is relevance, and then, of course,

confidentiality.  So those are the two issues I wanted to focus

on.

As for relevancy, I think your Honor understands why

the general concept that we think it's relevant to the damages

question of whether starting on the date of first infringement

Celltrion could have switched to using a noninfringing

alternative.  That's what I pointed to.

THE COURT:  I do, and that's consistent with the

guidance I gave you on damages about a year ago.  This isn't

perhaps directly material to this motion, but -- let me see if

I understand the implications of this right, not just the

general law but how it would operate in this case.

So if Janssen proves that Celltrion is responsible for

using media that infringes the '083 patent, then the issue is

damages.  If there was an available noninfringing alternative

that Celltrion could have used at the time of first

infringement is the general rule, damages would be limited to a

reasonable royalty, correct?

 1          MR. KLEIN:  That is correct, yes.

 2          THE COURT:  But if there's no available noninfringing

 3  alternative, then at some point, Janssen would be entitled to

 4  lost profits that it could prove.  That's the corollary?

 5          MR. KLEIN:  They would still need to prove lost

 6  profits.

 7          THE COURT:  Right.  They'd have to prove lost profits.

 8  If they could prove lost profits, lost profits would be the

 9  measure, not a reasonable royalty, right?

10:33 10          MR. KLEIN:  It could be the measure, yes, your Honor.

11          THE COURT:  I think that's what I ruled.

12          MR. KLEIN:  And this is from your ruling.

13          THE COURT:  As a practical matter in this case, there

14  could be no lost profits, as I conceive it now -- but if this

15  is wrong, correct me -- until January 2017 when Celltrion

16  started selling its allegedly -- well, its biosimilar product,

17  right?

18          MR. KLEIN:  Correct.  That's when it was launched by

19  us.

10:34 20          THE COURT:  So the date of first infringement might

21  have been before, for example, when Celltrion was using the

22  HyClone media to develop samples that would get FDA approval,

23  but the reasonable royalty -- the issue of whether there's a

24  reasonable royalty or lost profits is the measure of damages

25  for any proven infringement doesn't become a meaningful issue

```
 1    until they start selling -- you start selling in about January
 2    of 2017.
 3             MR. KLEIN:  Yes.  The lost profits would not -- any
 4    lost profits would not accrue until the product was marketed.
 5             THE COURT:  Okay.  Thank you.
 6             MR. KLEIN:  And this is exactly what I was getting at.
 7    I'm not going to spend a lot of time, but I do think it's
 8    important to understand the context and why we think the
 9    information was relevant from the legal perspective.
10             In terms of lost profits, Janssen has the burden of
11    proving that Celltrion had to use an infringing media, right.
12    So it has -- there's a but-for test there, and one way that
13    test fails is if there's a noninfringing alternative on the
14    market.
15             THE COURT:  On the market.
16             MR. KLEIN:  I'm sorry, I misspoke.  If there's a
17    noninfringing alternative.  It doesn't have to be on the market
18    at the time.
19             THE COURT:  No, it has to be available.
20             MR. KLEIN:  It has to be available, yes.
21             THE COURT:  If it's not on the market in the sense if
22    you couldn't go and buy it from Biogen or license it, then, as
23    I understand it, refreshed by what I decided last year, you
24    have to prove that you could have quickly developed your own
25    noninfringing alternative.
```

 1          MR. KLEIN:  I think you're referring to the Grain

 2    Processing case.

 3          THE COURT:  Yes.  Grain Processing was two weeks.

 4          MR. KLEIN:  I'm not sure that was required, in Grain

 5    Processing it was two or three weeks.  The issue is clearly

 6    whether Celltrion had an noninfringing alternative --

 7          THE COURT:  Go ahead, finish.

 8          MR. KLEIN:  -- available or could have --

 9          THE COURT:  At the time of first infringement.

10:36 10          MR. KLEIN:  Right.  Which, for purposes of this

11    analysis we're assuming, I think the parties are all assuming,

12    is October 2009 when the patent issued.

13          THE COURT:  That's -- all right.  But this may get a

14    little bit at some trial issues.  That's when HyClone might

15    have first infringed.  I don't know if Celltrion was involved

16    with HyClone back in 2009.  I suppose you do.

17          MR. KLEIN:  They were.

18          THE COURT:  They were.  Okay, so that helps me.

19          MR. KLEIN:  Celltrion was developing the media before

10:36 20    then.

21          THE COURT:  Go ahead.

22          MR. KLEIN:  In terms of noninfringing alternatives, I

23    don't think there's any dispute in this case you go back to

24    2009, there were other media alternatives available to

25    Celltrion.  So Janssen isn't saying its '083 patent covers all

1   media options that were available to Celltrion back in 2009.

2   They've never said that.  So there were alternatives available.

3   The question is, well, could Celltrion have used at least one

4   of these alternative mediums to produce an infliximab

5   biosimilar?  That's going to be a question in the case.  And if

6   the answer to that is yes, then there's no lost profits.

7       But I also want to emphasize that if the answer to

8   that question is yes, it also slashes the reasonable royalty as

9   well.  So this question is relevant not just to lost profits

10:37 10  but also to a reasonable royalty.  Because in the reasonable

11  royalty context you have this hypothetical negotiation, and if

12  Celltrion had an option, sure, it might pay something to avoid

13  the inconvenience of switching, but at some point, the royalty

14  would go up to a level where Celltrion would have said, I'm

15  just going to use the alternative instead, sorry.  And the

16  courts have talked about that.

17      So the issues are -- the information we seek is

18  relevant to damages generally, but specifically to key

19  questions related to reasonable royalty and lost profits, and

10:38 20  this is literally -- it could be a billion-dollar question.

21  So, again, for proportionality, this is a big deal.

22      THE COURT:  It's not a question of proportionality, in

23  my view, but go ahead.

24      MR. KLEIN:  So, again, there were media available to

25  Celltrion back in 2009 other than the HyClone media that it

1    used, and we now know, because Janssen has conceded, that

2    Biogen was able to develop a media that admittedly does not

3    infringe the '083 patent and successfully makes infliximab.

4         The so the question -- the way we view this motion,

5    your Honor, the question is really is Biogen's development of a

6    noninfringing alternative relevant to whether Celltrion could

7    have developed its own noninfringing --

8         THE COURT:  My present conception is that is not the

9    right way to frame the question, because that question is

10:39 10   already answered.  It was possible for somebody to develop a

11   noninfringing alternative to the '083 media that would produce

12   a biosimilar to Remicade.  That you know -- that we know, or

13   there's evidence of that.

14        So the question -- but the relevant question is:

15   Could Celltrion have done it?  And, you know, you've already

16   said there were a lot of medium, media out there.  To me, I

17   don't at the moment see why you need to know or it would be

18   fair for you to know how Biogen did it, except maybe to know

19   did it take them two weeks and two people to do it, or, as the

10:40 20   affidavit suggests, it was a long, expensive process.

21        MR. KLEIN:  I think this will help.  I'd like to give

22   you three hypotheticals as to why the information we seek is

23   relevant to these damages issues.

24        The first one -- and we think this is --

25        THE COURT:  I'm sorry, go ahead.

1          MR. KLEIN:  And obviously, we don't know the contents

2     of their media, we don't know the details of their drug

3     development, and that's why we're seeking discovery; that's the

4     purpose of discovery.  But here are three hypotheticals to help

5     illustrate why the information we seek is relevant.

6          And the first one -- and we think this is probably a

7     likely scenario -- is that even if you assume that Biogen's

8     media is proprietary and they never sold it -- and I think at a

9     minimum we should be able to take some discovery on that

10:41 10    issue --

11          THE COURT:  I told you it's still my inclination to

12    let you take a deposition to challenge the credibility that

13    they never sold it.  And, as I read it, the affidavit of

14    Mr. Reusch, if I'm saying it right, remembering it right, is

15    not explicit on whether they ever licensed it to somebody they

16    weren't collaborating with themselves.

17          Go ahead.

18          MR. KLEIN:  For purposes of these hypotheticals, we'll

19    assume the media is proprietary and they've never sold it.

10:41 20    Even if that were true, they may have started with a publicly

21    available media and optimized.  And that's typically what's

22    done in media development.  And we don't know that, but we'd

23    like to take discovery on whether Biogen started with a media

24    that was available to Celltrion back in 2009 and then optimized

25    it, because then our experts could say Celltrion could have

1  started with the same media, done its own optimization, arrived

2  at a media that successfully works, infliximab.

3          THE COURT:  To me that's analogous to a leading

4  question that would be impermissible in Court.  If it's easy

5  and obvious to take one of the many media out there and

6  optimize it, Dr. Glacken or somebody else should be able to

7  say, without knowing what Biogen did, here's what I would have

8  done and it would have worked.

9          MR. KLEIN:  He could say that, but it certainly is

10:42 10  helpful and would be helpful to this important question if

11  another company had started with the same media and

12  successfully developed an infliximab biosimilar.

13          THE COURT:  At the moment -- if there are -- you just

14  said there were many media out there.  If Biogen, either

15  through trial and error or good luck, you know, picked quickly

16  the one -- found the one that worked, you know, it doesn't mean

17  that -- to me it's not very probative of whether Celltrion on

18  its own would have come up with the same thing.  It's feasible,

19  but at the moment, particularly if in view of their interest in

10:43 20  confidentiality, I really would wonder how important the

21  details of the formula, the ingredients of the formula are.

22          But keep going.

23          MR. KLEIN:  Your Honor, I do think this would be very

24  important to our experts.  And in terms of the standard, I

25  don't believe the standard is that in the but-for world you

1   have to show which media Celltrion would have chosen among

2   other media.  The question is:  Was there an alternative

3   available?  And if Biogen used a publicly available media and

4   optimized it, that would go a long way for us to show that

5   Celltrion could have started with that same media and optimized

6   it, because it was successful for Biogen.

7          THE COURT:  Is the answer whether you could have or

8   whether you would have?  I mean --

9          MR. KLEIN:  It's could.

10:44 10          THE COURT:  I mean, if there are a thousand media out

11   there, hypothetically, you know, maybe you could have started

12   with the one that Biogen started with, but maybe you won't be

13   able -- you know, the jury wouldn't find that you would have,

14   at least quickly or feasibly because you would have had to test

15   all thousand of them.

16          MR. KLEIN:  And maybe that's true, your Honor.  But

17   this is going to admissibility.  This is going to what would

18   happen at trial, and that's why I started my argument

19   emphasizing we're in the discovery phase and admissibility is

10:45 20   not an issue.  And maybe there's an argument down the road as

21   to, you know, whether this would be an appropriate substitute.

22   But that's not the issue today.  The question is:  Is it

23   relevant?  And it's clearly relevant --

24          THE COURT:  It's relevant.  The question is the

25   balancing.  I mean, does Biogen have a legitimate interest in

1    the confidentiality of its formula?

2             MR. KLEIN:  It does, and I'll get to that in a moment.

3             Again, this is part of the balancing, and that's what

4    Rule 26 talks about, and Rule 45.  It's critical, your Honor,

5    because Biogen got FDA approval.  If Biogen started with a

6    publicly available media, optimized it, we know it got FDA

7    approval, and it's admittedly noninfringing.  This would be

8    powerful evidence for the jury to consider in conjunction with

9    an opinion by our expert that Celltrion could have started with

10   the same media, done routine optimization.  Again, when you

11   consider the fact that this literally could be a billion-dollar

12   question, that hypothetical alone should entitle us to take the

13   discovery.

14            As for a second hypothetical, your Honor, in terms of

15   the formula, again, we don't know what the formula is, but this

16   is why discovery is needed.  We don't know why Janssen decided

17   that Biogen's media doesn't infringe.  It could turn out that

18   Biogen's media is missing one or two of the ingredients that's

19   required by the '083 patent.  If that's the case, that would be

20   powerful evidence for our experts to say and offer an opinion

21   that the HyClone media Celltrion used could have been tweaked,

22   they could have just taken out an ingredient or two, maybe

23   swapped in something else that isn't required by the patent,

24   and avoided infringement.  And the only way we'll know that is

25   by seeing the formula.

1          Again, even putting aside whether Biogen's media

2     itself was publicly available, the fact that Janssen has now

3     conceded that Biogen's media doesn't infringe could be highly

4     relevant to whether the HyClone formula itself could have been

5     modified with very minor tweaks to avoid infringement.

6          And a third hypothetical is even if the Biogen media

7     is completely confidential and wasn't sold, the ultimate

8     formula may be pretty close to a formula that was publicly

9     available.  Again, we can't assess this without looking at the

10:47 10    formula and comparing it to what was publicly available at the

11    time.

12          And if there's a similarity between what FDA approved

13    for an infliximab biosimilar and what was available at the

14    market, that, too, would be highly relevant to our expert's

15    opinions with regard to noninfringing alternatives.

16          THE COURT:  Okay.

17          MR. KLEIN:  So that's -- those are non-exhaustive

18    relevancy hypotheticals.

19          I want to just briefly touch on confidentiality, and I

10:48 20    certainly understand they have confidentiality concerns, but

21    two quick points.  The first one is, those concerns didn't stop

22    Samsung Bioepis from agreeing to a protective order in New

23    Jersey and filing its formula under seal in the New Jersey

24    court, and the terms of our protective order are

25    insubstantially different.  They're essentially the same thing.

1        And the second point is Biogen is not the first third

2  party or would not be the first third party in this case to

3  produce a media formula under the terms of the protective

4  order.  HyClone did that.  HyClone's already done that.

5  HyClone's made many witnesses available for deposition under

6  the terms of the protective order.  And the parties have been

7  working with HyClone in conjunction with the hearing to make

8  sure that its information is protected.

9        And it's -- no matter what happens, I think it's

10:49 10  highly unlikely that an entire formula at a trial in this case

11  would have to be disclosed or publicly disseminated.  Steps can

12  be taken to ensure only information necessary to go to the jury

13  or your Honor is publicly disclosed, and that's what we've done

14  so far.  And there's been no assertion in this case that any

15  HyClone confidential information has somehow been misused.

16  So --

17        THE COURT:  If we try the case, the details of the

18  HyClone formula will have to be in evidence, right?

19        MR. KLEIN:  Some of them, but not the entire formula.

10:50 20        THE COURT:  I'm talking about the HyClone formula.

21        MR. KLEIN:  Right.  I don't think the entire HyClone

22  formula would have to go into evidence.

23        THE COURT:  How would it not go into evidence if it's

24  alleged to be the infringing product?

25        MR. KLEIN:  The parties can --

1      THE COURT:  Under the -- am I remembering right, under

2   the doctrine of equivalence, how is the whole formula not going

3   to go into evidence?

4      MR. KLEIN:  A number of ingredients that aren't

5   required by the patent are just irrelevant to the case.  There

6   would be no need -- I don't think there's any need to show the

7   jury a complete formula with ingredients that will never be

8   discussed in the case and that just aren't important.

9      THE COURT:  This is discussed in some of the case law.

10:50  10   Celltrion and Janssen, as a practical matter, are the parties

11   in the case.  Biogen, Samsung not parties to the case.  This is

12   going to be a very complicated, challenging trial in any event,

13   but I don't know that they're going to want to rely on you to

14   decide what can go into evidence, and then you're going to have

15   a battalion of people working all night, despite our best

16   efforts to get everything possible done in advance of trial,

17   and they're going to want to intervene and complain.

18      At the moment, I'm not as sanguine as you are that

19   Biogen's formula or confidential information is not going to

10:51  20   get exposed at trial.

21      MR. KLEIN:  Your Honor, but that's an issue down the

22   line.  After we take discovery, maybe we don't use it at all.

23   Maybe a key point is that there are only two missing claim

24   limitations and the actual formula isn't something that would

25   need to be shown to the jury.  We don't know.  We haven't taken

1     discovery, but that's why I emphasize, again, the Rule 26

2     issue, that admissibility is an issue down the line.  Right now

3     we're just asking to take the discovery.  And if there are

4     admissibility issues, if there are issues with regard to public

5     disclosure, we can talk about that.  We have no problem

6     providing notice to Biogen and Samsung Bioepis to give them an

7     opportunity to be heard on any issues that could affect --

8            THE COURT:  I may have a problem giving them an

9     opportunity to be heard.  You can't even get -- we don't even

10:52 10     have Mr. Hurst here today -- can't even get all of the lawyers

11     to argue these motions within the enclosure of the court

12     because -- but, anyway, go ahead.  Go ahead.

13            MR. KLEIN:  Those are the key points with regard to

14     confidentiality.  HyClone's a third party.  The protective

15     order has been working with them and their confidential media,

16     and Bioepis agreed to very similar terms already.  To the

17     extent there are additional terms, we're happy to talk about

18     that if it's necessary, required.  And it might be irrelevant,

19     depending upon what discovery shows.

10:53 20            THE COURT:  Okay, thank you.

21            MR. KLEIN:  Thank you.

22            THE COURT:  Who would like to be heard from Biogen on

23     this?

24            Say your name for the record, please.

25            MR. HAUG:  Certainly.  Ed Haug.

1           THE COURT:  Tell me whatever you want to tell me;

2      don't be too encouraged by my tentative views or my responses

3      to Mr. Klein.

4           MR. HAUG:  Thank you, your Honor.

5           Well, I will say I think your Honor has the law

6      correct.  I think what it really comes down to is the balance,

7      the balance between what -- the relevance versus the need to

8      know which comes from the Micro Motion case, for example, from

9      the Federal Circuit.  It is balance, and I think the Court has

10:54 10     to make that balance and your Honor is making that balance, and

11     ultimately, that will determine your ultimate view, I'm sure,

12     as it should.

13          I think the papers are very, very clear here, in

14     particular, the declaration of Mr. Reusch, setting forth the

15     supreme confidentiality and proprietary nature of the trade

16     secrets that we're talking about here.  Biogen has set forth in

17     that declaration began working on this cell media, its cell

18     media, on a difference cell line, as I understand it, from what

19     the defendants are using.  They started that work many years

10:54 20     ago, as is set forth, stated in the declaration; and they did

21     invest substantially to do that.  It was not done in matter of

22     weeks, months, it took a long time.

23          It is a very, very complicated media in the sense of

24     there are many, many components that go into that media, not

25     just a couple, like a dozen, like there are many.

1          In addition, there are all kinds of processing details

2     that are essential to how that media is prepared, how it is

3     used, and how it ultimately fits into the cell line culture to

4     ultimately result in Samsung Bioepis' infliximab.

5          So what we really have here, your Honor, we have three

6     products on the market, as I understand it.  You have Janssen's

7     product, you have Celltrion's product, and you have Samsung

8     Bioepis' product to which Biogen provides the cell media.

9          So these are direct competitors.  And so the Biogen

10:55  10  cell media has never been publicly available, certainly never

11    available to Celltrion, and will never be available to

12    Celltrion short of an order from this Court to produce it to

13    them.

