IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____

| | | |
|---|---|---|
| JANSSEN BIOTECH, INC., | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:17-cv-11008-MLW |
| | ) | |
| CELLTRION HEALTHCARE CO., LTD., | ) | **CONFIDENTIAL** |
| CELLTRION, INC., and | ) | **FILED UNDER SEAL** |
| HOSPIRA, INC., | ) | |
| Defendants. | ) | |

_____ )

**MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OF NON-INFRINGEMENT BASED ON ENSNAREMENT**

**[Leave to File 30 Page Brief Granted April 4, 2018, Dkt. 224]**

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................................1

ARGUMENT ......................................................................................................................5

I.     LEGAL STANDARDS ...............................................................................................5

     A.    Summary Judgment ......................................................................................5

     B.    Ensnarement...................................................................................................6

     C.    Obviousness ..................................................................................................7

II.    A HYPOTHETICAL CLAIM LITERALLY ENCOMPASSING THE ACCUSED
     MEDIA WOULD NOT HAVE BEEN OBVIOUS ..........................................................10

     A.    The Hypothetical Claim.................................................................................10

     B.    Defendants Ignore the "Would Have Been Obvious" Standard of 35
          U.S.C. § 103(a) .............................................................................................11

     C.    Neither the Hypothetical Claim Nor the Actual Claim Would Have Been
          Obvious to One of Ordinary Skill..................................................................15

          1.    Glacken Step 1:  Select A Starting Formulation .......................................15

          2.    Glacken Steps 2 and 3:  Select the Ingredients.........................................18

          3.    Glacken Steps 4 and 5:  Select the Concentrations for the
                Ingredients.................................................................................................22

     D.    Defendants Ignore Evidence of Secondary Considerations....................................27

CONCLUSION......................................................................................................................30

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abbott Labs. v. Dey, L.P.*,
  287 F.3d 1097 (Fed. Cir. 2002)............................................................................7, 27

*Allergan, Inc. v. Sandoz, Inc.*,
  796 F.3d 1293 (Fed. Cir. 2015).................................................................................25

*Anderson v. Liberty Lobby*,
  477 U.S. 242 (1986)....................................................................................................5

*Apple Inc. v. Samsung Elecs. Co.*,
  839 F.3d 1034 (Fed. Cir. 2016).................................................................................28

*Belden Inc. v. Berk-Tex LLC*,
  805 F.3d 1064 (Fed. Cir. 2015)...........................................................................14, 21

*Berkovitz v. Home Box Office, Inc.*,
  89 F.3d 24 (1st Cir. 1996)...........................................................................................5

*Cheese Sys. v. Tetra Pak Cheese & Powder Sys.*,
  725 F.3d 1341 (Fed. Cir. 2013)...................................................................................2

*Conroy v. Reebok Int'l, Ltd.*,
  14 F.3d 1570 (Fed. Cir. 1994).....................................................................................6

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
  567 F.3d 1314 (Fed. Cir. 2009)...................................................................................6

*Eisai Co. v. Dr. Reddy's Labs., Ltd.*,
  533 F.3d 1353 (Fed. Cir. 2008).................................................................................21

*Genetics Institute, LLC v. Novartis Vaccines & Diagnostics, Inc.*,
  655 F.3d 1291 (Fed. Cir. 2011).............................................................................25, 26

*Graham v. John Deere Co.*,
  383 U.S. 1 (1966)............................................................................................3, 7, 28

*In re Applied Materials, Inc.*,
  692 F.3d (Fed. Cir. 2012)..........................................................................................27

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*,
676 F.3d 1063 (Fed. Cir. 2012)..................................................................8, 22, 28

*In re Kahn*,
441 F.3d 977 (Fed. Cir. 2006).................................................................................9

*In re Kubin*,
561 F.3d 1351 (Fed. Cir. 2009)........................................................................4, 22

*In re Peterson*,
315 F.3d 1325 (Fed. Cir. 2003)....................................................24, 25, 26, 27

*In re Rouffet*,
149 F.3d 1350 (Fed. Cir. 1998)............................................................................15

*Intendis GmbH v. Glenmark Pharm., Inc.*,
822 F.3d 1355 (Fed. Cir. 2016)....................................................................6, 7, 10

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
274 F.3d 1371 (Fed. Cir. 2001)...............................................................................7

*InTouch Techs., Inc. v. VGo Commc'ns, Inc.*,
751 F.3d 1327 (Fed. Cir. 2014)..........................................................................2, 9

*Jang v. Boston Sci. Corp.*,
872 F.3d 1275 (Fed. Cir. 2017).........................................................................6, 7

*Janssen Biotech, Inc. v. Celltrion Healthcare Co.*,
211 F. Supp. 3d 364, 366 (D. Mass. 2016) ............................................................5

*KSR Int'l Co. v. Teleflex Inc.*,
550 U.S. 398 (2007) ............................................................................... *passim*

*Merck Sharp & Dohme B.V. v. Warner Chilcott Co., LLC*,
711 F. App'x 633 (Fed. Cir. 2017) .......................................................................8

*NPF Ltd. v. Smart Parts, Inc.*,
187 F. App'x 973 (Fed. Cir. 2006) ...................................................................9, 12

*Ortho-McNeil Pharm. v. Mylan Labs.*,
520 F.3d 1358 (Fed. Cir. 2008)............................................................................26

*Otsuka Pharm. Co. v. Sandoz, Inc.*,
678 F.3d 1280 (Fed. Cir. 2012)......................................................................17, 18

*Personal Web Techs., LLC v. Apple, Inc.*,
848 F.3d 987 (Fed. Cir. 2017).......................................................................14, 21

iii

*Polaris Indus., Inc. v. Arctic Cat, Inc.*,
    882 F.3d 1056 (Fed. Cir. 2018)..................................................................7, 9

*Rolls-Royce, PLC v. United Tech. Corp.*,
    603 F.3d 1325 (Fed. Cir. 2010)......................................................................9

*Ruiz v. A.B. Chance Co.*,
    357 F.3d 1270 (Fed. Cir. 2004)......................................................................8

*Sanchez v. Triple-S Mgmt. Corp.*,
    492 F.3d 1 (1st Cir. 2007)..............................................................................5

*Senju Pharm. Co. v. Lupin Ltd.*,
    780 F.3d 1337 (Fed. Cir. 2015)......................................................................8

*Spectralytics, Inc. v. Cordis Corp.*,
    649 F.3d 1336 (Fed. Cir. 2011)....................................................................22

*Takeda Chem. Indus. v. Alphapharm Pty.*,
    492 F.3d 1350 (Fed. Cir. 2007)..............................................................18, 19

*Unigene Labs., Inc. v. Apotex, Inc.*,
    655 F.3d 1352 (Fed. Cir. 2011)............................................2, 12, 17, 18

*United States v. Massachusetts*,
    781 F. Supp. 2d 1 (D. Mass. 2011) ..........................................................5, 30

*W.L. Gore & Assocs., Inc. v. Garlock, Inc.*,
    721 F.2d 1540 (Fed. Cir. 1983)......................................................................8

*Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*,
    904 F.2d 677 (Fed. Cir. 1990)....................................................................6, 7

**Statutes**

35 U.S.C. § 103(a) ............................................................................. *passim*

**Other Authorities**

Federal Rule of Civil Procedure 56(a) ............................................................5

Federal Rule of Civil Procedure 56(f)(1) ...............................................1, 5, 30

## INTRODUCTION

Defendants have moved for summary judgment of non-infringement based on ensnarement, a prior art-derived limitation on the doctrine of equivalents.  While the doctrine is a non-infringement defense, it is based on the law of obviousness.  The ensnarement doctrine holds that if a hypothetical claim that literally covered the accused product would have been obvious over (or anticipated by) the prior art, the doctrine of equivalents is not available.  There is no ensnarement here because Defendants' theories of obviousness with respect to their hypothetical claim are baseless: they lack support either in their expert's opinions or in the law.  A review of the evidence and the law will allow the Court to grant summary judgment to Janssen dismissing the ensnarement defense pursuant to Federal Rule of Civil Procedure 56(f)(1).  This review will also demonstrate that Defendants' obviousness defense suffers from the same defects as their ensnarement defense.  Indeed, Janssen consented to the filing of this untimely liability motion because we welcome the opportunity to respond to Defendants' obviousness arguments now.  Rejecting Defendants' ensnarement defense, as the Court should do on this motion, will set the stage for judgment as a matter of law dismissing Defendants' obviousness defense.

