IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

_____
                                       )
JANSSEN BIOTECH, INC.,                 )
                    Plaintiff,         )
                                       )
        v.                             )        Civil Action No. 1:17-cv-11008-MLW
                                       )
CELLTRION HEALTHCARE CO., LTD.,        )
CELLTRION, INC., and                   )        **CONFIDENTIAL**
HOSPIRA, INC.,                         )        **FILED UNDER SEAL**
                    Defendants.        )
_____ )


**JANSSEN'S RESPONSE TO DEFENDANTS' RULE 56.1 STATEMENT OF
UNDISPUTED MATERIAL FACTS IN SUPPORT OF DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT OF NON-INFRINGEMENT BASED ON ENSNAREMENT
AND COUNTERSTATEMENT OF MATERIAL FACTS**

Pursuant to Local Rule 56.1, Plaintiff Janssen Biotech, Inc., ("Janssen") respectfully

submits the following Response to Defendants' Rule 56.1 Statement of Material Facts (Dkt. No.

228) and Counterstatement of Material Facts.  Janssen's agreement to any statement of fact

presented by Defendants is for purposes of Defendants' motion only and does not constitute an

admission for any other purpose.

I.      **The '083 Patent**

        A.      *The Alleged Goal Of The Claimed Invention*

        1.      Both the '083 patent application and the provisional patent application to which

the '083 patent claims priority were entitled "Chemically Defined Media Compositions." Ex. 14

(Provisional App.); Ex. 15 ('083 Patent Application).

**RESPONSE TO 1:**   This fact is immaterial to Defendants' motion, which relates to

whether application of the doctrine of equivalents would ensnare the prior art by obviousness.

Nevertheless, it is undisputed that the respective patent applications are so titled.

1

2.     The '083 patent application and provisional application stated that the "present

invention" relates to "chemically defined media compositions for the culture of eukaryotic cells."

Ex. 14 (Provisional App.) at 1:4-5 and 7:3-4; Ex. 15 ('083 Patent Application) at 1:10-11 and

6:38-7:1.

**RESPONSE TO 2:**   This fact is immaterial to Defendants' motion, which relates to

whether application of the doctrine of equivalents would ensnare the prior art by obviousness.

Nevertheless, it is undisputed that the respective patent applications include the stated text.


3.     The '083 patent applicants told the Patent Office that chemically undefined

media, such as media containing serum, posed a threat to patients through "adventitious particle

contamination" (Ex. 14 (Provisional App.) at 1:8-37) and that the inventors allegedly solved that

problem by creating an "animal component free cell culture media" that is "'chemically defined'

such that the media compositions contain only known chemical compounds, and are free of all

proteins--even those not of animal origin such as recombinant proteins." *Id.* at 1:32-37.

**RESPONSE TO 3:**   This fact is immaterial to Defendants' motion, which relates to

whether application of the doctrine of equivalents would ensnare the prior art by obviousness.

Furthermore it is disputed.  The '083 patent application, in the background of the invention

section, described the problem of "adventitious particule contamination" of "conventional

eukaryotic cell culture media," and stated that the problem "can be avoided by culturing

eukaryotic cells in animal component free cell culture media," which is "ideally" "'chemically

defined' such that the media compositions contain only known chemical compounds, and are

free of all proteins—even those not of animal origin such as recombinant proteins."  (Def. Ex.

14, at 1:8-37.)

4.      During claim construction proceedings before the Court, Janssen argued that the
claims cover chemically undefined media:

> If the inventors had wished to limit the claimed invention to those "cell
> culture media" that are "chemically defined," they would have used the
> words "chemically defined" in the claim. They did not. The plain and
> ordinary meaning of the claim language contains no limitation to
> "chemically defined" cell culture media.

*E.g.* No. 15-10698, Dkt. 149 at 1.

**RESPONSE TO 4:**   This fact is immaterial to Defendants' summary judgment motion,
which relates to whether application of the doctrine of equivalents would ensnare the prior art by
obviousness.  The Court has construed the term "cell culture media" in claim 1 of the '083 patent
to mean "nutritive media for culturing cells."  (JSOF Ex. 1 (8/17/2016 Hr'g Tr.) at 103.)
Nevertheless, Janssen does not dispute that the quoted statement from Janssen's Opening
*Markman* Brief for the Disputed Term in U.S. Patent 7,598,083 (Case No. 15-10698, Dkt. No.
149, at 1) is reproduced accurately.

### B.      The Asserted Claims

5.      Janssen is asserting claims 1 and 2 of U.S. Patent No. 7,598,083 ("the '083
patent") against Defendants in this litigation. D.I. 1, Complaint at ¶¶ 112, 122, 127, 133.

**RESPONSE TO 5:**   Undisputed.

6.      Claim 1 of the '083 patent states: "A soluble composition, suitable for producing
a final volume of cell culture media, wherein the composition comprises the following
components in the following amounts per liter of the final volume of cell culture media:

> anhydrous $CaCl_2$, 5-200 mg;
> anhydrous $MgCl_2$, 15-50 mg;
> anhydrous $MgSO_4$, 20-80 mg;
> $FeSO_4.7H_2O$, 0.05-0.50 mg;
> $Fe(NO_3)_3.9H_2O$, 0.01-0.08 mg;

$ZnSO_4.7H_2O$, 0.40-1.20 mg;
ferric ammonium citrate, 0.04-200 mg;
$KCl$, 280-500 mg;
$NaCl$, 5000-7500 mg;
$NaH_2PO_4.H_2O$, 30-100 mg;
$Na_2HPO_4$, 30-100 mg;
$CuSO_4.5H_2O$, 0.001-0.005 mg;
$CoCl_2.6H_2O$, 0.001-0.10 mg;
$(NH_4)_6Mo_7O_{24}$ $4H_2O$, 0.001-0.005 mg;
$MnSO_4.H_2O$, 0.000070-0.0080 mg;
$NiSO_4.6H_2O$, 0.000025-0.0005 mg;
$Na_2SeO_3$, 0.004-0.07 mg;
$Na_2SiO_3.9H_2O$, 0.02-0.4 mg;
$SnCl_2.2H_2O$, 0.000025-0.0005 mg;
$NH_4VO_3$, 0.0001-0.0025 mg;
D-Glucose, 500-8000 mg;
sodium pyruvate, 0.0-1000 mg;
sodium hypoxanthine, 0.0-20.0 mg;
glycine, 0.0-150 mg;
L-alanine, 0.0-150 mg;
L-arginine.HCl, 200-5000 mg;
L-asparagine.$H_2O$, 40-250 mg;
L-aspartic acid, 20-1000 mg;
L-cysteine.HCl $H_2O$, 25.0-250 mg;
L-cystine.2HCl, 15-150 mg;
L-glutamic acid, 0-1000 mg;
L-histidine.HCl.$H_2O$, 100-500 mg;
L-isoleucine, 50-1000 mg;
L-leucine, 50-1000 mg;
L-lysine.HCl, 100-1000 mg;
L-methionine, 50-500 mg;
L-ornithine.HCl, 0-100 mg;
L-phenylalanine, 25-1000 mg;
L-proline, 0-1000 mg;
L-serine, 50-500 mg;
L-taurine, 0-1000 mg;
L-threonine, 50-600 mg;
L-tryptophan, 2-500 mg;
L-tyrosine.2Na.$2H_2O$, 25-250 mg;
L-valine, 100-1000 mg;
d-biotin, 0.04-1.0 mg;
D-calcium pantothenate, 0.1-5.0 mg;
choline chloride, 1-100 mg;
folic acid, 1-10 mg;
i-Inositol, 10-1000 mg;
nicotinamide, 0.5-30 mg;

p-aminobenzoic acid, 0.1-20 mg;
riboflavin, 0.05-5.0 mg;
thiamine.HCl, 0.5-20 mg;
thymidine, 0-3.0 mg;
vitamin B12, 0.05-5.0 mg;
linoleic acid, 0.01-2.0 mg;
DL-α-lipoic acid, 0.03-1.0 mg;
pyridoxine.HCl, 0.5-30 mg;
putrescine.2HCl, 0.025-0.25 mg; and
ethanolamine.HCl, 2-100 mg."

Ex. 13 ('083 Patent) at Claim 1.

**RESPONSE TO 6:**   Undisputed.

7.      9 of the 61 ingredients recited in claim 1 list a concentration range with a lower

end of zero and are therefore optional: (1) sodium pyruvate; (2) sodium hypoxanthine; (3)

glycine; (4) L-alanine; (5) L-glutamic acid; (6) L-ornithine.HCl; (7) L-proline; (8) L-taurine; (9)

thymidine. Ex. 10 (Butler Op.) at ¶ 19.

**RESPONSE TO 7:**   Undisputed that the lower end of the claimed concentration range

for the nine ingredients listed in this fact is zero, and that, therefore, "a cell culture media

formulation can omit one or more of these ingredients and still meet all the limitations of claim

1." (Def. Ex. 10 (Butler Report) ¶ 19). To that extent, the stated ingredients are "optional." (*Id.*)

The concentration ranges with lower ends of zero are otherwise limitations of the claim.

8.      Claim 2 of the '083 patent depends from claim 1 and states: "The soluble

composition of claim 1 further comprising a buffering molecule with a pKa between 5.9 and 7.9

and a cell protectant." Ex. 13 ('083 Patent) at Claim 2.

**RESPONSE TO 8:**   Undisputed.

9.      According to the '083 patent's specification, "[t]he term 'cell protectant' as used herein and in the claims means a substance that protects eukaryotic cells from damage." *Id.* at 4:25-27.

**RESPONSE TO 9:**   Undisputed.

### B.      *The Claimed Ranges*

10.     Janssen has argued that "there's a broad plateau of interchangeable concentrations in cell media." Ex. 2 (1/31/2018 Hr'g Tr.) at 11:17-18.

**RESPONSE TO 10:**   This oral argument citation is immaterial to Defendants' summary judgment motion.  The extent to which ingredient concentrations in cell culture media are interchangeable relates to whether certain different concentrations are equivalent under the DOE, not to whether application of DOE to this case would ensnare the prior art by obviousness.  *See, e.g.*, *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1282 (Fed. Cir. 2011).

