# JANSSEN EXHIBIT 14

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MASSACHUSETTS

JANSSEN BIOTECH, INC. and NEW YORK UNIVERSITY,

Plaintiffs,

v.

CELLTRION HEALTHCARE CO., LTD., CELLTRION, INC., and HOSPIRA, INC.,

Defendants.

Civil Action No. 1:15-cv-10698-MLW
Civil Action No. 1:16-cv-11117-MLW

CONFIDENTIAL

## REPLY EXPERT REPORT OF MICHAEL GLACKEN, SC.D. REGARDING INVALIDITY OF UNITED STATES PATENT NO. 7,598,083

Michael Glacken, Sc.D.

Date: 11 NOV 2016

## Table of Contents

Page

I.   Introduction ......................................................................................................... 1

II.  Summary of Opinions ......................................................................................... 1

III. Profs. Butler And Wurm Have Taken Contradictory Positions With Regard To The Scope Of The Asserted Claims Of The '083 Patent. ...................................... 2

IV.  The Asserted Claims of the '083 Patent, Whether Construed Narrowly Or Broadly, Would Have Been Obvious To A Person Of Ordinary Skill In The Art. ........... 7

     A.   The Level Of Ordinary Skill In The Art .................................................... 7

     B.   Scope And Content Of The Prior Art, And The Knowledge Of A POSA ............. 8

     C.   The Asserted Claims Are Obvious In View Of The Prior Art .......................... 11

          1.   Obviousness in view of Jayme 1997, the '704 patent, and the knowledge of a POSA at the time ............................................. 11

               a)   The eRDF Formulation in Jayme 1997 discloses all of the active components of the required ingredients recited in claim 1 except for ethanolamine.HCl and the trace elements ....... 13

               b)   Jayme 1997 discloses ethanolamine as a preferred supplement .................................................................... 17

               c)   It would have been obvious for a POSA to combine eRDF, supplemented with ethanolamine.HCl, with the trace elements of the '704 patent ........................................... 17

               d)   A POSA would have been motivated to use ferric ammonium citrate and Keenan does not teach away from using this form ............................................................ 21

               e)   The resulting, obvious compositions would fall within the scope of claim 1 ................................................................ 25

               f)   As for claim 2, it would have been obvious to use a cell protectant when preparing a cell culture media ...................... 26

          2.   Obviousness in view of WO 1998/15614 and the knowledge of a POSA at the time .................................................................... 28

               a)   The '614 application contains all active components of all required ingredients recited in both claims 1 and 2 ................. 29

               b)   A POSA would have been motivated to use the '614 application composition with a reasonable expectation of success ................................................................................ 30

c) This prior art composition would fall within the scope of claims 1 and 2 as broadly construed by Janssen .......................... 34

d) The asserted claims still would have been obvious over the '614 application and the knowledge of a POSA even if the claims were construed literally ...................................................... 36

3. Obviousness in view of WO 2004/078955 and the knowledge of a POSA at the time. ...................................................................... 50

a) The '955 application contains all active components of all required ingredients recited in both claims 1 and 2 ..................... 50

b) A POSA would have been motivated to use the '955 application composition for cell culture media development with a reasonable expectation of success ...................................... 51

c) This prior art composition would fall within the scope of claims 1 and 2 as broadly construed by Janssen .......................... 53

d) The asserted claims would still be obvious over the '955 application and the knowledge of a POSA even if the claims were construed literally ...................................................... 55

D. There Are No Secondary Considerations Of Nonobviousness Relevant To My Obviousness Analysis ................................................................... 67

V. Invalidity Under 35 U.S.C. § 112 ................................................................ 71

A. Based on Janssen's Infringement Allegations, The Asserted Claims Are Indefinite ........................................................................................... 71

B. The Asserted Claims Lack Sufficient Written Description ................................. 73

C. The Asserted Claims Cannot Be Both Nonobvious And Enabled ....................... 75

1. Nature of the invention and scope of the claims ....................................... 75

2. State of the prior art and relative skill of those in the art .......................... 76

3. The presence of working examples, the amount of direction or guidance, and the predictability of the art ................................................. 76

4. Quantity of experimentation ................................................................... 77

VI. Supplementation and Rebuttal ......................................................................... 77

VII. Conclusion ...................................................................................................... 78

Michael Glacken, Sc.D.
**Reply Expert Report**                                    **U.S. Pat. No. 7,598,083**

## I.        Introduction

1.        I, Michael Glacken, Sc.D., hereby submit this reply expert report on behalf of
Defendants Celltrion Healthcare Co., Ltd., Celltrion, Inc., and Hospira, Inc.

2.        Defendants have retained me to provide technical expertise and my expert opinion
regarding the '083 patent.[1]  I have been asked to respond to the arguments set forth by Janssen's
experts, Profs. Butler and Wurm, in their respective rebuttal validity expert reports submitted in
response to my opening report.[2]

3.        My personal background and expert qualifications are set forth in my opening
report and in my CV at Exhibit 3.  The facts or data considered for this reply report include
information cited in my opening report, the rebuttal reports submitted by Profs. Butler and Wurm
as well as information cited in this report.  I have disclosed my prior testimony and compensation
in my earlier reports submitted in this case.  My compensation is also the same for this report as it
was for my opening report.

## II.       Summary of Opinions

4.        The validity reports submitted by Profs. Butler and Wurm have not caused me to
change my opinions expressed in my opening report—namely, that the asserted claims 1 and 2 of
the '083 patent are invalid as obvious, indefinite, lacking an adequate written description and/or
lacking an enabling patent disclosure.[3]

---

[1] I use terms in this reply report that are defined in my Opening Expert Report Regarding Invalidity
of United States Patent No. 7,598,083 ("Glacken opening report" or "my opening report").

[2] The reports of Profs. Butler and Wurm are entitled "opening invalidity expert report." However,
I understand that these reports are responding to my positions as stated in my opening report.
Accordingly, I refer to each respectively as rebuttal reports throughout this report.

[3] Profs. Butler and Wurm provide overlapping opinions in their respective rebuttal reports.  Thus,
to the extent I reply to an opinion (or issue) addressed by one of Janssen's experts, that reply should

Michael Glacken, Sc.D.
**Reply Expert Report**                                    **U.S. Pat. No. 7,598,083**

### III.   Profs. Butler And Wurm Have Taken Contradictory Positions With Regard To The Scope Of The Asserted Claims Of The '083 Patent.

5.     Since serving my opening report, I have reviewed and responded to Profs. Butler's and Wurm's respective infringement reports.  In those reports, both of Janssen's experts have taken the position that asserted claims 1 and 2 of the '083 patent should be broadly construed such that: (a) the claimed concentration ranges do not limit the scope of the claims (*see* Butler opening report at ¶¶ 39-40, 42, 65; Wurm opening report at ¶¶ 49-51); (b) the claimed compositions may include any number of additional ingredients not claimed in the claims, including chemically undefined ingredients and proteins (*see* Butler opening report at ¶ 36); and (c) the claimed forms of the claimed ingredients do not limit the scope of the claims (*see* Butler opening report at ¶¶ 57-61, 72-84; Wurm opening report at ¶¶ 52, 60).

6.     Despite this expansion of the literal scope of claims 1 and 2 with respect to the alleged infringement (a claim-scope expansion Janssen admits it needs to assert infringement), both Profs. Butler and Wurm have responded to my invalidity opinions by reading the scope of claims 1 and 2 much more narrowly.  First, in addressing the question of obviousness, they read the asserted claims as strictly limited to the claimed concentration ranges.  For example, they say:

- "Th[e] concentration [of CuSO4.5H2O] is outside the claimed range.  Dr. Glacken's report is silent as to why a POSA would have changed the concentration of $CuSO_4.5H_2O$…to arrive at claim 1."  Butler rebuttal report at ¶ 58; *see also id.* at ¶ 59 (concentration of $ZnSO_4.7H_2O$), ¶¶ 122-23 (concentration of putrescine.2HCl); Wurm rebuttal report at ¶¶ 40-41 (concentrations of $ZnSO_4.7H_2O$ and $CuSO_4.5H_2O$), ¶ 79 (concentration of putrescine.2HCl).

- "Dr. Glacken addresses only the concentration difference in putrescine.2HCl, where the range disclosed in the WO '614 application does not overlap with the claimed concentration range at all.  However, the fact that the other concentration ranges overlap does not mean that they are the same.  In order to arrive at the

be considered a response to both experts., to the extent they provide similar or parallel opinions regarding an issue, regardless of whether both opinions are expressly cited in my reply report.

Michael Glacken, Sc.D.
**Reply Expert Report**                                    **U.S. Pat. No. 7,598,083**

concentration ranges of claim 1 of the '083 patent, it would have been necessary to modify each of the concentration ranges disclosed in Table 1 of the WO '614 application." Butler rebuttal report at ¶ 102; *see also id.* at ¶¶ 137-140 (asserting that the claimed concentration ranges would not have been obvious to a POSA where the prior art teaches overlapping concentration ranges); Wurm rebuttal report at ¶¶ 70, 90 (same).

- "[C]laim 1 claims cell culture media compositions with structural features in common. That is, the claimed cell culture media compositions each share at least 52 ingredients (described in the claim by chemical name or formula) and have a clearly defined concentration range (described in the claim by upper and lower limits)." Butler rebuttal report at ¶ 168; *see also* Wurm rebuttal report at ¶ 113.

- "Beyond requiring particular ingredients, the asserted claims further identify the concentration range of each ingredient. The upper and lower claimed amounts for each range are tailored to and bracket a specific composition disclosed in the '083 patent called MET 1.5 which, as described further below, is a nutritive cell culture media." Butler rebuttal report at ¶ 175; *see also* Wurm rebuttal report at ¶ 117.

7.      By contrast, when addressing infringement, they assume that that literal differences between the concentrations of ingredients in the accused HyClone products and the asserted claims are insubstantial, so long as both cell culture media function to promote cell growth. For example, they state:

- "Generally speaking, the precise concentrations of the trace element-containing ingredients are not critical. What is important is that there be a sufficient amount present to fulfill the biological function of the element, and that the ingredient be present in trace amounts (and that the concentration not be so high as to be toxic to the cells)." Butler opening report at ¶ 42.

- "Claim 1 requires between 0.000025-0.0005 mg/L of $SnCl_2.2H_2O$, while [the HyClone growth product] contains 0.0000079 mg/L and [the HyClone production product] contains 0.0000092 mg/L." Butler opening report at ¶ 51. This means that the HyClone growth and production products contain, respectively, 32% and 37% of the lower limit of the claimed concentration range. Prof. Butler asserts that "the concentrations in the [accused HyClone products] are close to the claimed concentration range. I would expect, subject to experimentation, that mammalian cells would perform similarly in the [accused HyClone products] as in media that were otherwise identical but had $SnCl_2.2H_2O$ within the claimed concentration range." *Id.* at ¶ 52.

- "Claim 1 requires between 100-500 mg/L of L-histidine.HCl.$H_2O$.  [The HyClone growth product] contains 13.52 mg/L of L-histidine.HCl.$H_2O$ and [the HyClone production product] contains 15.64 mg/L of L-histidine.HCl.$H_2O$."  Butler opening report at ¶ 72.  This means that the HyClone growth and production products contain, respectively, 14% and 16% of the lower limit of the claimed concentration range.  Prof. Butler asserts that for the ingredient L-histidine.HCl.H2O "the literal differences in concentration are small."  *Id.* at ¶ 74.  He further opines that "the impact of the literal differences on the total molar concentration of L-histidine are reduced by the addition of L-histidine freebase.  I would expect, subject to experimentation, that mammalian cells would perform similarly in the [accused HyClone products] as in media that had L-histidine.HCl.H2O within the claimed concentration range."  *Id.*

- "Based on my knowledge and experience working with cell culture, the literal differences between the concentration ranges in the [accused HyClone products] and those in claim 1 of the '083 patent do not appear to be substantial.  As such, I would expect that cultured cells would perform similarly in the [accused HyClone products] as they would in cell culture media that literally meet the limitations of claim 1."  Wurm opening report at ¶ 53.

8.      Second, in addressing the issue of obviousness, they read the asserted claims as limited to the expressly claimed ingredients and chemically-defined media compositions.  For example, they say:

- "Dr. Glacken does not address the fact that the basal medium in Table 1 of the WO '614 application requires nearly 30 additional ingredients that are not recited in claim 1 of the '083 patent…. [T]he POSA would have been taught that almost 30 unclaimed ingredients were necessary; none of the ranges for the ingredients in Table 1 of the WO '614 application have a lower limit of zero.  Nothing in the WO '614 application teaches that certain ingredients could be eliminated, but that the ingredients claimed in the '083 patent must be retained.  But this is the modification that would have been necessary to arrive at the claims of the '083 patent starting from the WO '614 application."  Butler rebuttal report at ¶ 98; *see also id.* at ¶ 134 (asserting that the '955 application teaches over 30 additional ingredients that would need to be eliminated to render the asserted claims obvious).

- "Dr. Glacken failed to address the fact that the Table 1 medium in the WO '614 application requires nearly 30 ingredients that are not recited in claim 1 of the '083 patent.  Dr. Glacken simply ignores these differences.  But, if a POSA would have started with the medium of Table 1 of the WO '614 application, he would have been taught that nearly 30 unclaimed ingredients were necessary (the lower limit of their range is non-zero in Table 1 of the WO '614 application).  To arrive at the claimed invention, one would have had to recognize that these ingredients were

4

unnecessary and could be eliminated." Wurm rebuttal report at ¶ 68; *see also id.* at ¶ 88 (asserting that the '955 application teaches over 30 additional ingredients that would need to be eliminated to render the asserted claims obvious).

- "As mentioned above, there was a long-felt need for chemically defined cell culture media whose formulations were known and publicly available that were capable of supporting high density cell culture in a bioreactor setting." Butler rebuttal report at ¶ 156. "The invention of the '083 patent addressed those long-felt needs. As the examples of the '083 patent demonstrate, the claimed cell culture medium, in a chemically-defined embodiment, is capable of supporting sustained high densities of viable cells in a bioreactor setting (between 10 and 20 million viable cells per milliliter days per week)." *Id.* at ¶ 158.

- "As I described above, the invention of the '083 patent was a breakthrough that addressed those long-felt needs…. That the inventors were able to demonstrate such results [of cell growth and antibody yield] with a chemically-defined medium at the time of the invention in the early 2000s, and publish both the results and the medium formulation in a patent, was a breakthrough that satisfied the long-felt need." Wurm rebuttal report at ¶ 105.

9.      By contrast, when addressing infringement, they assume that additional ingredients, even the chemically undefined ingredients in the accused HyClone products, are irrelevant. For example, they say:

- "The presence or absence of additional, unclaimed ingredients is irrelevant to the infringement analysis." Butler opening report at ¶ 36.

- Profs. Butler and Wurm assert that the accused HyClone products infringe the asserted claims, even though the accused products contain chemically undefined ingredients (███████ and hydrolysate ██████████) and proteins ██████. *See* Wurm opening report at Annex 1 at Table 10; Ex. 92 (Wurm claim construction declaration) at ¶ 6 ("'Cell culture media,' based on its ordinary meaning, may refer to media containing undefined components (such as soy hydrolysate) or media containing proteins (such as insulin).").

10.     Third, in addressing the issue of obviousness, they read the asserted claims as strictly limited to the forms of the recited ingredients. For example, they say:

- "[S]upplying an ingredient omitted from eRDF would not be a reason for the change, because eRDF contains a different [] source…" Butler rebuttal report at ¶ 50.

Michael Glacken, Sc.D.
**Reply Expert Report**                                    **U.S. Pat. No. 7,598,083**

- "Dr. Glacken has not identified a reason why a POSA reading Jayme 1997 would
  have reverted to the salt form of L-tyrosine in DMEM/F12, when the eRDF had
  already replaced this salt form with L-tyrosine in a non-salt form…"  Butler rebuttal
  report at ¶ 55.

- "[T]he WO '614 application would not have given a POSA any reason to modify
  the manganese salt used in its medium to arrive at the manganese salt recited in the
  claim."  Butler rebuttal report at ¶ 109; *see also id.* at ¶¶ 111, 113, 115, 147
  (disputing that it would have been obvious to substitute ingredients of different salt
  or hydrate forms that provide the same active component to the cell culture media);
  Wurm rebuttal report at ¶¶ 71-73, 93-95 (same).

11.    By contrast, when addressing infringement, they assume that ingredients that the
claimed ingredients can be reduced to just their "active component" in the final cell culture media,
so different salt or hydrated forms of an active component are interchangeable.  For example, they
say:

- "In addition to $CuSO_4.5H_2O$, the [accused HyClone products] contain another
  source of copper(II), $CuCl_2.2H_2O$.  At the concentrations of these ingredients in the
  [accused HyClone products], both of these ingredients are completely soluble in
  water.  Upon dissolution in water, the copper(II) ions separate (*i.e.*, dissociate) from
  the sulfate and chloride ions.  Whether the source of copper(II) in the media is a
  sulfate salt (as in the claim), or a mixture of chloride and sulfate salts (as in the
  accused HyClone products]), in solution cells will encounter free copper(II)."
  Butler opening report at ¶ 59.  "Adding together the $CuSO_4.5H_2O$ and $CuCl_2.2H_2O$
  in the [accused HyClone products], the total concentration of the active component
  (copper (II)) supplied by the [accused HyClone products] is within the range of that
  total concentration of copper (II) supplied by claim 1 of the '083 patent."  *Id.* at ¶
  60.

- "In addition to $L-histidine.HCl.H_2O$, [the accused HyClone products] also contain
  L-histidine free base.  This ingredient provides the same active component (L-
  histidine) as $L-histidine.HCl.H_2O$.   When both sources of L-histidine are
  considered, the total molar concentrations of L-histidine in the [accused HyClone
  products] are about 30-40% below the total molar concentration of L-histidine
  called for by claim 1 of the '083 patent."  Butler opening report at ¶ 73.

- "That is, the total amount of the active component (copper(II), arginine, and
  asparagine, respectively) was identical in the variant and in hydrated [HyClone
  growth product]; the only difference was the chemical form in which the respective
  active component was provided.  By way of example, the $CuSO_4.5H_2O$ variant—
  designed to test whether supplying copper(II) as $CuSO_4.5H_2O$ is insubstantially

6

different from supplying copper(II) as a mixture of $CuSO_4.5H_2O$ and $CuCl_2.2H_2O$—was identical in all respects to hydrated [HyClone growth product], and had the same total copper(II) concentration (*i.e.*, 12.602 nmol/L), but the copper (II) in the variant was supplied as $CuSO_4.5H_2O$ only (at 0.00314 mg/L) rather than as a mixture of $CuSO_4.5H_2O$ (at 0.000536727 mg/L) and $CuCl_2.2H_2O$ (at 0.0017819291 mg/L as in the [HyClone growth product]."  Wurm opening report at ¶ 60.

