# JANSSEN MIL Ex. 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

```
————————————————————————— X
                                    :
JANSSEN BIOTECH, INC. and           :
NEW YORK UNIVERSITY,                :
                                    :
            Plaintiffs,             :
                                    :   Civil Action No. 1:15-cv-10698-MLW
     v.                             :   Civil Action No. 1:16-cv-11117-MLW
                                    :
CELLTRION HEALTHCARE CO., LTD.,     :   CONFIDENTIAL
CELLTRION, INC., and HOSPIRA, INC., :
                                    :
            Defendants.             :
                                    :
————————————————————————— X
```

**REBUTTAL EXPERT REPORT OF MICHAEL GLACKEN, Sc.D. REGARDING
NON-INFRINGEMENT OF UNITED STATES PATENT NO. 7,598,083**

_Michael Glacken_

**Michael Glacken, Sc.D.**

14 OCT 2016

**Date**

CONFIDENTIAL

# TABLE OF CONTENTS

I. Introduction ...................................................................................................1

II. Summary Of Opinions ...................................................................................3

III. Personal Background and Expert Qualifications .........................................5

IV. Legal Standards .............................................................................................5

V. Background ....................................................................................................8

  A. U.S. Patent No. 7,598,083 ................................................................. 8

    1. Asserted Claims 1 And 2 Of The '083 Patent ............................9

    2. Specification Of The '083 Patent ..............................................12

    3. Prosecution History Of The '083 Patent ...................................15

  B. The Level Of Ordinary Skill In The Art ........................................... 16

  C. Claim Construction .......................................................................... 17

  D. The Accused HyClone Cell Culture Products ................................... 17

    1. The Accused Products As Supplied By HyClone ......................17

    2. The Media As Used By Celltrion In South Korea .....................23

    3. HyClone's Manufacturing Of The Accused Products In Singapore ..........23

VI. The Accused HyClone Products Do Not Literally Infringe Claims 1 And 2 Of The '083 Patent. ..............................................................................................24

VII. Profs. Wurm And Butler Have Not Offered An Appropriate Theory Of Infringement Under The Doctrine Of Equivalents. ......................................25

  A. A POSA Would Consider The Concentration Limitations of Claims 1 and 2 To Define The Outer Bounds Of The Claimed Invention. ............... 27

  B. The Broad Infringement Theory Advanced By Profs. Wurm And Butler Essentially Eliminates Claim Limitations. ............................................. 31

  C. The Broad Infringement Theory Advanced By Profs. Wurm And Butler Leave A POSA With No Practical Way To Assess Infringement Under The Doctrine Of Equivalents ................................................................ 37

  D. The Broad Infringement Theory Advanced By Profs. Wurm And Butler Ensnares Prior Art. ............................................................................... 40

    1. Hypothetical Claims That Literally Encompass The Accused HyClone Products Require Many Changes. ...............................41

    2. The Hypothetical Claims Ensnare The Prior Art. ....................45

      a. Jayme 1997 and '704 Patent ........................................46

      b. '614 Application .............................................................48

      c. '955 Application ............................................................51

CONFIDENTIAL

VIII.   Janssen Also Cannot Rely On Prof. Wurm's Testing To Show Infringement
Under The Doctrine Of Equivalents. .................................................................53

    A.   Summary Of Prof. Wurm's Experiments. ............................................... 53

        1.   Prof. Wurm Did Not Test The Accused Products But, Instead,
Purported To Replicate Them. ..................................................53

        2.   Prof. Wurm Admitted That His "Replicas" Of The HyClone
Growth Product Are Not Identical To The Accused Products. .................54

        3.   Prof. Wurm's "Replicas" Added Five Ingredients That Are Not
Included In The Accused Products. ............................................55

        4.   Prof. Wurm's "Replicas" Included 29 Ingredients That Are Not
Claimed In The Patent. .............................................................56

        5.   Prof. Wurm's "Variants" Do Not Test The Differences From The
Claimed Invention One Limitation At A Time. ...........................57

        6.   Four Of Prof. Wurm's "Variants" Replaced HyClone's Ingredients
With Claimed Ingredients. ........................................................59

        7.   Prof. Wurm Tested The Altered Accused Products To Produce
Janssen's Proprietary Antibody. ...............................................61

        8.   Prof. Wurm's Experiments Include Steps Not Addressed In The
Patent. ......................................................................................62

    B.   Prof. Wurm's Testing Was Not Properly Designed To Show Infringement
Under The Doctrine Of Equivalents. ..................................................... 64

        1.   Prof. Wurm's Testing As To The HyClone Growth Media Is Not
Reliable Due To An "Inadvertent" Error. ..................................64

        2.   Prof. Wurm's Testing As To Both The Growth And Production
Products Are Also Unreliable Because He Intentionally Altered
The Accused HyClone Products. ...............................................65

        3.   Prof. Wurm Performed The Wrong Type Of Tests On His Altered
Replicas. ..................................................................................68

            a.   Prof. Wurm's Experiments Are, At Best, Low-Resolution
Experiments That Cannot Provide Sufficiently Definitive
Information, Particularly In The Context Of This Inquiry. ..........69

            b.   Prof. Wurm Should Have Performed A Higher Resolution
Experiment Such As A Fed-Batch Experiment. ...........................72

        4.   Prof. Wurm's Experiments Cannot And Do Not Assess
Equivalence On A Limitation-By-Limitation Basis. ...............74

            a.   Prof. Wurm's "Variants" Are Not Designed To Show
Equivalents On A Limitation-By-Limitation Basis .....................74

            b.   Prof. Wurm Incorrectly Compared The "Variants" To The
Accused Product, Instead Of To The Patent Claims. ....................75

       c.     Prof. Wurm Did Not Address The Well-Known Functions Of The "Trace Element-Containing Ingredients." ..........................77

       d.     Prof. Wurm Did Not Address The Well-Known Functions Of The "Amino Acid Ingredients." .................................................79

       e.     Prof. Wurm Did Not Address The Well-Known Functions Of The "Phosphate-Containing Ingredients." ................................80

       f.     Prof. Wurm Did Not Address The Well-Known Functions Of The NaCl Ingredient. ................................................................81

     5.     Prof. Wurm's Samples Included 29 Ingredients Not Mentioned In Claim 1 That Skew The Results...................................................83

  C.     Given The Significant Issues With Prof. Wurm's Testing Described Above, That Testing Is Insufficient And Unreliable Evidence To Show Infringement Under The Doctrine Of Equivalents. .............................. 85

IX.    Prof. Butler Relies Heavily On Prof. Wurm's Insufficient Testing And Otherwise Fails To Provide Opinions That Support Infringement Under The Doctrine Of Equivalents.....................................................................................................85

X.     Defendants Have Non-Infringing Alternatives To The Accused Products. .....................88

XI.    The Claimed Soluble Composition Is Not A Component Of Remicade®. ......................90

XII.   Conclusion .....................................................................................................................90

CONFIDENTIAL

## I.      Introduction

1.      I, Michael Glacken, Sc.D., submit this rebuttal expert report on behalf of Defendants Celltrion Healthcare Co., Ltd., Celltrion, Inc. (together, "Celltrion"), and Hospira, Inc. ("Hospira") (collectively, "Defendants").

2.      I previously submitted an opening expert report dated August 31, 2016 regarding my opinion on the validity of asserted claims 1 and 2 of U.S. Patent No. 7,598,083 ("the '083 patent") ("Glacken Opening Invalidity Report").   In that report, I described my relevant personal background and qualifications, as well as my compensation and prior experience as an expert witness.   I incorporate by reference, as if fully set forth herein, the opinions and information set forth in my opening expert report.[1]

3.      I submit this rebuttal expert report to offer my opinions regarding whether the accused products provided by HyClone Laboratories, Inc. ("HyClone")—specifically, (a) HyQ ADCF Mab-New Production (HyClone Catalog No. SH3A2800 for the packaged unit and Catalog No. SH2A1132 for the bulk powder formulation) ("HyClone's production product") and (b) HyQ ADCF Mab-Growth (HyClone Catalog No. SH3A2713 for the packaged unit and Catalog No. SH2A1119 for the bulk powder formulation) ("HyClone's growth product")— infringe asserted claims 1 and 2 of the '083 patent.   I understand that Plaintiffs have not asserted infringement of products other than HyClone's production product and HyClone's growth product (collectively, "accused HyClone products").

---

[1] To the extent any of my opinions as to invalidity appear to be inconsistent with my opinions in this report as to non-infringement, those invalidity opinions should be construed to be in the alternative.

**Michael Glacken, Sc.D.**                                              **Page 2**
**Rebuttal Expert Report re Non-Infringement**                 **US Patent No. 7,598,083**

<b>CONFIDENTIAL</b>

4.       I have been asked to review: (a) the opening infringement expert report of Michael Butler, Ph.D. (the "Butler report"); (b) the opening infringement expert report of Florian M. Wurm, Prof. Rer. Nat. (the "Wurm report"); (c) the supplemental declaration of Professor Florian M. Wurm, Prof. Rer. Nat. concerning alleged infringement of the '083 patent (the "supplemental Wurm report"); and (d) the supplemental declaration of Michael Butler, Ph.D. (the "supplemental Butler report").  The additional information on which I have relied to form my opinions set forth in this report are provided at Ex. 87.  Profs. Butler and Wurm have opined that the accused HyClone products infringe each limitation of the asserted claims of the '083 patent under the doctrine of equivalents.  I have reviewed their analyses—including the testing methods, underlying materials and assumptions used in forming their conclusions.  Based upon my review, it is my opinion that Prof. Butler, without presenting any supporting information or data, made conclusions without equivocation based on generalizations, while Prof. Wurm's experimental design did not appropriately address the relevant scientific or legal questions at issue.  Based on these deficiencies, and other reasons as stated below, their opinions of infringement are unsupported.

5.       The opinions to which I will testify at trial, if asked, are set forth in this report and are based upon the information I have reviewed so far.  The bases for my opinions include, among other things: the materials cited in this report and the opening expert reports and supplemental declaration of Profs. Butler and Wurm; my education and over 35 years of experience, teaching, and performing research in the field of cell culture media; and my understanding of the prior art and the knowledge of a person of ordinary skill in this art.  My opinions may be later amended, supplemented or modified in the event additional information is

## CONFIDENTIAL

made available to the parties or to respond to or rebut issues, statements, and opinions advanced by Janssen or its witnesses or experts at any time in this action.  I may rely upon demonstrative exhibits at trial to assist in explaining my trial testimony.

## II.     Summary Of Opinions

6.      In my opinion, HyClone's production and growth products do not infringe the asserted claims literally or under the doctrine of equivalents.

7.      *First*, as for literal infringement, both Profs. Butler and Wurm concede that the accused HyClone products do not literally satisfy multiple concentration limitations in asserted claim 1 (and asserted dependent claim 2) of the '083 patent.  As a result, their opinions turn solely on application of the doctrine of equivalents.  I agree that the accused HyClone products do not literally infringe the asserted claims of the '083 patent.

8.      *Second*, in my opinion, neither Prof. Wurm nor Prof. Butler has advanced a viable theory of infringement under the doctrine of equivalents—regardless of what Prof. Wurm's testing shows—because, among other reasons:  (a) a person of ordinary skill in the art ("POSA")[2] would read the intrinsic record as leaving little to no room for expanding the scope of the concentration ranges beyond what is disclosed in claim 1 under the doctrine of equivalents; (b) the broad infringement theory advanced by Janssen, through Profs. Wurm and Butler, essentially eliminates the ingredient concentration limitations; (c) there is no practical testing method for a skilled artisan to assess whether the accused products infringe under Janssen's expansive application of the doctrine of equivalents such that the public could have

---

[2] I defined a "person of ordinary skill" in my invalidity report and also below.

Michael Glacken, Sc.D.                                                        **Page 4**
Rebuttal Expert Report re Non-Infringement                    US Patent No. 7,598,083

## CONFIDENTIAL

fair notice of the boundaries of the claimed invention; and (d) Janssen's infringement theory expands the asserted claims to ensnare prior art.

9.      *Third*, should Prof. Wurm's testing even be considered, such testing does not show that the accused products infringe under the doctrine of equivalents because, among other reasons:  (a) Prof. Wurm did not test actual samples of the accused HyClone products but instead purported to replicate them; (b) Prof. Wurm admitted that he did not accurately reproduce the HyClone growth product in conducting his testing due to what he referred to as an inadvertent error; (c) in fact, he intentionally altered his formulations of the accused HyClone products before conducting his experiments; (d) his "low-resolution" experiments on these altered products were insufficient to properly assess infringement under the doctrine of equivalents; (e) his experiments were not properly designed to, and did not, show equivalence on a limitation-by-limitation basis; and (f) his experiments did not account for the effect of including 29 additional ingredients that are not recited in the asserted claims.

10.      *Fourth*, Prof. Butler's opinions, which rely heavily on Prof. Wurm's testing, do not address these deficiencies and otherwise are insufficient to show that the accused products infringe under the doctrine of equivalents.  Prof. Butler relies on the supposition that the mere presence of an ingredient dictates its function irrespective of its concentration, a supposition that is not supported by the literature and for which he presents no supporting evidence.

11.      *Fifth*, neither Prof. Butler nor Prof. Wurm addresses the fact that Celltrion and Hospira had and have non-infringing alternatives to the accused products.

12.      *Sixth*, Janssen has not and does not use the claimed soluble composition to grow cells that produce Remicade®.  The subject matter claimed by the '083 patent is not a

### CONFIDENTIAL

component or feature of infliximab or Remicade®, which itself is a complex, multi-faceted product that derives its efficacy from a number of features, none of which are claimed by the '083 patent.

### III.    Personal Background and Expert Qualifications

13.     My personal background and expert qualifications are set out in full in the Glacken Opening Invalidity Report at Section II.  My full *curriculum vitae* has been previously provided as Exhibit 3.[3]

### IV.    Legal Standards

14.     I have been informed of the applicable legal standards relating to patent claim infringement.  I have relied upon these legal principles, as explained to me by counsel, in forming my opinions set forth in this report.

15.     I have been informed that plaintiffs bear the burden of proving infringement by a preponderance of the evidence.  I understand that this means that plaintiffs must prove that the infringement is more likely than not to have occurred.

16.     I have been informed that analyzing whether a particular product infringes any claims of a patent is a two-step process. The first step is to construe claims to determine the scope of the claimed invention, as understood by POSAs.  The second step is to compare each accused product to the properly construed claim(s).

17.     I understand that an accused product does not infringe unless it contains each and every element of the properly construed claim.  I further understand that literal infringement requires that every limitation set forth in a claim must be found in an accused product.

---

[3] Exhibits to this report continue from those provided in support of my opening invalidity report.

**CONFIDENTIAL**

18.     I understand that infringement under the doctrine of equivalents comes into play only when there is no literal infringement.  I further understand that to find infringement under the doctrine of equivalents, any differences between the claimed invention and the accused product must be insubstantial.   One way of proving infringement under the doctrine of equivalents is to show, for each claim limitation, on an element-by-element basis, that the accused product performs substantially the same function in substantially the same way with substantially the same result as each claim limitation of the patented invention ("the function-way-result test").

19.     I understand that under the insubstantial differences test, an element in the accused product is equivalent to a claim limitation if the only differences between the two are insubstantial.   I further understand that a finding of known interchangeability, while an important factor in determining equivalence, is not dispositive with respect to infringement under the doctrine of equivalents.

20.     I understand that both the insubstantial differences test and the function-way-result test are considered in determining infringement under the doctrine of equivalents.

21.     I understand that, when asserting infringement under the doctrine of equivalents, a patentee must provide particularized testimony and linking argument as to the insubstantiality of the differences between the claimed invention and the accused product, or with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents.   Such evidence must be presented on a limitation-by-limitation basis, and generalized testimony as to the overall similarity between the claims and the accused infringer's product will not suffice.

**CONFIDENTIAL**

22.     I also understand that, if applied, the doctrine of equivalents cannot read out or vitiate a claim limitation.  I understand that an infringement allegation under the doctrine of equivalents will fail if it renders a claim limitation inconsequential or ineffective.  For example, I understand that if a proposed equivalent is the antithesis or exact opposite of the claimed limitation, this cannot be insubstantially different from each other under the doctrine of equivalents.  Further, I understand that there are limitations to the doctrine of equivalents.  For example, if the claim language expressly excludes a potential equivalent, the excluded equivalent cannot form the basis for infringement.  Also, where a patentee has brought what would otherwise be an equivalent of a limitation into the literal scope of the claim, the doctrine of equivalents is unavailable to further broaden the scope of the claim.

23.     I understand that the prior art can also limit the range of permissible equivalents of a claim limitation, because the doctrine of equivalents cannot be so broad as to encompass what was known and obvious in the prior art.  I have been informed by counsel that when determining whether the prior art restricts the possible range of equivalents, it may be helpful to visualize a hypothetical patent claim that is broad enough in scope to literally cover the accused product.  I understand that the key inquiry is whether that hypothetical claim could have been allowed by the Patent and Trademark Office ("PTO") over the prior art.  I understand that if multiple references may be combined to show that the hypothetical claim would have been obvious to a POSA, the hypothetical claim would not have been allowed and the patentee cannot assert the doctrine of equivalents to cover the accused product.  I understand that the burden is on the patentee to prove that the range of equivalence it seeks would not ensnare the prior art.  I understand that while defendants must raise the defense of ensnarement, the patent

## CONFIDENTIAL

holder bears the burden of proving that application of the doctrine of equivalents to show infringement would not ensnare the prior art.

24.     I understand that a dependent claim contains all of the limitations of the independent claim from which it depends.

25.     I understand that the existence of non-infringing alternatives may be relevant to certain damages calculations and other issues in patent infringement suits. I further understand that in order for an allegedly non-infringing alternative to be relevant, the alternative design must be (a) acceptable to customers of the patented product, and (b) available on the market at the time of infringement.  However, I understand that an alternative that is not actually on the market at the time of infringement may nonetheless be considered available if the alleged infringer had all of the necessary equipment, know-how, and experience to make a substitution as long as that substitution process would not be prohibitively costly.

26.     I understand that to be an acceptable alternative, an alternative design must not possess characteristics significantly different from or be otherwise inferior to the patented product.

## V.      Background

### A.      U.S. Patent No. 7,598,083

27.     The '083 patent, entitled "Chemically Defined Media Compositions," issued on October 6, 2009 to named inventors David Epstein, Roger Monsell, Joseph Horwitz, Susan Lenk, Sadettin Ozturk, and Christopher Marsh.  Ex. 1.  I understand Janssen asserts that HyClone's production and growth products both infringe claims 1 and 2 of the '083 patent (the "asserted claims").

**CONFIDENTIAL**

### 1.    Asserted Claims 1 And 2 Of The '083 Patent

28.    Independent claim 1 of the '083 patent recites as follows:

1.    A soluble composition, suitable for producing a final volume of cell culture media, wherein the composition comprises the following components in the following amounts per liter of the final volume of cell culture media:

> anhydrous $CaCl_2$, 5-200 mg;
> anhydrous $MgCl_2$, 15-50 mg;
> anhydrous $MgSO_4$, 20-80 mg;
> $FeSO_4.7H_2O$, 0.05-0.50 mg;
> $Fe(NO_3)_3.9H_2O$, 0.01-0.08 mg;
> $ZnSO_4.7H_2O$, 0.40-1.20 mg;
> ferric ammonium citrate, 0.04-200 mg;
> KCl, 280-500 mg;
> NaCl, 5000-7500 mg;
> $NaH_2PO_4.H_2O$, 30-100 mg;
> $Na_2HPO_4$, 30-100 mg;
> $CuSO_4.5H_2O$, 0.001-0.005 mg;
> $CoCl_2.6H_2O$, 0.001-0.10 mg;
> $(NH_4)_6Mo_7O_{24} 4H_2O$, 0.001-0.005 mg;
> $MnSO_4.H_2O$, 0.000070-0.0080 mg;
> $NiSO_4.6H_2O$, 0.000025-0.0005 mg;
> $Na_2SeO_3$, 0.004-0.07 mg;
> $Na_2SiO_3.9H_2O$, 0.02-0.4 mg;
> $SnCl_2.2H_2O$, 0.000025-0.0005 mg;
> $NH_4VO_3$, 0.0001-0.0025 mg;
> D-Glucose, 500-8000 mg;
> sodium pyruvate, 0.0-1000 mg;
> sodium hypoxanthine, 0.0-20.0 mg;
> glycine, 0.0-150 mg;
> L-alanine, 0.0-150 mg;
> L-arginine.HCl, 200-5000 mg;
> L-asparagine.$H_2O$, 40-250 mg;
> L-aspartic acid, 20-1000 mg;
> L-cysteine.HCl $H_2O$, 25.0-250 mg;
> L-cystine.2HCl, 15-150 mg;
> L-glutamic acid, 0-1000 mg;
> L-histidine.HCl.$H_2O$, 100-500 mg;
> L-isoleucine, 50-1000 mg;
> L-leucine, 50-1000 mg;
> L-lysine.HCl, 100-1000 mg;

**CONFIDENTIAL**

> L-methionine, 50-500 mg;
> L-ornithine.HCl, 0-100 mg;
> L-phenylalanine, 25-1000 mg;
> L-proline, 0-1000 mg;
> L-serine, 50-500 mg;
> L-taurine, 0-1000 mg;
> L-threonine, 50-600 mg;
> L-tryptophan, 2-500 mg;
> L-tyrosine.2Na.2$H_2O$, 25-250 mg;
> L-valine, 100-1000 mg;
> d-biotin, 0.04-1.0 mg;
> D-calcium pantothenate, 0.1-5.0 mg;
> choline chloride, 1-100 mg;
> folic acid, 1-10 mg;
> i-Inositol, 10-1000 mg;
> nicotinamide, 0.5-30 mg;
> p-aminobenzoic acid, 0.1-20 mg;
> riboflavin, 0.05-5.0 mg;
> thiamine.HCl, 0.5-20 mg;
> thymidine, 0-3.0 mg;
> vitamin $B_{12}$, 0.05-5.0 mg;
> linoleic acid, 0.01-2.0 mg;
> DL-α-lipoic acid, 0.03-1.0 mg;
> pyridoxine.HCl, 0.5-30 mg;
> putrescine.2HCl, 0.025-0.25 mg; and
> ethanolamine.HCl, 2-100 mg.

