# JANSSEN MIL Ex. 15

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JANSSEN BIOTECH, INC. and NEW YORK UNIVERSITY,<br><br>Plaintiffs,<br><br>v.<br><br>CELLTRION HEALTHCARE CO., LTD., CELLTRION, INC., and HOSPIRA, INC.,<br><br>Defendants. | Civil Action No. 1:15-cv-10698-MLW<br>Civil Action No. 1:16-cv-11117-MLW<br><br>CONFIDENTIAL |

**REPLY EXPERT REPORT OF MICHAEL GLACKEN, SC.D. REGARDING INVALIDITY OF UNITED STATES PATENT NO. 7,598,083**

_(signature)_                                                  11 NOV 2016
Michael Glacken, Sc.D.                                         Date

### III. Profs. Butler And Wurm Have Taken Contradictory Positions With Regard To The Scope Of The Asserted Claims Of The '083 Patent.

5. Since serving my opening report, I have reviewed and responded to Profs. Butler's and Wurm's respective infringement reports. In those reports, both of Janssen's experts have taken the position that asserted claims 1 and 2 of the '083 patent should be broadly construed such that: (a) the claimed concentration ranges do not limit the scope of the claims (*see* Butler opening report at ¶¶ 39-40, 42, 65; Wurm opening report at ¶¶ 49-51); (b) the claimed compositions may include any number of additional ingredients not claimed in the claims, including chemically undefined ingredients and proteins (*see* Butler opening report at ¶ 36); and (c) the claimed forms of the claimed ingredients do not limit the scope of the claims (*see* Butler opening report at ¶¶ 57-61, 72-84; Wurm opening report at ¶¶ 52, 60).

6. Despite this expansion of the literal scope of claims 1 and 2 with respect to the alleged infringement (a claim-scope expansion Janssen admits it needs to assert infringement), both Profs. Butler and Wurm have responded to my invalidity opinions by reading the scope of claims 1 and 2 much more narrowly. First, in addressing the question of obviousness, they read the asserted claims as strictly limited to the claimed concentration ranges. For example, they say:

- "Th[e] concentration [of $CuSO_4.5H_2O$] is outside the claimed range. Dr. Glacken's report is silent as to why a POSA would have changed the concentration of $CuSO_4.5H_2O$…to arrive at claim 1." Butler rebuttal report at ¶ 58; *see also id.* at ¶ 59 (concentration of $ZnSO_4.7H_2O$), ¶¶ 122-23 (concentration of putrescine.2HCl); Wurm rebuttal report at ¶¶ 40-41 (concentrations of $ZnSO_4.7H_2O$ and $CuSO_4.5H_2O$), ¶ 79 (concentration of putrescine.2HCl).

- "Dr. Glacken addresses only the concentration difference in putrescine.2HCl, where the range disclosed in the WO '614 application does not overlap with the claimed concentration range at all. However, the fact that the other concentration ranges overlap does not mean that they are the same. In order to arrive at the

---

be considered a response to both experts., to the extent they provide similar or parallel opinions regarding an issue, regardless of whether both opinions are expressly cited in my reply report.

concentration ranges of claim 1 of the '083 patent, it would have been necessary to modify each of the concentration ranges disclosed in Table 1 of the WO '614 application." Butler rebuttal report at ¶ 102; *see also id.* at ¶¶ 137-140 (asserting that the claimed concentration ranges would not have been obvious to a POSA where the prior art teaches overlapping concentration ranges); Wurm rebuttal report at ¶¶ 70, 90 (same).

- "[C]laim 1 claims cell culture media compositions with structural features in common. That is, the claimed cell culture media compositions each share at least 52 ingredients (described in the claim by chemical name or formula) and have a clearly defined concentration range (described in the claim by upper and lower limits)." Butler rebuttal report at ¶ 168; *see also* Wurm rebuttal report at ¶ 113.

- "Beyond requiring particular ingredients, the asserted claims further identify the concentration range of each ingredient. The upper and lower claimed amounts for each range are tailored to and bracket a specific composition disclosed in the '083 patent called MET 1.5 which, as described further below, is a nutritive cell culture media." Butler rebuttal report at ¶ 175; *see also* Wurm rebuttal report at ¶ 117.

