IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

---

| | |
|---|---|
| JANSSEN BIOTECH, INC. | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) Civil Action. No. 1:17-cv-11008-MLW |
| CELLTRION HEALTHCARE CO., LTD., | ) |
| CELLTRION, INC., and | ) |
| HOSPIRA, INC., | ) |
| Defendants. | ) |
| | ) |

---

**JANSSEN'S MEMORANDUM OF LAW IN SUPPORT OF MOTIONS *IN LIMINE* NOS.
8-10 REGARDING ECONOMIC DAMAGES**

# <u>TABLE OF CONTENTS</u>

**Page**

TABLE OF AUTHORITIES ......................................................................................... ii

Janssen's Damages MIL No. 8: To Exclude Evidence or Argument that Janssen's Lost Profits and Reasonable Royalty Are Subject to Apportionment .............................................................. 2

Janssen's Damages MIL No. 9: To Exclude Evidence or Argument that Janssen's Reasonable Royalty Analysis Is Based on a "Hold Up" .................................................................................. 6

Janssen's Damages MIL No. 10: To Exclude Evidence or Argument on the Effect of Ixifi on Janssen's Damages ..................................................................................................................... 11

CONCLUSION ............................................................................................................. 13

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Afros S.P.A. v. Krauss-Maffei Corp.*,
113 F.R.D. 127 (D. Del. 1986) ...................................................................12

*Astrazeneca AB v. Apotex Corp.*,
985 F. Supp. 2d 452 (S.D.N.Y. 2013).........................................................9

*Edwards Lifesciences. AG v. CoreValve, Inc.*,
699 F.3d 1305 (Fed. Cir. 2012).................................................................7

*Eidos Display, LLC v. Chi Mei Innolux Corp.*,
2017 U.S. Dist. LEXIS 157062 (E.D. Tex. May 26, 2017).......................6

*Ericsson, Inc. v. D-Link Sys.*,
773 F.3d 1201 (Fed. Cir. 2014).........................................................5, 7, 9

*Fujifilm Corp. v. Benun*,
605 F.3d 1366 (Fed. Cir. 2010).................................................................8

*Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*,
2017 U.S. Dist. LEXIS 148485 (E.D. Tex. Sept. 13, 2017) .....................8

*Janssen Biotech, Inc. v. Celltrion Healthcare Co.*,
239 F. Supp. 3d 328 (D. Mass 2017) ....................................................1, 2

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
694 F.3d 51 (Fed. Cir. 2012).....................................................................5

*Mentor Graphics Corp. v. EVE-USA, Inc.*,
851 F.3d 1275 (Fed. Cir. 2017).........................................................3, 4, 5

*Micro-Chem., Inc. v. Lextron, Inc.*,
318 F.3d 1119 (Fed. Cir. 2003).............................................................2, 3

*Minco, Inc. v. Combustion Eng'g*,
95 F. 3d 1109 (Fed. Cir. 1996)...............................................................2, 3

*Mondis Tech., Ltd. v. Chimei InnoLux Corp.*,
822 F. Supp. 2d 639 (E.D. Tex. 2011) ......................................................8

*N.J. Physicians United Reciprocal Exch. v. Boynton & Boynton, Inc.*,
2017 U.S. Dist. LEXIS 134899 (D.N.J. Aug. 23, 2017).........................13

ii

*Orthoarm, Inc. v. Forestadent USA, Inc.*,
   2007 U.S. Dist. LEXIS 44429 (E.D. Mo. June 19, 2007).......................................................12

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*,
   575 F.2d 1152 (6th Cir. 1978) ...............................................................................................3

*Paper Converting Mach. Co. v. Magna-Graphics Corp.*,
   745 F.2d 11 (Fed. Cir. 1984).............................................................................................3, 4

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l Inc.*,
   2014 U.S. Dist. LEXIS 126294 (N.D. Cal. Sept. 9, 2014) ......................................................8

*Realtek Semiconductor Corp. v. LSI Corp.*,
   2014 U.S. Dist. LEXIS 1171 (C.D. Cal. Jan. 6, 2014) ...........................................................9

*Soletanche & Rodio, Inc. v. Brown & Lambrecht Earth Movers, Inc.*,
   99 F.R.D. 269 (N.D. Ill. 1983)..............................................................................................12

