# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

JANSSEN BIOTECH, INC.,

             Plaintiff,

   v.

CELLTRION HEALTHCARE CO., LTD.,
CELLTRION, INC., and
HOSPIRA, INC.

             Defendants.

No. 1:17-cv-11008

**PUBLIC**
**REDACTED VERSION**

## DEFENDANTS' OPPOSITION TO JANSSEN'S MOTION FOR SUMMARY JUDGMENT ON THE ISSUE OF NON-INFRINGING ALTERNATIVES

## TABLE OF CONTENTS

Page

I.     **INTRODUCTION** ................................................................................... 1

II.    **BACKGROUND** ................................................................................. 2

     A.     Janssen's Lost Profits Case Conflates The Market For Cell Culture Media With The Market For Infliximab ................................................ 2

     B.     Non-Infringing Alternatives To The Accused Media ............................. 4

         1.     Magnesium Switch ........................................................................ 5

         2.     CD Hybridoma ............................................................................... 5

         3.     Outside the US manufacturers. .................................................... 7

         4.     Additional Alternatives ................................................................ 8

     C.     If Celltrion Turned To Any One Of The Non-Infringing Media Options Available In October 2009, It Would Have Developed And Released Biosimilar Infliximab On The Same Timetable ....................................... 9

III.   **ARGUMENT** ...................................................................................... 10

     A.     In The Market For Media, Janssen Cannot Establish An Absence of Material Facts In Dispute Regarding The Absence Of Non-Infringing Alternatives ............................................................................................. 12

     B.     In The Market For Infliximab, Janssen Cannot Establish An Absence of Material Facts In Dispute Regarding The Absence Of Non-Infringing Alternatives That Celltrion Could Use In The Process of Making Inflectra ....... 13

         1.     Clear Binding Precedent Requires Analyzing Availability "During The Accounting Period" ............................................................. 14

         2.     Janssen Misapprehends This Court's Guidance On Lost Profits .............. 18

         3.     The Evidence Proves That Inflectra Made With Non-Infringing Media Would Have Been Available During The Accounting Period ....... 18

         4.     Other, On-The-Market Alternatives To Remicade Are Also Indisputably Available And Acceptable ................................................. 20

         5.     Celltrion Need Not Implement A Design-Around In The Real World While It Rightly Disputes Infringement ................................................. 21

**IV.    CONCLUSION** ................................................................................................................ **22**

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Apple, Inc. v. Samsung Elecs. Co.*,
 No. 11-cv-01846-LHK, 2013 WL 5958172 (N.D. Cal. Nov. 7, 2013)..............................1, 16

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
 377 U.S. 476 (1964)..................................................................................................................10

*Chadwick v. WellPoint, Inc.*,
 561 F.3d 38 (1st Cir. 2009).......................................................................................................11

*EMC Corp. v. Pure Storage, Inc.*,
 154 F. Supp. 3d 81 (D. Del. 2016).....................................................................................11, 19

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
 185 F.3d 1341 (Fed. Cir. 1999)...................................................................................... *passim*

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
 893 F.Supp. 1386 (N.D. Ind. 1995) ...............................................................................15, 16, 22

*Mentor Graphics Corp. v. EVE-USA, Inc.*,
 851 F.3d 1275 (Fed. Cir. 2017)..........................................................................................17, 18

*Micro Chem., Inc. v. Lextron, Inc.*,
 318 F.3d 1119 (Fed. Cir. 2003)..........................................................................................16, 17

*Pall Corp. v. Micron Separations, Inc.*,
 66 F.3d 1211 (Fed. Cir. 1995).................................................................................................17

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
 875 F.3d 1369 (Fed. Cir. 2017).........................................................................................10, 11

## I.    INTRODUCTION

Janssen's motion badly misstates the law. According to Janssen, "the Federal Circuit made clear in *Grain Processing*" and in "subsequent case law" that "to preclude lost profits…a non-infringing alternative must be '*readily available*' as of the date of first infringement," as opposed to being available later, during "the accounting period." Br. at 1-2. But no case says that, and *Grain Processing* says the opposite: "The critical time period for determining availability of an alternative is the period of infringement for which the patent owner claims damages, *i.e.*, the '*accounting period.*'" *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350-51 (Fed. Cir. 1999) (emphasis added). Janssen's failure to accurately recite, or faithfully apply, this binding precedent is fatal to its motion.

There's a difference in the "but for" world—a difference Janssen disingenuously ignores—between the date for *starting* efforts to avoid infringement and the date when the non-infringing alternative must be *available*.   Janssen also ignores that this Court specifically recognized that clear difference in its guidance on lost profits:

> [I]f Celltrion could, as a practical matter, have made [a] Remicade biosimilar…in the United States on about January 1, 2017—at a competitive price and on a comparable schedule—without infringing the '083 Patent, Janssen would not be entitled to recover any profits on Remicade that it lost to Inflectra.

