# EXHIBIT 32

# Manual of PATENT EXAMINING PROCEDURE

Original Ninth Edition, March 2014

Latest Revision January 2018 [R-08.2017]

## U.S. DEPARTMENT OF COMMERCE



## United States Patent and Trademark Office

Rev. 08.2017, January  2018

## AVAILABILITY

The paperbound format of the Manual was discontinued by the Government Publishing Office effective December 13, 2012. The Manual is available electronically in html and PDF renderings on the USPTO website at **www.uspto.gov/web/offices/pac/mpep/**. The Office also provides a search engine for searching the full text of the Manual at **http://mpep.uspto.gov/RDMS**.

Most hyperlinks from the Manual to internal and external websites are active. For particularly long website addresses (URLs), an extra space has been added to the rendered text for readability (especially in the PDF rendering). Clicking on a hyperlink will direct the user to the referenced website because the reference link data in the source document includes the URL without the extra space; however, copying text that includes the extra space and thereafter pasting it in a browser will result in an error.

Previous editions and revisions of the Manual are available from the MPEP Archives page on the USPTO website at **www.uspto.gov/web/offices/pac/mpep/old/index.htm**.

## EXPLANATION OF NOTATIONS

Revision Date Indicator. Each section within an MPEP Chapter includes a revision date indicator, e.g., [R-07.2015]. The numbers within the bracket indicate the date the revision cycle for that section was completed, which would be July 2015 in the example above. Note that the publication date of the Manual as indicated on the title page and on the bottom of the PDF renderings may be later than the date the revision cycle was completed because of the time required for clearance processes.

"Pre-AIA." Where the phrase "pre-AIA" is associated with a law or rule, it means that version which was in force before the date of the change necessitated by the Leahy-Smith America Invents Act (AIA), Public Law 112-29, 125 Stat. 284.

"Pre-PLT" or pre-PLT (AIA)." Where the phrase "pre-PLT" or "pre-PLT (AIA)" is associated with a law or rule, it means that version which was in force before the date of the change necessitated by the Patent Law Treaties Implementation Act of 2012, Title II (Patent Law Treaty Implementation (PLT)), Public Law 112-211, 126 Stat. 1527 (Dec. 18, 2012). Note that the "pre-PLT (AIA)" designation is used when there is also a "pre-AIA" version of the law or rule that still has applicability in limited circumstances.

Five Asterisks. The use of five asterisks in the body of the laws, rules, treaties, and administrative instructions indicates a portion of the law, rule, treaty, or administrative instruction which was not reproduced.

First Edition,  November 1949
Second Edition,  November 1953
Third Edition,  November 1961
Fourth Edition,  June 1979
Fifth Edition,  August 1983
Sixth Edition,  January 1995
Seventh Edition,  July 1998
Eighth Edition,  August 2001
    Final Revision,  August 2012
Ninth Edition,  March 2014 [R-11.2013]
    Revised,  October 2015 [R-07.2015]
    Revised,  November 2015 [R-07.2015]
    Revised,  January 2018 [R-08.2017]

## 2143  Examples of Basic Requirements of a *Prima Facie* Case of Obviousness [R-08.2017]

*[Editor Note: This MPEP section is **applicable to** applications subject to the first inventor to file (FITF) provisions of the AIA except that the relevant date is the "effective filing date" of the claimed invention instead of the "time of the invention" or "time the invention was made," which are only applicable to applications subject to pre-AIA 35 U.S.C. 102. See 35 U.S.C. 100 (note) and MPEP § 2150 et seq.]*

The Supreme Court in *KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 415-421, 82 USPQ2d 1385, 1395-97 (2007) identified a number of rationales to support a conclusion of obviousness which are consistent with the proper "functional approach" to the determination of obviousness as laid down in *Graham*. The key to supporting any rejection under 35 U.S.C. 103 is the clear articulation of the reason(s) why the claimed invention would have been obvious. The Supreme Court in *KSR* noted that the analysis supporting a rejection under 35 U.S.C. 103 should be made explicit. In *Ball Aerosol v. Ltd. Brands,* 555 F.3d 984, 89 USPQ2d 1870 (Fed. Cir. 2009), the Federal Circuit offered additional instruction as to the need for an explicit analysis. The Federal Circuit explained that the Supreme Court's requirement for an explicit analysis does not require record evidence of an explicit teaching of a motivation to combine in the prior art.

"[T]he analysis that "should be made explicit" refers not to the teachings in the prior art of a motivation to combine, but to the court's analysis. . . . Under the flexible inquiry set forth by the Supreme Court, the district court therefore erred by failing to take account of 'the inferences and creative steps,' or even routine steps, that an inventor would employ and by failing to find a motivation to combine related pieces from the prior art." *Ball Aerosol,* 555 F.3d at 993, 89 USPQ2d at 1877.

The Federal Circuit's directive in *Ball Aerosol* was addressed to a lower court, but it applies to Office personnel as well. When setting forth a rejection, Office personnel is to continue to make appropriate findings of fact as explained in MPEP § 2141 and § 2143, and must provide a reasoned explanation as

to why the invention as claimed would have been obvious to a person of ordinary skill in the art at the time of the invention. This requirement for explanation remains even in situations in which Office personnel may properly rely on intangible realities such as common sense and ordinary ingenuity.

## I.  EXEMPLARY RATIONALES

Exemplary rationales that may support a conclusion of obviousness include:

(A)  Combining prior art elements according to known methods to yield predictable results;

(B)  Simple substitution of one known element for another to obtain predictable results;

(C)  Use of known technique to improve similar devices (methods, or products) in the same way;

(D)  Applying a known technique to a known device (method, or product) ready for improvement to yield predictable results;

(E)  "Obvious to try" – choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success;

(F)  Known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations are predictable to one of ordinary skill in the art;

(G)  Some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior art reference or to combine prior art reference teachings to arrive at the claimed invention.

Note that the list of rationales provided is not intended to be an all-inclusive list. Other rationales to support a conclusion of obviousness may be relied upon by Office personnel. Any rationale employed must provide a link between the factual findings and the legal conclusion of obviousness.

It is important for Office personnel to recognize that when they do choose to formulate an obviousness rejection using one of the rationales suggested by the Supreme Court in *KSR* and discussed herein, they are to adhere to the guidance provided regarding

the necessary factual findings. It remains Office policy that appropriate factual findings are required in order to apply the enumerated rationales properly.

The subsections below include discussions of each rationale along with examples illustrating how the cited rationales may be used to support a finding of obviousness. Some examples use the facts of pre-*KSR* cases to show how the rationales suggested by the Court in *KSR* may be used to support a finding of obviousness. The cases cited (from which the facts were derived) may not necessarily stand for the proposition that the particular rationale is the basis for the court's holding of obviousness, but they do illustrate consistency of past decisions with the lines of reasoning laid out in *KSR*. Other examples are post-*KSR* decisions that show how the Federal Circuit has applied the principles of *KSR*. Cases are included that illustrate findings of obviousness as well as nonobviousness. Note that, in some instances, a single case is used in different subsections to illustrate the use of more than one rationale to support a finding of obviousness. It will often be the case that, once the *Graham* inquiries have been satisfactorily resolved, a conclusion of obviousness may be supported by more than one line of reasoning.

### A. Combining Prior Art Elements According to Known Methods To Yield Predictable Results

To reject a claim based on this rationale, Office personnel must resolve the *Graham* factual inquiries. Then, Office personnel must articulate the following:

(1)  a finding that the prior art included each element claimed, although not necessarily in a single prior art reference, with the only difference between the claimed invention and the prior art being the lack of actual combination of the elements in a single prior art reference;

(2)  a finding that one of ordinary skill in the art could have combined the elements as claimed by known methods, and that in combination, each element merely performs the same function as it does separately;

(3)  a finding that one of ordinary skill in the art would have recognized that the results of the combination were predictable; and

(4)  whatever additional findings based on the *Graham* factual inquiries may be necessary, in view of the facts of the case under consideration, to explain a conclusion of obviousness.

The rationale to support a conclusion that the claim would have been obvious is that all the claimed elements were known in the prior art and one skilled in the art could have combined the elements as claimed by known methods with no change in their respective functions, and the combination yielded nothing more than predictable results to one of ordinary skill in the art. *KSR,* 550 U.S. at 416, 82 USPQ2d at 1395; *Sakraida v. AG Pro, Inc.,* 425 U.S. 273, 282, 189 USPQ 449, 453 (1976); *Anderson's-Black Rock, Inc. v. Pavement Salvage Co.,* 396 U.S. 57, 62-63, 163 USPQ 673, 675 (1969); *Great Atl. & P. Tea Co. v. Supermarket Equip. Corp.,* 340 U.S. 147, 152, 87 USPQ 303, 306 (1950). "[I]t can be important to identify a reason that would have prompted a person of ordinary skill in the relevant field to combine the elements in the way the claimed new invention does." *KSR,* 550 U.S. at 418, 82 USPQ2d at 1396. If any of these findings cannot be made, then this rationale cannot be used to support a conclusion that the claim would have been obvious to one of ordinary skill in the art.

**Example 1:**

The claimed invention in *Anderson's-Black Rock, Inc. v. Pavement Salvage Co.,* 396 U.S. 57, 163 USPQ 673 (1969) was a paving machine which combined several well-known elements onto a single chassis. Standard prior art paving machines typically combined equipment for spreading and shaping asphalt onto a single chassis. The patent claim included the well-known element of a radiant-heat burner attached to the side of the paver for the purpose of preventing cold joints during continuous strip paving. The prior art used radiant heat for softening the asphalt to make patches, but did not use radiant heat burners to achieve continuous strip paving. All of the component parts were known in the prior art. The only difference was the combination of the "old elements" into a single device by mounting them on a single chassis. The Court found that the operation of the heater was in no way dependent on the operation of the other equipment, and that a separate heater could also be used in conjunction with a standard paving machine to achieve the same results. The Court concluded that "[t]he convenience of putting the burner together with the other elements in one machine, though perhaps a matter of great convenience, did not produce a 'new' or 'different function'" and that to those skilled in the art the use of the old elements in combination would have been obvious. *Id.* at 60, 163 USPQ at 674.

Note that combining known prior art elements is not sufficient to render the claimed invention obvious if the results would not

have been predictable to one of ordinary skill in the art. *United States v. Adams,* 383 U.S. 39, 51-52, 148 USPQ 479, 483-84 (1966). In *Adams,* the claimed invention was to a battery with one magnesium electrode and one cuprous chloride electrode that could be stored dry and activated by the addition of plain water or salt water. Although magnesium and cuprous chloride were individually known battery components, the Court concluded that the claimed invention was nonobvious. The Court stated that "[d]espite the fact that each of the elements of the Adams battery was well known in the prior art, to combine them as did Adams required that a person reasonably skilled in the prior art must ignore" the teaching away of the prior art that such batteries were impractical and that water-activated batteries were successful only when combined with electrolytes detrimental to the use of magnesium electrodes. *Id.* at 42-43, 50-52, 148 USPQ at 480, 483. "[w]hen the prior art teaches away from combining certain known elements, discovery of successful means of combining them is more likely to be nonobvious." *KSR,* 550 U.S. at 416, 82 USPQ2d at 1395.

**Example 2:**

The claimed invention in *Ruiz v. A.B. Chance Co.,* 357 F.3d 1270, 69 USPQ2d 1686 (Fed. Cir. 2004) was directed to a system which employs a <u>screw anchor</u> for underpinning existing foundations and a <u>metal bracket</u> to transfer the building load onto the screw anchor. The prior art (Fuller) used screw anchors for underpinning existing structural foundations. Fuller used a concrete haunch to transfer the load of the foundation to the screw anchor. The prior art (Gregory) used a push pier for underpinning existing structural foundations. Gregory taught a method of transferring load using a bracket, specifically: a metal bracket transfers the foundation load to the push pier. The pier is driven into the ground to support the load. Neither reference showed the two elements of the claimed invention – screw anchor and metal bracket – used together. The court found that "artisans knew that a foundation underpinning system requires a means of connecting the foundation to the load-bearing member." *Id.* at 1276, 69 USPQ2d at 1691.

The nature of the problem to be solved – underpinning unstable foundations – as well as the need to connect the member to the foundation to accomplish this goal, would have led one of ordinary skill in the art to choose an appropriate load bearing member and a compatible attachment. Therefore, it would have been obvious to use a metal bracket (as shown in Gregory) in combination with the screw anchor (as shown in Fuller) to underpin unstable foundations.

**Example 3:**

The case of *In re Omeprazole Patent Litigation,* 536 F.3d 1361, 87 USPQ2d 1865 (Fed. Cir. 2008), is one in which the claims in question were found to be nonobvious in the context of an argument to combine prior art elements. The invention involved applying enteric coatings to a drug in pill form for the purpose of ensuring that the drug did not disintegrate before reaching its intended site of action. The drug at issue was omeprazole, the generic name for gastric acid inhibitor marketed as Prilosec®. The claimed formulation included two layers of coatings over the active ingredient.

The district court found that Astra's patent in suit was infringed by defendants Apotex and Impax. The district court rejected Apotex's defense that the patents were invalid for obviousness. Apotex had argued that the claimed invention was obvious because coated omeprazole tablets were known from a prior art reference, and because secondary subcoatings in pharmaceutical preparations generally were also known. There was no evidence of unpredictability associated with applying two different enteric coatings to omeprazole. However, Astra's reason for applying an intervening subcoating between the prior art coating and omeprazole had been that the prior art coating was actually interacting with omeprazole, thereby contributing to undesirable degradation of the active ingredient. This degradation of omeprazole by interaction with the prior art coating had not been recognized in the prior art. Therefore, the district court reasoned that based on the evidence available, a person of ordinary skill in the art would have had no reason to include a subcoating in an omeprazole pill formulation.

