# EXHIBIT 2

```
                    UNITED STATES DISTRICT COURT
                   FOR THE DISTRICT OF MASSACHUSETTS


                                      )
  JANSSEN BIOTECH, INC.,               )
  and NEW YORK UNIVERSITY,             )
                                      )
           Plaintiffs,                 )
                                      )   Civil Action
  v.                                   )   No. 15-CV-10698-MLW
                                      )
  CELLTRION HEALTHCARE CO.,            )
  LTD, CELLTRION, INC., and            )
  HOSPIRA, INC.,                       )
                                      )
           Defendants.                 )
                                      )



              BEFORE THE HONORABLE MARK L. WOLF
                 UNITED STATES DISTRICT JUDGE


                           HEARING
                          10:06 a.m.

                       January 30, 2018



           John J. Moakley United States Courthouse
                       Courtroom No. 10
                      One Courthouse Way
                  Boston, Massachusetts  02210




                 Kelly Mortellite, RMR, CRR
                    Official Court Reporter
           John J. Moakley United States Courthouse
                 One Courthouse Way, Room 5200
                  Boston, Massachusetts  02210
                      mortellite@gmail.com
```

1  Q.  Let me just wrap it up then with the question and answer
2  that Celltrion so likes.
3      You gave the opinion that any concentration of the 52
4  required elements would be an equivalent cell culture media for
5  Claim 1 so long as that cell culture media produced
6  substantially the same results in Dr. Wurm's testing, and your
7  answer was yes.  Is it still yes?
8  A.  Yes, it is.  I mean, I would say that, you know, we talked
9  about a plateau, and there is a plateau for equivalent
10 concentrations in terms of any element in the media.  So any
11 concentration within that plateau would produce the same result
12 that we see from Dr. Wurm's experiments.
13 Q.  So the experimental results prove that Celltrion's
14 concentrations rest on the plateau of interchangeable
15 concentrations?
16 A.  That's what I would conclude, yes.
17 Q.  And if they didn't, if there were substantial differences
18 between the Celltrion concentrations and those claimed in the
19 patent, would the experiments be able to tell that?
20 A.  Yes.  I think the experiments are sufficiently sensitive
21 to show differences.
22 Q.  Okay.  So you rely on the experiments and you also rely on
23 your own analysis?
24 A.  Exactly, yes.
25 Q.  Have you ever eliminated the claim limitations from that

```
 1  A.   It's not sufficient to determine the plateau, but it is
 2  sufficient to determine if those particular concentrations are
 3  within the plateau or whether they fall outside the plateau.
 4  Q.   I want to talk to you about that, but for now I just want
 5  to make sure you and I are on the same page.
 6       Two concentration experiments is not enough to determine
 7  the width of the plateau for any one ingredient in the context
 8  of this particular cell media and this particular cell, true?
 9  A.   Yes, correct.
10  Q.   When we talk about this particular cell media, this is,
11  the length of the plateau can be specific to the kind of media
12  that's in question, right?
13  A.   There is some variation, but the principle is the same.
14  Otherwise -- Dr. Ham published this, remember, so in publishing
15  it, it becomes something which is applicable to many cells in
16  many media formulations.
17  Q.   But here we're talking about a particular media with 91
18  ingredients, right, 90 plus, right?
19  A.   In the Celltrion case, yes, yes.
20  Q.   Yes, that's what I'm talking about.  And a particular kind
21  of cell as well, correct?
22  A.   Yes.
23  Q.   Can we agree that Dr. Wurm did not run the kind of
24  experiments that are necessary to determine the length of the
25  plateau for each of the 12 or 13 ingredients we're here to talk
```

