# EXHIBIT 1

```
                      UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF MASSACHUSETTS


                                         )
    JANSSEN BIOTECH, INC.,                )
    and NEW YORK UNIVERSITY,              )
                                         )
            Plaintiffs,                   )
                                         )   Civil Action
    v.                                    )   No. 15-CV-10698-MLW
                                         )
    CELLTRION HEALTHCARE CO.,             )
    LTD, CELLTRION, INC., and             )
    HOSPIRA, INC.,                        )
                                         )
            Defendants.                   )
                                         )




               BEFORE THE HONORABLE MARK L. WOLF
                  UNITED STATES DISTRICT JUDGE


                              HEARING
                            10:06 a.m.

                         January 30, 2018



               John J. Moakley United States Courthouse
                         Courtroom No. 10
                         One Courthouse Way
                     Boston, Massachusetts  02210




                      Kelly Mortellite, RMR, CRR
                       Official Court Reporter
                John J. Moakley United States Courthouse
                      One Courthouse Way, Room 5200
                       Boston, Massachusetts  02210
                           mortellite@gmail.com
```

```
 1   tangents to the minus seven to three tangents to the minus two.
 2   And on the Y axis is the growth, the growth which would
 3   represent the performance of the cell.
 4        Now, in this profile you can see are three segments.  So
 5   the first segment is the triangle on the left-hand side, and
 6   that's where there is a direct correlation between the increase
 7   in the concentration of the ingredient and the growth of the
 8   cells.  So clearly in that segment, the ingredient is having an
 9   effect proportional to its concentration in the media.
10        Then you come to, in this particular case it's identified
11   by the vertical line, 10 to the minus 6, and you see there's a
12   plateau there.  And that plateau is what I refer to as the
13   sweet spot.  So that's the sweet spot in that plateau in which
14   there are interchangeable concentrations.  So any concentration
15   of an ingredient within that plateau would allow the media to
16   perform, to function in that particular way.
17        And then when you go beyond the maximum range in that
18   plateau, you come to a triangle, in this case identified
19   between three tangents to the minus four, three tangents to the
20   minus two.  You have another triangle, and that triangle
21   represents the toxicity.  So what's happened there is that, as
22   you're increasing the concentration, you're getting an
23   inhibitory effect on cell growth.  And what's essentially
24   happening is the ingredient is becoming inhibitory to cells.
25   But what I want you to notice is that the plateau, that sweet
```

1   A.   It's not sufficient to determine the plateau, but it is
2   sufficient to determine if those particular concentrations are
3   within the plateau or whether they fall outside the plateau.
4   Q.   I want to talk to you about that, but for now I just want
5   to make sure you and I are on the same page.
6        Two concentration experiments is not enough to determine
7   the width of the plateau for any one ingredient in the context
8   of this particular cell media and this particular cell, true?
9   A.   Yes, correct.
10  Q.   When we talk about this particular cell media, this is,
11  the length of the plateau can be specific to the kind of media
12  that's in question, right?
13  A.   There is some variation, but the principle is the same.
14  Otherwise -- Dr. Ham published this, remember, so in publishing
15  it, it becomes something which is applicable to many cells in
16  many media formulations.
17  Q.   But here we're talking about a particular media with 91
18  ingredients, right, 90 plus, right?
19  A.   In the Celltrion case, yes, yes.
20  Q.   Yes, that's what I'm talking about.  And a particular kind
21  of cell as well, correct?
22  A.   Yes.
23  Q.   Can we agree that Dr. Wurm did not run the kind of
24  experiments that are necessary to determine the length of the
25  plateau for each of the 12 or 13 ingredients we're here to talk

1  about?  Is that true?
2  A.   We can agree on that, but --
3  Q.   Thank you.
4  A.   -- that wasn't the objective of the experiment.
5            MR. HURST:  Can we put up Claim 1 of the '083 patent,
6  please.  I think we need to switch.
7  Q.   So there's 61 ingredients.  There's 52 individual required
8  ingredients, right?
9  A.   Correct.
10 Q.   And we can agree, I believe, that Claim 1 lists precise
11 concentrations for those 52 required ingredients, correct?
12 A.   Concentration ranges, yes.
13 Q.   Right.  And Claim 1 indicates that the inventors were
14 defining concentration ranges with precise outer boundaries,
15 correct?
16 A.   Well, when you say "precise outer boundaries," as far as
17 I'm aware they didn't do precise experiments to determine those
18 boundaries.  I mean, they do say in the patent that there are
19 possibilities for variation.
20 Q.   A natural reading of the list of concentrations is that
21 the inventors were specifying precise concentrations when
22 defining the scope of their invention.  Is that true?
23 A.   I mean, they were, as far as I know, and I'm taking some
24 reference to Dr. Epstein, who is one of the inventors, these
25 were meant to be the guidelines for estimation of that plateau

