**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | | |
|---|---|---|
| JANSSEN BIOTECH, INC., | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 1:17-cv-11008-MLW |
| | ) | |
| v. | ) | |
| | ) | **REDACTED VERSION** |
| CELLTRION HEALTHCARE CO., LTD., | ) | |
| CELLTRION, INC., and | ) | |
| HOSPIRA, INC., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**REPLY BRIEF IN SUPPORT OF JANSSEN'S MOTION
FOR SUMMARY JUDGMENT ON THE ISSUE
OF NON-INFRINGING ALTERNATIVES**

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................................. 1

II.   A NON-INFRINGING ALTERNATIVE MUST BE READILY AVAILABLE ................. 4

   A.   The "Readily Available" Standard is Clearly Established in the Case Law ...................... 4

   B.   The "Readily Available" Standard Serves to End Infringement ......................................... 7

   C.   The "Readily Available" Standard Serves to Eliminate Alternatives That Are "Only Theoretical[]" .................................................................................................................. 10

   D.   No Authority Supports Defendants' "Within Seven Years" Theory ............................... 12

III.   NONE OF DEFENDANTS' PROPOSED ALTERNATIVES WAS READILY AVAILABLE AND ALL (EXCEPT SINGAPORE) ARE ONLY THEORETICAL ................. 16

   A.   Singapore ...................................................................................................................... 17

   B.   ██████████ ............................................................................................................ 18

   C.   Magnesium Switch (And Other Modifications) ............................................................. 20

   D.   The Remaining Alternatives .......................................................................................... 20

IV.   CONCLUSION .................................................................................................... 22

<u>**TABLE OF AUTHORITIES**</u>

**Page(s)**

**Cases**

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
    805 F.3d 1368 (Fed. Cir. 2015)......................................................................8

*Apple, Inc. v. Samsung Elecs. Co.*,
    2013 U.S. Dist. LEXIS 160189 (N.D. Cal. Nov. 7, 2013)...........................8, 14, 15

*Apple, Inc. v. Samsung Elecs. Co.*,
    2014 U.S. Dist. LEXIS 17204 (N.D. Cal. Feb. 7, 2014) .........................................15

*Comcast IP Holdings I LLC v. Sprint Commc'ns Co., L.P.*,
    850 F.3d 1302 (Fed. Cir. 2017)......................................................................9

*DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*,
    567 F.3d 1314 (Fed. Cir. 2009).................................................................2, 5, 6

*Grain Processing Corp. v. Am. Maize-Products Co.*,
    893 F. Supp. 1386 (N. D. Ind. 1995) ...........................................................13, 14

*Grain Processing Corp. v. American Maize-Products*,
    185 F.3d 1341 (Fed. Cir. 1999).......................................................... *passim*

*Janssen Biotech, Inc. v. Celltrion Healthcare Co.*,
    239 F. Supp. 3d 328, 330 (D. Mass. 2017) ...................................................13, 16

*Mars, Inc. v. Coin Acceptors, Inc.*,
    527 F.3d 1359 (Fed. Cir. 2008).....................................................................10

*Micro. Chem, Inc. v. Lextron, Inc.*,
    161 F. Supp. 2d 1187 (D. Colo. 2001) ...............................................................6

*Micro Chem., Inc. v. Lextron, Inc.*,
    318 F.3d 1119 (Fed. Cir. 2003)........................................................... *passim*

*Minco, Inc. v. Combustion Eng'g, Inc.*,
    95 F. 3d 1109 (Fed. Cir. 1996).....................................................................11

*Sheehan v. N. Am. Mktg. Corp.*,
    610 F.3d 144 (1st Cir. 2010).......................................................................17

*Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*,
    637 F.3d 1269 (Fed. Cir. 2011).................................................................2, 5, 6

*Synqor, Inc. v. Artesyn Techs., Inc.*,
709 F.3d 1365 (Fed. Cir. 2013)........................................................................................2, 5, 6

**Statutes**

35 U.S.C. § 271(f)(1) ....................................................................................................3, 17, 18

35 U.S.C. § 287(a) .................................................................................................................15

## I.   INTRODUCTION

In the nearly 20 years since *Grain Processing* was decided the Federal Circuit has only once – in *Grain Processing* itself – found that an accused infringer has carried its burden of proving that an alternative not actually on the market at the time of first infringement was both "readily available" and not "only theoretical[]", so as to cut off lost profits damages.  Defendants contend that this should be the second case.  They say they are entitled to prove that ***over seven years*** they could have created some form of alternative cell media that would retroactively preclude liability for lost profits.  This would turn the law of non-infringing alternatives upside down and the damages case into a circus of speculation and guess work.  The Court should not permit this to occur.

As Defendants' opposition brief makes clear, Janssen's motion for summary judgment turns on a pure question of law.  Janssen contends that in order for an alleged non-infringing alternative to preclude lost profits, it must be "readily available" – that is, capable of being substituted for the infringing product in a very short period of time beginning on the date of first infringement.  Defendants respond that this is a "frivolous position."  Def. Opp. (Dkt. 303) at 15.  They argue that an alleged non-infringing alternative can foreclose lost profits if it could have ***become*** available in the time period between the date of first infringement and the time that the plaintiff begins to lose recoverable profits.  On the facts of this case, that period is seven years.

