# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| JANSSEN BIOTECH, INC.<br><br>                        Plaintiff,<br><br>     v.<br><br>CELLTRION HEALTHCARE CO., LTD.,<br>CELLTRION, INC., and<br>HOSPIRA, INC.<br><br>                        Defendants. | Civil Action No. 1:17-cv-11008 |

**DEFENDANTS' PROPOSED POST-TRIAL JURY INSTRUCTIONS**

Defendants Celltrion Healthcare Co., Ltd., Celltrion, Inc., and Hospira, Inc. (collectively, "Defendants"), by and through its counsel, hereby propose the following Post-Trial Jury Instructions.

Defendants reserve the right to modify, supplement and/or amend its proposed post-trial instructions to the jury, including without limitation based upon Janssen's proposed *voir dire* questions, pre- and post-trial instructions to the jury and verdict form; the parties' arguments regarding and efforts to agree upon such materials; discussions regarding the Court's practices for jury selection; the parties' discussions regarding the claims and defenses that remain to be tried; and to respond to any other issues raised and/or resolved after this submission.

## TABLE OF CONTENTS

INSTRUCTION NO. 1: INTRODUCTION .......................................................................... 1

INSTRUCTION NO. 2: EQUAL BEFORE THE LAW ...................................................... 3

INSTRUCTION NO. 3: EVIDENCE ................................................................................. 4

INSTRUCTION NO. 4: USE OF DEPOSITIONS AS EVIDENCE .................................. 6

INSTRUCTION NO. 5: NOTETAKING ........................................................................... 7

INSTRUCTION NO. 6: JUROR USE OF ELECTRONIC COMMUNICATION TECHNOLOGIES ........................................................................ 8

INSTRUCTION NO. 7: PROVINCE OF THE JURY ....................................................... 9

INSTRUCTION NO. 8: DIRECT AND CIRCUMSTANTIAL EVIDENCE ................. 10

INSTRUCTION NO. 9: CREDIBILITY .......................................................................... 11

INSTRUCTION NO. 10: BURDEN OF PROOF .............................................................. 12

INSTRUCTION NO. 11: EXPERT TESTIMONY ........................................................... 14

INSTRUCTION NO. 12: ANSWERS TO INTERROGATORIES ................................... 15

INSTRUCTION NO. 13: CHARTS AND SUMMARIES ................................................. 16

INSTRUCTION NO. 14: DEMONSTRATIVE EXHIBITS .............................................. 17

INSTRUCTION NO. 15: MULTIPLE DEFENDANTS .................................................... 18

INSTRUCTION NO. 16: TRANSITION TO CASE-SPECIFIC INSTRUCTIONS ....... 19

INSTRUCTION NO. 17: SUMMARY OF CONTENTIONS ........................................... 20

INSTRUCTION NO. 18: THE ROLE OF THE CLAIMS OF A PATENT ..................... 23

INSTRUCTION NO. 19: HOW A CLAIM DEFINES WHAT IT COVERS .................. 24

INSTRUCTION NO. 20: INDEPENDENT AND DEPENDENT CLAIMS ..................... 25

INSTRUCTION NO. 21: CLAIM INTERPRETATION .................................................. 26

INSTRUCTION NO. 22: INFRINGEMENT GENERALLY ........................................... 27

INSTRUCTION NO. 23: DIRECT INFRINGEMENT BY "LITERAL INFRINGEMENT" ...................................................................... 28

**INSTRUCTION NO. 24:** **APPLICATION OF DIRECT INFRINGEMENT UNDER THE DOCTRINE OF EQUIVALENTS TO THIS CASE** ................................................................ **30**

**INSTRUCTION NO. 25:** **DOCTRINE OF EQUIVALENTS—APPLICATION ON A LIMITATION-BY-LIMITATION BASIS** ................... **32**

**INSTRUCTION NO. 26:** **VITIATION AND DOCTRINE OF EQUIVALENTS** ........... **33**

**INSTRUCTION NO. 27:** **INFRINGEMENT—COMPARISON TO THE ACCUSED PRODUCTS** ................................................. **36**

**INSTRUCTION NO. 28:** **INFRINGEMENT BY SUPPLY OF ALL OR A SUBSTANTIAL PORTION OF THE COMPONENTS OF A PATENTED INVENTION TO ANOTHER COUNTRY (§271(F)(1))** ................................................. **39**

**INSTRUCTION NO. 29:** **DIVIDED INFRINGEMENT** ..................................... **41**

**INSTRUCTION NO. 30:** **DIRECT INFRINGEMENT: ACTS OF MULTIPLE PARTIES COMBINED TO MEET ALL CLAIM LIMITATIONS** ........................................................... **42**

**INSTRUCTION NO. 31:** **VICARIOUS LIABILITY** ......................................... **44**

**INSTRUCTION NO. 32:** **ACTIVE INDUCEMENT** .......................................... **46**

**INSTRUCTION NO. 33:** **INVALIDITY—BURDEN OF PROOF** ...................... **51**

**INSTRUCTION NO. 34:** **PRIOR ART** .............................................................. **52**

**INSTRUCTION NO. 35:** **OBVIOUSNESS INTRODUCTION** .......................... **53**

**INSTRUCTION NO. 36:** **LEVEL OF ORDINARY SKILL** .............................. **54**

**INSTRUCTION NO. 37:** **SCOPE AND CONTENT OF THE PRIOR ART** ................... **55**

**INSTRUCTION NO. 38:** **OBVIOUSNESS ANALYSIS** ..................................... **56**

**INSTRUCTION NO. 39:** **PRIOR ART—OVERLAPPING RANGES** ............................. **60**

**INSTRUCTION NO. 40:** **OBJECTIVE CONSIDERATIONS OF NON-OBVIOUSNESS** ......................................................... **62**

**INSTRUCTION NO. 41:** **PRIOR ART—ADDITIONAL ELEMENTS** ........................... **64**

**INSTRUCTION NO. 42:** **WRITTEN DESCRIPTION REQUIREMENT** ...................... **65**

**INSTRUCTION NO. 43:** **WRITTEN DESCRIPTION REQUIREMENT— GENUS CLAIMS** .......................................................................... 67

**INSTRUCTION NO. 44:** **DAMAGES—INTRODUCTION** ................................................ 69

**INSTRUCTION NO. 45:** **DAMAGES—FOREIGN SALES** ................................................ 71

**INSTRUCTION NO. 46:** **DAMAGES—INTERVENING CAUSE** .................................... 72

**INSTRUCTION NO. 47:** **DAMAGES—PATENT HOLD-UP VALUE** ........................... 73

**INSTRUCTION NO. 48:** **DAMAGES—FUTURE SALES** .................................................. 74

**INSTRUCTION NO. 49:** **DAMAGES—APPORTIONMENT** .......................................... 75

**INSTRUCTION NO. 50:** **DAMAGES—ENTIRE MARKET VALUE RULE** ................. 76

**INSTRUCTION NO. 51:** **LOST PROFITS—IDENTITY OF THE RELEVANT MARKET** ....................................................................................... 77

**INSTRUCTION NO. 52:** **LOST PROFITS—PARTICIPATION IN RELEVANT MARKET** ....................................................................................... 78

**INSTRUCTION NO. 53:** **LOST PROFITS—*PANDUIT* FACTORS** ............................... 79

**INSTRUCTION NO. 54:** **LOST PROFITS—DEMAND** .................................................... 80

**INSTRUCTION NO. 55:** **LOST PROFITS—NON-INFRINGING SUBSTITUTES** ............................................................................. 81

**INSTRUCTION NO. 56:** **LOST PROFITS—CAPACITY** ................................................. 84

**INSTRUCTION NO. 57:** **LOST PROFITS—AMOUNT OF PROFIT** ............................. 85

**INSTRUCTION NO. 58:** **LOST PROFITS—PRICE EROSION** ...................................... 86

**INSTRUCTION NO. 59:** **REASONABLE ROYALTY—ENTITLEMENT** .................... 88

**INSTRUCTION NO. 60:** **REASONABLE ROYALTY—DEFINITION** ......................... 89

**INSTRUCTION NO. 61:** **REASONABLE ROYALTY—RELEVANT FACTORS** ........ 90

**INSTRUCTION NO. 62:** **REASONABLE ROYALTY—AVAILABILITY OF NON-INFRINGING SUBSTITUTES** ........................................ 92

**INSTRUCTION NO. 63:** **WILLFUL INFRINGEMENT** .................................................... 93

**INSTRUCTION NO. 64:** **SPECIAL VERDICT FORM** ...................................................... 94

**INSTRUCTION NO. 65:    DELIBERATIONS** ........................................................................ **95**

INSTRUCTION NO. 1:         **INTRODUCTION**[1]

Members of the Jury, I am now going to give you the instructions that you must follow in your deliberations and in deciding this case. I am going to give you the instructions in three parts. The first part would apply in all civil cases like this one. When we get to the second part, the instructions will be specific to the issues in this case. After that, I will give you the verdict form. The instructions correspond to particular questions on the verdict form. Finally, I will give you the third part of the instructions, which will relate to the process of your deliberating and deciding the case.

With regard to the first part of the instructions that would apply to any civil case, as opposed to a criminal case, I will tell you the following: the law permits me to comment on the evidence that you have heard, but I choose not to do that. Therefore, as I told you at the beginning of the case, you should not interpret, or to be more precise, misinterpret anything that I have said or done in the course of the case or anything I say now as a suggestion of what I think your verdict should be. That is entirely up to you.

As I have also told you previously, you must follow the law as I am describing it now. You should disregard anything the lawyers said in their closing arguments or any other time about the law if it sounds different or inconsistent with what I am telling you now. In addition, at the outset of the case, I gave you a very brief preliminary instruction on some of the applicable law to help you listen to the evidence. If anything I tell you now sounds different than or inconsistent with what I said at the beginning of case, follow the law as I am describing it now.

---

[1] Based on the Jury Charge from *Alves v. Daly, et al.*, Civ. No. 12-cv-10935, Jury Trial Day 14 at 96-138, 145-146 (D. Mass. May 26, 2015) (J. Wolf).

You should not single out any one instruction. I have endeavored to develop accurate, complete, balanced descriptions of the various relevant laws. And you should consider the instructions as a whole. You should also disregard what you may think about what the law should be. You have taken an oath to follow the law, and this is the law as it has been made, and you need to apply the law whether you think it is wise or foolish or might be better in some way.

In the course of deciding the case you are obligated to put aside any possible bias, prejudice, sympathy or antagonism you might have to one party or another and to decide the facts solely on the evidence and the law. That means, among other things, that you should not be influenced by emotion. It also means that you should not consider or be influenced by anything that you might have read or heard about allegations against any other third party. That was not evidence in this case, of course, and you have to decide this case based on the evidence that has been presented to you in court.

INSTRUCTION NO. 2:      **EQUAL BEFORE THE LAW**[2]

You should understand that all parties are equal before the law.  All of the parties in this case are corporations.  Corporations are entitled to the same fair trial as a private individual. Corporations act through their officers, employees and agents, who may bind the corporation by their acts and declarations made while acting within the scope of their authority delegated to them by the corporation or within the scope of their duties as employees of the corporation.[3]

---

[2] Based on the Jury Charge from *Alves v. Daly, et al.*, Civ. No. 12-cv-10935, Jury Trial Day 14 at 96-138, 145-146 (D. Mass. May 26, 2015) (J. Wolf).

[3] 3 Kevin F. O'Malley, Jay Grenig, and William C. Lee, *Federal Jury Practice & Instructions* § 103:31 (6th ed. 2016); *see also* Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit, Instruction 4.2 (2007).

INSTRUCTION NO. 3:          **EVIDENCE**[4]

I have said to you repeatedly that you have to decide the case based on the evidence.  The evidence has come to you in several forms.  It has come to you through the testimony of the witnesses.  It has come to you in the form of exhibits and documents that you will have in the jury room.  In addition, there were facts that the parties stipulated to and agree are true and you may accept as true.  You have also been exposed to some things that are not evidence.  As I have told you repeatedly, anything the lawyers say is not evidence.  Their opening statements were not evidence.  The questions they asked were not evidence.  The answers were the evidence.  And the closing arguments that they just made were not evidence.

As occurs in every case, there were objections to some of the questions, some of the exhibits, and I ruled on those objections.  You should not be influenced by the way I ruled.  If I overruled an objection and you heard an answer, you can consider that answer or that exhibit like any others.  If I sustained the objection, you should not speculate or guess what the answer or exhibit would have been.  And if I ordered you to disregard some evidence, you should disregard it and not rely on it in your deliberations.

In addition, I ruled that some evidence was admissible for a limited purpose, for example, against one party but not against other parties, or to be considered for one issue but not another issue.  You are obligated to use that evidence only for those limited purposes.  In addition, anything you may have seen or heard outside of this court is not evidence and you should not consider it or be influenced by it.  Your memory of the evidence will govern in your deliberations.  If the lawyers referred to evidence that you do not remember individually or after discussing the evidence

---

[4] Based on the Jury Charge from *Alves v. Daly, et al.*, Civ. No. 12-cv-10935, Jury Trial Day 14 at 96-138, 145-146 (D. Mass. May 26, 2015) (J. Wolf).

collectively, you should rely on the evidence as you remember it, not as the lawyers characterized it. You should not be influenced by the quality of the lawyering. You are deciding what facts, if any, have been proven by the evidence.

INSTRUCTION NO. 4:        **USE OF DEPOSITIONS AS EVIDENCE**[5]

During the trial, certain testimony has been presented by way of deposition.  The deposition consisted of sworn, recorded answers to questions asked of the witness in advance of the trial by attorneys for the parties to the case.  The testimony of a witness who, for some reason, is not present to testify from the witness stand may be presented in writing under oath or on a videotape.

Such testimony is entitled to the same consideration and is to be judged as to credibility, and weighed, and otherwise considered by you, insofar as possible, in the same way as if the witness had been present and had testified from the witness stand.

---

[5] 3 Kevin F. O'Malley, Jay Grenig, and William C. Lee, *Federal Jury Practice & Instructions* § 105:02 (6th ed. 2016); *see also* Model Civil Jury Instructions for the District Courts of the Third Circuit, Instruction No. 2.5 (2014); Fifth Circuit Pattern Civil Jury Instructions, Instruction No. 2.13 (2014); Federal Civil Jury Instructions of the Seventh Circuit, Instruction No. 1.05 (2009); Eleventh Circuit Pattern Jury Instructions (Civil Cases), Instruction No. 2.2 (2013).

INSTRUCTION NO. 5:        **NOTETAKING**[6]

I said that your recollection of the evidence controls.  As I told you at the outset, I let you take notes because I knew this would be a long trial, but it is impossible to write everything down. In addition, sometimes your notes may not be accurate. So while the notes can be helpful, do not assume that if one person wrote it down and somebody else remembers it differently that the person who wrote it down is necessarily accurate.  Use your judgment in making these decisions.

---

[6] Based on the Jury Charge from *Alves v. Daly, et al.*, Civ. No. 12-cv-10935, Jury Trial Day 14 at 96-138, 145-146 (D. Mass. May 26, 2015) (J. Wolf).

INSTRUCTION NO. 6:      **JUROR USE OF ELECTRONIC COMMUNICATION TECHNOLOGIES**[7]

During your deliberations, you must not communicate with or provide any information to anyone by any means about this case.  You may not use any electronic device or media, such as the telephone, a cell phone, smart phone, iPhone, Blackberry or computer, the Internet, any Internet service, any text or instant messaging service, any Internet chat room, blog, or website such as Facebook, LinkedIn, YouTube or Twitter, to communicate to anyone any information about this case or to conduct any research about this case until I accept your verdict.  In other words, you cannot talk to anyone in person, or on the phone, or correspond with anyone, or electronically communicate with anyone about this case.  You can only discuss the case in the jury room with your fellow jurors during deliberations.  I expect you will inform me as soon as you become aware of another juror's violation of these instructions.

You may not use these electronic means to investigate or communicate about the case because it is important that you decide this case based solely on the evidence presented in this courtroom.  Information on the Internet or available through social media might be wrong, incomplete, or inaccurate.  You are only permitted to discuss the case with your fellow jurors during deliberations because they have seen and heard the same evidence you have.  In our judicial system, it is important that you are not influenced by anything or anyone outside of this courtroom. Otherwise, your decision may be based on information known only by you and not to your fellow jurors or the parties in the case.  This would unfairly and adversely impact the judicial process.

---

[7] Based on 3 Kevin F. O'Malley, Jay Grenig, and William C. Lee, *Federal Jury Practice & Instructions* § 103:04 (6th ed. 2016).

INSTRUCTION NO. 7:          **PROVINCE OF THE JURY**[8]

As the jury, you are the judges of the facts.  You decide what facts have been proven by a preponderance of the evidence or by clear and convincing evidence, and then you decide what inferences, what conclusions to draw from those facts.  As part of this — and it happens in every trial — you are called upon to judge the credibility, the believability of evidence that is disputed.  You can, if you feel you should, accept as true everything that a witness said.  You could also find that everything a witness said is not true.  And you could also find that some of what the witness said is true and some of what the witness said is not true.  And so as I said, when you consider each witness's testimony, each piece of disputed evidence, you can choose to believe all of it, you can choose to believe none of it, or you can find that some of it is true and some of it is not true.  And once you find that certain testimony or evidence is credible (believable), then you decide what weight to give that evidence, which means how much importance to attach to it.

In addition, once facts are proven, you can use your experience and your common sense to draw reasonable inferences from proven facts.  I told you a few minutes ago you were required to put aside any bias or prejudice or sympathy you might have for one side or the other, but you are not expected to put aside your experience and your common sense.  In fact, you are here as a jury in part to bring the common sense of the community in making judgments with regard to disputed evidence in deciding what facts are proven.

---

[8] Based on the Jury Charge from *Alves v. Daly, et al.*, Civ. No. 12-cv-10935, Jury Trial Day 14 at 96-138, 145-146 (D. Mass. May 26, 2015) (J. Wolf).

INSTRUCTION NO. 8:        **DIRECT AND CIRCUMSTANTIAL EVIDENCE**[9]

As I told you at the beginning of the case, the evidence falls into two categories.  There is direct evidence, such as the testimony of an eyewitness who says, "I was there and this is what I saw."  And then there is circumstantial evidence. Circumstantial evidence is proof of events from which you can infer that other facts exist.  And as I told you at the beginning of the case, reasoning from circumstantial evidence may initially seem like some complicated legal concept, but it is really something you do every day of your life.  So to remind you of the example I gave you at the beginning of the case and elaborate on it, if you go to sleep and the ground is green in front of your house, and you wake up in the morning and there is six inches of snow on the ground, you would infer that during the night, while you were sleeping, it snowed, although you did not actually see the snow falling from the sky. Nobody told you that happened. And then to elaborate a bit, if you saw footsteps in the snow leading up to your door, you would infer that during the night, while you were sleeping, somebody came to your front door.  And if your newspaper was at the end of the footsteps, you would infer that during the night, while you were sleeping, whoever delivers the newspaper came and delivered the newspaper.  That is reasoning from circumstantial evidence.

---

[9] Based on the Jury Charge from *Alves v. Daly, et al.*, Civ. No. 12-cv-10935, Jury Trial Day 14 at 96-138, 145-146 (D. Mass. May 26, 2015) (J. Wolf).

INSTRUCTION NO. 9:        **CREDIBILITY[10]**

I would like to give you somewhat of a commonsense checklist that you might want to use in deciding issues of credibility, in evaluating the believability of disputed testimony and other evidence.  So with regard to all the witnesses, you should start with an open mind and ask yourself questions, such as the following:

Did the witness seem honest or biased or hostile?  Did the witness have a motive not to tell the truth? Did the witness have an interest in the outcome of the case?  Did the witness seem to have a good memory?  Did the witness have a good opportunity to observe what he or she was testifying to?  How reasonable is the witness's story?  And was it consistent with the testimony of others, that witness's prior testimony and other believable evidence in the case?