14         And in fact, as Mr. Reusch also states, the cell media

15    used by Biogen, or provided by Biogen which is then used by

16    Samsung, results in a higher yield, lower-cost product.  And

17    again, this goes back to we're talking about direct

18    competitors.  And certainly Biogen has a supreme interest not

19    to share with a direct competitor on the market how to make a

10:56  20  noninfringing product.

21         THE COURT:  Well, the argument is there's a

22    protective -- you just heard it -- there's a protective order

23    in this case, it prohibits Celltrion from using the formula, if

24    it gets it, for competitive purposes.  It could only be used

25    for the purpose of this litigation, and there are limitations

1    on who at Celltrion could see it.  So why would that not be

2    adequate to protect Biogen's interest?

3         MR. HAUG:  I think in most cases protective orders

4    along the lines of what I understand is in this case is

5    sufficient and not atypical.

6         First of all, Biogen is not a party, as your Honor is

7    aware; it's a third party.  The protective order that we have

8    looked at here we think is -- falls well short of what it would

9    have to be if there were to be a disclosure.  For example, I

10:57 10   believe it has access to in-house counsel, it has access to

11   outside experts retained by the parties.  In fact, I think I

12   received from counsel a proposal for five experts, five experts

13   that they would like to show this to already.  And that's just

14   one party in the case.

15        And so we're talking about a situation where it's not

16   just confidential information, it's highly proprietary trade

17   secret information, that is what the company is all about.

18   Biogen's product is that trade secret.  It's those ingredients,

19   how they're put together, how they're used, and how that does

10:58 20   or doesn't result in a finally approved product, which is what

21   happened here.

22        THE COURT:  This isn't a rhetorical question.  Does

23   your brief characterize the media as a trade secret?  Or maybe

24   you're using that synonymous -- as synonymous with

25   confidential.

1          MR. HAUG:  Standing here now, your Honor, I don't

2     remember using those words "trade secret."

3          THE COURT:  I don't recall that --

4          MR. HAUG:  I'm sorry, I did not want to interrupt.

5          It's certainly synonymous with highly proprietary,

6     highly confidential.  Whether we used the words "trade secret,"

7     I don't remember doing that.

8          So, your Honor, again, I think back to the balance,

9     which I think is really where it comes out.  The balance here

10:58 10   is it's highly, highly problematical for Biogen to disclose

11    this information.

12         THE COURT:  You just heard Mr. Klein argue you gave it

13    to Janssen.  Why would it be a problem giving it to --

14         MR. HAUG:  Biogen didn't give anything to Janssen in

15    that case; they weren't in that case.  In fact, the documents

16    that Samsung produced in that case, which I understand are the

17    subject of the motion to compel against them, I've never seen.

18    There's a protective order in that case.  So we weren't

19    provided with those documents.

10:59 20        Now, without having seen them, do I believe they may

21    have -- they have some Biogen information?  Yes.  I just don't

22    know what it is.  Because, as I understand it, they produced

23    some documents that were part of their BLA that they filed with

24    the FDA.  So to the extent Samsung was working with Biogen's

25    media, there may well be information in there, but I don't

1   exactly know what it is.  To the extent there's any Biogen

2   proprietary information there, we do object to that being

3   produced to the defendants here.  Different case, Biogen wasn't

4   in it, and the subject matter of that case was the Samsung

5   Bioepis product, including whatever Biogen did with them.  So

6   that's not the case in here.  We are clearly not interested in

7   the Celltrion product, or the Janssen product for that matter.

8           THE COURT:  Okay.  I guess -- let me ask you this:  I

9   have expressed the tentative view that I would allow a limited

11:00 10  deposition of Mr. Reusch essentially to test the allegations or

11  the statements in his declaration, Docket No. 142, to clarify

12  whether Biogen has ever licensed this.  Because I don't think

13  it expressly says, although it implies, that Biogen hasn't

14  licensed this to people it wasn't essentially in a joint

15  venture with.  Do you want to be heard on that deposition?

16          MR. HAUG:  Yes, your Honor.

17          I don't believe the declaration mentions anything

18  about licensing, you're correct there.  I'm sure we could

19  supplement that declaration with another declaration on that

11:01 20  point.  I don't want to guess what the answer would be.  I'm

21  not aware of any licensing to the public or to other parties

22  beyond whatever relationship Samsung Bioepis has with Biogen.

23  Beyond that, I'm not aware of any licensing arrangement.  But,

24  again, I'm not the declarant, so I don't want to be -- I want

25  to be certain about that.

1          THE COURT:  There are statements, you've mentioned

2     some of them, that -- for example, paragraph A, I understand

3     based on the information presently available to me that Biogen

4     developed the Biogen media through extensive experimentation

5     and expenditure of much effort and financial resources.

6     Biogen's development of the Biogen media was an iterative

7     process that took place continually over the course of many

8     years before Biogen arrived at proprietary formulation of the

9     Biogen media.

11:02 10          I don't know, that may be something -- the type of

11    thing that defendant Celltrion might want to ask some questions

12    about, which don't get into the ingredients or the formula but

13    just the process.  So I was thinking I might allow them

14    essentially to test the credibility of that or -- do you want

15    to be heard on that possibility?

16          MR. HAUG:  Based on my knowledge and my conversations

17    with the declarant, he's very credible and this is accurate

18    information, so I can make that statement.

19          If your Honor decides that you want to order, compel a

11:03 20    deposition of the -- with the scope that you're talking about,

21    perhaps I would propose written questions, deposition by

22    written questions.

23          THE COURT:  That's not my understanding of a

24    deposition.

25          MR. HAUG:  Your Honor will decide what you decide.

        1            THE COURT:  What if -- I mean, this is coming to a

        2    little sharper focus.  They're going to want to ask:  Did you

        3    start with -- what are they calling it, an off-the-shelf media,

        4    is that --

        5            MR. KLEIN:  Essentially, or publicly available.

        6            THE COURT:  A publicly available media.  If I allow

        7    that limited question, do you perceive that would be a problem?

        8            MR. HAUG:  Based on what I think the answer would be,

        9    my answer would be no.

11:04  10            THE COURT:  Okay.  Thank you.

       11            Mr. Reusch lives in Lexington, Massachusetts.

       12            MR. HAUG:  Correct, your Honor.

       13            THE COURT:  So he's around here.  All right.

       14            Let's see, does Samsung want to be heard on this?

       15            MR. GAGALA:  Your Honor, Samsung wants to be heard as

       16    long as our documents are still at issue.

       17            THE COURT:  Could you say your name, please?

       18            MR. GAGALA:  Yes, your Honor.  It's Bruce Gagala for

       19    Samsung Bioepis.

11:05  20            The way the discussion has gone this morning, it

       21    sounds as if Samsung Bioepis documents are no longer at issue.

       22            THE COURT:  Mr. Klein, are they at issue?

       23            MR. KLEIN:  Yes.  We still certainly want them.  I do

       24    believe the formula was given to Janssen and the Court, but

       25    maybe Samsung Bioepis counsel can clarify that.

        1            MR. GAGALA:  The question is, I thought from your

        2    Honor, was that the media is -- the composition of the media

        3    doesn't seem to be in question any longer.  It seems --

        4            THE COURT:  Oh, no, I haven't made a decision yet.

        5            MR. GAGALA:  I do want to be heard, your Honor.

        6            THE COURT:  Go ahead.

        7            MR. GAGALA:  I think we are starting in the wrong

        8    place, with all due respect.

        9            We're assuming relevancy under Rule 26, and, your

11:06  10    Honor, I disagree.  I think if you look at Rule 26 in this case

       11    is constrained by the Grain Processing case, and it's

       12    constrained by the Micro Motion case.  Both of those

       13    specifically say it's relevance and need.  Grain Processing

       14    identifies relevance in the context of availability to the

       15    defendant, to Celltrion.  It has nothing to do with what might

       16    be out there that somebody did --

       17            THE COURT:  Have you read my brief decision

       18    summarizing what I described at length last February, I

       19    think --

11:06  20            MR. GAGALA:  I did, your Honor.

       21            THE COURT:  -- on damages?  Because I found the

       22    availability essentially has two dimensions, one is available

       23    on the market, and if not -- I think they ought to be able to

       24    test the assertion that it wasn't available on the market.  But

       25    assuming it's not available on the market, then the question

```
 1   would be could Celltrion have quickly developed its own or take

 2   up the question -- develop its own noninfringing alternative?

 3        MR. GAGALA:  Your Honor, I don't disagree with that,

 4   but with a caveat.  The caveat is very clear, it's very clear

 5   on the case law, based on Celltrion's knowledge, experience,

 6   availability of materials, et cetera.

 7        THE COURT:  Precisely, and that's -- go ahead.

 8        MR. GAGALA:  And that is precisely why we need to stop

 9   this inquiry, because the answer to that is very simple.  It
```
11:08 10   wasn't available to Celltrion at any point in time prior to the
```
11   time of the commercialization by Biogen.  In other words,

12   once -- if we look at the case law, your Honor, let's look at

13   Grain Processing.  I also would like to look at Slimfold.

14        THE COURT:  Which one?

15        MR. GAGALA:  Slimfold Manufacturing Company.  It's

16   cited in our brief --

17        THE COURT:  It's in your brief?

18        MR. GAGALA:  It's in the brief.

19        THE COURT:  Hold on a second.  I'll get it.  You cited
```
11:08 20   it; I should have it here in court.
```
21        (Pause.)

22        THE COURT:  What is the cite for it, please?  If it

23   was in your brief, we should have printed it out, but we don't

24   seem to have it.

25        MR. GAGALA:  It's 932 F.2d 1453, Slimfold --
```

1           THE COURT:  Say it again.

2           MR. GAGALA:  932 F.2d 1453.

3           THE COURT:  And what's it called, the name of the

4    case?

5           MR. GAGALA:  It's Slimfold Manufacturing Company, Inc.

6    v. Kinkead Industries.

7           THE COURT:  Okay.

8           MR. GAGALA:  Your Honor, if we're going to do it this

9    way, I'd like to then talk about four cases in tandem then.

11:09 10           THE COURT:  What's that?

11           MR. GAGALA:  I'd like to talk about four cases in

12   tandem.

13           THE COURT:  Do you have slides there?

14           MR. GAGALA:  No, your Honor, I don't have anything to

15   hand up.

16           THE COURT:  What are the four cases?  If you've cited

17   them, I should have them.

18           MR. GAGALA:  Okay.  The first one, of course, is the

19   Grain Processing case that we've been talking about.

11:09 20           THE COURT:  I've got that.

21           MR. GAGALA:  The second one is the Slimfold case that

22   I just mentioned.  The third case is the Micro Chemical case,

23   your Honor.

24           THE COURT:  I have that.

25           MR. GAGALA:  And the fourth case is the Siemens case,

1    your Honor.

2              THE COURT:  Siemens?

3              MR. GAGALA:  Yes.  Siemens v. Saint-Gobain.

4              THE COURT:  All right.

5              I have all of them, except Slimfold.

6              MR. GAGALA:  If you look at the cases, because

7    Slimfold is discussed at length, actually, in the Grain

8    Processing case; and the MicroChemical case also, your Honor,

9    is also a very interesting case.

11:10 10              What we have is a situation where --

11              (Pause.)

12              MR. GAGALA:  When we look at these four cases

13    together, your Honor, it's very clear that what we have to find

14    is relevance, and that's the threshold inquiry, to find

15    relevance, is was the product on sale or commercially

16    available?  Was it otherwise in the public domain?  Or was it

17    somehow privately known by the accused infringer such that the

18    accused infringer could make a change to make an noninfringing

19    alternative?

11:11 20              So, your Honor, when we get to the point of what was

21    available to Celltrion, it's not just randomly what might have

22    been out that somebody in the universe might have been doing.

23    They have to bring it back to the idea that it was commercially

24    available or on sale or was otherwise publicly known, and/or

25    that they personally had knowledge.

1          THE COURT:  The way I've -- I've considered the point

2     you're making now and have thought -- the issue isn't whether

3     Biogen was capable of developing a noninfringing media.  The

4     question is whether Celltrion was capable of developing a

5     noninfringing media knowing what was publicly available which

6     doesn't include the Biogen formula.

7          MR. GAGALA:  That's correct, your Honor.

8          THE COURT:  Is that a good way of thinking about it?

9          MR. GAGALA:  I think that's an excellent way of

11:12 10    thinking about it.  I think that's exactly why this motion to

11     compel should be denied.  It should be denied as to Biogen and

12     it should be denied as to Samsung Bioepis.  Because no matter

13     what we say, no matter what they tell you hypothetically they

14     could have done, might have done, would have been wonderful to

15     do, the answer is they didn't have the wherewithal because they

16     didn't have the Biogen media at the relevant time frame.  And

17     they still don't.  And they don't have the Samsung media at the

18     relevant time frame, they still don't, and they never will.

19     You just heard from Mr. Haug that they never will.

11:13 20         So, your Honor, it's very clear that we need to start

21     the inquiry under Rule 26 with Grain Processing with relevancy

22     and need, and that's what these cases are telling us to do.

23          THE COURT:  Thank you.

24          And does Janssen want be to heard?

25          MR. DISKANT:  Yes, your Honor, briefly.

 1          On the issue of the motion to compel, I don't think we
 2     have much of a horse in the race.  That is to say, we don't
 3     really care if the motion is granted or denied so long as it
 4     doesn't disrupt the discovery schedule.
 5          However, I think I agree very much with the comments
 6     made by the Samsung counsel, and I think Mr. Klein's
 7     presentation of what the issues are is incorrect.  So I would
 8     like to briefly be heard where does this all shake out,
 9     because, in my view, all of these could have, would have,
11:14 10    should have exercises which they are engaged in mightily in the
 11     noninfringing alternatives discovery period will be excluded at
 12     trial and will be subject of a summary judgment motion by us.
 13          So what did you decide last time?  You decided what
 14     the relevant time period was, from the date of first
 15     infringement more or less to the time at trial, and that's
 16     fine.  And we've disagreed with that, but that's fine.
 17          What the time period defines is the time period in
 18     which one can consider whether an acceptable noninfringing
 19     alternative was either on the market or available.  And prior
11:14 20    to Grain Processing, on the market was all there was.  There
 21     was no -- basically Grain Processing is the first case to go
 22     beyond that and say, okay, it's entirely fair that if a
 23     noninfringing alternative was not on the market but nonetheless
 24     available to the defendant, you know, that counts, too.  So
 25     we're interested in that.  But it can't be speculative, it

1    can't be hypothetical, it can't be theoretical.  It's got to be

2    available.  And on the facts of Grain Processing, available

3    meant practically instantaneously available, two weeks.  Case

4    law since that time has used I think a word your Honor used,

5    which is "readily available."  MicroChem defines it that way,

6    Siemens does the same.  If the substitute cannot be

7    commercialized readily, then it is not available.

8              THE COURT:  I'm sorry, you're reading from MicroChem?

9              MR. DISKANT:  No, I'm reading from Siemens.

11:15 10         THE COURT:  What page?

11             MR. DISKANT:  Excuse me?

12             THE COURT:  What page?

13             MR. DISKANT:  I am very embarrassed, Judge, but I have

14    a printout that doesn't have pages on it.

15             THE COURT:  Just go ahead.

16             MR. DISKANT:  In any event, readily available will be

17    the test.

18             In each and every one of these noninfringing

19    alternative cases, the alternative that was pointed to was

11:16 20    actually developed in the real world.  It was not a theoretical

21    alternative, it was a real-world alternative.

22             In MicroChem there's a real-world alternative but it

23    took four months to create it.  And the Federal Circuit said

24    that's a summary judgment issue; four months is not readily

25    available.  And so, you know, the other cases are year, year

and a half.

You know, we talked about the Apple v. Samsung case
when we were here last time.  Where that finally wound up in
the Federal Circuit after trial, the alternatives that Samsung
pointed to were real-world alternatives, phones that it had
actually developed.

So this entirely hypothetical exercise is one that has
never received any traction in any court anywhere.  There is
not going to be something that was readily available to the
defendants at any time.  From 2009 until today they do not have
a readily available alternative cell media.  It would take them
nine months, 12 months, a year and a half.  It would take a
long time to develop.  And for purposes of the lost profits
analysis, that just has nothing to do with the analysis.  It
will wash away on summary judgment.

So I think your Honor's proposal of, you know, having
a deposition or some brief inquiry to confirm the declaration
seems like a practical choice to me.  Again, we don't really
have a horse in the race.  But we do have a horse in the final
race, which is what is an available -- a readily available
alternative that's not hypothetical or theoretical.  And none
of this discovery that they are engaged in on this subject has
anything to do with that subject.

THE COURT:  Okay.

Mr. Klein, do you want to respond to any of that

1    briefly?

2              MR. KLEIN:  Briefly, your Honor.

3              First of all, what Mr. Diskant was talking about may

4    relate to admissibility at trial.  Again, we're just here for

5    discovery.

6              We don't know what development efforts Biogen went

7    through, and that's why we want to take the discovery.

8              And so to get back to one of the hypotheticals, your

9    Honor, with regard to the missing claim limitations, if your

11:18 10   Honor allows a deposition, may we ask the witness how many of

11   the claimed ingredients are not in the Biogen media?

12             THE COURT:  No.  Not my present conception.

13             The question is whether you can do it, not whether

14   they had the ingenuity do it.

15             I'm going to take a brief break.  Court is in recess.

16             THE CLERK:  All rise for the Honorable Court.

17             (After recess).

18             THE CLERK:  Court is back in session.  You may be

19   seated.

11:44 20            THE COURT:  With regard to Celltrion's motions to

21   compel Janssen, which are Docket Nos. 86 and 87, and Biogen and

22   Samsung Docket Nos. 127 and 128 to provide documents and

23   depositions regarding Biogen's cell culture medium used to make

24   Samsung's infliximab or biosimilar product Renflexis, I am

25   hereby denying the motions, except I will allow a limited

1    deposition of Biogen, presumably the affiant, John Reusch,

2    whose declaration, No. 142, concerning the development of the

3    Biogen media used to produce Renflexis, the deposition

4    essentially testing the credibility of that affidavit and

5    clarifying whether Biogen ever licensed the formula, the media,

6    will be allowed.

7            With regard to the standards that are relevant,

8    basically, as the parties recognize, I have to determine

9    whether the information sought is relevant.  If it is, I have

11:46 10   to determine if there are legitimate competing considerations

11   that weigh against allowing discovery, and if there are such

12   competing considerations, I have to balance them.

13           I do find that the information being sought is

14   relevant for trial purposes.  Federal Rule of Evidence 401

15   defines relevant evidence as evidence that has a tendency to

16   prove a fact or disprove a fact that has a consequence of

17   deciding an issue in the case.