Defendants rely on two prior art references, what they call the GSK and Life Techs media.  Initially, Defendants exaggerate the supposed similarity of those media to their hypothetical claim (and to the '083 invention).  The GSK media lacks two of the ingredients of the hypothetical claim and 17 of its preferred concentrations fall outside of, and do not overlap, the concentrations of the hypothetical claim.  Meanwhile, the Life Techs media lacks five of the ingredients of the hypothetical claim and 12 of its preferred concentrations fall outside of, and do not overlap, the concentrations of the hypothetical claim.  (The differences between those two references and the actual claim are even greater).  But the legal flaws in Defendants' motion are

even more glaring.  Most notably, (1) Defendants rely entirely on ***hindsight*** in selecting and modifying the GSK and Life Techs media; (2) Defendants do not even attempt to provide any ***motivation*** for an artisan to make the invention of the hypothetical claim (or the '083 patent); and (3) Defendants do not, and cannot, assert that the invention "***would have been obvious***" to one of skill in the art, as required by 35 U.S.C. § 103(a).

Defendants specifically selected the obscure GSK and Life Techs references because, with hindsight and using the '083 patent as a reference guide, they are the closest prior art to Janssen's patent and the hypothetical claim based on Janssen's patent.  (They offer no other reason for the choice).  Defendants then propose to modify those references, also with hindsight, to make them identical to the hypothetical claim.  (Again, they offer no other reason for the modifications).  Based on this two-step hindsight exercise they claim, *voila*, the hypothetical claim is obvious.  But an obviousness analysis requires "avoidance of even a hint of hindsight." *Cheese Sys. v. Tetra Pak Cheese & Powder Sys.*, 725 F.3d 1341, 1352 (Fed. Cir. 2013).  Using the patent in dispute "as a roadmap" for the obviousness analysis is a classic example of improper reliance on hindsight.  *InTouch Techs., Inc. v. VGo Commc'ns, Inc.*, 751 F.3d 1327, 1351 (Fed. Cir. 2014).

As a consequence, Defendants do not even attempt to provide any motivation for one of skill in the art either to select or to modify the two references they have identified to arrive at the hypothetical claim (or the actual claim of the '083 patent).  This is notwithstanding the fact that an obviousness analysis requires both – a reason why a person of ordinary skill "would have selected and combined those prior art elements in the normal course of research and development to yield the claimed invention."  *Unigene Labs., Inc. v. Apotex, Inc.*, 655 F.3d 1352, 1360 (Fed. Cir. 2011) (citing *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 418, 421 (2007)).  Here it is

undisputed – because Defendants' expert Dr. Glacken tells us so – that one of skill in the art would ***not*** select either the GSK or the Life Techs applications in the normal course of research and development of a cell culture media.  Instead, one would start, as he has in the past and as Janssen did here, with one of "the classics", a standard basal media; "you don't start . . . with a serum free medium that you saw in a paper somewhere" like the GSK and Life Techs media. (JSOF Ex. 4 (Glacken Tr.) at 72:4-8, 10-12.)  Defendants do not contend that the hypothetical claim is obvious in light of any standard basal media that one might reasonably select as a starting point, and it is not.

Meanwhile, even if one used hindsight to select the GSK and Life Techs media for further development, there is no reason to modify them to make the hypothetical claim (or the claim of the '083 patent).  Starting with either media, there are literally ***trillions*** of different unique combinations that could be created by modifying different forms of active ingredients and different concentrations.  This is an art in which, as Dr. Glacken has put it in his writings, there are "[a]lmost an infinite number of possible formulations" to choose among.  (Janssen's Statement of Facts ("JSOF") ¶ 23.)  Using 20-20 hindsight, Defendants propose modifying ***only*** the ingredients in the GSK and Life Techs media that differ from the formulation of the hypothetical claim in order to yield the combination of the hypothetical claim.  But there is no reason to do that other than yielding to "the temptation to read into the prior art the teachings of the invention in issue."  *Graham v. John Deere Co.,* 383 U.S. 1, 36 (1966).  Using foresight rather than hindsight, as of the time of the invention and unaware of the later '083 patent, a scientist who chose to modify the GSK or Life Techs media could make trillions of different combinations of ingredients – ***only one*** of which would result in the exact combination claimed

3

in the hypothetical claim (or the '083 patent).  And that is before choosing concentrations, which permit limitless other non-obvious combinations.

What is the motivation to make the exact choices from this endless menu of possibilities that result in the hypothetical claim (or the '083 patent)?  Defendants do not engage on this question; they offer no reason to modify either the GSK or Life Techs media to create the hypothetical claim.  They just say it is technically possible to do and so could be done.  But for a patent to be obvious, there must be "an apparent reason to combine known elements in the fashion claimed in the patent at issue."  *KSR*, 550 U.S. at 418.  Otherwise, one is merely "throw[ing] metaphorical darts at a board" filled with an infinite number of possible combinations.  *In re Kubin,* 561 F.3d 1351, 1359 (Fed. Cir. 2009).

The '083 patent is a unique combination of ingredients and concentrations, selected by the Janssen inventors from a near-infinite range of possibilities.  The ingredients and concentrations were, of course, known in the art, but that is always true of combination patents and is not a reason to deny Janssen a patent on its novel combination.  After Janssen revealed its then-confidential formula for what became the '083 patent to HyClone so that it could manufacture quantities of the media for testing by Janssen, HyClone developed the infringing media for Celltrion – containing the ***exact same ingredients*** in the ***exact same form*** as Janssen's formula.  Only the concentrations of a handful of ingredients were outside the claim, and those differences are insubstantial.  And in the hypothetical claim, even those minor differences disappear.  ███████████████████████████████████████████████████████
███████████████████████████████████  (JSOF ¶ 66.)

The undisputed evidence demonstrates that one of ordinary skill in the art would have had ***no*** reason to select the prior art media on which Defendants rely, ***no*** reason to modify them

by altering ingredients and concentrations, and *no* reason to arrive at cell culture media of the hypothetical claim (or the '083 patent).  Defendants best argument is that, working like a monkey at a typewriter, one of skill in the art could come up with a cell culture media that ████████ ███████████████████████████████████████████ (JSOF Ex. 4 (Glacken Tr.) at 149:12-17, 215:17-20.)  That does not make the hypothetical claim (or the '083 patent) obvious. Unless one of skill in the art "*would have*" arrived at cell culture media covered by the hypothetical claim, they are patentable.  35 U.S.C. § 103(a).