Nevertheless, it is undisputed that Janssen's attorney, during argument on Defendants *Daubert* motion relating to Dr. Butler's expert opinions, described Dr. Butler's infringement analysis as follows:  "He [*i.e.*, Dr. Butler] used as a background to his thinking the knowledge that there's a broad plateau of interchangeable concentrations in cell media, you know, sometimes it's extremely broad, 2500 times, sometimes it's six times.  But it's never very, very tight."  (Def. Ex. 2 (1/31/2018 Hr'g Tr.) at 11:16-20.)

11.     Janssen has argued that the range of "interchangeable concentrations" is "sometimes... extremely broad, 2500 times, sometimes it's six times" and "never very, very tight." Ex. 2 (1/31/2018 Hr'g Tr.) at 11:17-22.

**RESPONSE TO 11:** This oral argument citation is immaterial to Defendants' summary

judgment motion.  The extent to which ingredient concentrations in cell culture media are

interchangeable relates to whether certain different concentrations are equivalent under the DOE,

not to whether application of DOE to this case would ensnare the prior art by obviousness.  *See,*

*e.g.*, *Siemens Med. Solutions*, 637 F.3d at 1282.

Nevertheless, it is undisputed that Janssen's attorney, during argument on Defendants

*Daubert* motion relating to Dr. Butler's expert opinions, described Dr. Butler's infringement

analysis as follows:  "He [*i.e.*, Dr. Butler] used as a background to his thinking the knowledge

that there's a broad plateau of interchangeable concentrations in cell media, you know,

sometimes it's extremely broad, 2500 times, sometimes it's six times.  But it's never very, very

tight."  (Def. Ex. 2 (1/31/2018 Hr'g Tr.) at 11:16-20.)

12.     Dr. Butler has argued that the specific ranges claimed in the '083 patent "don't

define the thresholds of that plateau," and further that "the precise concentrations of the trace

element-containing ingredients a[s] not critical." Ex. 3 (1/30/2018 Hr'g Tr. (Butler)) at 82:20-

83:3; Ex. 10 (Butler Op.) at ¶ 42.

**RESPONSE TO 12:** This fact is immaterial to Defendants' summary judgment motion.

Testimony about whether the DOE is applicable as a factual matter to this case (*i.e.*, whether

differences are insubstantial) is irrelevant to the question of whether application of DOE to this

case would ensnare the prior art by obviousness.

Furthermore, while the quotations in the paragraph are accurate, they are taken out of

context and therefore the paragraph disputed.  At the *Daubert* hearing, Defendants' counsel

asked Dr. Butler whether it was true that "[a] natural reading of the list of concentrations [in the

'083 patent claim] is that the inventors were specifying precise concentrations when defining the

scope of their invention."  (Def. Ex. 3 (1/30/2018 Hr'g Tr. (Butler)) at 82:20-22.)  In response to

that, Dr. Butler stated that "they were, as far as I know, and I'm taking some reference to Dr.

Epstein, who is one of the inventors, these were meant to be guidelines for estimation of that

plateau that we're talking about from Dr. Ham's work.  So they're not precise insofar as they

don't define the thresholds of that plateau or the sweet spot."  (*Id.* at 82:23-83:3.)  In Dr. Butler's

expert report on infringement, Dr. Butler stated that "*[g]enerally speaking*, the precise

concentrations of the trace-element containing ingredients are not critical."  (Def. Ex. 10 (Butler

Report) at ¶ 42 (emphasis added).)

13.    Dr. Wurm was specifically asked about "the ranges that are specified in claim 1"

and whether "you have to be in that range, it's critical?" to which he replied: "I cannot say

critical." Ex. 1 (Wurm Dep.) at 166:5-19.

**RESPONSE TO 13:**  This fact is immaterial to Defendants' summary judgment motion.

Testimony about whether the DOE is applicable as a factual matter to this case (*i.e.*, whether

differences are insubstantial) is irrelevant to the question of whether application of DOE to this

case would ensnare the prior art by obviousness.

Furthermore, disputed.  Defendants did not quote Dr. Wurm's complete answer.  Dr.

Wurm went on to state that "yes, there are [critical concentrations], but I cannot tell you ahead of

time with very few exceptions. . . . it's very difficult to predict."  (Def. Ex. 1 (Wurm Dep.) at

166:19-167:10.)

14.    The lead '083 inventor testified



Ex. 4 (Epstein Dep.) at 230:12-21.

**RESPONSE TO 14:**  This fact is immaterial to Defendants' summary judgment motion.

Testimony about whether the DOE is applicable as a factual matter to this case (*i.e.*, whether

differences are insubstantial) is irrelevant to the question of whether application of DOE to this

case would ensnare the prior art by obviousness.

Furthermore, disputed.  Defendants did not quote the complete answer of Dr. Epstein (the

first-named inventor on the '083 patent), or his answer to the analogous question asked ███

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████ (Def.

Ex. 4 (Epstein Dep.) at 230:21-232:4.)

15.    To determine the ranges listed in claim 1, the '083 inventors ████████



Ex. 4 (Epstein Dep.) at 220:2-221:10 (emphasis added, objections omitted).

**RESPONSE TO 15:**  This fact is immaterial to Defendants' summary judgment motion. Inventor testimony about the development of the invention is irrelevant to whether application of DOE to this case would ensnare the prior art by obviousness.  *See* 35 U.S.C. § 103(a) ("Patentability shall not be negated by the manner in which the invention was made.").

Furthermore, disputed.  While Dr. Epstein's testimony is accurately transcribed, the characterization ███████████████████████████████████████████████ ███████████████████████████████████████ is inaccurate and not supported by Dr. Epstein's testimony, which speaks for itself.

16.      The range of useful concentrations for the ingredients depends on the kind of cell being grown, such that the optimal concentration ranges of ingredients for one cell line will differ from the optimal ranges for another. Ex. 16 (Butler Dep.) at 274:23-275:13 ("for any particular cell you need a particular set of ingredients and a particular concentration of each of those ingredients").

**RESPONSE TO 16:**  Disputed.  Dr. Butler's cited testimony does not support the proffered factual proposition.

17.      The claims of the '083 patent broadly cover media for growing any kind of cell. Ex. 13 ('083 patent) at Claims 1, 2.

**RESPONSE TO 17:**  This proposition is both vague ("broadly") and legal ("cover"), and thus is not a fact.  Nevertheless, it is undisputed that claims 1 and 2 of the '083 patent do not recite any particular kind of cell with which the recited cell culture media compositions can be used.

II.     **The Accused Media**

18.     Plaintiffs contend that two products manufactured by third party HyClone

Laboratories, Inc. ("HyClone") for Celltrion infringe asserted claims 1 and 2 of the '083 patent

under the doctrine of equivalents: (a) HyQ ADCF Mab-New Production product ("Celltrion

Production Media" or "CPM") and (b) HyQ ADCF Mab-Growth product ("Celltrion Growth

Media" or "CGM") (together, the "accused products"). Case No. 1:15-cv-10698, Dkt. 282

(Janssen's Response to Def.'s Statement of Material Facts In Support Of Their Motion For

Partial Summary Judgment) at 31-32.

**RESPONSE TO 18:** Undisputed.

19.     The accused products contain all of the ingredients required by independent claim

1 (among other ingredients), but 12 of the ingredients in the Celltrion Production Media

("CPM") and 13 of the ingredients in the Celltrion Growth Media ("CGM") are present "in

quantities that are literally outside the claimed ranges." Ex. 29 (Plaintiffs' Infringement

Contentions) at 7–11; *see* Ex. 11 (Wurm Op.) at ¶ 49. Plaintiffs have stated that "it is true that

twelve ingredients [in CPM] fall outside the literal ranges of" claim 1 of the '083 patent and that

"10% of the limitations (12 out of 122) are not met literally." Case No. 1:15-cv-10698, Dkt. 202

at 6; Case No. 1:15-cv-10698, Dkt. 140 at 1–2; Case No. 1:15-cv-10698, Dkt. 282 (Janssen's

Response to Def.'s Statement of Material Facts In Support Of Their Motion For Partial Summary

Judgment) at 32.

**RESPONSE TO 19:** Undisputed (except as to the concentration of

$(NH4)6Mo7O24•4H2O$ in CGM, which "is within rounding error of the claimed range"). (JSOF

Ex. 2 (Butler Opening Report) ¶ 39 n.1.)

20.    The concentration differences in the accused media extend as high as over 400%

*above* the '083 patent's claimed range and as low as only 10% of the claimed ranged:

| Ingredients Present In Amounts Less Than The Claimed Concentration Range | | |
|---|---|---|
| Elements of '083 Patent | Amount in HyClone's Production Product | % of the Lower Limit |
| $CoCl_2.6H_2O$, 0.001-0.10 mg; | COBALT CHLORIDE $6H_2O$, 0.00043 mg | 43% of lower limit |
| $SnCl_2.2H_2O$, 0.000025-0.0005 mg; | STANNOUS CHLORIDE $2H_2O$, 0.00001 mg | 40% of lower limit |
| L-arginine.HCl, 200-5000 mg; | L-ARGININE-HCL, 73.27 mg | 37% of lower limit |
| L-histidine.HCl.$H_2O$, 100-500 mg; | L-HISTIDINE-HCL-$H_2O$, 15.64 mg | 16% of lower limit |
| L-asparagine.$H_2O$, 40-250 mg; | L-ASPARAGINE-$H_2O$, 3.72 mg | 9% of lower limit |

| Ingredients Present in Amounts Greater Than The Claimed Concentration Range | | |
|---|---|---|
| Elements of '083 Patent | Amount in HyClone's Production Product | % of the Upper Limit of the Claim |
| $Na_2HPO_4$, 30-100 mg; | SODIUM PHOSPHATE DIBASIC, ANHY, 432.64 mg | 433% of upper limit |
| $NaH_2PO_4.H_2O$, 30-100 mg; | SODIUM PHOSPHATE MONOBASIC $H_2O$, 262.97 mg | 263% of upper limit |
| $NiSO_4.6H_2O$, 0.000025-0.0005 mg; | NICKEL SULFATE-$6H_2O$, 0.00109275 mg | 219% of upper limit |

| Ingredients Present In Amounts Less Than The Claimed Concentration Range | | |
|---|---|---|
| Elements of '083 Patent | Amount in HyClone's Growth Product | % of the Lower Limit of the Claim |
| $NH_4VO_3$, 0.0001-0.0025 mg; | AMMONIUM METAVANADATE, 0.000046 mg | 46% of lower limit |
| $CoCl_2.6H_2O$, 0.001-0.10 mg; | COBALT CHLORIDE $6H_2O$, 0.000369 mg | 37% of lower limit |
| $SnCl_2.2H_2O$, 0.000025-0.0005 mg; | STANNOUS CHLORIDE $2H_2O$, 0.000008 mg | 32% of lower limit |
| L-arginine.HCl, 200-5000 mg; | L-ARGININE-HCL, 63.34 mg | 32% of lower limit |