12.     I understand that patent claims must be interpreted and given the same meaning for purposes of both validity and infringement analyses—a standard I have applied in all of my expert reports submitted in this case.  Profs. Butler and Wurm, however, have not offered opinions as to whether the asserted claims—as broadly construed by Janssen to cover the accused HyClone products—are valid in light of the standards for obviousness and sufficient patent disclosures.  In my opinion, the asserted claims are to be construed narrowly as Profs. Butler and Wurm maintain in their validity reports (and, thus, the accused HyClone products do not infringe).  But if the trier of fact were to construe the claims broadly to cover the accused products, as Profs. Butler and Wurm maintain in their infringement reports, the asserted claims would have to be invalid.  In fact, as I discuss below, the asserted claims are invalid in my opinion regardless of whether they are construed narrowly or broadly.

**IV.     The Asserted Claims of the '083 Patent, Whether Construed Narrowly Or Broadly, Would Have Been Obvious To A Person Of Ordinary Skill In The Art.**

13.     The rebuttal reports submitted by Profs. Butler and Wurm do not change my opinions that the asserted claims would have been obvious to a POSA.

**A.     The Level Of Ordinary Skill In The Art**

14.     Profs. Butler and Wurm disagree with my definition of a POSA, which they assert requires a level of ordinary skill in the art that "is somewhat higher than [they] believe is appropriate as of 2004."  Butler rebuttal report at ¶ 34; *see also* Wurm rebuttal report at ¶ 22.  I

7

Michael Glacken, Sc.D.
**Reply Expert Report**                                          **U.S. Pat. No. 7,598,083**

believe my definition is correct because, in my over 20 years of experience by 2004, researchers

working on medium development had Ph.D.'s with a few years of relevant experience or were

scientists with bachelor degrees with about five years of relevant experience.   Nevertheless,

applying the definition of the level of ordinary skill in the art proposed by Profs. Butler and Wurm

would not materially change my opinions as to patent invalidity.

### B.      Scope And Content Of The Prior Art, And The Knowledge Of A POSA

15.      As Janssen's experts admit, none of the ingredients recited in the asserted claims

are novel.  As Prof. Butler concedes, "the individual ingredients listed in claim 1 were known in

the art."  Butler rebuttal report at ¶ 177.  Prof. Wurm similarly agrees that the "nature of the

invention" is a "cell culture media with 61 *well-known ingredients* provided in *well-known*

*concentrations.*"   Wurm rebuttal report at ¶ 118 (quoting Glacken opening report at ¶ 281)

(emphasis added).  Prof. Wurm further concedes that "a POSA could readily make and use" the

claimed cell culture media.  *Id.*

16.      There is nothing else to the claimed invention, particularly given that the listed

inventors do not (and could not) claim to have invented the concept of chemically defined cell

culture media.   Again, although the listed inventors claimed a specific cell culture media

composition in (unasserted) claim 6, claims 1 and 2 recite a virtually unlimited number of

compositions (that, according to Janssen, do not even need to be chemically defined) comprising

well-known ingredients in well-known concentrations, thus merely inviting a POSA to optimize

cell culture media for specific purposes through routine experimentation.  It was certainly within

the skill of a POSA to formulate, with a reasonable expectation of success, soluble cell culture

media compositions with these well-known ingredients in their well-known concentrations.  This

is true regardless of whether the asserted claims are construed narrowly or broadly.  But it is

8

Michael Glacken, Sc.D.
**Reply Expert Report**                                                    **U.S. Pat. No. 7,598,083**

particularly true if, as Janssen contends for infringement, the claimed concentration ranges should

not be construed literally.

17.    Janssen's experts ignore how a POSA would have approached formulating a

soluble cell culture media composition, particularly a chemically-defined composition, back in

2003 or 2004.  I have been involved in developing chemically-defined and serum-free media

throughout my career, both in academic and industrial settings.[4]  In my opinion, a POSA as of the

priority date would have looked to known cell culture media and would have combined the desired

ingredients and determined their concentrations through routine experimentation.  The following

steps illustrate how a POSA in the 2003-04 timeframe typically would have developed a serum-

free, or chemically-defined, medium:

- Consider basal medium as a potential starting point, which are typically mixtures of various media, for example, DMEM/F12 or eRDF (which itself is a modified mixture of three standard media formulations).

- Assemble a list of potential active components.  By active component, I mean the component that provides the functional activity of interest in the ingredient independent of the form (e.g., salt form).

- Select ingredients that can provide the active components from the assembled list to formulate a candidate medium.  A POSA would consider various forms of an active component interchangeable and would select a particular ingredient based on such considerations as availability, purity, stability, cost, etc.

- Develop an experimental design where the concentrations of the ingredients are varied in the medium to determine the optimal amount(s).

- Execute the designed experiments using a matrix-based experiment, an example of which is described in Lao and Schalla.  Ex. 88 (Lao and Schalla, "Development of

---

[4] I disagree that my theories lack "a sound basis in the scientific realities of media development." Butler rebuttal report at ¶ 39.  As I explain in my opening report and as my CV depicts, my at least 23 years of cell culture media development experience (as of 2004) form the sound basis for my opinions regarding the scientific reality of developing cell culture media.  Prof. Butler's statement is clearly unfounded, as evidenced by the lack of any support for such an assertion.

9

a serum-free medium using computer-assisted factorial design and analysis," CYTOTECHNOLOGY, 22:25-31 (1996).

18.     The prior art references I discussed in my opening report confirm this common practice at the time.  As Jayme 1997 states, research in this field was (and still is) "an iterative process of continuous modification and refinement" of cell culture media—which has been commonplace since "the 1950's."  Ex. 11 (Jayme 1997) at 95.  Prof. Kitano similarly commented that "[c]ombinations of commercially available basal media have been effectively employed" for cell culture media at least because "[s]uch use is an easy way to complement the ingredients required in a serum-free culture."  Ex. 49 (Kitano) at 75.  And, "[s]ince most basal media have been developed to be used with serum, corrections of the ingredients are sometimes necessary for serum-free cultures."  *Id.* at 76.

19.     Prof. Butler and Prof. Wurm have not cited any prior art that contradicts these well-known practices.  And, again, all ingredients recited in claims 1 and 2 were well known, and it was also known in the art that all of these ingredients could be used within the recited concentration ranges.  The only required step by a POSA was to utilize routine skill and commonplace techniques of combining known ingredients with known concentrations together to create the claimed soluble composition.  This task was well within the ability of a POSA as of 2004, as the prior art references discussed herein, including the specific combinations discussed below, clearly demonstrate.  Further, I do not agree with Prof. Wurm's statement that my discussion of prior art in the "Scope and Content of the Prior Art" section of my opening report was "essentially background information."  Wurm rebuttal report at ¶ 24.  Rather, as I lay out in my obviousness analyses, and as set forth in Appendices 3-5 on an element-by-element basis, the asserted claims would have been obvious in view of these references and I considered them when forming my opinions.

Michael Glacken, Sc.D.
**Reply Expert Report**                                                    **U.S. Pat. No. 7,598,083**

### C.    The Asserted Claims Are Obvious In View Of The Prior Art

20.     In my opinion, the asserted claims—especially as broadly construed by Janssen for infringement—merely capture the results of routine work at the time and were obvious, or, at a minimum, obvious to try.  This is confirmed by certain combinations of prior art discussed in my opening report.  As discussed below, Profs. Butler and Wurm have not offered any persuasive rebuttal to those opinions.

### 1.    Obviousness in view of Jayme 1997, the '704 patent, and the knowledge of a POSA at the time

21.     Prof. Butler and Prof. Wurm do not appear to understand my opinion with respect to Jayme 1997 (which neither Prof. Butler nor Prof. Wurm disputes is prior art).  I am not applying a hindsight-driven analysis or opining that a POSA would look only to eRDF and then modify eRDF to arrive at the asserted claims.  Rather, it is my opinion that a POSA at the relevant time would have viewed Jayme 1997 as disclosing multiple, well-known formulae of cell culture media and followed common practice in developing an appropriate medium.  That is, as discussed throughout my opening report and in more depth below, the POSA would have combined the ingredients disclosed in Jayme 1997 because they were known to be useful in cell culture media, and would have performed routine substitutions of those ingredients with known and predictable results, and then would have selected the desired concentrations applying known techniques with a reasonable expectation of success in the development of new cell culture media formulations.  A POSA would not have focused exclusively on eRDF to the exclusion of the other well-known and widely used cell culture media formulations as of 2004.  Indeed, eRDF itself is a modified mixture of three standard media formulations (RPMI 1640, DMEM, and F12).  Ex. 11 (Jayme 1997) at 99.

11

Michael Glacken, Sc.D.
**Reply Expert Report**                                    **U.S. Pat. No. 7,598,083**

22.     In my opinion, a POSA interested in formulating a new cell culture media formulation would have been motivated to select any of the ingredients disclosed in Jayme 1997, including but not limited to the eRDF formulation.  Indeed, Prof. Butler agrees with the premise of my analysis, i.e., that eRDF "would have been [a] possible starting point[]" for developing a cell culture media at the time.  Butler rebuttal report ¶ 42.  Profs. Butler and Wurm point out that the eRDF formula differs from claims 1 and 2 in several ways, such as (a) certain active components in the eRDF formula are in different forms than those recited in the claims, (b) the eRDF formula does not include the recited ethanolamine.HCl ingredient and the trace elements, and (c) the eRDF formula does not include a cell protectant required under claim 2.  These differences, however, do not render the asserted claims inventive in view of the prior art— particularly given how Janssen has broadly construed those claims to support its infringement contentions.

23.     For example, as Janssen argues to support its infringement allegations, and I agree, the various forms of the active components in cell culture media are interchangeable, because the primary goal is to solubilize those ingredients in a medium.  Importantly, the eRDF formulation disclosed in Jayme 1997 (including the supplements taught by Jayme 1997) has all of the active components of ingredients recited in the asserted claims except for the trace elements.  Those elements, however, are disclosed in the '704 patent (which again neither Prof. Butler nor Prof. Wurm disputes is prior art).  As I discuss in more detail below, it would have been obvious for a POSA at the time to combine eRDF with the trace elements from the '704 patent and arrive at compositions that fall within the scope of claim 1, especially as broadly construed by Janssen.  It also would have been obvious to include a cell protectant, thus rendering claim 2 obvious as well.

12

Michael Glacken, Sc.D.
**Reply Expert Report**                                                    **U.S. Pat. No. 7,598,083**

> a)      **The eRDF Formulation in Jayme 1997 discloses all of the active components of the required ingredients recited in claim 1 except for ethanolamine.HCl and the trace elements**

24.      As discussed in my opening report, eRDF teaches each of the active components of the claimed ingredients in asserted claim 1, except for ethanolamine.HCl and ten trace element-containing ingredients (specifically, $Fe(NO_3)_3$, ferric ammonium citrate, $CoCl_2.6H_2O$, $(NH_4)_6Mo_7O_{24}.4H_2O$, $MnSO_4.H_2O$, $NiSO_4.6H_2O$, $Na_2SeO_3$, $Na_2SiO_3.9H_2O$, $SnCl_2.2H_2O$, and $NH_4VO_3$)).  Glacken opening report at ¶ 211.

25.      Profs. Butler and Wurm do not dispute this.  *See* Butler rebuttal report ¶¶ 50-55; Wurm rebuttal report at ¶¶ 35-37.  In Prof. Butler's Table 1, he purports to provide a comparison of claim 1 to DMEM/F12 and eRDF as published in Jayme 1997.   Butler rebuttal report at ¶ 46.  Setting aside ethanolamine.HCl and the trace element-containing ingredients, as shown below, eRDF has a corresponding ingredient that provides the same active component as each of the required claimed ingredients that Prof. Butler has identified as "absent" (and each of these "absent" ingredients are further provided in the formulation DMEM/F12 (also disclosed in Jayme 1997)):

| Glacken Table 1: Comparison of the Certain Ingredients In the '083 Patent Claims, eRDF, and DMEM/F12 | | |
|---|---|---|
| **Claim 1 of the '083 Patent** | **eRDF** | **DMEM/F12** |
| L-cystine.2HCl | $L\text{-cysteine.HCl.}H_2O$ | L-cystine.2HCl |
| $L\text{-tyrosine.2Na.}2H_2O$ | L-tyrosine | $L\text{-tyrosine.2Na.}2H_2O$ |
| $MgCl_2$ (anhyd) | $MgSO_4$ | $MgCl_2$ (anhyd) |
| $Na_2HPO_4$ | $Na_2HPO_4.12H_2O$ | $Na_2HPO_4$ |
| $NaH_2PO_4.H_2O$ | $Na_2HPO_4.12H_2O$ | $NaH_2PO_4.H_2O$ |
| $CaCl_2$ (anhyd) | $CaCl_2.2H_2O$ | $CaCl_2$ (anhyd) |

Ex. 11 (Jayme 1997) at Table 1.

13

26.     Prof. Butler argues that combining ingredients from DMEM/F12 and eRDF is inappropriate.  Butler rebuttal report at ¶ 43.  I disagree.  In my opinion, preparing such combinations and conducting related experiments would be routine and commonplace and performed without undue experimentation for a POSA seeking to customize a new medium for use in a cell line at the time, and would have been reasonably expected to result in a medium that was nutritive to cultured cells.  Indeed, Jayme 1997 describes the state of the art at the time as "an iterative process of continuous modification and refinement of the exogenous environment to cultivate new cell types and to support emerging applications of cultured mammalian cells."  Ex. 11 (Jayme 1997) at 95.  Further, there was a desire for "more complex nutrient media designed to sustain performance at elevated cell densities and to emphasize metabolic efficiency under culture conditions designed to minimize cell proliferation."  *Id.*  The approach taken by scientists at the time was to "optimize nutrient composition and delivery to mammalian cell bioreactors."  *Id.*  Optimization of nutrient composition required the combinations of various ingredients and evaluation of cell growth and other subcellular processes (specific to the ingredient(s) of interest).[5]

27.     Prof. Butler opines that a POSA would have had no reason to arrive at the claimed formulations by combining eRDF and DMEM/F12.  The specific forms of six claimed ingredients are missing in eRDF, but those specific ingredient forms are identified in Jayme and contained in DMEM/F12:  anhydrous $CaCl_2$, anhydrous $MgCl_2$, $NaH_2PO_4.H_2O$, $Na_2HPO_4$, L-cystine.2HCl, and L-tyrosine.2Na.$2H_2O$.  Prof. Butler states that a POSA would not have had a reason to select those

---

[5] Janssen has argued that a POSA could take this exact approach and reasonably be expected to understand whether the ingredients included (regardless of form or concentration) infringe the asserted claims.  *See, e.g.*, Butler opening report at ¶¶ 59-60, 73; Wurm opening report at ¶ 60. This same "straightforward" approach certainly would have been undertaken by a POSA in 1997 given the state of the art and the comprehensive disclosure of Jayme 1997.

14

particular ingredients and their corresponding amounts from the DMEM/F12 media formulation

and use them with the eRDF media.  In other words Prof. Butler opines that, because none of these

six ingredients are expressly listed in eRDF, this absence would have led a POSA away from using

these ingredients in a media formulation.  I disagree for several reasons.

28.     First, under Janssen's theory of infringement and reading of the asserted claims,

different forms of the same individual ingredients are equivalent, because they are intended to be

solubilized in a cell culture media.  *See, e.g.*, Butler opening report at ¶¶ 59-60.  I agree that when

formulating a soluble cell culture media, a POSA would have considered different salt forms of

active components to be interchangeable.  This is shown for example, in Table 1 of Jayme 1997

where different forms of the active ingredients are disclosed in various, well-known media and a

POSA would have known that any of those forms would work—all the media disclosed in Table

1 of Jayme 1997 are interchangeable and grow cells.  As discussed above, if one were to focus

solely on the active component of the ingredients in eRDF and compare them to the asserted

claims, only ethanolamine.HCl and the ten trace element-containing ingredients would be missing.

Choosing a particular salt form of an active component, therefore, can be a function of what form

is most readily available or less costly at the time.[6]  For example, while DMEM/F12 does not

contain L-cystine, I note that RDF contains both L-cysteine.HCl.H$_2$O and L-cystine and

---

[6] Janssen's infringement position also supports my opinion regarding the '848 patent.  In addition to the fact that a POSA would know that well-known trace elements "were 'given in the physical and ionization states common in the art of media formulation' but may be replaced with 'other physical and/or ionization states…if desired," it would have not been necessary for a POSA to take these into any special account in view of Janssen's infringement position.  Butler rebuttal report at ¶ 73.  And, even without considering Janssen's infringement position, a POSA would also have recognized that the various forms of the active components are interchangeable and there may be other reasons, such as availability, solubility, cost, etc. and so a POSA would not be limited to a specific form merely because it was "preferred" in the '848 patent.

DMEM/F12 contains both L-cysteine.HCl.$H_2O$ and L-cystine.2HCl.  Therefore, it is clear that the active component is what matters and these forms are interchangeable with one another.  As I explained in my opening report, and as is set out in Ex. 6 to my opening report, L-cysteine is well-known to oxidize to form L-cystine, *in vitro*.  Glacken opening report, at n.8.

29.     The same well-known interchangeability concept equally applies to L-tyrosine.2Na.2$H_2O$ (found in DMEM/F12 and others) while L-tyrosine is found in RDF and eRDF.  Ex. 11 (Jayme 1997) at 97 (Table 1).  This also applies to MgCl and the phosphate-containing ingredients.  As discussed above, it is not my opinion that a POSA would only look to "improve" eRDF, but instead, in my opinion, Jayme 1997 discloses multiple options with respect to forms and concentrations of well-known ingredients for use in customizing cell culture media for a particular cell line or application.

30.     Second, Prof. Butler overlooks that Jayme 1997 discloses a well-known set of options for cell culture media ingredients for each active component that a POSA would have combined at well-known concentrations. The mere fact that one of the seven disclosed media in Jayme 1997 had specific ingredients (or forms of ingredients) and another did not, or vice versa, would not have discouraged a skilled artisan at the time (or today) from using any of these ingredients in routine experimentation.  All of the ingredients and forms of ingredients discussed in Jayme were well-known ingredients used in media before Jayme 1997, and certainly used in media between 1997 and 2004.  Neither Prof. Butler nor Prof. Wurm disputes this.  Nor has either Prof. Butler or Prof. Wurm provided any basis for a skilled artisan at the time to conclude that the particular form of any of the disclosed ingredients must be used to the exclusion of other forms.

31.     Third, I disagree with Prof. Wurm that I did not address the "difference[s]" in concentration of the $ZnSO_4.7H_2O$ and $CuSO_4.5H_2O$.  These ingredients and their concentrations

were also well known.  Further, I specifically addressed these ingredients at least at pp. 3, 6 of

Appendix 3 to my opening report.