Ex. 1 at claim 1.

29.     As shown above, the soluble composition of claim 1 comprises 61 separate ingredients, each in a specific concentration range.  Many of these ingredients are claimed as specific "forms" of the ingredient, such as anhydrous versus hydrous.  In other words, while the patentee could have sought to claim an ingredient generally, such as L-histidine, here the specific form of L-histidine.HCl.$H_2O$ is claimed.

30.     As noted, I understand that each ingredient in the claimed final volume of cell culture media must be present in an amount that falls within a specific concentration range to literally infringe the asserted claims.  The named inventors appear to have selected a specific

CONFIDENTIAL

concentration range for each of the specific ingredients in claim 1. These concentration ranges vary from only a 1.5 fold difference for the ingredient NaCl (the difference between the minimum and maximum claimed concentrations of 5000-7500 mg/L), to a 5,000-fold difference for ferric ammonium citrate (0.04-200 mg/L). In my opinion, a POSA would recognize the wide disparity in the claimed ranges for each ingredient in claim 1 and would reasonably conclude and understand that each of these specific concentration ranges were intentionally and independently selected for each ingredient.

31.      Nine of the claimed 61 ingredients may be present in an amount as little as 0.00 mg/L of the final volume of cell culture media. These ingredients are: (a) sodium pyruvate, (b) L-alanine, (c) glycine, (d) L-proline, (e) L-glutamic acid, (f) L-taurine, (g) L-ornithine.HCl, (h) sodium hypoxanthine, and (i) thymidine. I understand that Janssen considers these ingredients as optional in the claimed soluble composition, and I do not dispute that position in this report. *See, e.g.*, Butler report at ¶ 37. A POSA would take note of these optional ingredients and would consequently note the 52 non-optional ingredients. By definition, non-optional ingredients must be present, i.e.*,* at a specific non-zero concentration, and a POSA would reasonably assume that the lower limit of the range listed for each ingredient in claim 1 would constitute the minimum value of this non-zero concentration.

32.      Asserted claim 2, which depends upon claim 1, recites as follows:

> 2.      The soluble composition of claim 1 further comprising a buffering molecule with a pK$_a$ between 5.9 and 7.8 and a cell protectant.

33.      Notably, unlike the 61 ingredients recited in claim 1, claim 2 does not recite specific ingredients or specific concentrations for those ingredients. Therefore, the ingredients required by claim 2 may be present in the soluble composition in any form or amount. To a

CONFIDENTIAL

POSA, this reinforces the significance of the specific forms of the ingredients and concentration ranges claimed in claim 1.  A POSA would understand that, where the claims recite specific forms or concentration ranges for an ingredient, that is essential to defining the claimed invention.

34.     Further, and as described in more depth below, the specification of the '083 patent describes a single soluble composition identified as MET 1.5 and a class of potential variants of MET 1.5.  This soluble MET 1.5 composition is specifically claimed in claim 6 of the '083 patent and also falls within the scope of claim 1.

35.     I further discussed the asserted claims of the '083 patent in the Glacken Opening Invalidity Report—which, again, is incorporated by reference.

## 2.      Specification Of The '083 Patent

36.     The specification of the '083 patent explains, in its discussion of the field of the invention, that "[t]he present invention relates to chemically defined media compositions for the culture of eukaryotic cells."   Ex. 1 at 1:13-14.   Within this field, "[c]ontamination of conventional eukaryotic cell culture media with 'adventitious particles' such as bacterial, virus, or prion particles is a serious potential problem in the industrial preparation of biopharmaceuticals such as antibodies or therapeutic proteins."   *Id.* at 1:17-21.  Contaminated cell culture media can infect biopharmaceutical products, which risks causing infections and diseases, like Mad Cow Disease, to patients administered those biopharmaceutical products.   *Id.* at 1:21-42.  "Adventitious particle contamination of conventional eukaryotic cell culture media can result from the incorporation of animal-derived components and protein growth factors into conventional media."   *Id.* at 1:32-35.  But this "contamination can be avoided by culturing

**Michael Glacken, Sc.D.**  
**Rebuttal Expert Report re Non-Infringement**

**Page 13**  
**US Patent No. 7,598,083**

## CONFIDENTIAL

eukaryotic cells in animal component free cell culture media. Ideally, such media are 'chemically defined' such that the media compositions contain only known chemical compounds, and are free of all proteins—even those not of animal origin such as recombinant proteins." *Id.* at 1:44-49.

37.     The specification further states that there is a need for "chemically defined media compositions" optimal for the production of biopharmaceutical production that satisfy the following four criteria:

> First, such compositions must limit eukaryotic cell damage resulting from shear forces and other cell-damaging processes that occur in the bioreactor vessels typically used for biopharmaceutical production. Second, such compositions must enable eukaryotic cell cultures to have high viable cell densities (i.e., number viable cells/ml media) and high percentages of viable cells. Third, such compositions must permit high titers of secreted biopharmaceutical products (i.e., antibody mg/L media) and high specific productivities (i.e., pg antibody/viable cell/day). Lastly, such compositions must limit the production of lactic acid by cultured eukaryotic cells to permit the most efficient cellular use of glucose.

*Id.* at 1:52-67.

38.     The specification identifies only a single soluble composition identified as MET 1.5, which is "typically . . . a powder," for preparing a chemically defined media composition. *Id.* at 6:5-7:6. In Examples 1-3, the '083 patent presents data purportedly showing that the "chemically defined MET 1.5 media" made from the soluble composition meets three of the recited criteria for the optimal production of biopharmaceuticals: (a) "high cell growth and viability" (Example 1); (b) "high monoclonal antibody titers and specific productivity" (Example 2); and (c) "decreased lactate production" (Example 3). *Id.* at 9:40-10:43; *see also id.* at 1:52-64. The MET 1.5 medium contains the same ingredients as recited in claim 1, including

Michael Glacken, Sc.D.                                                      **Page 14**
**Rebuttal Expert Report re Non-Infringement**                    US Patent No. 7,598,083

## CONFIDENTIAL

the 9 optional ingredients, with each ingredient present in an amount within the claimed concentration ranges. *Compare id.*; *with id.* at claim 1.

39.     The '083 patent further identifies a class of soluble compositions, referred to as "MET," which is recited in claim 1. *Id.* at 5:4-6:4; *see also id.* at claim 1. The MET 1.5 soluble composition is an example—indeed, the only specific example provided in the '083 patent—of a member of this class of MET compositions. *Compare id.* at 5:4-6:4; *with id.* at 6:5-7:6. The only difference between the MET 1.5 soluble composition and the class of MET soluble compositions is the specific concentrations of the ingredients, with the concentration ranges of the MET class encompassing the specific concentrations of the MET 1.5 soluble composition. *Id.* There is no information in the specification to suggest that the inventors had created, let alone tested, any other compositions within the class of MET compositions, other than the specific MET 1.5 soluble composition.

40.     When read as a whole, the specification of the '083 patent indicates to a POSA that the named inventors had developed the MET 1.5 composition, but they further believed, without providing data or scientific support in the specification, that certain modifications of the amounts of the ingredients in that MET 1.5 composition can be made. Thus, a POSA would understand that they defined the class of MET compositions as equivalents to the MET 1.5 composition, with specific concentration ranges, to disclose the *entire scope* of variations and equivalents of the MET 1.5 soluble composition that they considered to be covered by their patent.[4]

---

[4] As discussed in the Glacken Invalidity Report, I disagree that the MET 1.5 medium is representative of the full class of the MET media. *See* Glacken Invalidity Report ¶¶ 268-274. For example, without explanation, 9 ingredients provided in the MET 1.5 medium are listed as

## CONFIDENTIAL

41.      In my review of the specification, I have found no data or support for increasing or decreasing any of the concentration ranges beyond those literally recited in claim 1.  I have also found no complete experimental protocol that would allow a POSA to determine whether or not a particular cell culture medium that contains these ingredients but outside of the claimed concentration ranges would be equivalent or not to the claimed invention.

42.      I further discussed the specification of the '083 patent in the Glacken Opening Invalidity Report and incorporate that discussion here.

### 3.      Prosecution History Of The '083 Patent

43.      I have also reviewed the prosecution history of the '083 patent.  I understand that the file history of the '083 patent provides the rejections made by the patent examiner and the patentees' responses to those rejections.

44.      For example, I understand that the '083 patent originally contained the following claim language:

> 1.      A soluble composition, suitable for producing a cell culture media, wherein the media comprises the following components in the following amounts per liter: ….

The original claims, however, were rejected by the examiner as indefinite under 35 U.S.C. § 112 because "[c]laims 1 and 4 are drawn to a 'soluble composition,' but the components are expressed as various weights 'per liter'…"  Ex. 64, (Excerpt from '083 file history at Jan. 9, 2008 Non-final rejection), at 2.  The examiner stated that "[i]t is not clear whether these claims are meant to be drawn to, e.g., a dry powder comprising various weights of dry components that can then be added to water, or to the liquid media *per se*."  *Id.*

---

optional in the class of MET media.  The '083 patent does not address how the MET media would function in the absence of these ingredients.

**CONFIDENTIAL**

45.     The examiner proposed amendments that would "clarify that these claims are drawn to a composition … [that is] solubilized in the water such that the solid composition is provided in an amount relative to the final media volume." *Id.* at 5.

46.     In response, the patent applicants amended the claims[5] as shown here:

> 1.  (Currently Amended)  A soluble composition, suitable for producing a ~underline~final volume of~/underline~ cell culture media, wherein the ~strikethrough~media~/strikethrough~composition comprises the following components in the following amounts per liter ~underline~of the final volume of cell culture media~/underline~:

Ex. 65, (Excerpt from '083 file history, Jan. 22, 2008 Amendment/request for reconsideration after non-final rejection), at 3, 10.

### B.      The Level Of Ordinary Skill In The Art

47.     I understand that patent claims should be viewed from the perspective of a POSA. In the Glacken Opening Invalidity Report, I provided my opinion on the level of ordinary skill in the art. *See* Glacken Opening Invalidity Report at ¶ 65.   In my opinion, a POSA would have a doctorate degree in biochemistry, molecular biology, or a related field with one or two years of direct experience in formulation of and use of cell culture media in the context of biopharmaceutical product production.   A POSA could also have fewer years of formal education if they held either a bachelor's or master's degree in the same fields listed above but also had several years of hands-on experience in academic or industrial laboratories in this area.

48.     Profs. Butler and Wurm have not offered an opinion on the level of ordinary skill in the art in their opening infringement reports.[6]  Thus, it is unclear whether Profs. Butler and

---

[5] I understand that the patentees also did not traverse the rejection.  I have been instructed that, by not traversing the rejection, this means that the patentees did not record any disagreement with the PTO's reason for rejection.

CONFIDENTIAL

Wurm agree with my opinion or have applied an alternative definition of the level of ordinary

skill in their infringement analysis.  I reserve the right to address any opinion by Profs. Butler

and/or Wurm on this issue in any additional report I may submit in this case, or at trial.

### C.      Claim Construction

49.      I understand the Court has ruled that the term "cell culture media" means

"nutritive media for culturing cells."  Ex. 66 (Claim construction memorandum and order, Dkt.

226,) at 5.  In rendering my opinion, I have assumed the other claim terms will take on their

plain and ordinary meaning to a POSA.  I reserve the right to supplement my opinions should

different meanings or constructions of claim terms be proposed by Plaintiffs or set forth by the

Court.

### D.      The Accused HyClone Cell Culture Products

#### 1.      The Accused Products As Supplied By HyClone

50.      Janssen asserts that HyClone's production and growth products infringe asserted

claims 1 and 2 of the '083 patent.  My understanding is that HyClone prepares these products in

powder form in the United States (and may prepare them in Singapore), and the products are

then shipped to Celltrion in South Korea.  *See* Ex. 67 (HyClone Certificate of Analysis for

growth product) at CELLREM-0007989 ("Off-white powder"), (HyClone Certificate of

Analysis for production product) at CELLREM-0007996 ("Off-white powder").  I understand

that, for the purpose of an infringement analysis, the relevant inquiry is whether the powders as

manufactured by HyClone in the United States infringe the asserted claims.  As a result,

although Janssen and the documents may refer to the accused HyClone products as "media,"

---

[6] I note that Prof. Wurm commented on the level of ordinary skill in the art in his declaration and
during his deposition in the context of claim construction.

**Michael Glacken, Sc.D.**                                                    **Page 18**
**Rebuttal Expert Report re Non-Infringement**                    **US Patent No. 7,598,083**

CONFIDENTIAL

that technically is a misnomer.  The accused products are soluble compositions in the form of

powders, not liquid media, that are produced in the United States.

51.    I understand that Janssen carries the burden to prove that every claim limitation is

met by the accused products.  In an effort to satisfy Janssen's burden, Profs. Wurm and Butler

report the following ingredients in amounts per liter for HyClone's production and growth

products (although they do not explain how they obtained these reported concentrations):

| Glacken Table 1 | | | |
|---|---|---|---|
| | **Ingredients in HyClone Product** | **HyClone Production (mg)** | **HyClone Growth (mg)** |
| ██ | ████████ | ████ | ████ |
| ██ | █████████ | ████ | ████ |
| ██ | █████████ | ████ | ████ |
| ██ | ██████████ | ████ | ████ |
| ██ | ███████████ | ████ | ████ |
| ██ | ██████████ | ████ | ████ |
| ██ | ████████████████ | ████ | ████ |
| ██ | █████████ | ████ | ████ |
| 9. | SODIUM CHLORIDE | 4556.829915 | 5582.7323851 |
| 10. | SODIUM PHOSPHATE MONOBASIC H2O | 262.965 | 227.1698 |
| 11. | SODIUM PHOSPHATE DIBASIC | 432.635 | 374.1491 |
| 12. | COPPER SULFATE-5H2O | 0.00062087 | 0.0005367 |
| 13. | COBALT CHLORIDE 6H2O | 0.000427582 | 0.0003693 |
| 14. | AMMONIUM MOLYBDATE 4H2O | 0.00111575 | 0.0009636 |

Michael Glacken, Sc.D.                                                        **Page 19**
Rebuttal Expert Report re Non-Infringement                    US Patent No. 7,598,083

## CONFIDENTIAL

| | Glacken Table 1 | | |
|---|---|---|---|
| | **Ingredients in HyClone Product** | **HyClone Production (mg)** | **HyClone Growth (mg)** |
| ■ | ■■■■■■ | ■■■ | ■■■ |
| 16. | NICKEL SULFATE-6H2O | 0.00109275 | 0.00094471 |
| ■ | ■■■■ | ■■■ | ■■■ |
| ■ | ■■■■■ | ■■ | ■■■ |
| 19. | STANNOUS CHLORIDE 2H2O | 0.0000092 | 0.0000079 |
| 20. | AMMONIUM METAVANADATE | 0.0000532 | 0.0000460 |
| ■ | ■■■ | ■■ | ■■■■ |
| ■ | ■■■■ | ■■ | ■■■ |
| ■ | ■■ | ■■ | ■■■ |
| ■ | ■■■ | ■■■ | ■■■ |
| 25. | L-ARGININE-HCL | 73.273 | 63.3395100 |
| 26. | L-ASPARAGINE-H2O | 3.72475 | 3.2208020 |
| ■ | ■■■■ | ■■ | ■■■ |
| ■ | ■■■■■ | ■■ | ■■■ |
| ■ | ■■■■ | ■■ | ■■■ |
| ■ | ■■■■ | ■■ | ■■■ |
| 31. | L-HISTIDINE-HCL-H2O | 15.63925 | 13.5203380 |
| ■ | ■■■■ | ■■■ | ■■■■ |
| ■ | ■■■ | ■■■ | ■■■■ |
| ■ | ■■■■ | ■■■ | ■■■■ |
| 35. | L-METHIONINE | 43.428 | 37.5687000 |

Michael Glacken, Sc.D.                                                    **Page 20**
Rebuttal Expert Report re Non-Infringement                    US Patent No. 7,598,083

## CONFIDENTIAL

| Glacken Table 1 | | | |
|---|---|---|---|
| | **Ingredients in HyClone Product** | **HyClone Production (mg)** | **HyClone Growth (mg)** |
| ██ | ████████████ | ████ | ████ |
| ██ | ████████████ | ████ | ████ |
| ██ | ██████ | ████ | ████ |
| ██ | ██████ | ████ | ████ |
| ██ | ██████ | ████ | ████ |
| ██ | ███████ | ████ | ████ |
| ██ | ███████ | ████ | ████ |
| ██ | █████████ | ████ | ████ |
| 44. | L-VALINE | 104.7865 | 90.5603400 |
| ██ | ██████ | ████ | ████ |
| ██ | █████████████ | ████ | ████ |
| ██ | ████████ | ████ | ████ |
| ██ | ██████ | ████ | ████ |
| ██ | █████████ | ████ | ████ |
| ██ | ███████ | ████ | ████ |
| ██ | ███████████ | ████ | ████ |
| ██ | ███████ | ████ | ████ |
| ██ | █████████ | ████ | ████ |
| ██ | ███████ | ████ | ████ |
| ██ | ████████ | ████ | ████ |
| ██ | ██████████ | ████ | ████ |

Michael Glacken, Sc.D.                                                    **Page 21**
Rebuttal Expert Report re Non-Infringement                    US Patent No. 7,598,083

**CONFIDENTIAL**

| Glacken Table 1 | | | |
|---|---|---|---|
| | **Ingredients in HyClone Product** | **HyClone Production (mg)** | **HyClone Growth (mg)** |
| ■ | ███████ | ███ | ███ |
| ■ | ███████ | ███ | ███ |
| ■ | █████████████ | ███ | ███ |
| ■ | ████ | █████ | ███ |
| ■ | █████ | ███ | ███ |
| ■ | ████ | ███ | ██ |
| ■ | ███████ | ███ | ████ |
| ■ | █████████ | ███ | ████ |
| ■ | ███████ | ███ | ████ |
| ■ | ██████████████ | ███ | ████ |
| ■ | █████ | ███ | ████ |
| ■ | ██████ | ███ | ████ |
| ■ | ███████ | ███ | █████ |
| ■ | ███ | ███ | ████ |
| ■ | ██████████ | ████ | ███ |
| ■ | █████████ | ███ | ████ |
| ■ | ██████ | ████ | ████ |
| ■ | ███████████ | ███ | ███ |
| ■ | ████████████ | ███ | █████ |
| ■ | █████████████ | ███ | ████ |

Michael Glacken, Sc.D.                                                      **Page 22**
**Rebuttal Expert Report re Non-Infringement**                    US Patent No. 7,598,083

**CONFIDENTIAL**

| | Glacken Table 1 | | |
|---|---|---|---|
| | **Ingredients in HyClone Product** | **HyClone Production (mg)** | **HyClone Growth (mg)** |
| ▇ | ▇▇▇▇▇▇ | ▇▇▇ | ▇▇▇ |
| ▇ | ▇▇▇▇▇▇▇▇▇ | ▇▇▇ | ▇▇▇ |
| ▇ | ▇▇▇ | ▇▇▇ | ▇▇▇ |
| ▇ | ▇▇▇▇▇▇ | ▇▇▇ | ▇▇▇ |
| ▇ | ▇▇▇ | ▇▇▇ | ▇▇▇ |
| ▇ | ▇▇▇ | ▇▇▇ | ▇▇▇ |
| ▇ | ▇▇▇ | ▇▇▇ | ▇▇▇ |
| ▇ | ▇▇▇▇▇▇▇▇ | ▇▇▇ | ▇▇▇ |
| ▇ | ▇▇▇ | ▇▇ | ▇▇ |
| ▇ | ▇▇▇▇ | ▇▇▇ | ▇▇▇ |
| ▇ | ▇▇▇▇▇ | ▇ | ▇ |
| ▇ | ▇▇▇▇▇▇▇ | ▇▇▇ | ▇▇▇ |

Wurm report at Annex 1 at Table 10.