7. By contrast, when addressing infringement, they assume that that literal differences between the concentrations of ingredients in the accused HyClone products and the asserted claims are insubstantial, so long as both cell culture media function to promote cell growth. For example, they state:

- "Generally speaking, the precise concentrations of the trace element-containing ingredients are not critical. What is important is that there be a sufficient amount present to fulfill the biological function of the element, and that the ingredient be present in trace amounts (and that the concentration not be so high as to be toxic to the cells)." Butler opening report at ¶ 42.

- "Claim 1 requires between 0.000025-0.0005 mg/L of $SnCl_2.2H_2O$, while [the HyClone growth product] contains 0.0000079 mg/L and [the HyClone production product] contains 0.0000092 mg/L." Butler opening report at ¶ 51. This means that the HyClone growth and production products contain, respectively, 32% and 37% of the lower limit of the claimed concentration range. Prof. Butler asserts that "the concentrations in the [accused HyClone products] are close to the claimed concentration range. I would expect, subject to experimentation, that mammalian cells would perform similarly in the [accused HyClone products] as in media that were otherwise identical but had SnCl2.2H2O within the claimed concentration range." *Id.* at ¶ 52.

- "Claim 1 requires between 100-500 mg/L of L-histidine.HCl.$H_2O$. [The HyClone growth product] contains 13.52 mg/L of L-histidine.HCl.$H_2O$ and [the HyClone production product] contains 15.64 mg/L of L-histidine.HCl.$H_2O$." Butler opening report at ¶ 72. This means that the HyClone growth and production products contain, respectively, 14% and 16% of the lower limit of the claimed concentration range. Prof. Butler asserts that for the ingredient L-histidine.HCl.$H_2O$ "the literal differences in concentration are small." *Id.* at ¶ 74. He further opines that "the impact of the literal differences on the total molar concentration of L-histidine are reduced by the addition of L-histidine freebase. I would expect, subject to experimentation, that mammalian cells would perform similarly in the [accused HyClone products] as in media that had L-histidine.HCl.H2O within the claimed concentration range." *Id.*

- "Based on my knowledge and experience working with cell culture, the literal differences between the concentration ranges in the [accused HyClone products] and those in claim 1 of the '083 patent do not appear to be substantial. As such, I would expect that cultured cells would perform similarly in the [accused HyClone products] as they would in cell culture media that literally meet the limitations of claim 1." Wurm opening report at ¶ 53.

8. Second, in addressing the issue of obviousness, they read the asserted claims as limited to the expressly claimed ingredients and chemically-defined media compositions. For example, they say:

- "Dr. Glacken does not address the fact that the basal medium in Table 1 of the WO '614 application requires nearly 30 additional ingredients that are not recited in claim 1 of the '083 patent.... [T]he POSA would have been taught that almost 30 unclaimed ingredients were necessary; none of the ranges for the ingredients in Table 1 of the WO '614 application have a lower limit of zero. Nothing in the WO '614 application teaches that certain ingredients could be eliminated, but that the ingredients claimed in the '083 patent must be retained. But this is the modification that would have been necessary to arrive at the claims of the '083 patent starting from the WO '614 application." Butler rebuttal report at ¶ 98; *see also id.* at ¶ 134 (asserting that the '955 application teaches over 30 additional ingredients that would need to be eliminated to render the asserted claims obvious).

- "Dr. Glacken failed to address the fact that the Table 1 medium in the WO '614 application requires nearly 30 ingredients that are not recited in claim 1 of the '083 patent. Dr. Glacken simply ignores these differences. But, if a POSA would have started with the medium of Table 1 of the WO '614 application, he would have been taught that nearly 30 unclaimed ingredients were necessary (the lower limit of their range is non-zero in Table 1 of the WO '614 application). To arrive at the claimed invention, one would have had to recognize that these ingredients were

unnecessary and could be eliminated." Wurm rebuttal report at ¶ 68; *see also id.* at ¶ 88 (asserting that the '955 application teaches over 30 additional ingredients that would need to be eliminated to render the asserted claims obvious).