*Versata Software, Inc. v. SAP Am., Inc.*,
   717 F.3d 1255 (Fed. Cir. 2013).............................................................................................11

*VirnetX, Inc. v. Cisco Sys.*,
   767 F.3d 1308 (Fed. Cir. 2014)...............................................................................................5

*Warsaw Orthopedic, Inc. v. NuVasive, Inc.*,
   778 F.3d 1365 (Fed. Cir. 2015)...............................................................................................1

**Statutes**

35 U.S.C. § 154(a)(1)....................................................................................................................7

**Other Authorities**

AMERICAN HERITAGE DICTIONARY (SECOND COLLEGE EDITION) (1976).......................................6

WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1983) ...........................................................6

iii

Plaintiff Janssen Biotech, Inc. submits the following *in limine* motions on economic damages.  The Federal Circuit "recognizes two measures of damages:  lost profits and reasonable royalty."  *Warsaw Orthopedic, Inc. v. NuVasive, Inc.*, 778 F.3d 1365, 1374 (Fed. Cir. 2015).  Janssen seeks lost profits damages resulting from Defendants' infringing use of the patented cell media to make Inflectra, which is biosimilar to – and which competes with – Janssen's biologic drug Remicade.  Janssen also seeks a reasonable royalty for any infringement that is not the subject of any award of lost profits damages.

In an order of March 3, 2017, the Court rejected Defendants' contention that lost profits were not available as a matter of law and indicated that Janssen would be entitled to "reasonably foreseeable lost profits that it would not have suffered 'but for' the defendant's infringement."  *Janssen Biotech, Inc. v. Celltrion Healthcare Co.*, 239 F. Supp. 3d 328, 330 (D. Mass 2017).  Despite this ruling, Defendants and their experts contend that even if Janssen shows that it would have gained additional profits but for Defendants' infringement, it should not be awarded these lost profits because of the principle of "apportionment."  This contention is contrary to the law and should not be presented to the jury (**MIL No. 8**).

Defendants should also be precluded from introducing evidence or argument that Janssen's reasonable royalty case is based on improper "hold up," as it is appropriate for reasonable royalties to be calculated based on the economic realities at the time of the date of first infringement (**MIL No. 9**).  Furthermore, Defendants should be precluded from relying on evidence of a Pfizer infliximab biosimilar, Ixifi, because they expressly refused to produce information about Ixifi to Janssen during fact discovery (**MIL No. 10**).  The grounds for these motions are set forth below.

1

**Janssen's Damages MIL No. 8: To Exclude Evidence or Argument that Janssen's Lost Profits and Reasonable Royalty Are Subject to Apportionment**

In his export report, Defendants' expert Dr. Leonard asserts that any lost profits damages awarded to Janssen should be apportioned to reflect only the "value that the alleged invention creates for the defendant or patent owner, not value created by other economic factors." Janssen MIL Ex. 3 (Leonard Report) ¶ 89. Dr. Leonard's position is that the damage analysis must assess the contribution of the cell media to Inflectra's overall value, in comparison to the value created by the infliximab molecule and other factors, and should limit Janssen's lost profits to the portion of Inflectra's overall value that is attributable to the cell media. According to Dr. Leonard, this type of "'apportionment' is required as a legal matter to isolate the component to which the patented technology contributed." *Id.* Dr. Leonard's approach is legally incorrect. Moreover, Dr. Leonard is advocating an approach that this Court has already rejected. Defendants should not be permitted to offer evidence or argument on this subject.

This Court has already rejected the approach Dr. Leonard offers. In its order of March 3, 2017, the Court found that "[a] patentee may recover damages in the form of lost profits to compensate for sales of an unpatented product (i.e., Remicade) lost to an infringer's non-infringing product (i.e., Inflectra), if the infringer could only have captured the patentee's sales by infringing the patent by, in this case, using an infringing powder." *Janssen Biotech*, 239 F. Supp. 3d at 331 (citing *Micro-Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1125–26 (Fed. Cir. 2003); *Minco, Inc. v. Combustion Eng'g*, 95 F. 3d 1109, 1119 (Fed. Cir. 1996)). The Court made this finding in response to the same argument by Defendants that damages should be keyed to some measure of the "intrinsic value of the invention." 2/23/17 Hr'g Tr. at 141:9; Defs.' Memo. of Law Regarding Plaintiff's Inability to Obtain a Permanent Injunction or Lost Profits Damages,

2

*Janssen v. Celltrion*, No. 15-cv-10698, Dkt.414, at 6 (arguing that the cell culture media does not drive demand for Inflectra).