> \* \* \* \*

> To decide whether it was feasible for Celltrion to have used a non-infringing media powder to produce Inflectra, it must be determined whether, starting on the date of first infringement, Celltrion could have switched to using a non-infringing alternative.

Case No. 15-cv-10698, Dkt. 518 at 2-4.  *Apple v. Samsung* also recognized: "a patentee's eligibility for lost profits hinges on whether acceptable noninfringing alternatives were available to the infringer *during the period for which the patentee seeks lost profits*." *Apple, Inc. v. Samsung Elecs. Co.*, No. 11-cv-01846-LHK, 2013 WL 5958172, at \*4 (N.D. Cal. Nov. 7, 2013). As to when one

1

"must begin to consider what actions the infringer would have taken to develop an acceptable noninfringing alternative," it found that to be "as of the date of first infringement." *Id.* Against this, Janssen cites no case holding that a noninfringing alternative must be immediately available on the date of first infringement, rather than later during the accounting period.

Overwhelming evidence demonstrates Celltrion could have used an indisputably non-infringing media by the beginning of the accounting period. ███████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██ Celltrion also could have turned to another commercially-available media, CD Hybridoma, ████████████████████████████████████.

In fact, Defendants have moved for summary judgment because, as a matter of law, the availably of the magnesium switch precludes lost profits. Dkt. 236. Defendants also moved to exclude Janssen's lost-profits theory altogether, in its motion to exclude Dr. Nicholson, in view of (i) his misapplication of *Panduit* by mixing-and-matching two different markets, and (ii) his failure to apportion between the patented media and the countless other steps in the process used to produce biosimilar infliximab.  Dkt. 240 at 9-16.

Janssen chose to ignore such evidence. But under the correct application of law, Defendants—not Janssen—are entitled to summary judgment.

## II.    BACKGROUND

### A.    Janssen's Lost Profits Case Conflates The Market For Cell Culture Media With The Market For Infliximab

████████████████████████████████████████████████████

████████████████████████████████████████ Janssen, however, "does not seek lost profits based on lost sales of cell culture media," Dkt. 412 at 3, which has a value of single-digit dollars per $1,000 vial of drug product. In fact, Janssen has never competed in the cell culture media market ███████████████████████████████████████████ ██████████████████████ Def. Ex. 3, Janssen 5/31/16 RFA Response Nos. 6-8; Def. Ex. 4, Janssen 2/1/2018 RFA Response No. 14.

"Instead, Janssen seeks lost profits from Remicade caused by Defendants' sale of U.S. Inflectra[.]" No. 15-cv-10698, Dkt. 412 at 3. Janssen seeks lost profits in two forms: (i) alleged price erosion of Remicade® due to Inflectra®'s approval and entry into the market, and (ii) alleged lost sales of Remicade® due to sales of Inflectra®. Def. Ex. 5, Nicholson Rep. at 3-5. Janssen argues that its alleged "lost profits damages claim" begin with the launch of Inflectra® in "November 2016."[1] Dkt. 246 at 17. But Janssen ignores that the accused media is used in but one of numerous process steps to ultimately arrive at Inflectra®, Neither Remicade® nor Inflectra® are covered by the '083 patent, and the different patent that Janssen first asserted against Inflectra® itself is invalid.

Janssen's damages case depends on the opinions of its proffered expert, Dr. Sean Nicholson. Def. Ex. 5, Nicholson Rep. at 3-5. Dr. Nicholson's sole methodology is his application of "the four *Panduit* factors." Def. Ex. 5, Nicholson Rep. at 3; Def. Ex. 6, Nicholson Dep. Tr. at 197:11-19. For the first two *Panduit* factors—"demand for the patented product" and "absence of acceptable noninfringing substitutes"—Dr. Nicholson focuses on ████████████████████████ *Id.* ██████████████████████████████████████████████

---

[1] Janssen previously argued the accounting period began in January 2017. Dkt. 412 at 15; Dkt. 516, 3/3/2017 Hrg. Tr. at 28:23-29:4. For purposes of this motion, Defendants use November 2016.

████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████

When it comes to the third and fourth *Panduit* factors, however, Dr. Nicholson changes course. For those factors—the "capability to exploit the demand" and "the amount of the profit he would have made"—Dr. Nicholson looks at ████████████████. *Id.* ████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████

### B.      Non-Infringing Alternatives To The Accused Media

Defendants proffered two experts to rebut Janssen's non-infringing alternatives theory: Dr. Bert Frohlich, a biochemical engineer with expertise in cell culture processes, and Dr. Akhilesh Nagaich, an expert in pharmaceutical regulatory issues. Janssen Ex. 1, Frohlich Rep. ¶¶ 1-13; Janssen Ex. 10, Nagaich Rep. ¶¶ 4-20. The evidence, supported by their expert opinions, shows there were ample alternatives to the accused media that Celltrion could have switched to in October 2009, and still launched a biosimilar infliximab product no later than November 2016. ███████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████

### 1.    Magnesium Switch

As discussed in Defendants' motion for summary judgment (Dkt. 236), the asserted patents require, and the accused products contain, two magnesium sources: magnesium chloride and magnesium sulfate. Dkt. 227-13, '083 Patent at Claim 1. ████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ █████████████████████████████████████████████████ Because the accused products contain both magnesium sources, it would have been a simple matter for GE HyClone to eliminate one and increase the other with the materials and tools already used to make the accused products—a step that would take no more than a month, and could have been accomplished 7 *years* before Inflectra's commercial launch in November 2016. *Id.* As set forth in Defendants motion for summary judgment, Dkt. 236, the elimination of a claimed ingredient would avoid the patent.