The Federal Circuit affirmed the district court's decision that the claimed invention was not obvious. Even though subcoatings for enteric drug formulation were known, and there was no evidence of undue technical hurdles or lack of a reasonable expectation of success, the formulation was nevertheless not obvious because the flaws in the prior art formulation that had prompted the modification had not been recognized. Thus there would have been no reason to modify the initial formulation, even though the modification could have been done. Moreover, a person of skill in the art likely would have chosen a different modification even if they had recognized the problem.

Office personnel should note that in this case the modification of the prior art that had been presented as an argument for obviousness was an extra process step that added an additional component to a known, successfully marketed formulation. The proposed modification thus amounted to extra work and greater expense for no apparent reason. This is not the same as combining known prior art elements A and B when each would have been expected to contribute its own known properties to the final product. In the *Omeprazole* case, in view of the expectations of those of ordinary skill in the art, adding the subcoating would not have been expected to confer any particular desirable property on the final product. Rather, the final product obtained according to the proposed modifications would merely have been expected to have the same functional properties as the prior art product.

The Omeprazole case can also be analyzed in view of the discovery of a previously unknown problem by the patentee. If the adverse interaction between active agent and coating had been known, it might well have been obvious to use a subcoating. However, since the problem had not been previously known, there would have been no reason to incur additional time and expense to add another layer, even though the addition would have been technologically possible. This is true because the prior art of record failed to mention any stability problem, despite the acknowledgment during testimony at trial that there was a known theoretical reason that omeprazole might be subject to degradation in the presence of the known coating material.

**Example 4:**

The case of *Crocs, Inc. v. U.S. Int'l Trade Comm'n,* 598 F.3d 1294, 93 USPQ 1777 (Fed. Cir. 2010), is a decision in which the claimed foam footwear was held by the Federal Circuit to be nonobvious over a combination of prior art references.

The claims involved in the obviousness issue were from Crocs' U.S. Patent No. 6,993,858, and were drawn to footwear in which a one-piece molded foam base section formed the top of the shoe (the upper) and the sole. A strap also made of foam was attached to the foot opening of the upper, such that the strap could provide support to the Achilles portion of the wearer's foot. The strap was attached via connectors that allowed it to be in contact with the base section, and to pivot relative to the base section. Because both the base portion and the strap were made of foam, friction between the strap and the base section allowed the strap to maintain its position after pivoting. In other words, the foam strap did not fall under the force of gravity to a position adjacent to the heel of the base section.

The International Trade Commission (ITC) determined that the claims were obvious over the combination of two pieces of prior art. The first was the Aqua Clog, which was a shoe that corresponded to the base section of the footwear of the '858 patent. The second was the Aguerre patent, which taught heel straps made of elastic or another flexible material. In the ITC's view, the claimed invention was obvious because the prior art Aqua Clog differed from the claimed invention only as to the presence of the strap, and a suitable strap was taught by Aguerre.

The Federal Circuit disagreed. The Federal Circuit stated that the prior art did not teach foam heel straps, or that a foam heel strap should be placed in contact with a foam base. The Federal Circuit pointed out that the prior art actually counseled against using foam as a material for the heel strap of a shoe.

> The record shows that the prior art would actually discourage and teach away from the use of foam straps. An ordinary artisan in this field would not add a foam strap to the foam Aqua Clog because foam was likely to stretch and deform, in addition to causing discomfort for a wearer. The prior art depicts foam as unsuitable for straps.

*Id.* at 1309, 93 USPQ2d at 1787-88.

The Federal Circuit continued, stating that even if – contrary to fact – the claimed invention had been a combination of elements that were known in the prior art, the claims still would have been nonobvious. There was testimony in the record that the loose fit of the heel strap made the shoe more comfortable for the wearer than prior art shoes in which the heel strap was constantly in contact with the wearer's foot. In the claimed footwear, the foam heel strap contacted the wearer's foot only when needed to help reposition the foot properly in the shoe, thus reducing wearer discomfort that could arise from constant contact. This desirable feature was a result of the friction between the base section and the strap that kept the strap in place behind the Achilles portion of the wearer's foot. The Federal Circuit pointed out that this combination "yielded more than predictable results." *Id.* at 1310, 93 USPQ2d at 1788. Aguerre had taught that friction between the base section and the strap was a problem rather than an advantage, and had suggested the use of nylon washers to reduce friction. Thus the Federal Circuit stated that even if all elements of the claimed invention had been taught by the prior art, the claims would not have been obvious because the combination yielded more than predictable results.

The Federal Circuit's discussion in Crocs serves as a reminder to Office personnel that merely pointing to the presence of all claim elements in the prior art is not a complete statement of a rejection for obviousness. In accordance with MPEP § 2143, subsection I.A.(3), a proper rejection based on the rationale that the claimed invention is a combination of prior art elements also includes a finding that results flowing from the combination would have been predictable to a person of ordinary skill in the art. MPEP § 2143, subsection I.A.(3). If results would not have been predictable, Office personnel should not enter an obviousness rejection using the combination of prior art elements rationale, and should withdraw such a rejection if it has been made.

**Example 5:**

*Sundance, Inc. v. DeMonte Fabricating Ltd.,* 550 F.3d 1356, 89 USPQ2d 1535 (Fed. Cir. 2008), involved a segmented and mechanized cover for trucks, swimming pools, or other structures. The claim was found to be obvious over the prior art applied.

A first prior art reference taught that a reason for making a segmented cover was ease of repair, in that a single damaged segment could be readily removed and replaced when necessary. A second prior art reference taught the advantages of a mechanized cover for ease of opening. The Federal Circuit noted that the segmentation aspect of the first reference and the mechanization function of the second perform in the same way after combination as they had before. The Federal Circuit further observed that a person of ordinary skill in the art would have expected that adding replaceable segments as taught by the first reference to the mechanized cover of the other would result in a cover that maintained the advantageous properties of both of the prior art covers.

Thus, the Sundance case points out that a hallmark of a proper obviousness rejection based on combining known prior art elements is that one of ordinary skill in the art would reasonably have expected the elements to maintain their respective properties or functions after they have been combined.

**Example 6:**

In the case of *Ecolab, Inc. v. FMC Corp.,* 569 F.3d 1335, 91 USPQ2d 1225 (Fed Cir. 2009), an "apparent reason to combine" in conjunction with the technical ability to optimize led to the conclusion that the claimed invention would have been obvious.

The invention in question was a method of treating meat to reduce the incidence of pathogens, by spraying the meat with

an antibacterial solution under specified conditions. The parties did not dispute that a single prior art reference had taught all of the elements of the claimed invention, except for the pressure limitation of "at least 50 psi."

FMC had argued at the district court that the claimed invention would have been obvious in view of the first prior art reference mentioned above in view of a second reference that had taught the advantages of spray-treating at pressures of 20 to 150 psi when treating meat with a different antibacterial agent. The district court did not find FMC's argument to be convincing, and denied the motion for judgment as a matter of law that the claim was obvious.

Disagreeing with the district court, the Federal Circuit stated that "there was an apparent reason to combine these known elements – namely to increase contact between the [antibacterial solution] and the bacteria on the meat surface and to use the pressure to wash additional bacteria off the meat surface." *Id.* at 1350, 91 USPQ2d at 1234. The Federal Circuit explained that because the second reference had taught "using high pressure to improve the effectiveness of an antimicrobial solution when sprayed onto meat, and because an ordinarily skilled artisan would have recognized the reasons for applying [the claimed antibacterial] using high pressure and would have known how to do so, Ecolab's claims combining high pressure with other limitations disclosed in FMC's patent are invalid as obvious." *Id.*

When considering the question of obviousness, Office personnel should keep in mind the capabilities of a person of ordinary skill. In Ecolab, the Federal Circuit stated:

> Ecolab's expert admitted that one skilled in the art would know how to adjust application parameters to determine the optimum parameters for a particular solution. The question then is whether it would have been obvious to combine the high pressure parameter disclosed in the Bender patent with the PAA methods disclosed in FMC's '676 patent. The answer is yes. *Id.*

If optimization of the application parameters had not been within the level of ordinary skill in the art, the outcome of the Ecolab case may well have been different.

**Example 7:**

In the case of *Wyers v. Master Lock Co.,* 616 F.3d 1231, 95 USPQ2d 1525 (Fed. Cir. 2010), the Federal Circuit held that the claimed barbell-shaped hitch pin locks used to secure trailers to vehicles were obvious.

The court discussed two different sets of claims in *Wyers,* both drawn to improvements over the prior art hitch pin locks. The first improvement was a removable sleeve that could be placed over the shank of the hitch pin lock so that the same lock could be used with varying apertures of varying sizes. The second improvement was an external flat flange seal adapted to protect the internal lock mechanism from contaminants. Wyers had

admitted that each of several prior art references taught every element of the claimed inventions except for the removable sleeve and the external covering. Master Lock had argued that these references, in combination with additional references teaching the missing elements, would have rendered the claims obvious. The court first addressed the question of whether the additional references relied on by Master Lock were analogous prior art. As to the reference teaching the sleeve improvement, the court concluded that it dealt specifically with using a vehicle to tow a trailer, and was therefore in the same field of endeavor as Wyers' sleeve improvement. The reference teaching the sealing improvement dealt with a padlock rather than a lock for a tow hitch. The court noted that Wyers' specification had characterized the claimed invention as being in the field of locking devices, thus at least suggesting that the sealed padlock reference was in the same field of endeavor. However, the court also observed that even if sealed padlocks were not in the same field of endeavor, they were nevertheless reasonably pertinent to the problem of avoiding contamination of a locking mechanism for tow hitches. The court explained that the Supreme Court's decision in KSR "directs [it] to construe the scope of analogous art broadly." *Id.* at 1238, 95 USPQ2d at 1530. For these reasons, the court found that Master Lock's asserted references were analogous prior art, and therefore relevant to the obviousness inquiry.

The court then turned to the question of whether there would have been adequate motivation to combine the prior art elements as had been urged by Master Lock. The court recalled the *Graham* inquiries, and also emphasized the "expansive and flexible" post-KSR approach to obviousness that must not "deny factfinders recourse to common sense." *Id.* at 1238, 95 USPQ2d at 1530-31. (quoting *KSR,* 550 U.S. at 415, 421, 82 USPQ2d at 1395, 1397). The court stated:

> *KSR* and our later cases establish that the legal determination of obviousness may include recourse to logic, judgment, and common sense, in lieu of expert testimony. . . . Thus, in appropriate cases, the ultimate inference as to the existence of a motivation to combine references may boil down to a question of "common sense," appropriate for resolution on summary judgment or JMOL.

*Id.* at 1240, 82 USPQ2d at 1531 (citing *Perfect Web Techs., Inc. v. InfoUSA, Inc.,* 587 F.3d 1324, 1330, 92 USPQ2d, 1849, 1854 (Fed. Cir. 2009); *Ball Aerosol,* 555 F.3d at 993, 89 USPQ2d 1870, 1875 (Fed. Cir. 2009)).

After reviewing these principles, the court proceeded to explain why adequate motivation to combine had been established in this case. With regard to the sleeve improvement, it pointed out that the need for different sizes of hitch pins was well known in the art, and that this was a known source of inconvenience and expense for users. The court also mentioned the marketplace aspect of the issue, noting that space on store shelves was at a premium, and that removable sleeves addressed this economic concern. As to the sealing improvement, the court pointed out that both internal and external seals were well-known means to protect locks from contaminants. The court concluded that the

constituent elements were being employed in accordance with their recognized functions, and would have predictably retained their respective functions when combined as suggested by Master Lock. The court cited *In re O'Farrell*, 853 F.2d 894, 904 (Fed. Cir. 1988) for the proposition that a reasonable expectation of success is a requirement for a proper determination of obviousness.

Office personnel should note that although the Federal Circuit invoked the idea of common sense in support of a conclusion of obviousness, it did not end its explanation there. Rather, the court explained why a person of ordinary skill in the art at the time of the invention, in view of the facts relevant to the case, would have found the claimed inventions to have been obvious. The key to supporting any rejection under 35 U.S.C. 103 is the clear articulation of the reason(s) why the claimed invention would have been obvious. The Supreme Court in *KSR* noted that the analysis supporting a rejection under 35 U.S.C. 103 should be made explicit. The Court quoting *In re Kahn*, 441 F.3d 977, 988, 78 USPQ2d 1329, 1336 (Fed. Cir. 2006), stated that "[R]ejections on obviousness cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." See MPEP § 2141, subsection III. Office personnel should continue to provide a reasoned explanation for every obviousness rejection.

**Example 8:**

The claim in *DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.,* 567 F.3d 1314, 90 USPQ2d 1865 (Fed. Cir. 2009), was directed to a polyaxial pedicle screw used in spinal surgeries that included a compression member for pressing a screw head against a receiver member. A prior art reference (Puno) disclosed all of the elements of the claim except for the compression member. Instead, the screw head in Puno was separated from the receiver member to achieve a shock absorber effect, allowing some motion between receiver member and the vertebrae. The missing compression member was readily found in another prior art reference (Anderson), which disclosed an external fracture immobilization splint for immobilizing long bones with a swivel clamp capable of polyaxial movement until rigidly secured by a compression member. It was asserted during trial that a person of ordinary skill would have recognized that the addition of Anderson's compression member to Puno's device would have achieved a rigidly locked polyaxial pedicle screw covered by the claim.