1  about?  Is that true?
2  A.    We can agree on that, but --
3  Q.    Thank you.
4  A.    -- that wasn't the objective of the experiment.
5          MR. HURST:  Can we put up Claim 1 of the '083 patent,
6  please.  I think we need to switch.
7  Q.    So there's 61 ingredients.  There's 52 individual required
8  ingredients, right?
9  A.    Correct.
10 Q.    And we can agree, I believe, that Claim 1 lists precise
11 concentrations for those 52 required ingredients, correct?
12 A.    Concentration ranges, yes.
13 Q.    Right. And Claim 1 indicates that the inventors were
14 defining concentration ranges with precise outer boundaries,
15 correct?
16 A.    Well, when you say "precise outer boundaries," as far as
17 I'm aware they didn't do precise experiments to determine those
18 boundaries.  I mean, they do say in the patent that there are
19 possibilities for variation.
20 Q.    A natural reading of the list of concentrations is that
21 the inventors were specifying precise concentrations when
22 defining the scope of their invention.  Is that true?
23 A.    I mean, they were, as far as I know, and I'm taking some
24 reference to Dr. Epstein, who is one of the inventors, these
25 were meant to be the guidelines for estimation of that plateau

```
 1  that we're talking about from Dr. Ham's work.  So they're not
 2  precise insofar as they don't define the thresholds of that
 3  plateau or the sweet spot.
 4  Q.   Let's take a look at your deposition if we can.  If you go
 5  to page 59, 21 through 68.  You and I spoke before in the
 6  context of a deposition, correct?
 7  A.   We did, yes.
 8  Q.   And during that deposition I asked you the same question
 9  that I just asked you right now.  Do you recall that?
10  A.   I don't recall it.
11  Q.   It will be up on the screen for you.  Page 59, 21 to 68.
12  Let me just blow it up so we can see it.
13            THE COURT:  Is this a page that's in the materials in
14  the briefs?
15            MR. HURST:  It is.
16            THE COURT:  So it's something that was given to me?
17            MR. HURST:  Would you like to see the transcript?
18            THE COURT:  If there's a physical copy --
19            MR. HURST:  Yeah, I can get you one.
20            THE COURT:  -- that I can keep and write on?
21            MR. HURST:  Sure.
22  BY MR. HURST:
23  Q.   Did I ask you --
24            THE COURT:  Hold on a second.  Let me get the
25  transcript.  I think I have it.  It was Exhibit 1 to what?
```

1  Exhibit 1 to defendants' submission.  What page?
2          MR. HURST:  It's page 59, 21 to 68.
3  Q.   So question:  So as you go through this list, a natural
4  reading of the list of concentrations is that the inventors
5  were specifying precise concentrations when defining the scope
6  of their invention, true?
7       Answer:  Well, they defined a range as you've shown.
8       Question:  With precise boundaries, true?
9       Answer:  With precise boundaries.
10      Did you give those answers to those questions, sir?
11 A.   Yes.
12 Q.   So the invention as defined just in the words of the claim
13 is that there are precise outer boundaries in the words of the
14 claims.  Can we agree with that?
15 A.   Yes, there are precise ranges given, yes.
16 Q.   And what the inventors were telling the world is that
17 those concentrations that were specified in Claim 1, they were
18 important, right?  That's what they're saying.
19 A.   Well, you know, my information is that they were
20 guidelines.  I mean, I've now seen the report by Dr. Epstein
21 and a reference in the patent which indicates -- I can't see
22 the exact wording but indicates that these are guidelines.
23 Q.   Let's take a look at your transcript, page 60, 23 through
24 page 61, 4.  Did I ask you this question and did you give this
25 answer:

```
 1                CERTIFICATE OF OFFICIAL REPORTER
 2
 3           I, Kelly Mortellite, Registered Merit Reporter
 4   and Certified Realtime Reporter, in and for the United States
 5   District Court for the District of Massachusetts, do hereby
 6   certify that pursuant to Section 753, Title 28, United States
 7   Code that the foregoing is a true and correct transcript of the
 8   stenographically reported proceedings held in the
 9   above-entitled matter and that the transcript page format is in
10   conformance with the regulations of the Judicial Conference of
11   the United States.
12                     Dated this 16th day of January, 2018.
13
14                     /s/ Kelly Mortellite
15                     _____
16                     Kelly Mortellite, RMR, CRR
17                     Official Court Reporter
18
19
20
21
22
23
24
25
```