1   that we're talking about from Dr. Ham's work.  So they're not
2   precise insofar as they don't define the thresholds of that
3   plateau or the sweet spot.
4   Q.   Let's take a look at your deposition if we can.  If you go
5   to page 59, 21 through 68.  You and I spoke before in the
6   context of a deposition, correct?
7   A.   We did, yes.
8   Q.   And during that deposition I asked you the same question
9   that I just asked you right now.  Do you recall that?
10  A.   I don't recall it.
11  Q.   It will be up on the screen for you.  Page 59, 21 to 68.
12  Let me just blow it up so we can see it.
13          THE COURT:  Is this a page that's in the materials in
14  the briefs?
15          MR. HURST:  It is.
16          THE COURT:  So it's something that was given to me?
17          MR. HURST:  Would you like to see the transcript?
18          THE COURT:  If there's a physical copy --
19          MR. HURST:  Yeah, I can get you one.
20          THE COURT:  -- that I can keep and write on?
21          MR. HURST:  Sure.
22  BY MR. HURST:
23  Q.   Did I ask you --
24          THE COURT:  Hold on a second.  Let me get the
25  transcript.  I think I have it.  It was Exhibit 1 to what?

```
 1   Exhibit 1 to defendants' submission.  What page?
 2            MR. HURST:  It's page 59, 21 to 68.
 3   Q.   So question:  So as you go through this list, a natural
 4   reading of the list of concentrations is that the inventors
 5   were specifying precise concentrations when defining the scope
 6   of their invention, true?
 7        Answer:  Well, they defined a range as you've shown.
 8        Question:  With precise boundaries, true?
 9        Answer:  With precise boundaries.
10        Did you give those answers to those questions, sir?
11   A.   Yes.
12   Q.   So the invention as defined just in the words of the claim
13   is that there are precise outer boundaries in the words of the
14   claims.  Can we agree with that?
15   A.   Yes, there are precise ranges given, yes.
16   Q.   And what the inventors were telling the world is that
17   those concentrations that were specified in Claim 1, they were
18   important, right?  That's what they're saying.
19   A.   Well, you know, my information is that they were
20   guidelines.  I mean, I've now seen the report by Dr. Epstein
21   and a reference in the patent which indicates -- I can't see
22   the exact wording but indicates that these are guidelines.
23   Q.   Let's take a look at your transcript, page 60, 23 through
24   page 61, 4.  Did I ask you this question and did you give this
25   answer:
```

```
 1   that lack some of the ingredients in the '083 patent, correct?
 2   A.   Say again.
 3   Q.   There have been successful media in the past that lack
 4   some of the ingredients that are listed in the '083 patent?
 5   A.   Yeah.
 6   Q.   Okay.  One of the things that Dr. Butler said is that he
 7   is very certain that if you took an ingredient down to zero
 8   from the '083 patent it would have shown a result.  Do you
 9   remember him saying that?
10   A.   Maybe, yes, but I'm not quite sure which one he was
11   referring to.
12   Q.   Okay.  I think you would agree, based on the questions I
13   asked you before, that you would need to do tests to figure out
14   what the effect of an ingredient is or not is on a composition;
15   is that right?
16   A.   I did not test functionality, if that's the question.
17   Q.   My question to you is, sir, you would agree that you need
18   to do tests if you really want to understand what the effect is
19   of the having or removing an ingredient; is that correct?
20   A.   That's correct.
21   Q.   There are some things you could remove and you wouldn't
22   see a big difference or a meaningful difference in your view on
23   your viability, density or titer tests, correct?
24   A.   As long as we on the plate -- all removing to zero; is
25   that your question?
```

1   Q.   Yes.
2   A.   Okay.  Yeah, one has to do a test.
3   Q.   Because there are some that you could remove entirely, and
4   on the test that you did, density, viability and titer, you
5   might not see a difference?
6   A.   Correct.
7   Q.   Okay.  For all of the ingredients that you tested, the 12
8   that you varied, you don't know where the so-called trapezoid
9   you are, correct?
10  A.   Correct.
11  Q.   Now, there were some --
12       THE COURT:  Actually, let me see if I understand that.
13  Is the question he doesn't know where on the plateau they are
14  or where they are on the whole diagram?  In other words,
15  whether they're too low to generate cells well or too high so
16  they become toxic.
17       MR. HALES:  Could we have, I think it was slide 25 --
18       THE COURT:  Whose 25?
19       MR. HALES:  25 in Janssen's set, Your Honor, from Dr.
20  Butler.
21       THE COURT:  That's Exhibit 1, slide 25.
22       MR. HALES:  Okay.  Do you have it, Your Honor?
23       THE COURT:  Yes.
24       MR. HALES:  Your Honor, may I pass up the slides so
25  you can look at them?

```
 1                THE COURT:  Yes.
 2     BY MR. HALES:
 3     Q.   Dr. Wurm, we've got slide 25 up from the examination of
 4     Dr. Butler with the trapezoid that was talked about, right,
 5     correct?
 6     A.   Correct.
 7                THE COURT:  Wait, wait.  Let's get him the document
 8     and reduce the number of players on the field.
 9     Q.   Okay.  Thank you.  All right.  Dr. Wurm, I think it's
10     already been established that you didn't run the type of test
11     that's shown here to determine the shape of the profile for a
12     particular ingredient, correct?
13     A.   Correct.
14     Q.   All right.  So you did only two data points for every
15     variant, correct?
16     A.   Correct.
17     Q.   So if you only have two data points, you can't determine
18     what this profile looks like, correct?
19     A.   Never claimed.
20     Q.   Okay.  Now, it could be with your two data points they
21     don't even tell you whether you're on the plateau of whatever
22     response profile exists for that particular ingredient in a
23     particular whole composition that it's in, correct?
24     A.   I cannot predict whether the second point in comparison to
25     the reference point is on any of the slopes, so it could give
```

```
```

```
 1                    CERTIFICATE OF OFFICIAL REPORTER
 2
 3           I, Kelly Mortellite, Registered Merit Reporter
 4   and Certified Realtime Reporter, in and for the United States
 5   District Court for the District of Massachusetts, do hereby
 6   certify that pursuant to Section 753, Title 28, United States
 7   Code that the foregoing is a true and correct transcript of the
 8   stenographically reported proceedings held in the
 9   above-entitled matter and that the transcript page format is in
10   conformance with the regulations of the Judicial Conference of
11   the United States.
12                       Dated this 16th day of January, 2018.
13
14                       /s/ Kelly Mortellite
15                       _____
16                       Kelly Mortellite, RMR, CRR
17                       Official Court Reporter
18
19
20
21
22
23
24
25
```