The question whether the applicable legal standard is "readily available" at the time of first infringement or "within seven years" is dispositive of this motion.  Defendants do not seriously contend that any of their proposed alternatives were "readily available" to make biosimilar infliximab on the date of first infringement.  Their argument ignores the "readily available" standard and reads it out of the law.  Contrary to Defendants' contention, an alleged

non-infringing alternative must indeed be "readily available" at the time of first infringement in order to preclude retroactive lost profits.  That standard has been repeatedly invoked in the controlling case law.  *See Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1123 (Fed. Cir. 2003) (substitute must be "readily available at the time of infringement"); *accord DePuy Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 567 F.3d 1314, 1330 (Fed. Cir. 2009) (standard is "readily available"); *Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1288 (Fed. Cir. 2011) (substitute must be capable of being "commercialized 'readily'"); *Synqor, Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1382 (Fed. Cir. 2013) (proposed non-infringing alternative was not "readily available").  The holdings of these cases make the meaning of the standard clear: a substitute that could be implemented within two weeks is readily available at the time of first infringement, but one that would take four months is not.

Defendants' attempts to avoid the clear teachings of the case law are unpersuasive. Defendants contend that under *Grain Processing Corp. v. American Maize-Products*, 185 F.3d 1341 (Fed. Cir. 1999), the relevant question is not whether a non-infringing substitute was available on the date of first infringement, but rather whether it could have become available at some time between the date of first infringement and the beginning of the "accounting period" when the plaintiff is entitled to damages.  There are two fatal problems with this analysis.

First, the accounting period in this case for which Janssen seeks damages begins in 2009, not 2016.  Janssen's lost profits claim begins in 2016, but its damages claim also includes reasonable royalty damages beginning in 2009.   Second, and more fundamentally, even focusing only on the period for which Janssen seeks lost profits, neither *Grain Processing* nor any other case holds that a defendant may rely on the time between the date of first infringement and the beginning of the lost profits period to hypothesize a lengthy design around effort that never

occurred.  To the contrary, the "readily available" case law squarely forecloses the argument that there can be a substantial gap between the date when a hypothetical non-infringing substitute would begin to be implemented and when it would be complete.  As this Court has held, the substitution must start on the date on the date of first infringement.  And under the case law, it must conclude "readily," i.e. within about two weeks of that date.  Such a "practically instantaneous" implementation period is crucial to the logic of *Grain Processing* and its progeny. A longer period would neither eliminate infringement nor avoid embroiling the fact-finder in unbridled speculation about merely theoretical possibilities.

There is no serious dispute that under the "readily available" standard, summary judgment must be granted to Janssen.  Defendants raise an array of semantic and insubstantial disputes in response to Janssen's Statement of Material Facts, but they do not genuinely contend that an acceptable non-infringing alternative was readily available to make biosimilar infliximab as of the date of first infringement.  None of the alternatives they propose could be implemented in anywhere near the two week timeframe that was found to be available in *Grain Processing*. Upon confirming that the relevant legal standard is "readily available" at the time of first infringement, the Court should grant Janssen's motion.

Indeed, even if the Court rejects the "readily available" standard and accepts Defendants' point of view, the only alleged alternative that is not entirely theoretical is the Singapore plant. That is the only alternative that has actually been used to produce cell media that has been used to make Inflectra.  But the Singapore plant has not been an available alternative at any time.  It took years to establish. ██████████████████████████████████

███████████████████, and it continues to infringe under 35 U.S.C. § 271(f)(1) to this day. All of Defendants other proposals are entirely theoretical.  Whether the Court does, or does not,

accept the "readily available" standard, there is no reason for the Court to permit a detour into the theoretical world of Defendants' imaginary choices.

## II.   A NON-INFRINGING ALTERNATIVE MUST BE READILY AVAILABLE

As Janssen has argued, in order to preclude lost profits, an alleged non-infringing alternative must be "readily available" beginning on the date of first infringement.  Defendants respond that this argument "badly misstates the law" (Def. Opp. at 1), is "dead wrong" (*id.* at 14), and indeed represents a "frivolous position" (*id.* at 15).  Far from being "frivolous," Janssen's "readily available" argument relies on direct and oft-repeated holdings from the leading Federal Circuit cases.  In contrast, Defendants' argument relies on ambiguous quotations from two district court decisions whose ultimate outcomes support Janssen's position, not Defendants'.  Upon a fair reading of the case law, a proposed non-infringing alternative must be "readily available" at the time of first infringement in order to preclude lost profits.   Under that standard, Janssen's motion should be granted.