---

[10] Based on the Jury Charge from *Alves v. Daly, et al.*, Civ. No. 12-cv-10935, Jury Trial Day 14 at 96-138, 145-146 (D. Mass. May 26, 2015) (J. Wolf).

INSTRUCTION NO. 10:          **BURDEN OF PROOF**[11]

This is a civil case.  On every issue one party or the other, either Janssen or the Defendants,

has the burden of proof.  As we go through the verdict form and my instructions, I will tell you

who has the burden of proof on which question.  In this civil case, there are two burdens of proof:

(1) preponderance of the evidence, and (2) clear and convincing evidence.

To establish by a preponderance of the evidence means to prove that something is more

likely than not.  In other words, a preponderance of the evidence means that the evidence, when

considered and compared with the evidence opposed to it, has more convincing force and produces

in your minds the belief that what a party seeks to prove is more likely true than not true.  If you

want to try to visualize this, if you think of the scales of justice, the party with the burden of proof

has to provide evidence that you believe would tip the scales at least slightly in that party's favor.

When a party has the burden of proving any claim or defense by clear and convincing

evidence, it means that the party must present evidence that leaves you with a firm belief or

conviction that it is highly probable that the factual contentions of the claim or defense are true.

This is a higher standard of proof than proof by a preponderance of the evidence, but it does not

require proof beyond a reasonable doubt.

In determining whether any fact in issue meets the applicable burden of proof, you may,

unless otherwise instructed, consider the testimony of all witnesses regardless of who called them

and all exhibits received in evidence regardless of who may have introduced them.  The burden of

proof has not been carried if after you have considered all the evidence you find that you must

---

[11] Based on the Jury Charge from *Alves v. Daly, et al.*, Civ. No. 12-cv-10935, Jury Trial Day 14 at 96-138, 145-146 (D. Mass. May 26, 2015) (J. Wolf); 9th Circuit, Manual of Model Civil Jury Instructions 1.4 (citing *Colorado v. New Mexico*, 467 U.S. 310, 316 (1984).); *see also Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.4.1 (July 2016).

speculate, guess or imagine that one or more of the necessary facts is true.  Although on each issue the burden is on one party or the other to prove its contention, this rule does not of course require proof to an absolute certainty, since proof to an absolute certainty is seldom possible.  In addition, because this is not a criminal case, the party with the burden of proof is not required to prove anything beyond a reasonable doubt.  In a civil case like this one, there are lower standards of proof: proof by a preponderance of the evidence or clear and convincing evidence.

INSTRUCTION NO. 11:  **EXPERT TESTIMONY**[12]

The rules of evidence ordinarily do not ordinarily permit witnesses to testify as to opinions or conclusions.  There is an exception to this rule for "expert witnesses."  An expert witness is a person who by education and experience has become expert in some art, science, profession, or calling.  Expert witnesses state their opinions as to matters in which they profess to be expert, and may also state their reasons for their opinions.[13]

In the course of the case you heard from several experts, who were permitted to testify based on their training and experience essentially as experts because they had opinions that might be helpful to you.  However, that kind of opinion testimony is like all other testimony.  You have to decide what you believe and then decide what weight to give any testimony you find believable.  In judging the credibility, or believability of expert testimony, you may consider the person's training and experience.  You should disregard any speculation or guesswork.  If an opinion expressed is based on an assumed fact that you do not find to have been proven, then you must disregard that opinion to the extent that it relied on that assumed fact.

An expert witness is like any other witness.  You can accept everything he or she said, some of what he or she said, or none of what he or she said.  That is up to you.  If you decide to accept some or all of it, you also need to decide what weight to give to that evidence—*i.e.*, how important it is.

---

[12] Based on the Jury Charge from *Alves v. Daly, et al.*, Civ. No. 12-cv-10935, Jury Trial Day 14 at 96-138, 145-146 (D. Mass. May 26, 2015) (J. Wolf).

[13] 3 Kevin F. O'Malley, Jay Grenig, and William C. Lee, *Federal Jury Practice & Instructions* § 104:40 (6th ed. 2016).

INSTRUCTION NO. 12:      **ANSWERS TO INTERROGATORIES**[14]

Each party has introduced into evidence certain interrogatories—that is, questions together with answers signed and sworn to by the other party.  A party is bound by its sworn answers.

By introducing an opposing party's answers to interrogatories, the introducing party does not bind itself to those answers.  The introducing party may challenge the opposing party's answers in whole or in part or may offer contrary evidence.

---

[14] 3 Kevin F. O'Malley, Jay Grenig, and William C. Lee, *Federal Jury Practice & Instructions* § 104:72 (6th ed. 2016).

INSTRUCTION NO. 13:      **CHARTS AND SUMMARIES**[15]

Charts and summaries have been shown to you in order to help explain facts disclosed by books, records, and other documents in evidence in the case.  Unless I instruct you otherwise, these charts or summaries are not themselves evidence or proof of any facts.

The charts and summaries are used only as a matter of convenience.  To the extent that you find they are not accurate summaries of facts shown by the evidence in the case, you are to disregard them entirely.

---

[15] 3 Kevin F. O'Malley, Jay Grenig, and William C. Lee, *Federal Jury Practice & Instructions* § 104:50 (6th ed. 2016); *see also* Fifth Circuit Pattern Civil Jury Instructions, Instruction No. 2.7 (2014); 8th Cir. Civil Jury Instr. § 2.11 (2014); Manual of Model Civil Jury Instructions for the District Courts of the Ninth Circuit, Instruction No. 2.12 (2007).

INSTRUCTION NO. 14:      **DEMONSTRATIVE EXHIBITS**[16]

Certain demonstrative exhibits, such as models, diagrams, timelines, and sketches, have been shown to you.  Those exhibits are used for convenience and to help explain the facts of the case.  Unless I instruct you otherwise, they are not themselves evidence or proof of any facts.

---

[16] Based on Federal Civil Jury Instructions of the Seventh Circuit, Instruction No. 1.24 (2009).

INSTRUCTION NO. 15:      **MULTIPLE DEFENDANTS**[17]

You must give separate consideration to each claim and each party in this case.  Although there are multiple defendants—Celltrion (which includes Celltrion Healthcare Co., Ltd. and Celltrion, Inc.) and Hospira—it does not follow that if one is liable, another is also liable.  In considering a claim against a defendant, you must not consider evidence admitted only against other defendants or only as to other claims.

---

[17] Based on *Federal Civil Jury Instructions Of The Seventh Circuit*, Committee on Pattern Civil Jury Instructions of the Seventh Circuit, 1.25 (2005).

INSTRUCTION NO. 16:      **TRANSITION TO CASE-SPECIFIC INSTRUCTIONS**[18]

      That completes the first of the three parts of my instructions, the instructions that apply in every civil case.  I will now give you instructions specific to this case.

---

[18] Based on the Jury Charge from *Alves v. Daly, et al.*, Civ. No. 12-cv-10935, Jury Trial Day 14 at 96-138, 145-146 (D. Mass. May 26, 2015) (J. Wolf).

INSTRUCTION NO. 17:      **SUMMARY OF CONTENTIONS**[19],[20]

    As I did at the start of the case, I will first give you a summary of each side's contentions

in this case.  I will then provide you with detailed instructions on what each side must prove to win

on each of its contentions.

    As I previously told you, Janssen alleges that Celltrion and Hospira infringe claims 1 and

2 of the '083 patent.  Specifically, Janssen alleges that General Electric Company's subsidiary GE

Healthcare (also known as GE, GE HyClone, or HyClone), which is not a defendant in this case,

directly infringes the '083 patent by making two cell culture media powders that Janssen argues

are covered by claims 1 and 2 of the '083 patent.  Janssen admits that the accused media powders

do not literally infringe the '083 patent because there are differences between the accused products

and the asserted claims.   Specifically, Janssen admits that the concentrations of at least 12

ingredients in each accused product fall outside of the ranges listed in claim 1 of the '083 patent.

Instead, Janssen alleges that GE HyClone has infringed the '083 patent under the doctrine of

equivalents by making the cell culture media powders in the United States.   The GE HyClone

media powders that are alleged to infringe are (1) Catalog No. SH3A2713, also known as the

growth powder, or the growth media powder, and (2) Catalog No. SH3A2800, also known as the

production powder, or the production media powder.   Janssen also alleges that GE HyClone

infringes the '083 patent by supplying or causing to be supplied in or from the United States all or

a substantial portion of the components listed in claims 1 and 2 of the '083 patent, where such

components are uncombined in whole or in part, in such manner as to actively induce the

---

[19] Based on *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.1 (July 2016).

[20] Defendants have moved for summary judgment of non-infringement for Hospira. As part of that briefing, Defendants dispute the legal validity of any theory of infringement for Hospira based on an alleged joint enterprise with Celltrion. To the extent the Court denies Defendants' motion, Defendants will propose a modified version of this instruction to incorporate Janssen's allegations under a joint enterprise theory.

combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States. Janssen makes three arguments in an effort to hold Celltrion and Hospira liable for this alleged infringement.

First, as to Celltrion only, Janssen argues that even though Celltrion does not make the media powders, it should be held vicariously liable for GE HyClone's alleged acts of direct infringement under the theory that GE HyClone acted as Celltrion's agent in manufacturing the accused media powders.

Second, Janssen argues that Celltrion is liable for actively inducing GE HyClone to make the allegedly infringing media powders.

Third, Janssen argues that Hospira is liable for actively inducing GE HyClone to make the allegedly infringing media powders.

Janssen also alleges that Celltrion and Hospira infringe the '083 patent by causing to be supplied in or from the United States all or a substantial portion of the components listed in claims 1 and 2 of the '083 patent, where such components are uncombined in whole or in part, in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States.

You must consider each company separately when determining whether either actively induced GE HyClone's alleged direct infringement.

Celltrion and Hospira both deny that GE HyClone directly infringed the asserted claims of the '083 patent, because they deny that the GE HyClone media powders meet all of the requirements of claims 1 and 2 of the '083 patent literally or under the doctrine of equivalents. If the GE HyClone media powders do not directly infringe, then there can be no infringement by Celltrion or Hospira. Celltrion also denies that it is vicariously liable for GE HyClone's alleged

direct infringement under an agency theory.  Both Celltrion and Hospira also deny that they have actively induced any infringement by GE HyClone.  Both Celltrion and Hospira also deny that they have caused the supply of components from the United States in such manner as to actively induce the combination of such components outside of the United States in a manner that would infringe the patent if such combination occurred within the United States.  Finally, Celltrion and Hospira allege that claims 1 and 2 of the '083 patent are invalid due to obviousness and/or lack of written description.

Your job is to decide whether GE HyClone's media powders directly infringe the asserted claims of the '083 patent, whether Celltrion is vicariously liable for GE HyClone's alleged direct infringement, whether Celltrion has actively induced GE HyClone's alleged direct infringement, whether Hospira has actively induced GE HyClone's alleged direct infringement, and whether the asserted claims of the '083 patent are invalid.

If you find that Celltrion or Hospira is liable for infringement of one or more of the asserted claims of the '083 patent and you find that the infringed claim(s) are valid, you will determine what amount of damages, if any, Janssen is entitled to due to infringement of the '083 patent.

INSTRUCTION NO. 18:        **THE ROLE OF THE CLAIMS OF A PATENT**[21]

Before you can decide many of the issues in this case, you will need to understand the role of patent "claims."  The patent claims are the numbered sentences at the end of a patent.  The claims are important because it is the words of the claims that define what a patent covers.  The figures and text in the rest of the patent provide a description and/or examples of the invention and put the claims in context, but it is the claims themselves that define what the patent covers and does not cover.  Each claim is effectively treated as if it were a separate patent, and each claim may cover more or less than another claim.  Therefore, what a patent covers depends, in turn, on what each of its claims covers.  A patent claim must describe the exact scope of the invention to apprise the public of what is still open to them.[22]

To decide whether or not there is infringement of each claim, and to decide whether each claim is invalid, you will first need to understand what each claim covers.  The law says that it is my role to define the terms of the claims and it is your role to apply my definitions to the issues that you are asked to decide in this case.  Therefore, as I explained to you at the start of the case, I have determined the meaning of certain words in the claims and I will provide to you my definitions of those certain claim terms.  You must accept my definitions of these words in the claims as being correct.  It is your job to take these definitions and apply them to the issues that you are deciding, including the issues of infringement and validity.

---

[21] Based on *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.2.1 (July 2016).

[22] *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 373 (1996) ("It has long been understood that a patent must describe the exact scope of an invention and its manufacture to 'secure to [the patentee] all to which he is entitled, [and] to apprise the public of what is still open to them.'"); *see also Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014).

INSTRUCTION NO. 19:        **HOW A CLAIM DEFINES WHAT IT COVERS**[23]

I will now explain how a claim defines what it covers.

A claim sets forth, in words, a set of requirements.  Each claim sets forth its requirements in a single sentence.  If a product satisfies each of these requirements, then it is covered by the claim.

There can be several claims in a patent.  Each claim may be narrower or broader than another claim by setting forth more or fewer requirements.  The coverage of a patent is assessed claim-by-claim.  In patent law, the requirements of a claim are often referred to as "claim elements" or "claim limitations."  For example, "anhydrous $CaCl_2$ [calcium chloride], 5-200 mg" is an "element" or "limitation" of claim 1.  When a thing (such as a product) meets all of the requirements of a claim, the claim is said to "cover" that thing, and that thing is said to "fall" within the scope of that claim.  In other words, a claim covers a product where each of the claim elements or limitations is present in the product.

As I just instructed you, there are certain specific terms that I have defined and you are to apply the definitions that I provide to you.

By understanding the meaning of the words in a claim, and by understanding that the words in a claim set forth the requirements that a product must meet in order to be covered by that claim, you will be able to understand the scope of coverage for each claim.  Once you understand what each claim covers, then you are prepared to decide the issues that you will be asked to decide, such as infringement and invalidity.

---

[23] Based on *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.2.2 (July 2016).

INSTRUCTION NO. 20:        **INDEPENDENT AND DEPENDENT CLAIMS**[24]

This case involves two types of patent claims: independent claims and dependent claims.

An "independent claim" sets forth all of the requirements that must be met in order to be covered by that claim. Thus, it is not necessary to look at any other claim to determine what an independent claim covers. In this case, claim 1 of the '083 patent is an independent claim.

Claim 2 is a "dependent claim." A dependent claim does not itself recite all of the requirements of the claim but refers to another claim for some of its requirements. In this way, the claim "depends" on another claim. Claim 2 incorporates all of the requirements of claim 1, to which it refers. Claim 2 then adds its own additional requirements. To determine what claim 2 covers, it is necessary to look at both claim 2 and claim 1 to which it refers. For a product to be covered by claim 2, it must meet all of the requirements of both claim 2 and claim 1.

---

[24] Based on *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.2.2.a (July 2016).

INSTRUCTION NO. 21:       **CLAIM INTERPRETATION**

I will now explain to you the meaning of some of the words of the claims in this case.   In doing so, I will explain some of the requirements of the claims.   As I have previously instructed you, you must accept my definition of these words in the claims as correct.   For any words in the claim for which I have not provided you with a definition, you should apply their common meaning to a person of ordinary skill in the art.   You should not take my definition of the language of the claims as an indication that I have a view regarding how you should decide the issues that you are being asked to decide, such as infringement and invalidity.   These issues are yours to decide.[25]

"Cell culture media" in the beginning of claim 1 means "nutritive media for culturing cells."[26]

The asserted claims also contain several ingredients that may be at concentrations as low as zero.   For example, claim 1 recites "sodium hypoxanthine, 0.0-20.0 mg."   These limitations are called "optional" insofar as their absence or presence in the accused media within the upper limit of the claimed range has no bearing on infringement and their absence or presence in the prior art within the upper limit of the claimed range has no bearing on invalidity.

---

[25] Based on *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.2.3 (July 2016).

[26]  Dkt. No. 226, 8/19/2016 Memorandum and Order at ¶ 4.

INSTRUCTION NO. 22:       **INFRINGEMENT GENERALLY**[27]

I will now instruct you how to decide whether or not GE HyClone, Celltrion, or Hospira has infringed the '083 patent.  Infringement is assessed on a claim-by-claim and party-by-party basis.  Therefore, there may be infringement as to one patent claim but no infringement as to another.  There may be infringement by one defendant but not another.

In this case, there are two possible ways that a claim may be infringed.  The two types of infringement are called: (1) direct infringement; and (2) active inducement.  Direct infringement is when a person or company itself infringes a patent.  Active inducement is referred to as "indirect infringement" and it occurs when a person or company knowingly and intentionally takes affirmative steps to induce another person or company to directly infringe.[28]  There cannot be indirect infringement without someone else engaging in direct infringement.  As I will explain further below, to prove active inducement of infringement, Janssen must also prove that Celltrion or Hospira's alleged active inducement caused the direct infringement that Janssen claims was committed by GE HyClone.

In order to prove infringement, Janssen must prove that the requirements for these types of infringement are met by a preponderance of the evidence, *i.e.*, that it is more likely than not that all of the requirements of one or more of each of these types of infringement have been proved.

I will now explain each of these types of infringement in more detail.

---

[27] Based on *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.3.1 (July 2016).

[28] 35 U.S.C. § 271(b) ("Whoever actively induces infringement of a patent shall be liable as an infringer."); *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 760 (2011) ("the adverb 'actively' suggests that the inducement must involve the taking of affirmative steps to bring about the desired result"); *DSU Med. Corp. v. JMS Co.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (en banc) ("Accordingly, inducement requires evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities.").

INSTRUCTION NO. 23:       **DIRECT INFRINGEMENT BY "LITERAL INFRINGEMENT"[29]**

There are two types of "direct infringement": (1) "literal infringement" and (2) "infringement under the doctrine of equivalents."  In order to prove direct infringement by literal infringement, Janssen must prove by a preponderance of the evidence, *i.e.*, that it is more likely than not, that the growth powder and the production powder that GE HyClone made in the United States meet all of the requirements of the asserted claims.

In this case, it is undisputed that the accused GE HyClone media powders do not literally meet all of the requirements of asserted claims 1 and 2, and thus do not literally infringe those claims.  The amounts of at least 12 ingredients in the accused media powders do not fall within the ranges required by the asserted claims.  Thus, Janssen does not allege that GE HyClone's media products literally infringe the asserted claims.  Janssen's claim of direct infringement requires it to apply the doctrine of equivalents.  I will address this in detail in a moment.

You must compare each accused product with each and every one of the requirements of a claim to determine whether all of the requirements of that claim are met.  You must determine, separately for each asserted claim, whether or not there is infringement.  There is one exception to this rule.  If you find that a claim on which other claims depend is not infringed, there cannot be infringement of any dependent claim that refers directly or indirectly to that independent claim.  In this case, that means that if you find that claim 1 is not infringed, claim 2 cannot be infringed.  On the other hand, if you find that an independent claim has been infringed, you must still decide, separately, whether the accused product meets additional requirements of any claims that depend from the independent claim, thus, whether those claims have also been infringed.  A dependent

---

[29] Based on *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.3.1.a (July 2016).

claim includes all the requirements of any of the claims to which it refers plus additional requirements of its own.

**INSTRUCTION NO. 24:     APPLICATION OF DIRECT INFRINGEMENT UNDER
THE DOCTRINE OF EQUIVALENTS TO THIS CASE[30]**

As I mentioned a moment ago, Janssen agrees that the amounts of at least 12 ingredients in the accused media powders do not fall within the ranges required by the asserted claims. Therefore, the accused media products do not literally infringe asserted claims 1 and 2.

Janssen instead alleges direct infringement of asserted claims 1 and 2 under the "doctrine of equivalents."  Under the doctrine of equivalents, a product infringes a claim if the accused product contains elements corresponding to each and every requirement of the claim literally, or if an element is not present literally, the accused product contains elements equivalent to those claim limitations not literally met by the accused product.  Janssen argues that the GE HyClone media powders infringe under the doctrine of equivalents because while certain ingredients are present in an amount outside of that required by the claims, Janssen contends that the amount present in the media powder is equivalent to the amount claimed.