18           The Supreme Court in Oppenheimer, 437 U.S. 340, 351,

19   stated in 1978 that relevance is more broadly construed as

11:47 20   information bearing on the issues in the case for the purpose

21   of discovery, as opposed to admissibility.

22           If the information sought is relevant, Samsung and

23   Biogen must show that the information at issue was confidential

24   and that disclosure would harm or create a risk of harm to

25   Biogen and Samsung.

1      If the information at issue is relevant and disclosure
2  would involve harm or risk of harm to Biogen and Samsung, I
3  have to decide whether the defendants' need for the information
4  is outweighed by the potential injury to Biogen and Samsung, as
5  the 1st Circuit said in Cusumano, C-u-s-u-m-a-n-o, 162 F.3d
6  708, 716-17.  That's, I think, the standard that would apply in
7  the Federal Circuit as well.

8      I do find the information that defendant is seeking is
9  relevant.  As I've explained previously, if Janssen proves that
11:48 10  the HyClone media used to -- well, if Janssen proves that the
11  HyClone media infringes Janssen's '083 patent and Celltrion
12  induced that infringement, the plaintiff will be entitled to
13  recover the profits it proves it would have made after
14  Celltrion began selling Inflectra, its biosimilar to Remicade,
15  in the United States in about January 2017 but for the
16  infringement.

17      The reasons for that conclusion are reflected in the
18  transcript of the guidance I rendered last year, as
19  memorialized in Janssen, 239 F.Supp. 3rd 328, 330-331.
11:49 20  Basically I was relying on Grain Processing, 185 F.3d 1341,
21  1350-51.

22      Janssen would be limited to receiving a reasonable
23  royalty rather than lost profits if there was an adequate
24  alternative to the '083 media available to it as of the date of
25  first infringement, as the Federal Circuit explained in Grain

1   Processing at 1350-51.

2          In MicroChem, 318 F.3d at 1123, the Federal Circuit

3   characterized Grain Processing, as finding that in that case, a

4   substitute was readily available.

5          In Siemens, 637 F.3d 1269, 1288, also uses the term

6   "readily available."

7          If there was not an adequate noninfringing alternative

8   available or readily available on the date of first

9   infringement, then Janssen will be entitled to recover its

11:50 10   proven lost profits after the sale of Inflectra began in about

11   January of 2017, again, as reflected in the published decision

12   memorializing my reasoning, Janssen, 239 F.3d at 328.

13          This will require determining whether there was an

14   acceptable noninfringing alternative on the market, meaning

15   available to be bought or licensed by Celltrion.  As the

16   Federal Circuit said in Grain Processing at 1349, if an

17   acceptable noninfringing alternative was not available to be

18   bought or licensed, it must be shown -- the defendant,

19   essentially, Celltrion must show that it had the relevant

11:51 20   know-how, experience, and capability to make its own

21   noninfringing alternative.  That language comes from MicroChem,

22   318 F.3d 1119, 1123.

23          After reviewing confidential documents concerning the

24   Biogen media subject to a protective order, Janssen dismissed

25   its case alleging that the Biogen media infringed the '083

1   patent and publicly stated that it did not infringe.  That is

2   reflected in Docket No. 119-5 at page 1, a Law 360 November 14,

3   2017 article quoting a Janssen representative.

4            Therefore, the Biogen media is evidence that it is

5   feasible for someone to create a noninfringing media capable of

6   producing a product biosimilar to Janssen's Remicade.  This is

7   relevant to the issue of whether Janssen is entitled to only a

8   reasonable royalty rather than lost profits if it proves that

9   Celltrion is responsible for any infringement of the '083

11:53 10   patent.

11            Biogen, however, states that it has not sold its media

12   and implies that it has never licensed it.  Rather, Biogen

13   asserts that the formula for its media is carefully protected,

14   proprietary, confidential information.  This is stated in

15   Reusch, R-e-u-s-c-h, declaration, which is Docket No. 142.

16            If this is true, the Biogen media was not available to

17   Celltrion on the market.  However, the formula for the Biogen

18   media is relevant to whether Janssen could have, on its own,

19   have developed -- readily developed a noninfringing media from

11:54 20   publicly available information which does not include the

21   Biogen or Samsung media.

22            Federal Rule of Civil Procedure 26(c)(1) authorizes

23   the issuance of protective orders permitting the discovery of

24   relevant evidence.  The Federal Circuit has recognized that

25   confidential commercial information warrants special protection

1  under the rule.  It said that in Micro Motion, Inc., 894 F.2d

2  1318, 1323.

3        In addition, the Federal Circuit has stated that

4  courts have presumed that disclosure to a competitor is more

5  harmful than disclosure to a noncompetitor.  That's American

6  Standard, Inc., 828 F.2d 734, 741.  This is such a case.

7        As the parties recognize, the Rule 26(c) standard also

8  applies to motions to compel, as the Federal Circuit said in

9  Micro Motion, 894 F.2d at 1323.

11:55 10       Therefore, there are legitimate competing

11  considerations the Court must balance in deciding the motion to

12  compel.

13       Celltrion argues that the protective order restricting

14  the dissemination and use of confidential information assures

15  Biogen and Samsung will not be harmed by the disclosure of

16  confidential information concerning its media.  Despite the

17  protective order, however, there is a real risk that Biogen

18  confidential information or Biogen and Samsung confidential

19  information will be disclosed at trial and available for use by

11:56 20  competitors, possibly including Celltrion, but certainly other

21  present and potential competitors.

22       As I discussed with the parties on February 7, 2017,

23  and as defendants' counsel acknowledged, the protective order

24  now in effect governs pretrial proceedings only.  That's

25  reflected in the February 7, 2017 transcript at 65.  I have the

1    express authority to modify the protective order.  It's

2    reflected in Docket 170 at paragraph 15.

3         Celltrion's goal is to get evidence concerning

4    Biogen's media it can introduce at trial.  Although we're not

5    at that stage yet, information presented at trial is

6    presumptively public, while information produced in discovery

7    but not used as a basis for judicial decisions is presumptively

8    confidential.  The 1st Circuit has discussed this recognized

9    principle in Poliquin, 989 F.2d 527, 533, and Anderson v.

11:57 10   Cryovac, 805 F.2d 1, 11-12.

11        A higher standard is necessary to justify safeguarding

12   the confidentiality of evidence introduced at trial, as the 1st

13   Circuit also said in Poliquin at 533.  The 1st Circuit stated

14   that that is appropriate only in rare circumstances.

15        As the Federal Circuit has written in an analogous

16   case, it would be divorced from reality to believe that either

17   party here would serve as the champion of its competitor either

18   to maintain the confidentiality designation or limit public

19   disclosure as much as possible during the trial.

11:58 20        Here, Biogen and Samsung would, in fact, lose all

21   control of the situation since disclosure of its information

22   depends on the action by a court before whom it has no

23   standing.  That's Micro Motion 894 F.2d at 1325.  Moreover,

24   even if I allowed Biogen and Samsung to intervene to litigate

25   this issue in connection with the trial, there's a real risk

that ordering -- there's a real risk that I would order

disclosure of confidential information concerning Biogen's

media in connection with the trial.

In addition, and significantly, Celltrion does not

have a substantial need to know the confidential formula for

Biogen's media.  It has Janssen's admission that Biogen's media

which is used to to produce Renflexis does not infringe the

'083 patent.  This tends to show, or shows, that it is possible

for someone to develop a noninfringing alternative.

However, as explained earlier, the relevant question

is whether Celltrion had the relevant know-how, experience, and

capability to make its own noninfringing alternative.  That's

MicroChem, 318 F.3d at 1123.

I don't find the formula for Biogen's media to be

probative or significantly probative of this issue.  Indeed, if

what Biogen did in developing its noninfringing media is

obvious and easy, an expert for Celltrion, such as Dr. Glacken,

should be able to identify the formula for a media that doesn't

infringe on his own.

Therefore, the request for disclosure of confidential

documents and information concerning Biogen and Samsung's media

is being denied.

However, I am authorizing a limited deposition of John

Reusch to test the credibility of the assertions in his

declaration that Biogen's media was not available to be

acquired by Celltrion on the market because Biogen did not sell
it to third parties with which it was not in a joint venture or
closely collaborating, such as Samsung.

Celltrion can also ask whether Biogen licensed the
media to third parties similarly situated to Celltrion with
whom it was not collaborating.

Celltrion can also test the assertions in the
declaration, or Reusch declaration, as to the process for
developing the Biogen media, including the number and nature of
the scientists involved and the length of time and expense
involved in developing it.

I will let Celltrion ask if Biogen began with a
publicly available media and optimized it.  However, I will not
permit questioning about which media if it started with a
publicly available media, nor will Reusch be required to
disclose the confidential formula or any of its ingredients.

So the question comes next:  When should this
deposition be conducted?  Is there a reason it can't be done in
the next two weeks?

MR. HAUG:  I don't know Mr. Reusch's schedule, but I'm
not aware of any reason.

THE COURT:  All right.  Does Celltrion want to take
the deposition soon?

MR. KLEIN:  The sooner the better, your Honor.

THE COURT:  I agree, the sooner the better.

1           Can I see the book?

2           The deposition I just described shall be conducted by

3      March 2, 2018.

4           I'm ordering that the parties order on an expedited

5      basis the ruling, the transcript of the ruling I just made,

6      which will provide the framework for the deposition, and as

7      Celltrion and Janssen know, you don't want to have any

8      discovery disputes to bring to me.  I'm not going to probably

9      go question by question if there are a large number of them.

12:03 10  I'm going to look, and if there are themes, I'm going to see

11     who is most reasonable.  One of you will win, and one of you

12     will lose.  And I think in view of the argument and what I just

13     said, it should be clear what the parameters of the permissible

14     questions are.  You should be able to operate within them.  So

15     as much as I like seeing you, you don't want to see me again on

16     this.

17          We're going to take a brief break.  I want to start

18     with the argument on the motion to dismiss the counterclaim and

19     reply.  I expect we'll have to continue it after lunch.  But

12:04 20  court is in recess.

21          THE CLERK:  All rise for the Honorable Court.

22          (Recess taken.)

23          THE CLERK:  All rise for the Honorable Court.

24          THE COURT:  You may be seated.

25          With regard to the motion to strike or dismiss

1   plaintiffs' Section 271(f)(1) counterclaim and reply, briefly

2   my tentative view is the following.

3       The 271(f)(1) counterclaim states a plausible claim

4   that the defendants caused all or a substantial portion of the

5   components of the allegedly infringing HyClone media to be sent

6   to Singapore to be combined.  It appears to me at the moment

7   that this is a compulsory counterclaim which does not require

8   leave of court.  Once again, my late friend and colleague Judge

9   Becker is instructive in Southeastern, 70 F.R.D. 585-86.  If

12:13 10   leave of court were required, this would be -- and the Foman

11   standards applied, this would be a close question, but, at the

12   moment, I don't think this is discretionary.

13       If the counterclaim is not dismissed, I am interested

14   in knowing what discovery, if any, the plaintiff will be

15   seeking, what discovery, if any, the defendant will be seeking,

16   and the impact on schedule for trial.

17       There is one thing if the counterclaim is not

18   dismissed I want to discuss with you is whether there's a

19   way -- well, how you would do expedited discovery on my ability

12:14 20   and whether there could be the quick preparation of a motion

21   for summary judgment on liability.  Because if there's no -- if

22   Celltrion were to get summary judgment on liability, the

23   damages issues would be moot.

24       So that's my present state of mind.

25       It's Celltrion's motion to dismiss, so who would like

1  to address it?

2        MR. HALES:  Your Honor, Ms. Cutri is going to address

3  that motion.

4        Before she stands up, could I have -- not on the

5  motion, we understand your ruling on the motion that Mr. Klein

6  argued, got it loud and clear.

7        Can I make a comment about noninfringing alternatives

8  more broadly just because of some of the things that I observed

9  about that discussion, because that's an important issue for

12:15 10  the case?

11        THE COURT:  Go ahead.

12        MR. HALES:  I'll be quick.

13        Clearly, your Honor, the noninfringing alternatives

14  question is one where we're reconstructing the hypothetical

15  market, everybody gets that, and that's recognized in Grain

16  Processing.  And certainly the patent owners in that context

17  always reconstruct that argument in a very favorable way, and

18  you can rest assured that Janssen has done a very, very

19  favorable-for-them reconstruction of how things would have

12:16 20  played out.

21        The thing that I think where I want to make sure the

22  Court doesn't lose sight of as we get down the road on this

23  question is that what Grain Processing recognizes, your Honor

24  knows, is that you also have to account for what the infringer,

25  the accused infringer, would have done to have a fair

1    reconstruction of that market.  And as they say in Grain

2    Processing, without the infringing product, a rational would-be

3    infringer is likely to offer an acceptable noninfringing

4    alternative, if available, to compete; and your Honor has

5    talked about that.  The competitor in that marketplace is

6    hardly likely to surrender complete market share when faced

7    with a patent if it can complete in another lawful manner.

8         And one of the things they say that I think we've lost

9    sight a little bit of is, moreover, only by comparing the

12:16 10   patent invention to its next best available alternative,

11   regardless of whether they were actually produced and sold

12   during the infringement, can the Court discern the market value

13   of the patent owner's exclusive right.  So it's not just a

14   question of what we did, clearly, it's what would we have done

15   in that world.

16        And then the final point which I'm trying to get to,

17   you Honor, because this I don't think really came up, and that

18   is, this is a different situation than many cases.  In most

19   cases that are out there, the date of first infringement

12:17 20   coincides with the date on which the patent owner is asking for

21   their lost profits to begin accruing.

22        THE COURT:  I pointed that out.

23        MR. HALES:  Yes.  This is not that case, though.  The

24   date of first infringement is 2009, and our first sales of

25   Inflectra are eight years later in 2017.

1           So when you're thinking about what would have

2   happened, especially with the Court's and Mr. Diskant's focus

3   on readily available and how fast and Mr. Diskant saying nine

4   months is too long, when they show up in 2009 to ask for a

5   billion dollars, the relevant question, we submit -- and this I

6   know is for another day, but Mr. Diskant is talking about

7   evidence can be excluded, we submit that's dead wrong.  Because

8   the question the law asks is, in 2009 when they show up asking

9   for a billion dollars, what do we do?  And we have a lengthy

12:18 10   period of time to go about the business of trying to figure out

11   what to do before there's any lost profits.

12           THE COURT:  We're not going to resolve this now, and

13   this doesn't affect my ruling, but it's a useful

14   conversation --

15           MR. HALES:  Understood.

16           THE COURT:  -- because I was beginning to wrestle with

17   the same issue myself, which is part of the reason I made that

18   distinction.

19           Let me just -- I don't have Grain Processing right in

12:18 20   front of me.  I think it says, you know, essentially would you

21   have been able to -- would Celltrion in this case have been

22   able to do something to get to the market at the same time

23   without infringing?  That's kind of how I was beginning to

24   think about it.  You might argue that's the right way to think

25   about it.  But then, what's the date of first infringement?

1    And I'd have to be reminded or educated on this.

2         I don't know or remember when HyClone and Celltrion

3    started working together and if they were doing this as of 2009

4    and there is that long FDA approval process.  My current

5    reaction to your observation is that Celltrion would have had

6    to have come up with a noninfringing alternative before it went

7    to the FDA, because the FDA process took as long as it took.

8    If I remember right, you'd have to be able to show you would

9    have gotten to the market at the same time.

12:20 10        MR. HALES:  Two points on that, your Honor, and I

11   think --

12        THE COURT:  Am I talking about the right issue?

13        MR. HALES:  I think you're absolutely talking about

14   the right issue.  What I would add to that, I think you're

15   thinking about it in a reasonable way.

16        I think clearly there is this disconnect in this case,

17   right, and your Honor already decided in one of the rulings you

18   made when we were arguing damages some time ago that the date

19   of first infringement goes back to 2009, or that the relevant

12:20 20   question is what is the date of first infringement.  HyClone

21   was working on this already in 2009.  So that we think -- I

22   think they're still trying to dispute that maybe, but I think

23   your Honor already decided that.

24        THE COURT:  When do they think the date of first

25   infringement is?

1          MR. HALES:  I think Mr. Diskant said last week they

2     might still be trying to say the date we come on the market or

3     something.  I don't know if they've moved on beyond that.  But

4     we clearly believe, and we already argued to your Honor that

5     this goes back to 2009 when the patent issues, because HyClone

6     was already working on media then.

7          In that scenario they may want to argue about how much

8     time is used up by the FDA, and if they want to argue that we

9     have to have something that -- let's assume for a second we

12:21 10    have to show that we could have gotten to market at the same

11    time with an alternative -- I'm not sure that's right, but I'll

12    come back to that in a second -- that still leaves a period of

13    eight years in which, even if they're arguing some of that time

14    was used with the FDA, if we take the nine months Mr. Diskant

15    talked about just as the number he threw out, and I'm not

16    saying he's conceding that point, but he used nine months to

17    figure out a new media, to optimize a media.  The question then

18    would be something along the lines of in that period of time do

19    we have enough time to change media and get FDA approval and

12:21 20    still come on the market when we did.  And I think we'll be

21    able to prove that we did.

22          The second point I would make is I don't think lost

23    profits is an either/or litmus test, thumbs up, thumbs down.

24    You can also show -- you can't, perhaps, defeat lost profits

25    entirely if you can't show that you could have the alternative

1    readily available, but you could a little bit of time into the

2    period of infringement cut them off if you could demonstrate

3    that that would be your approach under these same principles of

4    Grain Processing.

5         So I do think -- I appreciate your Honor taking --

6    like, indulging this conversation, because we do have a very

7    different view than the way it was being portrayed there.  I

8    agree it's not going to be resolved today, but I think it's

9    super important, given the significance of these issues, that

12:22 10   we are thinking about this or have the opportunity to start

11   making sure that your Honor understands that we have a very

12   different view of this framework, the way Grain Processing

13   plays out.

14        THE COURT:  I was thinking about that, part of the

15   reason I tried to clarify that there would be no issue of lost

16   profits until January of 2017.  And when the time comes again,

17   I'll study whatever you give me and listen to you.

18        In a way, you're indicating that Janssen and Celltrion

19   are on the opposite side of the arguments that I was

12:23 20   anticipating.  I thought -- but anyway.  It's not immediate.

21        MR. DISKANT:  I know it's not immediate, but may I

22   just comment on all of this?

23        THE COURT:  Yes, yes.

24        MR. DISKANT:  I actually found this a fascinating

25   subject, and we've spent a large amount of time reading all of

1  the cases, and I know your Honor will when it's time for

2  thinking about summary judgment and jury charges.

3       But I think what defendants are doing is entering the

4  world of speculation and theory, and that Grain Processing

5  creates a very narrow expansion of the idea of on the market.