## ARGUMENT

## I.     LEGAL STANDARDS

### A.     Summary Judgment

"Federal Rule of Civil Procedure 56(a) provides that the court 'shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" *Janssen Biotech, Inc. v. Celltrion Healthcare Co.*, 211 F. Supp. 3d 364, 366 (D. Mass. 2016).  "A factual dispute, therefore, precludes summary judgment if it is 'material' and 'genuine.'"  *Id.* (citing *Anderson v. Liberty Lobby*, 477 U.S. 242, 247-48 (1986)).

Meanwhile, it is "well established" in the First Circuit that if briefing on a motion for summary judgment establishes that the *nonmovant* is entitled to summary judgment, "the court may *sua sponte* order summary judgment against the movant" so long as discovery is sufficiently advanced and the movant has received reasonable notice and opportunity to respond.  *United States v. Massachusetts*, 781 F. Supp. 2d 1, 7 n.12 (D. Mass. 2011) (citing *Berkovitz v. Home Box Office, Inc*., 89 F.3d 24, 29-30 (1st Cir. 1996) (internal quotation marks omitted); *Sanchez v. Triple-S Mgmt. Corp*., 492 F.3d 1, 7-9 (1st Cir. 2007)).  "Rule 56 expressly provides that the

court may 'grant summary judgment for a nonmovant'" upon reasonable notice to the movant. *Id.* (quoting Fed. R. Civ. P. 56(f)(1)).  Because Defendants' ensnarement defense fails as a matter of law and this motion will provide Defendants a fair opportunity to present their case, the Court should grant partial summary judgment to Janssen dismissing the ensnarement defense.

### B.    Ensnarement

Ensnarement is a non-infringement defense in a doctrine of equivalents case that relies on an obviousness analysis.  (Ensnarement can also be based on anticipation, but there is no such claim here.)  The prior art limits the application of the doctrine of equivalents so that a patentee cannot obtain coverage by equivalents of subject matter that was in, or would have been obvious over, the prior art.  *See Wilson Sporting Goods Co. v. David Geoffrey & Assocs.*, 904 F.2d 677, 684 (Fed. Cir. 1990).  Thus, "[a] doctrine of equivalents theory cannot be asserted it if will encompass or 'ensnare' the prior art."  *Jang v. Boston Sci. Corp.*, 872 F.3d 1275, 1285 (Fed. Cir. 2017) (quoting *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1322 (Fed. Cir. 2009)).

"A helpful first step in an ensnarement analysis is to construct a hypothetical claim that literally covers the accused device."  *DePuy Spine*, 567 F.3d at 1324.  "Hypothetical claims extend the actual claim to literally recite the accused product."  *Intendis GmbH v. Glenmark Pharm., Inc.*, 822 F.3d 1355, 1364 (Fed. Cir. 2016).  "Next, the district court must assess the prior art introduced by the accused infringer to determine whether the patentee has carried its burden of persuading the court that the hypothetical claim is patentable over the prior art."  *DePuy Spine*, 567 F.3d at 1325.  In doing so, "a court also must apply standards of patentability consistent with [the Federal Circuit's] jurisprudence regarding anticipation and obviousness."  *Conroy v. Reebok Int'l, Ltd.*, 14 F.3d 1570, 1577 (Fed. Cir. 1994); *accord DePuy Spine*, 567 F.3d

at 1326-28 (applying the framework of *KSR*, considering teachings away in the prior art, and assessing secondary considerations in deciding ensnarement); *Wilson Sporting Goods*, 904 F.2d at 684 (hypothetical claim approach "allows use of traditional patentability rules").

Whether a hypothetical claim is patentable – and therefore whether the prior art limits the application of the doctrine of equivalents – is a question of law for the Court predicated on underlying factual findings.  *See Intendis*, 822 F.3d at 1363 ("We review a district court's conclusion that the hypothetical claim does not encompass the prior art de novo and resolution of underlying factual issues for clear error.").  "The burden of producing evidence of prior art to challenge a hypothetical claim rests with an accused infringer, but the burden of proving patentability of the hypothetical claim rests with the patentee."  *Jang*, 872 F.3d at 1285 (quoting *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1380 (Fed. Cir. 2001)).

### C.     Obviousness

To "make the hypothetical claim obvious, the court must find that 'the differences between the subject matter sought to be patented [*i.e.*, the hypothetical claim] and the prior art are such that ***the subject matter as a whole*** would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.'" *Abbott Labs. v. Dey, L.P.*, 287 F.3d 1097, 1106 (Fed. Cir. 2002) (quoting 35 U.S.C. § 103(a)) (emphasis and interpolation in original).  Assessing obviousness requires an "objective" analysis of the differences between the claim and the prior art from the perspective of one of ordinary skill in the art at the time of the invention.  *See KSR*, 550 U.S. at 406 (quoting *Graham*, 383 U.S. at 17-18, and discussing the four *Graham* factors).

Because "invention is often a combination of known elements which in hindsight seems preordained," *Polaris Indus., Inc. v. Arctic Cat, Inc.*, 882 F.3d 1056, 1068 (Fed. Cir. 2018)

(internal quotation marks omitted), courts must guard against "the distortion caused by hindsight bias and must be cautious of arguments reliant on *ex post* reasoning," *KSR*, 550 U.S. at 421.  The Federal Circuit has explained the reasons for the rule against hindsight.  Before the rule,

> the instruments of decision-making applied in patent cases at the time were inadequate and allowed judges to rely on "judicial hunches," thereby deciding cases on extralegal grounds. Such "judicial hunches" are encouraged by hindsight bias. As one commentator recently observed, "decision-makers unconsciously let knowledge of the invention bias their conclusion concerning whether the invention was obvious in the first instance." In other words, knowing that the inventor succeeded in making the patented invention, a fact finder might develop a hunch that the claimed invention was obvious, and then construct a selective version of the facts that confirms that hunch.

*In re Cyclobenzaprine Hydrochloride Extended-Release Capsule Patent Litig.*, 676 F.3d 1063, 1079 (Fed. Cir. 2012) (citations omitted).  Today it is recognized that the use of hindsight is "improper."  *See Merck Sharp & Dohme B.V. v. Warner Chilcott Co., LLC*, 711 F. App'x 633, 637 (Fed. Cir. 2017).  Perhaps the paradigm improper use of hindsight is what the Defendants do here:  "us[e] the invention as a roadmap to find its prior art components."  *Ruiz v. A.B. Chance Co.*, 357 F.3d 1270, 1275 (Fed. Cir. 2004).  "It is difficult but necessary that the decisionmaker forget what he or she has been taught . . . about the claimed invention and cast the mind back to the time the invention was made (often as here many years), to occupy the mind of one skilled in the art . . . ."  *W.L. Gore & Assocs., Inc. v. Garlock, Inc.,* 721 F.2d 1540, 1553 (Fed. Cir. 1983).  "Obviousness is a matter of foresight, not hindsight."  *Senju Pharm. Co. v. Lupin Ltd.*, 780 F.3d 1337, 1356 (Fed. Cir. 2015).