12

| L-histidine.HCl.H2O, 100-500 mg; | L-HISTIDINE-HCL-H2O, 13.52 mg | 14% of lower limit |
| L-asparagine.H2O, 40-250 mg; | L-ASPARAGINE-H2O, 3.22 mg | 8% of lower limit |

| Ingredients Present in Amounts Greater Than The Claimed Concentration Range | | |
|---|---|---|
| Elements of '083 Patent | Amount in HyClone's Growth Product | % of the Upper Limit of the Claim |
| Na2HPO4, 30-100 mg; | SODIUM PHOSPHATE DIBASIC, ANHY, 374.15 mg | 374% of upper limit |
| NaH2PO4.H2O, 30-100 mg; | SODIUM PHOSPHATE MONOBASIC H2O, 227.17 mg | 227% of upper limit |
| NiSO4.6H2O, 0.000025-0.0005; | NICKEL SULFATE-6H2O, 0.00094471 mg | 188% of upper limit |

*See* Ex. 29 (Plaintiffs' Infringement Contentions) at 7-8; Ex. 11 (Wurm Op.) at ¶ 49; Case No. 1:15-cv-10698, Dkt. 282 (Janssen's Response to Def.'s Statement of Material Facts In Support Of Their Motion For Partial Summary Judgment) at 32-34.

**RESPONSE TO 20:** Disputed.  The table above fails to account for the respective second sources of copper(II), L-asparagine, L-arginine, and L-histidine in the accused media. (JSOF Ex. 2 (Butler Opening Report) ¶¶ 59-61, 73-74, 77-79, 82-84.)

## II.    Prior Art Cell Culture Media

### A.    *Essential Cell Culture Ingredients*

21.    Scientists have used cell culture media to grow cells since the 1950s, starting with the work of Harry Eagle. Ex. 5 (Glacken Op.) at ¶¶ 70-75; Ex. 6 (Frohlich) at ¶ 66.

**RESPONSE TO 21:** Undisputed.

22.    Over sixty years ago, Eagle figured out the essential "food" categories required to grow cells: "amino acids or proteins, an energy source such as glucose or other carbohydrates,

elements such as iron, lipids or fats, vitamins, and other well-known factors." Ex. 5 (Glacken Op.) at ¶ 70; Ex. 6 (Frohlich) at ¶ 63.

**RESPONSE TO 22:**  Disputed.  The cited evidence does not support the stated proposition.  In the 1950s, Eagle introduced a medium "which consisted of glucose, amino acids, and vitamins in a balanced salt solution," but that medium "would not support cell growth without the addition of substantial amounts of serum."  (JSOF Ex. 3 (Butler Rebuttal Report) ¶ 13.)

23.     Eagle identified the specific nutrients necessary for basic cell growth: 13 amino acids, 8 vitamins, 6 salts, and glucose, along with serum. Ex. 5 (Glacken Op.) at ¶ 76; Ex. 7 (Butler Reb.) at ¶ 13. "The same categories of ingredients that Eagle identified in 1955 remain the same basic nutrient groups used in cell culture media to this day." Ex. 6 (Frohlich) at ¶ 65.

**RESPONSE TO 23:**  Undisputed that Eagle identified nutrients ("13 amino acids, 8 vitamins, 6 salts, and glucose") that would support basic cell growth when supplemented with serum.  Disputed that "[t]he same categories of ingredients that Eagle identified in 1955 remain the same basic nutrient groups used in cell culture media to this day"; the biopharmaceutical industry has moved away from the use of serum in cell culture media.  (JSOF Ex. 3 (Butler Rebuttal Report) ¶¶ 15-17.)

24.     In 1959, Eagle "introduced a minimal essential medium (MEM) for the growth of mammalian cells which consisted of glucose, amino acids, and vitamins in a balanced salt solution," and which is still sold commercially today. Ex. 7 (Butler Reb.) at ¶ 13; Ex. 5 (Glacken Op.) at ¶ 79; Ex. 6 (Frohlich) at ¶ 66.

**RESPONSE TO 24:**  Undisputed.

### B.      *Interchangeability of Cell Culture Ingredients*

25.      Janssen's expert, Dr. Butler, admitted that two different ingredients were

"interchangeable" because they both provide the nutrient "asparagine:"

> Q.  Would you consider asparagine and asparagine hydrate to be interchangeable sources of asparagine?

> A.  Certainly, yes. It's the same components. It's the same active component. Essentially it's the amino acid asparagine.

Ex. 3 (1/30/2018 Hr'g Tr.) at 59:9-12; Ex. 2 (1/31/2018 Hr'g Tr.) at 11:8-14.

**RESPONSE TO 25:**  This fact is immaterial to Defendants' summary judgment motion.

The extent to which ingredients in cell culture media are interchangeable relates to whether they

are equivalent under the DOE, not to whether application of the DOE to this case would ensnare

the prior art by obviousness. *See, e.g.*, *Siemens Med. Solutions* 637 F.3d at 1282.

Nevertheless, it is undisputed that Dr. Butler testified, in connection with his DOE

opinion, that asparagine and asparagine hydrate are "interchangeable" because they both provide

"the same active component," "the amino acid asparagine."  (Def. Ex. 3 (1/30/2018 Hr'g Tr.) at

59:9-12.)

26.      Dr. Butler similarly explained that "L-histidine•HCl•H20" and "L-histidine free

base" are interchangeable because both ingredients provided cells with the "same active

component (L-histidine)." Ex. 10 (Butler Op.) at ¶¶ 73-74.

**RESPONSE TO 26:**  This fact is immaterial to Defendants' summary judgment motion.

The extent to which ingredients in cell culture media are interchangeable relates to whether they

are equivalent under the DOE, not to whether application of the DOE to this case would ensnare

the prior art by obviousness.  *See, e.g.*, *Siemens Med. Solutions* 637 F.3d at 1282.

Nevertheless, undisputed.

27.     Janssen's other expert, Dr. Wurm, took the same position regarding the

interchangeability of various ingredients:

> [F]or a number of the ingredients for which the Celltrion Media are literally below the claimed range... the Celltrion Media contain other ingredients that supply the same active component in solution. These additional sources of the active component offset all or most of the literal concentration differences between the Celltrion Media and claim 1 for these ingredients.

Ex. 11 (Wurm Op.) at ¶ 52.

**RESPONSE TO 27:**  This fact is immaterial to Defendants' summary judgment motion.

The extent to which ingredients in cell culture media are interchangeable relates to whether they

are equivalent under the DOE, not to whether application of the DOE to this case would ensnare

the prior art by obviousness.  *See, e.g.*, *Siemens Med. Solutions* 637 F.3d at 1282.

Nevertheless, undisputed that Dr. Wurm rendered the stated opinion as to CuSO45•H2O,

L-arginine•HCl, L-asparagine•H2O, and L-histidine•HCl•H2O.  (Def. Ex. 11 (Wurm Report) ¶

52.)

28.     Before the '083 patent priority date in 2004, numerous media formulations—all

using the same basic formula with numerous overlapping and alternative ingredients—were

being widely used for research and commercial purposes. Ex. 5 (Glacken Op.) at ¶¶ 83-98.

**RESPONSE TO 28:**  Disputed.  Cell culture media formulations in the prior art are

diverse, and none include all of the ingredients required by the '083 patent.  (*See* Def. Ex. 5

(Glacken Opening Report) at ¶¶ 83-98; JSOF Ex. 4 (Glacken Tr.) at 231:22-232:6 (████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

█████████████████████████████████████████████

(JSOF Ex. 5 (Glacken Report Ex. 10), at CELLREM-0345754.)

29.     Before the '083 patent priority date in 2004, media formulations free of any animal or human serum were sold by at least Gibco/Invitrogen, HyClone, Irvine Scientific, Roche, and Sigma-Aldrich. *E.g.* Ex. Ex. 12 (Serum-Free Media For Cell Culture [CELLREM-0246022]). This also included chemically defined media, in which all the components are known and defined, such as CD Hybridoma and CD CHO offered by Gibco/Invitrogen. *Id.* at 030; *see also* █████████████████████████████████████████████

██████████████████████████████████

**RESPONSE TO 29:**  Disputed insofar as the fact implies that the components of CD Hybridoma and CD CHO media were *publicly* known.  These media are proprietary media and their formulations are confidential.  (JSOF Ex. 6 (TMO_Celltrion Sub_000001-10) (formulations of CDH and CD CHO, produced by Thermo Fisher in this litigation and marked as "Thermo Fisher Confidential Information").)  Otherwise, undisputed.

30.     All ingredients recited in claim 1 of the '083 patent have been used in cell culture media before 2004:

> Q.  You couldn't if I asked you right now to say can you pick out anything on this list which these inventors are using in a cell culture medium for the first time in 2004, can you identify one?
>
> A. No.

Ex. 16 (Butler Dep.) at 55:19-24.

> Q.  [] None of the ingredients listed in Claim 1 were new for cell media preparations as of the invention date in 2004, correct?
>
> A. Correct.

Ex. 3 (1/30/2018 Hr'g Tr. (Butler)) at 86:15-18.