### b)      Jayme 1997 discloses ethanolamine as a preferred supplement

32.      Jayme 1997 further taught adding ethanolamine as a supplement to the commercial

basal media formulations:  "Murakami's careful studies identified yet another nutrient commonly

required as an ingredient for serum-free cultivation of hybridomas and other rapidly proliferating

cell lines, ethanolamine (Murakami *et al.*, 1982)."   Ex. 11 (Jayme 1997) at 98.   Jayme 1997

explained that "[t]his cocktail of four additives (insulin, transferrin, selenium, ethanolamine)

(ITES) has been commercialized by several suppliers, both as a serum extender to permit superior

culture performance with reduced serum supplementation and as an additive to DMEM/F12 *and*

*similar basal media* to permit serum-free cultivation of many cell types."  *Id.*

33.      A POSA following the teachings of Jayme 1997 would have been motivated to add

ethanolamine (or its salt form ethanolamine.HCl) to the disclosed basal media, including eRDF.

Profs. Butler and Wurm do not opine otherwise.

### c)      It would have been obvious for a POSA to combine eRDF, supplemented with ethanolamine.HCl, with the trace elements of the '704 patent

34.      Prof. Butler argues that Jayme 1997 would not have "led" a POSA to add trace

elements to its cell culture formulation.  Butler rebuttal rebuttalreport at ¶¶ 62-63.  I disagree for

multiple reasons.

35.      First, I understand there is no requirement that a single reference must "lead" a

POSA to add or include other limitations of an asserted claim.  I understand that such additions or

inclusions can be based on the knowledge of a POSA, or based on well-known practices in the art

at the time.  In this case, the common practices of a POSA at the time (discussed throughout my

Michael Glacken, Sc.D.
**Reply Expert Report**                                                    **U.S. Pat. No. 7,598,083**

opening report and here) would have motivated a POSA to combine eRDF, supplemented with ethanolamine.HCl, and with the trace elements identified in the '704 patent as part of routine experimentation.[7]

36.    Second, Prof. Butler's analysis overlooks that trace elements—particularly the trace element mixture by Prof. Cleveland described in the '704 patent—were known to be useful in serum-free, protein-free, or basal media, by 1997 (and certainly by 2004).  Kitano explains that "Cleveland et al (1983) succeeded in producing mouse [monoclonal antibody] under protein-free conditions using a medium supplemented with 22 trace elements."  *See* Ex. 49 (Kitano) at 94.  In the *very next sentence*, Kitano states that "[a]n effective basal medium, eRDF, was established for the high density culture of hybridomas (Murakami et al. 1984)."  *Id.*  Kitano reflects the knowledge of those in the art that trace element supplements enhance the performance of serum-free or basal

---

[7] Prof. Butler says I have "incompletely" quoted Jayme 1997 in showing that a POSA would have been motivated to add a trace element mixture to eRDF.  Butler rebuttal report at ¶¶ 62-63. This is not correct.  Prof. Butler quotes Jayme 1997, purportedly in full, as stating: "Beginning with the basal DMEM/F12 formulation, [Murakami] and other colleagues from Dr. Sato's laboratory reported a common requirement for supplementation of the basal formulation with three additional nutrients, insulin, transferrin and selenium.   The metabolic requirements for a cell cycle progression factor, iron-binding activity, and various trace elements (including selenium) persist as universal constituents of serum-free media."  *Id.* at ¶ 62 (quoting Ex. 11 (Jayme 1997) at 96-98).  As I explained in my opening report, the import of this passage is that "various trace elements (including selenium) persist as universal constituents of serum-free media."  Glacken opening report at ¶ 214.  Prof. Butler's assertion that this sentence is *only* referring to the trace elements cited in DMEM/F12 makes no sense, and he cites no support for this narrow reading.  Butler rebuttal report at ¶¶ 62-63.  Even if he were correct, however, Jayme goes on to disclose that, "in the spirit of continuous improvement" of serum-free culture applications, "Murakami still pursued additional refinements" to address "sub-optimal levels of critical constituents in the DMEM/F12 formulation…."  Jayme 1997 at 98-99.   Even further, beyond eRDF, Jayme 1997 discloses that "superior results may be achieved by preparing a supplemental nutrient cocktail which matches the nutrient utilization pattern for the desired cell type, bioreactor system and target product."  *Id.* at 99.

18

Michael Glacken, Sc.D.
**Reply Expert Report**                                          **U.S. Pat. No. 7,598,083**

media, and that Prof. Cleveland (a well-known scientist in this specialty) had already developed a

trace element mixture that was important for basal media success.  *Id.*

37.    I also disagree with Prof. Wurm's contention that I "point[ed] to no reason to select

the particular salt/hydrate forms of the particular claimed trace-element-containing compounds

among the essentially infinite number of possibilities disclosed by the '704 patent."  Wurm rebuttal

report at ¶ 49.  As I stated in my opening report, and discussed herein, a POSA, in view of the prior

art and his knowledge, would have understood that the salt forms of the trace elements are

interchangeable and what is important is the active component (as Janssen also argues in its

infringement contentions).  Therefore, it would be routine experimentation on the part of a POSA

to have utilized the well-known salt forms, disclosed in, for example, the specific examples of the

'704 patent to deliver the trace elements that Jayme, the '704 patent, and the prior art so instruct

at well-known concentrations.[8]   Further, a POSA would have recognized whether or not the

concentrations of these well-known ingredients disclosed in the '704 patent had potential toxicity

to certain cells, and if not clear, only straight-forward experimentation would have been needed to

determine any maximum concentration based on toxicity.

38.    Third, a POSA interested in producing monoclonal antibodies using hybridoma

cells would have relied on teachings in Jayme 1997 that lead to the use of trace elements.  For

example, Jayme 1997 teaches adding additional ingredients needed by the cells, such as trace

---

[8] Prof. Butler's assertion that I incorrectly stated that the ranges "completely overlap" between the
'704 patent and the '083 patent is misleading.  Butler rebuttal report at ¶ 77.  In footnote 21 of my
opening report, I specifically stated "that all of these ['704 patent] ingredients are within the
claimed ranges, *other than* molybdenum." (emphasis added).  Therefore, I did not overlook this
slight concentration difference as Dr. Prof. Butler claims.  Instead, I addressed it in the first
instance and indicated that a POSA would not consider that concentration difference to be
substantial.

19

elements or other ingredients,  because "superior results may be achieved by preparing" media "that matches the nutrient utilization pattern for the desired cell type…and target product." Ex. 11 (Jayme 1997) at 99.   This prior art further says that "[s]uccessful results" for "biological production" had "been obtained by [using] a production medium … [which] may contain additives which induce or stimulate biological production."  *Id.* at 100.

39.     Prof. Butler identifies no reason why a POSA would have ignored these teachings and avoided adding trace elements through routine experimentation.  For example, he does not dispute that it was well known that trace elements exactly like those recited in the '083 patent could be added to media.

40.     Fourth, Prof. Butler does not dispute that the '704 patent discloses each trace-element containing ingredient required by the asserted claims.  *See* Butler rebuttal report at ¶ 67. Because it is clear that a POSA, after reviewing Jayme 1997, would have considered adding trace elements to a medium, it would have been a logical next step for a cell culture formulator to have reviewed the available literature for such supplementation for that exact purpose.  Prof. Cleveland and his group were well known in the field for their work on trace element supplementation of cell culture media.[9]  In my opinion, the listed inventors of the '083 patent could not credibly assert that they invented the concept of adding trace elements to a prior art formulation such as eRDF.  Profs. Butler and Wurm do not opine otherwise.

41.     Fifth, Prof. Butler ignores the fact that claims 1 and 2 are "comprising" claims, which I understand means that the claimed compositions may include ingredients in addition to

---

[9] Even Prof. Butler cited to Prof. Cleveland's work in his opening report.  Butler opening report at ¶ 42, n. 2.

those expressly stated.[10]  In fact, this is a key concession in Janssen's infringement contentions given that the accused HyClone products contain many such additional, unclaimed ingredients. Yet, Prof. Butler still opines that, "to arrive at the claimed invention," "one would have had to recognize that, of the 22 'essential' trace elements of the '704 patent, only 11 of them were required for a successful medium as in the '083 patent, and the other 11 were superfluous."  Butler rebuttal report at ¶ 67.  I disagree.  Thus, as long as the resulting composition would be suitable for producing a final volume of nutritive media for culturing cells, a POSA would not have needed to omit the additional ingredients from the '704 application to render the asserted claims obvious.

42.     A POSA would have been motivated to add *all* 22 essential trace elements of the '704 patent to a cell culture media formulation.  In particular, a POSA would have had a strong motivation to add these trace elements given that the '704 patent describes them as being "essential."  There is no requirement in view of the "comprising" claims 1 and 2 of the '083 patent that a POSA had to select only the precise 11 trace elements to the exclusion of the remaining 11 trace elements.  According to Janssen's reading of the claims, they are not "closed"—that is, the compositions of claims 1 and 2 can include all 22 of the trace elements.

### d)     A POSA would have been motivated to use ferric ammonium citrate and Keenan does not teach away from using this form

43.     Prof. Butler opines that a POSA would not have been motivated to select ferric ammonium citrate and that the prior art Keenan reference would have taught away from using ferric ammonium citrate in cell culture media compositions.  *See* Butler rebuttal report at ¶¶ 80-84. I disagree.

---

[10] I further understand that even those expressly stated need not be present if they are expressly optional, such as those ingredients in claim 1 that are present at 0.0 mg/L or soy hydrolysate in claim 4 which is described as "optionally add[ed]."

21

44.     The prior art provided a POSA with a motivation to replace the protein transferrin, which was well known to serve as a delivery vehicle for soluble iron for cultured cells.  *See* Ex. 12 ('704 patent) at 1:44-65; Ex. 49 (Kitano) at 83 ("Two highly soluble iron salts, ferric ammonium citrate and ferric ammonium sulfate, can completely replace transferrin to support the growth of human leukemic cell lines (Titeux et al. 1984).").  The '704 patent taught that "[t]he present invention arose with the discovery that protein supplements could be eliminated from media used to grow monoclonal antibody-producing hybridoma cell lines by replacing the protein supplements in an otherwise rich, balanced basal media with a mixture of trace elements."  Ex. 12 ('704 patent) at 3:21-26.  It explained that "[t]he elimination of albumin, transferrin, and insulin is an important advance in hybridoma media since these substances are expensive and are potential sources of artifacts, for example, in the use of monoclonal antibodies to determine cell surface antigens."  *Id.* at 3:35-39.

45.     Likewise, Jayme 1997 instructed that a goal of POSAs, such as Dr. Murakami, was to develop "a superior substitute for transferrin."  Ex. 11 (Jayme 1997) at 99; *see also* Ex. 36 (Keenan), at 451, Ex. 49 (Kitano), at 83.  Development of a transferrin replacement was important as the art moved towards protein-free cell culture media, for media from which proteins may need to be isolated (such as antibodies).  For this reason, a POSA would have been motivated to use other well-known sources for transferrin.

46.     Ferric ammonium citrate was a well-known transferrin replacement that served as a source of iron in cell culture media.  As Prof. Butler acknowledges, ferric ammonium citrate is "a chelated iron" and "[a] chelated iron-containing compound is used in a protein-free medium as a replacement for transferrin, a natural protein that transports free iron from outside the cells into the cell for utilization."  Butler rebuttal report at ¶ 81.  This was not a novel discovery of the '083

patent.  For example, Keenan identified ferric ammonium citrate among a list of seven known "transferrin replacements."  Ex. 36 (Keenan 1996) at 451.  In her study of these transferrin replacements, Dr. Keenan concluded that "all the factors tested [including ferric ammonium citrate] were able to exert a concentration-dependent, growth-promoting effect on MDCK cells in single-stage growth assays."  *Id.* at 453.  Keenan further reported that "[t]hese factors have been previously used as transferrin replacements with various degrees of success, being tested primarily on hybridomas and myeloma cell lines…."  *Id.*

47.     Prof. Butler states that Keenan teaches away from using ferric ammonium citrate as an iron source, because, according to Prof. Butler, Dr. Keenan "discarded [ferric ammonium citrate] from further experimentation in favor of four better-performing alternatives."  Butler rebuttal report at ¶ 83.  In my opinion, Prof. Butler is mistaken.  Prof. Butler's characterization of Figure 1 of Keenan as "evidenc[ing]" "the reason" that Dr. Keenan did not choose ferric ammonium citrate for "further analysis" is factually incorrect and more importantly, misses the point.  This study only examined one cell type (MDCK cells) and found that other iron chelators "stimulated growth almost equal to that of the bovine transferrin control."[11]  Ex. 36 (Keenan 1996) at 452.  Although ferric ammonium citrate did not provide growth equal to transferrin in this cell line, Dr. Keenan ultimately concluded that "all the factors tested [including ferric ammonium citrate] were able to exert a concentration-dependent, growth promoting effect on MDCK cells in single growth stage."  *Id.* at 453.  Keenan further states that "it should be noted that the

---

[11] Keenan selected $Fe_2SO_4$, FAS, ICC, and SNP, which provided the greatest activity at maximum stimulation among the transferrin replacements tested, for further analysis.  Ex. 36 (Keenan) at 452.  However, Keenan noted that "[o]n the basis of moles of iron provided per mole of each compound,", ferric ammonium citrate provided the third greatest activity at maximum stimulation, which was greater than FAS, ICC, and SNP.  *Id.*

23

effectiveness of any of these factors will depend not only the cell line but also the culture system being used." *Id.* at 453.  Clearly, Keenan suggest that due to cell line to cell line differences, all of these iron chelators may be tested to determine which would work best for a given cell line. A POSA would not have discarded ferric ammonium citrate, a well-known transferrin replacement, merely because it was not the best performing factor in this test in a single cell line.  Contrary to Prof. Butler's assertion of teaching away, Keenan concluded that all transferrin replacements tested, including ferric ammonium citrate, promoted cell growth.

48.     As I understand the asserted claims are not limited to a specific cell line, a POSA would further consider ferric ammonium citrate as a potential source for chelated iron (and iron, in general) when using other types of cells.  *See e.g.*, Ex. 89 (Titeux, M. et al., "The Role of Iron in the Growth of Human Leukemic Cell Lines," J. Cell. Phys., 121:251-256 (1984)) ("Titeux") (disclosing the use of ferric ammonium citrate and ferric ammonium sulfate in media to grow hematopoietic cell lines).  The Titeux reference reported a study "to determine whether iron may efficiently replace [transferrin] to support the growth of cells" in serum-free media.  Ex. 89 (Titeux) at 251.  What Titeux's group found was that "two highly water-soluble iron salts (ferric ammonium citrate and ferric ammonium sulfate) may completely replace [transferrin] for supporting the growth of the cell lines here investigated." *Id.*  Titeux also noted that "[f]erric ammonium citrateor sulfate exhibit the important property of $Fe3+$-iron salts, i.e., they are highly hydrosoluble." *Id*. at 254.

49.     In my opinion, a POSA reading Keenan would not have been discouraged to use ferric ammonium citrate because ferric ammonium citrate was not selected for the second set of experiments focusing on a particular cell line, especially if the POSA were focusing on a different cell line (I understand the asserted claims are not limited to use for a particular cell line).  Instead,

as is typical for a POSA, Keenan makes clear that ferric ammonium citrate was a well-known source of iron in cell culture media and that it had been used, with success in several cell lines, including those reported in Keenan and other prior art, such as Titeux.[12]

### e) The resulting, obvious compositions would fall within the scope of claim 1

50.    For all of the reasons discussed above, it would have been obvious to supplement the media compositions of Jayme 1997 with the trace element mixture of the '704 patent. If the scope of the asserted claims were viewed through the lens of Janssen's infringement theory under the doctrine of equivalents, there would be *no differences* between the asserted claims and this prior art combination. Thus, claim 1 would have been obvious.

51.    As discussed previously, Profs. Butler and Wurm's infringement opinions attempt to expand the scope of claim 1 to cover the accused HyClone products by arguing that: (a) the salt or hydrated forms of an active component are interchangeable (Butler opening report at ¶¶ 59-60, 81-85; Wurm opening report at ¶¶ 59-61, 73-74, 77-79, 82-84); (b) the differences in concentrations between the HyClone products and the claimed ranges are not critical (Butler opening report at ¶¶ 51-52, 72-74); (c) the presence of additional, non-claimed ingredients is irrelevant (*id.* at ¶ 36); and (d) the claimed ingredients with a concentration as low as 0 mg/L are optional (*id.* at ¶ 37). Certainly, if this claim scope was expanded, routine experiments combining the teachings of Jayme 1997 and the '704 patent (supported by other prior art, such as Keenan and

---

[12] I note that as the cell culture media formulations were developing towards a powder composition containing all or most of the ingredients, any form of a critical component (such as iron) would have been more desirable by a POSA if it were more water-soluble, as ferric ammonium citrate was known to be, per the disclosure of Titeux.

Kitano) would have led a POSA to formulate compositions that fall within the scope of this expanded claim 1.

52.      If claim 1 were construed literally for purposes of validity, the differences between the media compositions and related teachings in the prior art and the compositions of literally-construed claim 1 would require simple substitution of one known element for another to obtain predictable results.  For example, Prof. Butler notes that the concentrations of two ingredients ($CuSO_4.5H_2O$ and $ZnSO_4.7H_2O$) in the eRDF formulation as disclosed in Jayme 1997 are "outside the claimed range."  *See e.g.*, Butler rebuttal report at ¶ 58.  But the disclosure in the Jayme 1997 reference of DMEM/F12 includes the same form of these ingredients within the claimed ranges.

53.      In sum, it would have been well within the knowledge and skill of a POSA to combine these prior art elements according to known methods to yield predictable results, i.e., to arrive at one or more compositions covered by claim 1—whether claim 1 were construed literally or broadly.

>     **f)**       **As for claim 2, it would have been obvious to use a cell protectant when preparing a cell culture media**

54.      Claim 2, which depends upon claim 1, further recites the addition of a buffering molecule with a $pK_a$ between 5.9 and 7.8 and a cell protectant in any amount.  Prof. Butler does not dispute that the eRDF formulation disclosed in Jayme 1997 contains such a buffering molecule.  Glacken opening report at ¶ 211.  Instead, he disputes that Jayme 1997 teaches the addition of serum as a cell protectant.  Butler rebuttal report at ¶¶ 90-91.  His opinion, however, misses the point.

55.      First, Prof. Butler does not dispute it was obvious at the time to include a cell protectant to protect from damage caused by shear forces in cell cultivation.  For example, he

admits that "[a] POSA developing a cell culture media would have had a reason to use a cell protectant if the media were intended for suspension cell culture." Butler rebuttal report at ¶ 154. I agree that addition of a cell protectant was a well-known solution to the known problem of cell shearing during suspension cell growth. *See, e.g.,* Ex. 90 (Papoutsakis ET,E.T., et al., *Media additives for protecting freely suspended animal cells against agitation and aeration damage*, Trends in Biotechnology, 9(9):316-24, 320 (1991) ("Papoutsakis").