52.     The accused HyClone products each contain 88 ingredients, including 29 ingredients that are not recited in claim 1 of the '083 patent. These additional ingredients include proteins, i.e., ▇▇▇▇▇▇▇ and ▇▇, and chemically undefined ingredients, i.e., ▇▇▇▇ and ▇▇▇▇▇. The presence of these proteins and chemically undefined ingredients disqualifies the accused media from fulfilling the stated goal of the '083 patent to satisfy "a need . . . for *chemically defined media compositions* which satisfy [certain recited] criteria and are optimized for biopharmaceutical production."  Ex. 1 ('083 patent) at

**CONFIDENTIAL**

1:44-67 (emphasis added).  Specifically, the accused HyClone products are not "chemically defined" media compositions "such that the media compositions contain only known chemical compounds, and are free of all proteins—even those not of animal origin such as recombinant proteins."  *Id.* at 1:44-49.  In my opinion, as explained further below, this alone disqualifies these accused products from being considered insubstantially different from the '083 patent claims 1 and 2, as these products do not meet the stated goal of the claims, as set out in the '083 patent specification.

### 2.      The Media As Used By Celltrion In South Korea

53.      Once HyClone's products are shipped to Celltrion in South Korea, Celltrion combines the accused products with other supplements to create the media that is used in the production of its biosimilar infliximab product.  *See* Ex. 68 (GR-MF-09-090 (Upstream Process Description for the Production of 000B)) at CELLREM-0061050-52.   I understand that Plaintiffs have not made Celltrion's use of HyClone's products in South Korea the focus of their infringement inquiry.

### 3.      HyClone's Manufacturing Of The Accused Products In Singapore

54.      I understand from the discovery record that HyClone has a manufacturing plant in Singapore, Celltrion has issued purchase orders for the accused HyClone products from that Singapore plant, and I have been informed by counsel that Celltrion intends to primarily (if not exclusively) source those products from HyClone's Singapore plant, instead of HyClone's plant in the United States (Utah).  *See* Ex. 69 (Purchase Orders to GE Healthcare PTE. LTD (Singapore)) at CELLREM-0347016-17.  My understanding from counsel is that the accused products, if manufactured and used outside of the United States, could not infringe the asserted

Michael Glacken, Sc.D.                                                    **Page 24**
**Rebuttal Expert Report re Non-Infringement**              US Patent No. 7,598,083

**CONFIDENTIAL**

patent claims, regardless of Janssen's infringement contentions regarding the doctrine of

equivalents.  I reserve the right to testify at trial as to any updates on this factual issue following

the submission of this report.

**VI.    The Accused HyClone Products Do Not Literally Infringe Claims 1 And 2 Of The
'083 Patent.**

55.      It is my opinion that neither of the accused HyClone products literally infringes

the asserted claims of the '083 patent.  Both Profs. Wurm and Butler admit that the accused

products do not literally satisfy at least a dozen claim limitations.  Butler report at ¶¶ 37-40;

Wurm report at ¶¶ 48-50.  According to Profs. Wurm and Butler, 13 claim limitations are

missing in HyClone's growth product, and 12 are missing in HyClone's production product.

Butler report at ¶ 38.  This is shown in Table 1 below from Prof. Wurm's report (Table 2 of

Prof. Butler's report):

**CONFIDENTIAL**

**Table 1**. Literal Differences Between Claim 1 and the Celltrion Media

| '083 Patent Claim 1 | | **CGM** | **CPM** |
|---|---|---|---|
| **Ingredient** | **Amount (per liter)** | **Amount (per liter)** | **Amount (per liter)** |
| NaCl | 5000-7500 mg | literally within range | 4556.83 mg |
| NaH2PO4•H2O | 30-100 mg | 227.17 mg | 262.97 mg |
| Na2HPO4 | 30-100 mg | 374.15 mg | 432.64 mg |
| CuSO4•5H2O | 0.001-0.005 mg | 0.000536727 mg | 0.00062087 mg |
| CoCl2•6H2O | 0.001-0.10 mg | 0.000369 mg | 0.00043 mg |
| (NH4)6Mo7O24•4H2O | 0.001-0.005 mg | 0.000964 mg | literally within range |
| NiSO4•6H2O | 0.000025-0.0005 mg | 0.00094471 mg | 0.00109275 mg |
| SnCl2•2H2O | 0.000025-0.0005 mg | 0.000008 mg | 0.00001 mg |
| NH4VO3 | 0.0001-0.0025 mg | 0.000046 mg | 0.00005 mg |
| L-arginine•HCl | 200-5000 mg | 63.34 mg | 73.27 mg |
| L-asparagine•H2O | 40-250 mg | 3.22 mg | 3.72 mg |
| L-histidine•HCl•H2O | 100-500 mg | 13.52 mg | 15.64 mg |
| L-methionine | 50-500 mg | 37.57 mg | 43.43 mg |
| L-valine | 100-1000 mg | 90.56 mg | literally within range |

56.     The accused products provide some of the claimed ingredients in a different form than what is claimed and thus not literally infringe the claim limitations.

**VII.    Profs. Wurm And Butler Have Not Offered An Appropriate Theory Of Infringement Under The Doctrine Of Equivalents.**

57.     In my opinion, Profs. Wurm and Butler have not offered an adequate theory of infringement under the doctrine of equivalents for each of the missing claim limitations.  That

**CONFIDENTIAL**

is, in my opinion, Janssen cannot meet its burden of showing infringement regardless of what Prof. Wurm's testing shows.

58.     As discussed above, the accused products are not "chemically defined," in that they include chemically undefined ingredients as well as proteins.  Thus, in my opinion, a POSA would not consider the accused products to fall within what the inventors considered to be the field of their claimed invention—i.e., "chemically defined media compositions for the culture of eukaryotic cells."  Ex. 1 ('083 patent at 1:12-14); *see also id.* at 4:30-31.  Nor would a POSA consider that the accused products which contain undefined ingredients function in the same way, because the purpose of claims 1 and 2 was to provide chemically defined soluble compositions.  Nevertheless, I understand that the Court's construction of "cell culture media" may, as a legal matter, mean the scope of the patent covers certain soluble compositions even if they include chemically undefined ingredients (such as hydrolysates) and proteins.

59.     Even assuming that to be the case, in my opinion—regardless of what Prof. Wurm's testing shows (which I address later in this report)—Profs. Wurm and Butler have not justified expanding the literal scope of claims 1 and 2 to cover the accused products under the doctrine of equivalents.  This is because:  (a) based on the intrinsic record, a POSA would consider the claimed concentration ranges to define the outer bounds of the claimed invention under the doctrine of equivalents; (b) the broad claim interpretation advanced by Profs. Wurm and Butler essentially reads the concentration limitations out of claim 1; (c) a POSA would have no guidance to conduct tests to assess infringement under the infringement theory advanced by Profs. Wurm and Butler; and (d) construing the asserted claims broadly enough to capture the accused products would ensnare prior art.

**CONFIDENTIAL**

A.     **A POSA Would Consider The Concentration Limitations of Claims 1 and 2
       To Define The Outer Bounds Of The Claimed Invention.**

60.     A POSA reviewing the '083 patent would believe that the asserted claims should

not be afforded a broader range of equivalents for each of the claimed concentration ranges—

because these ranges represent the furthest reach of the purported invention.

61.     As discussed, the '083 patent sought to address an express need in the art for a

chemically defined media composition that was optimal for the production of biopharmaceutical

products. Ex. 1 ('083 patent), at 1:52-67.   That composition was MET 1.5.   The '083 patent

describes a single example and embodiment of the alleged invention, referred to as the MET 1.5

medium.   *Id*. at 6:5-7:6.   In Examples 1-3, the patent asserts that the "chemically defined MET

1.5 media" fulfill three of the express criteria for the optimal production of biopharmaceutical

products: (a) "high cell growth and viability" (Example 1); (b) "high monoclonal antibody titers

and specific productivity" (Example 2); and (c) "decreased lactate production" (Example 3).   *Id*.

at 9:40-10:43; *see also id.* at 1:52-64.   The MET 1.5 medium is recited in claim 6 of the '083

patent.   See *id*. at claim 6.   I understand that claim 6 is not asserted against Defendants.

62.     As compared to the MET 1.5 medium (and corresponding unasserted claim 6), the

soluble composition of claim 1 (called generically the "MET" composition) contains the exact

same ingredients.   *Compare id*. at 6:5-7:6 *with* claim 1.   The only difference is the ingredient

concentrations, with claim 1 reciting concentration *ranges* for each named ingredient that

encompass the specific concentrations found in the MET 1.5 composition.   *Id*.   For example,

L-histidine HCL $H_2O$ is disclosed in MET 1.5 media composition and claimed in claim 6 as

250.55 mg, but it is claimed as a range of 100-500 mg in the MET media composition and in

claim 1.   The lone example of a composition within this range from the specification—the MET

Michael Glacken, Sc.D.                                                                    **Page 28**
Rebuttal Expert Report re Non-Infringement                          US Patent No. 7,598,083

CONFIDENTIAL

1.5 composition—illustrates to a POSA that the concentration ranges in claim 1 must have meaning.  In view of the single embodiment of the MET 1.5 composition and the patent claims, a POSA would reasonably infer that, at least according to the named inventors, the MET composition, as claimed in asserted claim 1, represents the permissible range of equivalents of the MET 1.5 composition.  In other words, a POSA would read claim 1 already to cover and capture a range of equivalents for the concentration ranges of the specific ingredients, because claim 1 already incorporates broader concentration ranges than the sole MET 1.5 composition that the inventors made, disclosed, and tested in the '083 patent.

63.     The language of claim 1 itself confirms that the inventors carefully chose the upper and lower concentration ranges for each of the recited ingredients.  Evidence of this is suggested by the tremendous variance in the relative breadth of concentration ranges specified by claim 1 of the '083 patent.  This may be most easily seen by calculating the ratio of the high end of the claimed range to the low end of the claimed range for each ingredient from the '083 patent.  Ingredients with the lowest ratios (i.e., narrowest ranges) are NaCl (1.5-fold difference [5000 – 7500 mg/L]), KCl (1.8-fold difference [280 – 500 mg/L]) and $ZnSO_4.7H_2O$ (3-fold difference, [0.40-1.20 mg/L]) while ingredients with the highest ratios (i.e., widest ranges) are ferric ammonium citrate (5000-fold difference [0.04-200 mg/L]) and L-tryptophan (250-fold difference, [2-500 mg/L]).  Indeed, there are 23 different ratios for the maximum to minimum concentrations specified among the 52 non-optional ingredients.  Table 2 provides the number of ratio differences among the 52 ingredients in claim 1.

CONFIDENTIAL

| Glacken Table 2 | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Occurrence of Max/Min Ratio | | | | | | | | | | | |
| Max/Min Ratio | 1.5 | 1.8 | 3 | 3.3 | 4 | 5 | 6.3 | 8 | 10 | 12 | 16 | 18 |
| Occurrence | 1 | 1 | 1 | 3 | 1 | 3 | 1 | 1 | 10 | 1 | 1 | 1 |
| Occurrence of Max/Min Ratio | | | | | | | | | | | |
| Max/Min Ratio | 20 | 25 | 33 | 40 | 50 | 60 | 100 | 114 | 200 | 250 | 5000 | Opt. |
| Occurrence | 5 | 3 | 1 | 3 | 3 | 2 | 5 | 1 | 2 | 1 | 1 | 9 |

64.     Given the tremendous variety of these ratios of the maximum specified concentrations to the minimum specified concentrations, a POSA would conclude these concentrations are indeed meaningful, as clearly the inventors did not arbitrarily specify a uniform 2-fold, 5-fold, 10-fold, or 100-fold concentration span on either side of each of the MET 1.5 concentrations.  Given these unique maximum-to-minimum concentrations and ratios specified by claim 1 for nearly half of the ingredients, a POSA would reasonably conclude that these concentrations and ratios were deliberately established and supported as equivalents of MET 1.5.  The fact that 9 ingredients are deemed optional, in that their minimum concentrations may be 0, further enforces this notion.  That is, the 52 non-optional ingredients must be included in the medium at some non-zero concentration.  A POSA would reasonably assume that these minimum non-zero concentrations for each ingredient would be the lower value of the concentration ranges specified in claim 1 of the '083 patent.

65.     A POSA would also understand that the forms and concentration limits for the ingredients recited in claim 1 are critical in view of claim 2.  Claim 2 recites two additional types of ingredients—a buffering molecule and a cell protectant—that may be added to the soluble composition of claim 1 in any amount.  Notably, the inventors did not specify any

## CONFIDENTIAL

particular form or amount for either of these ingredients.  This shows a POSA that the inventors claimed particular forms and concentrations when important to defining their claimed invention, and they omitted form and concentration limitations when such a limitation would be less important to the claimed invention.

66.     A POSA would have further read the claimed concentration limitations of claim 1 more strictly given the advanced state of the prior art.  The soluble composition of the '083 patent is not a pioneering or first-of-its-kind invention.  As discussed in my opening expert report, the field of cell culture media was well-developed by the asserted priority date of October 2004.  *See generally* Glacken Invalidity Report ¶¶ 67-201.  Each of the claimed ingredients was commonly used in cell culture media in amounts that overlap with the claimed concentration ranges.  *Id*. ¶¶ 202-260.  Claim 1, therefore, already is directed to equivalents of the ingredients found in the specific chemically defined cell culture media composition (MET 1.5).

67.     I understand that where, as here, a patentee has brought what would otherwise be equivalents of a limitation into the literal scope of the claim, the doctrine of equivalents is unavailable to further broaden the scope of the claim.  I understand that in these circumstances, a patentee cannot rely on the doctrine of equivalents to encompass equivalents of equivalents.

68.     Given the intrinsic record and the extensive prior art, a POSA would afford the '083 patent a narrow range of equivalents for the claimed compositions and not more than the MET composition claimed in claim 1.  As I discuss in more depth below, a POSA certainly would not afford the asserted claims the breadth advanced by Profs. Wurm and Butler, because doing so would mean that the many concentration limits in the asserted claims go well beyond

## CONFIDENTIAL

the inventors' supposed contribution, would be effectively meaningless, and would ensnare prior art.

**B.      The Broad Infringement Theory Advanced By Profs. Wurm And Butler Essentially Eliminates Claim Limitations.**

69.      I understand that each element contained in a patent claim is considered important to defining the scope of the claimed invention.  I further understand that the application of the doctrine of equivalents, even as to a single claim element, cannot be so broad as to effectively eliminate that element in its entirety.

70.      Even accepting the ingredient concentrations as reported by Profs. Wurm and Butler, the accused products contain multiple claimed ingredients that are more than double the maximum claimed concentrations or less than half the minimum claimed concentrations.  Below are charts that illustrate this point:[7]

| Glacken Table 3 | | |
|---|---|---|
| **Ingredients Present In Amounts Less Than The Claimed Concentration Range** | | |
| **Elements of '083 Patent** | **Amount in HyClone's Production Product** | **% of the Lower Limit of the Claim** |
| $CoCl_2.6H_2O$, 0.001-0.10 mg; | COBALT CHLORIDE 6H2O, 0.000427582 mg | 43% of lower limit |
| $SnCl_2.2H_2O$, 0.000025-0.0005 mg; | STANNOUS CHLORIDE 2H2O, 0.0000092 mg | 37% of lower limit |
| L-arginine.HCl, 200-5000 mg; | L-ARGININE-HCL, 73.273 mg | 37% of lower limit |
| L-histidine.HCl.$H_2O$, 100-500 mg; | L-HISTIDINE-HCL-H2O, 15.63925 mg | 16% of lower limit |
| L-asparagine.$H_2O$, 40-250 mg; | L-ASPARAGINE-H2O, 3.72475 mg | 9% of lower limit |

---

[7] Profs. Butler and Wurm note that the accused HyClone products also contain other forms of the active component for L-arginine, L-histidine, L-asparagine, and copper.  These other forms are not recited in claim 1.

Michael Glacken, Sc.D.                                                    **Page 32**
Rebuttal Expert Report re Non-Infringement          US Patent No. 7,598,083

CONFIDENTIAL

| Glacken Table 4 | | |
|---|---|---|
| **Ingredients Present in Amounts Greater Than The Claimed Concentration Range** | | |
| **Elements of '083 Patent** | **Amount in HyClone's Production Product** | **% of the Upper Limit of the Claim** |
| $Na_2HPO_4$, 30-100 mg; | SODIUM PHOSPHATE DIBASIC, ANHY, 432.635 mg | 433% of upper limit |
| $NaH_2PO_4.H_2O$, 30-100 mg; | SODIUM PHOSPHATE MONOBASIC H2O, 262.965 mg | 263% of upper limit |
| $NiSO_4.6H_2O$, 0.000025-0.0005 mg; | NICKEL SULFATE-6H2O, 0.00109275 mg | 219% of upper limit |

| Glacken Table 5 | | |
|---|---|---|
| **Ingredients Present In Amounts Less Than The Claimed Concentration Range** | | |
| **Elements of '083 Patent** | **Amount in HyClone's Growth Product** | **% of the Lower Limit of the Claim** |
| $NH_4VO_3$, 0.0001-0.0025 mg; | AMMONIUM METAVANADATE, 0.0000460 mg | 46% of lower limit |
| $CoCl_2.6H_2O$, 0.001-0.10 mg; | COBALT CHLORIDE 6H2O, 0.0003693 mg | 37% of lower limit |
| $SnCl_2.2H_2O$, 0.000025-0.0005 mg; | STANNOUS CHLORIDE 2H2O, 0.0000079 mg | 32% of lower limit |
| L-arginine.HCl, 200-5000 mg; | L-ARGININE-HCL, 63.3395100 mg | 32% of lower limit |
| L-histidine.HCl.H_2O, 100-500 mg; | L-HISTIDINE-HCL-H2O, 13.5203380 mg | 14% of lower limit |
| L-asparagine.H_2O, 40-250 mg; | L-ASPARAGINE-H2O, 3.2208020 mg | 8% of lower limit |

Michael Glacken, Sc.D.                                                    **Page 33**
Rebuttal Expert Report re Non-Infringement                   US Patent No. 7,598,083

CONFIDENTIAL

| Glacken Table 6 | | |
|---|---|---|
| **Ingredients Present in Amounts Greater Than The Claimed Concentration Range** | | |
| **Elements of '083 Patent** | **Amount in HyClone's Growth Product** | **% of the Upper Limit of the Claim** |
| $Na_2HPO_4$, 30-100 mg; | SODIUM PHOSPHATE DIBASIC, ANHY, 374.1491 mg | 374% of upper limit |
| $NaH_2PO_4.H_2O$, 30-100 mg; | SODIUM PHOSPHATE MONOBASIC H2O, 227.1698 mg | 227% of upper limit |
| $NiSO_4.6H_2O$, 0.000025-0.0005 mg; | NICKEL SULFATE-6H2O, 0.00094471 mg | 188% of upper limit |

71.     Applying the doctrine of equivalents to differences of this magnitude would essentially eliminate the claim limitations that require particular ingredients within specified concentration ranges.  In essence, to support Janssen's contention of infringement, Profs. Wurm and Butler opine that only the active component of the ingredients recited in claim 1—and not the specific concentration ranges for the ingredients—matters for purposes of assessing infringement.  In other words, Profs. Wurm and Butler's infringement opinions and analyses render concentration claim limitations meaningless.

72.     For example, Prof. Butler's discussion of the 5 trace element-containing ingredients shows how his analysis eliminates the claim limitations that require ingredients in specific concentration ranges.  Prof. Butler states that, "[g]enerally speaking, the precise concentrations of the trace element-containing ingredients are not critical.  What is important is that there be a sufficient amount present to fulfill the biological function of the element, and that the ingredient be present in trace amounts (and that the concentration not be so high as to be toxic to the cells)."  Butler report ¶ 42.