- "As mentioned above, there was a long-felt need for chemically defined cell culture media whose formulations were known and publicly available that were capable of supporting high density cell culture in a bioreactor setting." Butler rebuttal report at ¶ 156. "The invention of the '083 patent addressed those long-felt needs. As the examples of the '083 patent demonstrate, the claimed cell culture medium, in a chemically-defined embodiment, is capable of supporting sustained high densities of viable cells in a bioreactor setting (between 10 and 20 million viable cells per milliliter days per week)." *Id.* at ¶ 158.

- "As I described above, the invention of the '083 patent was a breakthrough that addressed those long-felt needs…. That the inventors were able to demonstrate such results [of cell growth and antibody yield] with a chemically-defined medium at the time of the invention in the early 2000s, and publish both the results and the medium formulation in a patent, was a breakthrough that satisfied the long-felt need." Wurm rebuttal report at ¶ 105.

9. By contrast, when addressing infringement, they assume that additional ingredients, even the chemically undefined ingredients in the accused HyClone products, are irrelevant. For example, they say:

- "The presence or absence of additional, unclaimed ingredients is irrelevant to the infringement analysis." Butler opening report at ¶ 36.

- Profs. Butler and Wurm assert that the accused HyClone products infringe the asserted claims, even though the accused products contain chemically undefined ingredients (█████ and hydrolysate █████) and proteins █████ █████. *See* Wurm opening report at Annex 1 at Table 10; Ex. 92 (Wurm claim construction declaration) at ¶ 6 ("'Cell culture media,' based on its ordinary meaning, may refer to media containing undefined components (such as soy hydrolysate) or media containing proteins (such as insulin).").

10. Third, in addressing the issue of obviousness, they read the asserted claims as strictly limited to the forms of the recited ingredients. For example, they say:

- "[S]upplying an ingredient omitted from eRDF would not be a reason for the change, because eRDF contains a different [] source…" Butler rebuttal report at ¶ 50.

5

- "Dr. Glacken has not identified a reason why a POSA reading Jayme 1997 would have reverted to the salt form of L-tyrosine in DMEM/F12, when the eRDF had already replaced this salt form with L-tyrosine in a non-salt form…" Butler rebuttal report at ¶ 55.

- "[T]he WO '614 application would not have given a POSA any reason to modify the manganese salt used in its medium to arrive at the manganese salt recited in the claim." Butler rebuttal report at ¶ 109; *see also id.* at ¶¶ 111, 113, 115, 147 (disputing that it would have been obvious to substitute ingredients of different salt or hydrate forms that provide the same active component to the cell culture media); Wurm rebuttal report at ¶¶ 71-73, 93-95 (same).

11. By contrast, when addressing infringement, they assume that ingredients that the claimed ingredients can be reduced to just their "active component" in the final cell culture media, so different salt or hydrated forms of an active component are interchangeable. For example, they say:

- "In addition to $CuSO_4.5H_2O$, the [accused HyClone products] contain another source of copper(II), $CuCl_2.2H_2O$. At the concentrations of these ingredients in the [accused HyClone products], both of these ingredients are completely soluble in water. Upon dissolution in water, the copper(II) ions separate (*i.e.*, dissociate) from the sulfate and chloride ions. Whether the source of copper(II) in the media is a sulfate salt (as in the claim), or a mixture of chloride and sulfate salts (as in the [accused HyClone products]), in solution cells will encounter free copper(II)." Butler opening report at ¶ 59. "Adding together the $CuSO_4.5H_2O$ and $CuCl_2.2H_2O$ in the [accused HyClone products], the total concentration of the active component (copper (II)) supplied by the [accused HyClone products] is within the range of that total concentration of copper (II) supplied by claim 1 of the '083 patent." *Id.* at ¶ 60.

- "In addition to $L$-histidine.$HCl.H_2O$, [the accused HyClone products] also contain L-histidine free base. This ingredient provides the same active component (L-histidine) as L-histidine.$HCl.H_2O$. When both sources of L-histidine are considered, the total molar concentrations of L-histidine in the [accused HyClone products] are about 30-40% below the total molar concentration of L-histidine called for by claim 1 of the '083 patent." Butler opening report at ¶ 73.