The Court's ruling recognizes that although Remicade is not itself patented, Janssen is entitled under the law to seek damages based on the sales of this non-patented product, when those sales would not have been lost but for Defendants infringement of Janssen's cell media patent.  This recognition is in accord with black letter law.  *See Micro-Chem.*, 318 F.3d at 1125–26 (holding that lost profits damages properly awarded where it was "reasonably foreseeable" that infringement would cause plaintiff to lose sales on unpatented product); *Minco*, 95 F. 3d at 1119 (holding damages properly based on sales of unpatented fused silica made using patented rotary furnace).

The principle the Court adopted also flows directly from *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275 (Fed. Cir. 2017).   In *Mentor Graphics*, the infringer argued that the patentee should first "calculate the amount of profits it lost as a result of the infringement" and then "apportion its lost profits to cover only the patentee's inventive contribution."  *Id.* at 1287. The Federal Circuit disagreed.  It held that the proof of two *Panduit* factors, which often are used in assessing but-for causation,[1] *i.e.*, demand for the patented product and a lack of non-infringing alternatives, "satisfies principles of apportionment."  *Id.* at 1288.  Where a patentee satisfies these factors to show but-for causation, that showing sufficiently attributes the appropriate value to the patent, with no need to further "apportion."  *Id.*; *see also Minco*, 95 F.3d at 1119 (holding that the district court's finding that plaintiff "had a reasonable probability of making . . .  sales but for the infringement" was sufficient to support lost profits award); *Paper Converting Mach. Co. v. Magna-Graphics Corp.*, 745 F.2d 11, 22–23 (Fed. Cir. 1984) (declining to further

---

[1]  *See Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978).

3

apportion a lost profits award because the patentee proved it would have made the sales in question but for the infringing sales). The Federal Circuit also left open the possibility that other methods of proving but-for damages could also "adequately incorporate[] apportionment principles." *Mentor Graphics*, 851 F.3d at 1288.

In this case, the *Panduit* factors need to be adjusted, of course, to reflect the fact that the relevant demand that causes lost profits is the demand for the non-patented product Remicade, not the patented product itself. The Court already made that adjustment in its earlier ruling on this issue and, with that adjustment, Janssen's damages case fully incorporates apportionment principles, just as in *Mentor Graphics*. Thus, at trial Janssen will prove that the '083 patent covers the cell media that Celltrion uses – and needs to use – to make Inflectra, a biosimilar to Remicade that is sold in direct competition with Remicade. The cell medium is not one of many "components" of Inflectra, but rather is an essential predicate to its existence. It is foundational to Inflectra's existence. *See* Janssen MIL Ex. 3 ¶ 188. Defendants could not have an infliximab biosimilar without growing it in a particular cell media that has been optimized to make a biosimilar to Remicade, and as Janssen has demonstrated (and will demonstrate at trial, if necessary), Defendants did not have an available noninfringing alternative to the cell media covered by the '083 patent. *See* Memo. in Support of Janssen's Motion for Summary Judgment, Dkt. 246. Meanwhile, there unquestionably is demand for the product on which Janssen seeks damages (*i.e.*, Remicade) and whose lost sales and eroded price provide the measure of lost profits. Janssen's lost profits claim is premised on its contention, which it will prove at trial, that Celltrion's use of the patented cell media to make Inflectra is a but-for cause of the lost profits on Remicade that Janssen suffers due to Inflectra sales. Such a claim needs to be proved, of course, but once it is, there is no basis to apply Dr. Leonard's apportionment principle.

4

The Federal Circuit has applied an "apportionment" requirement only in cases, unlike this one, where the patent-in-suit covers a particular feature or component of a multi-component product – *e.g.*, a flashlight app for a cellphone or a variable speed windshield wiper for an automobile. "[W]here multi-component products are involved" damages must "reflect the value attributable to the infringing features of the product and no more." *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014). Therefore, when the "accused infringing products have both patented and unpatented *features*" the fact-finder must make "a determination of the value added by such *features*." *Id.* (emphasis added). In such situations, lost profits for infringing a patent on the flashlight or windshield wiper are limited to the value that technology adds to the overall device and should not include the entire value of the cellphone or automobile.