### 2.    CD Hybridoma

Celltrion could have also used CD Hybridoma, a commercial cell culture media that is prior art to the '083 Patent and was on the market as of October 2009. Janssen Ex. 1, Frohlich Rep. ¶ 143-145; Dkt. 227-12, Serum-Free Media For Cell Culture [CELLREM-0246022], at 030. ██ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████████████████████

Janssen Ex. 17, CELLREM-0182204 at '217-'218. As Dr. Frohlich opined, and Celltrion's Mr. Cho will explain, ███████████████████████████████, were acceptable if Celltrion no longer could use the accused media.  Janssen Ex. 1, Frohlich Rep. ¶ 104-106.

████████████████████████

Defendants' expert, Dr. Frohlich, tested CD Hybridoma using the same metrics analyzed by Dr. Butler for purposes of infringement, and he even went a step further, because he also tested whether the cells produced infliximab, which they did. *E.g.* Janssen Ex. 1, Frohlich Rep. ¶ 151-160. In response, Dr. Butler did not conduct any testing. But he did agree that scientific equivalence is tested in this field according to the method used by Dr. Wurm, and thus by extension Dr. Frohlich. 1/30/18 Hearing Tr. at 147:21-148:11; *e.g.* Janssen Ex. 1, Frohlich Rep. ¶ 151-160.

CD Hybridoma could have been substituted into Celltrion's process, even if optimization would have been necessary (as Janssen asserts). *E.g.* Janssen Ex. 1, Frohlich Rep. ¶ 180-190.

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

Dr. Frohlich concluded that any optimization would not have delayed Celltrion from launching a biosimilar infliximab in 2016. Janssen Ex. 1, Frohlich Rep. ¶ 180-190.

### 3. Outside the US manufacturers.

Celltrion could have also avoided the patent by sourcing its media from a foreign manufacturer in October 2009. As Dr. Frohlich explained, numerous media manufacturers, including ThermoFisher, Millipore Sigma, Irvine Scientific, and Lonza, had facilities outside of the U.S. that could have manufactured the accused media in October 2009. Janssen Ex. 1, Frohlich Rep. ¶ 247. ████████████████████████████████

████████████████████████████████

Instead, Janssen argues Celltrion did not have the formula for the accused media in 2009 and thus could not have given it to a different manufacturer to make. Dkt. 246 at 7. That is ridiculous. In the "but for" world, Hyclone would be a direct infringer too, and could not sell *any*

media absent cooperation. So it would have every incentive to facilitate an alternative outside U.S. manufacturer, perhaps through a partnership or licensing fee from the manufacturer. Moreover, Janssen ignores that the GE Hyclone-Celltrion supply agreement ████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████

### 4.  Additional Alternatives

Dr. Frohlich's report identifies additional alternatives to the accused media that Celltrion could have turned to in October 2009. For example, Dr. Frohlich tested another media, CD CHO, that was also commercially-available off the shelf before October 2009. *E.g.*, Janssen Ex. 1, Frohlich Rep. ¶¶ 23, 191, 203-204, 217, 224, 225. ████████████████████████████

████████████████████████████████████████████████████

█████████████████████████████████████████████████

Dr. Frohlich also opined that Celltrion could have turned to prior art serum-free, chemically-defined media, such as that disclosed in the prior art from Glaxo-SmithKline. *Id*. at ¶ 256. Celltrion could have made minor modifications to the accused media, in view of GSK, such that it was non-infringing and acceptable. *Id*.

Dr. Frohlich also opined that, instead of removing one of the claimed sources of magnesium (discussed above), Celltrion could have removed other claimed components that are redundant. For example, the accused media have two sources of phosphate and chelated iron; in either case, Celltrion could have removed one source and increased the other. *Id*. at ¶¶ 274, 278. Such changes would not require further optimization to produce biosimilar infliximab. *Id*. at ¶ 275.

**C.**    **If Celltrion Turned To Any One Of The Non-Infringing Media Options Available In October 2009, It Would Have Developed And Released Biosimilar Infliximab On The Same Timetable**

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

███████████████████████████████ Any such delay, however, would not have affected the development or release of Celltrion's infliximab biosimilar.