In conducting its analysis, the Federal Circuit noted that the "predictable result" discussed in *KSR* refers not only to the expectation that prior art elements are capable of being physically combined, but also that the combination would have worked for its intended purpose. In this case, it was successfully argued that Puno "teaches away" from a rigid screw because Puno warned that rigidity increases the likelihood that the screw will fail within the human body, rendering the device inoperative for its intended purpose. In fact, the reference did not merely express a general preference for pedicle screws having a "shock absorber" effect, but rather expressed concern for failure and stated that the shock absorber feature "decrease[s] the chance of failure of the screw of the bone-screw interface" because "it

prevent[s] direct transfer of load from the rod to the bone-screw interface." Thus, the alleged reason to combine the prior art elements of Puno and Anderson—increasing the rigidity of the screw—ran contrary to the prior art that taught that increasing rigidity would result in a greater likelihood of failure. In view of this teaching and the backdrop of collective teachings of the prior art, the Federal Circuit determined that Puno teaches away from the proposed combination such that a person of ordinary skill would have been deterred from combining the references as proposed. Secondary considerations evaluated by the Federal Circuit relating to failure by others and copying also supported the view that the combination would not have been obvious at the time of the invention.

## B. Simple Substitution of One Known Element for Another To Obtain Predictable Results

To reject a claim based on this rationale, Office personnel must resolve the *Graham* factual inquiries. Then, Office personnel must articulate the following:

(1)  a finding that the prior art contained a device (method, product, etc.) which differed from the claimed device by the substitution of some components (step, element, etc.) with other components;

(2)  a finding that the substituted components and their functions were known in the art;

(3)  a finding that one of ordinary skill in the art could have substituted one known element for another, and the results of the substitution would have been predictable; and

(4)  whatever additional findings based on the *Graham* factual inquiries may be necessary, in view of the facts of the case under consideration, to explain a conclusion of obviousness.

The rationale to support a conclusion that the claim would have been obvious is that the substitution of one known element for another yields predictable results to one of ordinary skill in the art. If any of these findings cannot be made, then this rationale cannot be used to support a conclusion that the claim would have been obvious to one of ordinary skill in the art.

**Example 1:**

The claimed invention in *In re Fout*, 675 F.2d 297, 213 USPQ 532 (CCPA 1982) was directed to a method for decaffeinating coffee or tea. The prior art (Pagliaro) method produced a decaffeinated vegetable material and trapped the caffeine in a fatty material (such as oil). The caffeine was then removed from

the fatty material by an aqueous extraction process. Applicant (Fout) substituted an evaporative distillation step for the aqueous extraction step. The prior art (Waterman) suspended coffee in oil and then directly distilled the caffeine through the oil. The court found that "[b]ecause both Pagliaro and Waterman teach a method for separating caffeine from oil, it would have been *prima facie* obvious to substitute one method for the other. Express suggestion to substitute one equivalent for another need not be present to render such substitution obvious." *Id.* at 301, 213 USPQ at 536.

**Example 2:**

The claimed invention in *In re O'Farrell,* 853 F.2d 894, 7 USPQ2d 1673 (Fed. Cir. 1988) was directed to a method for synthesizing a protein in a transformed bacterial host species by substituting a heterologous gene for a gene native to the host species. Generally speaking, protein synthesis *in vivo* follows a path from DNA to mRNA. Although the prior art Polisky article (authored by two of the three inventors of the application) had explicitly suggested employing the method described for protein synthesis, the inserted heterologous gene exemplified in the article was one that normally did not proceed all the way to the protein production step, but instead terminated with the mRNA. A second reference to Bahl had described a general method of inserting chemically synthesized DNA into a plasmid. Thus, it would have been obvious to one of ordinary skill in the art to replace the prior art gene with another gene known to lead to protein production, because one of ordinary skill in the art would have been able to carry out such a substitution, and the results were reasonably predictable.

In response to applicant's argument that there had been significant unpredictability in the field of molecular biology at the time of the invention, the court stated that the level of skill was quite high and that the teachings of Polisky, even taken alone, contained detailed enabling methodology and included the suggestion that the modification would be successful for synthesis of proteins.

This is not a situation where the rejection is a statement that it would have been "obvious to try" without more. Here there was a reasonable expectation of success. "Obviousness does not require absolute predictability of success." *Id.* at 903, 7 USPQ2d at 1681.

**Example 3:**

The fact pattern in *Ruiz v. AB Chance Co.,* 357 F.3d 1270, 69 USPQ2d 1686 (Fed. Cir. 2004) is set forth above in Example 2 in subsection I.A., above.

The prior art showed differing load-bearing members and differing means of attaching the foundation to the member. Therefore, it would have been obvious to one of ordinary skill in the art to substitute the metal bracket taught in Gregory for Fuller's concrete haunch for the predictable result of transferring the load.

**Example 4:**

The claimed invention in *Ex parte Smith,* 83 USPQ2d 1509 (Bd. Pat. App. & Int. 2007), was a pocket insert for a bound book made by gluing a base sheet and a pocket sheet of paper together to form a continuous two-ply seam defining a closed pocket. The prior art (Wyant) disclosed at least one pocket formed by folding a single sheet and securing the folder portions along the inside margins using any convenient bonding method. The prior art (Wyant) did not disclose bonding the sheets to form a continuous two-ply seam. The prior art (Dick) disclosed a pocket that is made by stitching or otherwise securing two sheets along three of its four edges to define a closed pocket with an opening along its fourth edge.

In considering the teachings of Wyant and Dick, the Board "found that (1) each of the claimed elements is found within the scope and content of the prior art; (2) one of ordinary skill in the art could have combined the elements as claimed by methods known at the time the invention was made; and (3) one of ordinary skill in the art would have recognized at the time the invention was made that the capabilities or functions of the combination were predictable." Citing *KSR,* the Board concluded that "[t]he substitution of the continuous, two-ply seam of Dick for the folded seam of Wyant thus is no more than the simple substitution of one known element for another or the mere application of a known technique to a piece of prior art ready for improvement.

**Example 5:**

The claimed invention in *In re ICON Health & Fitness, Inc.,* 496 F.3d 1374, 83 USPQ2d 1746 (Fed. Cir. 2007), was directed to a treadmill with a folding tread base that swivels into an upright storage position, including a gas spring connected between the tread base and the upright structure to assist in stably retaining the tread base in the storage position. On reexamination, the examiner rejected the claims as obvious based on a combination of references including an advertisement (Damark) for a folding treadmill demonstrating all of the claim elements other than the gas spring, and a patent (Teague) with a gas spring. Teague was directed to a bed that folds into a cabinet using a novel dual-action spring that reverses force as the mechanism passes a neutral position, rather than a single-action spring that would provide a force pushing the bed closed at all times. The dual-action spring reduced the force required to open the bed from the closed position, while reducing the force required to lift the bed from the open position.

The Federal Circuit addressed the propriety of making the combination since Teague was in a different field than the application. Teague was found to be reasonably pertinent to the problem addressed in the application because the folding mechanism did not require any particular focus on treadmills, but rather generally addressed problems of supporting the weight of such a mechanism and providing a stable resting position.

The court also considered whether one skilled in the art would have been led to combine the teachings of Damark and Teague. Appellant argued that Teague teaches away from the invention because it directs one skilled in the art not to use single-action

Case 1:17-cv-11008-MLW  Document 306-3  Filed 05/29/18  Page 11 of 26

springs and does not satisfy the claim limitations as the dual-action springs would render the invention inoperable. The Federal Circuit considered these arguments and found that, while Teague at most teaches away from using single-action springs to decrease the opening force, it actually instructed that single-action springs provide the result desired by the inventors, which was to increase the opening force provided by gravity. As to inoperability, the claims were not limited to single-action springs and were so broad as to encompass anything that assists in stably retaining the tread base, which is the function that Teague accomplished. Additionally, the fact that the counterweight mechanism from Teague used a large spring, which appellant argued would overpower the treadmill mechanism, ignores the modifications that one skilled in the art would make to a device borrowed from the prior art. One skilled in the art would size the components from Teague appropriately for the application.

 *ICON* is another useful example for understanding the scope of analogous art. The art applied concerned retaining mechanisms for folding beds, not treadmills. When determining whether a reference may properly be applied to an invention in a different field of endeavor, it is necessary to consider the problem to be solved. It is certainly possible that a reference may be drawn in such a way that its usefulness as a teaching is narrowly restricted. However, in *ICON,* the problem to be solved was not limited to the teaching of the "treadmill" concept. The Teague reference was analogous art because "Teague and the current application both address the need to stably retain a folding mechanism," and because "nothing about ICON's folding mechanism requires any particular focus on treadmills," *Id.* at 1378, 1380, 83 USPQ2d at 1749-50.

 *ICON* is also informative as to the relationship between the problem to be solved and existence of a reason to combine. "Indeed, while perhaps not dispositive of the issue, the finding that Teague, by addressing a similar problem, provides analogous art to ICON's application goes a long way towards demonstrating a reason to combine the two references. Because ICON's broad claims read on embodiments addressing that problem as described by Teague, the prior art here indicates a reason to incorporate its teachings." *Id.* at 1380-81, 83 USPQ2d at 1751.

The Federal Circuit's discussion in *ICON* also makes clear that if the reference does not teach that a combination is undesirable, then it cannot be said to teach away. An assessment of whether a combination would render the device inoperable must not "ignore the modifications that one skilled in the art would make to a device borrowed from the prior art." *Id.* at 1382, 83 USPQ2d at 1752.

**Example 6:**

 *Agrizap, Inc. v. Woodstream Corp.,* 520 F.3d 1337, 86 USPQ2d 1110 (Fed. Cir. 2008), involved a stationary pest control device for electrocution of pests such as rats and gophers, in which the device is set in an area where the pest is likely to encounter it. The only difference between the claimed device and the prior art stationary pest control device was that the claimed device employed a resistive electrical switch, while the prior art device

used a mechanical pressure switch. A resistive electrical switch was taught in two prior art patents, in the contexts of a hand-held pest control device and a cattle prod.

In determining that the claimed invention was obvious, the Federal Circuit noted that "[t]he asserted claims simply substitute a resistive electrical switch for the mechanical pressure switch" employed in the prior art device. *Id.* at 1344, 86 USPQ2d at 1115. In this case, the prior art concerning the hand-held devices revealed that the function of the substituted resistive electrical switch was well known and predictable, and that it could be used in a pest control device. According to the Federal Circuit, the references that taught the hand-held devices showed that "the use of an animal body as a resistive switch to complete a circuit for the generation of an electric charge was already well known in the prior art." *Id.* Finally, the Federal Circuit noted that the problem solved by using the resistive electrical switch in the prior art hand-held devices – malfunction of mechanical switches due to dirt and dampness – also pertained to the prior art stationary pest control device.

The Federal Circuit recognized *Agrizap* as "a textbook case of when the asserted claims involve a combination of familiar elements according to known methods that does no more than yield predictable results." *Id. Agrizap* exemplifies a strong case of obviousness based on simple substitution that was not overcome by the objective evidence of nonobviousness offered. It also demonstrates that analogous art is not limited to the field of applicant's endeavor, in that one of the references that used an animal body as a resistive switch to complete a circuit for the generation of an electric charge was not in the field of pest control.

**Example 7:**

The invention at issue in *Muniauction, Inc. v. Thomson Corp.,* 532 F.3d 1318, 87 USPQ2d1350 (Fed. Cir. 2008), was a method for auctioning municipal bonds over the Internet. A municipality could offer a package of bond instruments of varying principal amounts and maturity dates, and an interested buyer would then submit a bid comprising a price and interest rate for each maturity date. It was also possible for the interested buyer to bid on a portion of the offering. The claimed invention considered all of the noted parameters to determine the best bid. It operated on conventional Web browsers and allowed participants to monitor the course of the auction.

The only difference between the prior art bidding system and the claimed invention was the use of a conventional Web browser. At trial, the district court had determined that Muniauction's claims were not obvious. Thomson argued that the claimed invention amounted to incorporating a Web browser into a prior art auction system, and was therefore obvious in light of *KSR.* Muniauction rebutted the argument by offering evidence of skepticism by experts, copying, praise, and commercial success. Although the district court found the evidence to be persuasive of nonobviousness, the Federal Circuit disagreed. It noted that a nexus between the claimed invention and the proffered evidence was lacking because the evidence was not coextensive with the claims at issue. For this reason,

the Federal Circuit determined that Muniauction's evidence of secondary considerations was not entitled to substantial weight.

*The Federal Circuit analogized this case to Leapfrog Enters., Inc. v. Fisher-Price, Inc.,* 485 F.3d 1157, 82 USPQ2d 1687 (Fed. Cir. 2007). The *Leapfrog* case involved a determination of obviousness based on application of modern electronics to a prior art mechanical children's learning device. In *Leapfrog,* the court noted that market pressures would have prompted a person of ordinary skill to use modern electronics in the prior art device. Similarly in *Muniauction,* market pressures would have prompted a person of ordinary skill to use a conventional Web browser in a method of auctioning municipal bonds.