### A.   The "Readily Available" Standard is Clearly Established in the Case Law

In *Grain Processing*, the Federal Circuit held that a non-infringing alternative was available when, based on "specific, concrete facts,  it took "two weeks" to "perfect" and "begin mass-producing," a time period that was ''practically instantaneous' for large-scale production." *Grain Processing*, 185 F.3d at 1346, 1353.  As the Federal Circuit further explained in *Micro Chem.*, the holding of *Grain Processing* is that it is not sufficient for a non-infringing alternative to be hypothetically or theoretically available, or even actually available years later; it must be "***readily available at the time of infringement***."  *Micro Chem.*, 318 F.3d at 1123 (emphasis added).  In subsequent case law, the Federal Circuit has repeatedly reaffirmed the "readily

available" standard.  *See DePuy Spine,* 567 F.3d at 1330 (an "acceptable noninfringing substitute [must be] ***readily available***") (emphasis added); *Siemens Med. Solutions USA, Inc.*, 637 F.3d at 1288 ("[I]f the substitute cannot be ***commercialized 'readily*,**' then it is not available for purposes of a lost profits determination.") (citing *Micro Chem.*, 318 F.3d at 1123) (emphasis added); *Synqor Inc. v. Artesyn Techs., Inc.*, 709 F.3d 1365, 1382 (Fed. Cir. 2013) (rejecting proposed non-infringing alternative that was not "***readily available***") (emphasis added).

The holdings of the Federal Circuit cases make clear that the phrase "readily available" means what it says: a substitute must be available to replace the infringing product in a very short period of time, that is, quickly and easily.  The court in *Micro Chem*. noted that switching to a substitute "in the remarkably short period of two weeks," as the infringer did in *Grain Processing*, rendered that substitute "readily available."  *Micro Chem.*, 318 F.3d at 1123.  But a switch that took four months, as in *Micro Chem.*, was not "readily available at the time of infringement" as a matter of law.  *Id.*  Similarly, in *Synqor*, the Federal Circuit held that lost profits were not foreclosed when "it took Defendants nearly a year, if not longer, to make the [alleged non-infringing alternative] available for commercial use."  709 F.3d at 1382.  And in *Siemens*, the proposed alternative was not readily available when it was "at least a year and a half behind [the accused product] in development."  *Siemens*, 637 F.3d at 1288.

Defendants ignore the "readily available" standard and for good reason.  "Readily available at the time of infringement" is the polar opposite of "available within seven years after infringement begins."  Both cannot be the law; the ideas are antithetical to each other.  Defendants' brief uses the phrase "readily available" only twice, both times in the context of derisively quoting Janssen's opening brief; they never once address the repeated use of this language in the controlling case law.  Def. Opp. at 1, 14.  What does it mean to be "readily

available at the time of infringement"?  Defendants do not say.  More generally, Defendants fail

to engage the extensive body of post-*Grain Processing* Federal Circuit law on non-infringing

alternatives in any meaningful way.  Indeed, Defendants do not even cite three out of the four

post-*Grain Processing* Federal Circuit cases relied on by Janssen (*DePuy, Siemens*, and *Synqor*)

despite the fact that these decisions expressly reaffirm the "readily available" standard.

      The only post-*Grain Processing* Federal Circuit case that Defendants even discuss is

*Micro Chem*.  Defendants contend that the problem in *Micro Chem*. "was not that the design

around . . . took too long."  Def. Opp. at 17.  Rather, badly misquoting *Micro Chem.*, they claim

the problem was that "the defendant 'did not have the necessary equipment, know-how, and

experience to make the [design-around]' ***during the accounting period*."  *Id.* at 17 (italics in

Defendants' brief).  In fact, the *Micro Chem.* court observed the defendant "did not have the

necessary equipment, know-how, and experience to make the [design-around] ***at the time of

infringement***."  *Micro Chem.*, 318 F.3d at 1123 (emphasis added).  Obviously, the defendant in

*Micro Chem.* had the ability to design and make the non-infringing alternative at some time

***during*** the period of infringement.  That is exactly what it did.  During (but not "at") the time of

infringement, and indeed nine years after it began, the defendant created a design-around, which

took four months to implement.  It was the defendant's implementation of this design around, a

non-infringing alternative, that eventually ended its infringement, and therefore ended the period

for which the plaintiff was entitled to prospective – but not retrospective – lost profit damages.

*See Micro. Chem, Inc. v. Lextron, Inc.*, 161 F. Supp. 2d 1187, 1191 (D. Colo. 2001).

      The reason the plaintiff in *Micro Chem.* prevailed as a matter of law was not that the

defendant lacked the ability to create a non-infringing alternative ***during*** the period of

infringement, but rather that the alternative required a four-month effort to implement and was

therefore not "readily available *at* the time of infringement." *Micro Chem.*, 318 F.3d at 1123 (emphasis added).  In this context the Court is necessarily talking about the time that infringement began, since the entire point of the discussion was whether this subsequent design-around could serve retroactively to cut off damages that began to accrue nine years earlier, at the date of first infringement.  The discussion in *Micro Chem.* focuses primarily on the amount of time that was required for design and implementation:

> Lextron expended 984 hours to design the Type 5 machine and another 330 to test it. Charles Hoff, a Lextron engineer, worked full-time for several months on the design of the Type 5 machine. Thereafter, he continued to work part-time on the project, estimating that he tested and rejected five potential design changes. Lextron took over four months to convert all of its infringing Type 2 machines to Type 5 machines.

*Id.*  In short, Defendants' contention that *Micro Chem.* – and the controlling "readily available at the time of infringement" standard – are not about the length of time required for implementation at the date of first infringement is simply incorrect.

Here, there is no genuine dispute that Defendants' implementation efforts would have been at least as lengthy and elaborate as those at issue in *Micro Chem*.  *See* Dkt. No. 246 at 4-9; *infra* at 16-22.  None was "readily available at the time of infringement."  Straightforward application of controlling Federal Circuit authority requires granting Janssen's motion.