You may find that an ingredient amount is equivalent to a range recited in a claim if a person having ordinary skill in the field of technology of the patent would have considered the differences between the ingredient amount and the claimed range to be "insubstantial," or would have found that the particular ingredient amount: (1) performs substantially the same function and (2) works in substantially the same way (3) to achieve substantially the same result as the range required by the claim. These tests are referred to as the insubstantial differences test and the function-way-result test. Janssen bears the burden of proving by a preponderance of the evidence each prong of this function-way-result test.[31]   And, in order to prove infringement by

---

[30] Based on *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.3.1.c (July 2016).

[31] *Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*, 808 F.3d 1313, 1320 (Fed. Cir. 2015) ("To survive summary judgment of noninfringement under the doctrine of equivalents, [patentee] had to present evidence of equivalence under each prong of the function-way-result test.").

"equivalents," Janssen must prove the equivalency of the ingredient amount to a claimed range by a preponderance of the evidence.  It is important to keep in mind that the application of the doctrine of equivalents is the exception and not the rule.[32]

You must compare each accused media powder with each and every one of the requirements of a claim to determine whether all of the requirements of that claim are met, either literally or under the doctrine of equivalents.  As the plaintiff, Janssen must provide particularized testimony and linking argument as to the insubstantiality of the differences between the claimed invention and the accused products, or with respect to the function, way, result test.[33]

If you find that independent claim 1 is not infringed, there cannot be infringement of dependent claim 2.  On the other hand, if you find that independent claim 1 has been infringed, you must still decide, separately, whether the media powder meets additional requirements of claim 2.  Dependent claim 2 includes all the requirements of independent claim 1, plus additional requirements of its own.

---

[32] *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed. Cir. 1991) ("Application of the doctrine of equivalents is the exception, however, not the rule, for if the public comes to believe (or fear) that the language of patent claims can never be relied on, and that the doctrine of equivalents is simply the second prong of every infringement charge, regularly available to extend protection beyond the scope of the claims, then claims will cease to serve their intended purpose. Competitors will never know whether their actions infringe a granted patent.").

[33] *Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*, 808 F.3d 1313, 1319 (Fed. Cir. 2015) ("[A] patentee must … provide particularized testimony and linking argument as to the insubstantiality of the differences between the claimed invention and the accused device or process, or with respect to the function, way, result test when such evidence is presented to support a finding of infringement under the doctrine of equivalents.").

INSTRUCTION NO. 25:     **DOCTRINE OF EQUIVALENTS—APPLICATION ON A LIMITATION-BY-LIMITATION BASIS**

The application of the doctrine of equivalents must be applied to individual limitations of the patent claim, not to the invention as a whole.  In other words, the doctrine of equivalents must be applied on a limitation-by-limitation basis.[34]  This is because each limitation contained in a patent claim contributes to defining the scope of the patented invention.  Merely comparing the overall result of an accused product to an asserted patent claim is not enough to prove equivalence.[35]

In this case, Janssen agrees that the accused growth media powder is missing at least 13 limitations because at least 13 ingredient concentrations fall outside of the literal ranges listed in claim 1 of the '083 patent.  Janssen also agrees that the accused production media powder is missing at least 12 limitations because at least 12 ingredient concentrations fall outside of the literal ranges listed in claim 1 of the '083 patent.  In order to prove infringement under the doctrine of equivalents, Janssen must prove that each and every one of these ingredients is equivalent to its corresponding claim limitation concentration.

---

[34] *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997) ("Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole. It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety.").

[35] *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997) ("Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole. It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety."); *Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*, 808 F.3d 1313, 1320 (Fed. Cir. 2015) ("Generalized testimony as to the overall similarity between the claims and the accused infringer's product or process will not suffice.") (quotations and citations omitted).

INSTRUCTION NO. 26:      **VITIATION AND DOCTRINE OF EQUIVALENTS**

There can be no infringement under the doctrine of equivalents if even one element of a claim or its equivalent is not present in the accused device.[36]

Each element contained in a patent claim is material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole.[37]  It is important to ensure that the application of the doctrine, even as to an individual element, such as the concentration ranges claimed in the '083 patent, is not allowed such broad play as to effectively eliminate that element in its entirety.[38]  Not all claim limitations are entitled to an equal scope of equivalents.  You may find, due to the inherent narrowness of language in the patent claims, that the concentration claim limitations warrant little, if any, range of equivalents.[39,40]  A generalized showing of equivalency between the claim as a

---

[36] *Lockheed Martin Corp. v. Space Sys./Loral, Inc.*, 324 F.3d 1308, 1321 (Fed. Cir. 2003) ("Under the all elements rule, there can be no infringement under the doctrine of equivalents if even one limitation of a claim or its equivalent is not present in the accused device.").

[37] *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997) ("Each element contained in a patent claim is deemed material to defining the scope of the patented invention, and thus the doctrine of equivalents must be applied to individual elements of the claim, not to the invention as a whole. It is important to ensure that the application of the doctrine, even as to an individual element, is not allowed such broad play as to effectively eliminate that element in its entirety."); *see also Akzo Nobel Coatings, Inc. v. Dow Chem. Co.*, 811 F.3d 1334, 1342 (Fed. Cir. 2016) ("[A]ll claim limitations are not entitled to an equal scope of equivalents. Ultimately, many limitations warrant little, if any, range of equivalents." (internal citations and quotation marks omitted)); *id.* ("Under the doctrine of equivalents, an infringement theory thus fails if it renders a claim limitation inconsequential or ineffective."); *London v. Carson Pirie Scott & Co.*, 946 F.2d 1534, 1538 (Fed. Cir. 1991) ("Application of the doctrine of equivalents is the exception, however, not the rule, for if the public comes to believe (or fear) that the language of patent claims can never be relied on, and that the doctrine of equivalents is simply the second prong of every infringement charge, regularly available to extend protection beyond the scope of the claims, then claims will cease to serve their intended purpose. Competitors will never know whether their actions infringe a granted patent."); *see also Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.3.1.d (July 2016); *Moore U.S.A., Inc. v. Standard Register Co.*, 229 F.3d 1091, 1106 (Fed. Cir. 2000) ("[A]ll claim limitations are not entitled to an equal scope of equivalents. Whether the result of the All Limitations Rule, prosecution history estoppel, or the inherent narrowness of the claim language, many limitations warrant little, if any, range of equivalents." (internal citations omitted)).

[38] *Id.*

[39] *Id.*

[40] Defendants contend that the '083 patent's claimed ranges are so precise that Janssen should be precluded from using the doctrine of equivalents to expand them at all.  *Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*, 808 F.3d

whole and the allegedly infringing product or process is not sufficient to show infringement under the doctrine of equivalents.[41]   In no case may the doctrine of equivalents ignore the individual claim elements.[42]

Some elements in the asserted claims of the '083 patent recite ingredients and ranges of amounts for those ingredients.  You may not ignore the claimed range merely because the same ingredient is present in the GE HyClone media powder.  For the range of amounts, the doctrine of equivalents is not satisfied merely by showing the same ingredient is present in the accused product.  Equivalence must be shown between the claimed numerical range and the concentration of the ingredient in the accused product.[43]

---

1313, 1321 (Fed. Cir. 2015) (holding that doctrine of equivalents cannot "ignore the precise and specific . . . limitations in the claims"); *see also Nautilus, Inc. v. Biosig Instruments, Inc.*, 134 S. Ct. 2120, 2129 (2014) ("[A] patent must be precise enough to afford clear notice of what is claimed, thereby 'appris[ing] the public of what is still open to them.' Otherwise there would be '[a] zone of uncertainty which enterprise and experimentation may enter only at the risk of infringement claims.'"); *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 29 (1997) ("There can be no denying that the doctrine of equivalents, when applied broadly, conflicts with the definitional and public-notice functions of the statutory claiming requirement."); *Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki*, 493 F. 3d 1368, 1379 (Fed. Cir. 2007) ("The theory of the doctrine of equivalents is that an applicant through the doctrine of equivalents should only be able to protect the scope of his invention, not to expand the protectable scope of the claimed invention to cover a new and unclaimed invention." (internal citation omitted)).

[41]   *See id.*; *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1296 (Fed. Cir. 2009) ("Infringement analysis under the doctrine of equivalents proceeds element-by-element; a generalized showing of equivalency between the claim as a whole and the allegedly infringing product or process is not sufficient to show infringement."); *Intellectual Ventures I, LLC v. Canon Inc.*, 143 F. Supp. 3d 143, 155 (D. Del. 2015) ("The mere showing that an accused device is equivalent overall to the claimed invention is insufficient to establish infringement under the doctrine of equivalents.").

[42]   *Abbott Labs. v. Sandoz, Inc.*, 566 F.3d 1282, 1297 (Fed. Cir. 2009) ("In no case, however, may the doctrine of equivalents ignore the individual claim elements.").

[43]   *Forest Laboratories, Inc. v. Abbott Laboratories*, 239 F. 3d 1305, 1313 (Fed. Cir. 2001) ("Abbott presented testimony that the percentage of water in CLSE is irrelevant because the pharmaceutical composition made from CLSE, Infasurf®, is 'nearly all water.' As the court noted, however, this testimony does not satisfy Abbott's burden of proving that the percentage of water in CLSE, if any, is equivalent to the percentages of water set forth in claim 1 of the '301 and '839 patents. . . . A statement that water is 'irrelevant' does not establish that an unknown percentage of water is equivalent to the claimed water percentages. If we accepted this testimony and treated the water limitation as irrelevant, we would be vitiating that limitation." (internal citations omitted)); *Advanced Steel Recovery, LLC v. X-Body Equip., Inc.*, 808 F.3d 1313, 1317 (Fed. Cir. 2015) ("A patentee, bearing the burden of showing equivalence, cannot merely point to other claim limitations to satisfy the doctrine of equivalents. Doing so runs afoul of the 'all-elements rule' articulated in *Warner-Jenkinson*."); *see also Revlon Consumer Prods. Corp. v. Estee Lauder Co.*, No. 00-5960, 2003 WL 21751833, at *40 (S.D.N.Y. Jul. 30, 2003) ("Revlon fails to assert what range would suffice.

Janssen cannot support its claim for infringement under the doctrine of equivalents by arguing that a recited range is irrelevant.[44]   The doctrine of equivalents may not be applied so broadly as to encompass any alternative that accomplishes the same performance.[45]

---

Instead, Revlon asserts that the degree of coating is irrelevant as long as it results in hydrophobicity—effectively vitiating the structural coating element.").

[44]   *Amazin' Raisins Int'l, Inc. v. Ocean Spray Cranberries, Inc.*, 306 F. App'x 553, 558-59 (Fed. Cir. Oct. 31, 2008) ("To find that an item of fruit with a moisture content between 87 to 90% is insubstantially different from an item of dried fruit with a moisture content between 10 to 18% would defy reason and necessarily render the 'dried fruit' limitation meaningless."); *see also Tronzo v. Biomet, Inc.*, 156 F.3d 1154, 1160 (Fed. Cir. 1998) ("According to the expert testimony, any shape would be equivalent to the conical limitation of claims 2 and 10. Such a result is impermissible under the all-elements rule of Warner-Jenkinson because it would write the 'generally conical outer surface' limitation out of the claims"); *Chiron Corp. v. SourceCF Inc.*, 431 F. Supp. 2d 1019, 1035–36 (N.D. Cal. 2006) ("Under Chiron's view, concentration would become meaningless. This became glaringly obvious during the testimony of Chiron's expert . . . When he was asked to run the numbers for even weaker concentrations, i.e., concentrations at 30 mg/ml or less, the difference in lung-captured amounts was yet again small. His methodology tended to prove that almost any weak concentration would still infringe."); *Talbert Fuel Sys. Patents Co. v. Unocal Corp.*, 347 F.3d 1355, 1360 (Fed. Cir. 2003) ("The Unocal fuels do not simply depart by a few degrees from 345°F, but have 'true boiling point endpoints ranging from 373.8°F to 472.9°F.' . . . [N]o reasonable trier of fact could find only insubstantial differences between fuels having an endpoint of 345°F and fuels with the endpoints shown for the Unocal fuels.").

[45]   *See, id.*

INSTRUCTION NO. 27:      **INFRINGEMENT—COMPARISON TO THE ACCUSED PRODUCTS**

In evaluating doctrine of equivalents, the only proper comparison is between the accused products and the asserted claims.  It is not proper to compare the accused products to, for example, a preferred embodiment of the patent claim described in the specification or a commercialized embodiment of the patent claim.[46]

Janssen must prove the actual accused GE HyClone media powders infringe claims 1 and 2 of the '083 patent.  It is not sufficient to demonstrate that something that is not the accused media

---

[46] *Zenith Labs., Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1423 (Fed. Cir. 1994) ("The district court, instead of requiring the comparison of the accused compound following conversion to be made with the lines specified in the claim, allowed Bristol to make the comparison with the diffraction pattern exhibited by a sample (the reference pattern) of a material considered by Bristol to be the patented compound.  As we have repeatedly said, it is error for a court to compare in its infringement analysis the accused product or process with the patentee's commercial embodiment or other version of the product or process; the only proper comparison is with the claims of the patent."); *Stevenson v. Doyle Sailmakers, Inc.*, No. 87-892, 1992 WL 34693, at *1 (D. Mass. Feb. 18, 1992) (Wolf, J.) ("In order to apply the doctrine of equivalents, comparison is made between the accused device and the properly construed claims of plaintiff's patent, not with a preferred embodiment described in the specification or with a commercialized embodiment." (citing *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985).); *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) ("Infringement, literal or by equivalence, is determined by comparing an accused product not with a preferred embodiment described in the specification, or with a commercialized embodiment of the patentee, but with the properly and previously construed claims in suit."); *Insta-Foam Prod., Inc. v. Universal Foam Sys., Inc.*, 906 F.2d 698, 702 (Fed. Cir. 1990) ("[i]t is the limitations and functions of the invention described in the claims, not the elements or functions of the accused device, which establish the reference point for the doctrine of equivalents analysis.").

powders would infringe the claims.[47]  It also is not sufficient to demonstrate that the accused media

powders are equivalent to something that is not one of the asserted patent claims.[48]

---

[47] *See id.*; *Izumi Prods. Co. v. Koninklijke Philips Elec. N.V.*, 315 F. Supp. 2d 589, 602 (Sept. 30, 2010 N.D.Ill) ("Dr. Benedict reviewed the grooved inner cutter found on only two accused infringing electric rotary razors . . . in formulating his turbulence theory. He did not consider the grooved inner cutters on any of the other 114 accused infringing electric rotary razors. While the court acknowledges that turbulence is a well established engineering principle in the area of fluid dynamics, the court finds that Dr. Benedict essentially applied this theory to explain the function of the accused infringing electric rotary razors based solely on his subjective belief. He did not perform any testing on any of the accused infringing electric rotary razors or, for that matter, on an electric rotary razor manufactured by Izumi to validate his theory." (internal citations omitted)); *Yoon Ja Kim v. ConAgra Foods, Inc.*, 465 F.3d 1312, 1320 (Fed. Cir. 2006) ("While Kim, who was qualified as an expert, offered conclusory testimony that the additional ingredients would not have materially affected the pertinent characteristics of the bread, Kim did not support this determination with any examinations or tests of the actual accused products. Under the circumstances of this case, we agree with the district court that Kim did not prove infringement because she presented no testimony based on the accused products themselves that supported a finding of infringement."); *Lupin Ltd. v. Abbott Labs.*, 491 F. Supp. 2d 563, 569 (E.D. Va. 2007) (holding that expert's theoretical discussion in summary judgment declaration, which compared abstract hydrated forms of crystalline drug that might have shared characteristics with accused product, was not sufficient to allow reasonable jury to conclude accused product infringed patent claim under doctrine of equivalents); *Lakim Indus., Inc. v. Linzer Prod. Corp.*, No. CV12-04976-ODW(JEMX), 2013 WL 11323597, at *5 (C.D. Cal. Jan. 24, 2013) ("Conducting an infringement analysis from this physically altered accused product would lead to an absurd result. The Court cannot permit Quali-Tech to physically alter Linzer's commercial product in an attempt to create an outer cylinder from the remaining core of the disassembled paint roller."); *Abbott Labs. v. Baxter Healthcare Corp.*, No. 04 C 836, 2010 WL 3894427, at *3 (N.D. Ill. Sept. 30, 2010) ("Drs. Lessor and Rogers' testimony was not sufficiently based on an analysis of Baxter's insoluble epoxyphenolic liner itself."); *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1556 (Fed. Cir. 1995) ("The fact that it is possible to alter the AcuCam so that the camera becomes 'rotatably coupled' to its housing is not enough, by itself, to justify a finding that the manufacture and sale of the AcuCam infringe HTMI's patent rights."); *Phillips v. Am. Honda Motor Co.*, 238 F. App'x 537, 540-42 (11th Cir. 2007) ("[The expert] obtained his temperature readings from a plastic dummy reinforced with metal bars rather than from a human being. We recognize he may have had valid safety reasons for using a dummy instead of a human. But Burleson produced no data showing that the conductive and heat-retentive properties of the dummy's foot were similar to those of a human foot. Nor did he show a reliable way to extrapolate from the temperature readings on the dummy's foot to the comparable temperatures on a human foot. As a result, Burleson provided no reliable link between his data and the facts at issue in the case: the temperature Plaintiff's feet experienced while riding the Honda ATV and the temperature his feet would have experienced had he been riding the Arctic Cat ATV.").

[48] *Id.*; *see also Zenith Labs., Inc. v. Bristol-Myers Squibb Co.*, 19 F.3d 1418, 1423 (Fed. Cir. 1994) ("The district court, instead of requiring the comparison of the accused compound following conversion to be made with the lines specified in the claim, allowed Bristol to make the comparison with the diffraction pattern exhibited by a sample (the reference pattern) of a material considered by Bristol to be the patented compound.  As we have repeatedly said, it is error for a court to compare in its infringement analysis the accused product or process with the patentee's commercial embodiment or other version of the product or process; the only proper comparison is with the claims of the patent."); *Stevenson v. Doyle Sailmakers, Inc.*, No. 87-892, 1992 WL 34693, at *1 (D. Mass. Feb. 18, 1992) (Wolf, J.) ("In order to apply the doctrine of equivalents, comparison is made between the accused device and the properly construed claims of plaintiff's patent, not with a preferred embodiment described in the specification or with a commercialized embodiment." (citing *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985).); *SRI Int'l v. Matsushita Elec. Corp. of Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) ("Infringement, literal or by equivalence, is determined by comparing an accused product not with a preferred embodiment described in the specification, or with a commercialized embodiment of the patentee, but with the properly and previously construed claims in suit."); *Insta-Foam Prod., Inc. v. Universal Foam Sys., Inc.*, 906 F.2d 698, 702 (Fed. Cir. 1990) ("[i]t is the limitations and functions

As I noted, the accused products in this case are two media powders made by GE HyClone in Utah and shipped to Celltrion in South Korea.  You may not consider how the powder is used outside the United States or what is done to the powder outside the United States in determining whether the accused products infringe the '083 patent.[49]  Any modifications to the powders made in South Korea, anything done with the powders in South Korea, and any products made using the powders in South Korea are not the subject of this action and you should not consider them.[50]

---

of the invention described in the claims, not the elements or functions of the accused device, which establish the reference point for the doctrine of equivalents analysis.").