6  The narrow expansion is available, and as clarified by

7  MicroChem and Siemens, it's readily available.

8       In the but-for world, it may be that damages don't

9  start accruing until 2017, but infringement -- the reason we

12:24 10  have a dispute about that is the jury is going to decide the

11  date of first infringement based on the facts.  I don't think

12  we need -- for purposes of this discussion, we'll just say it's

13  October 1, 2009, the day the patent issued.

14       Every day thereafter there was infringement.  And so

15  filing with the FDA, they've got to stop infringing.  In order

16  to reconstruct this world, they have to stop infringing, and

17  they have to have a readily available alternative if they want

18  to defeat lost profits.

19       So I think in the end, it's going to turn on what was

12:25 20  readily available, and all of these -- we could have done this

21  and we could have done that.  I think it will be interesting to

22  take a look back at Judge Koh's opinion in Samsung v. Apple

23  where she sort of talks about these alternatives.  When push

24  comes to shove at trial, we're talking about real things.

25  They're not talking about we could have done this and we could

1    have done that.

2              THE COURT:  I will look at all of that.

3         I think it's coming somewhat into focus.  There's

4    something distinctive about this case probably as compared to,

5    say, Grain Processing, and that is the requirement of FDA

6    approval.  There is -- and I don't know, this may be -- I say

7    it may be theological; I think it has some practical

8    consequences.

9         My understanding at the moment, but I'm not as

12:26 10   immersed in this as I was a year ago and as I will be again, is

11   that in the real world -- the date that has monetary

12   implications is January 2017.  Since they weren't selling, you

13   couldn't have lost any profits to them before them.  So if

14   there was infringement before then, you'd be limited to a

15   reasonable royalty.  And I don't know when, at the moment, when

16   they went to the FDA.  And if they had a year before they went

17   to the FDA, maybe they would have had a year to come up with an

18   available alternative, although I don't know what leads to

19   thinking -- what kind of tests you have to do before you go to

12:26 20   the FDA.

21              MR. DISKANT:  I think you got to push that date back.

22   You'll hear the facts, obviously, but they can't start clinical

23   trials until they have a cell media.  They don't start -- the

24   clinical trials they began in 2009 or '10, '10, I think, were

25   for worldwide approval.  Entities like this don't have one set

```
 1    of clinicals for the U.S. and one set for the rest of the word.
 2    So they're doing the clinical trials, they're seeking
 3    approval --
 4              THE COURT:  All right.  I think we're going to have to
 5    stop this.
 6              MR. DISKANT:  Okay.
 7              THE COURT:  Ms. Cutri is getting anxious.
 8              I think you've identified an issue, and I do think --
 9    all I know now is there's a question.  I don't suggest I have
10    even a tentative view on the answer, and it will be dependent
11    on the facts to some degree.  But it's not as simple as if
12    you're selling something that doesn't require FDA approval.
13              MR. HALES:  I agree, your Honor.  And I can give you
14    the date.  We actually went to FDA approval in 2014.  That's
15    when we sought FDA approval.
16              There's a lot of facts that are out there.  I
17    appreciate your Honor allowing me to explain this context,
18    because it's important what we would do on that date when they
19    show up in '09.
20              THE COURT:  Okay.
21              All right.  Ms. Cutri, you're up.
22              (Discussion off the record.)
23              MS. CUTRI:  We do have copies of slides.  May I
24    approach?
25              THE COURT:  Yes.
```

1            MS. CUTRI:  Five?

2            THE COURT:  Yes.

3            We'll make this Exhibit 2.

4            (Exhibit 2 marked for identification.)

5            THE COURT:  Do you have an idea of how long you hope

6       to have to do this?

7            MS. CUTRI:  I think it depends on what your Honor

8       wants to hear and what you want to focus on.  It depends on

9       what you want to hear.

12:30 10       I'd like to cover the things we haven't talked about

11      first, which are the kind of legal issues.

12           THE COURT:  The legal issues are very important.  As I

13      told you, my tentative view is that this is a compulsory

14      counterclaim that can be asserted in a reply to a counterclaim,

15      and I have no discretion.  If I have no discretion, we can --

16      the Foman factors are not relevant, so it may actually make

17      sense to focus on that.  But you can also -- there's also the

18      question of whether it states plausible claims.

19           MS. CUTRI:  That's right.

20           THE COURT:  Is that where you wanted -- where did you

21      want to start?

22           MS. CUTRI:  That is what I was going to start with.

23           THE COURT:  Plausible claims.

24           MS. CUTRI:  Yes, futility --

25           THE COURT:  I may let you argue that and then hear

1    from Janssen, because if you persuade me there's no plausible

2    claim, you can go home earlier.

3            MS. CUTRI:  That makes sense.  That's fine with us.

4    Thank you.

5            Okay.  And so here we are, our futility argument, as

6    we put it, our futility argument.  I'd like to address

7    Celltrion and Hospira in turn since there are claims against

8    both defendants and they are slightly different.

9            THE COURT:  I haven't decided the motion for summary

12:31 10   judgment on Hospira, in part -- I haven't decided it, and let's

11   focus on Celltrion.  Because as a practical matter, if

12   Celltrion is in the case, Hospira is going to be in the case

13   for present purposes until I decide the motions for summary

14   judgment.

15           MS. CUTRI:  I think there are some important

16   differences between Hospira and Celltrion here.  I'll get to

17   that, but there are also some overlap.  There's some issues --

18           THE COURT:  I don't want to hear about Hospira.  I

19   want to here about Celltrion.

12:32 20        MS. CUTRI:  We'll talk about Celltrion.

21           So here we have just the statute that we're dealing

22   with, 271(f)(1).  And the point here, of course, there's a

23   number of things that have to be proven under that statute, a

24   number of different factors.  This is really about supply.

25   This is a statute about supply and causation of supply.  That's

1    really the key thing to keep in mind here is what this all

2    boils down to, in our view.

3            What Janssen is doing in this case is trying to

4    squeeze essentially a purchaser of an end product -- not the

5    purchaser of the components, to be clear -- the purchaser of

6    the end product, which is here Celltrion that we're talking

7    about, into this framework by saying that they're supplying --

8    really what they're saying is causing to be supplied the

9    components, even though all what's really happening here is

12:32 10   Celltrion is an end purchaser of the final totally assembled,

11   totally done product.

12           THE COURT:  Well, I denied the motion for summary

13   judgment on inducement, right?  I did that.

14           MS. CUTRI:  Mm-hmm.

15           THE COURT:  Correct?

16           MS. CUTRI:  That's right.

17           THE COURT:  So it seems to me plausible that if they

18   induced the alleged infringement, they -- is there a difference

19   between inducement and causation?

12:33 20         MS. CUTRI:  I think there is a difference here because

21   of the framework that we're under which is about this

22   supplying.  It's about this taking these components, multiple

23   different things, and causing them to come from the United

24   States, causing a specific thing here.  It's a more specific

25   thing, and it is a separate statute, it is a separate section

1      of the statute, so it does have to be treated differently.

2              THE COURT:  A separate section of the statute.  I

3      don't know that it has to be treated differently.  Usually the

4      statutes are read together.  I mean previsions of the statute

5      are read together.  But go ahead.

6              MS. CUTRI:  So 271(f) mentions active inducement, in

7      such a manner to actively induce the combination.  So there is

8      a component of this that is active inducement.  That would be

9      Janssen's burden to prove at trial.  All of these areas include

12:34 10  the active inducement.  But it's beyond that.  It's not just

11     that it can't just be that because there's all this other

12     language here --

13             THE COURT:  Don't talk so fast.

14             MS. CUTRI:  Apologies.

15             THE COURT:  The court reporter -- I know you've been

16     waiting two years to say something, but the court reporter has

17     got to write it down, and I've got to be able to follow.

18             MS. CUTRI:  That's fair; I appreciate that.

19             There's other language here.  It's not just

12:34 20  inducement.  There is active inducement; it's more than that.

21     271(f) goes beyond that.  There are requirements beyond just

22     inducing.

23             This is just to demonstrate what's really happening

24     here, as kind of a reminder of lay of the land and the cycle

25     here or the steps that are happening, which are important,

1    right.

2         We have HyClone affiliate or GE Healthcare affiliate

3    in Singapore -- I'm sorry, in the United States, now also there

4    is someone in Singapore, but this is relative to the claims

5    here.  In the United States -- and they are alleged to,

6    according to Janssen -- and that's the facts not fully in the

7    case at this point.  But according to Janssen, there was some

8    period of time when they were taking at least some components

9    of this media and shipping them to Singapore.

12:35 10        Yet, another third party, not in the case, foreign, a

11   foreign affiliate of GE HyClone, is assembling them, putting

12   these components together in Singapore to make the accused

13   product.  That's the accused product that we're seeing in

14   Singapore there.

15        Now where Celltrion comes in is after all this

16   happens.  After this is said and done, Celltrion orders, of

17   course, as we know, the accused media powder.  Celltrion takes

18   that powder, as you see here on the bottom right, a number of

19   steps that they do using the media.  They combine the media

12:35 20   with water and other ingredients; they, of course, grow the

21   cells; they then -- the cells produce the antibody; they

22   harvest the antibody; a number of other steps, filtration,

23   purification, whatnot; the antibodies eventually combined with

24   various other things; and then becomes the final end product.

25        As we know, this is where Hospira comes in.  So

1   Hospira is not on this graphic here, of course.  They don't
2   even come into the picture anywhere in this pathway here at
3   all.  They don't even come in until we have the complete
4   finished Inflectra product.
5         So this is -- anyway, the point here is Celltrion, all
6   they're doing is buying.  They're buying the finished product
7   after the components have come from the U.S., after they've
8   been assembled abroad.  And of course, they're bought by
9   Celltrion from foreign companies.  All of this is happening
10  overseas.
11        So let's talk about what 271(f) did.  So -- and this
12  is in our brief; this is discussed.  There was a time when you
13  could avoid infringement, 271(a)-type infringement, making,
14  selling, using, et cetera, by keeping your components separate,
15  either a U.S. domestic manufacturer, rather than just making my
16  stuff here in the United States, making this patented device,
17  I'm just going to send it abroad and we'll put it together over
18  there.  And that's essentially -- that's exactly what happened
19  in Deepsouth.  This is Microsoft -- this is the Supreme Court
20  talking about the Deepsouth case, which is done in a nice way;
21  it kind of puts it in context and explains what happened.
22        Deepsouth had done exactly that.  They had been found
23  to infringe, making these shrimp deveiners in the United
24  States.  And then they said, I know, we have a great idea,
25  we'll just send the components abroad, then we won't infringe.

1    And the court said at the time, you're right, that doesn't

2    infringe, that's right.

3         So there was this loophole.  There was this problem.

4    We had a U.S. manufacturer shipping its own components abroad

5    to have them assembled abroad.  That's what 271 was designed to

6    address.

7         So this was about exporting.  This was about closing

8    an export-related loophole in the patent statute.  And this is

9    again -- this is a Federal Circuit case, WesternGeco, talking

12:37 10  again about Deepsouth and talking about 271(f).

11        In response, this is in response to Deepsouth,

12    Congress enacted 271(f), overruled Deepsouth, and imposed

13    liability on domestic entities shipping components abroad, with

14    the requisite intent, of course, that's important, there's an

15    intent component here, essentially just as if they had done it

16    in the United States.  This is about manufacturers of exported

17    components.  And that's critical.  That's important, because

18    that is what 271 reaches.

19        This is more from WesternGeco.  There's more language

12:38 20  in this case talking about what 271(f) did.  It is the act of

21    exporting.  That's what we have underlined here.  I think

22    that's the really important thing to consider here.  It is the

23    act of exporting that creates the liability, that's it.

24        THE COURT:  Well, that's what creates the liability

25    for HyClone.  The question is whether Celltrion caused it.

1      MS. CUTRI:  Right.  I think, though, the act of

2  exporting has to create the liability for anybody.  There has

3  to either be -- what we've seen from the cases is either you

4  are the exporter, or there's the WesternGeco District Court

5  case is the one case we know of where it was found that

6  somebody was doing the exporting on someone else's behalf, for

7  them, for them, right.  So -- and I think the term actually --

8  and we have it on the slide -- is "freight forwarder."  It was

9  a shipping agent.

12:39 10      So the defendant, who actually ended up not making it

11  up to the Federal Circuit in that case, this wasn't addressed

12  on appeal, but that defendant said, Okay, I was going to just

13  gather up these components and ship them myself, but I'm going

14  to have someone do it for me, either like a UPS or a FedEx-type

15  or a shipping agent.

16      So the defendant in this case, Fugro I think was the

17  name of that defendant, was actually -- it was like having

18  someone else do the shipping and exporting on their own behalf

19  to themselves, their own shipping.

12:39 20      That's not what's happening here, right.  So that's a

21  very important distinction if Celltrion is not having anyone

22  ship anything to it on its behalf or on its behest.  They're

23  not telling anybody, Hey, can you please ship me this and that?

24      THE COURT:  How do I know that?  I'm looking at the

25  complaint.  This is a motion for summary judgment.  The

1      question is whether they made a plausible claim that Celltrion

2      caused HyClone to ship the components.  I've previously

3      denied -- found that there was sufficient evidence for a jury

4      to conclude that Celltrion had induced infringement, and that

5      was on summary judgment.  But why is it implausible that if

6      there was a violation of 271(f) by HyClone, that Celltrion

7      caused it?  In other words, caused HyClone to do what allegedly

8      violates 271(f)?

9            MS. CUTRI:  Well, Janssen doesn't plead that they're

12:41 10   having anything exported, that Celltrion is having anything

11     exported on its -- that it's doing the exporting or having it

12     done on its behalf.

13           THE COURT:  No, I thought they were alleging that

14     Celltrion caused HyClone to make the exports.

15           MS. CUTRI:  They do allege that.  They do allege that.

16     But I say the way they say that is because they buy it, they

17     buy the ultimate end product.

18           THE COURT:  But why --

19           MS. CUTRI:  It's like this chain of causation type

12:41 20   theory where just because we buy something, we, Celltrion, are

21     overseas in Korea, we call up, you know, the HyClone affiliate

22     in Singapore, we buy the end product, and therefore, we're

23     causing, somehow causing you to get the supplies from some

24     place that actually -- and Janssen doesn't plead this -- it's

25     not within their control, they're not directing them where to

get them from.  They're not telling them -- so all they're

doing is buying.  That's what they plead.  You're buying,

therefore, as a foreign buyer of a foreign-made product, you

are somehow causing what the statute is supposed to get at

which is the export activity.  That's what they plead.

They also plead, of course, they do mention that they

have this agency theory, they have an agency theory of

infringement.  That's different than what these cases talk

about, or at least the WesternGeco case talks about.  A

shipping agent picks up the materials on your behalf and gives

them to you on your behalf.  That's not what's happening here.

THE COURT:  Why is it implausible that HyClone's the

agent or that HyClone has caused --

MS. CUTRI:  It's not -- the problem is, that's not

what they're alleging.  That's not even what they're pleading.

They're not even saying that HyClone is doing the exporting act

for Celltrion, that Celltrion is essentially the exporter

because HyClone is doing it for them.  They plead there's this

agency relationship with development of the media.  We're

familiar with that, we've argued that, we heard a lot about

that over a year ago.  Generally years ago we went back and

forth they say about, you told us to add this or that and

that's their theory on that.  But that's different than the

only case they have that acknowledges this possibility of this

kind of agency-type concept is this WesternGeco District Court

1    case.  It's a different thing.  That's not what they're

2    pleading here.  They're not pleading that, Celltrion, you are

3    essentially the exporter; you're having someone do it on your

4    behalf.  That's not what they plead.  And that's the only thing

5    that there's any daylight in the law to recognize as of right

6    now.

7         THE COURT:  As of right now.  Causation is not -- not

8    an unfamiliar term in the law generally.  But anyway, go ahead.

9         MS. CUTRI:  Well, right.  We have to think not just

12:43 10   generally about the law or the common law, we have to think

11   about 271(f).  We have to think about what the statute is

12   about.  We have to think about the fact that this closed a

13   specific loophole in the patent laws, and we'll get to this

14   point, too.  271(f) was designed to be this very narrow

15   exception to the very well rounded principles about

16   territoriality of the patent law.  And we're not at liberty to

17   take this exception and expand it further.  The exception has

18   to be very limited and the Supreme Court has said that.

19        There are a number of cases that talk about this

12:44 20   being -- and these are all in our briefs, there are a number of

21   cases that talk about export, right.  The focus here is on the

22   export activity, and that's exactly what we just saw in

23   WesternGeco.  The Supreme Court has said this, exporters'

24   conduct.  The Federal Circuit as this, export of elements.

25   This circuit has said this, exporting.  Section 271(f) prevents

1  companies from circumventing the U.S. patent laws by exporting

2  noninfringing components to be assembled abroad, that's what

3  we're trying to reach.  That's not what's happening here.

4  Janssen, if they want to go back to their case against

5  HyClone, which is stayed right now, they have that case

6  pending, they've put it on hold, they don't want to bother with

7  that case.  If they want to go back to say, HyClone, you're

8  doing exporting here, that's totally different.  It may be true

9  that HyClone is sending stuff from the United States abroad.

12:45 10  We don't have all the facts.  They're not in the case.  That's

11  not why we're here today.  There may be an exporter of

12  material, it's not Celltrion.  It may be Hospira, it's

13  certainly not Celltrion.

14  THE COURT:  I think you're missing what I regard as

15  the point.  Did you cause -- I have to look at these

16  allegations in the context of all the allegations in the case.

17  The allegations are that HyClone's media infringes the '083

18  patent, that there's sufficient evidence for a reasonable jury

19  to find that Celltrion induced that infringement.  A reasonable

12:45 20  inference would be that this was moved to Singapore to avoid

21  having to pay damages for infringement on the product sold in

22  the United States, and for a long time we were all operating

23  under the assumption that once the Singapore media was used,

24  Celltrion's exposure to damages would end, but now Janssen

25  argues that there's a violation of 271(f)(1) occurring, and

1    that Celltrion caused it.

2         In view of the fact that it's already -- there's

3    already sufficient evidence -- I don't even know if I can take

4    this into account -- but why is it implausible that if there

5    was induced -- there was -- put it back in the motion to

6    dismiss.  There was alleged induced infringement in the United

7    States, and then an obvious motive to avoid -- minimize

8    damages, go to Singapore.  But why is it implausible that these

9    parties collaborated on infringement -- I have to accept this

12:47 10   is true for the purposes of the motion to dismiss -- they'd

11   also collaborate in some scheme to continue infringing but mask

12   it by doing it abroad?  Why is that implausible.

13         MS. CUTRI:  It's implausible because it's not a real

14   theory under the law.

15         THE COURT:  It's a factual issue, the statute creates

16   the law, of course it is.  The statute says that in certain

17   instances, somebody who doesn't export itself, some entity that

18   doesn't export itself is legally liable for infringement if it

19   caused the exporter to do it.