Courts use several techniques to avoid the influence of hindsight bias.  "The 'as a whole' instruction in title 35 [section 103(a)] prevents evaluation of the invention part by part," which is a "form of hindsight reasoning" that simply declares an invention obvious based on "its component parts" being present in the prior art.  *Ruiz*, 357 F.3d at 1275; *see KSR*, 550 U.S. at 418

("[A] patent composed of several elements is not proved obvious merely by demonstrating that each of its elements was, independently, known in the prior art.").

One of the most important ways that courts "preclude hindsight" is by "flexibly seek[ing] evidence from before the time of the invention in the form of some teaching, suggestion, or even mere motivation (conceivably found within the knowledge of an ordinarily skilled artisan) to make the variation or combination." *Rolls-Royce, PLC v. United Tech. Corp.*, 603 F.3d 1325, 1338 (Fed. Cir. 2010) (collecting post-*KSR* cases). Thus, *KSR* emphasized the importance of identifying "a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." 550 U.S. at 418. "This is so because inventions in most, if not all, instances rely upon building blocks long since uncovered, and claimed discoveries almost of necessity will be combinations of what, in some sense is already known." *Id.* at 418-19.

A court therefore must focus not on "what a skilled artisan would have been *able* to do," but on "what a skilled artisan would have been *motivated* to do at the time of the invention." *Polaris Indus.*, 882 F.3d at 1068-69 (emphases in original).

> What "could have been" merely employs hindsight to determine whether the claimed invention was technically feasible at the time of the invention. Such testimony does not address the central question in the motivation to combine inquiry—"whether a person of ordinary skill in the art . . . would have been led to make the combination recited in the claims." Merely knowing, years later, that someone could have successfully made the combination does not aid in determining whether at the time of the invention, one of skill in the art would have been motivated to do so.

*NPF Ltd. v. Smart Parts, Inc.*, 187 F. App'x 973, 978-79 (Fed. Cir. 2006) (quoting *In re Kahn*, 441 F.3d 977, 988 (Fed. Cir. 2006)) (alteration in original); *see InTouch Techs.*, 751 F.3d at 1352 (expert "succumbed to hindsight bias in her obviousness analysis" where "testimony primarily consisted of conclusory references to her belief that one of ordinary skill in the art *could*

combine [the] references, not that they *would* have been motivated to do so") (emphases in original); *see also Intendis*, 822 F.3d at 1366 (rejecting evidence that an artisan "could have" combined references).

## II.   A HYPOTHETICAL CLAIM LITERALLY ENCOMPASSING THE ACCUSED MEDIA WOULD NOT HAVE BEEN OBVIOUS

### A.   The Hypothetical Claim

The first step in an ensnarement analysis is typically the construction of a hypothetical claim.  As discussed above, a hypothetical claim is a version of the actual claim broadened to literally encompass the accused product commensurate with the plaintiff's theory of equivalence. *Intendis*, 822 F.3d at 1364.  Defendants' hypothetical claim accepts all the ingredients of the actual '083 claim and the concentration limits of most of the ingredients.[1]  (Def. SOF, at App'x A-B.)  For the handful of ingredients whose concentration is literally outside the claim, the hypothetical claim expands the concentration range to encompass the concentration of the accused equivalent.  Thus, for example, the bottom of the range for L-methionine in the '083 patent is 50 mg; in the hypothetical claim it is 37.57 mg.  For purposes of this motion, Janssen accepts Defendants' hypothetical claim.

As both parties agree, these modifications do not make the hypothetical claim different from the actual claim for purposes of the obviousness analysis.  Both the hypothetical claim and the actual claim have the exact same differences in ingredients from the prior art.  Moreover, although Defendants ignore these differences, both the hypothetical claim and the actual claim have a similarly large number of concentration differences from the preferred concentrations of

---

[1] Janssen has asserted claims 1 and 2 of the '083 patent against Defendants.  Defendants' hypothetical claim expands only the scope of elements in claim 1.  Meanwhile the obviousness analysis for claims 1 and 2 is the same.  For simplicity, in this brief, we refer to both the hypothetical claim and the asserted claims of the '083 patent in the singular.

the prior art.  *See infra* Part II.C.3.  Neither party contends that the minor concentration

differences between the hypothetical claim and the actual claim of the '083 patent make the

ensnarement analysis different in any way from the obviousness analysis.  Rather, as Dr. Butler

observed, "Dr. Glacken opines that his hypothetical claims are obvious over ***the same***

***references***, and ***for the same reasons***, on which he relied in opining that the actual claims were

obvious."  (JSOF Ex. 30 (Butler Reply Rep.) ¶ 39 (emphasis added).  *Compare* JSOF Ex. 15

(Glacken Opening Rep.) ¶¶ 208-260, *with* JSOF Ex. 31 (Glacken Rebuttal Rep.) ¶¶ 96-112.)

Thus, analysis of the hypothetical claim demonstrates not only that it is not obvious (and

therefore that Defendants' ensnarement defense fails), but also that the asserted claim in the '083

patent is not obvious (and therefore that their obviousness defense fails as well).

### B.     Defendants Ignore the "Would Have Been Obvious" Standard of 35 U.S.C. § 103(a)

Defendants assert two separate theories of ensnarement, based on the hypothetical claim's

supposed obviousness over the GSK and Life Techs applications.  (Def. Br. 17, 27.)  Both GSK

and Life Techs disclose cell culture media formulations with particular ingredients and

concentration ranges (with a single preferred concentration disclosed for each).  (JSOF ¶ 24, 29.)

Defendants argue that the hypothetical claim was obvious over these prior art media formulations

because they include nearly all of the claimed ingredients with nearly all concentration ranges

overlapping.  (Def. Br. 17-18, 27-28.)  For the different ingredients, Defendants argue that the

prior art includes allegedly interchangeable substitutes so that substitution is technically feasible.

(*Id.* at 21-22, 28.)  For the overlapping concentration ranges, Defendants simply presume that the

prior art meets those elements and say nothing further.  (*Id.* at 18-19, 29.)

Defendants' obviousness analysis collapses at the starting block.  An invention is obvious

only if it "***would*** have been obvious" at the time of the invention to one of ordinary skill in the

art.  35 U.S.C. § 103(a) (emphasis added).  As Defendants' concede by their failure to assert

anticipation, the hypothetical claim and the '083 patent both disclose a ***unique*** combination of

ingredients and concentrations that are nowhere to be found in the prior art.  To show that this

unique combination "would have been obvious" requires more than a showing that "the claimed

invention was technically feasible at the time of the invention," *NPF*, 187 F. App'x at 978-79, or

that "the prior art includes separate references covering each separate limitation in a claim under

examination," *Unigene Labs.*, 655 F.3d at 1360 (citing *KSR*, 550 U.S. at 418).  "Rather,

obviousness requires the additional showing that a person of ordinary skill at the time of the

invention ***would*** have selected and combined those prior art elements in the normal course of

research and development to yield the claimed invention."  *Id.* (citing *KSR*, 550 U.S. at 421)

(emphasis added).

Defendants entirely ignore what "would" have been obvious to an artisan at the time of

the invention, let alone what "would" have been obvious in the "normal course of research and

development."  *Id.*  They simply fast-forward to the GSK and Life Techs media – without

explaining why, in the normal course of research and development, anyone "would" have

selected those media for development.  And they assert that the differences between the

GSK/Life Techs media and the claims are so minor as to be patentably indistinct – without

explaining what "would" have caused an artisan in the normal course of research and

development to modify these prior art media to arrive at the claim.  (Def. Br. 20-22, 28.)  This

does not meet the "would have been obvious" standard of 35 U.S.C. § 103(a).