**RESPONSE TO 30:**  This fact is immaterial to Defendants' summary judgment motion. Whether the claimed ingredients were all known individually in the art and could be combined in a cell culture medium does not bear on the question of whether it would have been obvious to a person of ordinary skill in the art at the time to do so.  *See, e.g.*, *Belden Inc. v. Berk-Tek LLC*, 805 F.3d 1064, 1073 (Fed. Cir. 2015) ("[O]bviousness concerns whether a skilled artisan not only *could have made* but *would have been motivated to make* the combinations or modifications of prior art to arrive at the claimed invention.") (emphasis in original).

Nevertheless, undisputed.

31.    49 of the 52 required ingredients in claim 1 of the '083 patent were "commonly used in cell culture medium prior to 2004" and the other three were used "in a minority of culture media formulation." Ex. 16 (Butler Dep.) at 58:9-17, 57:6-19.

**RESPONSE TO 31:**  Disputed.  Dr. Butler testified that three of the ingredients in the claimed cell culture media were ***not*** commonly used in cell culture media prior to 2004, and that he was not "able to identify any other ingredient on that list of 61 that was not used, commonly used in cell culture media prior to 2004."  (Def. Ex. 16 (Butler Dep.) at 58:9-17, 57:6-19.)

32.    Prior to the '083 patent priority date, skilled scientists used the ingredients in claim 1 of the '083 patent to make useful cell culture media:

> Q.  [] Do you agree that the claimed ingredients were known in the art and that skilled artisans generally knew how to combine different ingredients to make soluble compositions useful for making media?
>
> A. Yes.

Ex. 16 (Butler Dep.) at 72:13-20 (objection omitted).

**RESPONSE TO 32:**  This fact is immaterial to Defendants' summary judgment motion. Whether the claimed ingredients were all known individually in the art and could be combined in a cell culture medium does not bear on the question of whether it would have been obvious to a person of ordinary skill in the art at the time to do so.  *See, e.g.*, *Belden*, 805 F.3d at 1073 ("[O]bviousness concerns whether a skilled artisan not only *could have made* but *would have been motivated to make* the combinations or modifications of prior art to arrive at the claimed invention.") (emphasis in original).

Nevertheless, undisputed that Dr. Butler testified as quoted above.

## II.     The GSK and Life Technology References

### A.     *Background of GSK and Life Techs References*

33.     The GlaxoSmithKline international patent application (WO 2004/078955) ("GSK") was filed March 1, 2004 and published September 16, 2004, and is therefore prior art to the '083 patent under 35 U.S.C. § 102(a) and (e). Ex. 18 (GSK).

**RESPONSE TO 33:**  Assuming, for purposes of this motion only, that the date of invention is no earlier than the October 29, 2004 priority date of the '083 patent, it undisputed that the GSK reference would be prior art to the '083 patent.

34.     GSK was not considered by the Patent Office during prosecution of the '083 patent. Ex. 13 ('083 Patent).

**RESPONSE TO 34:**  Undisputed that GSK was not listed on the face of the '083 patent.

35.     GSK discloses as "common ingredients" 50 of the 52 required ingredients of claim 1 of the '083 patent in one example media. Ex. 18 (GSK) at 21:5-6 ("An ex[e]mplary advantageous fresh culture medium comprises all or most of the common ingredients as listed in

Table 3."); Ex. 16 (Butler Dep.) at 269:14-270:8. *See* App'x A (comparing GSK to '083 Patent Claim 1).

**RESPONSE TO 35:** Disputed.  GSK discloses a cell culture medium that could comprise "all or most of the common ingredients as listed in Table 3."  (Def. Ex. 18 (GSK) at 21:5-6.)  GSK's Table 3 lists 96 ingredients, 50 of which are listed in claim 1 of the '083 patent as required ingredients.  (Def. Ex. 18 (GSK) at 21:8-24:1; *see also* JSOF Ex. 3 (Butler Rebuttal Report) ¶ 134 & n.12.)

36.     The nearly complete overlap of ingredients disclosed in GSK and claim 1 of the '083 patent is not surprising given the common knowledge of skilled artisans about useful ingredients:

> Q.  Do you recall that you've gone through this analysis and have confirmed that this prior art media has 50 of the 52 required ingredients from the '083 patent?
>
> A.  I believe that that was the case, but I can't see it from my picture here.
>
> Q.  Yeah. Fair enough. And the reason for that is because folks that make cell media, there's a convergence of ideas and a convergence of opinions on what kind of ingredients ought to be included in the mix, right?
>
> A.  Right.
>
> Q.  And that's why it's not surprising that GSK in the prior art made a similar, not the same, exactly the same, but made a similar cell culture media as the inventors of the '083 patent, correct?
>
> A.  Correct.

Ex. 3 (1/30/2018 Hr'g Tr. (Butler)) at 88:11-25; Ex. 16 (Butler Dep.) at 273:22-274:22.

**RESPONSE TO 36:** Disputed.  There is not a "nearly complete overlap" of ingredients in the '083 patented medium and the medium in Table 3 of GSK; GSK "requires over 30 additional ingredients that are not recited in claim 1 of the '083 patent" and does not teach "that certain specific ingredients can be eliminated" while "the ingredients claimed in the '083 patent

must be retained."  (JSOF Ex. 3 (Butler Rebuttal Report) ¶ 134.)

It is, however, undisputed that Dr. Butler testified as quoted above, and that at his

deposition he agreed that "there is in science a convergence of opinion, a convergence of ideas,"

such that "it's not surprising that they [the GSK inventors and the '083 inventors] came up with a

similar formulation, but not the same formulation."  (Def. Ex. 16 (Butler Dep.) 274:11-22.)

37.     Although GSK does not expressly disclose two ingredients required by claim 1 of

the '083 patent, "ammonium vanadate and ferric ammonium citrate," Ex. 16 (Butler Dep.) at

269:14-270:8, the GSK reference does disclose alternatives that supply the same nutrients—

sodium metavanadate to supply vanadium and ferric fructose to supply chelated iron. Ex. 18

(GSK) at Table 3 ("NaVO3 [sodium metavanadate] 0.00001-0.2") and 24:3-4 ("In Table 3

above, an iron complex (ferric fructose) is also used as an iron source in addition to an inorganic

iron.").

**RESPONSE TO 37:**  Undisputed that the medium of Table 3 of the GSK reference does

not include ammonium metavanadate and ferric ammonium citrate (as required by claim 1 of the

'083 patent), and that Table 3 includes unclaimed vanadium- and iron-containing ingredients.

Otherwise, disputed.  A person of ordinary skill in the art would never have selected the GSK

medium to begin with, let alone modified it to use ammonium metavanadate and ferric

ammonium citrate in place of sodium metavanadate and ferric fructose.  (JSOF Ex. 4 (Glacken

Tr.) at 72:10-12, 82:20-83:3, 172:22-173:22; JSOF Ex. 3 (Butler Rebuttal Report) ¶¶ 128-149.)

Furthermore, the prior art taught away from using ferric ammonium citrate as an iron source.

(JSOF Ex. 3 (Butler Rebuttal Report) ¶ 143; JSOF Ex. 7 (Keenan).)

38.    The Life Technologies application (WO 98/15614) ("Life Techs") was published

April 16, 1998 and is therefore prior art to the '083 patent under at least 35 U.S.C. § 102(b). Ex.

17 (WO 98/15614).

**RESPONSE TO 38:**  Undisputed.

39.    Life Techs was not considered by the Patent Office during prosecution of the '083

patent. Ex. 13 ('083 Patent).

**RESPONSE TO 39:**  Undisputed that Life Techs was not listed on the face of the '083

patent.

40.    Life Techs describes a cell culture media "capable of supporting the *in vitro*

cultivation of animal cells" using 47 of the 52 ingredients required by claim 1 of the '083 patent.

Ex. 17 (WO 98/15614) at Abstract, Table 1; App'x B (comparing Life Techs to '083 claim 1);

Ex 7 (Butler Reb.) at ¶ 100 ("Table 1 'Component Ranges'" column). With respect to the 5

remaining ingredients, Life Technologies provides the same active component in different

chemical forms. Ex. 5 (Glacken Op.) at ¶ 237.

**RESPONSE TO 40:**  Undisputed that the medium of Table 1 of the Life Techs reference

does not include five ingredients required by claim 1 of the '083 patent (ferric ammonium citrate,

MnSO4•H2O, Na2SeO3, SnCl2•2H2O, and NH4VO3), and that Table 1 includes unclaimed

iron-, manganese-, selenium-, tin-, and vanadium-containing ingredients.  Otherwise, disputed.

Life Tech discloses in Table 1 an 88-ingredient medium to which "[a]ccording to the invention,

at least one peptide, extract, enzymatic digest or hydrolysate of plant protein, and/or at least one

plant-derived lipid and/or fatty acid" can be added "to formulate the complete culture media of

the present invention."  (Def. Ex. 17 (Life Techs) at Table 1 & 18:14-19; JSOF Ex. 3 (Butler

Rebuttal Report) ¶ 95.)  "Other basal media, however, can be equivalently used in accordance

22

with the invention." (Def. Ex. 17 (Life Techs) at 18:15-16; JSOF Ex. 3 (Butler Rebuttal Report) ¶ 95.) Of the 88 ingredients in Table 1 of Life Tech, 47 are listed in claim 1 of the '083 patent as required ingredients. (Def. Ex. 17 (Life Techs) at Table 1; JSOF Ex. 3 (Butler Rebuttal Report) ¶ 98.)

41.    For the other 5 ingredients required by claim 1 of the '083 patent but not expressly disclosed in Life Techs, the Life Techs media contains an alternative ingredient that provides the same active component in a concentration of the active component that overlaps with the concentration of the active component provided by the corresponding ingredients of the '083 patent:

| Active Component | '083 Patent | | Life Techs | |
|---|---|---|---|---|
| | Ingredient | Amount Of Active Component (µmol/L) | Ingredient | Amount Of Active Component (µmol/L) |
| Chelated iron | Ferric ammonium citrate | $1.53 \times 10^{-1} – 7.63 \times 10^{2}$ | ferric citrate | $4.10 \times 10^{-2} – 8.16 \times 10^{1}$ |
| Manganese (Mn(II)) | MnSO4•H2O | $4.14 \times 10^{-4} – 4.73 \times 10^{-2}$ | MnCl2•4H2O | $5.05 \times 10^{-6} – 5.05 \times 10^{-3}$ |
| Selenium (SeO3(II)) | Na2SeO3 | $2.31 \times 10^{-2} – 4.05 \times 10^{-1}$ | H2SeO3 | $7.75 \times 10^{-5} – 3.88 \times 10^{-2}$ |
| Tin (Sn(II)) | SnCl2•2H2O | $1.11 \times 10^{-4} – 2.22 \times 10^{-3}$ | SnCl2 | $5.27 \times 10^{-6} – 5.27 \times 10^{-4}$ |
| Vanadium | NH4VO3 | $8.55 \times 10^{-4} – 2.14 \times 10^{-2}$ | NaVO3 | $8.20 \times 10^{-5} – 8.20 \times 10^{-3}$ |

Ex. 5 (Glacken Op.) ¶¶ 234-239, 244-247; Ex. 21 (Glacken Reb.) ¶104.