56.      Jayme 1997 addresses media for suspension cell culture. Jayme 1997 "focus[es] upon the development of basal nutrient formulations used for research and biotechnology applications" and describes "[i]nnovative techniques currently utilized to optimize nutrient compositions and delivery to mammalian cell bioreactors." Ex. 11 (Jayme 1997) at 95. Cells in bioreactors are in suspension and subject to damage from shear forces. Thus, regardless of whether the cell protectant is serum or another ingredient that functions to protect cells from shear stress and vessel absorption, Jayme 1997 teaches the addition of a cell protectant to the cell culture media, which would have been obvious to a POSA for this type of cell culture. *See* Ex. 11 (Jayme 1997) at 95 ("serum…protect[ed cells] from shear stress and vessel adsorption.")

57.      Second, Prof. Butler ignores that cell protectants other than serum were routinely used in cell culture media. *See* Glacken opening report at ¶ 230. As I explained in my opening expert report, well-known cell protectants include pluronics (such as Pluronic® or Tween compounds), which may be added to serum-free or chemically defined media. *Id.*, *see e.g. also* Ex. 90 (Papoutsakis) at 316.

58.      Third, Prof. Butler does not dispute that serum also was a well-known "cell protectant." *Id.* Instead, he says the state of the art at the time was to develop "a serum-independent medium" and, as a result, a POSA would not add serum as a cell protectant. This

27

opinion, however, ignores Janssen's claim construction—which expressly expands the scope of claims 1 and 2 to include compositions with serum. *See* Ex. 91 (Deposition transcript of Prof. Wurm regarding claim construction) at 125:25-126:4 (asserting that serum may be added to the composition of claim 1).

59.     In fact, those skilled in the art at the relevant time used serum as a cell protectant. Serum, like other undefined ingredients, was known to offer many benefits in addition to general cell nutrition—including, as Jayme 1997 discloses, protection from shear stress. Jayme 1997 at 95. The fact that the state of the art was moving towards media not dependent on serum (i.e., individual ingredients supplied the nutrition previously provided solely by serum), means that, if a POSA were to develop a serum-free media, such a person would have been motivated to replace serum with a cell protectant, like pluronics, that provides the shear protection to shear-sensitive cells that otherwise would have been provided by serum. *See e.g.*, Glacken opening report at ¶ 230, Ex. 11 (Jayme 1997) at 95.   Certainly, if the POSA is not concerned about the presence of serum in a formulation, Prof. Butler and Prof. Wurm does not dispute that it will act as a cell protectant.

60.     In short, claim 2 adds nothing to what was already known in the prior art.  In my opinion, once the trier of fact concludes that claim 1 is obvious, claim 2 necessarily would be obvious as well.

**2.     Obviousness in view of WO 1998/15614 and the knowledge of a POSA at the time**

61.     Profs. Butler and Wurm's respective rebuttals to my opening report also do not change my opinion that asserted claims 1 and 2 of the '083 patent would have been obvious over

the '614 application (which neither Prof. Butler nor Prof. Wurm disputes is prior art) in view of

the knowledge of a POSA.

> **a)      The '614 application contains all active components of all**
> **required ingredients recited in both claims 1 and 2**

62.     As discussed in my opening report, the only differences between the media of Table

1 of the '614 application and the literal scope of the asserted claims are: (a) five ingredients that

have the same active moiety but are present in a different form than the claimed elements (ferric

ammonium citrate, $MnSO_4.H_2O$, $Na_2SeO_3$, $SnCl_2.2H_2O$, and $NH_4VO_3$) and (b) the concentration

of a single ingredient (putrescine.2HCl).  *See* Glacken opening report at ¶ 237.

| Glacken Table 2: Comparison of the Differences Between the '083 Patent Claims and the '614 Application Medium ||
| --- | --- |
| **Claim 1 of the '083 Patent** | **Table 1 of the '614 Application** |
| ferric ammonium citrate, 0.04-200 mg/L | Ferric Citrate Chelate, 0.01-2 mg/L |
| $MnSO_4 \bullet H_2O$, 0.000070-0.0080 mg/L | $MnCl_2 \bullet 4H_2O$, 0.000001-0.001 mg/L |
| $Na_2SeO_3$, 0.004-0.07 mg/L | $H_2SeO_3$, 0.00001-0.005 mg/L |
| $SnCl_2.2H_2O$, 0.000025-0.0005 mg/L | $SnCl_2,$ 0.000001-0.0001 mg/L |
| $NH_4VO_3$, 0.0001-0.0025 mg/L | $NaVO_3$, 0.00001-0.001 mg/L |
| putrescine.2HCl, 0.025-0.25 mg/L | putrescine.2HCl, 0.0001-0.01 mg/L |

63.     With respect to the five literally missing (i.e., in a different form) claimed

ingredients (ferric ammonium citrate, $MnSO_4.H_2O$, $Na_2SeO_3$, $SnCl_2.2H_2O$, and $NH_4VO_3$), the

media of Table 1 of the '614 application includes corresponding ingredients (respectively, ferric

citrate chelate, $MnCl_2.4H_2O$, $H_2SeO_3$, $SnCl_2$, and $NaVO_3$) that provide the same active component

in the same molar amount as the asserted claims. *See id.* at ¶¶ 243-248. Profs. Butler and Wurm do not dispute that Table 1 of '614 application teaches each of the active components of the claimed ingredients in the asserted claims. *See* Butler rebuttal report at ¶ 109 (both $MnCl_2.4H_2O$ and $MnSO_4.H_2O$ provide the manganese trace element); ¶ 111 (both $H_2SeO_3$ and $Na_2SeO_3$ provide the selenium trace element); ¶ 113 (both $SnCl_2$ and $SnCl_2.2H_2O$ provide the tin trace element); ¶ 115 (both $NaVO_3$ and $NH_4VO_3$ provide the vanadium trace element); ¶¶ 118-119 (both ferric citrate chelate and ferric ammonium citrate provide iron).

> **b)** **A POSA would have been motivated to use the '614 application composition with a reasonable expectation of success**

64.     Profs. Butler and Wurm critique my obviousness opinion based on the '614 application because they believe that "[o]ut of the numerous media in the literature as of the time of the invention, a POSA would have had no reason to select the medium in the WO '614 application as a starting point for medium development." Wurm rebuttal report at ¶ 63; *see also* Butler rebuttal report at ¶ 93. I disagree.

65.     First, I understand that the premise underlying their analysis is improper as a legal matter. My understanding is that there is no requirement in conducting an obviousness analysis for a composition patent (such as the '083 patent) to identify a prior art reference as "a good starting point," much less as the most obvious "starting point," as Profs. Butler and Wurm assume. Instead, I understand a POSA is presumed to have knowledge of all the relevant prior art, and that the relevant obviousness inquiry is whether the differences between the claimed invention and the prior art are such that the claimed invention as a whole would have been obvious before the effective filing date of the claimed invention to a POSA. In other words, there may be many

Michael Glacken, Sc.D.
**Reply Expert Report**                                          U.S. Pat. No. 7,598,083

obvious cell culture media compositions.  As long as at least one of these cell culture media formulations falls within the scope of the asserted claims, those claims are obvious.

66.     Second, even if a "starting point" analysis were required as a legal matter, a POSA would have been motivated to select the cell culture medium of Table 1 of the '614 application among multiple potential starting points for further development with a reasonable expectation of success.  Profs. Butler and Wurm misconstrue my opinion when they assert that I "do[] not opine that the medium in the WO '614 application would have been a 'good starting point' for media development, as [I] stated DMEM/F12 and eRDF from Jayme 1997 would have been in [my] first obviousness theory."  Wurm rebuttal report ¶ 63; *see also* Butler rebuttal report ¶ 93.  Just because, as Dr. Butler "agree[s]," "*either* DMEM/F12 *or* eRDF would have been reasonable starting points for media formulation in 2004" and "eRDF would be preferred" (Butler rebuttal report ¶ 42), this does not diminish the merit of selecting other media described in the prior art as starting points.

67.     Instead, as I explained in my opening report, the '614 application provides a strong motivation for a POSA to select the composition of Table 1 for further development as a serum-free medium.  *See* Glacken opening report at ¶¶ 235-36.  As Prof. Butler acknowledges, "[b]y the 1990s, many in the biopharmaceutical industry were attempting to move away from animal-derived components, including serum, in cell culture media for biopharmaceutical production."  Butler rebuttal report at ¶ 15.  He further explains that "[t]he challenges in developing serum-free media were to replace the undefined and in large part unknown components of serum with substitutes capable of supporting the growth of cells."  *Id.* at ¶ 16.

Michael Glacken, Sc.D.
**Reply Expert Report**                                        **U.S. Pat. No. 7,598,083**

68.     The '614 application addresses this challenge of developing serum-free media.[13]   A

POSA would have looked to the composition of Table 1 of the '614 application because it provided

a "serum-free, low protein-culture medium suitable for cultivation of animal cells, which is

completely devoid of animal or human proteins."   Ex. 13 ('614 application) at p. 6, ll. 20-22.   That

is, making a media completely devoid of animal or human proteins was not a concept developed

by Janssen; instead, it was a well-known goal, for which the '614 application had already provided

a solution.

69.     The '614 application taught in Example 6 that the basal medium formulation of

Table 1 supplemented with EGF, yeast extract, and a hydrolysate "performed as well as or better

than the control," which was the commercially available Earle's Modified Medium (EMEM)

supplemented with 5% fetal bovine serum.   *Id.* at p. 38, ll. 10-11.   The '614 application also taught

that the composition of Table 1 was capable of supporting high cell growth comparable or better

than conventional serum-supplemented media, without the disadvantages associated with serum.

These teachings would have motivated a POSA to use the '614 application as a guide for preparing

serum-free media that supported high cell growth.   Profs. Butler and Wurm do not address this

---

[13] Profs. Butler and Wurm note that the '083 patent discloses not only serum-free media but also
"chemically-defined and animal-derived component free cell culture media" that is protein free.
Butler rebuttal report at ¶ 17; Wurm rebuttal report at ¶ 10.  I understand that the motivation for a
POSA to develop the claimed invention from the prior art does not need to be the same motivation
that the inventors had in developing the claimed invention.  Since the claims are not limited to
chemically-defined, animal-derived component free, or protein-free media, I understand that the
prior art does not need to meet these characteristics.  If these were limitations of the claims, Janssen
has conceded that the accused HyClone products are not chemically defined or protein free,
because they contain chemically undefined ingredients (████████ and hydrolysate ███
██) and proteins ██████████████). *See* Glacken rebuttal report at ¶¶ 51-52; Ex. 92 (Decl. of
Prof. Wurm regarding claim construction) at ¶ 19 ("[t]hose of ordinary skill in the art understand
that non-chemically defined media (such as those containing soy hydrolysate) and protein-
containing media (such as those containing inulin) are different types of 'cell culture media.'").

clear motivation to select the composition of the '614 application as a "starting point" for cell culture media development.

70.     Profs. Butler and Wurm nonetheless assert that a POSA would not have started with the composition of the '614 application, because "the WO '614 application focuses on plant-derived nutrient supplements to be added to a basal medium formulation for the serum-free cultivation of animal cells," and "its invention is the supplements to be added to a medium, not the medium itself."  Wurm rebuttal report ¶ 63; *see also* Butler rebuttal report ¶ 94.  I disagree.

71.     My understanding is that Profs. Butler and Wurm are applying an incorrect standard.  For an obviousness analysis, the teachings of a prior art patent application are not limited to just the claims of the '614 application.  In my opinion, a POSA would have been aware of the teachings of Table 1 of the '614 application regardless of whether it is the subject of the application's claims.  The important point for a POSA was that the '614 application taught that Table 1 supplemented with the plant-derived nutrients showed beneficial growth and metabolism of cells, without the disadvantages associated with serum.  As discussed above, a POSA would have been motivated to select the composition of Table 1, supplemented with these plant-derived nutrients, for further development based on the teachings of the '614 application as a whole.

72.     Regardless of the legal standard, the fact that the named inventors of the '614 application did not claim the formulation of Table 1 as their invention demonstrates that even this formulation was not innovative as early as in 1998—six years before the priority date for the '083 patent.  Profs. Butler and Wurm admit that the '614 application "ascribes no special significance to the medium in Table 1."  Wurm rebuttal report ¶ 66; Butler rebuttal report ¶ 95.  I agree.  Again, there was nothing novel or nonobvious about the medium in Table 1 of the '614 application in 1998, and certainly not by 2004.  That is, the '614 application confirms that many years before the

priority date, skilled artisans were experimenting with cell culture media compositions that would have rendered  the compositions of claims 1 and 2 obvious.  Indeed, Profs. Butler and Wurm fail to ascribe any special significance to any of the differences between Table 1 of the '614 application and the claimed composition.

> **c)**      **This prior art composition would fall within the scope of claims 1 and 2 as broadly construed by Janssen**

73.      When comparing the differences between the '614 application and the literal scope of the asserted claims, there are five missing (i.e., in a different form) ingredients from the prior art composition:  ferric ammonium citrate, $MnSO_4.H_2O$, $Na_2SeO_3$, $SnCl_2.2H_2O$, and $NH_4VO_3$.  But, again, the prior art media of Table 1 of the '614 application includes corresponding ingredients (respectively, ferric citrate chelate, $MnCl_2.4H_2O$, $H_2SeO_3$, $SnCl_2$, and $NaVO_3$) that provide the same active component in the same molar amount as the asserted claims.  *See* Glacken opening report at ¶¶ 243-248.  To the extent the claimed ingredients are deemed equivalent to other salt and hydrated forms under the doctrine of equivalents (as Janssen contends, (*see* Ex. 45 (Janssen's preliminary infringement contentions) at 9-11)), the five missing claimed ingredients from the prior art are not differences from the expanded scope of the asserted claims for purposes of obviousness.

74.      In addition, there is a single claimed ingredient (putrescine.2HCl) that is outside of the claim 1 range.  The '614 application teaches adding this ingredient in an amount ranging from 0.001-0.01 mg/L.  Ex. 13 ('614 application) at p. 15, l. 17.  But the highest amount of putrescine.2HCl in the '614 application is 40% of the lower claimed limit of 0.025 mg/L.  Ex. 1 ('083 patent) at claim 1; *see also* Glacken opening report at ¶¶ 248-249.

Michael Glacken, Sc.D.
**Reply Expert Report**                                    **U.S. Pat. No. 7,598,083**

75.     If the concentrations of the claimed ingredients are not critical (or at least may vary

in magnitude by as much as the difference between the asserted claims and the accused products)

under the doctrine of equivalents as Janssen contends (Janssen's preliminary infringement

contentions at 11-14) and I dispute, the concentration of putrescine.2HCl is not a material

difference for purposes of obviousness between the '614 application and the asserted claims.

Indeed, the difference of 40% is far less than the differences to which Janssen has asserted doctrine

equivalents for the accused HyClone products.

76.     For example, in Prof. Butler's infringement analysis, he consistently characterized

the differences in the concentrations between ingredients in the accused HyClone products and the

asserted claims as "close" or "small," and further opined that these differences are insubstantial.

*See*, *e.g.*, Butler opening report at ¶¶ 51-52 (asserting that the concentration of $SnCl_2.2H_2O$ in the

accused HyClone growth product—an amount that is about 3.2-times less than the claimed lower

limit—is "close to the claimed concentration range"); *id.* at ¶¶ 72-74 (asserting that the difference

in concentrations of $L-histidine.HCl.H_2O$ in the accused HyClone growth product—an amount

that is about 7.4-times less than the claimed lower limit—and the claimed concentration is

"small").  But the difference in concentrations between putrescine.2HCl in the prior art and the

asserted claims is even closer (or smaller), i.e., putrescine.2HCl in the prior art is 2.5-times less

than the claimed lower limit.

77.     Thus, under Profs. Butler and Wurm's application of the doctrine of equivalents in

this case, there would be no differences between the '614 application and the asserted claims.

Michael Glacken, Sc.D.
**Reply Expert Report**                                   **U.S. Pat. No. 7,598,083**

        **d)**      **The asserted claims still would have been obvious over the '614 application and the knowledge of a POSA even if the claims were construed literally**

78.      Setting aside the expansive scope of the asserted claims resulting from Profs. Butler and Wurm's infringement analysis, the asserted claims as literally construed would have been obvious in view of the '614 application and the knowledge of a POSA.  Indeed, the '614 application disclosed 47 of the 52 required ingredients in the same form claimed, and taught a concentration of the claimed ingredients (or their active components) that was within or overlapped with 51 of the 52 required claimed ranges.  As discussed above, a POSA in 2004 would have been motivated, with a reasonable expectation of success, as part of routine experimentation, to substitute alternative forms of ingredients that already provide the same active component (including manganese, selenium, tin, vanadium, and iron) to achieve certain advantages tangentially related to its cell culture performance (e.g., more readily available, already-in-hand, more soluble, more stable, and cheaper ingredients) and to customize the concentrations of the ingredients (including putrescine.2HCl) to achieve better results for a cell line of interest to the POSA.

        **(1)**      **Profs. Butler and Wurm point to differences that have no significance to the obviousness inquiry**

79.      Profs. Butler and Wurm claim that my obviousness analysis "does not address many of the differences between the medium of the WO '614 application and the claimed media."  Butler rebuttal report at Section VI.D.2; *see also* Wurm rebuttal report at Section VII.C.2.  As discussed below, I disagree that any of these "differences" are pertinent to the obviousness analysis.

36

> (a)     **The presence of unclaimed ingredients is inconsequential**

80.     Profs. Butler and Wurm assert that my analysis "does not address the fact that the basal medium in Table 1 of the WO '614 application includes nearly 30 additional ingredients that are not recited in claim 1 of the '083 patent."  Butler rebuttal report at ¶ 98; Wurm rebuttal report at ¶ 68.  They assert that elimination of these additional ingredients "would have been necessary to arrive at the claims of the '083 patent starting from the WO '614 application."[14]  *Id.*  I disagree.

81.     The asserted claims recite a soluble composition that "comprises" the claimed ingredients in the claimed amounts.  Ex. 1 ('083 patent) at claims 1-2.  I understand that the term "comprises" is a legal term used in claim language which means that the named elements are essential but that other elements may be added and still form a construct within the scope of the claims.  This would remain true even under a literal application of the asserted claims.  Thus, as long as the resulting composition would be suitable for producing a final volume of nutritive media for culturing cells, a POSA would not have needed to omit the nearly 30 additional ingredients from Table 1 of the '614 application to render the asserted claims obvious.