CONFIDENTIAL

73.     I disagree with Prof. Butler's interpretation of the concentration limitations.  First, the inventors could have tried to define their invention in functional terms (e.g., "a sufficient amount present to fulfill the biological function of the element"), but they did not do that. Instead, they chose specific concentration ranges, which the PTO accepted with modification.

74.     Second, Prof. Butler offers no scientific reason why a POSA would read the concentration limits of the asserted claims to be "not critical."  *Id.*  Prof. Butler does not identify any support in the patent specification or claims suggesting that the specific concentration limits may extend to an amount as little as "a sufficient amount present to fulfill the biological function of the element," or as much as "the concentration not be so high as to be toxic to the cells."  *Id.*  In short, the way that I read Prof. Butler's report, he essentially is saying a POSA would ignore the claimed concentration ranges altogether.  I disagree.

75.     Prof. Butler's assumption that the claimed concentration limits are entitled to equivalence to any functional amount of the ingredient underlies his analysis of each of the trace element-containing ingredients.   For example, Prof. Butler explains that the function of $CoCl_2.6H_2O$ is to provide a trace amount of cobalt (II), which he asserts plays a role as a cofactor in certain vitamin-$B_{12}$-dependent enzymes and other enzymes in mammalian cells.  *See* Butler report ¶ 46.  While he identifies a function for the claimed ingredient, he does not associate any function, way, or result to the claimed *concentration* of $CoCl_2.6H_2O$.  In place of this analysis, he concludes that "the differences in the concentration between the $CoCl_2.6H_2O$ in the [HyClone products] and in claim 1 are insubstantial," because "the concentrations in the [HyClone products] are close to the claimed concentration range."  *Id.*  I disagree.

CONFIDENTIAL

76.     Again, in offering this opinion, Prof. Butler does not provide any standard for how he evaluates an "insubstantial" or "close" difference. *Id.* Further, Prof. Butler provides no testing to support his characterizations of "insubstantial" or "close" difference with respect to an ingredient's function or concentration.

77.     Prof. Butler then asserts that Prof. Wurm's laboratory testing confirms that the differences in amounts are insubstantial. *Id.* ¶ 47. But, as discussed in more depth below, Prof. Wurm's testing only measured cell growth and antibody production. He did not evaluate whether the difference in concentration of CoCl2.6H2O led to a different result in its performance—*i.e.*, serving as a cofactor in certain vitamin-B12-dependent enzymes and other enzymes in mammalian cells. At best, Prof. Wurm's testing evaluated the overall performance of the accused media, as opposed to the function, way, and result of each ingredient at the specific concentration on a limitation-by-limitation basis.

78.     Prof. Butler's doctrine of equivalents analysis follows the same pattern for each of the other missing claim limitations—*i.e.*, the concentration elements for $NiSO_4.6H_2O$, $SnCl_2.2H_2O$, $NH_4VO_3$, $CuSO_4.5H_2O$, L-methionine, L-valine, L-histidine.$HCl.H_2O$, L-arginine.HCl, L-asparagine.$H_2O$, $NaH_2PO_4.H_2O$, $Na_2HPO_4$, and NaCl. That is, Prof. Butler's analysis again does not identify any function, way, or result associated with the non-infringing ingredient in the claimed concentration ranges. Nor did he articulate any scientific basis for evaluating whether the differences in the amounts of the ingredients are actually "insubstantial" as he alleges.

79.     Prof. Butler set out specific functions for each of these ingredients. Butler report at ¶ 46 (function of CoCl2.6H2O); *see also* ¶¶ 49, 52, 55, 58, 67, 70, 74, 79, 84, 89, 92 (setting

**CONFIDENTIAL**

out the function of ingredients, each of which are not present in the claimed concentrations in the accused HyClone products). He states that he would "expect, subject to experimentation" that cells would perform similarly in the HyClone products as it would in media having the concentration of the ingredients actually claimed. Butler report at ¶ 46. Yet, he provides *no experimentation and conducts no observations* regarding these functions or the impact of the different concentrations on the any aspect of the cells' characteristics. As such, his conclusions are based on speculation and do not assess equivalence on a limitation-by-limitation basis for any limitations alleged to be equivalent.

80.       Therefore, in my opinion, Prof. Butler's analysis does not address the key question raised here: whether the concentrations of the ingredients at issue in the accused products are equivalent to the concentrations of those ingredients claimed in the patent. Prof. Butler avoids identifying the function, way, and result associated with each of the missing *concentrations*. Instead, without justification from the patent specification and claims, Prof. Butler adopts a broad functional test under which, in his opinion, any differences in the concentrations of the ingredients are deemed "insubstantial," or he "expects" them to be insubstantial, so long as the cells grown in the cell culture media perform similarly.

81.       This analysis by Prof. Butler ignores the specific contribution of each of the concentration ranges of claim 1, and instead attempts to make a general comparison of the accused products against the claimed invention as a whole. Whatever test he purports to apply to show equivalence, I understand it is not permissible under the law to avoid evaluating equivalence on a limitation-by-limitation basis.

**CONFIDENTIAL**

C.    **The Broad Infringement Theory Advanced By Profs. Wurm And Butler Leave A POSA With No Practical Way To Assess Infringement Under The Doctrine Of Equivalents**

82.    I understand that the language of the patent claims serves an important notice function—namely, to provide the public notice of the scope of the alleged invention.  That is, the public generally, and in particular, the patentee's competitors, are entitled to clear and specific notice of what the inventor claims as his invention.  Such clear notice informs a competitor, who may be contemplating an expensive investment, of what is permissible.

83.    I have been informed that each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim not to the invention as a whole.  I understand that the application of the doctrine of equivalents, even as to an individual element, cannot be allowed such broad play as to effectively eliminate that element in its entirety.  I further understand that equivalency must be determined based on the context of the patent, the prior art, and the particular circumstances of a case.  And consideration must be given to the purpose for which an ingredient is used in a patent, the qualities it has when combined with the other ingredients, and the function which it is intended to perform.

84.    In evaluating claim 1 of the '083 patent where there is no literal infringement, the POSA's job is made very difficult by the fact that all of the ingredients in claim 1—every single one—are described in the public literature for use in serum-free cell culture medium.  So when faced with claim 1 of the '083 patent, a POSA is given somewhat of a dilemma:  how exactly does this '083 patent distinguish itself from what is in the literature?  How do I, as a POSA, know what I can use from the public literature and what I am prevented from using by the '083

Michael Glacken, Sc.D.                                                          **Page 38**
Rebuttal Expert Report re Non-Infringement                          US Patent No. 7,598,083

## CONFIDENTIAL

patent?  In the specification of the '083 patent, the inventors do not compare and contrast their invention to what already exists in the public domain.  They make no claims regarding what is important and what is not important in their invention compared to what is in the public domain.

85.     For example, a POSA would surely think he or she could use glucose in some capacity in their medium.  Glucose was in Eagle's medium in 1955.  The same is true for lysine, valine, leucine, NaCl, KCl, riboflavin, thiamine and many more compounds that are all in Eagle's medium formulation he published more than 60 years ago.  Surely, a POSA would think that he or she was allowed to use these ingredients even though they are also in claim 1 of the '083 patent.  If a POSA can use all of these ingredients at some level, what does the patent prevent the POSA from doing?  The most obvious answer is the claimed ingredients at the concentration ranges listed in claim 1.  Because each and every ingredient in claim 1 of the '083 patent is in the public domain for a cell culture medium, the only limitation that would make sense to the POSA would be the concentration ranges specified in claim 1.

86.     According to Profs. Wurm and Butler, a POSA considering whether to make a soluble composition that includes at least the 52 ingredients required by claim 1 (all of which were used to prepare cell culture media at the time) would have to conduct extensive and expensive testing[8] to assess infringement—even if the composition included chemically undefined ingredients, proteins, and recited ingredients far beyond the scope of the claimed concentration ranges.

---

[8] I understand that Janssen paid Prof. Wurm about $1 million to conduct his testing.  Ex. 70 (Plaintiffs' Responses and Objections to Defendants' Interrogatory No. 7, dated July 22, 2016) at 9.

## CONFIDENTIAL

87.     In fact, Prof. Wurm did not even conduct testing under the same conditions as described in the '083 patent.  For instance, as discussed further below, the testing of the MET 1.5 medium in the '083 patent was conducted using a perfusion bioreactor run over 29 days.  Glacken Invalidity Ex. 1, ('083 patent) at Examples 1-3.  By contrast, Prof. Wurm conducted testing in a batch culture at a much smaller scale for only up to 10 days.  Wurm report at ¶¶ 67-68.  Conducting a full perfusion bioreactor test over the course of 29 days, as discussed in the '083 patent, would be significantly more extensive and expensive to conduct.

88.     Even if the doctrine of equivalents could be applied to claims 1 and 2 based on testing, a POSA would find it difficult to apply that doctrine based on testing of the accused products here because, among other reasons:  (a) there are many ingredients of the accused HyClone products that are outside of the claimed concentration ranges; (b) claim 1 is a "comprising" claim, meaning that additional ingredients not addressed in claim 1 could affect test results; (c) the broadly worded claim 1 already covers equivalents to MET 1.5, and there is no specified testing in the '083 patent for assessing further equivalents; (d) claim 1 does not specify a publicly-available cell line to use for testing, and cell lines differ in their growth and productivity response to cell media formulations (e.g., Ex. 81 (Lonza Presentation) at 12-14, 18); and (e) any testing for further equivalents would require undue experimentation, be expensive and time consuming, and ultimately still be subject to criticisms and disputes.

89.     In short, applying the doctrine of equivalents under the circumstances here would not give a skilled artisan fair notice that the accused products infringe the asserted claims of the '083 patent.  Thus, a POSA reading claims 1 and 2—including the specific concentration

Michael Glacken, Sc.D.                                                    **Page 40**
Rebuttal Expert Report re Non-Infringement                    US Patent No. 7,598,083

CONFIDENTIAL

limitations of claim 1—would not conclude that either of these claims could reasonably be expanded under the doctrine of equivalents to cover the accused products here.

### D. The Broad Infringement Theory Advanced By Profs. Wurm And Butler Ensnares Prior Art.

90.      I understand that the prior art can also limit the range of permissible equivalents of a claim limitation under a defense referred to as "ensnarement."  I understand that there can be no infringement under the doctrine of equivalents if the asserted scope of equivalency would encompass the prior art.  I understand that, when determining whether the prior art restricts the range of equivalents of what is literally claimed, it may be helpful to visualize a hypothetical patent claim that is sufficient in scope to literally cover the accused product.  I understand that the key inquiry is whether that hypothetical claim could have been allowed by the PTO over the prior art.  I understand that if the hypothetical claim could have been allowed by the PTO in view of the prior art, then the prior art does not preclude the application of the doctrine of equivalents.  I further understand that if references may be combined to show that the hypothetical claim would have been obvious to one of ordinary skill in the art, the hypothetical claim would not have been allowed and the patentee cannot assert the doctrine of equivalents to cover the accused product.  I understand that the burden is on the patentee to prove that the range of equivalence it seeks would not ensnare the prior art.

91.      In my opinion, this principle applies here to bar the application of the doctrine of equivalents, because hypothetical versions of the asserted claims read upon the prior art.[9]

---

[9] I have been informed by counsel that whether the prior art limits application of the doctrine of equivalents to prove infringement is a separate inquiry from whether the asserted claims are obvious over the prior art to prove invalidity.  I note that, as set forth in my opening invalidity report, the asserted claims are invalid as obvious over the prior art.

## CONFIDENTIAL

1. **Hypothetical Claims That Literally Encompass The Accused HyClone Products Require Many Changes.**

92.    Below I have prepared hypothetical versions of the asserted claims that would literally encompass both the accused HyClone products.  For purposes of this analysis, I have assumed that, for each of the literally absent claim limitations, the concentration of each ingredient or each active component in the accused products represents the outer bound for claims 1 and 2.  I note, however, that neither Prof. Wurm nor Prof. Butler has made that assertion.  In other words, they have not identified what they purport to be the full range of equivalents for each claim limitation; instead, they merely assert that the accused HyClone products contain equivalent ingredients.  Under their analysis, claims 1 and 2 may capture products that are even further removed from the literal scope of those claims than the accused products.

93.    For purposes of my analysis, I identified each of the claim limitations that Profs. Butler and Wurm agree are not literally met, and then re-wrote them to include the concentrations of those respective ingredients or their active component in the accused HyClone products.  The claim limitations that have been changed to conform to their analysis are highlighted below.

| Glacken Table 7 | |
|---|---|
| **Claim 1 of the '083 Patent** | **Hypothetical DOE Claim 1** |
| A soluble composition, suitable for producing a final volume of cell culture media, wherein the composition comprises the following components in the following amounts per liter of the final volume of cell culture media: | A soluble composition, suitable for producing a final volume of cell culture media, wherein the composition comprises the following components in the following amounts per liter of the final volume of cell culture media: |
| anhydrous $CaCl_2$, 5 – 200 mg; | anhydrous $CaCl_2$, 5 – 200 mg; |
| anhydrous $MgCl_2$, 15 – 50 mg; | anhydrous $MgCl_2$, 15 – 50 mg; |

Michael Glacken, Sc.D.                                                    **Page 42**
Rebuttal Expert Report re Non-Infringement              US Patent No. 7,598,083

**CONFIDENTIAL**

| Glacken Table 7 | |
|---|---|
| **Claim 1 of the '083 Patent** | **Hypothetical DOE Claim 1** |
| anhydrous $MgSO_4$, 20 – 80 mg; | anhydrous $MgSO_4$, 20 – 80 mg; |
| $FeSO_4.7H_2O$, 0.05 – 0.50 mg; | $FeSO_4.7H_2O$, 0.05 – 0.50 mg; |
| $Fe(NO_3)_3.9H_2O$, 0.01 – 0.08 mg; | $Fe(NO_3)_3.9H_2O$, 0.01 – 0.08 mg; |
| $ZnSO_4.7H_2O$, 0.40 – 1.20 mg; | $ZnSO_4.7H_2O$, 0.40 – 1.20 mg; |
| ferric ammonium citrate, 0.04 – 200 mg; | ferric ammonium citrate, 0.04 – 200 mg; |
| KCl, 280 – 500 mg; | KCl, 280 – 500 mg; |
| NaCl, **5000** – 7500 mg; | NaCl, **4556.829915** – 7500 mg;[10] |
| $NaH_2PO_4.H_2O$, 30 – **100** mg; | $NaH_2PO_4.H_2O$, 30 – **262.965** mg;[11] |
| $Na_2HPO_4$, 30 – **100** mg; | $Na_2HPO_4$, 30 – **432.635** mg;[12] |
| $CuSO_4.5H_2O$, **0.001** – 0.005 mg; | **Copper (II)**, **0.00025-0.0013** mg;[13] |
| $CoCl_2.6H_2O$, **0.001** – 0.10 mg; | $CoCl_2.6H_2O$, **0.0003693** – 0.10 mg;[14] |
| $(NH_4)_6Mo_7O_{24} \cdot 4H_2O$, **0.001** – 0.005 mg; | $(NH_4)_6Mo_7O_{24} \cdot 4H_2O$, **0.0009636** – 0.005 mg;[15] |
| $MnSO_4 \cdot H_2O$, 0.000070 – 0.0080 mg; | $MnSO_4 \cdot H_2O$, 0.000070 – 0.0080 mg; |
| $NiSO_4 \cdot 6H_2O$, 0.000025 – **0.0005** mg; | $NiSO_4 \cdot 6H_2O$, 0.000025 – **0.00109275** mg;[16] |
| $Na_2SeO_3$, 0.004 – 0.07 mg; | $Na_2SeO_3$, 0.004 – 0.07 mg; |

[10] HyClone's production product contains 4556.829915 mg SODIUM CHLORIDE, about 91% of the claimed lower limit.

[11] HyClone's production product contains 262.965 mg SODIUM PHOSPHATE MONOBASIC $H_2O$, about 263% of the claimed upper limit.

[12] HyClone's growth product contains 432.635 mg SODIUM PHOSPHATE DIBASIC, ANHY, about 433% of the claimed upper limit.

[13] HyClone's growth product contains 0.000536727 mg COPPER SULFATE-5H2O, about 54% of the claimed lower limit.  Prof. Butler asserts that the combined molar amount of copper (II) contained in two ingredients in HyClone's growth product (0.000536727 mg COPPER SULFATE-5H2O and 0.001781929 mg CUPRIC CHLORIDE-2H2O) is equivalent to this claim limitation.  Butler report ¶¶ 59-61.  He calculates that this claim limitation provides between 4.005-20.25 nmol copper (II), equivalent to 0.00025-0.0013 mg copper (II). *Id.*

[14] HyClone's production product contains 0.000369285 mg COBALT CHLORIDE 6H2O, about 37% of the claimed lower limit.

[15] HyClone's growth product contains 0.000963629 mg AMMONIUM MOLYBDATE 4H2O, about 96% of the claimed lower limit.

[16] HyClone's production product contains 0.00109275 mg NICKEL SULFATE-6H2O, about 219% of the claimed upper limit.

Michael Glacken, Sc.D.                                                    **Page 43**
Rebuttal Expert Report re Non-Infringement                US Patent No. 7,598,083

**CONFIDENTIAL**

| Glacken Table 7 | |
|---|---|
| **Claim 1 of the '083 Patent** | **Hypothetical DOE Claim 1** |
| $Na_2SiO_3.9H_2O$, 0.02 – 0.4 mg; | $Na_2SiO_3.9H_2O$, 0.02 – 0.4 mg; |
| $SnCl_2.2H_2O$, **0.000025** – 0.0005 mg; | $SnCl_2.2H_2O$, **0.0000079** – 0.0005 mg;[17] |
| $NH_4VO_3$, **0.0001** – 0.0025 mg; | $NH_4VO_3$, **0.0000460** – 0.0025 mg;[18] |
| D-Glucose, 500 – 8000 mg; | D-Glucose, 500 – 8000 mg; |
| sodium pyruvate, 0.0 – 1000 mg; | sodium pyruvate, 0.0 – 1000 mg; |
| sodium hypoxanthine, 0.0 – 20.0 mg; | sodium hypoxanthine, 0.0 – 20.0 mg; |
| glycine, 0.0 – 150 mg; | glycine, 0.0 – 150 mg; |
| L-alanine, 0.0 – 150 mg; | L-alanine, 0.0 – 150 mg; |
| L-arginine.HCl, **200** – 5000 mg; | **L-arginine**, **165-4130** mg;[19] |
| L-asparagine.$H_2O$, **40** – 250 mg; | **L-asparagine**, **35-220** mg;[20] |
| L-aspartic acid, 20 – 1000 mg; | L-aspartic acid, 20 – 1000 mg; |
| L-cysteine.HCl.$H_2O$, 25.0 – 250 mg; | L-cysteine.HCl.$H_2O$, 25.0 – 250 mg; |
| L-cystine.2HCl, 15 – 150 mg; | L-cystine.2HCl, 15 – 150 mg; |
| L-glutamic acid, 0 – 1000 mg; | L-glutamic acid, 0 – 1000 mg; |
| L-histidine.HCl.$H_2O$, **100** – 500 mg; | **L-histidine**, **44-370** mg;[21] |

[17] HyClone's growth product contains 0.0000079 mg STANNOUS CHLORIDE 2H2O, about 32% of the claimed lower limit.

[18] HyClone's growth product contains 0.000046 mg AMMONIUM METAVANADATE, about 46% of the claimed lower limit.