- "That is, the total amount of the active component (copper(II), arginine, and asparagine, respectively) was identical in the variant and in hydrated [HyClone growth product]; the only difference was the chemical form in which the respective active component was provided. By way of example, the $CuSO_4.5H_2O$ variant— designed to test whether supplying copper(II) as $CuSO_4.5H_2O$ is insubstantially

6

different from supplying copper(II) as a mixture of $CuSO_4 \cdot 5H_2O$ and $CuCl_2 \cdot 2H_2O$—was identical in all respects to hydrated [HyClone growth product], and had the same total copper(II) concentration (*i.e.*, 12.602 nmol/L), but the copper (II) in the variant was supplied as $CuSO_4 \cdot 5H_2O$ only (at 0.00314 mg/L) rather than as a mixture of $CuSO_4 \cdot 5H_2O$ (at 0.000536727 mg/L) and $CuCl_2 \cdot 2H_2O$ (at 0.0017819291 mg/L as in the [HyClone growth product]." Wurm opening report at ¶ 60.

12. I understand that patent claims must be interpreted and given the same meaning for purposes of both validity and infringement analyses—a standard I have applied in all of my expert reports submitted in this case. Profs. Butler and Wurm, however, have not offered opinions as to whether the asserted claims—as broadly construed by Janssen to cover the accused HyClone products—are valid in light of the standards for obviousness and sufficient patent disclosures. In my opinion, the asserted claims are to be construed narrowly as Profs. Butler and Wurm maintain in their validity reports (and, thus, the accused HyClone products do not infringe). But if the trier of fact were to construe the claims broadly to cover the accused products, as Profs. Butler and Wurm maintain in their infringement reports, the asserted claims would have to be invalid. In fact, as I discuss below, the asserted claims are invalid in my opinion regardless of whether they are construed narrowly or broadly.

**IV. The Asserted Claims of the '083 Patent, Whether Construed Narrowly Or Broadly, Would Have Been Obvious To A Person Of Ordinary Skill In The Art.**

13. The rebuttal reports submitted by Profs. Butler and Wurm do not change my opinions that the asserted claims would have been obvious to a POSA.

**A.   The Level Of Ordinary Skill In The Art**

14. Profs. Butler and Wurm disagree with my definition of a POSA, which they assert requires a level of ordinary skill in the art that "is somewhat higher than [they] believe is appropriate as of 2004." Butler rebuttal report at ¶ 34; *see also* Wurm rebuttal report at ¶ 22. I

7

Michael Glacken, Sc.D.
**Reply Expert Report**                                                                U.S. Pat. No. 7,598,083

namely ████████, ████ hydrolysate, ████████████, but are still accused of infringing these claims. *See* Dr. Glacken rebuttal report at pp. 18-22 (Glacken Table 1).

## V.      Invalidity Under 35 U.S.C. § 112

### A.      Based on Janssen's Infringement Allegations, The Asserted Claims Are Indefinite

160.    In response to my opinion on indefiniteness, Profs. Butler and Wurm assert that the claims particularly point out and distinctly claim cell media compositions that fall within their literal scope and this literal scope is "defined by a *specific list of ingredients* along with *specific concentration ranges* for each of those ingredients." Butler rebuttal report at ¶ 160 (emphasis added); *see* Wurm rebuttal report ¶¶ 107-09 ("Each ingredient and corresponding concentration range is recited with certainty."). Prof. Butler further states that "claim 1 sets forth a formula—including the specific chemical ingredients and concentration ranges—that *precisely defines* the compositions that falls within its scope." Butler rebuttal report at ¶ 166 (emphasis added); *see* Wurm rebuttal report at ¶ 107-09. And Profs. Butler and Wurm emphasize that the claimed invention is a "*chemically defined* cell culture media[.]" Butler rebuttal report ¶¶ 156-58 (emphasis added); *see also* Wurm rebuttal report ¶¶ 103-05.

161.    Based on these narrow characterizations of the asserted claims (under which, of course, there could be no infringement contentions in this case), Profs. Butler and Wurm opine that a POSA should have been able to rely on the "chemical formula" and "clearly defined concentration ranges" set forth in the claims and determine whether a formulation would infringe the claims. Butler rebuttal report at ¶ 167-68; *see* Wurm rebuttal report at ¶ 107-09. In other words, Janssen's experts are arguing for a double standard: one for infringement, and an entirely different one for validity.

71