The cases Dr. Leonard cites to support his "apportionment" theory all address that inapposite scenario. *See Ericsson*, 773 F.3d at 1226; *VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1326 (Fed. Cir. 2014) ("[W]hen claims are drawn to an individual component of a *multi-component product*, it is the exception, not the rule, that damages may be based upon the value of the *multi-component product*.") (emphasis added); *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012) (applying apportionment requirement to "any case involving *multi-component products*") (emphasis added). None of these cases concerns a situation where the infringer's damages-causing product would not *exist* without use of the patented technology. The apportionment concept has no application here, where Janssen's lost profits case is premised on proving that without Janssen's patented cell media, Defendants would have no Inflectra to sell. *See Mentor Graphics*, 851 F.3d at 1277–78. Dr. Leonard is incorrect when he asserts that "'apportionment' is required as a legal matter" on the facts of this case. *See* Janssen MIL Ex. 3 ¶ 89.

5

Dr. Leonard's report recycles the same argument that this Court already rejected, without acknowledging the Court's previous ruling or providing a rationale for departing from it. Meanwhile, Janssen's expert Dr. Sean Nicholson prepared a damage analysis in reliance on the Court's ruling.  Defendants should not be permitted to offer evidence or argument that Janssen's lost profits should be apportioned to reflect only the "value" of the patented cell medium as a portion of Inflectra's overall value.

**Janssen's Damages MIL No. 9: To Exclude Evidence or Argument that Janssen's Reasonable Royalty Analysis Is Based on a "Hold Up"**

In his expert report, Dr. Leonard faults Janssen for basing its reasonable royalty analysis on an "economic hold up," based on an alleged "non-recoverable investment in the product" made by Defendants before they were aware of the '083 patent.  *See* Janssen MIL Ex. 3 ¶¶ 90, 248; *see also id.* ¶¶ 134–36.  These criticisms of Janssen's analysis are contrary to settled law – as Dr. Leonard has acknowledged in his published articles.  Moreover, use of the term "hold up" is pejorative and highly prejudicial and, in any event, should not be used.  *See Eidos Display, LLC v. Chi Mei Innolux Corp.*, 2017 U.S. Dist. LEXIS 157062, at *4 (E.D. Tex. May 26, 2017) (granting motion *in limine* to preclude use of the term "hold up" as "[p]erjorative").  *See also* WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY (1983) at 575 (defining "hold up" as a "rob[bery] carried out at gunpoint"); THE AMERICAN HERITAGE DICTIONARY (SECOND COLLEGE EDITION) (1976) at 616 (defining "hold up" as a "robbery, esp. an armed robbery").

Name calling aside, Dr. Leonard contends that it is somehow improper for the hypothetical negotiation to take into account the negotiating leverage that a patentee may have due to the defendants' prior investments – what he calls "hold-up value."  This is not the law. The problems that the defendant faces at the time of the hypothetical negotiation, from prior

6

investments or otherwise, are crucial to fairly analyzing the amount the defendant would agree to pay in a hypothetical negotiation for the right to practice the patent.  Defendants should not be permitted to offer evidence or argument on their "hold-up" theory.

It is settled law that, contrary to Dr. Leonard's argument, a patentee is entitled to obtain the best price it can negotiate for the use of its invention and that may mean the prospective licensee has no other choice but to acquiesce to the patentee's terms.  "A patentee's right to exclude is a fundamental tenet of patent law." *Edwards Lifesciences. AG v. CoreValve, Inc.*, 699 F.3d 1305, 1314 (Fed. Cir. 2012) (citations omitted); *see* 35 U.S.C. § 154(a)(1) (explaining that a patent grants "the right to exclude others from making, using, offering for sale or selling the invention").  A patent holder may choose to license its invention on any terms it wishes, or not to license the patent at all.  *Cf. Ericsson*, 773 F.3d at 1230 (explaining that one of the *Georgia-Pacific* factors is the patentee's "policy . . . to maintain his patent monopoly") (internal quotation marks omitted).