For example, Celltrion could have continued its development of Inflectra, including conducting clinical trials, and replaced the media after running appropriate comparability testing. Janssen Ex. 10, Nagaich Rep. ¶ 193. ████████████████████████████████

████████████████████████████████████████████████████████████████ anssen Ex. 10, Nagaich Rep. ¶ 183 n. 328; Janssen Ex. 7, CELLREM-0183386 at row 3175.

████████████████████████████████████████████████████████████████

████████████████████████████████████████ Celltrion could have made up that time well before the November 2016 launch of Inflectra®. ████████

████████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████ Dr. Nagaich confirmed this, opining that Celltrion would have made up any time lost during clinical trials by adding enrollment sites or enrolling patients faster, resulting in no delay in FDA approval. Janssen Ex. 10, Nagaich Rep. ¶ 198 n. 345.

Celltrion also could have made up time in other ways.  For instance, before the FDA's draft guidance in February 2012, "there was no regulatory pathway in the United States to approve the bio-similar." Def. Ex. 17, Jeon Dep. Tr. at 40:10-15. ████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

Janssen Ex. 10, Nagaich Rep. ¶ 204, ¶ 197-198; Def. Ex. 18, 2/16/2015 Hospira Press Release.

Celltrion would have made up any delay in other ways as well. ██████████

████████████████████████████████████████████████████████████████████████

Janssen Ex. 10, Nagaich Rep. ¶ 199. Also, Defendants agreed (for purposes of this litigation) not to launch Inflectra® immediately following FDA approval, resulting in an additional seven-month delay. But they did not have to, and thus could have made up for lost time during those seven-months if need be. *Id.*

## III.   ARGUMENT

"To recover lost profits, the patentee bears the burden of proof to show a 'reasonable probability that, 'but for' infringement, it would have made the sales that were made by the infringer.'" *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1380 (Fed. Cir. 2017) (quotations omitted). The "determinative question," as framed by the Supreme Court, is:  "had the Infringer not infringed, what would the Patent Holder-Licensee have made?" *Grain Processing,* 185 F.3d at 1350 (quoting *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 507 (1964)). "The 'but for' inquiry therefore requires a reconstruction of the market, as it would have developed absent the infringing product, to determine what the patentee 'would ... have made.'" *Grain Processing*, 185 F.3d at 1350 (Fed. Cir. 1999) (quoting *Aro*, 377 U.S. at 507).

In *Grain Processing*, the Court held that "a fair and accurate reconstruction of the 'but for' market" "must take into account, where relevant, alternative actions the infringer foreseeably would have undertaken had he not infringed." *Id.* at 1350-51. "Without the infringing product, a rational would-be infringer is likely to offer an acceptable noninfringing alternative, if available, to compete with the patent owner rather than leave the market altogether. The competitor in the 'but for' marketplace is hardly likely to surrender its complete market share when faced with a patent, if it can compete in some other lawful manner." *Id.* at 1351.

"Acceptable substitutes" that are "available *during the accounting period* can preclude or limit lost profits[.]"  *Id.* at 1353 (emphasis added). "To prove the absence of acceptable, non-infringing alternatives, the patentee may prove either that the potential alternative was not acceptable to potential customers or was not available at the time." *Presidio*, 875 F.3d at 1380. "When an alleged alternative is not on the market *during the accounting period*, a trial court may reasonably infer that it was not available as a noninfringing substitute at that time." *Grain Processing*, 185 F.3d at 1353 (emphasis added). "The accused infringer then has the burden to overcome this inference by showing that the substitute was available *during the accounting period*." *Id.* (emphasis added).

On summary judgment, the Court "must view the record in the light most favorable to the nonmoving party [Defendants] and draw all reasonable inferences in favor of the same." *Chadwick v. WellPoint, Inc.*, 561 F.3d 38, 41 (1st Cir. 2009); *EMC Corp. v. Pure Storage, Inc.*, 154 F. Supp. 3d 81, 118 (D. Del. 2016) ("Although [defendant] bears the burden to establish the availability of its posited non-infringing alternatives, on summary judgment the Court must view the evidence in the light most favorable [to defendant] and draw all reasonable inferences in its favor.").

Here, as an initial matter, and as set forth in Defendants' motion to exclude testimony of Dr. Nicholson, Dkt. 240 at 9-16, Janssen and its expert advance a flawed lost profits analysis under *Panduit*, conflating the market for media and the market for infliximab. Def. Ex. 6, Nicholson Dep. Tr. at 197:6-19. ███████████████████████████████████████████
███████████████████████████████████████████ Def. Ex. 5, Nicholson Rep. at ¶ 11. This mix-and-match approach fails at the threshold, and Janssen is not entitled to lost profits. Nevertheless, when conducting the analysis with reference to either the media market or the infliximab market, Janssen's motion fails to establish the absence of a genuine

issue of material fact, and summary judgment should be denied.