**Example 8:**

In *Aventis Pharma Deutschland v. Lupin Ltd.,* 499 F.3d 1293, 84 USPQ2d 1197 (Fed. Cir. 2007), the claims were drawn to the 5(S) stereoisomer of the blood pressure drug ramipril in stereochemically pure form, and to compositions and methods requiring 5(S) ramipril. The 5(S) stereoisomer is one in which all five stereocenters in the ramipril molecule are in the S rather than the R configuration. A mixture of various stereoisomers including 5(S) ramipril had been taught by the prior art. The question before the court was whether the purified single stereoisomer would have been obvious over the known mixture of stereoisomers.

The record showed that the presence of multiple S stereocenters in drugs similar to ramipril was known to be associated with enhanced therapeutic efficacy. For example, when all of the stereocenters were in the S form in the related drug enalapril (SSS enalapril) as compared with only two stereocenters in the S form (SSR enalapril), the therapeutic potency was 700 times as great. There was also evidence to indicate that conventional methods could be used to separate the various stereoisomers of ramipril.

The district court saw the issue as a close case, because, in its view, there was no clear motivation in the prior art to isolate 5(S) ramipril. However, the Federal Circuit disagreed, and found that the claims would have been obvious. The Federal Circuit cautioned that requiring such a clearly stated motivation in the prior art to isolate 5(S) ramipril ran counter to the Supreme Court's decision in KSR, and the court stated:

> Requiring an explicit teaching to purify the 5(S) stereoisomer from a mixture in which it is the active ingredient is precisely the sort of rigid application of the TSM test that was criticized in *KSR.*

*Id.* at 1301, 84 USPQ2d at 1204. The *Aventis* court also relied on the settled principle that in chemical cases, structural similarity can provide the necessary reason to modify prior art teachings. The Federal Circuit also addressed the kind of teaching that would be sufficient in the absence of an explicitly stated prior art-based motivation, explaining that an expectation of similar properties in light of the prior art can be sufficient, even without an explicit teaching that the compound will have a particular utility.

In the chemical arts, the cases involving so-called "lead compounds" form an important subgroup of the obviousness cases that are based on substitution. The Federal Circuit has had a number of opportunities since the *KSR* decision to discuss the circumstances under which it would have been obvious to modify a known compound to arrive at a claimed compound. The following cases explore the selection of a lead compound, the need to provide a reason for any proposed modification, and the predictability of the result.

**Example 9:**

*Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd.,* 533 F.3d 1353, 87 USPQ2d 1452 (Fed. Cir. 2008), concerns the pharmaceutical compound rabeprazole. Rabeprazole is a proton pump inhibitor for treating stomach ulcers and related disorders. The Federal Circuit affirmed the district court's summary judgment of nonobviousness, stating that no reason had been advanced to modify the prior art compound in a way that would destroy an advantageous property.

Co-defendant Teva based its obviousness argument on the structural similarity between rabeprazole and lansoprazole. The compounds were recognized as sharing a common core, and the Federal Circuit characterized lansoprazole as a "lead compound." The prior art compound lansoprazole was useful for the same indications as rabeprazole, and differed from rabeprazole only in that lansoprazole has a trifluoroethoxy substituent at the 4-position of the pyridine ring, while rabeprazole has a methoxypropoxy substituent. The trifluoro substituent of lansoprazole was known to be a beneficial feature because it conferred lipophilicity to the compound. The ability of a person of ordinary skill to carry out the modification to introduce the methoxypropoxy substituent, and the predictability of the result were not addressed.

Despite the significant similarity between the structures, the Federal Circuit did not find any reason to modify the lead compound. According to the Federal Circuit:

> Obviousness based on structural similarity thus can be proved by identification of some motivation that would have led one of ordinary skill in the art to select and then modify a known compound (i.e. a lead compound) in a particular way to achieve the claimed compound. . . . In keeping with the flexible nature of the obviousness inquiry, the requisite motivation can come from any number of sources and need not necessarily be explicit in the art. Rather "it is sufficient to show that the claimed and prior art compounds possess a 'sufficiently close relationship . . . to create an expectation,' in light of the totality of the prior art, that the new compound will have 'similar properties' to the old." *Id.* at 1357, 87 USPQ2d at 1455. (citations omitted)

The prior art taught that introducing a fluorinated substituent was known to increase lipophilicity, so a skilled artisan would have expected that replacing the trifluoroethoxy substituent with a methoxypropoxy substituent would have reduced the lipophilicity of the compound. Thus, the prior art created the

expectation that rabeprazole would be less useful than lansoprazole as a drug for treating stomach ulcers and related disorders because the proposed modification would have destroyed an advantageous property of the prior art compound. The compound was not obvious as argued by Teva because, upon consideration of all of the facts of the case, a person of ordinary skill in the art at the time of the invention would not have had a reason to modify lansoprazole so as to form rabeprazole.

Office personnel are cautioned that the term "lead compound" in a particular opinion can have a contextual meaning that may vary from the way a pharmaceutical chemist might use the term. In the field of pharmaceutical chemistry, the term "lead compound" has been defined variously as "a chemical compound that has pharmacological or biological activity and whose chemical structure is used as a starting point for chemical modifications in order to improve potency, selectivity, or pharmacokinetic parameters;" "[a] compound that exhibits pharmacological properties which suggest its development;" and "a potential drug being tested for safety and efficacy." See, e.g., http://en.wikipedia.org/wiki/Lead_compound, accessed January 13, 2010; www.combichemistry.com/glossary_k.html, accessed January 13, 2010; and www.buildingbiotechnology.com/glossary4.php, accessed January 13, 2010.

The Federal Circuit in *Eisai* makes it clear that from the perspective of the law of obviousness, any known compound might possibly serve as a lead compound: "Obviousness based on structural similarity thus can be proved by identification of some motivation that would have led one of ordinary skill in the art to select and then modify a known compound (i.e. a lead compound) in a particular way to achieve the claimed compound." *Eisai,* 533 F.3d at 1357, 87 USPQ2d at 1455. Thus, Office personnel should recognize that a proper obviousness rejection of a claimed compound that is useful as a drug might be made beginning with an inactive compound, if, for example, the reasons for modifying a prior art compound to arrive at the claimed compound have nothing to do with pharmaceutical activity. The inactive compound would not be considered to be a lead compound by pharmaceutical chemists, but could potentially be used as such when considering obviousness. Office personnel might also base an obviousness rejection on a known compound that pharmaceutical chemists would not select as a lead compound due to expense, handling issues, or other business considerations. However, there must be some reason for starting with that lead compound other than the mere fact that the "lead compound" merely exists. See *Altana Pharma AG v. Teva Pharm. USA, Inc.,* 566 F.3d 999, 1007, 91 USPQ2d 1018, 1024 (Fed. Cir. 2009) (holding that there must be some reason "to select and modify a known compound"); *Ortho-McNeil Pharm., Inc. v. Mylan Labs, Inc.,* 520 F.3d 1358, 1364, 86 USPQ2d 1196, 1201 (Fed. Cir. 2008).

**Example 10:**

The claimed chemical compound was also found to be nonobvious in *Procter & Gamble Co. v. Teva Pharm. USA, Inc.,* 566 F.3d 989, 90 USPQ2d 1947 (Fed. Cir. 2009). The compound at issue was risedronate – the active ingredient of

Procter & Gamble's osteoporosis drug Actonel®. Risedronate is an example of a bisphosphonate, which is a class of compounds known to inhibit bone resorption.

When Procter & Gamble sued Teva for infringement, Teva defended by arguing invalidity for obviousness over one of Procter & Gamble's earlier patents. The prior art patent did not teach risedronate, but instead taught thirty-six other similar compounds including 2-pyr EHDP that were potentially useful with regard to osteoporosis. Teva argued obviousness on the basis of structural similarity to 2-pyr EHDP, which is a positional isomer of risedronate.

The district court found no reason to select 2-pyr EHDP as a lead compound in light of the unpredictable nature of the art, and no reason to modify it so as to obtain risedronate. In addition, there were unexpected results as to potency and toxicity. Therefore the district court found that Teva had not made a *prima facie* case, and even if it had, it was rebutted by evidence of unexpected results.

The Federal Circuit affirmed the district court's decision. The Federal Circuit did not deem it necessary in this case to consider the question of whether 2-pyr EHDP had been appropriately selected as a lead compound. Rather, the Federal Circuit reasoned that, if 2-pyr EHDP is presumed to be an appropriate lead compound, there must be both a reason to modify it so as to make risedronate and a reasonable expectation of success. Here, there was no evidence that the necessary modifications would have been routine, so there would have been no reasonable expectation of success.

*Procter & Gamble* is also informative in its discussion of the treatment of secondary considerations of non-obviousness. Although the court found that no *prima facie* case of obviousness had been presented, it proceeded to analyze Procter & Gamble's proffered evidence countering the alleged *prima facie* case in some detail, thus shedding light on the proper treatment of such evidence.

The Federal Circuit noted in dicta that even if a *prima facie* case of obviousness had been established, sufficient evidence of unexpected results was introduced to rebut such a showing. At trial, the witnesses consistently testified that the properties of risedronate were not expected, offering evidence that researchers did not predict either the potency or the low dose at which the compound was effective. Tests comparing risedronate to a compound in the prior art reference showed that risedronate outperformed the other compound by a substantial margin, could be administered in a greater amount without an observable toxic effect, and was not lethal at the same levels as the other compound. The weight of the evidence and the credibility of the witnesses were sufficient to show unexpected results that would have rebutted an obviousness determination. Thus, nonobviousness can be shown when a claimed invention is shown to have unexpectedly superior properties when compared to the prior art.

The court then addressed the evidence of commercial success of risedronate and the evidence that risedronate met a long felt need. The court pointed out that little weight was to be afforded to the commercial success because the competing product was also assigned to Procter & Gamble. However, the Federal Circuit affirmed the district court's conclusion that risedronate met a long-felt, but unsatisfied need. The court rejected Teva's contention that because the competing drug was available before Actonel7, there was no unmet need that the invention satisfied. The court emphasized that whether there was a long-felt but unsatisfied need is to be evaluated based on the circumstances as of the filing date of the challenged invention – not as of the date that the invention is brought to market.

It should be noted that the lead compound cases do not stand for the proposition that identification of a single lead compound is necessary in every obviousness rejection of a chemical compound. For example, one might envision a suggestion in the prior art to formulate a compound having certain structurally defined moieties, or moieties with certain properties. If a person of ordinary skill would have known how to synthesize such a compound, and the structural and/or functional result could reasonably have been predicted, then a *prima facie* case of obviousness of the claimed chemical compound might exist even without identification a particular lead compound. As a second example, it could be possible to view a claimed compound as consisting of two known compounds attached via a chemical linker. The claimed compound might properly be found to have been obvious if there would have been a reason to link the two, if one of ordinary skill would have known how to do so, and if the resulting compound would have been the predictable result of the linkage procedure. Thus, Office personnel should recognize that in certain situations, it may be proper to reject a claimed chemical compound as obvious even without identifying a single lead compound.

**Example 11:**

The decision reached by the Federal Circuit in *Altana Pharma AG v. Teva Pharm. USA, Inc.,* 566 F.3d 999, 91 USPQ2d 1018 (Fed. Cir. 2009), as discussed below, involved a motion for preliminary injunction and did not include a final determination of obviousness. However, the case is instructive as to the issue of selecting a lead compound.

The technology involved in *Altana* was the compound pantoprazole, which is the active ingredient in Altana's antiulcer drug Protonix[®]. Pantoprazole belongs to a class of compounds known as proton pump inhibitors that are used to treat gastric acid disorders in the stomach.

Altana accused Teva of infringement. The district court denied Altana's motion for preliminary injunction for failure to establish a likelihood of success on the merits, determining that Teva had demonstrated a substantial question of invalidity for obviousness in light of one of Altana's prior patents. Altana's patent discussed a compound referred to as compound 12, which was one of eighteen compounds disclosed. The claimed compound pantoprazole was structurally similar to compound 12. The district court found that one of ordinary skill in the art would

have selected compound 12 as a lead compound for modification, and the Federal Circuit affirmed.

Obviousness of a chemical compound in view of its structural similarity to a prior art compound may be shown by identifying some line of reasoning that would have led one of ordinary skill in the art to select and modify the prior art compound in a particular way to produce the claimed compound. The necessary line of reasoning can be drawn from any number of sources and need not necessarily be explicitly found in the prior art of record. The Federal Circuit determined that ample evidence supported the district court's finding that compound 12 was a natural choice for further development. For example, Altana's prior art patent claimed that its compounds, including compound 12, were improvements over the prior art; compound 12 was disclosed as one of the more potent of the eighteen compounds disclosed; the patent examiner had considered the compounds of Altana's prior art patent to be relevant during the prosecution of the patent in suit; and experts had opined that one of ordinary skill in the art would have selected the eighteen compounds to pursue further investigation into their potential as proton pump inhibitors.

In response to Altana's argument that the prior art must point to only a single lead compound for further development, the Federal Circuit stated that a "restrictive view of the lead compound test would present a rigid test similar to the teaching-suggestion-motivation test that the Supreme Court explicitly rejected in *KSR* . . . . The district court in this case employed a flexible approach – one that was admittedly preliminary – and found that the defendants had raised a substantial question that one of skill in the art would have used the more potent compounds of [Altana's prior art] patent, including compound 12, as a starting point from which to pursue further development efforts. That finding was not clearly erroneous." *Id.* at 1008, 91 USPQ2d at 1025.