## B.      The "Readily Available" Standard Serves to End Infringement

Defendants' "within seven years" theory is contrary to the logic of the non-infringing alternatives doctrine and the "but for" causation analysis it is meant to serve. "The 'but for' inquiry . . . requires a reconstruction of the market, as *it would have developed absent the infringing product*." *Grain Processing*, 185 F.3d at 1350 (emphasis added).  That is, the but-for world is not one in which the infringer continues to infringe but finds a hypothetical way to steer that infringement so as to avoid liability for lost profits while it continues to violate the law.

7

Rather, determining what would have happened "but for" infringement requires eliminating *all* infringement. *See id.* at 1350 (requiring construction of the market "with infringement factored out of the economic picture"); *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 805 F.3d 1368, 1379 (Fed. Cir. 2015) (same); *Apple, Inc. v. Samsung Elecs. Co.*, 2013 U.S. Dist. LEXIS 160189, at *44 (N.D. Cal. Nov. 7, 2013) ("[R]econstructing the hypothetical market requires one to factor out infringement *entirely*.") (emphasis added).   That goal is achieved by allowing profits to be cut off only if a non-infringing alternative is "readily available at the time of infringement."  We made that point in our opening brief and Defendants ignore it entirely. Dkt. No. 246 at 18-19.

Here, it is undisputed that during the seven years during which Defendants contend they could have worked to implement a non-infringing alternative, they were infringing the '083 patent continuously around the world.  Defendants admit that they ███████████████████ ████████████████████████████ Dkt. 304 (Defendants' Response to Plaintiffs' Statement of Material Facts In Support of Plaintiff's Motion For Summary Judgment On the Issue of Non-Infringing Alternatives) ¶ 3.  Although Defendants did not begin selling in the U.S. market until 2016, it did not take Defendants seven years to get to other markets. ████████████████ ███████████████████████████████ Dkt. 247 (Statement of Material Facts In Support of Plaintiff's Motion For Summary Judgment On the Issue Of Non-Infringing Alternatives) ¶¶ 4-5.

███████████████████████████████████████████████████ ███████████████████████ *Id.*; Dkt. 304 ¶¶ 4-5.  In order to avoid infringement of the '083 patent, Defendants would have needed to change cell culture media "readily" in October 2009 when infringement began.  The "readily available" standard envisions a world without infringement, whereas Defendants' "within seven years" theory fails to do so.

Indeed, on the facts of this case, Defendants' "within seven years" theory not only fails to

avoid actionable infringement, it extends a full seven years into the accounting period.   "The critical time period for determining availability of an alternative is ***the period of infringement for which the patent owner claims damages***, *i.e.*, the 'accounting period.'"   *Grain Processing*, 185 F.3d at 1353 (emphasis added).   Here the accounting period for which Janssen seeks damages begins on the date of first infringement, October 6, 2009.  It is true that, under current case law, Janssen seeks lost profits only for Defendants' U.S. sales of Inflectra, which began in November 2016.  But Janssen also seeks a reasonable royalty to compensate Janssen for Defendants' continuing infringement in the United States beginning on October 6, 2009.  Both parties agree that reasonable royalty damages should be based on a hypothetical negotiation occurring in September 2009, shortly before infringement began.  See Dkt. 273 and Janssen's response.  And both parties' experts agree that reasonable royalty damages in this case should be in the form of a lump sum, which would give Defendants a royalty-free license beginning in 2009.  *See* Dkt. 295 Ex. A (Expert Report of Sean Nicholson, Ph.D.)  ¶¶ 138-39 (calculating lump sum payment representing paid-up reasonable royalty for period beginning in September 2009); *id.* ¶ 16 (estimating reasonable royalty on the portion of Inflectra sales in the U.S. that are not subject of an award of lost profits); Dkt. 240 Ex. 3 (Expert Report of Dr. Gregory K. Leonard) ¶¶ 127, 132 (calculating lump sum payment representing reasonable royalty beginning in September 2009).  *Accord Comcast IP Holdings I LLC v. Sprint Commc'ns Co., L.P.*, 850 F.3d 1302, 1314 (Fed. Cir. 2017) (affirming damages award taking "the form of a lump sum royalty payment" running from the date of the hypothetical negotiation).

Thus, the accounting period for which Janssen claims damages begins on the date of first infringement, October 6, 2009.  But regardless of the accounting period, a non-infringing alternative must be "readily available" at the time of first infringement.  That is the point of the

9

exercise – to imagine a law-abiding defendant operating in a world without infringement.  The "readily available" standard mandates as much.

### C.     The "Readily Available" Standard Serves to Eliminate Alternatives That Are "Only Theoretical[]"

The "readily available" standard also serves to limit acceptable alternatives to those that are actually available and it eliminates those that are "only theoretically possible", as *Grain Processing* requires.  *Grain Processing*, 185 F.3d at 1353.  It is always possible to theorize about a non-infringing alternative that could become available at a later time.  That is what scientists do – they theorize and then they get to work.  Frequently it is plausible or even probable that these theoretical alternatives could be implemented.  That is not good enough.  *See Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1373 (Fed. Cir. 2008) (although the infringer "had the ability, the resources, and the desire to design around [the patentholder's] patents" and "it could probably figure out a way to avoid infringement," there was "no available and acceptable noninfringing alternative, . . . merely the possibility that it could have come up with one.").  For an infringer that believes it has a plausible non-infringing alternative, the remedy is not to present its ideas in litigation.  Rather, the defendant must implement the alternative in the real world and thereby cut off infringement and damages.  That is what Defendants attempted, but failed, to do in switching manufacture of the cell media to the Singapore plant.