[49] *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 439 (2007) ("[F]oreign law alone, not United States law, currently governs the manufacture and sale of components of patented inventions in foreign countries. If AT & T desires to prevent copying in foreign countries, its remedy today lies in obtaining and enforcing foreign patents."); *Power Integrations v. Fairchild Semiconductor Int'l.*, 711 F.3d 1348,  1371-72 (Fed. Cir. 2013) ("It is axiomatic that U.S. patent law does not operate extraterritorially to prohibit infringement abroad."; "[F]oreign exploitation of a patented invention [] is not infringement at all."; "Regardless of how the argument is framed under the facts of this case, the underlying question here remains whether Power Integrations is entitled to compensatory damages for injury caused by infringing activity that occurred outside the territory of the United States. The answer is no."; "The entirely extraterritorial production, use, or sale of an invention patented in the United States is an independent, intervening act that, under almost all circumstances, cuts off the chain of causation initiated by an act of domestic infringement.").

[50] *Id.*

INSTRUCTION NO. 28:     **INFRINGEMENT BY SUPPLY OF ALL OR A SUBSTANTIAL PORTION OF THE COMPONENTS OF A PATENTED INVENTION TO ANOTHER COUNTRY (§271(F)(1))**[51]

Janssen also asserts that Celltrion and Hospira infringed the '083 patent by causing to be supplied all or a substantial portion of the components of listed in claim 1 of the '083 patent from the United States to Singapore and actively induce the combination of those components into a product that would infringe the '083 patent if it had been assembled in the United States.

To show infringement under Section 271(f)(1), Janssen must prove that each of the following is more likely than not:

1.      The GE HyClone media powders, as they were intended to be assembled outside the United States, would have included all elements of at least claim 1 of the '083 patent;

2.      That Celltrion and Hospira caused to be supplied components from the United States that made up all or a substantial portion of the invention of at least claim 1 of the '083 patent; and

3.      That Celltrion and Hospira specifically intended to induce the combination of the components into a product that would infringe the '083 patent if the components had been combined in the United States, knowing that such a combination would infringe the '083 patent.

A substantial portion of components requires a quantitative, not a qualitative, assessment. The export of a single component of a multi-component invention cannot create liability under § 271(f)(1).

In order to establish that Celltrion or Hospira "supplied, or caused to be supplied," components, it is not sufficient that GE HyClone exported components in response to an order. Rather, you must find that the accused infringer, here Celltrion or Hospira, physically exported the

---

[51] Based on AIPLA Model Patent Jury Instruction 3.11; *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.3.4 (July 2016); *Microsoft Corp. v. AT & T Corp.*, 550 U.S. 437 (2007); *WesternGeco L.L.C. v. ION Geophysical Corp.*, 791 F.3d 1340 (Fed. Cir. 2015), *cert. granted, judgment vacated on other grounds,* 136 S. Ct. 2486 (2016); *Pellegrini v. Analog Devices, Inc.*, 375 F.3d 1113 (Fed. Cir. 2004).

components from the U.S. or Celltrion and/or Hospira controlled that physical act of exportation. In order to find that GE HyClone was acting as Celltrion or Hospira's agent for the exportation of components, you must find that Celltrion or Hospira directed or controlled the physical act of exportation by GE HyClone.

In order to establish active inducement of infringement under § 271(f)(1), it is not sufficient that GE HyClone itself allegedly directly infringes the claim. Nor is it sufficient that Celltrion and Hospira were aware of the act(s) that allegedly constitute the direct infringement. Rather, you must find that Celltrion and Hospira specifically intended for GE HyClone to infringe the '083 patent, in order to find inducement of infringement under § 271(f)(1). If you do not find that Celltrion and Hospira specifically intended to infringe, then you must find that Celltrion and Hospira have not actively induced the alleged infringement under § 271(f)(1).

If you find that Celltrion was aware of the patent, but believed that the acts it encouraged would not constitute infringement of the patent if carried out in the United States, Celltrion cannot be liable for inducement under § 271(f)(1).

Likewise, if you find that Hospira was aware of the patent, but believed that the acts it encouraged would not constitute infringement of the patent if carried out in the United States, Hospira cannot be liable for inducement under § 271(f)(1).

INSTRUCTION NO. 29:      **DIVIDED INFRINGEMENT**[52]

[This instruction should only be given where the patentee alleges direct infringement of a method claim by the combined acts of multiple persons or companies. Defendants do not agree this instruction should be given at all, as stated in Defendants' motion for summary judgment.]

Divided infringement describes the situation in which more than one actor is involved in practicing the steps of a claimed method.  Only method claims can raise an issue of divided infringement.

---

[52] *Rearden LLC v. Walt Disney Co.*, 293 F. Supp. 3d 963, 972 (N.D. Cal. 2018) ("Divided infringement describes a situation in which more than one actor is involved in practicing the steps of the claimed method."); *Akamai Techs., Inc v. Limelight Networks, Inc.*, 786 F.3d 899, 910 (Fed. Cir.), *on reh'g en banc sub nom. Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020 (Fed. Cir. 2015), and *reh'g en banc granted, opinion vacated sub nom. Akamai Techs., Inc. v. Limelight Networks, Inc.*, 612 F. App'x 617 (Fed. Cir. 2015) ("only method claims can raise an issue of divided infringement").

INSTRUCTION NO. 30:     **DIRECT INFRINGEMENT: ACTS OF MULTIPLE PARTIES COMBINED TO MEET ALL CLAIM LIMITATIONS**[53]

[This instruction should only be given where the patentee alleges direct infringement of a method claim by the combined acts of multiple persons or companies. Defendants do not agree this instruction should be given at all, as stated in Defendants' motion for summary judgment.]

The following instruction only applies in cases where there is divided infringement of a method claim.  Direct infringement occurs where all steps of a claimed method are performed by or are attributable to a single party. Where more than one party is involved in practicing the steps, you must determine whether the acts of one are attributable to the other such that a single party is responsible for the infringement. There are two situations where there may be direct infringement if no single party performs all of the steps of a claimed process but more than one party performs every step of the process: (1) the parties have formed a joint enterprise or (2) one party directs or controls other party's performance of the claim steps.

The patent holder alleges that alleged infringer A and alleged infringer B, collectively infringe the claims of a method patent.

To prove infringement through the acts of multiple parties, the patent holder must prove by a preponderance of the evidence (1) that all the steps of a claimed process were performed in the United States and (2) that the acts of alleged infringer B are attributable to alleged infringer A, either because alleged infringer A and alleged infringer B have formed a joint enterprise or because alleged infringer A directs or controls the acts of alleged infringer B.

To prove that alleged infringer A and alleged infringer B have formed a joint enterprise, the patent holder must prove four elements:

---

[53] Based on *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.3.7 (July 2016); 35 U.S.C. § 271(a); *Limelight Networks, Inc. v. Akamai Technologies, Inc.,* 797 F.3d 1020, 1022- 24 (Fed. Cir. 2015) (en banc).

(1)     there was an agreement, either express or implied, between alleged infringer

        A and alleged infringer B;

(2)     they shared a common purpose;

(3)     each had a financial interest in that purpose; and

(4)     each had an equal right of control in the enterprise.

To prove that alleged infringer A directed or controlled the acts of alleged infringer B, Janssen must prove that alleged infringer B performed the claim step(s) in order to receive a benefit from alleged infringer A and that alleged infringer A established how or when the claim step(s) were performed.

To be liable under these theories, each alleged infringer must have performed at least one step of the method claim. You may only find liability under these theories for method claims of a patent. The '083 patent has no method claims and Janssen does not accuse Defendants of infringing any method claims.

Further, liability under these theories is limited to direct infringement under 35 U.S.C. § 271(a). You may not find liability under these theories for indirect infringement, such as inducement, under 35 U.S.C. § 271(b), (c), or (f).

INSTRUCTION NO. 31:     **VICARIOUS LIABILITY**

Celltrion and Hospira do not directly infringe the '083 patent. Janssen alleges that GE HyClone directly infringes the '083 patent, and that Celltrion and Hospira are legally responsible for GE HyClone's alleged infringement. If you find that GE HyClone does not infringe, there is no reason to consider other infringement issues presented to you, including whether or not Celltrion or Hospira are legally responsible for GE HyClone. However, if you find that GE HyClone does directly infringe the '083 patent, then you must also consider whether Celltrion or Hospira are legally responsible for GE HyClone's alleged infringement. I will now instruct you on what legal responsibility requires.

Janssen alleges that Celltrion is liable for GE HyClone's alleged direct infringement under a theory of vicarious liability. In order for GE HyClone's actions to be attributable to Celltrion, Janssen must prove by a preponderance of the evidence that GE HyClone was acting as Celltrion's agent when GE HyClone conducted the activities alleged to infringe the '083 patent.[54]

The mere purchase of a product does not make the seller the buyer's agent.[55] Some aspect of direction and control is not enough, either. Instead, agency is a fiduciary relationship that arises

---

[54] *Cross Med. Prod. v. Medtronic Sofamor Danek*, 424 F.3d 1293, 1311 (Fed. Cir. 2005) ("In support of its argument that Medtronic directly infringes, Cross Medical cites evidence that Medtronic's representatives appear in the operating room, identify instruments used by surgeons, and thus in effect 'join' the anchor seat to the bone. Cross Medical argues that the situation is analogous to those in which courts have found a party to directly infringe a method claim when a step of the claim is performed at the direction of, but not by, that party. See, e.g., Shields v. Halliburton Co., 493 F.Supp. 1376, 1389 (W.D. La. 1980). However, if anyone makes the claimed apparatus, it is the surgeons, who are, as far as we can tell, not agents of Medtronic. Because Medtronic does not itself make an apparatus with the 'interface' portion in contact with bone, Medtronic does not directly infringe."); *Centillion Data Sys. v. Qwest Commc'ns.*, 631 F.3d 1279, 1287 (Fed. Cir. 2011) ("In Cross Medical, we considered the issue of vicarious liability for making a claimed apparatus or system under § 271(a). The claim related to a medical device and, as properly construed, required contact between the device and human bone. 424 F.3d at 1310–11. In the particular facts of that case, the accused manufacturer created the accused product, but did not perform surgeries to bring the device into contact with bone. We held that the manufacturer did not "make" the claimed apparatus. We held that if anyone made the claimed apparatus, it was the surgeon who implanted the accused device, possibly bringing it into contact with bone. Id. at 1311. We noted that the manufacturer would not be liable for the surgeon's direct infringement unless the surgeon acted as an agent of the manufacturer. Id.").

[55] *Joao Control & Monitoring Sys. of Cal. v. Sling Media*, No. C-11-6277 EMC, 2012 WL 3249510, at *7 (N.D. Cal. Aug. 7, 2012) ("To allow a vicarious liability claim based solely on a customer relationship[] . . . would run afoul of

when one person (a "principal") manifests assent to another person (an "agent") that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.[56]   The formation of an agency relationship requires the consent of both parties.[57]   Specifically, agency requires that (1) the principal manifested intent to grant authority to the agent, and (2) the agent agreed or consented to the agency relationship.[58]   If two parties disavow an agency relationship relating to the creation of the allegedly infringing media powders, you should not find that one exists.[59]

---

the Federal Circuit's warning in BMC that 'expanding the rules governing direct infringement to reach independent conduct of multiple actors would subvert the statutory scheme for indirect infringement.'"); *see also BMC Res., Inc. v. Paymentech, L.P.*, 498 F.3d 1373, 1381 (Fed. Cir. 2007) ("expanding the rules governing direct infringement to reach independent conduct of multiple actors would subvert the statutory scheme for indirect infringement").

[56] Restatement (Third) of Agency § 1.01 (2006) ("Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act.").

[57] *Ericsson v. D-Link Sys.*, 773 F.3d 1201, 1236 (Fed. Cir. 2014) (Agency requires "(1) the principal manifested intent to grant authority to the agent, and (2) the agent agreed or consented to the agency relationship."); *All Boys Music v. DeGroot*, No. 89 CIV. 8258 (LMM), 1992 WL 51502, at *12 (S.D.N.Y. Mar. 9, 1992) ("It is axiomatic…that the formation of an agency relationship requires the consent of both parties thereto."); *Tellium v. Corning*, No. 03 CIV. 8487 (NRB), 2004 WL 307238, at *6 (S.D.N.Y. Feb. 13, 2004) ("Where an agreement specifically precludes the creation of an agency relationship, courts will not create one."); *Butto v. Collecto*, 802 F. Supp. 2d 443, 449 (E.D.N.Y. 2011) ("Given Collecto's express disavowal of an agency relationship with either wireless provider—including an express disavowal of the wireless providers' control over Collecto's operations—it is difficult to find that Collecto was an agent of either.").

[58] *Id.*

[59] *Id.*

INSTRUCTION NO. 32:      **ACTIVE INDUCEMENT**[60]

Janssen alternately alleges that Celltrion and Hospira are each liable for infringement by actively inducing GE HyClone to directly infringe the '083 patent under the doctrine of equivalents.  As with direct infringement, you must determine whether there has been active inducement on a claim-by-claim basis, meaning one patent claim at a time, and on a party-by-party basis.

Celltrion or Hospira is liable for active inducement of a claim of the '083 patent only if Janssen proves by a preponderance of the evidence:

> (1)     the accused GE HyClone media powders directly infringe the '083 patent under the doctrine of equivalents;

> (2)     Celltrion or Hospira took active and affirmative steps during the time the '083 patent was in force with the specific intent to cause the infringing acts by GE HyClone; and

> (3)     at the time Celltrion or Hospira took active and affirmative steps with specific intent to cause the infringing acts by GE HyClone, Celltrion or Hospira was aware of the '083 patent and knew that the acts, if taken, would constitute infringement of the '083 patent, or that Celltrion or Hospira believed there was a high probability that the acts by GE HyClone infringed the '083 patent and took deliberate steps to avoid learning of that infringement.[61]

---

[60] Based on *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.3.2 (July 2016).

[61] Defendants do not believe that Janssen can prove willful blindness as a matter of law.  Defendants offer an instruction on willful blindness only in the event the Court believes a willful blindness instruction is appropriate.

You must consider each defendant individually when assessing whether Celltrion or Hospira is liable for active inducement.

In order to establish active inducement of infringement, it is not sufficient for you to find that GE HyClone itself directly infringes a claim of the '083 patent. It is not sufficient that Celltrion or Hospira was aware of only the acts by GE HyClone that are alleged to constitute or result in the direct infringement. Rather, in order to find active inducement of infringement, you must find that Celltrion or Hospira knowingly and specifically intended GE HyClone to infringe the '083 patent and took affirmative steps that caused that infringement by GE HyClone.

Knowledge of the '083 patent is not enough to prove active inducement of infringement.[62] And there is no requirement that Celltrion or Hospira investigate any allegation of infringement.[63] It also is not sufficient for you to find that Celltrion or Hospira knew there was a substantial risk

---

[62] *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1926, 1928 (2015) (inducement liability "requires knowledge of the patent in suit and knowledge of patent infringement" and "proof the defendant knew the acts were infringing"); *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 765 (2011) (inducement "requires knowledge of the existence of the patent that is infringed"); *Allvoice Dev. U.S., LLC v. Microsoft Corp.*, 988 F. Supp. 2d 1248, 1263 (W.D. Wash. 2013), *aff'd sub nom. Allvoice Dev. US, LLC v. Microsoft Corp.*, 612 F. App'x 1009 (Fed. Cir. 2015) (finding no inducement because the patent holder only provided evidence of awareness of the patent).

[63] *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769–70 (2011) ("We think these requirements give willful blindness an appropriately limited scope that surpasses recklessness and negligence. Under this formulation, a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to have actually known the critical facts. See G. Williams, Criminal Law § 57, p. 159 (2d ed. 1961) ('A court can properly find wilful blindness only where it can almost be said that the defendant actually knew'). By contrast, a reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing, see ALI, Model Penal Code § 2.02(2)(c) (1985), and a negligent defendant is one who should have known of a similar risk but, in fact, did not, see § 2.02(2)(d).The test applied by the Federal Circuit in this case departs from the proper willful blindness standard in two important respects. First, it permits a finding of knowledge when there is merely a "known risk" that the induced acts are infringing. Second, in demanding only 'deliberate indifference' to that risk, the Federal Circuit's test does not require active efforts by an inducer to avoid knowing about the infringing nature of the activities."); *Largan Precision Co, Ltd v. Genius Elec. Optical Co., Ltd.*, 86 F. Supp. 3d 1105, 1120 (N.D. Cal. 2015)5 ("Willful blindness requires not just a failure to ask whether any sales infringed, but an affirmative act to remain ignorant of infringing sales."); *Apeldyn Corp. v. AU Optronics Corp.*, 831 F. Supp. 2d 817, 831 (D. Del. 2011), *aff'd*, 522 F. App'x 912 (Fed. Cir. 2013) (finding that the fact that defendant never looked for patents in the relevant area "fall[s] short of willful blindness as articulated by the Global–Tech Court"); *Largan Precision Co., Ltd. v. Genius Elec. Optical Co., Ltd.*, No. 13-02502, 2015 WL 2063988, at *4 (N.D. Cal. May 4, 2015), *aff'd*, 646 F. App'x 946 (Fed. Cir. 2016) (there is no "affirmative duty to investigate all potential bases for infringement after receiving notice, no matter how difficult it may be to do so.").

that GE HyClone's acts infringed the '083 patent.  In other words, mere knowledge that GE HyClone's acts might infringe the '083 patent is not enough for Janssen to prove active inducement of infringement.  Rather, a finding of induced infringement requires proof that the defendant actually knew that GE HyClone's acts were in fact infringing or that Celltrion or HyClone believed there was a high probability that GE HyClone would infringe the '083 patent, but deliberately avoided learning the infringing nature of GE HyClone's acts.[64]

A good faith belief that the '083 patent was not infringed by GE HyClone is relevant evidence that tends to show that Celltrion and Hospira lacked the intent required to be held liable for induced infringement.[65]  If you find that Celltrion or Hospira was aware of the '083 patent, but

---

[64] *Takeda Pharm. U.S.A., v. W.-Ward Pharm.*, 785 F.3d 625, 631 (Fed. Cir. 2015) ("[I]t is well-established that 'mere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven.'"); *Global-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769–70 (2011) ("While the Courts of Appeals articulate the doctrine of willful blindness in slightly different ways, all appear to agree on two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact. We think these requirements give willful blindness an appropriately limited scope that surpasses recklessness and negligence. Under this formulation, a willfully blind defendant is one who takes deliberate actions to avoid confirming a high probability of wrongdoing and who can almost be said to  have actually known the critical facts. See G. Williams, Criminal Law § 57, p. 159 (2d ed.   *770 1961) ('A court can properly find wilful blindness only where it can almost be said that the defendant actually knew'). By contrast, a reckless defendant is one who merely knows of a substantial and unjustified risk of such wrongdoing, see ALI, Model Penal Code § 2.02(2)(c) (1985), and a negligent defendant is one who should have known of a similar risk but, in fact, did not, see § 2.02(2)(d).The test applied by the Federal Circuit in this case departs from the proper willful blindness standard in two important respects. First, it permits a finding of knowledge when there is merely a 'known risk' that the induced acts are infringing. Second, in demanding only 'deliberate indifference' to that risk, the Federal Circuit's test does not require active efforts by an inducer to avoid knowing about the infringing nature of the activities."); *Largan Precision Co, Ltd v. Genius Elec. Optical Co., Ltd.*, 86 F. Supp. 3d 1105, 1120 (N.D. Cal. 2015) ("Willful blindness requires not just a failure to ask whether any sales infringed, but an affirmative act to remain ignorant of infringing sales."); *Apeldyn Corp. v. AU Optronics Corp.*, 831 F. Supp. 2d 817, 831 (D. Del. 2011), aff'd, 522 F. App'x 912 (Fed. Cir. 2013) (finding that the fact that defendant never looked for patents in the relevant area "fall[s] short of willful blindness as articulated by the Global–Tech Court"); *Largan Precision Co., Ltd. v. Genius Elec. Optical Co., Ltd.*, No. 13-02502, 2015 WL 2063988, at *4 (N.D. Cal. May 4, 2015), aff'd, 646 F. App'x 946 (Fed. Cir. 2016) ("there is no 'affirmative duty to investigate all potential bases for infringement after receiving notice, no matter how difficult it may be to do so.'").