12:47 20        Are there any cases that you'd point me to that

21   discuss what causation means in this context?

22         MS. CUTRI:  So there are.  There are actually some

23   cases that Janssen tried to point to and to say that they

24   support that principle, and they don't.  The WesternGeco

25   District Court is one of them.  This is, actually, kind of my

1    next point.

2              Janssen has no case, they have nothing finding that

3    there's 271(f) liability where a foreign company simply

4    purchases a foreign-made product.  And the word "causation"

5    here, they're just trying to wedge in buyer liability.  There

6    is no buyer liability under the patent laws.  There has to be

7    more than that, right.  There has to be more.  There has to be

8    more.  There is no buyer liability.  If you look at 271(a),

9    it's make, use, sell, offer, import, right.  The only way to

12:48 10   get liability to get at a buyer would be at one of these

11   theories like 271(b) that they're trying to use.  It's like

12   another form of buyer liability, but there's all these

13   heightened requirements they have to prove: the intent, the

14   knowledge, and whatnot.  271(f) is not about buyer liability.

15   And Congress had the opportunity to do that.  It could have

16   created liability against the buyer but just didn't do that

17   here.  It's about supplier causing the actual supply and not

18   just generically causing something to be made because you're

19   purchasing it.  That's really the most that could be said about

12:49 20   Celltrion maybe, is that when we order it, we make it.  But

21   it's a whole other step removed to say where you're getting it

22   from or you're supplying it from the United States.

23              The WesternGeco one we talked about.  Oh, no, this was

24   an agency case.  This was you did it, you did it.  We didn't do

25   it, someone else did it, therefore, you were causing the supply

because someone else was actually doing it.  But, like I said,

if you look at the language in that case --

THE COURT:  Don't talk so fast.  Although, you are

going to have to stop at 1:00 on this plausibility, so figure

out what you want to argue; maybe it's not everything in your

slide.

MS. CUTRI:  Sure.  I think the WesternGeco case we've

talked about.  Your Honor should look at the language in that

case.  I would encourage you to do that and to look at the

District Court there said constituted causing freight order,

the goods were sent to Fugro.  They're having someone do it for

them.  That did cut it.  That was enough in that case; that cut

it.  That's not what happened here.

They also point to this Jacobs Vehicle Sys. case; also

not the same situation.  This was domestic companies,

subsidiary and its parent.  On summary judgment there was

enough, and the court said, Well, okay, the parent, we're going

to say the parent did enough here encouraging and kind of

paying for things, financial support, to cause the sale or the

supply of components outside the U.S.  That's not what we have

here either.  That's just not the situation.  We don't have a

parent/sub situation here; we don't have domestic companies

either.

The last case I point to is this T.D. Williamson case,

another District Court case.  This is inapposite.  It's very

broad.  They just cite this case for the general proposition

that 271(f)(1) reaches not just supply, but caused to be

supplied.  We already know that, that's right, that's in the

statute.  But this case dealt with whether or not you have to

have a third party that's actually doing the combining, and

said, no, you don't.  You can essentially introduce yourself

once you get the stuff abroad.  This case is, frankly,

inapposite; it's just not on point.

So Janssen doesn't have anything that's recognized

12:51  this situation: A foreign buyer buying the final foreign made

end product is somehow responsible, not for the making of that

product, but for the supply of the components.  Someone else is

getting them, someone else is getting them for themselves.  Not

Celltrion here.

This is important, okay.  This is the Supreme Court in

Microsoft talking about this very statute.  And the court said

right up at the start, "Recognizing that 271(f) is an exception

to the general rule that our patent law does not apply

extraterritoriality, we resist giving the language in which

12:51  Congress cast 271(f) an expansive interpretation."  Right.

"Our decision leaves to Congress' informed judgment any

adjustment of 271(f) if it deems it necessary or proper."

THE COURT:  What were the facts in Microsoft?

MS. CUTRI:  The facts are a little bit different in

Microsoft.  Essentially, Microsoft was making what it called

these master copies of software here in the United States, and it was sending these master copies abroad where they were purchased by buyers and copied, copies were made oversees. Copies of the software were then installed on computers overseas, and that's what was alleged to infringe.  Once you put the software on the computer, then it does what the patent claims.  The patent was an apparatus claim, I believe.  But it took software on a machine and that had to happen overseas.

THE COURT:  Because something vital was not exported: the computer.  I think that was the essence -- I thought that was the essence of Microsoft.  But go ahead.

MS. CUTRI:  I think the essence of that case was the Supreme Court said, No, we're cabining 271(f).

THE COURT:  So let me see -- what -- would this be a violation, in your view, of 271(f)(1), I think it is:  Let's say Celltrion induced HyClone to infringe the '083 patent. Then this case was threatened abroad, and Celltrion said to HyClone, This could be very expensive if we lose this case.  We want to limit our risk.  So there are four components that have to be mixed together to make the HyClone media, we want you to ship $4 million worth of those components to Singapore and then mix them together in Singapore and not in the United States. Would that violate 271(f)?

MS. CUTRI:  No, I don't think it would.  Because in that case, still it's HyClone doing the exporting.  Celltrion

1   is not doing the exporting, and they're not causing the

2   exporting.

3            THE COURT:  I don't think I need to hear much more on

4   this.

5            You've got five more minutes on plausibility.

6            MS. CUTRI:  Okay.

7            So Microsoft also tells us this is an important

8   guiding principle at 271(f).  That where there's presumption

9   against extraterritoriality.  That's where we have to default

12:54 10  to.  If there's any question about whether we can expand 271(f)

11  and use it to kind of reach conduct outside of the United

12  States, which is precisely what Janssen is doing here, trying

13  to reach outside the U.S. to get at entirely extraterritorial

14  conduct, any doubt it's a no.  Because the presumption against

15  extraterritoriality tells us we can't reach that, and that's

16  solely the province of foreign law with foreign patent laws

17  that you're left with if that's what you're trying to do.

18            THE COURT:  But Microsoft doesn't focus on causation,

19  does it, the meaning of causation?

12:55 20  MS. CUTRI:  No.  It more focuses on this

21  extraterritoriality concept and the concept that you cannot

22  use -- they talk about the springboard.  What's happening in

23  the United States cannot be used a springboard to reach for

24  liability to reach extraterritorial conduct.

25            This is the slide.

1          And like I said, the facts here were different.  It

2    was the copy, the master software and the copies.  But

3    basically the goal here, the patent he was trying to say I

4    should be able to reach these totally extraterritorial acts

5    because there's something happening in the U.S., there's

6    something happening here.  And the Supreme Court said no.  You

7    cannot use what happens here as a springboard for liability

8    every time these other subsequent, totally foreign things are

9    happening.  Foreign law alone, not U.S. law, is what governs

12:55 10    that.

11          The rest of the slides I have relate to Hospira more

12    specifically.

13          THE COURT:  All right.  I don't want to see anything

14    on Hospira.

15          In fact, who's going to argue this motion for Janssen?

16          MR. DISKANT:  I will, your Honor.

17          THE COURT:  What's the -- you don't have to make the

18    whole argument.  What's your essence of your argument on

19    plausibility and causation?

12:56 20          MR. DISKANT:  The essence is the facts are

21    overwhelming.  I'm going to present them to you.

22          We have evidence from 2012 -- your Honor found -- you

23    may have forgotten this.  Besides finding the evidence was

24    sufficient to support inducement, your Honor found we could

25    allege and attempt to prove to the jury that Celltrion

1    controlled HyClone, that HyClone was Celltrion's agent making

2    Celltrion directly liable for HyClone's --

3         THE COURT:  I found that on the motion for summary

4    judgment.

5         MR. DISKANT:  Yes, you did, your Honor.

6         So we have an agency theory that your Honor has

7    already upheld on the evidence against a motion for summary

8    judgment; and in addition, an inducement theory your Honor's

9    also upheld on the motion for summary judgment.  So there's

12:56 10  just nothing to this.

11        But I'd like to show you some of the facts.

12        THE COURT:  Well, you will after lunch, but what's the

13   meaning of causation?

14        MR. DISKANT:  I think it's got an ordinary meaning;

15   you cause something to happen.  I don't think it's a tricky

16   word.  It's something juries find every day in all kinds of

17   fact patterns.

18        Where you have -- on our facts, you have Celltrion

19   directing its agent, interacting with its agent, approving its

12:57 20  agent's efforts to avoid infringement.

21        Here's a non-privileged e-mail from Celltrion

22   internally.  ████████████████████████████████████████

23   ████████████████████████████████████████████████

24   ████████████████████████████

25        I mean, that's what's going on.  And I think they

1    moved as quickly as they could.  I think, finally, they have

2    stopped causing the goods to be shipped ex-U.S., because that's

3    the only way ultimately to defeat infringement, but there are a

4    lot of constraints that tied them up.  And --

5            THE COURT:  Okay.  It's now 1:00.  You should come

6    back at 2:15.

7            MR. DISKANT:  Thank you, Judge.

8            THE COURT:  Court is in recess.

9            THE CLERK:  All rise for the Honorable Court.

02:02  10            (Lunch recess taken.)

11            THE CLERK:  Court is back in session.  You may be

12   seated.

13            THE COURT:  Mr. Diskant, you can speak briefly to the

14   issue of plausibility.  Again, the allegations in the

15   complaint, at the moment I'm satisfied they state a plausible

16   claim.

17            MR. DISKANT:  Your Honor, if I may, I would like to do

18   that.  I can literally in the same breath address why there's

19   no more discovery needed.  Does that make sense to combine the

02:23  20   two?

21            THE COURT:  Well --

22            MR. DISKANT:  It's the same presentation.

23            THE COURT:  That's fine.  We're going to have to at

24   some point address whether you had a right to add this in the

25   counterclaim rather than it's an amendment subject to the Foman

1  standards, but go ahead.  Thank you.

2          Actually, I'll tell you another question I have so you

3  can address it.

4          When you say "no additional discovery," does that mean

5  no discovery after today, or does it mean no discovery that you

6  wouldn't otherwise be doing on the --

7          MR. DISKANT:  It means the latter.

8          THE COURT:  It means the latter.  That's what I was

9  afraid of -- no, no, that's what I thought.  That's what I

02:24 10  thought.

11          MR. DISKANT:  There's not much left.

12          THE COURT:  Okay.  Go ahead.

13          MR. DISKANT:  It's all scheduled.  It has to be done,

14  I think, by February 28 or something like that.  So there's

15  hardly any left, but there is little bits and pieces left.

16          So let me hand this out.

17          (Pause.)

18          THE COURT:  This will be Exhibit 3.

19          (Exhibit 3 marked for identification.)

02:25 20  (Discussion off the record.)

21          MR. HALES:  Your Honor, could I raise one housekeeping

22  issue?  This is really short.  It relates to something that

23  Mr. Diskant and I just spoke about.

24          While Mr. Diskant was making his piece, he read into

25  the record and excerpt or something out of a document that he

1  said was a Celltrion document and he said that was not

2  privileged.

3        We actually recently had a privilege clawback, your

4  Honor; and the thing that Mr. Diskant read is very much like

5  the type of things that we clawed back.  It's a document in

6  Korean.  So some things, you know, they're Korean, they didn't

7  get caught properly.

8        We've sent them a clawback letter.  I don't know if

9  this one was on it, but it's very similar to things that I know

02:26 10  we clawed back.  So I raised that with Mr. Diskant and said

11  until I can actually investigate this document, it's one that

12  we would claw back.  We're in this awkward position now that

13  it's something that was read into the record.  So I wanted to

14  raise it promptly with your Honor.

15        THE COURT:  What do you propose?

16        MR. HALES:  My proposal is that I've told them that we

17  want to claw that back, so under the protective order, they've

18  got to return it to us, or cordon it off, so we can do

19  the investigation that is done on these things.

02:26 20        THE COURT:  Do you want a redaction of the transcript?

21        MR. HALES:  Yes.  It's one line that we could identify

22  that would be redacted.

23        THE COURT:  I directed that you order my decision on

24  the motion to compel on an expedited basis.  This sentence is

25  not in that part of the transcript, correct?

```
 1              MR. HALES:  That's correct.

 2              THE COURT:  All right.

 3              MR. HALES:  It was just before the break, lunch break.

 4              THE COURT:  That's fine.

 5              When the transcript -- the rest of this is prepared,

 6    because, although it's unnecessary, I'm sure -- I'm directing

 7    that you order the complete transcript of today's proceedings,

 8    but I'm directing the court reporter to give it to me and to

 9    you but not to docket it until you have a week to make the

10    necessary redaction.

11              MR. HALES:  I appreciate that, your Honor.

12              THE COURT:  Okay.

13              MR. DISKANT:  And let me just say, Judge, the document

14    I read from, which I've provided to them, is a document between

15    two scientists at South Carolina -- do you mind if I hand it

16    up?  It's going to be before the judge --

17              MR. HALES:  I think the procedure that is spelled out

18    is if I claw it back, that we make a log and we deal with it

19    that way.

20              THE COURT:  Excuse me.  Can you give me the protective

21    order?  It's in the file I had this morning.

22              MR. HALES:  This is something -- what I've asked is

23    that we have a chance -- it's in Korean, and it's an Excel

24    file --

25              THE COURT:  Is this document really material to your
```

argument?

MR. DISKANT:  No.  I just wanted to explain why I used it.

THE COURT:  No, you don't need to.  It's not an efficient use of time.  It illustrates part of the reason I don't want to get in the middle of trial and be talking about Biogen's documents as well as your documents.

Go ahead.

MR. DISKANT:  That's fine, Judge.

02:28  I'll only say that they have been very aggressive in claiming privilege over things that I doubt are privileged, and probably this will all be before you soon enough.

In any event --

THE COURT:  Probably too soon.  Go ahead.

But that's the other thing, I'll reiterate it, if you've got disputes like this, I'm not going to go line by line.  I don't think that's reasonable.  And you need this admonition less than many lawyers and litigants, but you each want to be very comfortable that your position is going to

02:29  prevail as the most reasonable.

Go ahead.

MR. DISKANT:  Let me just walk through first where this claim came from.  And if I can go back, because there's been some suggestion that we should have brought it earlier, I just want to walk through very quickly where this came from.

1          So in October, back -- the first trial we subpoenaed

2    HyClone for documents.  They fought us.  We had to go to the

3    magistrate judge.  Meanwhile, fact discovery ended in the first

4    trial -- in the liability phase.  The district judge overruled

5    our objections, compelled production in August.  Meanwhile,

6    expert reports were due in the liability phase, rebuttal

7    reports were due, reply reports were due.  Finally, in this

8    period of a month in October, HyClone produced 44,000 pages of

9    e-mails, and then --

02:29 10          THE COURT:  In liability --

11          MR. DISKANT:  On liability.

12          THE COURT:  -- discovery, fact discovery closed July

13    2016.

14          MR. DISKANT:  That's right.

15          THE COURT:  And you got these documents, more than

16    44,000, in about October 2016, and your counterclaim is based

17    on three e-mails that were in the 44,000 documents.

18          MR. DISKANT:  That's correct, Judge.

19          THE COURT:  Okay.

02:30 20          MR. DISKANT:  At the time, we were focused entirely on

21    whether moving to Singapore was -- was or was not going to be

22    used as an admission of liability, it could be used on

23    inducement; we argued all those things.  We were not focused on

24    what turned out to be this issue.  And indeed, in that time

25    period -- throughout that time period, the defendants were

saying again and again and again that the Singapore media was

not infringing.  They served an expert report that said that.

Mr. Hurst said that in court.  They made a motion that was

based upon that, and they've argued it.

So throughout that entire period, we essentially

accepted as true the thought that by moving to Singapore they

would escape infringement.

So then we discovered the infringement as follows:

This -- for the first time, damages were consolidated with

02:31  liability after we filed the 2017 action.  They moved to

dismiss it.  Your Honor, nonetheless, set a deadline for

exchanging damages discovery requests; and on August 14 of last

summer, they asserted that Singapore was a noninfringing

alternative, possible noninfringing alternatives include the

media composition Celltrion currently purchases from GE

HyClone's Singapore facility.

So it became squarely part of the damages case.  And

if it's not infringing, then it may be an alternative; but if

it is infringing, then it's not an alternative.

02:32  So your Honor denied their motion to dismiss.  And on

November 6, 2017, my very smart colleague, Andrew Cohen,

reviewing these documents with great care, discovered these

three documents that showed that HyClone was actually shipping

all of the components of the Celltrion media --

THE COURT:  Excuse me just this moment.

1          (Discussion off the record.)

2          THE COURT:  Go ahead.

3          MR. DISKANT:  Mr. Cohen discovered these three

4    documents that showed that HyClone was shipping the components

5    of the Celltrion media to Singapore to be combined there.  And

6    I'll just show quickly those three e-mails.

7          There's one from 2015.  It's shipped from Logan's

8    existing inventory.  Information shared with Celltrion in 2015.

9          Here's another one.  The components are currently

02:33 10   arriving in Logan and shipped to Singapore, raw materials.

11          The meeting that Celltrion attended, Celltrion

12   attendees, three of them.

13          And one more e-mail in this collection.  We ordered

14   the components specifically to be sent to Singapore in case

15   Celltrion orders them from Singapore.

16          So basically these three e-mails led to us say, Whoa,

17   there's a 271(f)(1) violation.

18          Meanwhile, the defendants filed their answer and

19   counterclaims against us, which asserted, among other things,

02:33 20   that they do not infringe the patent, period.  Not they don't

21   infringe 271(f)(1), (2), (3); they don't infringe.

22          And we sought more discovery from HyClone.  We advised

23   the defendants that we had identified this 271(f)(1) issue, and

24   we filed our counterclaim.

25          So that is the factual story where this came from.

1          THE COURT:  And actually -- I don't think you have

2     it -- you file -- your counterclaim under the Federal Rules of

3     Civil Procedure is your counterclaim reply was due 21 days

4     after the counterclaim was filed.  The parties reached

5     agreement to give you another two days.  I think within those

6     21 days you could have amended your complaint as a right, too,

7     under the rules.

8          MR. DISKANT:  I think we could have.  But, anyway,

9     this is what we did.

02:35 10          And of course, we've looked at the statute; your

11     Honor's familiar with it.  Causes to be supplied from the

12     United States all or substantial portion of the components of a

13     patented invention, where they're uncombined in such a manner

14     as to actively induce their combination outside the U.S. in a

15     manner that would infringe the patent if it occurred in the

16     U.S.  It's like a precise actual description of what we alleged

17     was happening.  We did allege that, and our allegations were

18     both direct and induced, and were relying on your Honor's

19     rulings on the summary judgment motion.

02:35 20          By directing and controlling its agent, HyClone,

21     supply from the United States at least a substantial portion of

22     the components of the infringing media, Celltrion infringes.