Defendants' own expert Dr. Glacken identified what an artisan "would" have done in the

"normal course of research and development" in this art, and it is an approach wholly

inconsistent with Defendants' obviousness theory.  Dr. Glacken explained the normal five-step

12

course that an artisan "would" have followed in paragraph 17 of his reply report.   (JSOF ¶ 1.)

These five steps – ignored by Defendants – are fatal to Defendants' case at every step.   Dr.

Glacken wrote:

> The following steps illustrate how a POSA [person of ordinary skill in the art] in the 2003-04 timeframe typically **would** have developed a serum-free, or chemically defined medium:
>
> [**Step 1**:] Consider basal medium as a potential starting point, which are typically mixtures of various media, for example, DMEM/F12 or eRDF (which itself is a modified mixture of three standard media formulations).
>
> [**Step 2**:] Assemble a list of potential active components.   By active component, I mean the component that provides the functional activity of interest in the ingredient independent of form (e.g., salt form).
>
> [**Step 3**:] Select ingredients that can provide the active components from the assembled list to formulate a candidate medium.   A POSA would consider various forms of an active component interchangeable and would select a particular ingredient based on such considerations as availability, purity, stability, cost, etc.
>
> [**Step 4**:] Develop an experimental design where the concentrations of the ingredients are varied in the medium to determine the optimal amount(s).
>
> [**Step 5**:] Execute the designed experiments using a matrix-based experiment, an example of which is described in Lao and Schalla.

(*Id.* (emphasis added).) ███████████████████████████████

███████████████████████████████████████████████████The '083 patent

inventors used a similar approach.   (*See* JSOF Ex. 16 (Epstein Tr.) at 210:15-214:17.)

As explained in detail below, a POSA following these steps would **not** have started with

the GSK or Life Techs applications.   And if a POSA nonetheless chose to start with those media,

she would **not** have any reason to arrive at the cell culture media of the hypothetical claim (or the

'083 patent).   Speaking about the actual '083 claim at his deposition, Dr. Glacken stated

repeatedly that by following this five-step plan, a POSA merely **could** or **might** arrive at a

formulation within the claim.   That is, the necessary changes in the prior art were simply

13

technically possible.  Defendants do not suggest, nor could they, that this conclusion would be any different for the hypothetical claim.



Dr. Glacken's opinion is fatal to Defendants' obviousness and ensnarement arguments, because "obviousness concerns whether a skilled artisan not only ***could have made*** but ***would have been motivated to make*** the combinations or modifications of prior art to arrive at the claimed invention."  *Belden Inc. v. Berk-Tex LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015) (emphases in original); *accord Personal Web Techs., LLC v. Apple, Inc.*, 848 F.3d 987, 993-94 (Fed. Cir. 2017) (that a POSA "would have understood that [two references] ***could be*** combined" was "not enough:  it does not imply a motivation to pick out those two references and combine them to arrive at the claimed invention") (emphasis in original).

Meanwhile, Janssen has come forward with expert testimony from Dr. Butler that a POSA ***would not*** have been motivated to start with GSK or Life Techs, (JSOF ¶¶ 18-19), and that even if a POSA had started with those references, she ***would not*** have any reason to modify

them to arrive at a formulation within the actual or hypothetical claims (JSOF ¶¶ 29-47; JSOF

Ex. 3 (Butler Rebuttal Rep.) ¶¶ 97-123, 133-149).  That puts Defendants' arguments to an end.

### C.      Neither the Hypothetical Claim Nor the Actual Claim Would Have Been Obvious to One of Ordinary Skill

The undisputed testimony of the parties' expert witnesses, largely ignored by Defendants,

shows that a POSA engaged in the "normal course of research and development" in this field

would not have arrived at the formula of the hypothetical claim (or the '083 patent).  At each step

of Dr. Glacken's five-step process, a POSA would have had no particular reason to make the

particular choices Defendants argue were obvious and would instead have been faced with a

practically infinite number of choices that were at most "obvious to try," with no particular

reason to choose any one of them.

### 1.      Glacken Step 1:  Select A Starting Formulation

Defendants' analysis starts with the GSK and Life Techs media.  Defendants have

obviously employed patent search firms to exhaustively review the prior art and to identify the

prior art references – no matter how obscure – that are closest to the '083 patent.  There is

nothing wrong with that exercise because a POSA is assumed to be aware of the entire prior art.

*See, e.g.*, *In re Rouffet*, 149 F.3d 1350, 1357 (Fed. Cir. 1998).  But having found those references

by using hindsight, Defendants must identify a reason – without using hindsight – why someone

in 2004 would have turned to the GSK or Life Techs references in attempting to develop a cell

culture media.  Defendants do not even to try to answer that question.

As Dr. Glacken explained above, the first step in a POSA's cell culture media

development is to "[c]onsider ***basal medium*** as a potential starting point, which are typically

mixtures of various media, for example, DMEM/F12 or eRDF (which itself is a modified

mixture of three standard media formulations)."  (JSOF ¶ 1 (emphasis added); *id.* ¶ 5.)  ▮

████████████████████████████████████████████████████

████████████████████ (JSOF Ex. 4 (Glacken Tr.) at 78:3-6.)  Janssen's expert agrees.

(*See* JSOF Ex. 3 (Butler Rebuttal Rep.) ¶ 41.)  Thus, Dr. Glacken would use a standard or

textbook basal media in developing a cell culture media.  (JSOF ¶ 6.)  Indeed, his report cited a

standard reference that included a list of seven basal media.  (*Id.* ¶ 7.)  DMEM/F12 and eRDF

are classic standards that can be modified by an artisan to meet the needs of a particular

development project.  Janssen began developing the '083 formula by starting with DMEM/F12.

(*Id.* ¶ 8.)

The GSK and Life Techs references are not standard textbook basal media used in

research and development.  Rather, they disclose so-called complete serum-free cell culture

media that have already been optimized for a particular application.  (*Id.* ¶¶ 9-16.)  Both include,

as an example, a basal medium that the inventors used to make their complete serum-free cell

culture, but both suggest that other basal media could be used as well.  (*Id.* ¶ 11, 15.)  Neither

suggests that the particular basal medium disclosed in the patent is of any importance.  (*Id.* ¶ 12,

16.)  Indeed, Dr. Glacken did not recall being familiar with either before this case and neither is

cited in any standard reference he identified.  (*Id.* ¶ 20.)  Nonetheless, it is these obscure media

that Defendants latch onto for their obviousness case.

Critically, however, Dr. Glacken confirmed that the GSK and Life Techs media are ***not***

where he would start a development project.  His work plan is explicit:  he would start with a

"basal medium." ███████████████████████████████████████████████

████████████████████████████████████████████████ (JSOF Ex.

4 (Glacken Tr.) at 72:23-25.) ███████████████████████████████

████████████████████████████████████████████████████

16

████████████████████████████████████████████████████████

████████████████████████████  (*Id.* at 72:5-22 (emphasis added).)   ██████████████

████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

(JSOF Ex. 4 (Glacken Tr.) at 82:20-83:3.)   ███████████████████████████

████████████████████████████████████  (*Id.* at 72:10-12.)