**RESPONSE TO 41:** To the extent this fact relates to the interchangeability of ingredients in cell culture media, it is immaterial to Defendants' summary judgment motion. The extent to which ingredients in cell culture media are interchangeable relates to whether they are equivalent under the DOE, not to whether application of the DOE to this case would ensnare the prior art by obviousness. *See, e.g.*, *Siemens Med. Solutions*, 637 F.3d at 1282.

Nevertheless, undisputed that the medium of Table 1 of the Life Techs reference does not

include five ingredients  required by claim 1 of the '083 patent (ferric ammonium citrate, MnSO4•H2O, Na2SeO3, SnCl2•2H2O, and NH4VO3), and that Table 1 includes unclaimed iron-, manganese-, selenium-, tin-, and vanadium-containing ingredients.  Furthermore, undisputed that the respective range of molar amounts of iron, manganese, selenium, tin, and vanadium supplied by ferric citrate, MnCl4•H2O, H2SeO3, SnCl2, and NaVO3 in the Life Techs media overlaps with the range of molar amounts supplied by ferric ammonium citrate, MnSO4•H2O, Na2SeO3, SnCl2•2H2O, and NH4VO3 in claim 1 of the '083 patent.  A person of ordinary skill in the art, however, would have had no reason to select the Life Techs medium to begin with, let alone to modify it to use ferric ammonium citrate, MnSO4•H2O, Na2SeO3, SnCl2•2H2O, and NH4VO3 in place of ferric citrate, MnCl4•H2O, H2SeO3, SnCl2, and NaVO3, respectively.  (JSOF Ex. 4 (Glacken Tr.) at 72:10-12, 82:20-83:3, 172:22-173:22; JSOF Ex. 3 (Butler Rebuttal Report) ¶¶ 93-120.)  Furthermore, the prior art taught away from using ferric ammonium citrate as an iron source.  (JSOF Ex. 3 (Butler Rebuttal Report) ¶¶ 118-119; JSOF Ex. 7 (Keenan).)

### B.    Substitution of Ammonium Metavanadate For Sodium Metavanadate

42.    Before 2004, skilled artisans knew sodium metavanadate (disclosed in the GSK application, and Life Techs) and ammonium metavanadate (disclosed in the '083 patent) were interchangeable sources of vanadium.  For instance, a 1983 article reports the "substitute[ion]" in one media recipe of "NaVO3" (sodium metavanadate) "for NH4VO3" (ammonium metavanadate) simply "for reasons of convenience."  Ex. 19 (Cleveland 1983) at Table 1.

**RESPONSE TO 42:**  This fact is immaterial to Defendants' summary judgment motion. The extent to which ingredients in cell culture media are interchangeable relates to whether they are equivalent under the DOE, not to whether application of the DOE to this case would ensnare

the prior art by obviousness.  *See, e.g.*, *Siemens Med. Solutions*, 637 F.3d at 1282.

Nevertheless, undisputed that the Cleveland 1983 reference reported that NaVO3 was substituted for NH4VO3 "for reasons of convenience."  A person of ordinary skill in the art, however, would have had no reason to substitute the sodium metavanadate in GSK and Life Techs with ammonium metavanadate.  (JSOF Ex. 3 (Butler Rebuttal Report) ¶¶ 107-108, 115, 146-149; JSOF Ex. 4 (Glacken Tr.) at 172:22-173:22.)

43.     The '083 patent does not disclose anything "inventive" about ammonium metavanadate. Ex. 13 ('083 Patent) at 5:27.

**RESPONSE TO 43:**  Disputed.  The '083 patent discloses and claims novel and non-obvious cell culture media compositions that include ammonium metavanadate along with 60 other ingredients in various concentrations.  (Def. Ex. 13 ('083 Patent) at col. 5:4-6:2, claim 1; (JSOF Ex. 3 (Butler Rebuttal Report) ¶¶ 21-22.)  The USPTO issued the '083 patent, each claim of which is presumed valid, *i.e.*, inventive.  *See* 35 U.S.C. § 282(a).

44.     One of the '083 patent inventors explained that the ████████████████████
████████████████████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████████████████
██████████; Ex. 5 (Glacken Op.) at ¶ 258, Ex. 21 (Glacken Reb.) at ¶ 109.

**RESPONSE TO 44:**  This fact is immaterial to Defendants' summary judgment motion. The "function" an element performs in the context of the claim relates to equivalence under the DOE (*i.e.*, via the function-way-result test), not to whether application of the DOE to this case would ensnare the prior art by obviousness.

Nevertheless, disputed. ████████████████████████████████████████████████
██████████████████████████████████████(Def. Ex. 20 (Lenk Dep.) at 165:5-10; *see also*

JSOF Ex. 2 (Butler Opening Report) ¶ 55 ("The function the NH4VO3 ingredient at the claimed

concentration performs in the context of claim 1 is to provide a trace amount of vanadium in its

+5 oxidation state (*i.e.*, vanadium(V)).".)

45.     Skilled scientists would have known prior to the '083 patent priority date that

ammonium metavanadate is a source of vanadium:

Q.  Folks in 2004 would also know that one way to deliver vanadium to cells is to use
ammonium vanadate, correct?

A.  I would presume that's correct, yes.

Ex. 16 (Butler Dep.) at 311:16-20; *id.* at 155:25-156:6; *see also* Ex. 10 (Butler Op.) at ¶ 55

(function of ammonium metavanadate is to provide vanadium).

**RESPONSE TO 45:**  Undisputed that it was known in 2004 that ammonium

metavanadate was one of at least five potential sources of vanadium used in cell culture media.

(*See, e.g.*, JSOF Ex. 8 (U.S. Patent No. 4,767,704 ("'704 Patent")) at 6:26-62 (disclosing

"ammonium metavan[ad]ate, ammonium vanadium sulfate, . . . vanadium tribromide, [and]

vanadium pentoxide," as examples of vanadium-containing ingredients for use in cell culture

media); JSOF Ex. 9 (International Patent App. No. WO2004/078955 ("GSK")) at Table 3.)

### B.     Substitution of Ferric Ammonium Citrate for Ferric Fructose and Ferric Citrate

46.     Before 2004, it was well known that ferric fructose (the GSK application), ferric

citrate (Life Techs) and ferric ammonium citrate (the '083 patent) were alternative sources of

chelated iron, often to replace transferrin. *E.g.*, Ex. 5 (Glacken Op.) ¶¶ 243, 256-57.

**RESPONSE TO 46:**  Disputed.  Before 2004, it was known that different forms of

chelated iron performed differently as transferrin replacements in cell culture.  (JSOF Ex. 3

(Butler Rebuttal Report) ¶¶ 82-88; JSOF Ex. 7 (Keenan) at Fig. 1.).)  Furthermore, the prior art

taught away from using ferric ammonium citrate.  (JSOF Ex. 3 (Butler Rebuttal Report) ¶¶ 82-88, 118-119, 143; JSOF Ex. 7 (Keenan).)

47.    The '083 patent cites to a published patent application filed in 2002 that states "[t]he chelated salts such as ferric citrate and *ferric ammonium citrate are preferred*." Ex. 13 ('083 Patent) at Cover; Ex. 22 (WO 03/046162) at 18:28-31.

**RESPONSE TO 47:**  Undisputed that WO 03/046162 is listed on the face of the '083 patent and that WO 03/046162 states that an "iron source may be an inorganic or organic form," "[e]xamples [of which] include ferric and ferrous salts such as ferric citrate or ferrous sulfate." (Def. Ex. 22 (WO 03/046162) at 18:18:28-30.)  While WO 03/046162 goes on to state that "[t]he chelated salts *such as* ferric citrate and ferric ammonium citrate are preferred," (*id.* at 18:30-31), the prior art teaches away from using ferric ammonium citrate.  (JSOF Ex. 3 (Butler Rebuttal Report) ¶¶ 82-88, 118-119, 143; JSOF Ex. 7 (Keenan).)  Furthermore, Defendants' liability expert (Dr. Glacken) did not cite WO 03/046162 in any of his expert reports submitted in this case.

48.    The Keenan 1996 reference lists ferric citrate and ferric ammonium citrate as two of various "simple iron compounds or iron chelators" that were known to be used "to replace transferrin" as an iron source, states that "all" of the compounds tested were successful as transferrin replacements, and notes that "the effectiveness of any of these [compounds or chelators] will depend not only on the cell line but also the culture system being used[.]" Ex. 23 (Keenan) at 451-453.

**RESPONSE TO 48:**  Disputed.  The Keenan 1996 reference tested ferric ammonium citrate along with six other iron-containing compounds as potential transferrin replacements and "discarded it from further experimentation in favor of four better-performing alternatives."

(JSOF Ex. 3 (Butler Rebuttal Report) ¶ 83; JSOF Ex. 7 (Keenan).)  Indeed, Keenan 1996

concludes that "*only* FAS, SNP, and Fe2SO4 appeared as suitable replacements for transferrin";

ferric ammonium citrate was *not* a suitable replacement.  (JSOF Ex. 7 (Keenan) at 453; JSOF

Ex. 3 (Butler Rebuttal Report) ¶ 84.)

49.    Kitano's 1991 chapter on serum-free media, explained:

Two highly water soluble iron salts, *ferric ammonium citrate* and ferric ammonium
sulfate, can completely replace transferrin [an iron rich component of natural serum] to
support the growth of human leukemic cell lines (Titeux et al. 1984). Kovar and Franek
(1987) succeeded in establishing a chemically defined protein-free medium for mouse
hybridomas by replacing transferrin with high concentration of ferric citrate.