> (b)     **Profs. Butler and Wurm place undue weight on preferred embodiments in the prior art**

82.     Profs. Butler and Wurm note that Table 1 of the '614 application provides "component ranges," a "preferred embodiment," and a "most preferred embodiment."  *See* Butler rebuttal report at ¶ 100; Wurm rebuttal report at ¶ 69.  They assert that my obviousness analysis

---

[14] Profs. Butler and Wurm took the position in their infringement reports that "the presence or absence of additional, unclaimed ingredients is irrelevant to the infringement analysis."  Butler opening report at ¶ 36; Wurm opening report at ¶ 46.  To the extent the literal scope of the asserted claims is limited to just those expressly listed in the '083 patent, the accused HyClone products do not infringe—because they contain at least 29 unclaimed ingredients.  Glacken rebuttal report at ¶¶ 51-52.

37

ignores the preferred and most preferred embodiments.  *Id.*  But I understand that an obviousness analysis does not require a particular combination be the preferred, or the most desirable, combination over other alternatives described in the prior art in order to provide motivation to develop the claimed invention.  To the contrary, I understand it would be improper to limit the teachings of the prior art to just preferred embodiments, as Profs. Butler and Wurm appear to suggest.  *See* Butler rebuttal report at ¶ 101; Wurm rebuttal report at ¶ 70.

83.     Thus, I disagree that comparing only the preferred embodiments to the exclusion of the other teachings of the prior art accurately reflects the differences between the teaching of the '614 application and the asserted claims for evaluating obviousness.  Nor does it reflect the commonplace approach of a POSA developing cell culture media at that time.

### (c)     The overlapping concentration ranges render the claims obvious

84.     Profs. Butler and Wurm further assert that my obviousness analysis "does not address the fact that there are numerous differences in concentrations of the ingredients that are common" between the '614 application and the '083 patent.  Butler rebuttal report at ¶ 99; Wurm rebuttal report at ¶ 69.  They note that "none of the 'component ranges' of concentrations in the WO '614 application *are identical* to those in the '083 patent," and that "[f]or twenty-six of the common ingredients, moreover, the ranges only partially overlap."  Butler rebuttal report at ¶¶ 101-104; Wurm rebuttal report at ¶ 70 (emphasis added).  Prof. Butler presents the ingredients $Fe(NO_3)_3.9H_2O$ and pyridoxine.HCl as examples of ingredients for which there are purported differences for purposes of obviousness.  Butler rebuttal report at ¶¶ 103-104.

85.     To be clear, for the ingredients in common between the '614 application and the '083 patent (including $Fe(NO_3)_3.9H_2O$ and pyridoxine.HCl), neither Prof. Butler nor Prof. Wurm

38

disputes that the ranges for each of these ingredients overlap except for the ingredient putrescine.2HCl, discussed in more detail below.  I understand that, in such a situation where there is a range disclosed in the prior art and the claimed range lies within or overlaps that prior art range, the prior art shows that element of the claim to be obvious and known by a POSA, until proved otherwise by Janssen.

86.     As discussed above, when the prior art discloses a concentration range as being beneficial for cell growth, a POSA would have used this concentration range as a guide in selecting concentrations to test in a cell culture experiment.  The '614 application would have motivated a POSA to determine the optimum combination of concentrations for developing a cell culture media.

87.     Profs. Butler and Wurm have not come forward with any evidence that the prior art disparages the disclosed ranges, or that there are new and unexpected results of the claimed ranges compared to the prior art ranges.

88.     With respect to teaching away, Prof. Butler notes that, in the examples of $Fe(NO_3)_3.9H_2O$ and pyridoxine.HCl, their concentrations in the preferred embodiments of the '614 application are outside of the range disclosed in the '083 patent.  Butler rebuttal report at ¶¶ 103-104.  But this does not mean that the '614 application teaches away from the claimed concentration ranges.  I understand that a reference does not teach away if it merely expresses a preference for an alternative embodiment if it also does not criticize, discredit, or otherwise discourage investigation into the claimed invention.  In other words, the '614 patent does not indicate that concentrations outside the disclosed ranges do not work.

89.     The issue from a question of obviousness is not whether the disclosure includes ranges outside of the claimed range, but whether it includes ranges within the claimed range.  Here,

the '614 application clearly discloses concentrations falling within and meeting the elements of almost all of the claimed ranges of the '083 patent claim 1 (all but one—putrescine.2HCl).  While the '614 application describes a general preference for the concentrations provided in the preferred embodiments, it does not criticize, discredit, or otherwise discourage the concentration ranges that overlap with the claimed concentrations or discourage investigation into the remainder of the claimed ranges.  Likewise, Profs. Butler and Wurm have not come forward with any evidence to suggest that the claimed ranges provide any new or unexpected results relative to the '614 application.

### (d)     The optional ingredients are not required

90.     Profs. Butler and Wurm further identify the absence of L-ornithine.HCl and L-taurine as differences between the '614 application and the claimed compositions.  *See* Butler rebuttal report at Table 4; Wurm rebuttal report at Appendix B.  But both of these ingredients are recited in the asserted claims in an amount as low as 0 mg per liter of the final volume of cell culture media.  Ex. 1 ('083 patent) at claim 1.  As such, they are optional ingredients—as Janssen itself has contended and admitted.  *See* Janssen's preliminary infringement contentions at 4-7 (claimed ingredients sodium hypoxanthine and thymidine are not provided in the accused HyClone products).  As these ingredients are "optional," none are required to be disclosed in the '614 application.[15]

---

[15] In his infringement report, Prof. Butler referred to these ingredients as optional "(*i.e.*, the ingredients with a concentration range that includes zero.)."  Butler opening report at ¶ 37.  If, contrary to Prof. Butler's prior statement, these "optional" ingredients are required by the claims (which they are not), then the accused HyClone products would not infringe.  Specifically, sodium hypoxanthine is absent from the accused HyClone products.  *See* Wurm opening report at Annex 1 at Table 10.

40

Michael Glacken, Sc.D.
**Reply Expert Report**                                    **U.S. Pat. No. 7,598,083**

> **(2)**      **The claimed salt/hydrate forms are obvious variations of the exemplary trace element-containing ingredients of the '614 application**

91.      Profs. Butler and Wurm acknowledge that the '614 application discloses each of the claimed ingredients precisely (in the form claimed), except for the ingredients ferric ammonium citrate, $MnSO_4.H_2O$, $Na_2SeO_3$, $SnCl_2.2H_2O$, and $NH_4VO_3$.  Butler rebuttal report at ¶ 105; Wurm rebuttal report at ¶ 71.  They dispute my opinion that "it would have been obvious to modify $MnCl_2.4H_2O$, $H_2SeO_3$, $SnCl_2$, and $NaVO_3$, respectively, which are disclosed in the WO '614 application, to arrive at the claimed ingredients."[16]  *Id.*  Their arguments do not change my opinion.

92.      As an initial matter, I note that Profs. Butler and Wurm do not dispute several of the facts supporting my opinion that it would have been obvious to substitute the claimed salt/hydrate forms of the trace element-containing ingredients for those disclosed in the '614 application.  First, they do not dispute that a POSA would have known that the claimed ingredients $MnSO_4.H_2O$, $Na_2SeO_3$, $SnCl_2.2H_2O$, and $NH_4VO_3$ were common sources of the desired active components—respectively, manganese, selenium, tin, and vanadium.  *See* Glacken opening report at ¶¶ 244-247, Appendix 4; Butler rebuttal report at ¶¶ 109, 111, 113, 115; *see generally* Wurm rebuttal report at ¶¶ 71-75.  Indeed, Prof. Butler acknowledges that "the individual ingredients listed in claim 1 were known in the art."  Butler rebuttal report at ¶ 177.  Prof. Butler also opined that "[w]hat is important is that there be a sufficient amount present to fulfill the biological function of the ingredient be present in trace amounts."  Butler opening report at ¶ 42.

---

[16] I address the missing ingredient ferric ammonium citrate separately below.

41

Michael Glacken, Sc.D.
**Reply Expert Report**                                           **U.S. Pat. No. 7,598,083**

93.     Second, Prof. Butler and Prof. Wurm do not dispute my opinion that "a POSA would understand that different salt forms of a trace element are interchangeable at least because these salts will dissociate into the desired [ionic] form of the trace element when placed in the aqueous cell culture media." *See* Glacken opening report at ¶ 241; Butler rebuttal report at ¶ 106; *see generally* Wurm rebuttal report at ¶¶ 71-75.[17]

94.     Instead, the only critique by Profs. Butler and Wurm as to the selection of the claimed trace element-containing ingredients is that a POSA would not have had a reason based on the '614 application to make these substitutions.  Specifically, they opine that "the WO '614 application provides no reason to select different salt forms of the trace element-containing ingredients in Table 1, much less the particular salt forms claimed in the '083 patent."  Butler rebuttal report at ¶ 107; Wurm rebuttal report at ¶ 72.

95.     But the known interchangeability of different forms of active components provides the motivation to substitute the trace element-containing ingredients of the '614 application with its equivalent salt/hydrate form claimed in the '083 patent.  I understand that the combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results.  I further understand that, when considering obviousness of a combination of known elements, the key inquiry is whether the combination is more than the predictable use of

---

[17] To the extent that Profs. Butler and Wurm now claim that the specific salt/hydrate form of a claimed ingredient is critical, this is inconsistent with their opinion underlying their infringement analysis.  A key premise of their infringement analysis is that salt/hydrate forms of the same active component are interchangeable.  *See, e.g.*, Butler opening report at ¶ 59 ("In addition to $CuSO_4.5H_2O$, the Celltrion Media contain another source of copper(II), $CuCl_2.H_2O$.  At the concentrations of these ingredients in the Celltrion Media, both of these ingredients are completely soluble in water.  Upon dissolution in water, the copper(II) ions separate (*i.e.*, dissociate) from the sulfate and chloride ions.  Whether the source of copper(II) in the media is a sulfate salt (as in the claim), or a mixture of chloride and sulfate salts (as in the Celltrion Media), in solution cells will encounter free copper(II).")

42

Michael Glacken, Sc.D.
**Reply Expert Report**                                    **U.S. Pat. No. 7,598,083**

prior art elements according to their established functions.  I understand that a claimed invention that involves nothing more by a POSA than the simple substitution of one known element for another would be invalid as obvious.

96.    The motivation to substitute the trace element-containing ingredients is supported by the '614 application itself.  The '614 application taught that trace elements were needed for cell culture media and that these trace elements "may be provided, for example, in the trace element salts" recited in Table 1.  Ex. 13 ('614 application) at p. 12, l. 22 – p. 13, l. 4.  In other words, the specific trace element-containing ingredients were merely exemplary of the types of ingredients that could have served as a source for that trace element.  As exemplary salt/hydrate forms, I disagree with Profs. Butler and Wurm that the ingredients expressly recited in Table 1 of the '614 application were the only ingredients that may be used, and that the '614 application does not contemplate other salt or hydrate forms.  *See* Butler rebuttal report at ¶ 107; Wurm rebuttal report at ¶ 72.  Instead, a POSA would have understood from the '614 application that these substitutions and modifications may be made to the composition of Table 1 with the common salt/hydrate forms of the trace elements.

97.    As I explained in my opening report, a POSA would have known that the claimed ingredients $MnSO_4.H_2O$, $Na_2SeO_3$, $SnCl_2.2H_2O$, and $NH_4VO_3$ were common forms of the trace elements manganese, selenium, tin, and vanadium, respectively.  Glacken opening report at ¶¶ 244-247; Appendix 4.  I cited to numerous prior art references reflecting the knowledge of a POSA that these specifically claimed forms of the trace elements were interchangeable with their corresponding ingredients in the '614 application and that these forms could be substituted depending on, for example, local availability, purity, and price.  *Id.*  Profs. Butler and Wurm do not dispute these opinions.

43

98.     Profs. Butler and Wurm also assert that "even if one were somehow motivated to alter the salt/hydrate forms of the trace-element-containing ingredients in the '083 patent, a POSA would have been presented with an essentially infinite set of possible combinations."  Butler rebuttal report at ¶ 108; Wurm rebuttal report at ¶ 73.  Neither provides any support for this assertion, and neither explains why this assertion supports the nonobviousness of the asserted claims.  It does not.  A POSA would have understood that each of the trace elements recited in the '614 application had only a handful of salt and hydrated forms that had been commonly used in cell culture media.  The list is further narrowed considering that each of the claimed trace element-containing ingredients were commonly used sources for the desired trace elements.  *See* Glacken opening report at ¶¶ 244-247, Appendix 4.  When customizing a culture medium for a new cell line or to produce a new biopharmaceutical product, it would have been obvious to try these commonly used sources for the desired trace elements.

99.     Even if one were to consider there to be many potential recipes of cell culture media by virtue of the fact that each of the trace elements may have a few commonly used salt/hydrate forms, this would not have rendered the selection of one of these recipes nonobvious.  In light of the teachings of the '614 application, Profs. Butler and Wurm have not presented any evidence that the selection of a particular salt/hydrate form of trace elements would be not obvious.  Nor have they presented any evidence or opinion that the prior art taught away from the claimed salt/hydrate form of the trace elements, or that the claimed salt/hydrate form of the trace elements provided any unexpected or superior property.

100.     Profs. Butler and Wurm also assert that my obviousness analysis "fails to address how, even if one would have substituted one salt/hydrate form for another, one would have arrived at the claimed concentration ranges for the ingredients."  Wurm rebuttal report at ¶ 74; Butler

Michael Glacken, Sc.D.
**Reply Expert Report**                                    **U.S. Pat. No. 7,598,083**

rebuttal report at ¶¶ 110, 112, 114, 116.  To be clear, there is no dispute that the molar amounts of

the trace elements provided by the '083 patent (including for the four claimed ingredients

$MnSO_4.H_2O$, $Na_2SeO_3$, $SnCl_2.2H_2O$, and $NH_4VO_3$) overlap with those for the ingredients in Table

1 of the '614 application.  *See* Glacken opening report at ¶¶ 244-247; Butler rebuttal report at ¶¶

110, 112, 114, 116; Wurm rebuttal report at ¶ 74.  A POSA would have understood that each cell

line is different and that one would have optimized the concentration of the ingredients depending

on the cell line.  Neither Prof. Butler nor Prof. Wurm has opined otherwise.

101.    So long as the prior art taught or suggested compositions within the scope of claims

1 and 2, I understand this means the entire claims would have been obvious.  Again, Profs. Butler

and Wurm have not come forward with any evidence that the prior art teaches away from the

claimed ranges, or that there are new and unexpected results of the claimed ranges relative to the

prior art ranges.

**(3)     It would have been obvious to substitute ferric citrate
chelate for ferric ammonium citrate in the claimed
amount**

102.    The '614 application teaches the use "ferric citrate chelate" in the cell culture media

of Table 1 "as a substitute for transferrin."  Ex. 13 ('614 application) at Table 1; p. 13, ll. 28-29.

Profs. Butler and Wurm contend that the phrase "ferric citrate chelate" refers to the ingredient

ferric citrate but cite no support for this contention.  *See* Butler rebuttal report at ¶ 117; Wurm

rebuttal report at ¶ 76.  In my opinion, a POSA would have understood the phrase "ferric citrate

chelate" to refer to a ferric citrate chelate (a class that includes both the ingredients ferric citrate

and ferric ammonium citrate) rather than just the specific ingredient commonly referred to in the

art as simply "ferric citrate."  But under either interpretation, it would have been obvious to add

45

ferric ammonium citrate in place of "ferric citrate chelate" in the '614 application as a transferrin substitute.

103.    Ferric ammonium citrate and ferric citrate are chelates (chemical complexes derived from binding a metal atom to one or more ligands) that serve to carry and supply iron to eukaryotic cells.  *See, e.g.,* Ex. 36 (Keenan 1996) at 451.  Both ingredients were recognized in the art as among a finite number of "transferrin replacements" used in cell culture media.  *Id*.  As discussed above, the prior art (as reflected by Kennan 1996, the '140 patent, and Kitano) did not teach away from using ferric ammonium citrate as a transferrin replacement.  Indeed, contrary to Profs. Butler and Wurm's opinions (*see* Butler rebuttal report at ¶ 119; Wurm rebuttal report at ¶ 77), Kennan 1996 concluded that all the factors tested, including ferric ammonium citrate and ferric citrate, "were able to exert a concentration-dependent, growth-promoting effect on MDCK cells in single-stage growth assays."  *Id.* at 453.  Thus, both ferric ammonium citrate and ferric chelate were successful in promoting cell growth, even though other transferrin replacements promoted greater cell growth.  *Id.*  Further, as between these two ingredients, Keenan 1996 found that ferric ammonium citrate provided comparable or greater MDCK cell growth activity than ferric citrate at maximal stimulation.  *Id.* at 452, Fig. 1a.  Thus, whether the '614 application refers to "ferric citrate chelate" as an ingredient or a class, Keenan 1996 provided a POSA motivation to replace ferric citrate with ferric ammonium citrate and a motivation to select ferric ammonium citrate among the class of ferric citrate chelates.  *See also* Ex. 89 (Titeux) at 251 ("two highly water-soluble iron salts (ferric ammonium citrate and ferric ammonium sulfate) may completely replace [transferrin] for supporting the growth of the cell lines here investigated.")

104.    Profs. Butler and Wurm assert that I do not address whether "even if one were motivated to substitute [ferric ammonium citrate] for ferric citrate, one would have been motivated

46

to adjust the concentration to arrive at the claimed range."  Butler rebuttal report at ¶ 120; Wurm

rebuttal report at ¶ 78.  But a POSA would not have needed to adjust the concentration of ferric

ammonium citrate.  The '614 application teaches adding a ferric citrate chelate in the amount of

0.01-2 mg/L.  If a POSA selected ferric ammonium citrate as the ferric citrate chelate (as taught

by the prior art), the concentration ranges of the '083 patent and the '614 application would

overlap.[18]  Even if Profs. Butler and Wurm are correct that the '614 application is meant to refer

to the ingredient ferric citrate, as illustrated in Glacken Table 3, the '614 application teaches adding

0.01-2 mg/L of ferric citrate, which will deliver an amount of iron (III) ion that overlaps with that

provided by the claimed amount of 0.04-200 mg ferric ammonium citrate.

| Glacken Table 3 | | | |
|---|---|---|---|
| **'083 Patent Claim 1** | | **Table 1 of WO 1998/15614** | |
| **Ingredient** | **Molar Amount of Iron (III)** | **Ingredient** | **Molar Amount of Iron (III)** |
| Ferric ammonium citrate, 0.04-200 mg/L | $1.53 \times 10^{-1} -$ $7.63 \times 10^2$ µmol/L | Ferric citrate [chelate], 0.01-2 mg/L | $4.1 \times 10^{-2} -$ $8.165 \times 10^1$ µmol/L |
| **Total Iron (III)** | $1.53 \times 10^{-1} -$ $7.63 \times 10^2$ µmol/L | **Total Iron (III)** | $4.1 \times 10^{-2} -$ $8.165 \times 10^1$ µmol/L |

105.    As discussed above with respect to the overlapping but non-identical concentrations

for the other claimed ingredients, any such difference in the range of the amount of iron (III) is

---

[18] In my opening expert report, I mistakenly stated the amount of a ferric citrate chelate provided in the '614 application was identical to the amount of ferric ammonium citrate claimed in the '083 patent.  *See* Glacken opening report at ¶ 243.  I note that this comparison was correctly reported in Appendix 4 of my opening report as the '083 patent claiming ferric ammonium citrate in an amount of 0.04-200 mg/L and the '614 application teaching a ferric citrate chelate in the amount of 0.01-2 mg/L.

insignificant and presents evidence of obviousness that neither Prof. Butler nor Prof. Wurm adequately addressed.  For example, Profs. Butler and Wurm have not come forward with any evidence that the specifically claimed concentrations for ferric ammonium citrate is more than a simple substitution of one known element for another to obtain predictable results.