[19] HyClone's growth product contains 63.33951 mg L-ARGININE-HCL, about 32% of the claimed lower limit.  Prof. Butler asserts that the combined molar amount of L-arginine contained in two ingredients in HyClone's growth product (63.33951 mg L-ARGININE-HCL and 161.0401 mg L-ARGININE)  is equivalent to this claim limitation.  Butler report ¶¶ 76-77. He calculates that this claim limitation provides between 0.949-23.735 mmol L-arginine, which is equivalent to 165-4130 mg of L-arginine.  *Id.*

[20] HyClone's growth product contains 3.220802 mg L-ASPARAGINE-H2O, about 8% of the claimed lower limit.  Prof. Butler asserts that the combined molar amount of L-asparagine contained two ingredients in HyClone's growth product (3.220802 mg L-ASPARAGINE-H2O and 167.60913 mg L-ASPARAGINE) is equivalent to this claim limitation.  Butler report ¶¶ 81-84.  He calculates that this claim limitation provides between 0.266-1.665 mmol L-asparagine, which is equivalent to 35-220 mg L-asparagine.  *Id.*

[21] HyClone's growth product contains 13.520338 mg L-HISTIDINE-HCL-H2O, about 14% of the claimed lower limit.  Prof. Butler asserts that the combined molar amount of L-histidine contained two ingredients in HyClone's growth product (13.520338 mg L-HISTIDINE-HCL-H2O and 34.4929 L-HISTIDINE, comprising a total of 0.286 mmol L-HISTIDINE which is

Michael Glacken, Sc.D.                                                    **Page 44**
Rebuttal Expert Report re Non-Infringement                    US Patent No. 7,598,083

### CONFIDENTIAL

| Glacken Table 7 | |
| :---: | :---: |
| **Claim 1 of the '083 Patent** | **Hypothetical DOE Claim 1** |
| L-isoleucine, 50 – 1000 mg; | L-isoleucine, 50 – 1000 mg; |
| L-leucine, 50 – 1000 mg; | L-leucine, 50 – 1000 mg; |
| L-lysine.HCl, 100 – 1000 mg; | L-lysine.HCl, 100 – 1000 mg; |
| L-methionine, **50** – 500 mg; | L-methionine, **37.5687000** – 500 mg;[22] |
| L-ornithine.HCl, 0 – 100 mg; | L-ornithine.HCl, 0 – 100 mg; |
| L-phenylalanine, 25 – 1000 mg; | L-phenylalanine, 25 – 1000 mg; |
| L-proline, 0 – 1000 mg; | L-proline, 0 – 1000 mg; |
| L-serine, 50 – 500 mg; | L-serine, 50 – 500 mg; |
| L-taurine, 0 – 1000 mg; | L-taurine, 0 – 1000 mg; |
| L-threonine, 50 – 600 mg; | L-threonine, 50 – 600 mg; |
| L-tryptophan, 2 – 500 mg; | L-tryptophan, 2 – 500 mg; |
| L-tyrosine.2Na.2H$_2$O, 25 – 250 mg; | L-tyrosine.2Na.2H$_2$O, 25 – 250 mg; |
| L-valine, **100** – 1000 mg; | L-valine, **90.5603400** – 1000 mg;[23] |
| d-biotin, 0.04 – 1.0 mg; | d-biotin, 0.04 – 1.0 mg; |
| D-calcium pantothenate, 0.1 – 5.0 mg; | D-calcium pantothenate, 0.1 – 5.0 mg; |
| choline chloride, 1 – 100 mg; | choline chloride, 1 – 100 mg; |
| folic acid, 1 – 10 mg; | folic acid, 1 – 10 mg; |
| i-Inositol, 10 – 1000 mg; | i-Inositol, 10 – 1000 mg; |
| nicotinamide, 0.5  – 30 mg; | nicotinamide, 0.5 – 30 mg; |
| p-aminobenzoic acid, 0.1 – 20 mg; | p-aminobenzoic acid, 0.1 – 20 mg; |
| riboflavin, 0.05 – 5.0 mg; | riboflavin, 0.05 – 5.0 mg; |
| thiamine.HCl, 0.5 – 20 mg; | thiamine.HCl, 0.5 – 20 mg; |
| thymidine, 0 – 3.0 mg; | thymidine, 0 – 3.0 mg; |
| vitamin B12, 0.05 – 5.0 mg; | vitamin B12, 0.05 – 5.0 mg; |

equivalent to 44 mg of L-histidine) is equivalent to this claim limitation.  Butler report ¶¶ 72-74.
He calculates that this claim limitation provides between 0.477-2.385 mmol L-histidine, which is
equivalent to 74-370 mg L-histidine.  *Id.*  Thus, HyClone's growth product contains about 60%
of the total amount of L-histidine provided in the composition of claim 1.

[22] HyClone's growth product contains 37.5687 mg L-METHIONINE, about 75% of the claimed lower
limit.

[23] HyClone's growth product contains 90.56034 mg L-VALINE, about 91% of the claimed lower
limit.

CONFIDENTIAL

| Glacken Table 7 | |
|---|---|
| **Claim 1 of the '083 Patent** | **Hypothetical DOE Claim 1** |
| linoleic acid, 0.01 – 2.0 mg; | linoleic acid, 0.01 – 2.0 mg; |
| DL-α-lipoic acid, 0.03 – 1.0 mg; | DL-α-lipoic acid, 0.03 – 1.0 mg; |
| pyridoxine.HCl, 0.5 – 30 mg; | pyridoxine.HCl, 0.5 – 30 mg; |
| putrescine.2HCl, 0.025 – 0.25 mg; and | putrescine.2HCl, 0.025 – 0.25 mg; and |
| ethanolamine.HCl, 2 – 100 mg. | ethanolamine.HCl, 2 – 100 mg. |
| **Claim 2 of the '083 Patent** | **Hypothetical DOE Claim 2** |
| The soluble composition of claim 1 further comprising | The soluble composition of claim 1 further comprising |
| a buffering molecule with a pKa between 5.9 and 7.8 and | a buffering molecule with a pKa between 5.9 and 7.8 and |
| a cell protectant. | a cell protectant. |

94.     Drafting these hypothetical claims to literally encompass the accused HyClone products, under Prof. Butler's theory of infringement, requires broadening at least fourteen (14) claimed concentrations and rewriting four (4) claimed ingredients to recite simply the active component.[24]   In my opinion, this exercise alone confirms that Profs. Butler and Wurm's theory of infringement is untenable, because it requires materially rewriting claim 1 to literally encompass the accused products.  As discussed below, because this hypothetical claim (as well as dependent claim 2) would ensnare the prior art, Janssen cannot assert that the accused products infringe under the doctrine of equivalents.

### 2.     The Hypothetical Claims Ensnare The Prior Art.

95.     In my opinion, these hypothetical claims that literally encompass the accused HyClone products would cover prior art.  Specifically, these hypothetical claims would have

---

[24] As identified above, for their doctrine of equivalents analysis of four claim limitations, Profs. Butler and Wurm rely on calculating the combined amount of an "active component" provided by two different ingredients in the accused HyClone products.  In doing so, they re-write the literal claim language requiring specific ingredients to recite merely the active component of the ingredient.

CONFIDENTIAL

been obvious to a POSA in view of at least the following combinations: (a) Jayme *et al.*, *Basal medium development for serum-free culture: a historical perspective,* CYTOTECHNOLOGY, 23:95-101 (1997) ("Jayme 1997") (Ex. 11) in view of U.S. Patent No. 4,767,704 ("the '704 patent") (Ex. 12) and the knowledge of a POSA; (b) WO 98/15614 ("the '614 application") (Ex. 13) in view of the knowledge of a POSA; and (c) WO 04/078955 ("the '955 application") (Ex. 14) in view of the knowledge of a POSA. *See generally* Glacken Opening Invalidity Report ¶¶ 202-260.

### a.  Jayme 1997 and '704 Patent

96.  In my opinion, the hypothetical claims described above would ensnare the prior art as exemplified by the compositions of Jayme 1997 (Ex. 11) supplemented with the trace element mixture of the '704 patent (Ex. 12) in view of the knowledge of a POSA.[25] Thus, the scope of equivalents of the asserted claims cannot be applied so broadly as to capture the accused HyClone products.

97.  As demonstrated in Appendix A, the compositions of Jayme 1997 (Ex. 11) supplemented with the trace element mixture of the '704 patent (Ex. 12) teach each of the elements of the hypothetical claims, except for the claimed form of the trace metal ions and the amount of ethanolamine HCl. Each of these differences is insubstantial under Prof. Butler's reasoning supporting his theory of infringement under the doctrine of equivalents.

---

[25] I included an extensive discussion of the teachings of Jayme 1997, the teachings of the '704 patent, and why a POSA would have been motivated to supplement the media of Jayme 1997 with the trace element mixture of the '704 patent in the Glacken Opening Invalidity Report. *See* Glacken Opening Report ¶¶ 117-131, 163-169, 227-28, Appendices 2, 3. I incorporate that discussion as if set forth herein.

CONFIDENTIAL

98.     First, Prof. Butler assumes that each of the claimed ingredients can be reduced to just its "active component" in the final cell culture media.  He combines ingredients of different salt forms and ingredients of different hydrated/anhydrous states to calculate the combined amount of the active component.  *See, e.g.,* Butler report ¶¶ 57-61.  He then compares the combined amount of the active component in the accused HyClone products to the amount of active component supplied by the asserted claims.  *Id.*  By the same reasoning, the hypothetical claims would ensnare the prior art that provides the same amount of the active component as supplied by the hypothetical claims.  The '704 patent discloses every trace metal recited in the hypothetical claims—namely, cobalt, molybdenum, nickel, selenium, silicon, tin, vanadium, copper, iron, zinc, and manganese.  Ex. 12, ('704 patent), at cols. 7-8.  In addition, as set forth in Appendix B, the amounts of the trace metals recited in the hypothetical claims and disclosed by the '704 patent of the trace elements completely overlap.[26]  Selecting the specific trace element-containing ingredient recited by the hypothetical claims, which were commonly used in cell culture media, would have been obvious to a POSA.  *See* Glacken Opening Invalidity Report, Appendix 3.

99.     Second, Prof. Butler assumes that the claimed amount of each of the ingredients is insubstantial.  By the same reasoning, the claimed amount of ethanolamine HCl does not render the hypothetical claims novel or nonobvious.  Jayme 1997 teaches that ethanolamine is added "as a serum extender to permit superior culture performance with reduced serum supplementation and as an additive to DMEM/F12 and similar basal media to permit serum-free cultivation of many cell types."  Ex. 11, (Jayme 1997), at 98.  Adding the amount of

---

[26] I previously provided my calculations for these molar amounts in Appendix 2 to the Glacken Opening Invalidity Report.

ethanolamine HCl commonly used in cell culture media would have been obvious to a POSA.

*See* Glacken Opening Report, Appendix 3.

100.    Thus, after drafting hypothetical claims that literally encompass both of the accused HyClone products, these hypothetical claims would have encompassed the compositions of Jayme 1997 supplemented with the trace element mixture of the '704 patent.

### b.    '614 Application

101.    The hypothetical claims described above also would ensnare the prior art as exemplified by the '614 application (Ex. 13) in view of the knowledge of a POSA.[27]   Thus, the scope of equivalents of the asserted claims cannot be applied so broadly as to capture the accused HyClone products.

102.    As demonstrated in Appendix C, the basal cell culture medium of the '614 application contains every ingredient recited in the hypothetical claims, except for the claimed form of the trace metal ions and the amount of putrescine.2HCl.[28]   Each of the differences between the hypothetical claim and the basal medium of Table 1 of the '614 application (Ex. 13) is insubstantial under Prof. Butler's reasoning supporting his theory of infringement under the doctrine of equivalents.

103.    As Appendix C shows, five of the six differences between the hypothetical claims and the cell culture medium recited in Table 1 of the '614 application concern different forms of

---

[27] I included an extensive discussion of the teachings of the '614 application in the Opening Glacken Invalidity Report, which is incorporated by reference.  *See* Glacken Opening Report ¶¶ 174-179, Appendix 4.

[28] In other words, of the 122 claim elements, only 11 elements (5 ingredient elements and 6 concentration elements) are not literally met by the composition of Table 1 of the '614 application.  This is less than the 12 or 13 elements that Prof. Butler admits are not literally met by CPM and CGM respectively.

**CONFIDENTIAL**

the same trace elements.  The '614 application teaches that the active component—not the specific salt form—is needed for the cell culture media.  Ex. 13.  More specifically, the '614 application teaches that the "[t]race elements which may be used in the media of the present invention include *ions* of barium, bromium, cobalt, iodine, manganese, chromium, copper, nickel, selenium, vanadium, titanium, germanium, molybdenum, silicon, iron, fluorine, silver, rubidium, tin, zirconium, cadmium, zinc and aluminum."  Ex. 13, ('614 application), at p. 12, ll. 23-26 (emphasis added).  The specifically recited salts are merely examples of the salt forms that can deliver these trace element ions to the cell culture medium.  *Id.* at p. 12, l. 26 – p. 13, l. 2.  Notably, the cell culture medium of Table 1 of the '614 application provides a source for each of the active components (e.g., trace elements) recited in the hypothetical claims.

104.    By Profs. Butler and Wurm's same reasoning in asserting the accused products infringe under the doctrine of equivalents, the cell culture medium of Table 1 of the '614 application provides an equivalent source of the active component for each of the claimed ingredients within the claimed amounts.  As summarized in Glacken Table 8 below, for each of the five claimed ingredients that is not expressly recited in the '614 application, the '614 application includes a corresponding ingredient that provides an active component in an amount that overlaps with the total molar amounts of that active component in the hypothetical claim.

CONFIDENTIAL

| Glacken Table 8 Comparison Of Hypothetical Claim Ingredients And '614 Application Medium Concentrations | | | |
|---|---|---|---|
| **Hypothetical DOE Claim 1** | **Total Amounts Of Active Component in Hypothetical Claims** | **Table 1 of '614 Ingredient** | **Total Amounts Of Active Component in '614 Application** |
| ferric ammonium citrate, 0.04-200 mg; | | Ferric Citrate Chelate, 0.01-2 mg | Ferric ammonium citrate is an example of a ferric citrate chelate. The '614 application teaches an amount that overlaps with the hypothetical claim. |
| $MnSO_4 \cdot H_2O$, 0.000070-0.0080 mg; | Manganese (II), 0.000022-0.000026 mg | $MnCl_2 \cdot 4H_2O$, 0.000001-0.001 | Manganese (II), 0.00000028-0.00028 mg |
| $Na_2SeO_3$, 0.004-0.07 mg; | Selenium, 0.0018-0.032 mg | $H_2SeO_3$, 0.00001-0.005 | Selenium, 0.0000061-0.0031 mg |
| $SnCl_2.2H_2O$, _**0.0000079**_-0.0005 mg; | Tin (II), 0.0000042-0.00026 mg | $SnCl_2$, 0.000001-0.0001 | Tin (II), 0.00000063-0.000063 mg |
| $NH_4VO_3$, _**0.000046**_ -0.0025 mg; | Vanadium, 0.000020-0.0011 mg | $NaVO_3$, 0.00001-0.001 | Vanadium, 0.0000045-0.00045 mg |

Selecting the specific trace element-containing ingredient recited by the hypothetical claims, which were commonly used in cell culture media, would have been obvious to a POSA. *See* Glacken Opening Invalidity Report, Appendix 4.

105.    As Appendix C shows, the final difference between the hypothetical claims and the cell culture medium recited in Table 1 of the '614 application concerns the amount of the ingredient putrescine.2HCl.  Whereas the hypothetical claim requires between 0.025-0.25 mg putrescine.2HCl, the '614 application teaches incorporation of putrescine.2HCl in an amount of 0.0001-0.01 mg.    Ex. 13.    In other words, the '614 application teaches the use of putrescine.2HCl in an amount of about 40% of the claimed lower limit.

CONFIDENTIAL

106.    Under Plaintiffs' theory of infringement under the doctrine of equivalents, an ingredient present in an amount of 40% of the claimed lower limit is an insubstantial difference. Indeed, Prof. Butler has asserted that ingredients even further from the claimed range—i.e., in an amount even less than 40% of the claimed lower limit—are similarly insignificant. *See, e.g.*, Butler report ¶ 45 ($CoCl_2.6H_2O$ is present in HyClone's growth product in an amount of 37% of the claimed lower limit.); *id.* ¶ 51 ($SnCl_2.2H_2O$ is present in HyClone's growth and production products in an amount of 32% and 37% of the claimed lower limit).

107.    Thus, after drafting hypothetical claims that literally encompass both of the accused HyClone products, in my opinion, these hypothetical claims would have encompassed the '614 application medium in view of the knowledge of a POSA.

### c.      '955 Application

108.    In my opinion, the hypothetical claims described above would ensnare the prior art as exemplified by the '955 application (Ex. 14) in view of the knowledge of a POSA.[29] Thus, the scope of equivalents of the asserted claims cannot be applied so broadly as to capture the accused HyClone products.

109.    As demonstrated in Appendix D, the medium in Table 3 of the '955 application contains every ingredient recited in the hypothetical claims, except for the claimed form of two ingredients—the iron chelator/iron complex ferric ammonium citrate and $NH_4VO_3$.[30]   But the medium of the '955 application includes other ingredients—the iron chelator/iron complex

---

[29] I included an extensive discussion of the teachings of the '955 application in my opening invalidity report.  *See* Glacken Opening Invalidity Report ¶¶ 197-201, Appendix 5.

[30] In other words, of the 122 claim elements, only 4 elements (2 ingredient elements and 2 concentration elements) are not literally met by the composition of Table 3 of the '955 application.  This is less than the 12 or 13 elements that Prof. Butler admits are not literally met by CPM and CGM respectively.

**CONFIDENTIAL**

ferric fructose, and $NaVO_3$—that have the same active component as the claimed ingredients but in a different form.  Ex. 14, ('955 application), at Table 3.  These differences between the hypothetical claims and the medium in Table 3 of the '955 application are insubstantial under Prof. Butler's reasoning supporting his theory of infringement under the doctrine of equivalents.

110.    The '955 application teaches that the composition provided in Table 3 is "an example of a basic composition" that is intended to provide the necessary components for an animal-free medium, including a "source of … trace of elements."  *Id.* at p. 12, ll. 12-20.  In his analysis, Prof. Butler adopts this same premise that ingredients providing the same active component are interchangeable to support his infringement theory under the doctrine of equivalents.

111.    By this same reasoning, the cell culture medium of Table 3 of the '955 application provides an equivalent source of the active component for each of the claimed ingredients within the claimed amounts.  As summarized in Glacken Table 9 below, for each of these claimed ingredients that is not expressly recited in the '955 application, the '955 application includes a corresponding ingredient that provides an active component in an amount that overlaps with the ranges of total molar amounts of that active component supplied by the hypothetical claim.

Michael Glacken, Sc.D.           **Page 53**
Rebuttal Expert Report re Non-Infringement     US Patent No. 7,598,083

**CONFIDENTIAL**

| Glacken Table 9 Comparison Of Hypothetical Claim Ingredients And '955 Application Medium Concentrations | | | |
|---|---|---|---|
| **Hypothetical DOE Claim** | **Total Amounts Of Active Component in Hypothetical Claims** | **'955 Table 3 Ingredient** | **Total Amounts Of Active Component in '955 Application** |
| **Vanadium** | | | |
| $NH_4VO_3$, ***0.000046*** -0.0025 mg; | Vanadium, 0.000020-0.0011 mg | $NaVO_3$, 0.00001-0.2 mg | Vanadium, 0.000042-0.084 mg |
| **Iron** | | | |
| $Fe(NO_3)_3.9H_2O$, 0.01-0.08 mg | Iron, 0.0014-0.011 mg | $Fe(NO_3)_3 \cdot 9H_2O$, 0.005-1 mg | Iron, 0.00069-0.14 mg |
| $FeSO_4.7H_2O$, 0.05-0.50 mg | Iron, .010-0.10 mg | $FeSO_4.7H_2O$, 0.02-2 mg | Iron, 0.0040-0.40 mg |
| ferric ammonium citrate, 0.04-200 mg | Iron, 0.0085-42.6 mg | Ferric fructose stock solution, 50-1000 μL | Iron, 0.025-0.50 mg |
| **Total Iron** | Iron, 0.020-42.7 mg | **Total Iron** | Iron, 0.030-1.0 mg |

112. Thus, after drafting hypothetical claims that literally encompass both of the accused HyClone products, in my opinion, these hypothetical claims would have encompassed the '955 application medium in view of the knowledge of a POSA.

**VIII. Janssen Also Cannot Rely On Prof. Wurm's Testing To Show Infringement Under The Doctrine Of Equivalents.**

    **A.    Summary Of Prof. Wurm's Experiments**

        **1.    Prof. Wurm Did Not Test The Accused Products But, Instead, Purported To Replicate Them.**

113. I have reviewed Prof. Wurm's experimental design, data, and analyses. My understanding is that Prof. Wurm did not use (and, in fact, Janssen never requested) actual

CONFIDENTIAL

samples of HyClone's products.  Instead, he attempted to create "replicas" of both the HyClone growth ("CGM") and production ("CPM") products based on the formulations provided by HyClone.  Wurm report at ¶¶ 57-58.  The "replicas" Prof. Wurm created, however, are not the same as or even representative of the accused products.

### 2. Prof. Wurm Admitted That His "Replicas" Of The HyClone Growth Product Are Not Identical To The Accused Products.

114.    Prof. Wurm's "replicas" of the HyClone growth product used in his testing were not accurate productions of the accused HyClone growth product.  For example, as Prof. Wurm admitted in his supplemental declaration, the accused HyClone growth product includes the ingredient galactose, which was omitted from Prof. Wurm's preparation of his CGM "replicas." Supplemental Wurm report at ¶ 2.

115.    In his opening report, Prof. Wurm provided in Table 10 of Annex 1 a listing of the "components, supplier details, and concentrations of components" in his preparation of CGM. Wurm report at Ex. B, Annex 1, Table 10.  According to this list, his CGM contains ███████ ████████.  *Id.*  He also reported that ████████████████ was added to his "CC-CGM"—a common core batch of CGM—that was used to create each of the "variants" of CGM tested in his study, which are discussed below.