Dr. Leonard characterizes Janssen's reasonable royalty analysis as a "hold up" because it relies on the fact that Defendants had made a "non-recoverable investment in the product" before the date of the hypothetical negotiation, *i.e.*, Defendants already had gone to the expense of testing and optimizing the infringing cell media and using it to make a biosimilar.  *See* Janssen MIL Ex. 3 ¶¶ 90, 135.  In Dr. Leonard's view, it is improper for Janssen to take advantage of that fact in the hypothetical negotiation.  But the investment that Defendants had made in developing the cell media and their biosimilar provides the factual setting for the hypothetical negotiation.  It provides valuable information about the relative strengths of the parties' bargaining positions in the hypothetical negotiation and thus helps explain what royalty would be reasonable under the

7

circumstances of this case.  There is no reason why a jury should ignore these facts, and considering them does not turn Janssen's reasonable royalty analysis into a hold up.

The relative "bargaining positions" of the parties is part and parcel of the reasonable royalty analysis. *Mondis Tech., Ltd. v. Chimei InnoLux Corp.*, 822 F. Supp. 2d 639, 648 (E.D. Tex. 2011).  In the hypothetical negotiation – as in any negotiation – each side may rely on factors that strengthen its bargaining position. *See*, *e.g.*, *Fujifilm Corp. v. Benun*, 605 F.3d 1366, 1372 (Fed. Cir. 2010) ("Fuji presented testimony that in a hypothetical negotiation is would have enjoyed a strong bargaining position based on [various factors]."); *Imperium IP Holdings (Cayman), Ltd. v. Samsung Elecs. Co.*, 2017 U.S. Dist. LEXIS 148485, at *6–7 (E.D. Tex. Sept. 13, 2017) (same); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l Inc.*, 2014 U.S. Dist. LEXIS 126294, at *18 (N.D. Cal. Sept. 9, 2014) (accepting expert's conclusion that plaintiff "would have been in an exceptionally strong bargaining position at the time of the hypothetical negotiation").  Defendants should not be allowed to accuse Janssen of engaging in a "hold up" simply because it relies on factors that enhance its bargaining position.

Dr. Leonard seems to envision the hypothetical negotiation as a one-way street, in which the infringer can rely on factors that enhance its bargaining position, *e.g.*, the time it would take to design around the patent, but the patentee cannot do the same.  In Dr. Leonard's analysis, a patentee in Janssen's situation would have to negotiate with one hand tied behind its back, by not relying on factors that enhance its bargaining position, or face accusations that it is engaging in an impermissible "hold up."  That is not the law.

Cases have not recognized the "hold-up" concept outside a very narrow situation that is not present here.  The only Federal Circuit cases recognizing that concept address a completely inapposite situation where a patentee committed to licensing a "standard essential patent," which

8

competitors are required to use to comply with a technological standard, on "reasonable and non-discriminatory" ("RAND") terms. *Ericsson*, 773 F.3d at 1209; *see also Realtek Semiconductor Corp. v. LSI Corp.*, 2014 U.S. Dist. LEXIS 1171, at *23–24 (C.D. Cal. Jan. 6, 2014) (explaining hold up and switching costs in the context of RAND licensing for standard-essential patents).  In that scenario, a patentee agrees in advance to license its patents on RAND terms in exchange for the inclusion of its technology in the relevant standard.  If the patentee then attempts to extract an excessive royalty because its agreement to these terms induced others to agree to the inclusion of its technology in the standard and make substantial investments to incorporate the patented technology in their products, pursuant to the standard, the district court may "instruct[] the jury on patent hold-up or, perhaps, set[] the hypothetical negotiation date before the adoption of the standard." *Ericsson*, 773 F.3d at 1234.  The reasoning underlying the "hold-up" concept is limited to standard-essential patents and has never been applied outside the context of standard-essential patents.  *See Astrazeneca AB v. Apotex Corp.*, 985 F. Supp. 2d 452, 501 (S.D.N.Y. 2013) (explaining that hold up "considerations are simply inapplicable" outside of standard-essential patent context), *rev'd in part on other grounds*, 782 F.3d 1324 (Fed. Cir. 2015). Indeed, the practice of executing RAND commitments in the context of standard-essential patents demonstrates the recognition that, in the absence of such a commitment, the law would permit the patentee to use any leverage it has when negotiating a license – including what Dr. Leonard calls "hold-up value."