**A.    In The Market For Media, Janssen Cannot Establish An Absence of Material Facts In Dispute Regarding The Absence Of Non-Infringing Alternatives**

In its brief, Janssen states without support that Defendant only offers "hypothetical" alternatives to the patented media that were never on the market, such that the burden of proof shifts to Defendants. But when looking at alternatives *to the patented media*, Janssen's assertion is just plain wrong.  The record is replete with testimony, documents, and admissions proving that there were numerous non-infringing substitute cell culture media on the market and available to Celltrion as of the date of first infringement, October 2009.  Those include, for example:

- commercially available media, CD Hybridoma (*e.g.* Janssen Ex. 1, Frohlich Rep. ¶ 140-190; Def. Ex. 1, Butler 4/17/2018 Dep. Tr. at 21:21-24, 108:23-109:16; Dkt. 227-12 (Serum-Free Media For Cell Culture, August 2003, CELLREM-0246022));

- commercially available media, CD CHO (*e.g.* Janssen Ex. 1, Frohlich Rep. ¶ 191-225; Def. Ex. 1, Butler 4/17/2018 Dep. Tr. at 102:5-9); and

- other media screened by Celltrion (*e.g.* Janssen Ex. 1, Frohlich Rep. ¶104-106; Def. Ex. 1, Butler 4/17/2018 Dep. Tr.  at 191:12-25, 192:5-193:13).

For each of these, the availability is beyond dispute—they were commercially available to Celltrion even before 2009, and ████████████████████████████████████████ ████████████████████████████████████ Indeed, Janssen does not seriously dispute the commercial availability of these alternatives. The burden never shifts, and remains with Janssen.

Instead, without saying so, Janssen focuses on a different question—the *acceptability* of these alternatives—arguing that Celltrion would have needed to modify any such alternative media to produce biosimilar infliximab, and further arguing (incorrectly, addressed below) that those alleged modifications would have to exist *on the date of first infringement*. But that is not the standard for acceptability. ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████ Janssen cites no case holding that substitutes in

the "but-for" world have to meet a standard that the actual media did not meet in the real world.

And it would make no sense. "[W]hether and to what extent [an alternative is] acceptable

as a substitute in the relevant market" turns on "[c]onsumer demand," which "defines the relevant

market and relative substitutability among products therein." *Grain Processing*, 185 F.3d at 1355.

"Important factors shaping demand may include consumers' intended use for the patentee's

product, similarity of physical and functional attributes of the patentee's product to alleged

competing products, and price." *Id.* Here, the "consumer" of media is Celltrion, making the correct

measure of acceptability whether an alternative would satisfy its "intended use" for the media. As

of October 2009, Celltrion's "intended use" called for a media that could grow cells and that could

potentially be modified and optimized to eventually be used to produce biosimilar infliximab.  The

commercially-available media listed above surely met that criteria, and thus any subsequent

modification or optimization is irrelevant.

Janssen, of course, ignores these facts entirely, based on its mix-and-match, legally-flawed

application of the *Panduit* test, in which it considers the cell culture media market for two *Panduit*

factors and the infliximab market for two others. Dkt. 240 at 9-16. Janssen's flawed methodology

precludes summary judgment, as the facts above demonstrate *at least* a material fact dispute

regarding the existence of numerous noninfringing alternatives available and acceptable to

Celltrion for use in its development program in October 2009.

**B.      In The Market For Infliximab, Janssen Cannot Establish An Absence of
         Material Facts In Dispute Regarding The Absence Of Non-Infringing
         Alternatives That Celltrion Could Use In The Process of Making Inflectra**

Ample evidence demonstrates *at least a* material fact dispute regarding Celltrion's ability

to switch to an alternative media in October 2009, and still develop biosimilar infliximab on the

schedule on which Defendants launched Inflectra in the U.S., in November 2016. Janssen makes

*zero* attempt to disprove, this, requiring denial of Janssen's motion.

### 1.    Clear Binding Precedent Requires Analyzing Availability "During The Accounting Period"

Janssen rests its entire motion on an incorrect legal premise, that "the relevant date for analyzing the availability of non-infringing alternatives is the date of first infringement—and not the later onset of the accounting period." Br. at 15. According to Janssen, "[u]nder *Grain Processing* and its progeny, the non-infringing alternative must be 'readily available' on the date of first infringement. That is, it must be available within perhaps two weeks of October 6, 2009, but not four months. And certainly not *seven years* after infringement began." *Id.* at 16.

Janssen is dead wrong.  Under Janssen's theory, the alleged lost profits begin in November 2016 when Defendants first released Inflectra in the U.S. Def. Ex. 5, Nicholson Rep. at 3. The correct question is thus whether, in the "but for" world, Celltrion could introduce an infliximab product not made with the accused media on the same schedule as it introduced Inflectra in the real world. "The critical time period for determining availability of an alternative is the period of infringement for which the patent owner claims damages, i.e., the 'accounting period.'" *Grain Processing*, 185 F.3d at 1353. "Acceptable substitutes that the infringer proves were available ***during the accounting period*** can preclude or limit lost profits[.]" *Id.*

*Grain Processing* explains the forceful logic underlying this rule: "The competitor in the 'but for' marketplace is hardly likely to surrender its complete market share when faced with a patent, if it can compete in some other lawful manner." *Grain Processing*, 185 F.3d at 1351. Because Janssen's damages claims focus squarely on the infliximab market, to determine whether Celltrion "can compete in some other lawful manner," the factfinder has to determine if Celltrion could take actions beginning on the date of first alleged infringement to offer a biosimilar infliximab product, not made with the accused media, on about the same schedule as it introduced

Inflectra in the real world, i.e., when the accounting period begins.  Somehow, Janssen alleges just the *opposite*, but its frivolous position has been soundly rejected.