### C. Use of Known Technique To Improve Similar Devices (Methods, or Products) in the Same Way

To reject a claim based on this rationale, Office personnel must resolve the *Graham* factual inquiries. Then, Office personnel must articulate the following:

(1) a finding that the prior art contained a "base" device (method, or product) upon which the claimed invention can be seen as an "improvement;"

(2) a finding that the prior art contained a "comparable" device (method, or product that is not the same as the base device) that has been improved in the same way as the claimed invention;

(3) a finding that one of ordinary skill in the art could have applied the known "improvement" technique in the same way to the "base" device

(method, or product) and the results would have been predictable to one of ordinary skill in the art; and

(4) whatever additional findings based on the *Graham* factual inquiries may be necessary, in view of the facts of the case under consideration, to explain a conclusion of obviousness.

The rationale to support a conclusion that the claim would have been obvious is that a method of enhancing a particular class of devices (methods, or products) has been made part of the ordinary capabilities of one skilled in the art based upon the teaching of such improvement in other situations. One of ordinary skill in the art would have been capable of applying this known method of enhancement to a "base" device (method, or product) in the prior art and the results would have been predictable to one of ordinary skill in the art. The Supreme Court in *KSR* noted that if the actual application of the technique would have been beyond the skill of one of ordinary skill in the art, then using the technique would not have been obvious. *KSR,* 550 U.S. at 417, 82 USPQ2d at 1396. If any of these findings cannot be made, then this rationale cannot be used to support a conclusion that the claim would have been obvious to one of ordinary skill in the art.

**Example 1:**

The claimed invention in *In re Nilssen,* 851 F.2d 1401, 7 USPQ2d 1500 (Fed. Cir. 1988) was directed to a "means by which the self-oscillating inverter in a power-line-operated inverter-type fluorescent lamp ballast is disabled in case the output current from the inverter exceeds some pre-established threshold level for more than a very brief period." *Id.* at 1402, 7 USPQ2d at 1501 That is, the current output was monitored, and if the current output exceeded some threshold for a specified short time, an actuation signal was sent and the inverter was disabled to protect it from damage.

The prior art (a USSR certificate) described a device for protecting an inverter circuit in an undisclosed manner via a control means. The device indicated the high-load condition by way of the control means, but did not indicate the specific manner of overload protection. The prior art (Kammiller) disclosed disabling the inverter in the event of a high-load current condition in order to protect the inverter circuit. That is, the overload protection was achieved by disabling the inverter by means of a cutoff switch.

The court found "it would have been obvious to one of ordinary skill in the art to use the threshold signal produced in the USSR device to actuate a cutoff switch to render the inverter inoperative as taught by Kammiller." *Id.* at 1403, 7 USPQ2d at 1502. That is, using the known technique of a cutoff switch for protecting a circuit to provide the protection desired in the

inverter circuit of the USSR document would have been obvious to one of ordinary skill.

**Example 2:**

The fact pattern in *Ruiz v. AB Chance Co.,* 357 F.3d 1270, 69 USPQ2d 1686 (Fed. Cir. 2004) is set forth above in Example 2 in subsection I.A.

The nature of the problem to be solved may lead inventors to look at references relating to possible solutions to that problem. *Id.* at 1277, 69 USPQ2d at 1691. Therefore, it would have been obvious to use a metal bracket (as shown in Gregory) with the screw anchor (as shown in Fuller) to underpin unstable foundations.

### D. Applying a Known Technique to a Known Device (Method, or Product) Ready for Improvement To Yield Predictable Results

To reject a claim based on this rationale, Office personnel must resolve the *Graham* factual inquiries. Then, Office personnel must articulate the following:

(1) a finding that the prior art contained a "base" device (method, or product) upon which the claimed invention can be seen as an "improvement;"

(2) a finding that the prior art contained a known technique that is applicable to the base device (method, or product);

(3) a finding that one of ordinary skill in the art would have recognized that applying the known technique would have yielded predictable results and resulted in an improved system; and

(4) whatever additional findings based on the *Graham* factual inquiries may be necessary, in view of the facts of the case under consideration, to explain a conclusion of obviousness.

The rationale to support a conclusion that the claim would have been obvious is that a particular known technique was recognized as part of the ordinary capabilities of one skilled in the art. One of ordinary skill in the art would have been capable of applying this known technique to a known device (method, or product) that was ready for improvement and the results would have been predictable to one of ordinary skill in the art. If any of these findings cannot be made, then this rationale cannot be used to support a conclusion that the claim would have been obvious to one of ordinary skill in the art.

**Example 1:**

The claimed invention in *Dann v. Johnston,* 425 U.S. 219, 189 USPQ 257 (1976) was directed towards a system (i.e., computer) for automatic record keeping of bank checks and deposits. In this system, a customer would put a numerical category code on each check or deposit slip. The check processing system would record these on the check in magnetic ink, just as it does for amount and account information. With this system in place, the bank can provide statements to customers that are broken down to give subtotals for each category. The claimed system also allowed the bank to print reports according to a style requested by the customer. As characterized by the Court, "[u]nder respondent's invention, then, a general purpose computer is programmed to provide bank customers with an individualized and categorized breakdown of their transactions during the period in question." *Id.* at 222, 189 USPQ at 259.

BASE SYSTEM - The nature of the use of data processing equipment and computer software in the banking industry was that banks routinely did much of the record-keeping automatically. In routine check processing, the system read any magnetic ink characters identifying the account and routing. The system also read the amount of the check and then printed that value in a designated area of the check. The check was then sent through a further data processing step which used the magnetic ink information to generate the appropriate records for transactions and for posting to the appropriate accounts. These systems included generating periodic statements for each account, such as the monthly statement sent to checking account customers.

IMPROVED SYSTEM - The claimed invention supplemented this system by recording a category code which could be used to track expenditures by category. Again, the category code will be a number recorded on the check (or deposit slip) which will be read, converted into a magnetic ink imprint, and then processed in the data system to include the category code. This enabled reporting of data by category as opposed to only allowing reporting by account number.

KNOWN TECHNIQUE - This is an application of a technique from the prior art – the use of account numbers (generally used to track an individual's total transactions) to solve the problem of how to track categories of expenditures to more finely account for a budget. That is, account numbers (identifying data capable of processing in the automatic data processing system) were used to distinguish between different customers. Furthermore, banks have long segregated debits attributable to service charges within any given separate account and have rendered their customers subtotals for those charges. Previously, one would have needed to set up separate accounts for each category and thus receive separate reports. Supplementing the account information with additional digits (the category codes) solved the problem by effectively creating a single account that can be treated as distinct accounts for tracking and reporting services. That is, the category code merely allowed what might previously have been separate accounts to be handled as a single account, but with a number of sub-accounts indicated in the report.

The basic technique of putting indicia on data to enable standard sorting, searching, and reporting yielded no more than the predictable outcome which one of ordinary skill would have expected to achieve with this common tool of the trade and was therefore an obvious expedient. The Court held that "[t]he gap between the prior art and respondent's system is simply not so great as to render the system nonobvious to one reasonably skilled in the art." *Id.* at 230, 189 USPQ at 261.

**Example 2:**

The fact pattern in *In re Nilssen,* 851 F.2d 1401, 7 USPQ2d 1500 (Fed. Cir. 1988) is set forth above in Example 1 in subsection C.

The court found "it would have been obvious to one of ordinary skill in the art to use the threshold signal produced in the USSR device to actuate a cutoff switch to render the inverter inoperative as taught by Kammiller." *Id.* at 1403, 7 USPQ2d at 1502. The known technique of using a cutoff switch would have predictably resulted in protecting the inverter circuit. Therefore, it would have been within the skill of the ordinary artisan to use a cutoff switch in response to the actuation signal to protect the inverter.

**Example 3:**

The claimed invention in *In re Urbanski,* 809 F.3d 1237, 1244, 117 USPQ2d 1499, 1504 (Fed. Cir. 2016) was directed to a method of enzymatic hydrolysis of soy fiber to reduce water holding capacity, requiring reacting the soy fiber and enzyme in water for about 60-120 minutes. The claims were rejected over two references, wherein the primary reference, Gross, taught using a reaction time of 5 to 72 hours and the secondary reference, Wong, taught using a reaction time of 100 to 240 minutes, preferably 120 minutes. The applicant argued that modifying the primary reference in the manner suggested by the secondary reference would forego the benefits taught by the primary reference, thereby teaching away from the combination. The court found there was sufficient motivation to combine because both references recognized reaction time and degree of hydrolysis as result-effective variables, which can be varied to have a predictable effect on the final product; and the primary reference does not contain an express teaching away from the proposed modification. "Substantial evidence thus supports the Board's finding that a person of ordinary skill would have been motivated to modify the Gross process by using a shorter reaction time, in order to obtain the favorable properties disclosed in Wong."

*E.* *"Obvious To Try" – Choosing From a Finite Number of Identified, Predictable Solutions, With a Reasonable Expectation of Success*

To reject a claim based on this rationale, Office personnel must resolve the *Graham* factual inquiries. Then, Office personnel must articulate the following:

(1)  a finding that at the time of the invention, there had been a recognized problem or need in the art, which may include a design need or market pressure to solve a problem;

(2)  a finding that there had been a finite number of identified, predictable potential solutions to the recognized need or problem;

(3)  a finding that one of ordinary skill in the art could have pursued the known potential solutions with a reasonable expectation of success; and

(4)  whatever additional findings based on the *Graham* factual inquiries may be necessary, in view of the facts of the case under consideration, to explain a conclusion of obviousness.

The rationale to support a conclusion that the claim would have been obvious is that "a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to the anticipated success, it is likely that product [was] not of innovation but of ordinary skill and common sense. In that instance the fact that a combination was obvious to try might show that it was obvious under § 103." *KSR,* 550 U.S. at 421, 82 USPQ2d at 1397. If any of these findings cannot be made, then this rationale cannot be used to support a conclusion that the claim would have been obvious to one of ordinary skill in the art.

The question of whether a claimed invention can be shown to be obvious based on an "obvious to try" line of reasoning has been explored extensively by the Federal Circuit in several cases since the *KSR* decision. The case law in this area is developing quickly in the chemical arts, although the rationale has been applied in other art areas as well.

Some commentators on the *KSR* decision have expressed a concern that because inventive activities are always carried out in the context of what has come before and not in a vacuum, few inventions will survive scrutiny under an obvious to try standard. The cases decided since KSR have proved this fear to have been unfounded. Courts appear to be applying the KSR requirement for "a finite number of identified predictable solutions" in a manner that places particular emphasis on predictability and the reasonable expectations of those of ordinary skill in the art.

The Federal Circuit pointed out the challenging nature of the task faced by the courts – and likewise by Office personnel – when considering the viability of an obvious to try argument: "The evaluation of the choices made by a skilled scientist, when such choices lead to the desired result, is a challenge to judicial understanding of how technical advance is achieved in the particular field of science or technology." *Abbott Labs. v. Sandoz, Inc.,* 544 F.3d 1341, 1352, 89 USPQ2d 1161, 1171 (Fed. Cir. 2008). The Federal Circuit cautioned that an obviousness inquiry based on an obvious to try rationale must always be undertaken in the context of the subject matter in question, "including the characteristics of the science or technology, its state of advance, the nature of the known choices, the specificity or generality of the prior art, and the predictability of results in the area of interest." *Id.*

**Example 1:**

The claimed invention in *Pfizer, Inc. v. Apotex, Inc.,* 480 F.3d 1348, 82 USPQ2d 1321 (Fed. Cir. 2007), was directed to the amlodipine besylate drug product, which was sold in tablet form in the United States under the trademark Norvasc®. Amlodipine and the use of besylate anions were both known at the time of the invention. Amlodipine was known to have the same therapeutic properties as were being claimed for the amlodipine besylate, but Pfizer discovered that the besylate form had better manufacturing properties (e.g., reduced "stickiness").

Pfizer argued that the results of forming amlodipine besylate would have been unpredictable and therefore nonobvious. The court rejected the notion that unpredictability could be equated with nonobviousness here, because there were only a finite number (53) of *pharmaceutically acceptable* salts to be tested for improved properties.

The court found that one of ordinary skill in the art having problems with the machinability of amlodipine would have looked to forming a salt of the compound and would have been able to narrow the group of potential salt-formers to a group of 53 anions known to form pharmaceutically acceptable salts, which would be an acceptable number to form "a reasonable expectation of success."

**Example 2:**

The claimed invention in *Alza Corp. v. Mylan Labs., Inc.,* 464 F.3d 1286, 80 USPQ2d 1001 (Fed. Cir. 2006) was drawn to sustained-release formulations of the drug oxybutynin in which the drug is released at a specified rate over a 24-hour period. Oxybutynin was known to be highly water-soluble, and the specification had pointed out that development of sustained-release formulations of such drugs presented particular problems.

A prior art patent to Morella had taught sustained-release compositions of highly water-soluble drugs, as exemplified by a sustained-release formulation of morphine. Morella had also identified oxybutynin as belonging to the class of highly water-soluble drugs. The Baichwal prior art patent had taught a sustained-release formulation of oxybutynin that had a different release rate than the claimed invention. Finally, the Wong prior art patent had taught a generally applicable method for delivery of drugs over a 24-hour period. Although Wong mentioned applicability of the disclosed method to several categories of drugs to which oxybutynin belonged, Wong did not specifically mention its applicability to oxybutynin.