When a defendant in litigation relies on an alternative that does not exist in the real world, *Grain Processing* counsels caution.  "After all, the infringer chose to produce the infringing, rather than noninfringing, product."  *Grain Processing*, 185 F.3d at 1353.  Only in the rare situation when "specific, concrete" facts show that the alternative was readily available at the time of first infringement can an alternative that was not actually implemented cut off lost profits prior to its implementation date.  *Id.*; *see also id.* ("Acceptable substitutes that the

10

infringer proves were available" can preclude lost profits; "substitutes only theoretically possible will not"); *Minco, Inc. v. Combustion Eng'g, Inc.*, 95 F. 3d 1109, 1119 (Fed. Cir. 1996) ("[T]estimony that an infringer might have been able to design around a patent does not, in itself, defeat a claim for lost profits.").

The "readily available" standard serves to exclude alternatives that were "only theoretically possible."  Indeed, the Federal Circuit has employed it in case after case to reject alternatives that were real, that had actually been implemented in the real world by the defendant to stop infringement and cut off future damages, but did so years later.  In case after case, these real alternatives were at best only theoretical at the time of first infringement, and so they could not meet the "readily available" standard and retroactively cut off damages that began to accrue years earlier.  That is what the Federal Circuit intended in *Grain Processing* and what its consistent body of subsequent case law demands.  Defendants cannot read "readily available" out of the law because to do so would invite unbridled speculation.

Here, Defendants do not rely on a real alternative that was implemented years later or ever (except for the Singapore plant, which did not produce cell media until 2016 and which continues to infringe to this day).  Rather, Defendants' experts theorize that within seven years theoretical alternatives that did not exist in 2009 and do not exist today could have been designed.  They then imagine a hypothetical seven-year drug development timeline in which imaginary process changes could theoretically have been implemented without causing any delay at all in the launch of Inflectra in the United States.  Dkt. 247 Ex. 10 (Rebuttal Expert Report of Akhilesh Nagaich, Ph.D.) ¶¶ 37-49; *id.* Ex. 1 (Rebuttal Damages Expert Report of Dr. Bert T. Frohlich) ¶¶ 249, 292.   No case in the Federal Circuit remotely considers, let alone accepts, such a belabored hypothetical scenario.  The "readily available" standard serves to reject such a purely

11

theoretical exercise at the starting gate.

**D.     No Authority Supports Defendants' "Within Seven Years" Theory**

In contrast to the five Federal Circuit cases that established the "readily available" standard, Defendants' "within seven years" theory has no support in the case law.  Defendants cite no authority holding that a theoretical non-infringing alternative that was never actually created in the real world and that would have taken months or years to implement cuts off a retroactive award of lost profits.  None exists.  To the contrary, as Janssen pointed out in its opening motion, the only Federal Circuit case that has ever approved a non-infringing alternative that was not on the market is *Grain Processing*, and there the alternative was real and had been implemented in two weeks.  Dkt. No. 246 at 10-15.

Defendants' "within seven years" theory relies on revisiting an issue that this Court addressed last year: the proper time for assessing the availability of non-infringing alternatives.  Defendants contend that the availability of non-infringing alternatives is determined as of the "accounting period" (Def. Opp. at 14-15), which they characterize as beginning in November 2016, and that as a result the Court "need not decide" whether an alternative was available as of the date of first infringement, here October 2009 (*id*. at 16).

Defendants' contention that the relevant point of time is the "accounting period" is a jarring turnabout.  In prior briefing on this issue, Janssen, relying on the exact same passages from *Grain Processing* that Defendants now embrace, argued that the accounting period was the appropriate date for assessing the availability of non-infringing alternatives.  *See* Mem. of Law, *Janssen Biotech, Inc. v. Celltrion Healthcare Co.*, No. 15-10698 (Dkt. 412) at 9-13.  Defendants argued then that the date of first infringement was the right one.  *See* Mem. of Law, *Janssen Biotech, Inc. v. Celltrion Healthcare Co.*, No. 15-10698 (Dkt. 441) at 18 ("The question is

***whether there were available, feasible non- infringing options on the date of first***

***infringement***.") (emphasis added).  This Court agreed with Defendants that the appropriate date

is the date of first infringement.  *Janssen Biotech, Inc. v. Celltrion Healthcare Co.*, 239 F. Supp.

3d 328, 330 (D. Mass. 2017).  Janssen accepts that decision and has applied it in this motion.

Having prevailed on this question, Defendants cannot now reverse course.

There is no need, in any event, for the Court to revisit the issue of the correct time for

assessing non-infringing alternatives.  Defendants' argument fails under any reading of the law.