[65] *Commil USA, LLC v. Cisco Sys., Inc.*, 135 S. Ct. 1920, 1928 (2015) ("And the Global–Tech rationale is sound. Qualifying or limiting its holding, as the Government and Commil seek to do, would lead to the conclusion, both in inducement and contributory infringement cases, that a person, or entity, could be liable even though he did not know the acts were infringing. In other words, even if the defendant reads the patent's claims differently from the plaintiff, and that reading is reasonable, he would still be liable because he knew the acts might infringe. Global–Tech requires more. It requires proof the defendant knew the acts were infringing. And the Court's opinion was clear in rejecting any lesser mental state as the standard."); *Koninklijke Philips N.V. v. Zoll Med. Corp.*, 656 F. App'x 504, 523 (Fed. Cir. 2016) ("For the claims of the '454 waveform patent and the '905 waveform patent, we find that Zoll's belief in

believed in good faith that the acts it encouraged did not infringe that patent, Celltrion and Hospira cannot be liable for inducement.[66]  If you find that Celltrion or Hospira read the claims of the '083 patent and believed in good faith it did not infringe, and its reading of the '083 patent claims was reasonable, Celltrion and Hospira cannot be liable for inducement.[67]  As noted, Janssen must prove Celltrion or Hospira took affirmative steps with the specific intent to cause the infringing acts by GE HyClone at a time when the '083 patent was in force.[68]  In other words, actions taken before October 6, 2009—the day the '083 patent issued—should not be considered in your analysis.  The mere purchase of a product is not active inducement.[69]  Also, a party cannot be liable for induced

---

non-infringement, based on its reasonable claim construction argument, does negate the knowledge requirement of contributory infringement."); *Commil USA, LLC v. Cisco Sys., Inc.*, 720 F.3d 1361, 1367–68 (Fed. Cir. 2013), *vacated in part on other grounds*, 135 S. Ct. 1920 ("Under our case law, it is clear that a good-faith belief of non-infringement is relevant evidence that tends to show that an accused inducer lacked the intent required to be held liable for induced infringement.").

[66] *Id.*

[67] *Id.*

[68] *Nat'l Presto Indus., Inc. v. W. Bend Co.*, 76 F.3d 1185, 1196 (Fed. Cir. 1996) ("[W]e hold that the general rule is that inducement of infringement under § 271(b) does not lie when the acts of inducement occurred before there existed a patent to be infringed."); *McRee v. Goldman*, No. 11-CV-00991-LHK, 2012 WL 3745190, at *3 (N.D. Cal. Aug. 28, 2012) ("D. Goldman's financial contributions to the Stern Grove Canopy pre-date 2005, which is when Plaintiff alleges Defendants first learned that the Stern Grove Canopy allegedly infringed the '269 Patent. Thus, Plaintiff has not pled that D. Goldman provided funding to the Stern Grove Canopy project with the specific intent to induce an infringing act. Moreover, although Plaintiff alleges that Defendants first learned of his ' '269 Patent inventions as early as 1994,' SAC ¶ 42, the '269 Patent did not even issue until December 21, 1999. '[A]s a matter of law § 271(b) does not reach actions taken before issuance of the adverse patent.'"); *Micro Chem., Inc. v. Great Plains Chem. Co.*, 194 F.3d 1250, 1261 (Fed. Cir. 1999) ("Pre-issuance activities alone cannot establish inducement to infringe.").

[69] *Keplinger v. De Young*, 23 U.S. 358, 365 (1825) ("If this contract was real, and not colourable, which is the obvious meaning of the instruction, and the defendant had no other connexion with H. & K. in regard to these chains than what grew out of it, it would, in the opinion of the Court, be an extravagant construction of the patent law, to pronounce that it amounted to a breach of the plaintiff's patent right, by fixing upon the defendant the charge of having used the plaintiff's machine. Such a construction would be highly inconvenient and unjust to the rest of the community, since it might subject any man who might innocently contract with a manufacturer to purchase all the articles which he might be able to make within a limited period, to the heavy penalty inflicted by the act, although he might have been ignorant of the plaintiff's patent, or that a violation of it would be the necessary consequence of the contract."); *epicRealm, Licensing, LLC v. Autoflex Leasing, Inc.*, 492 F. Supp. 2d 608, 637 (E.D. Tex. 2007) ("In *Keplinger*, the Supreme Court considered whether a watch manufacturer was liable for inducing infringement by entering into an output contract to purchase all the watch chains made by a third-party chain maker who produced them on an infringing machine. *Id.* at 362–67. The watch maker knew which machine the chain maker would use and knew that the machine infringed the plaintiff's patent. *Id.* at 362. The contract, however, did not require the watch chains to be made on any particular machine but, instead, left that choice open to the chain maker. *Id.* at 364–65. The Court held that the

infringement if it does not successfully communicate with the alleged direct infringer and induce

them to commit the allegedly infringing acts.[70]   In addition, the intent necessary to induce

infringement must be directed to the actions of the underlying alleged direct infringer.[71]

---

contractual relationship could not support indirect liability of the watch maker for the chain maker's infringement. *Id.* at 365."); *Amgen, Inc. v. Elanex Pharm., Inc.*, No. C93-1483D, 1996 WL 84590, at *6 (W.D. Wash. Feb. 6, 1996) ("Here, as Merckle argues, its actions show a lack of specific intent to induce infringement. Prior to negotiating its distribution agreement with Merckle, Elanex had obtained its technology, had filed for various patent application, and had developed a plan to commercialize and market its EPO. Elanex solicited Merckle to market EPO in three countries in Europe. The contract provided that the EPO supplied would be manufactured in Germany by an independent supplier. Under its agreement with Merckle, Elanex retained control over the technology, production of EPO, and its contract supplier. Under these circumstances, summary judgment in favor of Merckle is granted."); *Gammino v. Cellco P'ship*, 527 F. Supp. 2d 395, 399 (E.D. Pa. 2007), *dismissed sub nom. Gammino v. Davel Commc'ns, Inc.*, 363 F. App'x 739 (Fed. Cir. 2009) ("Gammino argues, however, that once it informed Davel of his patents in March 2003, Davel then possessed the requisite intent. But informing Davel of the patents did not impose on Davel a duty to inquire after the local providers' methods; it merely put Davel on notice that Gammino's patent existed. '[M]ere knowledge of possible infringement by others does not amount to inducement; specific intent and action to induce infringement must be proven.' *Warner–Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1364 (Fed.Cir.2003). Even recognizing that direct evidence of intent is generally not available, *id.* at 1363, nothing in this record suggests that Davel specifically intended for the local providers to infringe Gammino's patents. Rather, the evidence indicates that Davel merely purchased call-blocking features in the normal course of trade and left it to the providers of those features to ensure that their methods complied with the patent laws."); *Hughes Aircraft Co. v. Nat'l Semiconductor Corp.*, 857 F. Supp. 691, 700 (N.D. Cal. 1994) ("NSC and Fairchild's evidence does nothing but prove the obvious proposition that General Motors, as the parent company of Delco Electronics and Hughes, has extensive involvement and control over their activities. However, none of the evidence which NSC and Fairchild have presented (1) gives any direct indication that General Motors had any knowledge of the '735 and '984 patents; (2) knew whether its subsidiaries or suppliers used processes which were in any way similar to those taught by these patents; (3) intended for its subsidiaries to infringe the '735 and '984 patents; or (4) had any interest in how the products purchased from its suppliers were manufactured. Accordingly, General Motors is entitled to summary judgment on NSC and Fairchild's claim that it induced the infringement of the '735 and '984 patents. Furthermore, because NSC and Fairchild have failed to raise a genuine issue of material fact regarding whether Delco Electronics infringed the '634 patent, see Section B.2 of this Order, their argument that General Motors induced Delco Electronics to do so must also fail."); *Goodwall Const. Co. v. Beers Const. Co.*, No. C79-1774A, 1981 WL 59408, at *5 (N.D. Ga. Sept. 24, 1981).

[70] *Power Integrations v. Fairchild Semiconductor*, No. 2015-1329, 2016 WL 7187430 at *19 (Fed. Cir. Dec. 12, 2016) ("This instruction left the jury with the incorrect understanding that a party may be liable for induced infringement even where it does not successfully communicate with and induce a third-party direct infringer.  The Supreme Court has explained that the term 'induce' as it is used in § 271(b) 'means '[t]o lean on; to influence; to prevail on; to move by persuasion.'  Each definition requires successful communication between the alleged inducer and the third-party direct infringer.").

[71] *Eli Lilly & Co. v. v. Teva Parenteral Medicines, Inc., et al.*, No. 2015-2067, 2017 WL 117164 at *16 (Fed. Cir. Jan. 12, 2017) ("First, to be clear, the intent for inducement must be with respect to the actions of the underlying direct infringer, here physicians.").

INSTRUCTION NO. 33:      **INVALIDITY—BURDEN OF PROOF**[72]

The fact that the PTO grants a patent does not necessarily mean that any invention claimed in the patent, in fact, deserves the protection of a patent.  For example, the PTO may not have had available to it all of the prior art that was presented to you, or the PTO could have made a mistake. A person accused of infringement has the right to argue here in federal court that a claimed invention in the patent is invalid because it does not meet the requirements for a patent.  It is your job to consider the evidence presented by the parties and determine independently whether or not Defendants have proven that the patent is invalid.[73]

I will now instruct you on the rules you must follow in deciding whether or not Defendants have proven that claims 1 and 2 of the '083 patent are invalid.  To prove that any claim of a patent is invalid, Defendants must persuade you by clear and convincing evidence, *i.e.*, you must be left with a clear conviction that the claim is invalid.

It is important to remember that a patent must be interpreted the same way for determining infringement and for determining invalidity.[74]

---

[72] Based on *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.4.1 (July 2016).

[73] Based on *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. A.1 (July 2016).

[74] *Source Search Techs., LLC v. LendingTree, LLC*, 588 F.3d 1063, 1075 (Fed. Cir. 2009) ("As this court has repeatedly instructed in the past, '[i]t is axiomatic that claims are construed the same way for both invalidity and infringement.'"); *Amazon.com, Inc. v. Barnesandnoble.com, Inc.*, 239 F.3d 1343, 1351 (Fed. Cir. 2001) ("A claim must be construed before determining its validity just as it is first construed before deciding infringement."); *C.R. Bard, Inc. v. M3 Sys., Inc.*, 157 F.3d 1340, 1363 (Fed. Cir. 1998) ("Claims must be interpreted the same way for determining infringement as was done to sustain their validity."); *Southwall Techs., Inc. v. Cardinal IG Co.*, 54 F.3d 1570, 1576 (Fed. Cir. 1995) ("Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers."); *Beachcombers, Int'l, Inc. v. WildeWood Creative Prods., Inc.*, 31 F.3d 1154, 1163 (Fed. Cir. 1994) ("We have already interpreted the claims for purposes of assessing their validity. The same claim interpretation of course applies to the infringement analysis.").

INSTRUCTION NO. 34:      **PRIOR ART**[75]

Prior art may include items that were publicly known or that have been used or offered for sale, or references, such as publications or patents, that disclose the claimed invention or elements of the claimed invention.  To be prior art, the item or reference must have been made, known, used, published, or patented before October 29, 2004.

Prior art includes the previously known subject matter in the field of a claimed invention for which a patent is being sought.  It includes issued patents, whether expired or unexpired, publications, and knowledge deemed to be publicly available, such as trade skills, trade practices, and the like.[76]  References do not need to have been known to Janssen, Celltrion, or Hospira, at the time of the invention in order to qualify as prior art.  Prior art can include patents and printed publications from anywhere in the world.[77]

---

[75] Based on *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.4.3a-1 (July 2016).

[76] Based on *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. C, *78 (July 2016).

[77] 35 U.S.C. §§ 102(a), (b).

INSTRUCTION NO. 35:       **OBVIOUSNESS INTRODUCTION**[78]

Even though an invention may not have been identically disclosed or described before it was made by an inventor, in order to be patentable, the invention must also not have been obvious to a person of ordinary skill in the field of technology of the patent at the time the invention was made.

Defendants may establish that a patent claim is invalid by showing, by clear and convincing evidence, that the claimed invention would have been obvious to persons having ordinary skill in the art in the field of cell culture media compositions at the time the invention was made.

In determining whether a claimed invention is obvious, you must consider the level of ordinary skill in the field of cell culture media compositions that someone would have had at the time the invention was made, the scope and content of the prior art, and any differences between the prior art and the claimed invention.

---

[78] Based on *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.4.3c (July 2016).

INSTRUCTION NO. 36:      **LEVEL OF ORDINARY SKILL**[79]

In deciding what the level of ordinary skill in the field of cell culture media compositions is, you should consider all the evidence introduced at trial, including but not limited to: (1) the levels of education and experience of the inventors and other persons actively working in the field; (2) the types of problems encountered in the field; (3) prior art solutions to those problems; (4) the rapidity with which innovations are made; and (5) the sophistication of the technology.

A person of ordinary skill in this art area would have a doctorate degree in biochemistry, molecular biology, or a related field with one or two years of direct experience in formulation of and use of cell culture media in the context of biopharmaceutical product production.  A person of ordinary skill in the art could also have fewer years of formal education if they held either a bachelor's or master's degree in the same fields listed above but also had several years of hands-on experience in academic or industrial laboratories in this area.

The person of ordinary skill in the art is presumed to know all prior art that you have determined to be reasonably relevant.[80] The person of ordinary skill is also a person of ordinary creativity that can use common sense to solve problems.[81]

---

[79] Based on *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.4.3c(i) (July 2016).

[80] *In re GPAC Inc.*, 57 F.3d 1573, 1579 (Fed. Cir. 1995) ("The person of ordinary skill in the art is a hypothetical person who is presumed to know the relevant prior art."); *Componex Corp. v. Elecs. For Imaging, Inc.*, No. 13-CV-384-WMC, 2014 WL 5361946, at *9 (W.D. Wis. Oct. 21, 2014) ("One skilled in the art is assumed to be "a person of ordinary creativity" and "common sense," familiar with the prior art and capable of researching accessible resources."); *Teva Women's Health, Inc. v. Lupin, Ltd.*, No. CIV.A. 10-603 PGS, 2012 WL 2523007, at *3 (D.N.J. June 29, 2012), *aff'd*, 505 F. App'x 959 (Fed. Cir. 2013) ("The person of ordinary skill in the art is a hypothetical person who is presumed to know the relevant prior art.").

[81] *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 421 (2007) ("A person of ordinary skill is also a person of ordinary creativity, not an automaton.").

INSTRUCTION NO. 37:        **SCOPE AND CONTENT OF THE PRIOR ART**[82]

In considering whether the claimed invention was obvious, you must first determine the scope and content of the prior art.

The scope and content of prior art for deciding whether the invention was obvious includes at least prior art in the same field as the claimed invention.  It also includes prior art from different fields that a person of ordinary skill in the art would have considered when trying to solve the problem that is addressed by the invention.

Where the party challenging the validity of the patent is relying on prior art that was not considered by the PTO during examination of the patent, you may consider whether that prior art is significantly different and more relevant than the prior art that the PTO did consider.  If you decide it was different and more relevant, you may weigh that prior art more heavily when considering whether the challenger has carried its clear-and-convincing burden of proving invalidity.

---

[82] Based on *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.4.3c(ii) (July 2016).

INSTRUCTION NO. 38:        **OBVIOUSNESS ANALYSIS**[83]

As I noted, in determining whether a claimed invention is obvious, you must consider the level of ordinary skill in the field of cell culture media compositions that someone would have had at the time the invention was made, the scope and content of the prior art, and any differences between the prior art and the claimed invention.   The prior art reference (or references when combined) need not teach or suggest all the claim limitations, for example the exact ingredients or concentration ranges of those ingredients, if the differences between the prior art and the claimed invention would have been obvious to a person of ordinary skill in the art.[84]   There is no requirement that there be an explicit suggestion, teaching, or motivation to combine prior art references.[85]   Instead, a motivation to combine references can come from a number of sources,

---

[83] Based on *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.4.3c (July 2016).

[84] Examination Guidelines for Determining Obviousness Under 35 U.S.C. 103 in View of the Supreme Court Decision in *KSR International Co. v. Teleflex Inc.*, 72 FR 57526-01; *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 419 (2007) ("The obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents. The diversity of inventive pursuits and of modern technology counsels against limiting the analysis in this way. In many fields it may be that there is little discussion of obvious techniques or combinations, and it often may be the case that market demand, rather than scientific literature, will drive design trends. Granting patent protection to advances that would occur in the ordinary course without real innovation retards progress and may, in the case of patents combining previously known elements, deprive prior inventions of their value or utility.").

[85] *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 419 (2007) ("Helpful insights, however, need not become rigid and mandatory formulas; and when it is so applied, the TSM test is incompatible with our precedents. The obviousness analysis cannot be confined by a formalistic conception of the words teaching, suggestion, and motivation, or by overemphasis on the importance of published articles and the explicit content of issued patents. The diversity of inventive pursuits and of modern technology counsels against limiting the analysis in this way. In many fields it may be that there is little discussion of obvious techniques or combinations, and it often may be the case that market demand, rather than scientific literature, will drive design trends. Granting patent protection to advances that would occur in the ordinary course without real innovation retards progress and may, in the case of patents combining previously known elements, deprive prior inventions of their value or utility."); *In re Kahn*, 441 F.3d 977, 987 (Fed. Cir. 2006) ("A suggestion, teaching, or motivation to combine the relevant prior art teachings does not have to be found explicitly in the prior art."); *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 415 (2007) ("Throughout this Court's engagement with the question of obviousness, our cases have set forth an expansive and flexible approach inconsistent with the way the Court of Appeals applied its TSM test here."); *Id.* at 415, 419 ("As our precedents make clear . . . , the analysis need not seek out precise teachings directed to the specific subject matter of the challenged claim, for a court can take account of the inferences and creative steps that a person of ordinary skill in the art would employ."); *see also Arrow Int'l., Inc. v. Spire Biomedical, Inc.*, 635 F. Supp. 2d 46, 70 n.24 (D. Mass. 2009).

including, for example, the prior art, market demand, or ordinary creativity, keeping in mind that the obviousness analysis is expansive and flexible.[86]

The asserted claims of the '083 patent are likely to be obvious if they are the result of combining familiar elements according to known methods to yield predictable results.[87]  Indeed, when a patent simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an arrangement, the combination is obvious.[88]  You may take into account such factors as (1) whether the claimed invention was merely the predictable result of using prior art elements according to their known function(s); (2) whether the claimed invention provides an obvious solution to a known problem in the relevant field; (3) whether the prior art teaches or suggests the desirability of combining elements claimed in the invention; (4) whether the prior art teaches away from combining elements in the claimed invention; (5) whether it would have been obvious to try the combinations of elements, such as when there is a design need or market pressure to solve a problem and there are a finite number of identified, predictable solutions; (6) whether the change resulted more from design incentives or other market forces; and (7) whether the changes are the result of routine optimization or testing.[89]  To find the invention obvious, you must find that the prior art provided a reasonable expectation of success.

---

[86] *Id.*

[87] *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 416 (2007) ("The combination of familiar elements according to known methods is likely to be obvious when it does no more than yield predictable results."); *Tyco Healthcare Grp. LP v. Ethicon Endo-Surgery, Inc.*, 774 F.3d 968, 977 (Fed. Cir. 2014) ("Claims would have been obvious if they are nothing more than a combination of familiar elements that yield predictable results.").

[88] *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 417 (2007) ("[T]he Court derived from the precedents the conclusion that when a patent 'simply arranges old elements with each performing the same function it had been known to perform' and yields no more than one would expect from such an arrangement, the combination is obvious.").