23          And likewise, by causing HyClone to do it, to supply

24     the components, Celltrion has actively induced and continues to

25     actively induce the combination of the components outside the

1    U.S.

2         THE COURT:  And I believe in paragraph 34 you alleged

3    that HyClone was acting as Celltrion's agent.

4         MR. DISKANT:  That's correct.

5         And 36 makes reference to directing and controlling

6    its agent, HyClone.

7         And to remind your Honor of your ruling on summary

8    judgment -- could we go to 43, please?

9         You made two rulings on summary judgment.  In one, I

02:36 10   find there is a genuine issue of material fact as to whether

11   HyClone acted as Celltrion's agent in manufacturing the media

12   for infliximab.

13        And secondly, there's evidence of defendants'

14   subjective intent, Celltrion's subjective intent to induce

15   infringement.

16        THE COURT:  I now realize I didn't issue an order

17   summarizing this.  It's been drafted for a long time, but I

18   hope to get it to you soon.

19        Go ahead.

02:37 20        MR. DISKANT:  In any event, both issues are on the

21   table; your Honor ruled on them both.

22        So we can go back to where we were.

23        We can skip Hospira for the moment.

24        So we allege HyClone, as Celltrion's agent, is causing

25   to be shipped overseas, and Celltrion is causing to be shipped

1    overseas.  This is not a mere purchaser; this is an actor

2    principal directing its agent.

3              THE COURT:  That's the allegation.

4              MR. DISKANT:  That is the allegation.

5              THE COURT:  A plausible allegation for the purposes of

6    Rule 12(b)(6) is -- well, a claim has facial plausibility when

7    plaintiff pleads content that allows the court to draw the

8    reasonable inference that defendant is liable for the

9    misconduct alleged.  That's Iqbal.

02:38 10         I don't think I can take into account in a motion to

11   dismiss the evidence concerning the motion for summary

12   judgment, but --

13             MR. DISKANT:  We did summarize it in the counterclaim,

14   I believe.

15             THE COURT:  The evidence.

16             MR. DISKANT:  Well, let's see --

17             THE COURT:  I was going to say, why is it a plausible

18   claim, even putting aside that evidence?

19             MR. DISKANT:  Well, it's a plausible claim -- I mean,

02:38 20   because the evidence is -- and you can just look at the

21   complaint.  During 2015 and '16, representatives of Celltrion

22   and HyClone communicated regularly regarding the possibility of

23   having HyClone make the Celltrion media at its facility.

24             You know, during this time, they repeatedly discussed

25   Celltrion's plans to evaluate, eventually purchase the media

1     from the components combined in the facility.

2            Celltrion received samples, evaluated the media.  They

3     concluded that the tests in Singapore made an acceptable

4     substitute.

5            THE COURT:  Is this the counterclaim you're reading

6     from?

7            MR. DISKANT:  Yes.

8            THE COURT:  I thought you said the complaint.

9            MR. DISKANT:  I'm sorry.

02:39 10            It does say it's alleged more completely in the

11     complaint, which I'm sure is incorporated by reference.

12            THE COURT:  That's okay.

13            MR. DISKANT:  There's quite a lot of factual detail.

14            THE COURT:  There is a lot.

15            MR. DISKANT:  So this all happened.  And, you know, I

16     do think the motion for summary judgment -- we relied on your

17     Honor's analysis of the same evidence as part of our plausible

18     basis for making the allegations.  So I think it certainly

19     bears at least to that extent.

02:39 20            In any event, we went forward with this; and, you

21     know, we've taken discovery.  Why have we taken the discovery?

22     Well, it's part of our counterclaim, but it's also exactly the

23     same evidence that we need to prove that it is not a

24     noninfringing alternative.  That's squarely at issue in the

25     damages case, the exact same issue.

1       If it's a noninfringing alternative, then it's a

2   noninfringing alternative, and we lose our infringement case

3   and we lose our lost profits, potentially.  And if it is an

4   infringing alternative, then it infringes and we win, and they

5   lose their damages defense.  They're mirror images of the same

6   point.

7       THE COURT:  Is it your argument that the only

8   additional work that will need to be done is by the experts in

9   doing an additional damage calculation?

02:40   10       MR. DISKANT:  Oh, the monetary expert, yes.  The

11   economic expert has done an additional -- some numbers, which

12   we provided to them already.

13       The other experts are providing evidence they would

14   have provided in any event on the noninfringing alternative

15   analysis.

16       We took HyClone's deposition, and they agreed it was

17   true.

18       Was there ever a time when all or substantially all of

19   the raw materials used to manufacture the Celltrion media in

02:41   20   Singapore were shipped from the Logan facility to Singapore?

21       Yes.

22       Then, we said:  When did it stop?

23       2017.

24       And by matching the 2017 up with other testimony from

25   the same witness, Brian Douglass, it's April/May 2017.  They

 1    stopped shipping all of the components to Singapore, and

 2    Singapore starts sourcing on its own.

 3            So what's that timeline look like?  This is slightly

 4    off, but that's okay.

 5            So back in January 2012 is the origins of the

 6    Singapore plant, and the language, which you can't read, but

 7    I'll show you the documents in a moment, I'm just really

 8    walking you through it.

 9            From the beginning, the common source of raw materials

02:42 10    was to be used for both sides.  And our experts have already

 11    explained in their noninfringing alternatives' opinion why that

 12    makes good sense.  There's good quality control, there's less

 13    regulatory hassle and the like.

 14            So the original plan was for Logan to be the source of

 15    the materials for both facilities.

 16            Construction began in 2012, completed in 2013.

 17            December 1, 2014, another HyClone document confirming

 18    all raw components are shipped from Logan to the Singapore

 19    site.

02:42 20            January 2015, Celltrion approved the facility, begins

 21    the approval process.

 22            Another document -- many of these shared and discussed

 23    with Celltrion -- all raw materials, including media

 24    components, are procured and tested through the Logan facility.

 25            October, all raw materials will be supplied from

Logan,

November, produces its first batch of Celltrion media using raw materials from Logan.

2016, components currently arriving at Logan, ship to Singapore.

2017, and now in April/May, they make the switch.

May 1 -- approximated between April and May sometime, it's the mid-date.  HyClone stops sending most raw materials from Logan to Singapore.

02:43   Now, why does that matter in terms of where we are today?  It matters because shipping the raw materials is many months away from a finished product.  First you get the raw materials, then you make the cell media, then you ship the cell media to Korea, then they make the -- they make something called the drug substance, then they make the drug product, then they ship it to the U.S.  And we've tracked this back with the documents, and the bottom line is, all Inflectra available for sale in the United States today was made with infringing cell media, either from Logan or from Singapore.

02:44   So these are the facts that we're going to lay out, but I show you some of the documents to give you a sense of the substance of the case.

This is back in the beginning.

Common source of raw materials to be used for both Logan and Singapore sites.  Celltrion accepted.

1           And remember, we're alleging, and your Honor found

2      substantial evidence to support the allegation --

3           THE COURT:  This is a motion to dismiss.  And as I

4      told you, I'm persuaded that Janssen's alleged a plausible

5      claim.

6           So I think the next issue logically is whether I have

7      any discretion to dismiss or strike it, Celltrion's motion.  I

8      should hear from them.

9           MR. DISKANT:  That's fine, Judge.

02:45 10          (Pause.)

11          THE COURT:  So, essentially, the question is

12     whether -- I think it's agreed, this is -- Janssen's is a

13     compulsory counterclaim, and the question is whether they had a

14     right to file it or whether they required leave of court.  And

15     if they required -- or whether they required leave of court.

16     We'll take it in small pieces.

17          MS. CUTRI:  Okay, sure.

18          I actually have a couple more comments about the

19     causation issues --

02:46 20          THE COURT:  I don't need to hear.  I'm going to start

21     behaving like every other judge and say enough is enough.

22          Go ahead.

23          MS. CUTRI:  Can we go to slide 40, please?  We're

24     going to go directly there.

25          THE COURT:  40?

1        MS. CUTRI:  Please, yes.

2        Thank you.

3        And I'm actually going to start in the section which

4   is 41.

5        THE COURT:  41.

6        MS. CUTRI:  Right.

7        THE COURT:  I want you to address the legal issue of

8   whether this is --

9        MS. CUTRI:  Sure.

02:47 10       So I think Janssen's position here has been -- and

11  what they have said, what your Honor had mentioned -- it was

12  compulsory.  That's what they're saying.  This is compulsory,

13  so it's just in, that's it, end of story, right.  And our

14  response to that is, no, that's not right.

15       We have to look at what's really going on here.

16  That's the label they've slapped on this and said, Well, look

17  at the standard for compulsory counterclaim, these four things,

18  Oh, check, check, check, done, we're in, it's done.  That's it,

19  and nobody can do anything about it.  Never mind the fact we've

02:47 20  had these documents for 15 months.  Never mind the fact we had

21  the documents the last time the defendants pled these very same

22  counterclaims.

23       THE COURT:  Whether there was undue delay and whether

24  they have a right to amend are two separate issues.

25       I don't get to whether there was excusable delay or

 1   undue delay if they had a right to add the counterclaim.

 2   That's why I mentioned Judge Becker's decision in Southeastern

 3   Industries as an early statement of, it seems to me a correct

 4   statement, of what's now the law.  But that's the issue I want

 5   you to address.

 6          MS. CUTRI:  Right.  And I'll do that.

 7          They don't have the right to add these at this point.

 8   And you know, there are cases kind of on both sides of this

 9   issue of whether or not this exists, okay.  Is there such a

02:49 10  thing as a counterclaim in reply?  Does it exist or not?  A lot

 11   of cases say no.  We have cited a bunch of cases.  This doesn't

 12   exist at all, in fact, you try it, it's gone, it's just

 13   stricken.  It doesn't exist, okay.

 14          THE COURT:  Okay.  What's the best case for that

 15   proposition?

 16          MS. CUTRI:  Well, a number of these on the screen

 17   here.  These are all cases that we cited in the brief.

 18          THE COURT:  I know.  What do you think is the best

 19   one?  The best reasoned one.

02:49 20          MS. CUTRI:  I think the best reasoned one is, because

 21   usually where this happens -- there's a Tenth Circuit case --

 22   let me see if I have it in here, if I can get to it -- a case

 23   talking about this issue within the Tenth Circuit.  I'm not

 24   finding it right now.

 25          THE COURT:  I'm sorry, I can't hear you.

1           MS. CUTRI:  I apologize.  I'm trying to find the case

2      for you, your Honor.

3           Here, I went past it.

4           This Turner case, Kansas, 1997.  It's on slide 42,

5      your Honor.

6           THE COURT:  Hold on just a second.

7           MS. CUTRI:  Sure.

8           (Pause.)

9           THE COURT:  Hold on just one second.

02:50 10           MS. CUTRI:  Sure, of course.

11           (Pause.)

12           THE COURT:  Turner?

13           MS. CUTRI:  Yes.  It's our slide 42.

14           And there's a District of Massachusetts case on the

15      same slide, kind of gets to the same idea.

16           The principle in your question was why, right, and

17      why?  The principle is because many times what this is is an

18      end run around the rules.  That's the reason.  And the reason I

19      like this Turner case is because it says that.

02:51 20           This court is not convinced that we should adopt this

21      method of circumventing the limitations of Rule 15.

22           Because that's exactly what's happening here.  And the

23      courts have acknowledged this, that a lot of times what's just

24      happening here is you're sneaking in something late.  It should

25      have come earlier.  This is part of your original nucleus of

facts, your original case, it should have come in earlier.  And

now you're using this procedural trick whereby your opponent

pled some claims, and now you're saying, Oh, now, me, too.  And

that's why the courts have said in many instances -- and there

are cases saying this, too, they say sometimes these

counterclaims in reply, this counterclaim to a counterclaim,

sometimes that's okay.

When you look at even the cases they cite that say,

okay, maybe this is a real thing, they still say the better

practice is to treat it as an amendment, because that's really

what's going on.

THE COURT:  What case says that?

MS. CUTRI:  So the ones on 42, on my slide 42 say

that.

The better practice would call for an amendment to the

complaint rather than a counterclaim to a counterclaim.

THE COURT:  Wait a minute.  Okay.  That's Bethlehem.

MS. CUTRI:  Mm-hmm.

THE COURT:  Hold on a second.

The 1940 case.

MS. CUTRI:  Mm-hmm.

THE COURT:  Even older than Judge Becker's.

MS. CUTRI:  We have cases going all the way up -- I

think the most recent we have on our slides is 2015.  It's an

old principle, but it's a new principle, and one that's still

1  valid here, too.

2          And I liked the <u>Turner</u> case, even though it's a

3  different district here, because it really nicely captures in

4  this principle about circumvention.  Hey, you're trying to get

5  around the rules here by sneaking something in that you should

6  have pled earlier and you could have plead earlier, it relates

7  to your claims.  And this court, the District of Kansas, said

8  the very same thing.  The better thing here to is to treat this

9  as a motion for leave to amend.  For present purposes, that's

02:53 10  what we're going to do.  Plaintiffs' counterclaim in reply,

11  exactly what we're dealing with here, plaintiffs' counterclaim

12  in reply shall be construed as such on a motion to amend.

13          That's precisely what this Court should do.  I think

14  your Honor mentioned that last time we were here, maybe this

15  ought to be treated as an amendment; we think that's exactly

16  right.

17          THE COURT:  At that time I hadn't read the cases.

18          MS. CUTRI:  Well, the cases we have on our next slide

19  talk about this -- well, first of all, there are number of

02:53 20  cases that say you can't do this at all, and it's gone.  We

21  have a list of cases there.  But we don't even need you to say

22  that here.  We're happy with, Judge, you need to look at the

23  motion-to-amend rubric, and we need to be looking at either

24  Rule 15 or Rule 16 here.  And let's talk about why.

25          I want to talk about your question about compulsory

1  and the compulsory nature here, because I think that's

2  important.

3          They're saying it's compulsory, and that's it.  We had

4  to do it; we had no choice.  That's not right.  They're saying

5  it's compulsory in response to our counterclaims.

6          The only reason they can try and go through and check

7  the boxes for compulsory counterclaim in response to our

8  counterclaims is because our counterclaims were compulsory to

9  their counterclaim, same nucleus of facts.  They're saying, Oh,

02:54 10  this all arises out of what you pled.  No, no, no, that's

11  because what we pled arose out of what you pled, right.

12          You know what else checks all the boxes?  Your most

13  recent claim, your, quote, counterclaim to counterclaim, checks

14  all these same boxes with respect to what you pled in your

15  complaint.  This should have been part of your complaint.

16          It's a procedural trick.  It's smoke and mirrors is

17  what it is.  It's just a label they're putting on it.  It's not

18  really looking at what's going on.

19          THE COURT:  But I pointed out -- and I'll have to go

02:55 20  back and -- I can go back.

21          I believe they could have amended as a right within 21

22  days of your counterclaim.

23          (Discussion off the record.)

24          THE COURT:  So this Rule 15.  Amending as a matter of

25  course.  Party may amend its pleading once as matter of course

```
 1   within 21 days after serving it --

 2          MS. CUTRI:  That's their opinion.

 3          THE COURT:  -- or if the pleading is one to which a

 4   responsive pleading is required, 21 days after service of a

 5   responsive pleading or -- well, 21 days after service of a

 6   responsive pleading.

 7          So I think what happened -- I'm just trying to see

 8   what's -- Celltrion agreed to give them another two days to

 9   respond to the counterclaims.  They had to respond to the

02:56 10   counterclaims, I believe, right?

11          MS. CUTRI:  To answer.

12          THE COURT:  You gave them another two days.  They -- I

13   don't know if anybody foresaw this, but they hadn't asked for

14   and received from you, and I guess from me, a two-day

15   extension.  They could have, as a matter of right, amended

16   their complaint.  Right?

17          MS. CUTRI:  Are you talking about the second part of

18   the rule you just read?  I don't have the rule in front of me.

19   I'm trying to follow what you just said.

02:57 20          THE COURT:  It's Rule 15 --

21          (Discussion off the record.)

22          THE COURT:  -- (a)(1).

23          So it says, Party may amend its pleading once as a

24   matter of course.  And then, (b), if the pleading is one to

25   which a responsive pleading is required and you had to respond
```

1   to the complaint after I declined to dismiss it, 21 days after

2   service of a responsive pleading would be the pertinent part.

3           So if on day 21, instead of day 23, they had wanted to

4   do this, they could have amended their complaint without asking

5   me, is the way I read it at the moment.

6           Did anybody make that argument?

7           This is not in anybody's brief, and probably you don't

8   have the rule.  But -- so I'm just -- you know, in my view, A,

9   as you noticed, I try to -- very hard to figure out what the

02:58 10   law is and follow it; but, B, the law is not a game.  If you

11   all had looked at this rule, maybe they wouldn't have asked you

12   for two more days, maybe they would have styled their request

13   differently.

14           There are cases that go both ways.  Wright & Miller,

15   if you look at 5 Federal Practice and Procedure Civil Section

16   1188, recognizes there are different cases and says basically

17   that at least if it's a compulsory counterclaim, leave of court

18   should not be required.

19           MS. CUTRI:  I'm not sure this is right.  I'm looking

03:00 20   at this, because it's a party may amend its pleading once as a

21   matter of course.  We're saying Janssen could amend its

22   complaint once as a matter of course if their pleading was one

23   to which a responsive pleading was required.

24           THE COURT:  Right.  So you had to answer the

25   complaint.

1          MS. CUTRI:  That's right.

2          THE COURT:  Their complaint required a responsive

3     pleading.

4          MS. CUTRI:  That's right.  I do see what you're

5     saying.

6          THE COURT:  Then the complaint -- so you didn't just

7     answer; you filed a counterclaim.  If they had answered it more

8     quickly and thought about Rule 15, they would have just amended

9     the complaint.  So anyway.

03:00 10        You know, we are where we are because they didn't do

11    it within 21 days, they did it in 23 days; but when there's a

12    case that sometimes is said to involve a billion dollars or

13    more of damages, how much should turn on that?

14         That was just an observation.

15         MS. CUTRI:  And I think that's a good one that your

16    Honor points out that we didn't acknowledge, and I guess they

17    didn't either, of course.

18         You know, where we're at here, where we're at now is

19    that this was something that could have happened a year ago,

03:01 20   over a year ago, a year before it happened, right.  I think

21    it's telling that we pled -- these are basic responsive

22    counterclaims.  They're simple, right.  They're just

23    declaratory judgment, we don't infringe, the patent is not

24    valid.  We pled them in November of 2016.  In the thick --

25         THE COURT:  Wait a minute.  What did you do in

1   November of 2016?

2           MS. CUTRI:  We pled these very same counterclaims,

3   identical, it's verbatim, actually.