In a field of compositions with dozens of ingredients at various concentrations, where the number of combinations is practically infinite, starting with one of the "classics," a standard basal medium, is the only sensible and practical course.  Here, the uncontradicted evidence demonstrates that using such a starting point is the normal course of research and development.  Where that is true – where an artisan would start development by selecting a "reference composition" or "lead compound" for further modification – an obviousness analysis must provide a reason to select a particular reference composition to start with, particularly if the proposed starting point is off the beaten path.  *See Otsuka Pharm. Co. v. Sandoz, Inc.*, 678 F.3d 1280, 1291-92 (Fed. Cir. 2012) ("First, the court determines whether a chemist of ordinary skill would have selected the asserted prior art compounds as lead compounds, or starting points, for further development efforts."); *Unigene Labs.*, 655 F.3d at 1362 (using the term "reference composition" rather than "lead compound").  Defendants provide no reason why an artisan would start with the GSK or Life Techs media, and there is none.

Defendants' hindsight selection of those media based solely on their similarity to the hypothetical claim (and the '083 patent) does not help.  "Absent a reason or motivation based on such prior art evidence, mere structural similarity between a prior art compound and the claimed

17

compound does not inform the lead compound selection." *Otsuka*, 678 F.3d at 1292. Defendants' obviousness theories therefore fail at Dr. Glacken's first step; a POSA never "would" have selected the GSK and Life Techs media in the first place. *See Unigene*, 655 F.3d at 1361 ("[T]he claimed invention is not obvious if a person of ordinary skill would not select and combine the prior art references to reach the claimed composition or formulation."); *Takeda Chem. Indus. v. Alphapharm Pty.*, 492 F.3d 1350, 1357 (Fed. Cir. 2007) (obviousness argument "clearly depends on a preliminary finding that one of ordinary skill in the art would have selected [the prior art compound] as a lead compound").

### 2.    Glacken Steps 2 and 3:  Select the Ingredients

Once a POSA selects a medium as a starting point, he would, according to Dr. Glacken, identify the "potential active components" for their necessary biological activity and then pick "the form of [the] active component" to use in the media.  (JSOF ¶ 1.)  These ingredients would be selected "based on such considerations as availability, purity, stability, cost, etc."  (*Id.*)  Thus, for **each** active component intended to be used in the media, a POSA needs to choose a particular form of active component to include in the formulation.

Of course, if the POSA is not starting with the GSK and Life Techs media, there is no reason why a POSA would wind up with the 52 particular forms of active components of the hypothetical claim (and the '083 patent), and Defendants do not claim otherwise.  And even if one started with those media, there is no particular reason for an artisan to wish to modify them, and Defendants make no effort to provide a reason.  But assuming that (for some reason) a POSA would select the GSK and Life Techs media as a starting point and assuming further that (for some reason) a POSA might wish to modify them, Defendants' improper use of hindsight becomes all the more clear – and their claims of obviousness become all the more baseless.

18

We'll focus on the GSK media (the analysis of the Life Techs media is similar).  Of the 52 required ingredients in the hypothetical claim (and the '083 patent), the GSK media has 50. (JSOF ¶ 25.)  The two differences are:  (1) the hypothetical claim has ferric ammonium citrate, while the GSK media uses ferric fructose; and (2) the hypothetical claim has ammonium metavanadate, while the GSK media uses sodium metavanadate.  (*Id.*)  Focusing on those two differences, and those two differences alone, Defendants argue that each "could" be substituted for the other, which would result in exactly matching the GSK components with those of the hypothetical claim.  Citing a 1983 paper, for example, they argue that "the prior art has long taught [sodium and ammonium metavanadate] were interchangeable, and that they ***could be*** substituted simply 'for reasons of convenience.'"  (Def. Br. 22 (emphasis added).)

But this argument is simply one of technical feasibility.  Defendants do not argue that anything in particular would motivate a POSA to make those changes, just that they are possible. And they admit doing so would be a completely random choice, one that a POSA "could" make, not one that she "would" make.  There are at least 11 forms of iron and 5 forms of vanadium. (JSOF ¶¶ 34-35.)  If one wanted to substitute the forms of iron and vanadium in the GSK media, there are thus 55 unique possible combinations (11 x 5) of iron and vanadium components that one could choose – ***and only one of those 55 combinations would result in the particular combination of ferric ammonium citrate and sodium metavanadate that is in the hypothetical claim (and the '083 patent).*** (*Id.* ¶¶ 36-37.)

The more fundamental flaw with Defendants' analysis, however, is there is no reason other than hindsight for a POSA to focus on modifying only the iron and vanadium components of the GSK reference.  (*Id.* ¶ 27.)  Using foresight, a POSA who selected the GSK reference for further development would need to consider the possibility of modifying ***any and all*** of the 90-

plus ingredients disclosed in that reference.  The choices rapidly spin out of control.  Consider changing just four ingredients: ferric fructose, sodium metavanadate, nickel sulfate and copper sulfate.  Each active ingredient has 5 or more different forms.  (*Id.* ¶¶ 34-35, 38-39.)  That means there are more than 5 x 5 x 5 x 5 different unique combinations of just those four ingredients. (*Id.* ¶ 40.)  That is at least 625 different combinations – **and only one combination would be the one in the hypothetical claim (and the '083 patent)**.  (*Id.* ¶¶ 40-41.)  When a POSA considers changing all 52 required ingredients from one form to another, there are trillions of possible combinations (assuming only an average of 3 different forms of the 52 ingredients, that is approximately 3 to the 52nd power, or 6 followed by 24 zeros) – **and only one combination would be the one in the hypothetical claim (and the '083 patent)**.  Meanwhile, there is no reason to pick any particular form – and no reason other than hindsight to select a combination of the exact 52 forms in the hypothetical claim.  The chance that one "would" wind up with the ingredients actually in the hypothetical claim (and the '083 patent) is much lower than being struck by lightning or eaten by sharks.

   Dr. Glacken does not really disagree.  ██████████████████████████████████ ████████████████████████████████████████████████████  (*Id.* ¶ 23.)  And, as noted above, he argues only that a POSA "could" or "might" wind up with particular components of the '083 patent.  █████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████  (*See* JSOF Ex. 4 (Glacken Tr.) at 178:13-179:13.) Nor do Defendants provide a reason in their brief.  Instead, Defendants argue only that a POSA **could** have made the exactly correct substitutions to arrive at the exactly correct combination of ingredients, not that she necessarily **would** have.  But "coulds" and "mights" do not suffice for

obviousness under section 103(a).  *See Personal Web Techs.*, 848 F.3d at 993-94; *Belden Inv.*, 805 F.3d at 1073.

Defendants argue only that the different forms of active ingredient are largely interchangeable and known in the art, and they claim that that suffices.  They lean heavily on this line from *KSR* to contend that that alone makes the combination obvious:  "The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."  550 U.S. at 416.  But there is more to *KSR* to that.  In *KSR*, there were only a handful of locations to put the claimed sensor.  The few choices were all "obvious to try" and, the Court found, would have resulted in the claimed invention, making it obvious under section 103(a).  "When there is a design need or market pressure to solve a problem and there are a ***finite number*** of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp."  *Id.* at 421 (emphasis added).

Post-*KSR* case law has consistently limited this "obvious to try" doctrine to circumstances, unlike this one, where the number of interchangeable choices are few.  "[T]he Supreme Court's analysis in *KSR* presumes that the record before the time of the invention would supply some reasons for narrowing the prior art universe to a 'finite number of identified, predictable solutions.'"  *Eisai Co. v. Dr. Reddy's Labs., Ltd.*, 533 F.3d 1353, 1359 (Fed. Cir. 2008) (quoting *KSR*, 550 U.S. at 421).  Reliance on an "obvious to try" theory "is insufficient unless it indicates the possible options skilled artisans would have encountered were 'finite,' 'small' or 'easily traversed,' and that the skilled artisan would have had a reason to select the route that produced the claimed invention."  *Cyclobenzaprine*, 676 F.3d at 1072.