Ex. 24 (Kitano) at 83 (emphasis added).

**RESPONSE TO 49:**  Undisputed that the Kitano book chapter is accurately quoted.  The

prior art, however, taught away from using ferric ammonium citrate.  (JSOF Ex. 3 (Butler

Rebuttal Report) ¶¶ 82-88, 118-119, 143; JSOF Ex. 7 (Keenan).)

50.    Dr. Butler admitted that ferric ammonium citrate "is a particular form of iron—a

chelated iron . . . [and] a replacement for transferrin," which is an iron rich component of natural

serum. Ex. 7 (Butler Reb.) at ¶ 81.

**RESPONSE TO 50:** Disputed.  Dr. Butler wrote in his expert report that "FAC is a

particular form of iron—a chelated iron" and that "[a] chelated iron-containing compound is

used in a protein-free medium as a replacement for transferrin, a natural protein that transports

free iron from outside the cells into the cell for utilization."  (Def. Ex. 7 (Butler Rebuttal Report)

at ¶ 81.)  Additionally, the prior art taught away from using ferric ammonium citrate.  (JSOF Ex.

3 (Butler Rebuttal Report) ¶¶ 82-88, 118-119, 143; JSOF Ex. 7 (Keenan).)

51. ████████████████████████████████

███████████████████████████████████████████

████████████████████████████████

**RESPONSE TO 51:**  Disputed.  ███████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

██████████████████

52.     GSK discloses ferric fructose not as some particularly preferred ingredient, but merely as a routine option for providing iron. Ex. 5 (Glacken Op.) at ¶ 256, Ex. 21 (Glacken Reb.) at ¶ 109. GSK explains its use of ferric fructose is "an iron source," one that will serve to replace the iron-rich component transferrin found in serum. Ex. 18 (GSK) at 1:29-32 ("Serum is a major source for . . . iron (transferrin)."); *id.* at 24:3-4 ("In Table 3 above, an iron complex (ferric fructose) is also used as an iron source."; *see* lack of transferrin in Table 3); Ex. 5 (Glacken Op.) at ¶ 257, Ex. 21 (Glacken Reb.) at ¶ 109.

**RESPONSE TO 52:**  Disputed.  A person of ordinary skill in the art would have had no reason select the GSK medium to begin with, let alone to modify it to use ferric ammonium citrate in place of ferric fructose.  (JSOF Ex. 4 (Glacken Tr.) at 72:10-12, 82:20-83:3, 172:22-173:22; JSOF Ex. 3 (Butler Rebuttal Report) ¶¶ 128-149.)  Furthermore, the prior art taught

away from using ferric ammonium citrate.  (JSOF Ex. 3 (Butler Rebuttal Report) ¶ 143; JSOF

Ex. 7 (Keenan).)

### B.    *Alternative Sources of Manganese, Selenium, and Tin*

53.    Life Techs expressly disclosed the purpose of the media was to provide trace

metals, including: "manganese [Mn(II)], ... selenium [SeO3(II)], [and] ... tin [Sn(II)]." Ex. 17

(Life Techs) at 12:23-13:2. To accomplish this, Life Techs states: "These ions may be provided,

for example, in trace elements salts such as... MnCl2.4H2O [providing manganese]... H2SeO3

[providing selenium]... [and] SnCl2 [providing tin]." *Id.*

**RESPONSE TO 53:**  Disputed.  The invention in Life Techs is "medium formulations

'comprising plant peptides, preferably as a primary protein sources,' and more specifically,

formulations comprising 'at least one plant peptide which is not derived from wheat and which is

most preferably derived from rice' and/or 'at least one plant lipid and/or fatty acid,' and 'further

compris[ing] and enzymatic digest or extract of yeast cells.'"  (JSOF Ex. 3 (Butler Rebuttal

Report) ¶ 94.)  "Trace elements which may be used in the media of the [Life Techs] invention

include ions of barium, bromine, cobalt, iodine, manganese, chromium, copper, nickel, selenium,

vanadium, titanium, germanium, molybdenum, silicon, iron, fluorine, silver, rubidium, tin,

zirconium, cadmium, zinc and aluminum," most of which are not recited in the '083 patent

claims.  (Def. Ex. 17 (Life Techs) at 12:23-26.)  Life Techs also recites a laundry list of specific

salts that can provide these ions.  (*Id.* at 12:25-13:2.)

54.    Alternative chemical forms of manganese, selenium, and tin, and specifically

those recited in the '083 patent, were all known in the literature as common sources used to

provide these active trace elements. *E.g.* Ex. 26 (Hamilton 1977) at Table 1 ("MnSO4•5H2O...

manganese," "SnCl2·2H2O"); Ex. 27 (WO 98/08934 to Life Technologies) at Table 2

("manganous sulfate•H2O [MnSO4•H2O]," "sodium selenite [Na2SeO3]," and "stannous chloride•2H2O [SnCl2.2H2O]").

**RESPONSE TO 54:**  Undisputed that the claimed manganese-, selenium-, and tin-containing ingredients recited in the '083 patent are among the many known manganese-, selenium-, and tin-containing ingredients used in cell culture media.  (*See, e.g.*, JSOF Ex. 8 ('704 Patent) at 6:26-62 (disclosing "ammonium iron (II) selenate, ammonium permanganate, ammonium manganese phosphate, . . . ammonium selenate, ammonium selenide, . . . cadmium selenate, . . . calcium permanganate, calcium selenide, . . . cobalt (II) selenate, . . . manganese (II) acetate, manganese dibromide, permanganic acid, . . . potassium permanganate, . . . selenic acid, selenium tetrachloride, selenium trioxide, selenious acid, . . . sodium manganate, . . . sodium hydrostannate, tin (IV) fluoride, tin (II) chloride, tin (II) nitrate, [and] tin (II) sulfate" as examples of manganese-, selenium-, and tin-containing ingredients for use in cell culture media).)

### B.    *Overlap In Claimed Ranges And Accused Media*

55.    For the 50 ingredients required by claim 1 of the '083 patent that are disclosed in GSK, the concentrations disclosed in GSK literally overlap for all but one ingredient with the concentration ranges in claim 1 of the '083 patent. App'x A (comparing GSK to '083 Patent Claim 1); *see also* Ex. 7 (Butler Reb.) at ¶ 136 ("Table 3 'Concentration Ranges'" column).

**RESPONSE TO 55:**  Undisputed to the extent that the phrase "literally overlap" includes partial overlaps in concentration ranges.  However, concentration ranges of ingredients in the GSK medium that partially overlap with concentration ranges of those ingredients in the '083 patent claim are differences between the GSK and the patent media, and there is no reason why a person of skill in the art would necessarily explore the portion of the GSK range that overlaps

31

with the claimed range.  (JSOF Ex. 3 (Butler Rebuttal Report) ¶¶ 135-139.)  Indeed, for the

claimed ingredients, 22 of the preferred concentrations in Table 3 of GSK fall outside the

claimed range (and 17 fall outside the ranges in Defendants' proposed hypothetical claim).  (*Id.*

¶¶ 136-137; JSOF Ex. 4 (Glacken Tr.) at 211:1-11 (███████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████)

56.     In GSK, the only non-overlapping concentration for ingredients required by claim

1 of the '083 patent is L-histidine.HCl.H2O. App'x A (comparing GSK to '083 Patent Claim 1);

*see also* Ex. 7 (Butler Reb.) at ¶ 136 ("Table 3 'Concentration Ranges'" column).

**RESPONSE TO 56:**  Undisputed to the extent that partially overlapping ranges are

considered overlapping.

57.     GSK discloses using 15-70 mg/L of L-histidine.HCl.H2O, which is 30 mg/L

below the '083 patent's claimed range of 100-500 mg/L. App'x A (comparing GSK to '083

Patent Claim 1).

**RESPONSE TO 57:**  Undisputed that the concentration range for L-histidine.HCl.H2O

in Table 3 of GSK is 15-70 mg/L, that the preferred concentration range for L-

histidine.HCl.H2O in Table 3 of GSK is 20-50 mg/L, that the preferred concentration for L-

histidine.HCl.H2O in Table 3 of GSK is 26.2052 mg/L, and that range recited in claim 1 of the

'083 patent is 100-500 mg/L.  (JSOF Ex. 3 (Butler Rebuttal Report) ¶ 136 & Table 5.)

58.     With respect to L-histidine.HCl.H2O, the accused media have concentrations of

13.52 mg/L for CGM and 15.64 mg/L for CPM, which is further away from the claimed ranges

than GSK. Ex. 11 (Wurm Op.) at ¶ 49.

**RESPONSE TO 58:**  Disputed.  The accused media include both L-histidine.HCl.H2O and L-histidine free base, a second source of the amino acid histidine, L-histidine.  (JSOF Ex. 3 (Butler Rebuttal Report) ¶ 73.)  The total amount of the amino acid L-histidine supplied by the L-histidine.HCl.H2O and L-histidine is 0.286 mmol in CGM and 0.332 mmol in CPM (equivalent to 59.95 mg and 69.60 mg of L-histidine.HCl.H2O, respectively).  (*Id.* at Table 6.)

59.     For the 47 ingredients required by claim 1 of the '083 patent that are disclosed in Life Techs, Life Techs discloses concentrations that overlaps [*sic*] for all but one ingredient, putrescine•2HCl. App'x B (comparing Life Techs to '083 Patent Claim 1); *see also* Ex 6 (Butler Reb.) at ¶ 100 ("Table 1 'Component Ranges'" column).