> **(4)**    **It would have been obvious to modify the concentration of putrescine.2HCl to arrive at the claimed concentration**

106.    Profs. Butler and Wurm acknowledge that the '614 application teaches the use of the claimed ingredient putrescine.2HCl.  *See* Butler rebuttal report at ¶ 121; Wurm rebuttal report at ¶ 79.  But the '614 application teaches an amount of 0.0001-0.01 mg/L putrescine.2HCl that is literally outside of the claimed range of 0.025-0.25 mg/L.  *Id.*

107.    As I previously explained, a POSA would have been motivated to add more putrescine.2HCl because the prior art consistently taught including a concentration that overlaps with the claimed concentration range of 0.025-0.25 mg/L.  *See* Glacken opening report at ¶ 248 (listing the concentration of putrescine.2HCl disclosed in twelve cell culture media recipes from eight prior art references).[19]  The teachings of the prior art provided a strong motivation to increase

---

[19] Prof. Butler states that the published media I cited discloses various putrescine.2HCl concentrations with "some within the claimed range and some outside the claimed range."  Butler rebuttal report at ¶ 122.  In paragraph 248 of my opening expert report, I cite eight references describing the composition of a dozen different cell culture media.  Glacken opening report at ¶ 248.  Eleven of those compositions have reported concentrations of putrescine.2HCl that is within the claimed range.  *Id.*  The twelfth composition from Hamilton 1997 (Ex. 26) also includes a concentration of putrescine.2HCl that is likely within the claimed range, although it is misreported in Table 1.  Ex. 26 (Hamilton 1997) at Table 1.  In that table, Hamilton 1997 reports two measures of the amount of putrescine.2HCl in the medium MCDB 301: (i) a concentration of 0.01611 mg/L; and (ii) a molar concentration of 1.0 x $10^{-6}$ mol/L.  *Id.*  Table 1 of Hamilton 1997 includes a typo, because a molar concentration of 1.0 x $10^{-6}$ mol/L putrescine.2HCl (MW=161.07 g/mol) is equivalent to a concentration of 0.1611 mg/L (not 0.01611 mg/L).  *Id.*  A POSA would recognize that the molar concentration is correct, because the medium MCDB 301 is derived from the commercial medium F12 and the legend to Table 1 reports that the amount of putrescine.2HCl is

the concentration of the amount of putrescine.2HCl in cell culture media.  Profs. Butler and Wurm

provide no evidence that a POSA would have been discouraged from following the teaching of the

prior art to increase the concentration of the amount of putrescine.2HCl in a cell culture medium.

108.    Instead, Prof. Butler asserts that "nothing in the WO '614 application suggest[s]

that an amount of putrescine.2HCl outside of its disclosed range would be successful in the

medium of the WO '614 application."  Butler rebuttal report at ¶ 122.  Prof. Butler further states

that "one would have no way of knowing to select and use in a medium only putrescine.2HCl

concentration from those media (which fall within the range) while avoiding selecting

concentrations of other ingredients that fall outside the claimed range."  *Id.* at ¶ 123.  These

opinions do not rebut obviousness based on the difference in concentration of putrescine.2HCl,

because Prof. Butler fails to account for the skill of a POSA.  A POSA had the skill to optimize

the concentration of ingredients within the ranges disclosed in the prior art using routine

experimentation.

109.    Prof. Butler's own opinion on enablement supports that optimizing the amount of

putrescine.2HCl within a range disclosed in the asserted claims would have required nothing more

than ordinary skill for a POSA.  As Prof. Butler acknowledges, "the highest end of the

putrescine.2HCl range in the WO '614 application is 2.5 times below the low end of the claimed

range."  Butler rebuttal report at ¶ 121.  By comparison, all but two of the 52 non-optional claimed

ingredients have a ratio for the maximum to minimum claimed concentration that is greater than

2.5-fold, reaching as high as a 5000-fold concentration span.  *See* Glacken rebuttal report at ¶ 63

---

unchanged (U) with respect to the commercial medium F12.  *Id.* at 537, Table 1.  The amount of
putrescine.2HCl in F12 as reported in Jayme 1997 is 0.161 mg/L, which is consistent with the
molar concentration of putrescine.2HCl as reported in Table 1 of Hamilton 1997.  Ex. 11 (Jayme
1997) at Table 1.

(listing the ratios between the maximum to minimum claimed concentrations).  To the extent a

POSA had the knowledge and skill to practice the full scope of the claimed invention, which has

significantly larger variance in the concentration span (Butler rebuttal report at ¶¶ 181-82), such a

person would also have had the knowledge and skill to optimize the amount of putrescine.2HCl

within the range disclosed in the prior art.

> **3.      Obviousness in view of WO 2004/078955 and the knowledge of a POSA
> at the time.**

110.    Profs. Butler and Wurm's respective rebuttals to my opening report also do not

change my opinion that asserted claims 1 and 2 of the '083 patent would have been obvious over

the '955 application which neither Prof. Butler nor Prof. Wurm disputes is prior art[20]) in view of

the knowledge of a POSA.  *See* Butler rebuttal report at ¶ 124, n. 11; Wurm rebuttal report at ¶ 81,

n. 3.

> **a)      The '955 application contains all active components of all
> required ingredients recited in both claims 1 and 2**

111.    As discussed in my opening report, the only differences between the media of Table

3 of the '955 application and the literal scope of the asserted claims are: (a) two ingredients that

have the same active moiety but are present in a different form than the claimed elements (ferric

ammonium citrate and $NH_4VO_3$) and (b) the concentration of a single ingredient (L-

histidine.HCl.$H_2O$).  *See* Glacken opening report at ¶ 237.

---

[20] To the extent that Janssen presents evidence that a purported date of invention predates the '955
application, I reserve the right to respond to that evidence at deposition or trial.

Michael Glacken, Sc.D.
**Reply Expert Report**                                      **U.S. Pat. No. 7,598,083**

| Glacken Table 4: Comparison of the Differences Between the '083 Patent Claims and the '955 Application Medium | |
|---|---|
| **Claim 1 of the '083 Patent** | **Table 3 of the '955 Application** |
| ferric ammonium citrate, 0.04-200 mg/L | Ferric fructose stock solution[21], 50-1000 µL |
| $NH_4VO_3$, 0.0001-0.0025 mg/L | $NaVO_3$, 0.00001-0.2 mg/L |
| L-histidine.HCl.$H_2O$, 100-500 mg/L | L-histidine.HCl.H2O, 15-70 mg/L |

112.     With respect to the two missing (i.e., in a different form) claimed ingredients (ferric ammonium citrate and $NH_4VO_3$), the media of Table 3 of the '955 application includes another ingredient that provides the same active moiety (respectively, ferric fructose and $NaVO_3$) in the same molar amount as the asserted claims. *See id.* at ¶¶ 257-258. Profs. Butler and Wurm do not dispute that Table 3 of '955 application teaches each of the active components of the claimed ingredients in claim 1. *See* Butler rebuttal report at ¶¶ 146-147 (both $NaVO_3$ and $NH_4VO_3$ provide the vanadium trace element); *id.* at ¶¶ 141-143 (both ferric fructose and ferric ammonium citrate provide iron).

      **b)**      **A POSA would have been motivated to use the '955 application composition for cell culture media development with a reasonable expectation of success**

113.     Profs. Butler and Wurm critique my obviousness opinion based on the '955 application, because "out of the numerous media in the literature at the time of the invention, a POSA would have had no reason to select the medium in the WO '955 application as a starting point for medium development." Wurm rebuttal report at ¶ 82; *see* Butler rebuttal report at ¶ 128. As discussed above with respect to the '614 application, I understand that Profs. Butler and

---

[21] The '955 application's ferric fructose stock solution comprises 2420 mg/L $FeCl_3.6H_2O$ and 160,000 mg/L D-Fructose. Ex. 14 ('955 application) at 24.

Michael Glacken, Sc.D.
**Reply Expert Report**                                          **U.S. Pat. No. 7,598,083**

Wurm's "starting point" analysis is improper under the law and, regardless, I disagree from a scientific perspective for the reasons discussed in this reply.

114.    As I explained in my opening report, the '955 application discloses a motivation to select the composition of Table 3 for further development, and the POSA would have a reasonable expectation of success. *See* Glacken opening report at ¶¶ 251-60. As Prof. Butler acknowledges, to avoid the problem of potential contamination by adventitious agents from animal-derived ingredients, "some scientists began to develop animal-component-free media (media without animal derived components)." Butler rebuttal report at ¶ 17. The '955 application provides this advantage of animal-component-free media. A POSA would have looked to the composition of Table 3 of the '955 application because it provides "a cell culture medium substantially free of exogenous components of primary animal origin suitable for" culturing animal cells. Ex. 14 ('955 application) at Abstract. The '955 application provides in Example I.1 and Table 3 an example of an animal-free cell culture medium. *Id.* at p. 21-24; *see also id.* at p. 12, ll. 19-20. The '955 application taught that the composition of Table 3 supplemented with an exogenous growth factor and at least one of IGF-1 and/or insulin provides "equivalent" results in cell density, cell viability, and cell growth as conventional medium, without the disadvantages associated with animal-derived components. Thus, a POSA would have been motivated to further develop the '955 application as an animal-free cell culture medium that supported high cell growth. Profs. Butler and Wurm do not address this motivation to select the composition of the '955 application.

115.    Profs. Butler and Wurm further assert that a POSA would not have started with the composition of the '955 application, because "[t]he WO '955 application is not directed to basal media, but rather to 'exogenous animal-free growth factors' to be added to a basal medium

52

formulation."  Butler rebuttal report at ¶¶ 129-32; Wurm rebuttal report at ¶¶ 83-84.  Again, I

disagree.

116.    First, and again, I understand that, for an obviousness analysis, the teachings of a

prior art patent application are not limited to just its claims.  In other words, a POSA would have

been aware of the teachings of Table 3 of the '955 application regardless of whether it is the subject

of the application's claims.  As discussed above, a POSA would have been motivated to select the

composition of Table 1 for further development based on the teachings of the '955 application as

a whole.

117.    Second, the fact that the named inventors of the '955 application did not claim the

formulation of Table 3 as their invention demonstrates that the formulation, which is highly similar

to the claimed composition, was not innovative in 2004 when the '955 application was filed and

published.  Profs. Butler and Wurm admit that the '955 application "ascribes no special

significance to the medium in Table 3."  Wurm rebuttal report ¶ 85; Butler rebuttal report ¶ 131.

That is the case because there is nothing novel or nonobvious about the medium in Table 3 of the

'955 application.  Likewise, Profs. Butler and Wurm fail to ascribe any special significance to any

of the differences between Table 3 of the '955 application and the asserted claims.

> c)    **This prior art composition would fall within the scope of claims
> 1 and 2 as broadly construed by Janssen**

118.    If the scope of the asserted claims were construed as broadly as Profs. Butler and

Wurm construe them for purposes of infringement (see above), those claims would be at least

obvious (if not anticipated) based on the '955 application in view of the knowledge of a POSA.

119.    When comparing the differences between the '955 application and the literal scope

of the asserted claims, there are only two missing (i.e., in a different form) claimed ingredients

(ferric ammonium citrate and $NH_4VO_3$), but the media of Table 3 of the '955 application includes corresponding ingredients (respectively, ferric fructose and $NaVO_3$) that provide the same active component in the same molar amount as the asserted claims. *See* Glacken opening report at ¶¶ 257-258. If these ingredients were deemed equivalent, as Janssen contends, then the differences between these ingredients and the claims cannot be material, thus supporting my opinion regarding obviousness.

120. There also is a single claimed ingredient (L-histidine.HCl.H$_2$O) that is outside of the claimed range. The '955 application teaches adding this ingredient in an amount ranging from 15-70 mg/L. *Id.* at ¶ 259 (citing Ex. 14 ('955 application) at Table 3). The highest amount of L-histidine.HCl.H$_2$O in the '955 application is 70% of the lower claimed limit of 100 mg/L. Ex. 1 ('083 patent) at claim 1; *see also* Glacken opening report at ¶ 259. Further, the accused HyClone production and growth products contain 15.63925 mg/L and 13.5203380 mg/L L-histidine.HCl.H$_2$O, respectively. *See* Glacken rebuttal report at ¶ 70. Since the amount of L-histidine.HCl.H$_2$O in the '955 application is in between the amount of L-histidine.HCl.H$_2$O found in the accused HyClone products and the lower limit of the claimed concentration, any application of the doctrine of equivalents to the amount of L-histidine.HCl.H$_2$O in the HyClone products would necessarily capture the '955 application under Janssen's own analysis. In other words, any expansion of the claimed concentration of the amount of L-histidine.HCl.H$_2$O to reach the accused HyClone products would also capture the amount of L-histidine.HCl.H$_2$O in the '955 application. Accordingly, if HyClone products are captured, the amount of L-histidine.HCl.H$_2$O is clearly not a material difference between the '955 application and the expanded scope of the asserted claims.

54

Michael Glacken, Sc.D.
**Reply Expert Report**                    **U.S. Pat. No. 7,598,083**

121.    In sum, under Janssen's contentions and Profs. Butler and Wurm's opinions under the doctrine of equivalents, there would be no differences between the '955 application and the asserted claims.  If the accused HyClone products were found to infringe (a premise with which I disagree), the asserted claims necessarily would have been at least obvious to a POSA, if not anticipated.

> **d)    The asserted claims would still be obvious over the '955 application and the knowledge of a POSA even if the claims were construed literally**

122.    Setting aside the expansive scope of the asserted claims as provided under Profs. Butler and Wurm's infringement analysis, the asserted claims as literally construed would have been obvious in view of the '955 application and the knowledge of a POSA.  The '955 application discloses 50 of the 52 required ingredients in the same form claimed, and teaches a concentration of the claimed ingredients (or their active components) that is within or overlaps with 51 of the 52 required claimed ranges.  *See e.g.*, Glacken opening report at pp. 135-137 (Glacken Table 9).  To arrive at the claim 1 and 2 compositions as construed by me, a POSA merely would have had to substitute two forms of ingredients that provide the same active component (vanadium and iron) and increase the concentration of the ingredient L-histidine.HCl.H$_2$O.  As explained below and in my opening report, these minor modifications were taught in the prior art and would have been routine for a POSA in 2004.

> **(1)    Profs. Butler and Wurm point to additional differences that have no significance to the obviousness inquiry**

123.    Profs. Butler and Wurm claim that my obviousness analysis "does not address numerous differences between the medium of the WO '955 application and the claimed media." Butler rebuttal report at Section VI.E.2; *see* Wurm rebuttal report at Section VII.D.2.  For many

55

of the same reasons as discussed above with respect to the '614 application and as further discussed below, I disagree that these are differences with respect to the obviousness analysis.  Even if they were, Profs. Butler and Wurm do not assert, let alone show, that these differences are significant to the obviousness analysis.

### (a)   The presence of unclaimed ingredients is inconsequential

124.   Profs. Butler and Wurm assert that my analysis "does not address the fact that the basal medium in Table 3 of the WO '955 application requires over 30 additional ingredients that are not recited in claim 1 of the '083 patent."  Butler rebuttal report at ¶ 134; *see* Wurm rebuttal report at ¶ 88.  They assert that elimination of these additional ingredients "would have been necessary to arrive at the claimed of the '083 patent starting from the WO '955 application."  *Id.* I disagree.  As discussed above with respect to the '614 application, I understand that the elimination of the nearly 30 additional ingredients from Table 3 of the '955 application is not required to render the asserted claims obvious.

### (b)   The overlapping concentration ranges render the claims obvious

125.   Profs. Butler and Wurm note that Table 3 of the '955 application provides "concentration ranges," "preferred concentration ranges" and "preferred concentrations."  *See* Butler rebuttal report at ¶ 136; Wurm rebuttal report at ¶ 89.  They assert that my obviousness analysis ignores the preferred and most preferred embodiments.  *Id.*  As discussed above, I understand that an obviousness analysis does not require that a particular combination be the preferred, or the most desirable, combination over the other alternatives described in the prior art in order to provide motivation to develop the claimed invention.

Michael Glacken, Sc.D.
**Reply Expert Report**                                    **U.S. Pat. No. 7,598,083**

126.     Profs. Butler and Wurm further assert that my obviousness analysis "does not address the fact that there are numerous differences in concentrations of the ingredients that are common" between the '955 application and the '083 patent.  Butler rebuttal report at ¶ 135; *see* Wurm rebuttal report at ¶ 89.  They note that "none of the concentration ranges are identical," and that "twenty-eight of the 'concentration ranges' disclosed in Table 3 of the WO '955 application for ingredients claimed in the '083 patent overlap incompletely with the ranges claimed in the '083 patent."  Wurm rebuttal report at ¶ 90; *see also* Butler rebuttal report at ¶ 137.  Prof. Butler presents the ingredients $CoCl_2.6H_2O$ and $L\text{-cysteine}.HCl.H_2O$ as examples of ingredients for which there are purported differences for purposes of obviousness.  Butler rebuttal report at ¶¶ 138-139.

127.     To be clear, for the ingredients in common between the '955 application and the '083 patent (including $CoCl_2.6H_2O$ and $L\text{-cysteine}.HCl.H_2O$), neither Profs. Butler nor Wurm disputes that the ranges for each of these ingredients overlap except for the ingredient L-histidine.$HCl.H_2O$ as discussed further below.  As discussed above, I understand that, in such a situation where there is a range disclosed in the prior art and the claimed invention lies within or overlaps that prior art range, the prior art shows that element of the claim to be obvious and known by a POSA.

128.     As discussed above, when the prior art discloses a concentration range as being beneficial for cell growth, a POSA would have used this concentration range as a guide in selecting concentrations to test in a cell culture experiment.  The '955 application would have motivated a POSA to determine the optimum combination of concentrations for developing a cell culture media.