116.    In his supplemental declaration, however, Prof. Wurm reported: "galactose was inadvertently omitted from the CGM "replica" and the "variants" tested in the CGM laboratory experiments described in my opening report (at paragraphs 57-80)."  Supplemental Wurm report at ¶ 2.  Due to this omission, he admitted that "the CGM medium used in the CGM laboratory experiments was not an exact replica of the hydrated CGM used by Celltrion.  The CGM variants created to test literal differences in concentration of other ingredients from the

**CONFIDENTIAL**

asserted claims also had the same inadvertent omission of galactose." *Id.* Thus, in conducting his CGM experiment, Prof. Wurm not only tested "replicas" instead of the accused HyClone products, but the purported replicas of the growth product were not even "exact replicas."

### 3.   Prof. Wurm's "Replicas" Added Five Ingredients That Are Not Included In The Accused Products.

117.   In preparing both of his CGM and CPM "replicas," Prof. Wurm added five ingredients that are not included in the accused HyClone products. As discussed, the accused HyClone products are powders. Prof. Wurm did not prepare a powder version of the accused products. Wurm report at ¶¶ 57-58. Instead, in his testing, "[t]he replica and variants were prepared directly as liquid media." *Id.* at ¶ 61. In preparing his CGM and CPM "replicas" (including his "variants," discussed further below), Prof. Wurm added 1.022 g/L of L-glutamine and 2.1 g/L of sodium bicarbonate. *Id.* Prof. Wurm also added 0.5 mg/L mycophenolic acid, 2.5 mg/L hypoxanthine, and 50 mg/L xanthine (which he refers to as "MHX") to his "replicas" and "variants." *Id.* at ¶ 63.

118.   I understand, however, that the accused products, which HyClone manufactures in the United States, do not contain sodium bicarbonate and glutamine. *Id.* at Ex. B, Annex 1, Table 10. My understanding is that these ingredients are added to the HyClone products outside the United States by Celltrion. More specifically, Celltrion adds ▮▮▮▮ of L-glutamine and ▮▮▮▮ of sodium bicarbonate to both products outside of the United States. *See* Ex. 68 (GR-MF-09-090 (Upstream Process Description for the Production of 000B)) at CELLREM-0061051-52.

119.   I also understand that the accused products, which HyClone manufactures in the United States, do not include MHX. Wurm report at Ex. B, Annex 1, Table 10. In addition, I

Michael Glacken, Sc.D.                                                                    **Page 56**
Rebuttal Expert Report re Non-Infringement                        US Patent No. 7,598,083

**CONFIDENTIAL**

further understand that these ingredients are not ever added to the HyClone products, even by

Celltrion outside the United States.  *See* Ex. 68 (GR-MF-09-090 (Upstream Process Description

for the Production of 000B)) at CELLREM-0061051-52.

120.     Therefore, Prof. Wurm added five extra ingredients that are never included in the

accused products made in the United States—including three ingredients that are never added to

the accused products by Celltrion.

**4.     Prof. Wurm's "Replicas" Included 29 Ingredients That Are Not Claimed In The Patent.**

121.     Prof. Wurm's CGM and CPM "replicas" also include 29 ingredients not listed in

the asserted claims.   HyClone's production and growth products contain a total of 88

ingredients, as replicated by Prof. Wurm, but only 59 of these ingredients are recited in claim 1.

*Compare* Wurm report at Ex. B, Annex 1, Table 10; *with* Ex. 1, '083 patent, at claims 1-2.

Prof. Wurm's CGM and CPM formulations thus contain 29 additional unclaimed ingredients.

Wurm report at Ex. B, Annex 1, Table 10.

122.     These unclaimed ingredients include chemically undefined ingredients ████

████ (hydrolysate) and ████████ , which, as discussed elsewhere in this report, contain

additional amino acids, trace elements, and other ingredients recited in claim 1.  The unclaimed

ingredients found in the accused HyClone products also include the proteins ████ and ████

████████████ .

123.     Prof. Wurm's testing does not account for the contribution of these 29 additional

ingredients to the nature and performance of the claimed ingredients.  As I explain below, these

29 additional unclaimed ingredients materially affect his results.

## CONFIDENTIAL

### 5.      Prof. Wurm's "Variants" Do Not Test The Differences From The Claimed Invention One Limitation At A Time.

124.    Prof. Wurm prepared 13 "variants" of each the CGM and CPM "replicas." Wurm report at ¶ 58. Each of the first 12 "variants" modified the composition of the CGM or CPM "replicas" with respect to one of the 12 literally absent claim limitations to bring the concentration of the ingredient from outside to inside the claimed concentration range. *Id.* The thirteenth "variant" made all 12 changes together. *Id.* None of these "variants" modified the CGM and CPM "replicas" to have only one missing claim limitation—i.e., having only one ingredient outside of the claimed range at a time. *Id.*

125.    In creating the CGM and CPM "replicas" and their "variants," Prof. Wurm apparently began with a "common core medium" that contained all the ingredients common to the tested media (except the "20%" and "PBS" controls). Wurm report at Ex. B at 6-8. This common core medium contains those ingredients at the lowest concentration common to every test media.[31] *Id.* Because each ingredient in the core medium is at the lowest common concentration to every other test medium, certain ingredients required an increase in concentration—depending upon which test medium was desired ("replica" or "variant"). *Id.* These increases were completed by adding more of the similarly concentrated stock solutions of that ingredient to the formulation. *Id.* For his CGM and CPM "replicas," Prof. Wurm started

---

[31] Prof. Wurm, to my knowledge, did not actually measure each ingredient to the milligrams he reports in Annex A of his Exhibit B. Instead, I understand that he created stock solutions, solubilizing the desired ingredient at a much higher concentration than required for the core medium. Wurm report, Ex. B, at 6; Annex 3, Table 13. The test media was then created by diluting each stock solution, with the intent for the final concentration of each ingredient to match the concentrations reported in Annex A.

## CONFIDENTIAL

with the core medium and sought to add the necessary ingredients to replicate the formulation concentrations for the 88 ingredients.

126.    Prof. Wurm then created 12 "variants" for each HyClone product, one "variant" for each literal difference.[32]   According to Prof. Wurm, "[e]ach variant was identical to CGM except with respect to the literal difference from the claim element being tested."  Wurm report at ¶ 58.  "For that element, either the source of the active component and/or the ingredient's concentration was altered so that the variant literally met that claim element but was in all other respects identical to CGM."  *Id.*

127.    Thus, each "variant" had one ingredient's concentration modified to be within the claimed concentration, while the concentrations of 11 ingredients remained *outside* of the claimed ranges consistent with the formulations of the HyClone production or growth product. *Id.*  That is, none of these 12 "variants" was missing only a single claim limitation.

128.    Prof. Wurm also formulated a modified "variant" for both of HyClone's production and growth products that he refers to as the "All Changes" "variant" in his expert report and the "all together changed" in his underlying laboratory report.  *Id.* at ¶ 60 n.6; Wurm report at Ex. B at 6-8.  I understand that this "variant" modified all of the 12 ingredients that do not literally infringe claim 1 such that each missing ingredient's concentration has been brought to the far literal edge of the claimed concentrations (either upper or lower, depending on the ingredient) in one sample.  *Id.*

---

[32] Although Prof. Wurm notes that there are 13 literal differences between claim 1 and the accused HyClone growth product (*see* Wurm report at 14 at Table 1), Prof. Wurm only tested 12 variants of CGM—without a "variant" for the ingredient $(NH_4)_6Mo_7O_{24}.4H_2O$.

CONFIDENTIAL

129.     Prof. Wurm also used two alleged controls—100% PBS and a PBS at 20% final dilution of HyClone's products.  Wurm report at ¶ 65.  Prof. Wurm does not appear to provide an explanation for why he chose these specific controls.

### 6.     Four Of Prof. Wurm's "Variants" Replaced HyClone's Ingredients With Claimed Ingredients.

130.     When he prepared 4 "variants" of his CGM and CPM "replicas," Prof. Wurm altered his formulations by replacing an ingredient in the accused HyClone products with a higher concentration of a claimed ingredient.  Specifically, as shown in Tables 10 and 11 below, the accused HyClone products include the following four additional unclaimed ingredients: (a) cupric chloride $2H_2O$, (b) L-arginine, (c) L-asparagine, and (d) L-histidine.  *See* Wurm report at Ex. B, Annex 1, Table 10.  Prof. Wurm reasoned that the 4 unclaimed ingredients did not need to be included in these "variants," because there is another ingredient in the accused HyClone products that provides a second source of the same active component.  Wurm report ¶ 60. When preparing these "variants," he substituted each of these 4 unclaimed ingredients with a greater amount of the second source of the active component, i.e., the corresponding claimed ingredient.  *Id.*  The tables below, as abridged from Prof. Wurm's Tables 5 and 6 from Exhibit B, summarize the differences in composition between the accused HyClone products and Prof. Wurm's "replicas" of these products with respect to these ingredients:

Michael Glacken, Sc.D.                                                              **Page 60**
Rebuttal Expert Report re Non-Infringement                          US Patent No. 7,598,083

CONFIDENTIAL

| Glacken Table 10[33] | |
|---|---|
| **HyClone's Growth Product** | **Wurm's CGM "Variants"** |
| $CuSO_4$ $5H_2O$, 0.000536727 mg, and $CuCl_2$ $2H_2O$, 0.001782 mg | $CuSO_4$ $5H_2O$, 0.003146696 mg |
| L-arginine HCl, 63.33951 mg, and L-arginine, 161.0401 mg | L-arginine HCl, 258.08525 mg |
| L-asparagine $H_2O$, 3.220802 mg, and L-asparagine, 167.60913 mg | L-asparagine $H_2O$, 193.677649 mg |
| L-histidine HCl $H_2O$, 13.520338 mg, and L-histidine, 34.4929 mg | L-histidine HCl $H_2O$, 100 mg |

| Glacken Table 11 | |
|---|---|
| **HyClone's Production Product** | **Wurm's CPM "Variants"** |
| $CuSO_4$ $5H_2O$, 0.00062087 mg, and $CuCl_2$ $2H_2O$, 0.002059329 mg | $CuSO_4$ $5H_2O$, 0.00363702 mg |
| L-arginine HCl, 73.273 mg, and L-arginine, 181.60095 mg | L-arginine HCl, 292.883 mg |
| L-asparagine $H_2O$, 3.72475 mg, and L-asparagine, 193.875 mg | L-asparagine $H_2O$, 224.02791 mg |
| L-histidine HCl $H_2O$, 15.63925 mg, and L-histidine, 39.903 mg | L-histidine HCl $H_2O$, 100 mg |

Wurm report at Ex. B at 7-8.  Accordingly, each of these "variants" is missing an ingredient found in the accused HyClone products.

---

[33] I understand that Prof. Wurm made one replacement per "variant."  Ex. 85 (Experiment Layout Spreadsheet for Growth Product) at JANREM0107642; Ex. 86 (Experiment Layout Spreadsheet for Production Product) at JANREM0107643.

## CONFIDENTIAL

131.    Prof. Wurm conducted no testing to validate how the absence of an ingredient affects results of his CGM and CPM studies.  I note that Prof. Wurm's testing for the L-asparagine $H_2O$ "variant" and Prof. Butler's analysis of those results do not support their assumption that replacing the form of an ingredient would lead to the same results.  In describing Prof. Wurm's study of the L-asparagine $H_2O$ "variant," Prof. Butler stated that "the L-Asparagine.$H_2O$ "variant" in each experiment had the same total concentration of L-Asparagine as the corresponding [HyClone products], with the only difference being the amount of L-Asparagine that was supplied as free base and the amount supplied as L-Asparagine.$H_2O$."  Butler report at ¶ 128.  Yet, Prof. Butler found statistically significant differences when comparing the L-Asparagine.$H_2O$ "variant" to each of the accused HyClone products.  *Id.*  He dismissed as "highly unlikely that the observed differences are attributable to the different concentrations of the two forms of L-Asparagine."  *Id.*  If true, the differences in result must have be attributed to switching from two forms of L-Asparagine to only one form of L-Asparagine.  In which case, it is improper for Prof. Wurm to have replaced an ingredient in the accused HyClone products with a higher concentration of a claimed ingredient, even though they provide for the same active component.

### 7.    Prof. Wurm Tested The Altered Accused Products To Produce Janssen's Proprietary Antibody.

132.    Prof. Wurm did not use the same cell line that I understand Celltrion uses to express the infliximab molecule.  Instead, Prof. Wurm tested his "variants" using a cell line that Janssen provided to produce Janssen's proprietary antibody ustekinumab (CNTO 1275).  Wurm report at Exhibit B at 5.  This cell line is "the C743B cell line, a 'SP2/0 derived cell line that

## CONFIDENTIAL

produces a fully human, anti-IL-12 mAb as the result of stable transfection.' ['083 patent] (Col. 4:58-60)." Wurm report at ¶ 62.

133.    Although the '083 patent identifies the C743B cell line, it does not identify ustekinumab as the specific antibody.  Ex. 1, ('083 patent), at 4:58-60.  Even if a POSA knew the identity of the antibody produced in the '083 patent, the materials required for this testing would not be publicly available for use in testing.  Prof. Wurm received the cell line and the reference standard for ustekinumab directly from Janssen to conduct its testing.  *See* Wurm report at Ex. B at 5.

134.    Therefore, Prof. Wurm's experiment used a proprietary cell line to express an antibody that neither Celltrion nor HyClone have expressed using the accused products.  I further note that, unlike the Janssen ustekinumab antibody produced in Prof. Wurm's testing, the cA2 antibody is chimeric (i.e., not fully human).

### 8.      Prof. Wurm's Experiments Include Steps Not Addressed In The Patent.

135.    Prof. Wurm sought to design a series of experiments to test "the substantiality (or lack thereof) of the literal differences between the [HyClone products] and claim 1."  Wurm report at ¶ 54.  According to Prof. Wurm, "similar results in cell culture experiments would confirm that the differences between the [HyClone accused products] and claim 1 are insubstantial."  *Id*. at ¶ 55.  Prof. Wurm then considered "the amount of antibody produced" and "cell growth characteristics" which included only "viable cell density and viability over the course of the culture."  *Id.* at ¶ 54.

136.    Prof. Wurm did not run the same type of experiment as described in the '083 patent.  I understand that Prof. Wurm used a "batch culture" experiment to grow the tested

CONFIDENTIAL

samples "in 50 mL orbitally-shaken tubes with a 10 mL working volume in batch mode." Wurm report at ¶ 67.   A batch culture experiment generally is an experiment where all the medium ingredients are provided only at the initiation of the cell culture.  *See* Ex. 71, (Glacken, MW *et. al.*,  *Mammalian cell culture:  engineering principles and scale-up*, Trends in Biotechnology, 1:102-108 (1983) ("Glacken 1983")).   Consequently, the cell densities in Prof. Wurm's experiments were relatively low.  This is because in this type of experiment the media is not replenished throughout the growth of the cells.   Therefore, as the nutrients are used up and toxic byproducts collect, the cells' growth slows in these conditions.  I further understand that this is not the procedure that Celltrion uses outside the U.S. when it grows cells using at least the HyClone production product.[34]  Nor is it the procedure used in the '083 patent.  Ex. 1 ('083 patent) at Examples 1-3.

137.    I understand that Prof. Wurm analyzed each of his "replicas," "variants" and controls in triplicate, and over a time period of 7 days (10 days for HyClone's production product).  Wurm report at ¶ 68.  This means that only 3 samples were taken (triplicate).  *Id.* at ¶ 66.

138.    I note that at least the culture method and time period of Prof. Wurm's tests are not discussed in the '083 patent (which discloses only perfusion bioreactors and a 29 day growth period).  Ex. 1, ('083 patent), at Examples 1-3.  Prof. Wurm provides no explanation for these strategic changes in his experimental design.

---

[34] Celltrion, as is common in industrial settings, ███████████████████████████.  *See* Ex. 79 (aBLA Section 3.2.S.2.2 (Description of Manufacturing Process and Process Controls)) at CELLREM-008784-85. ████████████████████████████████████
████████████████████████████████████████████████████████████████████

### CONFIDENTIAL

139.    In sum, the '083 patent does not provide a set protocol for testing whether a particular cell culture media would infringe under the doctrine of equivalents.  In conducting his test, Prof. Wurm picked aspects from Celltrion's manufacturing process, the patent's manufacturing process, and his own judgment.  Prof. Wurm chose to test purported replicas of the accused HyClone products supplemented with some—but not all—of the '083 patent optional ingredients to grow Janssen's cell line—not Celltrion's cell line—to produce the antibody ustekinumab—not infliximab.  In conducting this experiment, he chose to grow the cells in 50 mL orbitally shaken tubes—not the bioreactors used by Celltrion or described in the '083 patent.  He measured for just cell growth and antibody titer, which left out any measurements of lactic acid production as described in the '083 patent.  He also measured these factors for a period of 7-10 days—not the full 29-day period described in the '083 patent.  Ex. 1 ('083 patent) at Examples 1-3.  Each of these choices that deviates from the '083 patent limits the ability of a POSA to conduct his or her own testing to determine whether a proposed cell culture could infringe under the doctrine of equivalents.

### B.    Prof. Wurm's Testing Was Not Properly Designed To Show Infringement Under The Doctrine Of Equivalents.

140.    Prof. Wurm's testing was not designed to show (and, as discussed next, did not show) infringement under the doctrine of equivalents on a limitation-by-limitation basis.

#### 1.    Prof. Wurm's Testing As To The HyClone Growth Media Is Not Reliable Due To An "Inadvertent" Error.

141.    In his growth media (what he refers to as "CGM") experiment, Prof. Wurm sought to compare the cell growth and antibody production of each CGM "variant" to his CGM "replica."  But Prof. Wurm neither tested, nor accurately reproduced, the accused HyClone

## CONFIDENTIAL

growth product in preparing his CGM "replica," because he "inadvertent[ly]" omitted the ingredient galactose.  Supplemental Wurm report at ¶ 2.  Thus, the basis for his CGM experiment comparing each "variant" to his CGM "replica" is not reliable evidence of infringement under the doctrine of equivalents, because his CGM "replica" is not an accurate reproduction of the accused HyClone growth product.

142.    Prof. Wurm maintains that "[t]he omission of galactose from the CGM experiments does not alter [his] opinions about the results of the CGM experiments set forth in my opening report."  Supplemental Wurm report at ¶ 3.  He reasons that "[b]ecause galactose was omitted from both the CGM positive control medium and its variants, the omission of galactose does not impact the comparison of the CGM positive control to its variants in any way."  *Id.*

143.    I disagree.  Prof. Wurm's infringement opinion is based on the critical, but incorrect, assumption that the CGM "replica" is the accused HyClone growth product.  Therefore, his testing is not reliable evidence of whether the accused product infringes the asserted claims under the doctrine of equivalents.

       **2.    Prof. Wurm's Testing As To Both The Growth And Production Products Are Also Unreliable Because He Intentionally Altered The Accused HyClone Products.**

144.    Even putting aside the problems in Prof. Wurm's growth media experiment discussed above, Prof. Wurm did not test either of the accused HyClone products.  Instead, as discussed, he altered the products by, among other things, adding 5 ingredients in addition to water to the accused products manufactured by HyClone in the United States.  Wurm report at ¶¶ 61, 63.

**CONFIDENTIAL**

145.     According to Prof. Wurm, he added sodium bicarbonate and glutamine to the accused products because: (a) "Celltrion prepares its liquid media … [adding] sodium bicarbonate and glutamine," (b) "[t]he '083 patent similarly describes adding glutamine and sodium bicarbonate," and (c) these "are reasonable for mammalian cell culture." Wurm report at ¶ 61. With respect to MHX, Prof. Wurm added it to the accused products because: (a) the Janssen cell line he used required it; and (b) MHX "in amounts of 0.5 mg/L mycophenolic acid, 2.5 mg/L hypoxanthine, and 50 mg/L xanthine" was also described in the '083 patent. Wurm report at ¶¶ 22, 63.

146.     In my opinion, these product alterations render Prof. Wurm's testing insufficient to show infringement under the doctrine of equivalents. First, my understanding is that the claims are directed to, and Plaintiffs assert infringement of, soluble compositions. I understand that any act of infringement of a United States patent can only occur in the United States. Instead, the inquiry, as I have been instructed, must focus solely on what is made, sold, offered for sale, or used in the United States. The accused HyClone products made, sold, or offered for sale in the United States relevant to this litigation do not contain any of the five ingredients added by Prof. Wurm. Wurm report at Ex. B, Annex 1, Table 10. Therefore, Prof. Wurm did not test the accused products.