In his published articles, Dr. Leonard has acknowledged that his "hold-up" theory is not the law – and in the process used the vastly less pejorative term "lock in" to describe it.  For example, a recent article by Dr. Leonard states that "current law mandates that the date of hypothetical negotiation be set at the time of first infringement" and as a result "the defendant

9

may have incorporated the technology of the patent-in-suit before the patent actually issued" and

may be "'locked' into the patented technology."  Janssen MIL Ex. 4 (Gregory K. Leonard et al.,

*Patent Damages: What Reforms Are Still Needed?*, LANDSLIDE (May/June 2010)) at 39.  The

article explains that "[b]eing locked in can weaken the defendant's negotiating position in the

hypothetical negotiation and increase the royalty that it would be willing to pay.  In that case, the

resulting reasonable royalty damage award may incorporate 'lock-in value' in addition to the

inherent value of the technology."  *Id.*  The article is critical of that approach, but acknowledges

that it is "mandate[d]" under current law and can be changed only if "Congress may want to

address" it.  *Id.*; *see also* Janssen MIL Ex. 5 (Elizabeth M. Bailey, Gregory K. Leonard, Mario A.

Lopez, *Making Sense of "Apportionment" in Patent Damages*, 12 COLUM. SCI. & TECH. L. REV.

255 (2011)) at 271 (explaining that, because the hypothetical negotiation takes place at the date

of first infringement, "the infringer may have previously made large sunk cost investments that

are specific to the patent at issue, making a switch to a non-infringing alternative relatively more

costly").

          Under settled law, the hypothetical negotiation can take into account the negotiating

leverage that a patentee may have due to the defendants' prior investments.  The only exception

arises in the inapposite situation where a patentee has previously committed to licensing a

standards-essential patent on reasonable and non-discriminatory terms.  Defendants should be

barred from offering evidence or argument that Janssen's position on the hypothetical

negotiation is based on a hold-up or lock-in effect.

**Janssen's Damages MIL No. 10: To Exclude Evidence or Argument on the Effect of Ixifi on Janssen's Damages**

A lost profits analysis typically involves comparing the actual world (in which there was infringement) with a "but-for" world (where there was no infringement).  *Versata Software, Inc. v. SAP Am., Inc.*, 717 F.3d 1255, 1265 (Fed. Cir. 2013).  In his expert report, Dr. Leonard assumes – without citing anything – that Hospira's parent corporation, Pfizer, Inc., would have launched another infliximab biosimilar known as Ixifi in the but-for world in December 2017.  *See* Janssen MIL Ex. 3 ¶ 233.  Dr. Leonard criticizes Dr. Nicholson for not making the same assumption in his damages analysis.  *E.g.*, *id.* ¶ 216.

Pfizer obtained FDA approval for Ixifi in December 2017.[2]  Pfizer and Hospira have not yet launched Ixifi, and there have been reports that they do not intend to introduce it.[3]

Janssen asked for production of documents regarding Ixifi in discovery.  Defendants refused to produce responsive documents.  They repeatedly objected to Janssen's requests for discovery concerning Ixifi as "irrelevant" and not having "any bearing on the damages issues in this case."  *See* Janssen MIL Ex. 8 (letter from G. Sanford to A. Cohen dated April 3, 2018); Janssen MIL Ex. 9 (letter from E. Cutri to A. Cohen dated Oct. 20, 2017).  When Janssen asked for "All documents concerning the timeline (planned or actual) for [Defendants'] development and/or commercialization of a biosimilar of Remicade," Defendants limited their response to Inflectra only and refused to produce other documents.  *See* Janssen MIL Ex. 10 (Defs.'

---

[2]  *See* Janssen MIL Ex. 6 ("FDA Approves New Pfizer Biosimilar," Pfizer, December 13, 2017, https://www.pfizer.com/news/press-release/press-release-detail/fda_approves_new_pfizer_biosimilar (downloaded on May 17, 2018)).

[3]  *See* Janssen MIL Ex. 7 ("Pfizer Not Planning US Launch of its Second Remicade Biosimilar Approved by FDA," RAPS, December 14, 2017, https://www.raps.org/Regulatory-Focus/News/2017/12/14/29055/Pfizer-Not-Planning-US-Launch-of-its-Second-Remicade-Biosimilar-Approved-by-FDA (downloaded on May 17, 2018)).