In fact, *Grain Processing* dealt specifically with this issue. The patent there covered malto-dextrin products having specific properties. *Grain Processing Corp. v. Am. Maize-Prods. Co.*, 893 F.Supp. 1386, 1388-89 (N.D. Ind. 1995). Beginning in 1974, the defendant manufactured a particular type of malto-dextrin product, Lo-Dex 10, using Process I. *Id.* at 1390. Over the course of the lengthy (18-year) litigation, defendant made several different versions of Lo-Dex 10, all of which were functionally equivalent, using different processes and yielding products having slightly different physical characteristics. *Id.*  Lo-Dex 10 made by Processes I, II and III infringed; Lo-Dex 10 made by Process IV did not.  *Id.*  The defendant did not actually make Lo-Dex 10 using Process IV until 1991, 17 years after it first began producing Lo-Dex.  *Id.*

Nevertheless, Judge Easterbrook, sitting by designation, held that the non-infringing Lo-Dex 10 made using Process IV precluded lost profits. *Id.* at 1391-92. He found that Lo-Dex 10 was available, even though it was never on the market until 1991, as of the critical time period. *Id.* That time period was not (as Janssen contends here) the date of first infringement (1974); it was the beginning of the accounting period (1979), when the sales occurred for which plaintiff claimed lost profits.  *Id.*  The court explained:

> Could [defendant] have done the same thing [i.e., develop Process IV] in 1974? …
> In 1974 [defendant] was having difficulty making a 10 D.E. malto-dextrin. It
> encountered trouble with filtration, among other obstacles. … *As it happens,
> however, I need not decide whether [defendant] could have employed the dual-
> enzyme process [Process IV] from the get-go.* [Patent owner] did not transfer to
> [plaintiff] any right to recover damages for periods before assignment of the patent,
> so [plaintiff] concedes that it is not entitled to damages for any of [defendant]'s
> sales preceding October 10, 1979. *By then, I am confident, AMP could have
> produced a non-infringing 10 D.E. malto-dextrin by a dual-enzyme process.*

*Id.* at 1391.

The analysis here is exactly the same. Janssen asks whether Celltrion could have

instantaneously switched from the accused media to an acceptable substitute within two-weeks of the date the '083 patent issued, October 9, 2009.  "As it happens, however, [this Court] need not decide whether [Celltrion] could have employed" a non-infringing media "from the get go."  *Id.* So long as any steps that Celltrion could have taken starting on the date of first infringement, October 2009, would have led to the introduction of an acceptable infliximab product by November 2016, that "scotches [Janssen's] request for lost-profits damages."  *Id.* at 1392.

Courts have since applied the *Grain Processing* framework in precisely this way.  In *Apple,* 2013 WL 5958172, at *6, which Defendants cited to this Court in prior briefing on lost profits, the court was keen to distinguish between: (i) the date one assumes the development of non-infringing alternatives begins—the date of first infringement—and (ii) the date one looks to assess availability of non-infringing alternatives—"during the period for which the patentee seeks lost profits."  *Id.* at *4.  The *Apple* court explained:

> [A] patentee's eligibility for lost profits hinges on whether acceptable noninfringing alternatives were available to the infringer ***during the period for which the patentee seeks lost profits***.  … This aspect of the lost profits analysis is intuitive and uncontroversial…[That] does not resolve the more difficult question of when one must begin to consider what actions the infringer would have taken to develop an acceptable noninfringing alternative…

*Id.*  On "the more difficult question," the court held "that a proper reconstruction of the 'but for' world that would have existed absent infringement must consider actions the infringer would have taken to avoid infringement—including designing around the patented intellectual property— *starting on the date of first infringement, and not on some later date*…."  *Id.* (emphasis added) Janssen's brief simply ignores this critical distinction in the law.

Instead, Janssen points to *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119 (Fed. Cir. 2003), to support its position, but misreads the case. Janssen asserts that in *Micro Chemical* the Federal Circuit found that the defendants had "successfully implemented" a design around in a

"four-month period," Br. at 2, but that the Court "held that four months…was too long" even though the accounting period spanned a full nine years. *Id.* at 3.