The court found that because the absorption properties of oxybutynin would have been reasonably predictable at the time of the invention, there would have been a reasonable expectation of successful development of a sustained-release formulation of oxybutynin as claimed. The prior art, as evidenced by the specification, had recognized the obstacles to be overcome in development of sustained-release formulations of highly water-soluble drugs, and had suggested a finite number of ways to overcome these obstacles. The claims were obvious because it would have been obvious to try the known methods for formulating sustained-release compositions, with a reasonable expectation of success. The court was not swayed by arguments of a lack of absolute predictability.

**Example 3:**

The Federal Circuit's decision in *In re Kubin,* 561 F.3d 1351, 90 USPQ2d 1417 (Fed. Cir. 2009), affirmed the Office's determination in *Ex parte Kubin,* 83 USPQ2d 1410 (Bd. Pat. App. & Int. 2007) that the claims in question, directed to an isolated nucleic acid molecule, would have been obvious over the prior art applied. The claim stated that the nucleic acid encoded a particular polypeptide. The encoded polypeptide was identified in the claim by its partially specified sequence, and by its ability to bind to a specified protein.

A prior art patent to Valiante taught the polypeptide encoded by the claimed nucleic acid, but did not disclose either the sequence of the polypeptide, or the claimed isolated nucleic acid molecule. However, Valiante did disclose that by employing conventional methods such as those disclosed by a prior art laboratory manual by Sambrook, the sequence of the polypeptide could be determined, and the nucleic acid molecule could be isolated. In view of Valiante's disclosure of the polypeptide, and of routine prior art methods for sequencing the polypeptide and isolating the nucleic acid molecule, the Board found that a person of ordinary skill in the art would have had a reasonable expectation that a nucleic acid molecule within the claimed scope could have been successfully obtained.

Relying on *In re Deuel,* 51 F.3d 1552, 34 USPQ2d 1210 (Fed. Cir. 1995), appellant argued that it was improper for the Office to use the polypeptide of the Valiante patent together with the methods described in Sambrook to reject a claim drawn to a specific nucleic acid molecule without providing a reference showing or suggesting a structurally similar nucleic acid molecule. Citing *KSR,* the Board stated that "when there is motivation to solve a problem and there are a finite number of

identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp. If this leads to anticipated success, it is likely the product not of innovation but of ordinary skill and common sense." The Board noted that the problem facing those in the art was to isolate a specific nucleic acid, and there were a limited number of methods available to do so. The Board concluded that the skilled artisan would have had reason to try these methods with the reasonable expectation that at least one would be successful. Thus, isolating the specific nucleic acid molecule claimed was "the product not of innovation but of ordinary skill and common sense."

The Board's reasoning was substantially adopted by the Federal Circuit. However, it is important to note that in the *Kubin* decision, the Federal Circuit held that "the Supreme Court in *KSR* unambiguously discredited" the Federal Circuit's decision in *Deuel,* insofar as it "implies the obviousness inquiry cannot consider that the combination of the claim's constituent elements was 'obvious to try.'" *Kubin,* 561 F.3d at 1358, 90 USPQ2d at 1422. Instead, *Kubin* stated that *KSR* "resurrects" the Federal Circuit's own wisdom in *O'Farrell,* in which "to differentiate between proper and improper applications of 'obvious to try,'" the Federal Circuit "outlined two classes of situations where 'obvious to try' is erroneously equated with obviousness under [§ 103](#)." *Kubin,* 561 F.3d at 1359, 90 USPQ2d at 1423. These two classes of situations are: (1) when what would have been "obvious to try" would have been to vary all parameters or try each of numerous possible choices until one possibly arrived at a successful result, where the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful; and (2) when what was "obvious to try" was to explore a new technology or general approach that seemed to be a promising field of experimentation, where the prior art gave only general guidance as to the particular form of the claimed invention or how to achieve it. *Id.* (citing *In re O'Farrell,* 853 F.2d 894, 903, 7 USPQ2d 1673, 1681 (Fed. Cir.)).

**Example 4:**

*Takeda Chem. Indus., Ltd. v. Alphapharm Pty., Ltd.,* 492 F.3d 1350, 83 USPQ2d 1169 (Fed. Cir. 2007), is an example of a chemical case in which the Federal Circuit found that the claimed invention was not obvious. The claimed compound was pioglitazone, a member of a class of drugs known as thiazolidinediones (TZDs) marketed by Takeda as a treatment for Type 2 diabetes. The *Takeda* case brings together the concept of a "lead compound" and the obvious-to-try argument.

Alphapharm had filed an Abbreviated New Drug Application with the Food and Drug Administration, which was a technical act of infringement of Takeda's patent. When Takeda brought suit, Alphapharm's defense was that Takeda's patent was invalid due to obviousness. Alphapharm argued that a two-step modification – involving homologation and ring-walking – of a known compound identified as "compound b" would have produced pioglitazone, and that it was therefore obvious.

The district court found that there would have been no reason to select compound b as a lead compound. There were a large

number of similar prior art TZD compounds; fifty-four were specifically identified in Takeda's prior patent, and the district court observed that "hundreds of millions" were more generally disclosed. Although the parties agreed that compound b represented the closest prior art, one reference taught certain disadvantageous properties associated with compound b, which according to the district court would have taught the skilled artisan not to select that compound as a lead compound. The district court found no *prima facie* case of obviousness, and stated that even if a *prima facie* case had been established, it would have been overcome in this case in view of the unexpected lack of toxicity of pioglitazone.

The Federal Circuit affirmed the decision of the district court, citing the need for a reason to modify a prior art compound. The Federal Circuit quoted *KSR,* stating:

> The *KSR* Court recognized that "[w]hen there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions, a person of ordinary skill has good reason to pursue the known options within his or her technical grasp." *KSR,* 550 U.S. at 421, 82 USPQ2d at 1397. In such circumstances, "the fact that a combination was obvious to try might show that it was obvious under § 103." *Id.* That is not the case here. Rather than identify predictable solutions for antidiabetic treatment, the prior art disclosed a broad selection of compounds any one of which could have been selected as a lead compound for further investigation. Significantly, the closest prior art compound (compound b, the 6-methyl) exhibited negative properties that would have directed one of ordinary skill in the art away from that compound. Thus, this case fails to present the type of situation contemplated by the Court when it stated that an invention may be deemed obvious if it was "obvious to try." The evidence showed that it was not obvious to try.

*Takeda,* 492 F.3d at 1359, 83 USPQ2d at 1176.

Accordingly, Office personnel should recognize that the obvious to try rationale does not apply when the appropriate factual findings cannot be made. In *Takeda,* there was a recognized need for treatment of diabetes. However, there was no finite number of identified, predictable solutions to the recognized need, and no reasonable expectation of success. There were numerous known TZD compounds, and although one clearly represented the closest prior art, its known disadvantages rendered it unsuitable as a starting point for further research, and taught the skilled artisan away from its use. Furthermore, even if there had been reason to select compound b, there had been no reasonable expectation of success associated with the particular modifications necessary to transform compound b into the claimed compound pioglitazone. Thus, an obviousness rejection based on an obvious to try rationale was not appropriate in this situation.

**Example 5:**

The case of *Ortho-McNeil Pharm., Inc. v. Mylan Labs, Inc.,* 520 F.3d 1358, 86 USPQ2d 1196 (Fed. Cir. 2008), provides another example in which a chemical compound was determined not to be obvious. The claimed subject matter was topiramate, which is used as an anti-convulsant.

In the course of working toward a new anti-diabetic drug, Ortho-McNeil's scientist had unexpectedly discovered that a reaction intermediate had anti-convulsant properties. Mylan's defense of invalidity due to obviousness rested on an obvious to try argument. However, Mylan did not explain why it would have been obvious to begin with an anti-diabetic drug precursor, especially the specific one that led to topiramate, if one had been seeking an anti-convulsant drug. The district court ruled on summary judgment that Ortho-McNeil's patent was not invalid for obviousness.

The Federal Circuit affirmed. The Federal Circuit pointed out that there was no apparent reason a person of ordinary skill would have chosen the particular starting compound or the particular synthetic pathway that led to topiramate as an intermediate. Furthermore, there would have been no reason to test that intermediate for anticonvulsant properties if treating diabetes had been the goal. The Federal Circuit recognized an element of serendipity in this case, which runs counter to the requirement for predictability. Summarizing their conclusion with regard to Mylan's obvious to try argument, the Federal Circuit stated:

> [T]his invention, contrary to Mylan's characterization, does not present a finite (and small in the context of the art) number of options easily traversed to show obviousness. . . . *KSR* posits a situation with a finite, and in the context of the art, small or easily traversed, number of options that would convince an ordinarily skilled artisan of obviousness. . . . [T]his clearly is not the easily traversed, small and finite number of alternatives that *KSR* suggested might support an inference of obviousness. *Id.* at 1364, 86 USPQ2d at 1201.

Thus, *Ortho-McNeil* helps to clarify the Supreme Court's requirement in KSR for "a finite number" of predictable solutions when an obvious to try rationale is applied: under the Federal Circuit's case law "finite" means "small or easily traversed" in the context of the art in question. As taught in *Abbott,* discussed above, it is essential that the inquiry be placed in the context of the subject matter at issue, and each case must be decided on its own facts.

**Example 6:**

In *Bayer Schering Pharma A.G. v. Barr Labs., Inc.,* 575 F.3d 1341, 91 USPQ2d 1569 (Fed. Cir. 2009), the claimed invention was an oral contraceptive containing micronized drospirenone marketed as Yasmin®. The prior art compound drospirenone was known to be a poorly water-soluble, acid-sensitive compound with contraceptive effects. It was also known in the

art that micronization improves the solubility of poorly water soluble drugs.

Based on the known acid sensitivity, Bayer had studied how effectively an enteric-coated drospirenone tablet delivered a formulation as compared to an intravenous injection of the same formulation to measure the "absolute bioavailability" of the drug. Bayer added an unprotected (normal) drospirenone tablet and compared its bioavailability to that of the enteric-coated formulation and the intravenous delivery. Bayer expected to find that the enteric-coated tablet would produce a lower bioavailability than an intravenous injection, while the normal pill would produce an even lower bioavailability than the enteric-coated tablet. However, they found that despite observations that drospirenone would quickly isomerize in a highly acidic environment (supporting the belief that an enteric coating would be necessary to preserve bioavailability), the normal pill and the enteric-coated pill resulted in the same bioavailability. Following this study, Bayer developed micronized drospirenone in a normal pill, the basis for the disputed patent.

The district court found that a person having ordinary skill in the art would have considered the prior art result that a structurally related compound, spironenone, though acid-sensitive, would nevertheless absorb *in vivo*, would have suggested the same result for drospirenone. It also found that while another reference taught that drospirenone isomerizes *in vitro* when exposed to acid simulating the human stomach, a person of ordinary skill would have been aware of the study's shortcomings, and would have verified the findings as suggested by a treatise on the science of dosage form design, which would have then showed that no enteric coating was necessary.

The Federal Circuit held that the patent was invalid because the claimed formulation was obvious. The Federal Circuit reasoned that the prior art would have funneled the formulator toward two options. Thus, the formulator would not have been required to try all possibilities in a field unreduced by the prior art. The prior art was not vague in pointing toward a general approach or area of exploration, but rather guided the formulator precisely to the use of either a normal pill or an enteric-coated pill.

It is important for Office personnel to recognize that the mere existence of a large number of options does not in and of itself lead to a conclusion of nonobviousness. Where the prior art teachings lead one of ordinary skill in the art to a narrower set of options, then that reduced set is the appropriate one to consider when determining obviousness using an obvious to try rationale.

**Example 7:**

The case of *Sanofi-Synthelabo v. Apotex, Inc.,* 550 F.3d 1075, 89 USPQ2d 1370 (Fed. Cir. 2008), also sheds light on the obvious to try line of reasoning. The claimed compound was clopidogrel, which is the dextrorotatory isomer of methyl alpha-5(4,5,6,7-tetrahydro(3,2-c)thienopyridyl)(2-chlorophenyl)-acetate. Clopidogrel is an anti-thrombotic compound used to treat or prevent heart attack or stroke. The racemate, or mixture of

dextrorotatory and levorotatory (D- and L-) isomers of the compound, was known in the prior art. The two forms had not previously been separated, and although the mixture was known to have anti-thrombotic properties, the extent to which each of the individual isomers contributed to the observed properties of the racemate was not known and was not predictable.

The district court assumed that in the absence of any additional information, the D-isomer would have been *prima facie* obvious over the known racemate. However, in view of the evidence of unpredicted therapeutic advantages of the D-isomer presented in the case, the district court found that any *prima facie* case of obviousness had been overcome. At trial, the experts for both parties testified that persons of ordinary skill in the art could not have predicted the degree to which the isomers would have exhibited different levels of therapeutic activity and toxicity. Both parties' experts also agreed that the isomer with greater therapeutic activity would most likely have had greater toxicity. Sanofi witnesses testified that Sanofi's own researchers had believed that the separation of the isomers was unlikely to have been productive, and experts for both parties agreed that it was difficult to separate isomers at the time of the invention. Nevertheless, when Sanofi ultimately undertook the task of separating the isomers, it found that they had the "rare characteristic of 'absolute stereoselectivity,'" whereby the D-isomer provided all of the favorable therapeutic activity but no significant toxicity, while the L-isomer produced no therapeutic activity but virtually all of the toxicity. Based on this record, the district court concluded that Apotex had not met its burden of proving by clear and convincing evidence that Sanofi's patent was invalid for obviousness. The Federal Circuit affirmed the district court's conclusion.