Indeed, as Janssen has assembled its damages case, the date of first infringement and the onset of

the accounting period turned out to be the same date, since Janssen claims damages from

October 2009.  But the problem with Defendants' case is more fundamental.  To use their words

(quoted above) from a year ago and apply them to the facts, there were ***no "available, feasible***

***non- infringing options on the date of first infringement.***"  Defendants do not dispute this.  No

acceptable alternatives were available, let alone readily available, "on the date of first

infringement."  Any "option" would take months or years of work before it became available.

Defendants' "within seven years" theory is based on a misreading of the district court

decision in *Grain Processing*.  Defendants contend that the date of first infringement in *Grain*

*Processing* was 1974 and the accounting period began in 1979, and that the district court

considered whether the defendant could have developed the alternative within those five years.

Def. Opp. at 15.  This is wrong.  Although it is true that the *Grain Processing* defendant

infringed the asserted patent beginning in 1974, the period between 1974 and 1979 was

irrelevant because the patent was not owned by the *Grain Processing* plaintiff until 1979.  *Grain*

*Processing Corp. v. Am. Maize-Products Co.*, 893 F. Supp. 1386, 1388 (N. D. Ind. 1995).  1979

was the relevant date because that was when the defendant became liable to the plaintiff for

13

infringement – not because it was the conclusion of a hypothetical five-year design-around effort.  *Id.* at 1391; *see also Apple, Inc.*, 2013 U.S. Dist. LEXIS 160189, at *40 n.2 ("American Maize actually began selling maltodextrins in 1974.  Grain Processing, however, did not acquire the '194 patent rights until 1979.  Thus, ***the relevant infringement period in Grain Processing was from 1979 to 1991.***") (internal citations omitted) (emphasis added).

Contrary to Defendants' suggestion, the district court in *Grain Processing* did not make any factual findings about 1974 or the period between 1974 and 1979.  Rather, it held that it did not need to make any such findings because the relevant date was 1979.  *See Grain Processing*, 893 F. Supp. at 1391 ("I need not decide whether [the infringer] could have employed the dual-enzyme process [in 1974].  [The inventor] did not transfer to [plaintiff] any right to recover damages for periods before assignment of the patent.").  And the controlling Federal Circuit decision in *Grain Processing* certainly does not suggest, much less hold, that the defendant could have avoided lost profits by designing and implementing a non-infringing alternative in the five-year period between 1974 and 1979.  To the contrary, *Grain Processing* and subsequent Federal Circuit case emphasize that as of 1979, the relevant date of first infringement, the non-infringing alternative could have been implemented in two weeks, "practically instantaneous[ly]."  *Grain Processing*, 185 F.3d at 1346.  Thus, as *Micro Chem.* explained, it was "readily available at the time of infringement."  *Micro Chem.*, 318 F.3d at 1123.

Even if the Court were inclined to reinterpret *Grain Processing* according to facts that were not germane to the decision, that would not help Defendants.  This is because in *Grain Processing*, 1979 was not the beginning of the accounting period.  Because the patentee had not marked the product with the patent number, it could not seek damages until the period beginning on May 12, ***1981***.  *See Grain* Processing, 893 F. Supp. at 1393-96 (holding that the infringer

14

"must compensate [the plaintiff] for all production from *May 12, 1981*, until the adoption of [the non-infringing alternative] in May 1991") (emphasis added); *see also* 35 U.S.C. § 287(a) (patent marking requirement).  Were Defendants correct that the *Grain Processing* implicitly allowed for a lengthy implementation effort between the date of first infringement and the accounting period, the relevant question would have been whether a non-infringing alternative could have become available by 1981.  But as Defendants themselves acknowledge, that is not the case.  The assessment of availability began and ended in 1979.

*Apple v. Samsung*, the only other case Defendants cite in support of their argument, also does not support their position.  Def. Opp. at 16.  In *Apple*, Judge Koh recognized that the *Grain Processing* courts assessed availability at the beginning of the infringement period (1979), not the beginning of the accounting period (1981).  *See Apple, Inc.*, 2013 U.S. Dist. LEXIS 160189, at *40 n.2 ("[T]he relevant infringement period in Grain Processing was from 1979 to 1991.") (internal citations omitted); *see also id.* ("Because Grain Processing had not marked the '194 patent, Grain Processing was not entitled to damages for the 1979-1981 period during which American Maize was infringing '194 patent but did not yet have actual notice of infringement.").  And as Janssen pointed out in its opening brief, the outcome in *Apple* relies on the controlling "readily available at the time of infringement" standard and is inconsistent with Defendants' "within seven years" theory.  *See Apple, Inc. v. Samsung Elecs. Co.*, 2014 U.S. Dist. LEXIS 17204, at *54-55 (N.D. Cal. Feb. 7, 2014) (affirming lost profits award because defendant could not "have *easily and quickly* implemented the noninfringing" alternative) (emphasis added).  Defendants have cited no case – and there is none – that allows a defendant to cut off lost profits by hypothesizing that it could have implemented a non-infringing alternative in the period of

time between the date of first infringement and the onset of the plaintiff's lost profits claim.[1]

## III.  NONE OF DEFENDANTS' PROPOSED ALTERNATIVES WAS READILY AVAILABLE AND ALL (EXCEPT SINGAPORE) ARE ONLY THEORETICAL

If the Court applies Federal Circuit precedent that a proposed alternative not on the

market must be "readily available" at the time of first infringement, summary judgment must be

granted to Janssen.  In its opening motion, Janssen showed that none of Defendants' proposed

alternatives was readily available in October 2009.  Dkt. 246 at 1-9; *see generally* Dkt. 247.