[89] *Pfizer, Inc. v. Apotex, Inc.*, 480 F.3d 1348, 1368–69 (Fed. Cir. 2007) ("We find this case analogous to the optimization of a range or other variable within the claims that flows from the "normal desire of scientists or artisans to improve upon what is already generally known." In re Peterson, 315 F.3d 1325, 1330 (Fed.Cir.2003) (determining

As I mentioned, you may consider whether or not the prior art "teaches away" from the claimed invention.  A reference may be said to "teach away" when a person of ordinary skill, upon reading the reference, would be discouraged from following the path set out in the reference, or would be led in a direction divergent from the path that was taken by the patentee.[90] The teaching away inquiry does not focus on whether a person of ordinary skill in the art would have merely favored one disclosed option over another disclosed option.[91] In assessing whether prior art teaches away, that better alternatives exist in the prior art does not mean that an inferior combination is

---

where in a disclosed set of percentage ranges the optimum combination of percentages lies is prima facie obvious). In In re Aller, 42 C.C.P.A. 824, 220 F.2d 454, 456 (1955), our predecessor court set forth the rule that the discovery of an optimum value of a variable in a known process is usually obvious. See also In re Boesch, 617 F.2d 272, 276 (C.C.P.A.1980) ("[D]iscovery of an optimum value of a result effective variable in a known process is ordinarily within the skill of the art."). Similarly, we hold that the optimization of the acid addition salt formulation for an active pharmaceutical ingredient would have been obvious where as here the acid addition salt formulation has no effect on the therapeutic effectiveness of the active ingredient and the prior art heavily suggests the particular anion used to form the salt. Cf. In re Geisler, 116 F.3d 1465, 1470 (Fed.Cir.1997) ("'[I]t is not inventive to discover the optimum or workable ranges by routine experimentation.'" (quoting Aller, 220 F.2d at 456)); In re Kulling, 897 F.2d 1147, 1149 (Fed.Cir.1990) (finding no clear error in Board of Patent Appeals and Interferences' conclusion that the amount of eluent to be used in a washing sequence was a matter of routine optimization known in the pertinent prior art and therefore obvious). Indeed, the logical line of testing was to react benzene sulphonate with amlodipine to confirm the presence of a salt, and then to verify that the physicochemical properties of amlodipine besylate were adequate, particularly the trait of sufficient non-stickiness. The experimentation needed, then, to arrive at the subject matter claimed in the '303 patent was "nothing more than routine" application of a well-known problem-solving strategy, Merck, 874 F.2d at 809, and we conclude, "the work of a skilled [artisan], not of an inventor." DyStar, 464 F.3d at 1371; see also In re Luck, 476 F.2d 650, 652–53 (C.C.P.A.1973) (use of routine testing to identify optimum amounts of silane to be employed in a lamp coating, without establishing a critical upper limit or demonstrating any unexpected result, lies within the ambit of the ordinary skill in the art); In re Esterhoy, 58 C.C.P.A. 1116, 440 F.2d 1386, 1389 (1971) ("One skilled in the art would thus manifestly operate the Switzer et al. process under conditions most desirable for maximum and efficient concentration of the acid. The conditions recited in the claims appear to us to be only optimum and easily ascertained by routine experimentation."); In re Swentzel, 42 C.C.P.A. 757, 219 F.2d 216, 219 (1955) ("It may well be that the size represents the largest particles suitable for appellant's purpose, but the determination of that desired size under the present circumstances involves nothing more than routine experimentation and exercise of the judgment of one skilled in the art."); In re Swain, 33 C.C.P.A. 1266, 156 F.2d 246, 247–48 (1946) ("In the absence of a proper showing of an unexpected and superior result over the disclosure of the prior art, no invention is involved in a result obtained by experimentation.").").

[90] *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994).

[91] *Bayer Pharma AG v. Watson Labs., Inc.*, 874 F.3d 1316, 1328 (Fed. Cir. 2017) ("[T]he teaching away inquiry does not focus on whether a person of ordinary skill in the art would have merely favored one disclosed option over another disclosed option.")

inappropriate for obviousness purposes.[92] A known or obvious composition does not become patentable simply because it has been described as somewhat inferior to some other product for the same use.[93]

In determining whether the claimed invention was obvious, consider each claim separately. Do not use hindsight.  That is, consider only what was known at the time of the invention.

---

[92] *Bayer Pharma AG v. Watson Labs., Inc.*, 874 F.3d 1316, 1328 (Fed. Cir. 2017) ("In assessing whether prior art teaches away, that 'better alternatives exist in the prior art does not mean that an inferior combination is inapt for obviousness purposes.' *In re Mouttet*, 686 F.3d 1322, 1334 (Fed. Cir. 2012).")

[93] *In re Gurley*, 27 F.3d 551, 553 (Fed. Cir. 1994) ("A known or obvious composition does not become patentable simply because it has been described as somewhat inferior to some other product for the same use.")

INSTRUCTION NO. 39:     **PRIOR ART—OVERLAPPING RANGES**

For obviousness, it is not necessary for the prior art to disclose the same numerical range as an asserted claim. Instead, you may find obviousness if the claimed numerical ranges overlap with the ranges disclosed in the prior art.[94] Where there is a range disclosed in the prior art, and the claimed invention overlaps with that range, the burden of production falls on Janssen to come

---

[94] *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003) ("A *prima facie* case of obviousness typically exists when the ranges of a claimed composition overlap the ranges disclosed in the prior art."); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006) ("Where a claimed range overlaps with a range disclosed in the prior art, there is a presumption of obviousness."); *Ricoh Co. v. Quanta Computer Inc.*, 550 F.3d 1325, 1331 (Fed. Cir. 2008) ("Because the range of recording speeds disclosed in the European patents overlaps the range claimed by the ′109 patent, the parties do not dispute that the claims of the ′109 patent are presumed obvious."); *In re Geisler*, 116 F.3d 1465, 1469 (Fed. Cir. 1997) ("Geisler concedes that the examiner was correct to find the claims prima facie obvious, because the claimed thickness range of 50 to 100 Angstroms for the protective layer overlaps at its end point with the thickness range of 100 to 600 Angstroms disclosed by Zehender."); *Application of Malagari*, 499 F.2d 1297, 1303 (C.C.P.A. 1974) ("There is no question that the claimed invention is rendered prima facie obvious by the teachings of Goss. The process taught by Goss is similar to that claimed by appellant, and the claimed range of carbon in the steel used as a starting material touches that in the 'typical preferred range' of the reference."); *In re Woodruff*, 919 F.2d 1575, 1578 (Fed. Cir. 1990) (concluding that a claimed invention was rendered obvious by a prior art reference whose disclosed range ("about 1–5%" carbon monoxide) abutted the claimed range ("more than 5% to about 25%" carbon monoxide).

forward with evidence showing their claimed range was not obvious.[95] The prior art need not have

every claimed limitation or overlapping ranges in order to make a claimed invention obvious.[96]

---

[95] *See Galderma Labs., L.P. v. Tolmar, Inc.*, 737 F.3d 731, 738 (Fed. Cir. 2013) ("[W]here there is a range disclosed in the prior art, and the claimed invention falls within that range, the burden of production falls upon the patentee to come forward with evidence that (1) the prior art taught away from the claimed invention; (2) there were new and unexpected results relative to the prior art; or (3) there are other pertinent secondary considerations."); *see also Ineos USA LLC v. Berry Plastics Corp.*, 783 F.3d 865, 870-72 (Fed. Cir. 2015) (affirming summary judgment of anticipation based on overlapping ranges, noting "Ineos is also correct that when the prior art discloses a range, rather than a point, the court must evaluate whether the patentee has established that the claimed range is critical to the operability of the claimed invention."); *Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311 (Fed. Cir. 2006) ("This interval substantially overlaps with the interval specified in claim 17. [Patentee] has also failed to show that [the prior art] teaches away from the claimed range or that the claimed range produces new and unexpected results. Under these circumstances, [the patentee] has failed to rebut the presumption that the claimed range would have been obvious."); *Ricoh Co. v. Quanta Computer Inc.*, 550 F.3d 1325, 1331 (Fed. Cir. 2008) ("This presumption, however, 'can be rebutted if it can be shown that the prior art teaches away from the claimed range, or the claimed range produces new and unexpected results.' *Id.* at 1311 (citations omitted). The district court rejected [patentee's] expert testimony offered to rebut the presumption, reasoning that 'plaintiff ... fails to explain how the prior art 'teaches away' from its '109 patent or how the '109 patent provides 'new and unexpected results.'' Summary Judgment Order, 579 F.Supp.2d at 1115. We agree.");*In re Geisler*, 116 F.3d 1465, 1469 (Fed. Cir. 1997) ("a prima facie case of obviousness can be rebutted if the applicant (1) can establish "the existence of unexpected properties in the range claimed" or (2) can show "that the art in any material respect taught away" from the claimed invention"); *Application of Malagari*, 499 F.2d 1297, 1303 (C.C.P.A. 1974) ("We agree with the solicitor that appellant has not rebutted this prima facie case by establishing the existence of unexpected properties in the range claimed or by showing that the art in any material respect taught away from the use of the carbon range claimed."); *In re Woodruff*, 919 F.2d 1575, 1578 (Fed. Cir. 1990) ("These cases have consistently held that in such a situation, the applicant must show that the particular range is critical, generally by showing that the claimed range achieves unexpected results relative to the prior art range."); *GHC v. Sienna Biopharm., Inc.*, No. 2017-1012 at \*8 (Fed. Cir. May 4, 2018) ("Where a prior art patent discloses a range of values, showing a claimed value falls within that range meets a party's burden of establishing the narrower claim would have been obvious where there is no reason to think the result would be unpredictable.").

[96] *In re Peterson*, 315 F.3d 1325, 1329 (Fed. Cir. 2003) ("A prima facie case of obviousness exists when the claimed range and the prior art range do not overlap but are close enough such that one skilled in the art would have expected them to have the same properties."); *Titanium Metals Corp. of Am. v. Banner*, 778 F.2d 775, 783 (Fed. Cir. 1985) (finding prima facie obviousness where the "proportions are so close that prima facie one skilled in the art would have expected them to have the same properties."); *In re Thorner*, 923 F.2d 871 (Fed. Cir. 1990) ("The Board's finding that the cited prior art did not disclose the particular amounts recited for the concentration of the peptide in combination with the matrix, nor the dosage levels recited in claims 36 and 38, does not prevent a conclusion of prima facie obviousness.") (citing *In re Rinehart*, 531 F.2d 1048, 1051 (CCPA 1976) ("[a] prima facie case of obviousness is established when the teachings from the prior art itself would appear to have suggested the claimed subject matter to a person of ordinary skill in the art.); *In re Lalu*, 747 F.2d 703, 705 (Fed. Cir. 1984) ("In determining whether a case of prima facie obviousness exists, it is necessary to ascertain whether the prior art teachings would appear to be sufficient to one of ordinary skill in the art to suggest making the claimed substitution or other modification.")); *In re Woodruff*, 919 F.2d 1575, 1578 (Fed. Cir. 1990) (finding obviousness despite two differences between "the claimed invention and the prior art"; "The law is replete with cases" finding obviousness where "the difference between the claimed invention and the prior art is some range or other variable within the claims."); *Gardner v. TEC Sys., Inc.*, 725 F.2d 1338, 1345, 1349-50 (Fed. Cir. 1984) (finding obviousness despite differences between the claimed invention and the prior art because the "differences are such that the claimed invention as a whole would have been obvious to one of ordinary skill in the art at the time the invention was made.").

INSTRUCTION NO. 40:      **OBJECTIVE CONSIDERATIONS OF NON-OBVIOUSNESS**[97]

In evaluating obviousness, you may take into account certain objective evidence (sometimes called "secondary considerations") that may shed light on the obviousness or not of the claimed invention.  In order for secondary considerations to be given any substantial weight, there must be a nexus between the claimed invention and the secondary consideration.[98]

Here, Janssen contends that a "long felt but unresolved need" supports a finding of non-obviousness.  To demonstrate a long-felt but unresolved need, Janssen must point to an identified problem and evidence of efforts to solve that problem which were, before the invention, unsuccessful.[99] Likewise, Janssen must show a nexus between the claimed features of the invention

---

[97] Janssen has proposed jury instructions on new purported objective considerations of non-obviousness that were never disclosed during discovery.  Specifically, Janssen did not assert any secondary considerations of non-obviousness of the asserted claims other than an alleged long-felt need at any time during discovery, including in its response to Defendants' interrogatory seeking "identification of all secondary considerations" and its expert reports. Defendants dispute that these theories are properly raised in this case.  To the extent that these issues are presented at trial, Defendants reserve their rights to propose a jury instruction.

[98] *Therasense, Inc. v. Becton, Dickinson & Co.*, 593 F.3d 1325, 1336 (Fed. Cir. 2010) ("Abbott's objective evidence of non-obviousness fails because it is not 'commensurate in scope with the claims which the evidence is offered to support.'"); *In re GPAC Inc.*, 57 F.3d 1573, 1580 (Fed. Cir. 1995) ("For objective evidence to be accorded substantial weight, its proponent must establish a nexus between the evidence and the merits of the claimed invention."); *In re Grasselli*, 713 F.2d 731, 743 (Fed. Cir. 1983) ("It is well settled 'that objective evidence [of] non-obviousness must be commensurate in scope with the claims which the evidence is offered to support.'").

[99] *Ethicon Endo-Surgery, Inc. v. Covidien LP*, 812 F.3d 1023, 1035 (Fed. Cir. 2016), *cert. denied*, (U.S. Jan. 9, 2017) ("Here, Ethicon only pointed to a single passage in a marketing brochure (and expert testimony based on that marketing brochure) touting the advantages of the Covidien products to demonstrate long-felt need. But at most, these demonstrate a long-felt need for staples of different heights (a feature in the prior art), not the combination of features that is the invention here. As the Board found, this single brochure "does not support the assertion that there was a long-felt but unresolved need in the industry" for the claimed invention."); *ABT Sys., LLC v. Emerson Elec. Co.*, 797 F.3d 1350, 1362 (Fed. Cir. 2015) ("The disclosures of the prior art references—and especially Vogelzang's 'cycle position' option for running a system fan "during periods when there is no operation of the heating apparatus or cooling apparatus" to help mix air—eliminate any serious contention that there was a long-felt need for the invention claimed in the ′017 patent. *See Ormco Corp. v. Align Tech., Inc.*, 463 F.3d 1299, 1311–12 (Fed.Cir.2006) ("[I]f the feature that creates the commercial success was known in the prior art, the success is not pertinent."). ABT's argument of a long-felt need ignores the scope of claim 1, which does not set forth limits on how long or how often periodic fan operation is to be performed. In addition, claim 1 does not limit in any way the control logic for implementing such periodic operation.").

and solving the alleged long-felt need.[100]  If you find that the claims are broad enough to cover products that both do and do not solve the identified problem, Janssen cannot show a nexus between the claimed invention and any alleged long-felt need.[101]  Further, if you find that the differences between the prior art and the claimed invention are minimal, Janssen cannot show that any long-felt need existed.[102]

---

[100] *WMS Gaming, Inc. v. International Game Technology*, 184 F.3d 1339, 1359 (Fed. Cir. 1999) ("The patentee bears the burden of showing that a nexus exists between the claimed features of the invention and the objective evidence offered to show non-obviousness.").

[101] *Therasense,* 593 F.3d at 1336 ("Abbott's final argument against a verdict of obviousness is that the claimed invention solved the so-called 'short fill' problem, a problem for which Abbott submits there was a long-felt but unsolved need, but one which Nankai does not solve....  Because the claims are broad enough to cover devices that either do or do not solve the 'short fill' problem, Abbot's objective evidence of non-obviousness fails because it is not 'commensurate in scope with the claims which the evidence is offered to support.'"); *Regent Lighting Corp. v. FL Industries, Inc.*, 60 F.3d 840, 1995 WL 331122, at *5 ("[A] nexus was not established because the claims, properly construed, are not commensurate in scope with the offered evidence.  Rather, the evidence [of secondary considerations] embraces only outdoor quartz halogen fixtures with glass lenses, yet the claimed subject matter as a whole is broader, as discussed above.").

[102] *Geo. M. Martin Co. v. All. Mach. Sys. Int'l LLC*, 618 F.3d 1294, 1304 (Fed. Cir. 2010) ("Where the differences between the prior art and the claimed invention are as minimal as they are here, however, it cannot be said that any long-felt need was unsolved.").

INSTRUCTION NO. 41:      **PRIOR ART—ADDITIONAL ELEMENTS**

As I previously explained, I have construed "cell culture media" in the beginning of claim 1 as meaning "nutritive media for culturing cells."[103]  Based on my construction, it is not necessary for the prior art to describe a serum-free, or chemically defined, or protein-free cell culture media in order to render the asserted claims anticipated or obvious.

Based on my construction, prior art can render the '083 patent claims invalid even if the prior art discloses ingredients that are not recited in an asserted claim of the '083 patent, as long as you find that each limitation of the asserted claim is disclosed in the prior art or, if one or more limitations are not disclosed in the prior art, the missing limitations are obvious.  In other words, the fact that a prior art reference contains additional ingredients beyond the 52 non-optional ingredients would not be relevant to the obviousness determination.  The only question is whether the invention set forth in the asserted claims is obvious.

In addition, the '083 patent claims certain ingredients with concentration ranges down to zero (*i.e.*, "optional" ingredients).  Prior art can render the '083 patent claims invalid even if the prior art fails to disclose the "optional" ingredient.  In other words, the fact that a prior art reference contains fewer than all of the "optional" ingredients would not be relevant to the obviousness determination.

---

[103]  Dkt. No. 226, 8/19/2016 Memorandum and Order at ¶ 4.

INSTRUCTION NO. 42:        **WRITTEN DESCRIPTION REQUIREMENT**[104]

The patent law contains certain requirements for the part of the patent called the specification.  In the patent application process, the applicant may keep the originally filed claims, or change the claims between the time the patent application is first filed and the time a patent is issued.  An applicant may amend the claims or add new claims.  These changes may narrow or broaden the scope of the claims.  The written description requirement ensures that the issued claims correspond to the scope of the written description of the invention that the inventors provided in the specification.  The essence of the written description requirement is that a patent applicant, as part of the bargain with the public, must describe the full scope of his or her invention so that the public will know what it is and that he or she has truly possessed the full scope of the claimed invention.[105]  Put another way, the purpose of the written description requirement is to ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification.[106]

---

[104] Based on *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.4.2a (July 2016).

[105] *AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1298 (Fed. Cir. 2014) ("The essence of the written description requirement is that a patent applicant, as part of the bargain with the public, must describe his or her invention so that the public will know what it is and that he or she has truly made the claimed invention."); *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1351 (Fed. Cir. 2010) ("In other words, the test for sufficiency is whether the disclosure of the application relied upon reasonably conveys to those skilled in the art that the inventor had possession of the claimed subject matter as of the filing date."); *Wyeth v. Abbott Labs.*, No. CIV.A. 08-1021 JAP, 2012 WL 175023, at *7 (D.N.J. Jan. 19, 2012) ("no reasonable jury could conclude that the limited disclosures provided regarding rectal and transdermal administration are sufficient to show that the inventors were in possession of the full scope of the invention claimed"), *aff'd sub nom. Wyeth & Cordis Corp. v. Abbott Labs.*, 720 F.3d 1380 (Fed. Cir. 2013); *LizardTech, Inc. v. Earth Res. Mapping, Inc.*, 424 F.3d 1336, 1346 (Fed. Cir. 2005) ("[i]t seems to us that nothing can be more just and fair, both to the patentee and the public, than that the former should understand, and correctly describe, just what he has invented, and for what he claims a patent.").

[106] *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1353–54 (Fed. Cir. 2010) ("As this court has repeatedly stated, the purpose of the written description requirement is to 'ensure that the scope of the right to exclude, as set forth in the claims, does not overreach the scope of the inventor's contribution to the field of art as described in the patent specification.'").

Defendants contend that claims 1 and 2 of Janssen's '083 patent are invalid because the specification of the '083 patent does not contain an adequate written description of the invention. To succeed, Defendants must show by clear and convincing evidence that the specification fails to meet the law's requirements for written description of the invention.