4           What happened, as you'll recall, we had said we're

5   going to move to dismiss that, it would have been at that point

6   their second complaint.  We're going to move to dismiss.  Your

7   Honor said, No, let's do that on summary judgment instead.

8   Sure, that's what we'll do.  So we had to answer.  It was the

9   complaint from June 2016, the second one, which is now gone.

03:02 10          We answer in November 2016.  Very same counterclaims,

11  rogue counterclaims.

12          They had just gotten these documents from HyClone,

13  months -- the month before, and they were going through them,

14  of course, right.

15          Great.  We finally got all this discovery.  As

16  Mr. Diskant told us, we really wanted this.  We were tracking

17  this down.  We went to court for it.  This was so important to

18  us.  We finally got all these documents.  They're all about

19  Singapore.  Great.  They're combing through all these

03:02 20  documents.

21          We file our counterclaims.  The exact same ones we

22  file here.

23          They show up in court, in this court, with documents

24  from that production.  Look what we found.  This is great.

25  This is talking about Singapore.  We found some good stuff.

1    They dig.  They find a bunch of good stuff.  They take a

2    deposition of HyClone, right.  All of these documents in front

3    of a HyClone witness, multiple HyClone witnesses, there were

4    three or four.  We have all these documents we found in the

5    production, stuff we like.  Okay.  They marked these documents

6    at a deposition.  They showed them to your Honor.  They bring

7    them here in summary judgment.  Meanwhile, I said we had pled

8    these claims.

9            THE COURT:  Don't go too fast.  Slow down and speak

03:03 10    into the microphone, please.

11            MS. CUTRI:  So, right.

12            So they showed up in court with these documents.  They

13    had gone through them.  Meanwhile, our counterclaims were

14    pending.

15            They answered our counterclaims early December.  So

16    this is a year, 2016, December 2016.  They answered our

17    counterclaim, I think it was December 1st.  You know what was

18    nowhere in that answer to the counterclaims, the very same one,

19    is 271(f).  Nowhere in there.  They had all the documents.

03:03 20            THE COURT:  They had all 44,000 documents, and they

21    hadn't found the three e-mails.

22            MS. CUTRI:  That's not correct.

23            THE COURT:  They had found them.

24            MS. CUTRI:  They sure had.

25            Let me just -- on the 44,000 documents.  Your Honor,

1    this is a big case.  A case of this magnitude -- 44,000

2    pages -- I'm sorry, it's not documents, pages.  Forty-four

3    thousand pages -- like our FDA application alone is 70,000

4    pages.

5         They combed through that.  That was the basis of their

6    complaint.  They've been through that; we've all been through

7    it.  There's hundreds of thousands of documents in this case.

8    Forty-four thousand documents -- and they asked for all these,

9    and they wanted them.  These are the documents they sought that

03:04 10    they got and that they fought hard to get and that were so

11    important for them to have.

12         What happened was this -- let me find my pictures.

13         Okay.  First thing -- first time we ever hear this

14    whole case a year later -- first time we ever hear a mum about

15    271(f) is in December of last year, right, just a couple of

16    months ago.  They mention this in a joint report, I think, on

17    one of the phone calls with your Honor in early December.  Oh,

18    we think we have this 271(f) claim.

19         We've never heard of this before.  So I wrote to their

03:05 20    counsel.  This is me, this is my e-mail to Mr. Fischer.

21         Hey, you mentioned this on the phone today, what's the

22    basis -- where is this 271(f) claim coming from?  He cites

23    three documents.  These are not Celltrion --

24         THE COURT:  Wait a minute.

25         So this is one of the phone calls we had in December

1   2017?

2          MS. CUTRI:  That's right.

3          THE COURT:  Okay.  How much before -- and then when

4   did they file -- I have the chronology here.

5          MS. CUTRI:  Sure.  And I do, too.  I can go back --

6          THE COURT:  That's okay.

7          MR. DISKANT:  It's on page 16 of our slides, if you

8   want the timeline.

9          MS. CUTRI:  This was a few days before they actually

03:05 10   filed the claims.  So they gave us a little preview.  I think

11   we were all on the phone December -- I want to say it was

12   December 2nd is my best recollection, or 5th.  It may have been

13   the 5th -- it was somewhere in that approximate time frame.

14   And they had said this to us over e-mail I think to a draft

15   joint report.  Oh, also, you guys, there's this 271(f) theory.

16   We've never heard of this before.

17          This is what brings me to my e-mail.

18          Dear Mr. Fischer, what are you talking about?  Tell us

19   the basis for this claim.

03:06 20          And he responds with this:

21          Our basis for the statement includes -- and he cites

22   three documents -- these are GE HyClone documents, right.

23   These are the ones that were produced in October of 2016.  And

24   we figure that out.  We pull these up.  Where are these

25   documents?  Where are they?  Okay.  These were produced well

1    over a year ago.  We're thinking to ourselves, well, why are we

2    hearing about this now?  You've had these documents for over a

3    year.

4              THE COURT:  You're going too fast.

5              Although, actually, maybe not for the stenographer;

6    just for me.

7              MS. CUTRI:  Apologies.  I'll slow down.  Usually I get

8    dirty looks from the court reporters.  I will do my best.

9              Okay.  So these documents are identified.

03:06 10             Well, lo and behold, one of the documents Mr. Fischer

11   identified was one of the very same documents that was used in

12   court over a year earlier.

13             They filed this with their papers on the summary

14   judgment proceedings that happened in the fall of 2016.  The

15   same document, the very same one.

16             And they're coming here now and telling you, We didn't

17   know.  Oh, we didn't know.  We couldn't make it through all

18   44,000 documents.  I mean, it's just not right.  It's just

19   like -- it's demonstrably not correct.  They used at least one

03:07 20   of these documents in pleadings in this court in the very time

21   frame that we had pled the very same counterclaims a year

22   earlier.  And now they're saying, We didn't know.

23             THE COURT:  I thought they were saying they didn't

24   appreciate the importance of them, not that they didn't know

25   about the existence of the document.

1    MS. CUTRI:  They didn't appreciate, they didn't know.

2  They looked at them.  They had them.  I don't understand how

3  they can look at them -- they are looking at the exact same

4  document in e-mail they're saying we appreciate it differently

5  now.

6    THE COURT:  Now you've kind of transitioned -- if I

7  have discretion, you're arguing that there was undue delay.

8    MS. CUTRI:  That's exactly right.  Very --

9    THE COURT:  What's that?

03:08 10    MS. CUTRI:  Very undue on our part, substantially

11  undue.

12    THE COURT:  If this is a discretionary matter, and if

13  discretion was to be exercised to allow them to amend with

14  leave of court, how would Celltrion be unfairly prejudiced?

15    MS. CUTRI:  Sure.  I know we talked about this a

16  little bit earlier, I'll talk about that.

17    I think our view here is that if there's going to be a

18  new theory of liability in the case, they pled this as an

19  affirmative claim, of course, right.  They have a prayer for

03:08 20  relief where they're asking for a remedy.  They're asking for

21  injunctive relief, and they're asking for damages.  So this is

22  not the same as just a noninfringing alternative issue.  This

23  is an affirmative claim.  If they're going to come to court and

24  tell the jury that we're on the hook for some other form of

25  infringement --

1          THE COURT:  So that's a form of prejudice in the sense

2     that it would be bad for Celltrion if it was exposed or had to

3     pay more in damages if it's responsible for infringement, but

4     why would that be unfair?

5          MS. CUTRI:  Because it's coming in so late, and we

6     think we are entitled to expert opinions to lay out these

7     theories and not just -- we're entitled to their expert

8     opinion --

9          THE COURT:  Expert opinions on damages or on

03:09 10    liability?

11          MS. CUTRI:  Both.  But on the actual liability issue,

12     we don't have that.

13          THE COURT:  What kind of expert -- I mean testimony

14     would there be on liability -- yeah, for liability.

15          MS. CUTRI:  On liability --

16          THE COURT:  On the facts, not on the damages.

17          MS. CUTRI:  So we looked at the statute earlier, and

18     there's all those different prongs that have to be shown.  And

19     there's one of them, at least one of them, is this substantial

03:09 20    portion of the components.  And what we don't have right now is

21     anything laying out their case on that.  We have nothing to

22     respond to.

23          THE COURT:  I know at the moment I have a question as

24     to whether expert testimony would be admissible on that issue.

25     I don't know how many ingredients -- I don't know what the

1    facts are.  I don't know how many ingredients there are, but

2    once the facts are developed -- and I know there's a lot more

3    than four ingredients -- but if there were four ingredients and

4    they got shipped to Singapore and then HyClone employees

5    combined them the way they combined them in the United States,

6    I don't know that an expert would be necessary to testify,

7    whether they were just combining ingredients, and I don't think

8    an expert would testify -- I mean, I'm just -- this is

9    tentative, but I don't see how an expert would be necessary to

03:11 10   testify on causation or inducement.  I'd instruct the jury on

11   that, and they'd decide what facts are proved.

12        MS. CUTRI:  I think the substantiality of all or

13   substantially all is probably the best issue here.  And part of

14   the problem is, and part of the problem maybe you're struggling

15   and we don't really know yet, is we don't have all the facts;

16   that's part of the problem here, too, right.  We don't have all

17   the facts.

18        THE COURT:  Do you want all the facts?

19        MS. CUTRI:  I'm sorry?

03:11 20        THE COURT:  Do you want all the facts?

21        MS. CUTRI:  Both parties are in the process of getting

22   those facts.  I think by expert --

23        THE COURT:  One of things I was going to ask you --

24   but now I think Mr. Diskant wouldn't go for this -- I wasn't

25   sure -- it's clear in their brief, and I looked at it over the

break, but it wasn't clear to me from the passing reference on

February 2nd what he meant when he said no additional

discovery.  I was going to ask you, do you want to move for

summary judgment right now?  Does Celltrion want to move for

summary judgment right now?  But I think Mr. Diskant would

probably say that I should grant some additional discovery

under 56(f), if it's still (f).

Anyway, go ahead.

MS. CUTRI:  That's a valid point.  We do think this is

a point if this procedural mechanism, motion to dismiss or

strike, isn't going to work that we do think this is going to

be a summary judgment issue, and we'd be amenable to summary

judgment.  We do want to make sure we have an opportunity to do

that.

What we're concerned about is that we have -- we know

what their claim is, and right now we don't know.  We don't

know what their theory of liability is, and they have to have

someone --

THE COURT:  I think I do.  I know what their theory

is.  It's a classic -- it's a classic -- I mean, that's a

different argument.  Then you should have said this doesn't

satisfy the requirements of Rule 8, but that's not the issue

here.

MS. CUTRI:  No.  I think the issue is we think this is

prejudicial to us, because they're telling us that we don't

1   need anything from us; we're just going to wing it.

2        THE COURT:  No, I don't think that's what they're

3   telling you.

4        They're saying, as I understand Janssen's argument, is

5   that with regard to liability, the discovery that has to be

6   done in the period I ordered regarding whether there was an

7   available noninfringing alternative is the same discovery

8   necessary for the 271(f)(1) claim on liability, and that the

9   only additional work that would need to be done would be by the

03:14 10   damages' experts, that's it.  That's their argument.

11        MS. CUTRI:  Right.  So I think we have a difference of

12   view on whether or not the discovery for the noninfringing

13   alternatives issue is the same as --

14        THE COURT:  What additional discovery do you say would

15   be necessary?

16        MS. CUTRI:  I think it's just their claims or their

17   contentions or what their theory is is different, and the

18   issues are different.  Because all we have to show, and we've

19   made this point in our briefs, we've discussed this a lot

03:14 20   today -- is in the hypothetical world we could have had -- you

21   know, could have gotten ingredients or more ingredients or

22   whatever could have come from outside the United States; and

23   frankly, that's easy to show.  You can get these things

24   anywhere.  I think their expert said they come from all

25   different places.

1          THE COURT:  We'll see.  Maybe you want to do that to

2    the jury, but if you could have got them everywhere, I

3    think you'd probably get -- one might think you would get them

4    someplace other than in Logan and run the risk of this

5    expensive litigation that could cost Celltrion a huge amount of

6    money.

7          MS. CUTRI:  Well, we're not -- that's not -- we don't

8    source the ingredients --

9          THE COURT:  What's that?

03:15 10          MS. CUTRI:  Celltrion doesn't source the ingredients.

11    It's not our call, it's not our decision; it's HyClone.

12          THE COURT:  No.  Actually, they allege that HyClone is

13    your agent.  And I have to -- if there's enough facts alleged,

14    and there are to support that inference -- go ahead.

15          MS. CUTRI:  I think what we want --

16          THE COURT:  So what additional discovery -- who would

17    you want to depose?

18          MS. CUTRI:  It's expert.

19          THE COURT:  Or what additional documents would you

03:15 20    want?

21          MS. CUTRI:  It's about the expert issues.  We do think

22    that when -- the substantiality question is going to be

23    something that somebody is going to have -- this is -- the

24    ingredients here, there's many of them, this isn't a

25    four-ingredient thing, and some of them are minor ingredients,

1    right, tiny, itty-bitty things, these trace elements.  Some of

2    them are bigger, some of them may be combined.  I don't know

3    all the facts here.  That a substantiality issue --

4            THE COURT:  If and when we get to this issue, if you

5    want to offer expert testimony -- in fact, if both sides want

6    to offer expert testimony, you should remember -- my law clerk

7    will remind me -- that I have a question as to whether expert

8    testimony is necessary.  Because these may be common sense

9    things for the jury.  What was done?  Is this substantial?  Was

03:16 10    this caused -- I don't see, for example, how an expert could

11    testify on causation or inducement.

12            MS. CUTRI:  I think the substantiality there could be

13    a technical component there, that's what I think, and I'm a

14    little concerned --

15            THE COURT:  It might be.

16            MS. CUTRI:  I'm are a little concerned -- we are a

17    little concerned that we're going to get those opinions later

18    on, they have reply expert reports, and it's going to come out

19    of the blue and they're going to try to wedge it in and we're

03:17 20    not going to get a response.  And we're going to be barrelling

21    forward through depositions.  And then, under your Honor's

22    schedule, summary judgment promptly thereafter, and we're not

23    going to have a chance to respond.

24            We made that point in our opening brief.  We said,

25    Listen, if this is in, that's like, okay, then we have to deal

1    with it and we have to do it the way we do these things.

2    There's an opportunity for them to go first.  This is their

3    burden.  It's an infringement claim, they go first.

4            THE COURT:  I know.

5            MS. CUTRI:  If they don't want to put in anything or

6    maybe they want to put in a cursory opinion or whatever, that's

7    fine, but we're entitled to see that first.

8            THE COURT:  They'll have to make disclosure that's

9    adequate under Rule 26.

03:17 10            MS. CUTRI:  And I want to make sure that we get an

11   opportunity and fair opportunity in a timely fashion to respond

12   to that.

13           THE COURT:  We'll set up a schedule for that.  You'll

14   get an opportunity.

15           (Discussion off the record.)

16           MS. CUTRI:  And to depose.

17           Mr. Hales has reminded me, we've raised this with

18   them, and just this week, they said no.  We've said this is

19   what we want.  If this is in, it's where we're headed, this is

03:17 20   in, you can give us your opinions or whatever you're going to

21   give us, we'll respond, and we'll do this in the ordinary

22   course the way we do these things.  And they said no.  They

23   said no.

24           Like I said, I'm concerned that where we're heading is

25   we're going to see this later on and they're going to jam it in

1    at the last minute and it's going to be unfair to us.

2              THE COURT:  We'll see.

3              Go ahead.

4              MS. CUTRI:  That might just about cover it.  I'm not

5    sure if there's anything else I -- unless your Honor has other

6    questions about the procedural stuff.

7              THE COURT:  I don't think so.

8              Mr. Diskant, is there more you'd like to say now that

9    we've gone into -- and you addressed it, too.  This is

03:18 10   discretionary.

11             So why do you think I have no discretion, that you can

12   do this without leave of court.

13             MR. DISKANT:  I think that's what the rule says.

14   That's what Judge Becker analyzed it.

15             I was amused somewhat by the disclosure that Turner is

16   their best case.

17             If you look at Turner, Turner was a request for --

18             THE COURT:  Wait a second, I had it here.

19             Turner is the Kansas case?

03:19 20        MR. DISKANT:  Yes, supposedly their best case.

21             THE COURT:  Hold on a second.  Let me just find it.

22             (Pause.)

23             THE COURT:  Turner, go ahead.

24             MR. DISKANT:  So Turner involves an effort to file a

25   permissive counterclaim.  And the court says, While plaintiff

1   is correct that in some -- that some District Courts have

2   allowed plaintiffs to include compulsory counterclaims where

3   they're compulsory.  And when the court disagrees, it just

4   doesn't disagree with that line of thinking, it says, I don't

5   think the same rule applies for permissive counterclaims.

6           Okay.

7           THE COURT:  Hold on a second.  Let me read this.

8           MR. DISKANT:  Go ahead.  Sorry, Judge.

9           (Pause.)

03:21 10         THE COURT:  Okay.  Go ahead.

11          MR. DISKANT:  Okay.  In any event, the Court,

12  essentially, is skeptical that the Tenth Circuit would adopt

13  the view that a permissive counterclaim is equally subject to

14  filing as a right.

15          Okay.  That's not our facts.

16          And secondly, in the end, the court permits the claim

17  to be filed as a motion to amend, notwithstanding that they've

18  known the facts here for four years.  You know, with no good

19  claim of prejudice, the court said, Go ahead.

03:22 20         So I don't -- I don't think this advances the ball for

21  them very much.  And I think in the end -- you know, I

22  recognize this is an area -- can we go back to the slides,

23  please?

24          I recognize this is an area in which there's a

25  divergence of opinions.  And honestly, I don't think you have

 1  to -- and we'll go to slide 46, please.

 2          I think Judge Becker had it right.  Rule 13 states, A

 3  pleading may state a permissive counterclaim and shall state

 4  any compulsory counterclaim.  One such pleading which is

 5  authorized under 7(a) is a reply to a counterclaim.  Taking the

 6  two together, the counterclaim may be stated in reply to a

 7  counterclaim of the other party.  That is the majority rule,

 8  it's the better-reasoned rule, it's what the rules say.

 9          So I think that's correct.  I don't feel a need to

03:23 10  analyze it any further, unless your Honor wishes.

11          THE COURT:  And why is your counterclaim a compulsory

12  counterclaim?

13          MR. DISKANT:  I think I just heard counsel say it

14  checks all the boxes, which I viewed as a concession that it

15  was a compulsory counterclaim.

16          It's a compulsory counterclaim because their claim

17  against us -- we allege violations 271(a) and (b), and in

18  response, they went beyond that and they said we don't infringe

19  at all.  Well, having said they don't infringe at all, if we

03:23 20  ever wanted to assert that they infringed, this was our moment.

21  We were required to assert it, or we ran risk of *res judicata*

22  if we did not.