Here there are an infinite number of possible combinations and, as Defendants admit, no reason to favor one set over another.  A combination is not obvious where "what would have

been 'obvious to try' would have been to vary all parameters or try each of numerous possible choices until one possibly arrived at a successful result, where the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful." *In re Kubin*, 561 F.3d 1351, 1359 (Fed. Cir. 2009). "In such circumstances, where a defendant merely throws metaphorical darts at a board filled with combinatorial prior art possibilities, courts should not succumb to hindsight claims of obviousness." *Id.* This does not make a claim obvious.[2]

### 3. Glacken Steps 4 and 5: Select the Concentrations for the Ingredients

But the failure of Defendants' obviousness challenge does not end yet. ***Even if*** one were motivated to start with the GSK or Life Techs media, rather than a standard basal media, and ***even if*** one were motivated to defy the odds and select exactly the correct combination of ingredients, then one still has to select concentrations for the new media. As Dr. Glacken explained, in steps 4 and 5 an artisan must pick particular concentrations – not ranges – to study and then conduct experiments to optimize the chosen concentrations. (JSOF ¶ 1.) Here Defendants do no analysis of what those concentrations might be. They simply assert that the ranges of the hypothetical claim (and the '083 patent) largely overlap the ranges of the GSK and Life Techs media, so nothing further is necessary. (Def. Br. 19, 29.)

---

[2] Defendants' summary judgment motion also fails at this step because, as Dr. Butler explained, the prior art teaches away from using ferric ammonium citrate ("FAC") in a cell culture media. (JSOF ¶¶ 49-56.) Defendants devote pages (largely of attorney argument) to disputing Dr. Butler's testimony that the prior art teaches away from FAC. (*See* Def. Br. 23-25.) But "[w]hether the prior art teaches away from the claimed invention is a question of fact," *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1344 (Fed. Cir. 2011), the answer to which depends on how a POSA would have read the prior art, *see Kubin*, 561 F.3d at 1357. This is a factual dispute that cannot be resolved in Defendants' favor on summary judgment and it requires denial of their motion without more. At the same time, this factual dispute does not preclude the Court granting summary judgment in Janssen's favor because Janssen's argument is based on the many legal flaws in Defendants' arguments.

Not so.  As Dr. Glacken recognizes, developing a new media requires deciding on concentrations and testing which concentrations, and combinations of concentrations, are preferable.  This is, once again, a journey to infinity.  Dr. Glacken performed an "exemplary calculation" of just the number of different possible combinations of concentrations (not including combinations of ingredients) within the '083 claim itself.  (JSOF ¶ 42.)  Short circuiting the analysis by taking just three concentrations within each range (high, middle and low) and recognizing that there were 61 different concentrations to select in each embodiment of the invention (one for each ingredient), he computed that there were "trillions and trillions and trillions of media" of differing concentrations within Janssen's claim (3 to the 61st power).  (*Id.* ¶ 43.)

The same is true of the GSK and Life Techs media, each of which identifies a range of possible concentrations for each ingredient, resulting in a similarly "large number" of possible combinations.  (*See* JSOF Ex. 4 (Glacken Tr.) at 118:6-25, 212:17-213:2.)  Many of the ranges do overlap the ranges in hypothetical claim (and the '083 patent), but that does not mean that one of skill attempting to develop a new media would automatically – or obviously – pick concentrations within the hypothetical claim.  Rather, as Dr. Butler explained, the GSK and Life Techs applications each disclose a preferred embodiment.  That is where one of skill in the art would look for guidance about a starting concentration.  (*See* JSOF Ex. 3 (Butler Rebuttal Rep.) ¶¶ 101-104, 137-140.)  For the GSK patent, 17 of those concentrations are outside the range of the hypothetical claim.  (JSOF ¶ 45.)  (The number is 22 for the '083 patent itself).  For the Life Techs media, 12 of those concentrations are outside the range of the hypothetical claim.  (*Id.* ¶ 48.)  (The number is 14 for the '083 patent itself).

Dr. Glacken agreed that it was reasonable to start with the preferred concentrations in developing a new media.  (*Id.* ¶ 44.)  Take the GSK patent, for example, and use Dr. Glacken's approach of analyzing high, middle and low variations, using the preferred concentration as the middle (and presumptively optimal) value.  For the 17 ingredients whose preferred concentrations fall outside the hypothetical claim, that is 51 possible concentrations – 34 of which (by definition) fall outside the hypothetical claim.  One of skill would be motivated to select the best combination of concentrations for his purpose, but even for the limited universe of these 17 concentrations, there are ***millions*** of unique combinations (3 to the 17th power, approximately 129 million).  (*Id.* ¶ 46.)  And of those millions of different possible combinations, ***only one results in a formula with all 17 concentrations falling within the hypothetical claim.***  (*Id.*)  (The odds are even worse for the claims of the '083 patent).

Defendants do not engage on this problem.  Indeed, Dr. Glacken did no analysis with respect to concentrations other than to repeat an erroneous legal instruction that he was provided: "where there is a range disclosed in the prior art and the claimed invention lies within or overlaps that prior art range, the prior art shows that element of the claim to be obvious and known by a POSA."  (JSOF Ex. 14 (Glacken Reply Rep.) ¶ 127.)  He confirmed this understanding at deposition and offered no further analysis.  (JSOF Ex. 4 (Glacken Tr.) at 220:5-8.)  Dr. Glacken appears to have received his instructions about overlapping ranges based on the Federal Circuit's decision in *In re Peterson*, 315 F.3d 1325 (Fed. Cir. 2003), where the court noted that "[a] prima facie case of obviousness ***typically*** exists when the ranges of a claimed composition overlap the ranges disclosed in the prior art."  *Id.* at 1329 (emphasis added).  But the *Peterson* court made clear that overlapping ranges are *prima facie* obvious only in the "typical[]" case.  *Id.*  The court pointedly noted, "we do not have here any assertion that the disclosed range is so broad as to

24

encompass a ***very large number of possible distinct compositions***" and therefore "do not need to decide whether a disclosed range of such breadth" would render overlapping ranges *prima facie* obvious.  *Id.* at 1330 n.1 (emphasis added).

Subsequently, the Federal Circuit held that overlapping ranges in the prior art do ***not*** render a claim obvious where, as here, the prior art encompasses large numbers of distinct possible compositions within the ranges that are disclosed.  In *Genetics Institute, LLC v. Novartis Vaccines & Diagnostics, Inc*., 655 F.3d 1291 (Fed. Cir. 2011), the Federal Circuit held that the "facts here do not present the 'typical[]' case contemplated in *Peterson*" because "about 68,000 protein variants are encompassed by the claims of the '112 patent."  *Id.* at 1306.  This was "an important distinction" from *Peterson*.  "The facts here present a case where the 'disclosed range is so broad as to encompass a very large number of possible distinct compositions' thus 'requir[ing] nonobvious invention,' not a case, as in *Peterson*, where prior art 'ranges that are not especially broad invite routine experimentation to discover optimum values.'" *Id.* (quoting *Peterson*, 315 F.3d at 1330 n.1); *see also Allergan, Inc. v. Sandoz, Inc.*, 796 F.3d 1293, 1305 (Fed. Cir. 2015) ("[I]t may also be true here that the disclosed ranges are so broad as to encompass a very large number of possible distinct compositions, such that they do not teach any specific amounts or combinations and that the burden of producing evidence of teaching away, unexpected results, and other pertinent secondary considerations did not shift to [the patentee].") (alteration, citation, and internal quotation marks omitted).