**RESPONSE TO 59:**  Undisputed to the extent that the phrase "overlaps" includes partial overlaps in concentration ranges.  However, concentration ranges of ingredients in the Life Techs medium that partially overlap with concentration ranges of those ingredients in the '083 patent claim are differences between the Life Techs and the patent media, and there is no reason why a person of skill in the art would necessarily explore the portion of the Life Techs range that overlaps with the claimed range.  (JSOF Ex. 3 (Butler Rebuttal Report) ¶¶ 99-104.)  Indeed, for the claimed ingredients, 14 of the preferred concentrations in Table 1 of Life Techs fall outside the claimed range (and 12 fall outside of the ranges in Defendants' proposed hypothetical claim). (*Id.* ¶ 100-101; JSOF Ex. 4 (Glacken Tr.) at 211:1-11 (██████████████████████████ ████████████████████████████████████████████████████ ██████████████████████████████████████ )

60.     The GSK ranges, accused media ranges, and claimed ranges are provided in App'x A, with green denoting an overlap and blue denoting an overlap with respect to the active component. *See* App'x A.

**RESPONSE TO 60:**  Disputed to the extent that the fact implies that overlapping ranges are not differences between the claimed range and the GSK range.  (JSOF Ex. 3 (Butler Rebuttal Report) ¶¶ 135-139.)   Further disputed to the extent that the fact implies that ingredients that provide the same active component are necessarily interchangeable.  (*Id.* ¶¶ 141-149.)

61.     The Life Techs ranges, accused media ranges, and claimed ranges are provided in App'x B, with green denoting an overlap and blue denoting an overlap with respect to the active component. *See* App'x B.

**RESPONSE TO 61:**    Disputed to the extent that the fact implies that overlapping ranges are not differences between the claimed range and the Life Techs range.  (JSOF Ex. 3 (Butler Rebuttal Report) ¶¶ 99-104.)  Further disputed to the extent that the fact implies that ingredients that provide the same active component are necessarily interchangeable.  (*Id.* ¶¶ 105-120.)

### B.     GSK and Life Techs Disclose A Buffering Molecule And Cell Protectant

62.     GSK discloses use of HEPES, which is a well-known buffering molecule with a pKa of 7.3 (*i.e.* between 5.9 and 7.8). Ex. 5 (Glacken Op.) at ¶ 231, 253; Ex. 18 (GSK) at Table 3.

**RESPONSE TO 62:**  Undisputed.

63.     GSK discloses use of "oxidation stabilizers" to prevent the media from oxidizing and thus damaging the cells. Ex. 18 (GSK) at 11:21-12:2; Ex. 5 (Glacken Op.) at ¶ 254.

**RESPONSE TO 63:**  Disputed.  GSK merely states that suitable media can comprise, among other things, "oxidation stabilisers," with no further explanation.  (Def. Ex. 18 (GSK) at 11:21-12:2, 12:12-20.)  "A POSA would understand that the oxidation stabilizer in [GSK] is an ingredient that is included to protect the cell culture medium from oxidative degradation, not the cells."  (JSOF Ex. 3 (Butler Rebuttal Report) ¶ 151.)

64.     Life Techs discloses use of HEPES, which is a well-known buffering molecule with a pKa of 7.3 (*i.e.* between 5.9 and 7.8). Ex. 5 (Glacken Op.) at ¶ 231, 238; Ex. 17 (Life Techs) at 11:26-12:5, 15:10.

**RESPONSE TO 64:**  Undisputed.

65.     Life Techs discloses use of Pluronic-F68 (Ex. 17 (Life Techs) at 38:8-9) which the '083 patent identifies as a cell protectant. Ex. 13 ('083 Patent) at 7:14-15 ("Examples of cell protectants are non-ionic surfactants such as Pluronic-F68.").

**RESPONSE TO 65:**  Undisputed.

**Janssen's Statement of Material Facts**

1.      A person of ordinary skill in the art in 2003-2004 ("POSA") typically would have

developed a serum-free or chemically defined cell culture medium using the following steps:

> Consider basal medium as a potential starting point, which are typically
> mixtures of various media, for example, DMEM/F12 or eRDF (which itself
> is a modified mixture of three standard media formulations).
>
> Assemble a list of potential active components.  By active component, I
> mean the component that provides the functional activity of interest in the
> ingredient independent of form (e.g., salt form).
>
> Select ingredients that can provide the active components from the
> assembled list to formulate a candidate medium.  A POSA would consider
> various forms of an active component interchangeable and would select a
> particular ingredient based on such considerations as availability, purity,
> stability, cost, etc.
>
> Develop an experimental design where the concentrations of the ingredients
> are varied in the medium to determine the optimal amount(s).
>
> Execute the designed experiments using a matrix-based experiment, an
> example of which is described in Lao and Schalla.

(JSOF Ex. 14 (Glacken Reply Report) ¶ 17.)

2.      ███████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████

3.      Defendants' expert (Dr. Glacken) has not opined that a POSA following the steps

in JSOF ¶ 1 above would have arrived at the cell culture media claimed in the '083 patent.

(JSOF Ex. 4 (Glacken Tr.) at 140:23-141:3, 149:12-17, 213:24-214:3, 215:12-20.)

4.      By following the steps in JSOF ¶ 1 above, a POSA would not necessarily have

arrived at the cell culture media claimed in the '083 patent.  (JSOF Ex. 4 (Glacken Tr.) at

140:23-141:3, 149:12-17, 213:24-214:3, 215:12-20.)

5. ███████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

█████████████████████████████████████

███████████████████████████████████

6. ██████████████████████████████████

███████████████████████████████████████

███████████████████████████████████████

████████████████████

7.     Dr. Glacken's opening expert report cited the Jayme 1997 reference, which set forth the formulae of seven standard basal media:  MEM, F-12, DMEM, DMEM/F12, RPMI 1640, RDF, and eRDF.  (JSOF Ex. 15 (Glacken Opening Report) ¶ 168.)

8.     Dr. Epstein, the first-named inventor on the '083 patent, started the development process for the '083 patented media with DMEM/F12.  (JSOF Ex. 16 (Epstein Tr.) at 29:7-19, 212:21-212:8.)

9.     The GSK reference "relates to a process for animal, preferably human, diploid anchorage-dependent cell culture, in the absence of exogenous components of primary animal origin, and to a cell culture medium substantially free of exogenous components of primary animal origin suitable for carrying out said process."  (JSOF Ex. 9 (GSK) at Abstract.)

10.     The GSK reference specifically discloses "that the use of a cell culture medium substantially free from exogenous components of primary animal origin and comprising at least one exogenous growth factor of non-animal secondary origin, can advantageously replace

conventional culture media and serum-free media which are known to contain components from exogenous primary and/or secondary animal origin."  (JSOF Ex. 9 (GSK) at 3:25-30.)

11.     The GSK reference discloses its exogenous growth factors can be added to any suitable media, including "DMEM-based (high-glucose Dulbecco's Modified Eagle's Medium), MEM (Minimum Essential Medium), Medium 199, and RPM-I 1640," as well as Ultra-MEM and the medium in Table 3 of GSK.  (JSOF Ex. 9 (GSK) at 12:4-20.)

12.     The GSK reference ascribes no special significant to the medium of Table 3 in GSK as compared to any of the other media it describes as suitable for use with GSK's disclosed exogenous growth factors.  (JSOF Ex. 9 (GSK) at 12:4-20; JSOF Ex. 15 (Glacken Opening Report) ¶ 200.).)

13.     The Life Techs reference relates to "culture media formulations that support the culture of animal cells comprising plant peptides, preferably as a primary protein source," in particular, formulations including "at least one plant peptide which is not derived from wheat and which is most preferably derived from rice," "at least one plant lipid and/or fatty acid," and "an enzymatic digest or an extract of yeast cells."  (JSOF Ex. 17 (International Patent App. No. WO 98/15614 ("Life Techs")) at 7:2-11.)

14.     The Life Techs reference states that "[a]ccording to the invention, at least one plant peptide, extract, enzymatic digest or hydrolysate of plant protein, and/or at least one plant-derived lipid and/or fatty acid, is added to a basal medium to formulate the complete culture media of the present invention."  (JSOF Ex. 17 (Life Techs) at 18:14-19.)

15.     The medium in Table 1 of Life Techs is an example of a "basal medium" to which the Life Tech's additives can be added; "[o]ther basal media, however, can be equivalently used in accordance with the invention."  (JSOF Ex. 17 (Life Techs) at 18:14-19.)

16.     The Life Techs reference ascribes no special significance to the medium of Table 1 as compared to any other media it describes as suitable.  (JSOF Ex. 17 (Life Techs) at 18:14-19.)

17.     ████████████████████████████████████████████████████

████████████████████████████████████████████████████

18.     A POSA following the steps in JSOF ¶ 1 above would not have selected the medium disclosed in Table 3 of the GSK reference as a starting point for further cell culture media development.  (JSOF Ex. 4 (Glacken Tr.) at 72:10-12, 82:20-83:3; JSOF Ex. 3 (Butler Rebuttal Report) ¶¶ 128-132.)

19.     A POSA following the steps in JSOF ¶ 1 above would not have selected the medium disclosed in Table 1 of the Life Techs reference as a starting point for further cell culture media development.  (JSOF Ex. 4 (Glacken Tr.) at 72:10-12, 82:20-83:3; JSOF Ex. 3 (Butler Rebuttal Report) ¶¶ 93-96.)

20.     ████████████████████████████████████████████████████

████████████████████████████████████████████████████

████

21.     Defendants have selected the GSK and Life Techs references for analysis using hindsight.  (*See generally* Def. Br.)

22.     Defendants have identified no reason why a person of ordinary skill in the art would have selected the media in Table 3 of the GSK reference or Table 1 of the Life Techs reference as a starting point for further development.  (*See generally* Def. Br.; JSOF Ex. 15 (Glacken Opening Report); JSOF Ex. 14 (Glacken Reply Report).)

23. ████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████

24.     The medium of Table 3 of the GSK reference lists 96 ingredients with various concentration ranges and a preferred concentration for each.  (JSOF Ex. 9 (GSK) at Table 3.)

25.     The medium of Table 3 of the GSK reference does not include two ingredients required by claim 1 of the '083 patent:  ferric ammonium citrate and ammonium metavanadate. (JSOF Ex. 9 (GSK) at Table 3.)

26.     Defendants have identified no reason why a person of ordinary skill in the art would have selected the iron- and vanadium-containing ingredients in the medium of Table 3 of GSK for modification.  (*See generally* Def. Br.; JSOF Ex. 15 (Glacken Opening Report); JSOF Ex. 14 (Glacken Reply Report).)