57

Michael Glacken, Sc.D.
**Reply Expert Report**                                    **U.S. Pat. No. 7,598,083**

129.     Profs. Butler and Wurm have not come forward with any evidence that the prior art teaches away from the claimed ranges, or that there are new and unexpected results of the claimed ranges relative to the prior art ranges.

130.     For example, Prof. Butler notes that, in the examples of $CoCl_2.6H_2O$ and L-cysteine.$HCl.H_2O$, their concentrations in the preferred embodiments of the '955 application are outside of the range disclosed in the '083 patent.  Butler rebuttal report at ¶¶ 138-139.  But this does not show that the '955 application teaches away from the claimed concentration ranges. While the '955 application describes a general preference for the concentrations provided in the preferred embodiments, it does not criticize, discredit, or otherwise discourage the concentration ranges that overlap with the claimed concentrations or discourage investigation into the remainder of the claimed ranges.   Likewise, Profs. Butler and Wurm have not come forward with any evidence or opinions that the claimed ranges provide any new or unexpected results relative to the '955 application.

(c)      <strong>The optional ingredients are not required</strong>

131.     Profs. Butler and Wurm further identify the absence of L-ornithine.HCl and L-taurine as differences between the '955 application and the claimed compositions.  *See* Butler rebuttal report at p. 60 (Table 5); Wurm rebuttal report at Appendix C.  Both of these ingredients are recited in the asserted claims in an amount as low as 0 mg per liter of the final volume of cell culture media.  Ex. 1 ('083 patent) at claim 1.  As these ingredients are "optional," none are required to be disclosed in the '955 application.

Michael Glacken, Sc.D.
**Reply Expert Report**                                    **U.S. Pat. No. 7,598,083**

(2)    **It would have been obvious to substitute ferric fructose for ferric ammonium citrate in the claimed amount**

132.    The '955 application teaches the use of three iron-containing ingredients: $FeSO_4.7H_2O$, $Fe(NO_3)_3.9H_2O$, and ferric fructose solution. Ex. 14 ('955 application) at pp. 21-24 (Table 3). The asserted claims recite $FeSO_4.7H_2O$ and $Fe(NO_3)_3.9H_2O$, but they claim ferric ammonium citrate (instead of ferric fructose). Ex. 1 ('083 patent) at claims 1-2.

133.    It would have been obvious to add ferric ammonium citrate in place of ferric fructose in the '955 application. *See* Glacken opening report at ¶ 257. As Prof. Butler admits, ferric ammonium citrate and ferric fructose are chelated forms of iron. Butler rebuttal report at ¶ 142. As I described in my opening expert report, a POSA would have been motivated to use ferric ammonium citrate as a chelated form of iron as a transferrin replacement. *See* Glacken opening report at ¶ 257. For the same reasons as discussed above with respect to Keenan 1996, I disagree that the prior art teaches away from selecting ferric ammonium citrate as a source of iron chelate or as a transferrin replacement. *See also* Ex. 89 (Titeux) at 251 ("two highly soluble iron salts (ferric ammonium citrate and ferric ammonium sulfate) may completely replace [transferrin] for supporting the growth of the cell lines here investigated.")

134.    Prof. Butler further disputes whether, in reviewing the differences in the claimed concentrations, it is proper to compare the total contribution of iron of all the iron-containing ingredients (all three in the '955 application vs. all three in the '083 patent) as I do in my opening expert report. *See* Glacken opening report at ¶ 257. He also disputes that it is proper to compare separately the amount of iron from the non-chelated iron sources ($FeSO_4.7H_2O$ and $Fe(NO_3)_3.9H_2O$ in the '955 application vs. $FeSO_4.7H_2O$ and $Fe(NO_3)_3.9H_2O$ in the '083 patent) and the chelated iron sources (ferric fructose solution in the '955 application vs. ferric ammonium

59

Michael Glacken, Sc.D.
**Reply Expert Report**                                                 **U.S. Pat. No. 7,598,083**

citrate in the '083 patent).  *See* Butler rebuttal report at ¶ 142.  As illustrated in Glacken Table 5

below, the '955 application teaches an amount of iron that overlaps with the claimed composition

under any of the proposed frameworks: (a) the total amount of iron, (b) the total amount of iron

from the non-chelated iron sources, or (c) the total amount of iron from the chelated sources.

| Glacken Table 5 | | | |
|---|---|---|---|
| **'083 Patent Claim 1** | | **Table 3 of '955 application** | |
| **Ingredient** | **Molar Amount of Iron (III)** | **Ingredient** | **Molar Amount of Iron (III)** |
| $Fe(NO_3)_3.9H_2O$, 0.01-0.08 mg/L | $2.48 \times 10^{-2} - 1.98 \times 10^{-1}$ µmol/L | $Fe(NO_3)_3 \cdot 9H_2O$, 0.005-1 mg/L | $1.24 \times 10^{-2} - 2.48$ µmol/L |
| $FeSO_4.7H_2O$, 0.05-0.50 mg/L | $1.80 \times 10^{-1} - 1.80$ µmol/L | $FeSO_4.7H_2O$, 0.02-2 mg/L | $7.19 \times 10^{-2} - 7.19$ µmol/L |
| ferric ammonium citrate, 0.04-200 mg/L | $1.53 \times 10^{-1} - 7.63 \times 10^2$ µmol/L | Ferric fructose stock solution[22], 50-1000 µL | $4.48 \times 10^{-1} - 8.95$ µmol/L |
| **Total Amount of Iron** | $3.57 \times 10^{-1} - 7.65 \times 10^2$ µmol/L | **Total Amount of Iron** | $5.32 \times 10^{-1} - 1.86 \times 10^1$ µmol/L |
| **Iron From Non-Chelated Ingredients** | $2.05 \times 10^{-1} - 2.00$ µmol/L | **Iron From Non-Chelated Ingredients** | $8.43 \times 10^{-2} - 9.67$ µmol/L |
| **Iron From Chelated Ingredients** | $1.53 \times 10^{-1} - 7.63 \times 10^2$ µmol/L | **Iron From Chelated Ingredients** | $5.32 \times 10^{-1} - 1.86 \times 10^1$ µmol/L |

135.    As discussed above with the overlapping but non-identical concentrations for the

other claimed ingredients, Profs. Butler and Wurm have not come forward with any evidence that

---

[22] The '955 application's ferric fructose stock solution comprises 2420 mg/L $FeCl_3.6H_2O$ and 160,000 mg/L D-Fructose. Ex. 14 ('955 application) at 24.

the prior art teaches away from these specifically claimed ranges, or that there are new and unexpected results of these claimed ranges relative to the ranges of the same ingredient disclosed in the prior art.

(3)   **It would have been obvious to substitute $NaVO_3$ for $NH_4VO_3$ in the claimed amount**

136.   Profs. Butler and Wurm acknowledge that the '955 application discloses each of the claimed trace element-containing ingredients, except for the ingredient $NH_4VO_3$ (and ferric ammonium citrate, discussed elsewhere).  Butler rebuttal report at pp. 59-61 (Table 5); Wurm rebuttal report at Appendix C.  But they dispute my opinion that it would have been obvious to substitute the ingredient $NaVO_3$ in the '955 application for the claimed ingredient $NH_4VO_3$ as the source of the vanadium ion.  *See* Butler rebuttal report at ¶ 147; Wurm rebuttal report at ¶ 94. Their reports do not change my opinions as to obviousness.

137.   As an initial matter, I note that Profs. Butler and Wurm do not dispute several of the facts supporting my opinion that it would have been obvious to substitute $NaVO_3$ for the claimed ingredient $NH_4VO_3$.  First, they do not dispute that a POSA would have known that the claimed ingredient $NH_4VO_3$ was a common source of the trace element vanadium.  *See* Glacken opening report at ¶ 258, Appendix 5 at p. 7; Butler rebuttal report at ¶ 146-49; *see generally* Wurm rebuttal report at ¶¶ 93-97.  Indeed, Prof. Butler acknowledges that "the individual ingredients listed in claim 1 were known in the art."  Butler rebuttal report at ¶ 177.

138.   Second, they do not dispute my opinion that "a POSA would understand that different salt forms of a trace element are interchangeable at least because these salts will dissociate into the desired [ionic] form of the trace element when placed in the aqueous cell culture media."

Michael Glacken, Sc.D.
**Reply Expert Report**                                    **U.S. Pat. No. 7,598,083**

*See* Glacken opening report at ¶ 241; *see generally* Butler rebuttal report at ¶¶ 145-149; Wurm rebuttal report at ¶¶ 93-97.

139.    Third, they do not dispute my opinion that the claimed ingredient $NH_4VO_3$ was (and is) a known equivalent to, and substitute for, the ingredient $NaVO_3$ disclosed in the '955 application.  *See* Glacken opening report at ¶ 241; *see generally* Butler rebuttal report at ¶¶ 145-149; Wurm rebuttal report at ¶¶ 93-97.

140.    In short, Profs. Prof. Butler and Wurm do not dispute that the $NaVO_3$ disclosed in the '955 application was known to be equivalent to the claimed ingredient $NH_4VO_3$.  Instead, the only critique by Profs. Butler and Wurm as to the selection of $NH_4VO_3$ is that a POSA would not have had a reason based on the '955 application to substitute $NaVO_3$.  Specifically, they opine that "the WO '955 application provides no reason to select different salt forms of any of the trace element-containing ingredients in Table 3, nor doeProf. Butlerlacken point to any."  Butler rebuttal report at ¶ 147; *see also* Wurm rebuttal report at ¶ 94.  The known interchangeability (including that for $NaVO_3$ for $NH_4VO_3$ for the trace element vanadium) provides the motivation and ability to substitute the trace element-containing ingredients of the '955 application with its equivalent salt/hydrate form claimed in the '083 patent, depending on, for example, availability, solubility, or cost.

141.    Profs. Butler and Wurm allege that the disclosure of multiple forms of the same active component would have suggested to a POSA that *only* those disclosed forms would be useful.  Butler rebuttal report at ¶ 147, Wurm rebuttal report at ¶ 94.  I disagree for the reasons I discuss here and in my opening report.  A POSA would only consider the active component to be the critical ingredient and, because the different forms are interchangeable, a POSA, in view of this interchangeability, source, solubility, etc., would not be limited in any way to a particular

62

Michael Glacken, Sc.D.
**Reply Expert Report**                                                              **U.S. Pat. No. 7,598,083**

form.  For example, in Jayme 1997 at Table 1, some media disclosed there have magnesium sulfate

but a POSA added magnesium chloride  Ex. 11 (Jayme 1997) at 97.  The knowledge that a

formulation already contained one form did not preclude the POSA from adding a different form.

142.     Profs. Butler and Wurm further opine that "if a POSA somehow set out to change

the forms of the trace element-containing ingredients in Table 3 of the WO '955 application, there

would effectively be an infinite number of possible salt/hydrate combinations."  Butler rebuttal

report at ¶ 148; *see* Wurm rebuttal report at ¶ 95.  Neither provides any support for this assertion,

and neither explains why this assertion supports the nonobviousness of the asserted claims.  It does

not.  A POSA would have understood that vanadium had only a handful of salt and hydrated forms

that have been used in cell culture media.  The claimed ingredient $NH_4VO_3$ (as well as each of the

claimed trace element-containing ingredients) were commonly used sources for the desired trace

elements.  *See* Glacken opening report at ¶ 258, Appendix 5.  When customizing a culture medium

for a new cell line or to produce a new biopharmaceutical product, it would have been obvious to

try these commonly used sources for the desired trace elements, including $NH_4VO_3$.

143.     Even if one were to consider there to be many potential recipes of cell culture media

by virtue of the fact that each of the trace elements may have a few commonly used salt/hydrate

forms, this would not have rendered the selection of one of these recipes nonobvious.  In light of

the teachings of the '955 application, Profs. Butler and Wurm have not presented any evidence

that the selection of the claimed salt/hydrate form of the trace elements is critical.  Nor have they

presented any evidence or opinion that the prior art taught away from the claimed salt/hydrate form

of the trace elements, or that the claimed salt/hydrate form of the trace elements provided any

unexpected or superior property.

63

144.     Profs. Butler and Wurm also opine that my obviousness analysis "fails to address how, even if a POSA would have been motivated to substitute $NH_4VO_3$ for $NaVO_3$, the POSA would have arrived at the claimed concentration range for $NH_4VO_3$."  Butler rebuttal report at ¶ 149; Wurm rebuttal report at ¶ 96 (same quote).  To be clear, there is no dispute that the molar amounts of the trace elements provided by the '083 patent (including for the claimed ingredients claimed ingredient $NH_4VO_3$) overlap with those for the ingredients in Table 3 of the '955 application.  *See* Glacken opening report at ¶ 258, Appendix 5; Butler rebuttal report at ¶ 145-49; Wurm rebuttal report at ¶ 93-96.  A POSA would have understood that each cell line is different and that one would optimize the concentration of the ingredients depending on the cell line.  Profs. Butler and Wurm have not come forward with any evidence of teaching away or unexpected results associated with the specific concentration ranges in the '083.

> **(4)     It would have been obvious to modify the concentration of L-Histidine.HCl.$H_2O$ to arrive at the claimed concentration**

145.     In my opening expert report, I opined that "a POSA would have been motivated to add a greater amount of L-histidine.HCl.$H_2O$ as disclosed in the prior art, which amount overlaps with the claimed concentration range of 100-500 mg/L, and would have had a reasonable expectation of success."  Glacken opening report at ¶ 259.  Profs. Butler and Wurm do not dispute this opinion in their expert rebuttal reports.

> **(5)     The '955 application teaches the use of a cell protectant**

146.     The '955 application also teaches that "it will be understood that, depending on the cell-type cultured and the performance to be achieved, the fresh culture medium according to the invention may be optionally further supplemented with ingredients classically found in culture media and of non-animal origin," including "oxidation stabilisers."  Ex. 14 ('955 application) at

Michael Glacken, Sc.D.
**Reply Expert Report**                                   **U.S. Pat. No. 7,598,083**

11:21-12:2.  Profs. Butler and Wurm dispute whether the oxidation stabilisers disclosed in the '955 application would function as the claimed "cell protectants."  Butler rebuttal report at ¶¶ 150-151; Wurm rebuttal report at ¶¶ 98-99.  But the '083 patent defines a "cell protectant" to mean "a substance that protects eukaryotic cells from damage."  Ex. 1 ('083 patent) at 4:25-29.

147.    A POSA would have understood that an oxidation stabiliser protected cells from damage caused by oxidative degradation to both cells and the ingredients of the cell culture media. Indeed, Prof. Butler acknowledges that cells may experience "indirect damage from the oxidative breakdown of ingredients in the cell culture media."  Butler rebuttal report at ¶ 152.  Cellular lipids are particularly susceptible to oxidative damage.  Oxidation stabilisers protect eukaryotic cells from damage by preventing the formation of dangerous oxidation radicals or mitigate their impact.

148.    Profs. Butler and Wurm assert that "[t]he '083 patent is clear that the damage a 'cell protectant' is intended to prevent is damage 'by shear forces or the effect of gas bubble sparging in a bioreactor vessel….'"  Butler rebuttal report at ¶ 152; *see also* Wurm rebuttal report at ¶ 99.  I disagree that the claimed "cell protectant" is so limited.  Profs. Butler and Wurm rely on mere "example[s]" of the types of damage that cells may experience.  Ex. 1 ('083 patent) at 4:25-29. The '083 patent expressly defines "cell protectant" to be much broader than these examples.  *Id.* Thus, in my opinion, an oxidation stabiliser qualifies as a cell protectant as defined in the '083 patent.

149.    But even if an oxidation stabiliser were not considered a cell protectant (a proposition with which I disagree, because it fits the express definition), a POSA would have been motivated to add the type of cell protectant as construed by Profs. Butler and Wurm to the media of the '955 application.  As I described in my opening expert report and above, the use of a cell protectant was a common ingredient, for example, in cell culture media for use in suspension

65

cultures. *See e.g.* Glacken opening report at Appendix 5. A POSA would have been motivated to include a cell protectant to protect against damage to the cells. Indeed, Prof. Butler admits that "a POSA developing a cell culture media would have had a reason to use a cell protectant if the media were intended for suspension cell culture." Butler rebuttal report at ¶ 154. Contrary to Profs. Butler and Wurm's opinion otherwise (*see* Butler rebuttal report at ¶¶ 153-154; Wurm rebuttal report at ¶ 100), the '955 application teaches using the cell culture media in a suspension culture, such as with microcarriers.

150. Specifically, the '955 application taught a "process for producing animal, such as mammalian, or preferably human anchorage-dependent cells, preferably diploid cells, in a cell culture medium according to the invention…." Ex. 14 ('955 application) at p. 4, ll. 31-33. The '955 application taught that anchorage-dependent cells may use a variety of solid supports, including microcarriers, for growing and multiplying the cells. *Id.* at p. 7, l. 34 – p. 8, l. 4. Microcarriers provide suspended surfaces that are capable of supporting growth of anchorage-dependent cells. A POSA would have known that microcarriers are suspension culture and highly susceptible cell damage from shear forces, for which it would have been obvious to include a cell protectant to address this known problem. *See* Ex. 93 (Croughan MS *et al.*, "Hydrodynamic effects on animal cells grown in microcarrier cultures," Biotech. and Bioeng., 29:130-141, 130 (1987)) at 130 ("It is widely accepted but not well documented that animal cells on microcarriers are especially susceptible to damage from excessive agitation. This susceptibility probably results from the lack of a protective cell wall, from the relatively large size of animal cells, and from the lack of individual cell mobility.").

151. Thus, a POSA would have been motivated, and it would have been obvious, to add a cell protectant to the cell culture media of the '955 application for this additional reason.

66

152.    In sum, a POSA would have found that the literal difference(s) between the cell culture media claimed in claims 1 and 2 and the prior art as exemplified by the '955 application in light of the knowledge of a POSA were obvious.   A POSA would have found that the '955 application teaches a cell culture medium substantially free of animal derived components for culturing animal cells.   It would have been obvious for a POSA to substitute the trace element-containing ingredients in the '955 application for other commonly used salt/hydrate forms that provide same trace elements, such as the claimed ingredients.   A POSA would have had the knowledge and skill to optimize the amounts of the ingredients within the concentration ranges disclosed in the prior art.   Profs. Butler and Wurm have come forward with no teaching in the prior art that would have discouraged a POSA from following the teachings of the '955 application.   In light of the knowledge and skill of a POSA, such a person would have considered the asserted claims obvious over the '955 application as literally construed.   Further, the prior art is closer to the asserted claims than the asserted claims are to the accused HyClone products.   To the extent that Janssen's infringement contention would further expand the scope of the asserted claims, there would have been no apparent differences between the claimed cell culture media and the '955 application.