147.     Second, the mere fact that the '083 patent "describes" adding these ingredients does not, in my opinion, justify altering the accused products when conducting testing for equivalence. As I understand it, the correct inquiry is comparing the asserted claims to the accused products. Here, the asserted claims do not recite sodium bicarbonate, glutamine, or the three ingredients in MHX. The accused products do not contain any of these 5 ingredients.

**CONFIDENTIAL**

Wurm report at Ex. B, Annex 1, Table 10.  Nevertheless, Prof. Wurm added all 5.  Moreover,

Prof. Wurm did not even use the same concentrations of sodium bicarbonate and glutamine

added by Celltrion outside of the United States.[35]   And Celltrion does not even add the 3

ingredients in MHX to the accused products for use in South Korea.

148.    Additionally, with respect to MHX, Prof. Wurm states that these 3 ingredients are

added in order to facilitate expression of the antibody (whose titer he measures) in the cells he

grows in the "variants."  Wurm report at ¶¶ 22, 63.  However, in my opinion, this alters the

products that Prof. Wurm is testing.  Prof. Wurm does not provide any discussion or evidence of

what these additional products contain or their effect on his measures of cell growth and

antibody production—despite the fact that the testing is designed to assess the "function, way,

and result" for particular ingredients.

149.    Third, Prof. Wurm's assertion that these ingredients "are reasonable for

mammalian cell culture" is not relevant to the inquiry at issue here.  Wurm report at ¶ 61.

Again, adding these ingredients altered the HyClone products.

150.    In sum, Prof. Wurm did not even test the accused products; instead, he tested

altered replicas of those products that render the results unreliable.  For this reason alone, his

testing on altered products provides no reliable basis to conclude that these accused products

infringe the asserted claims under the doctrine of equivalents.  Prof. Wurm may assert that

alterations to the product must be made to conduct media testing, but such an assertion would

support my opinion set forth earlier in this report that a skilled artisan would not find it feasible

---

[35] While Prof. Wurm added 1.022 g/L of L-glutamine and 2.1 g/L of sodium bicarbonate, (Wurm report at Ex. B at 4), Celltrion—again, outside of the United States—adds ▮▮▮▮ of L-glutamine and ▮▮▮▮ of sodium bicarbonate for both products.  *See* Ex. 68 (GR-MF-09-090 (Upstream Process Description for the Production of 000B)) at CELLREM-0061051-52.

**CONFIDENTIAL**

to apply the doctrine of equivalents for the accused soluble compositions—particularly on a

limitation-by-limitation basis.

> **3.     Prof. Wurm Performed The Wrong Type Of Tests On His Altered Replicas.**

151.    Prof. Wurm conducted the wrong types of experiments, and failed to assess how

the differences between the accused products and the claimed compositions affect the nature of

a resulting biologic product, or even the functions and results of the cells that produce the

resulting biologic product.[36]   Similarly, Prof. Wurm failed to consider whether the accused

products result in each of the benefits purportedly afforded by the claimed product as described

in the '083 patent—namely, whether the accused composition "limit[s] eukaryotic cell damage

resulting from shear forces and other cell-damaging processes that occur in the bioreactor

vessels typically used for biopharmaceutical production… enable[s] eukaryotic cell cultures to

have high viable cell densities (i.e., number viable cells/ml media) and high percentages of

viable cells… permit[s] high titers of secreted biopharmaceutical products (i.e., antibody mg/L

media) and high specific productivities (i.e., pg antibody/viable cell/day)… [or] limit[s] the

production of lactic acid by cultured eukaryotic cells to permit the most efficient cellular use of

glucose." Ex. 1, ('083 patent), at 1:52-67.  While these are the purported benefits of the claimed

compositions, Prof. Wurm failed to evaluate eukaryotic damage or lactic acid production at all,

---

[36] As Janssen told the Court, "any substantial changes in the cell culture media being used to
make a biologic product will change the nature of the biologic product."  Ex. 72 (Brief in
Support of Janssen's Motion to Modify the Protective Order to Permit Filing of a New Action
(D.I. 69-2)) at 2-3; *see also* Ex. 73 (*Janssen v. Celltrion*, 16-11117, Complaint, D.I. 1) at ¶76
("any change in the media could cause a change in the characteristic of the biosimilar product
itself…").

CONFIDENTIAL

and he did not appropriately evaluate cell density or specific productivities based on the actual

accused product.

        a.      **Prof. Wurm's Experiments Are, At Best, Low-Resolution Experiments That Cannot Provide Sufficiently Definitive Information, Particularly In The Context Of This Inquiry.**

152.    Prof. Wurm's experiments are lower-resolution experiments. By "lower

resolution," I mean experiments that, for example, provide for lower cell density and for shorter

durations. Lower resolution experiments have less of a chance of detecting differences in the

performance of various media formulations than other "higher resolution" experiments.

153.    As described above, Prof. Wurm's experiment was a batch experiment that

limited cell growth and antibody production in the tested media. In contrast, ███████████

████████████████████████████████████████████ or perfusion

bioreactor cultures (as described in the '083 patent), are "higher resolution" experiments that

can achieve much higher cell densities and antibody production than batch cultures. *See* Ex. 68

(GR-MF-09-090 (Upstream Process Description for the Production of 000B)) at CELLREM-

0061050-52, CELLREM-0061091; Ex. 1 ('083 patent), at Examples 1-3; *see, e.g.*, Ex. 71

(Glacken 1983) at 103-104 (explaining the differences between batch, fed-batch, and perfusion

cell culture systems). Notably, the example cell culture reported in the '083 patent achieved

nearly a 10-fold greater cell density and 5-fold greater antibody titer than in Prof. Wurm's

experiment. *Compare id.* at Figs. 1-2; *with* Wurm report at Figs. 1, 3, 4, 6.

154.    Higher resolution culture experiments, like the one reported in the '083 patent,

can measure differences in performance between two media compositions that are masked in the

"low resolution" culture of Prof. Wurm's experiment. In my experience, media formulations

## CONFIDENTIAL

that exhibited no or small differences at 3 million cells/mL (as achieved by Prof. Wurm's experiments) have exhibited differences when the signal-to-noise ratio is increased by culture conditions that allow growth to 20 million cells/mL as in the examples presented in the '083 patent. *See, e.g.,* Ex. 81 (Presentation, Lonza, *Behavior of Cell Lines in a Selection Strategy* (Alison Porter Presenter, BioProcess International 2007) at 12-14, 18 (illustrating that relative performance in batch and fed-batch cultures can be very different, whereby the best media for a batch culture may not be best media for a fed-batch culture). Thus, in my opinion, it is possible that the different media formulations from Prof. Wurm's experiment could yield different results in a higher resolution experiment, and the resolution of Prof. Wurm's experiments was too low to detect such potential differences.

155.    In addition to the lower resolution of Prof. Wurm's batch cultures, and of some importance, 

. *See* Ex. 68 (GR-MF-09-090 (Upstream Process Description for the Production of 000B)) at CELLREM-0061050-52, CELLREM-0061091.

*Id.* Biopharmaceutical manufacturing processes strive to attain high cell densities and high product concentrations.

156.    What the cells need and require from the cell culture medium in a low cell density batch culture could be quite different than what is required, for example, at ten times the cell density and for much longer culture times achievable in a fed-batch culture. For example, the literature reflects that the most productive cell lines in batch culture may not be the most productive cell lines in fed-batch culture, which shows that what the cells need in each system

CONFIDENTIAL

and how they respond are different.  *See, e.g.,* Ex. 81 (Lonza Presentation) at 12-14, 18.  In a fed-batch culture, waste products from the cells are allowed to accumulate for longer times and to higher concentrations  *See* Ex. 71 (Glacken 1983) at 103-104.  Cellular metabolic requirements may be different when exposed to these waste products for much longer times and higher concentrations than for the batch cultures of Prof. Wurm's experiment.

157.    Celltrion uses two different formulations for their process:  HyClone's growth and production products.



*See* Ex. 68 (GR-MF-09-090 (Upstream Process Description for the Production of 000B)) at CELLREM-0061050-52, CELLREM-0061091; Ex. 79 (aBLA Section 3.2.S.2.2. Description of Manufacturing Process and Process Controls) at CELLREM-0008787, CELLREM-0008789.  If there were no differences in the metabolic needs of the cells between high and low cell density, why then did HyClone create two different media formulations?  Why not just use one medium formulation?

158.    As Prof. Butler acknowledged, "CGM and CPM each contain the same set of ingredients that are uniformly (other than NaCl) about 15% more concentration in CPM than in CGM."  Butler report at ¶ 96.  Prof. Wurm's experiment shows that changes in concentration in the ingredients can have a synergistic effect.  Synergy occurs between ingredients in cell culture media as they work together, at particular concentrations in particular combinations, to achieve desired cell growth or expression of a protein product.  That 15% greater concentration in CPM resulted in a 68% increase in the cells' antibody production.  *Compare id.* at ¶ 110 (The maximum antibody titer measured in CGM at day 7 was 95.73 ± 1.86 mg/L.); *with id.* at ¶ 122

CONFIDENTIAL

(The maximum antibody titer measured in CPM at day 7 was 160.55 ± 2.56 mg/L.).  A 68%

increase in antibody titer based on a 15% increase in ingredient concentration reflects synergy.

Prof. Wurm's lower resolution experiment was not designed to detect which changes between

the CGM and CPM caused this 68% increase in antibody titer.

159.    Thus, in addition to being a low resolution experiment that is less suited to

detecting differences in the performance of various media compositions, Prof. Wurm's

experiment was not appropriate for detecting differences in the HyClone production medium,

which was designed for a much different purpose.

160.    Quite  simply,  ██████████████████████████████████████

██████████████████████,  and  the  '083  patent  describes  a  perfusion  antibody

manufacturing process.  But Prof. Wurm did not conduct either of these types of experiment.

**b.      Prof. Wurm Should Have Performed A Higher Resolution
             Experiment Such As A Fed-Batch Experiment.**

161.    ████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████    *See* Ex. 68 (GR-MF-09-090 (Upstream Process

Description  for  the  Production  of  000B))  at  CELLREM-0061050-52,  CELLREM-0061091.

Therefore, in addressing the question of whether or not the concentrations of the various

ingredients perform differently at the HyClone concentrations versus the concentrations of the

## CONFIDENTIAL

'083 patent medium in the two measures of cell growth and antibody production,[37] it would have been more appropriate and relevant to utilize ███████████████ in a matrix format rather than the batch experiments employed by Prof. Wurm.

162.    At best, this lower resolution experiment would only identify gross differences between the compared samples.  It is merely a first step—certainly not sufficient to show equivalence.  And Prof. Wurm stopped at that first step.

163.    I would have conducted further analysis, such as a higher resolution experiment. To the extent testing for equivalence is even feasible under the circumstances of this case, Prof. Wurm at least should have designed testing, which is straightforward but far more sophisticated, that accounts for the potential synergy and/or inhibition between the ingredients in HyClone's production product in fed-batch experiments.  Because of the 29 additional ingredients that are not claimed but included in Prof. Wurm's experiment, this type of test would require a matrix-based approach, with various combinations of the ingredients to assess, at the ingredient level, the effects of changes of the concentration of one ingredient on the ability of the cells to grow. In view of such a complex formulation, where clearly concentration is not the only thing contributing to cell growth and antibody production, one cannot answer the question of whether there is a difference between each of these limitations without a higher resolution experiment.

164.    In my opinion, Prof. Wurm overstated the ability of this test to provide sufficient evidence to support his conclusions regarding infringement under the doctrine of equivalents.

---

[37] As discussed below, I disagree that it is appropriate to measure only cell growth and antibody production to evaluate the function, way, and result of each missing claim limitation on a limitation-by-limitation basis.

## CONFIDENTIAL

### 4.      Prof. Wurm's Experiments Cannot And Do Not Assess Equivalence On A Limitation-By-Limitation Basis.

165.    Aside from the problems in Prof. Wurm's testing discussed above, he did not test the accused HyClone products to assess equivalence on a limitation-by-limitation basis as I understand is required in order to determine whether an accused product infringes a claim under the doctrine of equivalents.

### a.      Prof. Wurm's "Variants" Are Not Designed To Show Equivalents On A Limitation-By-Limitation Basis

166.    Prof. Wurm's testing cannot show equivalent results on a limitation-by-limitation basis because the "variants" he prepared were not properly designed for that purpose.  In order to demonstrate equivalence on a limitation-by-limitation basis, Prof. Wurm should have at least created variants with all missing concentrations modified to be within the claimed concentration range, except for one.  This approach would have isolated the variants on a limitation-by-limitation basis.  But he did the opposite.  Specifically, each one of his "variants" had 11 missing claim elements.  Thus, it is not possible to assess equivalence—on a limitation-by-limitation basis—given Prof. Wurm's experimental design.  At most, he is comparing altered replicas that are each missing multiple claim elements.

167.    Prof. Butler's opinion based on Prof. Wurm's testing appears to be based on the mistaken impression that this testing actually compared variants on an element-by-element basis.  Prof. Butler explains that "[b]ecause equivalence under the doctrine of equivalents is assessed on an element-by-element basis, the performance of each of the [HyClone products] in cell culture was compared to the performance of variants each adjusted to reflect a single literal difference."  Butler report at ¶ 101.  This is an inaccurate description of Prof. Wurm's

## CONFIDENTIAL

experimental method.  The "replicas" of the accused HyClone products were not compared to "variants each adjusted to reflect a single literal difference," but rather "variants" that each had at least 11 literal differences to the asserted claims.  For at least this reason, Prof. Wurm's testing does not actually provide a comparison on an element-by-element basis.

168.    Although Prof. Wurm also created an "all together changed" media that had all of the missing concentrations modified to be within the claimed concentration ranges, he did not compare the "variants" to this claimed media, as discussed below.  And even then, again, each of those "variants" were deficient because none isolated a particular missing claim limitation— and each "variant" contained 29 additional ingredients not included in claim 1 of the '083 patent.

169.    In short, Prof. Wurm did not compare a control of the claimed invention to any media with only a single missing claim element—a comparison that, at a very minimum, would be necessary to show equivalent results on a limitation-by-limitation basis.

### b.    Prof. Wurm Incorrectly Compared The "Variants" To The Accused Product, Instead Of To The Patent Claims.

170.    In addition to analyzing the wrong products and not assessing equivalence on a limitation-by-limitation basis, in my opinion, Prof. Wurm also performed the wrong comparison.  As stated above, I understand that, in order to demonstrate infringement under the doctrine of equivalents, the patentee must compare each element of the *accused product* that does not literally infringe to the *patented invention*.  In my opinion, that is not what Prof. Wurm did.

171.    Prof. Wurm states unequivocally that he compared the "variants" to the HyClone products—*not* to the patented invention.  For example, Prof. Wurm states:  "[E]xperimentally

## CONFIDENTIAL

testing the relative performance in cell culture of the [HyClone products] compared with variant media in which the literal differences are eliminated is highly informative in determining whether the literal differences are substantial." Wurm report at ¶ 55. He also said: "[T]he performance of each of the [HyClone products] is assessed on an element-by-element basis, the performance of each of the [HyClone products] in cell culture has been compared to the performance of variants each adjusted to reflect a single literal difference." Wurm report at ¶ 57. In summarizing his overall conclusions, Prof. Wurm states: "I conclude that each of the element-by-element variants yields results that are substantially similar to CGM [or CPM]." Wurm report at ¶¶ 79, 91.

172.    This approach provides no information as to whether each claimed element that does not literally infringe the claims in the accused products, functions in substantially the same way to provide substantially the same results as the patented invention. Therefore, any comparison Prof. Wurm (and Prof. Butler) made between the "CGM" or "CPM" and the "variants' is irrelevant to any issue in this case.

173.    Prof. Wurm also used a control which he refers to as "20% CGM." Wurm report at ¶ 65. He describes this control as "80% PBS and 20% of a common medium used to reconstitute the positive control and all the variants." *Id*. Prof. Wurm then states that the "common medium contained nearly all of the ingredients in CGM, most of which were at the same concentration as in CGM. Thus, the 20% CGM negative control is essentially a version of CGM that has been diluted to a factor of five." *Id*. However, Prof. Wurm does not describe the purpose of this control. His description of "nearly all" and "most of which" provides no clarity, either.

CONFIDENTIAL

c.    **Prof. Wurm Did Not Address The Well-Known Functions Of The "Trace Element-Containing Ingredients."**

174.    Prof. Wurm only tested two aspects of the cell culture media he formulated: whether cells grow in the media and whether those cells produce antibody.  I understand that the doctrine of equivalents must be proven on a limitation-by-limitation basis for each missing ingredient, and it must be shown that the missing ingredient performs substantially the same function in substantially the same way to obtain substantially the same results.  Therefore, in my opinion, to meet this burden, Prof. Wurm should have, among other things, evaluated the function of each of the missing ingredients specifically—not just looked at overall cell growth and antibody production.  I understand that it is improper to apply the doctrine of equivalents to an invention as a whole.  At a minimum, Prof. Wurm should have evaluated at least the following with respect to each trace element missing ingredient:

| Glacken Table 11 | |
|---|---|
| **Trace Element Ingredient** | **Specific Function(s) As Described By Prof. Butler** |
| $CoCl_2.6H_2O$ | "Trace amounts of cobalt are thought to play a role not only as a cofactor in certain vitamin-B12-dependent enzymes but also as a cofactor in other enzymes in mammalian cells (e.g., methionine aminopeptidase)."  Butler report at ¶ 46 (citing Kobayashi, M. and Shimizu, S., "Cobalt proteins," *Eur. J. Biochem.* 1(1), 1-9 (1999)). |
| $NiSO_4.6H_2O$ | "Trace amounts of nickel are thought to play a role as a cofactor for enzymes in mammalian cells."  Butler report at ¶ 49 (citing Ragsdale, S.W., "Nickel based enzyme systems," *J. Bio. Chem.*, 284, 18571-18575 (2009)). |
| $SnCl_2.2H_2O$ | "Trace amounts of tin are thought to play a role in biological activity that may support cell growth." Butler report at ¶ 52. |

**CONFIDENTIAL**

| Glacken Table 11 | |
|---|---|
| **Trace Element Ingredient** | **Specific Function(s) As Described By Prof. Butler** |
| $NH_4VO_3$ | "Trace amounts of vanadium are thought to play a role in enzyme activity mammalian cells [sic] that may support cell growth in culture…it is reported to have an insulin-mimetic effect."  Butler report at ¶ 55 (citing Bhattacharyya, S., Tracey, A.S., "Vanadium (V) complexes in enzyme systems—aqueous chemistry, inhibition and molecular modeling in inhibitor design," *Journal of Inorganic Biochemistry,* 85, 1, 9-13 (2001)). |
| $CuSO_4.5H_2O$ | "In cell culture media, copper(II) is a cofactor for enzymes in mammalian cells that may support cell growth culture.  Additionally, it has recently been discovered that copper(II) plays a role in the regulation of cellular metabolism, at least in CHO cells."  Butler report at ¶ 58 (citing S. Nargun et al., "Elucidating the role of copper in CHO cell energy metabolism using 13C metabolic flux analysis," *Biotechnol. Prog.,* Vol. 31:5, 1179-86 (2015)). |

175.    In my opinion, and as evidenced by Prof. Butler's citations to various references regarding these functions, tests to analyze these functions are described in the public literature and could be used by a POSA.  These same references also provide additional functions for these same ingredients of which Prof. Butler made no mention.  *See, e.g.*, Ex. 82 (Kobayashi 1999) at JANREM0107717-19 (Cobalt plays an essential function in enzyme-mediated pathways involved in cell growth, including (i) protein turnover (methionine aminopeptidase) and (ii) collagen metabolism (prolidase).); Ex. 83 (Ragsdale 2009) at JANREM0107839-41 (Nickel plays an essential function in enzyme-mediated pathways involved in cell growth, including (i) detoxification (Glyoxylase I); (ii) amino acid salvage (Acireductone Dioxygenase); (iii) oxygen radical detoxification (superoxide dismutase); and (iv) energy metabolism and fatty acid synthesis (Acetyl-CoA Synthase).).  Yet, Prof. Wurm did not do any testing with respect to these functions, ways, or results.

176.    In addition, it is well known to a POSA that various ingredients frequently included in cell culture media (and that are included in the accused products here) perform

CONFIDENTIAL

*different* functions at *different* concentrations.  These well-known and documented phenomena were not addressed by Profs. Wurm and Butler.[38]  This further supports the difficulty of applying the doctrine of equivalents to the '083 patent.

177.    In my opinion, merely looking at overall cell growth and/or antibody production, like Prof. Wurm did, does not sufficiently address whether each individual missing ingredient performed substantially the same function, substantially the same way, for substantially the same result.