11

Responses and Objections to Janssen's First Set of Requests for Production of Documents Pertaining to Damages (August 14, 2017)) at 15−16. Janssen expressly requested documents from Hospira's "parents (including Pfizer, Inc.)." *See* Janssen MIL Ex. 11 (Janssen's First Set of Requests for Production of Documents Pertaining to Damages (July 11, 2017)) ¶ 5. Hospira is a wholly owned subsidiary of Pfizer, and Pfizer has an identical interest in this litigation to Hospira. Indeed, Pfizer's head of patent litigation has repeatedly appeared when the Court ordered the parties to be present. As a result, documents regarding Ixifi are within Hospira's control. *See*, *e.g.*, *Orthoarm, Inc. v. Forestadent USA, Inc*., 2007 U.S. Dist. LEXIS 44429, at *6 (E.D. Mo. June 19, 2007) ("[N]umerous courts have found that the documents of a parent company are within the 'control' of a subsidiary . . . ."); *Afros S.P.A. v. Krauss-Maffei Corp*., 113 F.R.D. 127, 130 (D. Del. 1986) ("Courts have also ordered discovery of documents held by another corporation where there is a parent-subsidiary relationship."); *Soletanche & Rodio, Inc. v. Brown & Lambrecht Earth Movers, Inc*., 99 F.R.D. 269, 272 (N.D. Ill. 1983) (ordering discovery of documents held by a parent corporation given "the identity of interests in this litigation" which "satisfies any showing of control which might be necessary").

Because Defendants refused to produce any documents concerning Ixifi, we are left guessing why Pfizer/Hospira have not commercialized that product. Perhaps they decided not to introduce Ixifi because Hospira is already selling another infliximab biosimilar (Inflectra), as Dr. Leonard assumes. Or perhaps they have not introduced Ixifi for some other reason that is completely unrelated to Inflectra – because of manufacturing problems, or because Ixifi is made using an infringing cell medium, or because they have concluded it is an inferior product, or for some other reason. We can only guess why Ixifi has not been introduced because Defendants refused to provide discovery on that issue.

Defendants cannot refuse to provide discovery on Ixifi and then have their expert speculate about outcomes that could be proven (or disproven) using information within their possession or control that they refused to produce.  *See*, *e.g.*, *N.J. Physicians United Reciprocal Exch. v. Boynton & Boynton, Inc.*, 2017 U.S. Dist. LEXIS 134899, at *37 (D.N.J. Aug. 23, 2017) (explaining that party was obligated to "produce all information it intended to rely on" in its damages case and that it was precluded from relying on "any unproduced information, including through its expert").  Defendants should be barred from offering evidence or argument that Pfizer/Hospira would have introduced Ixifi in the but-for world.

## CONCLUSION

This Court should grant Janssen's *in limine* motions on economic damages.

13

Dated:  May 18, 2018

Respectfully Submitted,

JANSSEN BIOTECH, INC.

By its attorneys,
*/s/ Alison C. Casey*_____
NUTTER MCCLENNAN & FISH LLP
Heather B. Repicky (BBO #663347)
Alison C. Casey (BBO# 688253)
155 Seaport Boulevard
Boston, MA  02210
Tel.: 617-439-2000
Fax: 617-310-9000
hrepicky@nutter.com
acasey@nutter.com

PATTERSON BELKNAP WEBB &
TYLER LLP
Gregory L. Diskant (*pro hac vice*)
Irena Royzman (*pro hac vice*)
Aron Fischer (*pro hac vice*)
Andrew D. Cohen (*pro hac vice*)
David S. Kleban (*pro hac vice*)
1133 Avenue of the Americas
New York, NY  10036
Tel.: 212-336-2000
Fax: 212-336-2222
gldiskant@pbwt.com
iroyzman@pbwt.com
afischer@pbwt.com
acohen@pbwt.com
dkleban@pbwt.com

## **CERTIFICATE OF SERVICE**

I certify that on May 18, 2018, this document, filed through the Court's ECF system, will be sent electronically to the parties or their counsel who are registered participants as identified on the Notice of Electronic Filing.


/s/ *Alison C. Casey*_____