But Janssen ignores the reasoning of the Federal Circuit: it was not that the design around that took too long, it was that the defendant "did not have the necessary equipment, know-how, and experience to make the [design-around]" *during the accounting period. Micro Chem.,* 318 F.3d at 1123. The Court pointed to the fact that: defendant "expended 984 hours to design the [design-around] and another 330 to test it"; one of defendant's engineers "worked full-time for several months" on the design around, and thereafter part-time, "estimating that he tested and rejected five potential design changes"; defendant "took over four months to convert its infringing [machines] to [design-around machines]." *Id.* Even after all that, defendant still did not know if the design-around would be acceptable: it "hired consultants to help it consider the impact and effectiveness of the new designs," it "hired [another] firm to consider 'alternative designs,'" and it "retained a Ph.D. nutritionist 'to assure the effectiveness of the new designs…'." *Id.* Finally, "the materials for the alleged substitutions" were not available from the get-go and would have been hard to come by. *Id.* All of this added up to a lack of evidence that the design around would have worked at *any point* during the accounting period. *See id.*

Nor does Janssen's all-or-nothing approach find support in the law. "[P]atent infringement is a continuing tort," and the unavailability of an acceptable non-infringing alternative may not preclude lost profits if an alternative is unavailable, but would thereafter. *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1221 (Fed. Cir. 1995); *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1286 (Fed. Cir. 2017) ("[I]t is quite common [that] … the patentee proves entitlement to lost profits for some of its sales, but not others."). As a leading patent treatise explains, "Given that infringement is a continuing tort, where lost profits are sought but the

circumstances change during the period of infringement, it may be necessary to divide the damages periods to account for time periods when an alleged noninfringing alternative was unavailable and when it was available. Failing to do so could give a patentee a windfall for purposes of lost profits." 4 Annotated Patent Digest § 30:35.50.

### 2. Janssen Misapprehends This Court's Guidance On Lost Profits

In the context of Janssen's lost profits methodology based on infliximab (which as stated, is legally flawed for other reasons), this Court has already adopted the *Grain Processing* framework. In its lost profits guidance, the Court framed the relevant question as whether, "starting on the date of first infringement, Celltrion could have switched to using a non-infringing alternative," such that "Celltrion could, as a practical matter, have made [a] Remicade biosimilar…on about January 1, 2017—at a competitive price and on a comparable schedule— without infringing the '083 Patent." Case No. 15-cv-10698, Dkt. 518 at 2. Accordingly, the Court correctly agreed with Defendants that in the hypothetical world, one analyses what actions Defendants could have taken to avoid the patent *as of the date of first infringement*. *Id.* But in doing so, the Court did not alter, and in fact reaffirmed, that one must look to *the duration of the accounting period* to assess the availability of substitutes.  *Id.*

Janssen's earlier briefing applied the correct framework. Before damages discovery occurred, Janssen rightly framed the issue as whether "any delay in developing an alternative cell media" in October 2009 "would have a ripple effect that would delay Celltrion's development program, and its U.S. market launch." Dkt. 412 at 11; *id.* at 12 ("Any change to CGM or CPM after those media were finalized in September 2009…would have delayed sales of Inflectra by at least the 9 months of the Accounting Period.").

### 3. The Evidence Proves That Inflectra Made With Non-Infringing Media Would Have Been Available During The Accounting Period

The evidence, all of which Janssen's motion ignores, proves that Defendants could have released biosimilar infliximab made with non-infringing media during the entire accounting period. Thus, as set forth below, there is at the very least a genuine issue of material fact that precludes summary judgment. Under the law, "[w]hile [plaintiff] may succeed in convincing the jury that the proffered non-infringing alternatives were not available during the damages period, [defendant] has submitted evidence sufficient to establish a genuine dispute of fact….[Plaintiff's] motion for partial summary judgment that [defendant's] posited non-infringing alternatives were not available during the damages period is DENIED." *EMC Corp.,* 154 F. Supp. 3d at 118.

The date of first alleged infringement is October 6, 2009, when the patent issued. Dkt. 246 at 1. ██████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████████████████████████ Celltrion did not receive FDA approval until April 2016, and did not launch Inflectra until November, 2016. *Id.* at ¶ 101.

Defendants' scientific expert has opined that Celltrion could have had non-infringing media available anywhere from immediately to, at most, six months (at six months, even including any optimization) after a switch became necessary in October 2009. Janssen Ex. 1, Frohlich at ¶ 23. Those substitutes include the commercially-available substitutes discussed above, as well as other substitutes that required nothing more than an alteration to the recipe for the accused media,

or a switch to source that media from abroad.[2]   Defendant's regulatory expert thus concludes that Celltrion would be on the exact same schedule-to-market had it switched to a non-infringing media in October 2009.   Janssen Ex. 10, Nagaich Rep. ¶¶ 38-49.   As he explained, there were several things Celltrion could have done to ensure that it was on schedule, including continuing development of Inflectra in parallel with the process of replacing the media (*e.g.*, comparability tests, if necessary), accelerating clinical trials, or taken advantage of other waiting periods that it experienced in the real world.   *Supra* § II.C.