Office personnel should recognize that even when only a small number of possible choices exist, the obvious to try line of reasoning is not appropriate when, upon consideration of all of the evidence, the outcome would not have been reasonably predictable and the inventor would not have had a reasonable expectation of success. In *Bayer,* there were art-based reasons to expect that both the normal pill and the enteric-coated pill would be therapeutically suitable, even though not all prior art studies were in complete agreement. Thus, the result obtained was not unexpected. In *Sanofi,* on the other hand, there was strong evidence that persons of ordinary skill in the art, prior to the separation of the isomers, would have had no reason to expect that the D-isomer would have such strong therapeutic advantages as compared with the L-isomer. In other words, the result in *Sanofi* was unexpected.

**Example 8:**

In *Rolls-Royce, PLC v. United Tech. Corp.,* 603 F.3d 1325, 95 USPQ2d 1097 (Fed. Cir. 2010), the Federal Circuit addressed the obvious to try rationale in the context of a fan blade for jet engines. The case had arisen out of an interference proceeding. Finding that the district court had correctly determined that there was no interference-in-fact because Rolls-Royce's claims would not have been obvious in light of United's application, the Federal Circuit affirmed.

The Federal Circuit described the fan blade of the count as follows:

> Each fan blade has three regions – an inner, an intermediate, and an outer region. The area closest to the axis of rotation at the hub is the inner region. The area farthest from the center of the engine and closest to the casing surrounding the engine is the outer region. The intermediate region falls in between. The count defines a fan blade with a swept-forward inner region, a swept-rearward intermediate region, and forward-leaning outer region.

*Id.* at 1328, 95 USPQ2d at 1099.

United had argued that it would have been obvious for a person of ordinary skill in the art to try a fan blade design in which the sweep angle in the outer region was reversed as compared with prior art fan blades from rearward to forward sweep, in order to reduce endwall shock. The Federal Circuit disagreed with United's assessment that the claimed fan blade would have been obvious based on an obvious to try rationale. The Federal Circuit pointed out that in a proper obvious to try approach to obviousness, the possible options for solving a problem must have been "known and finite." *Id.* at 1339, 95 USPQ2d at 1107 (citing *Abbott,* 544 F.3d at 1351, 89 USPQ2d at 1171). In this case, nothing in the prior art would have suggested that changing the sweep angle as Rolls-Royce had done would have addressed the issue of endwall shock. Thus, the Federal Circuit concluded that changing the sweep angle "would not have presented itself as an option at all, let alone an option that would have been obvious to try." *Id.* The decision in *Rolls-Royce* is a reminder to Office personnel that the obvious to try rationale can properly be used to support a conclusion of obviousness only when the claimed solution would have been selected from a finite number of potential solutions known to persons of ordinary skill in the art.

**Example 9:**

The case of *Perfect Web Tech., Inc. v. InfoUSA, Inc.,* 587 F.3d 1324, 1328-29, 92 USPQ2d 1849, 1854 (Fed. Cir. 2009), provides an example in which the Federal Circuit held that a claimed method for managing bulk email distribution was obvious on the basis of an obvious to try argument. In *Perfect Web,* the method required selecting the intended recipients, transmitting the emails, determining how many of the emails had been successfully received, and repeating the first three steps if a pre-determined minimum number of intended recipients had not received the email.

The Federal Circuit affirmed the district court's determination on summary judgment that the claimed invention would have been obvious. Failure to meet a desired quota of email recipients was a recognized problem in the field of email marketing. The prior art had also recognized three potential solutions: increasing the size of the initial recipient list; resending emails to recipients who did not receive them on the first attempt; and selecting a new recipient list and sending emails to them. The last option corresponded to the fourth step of the invention as claimed.

The Federal Circuit noted that based on "simple logic," selecting a new list of recipients was more likely to result in the desired outcome than resending to those who had not received the email on the first attempt. There had been no evidence of any unexpected result associated with selecting a new recipient list, and no evidence that the method would not have had a reasonable likelihood of success. Thus, the Federal Circuit concluded that, as required by KSR, there were a "finite number of identified, predictable solutions," and that the obvious to try inquiry properly led to the legal conclusion of obviousness.

The Federal Circuit in *Perfect Web* also discussed the role of common sense in the determination of obviousness. The district court had cited *KSR* for the proposition that "[a] person of ordinary skill is also a person of ordinary creativity, not an automaton," and found that "the final step [of the claimed invention] is merely the logical result of common sense application of the maxim 'try, try again.'" In affirming the district court, the Federal Circuit undertook an extended discussion of common sense as it has been applied to the obviousness inquiry, both before and since the *KSR* decision.

The Federal Circuit pointed out that application of common sense is not really an innovation in the law of obviousness when it stated, "Common sense has long been recognized to inform the analysis of obviousness if explained with sufficient reasoning." *Perfect Web,* 587 F.3d at 1328, 92 USPQ2d at 1853 (emphasis added). The Federal Circuit then provided a review of a number of precedential cases that inform the understanding of common sense, including *In re Bozek,* 416 F.2d 1385, 1390, 163 USPQ 545, 549 (CCPA 1969) (explaining that a patent examiner may rely on "common knowledge and common sense of the person of ordinary skill in the art without any specific hint or suggestion in a particular reference") and *In re Zurko,* 258 F.3d 1379, 1383, 1385, 59 USPQ2d 1693 at 1695, 1697 (Fed. Cir. 2001) (clarifying that a factual foundation is needed in order for an examiner to invoke "good common sense" in a case in which "basic knowledge and common sense was not based on any evidence in the record"). The Federal Circuit implicitly acknowledged in *Perfect Web* that the kind of strict evidence-based teaching, suggestion, or motivation required in *In re Lee,* 277 F.3d 1338, 1344, 61 USPQ2d 1430, 1434 (Fed. Cir. 2002), is not an absolute requirement for an obviousness rejection in light of the teachings of *KSR.* The Federal Circuit explained that "[a]t the time [of the Lee decision], we required the PTO to identify record evidence of a teaching, suggestion, or motivation to combine references." However, *Perfect Web* went on to state that even under *Lee,* common sense could properly be applied when analyzing evidence relevant to obviousness. Citing *DyStar Textilfarben GmbH v. C.H. Patrick Co.,* 464 F.3d 1356, 80 USPQ2d 1641 (Fed. Cir. 2006), and *In re Kahn,* 441 F.3d 977, 78 USPQ2d 1329 (Fed. Cir. 2006), two cases decided shortly before the Supreme Court's decision in *KSR,* the Federal Circuit noted that although "a reasoned explanation that avoids conclusory generalizations" is required to use common sense, identification of a "specific hint or suggestion in a particular reference" is not. See also Arendi v. Apple, 832 F.3d 1355, 119 USPQ2d 1822 (Fed. Cir. 2016) (finding that the Board had not provided a reasoned analysis, supported by the evidence of record, for why "common sense" taught the missing process step).

*F.  Known Work in One Field of Endeavor May Prompt Variations of It for Use in Either the Same Field or a Different One Based on Design Incentives or Other Market Forces if the Variations Are Predictable to One of Ordinary Skill in the Art*

To reject a claim based on this rationale, Office personnel must resolve the *Graham* factual inquiries. Then, Office personnel must articulate the following:

(1)  a finding that the scope and content of the prior art, whether in the same field of endeavor as that of the applicant's invention or a different field of endeavor, included a similar or analogous device (method, or product);

(2)  a finding that there were design incentives or market forces which would have prompted adaptation of the known device (method, or product);

(3)  a finding that the differences between the claimed invention and the prior art were encompassed in known variations or in a principle known in the prior art;

(4)  a finding that one of ordinary skill in the art, in view of the identified design incentives or other market forces, could have implemented the claimed variation of the prior art, and the claimed variation would have been predictable to one of ordinary skill in the art; and

(5)  whatever additional findings based on the *Graham* factual inquiries may be necessary, in view of the facts of the case under consideration, to explain a conclusion of obviousness.

The rationale to support a conclusion that the claimed invention would have been obvious is that design incentives or other market forces could have prompted one of ordinary skill in the art to vary the prior art in a predictable manner to result in the claimed invention. If any of these findings cannot be made, then this rationale cannot be used to support a conclusion that the claim would have been obvious to one of ordinary skill in the art.

**Example 1:**

The fact pattern in *Dann v. Johnston,* 425 U.S. 219, 189 USPQ 257 (1976) is set forth above in Example 1 in subsection D.

The Court found that the problem addressed by applicant – the need to give more detailed breakdown by a category of transactions – was closely analogous to the task of keeping track of the transaction files of individual business units. *Id.* at 229, 189 USPQ at 261. Thus, an artisan in the data processing area would have recognized the similar class of problem and the known solutions of the prior art and it would have been well within the ordinary skill level to implement the system in the different environment. The Court held that "[t]he gap between the prior art and respondent's system is simply not so great as to render the system nonobvious to one reasonably skilled in the art." *Id.* at 230, 189 USPQ at 261.

**Example 2:**

The claimed invention in *Leapfrog Enterprises, Inc. v. Fisher-Price, Inc.,* 485 F.3d 1157, 82 USPQ2d 1687 (Fed. Cir. 2007) was directed to a learning device to help young children read phonetically. The claim read as follows:

An interactive learning device, comprising:

a housing including a plurality of switches;

a sound production device in communication with the switches and including a processor and a memory;

at least one depiction of a sequence of letters, each letter being associable with a switch; and

a reader configured to communicate the identity of the depiction to the processor,

wherein selection of a depicted letter activates an associated switch to communicate with the processor, causing the sound production device to generate a signal corresponding to a sound associated with the selected letter, the sound being determined by a position of the letter in the sequence of letter.

The court concluded that the claimed invention would have been obvious in view of the combination of two pieces of prior art, (1) Bevan (which showed an electro-mechanical toy for phonetic learning), (2) the Super Speak & Read device (SSR) (an electronic reading toy), and the knowledge of one of ordinary skill in the art.

The court made clear that there was no technological advance beyond the skill shown in the SSR device. The court stated that "one of ordinary skill in the art of children's learning toys would have found it obvious to combine the Bevan device with the SSR to update it using modern electronic components in order to gain the commonly understood benefits of such adaptation, such as decreased size, increased reliability, simplified operation, and reduced cost. While the SSR only permits generation of a sound corresponding to the first letter of a word, it does so using electronic means. The combination is thus the adaptation of an old idea or invention (Bevan) using newer technology that is commonly available and understood in the art (the SSR)."

The court found that the claimed invention was but a variation on already known children's toys. This variation presented no

nonobvious advance over other toys. The court made clear that there was no technological advance beyond the skill shown in the SSR device. The court found that "[a]ccomodating a prior art mechanical device that accomplishes that goal to modern electronics would have been reasonably obvious to one of ordinary skill in designing children's learning devices. Applying modern electronics to older mechanical devices has been commonplace in recent years."

**Example 3:**

The claimed invention in *KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 398, 82 USPQ2d 1385 (2007), was an adjustable pedal assembly with a fixed pivot point and an electronic pedal-position sensor attached to the assembly support. The fixed pivot point meant that the pivot was not changed as the pedal was adjusted. The placement of the sensor on the assembly support kept the sensor fixed while the pedal was adjusted.

Conventional gas pedals operated by a mechanical link which adjusted the throttle based on the travel of the pedal from a set position. The throttle controlled the combustion process and the available power generated by the engine. Newer cars used computer controlled throttles in which a sensor detected the motion of the pedal and sent signals to the engine to adjust the throttle accordingly. At the time of the invention, the marketplace provided a strong incentive to convert mechanical pedals to electronic pedals, and the prior art taught a number of methods for doing so. The prior art (Asano) taught an adjustable pedal with a fixed pivot point with mechanical throttle control. The prior art ('936 patent to Byler) taught an electronic pedal sensor which was placed on a pivot point in the pedal assembly and that it was preferable to detect the pedal's position in the pedal mechanism rather than in the engine. The prior art (Smith) taught that to prevent the wires connecting the sensor to the computer from chafing and wearing out, the sensor should be put on a fixed part of the pedal assembly rather than in or on the pedal's footpad. The prior art (Rixon) taught an adjustable pedal assembly (sensor in the footpad) with an electronic sensor for throttle control. There was no prior art electronic throttle control that was combined with a pedal assembly which kept the pivot point fixed when adjusting the pedal.

The Court stated that "[t]he proper question to have asked was whether a pedal designer of ordinary skill, facing the wide range of needs created by developments in the field of endeavor, would have seen a benefit to upgrading Asano with a sensor." *Id.* at 424, 82 USPQ2d at 1399. The Court found that technological developments in the automotive design would have prompted a designer to upgrade Asano with an electronic sensor. The next question was where to attach the sensor. Based on the prior art, a designer would have known to place the sensor on a nonmoving part of the pedal structure and the most obvious nonmoving point on the structure from which a sensor can easily detect the pedal's position was a pivot point. The Court concluded that it would have been obvious to upgrade Asano's fixed pivot point adjustable pedal by replacing the mechanical assembly for throttle control with an electronic throttle control and to mount the electronic sensor on the pedal support structure.

**Example 4:**

The claimed invention in *Ex parte Catan,* 83 USPQ2d 1568 (Bd. Pat. App. & Int. 2007), was a consumer electronics device using bioauthentication to authorize sub-users of an authorized credit account to place orders over a communication network up to a pre-set maximum sub-credit limit.