Defendants do not seriously dispute this.  Rather, they contend that their various theoretical

alternatives could have been implemented at some time over the seven years that followed.  *See*

Def. Opp. at 4 ("[T]here were ample alternatives to the accused media that Celltrion could have

switched to in October 2009, and still launched a biosimilar infliximab product no later than

November 2016").  That is not good enough under the "readily available" standard.

Moreover, that is not the only flaw in Defendants' non-infringing alternatives case,  Even

Defendants accept, as they must, *Grain Processing*'s requirement that a proposed alternative

must be actually available and that "substitutes only theoretically possible will not" preclude lost

profits.  *Grain Processing*, 185 F.3d at 1353.  Except for the Singapore plant, which is not

theoretical but which was not available under either party's test, all of Defendants' proposed

---

[1] Defendants' argument that Janssen has impermissibly conflated the media and infliximab markets, Def. Opp. at 2-4, 11, 12-13, 20-21, has already been rejected by the Court.  If Janssen can establish that Defendants' infringing use of the accused cell culture media was the but-for cause of its ability to sell Inflectra and thereby cause Janssen to lose profits, then Janssen will be entitled to lost profits damages.  *See Janssen Biotech, Inc. v. Celltrion Healthcare Co.*, 239 F. Supp. 3d 328, 330 (D. Mass. 2017).  The relevant question is therefore whether a non-infringing substitute could have been substituted for the infringing product to make Inflectra.  Defendants' argument that other biological drugs are non-infringing alternatives (Def. Opp. at 20-21) is completely irrelevant.  ███████████████████████████████████████████████ ████████████████████████████████████████████████  This is a separate question from whether there was a non-infringing alternative to the accused product that cuts off lost profits damages altogether.

alternatives are "only theoretical[]" and did not exist in the real world.  Dkt. 246 at 1-9.

A.     **Singapore**

Defendants say virtually nothing about the availability of the only alternative that they actually attempted to implement in the real world and that is not theoretical – the accused media manufactured in HyClone's Singapore plant.    That was also the alternative that was front and center in all discussions of the subject with the Court – until Janssen discovered that Defendants were continuing to infringe in Singapore under 35 U.S.C. § 271(f)(1).  Now the Singapore plant has all but disappeared, except for the vague assertion that Defendants' liability under § 271(f)(1) "is not a foregone conclusion."[2]  Def. Opp. at 21-22.  Be that as it may, it is undisputed that                Dkt. 247 ¶¶ 67-84.                                                                      Dkt.

247 ¶ 79.  As a result, even if it does not infringe, the Singapore plant was not "readily available" in October 2009 or in November 2016, or at any time in between.

---

[2] Janssen supported its § 271(f)(1) argument on this motion with expert testimony and documentary evidence.  Assuming the media itself infringes, as must be assumed on this damages question, Defendants did not dispute that Singapore also infringes under § 271(f)(1).  *See* Dkt. 247 ¶¶ 67-84 and Defendants' responses thereto (Dkt. 304) (not disputing material facts relating to Singapore and instead registering unfounded arguments based on admissibility and privilege).  Any arguments disputing infringement under § 271(f)(1) have thus been waived.  *See Sheehan v. N. Am. Mktg. Corp.*, 610 F.3d 144, 148 n.6 (1st Cir. 2010) (issue not addressed in summary judgment opposition brief waived).

,

Because the Singapore plant does not qualify as a non-infringing alternative even under Defendants' theory, Defendants' experts instead ████████████████████████████ ████████████████████████████████████████████ Dkt. 304 ¶¶ 67-84.  This is all theoretical and, indeed, highly unrealistic.  ████████████████████ ████████████████████████████████████████████ ████████████████████████████ ████████████████████████████████ ████████████████████████ Speculation that they could have done better is inadequate under *Grain Processing*.  The Singapore plant is the sole non-theoretical alternative that Defendants' propose, but it was not available under either party's test. Meanwhile, to the extent infringement under § 271(f)(1) has any relevance to this issue, that will be determined in the liability trial.

**B.**   ████████████████

Largely ignoring Singapore, Defendants now lean heavily on ████████████, a commercially available medium, as a supposed non-infringing alternative.  Def. Opp. at 5-7. ████████████████████████████████████████████████████ ████████████████████████████████████ But the idea that it could have been implemented to produce Inflectra at all, let alone in a short period of time, is theoretical.  ██████████████████████████████████████ ████████████████████████████████████████ ████████████████████████████

As explained in Janssen's opening brief, ████████████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

█████████████████████████ Dkt. 246 at 5-6. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████ Dkt. 247 ¶¶ 18-19.  It is thus

undisputed that █████████████████████████████████ was not a "readily

available" acceptable alternative.

    Defendants attempt to misdirect the inquiry by suggesting that ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

Def. Opp. at 13 (emphasis added). ██████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████ *Id.* at 12-13.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

█████████████████████████████████████████████████ Dkt.

247 ¶¶ 14-16.