In deciding whether the patent satisfies this written description requirement, you must consider the description from the viewpoint of a person having ordinary skill in the field of technology of the patent when the application was filed. The written description requirement is not met simply because certain claim language appears verbatim in the specification.[107] Rather, the written description requirement is satisfied if a person having ordinary skill reading the original patent application would have recognized that the patent's specification describes the full scope of the claimed invention as it is finally claimed in the issued patent and that the inventor actually possessed that full scope by the filing date of the original application.

The written description requirement may be satisfied by any combination of the words, structures, figures, diagrams, formulas, etc., contained in the patent application. The full scope of a claim or any particular requirement in a claim need not be expressly disclosed in the patent specification if a person having ordinary skill in the field of technology of the patent at the time of filing would have understood that the full scope or missing requirement is in the written description in the specification.

---

[107] *Enzo Biochem, Inc. v. Gen-Probe Inc.*, 323 F.3d 956, 968 (Fed. Cir. 2002) ("We next address Enzo's additional argument that the written description requirement for the generic claims is necessarily met as a matter of law because the claim language appears *in ipsis verbis* in the specification. We do not agree. Even if a claim is supported by the specification, the language of the specification, to the extent possible, must describe the claimed invention so that one skilled in the art can recognize what is claimed. The appearance of mere indistinct words in a specification or a claim, even an original claim, does not necessarily satisfy that requirement.").

INSTRUCTION NO. 43:       **WRITTEN DESCRIPTION REQUIREMENT—GENUS CLAIMS**[108]

In this case, the '083 patent claims a general class of things which we refer to as a "genus." A sufficient written description of a "genus" requires more than a general description of the boundaries of the invention.[109] Instead, a sufficient written description requires the disclosure of either (1), a representative number of specific examples — which we refer to as "species" — falling within the scope of the genus, or, (2), structural features common to the members of the genus.[110] In either case, the disclosure must permit a person of ordinary skill in the art to "visualize or recognize" the members of the genus.[111] The written description must include a precise definition such as by structure, formula, chemical name or physical properties or other properties

---

[108] Based on the jury charge from *Abbott GMBH & Co., KG, et al. v. Centocor Ortho Biotech, Inc., et al.*, Civ. No. 09-11340, 2012 WL 11802669 at *8 (D. Mass Sept. 24, 2012) (J. Saylor); *aff'd, AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1299 (Fed. Cir. 2014) ("Whether the written description requirement for a genus is met by a particular disclosure depends upon the facts. *Ariad*, 598 F.3d at 1351. This case presents such a question. The jury found that the requirement was not met, and we agree."); *see also Abbott GMBH & Co., KG, et al. v. Centocor Ortho Biotech, Inc., et al.*, Civ. No. 09-11340, Dkt. 484 at *4-5 (D. Mass Sept. 23, 2012) (Centocor's Brief); *see also Abbott GMBH & Co., KG, et al. v. Centocor Ortho Biotech, Inc., et al.*, Civ. No. 09-11340, Dkt. 441 at *6-10 (D. Mass Aug. 29, 2012) (Centocor's Trial Brief) .

[109] *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1349 (Fed. Cir. 2010) (en banc) ("Recognizing this, we held in *Eli Lilly* that an adequate written description of a claimed genus requires more than a generic statement of an invention's boundaries.").

[110] *Ariad Pharm., Inc. v. Eli Lilly & Co.*, 598 F.3d 1336, 1350 (Fed. Cir. 2010) (en banc) ("We held that a sufficient description of a genus instead requires the disclosure of either a representative number of species falling within the scope of the genus or structural features common to the members of the genus so that one of skill in the art can 'visualize or recognize' the members of the genus. *Id.* at 1568–69. We explained that an adequate written description requires a precise definition, such as by structure, formula, chemical name, physical properties, or other properties, of species falling within the genus sufficient to distinguish the genus from other materials. *Id.* at 1568 (quoting *Fiers v. Revel*, 984 F.2d 1164, 1171 (Fed.Cir.1993)). We have also held that functional claim language can meet the written description requirement when the art has established a correlation between structure and function. *See Enzo*, 323 F.3d at 964 (quoting 66 Fed.Reg. 1099 (Jan. 5, 2001)). But merely drawing a fence around the outer limits of a purported genus is not an adequate substitute for describing a variety of materials constituting the genus and showing that one has invented a genus and not just a species."); *see also Carnegie Mellon Univ. v. Hoffmann-La Roche Inc.*, 541 F.3d 1115, 1124 (Fed. Cir. 2008).

[111] *Id.*

of the species falling within the genus sufficient to distinguish the genus from other materials.[112]

Again, the genus is defined by what is set forth in the claims.

It is not necessary that each and every aspect of the claim be described, as long as a person

of ordinary skill in the art would understand that the missing aspect is necessarily implied in the

patent specification.  The specification does not need to describe the infringing product, nor are

there any bright line rules governing the number of species that must be disclosed to describe a

genus claim, as this number necessarily changes with each invention and with progress in the field.

However, when there is a substantial variation within the claimed genus, the patent must describe

a sufficient variety of species to reflect the variation within the genus.  Merely drawing a fence

around the outer limits of a purported range is not an adequate substitute for describing a variety

of materials constituting the range and showing that one has invented a range and not just an

example.[113]

---

[112] *Id.*

[113] *Id.*; *see also AbbVie Deutschland GmbH & Co., KG v. Janssen Biotech, Inc.*, 759 F.3d 1285, 1300 (Fed. Cir. 2014) ("With the written description of a genus, however, merely drawing a fence around a perceived genus is not a description of the genus.  One needs to show that one has truly invented the genus, i.e., that one has conceived and described sufficient representative species encompassing the breadth of the genus. Otherwise, one has only a research plan, leaving it to others to explore the unknown contours of the claimed genus.").

INSTRUCTION NO. 44:      DAMAGES—INTRODUCTION[114]

If you find that Celltrion or Hospira infringed any valid claim of the '083 patent, you must then consider what amount of damages to award to Janssen. I will now instruct you about the measure of damages. By instructing you on damages, I am not suggesting which party should win this case, on any issue. If you find that Celltrion and Hospira have not infringed any valid claim of the patent, then Janssen is not entitled to any damages.

The damages you award must be adequate to compensate Janssen for the infringement. They are not meant to punish an infringer. Your damages award, if you reach this issue, should put Janssen in approximately the same financial position that it would have been in had the infringement not occurred.  This amount, however, is limited to damages attributable to the '083 patent.

Janssen has the burden to establish the amount of its damages by a preponderance of the evidence. In other words, you should award only those damages that Janssen establishes that it more likely than not suffered. While Janssen is not required to prove the amount of its damages with mathematical precision, it must prove them with reasonable certainty. You may not award damages that are speculative, damages that are only possible, or damages that are based on guesswork.

---

[114] Based on *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.6.1 (July 2016). *Garretson v. Clark*, 111 U.S. 120, 121 (1884) ("The patentee… must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features."); *Seymour v. McCormick*, 57 U.S. 480, 489 (1853) ("[O]ne who invents some improvement in the machinery of a mill could not claim that the profits of the whole mill should be the measure of damages for the use of his improvement."); *Philp v. Nock*, 84 U.S. 460, 462 (1873) ("Where the infringement is confined to a part of the thing sold, the recovery must be limited accordingly. It cannot be as if the entire thing were covered by the patent."); *Sessions v. Romadka*, 145 U.S. 29, 45 (1892) ("[P]rofits upon the entire article are only allowable where such article is wholly the invention of the patentee, or where its entire value is properly and legally attributable to the patented feature."); *Mentor Graphics v. EVE–USA*, 870 F.3d 1298, 1299 (Fed. Cir. 2017) (order denying rehearing en banc) ("[W]here an infringing product is a multi-component product with patented and unpatented components, apportionment is required.").

There are different types of damages that Janssen may be entitled to recover. In this case, Janssen seeks lost profits, price erosion, and a reasonable royalty. Lost profits consist of any actual reduction in business profits Janssen suffered as a result of Celltrion's or Hospira's alleged infringement. A reasonable royalty is defined as the money amount a willing licensor and willing licensee would have agreed upon as a fee for use of the invention at the time prior to when infringement began. But, regardless of the type of damages you may choose to award, you must be careful to ensure that award is no more or no less than the value of the patented invention.

I will give more detailed instructions regarding damages shortly. Note, however, that Janssen is entitled to recover no less than a reasonable royalty for each infringing sale of cell culture media. In no event, however, may Janssen seek damages from before May 31, 2011 because Janssen may not recover damages from more than six years prior to when it filed this lawsuit.[115]

---

[115] 35 U.S.C. § 286

INSTRUCTION NO. 45:       **DAMAGES—FOREIGN SALES**[116]

In determining the amount of damages, you may not consider Celltrion's or Hospira's sales outside of the United States. United States patent law does not operate beyond the limits of the United States.[117] Janssen is not entitled to compensation for Celltrion's or Hospira's foreign making, use, or sale of a patented invention, which is not infringement at all.[118]

---

[116] Based on *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1371 (Fed. Cir. 2013); *Brown v. Duchesne*, 60 U.S. (19 How.) 183, 195, 15 L.Ed. 595 (1856).

[117] *Brown v. Duchesne*, 60 U.S. (19 How.) 183, 195, 15 L.Ed. 595 (1856).

[118] *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1371 (Fed. Cir. 2013).

INSTRUCTION NO. 46:      **DAMAGES—INTERVENING CAUSE**

Janssen is not entitled to damages for any alleged injury caused by activity that occurred outside the territory of the United States.[119] When determining whether Janssen has proven damages or the amount of damages, you should not consider Celltrion's or Hospira's activities outside the United States.[120] For example, you should not take into account any alleged damages which are the result of Celltrion or Hospira using the allegedly infringing cell culture media outside of the United States.[121]

---

[119] *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1371(Fed. Cir. 2013).

[120] *Microsoft Corp. v. AT&T Corp.*, 550 U.S. 437, 454–55 (2007); *Brown v. Duchesne*, 60 U.S. 183, 195–96 (1856); *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, *1371*–72 (Fed. Cir. 2013); *WesternGeco L.L.C. v. Ion Geophysical Corp.*, 791 F.3d 1340, 1349–50 (Fed. Cir. 2015).

[121] *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 711 F.3d 1348, 1371–72 (Fed. Cir. 2013).

INSTRUCTION NO. 47:        **DAMAGES—PATENT HOLD-UP VALUE**[122]

In determining the amount of damages, you may only award damages that reflect the value attributable to the infringing features of the product, and no more.[123] You should not award Janssen damages based on patent hold-up value. Patent hold-up exists when the holder of patent, such as Janssen, demands excessive damages because a company is locked into using a particular product, as opposed to any value attributable to the patent itself.[124]

---

[122] Based on *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1209 (Fed. Cir. 2014); *TCL Comm'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, Case No.. SACV 14–341 JVS(DFMx), 2017 WL 6611635, at*54 (C.D. Cal. Dec. 21, 2017).

[123] *Commonwealth Sci. and Indus. Research Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (quoting *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1209 (Fed. Cir. 2014)).

[124] *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1209 (Fed. Cir. 2014); *see also TCL Comm'n Tech. Holdings, Ltd. v. Telefonaktiebolaget LM Ericsson*, Case No.. SACV 14–341 JVS(DFMx), 2017 WL 6611635, at*54 (C.D. Cal. Dec. 21, 2017); *Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1305 (Fed. Cir. 2015).

INSTRUCTION NO. 48:        **DAMAGES—FUTURE SALES**[125]

Janssen seeks to recover lost profits and/or reasonable royalties related to sales which it projects will be made in the future. To recover damages related to projected future sales, Janssen's projections cannot be speculative.[126] Janssen's burden of proving damages in the future is commensurately greater than for sales which have already occurred, because the future always harbors unknowns.[127] While estimates of future sales may necessarily contain some speculative elements, Janssen must provide you with such facts and circumstances to enable you to make an estimate of damage based upon judgment, not guesswork.[128]

---

[125] Based on *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1031 (Fed. Cir. 1996).

[126] *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1031 (Fed. Cir. 1996).

[127] *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1031 (Fed. Cir. 1996) (quoting *Brooktree Corp. v. Advanced Micro Devices, Inc.*, 977 F.2d 1555, 1581 (Fed Cir. 1992).

[128] *Oiness v. Walgreen Co.*, 88 F.3d 1025, 1031 (Fed. Cir. 1996) (quoting *Malloy v. Monohan*, 73 F.3d 1012, 1016 (10th Cir. 1996)).

INSTRUCTION NO. 49:      **DAMAGES—APPORTIONMENT**[129]

To recover damages, Janssen must prove the portion of its alleged lost profits or reasonable royalty that were due to the allegedly patented features of the accused products, as distinct from profits due to unpatented features of the accused products, of Inflectra, or other factors such as marketing or advertising, or Hospira's size or market position.[130]  If you find that Janssen has proved to a reasonable certainty that some portion of Janssen's profits or a reasonable royalty were due to the patented feature alone, Janssen is entitled to those lost profits or reasonable royalties, but no more. In short, in every case, Janssen must separate or apportion its damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative.[131]

---

[129] Based on *2017 Model Patent Jury Instructions*, American Intellectual Property Law Association, Instr. 11.2.5.4 (2017); *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1287–88 (Fed. Cir. 2017).

[130] *Ferguson Beauregard/Logic Controls, Div. of Dover Res., Inc. v. Mega systems, LLC*, 350 F.3d 1327, 1346 (Fed. Cir. 2003) ("The district court therefore failed to distinguish the allocation of profits that would have been made "but for" the infringement of the ′376 patent with the profits that could fairly be allocated to customer demand related to the features embodying the ′991 patent.") (vacating lost-profits damages award for failure to apportion).

[131] *Garretson v. Clark*, 111 U.S. 120, 121 (1884) ("'The patentee,' he says, 'must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features, and such evidence must be reliable and tangible, and not conjectural or speculative; or he must show, by equally reliable and satisfactory evidence, that the profits and damages are to be calculated on the whole machine, for the reason that the entire value of the whole machine, as a marketable article, is properly and legally attributable to the patented feature.'").

INSTRUCTION NO. 50:      **DAMAGES—ENTIRE MARKET VALUE RULE**[132]

There is one exception to the general rule that damages must be apportioned to reflect only the value the invention contributes to the accused products.  Only if you find by a preponderance of the evidence that Janssen has proven that the patented aspect of the accused product alone creates the basis for customers' demand for an entire product and the unpatented and patented components together are considered to be components of a single assembly or parts of a complete machine or they together constituted a functional unit, may you calculate damages based on the value of the entire product.  However, merely showing that the patented aspect is viewed as valuable, important, or even essential to the use of the product is not enough to show that the patented aspect is the basis for customers' demand for the entire product.  Janssen does not contend it can meet this exception to the rule of apportionment.

---

[132] Based on *2017 Model Patent Jury Instructions*, American Intellectual Property Law Association, Instr. 11.2.5.10 (2017); *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1549–50 (Fed. Cir. 1995).

INSTRUCTION NO. 51:      **LOST PROFITS—IDENTITY OF THE RELEVANT MARKET**[133]

My instructions regarding lost profits may use the phrase "relevant market." The "relevant market" is the market for the patented invention.[134]   In this case, the relevant market is cell culture media.  The relevant market also includes substitutes which are similar in physical and functional characteristics to the patented invention; in other words, within the "relevant market," consumer demand is relatively interchangeable among the patented product and products that compete with the patented product.[135]   The relevant market excludes, however, alternatives to the patented product with disparately different prices or significantly different characteristics.[136]

---

[133] Based on *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1380 (Fed. Cir. 2017); *BIC Leisure Prod., Inc. v. Windsurfing Int'l, Inc.*, 1 F.3d 1214, 1218 (Fed. Cir. 1993); *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1124 (Fed. Cir. 2003); *Grain Processing Corp. v. Am. Maize-Prod. Co.*, 185 F.3d 1341, 1355 (Fed. Cir. 1999).

[134] *Micro Chem., Inc. v. Lextron, Inc.*, 318 F.3d 1119, 1124 (Fed. Cir. 2003) ("The proper starting point to identify the relevant market is the patented invention. The relevant market also includes other devices or substitutes similar in physical and functional characteristics to the patented invention.").

[135] *Id.*; *Grain Processing Corp. v. Am. Maize-Prod. Co.*, 185 F.3d 1341, 1355 (Fed. Cir. 1999) ("Consumer demand defines the relevant market and relative substitutability among products therein.") (citing *BIC*, 1 F.3d at 1218).

[136] *Grain Processing*, 185 F.3d at 1350 ("The "but for" inquiry therefore requires a reconstruction of the market, as it would have developed absent the infringing product, to determine what the patentee would ... have made.").

INSTRUCTION NO. 52:    **LOST PROFITS—PARTICIPATION IN RELEVANT MARKET**[137]

To recover lost profits, Janssen must prove that it sells a product that practices the claimed invention of the '083 patent, or, if it does not practice the claimed invention of the '083 patent, Janssen must prove that it directly competes against the allegedly-infringing cell culture media products and had the capability to meet the demand for the accused cell culture media.[138] If Janssen does not compete directly against the allegedly-infringing product, it is not entitled to lost profits.[139]

---

[137] Based on *Rite–Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1548 (Fed. Cir. 1995); *Water Techs.*, 850 F.2d at 673; *Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F. 3d 1303, 1311 (Fed. Cir. 2004); *Yarway Corp. v. Eur-Control USA, Inc.*, 775 F.2d 268, 275-76 (Fed. Cir. 1985); *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 552 (Fed. Cir. 1984); *Stryker Corp. v. Intermedics Orthopedics, Inc.*, 891 F. Supp. 751, 825 (E.D.N.Y. 1995).

[138] *Rite–Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1548 (Fed. Cir. 1995) ("Normally, if the patentee is not selling a product, by definition there can be no lost profits."); *Water Techs.*, 850 F.2d at 673 (lost profits only appropriate for period of time when plaintiff was competitor in marketplace); *Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F. 3d 1303, 1311 (Fed. Cir. 2004) ("It is true that the recovery of lost profits by a patentee is not limited to the situation in which the patentee is selling the patented device. However, the patentee needs to have been selling some item, the profits of which have been lost due to infringing sales, in order to claim damages consisting of lost profits."); *Yarway Corp. v. Eur-Control USA, Inc.*, 775 F.2d 268, 275-76 (Fed. Cir. 1985) (defining the *Panduit* test as requiring "proof of (1) demand for the patented product in ***the market***, (2) the plaintiff's ability to meet ***the market demand***, . . ."); *Gyromat Corp. v. Champion Spark Plug Co.*, 735 F.2d 549, 552 (Fed. Cir. 1984) (defining the *Panduit* test as requiring "demand for the product" and that plaintiff had the "capability to meet the demand for the ***product covered by the patent***") (emphasis added); *Stryker Corp. v. Intermedics Orthopedics, Inc.*, 891 F. Supp. 751, 825 (E.D.N.Y. 1995), *aff'd*, 96 F.3d 1409 (Fed. Cir. 1996) ("The third-*Panduit* factor concerns the manufacturing and marketing capability of the patentee to ***meet the demand for the patented product***.") (emphasis added).

[139] *Rite–Hite Corp. v. Kelley Co., Inc.,* 56 F.3d 1538, 1546 (Fed. Cir. 1995) ("If a particular injury was or should have been reasonably foreseeable by an infringing competitor in the relevant market, broadly defined, that injury is generally compensable absent a persuasive reason to the contrary."); *id.* at 1548 ("Normally, if the patentee is not selling a product, by definition there can be no lost profits."); *id.* at 1551 ("It is a clear purpose of the patent law to redress competitive damages resulting from infringement of the patent, but there is no basis for extending that recovery to include damages for items that are neither competitive with nor function with the patented invention. Promotion of the useful arts, see U.S. Const., art. I, § 8, cl. 8, requires one, but not the other."); *Water Techs.*, 850 F.2d at 673 (lost profits only appropriate for period of time when plaintiff was competitor in marketplace); *Poly-America, L.P. v. GSE Lining Tech., Inc.*, 383 F. 3d 1303, 1311 (Fed. Cir. 2004) ("It is true that the recovery of lost profits by a patentee is not limited to the situation in which the patentee is selling the patented device. However, the patentee needs to have been selling some item, the profits of which have been lost due to infringing sales, in order to claim damages consisting of lost profits.").