23          We were required to assert it.  I think it's perfectly

24  straightforward as a compulsory counterclaim.

25          We aren't trying to play games with the Court; this is

1    just the fact pattern which these events emerged.  We learned

2    about it on November 6th.  As it happened, they just filed this

3    counterclaim, so it seemed the reasonable thing to do.  I

4    realize there are other ways we could have approached the same

5    issue.

6         I think as a permissive counterclaim I would think

7    your Honor should order it.  There's no prejudice that's

8    cognizable, I don't think.  You're entirely right, this is a

9    fact-based counterclaim, not an expert-based one.  There may be

03:24 10   an extremely small amount of expert testimony which we've

11   already put in in our opening report on noninfringing

12   alternatives in which our experts explain why from a

13   manufacturing standpoint it made sense to single source

14   ingredients.  And they may have some responsive -- you know,

15   the defendants put anything in response.  But this is -- this

16   is not expanding the case, except for a tiny amount of damages

17   testimony on which everyone's been taking the same damages

18   numbers -- all the underlying fact discovery on sales and

19   markets are exactly the same, it's just computing days,

03:25 20   basically.

21        So I don't see any cognizable prejudice, and, you

22   know, the facts are what I said.  We asserted this claim

23   promptly after discovering it.

24        THE COURT:  Okay.

25        It's now almost 3:30.  I'm going to take a break, I

expect for at least 20 minutes, and then I'll give you a

decision.

Court is in recess.

THE CLERK:  All rise for the Honorable Court.

(Recess taken.)

THE CLERK:  All rise for the Honorable Court.

Court is back in session.  You may be seated.

THE COURT:  I regret that that took me much longer

than I thought it would.

04:28   At the outset, I want to correct something I said.  I

don't think that Janssen could have amended its complaint

within 21 days of the answer filed by -- the answer and

counterclaim filed by Celltrion, the defendants, because there

had previously been a motion to dismiss.  So the motion to

dismiss started the 21 days running.  You'll find that in the

advisory notes to the 2009 amendment.  That's probably why,

with your legions of lawyers, nobody made that argument.  I

don't think it's a correct argument.

However, I am denying the defendants' motion to strike

04:29   or dismiss Celltrion's (sic.) Section 271(f)(1) counterclaim.

As I'll explain, I find that the counterclaim states a

plausible claim on which relief can be granted as required by

Rule 12(b)(6).  The counterclaim does not require leave of

court.  Even if leave of court were required, although it's a

competitive question, I expect I would authorize the

1    counterclaim.

2          With regard to Rule -- well -- the counterclaim I said

3    states a plausible claim under Section 271(f).  To violate that

4    provision, the defendant must, 1, supply or cause to be

5    supplied in or from the United States; 2, all or substantial

6    portion of the components of a patented invention, in this case

7    the ingredients of the media, where such components are

8    uncombined in whole or in part; 3, in such manner as to

9    actively induce the combination of such components outside the

04:30 10   United States; and 4, in a manner that would infringe the

11   patent if such combination occurred within the United States.

12         The standard for a Rule 12(b)(6) motion for failure to

13   state a claim is familiar.  I have to take all of the properly

14   pled factual allegations as true.  I must draw all reasonable

15   inferences.  The Supreme Court said in Twombly, A motion to

16   dismiss should be denied if a plaintiff has shown a plausible

17   entitlement to relief.  That's 550 U.S. at 559.  That means the

18   complaint must contain sufficient factual matter accepted as

19   true to state a claim to relief that is plausible on its face.

04:31 20   The claim has facial plausibility when the plaintiff pleads

21   factual content that allows the Court to draw the reasonable

22   inference that the defendant is liable for the misconduct

23   alleged, as the Supreme Court said in Iqbal, 556 U.S. 662, 678.

24         In this case, the plaintiff has adequately alleged

25   facts from which it could be reasonably inferred that the

1    defendant was liable under Section 271(f).

2          For example -- and these are only some of the

3    allegations on which I rely -- but, for example, as alleged in

4    paragraphs 23 to 26 of the counterclaim, on or about September

5    29, 2016, Celltrion ordered approximately $4 million of

6    Celltrion media from HyClone.  Knowing that all or substantial

7    portion of the components of the Celltrion media would be

8    supplied from Logan, Utah, Celltrion directed HyClone to

9    combine these components to make the Celltrion media at the

04:33 10   Singapore facility.

11          On information and belief, Celltrion has continued to

12   order and currently orders Celltrion media made at the

13   Singapore facility.

14          On information and belief, Hospira joined and

15   participated with Celltrion in the litigation-driven decision

16   to direct HyClone to make Celltrion cell media at the Singapore

17   facility.

18          On information and belief, Hospira did so knowing that

19   the Singapore media would infringe the '083 patent if its

04:33 20   components were combined to make the media in the United

21   States.

22          Building on these factual allegations, as well as

23   others, the counterclaim concludes that, at Celltrion 's

24   direction and control and acting as Celltrion's agent, HyClone

25   supplies from the United States at least a substantial portion

of the components of the infringing Celltrion media, which

HyClone then combined at the Singapore facility; that Hospira

and Celltrion are in a joint venture with respect to the

manufacture and marketing of Inflectra.  That's paragraph 45.

I previously quoted paragraph 34.

By causing HyClone to supply the components of the

infringing Celltrion media from the United States for

combination at the Singapore facility, Celltrion and Hospira

have activity induced and continue to actively induce the

combination of components outside the United States in a manner

that would infringe the '083 patent if such combination

occurred within the United States.  That's paragraphs 40 to 48.

They both do so intending that the Singapore media be

combined in a manner that would infringe the patent.

These allegations state a plausible claim for relief

under Section 271(f)(1).  Essentially, they're comparable to

those in WesternGeco, 876 Supp. 2d at 899 to 901, and Jacobs

Vehicle, 424 Supp. 2d 388, 395.

I also find, as I said, that leave of court is not

required to assert these counterclaims, or this counterclaim.

The defendants' counterclaim to the complaint seeks --

or counterclaims to the complaint seeks declaratory judgment of

noninfringement and invalidity.  These are compulsory

counterclaims.  As the District Court said in Ruckus, 2012 WL

588792 at 3, courts routinely hold that declaratory judgment

1   claims for invalidity, unenforceability, and noninfringement

2   are compulsory counterclaims to claims of infringement of the

3   same patent.

4        The plaintiffs' counterclaims are also compulsory.

5   They seek declaratory judgment of infringement arising

6   essentially from the same occurrence within the meaning of Rule

7   13.

8        In <u>Vivid Technologies</u>, for example, 200 F.3d 795, 801,

9   the Federal Circuit stated an infringement counterclaim is

04:37 10   compulsory in an action for declaration of noninfringement.

11        Rule 13 provides that a pleading must state as a

12   counterclaim any claim that at the time of its service the

13   pleader has against an opposing party if the claim, A, arises

14   out of the transaction or occurrence that is the subject matter

15   of the opposing party's claim; and B, does not require adding

16   another party over whom the court cannot acquire jurisdiction.

17   It may state as a counterclaim against an opposing party any

18   claim that is not compulsory.  That's Rule 13(a)(1) and (b).

19        Rule 7(a)(3) states that a pleading includes an answer

04:38 20   to a counterclaim designated as a counterclaim.

21        Under Rule 15, leave of court is only required for

22   amendments to a pleading.  Therefore, no such leave is required

23   for Johnson's counterclaim and its answer.  In essence, I find

24   Judge Becker's reasoning in <u>Southeastern Industrial Tire</u>

25   <u>Company</u>, 70 F.R.D. 585-86 persuasive on this issue.

1          More specifically, while I recognize there's

2     conflicting authority on this point, I find the most persuasive

3     authority holds that a party may assert a counterclaim in reply

4     without leave of court at least when the counterclaim in reply

5     is, as here, compulsory.  And Southeastern Industries, Judge

6     Becker, sitting when he was a district judge, allowed the

7     plaintiff to plead a counterclaim in reply.  He interpreted the

8     text of the Federal Rules of Civil Procedure as follows:

9          Both Federal Rule of Civil Procedure 13 and Federal

04:40  10    Rule of Civil Procedure 18 contemplate counterclaims in reply.

11    Rule 13 states that a pleading, not just an answer, may state a

12    permissive counterclaim and shall state any compulsory

13    counterclaims.  One such pleading which Federal Rule of Civil

14    Procedure 7(a) authorizes is a reply to a counterclaim.

15         Federal Rule of Civil Procedure 13, in conjunction

16    with Rule 7(a), thus authorizes a counterclaim to be stated in

17    a reply to the counterclaim with the other party.  It is

18    concomitantly clear that Rule 7(a) does not prohibit the

19    pleading of a counterclaim in reply.  Moreover, since Rule

04:41  20    18(a) specifically referred to counterclaims that applied prior

21    to its amendment in 1966, and since the purpose of the

22    amendment was to broaden the scope of claims that may be joined

23    in a single action, we believe that it should be construed to

24    continue to authorize counterclaim in reply.

25         Cases consistent with this conclusion are Wiggins,

2017, U.S. District Lexis 167042 at 11; <u>Power Tool Supply</u>, 207

U.S. District Lexus 29571 at 7-8.  Both the 9th Circuit and

Wright & Miller maintain that counterclaims in reply are

allowed without leave of court whenever they are compulsory.  I

have in mind particularly <u>Mattel</u>, 705 F.3d 1108, 1110; and

<u>Davis & Cox</u>, 751 F.2d 1507, 1525; as well as Wright & Miller, 5

Federal Practice and Procedure Civil, Section 1188 in the Third

Edition, the 2017 update.

In the interest of completeness, I will add that if

leave of court were required, I expect I would allow the

amendment.

The standard for amending the complaint is stated in

<u>Foman v. Davis</u>, 371 U.S. 178, 182.  If the underlying facts or

circumstances relied on by plaintiff may be a proper subject of

relief, he ought to be afforded an opportunity to test his

claim on the merits.  In the absence of any apparent or

declared reasons such as undue delay, bad faith, or dilatory

motive on the part of the movant, repeated failure to cure

deficiencies by amendments previously allowed, undue prejudice

to the opposing party by virtue of allowance of the amendment,

futility of the amendment, et cetera, the leave sought should,

as the rules require, be freely given.

Here, there is no prior history of chance and failing

to cure deficiencies in the pleadings by amendments, although

the original complaint was dismissed to -- in what turned out

1   to be a successful effort to cure an issue concerning standing.

2        In addition, I don't find that Janssen has acted in

3   bad faith or had a dilatory motive.

4        The most serious concern is the arguable undue delay.

5   Janssen received 44,000 pages of documents in discovery in

6   October 2016, after the period for fact discovery in the

7   original case had ended in July 2016.  Three pages have been

8   identified as relevant to the counterclaim and having prompted

9   its filing.  One of them was used or -- twice, once in a

04:45 10   November 2016 opposition to a motion for summary judgment.  It

11   was also designated as a trial exhibit when the case was

12   scheduled to go to trial in February of 2016.

13        Janssen represents that it overlooked the section

14   271(f) implications of the documents.

15        The claim could have been brought in the May 31, 2017

16   complaint that's now operative in this case.  However, in view

17   of the many, many issues in this case, it is unfortunate, but

18   explained and understandable, that it was -- the implications

19   of the documents were overlooked.

04:46 20        The key issue is undue prejudice.  In this case,

21   there's no argument that the delay has resulted in the loss of

22   evidence or that witnesses have died, in contrast, for example,

23   with Carter, 634 F.2d 187, 1982 1st Circuit case.

24        The issue has been raised after the end of discovery

25   on liability in July 2016.  However, Janssen represents that it

1    will be relying on only the discovery now already being done on

2    damages.  I note that it could not have raised this issue

3    during the period for liability discovery, because that period

4    ended in July of 2016, as I said, and these documents were not

5    produced until October 2016.

6         But this case is also distinguishable from Scott, 733

7    F.3d 105, 107-18.

8         If I had discretion, which I find I don't, I might

9    deny the leave to amend if I were persuaded that the

04:48 10   counterclaim would disrupt the schedule to complete discovery

11   and get to pretrial motions and trial that I established.

12   That's a consideration that's important in the 1st Circuit and

13   to me.  The 1st Circuit's view is reflected in Steir,

14   S-t-e-i-r, 383 F.3d 7, 12.  However, the plaintiff asserts, as

15   I said, that discovery will be the same for liability and

16   271(f)(1) and on the damages issue concerning the availability

17   of a noninfringing alternative that is going on now.  So no

18   additional discovery, that is, discovery that wouldn't be done

19   on damages, according to the plaintiff, will be required.

04:49 20        The case will require -- the counterclaim will require

21   additional information in the experts' reports on damages, but

22   I don't find that in the context of this enormously already

23   expensive case that that will be onerous or unfeasible.

24        It's not clear whether expert testimony on the

25   271(f)(1) issue will be necessary or whether there would be

1    much of that.  It wasn't mentioned in the argument, but I note

2    that in 2017, the Supreme Court decided Life Techs., 137

3    Supreme Court 734, 740, where the Court held that the

4    substantiality of a portion of the patented components for

5    271(f) analysis is a quantitative measure and does not depend

6    on the components' qualitative importance to the invention

7    overall.

8            I don't know how that will apply here.  The

9    composition of media is at issue, but it might limit expert

04:51 10    testimony.

11           So as I said -- I'll say one more thing that would

12    influence me if I had discretion.

13           The law is not a game.  If the defendant is infringing

14    under Section 271(f), it would be in the public interest that

15    it be held accountable.

16           The parties must continue to work hard to complete all

17    discovery on the existing schedule, including concerning this

18    271(f) claim.  And I fully expect, given our long history

19    together, that the parties will.

04:52 20           It's now five of five.  Hours ago I was told that some

21    discovery issues that the parties thought they had resolved by

22    agreement have reemerged.  Do you want to tell me what those

23    are, or maybe tell me that you settled them during some of

24    these large breaks?

25           MR. DISKANT:  Judge, if I may go first for just a

1    moment.

2         I think when you hear this, you will tell us to go

3    talk to each other some more.

4         THE COURT:  What's that?

5         MR. DISKANT:  I think when you hear this, you will

6    tell us to go talk to each other some more.

7         It's a question about how many contracts, how much

8    correspondence.  We've tried to work it out with them, I think

9    we can.  I suggest we not do this, perhaps schedule a phone

04:53 10   call in a week or a few days.

11        If we can't resolve it, Mr. Fischer is the one who

12   knows the facts, so I would much prefer to push this down --

13   I'm not seeking delay, just a couple of days.

14        THE COURT:  Mr. Hales, do you want to say what the

15   issues are?

16        MR. HALES:  I will do that briefly, your Honor,

17   recognizing all the things you have going on.

18        But we had two issues.  Your Honor asked us to come

19   last time, two weeks ago, prepared to raise any discovery

04:53 20   disputes if there were any because the schedule is very tight.

21   We had two.  It's contracts that they have related to Remicade,

22   and customer communications they have with the customers that

23   are reimbursed for Remicade.

24        THE COURT:  What do you mean by contracts

25   concerning --

1        MR. HALES:  So, for example, contracts that Janssen

2   has with insurance companies, hospitals, et cetera, relating to

3   the reimbursement of Remicade.

4        So those are the two issues that we thought we had

5   worked out.  Last time we came ready to argue them; they're

6   very important to the damages case.  As we were coming into the

7   court --

8        THE COURT:  The first one is contracts.  What's the

9   second one?

04:54 10        MR. HALES:  Customer communications related to pricing

11   and contracts.

12        Let me -- do you want me to give you just the real

13   quick version of why they're important?

14        THE COURT:  No.  They sound important to me.

15        MR. HALES:  They are very important.

16        THE COURT:  At least the first one sounds important.

17        MR. HALES:  And they both are.  We can deal with it

18   later.  But the point -- our concern is the timing, your Honor.

19   That is, last time we were in here, their focus was no

04:54 20   discovery disputes, let's just get the schedule in.  They told

21   us we were going to have these things worked out.  They got the

22   schedule.  We leave the courtroom, and all of a sudden these

23   agreements have gone away.

24        THE COURT:  Let me tell you what I have in mind.

25   Monday is a holiday.  I have in mind giving you until Wednesday

to try to work this out.  You work it out, great.  If you

don't, we'll have a telephone hearing next Friday morning,

February 23rd, and you'll make submissions on the 21st, and

we'll have a hearing at 10:00 on the 23rd if you haven't

revolved this by agreement, and I'll decide which you of you

has the more reasonable position, and that party will prevail.

MR. HALES:  Understood, your Honor.

And I'm just going to let you know, because I'd be

remiss if I didn't, this issue relates to a deposition that is

set for that Friday.

THE COURT:  For that Friday?

MR. HALES:  Yes.

THE COURT:  Fine.

MR. HALES:  Whatever --

THE COURT:  Why don't you give me the report by 12

noon on Wednesday, the 21st, and we'll have that hearing, if

necessary, at 10:00 on Thursday.

MR. HALES:  We can do that as well.

THE COURT:  And in the meantime, Janssen shall collect

all the documents that are responsive, because if I order you

to produce them, you'll have to produce them before the

deposition.

MR. DISKANT:  That's the problem, Judge.

THE COURT:  All right.

MR. DISKANT:  The problem is the burdensomeness of the

1   documents, and we've been trying to work this out with the

2   other side.

3          THE COURT:  Well, you may have to put the deposition

4   off a bit.

5          I'm -- look, I'm going to put this back on the

6   original schedule, because I have something on Thursday that

7   requires some attention.

8          You file a report by the close of business on

9   Wednesday and, if necessary -- give me your positions, and, if

04:57 10   necessary, we'll have a hearing at 10:30 on Friday the 23rd.

11          MR. DISKANT:  Thank you, Judge.

12          THE COURT:  You're going to have to adjust the

13   deposition, I think, unless you quickly reach an agreement on

14   Tuesday.

15          MR. DISKANT:  We'll talk and let you know on

16   Wednesday.

17          THE COURT:  Or on Monday.

18          MR. HALES:  All right.  Thank you.

19          THE COURT:  Some of us will be working on Monday.

04:57 20          MR. DISKANT:  Some of us will.

21          THE COURT:  Okay.  With profound thanks to the

22   pinch-hitting court reporter particularly, court will be in

23   recess.

24          THE CLERK:  All rise for the Honorable Court.

25          (Court adjourned at 4:57 p.m.)

- - - - - - - - - - - -

CERTIFICATION

I certify that the foregoing is a correct transcript of the record of proceedings in the above-entitled matter to the best of my skill and ability.


/s/Debra M. Joyce                    February 23, 2018
Debra M. Joyce, RMR, CRR, FCRR       Date
Official Court Reporter

1

2

                              E X H I B I T S

3

4        Exhibit No.              Description                    Received

5

            1                                                        10

6

            2                                                        61

7

            3                                                        82

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25