This reasoning is just an application of *KSR* and exemplifies the difference in the obviousness analysis when, unlike this case, "the easily traversed, small and finite number of alternatives that *KSR* suggested might support an inference of obviousness"  *Ortho-McNeil Pharm. v. Mylan Labs.*, 520 F.3d 1358, 1364 (Fed. Cir. 2008).  Where the choices of

25

concentration in the prior art are narrow and finite, that in and of itself may provide sufficient motivation to develop the overlapping range that is claimed in a later patent and be proof of obviousness.  This is because, as *Peterson* explained, a "normal desire of scientists or artisans to improve upon what is already generally known ***provides the motivation*** to determine where in a disclosed set of percentage ranges is the optimum combination of percentages."  315 F.3d at 1330 (emphasis added).  But as *Genetics Institute* explains, "[s]imply put, the typical desire of scientists to find an optimum value within a ***narrow*** disclosed range, does not apply to the facts of this case," where the prior art ranges are "so broad as to encompass a very large number" of possibilities.  655 F.3d at 1306 (emphasis added).  In a case such as this one, where the prior art ranges encompass combinations with many millions of possibilities, an obviousness analysis requires motivation, a reason presented in the prior art to make the choices made by the inventor.  Of course, a reason to choose particular concentrations for a particular combination of ingredients is exactly what Dr. Glacken routinely requires – proven by experimental results – in describing how an artisan "would" develop a cell media.  But Defendants provide no reason here.

The different analysis that applies when prior art ranges are broad, as opposed to narrow, disposes of Defendants' repeated assertion that the ranges in the hypothetical claim are not critical.  (Def. Br. 2, 12-13, 19, 29.)  That confuses the standards for infringement and obviousness.  For infringement, where hindsight does not come into play, a concentration outside the range can be substantially equivalent to one within the range if the concentration is not critical.  For obviousness, however, where hindsight is forbidden and there are a large number of possibilities, there must be a motivation to select a particular concentration.  It does not matter whether a claimed range is critical.  Criticality is relevant only if needed to overcome the

*Peterson* presumption of obviousness arising from overlapping ranges.  *E.g., In re Applied Materials, Inc*., 692 F.3d, 1289, 1297 (Fed. Cir. 2012) ("[A] prima facie case of obviousness established by the overlap of prior art value with the claimed range can be rebutted by evidence that the claimed range is 'critical' . . . .") (citation omitted).  Where, as here, the presumption does not apply in the first place because the choices are so many, there is no need to overcome it.

Rather, there must be a motivation in the prior art to select the ranges that appear in the hypothetical claim (and in the '083 patent).  There is none here.  As Dr. Butler opines, whatever motivation comes from the many millions of possible concentrations disclosed in the GSK and Life Techs media is the motivation to select the preferred embodiments of those media.  That does not yield the ranges of the hypothetical claim.  Dr. Glacken did not disagree.  Instead, he simply assumed the problem away based on an erroneous legal instruction that overlapping ranges are obvious, even where, as here, the number of possible combinations is essentially infinite.  The overlapping ranges in the prior art do not automatically render the corresponding concentration ranges in the hypothetical claim obvious and Defendants provide no other reasoning on the subject.  *See, e.g.*, *Abbott Labs.*, 287 F.3d at 1106 (holding that overlapping ranges do not create *prima facie* obviousness where "other limitations of the claim" are different).  Defendants' hindsight-driven obviousness theory fails when it comes to selecting concentrations, just as it does when it comes to selecting ingredients, just as it does when it comes to select an initial basal medium.

### D.        Defendants Ignore Evidence of Secondary Considerations

An obviousness analysis includes secondary considerations, also called objective indicia of non-obviousness.  Secondary considerations, "when considered with the balance of obviousness evidence in the record, guard as a check against hindsight bias."  *See*

*Cyclobenzaprine*, 676 F.3d at 1079; *see also Graham*, 383 U.S. at 36 (secondary considerations "serve to guard against slipping into the use of hindsight and to resist the temptation to read into the prior art the teachings of the invention in issue") (citation and internal quotation marks omitted).

Here the most relevant secondary consideration of non-obviousness is copying. *See, e.g.*, *Apple Inc. v. Samsung Elecs. Co.*, 839 F.3d 1034, 1052, 1054 (Fed. Cir. 2016). The accused Celltrion cell media contains the ***exact same ingredients*** in the ***exact same form*** as the '083 patent (and the hypothetical claim). Most of the concentrations of the Celltrion media are also within the ranges claimed in the '083 patent; a few are insubstantially different (and they are identical to the hypothetical claim). How can that be, when the odds of that happening are less than one out of many trillions? As Bogie wondered, "Of all the gin joints in all the towns in all the world, she walks into mine." Here it is not a coincidence. HyClone had access to the formula of the '083 patent when it was in development by Janssen and it used that formula in developing the Celltrion media.

28



That is objective evidence of non-obviousness, sufficient in itself to defeat Defendants' motion for summary judgment.  (We recognize that if the Court decides to grant summary judgment to Janssen based on the record of this motion, it is should not consider this evidence of copying, as it is disputed by Defendants).

## CONCLUSION

Defendants' motion should be denied.  Moreover, since the flaws in Defendants' arguments are ones of law, the Court can on this motion grant summary judgment ***for Janssen*** striking the ensnarement defense.  Fed. R. Civ. P. 56(f)(1); *see United States v. Massachusetts*, 781 F. Supp. 2d at 7 n.12.

30

Respectfully submitted

Dated:  May 10, 2018

*Of Counsel*:

|  |  |
|---|---|
|  | */s/ Alison C. Casey* |
| Gregory L. Diskant (admitted *pro hac vice*) | Heather B. Repicky (BBO # 663347) |
| gldiskant@pbwt.com | hrepicky@nutter.com |
| Irena Royzman (admitted *pro hac vice*) | Alison C. Casey (BBO #688253) |
| iroyzman@pbwt.com | acasey@nutter.com |
| Aron Fischer (admitted *pro hac vice*) | NUTTER MCCLENNEN & FISH LLP |
| afischer@pbwt.com | Seaport West |
| Andrew D. Cohen (admitted *pro hac vice*) | 155 Seaport Boulevard |
| acohen@pbwt.com | Boston, MA 02210 |
| PATTERSON BELKNAP WEBB & TYLER LLP | 617-439-2000 |
| 1133 Avenue of the Americas | FAX: 617-310-9192 |
| New York, NY 10036-6710 |  |
| 212-336-2000 | *Attorneys for Plaintiff Janssen Biotech, Inc.* |
| FAX: 212-336-2222 |  |

## <u>CERTIFICATE OF SERVICE</u>

I certify that on May 10, 2018, this document, filed through the Court's ECF system, will be sent electronically to the parties or their counsel who are registered participants as identified on the Notice of Electronic Filing and if not so registered, that copies will be electronically mailed to such parties or their counsel.

/s/ *Alison C. Casey*