27.     Defendants have identified no reason why a person of ordinary skill in the art would have selected only the iron- and vanadium-containing ingredients for modification out of the 96 ingredients in the medium of Table 3 of GSK.  (*See generally* Def. Br.; JSOF Ex. 15 (Glacken Opening Report); JSOF Ex. 14 (Glacken Reply Report).)

28.     Defendants have identified no reason why a person of ordinary skill in the art would have modified the iron- and vanadium-containing ingredients in the medium of Table 3 of GSK to arrive at the iron- and vanadium-containing ingredients of claim 1 of the '083 patent (or the hypothetical claim).  (*See generally* Def. Br.; JSOF Ex. 15 (Glacken Opening Report); JSOF Ex. 14 (Glacken Reply Report).)

29.     The medium of Table 1 of the Life Techs reference lists 88 ingredients with various concentration ranges and a preferred and most preferred concentration for each.  (JSOF Ex. 17 (Life Techs) at Table 1.)

30.     The medium of Table 1 of the Life Techs reference does not include five ingredients required by claim 1 of the '083 patent:  ferric ammonium citrate, MnSO4•H2O, Na2SeO3, SnCl2•2H2O, and NH4VO3.  (JSOF Ex. 17 (Life Techs) at Table 1.)

31.     Defendants have identified no reason why a person of ordinary skill in the art would have selected the iron-, managanese-, selenium-, tin-, and vanadium-containing ingredients in the medium of Table 1 of Life Techs for modification.  (*See generally* Def. Br.; JSOF Ex. 15 (Glacken Opening Report); JSOF Ex. 14 (Glacken Reply Report).)

32.     Defendants have identified no reason why a person of ordinary skill in the art would have selected only the iron-, managanese-, selenium-, tin-, and vanadium-containing ingredients for modification out of the 88 ingredients in the medium of Table 1 of Life Techs. (*See generally* Def. Br.; JSOF Ex. 15 (Glacken Opening Report); JSOF Ex. 14 (Glacken Reply Report).)

33.     Defendants have identified no reason why a person of ordinary skill in the art would have modified the iron-, managanese-, selenium-, tin-, and vanadium-containing ingredients in the medium of Table 1 of Life Techs to arrive at the iron-, managanese-, selenium-, tin-, and vanadium-containing ingredients of claim 1 of the '083 patent (or the hypothetical claim).  (*See generally* Def. Br.; JSOF Ex. 15 (Glacken Opening Report); JSOF Ex. 14 (Glacken Reply Report).)

34.     There are at least 11 iron-containing ingredients that can be used in a cell culture media.  (JSOF Ex. 8 ('704 patent) at col. 6:16-66; JSOF Ex. 9 (GSK) at Table 3; JSOF Ex. 17 (Life Techs) at Table 1; JSOF Ex. 18 ('083 patent) at claim 1.)

35.     There are at least 5 vanadium-containing ingredients that can be used in a cell culture medium. (JSOF Ex. 8 ('704 patent) at col. 6:16-66; JSOF Ex. 9 (GSK) at Table 3.)

36.     There are at least 55 (5 x 11) unique combinations of iron- and vanadium-containing ingredients that can be used in a cell culture medium.  (JSOF ¶¶ 34-35.)

37.     Of the at least 55 unique combinations of iron- and vanadium-containing ingredients that can be used in a cell culture medium, only one such combination (FAC and ammonium metavanadate) would meet the hypothetical claim (and the '083 patent claim). (JSOF ¶¶ 34-36.)

38.     There are at least 6 nickel-containing ingredients that can be used in a cell culture medium.  (JSOF Ex. 8 ('704 patent) at col. 6:16-66; JSOF Ex. 18 ('083 patent) at claim 1.)

39.     There are at least 6 copper-containing ingredients that can be used in a cell culture medium.  (JSOF Ex. 8 ('704 patent) at col. 6:16-66. JSOF Ex. 18 ('083 patent) at claim 1.)

40.     There are at least 625 (5 x 5 x 5 x 5) unique combinations of iron-, vanadium-, nickel-, and copper-containing ingredients that can be used in a cell culture medium.  (JSOF ¶¶ 34-35, 38-39.)

41.     Of the at least 625 unique combinations of iron-, vanadium-, nickel-, and copper-containing ingredients that can be used in cell culture, only one such combination (FAC, ammonium metavanadate, nickel sulfate, and copper sulfate) would meet the hypothetical claim (and the '083 patent claim).  (JSOF ¶¶ 34-35, 38-40.)

42.     Dr. Glacken performed an "exemplary calculation" of the number of different possible combinations of concentrations (not including combinations of ingredients) within claim 1 of the '083 patent.  (JSOF Ex. 14 (Glacken Reply Report) ¶ 168 n.23.)

43.     Taking just three concentrations within each range (high, middle, and low) in claim 1 of the '083 patent, there are $3^{61}$ (three possibilities for 61 ingredients, 3 to the 61st power, *i.e.*, "trillions and trillions and trillions") unique media within claim 1 of the '083 patent claim (and the hypothetical claim).  (JSOF Ex. 14 (Glacken Reply Report) ¶ 168 n.23; JSOF Ex. 4 (Glacken Tr.) at 117:20-118:14.)

44.     If a POSA were to conduct a media development project starting with a cell culture media formulation disclosed in terms of ingredients and concentration ranges, one common way to do so would be to look to the preferred embodiment of the cell culture media. (JSOF Ex. 4 (Glacken Tr.) at 211:1-11.)

45.     Seventeen (17) of the preferred concentrations of the ingredients in the medium of Table 3 of the GSK reference fall outside the corresponding concentration ranges in the hypothetical claim.  (*Compare* JSOF Ex. 9 (GSK) at Table 3, *with*, Def. SOF, at App'x A.)

46.     Considering the concentrations of only those 17 ingredients, and using Dr. Glacken's approach of analyzing high, middle (*i.e.*, preferred), and low concentrations within each range, there are approximately 129 million unique combinations of concentrations (3 to the 17th power), only one of which would literally fall within the concentration ranges of the hypothetical claim.  (JSOF ¶ 45; *see* JSOF Ex. 14 (Glacken Reply Report) ¶ 168 n.23.)

47.     Defendants have identified no reason why a person of ordinary skill in the art would have modified the preferred concentrations of all of the 17 ingredients in the medium of Table 3 of the GSK reference whose concentrations fall outside the corresponding range in the

hypothetical claim to arrive at concentrations within the hypothetical claimed range. (*See generally* Def. Br.; JSOF Ex. 15 (Glacken Opening Report); JSOF Ex. 14 (Glacken Reply Report).)

48.     Twelve (12) of the preferred concentrations of the ingredients in the medium of Table 1 of the Life Techs reference fall outside the corresponding concentration ranges in the hypothetical claim. (*Compare* JSOF Ex. 17 (Life Techs) at Table 1, *with*, Def. SOF, at App'x B.)

*     *     *

The following additional facts are material in that they provide an independent ground for denying summary judgment to Defendants. For purposes of granting summary judgment to Janssen pursuant to Federal Rule of Civil Procedure 56(f)(1), these facts are not material, as summary judgment can be granted to Janssen without consideration of them.

49.     Ferric ammonium citrate ("FAC") is a transferrin replacement that supplies chelated iron. (JSOF Ex. 3 (Butler Rebuttal Report) ¶ 81.)

50.     Neither the GSK nor the Life Techs media uses FAC as the chelated iron source; GSK uses a stock solution of ferric fructose, and Life Techs uses ferric citrate. (JSOF Ex. 3 (Butler Rebuttal Report) ¶ 117, 141; JSOF Ex. 9 (GSK) at Table 3; JSOF Ex. 17 (Life Techs) at Table 1.)

51.     Different forms of chelated iron have the potential to perform differently in cell culture. (JSOF Ex. 4 (Glacken Tr.) at 179:14-180:6; JSOF Ex. 3 (Butler Rebuttal Report) ¶¶ 83-88, 118-119.)

52.     ███████████████████████████████████████████████

███████████████████████████████████████████████████████

53.     The Keenan 1996 reference demonstrates that different forms of chelated iron promote cell growth to different extents.  (JSOF Ex. 3 (Butler Rebuttal Report) ¶¶ 83-84; JSOF Ex. 7 (Keenan) at Figure 1.)

54.     The prior art teaches away from using FAC as a transferrin replacement.  (JSOF Ex. 3 (Butler Rebuttal Report) ¶¶ 82-84.)

55.     Of the seven potential transferrin replacements studied in Keenan 1996 (including ferric ammonium citrate and ferric citrate), "only FAS, SNP, and Fe2SO4 appeared as suitable replacements for transferrin."  (JSOF Ex. 7 (Keenan) at 453; JSOF Ex. 3 (Butler Rebuttal Report) ¶¶ 83-84.)

56.     Given the Keenan 1996 reference, "one would have been dissuaded from [adding FAC] in favor of other iron-containing transferrin replacements."  (JSOF Ex. 3 (Butler Rebuttal Report) ¶ 89.)





███   ████████████████████████████████████

██████████████████████████████████████████

██████

Respectfully submitted,

Dated:  May 10, 2018

*Of Counsel*:


Gregory L. Diskant (admitted *pro hac vice*)
gldiskant@pbwt.com
Irena Royzman (admitted *pro hac vice*)
iroyzman@pbwt.com
Aron Fischer (admitted *pro hac vice*)
afischer@pbwt.com
Andrew D. Cohen (admitted *pro hac vice*)
acohen@pbwt.com
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
212-336-2000
FAX: 212-336-2222

*/s/ Alison C. Casey*
Heather B. Repicky (BBO # 663347)
hrepicky@nutter.com
Alison C. Casey (BBO #688253)
acasey@nutter.com
NUTTER MCCLENNEN & FISH LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210
617-439-2000
FAX: 617-310-9192

*Attorneys for Plaintiff Janssen Biotech, Inc.*

## CERTIFICATE OF SERVICE

I certify that on May 10, 2018, this document, filed through the Court's ECF system, will be sent electronically to the parties or their counsel who are registered participants as identified on the Notice of Electronic Filing and if not so registered, that copies will be electronically mailed to such parties or their counsel.

/s/ *Alison C. Casey*_____