### D.    There Are No Secondary Considerations Of Nonobviousness Relevant To My Obviousness Analysis

153.    Profs. Butler and Wurm have identified only one "secondary consideration" of non-obviousness, i.e., that there purportedly "was a long-felt need for chemically defined cell culture media whose formulations were known and publicly available that were capable of supporting high density cell culture in a bioreactor setting."   Butler rebuttal report at ¶¶ 156-58; *see also* Wurm rebuttal report at ¶¶ 103-05.

67

154.    I understand that objective evidence of the nonobviousness of the asserted claims, referred to as secondary considerations, must be weighed against the totality of the evidence indicating obviousness.  I understand that the patentee bears the burden of coming forward with evidence of secondary considerations.   The secondary considerations must be reasonably commensurate with the scope of the asserted claims.  There must also be a nexus between the asserted claims and the secondary considerations—i.e., the secondary consideration must result from the novel features of the claim.

155.    I disagree with Profs. Butler and Wurm's opinion as to whether the '083 patent satisfied a long-felt but unmet need.  First, there was no "long-felt need" for such "chemically defined cell culture media."  Butler rebuttal report at ¶¶ 156-58; *see also* Wurm rebuttal report at ¶¶ 103-05.  By 2004, chemically defined media were commonly known.  As set out in my opening report (*see generally*, ¶¶ 70-201), there were many publicly available formulations for cell culture media, including chemically defined media.  Indeed, two of those references are discussed in detail in my opening report and above: Jayme and the '704 patent.   While there are examples of those in industry who may have not disclose the composition of their cell culture media publicly, there is no support Profs. Butler and Wurm opinions that a need in the art existed for the public disclosure of such media.  Further, I disagree that there was a long-felt but unmet need for cell culture media that "were capable of supporting high density cell culture in a bioreactor setting."  Butler rebuttal report at ¶ 156.  *See* Ex. 94 (Sauer, P.W., et al, "A high-yielding, generic fed-batch cell culture process for production of recombinant antibodies," BIOTECH. AND BIOENG., 47:5 (585-597) 2000); Ex. 95 (Bibila, T.A. and Robinson, D.K.. "In pursuit of the optimal fed-batch process for monoclonal antibody production," BIOTECHNOL. PROG., 11:1-13 (1995)).

68

156.    Second, according to Janssen and the Court, the claimed compositions are not limited to those capable of supporting high density cell culture in a bioreactor setting.  Instead, I understand that the Court held—again, at Janssen's urging—that the claimed compositions must merely be suitable for a nutritive media for culturing cells.  *See* Ex. 66.  In fact, Janssen and the Court rejected Defendants' proposal that the term "cell culture media" be limited to media for biopharmaceutical production.  *Id.*  Yet, Profs. Butler and Wurm offer no opinion that the claimed compositions satisfy a long-felt and unmet need to the extent they contain serum, proteins, or chemically undefined ingredients.  Nor do they offer an opinion that the claimed compositions satisfy a long-felt and unmet need to the extent the claimed compositions are not capable of supporting high density cell culture in a bioreactor setting.

157.    Third, Profs. Butler and Wurm offer no evidence that claims 1 and 2 of the '083 patent are commensurate in scope with a purported disclosure of chemically-defined cell culture media that support high density cell culture in a bioreactor setting.  Indeed, claims 1 and 2 of the '083 patent encompass an enormous range of ingredients and concentrations, yet, provide an extremely limited example of any media comprised of that range supporting cell growth (*i.e.*, the MET 1.5 embodiment).  Profs. Butler and Wurm have identified nothing beyond that particular example of media disclosed in the '083 patent as evidencing a defined culture media that supports high density cell culture in a bioreactor setting.  As such, while they assert that the claims of the '083 patent fulfilled a long felt need, there is at best only evidence of a single embodiment among thousands if not millions of soluble compositions claimed that do not even arguably meet that need.  As such, the purported long felt need satisfied is not commensurate with the very broad scope of the claims.  Certainly, Profs. Butler and Wurm have not provided any evidence that this long felt need is commensurate with the claims' scope.

69

Michael Glacken, Sc.D.
**Reply Expert Report**                                      **U.S. Pat. No. 7,598,083**

158.    Fourth, the fact that skilled artisans unrelated to the invention developed cell culture media compositions almost identical to those covered by the asserted claims—particularly the composition of Table 3 of the '955 application—cuts against any relevance of the asserted long-felt but unmet need.  The theory, as I understand it, is that if there were a long-felt but unmet need, and the claimed invention was an obvious way to meet that need, the fact that a skilled artisan did not practice the claimed invention before the priority date may suggest non-obviousness.  Here, however, a skilled artisan *did* practice the claimed invention (or something incredibly similar to the claimed invention)—thus making the theory inapplicable here.  *See* Ex. 94 (Sauer, P.W., et al, "A high-yielding, generic fed-batch cell culture process for production of recombinant antibodies," BIOTECH. AND BIOENG., 47:5 (585-597) 2000); Ex. 95 (Bibila, T.A. and Robinson, D.K.. "In pursuit of the optimal fed-batch process for monoclonal antibody production," BIOTECHNOL. PROG., 11:1-13 (1995)).

159.    Finally, as discussed, I understand that evidence of long-felt but unmet need must be tied to the asserted claims.  That is not the case here, at least as the '083 patent has been construed by Janssen and the Court.  The Court held—at Janssen's urging—that the claims are not limited to chemically defined media.  Indeed, according to Janssen and Dr. Wurm, the claimed compositions can include serum, proteins and chemically undefined ingredients.  *See* Ex. 92 (Wurm claim construction declaration) at ¶ 6 ("'Cell culture media,' based on its ordinary meaning, may refer to media containing undefined components (such as soy hydrolysate) or media containing proteins (such as insulin).").  Indeed, according to Janssen and Prof. Wurm, the claimed compositions can include serum, proteins and chemically undefined ingredients.   And, the HyClone accused products in this case also contain chemically undefined ingredients and proteins,

70

Michael Glacken, Sc.D.
**Reply Expert Report**                                    **U.S. Pat. No. 7,598,083**

namely ███████, █████ hydrolysate, ██████████████, but are still accused of infringing

these claims.  *See* Dr. Glacken rebuttal report at pp. 18-22 (Glacken Table 1).

## V.    Invalidity Under 35 U.S.C. § 112

### A.    Based on Janssen's Infringement Allegations, The Asserted Claims Are Indefinite

160.    In response to my opinion on indefiniteness, Profs. Butler and Wurm assert that the

claims particularly point out and distinctly claim cell media compositions that fall within their

literal scope and this literal scope is "defined by a *specific list of ingredients* along with *specific*

*concentration ranges* for each of those ingredients."  Butler rebuttal report at ¶ 160 (emphasis

added); *see* Wurm rebuttal report ¶¶ 107-09 ("Each ingredient and corresponding concentration

range is recited with certainty.").  Prof. Butler further states that "claim 1 sets forth a formula—

including the specific chemical ingredients and concentration ranges—that *precisely defines* the

compositions that falls within its scope."  Butler rebuttal report at ¶ 166 (emphasis added); *see*

Wurm rebuttal report at ¶ 107-09.  And Profs. Butler and Wurm emphasize that the claimed

invention is a "*chemically defined* cell culture media[.]"  Butler rebuttal report ¶¶ 156-58

(emphasis added); *see also* Wurm rebuttal report ¶¶ 103-05.

161.    Based on these narrow characterizations of the asserted claims (under which, of

course, there could be no infringement contentions in this case), Profs. Butler and Wurm opine

that a POSA should have been able to rely on the "chemical formula" and "clearly defined

concentration ranges" set forth in the claims and determine whether a formulation would infringe

the claims.  Butler rebuttal report at ¶ 167-68; *see* Wurm rebuttal report at ¶ 107-09.  In other

words, Janssen's experts are arguing for a double standard:  one for infringement, and an entirely

different one for validity.

Michael Glacken, Sc.D.
**Reply Expert Report**                                          **U.S. Pat. No. 7,598,083**

162.    Janssen's inconsistent positions as to how the asserted claims should be construed proves my point that these claims are not definite, and a POSA could not understand the scope of the claims with reasonable certainty.  Their positions leave open the questions for competitors, such as: Does any form providing the same active component of the claimed ingredient fall within the scope of the asserted claims?  Will any concentration of the claimed ingredient fall within the scope of the asserted claims?  Does a formulation having additional, unclaimed ingredients in an accused product fall within the scope of the asserted claims?  Does a formulation lacking the claimed, optional ingredients still fall within the scope of the asserted claims?  Must a cell culture medium be chemically defined to fall within the scope of the asserted claims?  Must a cell culture medium be capable of supporting high density cell culture in a bioreactor setting to fall within the scope of the asserted claims?

163.    The accused HyClone products provide a good example of how Janssen's positions reveal the indefiniteness of the asserted claims.  If one were to believe the opinions of Profs. Butler and Wurm addressing indefiniteness, a skilled artisan would know for certain that these products do *not* infringe.  After all, by Janssen's admission, they do not literally satisfy the "*specific concentration ranges* for each of [the] ingredients" recited in claim 1.  *Compare* Butler rebuttal report at ¶¶ 160, 162 *and* Wurm report ¶¶ 107-09 (emphasis added) *with* Ex. 45 (Janssen's infringement contentions) at 7-8.  Yet, Janssen reads claim 1 much more broadly such that it would capture these products for the purposes of infringement.  How was HyClone to know whether its accused products infringe the '083 patent?  Neither Prof. Butler nor Prof. Wurm even attempts to answer this question.

164.    My understanding is that while an extension of a claim's scope may be permissible to cover subject matter that is substantially equivalent to that literally claimed, one cannot, in the

course of litigation and outside of the PTO, cut and trim, expanding here, and narrowing there, to arrive at a claim that encompasses an accused product, but avoids the prior art.  That seems to be exactly what Janssen is doing here.  As such, my opinion is that the asserted claims are indefinite.

### B.    The Asserted Claims Lack Sufficient Written Description

165.    In response to my opinion on lack of written description, Profs. Butler and Wurm rely on the language of claim 1 and assert that "[u]sing the list of ingredients and concentration ranges set forth in the claim, a POSA can readily visualize or recognize the identity of soluble compositions that fall within the claim."  Butler rebuttal report at ¶ 166; *see also* Wurm rebuttal report at ¶ 113.   Not only do these conclusions contradict other opinions they have offered in the case, what the claims recite has little to nothing to do with the written description requirement.

166.    I understand that the inventors must provide a written description that conveys to a POSA that the inventors had possession of the claimed invention as of the filing date.   The specification here is inadequate.  To be sure, the specification discloses an embodiment, i.e., MET 1.5.  But it does not disclose how the inventors got from that embodiment to claims 1 and 2.  For example, while the asserted claims include concentrations from only a 1.5 fold difference for the ingredient NaCl (the difference between the minimum and maximum claimed concentrations of 5000-7500 mg/L), to a 5,000-fold difference for ferric ammonium citrate (0.04-200 mg/L), no guidance is provided in the '083 patent as to why these particular ranges were selected, why certain ingredients may only have a 1.5 fold difference in the range while others may have a 5,000 fold difference, or why cell culture media would be expected to be nutritive at the full breadth of each of the ranges claimed for the claimed ingredients.  *See e.g.*, Glacken rebuttal report at ¶¶ 63-64, Table 2.

167.    In short, the scope of the asserted claims greatly exceeds what is described in the '083 patent as being possessed by the inventors, i.e., the MET 1.5 embodiment.  A skilled artisan would not reasonably believe that the listed inventors—who never claimed to have invented the concept of chemically-defined cell culture media—actually invented all compositions encompassed within claims 1 and 2.

168.    Prof. Butler also says I did not "address the fact that the claimed cell culture media all share structural features in common," and given that "claim 1 claims cell culture media compositions with structural features in common" this must constitute a precise written description of what is claimed.  Butler rebuttal report at ¶ 168.  This is not accurate based on the legal standard provided to me.  While the claim may be argued to cover a genus, the issue is that the *specification* of the '083 patent describes only one representative species by actual reduction to practice, i.e., MET 1.5.  I understand that a written description requirement for a claimed genus may be satisfied through sufficient description of a representative number of species by actual reduction to practice or by disclosure of relevant, identifying characteristics, i.e., structure or other physical and/or chemical properties, sufficient to show the applicant was in possession of the claimed genus. [23] But no such description is found within the '083 patent, and neither Profs. Butler nor Wurm point to any.

---

[23] To support my opinion that the inventors were not in possession of this broad genus claimed by merely disclosing a single embodiment, I have performed an exemplary calculation to illustrate how many species would be encompassed by the concentration ranges recited in claim 1. This calculation results in $1 \times 10^{29}$ distinctive media that would fall within this claim.  I note that this calculation only represents a small fraction of the actual species claimed because I only considered three concentrations for each of the claimed ranges (e.g., minimum, maximum, MET 1.5), while there are clearly many more potential concentrations encompassed by each claimed concentration range for each of the 61 claimed ingredients.  This value was obtained by calculating 3 to the power of 61.

### C.      The Asserted Claims Cannot Be Both Nonobvious And Enabled

169.    In rebuttal to my opinion on obviousness, Profs. Butler and Wurm opine that a POSA would not have had the requisite knowledge and skill to optimize the concentrations of the claimed ingredients within the ranges taught by the prior art to develop the claimed compositions. *See* Butler rebuttal report at ¶¶ 33-155, Wurm rebuttal report at ¶¶ 27-102.  I disagree with how Profs. Butler and Wurm characterize the knowledge and skill of a POSA as I discuss above.  But in a hypothetical world where a POSA does not have that knowledge and skill (based on Profs. Butler and Wurm's opinion that the asserted claims are not obvious), the specification would not be enabling.  That is, as explained below, if the claims would not have been obvious, the specification would not have enabled a POSA to make and use the full scope of the asserted claims, because the specification provides no new information to that disclosed in the prior art—namely, a "cell culture media with 61 *well-known ingredients* provided in *well-known concentrations.*" Wurm rebuttal report at ¶ 118 (quoting my opening report at ¶ 281) (emphasis added).

### 1.      Nature of the invention and scope of the claims

170.    Neither Profs. Butler nor Wurm point to a single sentence in the specification that "disclose[s] how [the claimed] concentration ranges were chosen or otherwise explain[s] the significance of these concentrations to the function of the claimed invention" (Glacken opening report at ¶ 283) to counter my opinion, or point to any part of the specification instructing under what circumstances the nine optional ingredients may be removed from the MET 1.5 medium without affecting the performance of the claimed media.  *Id.*  Because the claims are broad and encompass a number of potential soluble compositions, the single example of the MET 1.5 medium is not adequate to enable the full scope of the claimed invention, and neither Profs. Butler or Wurm provide evidence to the contrary.

75

Michael Glacken, Sc.D.
**Reply Expert Report**                                    U.S. Pat. No. 7,598,083

### 2.    State of the prior art and relative skill of those in the art

171.    Prof. Butler's explanation of the state of the prior art and the relative skill of those

in the art for purposes of enablement is inconsistent with his opinion that the asserted claims are

nonobvious.  While Prof. Butler opines that a POSA would have had the ability to take the example

of the MET 1.5 medium and make and use the full scope of the claimed invention with no more

than routine experimentation, he also opines that a POSA would *not* have had the knowledge and

skill to take the examples provided in the prior art to develop at least one composition falling

within the scope of the claimed invention.  *Compare* Butler rebuttal report at ¶ 177 *with id.* at ¶¶

33-155.  He offers no explanation for this contradiction.  Nor does Prof. Butler point to anything

in the '083 patent that supports his position that a POSA could modify the MET 1.5 medium to

practice the full scope of the claimed invention.

172.    In short, either a POSA would have the knowledge and skill to develop the claimed

compositions from the examples provided by the prior art (as I explained above in my discussion

of obviousness), thus also allowing the POSA to practice the full scope of the claimed invention

from the example of the MET 1.5 medium, or a POSA would not have the knowledge and skill to

do either.  Either way, in my opinion, the patent is invalid.

### 3.    The presence of working examples, the amount of direction or guidance, and the predictability of the art

173.    Prof. Butler does not address my criticism regarding the lack of guidance provided

in the '083 patent on how to modify that single MET 1.5 embodiment to practice the full scope of

the claimed invention.  Glacken opening report at ¶ 284.  And Prof. Butler's reliance on the

knowledge of a POSA, asserting that "a POSA could measure cell growth or viable cell density

using the protocols described in Example 1 [of the '083 patent] to determine whether other media

Michael Glacken, Sc.D.
**Reply Expert Report**                                    **U.S. Pat. No. 7,598,083**

compositions are nutritive" contradicts his opinion on obviousness.  Butler rebuttal report at ¶ 182.

As I have explained, to the extent a POSA would not have had the knowledge and skill to follow

the teachings of the prior art to develop the claimed compositions (which I disagree), that person

would require undue experimentation to practice the full scope of the claimed invention.  Prof.

Butler provides no evidence to the contrary.

### 4.        Quantity of experimentation

174.    Prof. Butler did not address a key issue as to enablement:  that the '083 patent does

not teach a POSA how to modify the composition of the MET 1.5 medium to practice the full

scope of the claimed invention without conducting an undue amount of experimentation.  *See e.g.*,

Glacken opening report at ¶ 284.  Prof. Butler assumes, but does not make any effort to explain,

why a POSA would expect that any medium encompassed by the asserted claims be nutritive.  But

there is tremendous variance in the relative breadth of the concentration ranges specified in claim

1, as illustrated by calculating the ratio of the high end of the claimed range to the low end of the

claimed range.   Glacken rebuttal report at ¶¶ 63-64, Table 2.   The asserted claims include

concentrations from a 1.5 fold difference (NaCl) to a 5,000-fold difference (ferric ammonium

citrate) with no guidance provided in the '083 patent as to why or how these numerous particular

ranges were selected.   Since there are at least 61 different claimed ingredients, at 61 different

claimed concentration ranges, all to be combined with each other and then tested individually,

extensive experimentation would be required to confirm that the full scope of the claimed

invention is suitable for preparing nutritive cell culture media.

## VI.    Supplementation and Rebuttal

175.    I reserve the right to supplement my report in response to any facts or evidence to

that comes to light after this report.  I also reserve the right to rebut any arguments or evidence set

77

Michael Glacken, Sc.D.
**Reply Expert Report**                                      **U.S. Pat. No. 7,598,083**

forth by the Janssen in this case in response to any argument or opinion I set forth above.  I further reserve the right to testify that arguments made herein for one invalidity point are equally applicable for other invalidity points I make in this report.

## VII.    Conclusion

176.    For the reasons explained above and in my opening report, the opinions of validity offered by Profs. Butler and Wurm do not change my opinions that asserted claims 1 and 2 of the '083 patent are invalid.