### d.    Prof. Wurm Did Not Address The Well-Known Functions Of The "Amino Acid Ingredients."

178.    Prof. Butler admits that the missing ingredients that are amino acids have a specific function in cell culture media as well: "[c]ells use amino acids to build new proteins – not only the proteins they use to survive, function, and multiply, but also any proteins (e.g., biopharmaceutical antibodies) they are engineered to produce.  In addition, cells use amino acids to generate the energy needed to survive, grow, and product proteins."  Butler report at ¶ 63.  Prof. Butler goes further to state that "[t]he function the [amino acid missing ingredient] performs in the context of claim 1 is to provide an amount of the amino acid [missing ingredient] for the cells in culture, which they use to make proteins."  *Id.* at ¶¶ 67 (L-methionine), 70 (L-valine), 74 (L-histidine), 79 (L-arginine-HCl), 84 and (L-asparagine-$H_2O$).

---

[38] Such ingredients include nickel, which at one concentration induces oxidative damage but at a much lower concentration, interferes with DNA strand repair via two distinct pathways. *See e.g*., Ex. 74 (Dally & Hartwig).  A second example is sodium chloride which at one concentration results in certain osmolality, but a second, higher concentration actually increases the expression of antibodies from certain cell lines when compared to cells grown in media with lower sodium chloride concentrations. *See, e.g.,* Ex. 75 (Chua 1994).

**CONFIDENTIAL**

179.     Although Prof. Butler identified the function of each of the amino acids, neither Prof. Butler nor Prof. Wurm can conduct any useful test for the function of the amounts of the amino acids in the accused products because of the presence of the other 29 ingredients, particularly the hydrolysate.   Therefore, Prof. Wurm's tests are inconclusive to determine if his changes to these amino acid missing ingredients affected each amino acid's performance in his formulations.

e.      **Prof. Wurm Did Not Address The Well-Known Functions Of The "Phosphate-Containing Ingredients."**

180.     Prof. Butler admits that the two "phosphate-containing" missing ingredients have a specific function in cell culture media.  Prof. Butler refers to the $NaH_2PO_4.H_2O$ and $Na_2HPO_4$ missing ingredients as the "phosphate-containing ingredients."   Butler report at ¶ 86.   Prof. Butler admits that the "primary function the $NaH_2PO_4.H_2O$ [and $Na_2HPO_4$] ingredient[s] perform[] in the context of claim 1 is to provide an extracellular amount of the phosphate nutrient.  Cells require phosphate to create high-energy molecules that they use to generate the energy needed to grow, survive, and produce the proteins the cell is engineered to produce. Cells also require phosphate as a building block of DNA, needed for cellular DNA as the cells divide."  *Id.* at ¶¶ 89, 92.

181.     Although Prof. Butler identified the function of the phosphate-containing ingredients, neither Prof. Butler nor Prof. Wurm evaluated whether the differences from the asserted claims actually affected the function, way, or result of each of the "phosphate-containing" missing ingredients.  Prof. Wurm conducted no testing to determine if his changes to these amino acid missing ingredients affected each ingredient's performance in his adjusted media.

Michael Glacken, Sc.D.                                                    **Page 81**
Rebuttal Expert Report re Non-Infringement              US Patent No. 7,598,083

## CONFIDENTIAL

182.    Further, as discussed above, certain concentrations of phosphate, similar to those found in HyClone's products (which is over 2- to 4-fold higher than the claimed ranges), catalyze DNA synthesis in synergy with ██████████████████████████████████ ██████, which is different than participating as a building block in DNA synthesis.  *See* Ex. 77 (Kanatani 2002).  Despite the possibility that these ingredients could be performing multiple functions, Prof. Wurm provides no functional testing.

183.    Therefore, by merely looking at overall cell growth and/or antibody production, Prof. Wurm did not sufficiently address whether the ingredients-at-issue at HyClone's concentrations performed substantially the same function, substantially the same way, for substantially the same result.  This is true at least because, as set forth above, each ingredient could have multiple, specific function(s) that must be addressed to answer this question.  And neither Prof. Wurm nor Prof. Butler did so.

### f.    Prof. Wurm Did Not Address The Well-Known Functions Of The NaCl Ingredient.

184.    Prof. Wurm's testing does not address Prof. Butler's admitted role of NaCl in the accused products.  For example, Prof. Butler admits that the "function of *the amount* of NaCl in a medium is to make it approximately isosmotic (having the same osmolality) with physiological fluids."  Butler report at ¶ 95 (emphasis added).  He also admits that "[o]smolality is a measure of the number of particles dissolved in solution.  Physiological osmolality, that is, the osmolality in living systems, is about 300 mOsm/kg, plus or minus about 10%."  Butler report at ¶ 95.  And, "[c]ell culture media are typically maintained at an osmolality in the neighborhood of physiological [*sic*]."  Butler report at ¶ 95. As Prof. Butler admits, "NaCl is a

CONFIDENTIAL

non-nutritive ingredient that is used to balance the osmolality of the medium" by varying the concentration of the NaCl in the medium.  Butler report at ¶ 95.

185.    Therefore, Prof. Butler admits that the concentration of the NaCl present in a cell culture media determines its function and may lead to a different result.  Prof. Butler stated that "the salt concentration to be a fluid, adjustable variable to control osmolality … [t]he more concentrated the medium, the less NaCl is needed.  The less concentrated the medium, the more NaCl is needed."  Butler report at ¶ 95 (citing Jo et al., "Balanced Nutrient Fortification Enables High-Density C[e]ll Culture in Batch Culture," *Biotech. Bioeng.*, 36, 717, 719 (1990) (Ex. 81)).  Prof. Butler also admits that "the reason the NaCl concentration is different in CGM and CPM is to maintain an appropriate osmotic balance in each."  Butler report at ¶ 96.

186.    In my opinion, and as Prof. Butler admits, the concentration of NaCl determines the osmolality of a composition.  Any change to the concentration of NaCl necessarily changes the resulting osmolality.  If more NaCl is added, the osmolality will change.  If less NaCl is added, the osmolality will change.   Therefore, at the very least, any change in NaCl concentration must be considered as a change in osmolality.

187.    Prof. Wurm did not measure the resultant osmolality of the formulation when the NaCl concentrations were changed or for the controls used, to properly determine whether such concentration changes changed the osmolality, as I would expect it would.   And, then, of course, any comparison should have been to the asserted claims, rather than the accused products.

188.    Although Prof. Butler identified the function of NaCl ingredient, neither Prof. Butler nor Prof. Wurm evaluated whether the differences from the asserted claims actually

**CONFIDENTIAL**

affected the function, way, or result of the NaCl ingredient.  Prof. Wurm conducted no testing to determine if his changes to the concentration of the NaCl ingredient affected the osmolality of any of his formulated compositions.

189.     Therefore, for each of the ingredients at issue, Prof. Wurm's tests (and resulting data) do not instruct as to whether the changes he made to the ingredients at issue would affect the ability of the cells to grow.

> **5.     Prof. Wurm's Samples Included 29 Ingredients Not Mentioned In Claim 1 That Skew The Results.**

190.     Prof. Wurm's results cannot show infringement under the doctrine of equivalents for another, independent reason:  As Prof. Wurm admits and as I describe above, he included 29 ingredients that are *not claimed* in each of his formulations, instead of using only the *claimed* ingredients as the control.   These 29 ingredients, which include proteins and chemically undefined ingredients, present variables that skew the results of Prof. Wurm's experiments. In other words, interactions between these additional 29 ingredients and those claimed may cause effects such as inhibition and synergy that Prof. Wurm did not take into account.

191.     I understand that claim 1 is a "comprising" claim and, therefore, the claims include soluble compositions that can include ingredients in addition to those specifically recited.  But any testing to assess infringement under the doctrine of equivalents of the claimed ingredients must account for these additional ingredients and, in particular, control for whether they affect the functions and results of the individual claim elements at issue, which Prof. Wurm did not do.

192.     Particularly in light of Prof. Wurm's testing which reduces the equivalence test to solely the two broad measures of cell growth and antibody production, Prof. Wurm should have

**CONFIDENTIAL**

controlled for the effect of these 29 additional ingredients on these two measures.  To the extent

that these 29 additional ingredients affect the extent of the tested outcome—cell growth and

antibody production—as a POSA would understand that they would, Prof. Wurm's testing

cannot and does not compare each difference from the asserted claims on a limitation-by-

limitation basis, because the test was not designed to isolate the effect of these 29 additional

ingredients.

193.    For instance, as discussed above, a POSA would readily recognize that the

inclusion of ingredients such as ███████████████████████, or ██████████ affect

the results of Prof. Wurm's "replicas" and "variants."  ██████████████████████



As a result, one cannot

tell from Prof. Wurm's experiments whether specific other ingredients in specific

concentrations perform the same functions, in the same ways, with the same results when those

concentrations are changed from the claimed ranges to those used by HyClone.  In fact, the

additional 29 ingredients may render one or more of the ingredients recited in claim 1

unnecessary—meaning that the ingredient serves no function at all, thus rendering one or more

of the ingredients recited in claim 1 redundant.  Neither Prof. Wurm nor Prof. Butler addresses

the effects of the 29 additional ingredients on the testing results.  For this additional reason, the

opinions by Profs. Wurm and Butler do not show infringement under the doctrine of equivalents

**CONFIDENTIAL**

C.  **Given The Significant Issues With Prof. Wurm's Testing Described Above, That Testing Is Insufficient And Unreliable Evidence To Show Infringement Under The Doctrine Of Equivalents.**

194.     In sum, there are several fundamental issues with Prof. Wurm's testing, results, and analyses.  And while each, in my opinion, individually undermines the value of these tests and the inappropriateness to rely on such information to draw conclusions regarding infringement, the combination of all of these issues renders Prof. Wurm's entire analysis unreliable and otherwise insufficient to show infringement under the doctrine of equivalents— certainly on a limitation-by-limitation basis.

IX.  **Prof. Butler Relies Heavily On Prof. Wurm's Insufficient Testing And Otherwise Fails To Provide Opinions That Support Infringement Under The Doctrine Of Equivalents.**

195.     As discussed previously, Prof. Butler acknowledged that each of the ingredients at issue has demonstrated, in some systems, certain function in cell culture media.  However, like Prof. Wurm, Prof. Butler performed no testing or analysis to determine whether the ingredients-at- issue (i.e., those that are not literally satisfied in the accused media) perform the same function in substantially the same way to provide substantially the same result as those in claim 1.  Also, as discussed above, Prof. Butler did not address the fact that these ingredients are known to have multiple functions.[39]

196.     Instead, Prof. Butler relied solely on Prof. Wurm's testing and the following conclusory statements to justify his conclusions regarding infringement by the doctrine of equivalents:

---

[39] I note that the patent specification does not discuss the specific function(s) of each claimed ingredient at the claimed concentrations.

**Michael Glacken, Sc.D.**
**Rebuttal Expert Report re Non-Infringement**

**Page 86**
**US Patent No. 7,598,083**

CONFIDENTIAL

| Glacken Table 12 | |
|---|---|
| **Ingredient at Issue** | **Prof. Butler's Evidence of Infringement (Other Than Prof. Wurm's Testing)** |
| $CoCl_2.6H_2O$ | "[T]he ingredient in the [HyClone products] is identical to the claimed ingredient and the concentrations in the [HyClone products] are *close* to the claimed concentration range.  I would *expect*, subject to experimentation, that mammalian cells would perform similarly in the [HyClone products] as in media that was otherwise identical but had $CoCl_2.6H_2O$ within the claimed concentration range." Butler report at ¶ 46 (emphasis added). |
| $NiSO_4.6H_2O$ | "[T]he ingredient in the [HyClone products] is identical to the claimed ingredient and the concentrations in the [HyClone products] are *close* to the claimed concentration range.  I would *expect*, subject to experimentation, that mammalian cells would perform similarly in the [HyClone products] as in media that was otherwise identical but had $NiSO_4.6H_2O$ within the claimed concentration range."  Butler report at ¶ 49 (emphasis added). |
| $SnCl_2.2H_2O$ | "[T]he ingredient in the [HyClone products] is identical to the claimed ingredient and the concentrations in the [HyClone products] are *close* to the claimed concentration range.  I would *expect*, subject to experimentation, that mammalian cells would perform similarly in the [HyClone products] as in media that was otherwise identical but had $SnCl_2.2H_2O$ within the claimed concentration range."  Butler report at ¶ 52 (emphasis added). |
| $NH_4VO_3$ | "[T]he ingredient in the [HyClone products] is identical to the claimed ingredient and the concentrations in the [HyClone products] are *close* to the claimed concentration range.  I would *expect*, subject to experimentation, that mammalian cells would perform similarly in the [HyClone products] as in media that was otherwise identical but had $NH_4VO_3$ within the claimed concentration range."  Butler report at ¶ 55 (emphasis added). |
| $CuSO_4.5H_2O$ | "[T]he total molar amounts of copper(II) supplied by $CuSO_4.5H_2O$ and $CuCl_2.2H_2O$ in the [HyClone products] fall within the range of molar amounts of copper(II) supplied by the claimed amount of $CuSO_4.5H_2O$.  This further confirms that the literal differences between $CuSO_4.5H_2O$ amounts in the [HyClone products] and the claimed $CuSO_4.5H_2O$ amount are insubstantial.  I would *expect*, subject to experimentation, that mammalian cells would perform similarly in the [HyClone products] as in media in which the same total concentration of copper (II) was supplied by an amount of $CuSO_4.5H_2O$ within the claimed concentration range."  Butler report at ¶ 61 (emphasis added). |

CONFIDENTIAL

| Glacken Table 12 | |
|---|---|
| **Ingredient at Issue** | **Prof. Butler's Evidence of Infringement (Other Than Prof. Wurm's Testing)** |
| L-methionine | "[T]he ingredient in the [HyClone products] is identical to the claimed ingredient, and the literal differences in concentration are *small*. I would *expect*, subject to experimentation, that mammalian cells would perform similarly in the [HyClone products] as in media that was otherwise identical but had L-methionine within the claimed concentration range." Butler report at ¶ 67 (emphasis added). |
| L-valine | "[T]he ingredient in the [HyClone products] is identical to the claimed ingredient, and the literal differences in concentration are *small*. I would *expect*, subject to experimentation, that mammalian cells would perform similarly in the [HyClone products] as in a medium that was otherwise identical but had L-valine within the claimed concentration range." Butler report at ¶ 70 (emphasis added). |
| L-histidine.HCl.$H_2O$ | "[T]he ingredient in the [HyClone products] is identical to the claimed ingredient and the concentrations, and the literal differences in concentration are *small*. Furthermore, the impact of the literal differences on the total molar concentration of L-histidine are reduced by the addition of L-histidine freebase. I would *expect*, subject to experimentation, that mammalian cells would perform similarly in the [HyClone products] as in media that was otherwise identical but had L-valine within the claimed concentration range." Butler report at ¶ 74 (emphasis added). |
| L-arginine.HCl | "[T]he ingredient in the [HyClone products] is identical to the claimed ingredient, and the literal differences in concentration are *small*; indeed there is no difference at all in the total concentration of L-arginine. I would *expect*, subject to experimentation, that mammalian cells would perform similarly in the [HyClone products] as in media that was otherwise identical but had L-arginine.HCl within the claimed concentration range." Butler report at ¶ 79 (emphasis added). |
| L-asparagine.$H_2O$ | "[T]he ingredient in the [HyClone products] is identical to the claimed ingredient, and the literal differences in concentration are *small*; indeed there is no difference at all in the total concentration of L-asparagine. I would *expect*, subject to experimentation, that mammalian cells would perform similarly in the [HyClone products] as in media in which the same total concentration of L-asparagine was supplied by an amount of L-asparagine.H2O within the claimed concentration range." Butler report at ¶ 84 (emphasis added). |

**CONFIDENTIAL**

| Glacken Table 12 | |
|---|---|
| **Ingredient at Issue** | **Prof. Butler's Evidence of Infringement (Other Than Prof. Wurm's Testing)** |
| $NaH_2PO_4.H_2O$ | "[T]he ingredient in the [HyClone products] is identical to the claimed ingredient, and the literal differences in concentration are *small*.  I would *expect*, subject to experimentation, that mammalian cells would perform similarly in the [HyClone products] as in media that was otherwise identical but had $NaH_2PO_4.H_2O$ within the claimed concentration range."  Butler report at ¶ 89 (emphasis added). |
| $Na_2HPO_4$ | "[T]he ingredient in the [HyClone products] is identical to the claimed ingredient, and the literal differences in concentration are *small*.  I would *expect*, subject to experimentation, that mammalian cells would perform similarly in the [HyClone products] as in media that was otherwise identical but had $Na_2HPO_4$ within the claimed concentration range."  Butler report at ¶ 92 (emphasis added). |
| $NaCl$ | "I would not *expect* the difference between the concentration of NaCl in [HyClone's production medium] and the claimed concentration of NaCl to affect the performance of mammalian cells in cell culture."  Butler report at ¶ 97 (emphasis added). |

197.    A few hours before this report was due, I received a Supplemental Declaration from Prof. Butler regarding the supplemental declaration of Prof. Wurm, dated October 4, 2016, reporting that galactose was omitted from his CGM "replica" and its "variants."  Supplemental Butler report.  Prof. Butler summarily concludes that "[t]his omission does not alter any of the opinions set forth in my opening report."  *Id.* at ¶ 2.  In my opinion, this conclusory opinion is unpersuasive for the reasons discussed above.

198.    In my opinion, for the reasons discussed earlier in this report, these opinions fall short of showing infringement under the doctrine of equivalents.

**X.    Defendants Have Non-Infringing Alternatives To The Accused Products.**

199.    I understand that the existence of a non-infringing alternative may relate to issues in this case, such as whether Janssen can show irreparable harm to support injunctive relief.  I understand that a non-infringing alternative is available when the necessary materials,

**CONFIDENTIAL**

equipment, know-how, and experience are available to make an alternative product during the relevant time.  I understand that a non-infringing alternative must not have a disparately higher price than or possess characteristics significantly different from the patented product.  I understand that a non-infringing alternative need not have been on the market during the alleged time of infringement if it could have been available.

200.    In my opinion, there are myriad non-infringing alternatives to the asserted claims.  Since the accused HyClone products contain hydrolysate, ███████████████████ ██████████████, in my opinion, it is quite likely that removal of one or more of the claimed ingredients would yield an alternative cell culture media.  Available non-infringing alternatives are soluble cell culture media compositions that omit one or more of the ingredients recited in claim 1.  If Celltrion wanted to design around the claimed compositions, it might have been able to omit one or more of those ingredients without making other changes.  Or Celltrion could have substituted additional ingredients (*e.g.*, serum, proteins, or chemically undefined ingredients) for recited ingredients.

201.    Also, as discussed above, sourcing the accused products from HyClone's manufacturing plant in Singapore would constitute a non-infringing alternative.  I understand that Celltrion already has begun to purchase the accused HyClone products from its Singapore plant, thus confirming the existence of this non-infringing alternative.  *See* Ex. 70 (Purchase Orders to GE Healthcare PTE. LTD (Singapore)) at CELLREM-0347016-17.  I reserve the right to supplement or amend my report and/or testify at trial as to any additional information regarding this issue.

CONFIDENTIAL

## XI.     The Claimed Soluble Composition Is Not A Component Of Remicade®.

202.    Janssen's statements and the testimony of one of the '083 patent inventors, Prof. Epstein, make clear that Janssen has not used and does not use a soluble composition claimed to grow expression cells that produce Remicade®.   *See* Ex. 78, (Janssen's Responses to Defendants' Request For Admissions, dated May 31, 2016 at Nos. 6-8); Ex. 55, (Deposition of David Epstein at 35-36, 151, 154-55, 175-76, 241).  Accordingly, use of the '083 patent is not necessary to make infliximab, or Remicade® specifically.

203.    Further, it is my opinion that none of the subject matter claimed by the '083 patent is a component or feature of infliximab or Remicade®.  Rather, the '083 patent concerns a soluble composition, which may be made into a media to grow cells.  The soluble composition, however, is not a component of any drug substance derived from those cells.

204.    In addition a soluble composition used to make media, in which cells are grown which then ultimately express a particular protein, is not a component of the expressed protein, just as the claimed soluble composition of the '083 patent claims is not a component of Remicade®, or of Defendants' biosimilar infliximab.

205.    As noted above, Profs. Wurm and Butler did not analyze any characteristics of the downstream antibody produced in Prof. Wurm's testing.

## XII.    Conclusion

206.    For the reasons discussed above, in my opinion, the accused HyClone production and growth products do not infringe the asserted claims literally or under the doctrine of equivalents.