Celltrion witnesses confirm, and will testify at trial, that Celltrion would have implemented any or all of these mechanisms had they needed to switch to an alternative media. Def. Ex. 16, Cho 2/5/2018 Dep. Tr. at 131:6-22; Def. Ex. 17, Jeon Dep. Tr. at 40:10-41:19, 103:7-22, 118:13-23; 121:15-122:18. Janssen's experts made no attempt to rebut this analysis. Quite to the contrary,



Def. Ex. 1, Butler 4/17/18 Dep Tr. at 201:3-7.                              *Id*. at 115:24-116:13; 120:9-121:13.

*Id*. at 30:13-18.

### 4.   Other, On-The-Market Alternatives To Remicade Are Also Indisputably Available And Acceptable

Since Janssen bases its lost profits computation solely on Remicade (which, as noted, is

---



flawed), it cannot ignore that in the infliximab market, with Inflectra factored out, products sold by other competitors are also non-infringing alternatives. But it did ignore them.

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████

5.      **Celltrion Need Not Implement A Design-Around In The Real World While It Rightly Disputes Infringement**

Janssen makes much of the fact that Celltrion has not actually switched to a non-infringing media in the "real" world, but this is misdirection.  Celltrion is not required to spend *any* resources switching to a different media—regardless of Janssen's persistence in pursuing an unprecedented 12-way DOE theory based on a paper-thin, legally-invalid patent allegedly covering an utterly routine media formulation.

Moreover, Defendants contend that GE Hyclone's manufacture of the accused media in Singapore *is* noninfringing. While Janssen has asserted a strained infringement theory under

§ 271(f) (which Defendants contest), it at the very least is not a foregone conclusion.

Also, the law requires the market reconstruction to "account" for "alternative actions the infringer foreseeably would have undertaken had he not infringed"—"regardless of whether the alternative(s) were actually produced and sold during the infringement." *Grain Processing*, 185 F.3d at 1350-51. That implicitly recognizes, of course, that the real world is different than the "but-for" world, and an accused infringer is entitled to maintain that its product does not infringe during the litigation, while still asserting it could take other actions in the "but-for" world.

That is exactly what the defendant in *Grain Processing* did, only attempting to implement design-around options after a Federal Circuit decision issued confirming infringement. 893 F. Supp. 1386 at 1389. Indeed, in *Grain Processing*, the district court and Federal Circuit considered that the defendant had not implemented the non-infringing design-around until after the damages period, but nevertheless found the alternative "available," in the "but-for" world and precluded lost profits, noting that the defendant "reasonably believed it had a noninfringing product" prior to that time. 185 F.3d at 1354.

## IV.   CONCLUSION

Janssen's motion should be denied, and Defendants' co-pending motion (Dkt. 238) should be granted.

22

Dated: May 25, 2018

Respectfully submitted,

Celltrion Healthcare Co., Ltd., Celltrion, Inc.,
and Hospira, Inc.

By their attorneys,

/s/*Andrea L. Martin, Esq.*
Dennis J. Kelly (BBO # 266340)
Andrea L. Martin (BBO #666117)
BURNS & LEVINSON LLP
125 Summer Street
Boston, MA 02110-1624
Tel: 617-345-3000
dkelly@burnslev.com
amartin@burnslev.com

James F. Hurst, P.C. (*pro hac vice*)
Bryan S. Hales, P.C. (*pro hac vice*)
Elizabeth A. Cutri (*pro hac vice*)
Gregory B. Sanford (*pro hac vice*)
KIRKLAND & ELLIS LLP
300 North LaSalle
Chicago, IL 60654
Tel: (312) 862-2000
james.hurst@kirkland.com
bryan.hales@kirkland.com
elizabeth.cutri@kirkland.com
gregory.sanford@kirkland.com

Ryan Kane (*pro hac vice*)
James McConnell (*pro hac vice*)
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, NY 10022
Tel: (212) 446-4800
ryan.kane@kirkland.com
james.mcconnell@kirkland.com

Noah S. Frank (*pro hac vice*)
KIRKLAND & ELLIS LLP
655 Fifteenth St., N.W.
Washington, DC 20005
Tel: (202) 879-5000
noah.frank@kirkland.com

Charles B. Klein (*pro hac vice*)
WINSTON & STRAWN LLP
1700 K Street, N.W.
Washington, D.C. 20006-3817
Tel: (202) 282-5000
cklein@winston.com

Samuel S. Park (*pro hac vice*)
Dan H. Hoang (*pro hac vice*)
WINSTON & STRAWN LLP
35 W. Wacker Drive
Chicago, IL 60601-9703
Tel: (312) 558-7931
spark@winston.com
dhoang@winston.com

*Attorneys for Defendants Celltrion Healthcare
Co., Ltd., Celltrion, Inc., and Hospira, Inc.*

**<u>CERTIFICATE OF SERVICE</u>**

I, Andrea L. Martin, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on May 25, 2018.

<u>/s/Andrea L. Martin, Esq.</u>
Andrea L. Martin, Esq.