The prior art (Nakano) disclosed a consumer electronics device like the claimed invention, except that security was provided by a password authentication device rather than a bioauthentication device. The prior art (Harada) disclosed that the use of a bioauthentication device (fingerprint sensor) on a consumer electronics device (remote control) to provide bioauthentication information (fingerprint) was known in the prior art at the time of the invention. The prior art (Dethloff) also disclosed that it was known in the art at the time of the invention to substitute bioauthentication for PIN authentication to enable a user to access credit via a consumer electronics device.

The Board found that the prior art "shows that one of ordinary skill in the consumer electronic device art at the time of the invention would have been familiar with using bioauthentication information interchangeably with or in lieu of PINs to authenticate users." The Board concluded that one of ordinary skill in the art of consumer electronic devices would have found it obvious to update the prior art password device with the modern bioauthentication component and thereby gain, predictably, the commonly understood benefits of such adaptation, that is, a secure and reliable authentication procedure.

### G. Some Teaching, Suggestion, or Motivation in the Prior Art That Would Have Led One of Ordinary Skill To Modify the Prior Art Reference or To Combine Prior Art Reference Teachings To Arrive at the Claimed Invention

To reject a claim based on this rationale, Office personnel must resolve the *Graham* factual inquiries. Then, Office personnel must articulate the following:

(1)  a finding that there was some teaching, suggestion, or motivation, either in the references themselves or in the knowledge generally available to one of ordinary skill in the art, to modify the reference or to combine reference teachings;

(2)  a finding that there was reasonable expectation of success; and

(3)  whatever additional findings based on the *Graham* factual inquiries may be necessary, in view of the facts of the case under consideration, to explain a conclusion of obviousness.

The rationale to support a conclusion that the claim would have been obvious is that "a person of ordinary skill in the art would have been motivated to combine the prior art to achieve the claimed invention and whether there would have been a reasonable expectation of success in doing so." *DyStar Textilfarben GmbH & Co. Deutschland KG v. C.H. Patrick Co.,* 464 F.3d 1356, 1360, 80 USPQ2d 1641, 1645 (Fed. Cir. 2006). If any of these findings cannot be made, then this rationale cannot be used to support a conclusion that the claim would have been obvious to one of ordinary skill in the art.

The courts have made clear that the teaching, suggestion, or motivation test is flexible and an explicit suggestion to combine the prior art is not necessary. The motivation to combine may be implicit and may be found in the knowledge of one of ordinary skill in the art, or, in some cases, from the nature of the problem to be solved. *Id.* at 1366, 80 USPQ2d at 1649. "[A]n implicit motivation to combine exists not only when a suggestion may be gleaned from the prior art as a whole, but when the 'improvement' is technology-independent and the combination of references results in a product or process that is more desirable, for example because it is stronger, cheaper, cleaner, faster, lighter, smaller, more durable, or more efficient. Because the desire to enhance commercial opportunities by improving a product or process is universal-and even common-sensical-we have held that there exists in these situations a motivation to combine prior art references even absent any hint of suggestion in the references themselves. In such situations, the proper question is whether the ordinary artisan possesses knowledge and skills rendering him *capable* of combining the prior art references." *Id.* at 1368, 80 USPQ2d at 1651.

## 2143.01 Suggestion or Motivation To Modify the References [R-08.2017]

Obviousness can be established by combining or modifying the teachings of the prior art to produce the claimed invention where there is some teaching, suggestion, or motivation to do so. *In re Kahn,* 441 F.3d 977, 986, 78 USPQ2d 1329, 1335 (Fed. Cir. 2006) (discussing rationale underlying the motivation-suggestion-teaching test as a guard against using hindsight in an obviousness analysis).

## I.  PRIOR ART SUGGESTION OF THE CLAIMED INVENTION NOT NECESSARILY NEGATED BY DESIRABLE ALTERNATIVES

The disclosure of desirable alternatives does not necessarily negate a suggestion for modifying the prior art to arrive at the claimed invention. In *In re Fulton,* 391 F.3d 1195, 73 USPQ2d 1141 (Fed. Cir. 2004), the claims of a utility patent application were directed to a shoe sole with increased traction having hexagonal projections in a "facing orientation." 391 F.3d at 1196-97, 73 USPQ2d at 1142. The Board combined a design patent having hexagonal projections in a facing orientation with a utility patent having other limitations of the independent claim. 391 F.3d at 1199, 73 USPQ2d at 1144. Applicant argued that the combination was improper because (1) the prior art did not suggest having the hexagonal projections in a facing (as opposed to a "pointing") orientation was the "most desirable" configuration for the projections, and (2) the prior art "taught away" by showing desirability of the "pointing orientation." 391 F.3d at 1200-01, 73 USPQ2d at 1145-46. The court stated that "the prior art's mere disclosure of more than one alternative does not constitute a teaching away from any of these alternatives because such disclosure does not criticize, discredit, or otherwise discourage the solution claimed…." *Id.* In affirming the Board's obviousness rejection, the court held that the prior art as a whole suggested the desirability of the combination of shoe sole limitations claimed, thus providing a motivation to combine, which need not be supported by a finding that the prior art suggested that the combination claimed by the applicant was the preferred, or most desirable combination over the other alternatives. *Id.* See also *In re Urbanski,* 809 F.3d 1237, 1244, 117 USPQ2d 1499, 1504 (Fed. Cir. 2016).

In *Ruiz v. A.B. Chance Co.,* 357 F.3d 1270, 69 USPQ2d 1686 (Fed. Cir. 2004), the patent claimed underpinning a slumping building foundation using a screw anchor attached to the foundation by a metal bracket. One prior art reference taught a screw anchor with a concrete bracket, and a second prior art reference disclosed a pier anchor with a metal bracket. The court found motivation to combine the references to arrive at the claimed invention in the "nature of the problem to

be solved" because each reference was directed "to precisely the same problem of underpinning slumping foundations." *Id.* at 1276, 69 USPQ2d at 1690. The court also *rejected* the notion that "an express written motivation to combine must appear in prior art references…." *Id.* at 1276, 69 USPQ2d at 1690.

## II. WHERE THE TEACHINGS OF THE PRIOR ART CONFLICT, THE EXAMINER MUST WEIGH THE SUGGESTIVE POWER OF EACH REFERENCE

The test for obviousness is what the combined teachings of the references would have suggested to one of ordinary skill in the art, and all teachings in the prior art must be considered to the extent that they are in analogous arts. Where the teachings of two or more prior art references conflict, the examiner must weigh the power of each reference to suggest solutions to one of ordinary skill in the art, considering the degree to which one reference might accurately discredit another. *In re Young,* 927 F.2d 588, 18 USPQ2d 1089 (Fed. Cir. 1991) (Prior art patent to Carlisle disclosed controlling and minimizing bubble oscillation for chemical explosives used in marine seismic exploration by spacing seismic sources close enough to allow the bubbles to intersect before reaching their maximum radius so the secondary pressure pulse was reduced. An article published several years later by Knudsen opined that the Carlisle technique does not yield appreciable improvement in bubble oscillation suppression. However, the article did not test the Carlisle technique under comparable conditions because Knudsen did not use Carlisle's spacing or seismic source. Furthermore, where the Knudsen model most closely approximated the patent technique there was a 30% reduction of the secondary pressure pulse. On these facts, the court found that the Knudsen article would not have deterred one of ordinary skill in the art from using the Carlisle patent teachings.).

## III. FACT THAT REFERENCES CAN BE COMBINED OR MODIFIED MAY NOT BE SUFFICIENT TO ESTABLISH *PRIMA FACIE* OBVIOUSNESS

The mere fact that references <u>can</u> be combined or modified does not render the resultant combination

obvious unless the results would have been predictable to one of ordinary skill in the art. *KSR Int'l Co. v. Teleflex Inc.,* 550 U.S. 538, 417, 82 USPQ2d 1385, 1396 (2007) ("If a person of ordinary skill can implement a predictable variation, <u>§ 103</u> likely bars its patentability. For the same reason, if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill.").

## IV. MERE STATEMENT THAT THE CLAIMED INVENTION IS WITHIN THE CAPABILITIES OF ONE OF ORDINARY SKILL IN THE ART IS NOT SUFFICIENT BY ITSELF TO ESTABLISH *PRIMA FACIE* OBVIOUSNESS

A statement that modifications of the prior art to meet the claimed invention would have been "'<u>well within the ordinary skill of the art</u> at the time the claimed invention was made'" because the references relied upon teach that all aspects of the claimed invention were individually known in the art is not sufficient to establish a *prima facie* case of obviousness without some objective reason to combine the teachings of the references. *Ex parte Levengood,* 28 USPQ2d 1300 (Bd. Pat. App. & Inter. 1993). "'[R]ejections on obviousness cannot be sustained by mere conclusory statements; instead, there must be some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness.'" *KSR,* 550 U.S. at 418, 82 USPQ2d at 1396 (quoting *In re Kahn,* 441 F.3d 977, 988, 78 USPQ2d 1329, 1336 (Fed. Cir. 2006)).

## V. THE PROPOSED MODIFICATION CANNOT RENDER THE PRIOR ART UNSATISFACTORY FOR ITS INTENDED PURPOSE

If a proposed modification would render the prior art invention being modified unsatisfactory for its intended purpose, then there is no suggestion or motivation to make the proposed modification. *In re Gordon,* 733 F.2d 900, 221 USPQ 1125 (Fed. Cir. 1984) (Claimed device was a blood filter assembly for use during medical procedures wherein both the inlet and outlet for the blood were located at the bottom end of the filter assembly, and wherein a gas vent was present at the top of the filter assembly. The prior art reference taught a liquid strainer for

removing dirt and water from gasoline and other light oils wherein the inlet and outlet were at the top of the device, and wherein a pet-cock (stopcock) was located at the bottom of the device for periodically removing the collected dirt and water. The reference further taught that the separation is assisted by gravity. The Board concluded the claims were *prima facie* obvious, reasoning that it would have been obvious to turn the reference device upside down. The court reversed, finding that if the prior art device were turned upside down it would be inoperable for its intended purpose because the gasoline to be filtered would be trapped at the top, the water and heavier oils sought to be separated would flow out of the outlet instead of the purified gasoline, and the screen would become clogged.). But see *In re Urbanski,* 809 F.3d 1237, 1244, 117 USPQ2d 1499, 1504 (Fed. Cir. 2016) (The patent claims were directed to a method of enzymatic hydrolysis of soy fiber to reduce water holding capacity, requiring reacting the soy fiber and enzyme in water for about 60-120 minutes. The claims were rejected over two prior art references, wherein the primary reference taught using a longer reaction time of 5 to 72 hours and the secondary taught using a reaction time of 100 to 240 minutes, preferably 120 minutes. The applicant argued that modifying the primary reference in the manner suggested by the secondary reference would forego the benefits taught by the primary reference, thereby teaching away from the combination. The court held that both prior art references "suggest[ed] that hydrolysis time may be adjusted to achieve *different* fiber properties. Nothing in the prior art teaches that the proposed modification would have resulted in an 'inoperable' process or a dietary fiber product with undesirable properties." (emphasis in original).

"Although statements limiting the function or capability of a prior art device require fair consideration, simplicity of the prior art is rarely a characteristic that weighs against obviousness of a more complicated device with added function." *In re Dance,* 160 F.3d 1339, 1344, 48 USPQ2d 1635, 1638 (Fed. Cir. 1998) (Court held that claimed catheter for removing obstruction in blood vessels would have been obvious in view of a first reference which taught all of the claimed elements except for a "means for recovering fluid and debris" in combination with a second reference describing a

catheter including that means. The court agreed that the first reference, which stressed simplicity of structure and taught emulsification of the debris, did not teach away from the addition of a channel for the recovery of the debris.). Similarly, in *Allied Erecting v. Genesis Attachments,* 825 F.3d 1373, 1381, 119 USPQ2d 1132, 1138 (Fed. Cir. 2016), the court stated "[a]lthough modification of the movable blades may impede the quick change functionality disclosed by Caterpillar, '[a] given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine'" (quoting *Medichem, S.A. v. Rolabo, S.L.,* 437 F.3d 1157, 1165, 77 USPQ2d 1865, 1870 (Fed Cir. 2006) (citation omitted)).

## VI. THE PROPOSED MODIFICATION CANNOT CHANGE THE PRINCIPLE OF OPERATION OF A REFERENCE

If the proposed modification or combination of the prior art would change the principle of operation of the prior art invention being modified, then the teachings of the references are not sufficient to render the claims *prima facie* obvious. *In re Ratti,* 270 F.2d 810, 813, 123 USPQ 349, 352 (CCPA 1959) (Claims were directed to an oil seal comprising a bore engaging portion with outwardly biased resilient spring fingers inserted in a resilient sealing member. The primary reference relied upon in a rejection based on a combination of references disclosed an oil seal wherein the bore engaging portion was reinforced by a cylindrical sheet metal casing. The seal construction taught in the primary reference required rigidity for operation, whereas the seal in the claimed invention required resiliency. The court reversed the rejection holding the "suggested combination of references would require a substantial reconstruction and redesign of the elements shown in [the primary reference] as well as a change in the basic principle under which the [primary reference] construction was designed to operate.").

## 2143.02   Reasonable Expectation of Success Is Required [R-08.2012]

*[Editor Note: This MPEP section is **applicable** to applications subject to the first inventor to file (FITF) provisions of the AIA except that the relevant*