██████████████████████████████████████████ Dkt. 247 ¶¶ 15-16.

████████████████████████████████████████████████████████████

████████████████████████████████████████████████

██████████████████████████████████ *Id.* ¶ 29.

    ████████████████████████████████████████████

██████████████████████████████ is not a "perfect substitute" or "effectively

identical" to the accused media, as the law requires. *Grain Processing*, 185 F.3d at 1355. ███

████████  was not "readily available" to replace the accused media in October 2009 and, even

today, it is an alternative that exists only in theory.

### C.    Magnesium Switch (And Other Modifications)

The only switch that Defendants contend could have been accomplished in anywhere

near the same timetable as in *Grain Processing* is the imaginary modification of the accused

media to remove one magnesium salt and replace it with an equivalent amount of the other,

scientifically interchangeable magnesium salt.  Def. Opp. at 5.  This concept is completely

theoretical, and therefore fails *Grain Processing* out of the gate.  Janssen's Motion In Limine No.

12 (Dkt. 268) at 13-18.  Moreover, even Defendants do not claim that this modification was

"readily available" and, as Janssen explains in its opposition to Defendants' partial summary

judgment motion on this proposed alternative, ████████████████████████████

████████████████████████████████████████████████████████

████████████████████████  Dkt. 297 at 12-17.  Finally, this modification is not

non-infringing (it would infringe under the doctrine of equivalents to the same extent the accused

media infringe).  *Id.* at 5-10.  ████████████████████████████

████████████████████  *Id.* at 17-18.  This proposed alternative is not readily available

and it is entirely theoretical.[3]

### D.    The Remaining Alternatives

The remaining alternatives to which Defendants pay lip service are, as explained in

Janssen's MIL No. 12, entirely theoretical, purely speculative, and completely unmoored from

the real world.  Dkt. 268 at 13-18.  Accordingly, they fail as a matter of law under *Grain*

*Processing*.  But even giving the Defendants the benefit of the doubt, these additional proposed

---

[3] Defendants' other completely theoretical and insubstantial proposed modifications to the
accused media, (Def. Opp. at 8), fail for similar reasons.

alternatives were also not "readily available" on the undisputed facts.

Defendants suggest that Celltrion could have implemented ████████████ ███████████████████████████████████████████████████████████████ Def. Opp. at 8.[4]  But this never crossed Celltrion's mind, then or now, and so is purely theoretical. ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ *See* Dkt. 247 ¶¶ 23-44; Dkt. 304 ¶¶ 23-44. ██████████████████████████████ ██████████████████████ Dkt. 247 ¶¶ 24, 40.  Neither could have been slotted into Celltrion's production process "practically instantaneous[ly]."  *Grain Processing*, 185 F.3d at 1346. ████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████ Dkt. 247 ¶¶ 38, 40, 42; Dkt. 304 ¶¶ 38, 40, 42.[5] ████████████████████████████████████████████████ ███████████████████████████████████████████ Def. Opp. at 7-8.  But, this too is entirely theoretical and highly speculative. ██████████████████████████████████ ████████████████████████████████████████████████████████ ████████████████████ Dkt. 304 ¶ 88. ███████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████ Def. Opp. at 8. ███████████

_____

[4] Without citation to evidence, Defendants also contend they could have used other media screened, but not selected, by Celltrion in 2008.  These alternatives fail for the same reasons.

[5] ██████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████ Dkt. 247 Ex. 1 (Frohlich Report) ¶ 224.

███████████████████████████████████████████ Dkt.

247 ¶¶ 85-86; Dkt. 304 ¶¶ 85-86. █████████████████████████

████████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████

## IV.   CONCLUSION

Summary judgment should be granted to Janssen.

Respectfully Submitted,

Dated: June 4, 2018


*Of Counsel*
Gregory L. Diskant (admitted *pro hac vice*)
gldiskant@pbwt.com
Irena Royzman (admitted *pro hac vice*)
iroyzman@pbwt.com
Aron Fischer (admitted *pro hac vice*)
afischer@pbwt.com
Andrew D. Cohen (admitted *pro hac vice*)
acohen@pbwt.com
Daniel A. Friedman (admitted *pro hac vice*)
dfriedman@pbwt.com
Benjamin F. Jackson (admitted *pro hac vice*)
bjackson@pbwt.com
PATTERSON BELKNAP WEBB & TYLER LLP
1133 Avenue of the Americas
New York, NY 10036-6710
212-336-2000
FAX: 212-336-2222

*/s/ Alison C. Casey*
Heather B. Repicky (BBO # 663347)
hrepicky@nutter.com
Alison C. Casey (BBO #688253)
acasey@nutter.com
NUTTER MCCLENNEN & FISH LLP
Seaport West
155 Seaport Boulevard
Boston, MA 02210
617-439-2000
FAX: 617-310-9192

*Attorneys for Plaintiff Janssen Biotech, Inc.*

## **CERTIFICATE OF SERVICE**

I certify that on June 4, 2018, this document, filed through the ECF system, will be sent electronically to the parties or their counsel who are registered participants as identified on the Notice of Electronic Filing and if not so registered, that copies will be electronically mailed to such parties or their counsel.


*/s/ Alison C. Casey*
Alison C. Casey