INSTRUCTION NO. 53:      **LOST PROFITS—*PANDUIT* FACTORS**[140]

Janssen bears the burden of proving entitlement to lost profits.[141]  Any award, however, should exclude damages based on infringing activity occurring between October 6, 2009, and May 31, 2011.  Janssen is entitled to lost profits if it proves all of the following by the more likely than not standard:

1.      the demand for the accused cell culture media;

2.      absence of acceptable non-infringing substitutes for the accused cell culture media;

3.      that Janssen had the manufacturing and marketing ability to make all or a part of the infringing sales of the allegedly infringing cell culture media; and

4.      the amount of profit that Janssen would have made if it were not for Celltrion's or Hospira's alleged infringement.

I will now explain each of these factors.

---

[140] Based on AIPLA Model Patent Jury Instruction 11.2.1.2; N.D. Cal. Model Patent Jury Instruction 5.3.

[141] *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009) ("The burden of proving damages falls on the patentee.")

INSTRUCTION NO. 54:      **LOST PROFITS—DEMAND**[142]

The first factor asks whether there was demand for the patented product in the relevant market, here, cell culture media. Demand for the patented product can be proven by significant sales of a patent holder's patented product or significant sales of an infringing product containing the patented features. To use sales of an allegedly infringing product as proof of this demand, however, Janssen's product and the allegedly infringing product must be sufficiently similar to compete against each other in the same market or market segment, here, cell culture media. You also should not consider sales of products mainly due to advertising and marketing, and unpatented features of the products as evidence of demand for the patented product.

---

[142] Based on AIPLA Model Patent Jury Instruction 11.2.1.3; *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.6.6.2 (July 2016).

INSTRUCTION NO. 55:     **LOST PROFITS—NON-INFRINGING SUBSTITUTES**[143]

The second factor asks whether there were non-infringing, acceptable substitutes for the patented product in the marketplace and the impact of such substitute products on the marketplace absent the sale of the allegedly infringing cell culture media products. Janssen must prove the absence of any non-infringing, acceptable substitutes.

To determine whether a non-infringing substitute is acceptable, it must be compared to Janssen's cell culture media product, not to the accused GE HyClone cell culture media product.[144] Note that in this case, Janssen does not sell cell culture media.

To be an acceptable substitute, a proposed substitute must have had one or more of the advantages of the patented invention that were important to the actual buyers of the infringing products, not the public in general. The substitute need not have had alleged advantages of the patented invention which were not important to the actual buyers of the infringing products.[145]

---

[143] Based on AIPLA Model Patent Jury Instruction 11.2.1.4; ND Cal Model Pat. Instruction 5.3b; *Grain Processing Corp. v. Am. Maize Prods. Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999); *Presidio*, 875 F.3d at 1381.

[144] *Presidio*, 875 F.3d at 1381.

[145] *Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1458 (Fed. Cir. 1991) ("Slimfold contends that the old hardware used by Kinkead and other companies cannot be acceptable non-infringing alternatives because they do not have the advantages of the new hardware covered by the Ford patent. That proposition may be correct if it is shown that consumers specifically want a device with those advantages. … However, not only has Slimfold failed to show that buyers of bi-fold metal doors specifically want a door having the advantages of the Ford patent, but the fact (found by the district court) that neither Slimfold's nor Kinkead's market share changed significantly after introduction of the "new" doors is very probative of the contrary conclusion."); *SmithKline Diagnostics, Inc. v. Helena Labs. Corp.*, 926 F.2d 1161, 1166 (Fed. Cir. 1991) ("If purchasers are motivated to purchase because of particular features of a product available only from the patent owner and infringers, products without such features would obviously not be acceptable noninfringing substitutes. TWM Corp., 789 F.2d at 901–02, 229 USPQ at 529. On the other hand, if the realities of the market are that others would likely have captured sales made by the infringer, despite a difference in the products, it follows that the "but for" test is not met. ").

Whether an alternative is acceptable depends on whether the alternative would satisfy the consumer's—here Celltrion's—intended use of that product.[146]

The acceptable substitutes also must not infringe the patent because they were licensed under the patent or they did not include all the features required by the patent. A non-infringing substitute may be one that involves a modification to the infringing product to avoid infringement or the removal of the patented feature from the product altogether.[147]

An acceptable substitute must also have been available during the damages period. An acceptable non-infringing substitute is available if it was on the market during the infringement period.[148] A substitute that is on the market need not have been widely advertised or sold in order to be available.[149] An acceptable non-infringing substitute also is available if, during the damages period, a competitor, a vendor, Celltrion, or Hospira had all the necessary equipment, materials, know-how, and experience to design and manufacture the acceptable non-infringing substitute. The substitute need not have actually been sold at that time. This is the case because a proper reconstruction of the market that would have existed absent infringement must consider actions the infringer would have taken to avoid infringement—including designing around the patented intellectual property—starting on the date of first infringement.[150]   In other words, a rational would-be infringer is likely to offer an acceptable non-infringing alternative, if available, to

---

[146]   *Grain Processing Corp. v. Am. Maize Prods. Co.*, 185 F.3d 1341, 1355 (Fed. Cir. 1999).

[147] ND Cal Model Pat. Instruction 5.3b.

[148] *Grain Processing Corp. v. Am. Maize Prods. Co.*, 185 F.3d 1341, 1349 (Fed. Cir. 1999).

[149] *Presidio*, 875 F.3d at 1381.

[150] No. 15-10698, Dkt. 518 (March 3, 2017).

compete with the patent owner rather than leave the market altogether.[151]  In this case, the date of first alleged infringement is October 6, 2009, the day the '083 patent issued.

If you determine that Celltrion would just as likely have purchased a non-infringing acceptable cell culture media for further development, then Janssen has not shown it lost those sales. Even if you find that the allegedly infringing cell culture media were the only products with the advantages of the patented invention, Janssen is nonetheless required to prove to you that it, in fact, would have made the alleged infringer's infringing sales of cell culture media.

---

[151] *Grain Processing Corp. v. American Maize-Products*, 185 F.3d 1341, 1350-51 (Fed. Cir. 1999).

INSTRUCTION NO. 56:      **LOST PROFITS—CAPACITY**[152]

The third factor asks whether Janssen had the manufacturing and marketing ability to actually make the sales of the patented cell culture media it allegedly lost due to the Defendants' infringement. Janssen must prove that it could have supplied the additional cell culture media products (or products that directly compete with the cell culture media products). Janssen also must prove that it more likely than not had the ability to market and sell these additional patented products.

---

[152] Based on AIPLA Model Patent Jury Instruction 11.2.1.6

INSTRUCTION NO. 57:        **LOST PROFITS—AMOUNT OF PROFIT**[153]

A patent holder may calculate its lost profits on lost sales by computing the lost revenue for sales of cell culture media it claims it would have made but for the infringement and subtracting from that figure the amount of additional costs or expenses it would have incurred in making those lost sales, such as cost of goods, sales costs, packaging costs, and shipping costs. Certain fixed costs that do not vary with increases in production or scale, such as taxes, insurance, rent, and administrative overhead, should not be subtracted from a patent holder's lost revenue. The amount of lost profits cannot be speculative, but it need not be proved with unerring certainty.

---

[153] Based on *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.6.2 (July 2016); AIPLA Model Patent Jury Instruction 11.2.1.7.

INSTRUCTION NO. 58:        **LOST PROFITS—PRICE EROSION**[154]

Janssen can recover additional damages if it can establish that it is more likely than not

that, if there had been no infringement, Janssen would have been able to charge higher prices for

cell culture media products. If this fact is established, you may award as additional damages the

difference between:

> (A) the amount of profits Janssen would have made by selling its product at the higher price,
> and (B) the amount of profits Janssen actually made by selling its product at the lower price
> Janssen actually charged for its product.

This type of damage is referred to as price-erosion damage.

If you find that Janssen suffered price erosion, you may also use the higher price in

determining Janssen's lost profits from sales that were lost because of the infringement. In

calculating Janssen's total losses from price erosion, you must take into account any drop in sales

that would have resulted from charging a higher price.

Janssen is only entitled to damages based on price erosion if it can determine the portion

of price erosion due to the patented feature of the accused product, as distinct from price erosion

due to other unpatented features of the accused product, or other factors such as marketing or

advertising or other competition or other market events, or Janssen's size or market position.  If

you find that Janssen has proved to a reasonable certainty that there was price erosion, and some

---

[154] Based on *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.6.4 (July 2016); AIPLA Model Patent Jury Instruction 11.2.2; *Garretson v. Clark*, 111 U.S. 120, 121 (1884) ("The patentee… must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features."); *Seymour v. McCormick*, 57 U.S. 480, 489 (1853) ("[O]ne who invents some improvement in the machinery of a mill could not claim that the profits of the whole mill should be the measure of damages for the use of his improvement."); *Philp v. Nock*, 84 U.S. 460, 462 (1873) ("Where the infringement is confined to a part of the thing sold, the recovery must be limited accordingly. It cannot be as if the entire thing were covered by the patent."); *Sessions v. Romadka*, 145 U.S. 29, 45 (1892) ("[P]rofits upon the entire article are only allowable where such article is wholly the invention of the patentee, or where its entire value is properly and legally attributable to the patented feature."); *Mentor Graphics v. EVE–USA*, 870 F.3d 1298, 1299 (Fed. Cir. 2017) (order denying rehearing en banc) ("[W]here an infringing product is a multi-component product with patented and unpatented components, apportionment is required.").

portion of that price erosion was due to the patented feature alone, Janssen may seek price-erosion

damages. If Janssen fails to make such a showing, such as if lawful competition caused Janssen to

lower its prices, then Janssen is not entitled to price erosion damages.

INSTRUCTION NO. 59:      **REASONABLE ROYALTY—ENTITLEMENT**[155]

If you find that Janssen has established infringement, Janssen is entitled to at least a reasonable royalty to compensate it for that infringement. If you find that Janssen has not proved its claim for lost profits, or has proved its claim for lost profits for only for a portion of the infringing sales of cell culture media, then you must award Janssen a reasonable royalty for all infringing sales of cell culture media for which it has not been awarded lost profits damages.

---

[155] *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.6.5 (July 2016).

INSTRUCTION NO. 60:      **REASONABLE ROYALTY—DEFINITION** [156]

A royalty is a payment made to a patent holder in exchange for the right to make, use, or sell the claimed invention. A reasonable royalty is the amount of royalty payment that a patent holder and the alleged infringer would have agreed to in a hypothetical negotiation taking place at a time prior to when the infringement first began. In this case, the hypothetical negotiation would have taken place in September 2009, just before the '083 patent issued.   In considering this hypothetical negotiation, you should focus on what the expectations of the patent holder and the alleged infringer would have been had they entered into an agreement at that time, and had they acted reasonably in their negotiations. In determining this, you must assume that both parties believed the patent was valid and infringed and that both parties were willing to enter into an agreement. The reasonable royalty you determine must be a royalty that would have resulted from the hypothetical negotiation, and not simply a royalty either party would have preferred. Evidence of things that happened after the infringement first began can be considered in evaluating the reasonable royalty only to the extent that the evidence aids in assessing what royalty would have resulted from a hypothetical negotiation. Should infringement be found, any reasonable royalty should exclude damages based on infringing activity occurring between the date of the hypothetical negotiation and May 31, 2011.

---

[156] *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.6.6 (July 2016).

INSTRUCTION NO. 61:     **REASONABLE ROYALTY—RELEVANT FACTORS**[157]

In determining the reasonable royalty, you should consider all the facts known and available to the parties at the time the infringement began. Some of the kinds of factors that you may consider in making your determination are:

(1)     Any royalties received by the licensor for the licensing of the patent-in-suit, proving or tending to prove an established royalty.

(2)     The rates paid by Celltrion or Hospira to license other patents comparable to the '083 patent.

(3)     The nature and scope of the license, as exclusive or non-exclusive, or as restricted or non-restricted in terms of its territory or with respect to whom the manufactured product may be sold.

(4)     Janssen's established policy and marketing program to maintain its right to exclude others from using the patented invention by not licensing others to use the invention, or by granting licenses under special conditions designed to preserve that exclusivity.

(5)     The commercial relationship between Janssen and Celltrion and Hospira, such as whether or not they are competitors in the same territory in the same line of business.

(6)     The effect of selling the patented product in promoting sales of other products of the licensee; the existing value of the invention to the licensor as a generator of sales of its non-patented items; and the extent of such collateral sales.

(7)     The duration of the '083 patent and the term of the license.

(8)     The established profitability of the product made under the '083 patent; its commercial success; and its current popularity.

(9)     The utility and advantages of the patented invention over the old modes or devices, if any, that had been used for achieving similar results.

(10)    The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention.

(11)    The extent to which Celltrion and Hospira have made use of the invention; and any evidence that shows the value of that use.

(12)    The portion of the profit or of the selling price that may be customary in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions.

---

[157] Based on *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.6.7 (July 2016); NDCAL Model Patent Jury Instruction B.5.7.

(13)   The portion of the profit that arises from the patented invention itself as opposed to profit arising from unpatented features, such as the manufacturing process, business risks, or significant features or improvements added by the accused infringer.

(14)   The opinion testimony of qualified experts.

(15)   The amount that a licensor and a licensee (such as Celltrion or Hospira) would have agreed upon (at the time the infringement began) if both sides had been reasonably and voluntarily trying to reach an agreement; that is, the amount which a prudent licensee—who desired, as a business proposition, to obtain a license to manufacture and sell a particular article embodying the patented invention—would have been willing to pay as a royalty and yet be able to make a reasonable profit and which amount would have been acceptable by a patentee who was willing to grant a license.

(16)   Any other economic factor that a normally prudent business person would, under similar circumstances, take into consideration in negotiating the hypothetical license.

No one factor is dispositive and you can and should consider the evidence that has been presented to you in this case on each of these factors. You may also consider any other factors which in your mind would have increased or decreased the royalty the alleged infringer would have been willing to pay and the patent holder would have been willing to accept, acting as normally prudent business people.

INSTRUCTION NO. 62:     **REASONABLE ROYALTY—AVAILABILITY OF NON-INFRINGING SUBSTITUTES**[158]

In determining a reasonable royalty, you may also consider evidence concerning the availability and cost of non-infringing alternatives to the patented invention. A non-infringing alternative must be an acceptable product that is licensed under the patent or that does not infringe the patent. The existence of a non-infringing alternative and its relationship to the patented invention is a consideration in the hypothetical negotiation and may limit the royalty Janssen could reasonably obtain.[159]

---

[158] Based on *2017 Model Patent Jury Instructions*, American Intellectual Property Law Association, Instr. 11.2.5.10 (2017); *Riles v. Shell Exploration and Prod. Co.*, 298 F.3d 1302, 1312 (Fed. Cir. 2002).

[159] *Riles v. Shell Exploration and Prod. Co.*, 298 F.3d 1302, 1312 (Fed. Cir. 2002).

INSTRUCTION NO. 63:      **WILLFUL INFRINGEMENT**[160]

In this case, Janssen argues both that Celltrion and Hospira infringed and, further, that Celltrion and Hospira infringed willfully. If you have decided that Celltrion or Hospira have infringed, you must go on and address the additional issue of whether or not the infringement was willful. In order to prove willfulness, Janssen must prove that Celltrion or Hospira knew of the '083 patent.[161]  You may not, however, determine that the infringement was willful just because the infringer knew of the '083 patent and infringed it. Instead, willful infringement is reserved for only the most egregious behavior, such as where the infringement is malicious, deliberate, consciously wrongful, or done in bad faith.

To determine whether the infringer acted willfully, consider all facts. These may include, but are not limited, to:

(1)      Whether or not Celltrion and Hospira acted consistently with the standards of behavior for its industry;

(2)      Whether or not Celltrion intentionally copied a product of Janssen that is covered by the '083 patent;[162]

(3)      Whether or not Celltrion and Hospira reasonably believed they did not infringe or that the patent was invalid;

(4)      Whether or not Celltrion and Hospira made a good-faith effort to avoid infringing the '083 patent, for example, whether the infringer attempted to design around the '083 patent; and

(5)      Whether or not Celltrion and Hospira tried to cover up its infringement.

---

[160] Based on *Model Patent Jury Instructions*, Fed. Circuit Bar Ass'n, Instr. B.3.10 (July 2016).

[161] *WBIP, LLC v. Kohler Co.*, 829 F.3d 1317, 1341 (Fed. Cir. 2016) ("Knowledge of the patent alleged to be willfully infringed continues to be a prerequisite to enhanced damages.").

[162] Defendants have moved in limine to exclude Janssen's argument that Defendants copied the '083 patent. Defendants, however, offer this instruction in the event the Court allows Janssen to make such an argument.

INSTRUCTION NO. 64:      **SPECIAL VERDICT FORM**[163]

Now I am going to have the court security officer give you the verdict form.  We do not have time to read the entire form right now, but I know it is going to be tempting.  You can flip through it, and then I am going to ask you to give me your undivided attention.

I am going to go over all these questions.  You may not have to answer all of those questions.  The answers to each question will dictate how many more parts, if any, you have to answer.  You should decide each question individually.  Depending on your view of the evidence, you might find all of the claims proven, some of the claims proven or none of the claims proven.  Similarly, when a question is asked about more than one defendant, depending on your view of the evidence, you might find one defendant liable, more than one defendant liable or none of the defendants liable.

[*EXPLAIN SPECIAL VERDICT FORM*]

---

[163] Based on the Jury Charge from *Alves v. Daly, et al.*, Civ. No. 12-cv-10935, Jury Trial Day 14 at 96-138, 145-146 (D. Mass. May 26, 2015) (J. Wolf).

INSTRUCTION NO. 65:        **DELIBERATIONS**[164]

The third part of my instructions, about your deliberations, will be much shorter.  In just a little while you are going to go back to the jury room and begin your deliberations.  The first thing you should do is select a jury foreperson, somebody to moderate your discussions and to communicate with me on your behalf.  Then you should discuss the case.

Your verdict needs to be unanimous on each question.  You cannot fill in a blank until all of you agree.  Your deliberation should be rational discussions aimed at getting a unanimous verdict.  Each juror should decide for himself or herself after considering all the evidence and the views of your fellow jurors.  You should reconsider your initial views if you are persuaded by rational discussion that they are wrong, but you should not abandon your views just to reach a unanimous verdict.

If and when you need to communicate with me, it has to be in writing.  The foreperson should write a note, for example, if you have a question about any of my instructions, or if you want to go home, you write a note.  The foreperson should sign the note and hand it to the court security officer who will be outside the door.  In your communications with the Court, you should not indicate how you are split on any question.  We are not entitled to know until you have reached a unanimous verdict on the question.  If you do have any questions, once you write them out, they will be given to me.  I will discuss them with the lawyers.  I will bring you back into the courtroom, and I will respond to your questions.

When you have reached unanimous decisions on answers to all the questions you have to answer, depending on your earlier answers, the foreperson should sign the verdict form, date it,

---

[164] Based on the Jury Charge from *Alves v. Daly, et al.*, Civ. No. 12-cv-10935, Jury Trial Day 14 at 96-138, 145-146 (D. Mass. May 26, 2015) (J. Wolf).

tell the court security officer that you have finished your deliberations, that you have a unanimous verdict on all issues, and then I will have you back in the courtroom.

You have been extraordinarily persevering and patient, and it is important that you continue to demonstrate that quality.  This is not the time to rush.  This is the most important time in the case, so take whatever time you think is necessary to answer whatever questions are necessary.